**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------X

FARAH JEAN FRANCOIS,

                                              Case No.: 1:22-cv-4447-JSR

                          **Plaintiff,**

        -against-

VICTORY AUTO GROUP LLC d/b/a
VICTORY MITSUBISHI,
SPARTAN AUTO GROUP LLC d/b/a
VICTORY MITSUBISHI,
STAVROS ORSARIS,
YESSICA VALLEJO,
DAVID PEREZ,
DIANE ARGYROPOULOS, and
PHILIP ARGYROPOULOS,

                        **Defendants.**

------------------------------------------------------------------------X

**FIRST-AMENDED COMPLAINT AND JURY DEMAND**

*Summary of Claims[1]*

      Plaintiff Farah Jean Francois brings suit against a dealership, Victory Auto Group LLC

d/b/a Victory Mitsubishi and Spartan Auto Group LLC d/b/a Victory Mitsubishi, employees

Stavros Orsaris, Yessica Vallejo, and David Perez, and owners and managers Diane

Argyropoulos and Philip Argyropoulos for their violations of the Fair Credit Reporting Act, 15

U.S.C. § 1681 *et seq.* and negligence.

      Ms. Francois was the victim of identity theft that was either willfully or negligently

facilitated by Defendants. On May 30 and June 29, 2020, Ms. Francois' brother-in-law

Emmanuel Laforest came to the Victory Mitsubishi dealership with Ms. Francois' stolen

---

[1] This summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

driver's license and her other personal information for the purpose of fraudulently purchasing a vehicle. Despite Ms. Francois not being present, Defendants pulled her credit report and submitted credit applications on her behalf, until financing for the Vehicle was secured in her name and it was sold to Emmanuel Laforest.

Ms. Francois would not learn about the fraud until September, and by then it had already started wreaking havoc on her life. The Vehicle incurred parking tickets and toll fees that were inaccurately attributed to her, some of which remaining outstanding at the time of this filing. Her credit reports reflected numerous pulls of her credit reports on May 30 and June 29, 2020, which negatively impacted her credit and was a factor in at least two denials of credit. Defendants meanwhile did not respond to her disputes, did not contact the credit reporting agencies to correct the record, and otherwise hindered rather than aided her in attempting to repair the damage they had done to her financial life.

Since 2012, Philip and Diane Argyropoulos have owned and managed the Victory Mitsubishi dealership under different legal entities such as but not limited to Victory Auto Group LLC and Spartan Auto Group LLC. Throughout this time, the dealership has been sued by the New York Attorney General and sued by consumers in both federal and state courts for their deceptive conduct involving unauthorized sales and unauthorized credit applications. Despite this, Defendants do not appear to have altered the way their business is structured or how they manage their employees, either intentionally or negligently abetting fraud like what happened to Ms. Francois.

The stress from the fallout of the identity theft caused by Defendants would so intense for Ms. Francois that she lost 25 pounds. She feared that the Vehicle would be used for

something criminal and it would be falsely attributed to her. And it ruptured her relationship with her husband and his family.

### *Jurisdiction and Venue*

1.     This Court has federal question jurisdiction under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

2.     Declaratory relief is available under 28 U.S.C. §§ 2201 and 2202.

3.     Venue is proper in this district under 28 U.S.C. § 1391(b), because the acts and transactions that give rise to this action occurred, in substantial part, in this district.

### *Parties*

4.     Plaintiff Farah Jean Francois ("Plaintiff" or "Ms. Francois") is a citizen of New York who resides within this District.

5.     Plaintiff is a "consumer" as that term is defined by § 1681a(c) of the FCRA.

6.     Defendant Victory Auto Group LLC, d/b/a Victory Mitsubishi, is a domestic limited liability company with a principal place of business in the Bronx County, New York.

7.     Defendant Spartan Auto Group LLC, d/b/a Victory Mitsubishi, is a domestic limited liability company with a principal place of business in the Bronx County, New York.

8.     Defendants Victory Auto Group LLC and Spartan Auto Group LLC are related by common ownership or affiliated by corporate control.

9.     Defendants Victory Auto Group LLC and Spartan Auto Group LLC essentially function as one common enterprise, the Victory Mitsubishi dealership. **Exhibit CC** (Nelson 56.1 Statement, ¶ 1).

10.     Per Defendants disclosures in this case so far, Defendants Stavros Orsaris, Yessica Vallejo, and David Perez are the employees of either Defendant Victory Auto Group LLC or Spartan Auto Group LLC who carried out the sale and financing of the Vehicle, including pulling Plaintiff's credit report without her authorization.

11.     Defendant Stavros Orsaris has worked at the dealership since at least 2016 as a manager.

12.     All acts of Stavros Orsaris, Yessica Vallejo, and David Perez described herein were carried out in the course and scope of their employment by Defendants.

13.     Thus Defendants Victory Auto Group LLC and Spartan Auto Group LLC are jointly and severally liable for the acts of each other and of Stavros Orsaris, Yessica Vallejo, and David Perez, and are hence referred to collectively as "Victory Mitsubishi" or "Victory."

14.     With respect to information it has obtained from consumer reporting agencies ("CRAs") regarding Plaintiff, Victory Mitsubishi is a "user" of credit information within the meaning of the FCRA at 15 U.S.C. § 1681 *et seq.*

15.     Defendants Diane Argyropoulos and Philip Argyropoulos are the sole owners, members, and managers of Defendant Victory Auto Group LLC, and reside in the state of New York.

16.     Mr. and Mrs. Argyropoulos have been the sole owners and managers of Defendant Victory Auto Group LLC since at least 2012.[2]

17.     Mr. Argyropoulos is also a member of the New York Bar and a practicing attorney with Argyropoulos and Associates LLC.

18.     Defendants Philip Argyropoulos and Diane Argyropoulos are the members and

---

[2] According to the K-10 filings for 2012 – 2016, Mr. Argyropoulos had a 99% percent ownership interest in Victory Auto Group LLC and Mrs. Argyropoulos had a 1% interest.

managers of Defendant Spartan Auto Group LLC.

19.    On January 30, 2018, Spartan Auto Group LLC entered into a "Dealer Sales and Service Agreement" with Mitsubishi Motors North America, Inc. **Exhibit DD** (Mitsubishi Contract).

20.    The Mitsubishi Contract had a 3 year term from its effective date, and thus upon information and belief it was in effect until at least January 30, 2021, and thus during the events described below.

21.    The Mitsubishi Contract states "**Dealer** represents that Diane Argyropoulos exercises the functions of general manager and Philip Argyropoulos exercises the functions of Dealer Principal (hereinafter referred to as the "*Executive Managers*") of its MMNA dealership and that each has complete authority to make all decisions on behalf of **Dealer** with respect to the dealership operations." *Id.,* p. 3.

22.    An earlier version of the same agreement was entered into on March 31, 2014, and shows Philip Argyorpoulos as the sole owner and executive manager of the dealership, which at that time was operated through the corporation Victory Motors LLC. **Exhibit EE** (2014 Mitsubishi Contract).

23.    In short, from 2012 to the time of the events below, Mr. and Mrs. Argyropoulos have been the owners and managers of the dealership regardless of the corporation they had behind it, whether it was Victory Auto Group, LLC, Spartan Auto Group, LLC, or Victory Motors LLC.

24.    Mr. and Mrs. Argyropoulos employed Stavros Orsaris and Yessica Vallejo, and their acts described herein were carried out in the scope and course of that employment.

25.    Mr. and Mrs. Argyropoulos established and execute the business structure, payment structure, and policies and procedures of Victory.

26.     Mr. and Mrs. Argyropoulos are personally liable for the misconduct that forms the basis of this suit. Mr. and Mrs. Argyropoulos set up an enterprise that systematically engages in illegal deceptive conduct to enrich itself, even after being previously sued by both individuals and the New York Attorney General for such conduct.

27.     Mr. and Mrs. Argyropoulos are intentionally or negligently setting up this deceptive business model, consciously disregarding the use of policies and procedures to prevent identity theft and other deception.

28.     At minimum, Mr. and Mrs. Argyropoulos were negligent or grossly negligent in setting up the policies and procedures that facilitated the identity theft against Ms. Francois.

## Factual Allegations

### *The Identity Theft*

29.     On or around May 30, 2020, unbeknownst to the Plaintiff, her brother-in-law Emmanuel Laforest attempted to buy a vehicle at Victory Mitsubishi in the name of Plaintiff.

30.     This transaction was carried out by Stavros Orsaris, Yessica Vallejo, and David Perez (who, upon information and belief, no longer works for the Defendants).

31.     This attempt led Victory Mitsubishi to pull Plaintiff's TransUnion credit report on May 30, 2020. **Exhibit A** (TransUnion Inquiries).

32.     This credit pull was carried out by Stavros Orsaris, Yessica Vallejo, and/or David Perez without Ms. Francois being present.

33.     Upon information and belief, inquiries made on or around May 30, 2020 by JPMCB Auto Finance to TransUnion, by Capital One Auto Finance to TransUnion, by BB&T Dealer

Finance to Equifax, and by Capital One to Equifax were all made due to solicitations by Emmanuel Laforest and Victory Mitsubishi in an attempt to purchase a vehicle in the name of Plaintiff. **Exhibit A** and **Exhibit B** (Equifax Inquiries).

34.    The credit applications that triggered these inquiries were filled out by Stavros Orsaris, Yessica Vallejo, and/or David Perez without Ms. Francois being present.

35.    Ms. Francois had not applied for credit with Victory Mitsubishi or any of the above-named lenders on or around May 30, 2020.

36.    Ms. Francois had not authorized Victory Mitsubishi or any of the other lenders to obtain any of her consumer reports on or around May 30, 2020.

37.    Prior to obtaining Ms. Francois' consumer reports, Stavros Orsaris, Yessica Vallejo, David Perez, and no other Victory personnel, who had neither seen Ms. Francois in person nor spoken to her regarding co-signing on a loan for Mr. Laforest, did not undertake any effort to confirm that Ms. Francois intended to purchase a vehicle and be liable for the financing of the vehicle.

38.    This failure was due to either the negligence of Mr. Argyropoulos and Victory in not implementing policies and practices necessary to prevent identity theft, the willful implementation of policies and practices under the auspice of the COVID-19 pandemic that evinced a conscious disregard for preventing identity theft, or the negligent employment and supervision of John Doe and other Victory employees.

39.    Ms. Francois had not authorized Victory Mitsubishi to distribute her Social Security Number or other personal identifying information to any lenders on or around May 30, 2020.

40.    Ms. Francois had not authorized Victory Mitsubishi to represent to lenders that she was

seeking a car loan on or around May 30, 2020.

41.     Ms. Francois did not receive any benefit, money, goods, or services as a result of Victory Mitsubishi's conduct on or around May 30, 2020.

42.     To the contrary, Victory Mitsubishi's conduct damaged Ms. Francois' credit reputation.

43.     For unknown reasons, no vehicle was purchased on or around May 30, 2020.

44.     On or around June 29, 2020, again unbeknownst to the Plaintiff, her brother-in-law Emmanuel Laforest went into Victory Mitsubishi and, using the identity of the Plaintiff, purchased a 2017 BMW 5 Series, VIN #WBAJA7C38HG904646 ("the Vehicle"), for a total cash price of $38,462.81. **Exhibit C** (Retail Installment Sales Contract).

45.     The sale was carried out by Stavros Orsaris, Yessica Vallejo, and David Perez.

46.     According to the fraudulent retail installment sales contract, Mr. Laforest made a $9,000 deposit on the Vehicle, and financed the rest in Plaintiff's name, making her liable for $43,326 in total payments at $601.75 a month for 72 months with an interest rate of 13.66%. *Id.*

47.     Upon information and belief, Mr. Laforest stole Plaintiff's driver's license on or around June 29, 2020 in order to provide personal information of Plaintiff's to secure the sale of the Vehicle.

48.     Upon information and belief, to the degree that there are documents related to the sale on or around June 29, 2020 that purport to have the signature of Plaintiff, those signatures were in fact forged by either Emmanuel Laforest, Stavros Orsaris, Yessica Vallejo, or David Perez.

49.     To obtain financing for this fraudulent transaction, Emmanuel Laforest and Victory Mitsubishi applied for financing, in Plaintiff's name, from several potential creditors.

50.    These applications were performed by or otherwise facilitated by Stavros Orsaris, Yessica Vallejo, and/or David Perez.

51.    Upon information and belief, Mr. and Mrs. Argyropoulos either expressly authorized these applications, or implicitly authorized and ratified them by setting policies and practices for Victory that allowed employees like Stavros Orsaris, Yessica Vallejo, and David Perez to make such applications without the presence and expressed consent of the consumer.

52.    At minimum, Mr. and Mrs. Argyropoulos and Victory were negligent in setting up the policies and practices that facilitated the conduct of Stavros Orsaris, Yessica Vallejo, and David Perez in processing these applications.

53.    These acts were carried out for the benefit of Victory, and thus for the benefit of Mr. and Mrs. Argyropoulos, and within the scope of employment of Stavros Orsaris, Yessica Vallejo, and David Perez.

54.    This led to Capital One Auto Finance making an inquiry on Plaintiff's TransUnion credit report, JPMCB Auto Finance making an inquiry on Plaintiff's TransUnion credit report, and Capital One making an inquiry on Plaintiff's Equifax credit report. **Exhibit A** and **Exhibit B**.

55.    Ms. Francois had not applied for credit with Victory Mitsubishi or any of the above-named lenders on or around June 29, 2020.

56.    Ms. Francois had not authorized Victory Mitsubishi or any of the other lenders to obtain any of her consumer reports on or around June 29, 2020.

57.    The credit reports pulled disclosed Ms. Francois' date of birth, her past and present addresses, and the names and account numbers of her purported current and former creditors for at least the prior seven years.

58.     It is embarrassing to disclose to strangers with no permissible purpose each and every account one has or is alleged to have over the last seven years, including every alleged missed payment or delinquency.

59.     Prior to obtaining Ms. Francois' consumer reports, Stavros Orsaris, Yessica Vallejo, David Perez, and other Victory Mitsubishi personnel, who had neither seen Ms. Francois in person nor spoken to her regarding co-signing on a loan for Mr. Laforest, did not undertake any effort to confirm that Ms. Francois intended to purchase a vehicle and be liable for the financing of the vehicle.

60.     The consumer reports were obtained, in Ms. Francois' name, without her being there at all or in any way giving her express authorization.

61.     Ms. Francois had not authorized Victory Mitsubishi to distribute her Social Security Number or other personal identifying information to any lenders at any time, including on or around June 29, 2020.

62.     Ms. Francois had not authorized Victory Mitsubishi to represent to lenders at any time that she was seeking a car loan, including on or around June 29, 2020.

63.     Ms. Francois did not receive any benefit, money, goods, or services as a result of Victory Mitsubishi's conduct on or around June 29, 2020.

64.     To the contrary, Victory Mitsubishi's conduct damaged Ms. Francois' credit reputation.

65.     Ms. Francois would not learn about this fraud until it started to wreak havoc on her life.

### *Ms. Francois Learns of the Fraud and Has to Spend Money and Time on Fighting It*

66.     On or around September 11, 2020, Ms. Francois learns about the fraud against her for

10

the first time when receives a copy of the title for the Vehicle in the mail.

67.     Concerned that she had received a title when she had never purchased a vehicle, she took the title to the police to ask them what she should do, and they instructed her to reach out to Victory to determine what happened.

68.     When Ms. Francois went to Victory with her uncle Papito Momplaisir, she learned that the Vehicle had been purchased with her stolen driver's license, but when she asked for documents about the purchase they told her to come back the next day.

69.     Coming back the next day as instructed, Victory now told Ms. Francois that they do not have the documents at the dealership but instead at a main office.

70.     When Ms. Francois learned that the Vehicle had been fraudulently purchased in her name by her brother-in-law, Emmanuel Laforest, she was devastated.

71.

72.     Victory told her that it would take care of the fraudulent loan, and that they had facilitated the fraud because of the COVID-19 pandemic, that because of the COVID-19 pandemic people were buying cars on behalf of other people and thus they had believed that Mr. Laforest was buying the car on her behalf.

73.     Upon information and belief, Mr. and Mrs. Argyropoulos in their role as owners and managers of Victory created this policy or practice of consciously disregarding requirements under the law and selling cars to people purporting to buy them on behalf of others, either willfully facilitating identity theft or recklessly disregarding, in a way close to criminality, the possibility that these policies or practices could facilitate identity theft.

11

74.     At minimum, the creation of these policies and practices by Mr. and Mrs. Argyropoulos was negligent.

75.     On September 19, 2020, Capital One sends Ms. Francois a letter confirming her claim of fraud and soliciting documents from her to prove that she was defrauded. **Exhibit D** (Capital One Fraud Confirmation Letter).

76.     On September 23, 2020, Ms. Francois fills out and submits the Affidavit of Fictitious Account and Fraud Questionnaire that Capital One had sent her. **Exhibit E** (Affidavit of Fictitious Account and Fraud Questionnaire).

77.     On September 25, 2020, Ms. Francois went to the 70th precinct of the New York Police Department and filled out an Incident Information Slip. **Exhibit F** (Police Report).

78.     For months, Ms. Francois did not hear anything more from Victory or Capital One about whether the identity theft would be resolved.

79.     In the meantime, she began to be flooded with the consequences of the identity theft.

### Ms. Francois Has to Deal with Tickets and Other Demands for Payment Due to the Identity Theft

80.     On or around August 20, 2020, Ms. Francois was sent a Pre-Penalty Notice of Unpaid Violation by the New York City Department of Finance, Parking Violations ("NYC Parking"), alleging that she owed $115 for parking by a fire hydrant with the Vehicle on June 30, 2020. **Exhibit G** (First Parking Ticket).

81.     This ticket was incurred with the Vehicle. Upon information and belief, either Emmanuel Laforest or someone authorized by Mr. Laforest was driving the Vehicle at the time this ticket was incurred.

82.     On or around August 25, 2020, Ms. Francois was sent a Notice of Liability by the New York City Department of Finance, School Zone Camera Unit, alleging that she owed $50 for speeding in a school zone on August 21, 2020. **Exhibit H** (Speeding Ticket).

83.     This ticket was incurred with the Vehicle. Upon information and belief, either Emmanuel Laforest or someone authorized by Mr. Laforest was driving the Vehicle at the time this ticket was incurred.

84.     On or around September 28, 2020, Ms. Francois was sent a Pre-Penalty Notice of Unpaid Violation by NYC Parking alleging that she owed $115 for a parking violation on September 10, 2020. **Exhibit I** (Second Parking Ticket).

85.     This ticket was incurred with the Vehicle. Upon information and belief, either Emmanuel Laforest or someone authorized by Mr. Laforest was driving the Vehicle at the time this ticket was incurred.

86.     On or around September 28, 2020, Ms. Francois was sent a Notice of Violation Enforcement Action by MTA Bridges and Tunnels seeking $76 for tolls passed through during various dates in August 2020. **Exhibit J** (First Toll Notice).

87.     These unpaid tolls were incurred with the Vehicle. Upon information and belief, either Emmanuel Laforest or someone authorized by Mr. Laforest was driving the Vehicle at the time these tolls were incurred.

88.     On or around September 28, 2020, Ms. Francois was sent a Notice of Toll(s) Due by Port Authority NY/NJ seeking $132 for tolls passed through during various dates in August 2020. **Exhibit K** (Second Toll Notice).

89.     These unpaid tolls were incurred with the Vehicle. Upon information and belief, either

13

Emmanuel Laforest or someone authorized by Mr. Laforest was driving the Vehicle at the time these tolls were incurred.

90.    On or around September 28, 2020, Ms. Francois was sent a Notice of Violation Enforcement Action by MTA Bridges and Tunnels seeking $76 for tolls passed through on August 26, 2020. **Exhibit L** (Third Toll Notice).

91.    These unpaid tolls were incurred with the Vehicle. Upon information and belief, either Emmanuel Laforest or someone authorized by Mr. Laforest was driving the Vehicle at the time these tolls were incurred.

92.    On or around October 1, 2020, Ms. Francois was sent a Pre-Penalty Notice of Unpaid Violation by NYC Parking, alleging that she owed $115 for parking by a fire hydrant on September 13, 2020. **Exhibit M** (Third Parking Ticket).

93.    This ticket was incurred with the Vehicle. Upon information and belief, either Emmanuel Laforest or someone authorized by Mr. Laforest was driving the Vehicle at the time this ticket was incurred.

94.    On or around October 13, 2020, Ms. Francois was sent a Notice of Violation Enforcement Action by MTA Bridges and Tunnels seeking $9.50 for tolls passed through on September 11, 2020. **Exhibit N** (Fourth Toll Notice).

95.    These unpaid tolls were incurred with the Vehicle. Upon information and belief, either Emmanuel Laforest or someone authorized by Mr. Laforest was driving the Vehicle at the time these tolls were incurred.

96.    On December 6, 2020, Ms. Francois received a collection letter from a company called Credit Collection Services, claiming she owed $3,908.66 to Progressive Max Insurance

14

Company. **Exhibit O** (First Insurance Collection Letter).

97.     On January 11, 2021, Emmanuel Laforest was arrested in connection with the identity theft he committed against Ms. Francois as facilitated by Victory. **Exhibit P** (Arrest Record).

98.     On March 30, 2021, Ms. Francois received another collection letter from Credit Collection Services, this time claiming she owed $2,476.40 to Progressive Max Insurance Company. **Exhibit Q** (Second Insurance Collection Letter).

99.     Realizing that Victory and Capital One had not resolved the identity theft as she had believed they would, Ms. Francois sent them a letter asking for confirmation that she was not being held liable in any way for the alleged debt incurred with the purchase of the Vehicle. **Exhibit R** (Dispute Letter to Victory and Capital One).

100.    Victory never responded to this letter.

101.    Capital One did respond, sending Ms. Francois a letter on or around July 26, 2021, confirming that her claim of identity theft was valid and additionally stating that Capital One would be requesting that the tradeline be deleted from the major credit reports. **Exhibit S** (Capital One Fraud Resolution Letter).

102.    On or around September 8, 2021, Ms. Francois wrote a dispute letter to Credit Collection Services and Progressive Max Insurance Company, explaining the identity theft and fraudulent purchase of the Vehicle and enclosing evidence. **Exhibit T** (Dispute Letter to Insurance).

103.    On or around November 22, 2021, Ms. Francois wrote a dispute letter to Transworld Systems Inc. and MTA Bridges and Tunnels, explaining the identity theft and fraudulent purchase of the Vehicle and enclosing evidence. **Exhibit U** (Dispute Letter to MTA).

104.    Ms. Francois has incurred significant costs due to the identity theft facilitated by Victory, including but not limited to the cost of printing and postage for the disputes.

105.    As of this filing, not all of the fines against her due to the fraud have been resolved, and both those obligations and the cost of further disputing them are injuries caused by Victory.

### Ms. Francois Has to Send Disputes to Remove Inaccurate Information from Her Credit Reports.

106.    When Ms. Francois pulled her Equifax and TransUnion credit reports on June 11, 2021, she discovered that the solicitations of potential creditors made by Victory, in her name but without her authorization or a permissible purpose, now appeared on her credit reports.

107.    Victory sent these solicitations for credit in Ms. Francois' name and without her authorization or a permissible purpose in order to facilitate the fraudulent purchase of the Vehicle by Emmanuel Laforest.

108.    Her Equifax credit report contained "Hard Inquiries" from BB&T Dealer Finance and Capital One dated May 30, 2020 – the date of the fraud.

109.    Her TransUnion credit report contained "Hard Inquiries" from JPMCB Auto Finance, Capital One Auto Finance, and Defendant Victory Mitsubishi, dated May 30, 2020 and June 29, 2020.

110.    While it is more widely known that inaccurate account information on your credit report can affect your credit, fraudulent credit pulls also can harm consumer's credit.

111.    As Experian notes on its website, "Hard inquiries have a negative impact on your credit score." **Exhibit V** (Experian Hard Inquiry Webpage).

112.    And even more applicable to Ms. Francois' circumstance, the Experian website further

notes that "Too many hard inquiries in a short time could make it look like you're seeking loans and credit cards that you may not be able to pay back." *Id.*

113.    Ms. Francois had 7 fraudulent hard inquiries and they all fell on the same two days – May 30, 2020 and June 29, 2020.

114.    When Ms. Francois pulled her credit reports again on September 2, 2021, after receiving the July 26, 2021 letter from Capital One, which most notably stated that "Capital One Auto Finance is requesting that the trade line be deleted from your Equifax, Trans Union, Experian, and Innovis credit bureau reports," she was dismayed to see that the fraudulent pulls still appeared on the credit reports.

115.    And when Ms. Francois pulled the credit reports on May 12, 2022, the fraudulent pulls were still on the credit reports.

116.    So on May 18, 2022, Ms. Francois sent TransUnion a dispute demanding that the fraudulent pulls be removed from her reports. **Exhibit W** (Dispute to TransUnion).

117.    TransUnion received the dispute on May 20, 2022.

118.    On May 25, 2022, Ms. Francois sent Equifax a dispute demanding that the fraudulent pulls be removed from her reports. **Exhibit X** (Dispute to Equifax).

119.    Equifax is expected to receive the dispute on May 31, 2022.

120.    Both disputes contained irrefutable proof that she had been the victim of identity theft, specifically:

      a.    The eCourts record showing the arrest of Emmanuel Laforest;

      b.    The Affidavit of Fictitious Account and Fraud Questionnaire submitted to

17

       Capital One Auto Finance;

   c.   The Police Report;

   d.   The DMV Stolen License Plate Surrender document; and

   e.   The DMV Report of Lost, Stolen or Confiscated Motor Vehicles.

121.    Ms. Francois incurred the expense of printing and mailing these documents to the credit bureaus due to the conduct of Defendants.

122.    As of this filing, Ms. Francois has not received a response from the credit bureaus to her disputes.

### Plaintiff Suffered Credit Harm Because of Victory's Conduct

123.    As a result of the intentional, willful, reckless, and grossly negligent conduct of Defendants, Ms. Francois has suffered significant damage to her credit reputation, credit score and ability to obtain credit.

124.    Credit reports containing the fraudulent and inaccurate credit pulls performed by Defendants were published to Premium Credit Bureau LLC, Comenity Capital, Capital One Bank USA, N.A., and Synchrony Bank.

125.    Upon information and belief, this negative information on Ms. Francois' credit report resulted in less favorable terms for credit she received from the above creditors.

126.    Credit reports containing the fraudulent and inaccurate credit pulls performed by Defendants were also published via account review inquiries, which are done for revolving credit accounts for purposes such as determining whether the creditor wishes to extend additional credit to a consumer.

127.    The credit reports containing the fraudulent and inaccurate credit pulls performed by Defendants were published via account review inquiries to Wallethub, T-Mobile, Synchrony Bank, Bank of America, Geico, Radius Global Solutions, ARS National Services, Capital One, Web Bank Avant LLC, Allstate, TD Bank, Klarna, Monevo Inc., Peerform Credit, Ally Financial, Apple Cardgs Bank, Comenity Bank, American Express, and Paypal, Inc.

128.    The negative effect of this experience on Ms. Francois' credit has made her hesitate from applying for a mortgage to buy a house.

129.    On or around June 14, 2022, Ms. Francois received an Adverse Action Notice from Mercedez-Benz Financial Services. **Exhibit FF** (Mercedez Adverse Action Notice). The Notice was in response to Ms. Francois applying for financing for a vehicle.

130.    Mercedez disclosed that it had pulled her TransUnion credit report, and under the header "The specific reason(s) for the action taken on your application is/are listed below:" was "Number of inquiries."

131.    These "Number of inquiries" would have included the unauthorized pulls facilitated by Defendants that appeared on Ms. Francois' TransUnion credit report.

132.    Ms. Francois received an Adverse Action Notice from Penfed Credit Union on or around June 30, 2022. **Exhibit GG** (Penfed Adverse Action Notice). The Notice was in response to Ms. Francois applying for financing for a vehicle.

133.    Penfed disclosed that it had pulled her Equifax credit report and under the header "Key factors that adversely affects your credit score" was "NUMBER OF INQ ADVERSELY AFFECTED THE SCORE."

134.    These "NUMBER OF INQ" would have included the unauthorized pulls facilitated by

Defendants that appeared on Ms. Francois' Equifax credit report.

## Defendants' History of Deceptive Misconduct

*New York Attorney General Lawsuit*

135.    On December 19, 2017, the New York Attorney General brought a lawsuit against Victory Motors, LLC and Victory Auto Group, LLC. **Exhibit Y** (NY AG Lawsuit).

136.    Under the management and ownership of Defendants Mr. and Mrs. Argyropoulos, and during the employment of Stavros Orsaris, the NY AG brought claims against Victory for "deceptive, fraudulent and illegal business practices in connection with the sale of an anti-theft window etch product that was added to the purchase or lease price of vehicles without the knowledge or consent of consumers, and in many instances was not provided to consumers who paid for the product." *Id.* ¶¶ 5-8.

137.    These repeated fraudulent and illegal activities caused consumers to pay $751,014 for a product that they did not know they had purchased, did not consent to, and in many instances, never received. *Id.* ¶ 50.

138.    On August 10, 2018, the Honorable Charles D. Wood, Justice of the Supreme Court, found Defendants liable under GBL § 349 and Executive Law § 63(12) for the above-described misconduct, and permanently enjoined Defendants from engaging in the conduct, found them liable for restitution at an amount to be determined, and levied a $5,000 civil penalty pursuant to GBL § 350-d for each violation of GBL § 349. **Exhibit Z** (Order in NY AG Lawsuit).

139.    On April 4, 2019, the Defendants and the New York Attorney General entered into a Stipulation requiring Defendants to pay $305,850 in restitution and penalties, and allowing a Confession of Judgment to be entered against Mr. Argyropoulos personally if Defendants failed

to make payments pursuant to the Stipulation. **Exhibit AA** (NY AG Stipulation).

140.    Defendants represented in the Stipulation that "they closed their dealerships in 2018 and that they are no longer in operation." *Id.*, p. 4. Upon information and belief, this was false.

*Jean-Baptiste Lawsuit*

141.    Despite entering into the Stipulation on April 4, 2019 and representing that they were closed, Victory was sued again about a year later in *Jean-Baptiste, et al. v. Capital One, N.A., et al.,* Case No. 1:20-cv-08006-ALC-JLC (S.D.N.Y.). **Exhibit BB** (Jean-Baptiste Lawsuit).

142.    Victory solicited Ms. Jean-Baptiste to take advantage of a $1,500 rebate with no cash down payment, but when she visited the dealership in October 2019, she was defraud by Defendants (1) fraudulently increasing the cash price of the vehicle by at least $5,640, (2) deceptively stating in the contract of sale that plaintiffs had made a cash down payment of $3,000, (3) deceptively informing plaintiffs that they were required to purchase a service contract at a cost of $3,000 in order to obtain financing, (4) fraudulently failing to apply the promised $1,500 rebate, (5) refusing to provide plaintiffs with a copy of the signed contract of sale, and (6) improperly reporting late payments to the credit bureaus, among other misconduct. *Id.* ¶ 2.

143.    In other words, Defendants' credit reporting misconduct against Plaintiff is not the first instance of credit reporting misconduct by Defendants against consumers.

144.    The case was settled for an undisclosed amount.

*Buddoo*

145.    On August 19, 2020, Sharon Buddoo and Matthew Rushie responded to an ad placed by

Defendants for the sale of a 2018 Nissan Rogue for $14,995. **Exhibit HH** (Buddoo Complaint),

¶ 11.

146.    A contract was prepared for, but not signed by, Buddoo and Rushie. *Id.* ¶ 12.

147.    The contract was for the sum of $23,498.48 rather than the $14,995 advertised. *Id.* ¶ 13.

148.    The purported sale was to be financed at 22.99% interest over 5 years, with a finance

charge of $20,011.84 and monthly payments of $604.31. *Id.* ¶ 16.

149.    What happened to Buddoo and Rushie is yet another example of Defendants making an

unauthorized sale and unauthorized financing of a vehicle.

*Utnicki*

150.    Ms. Francois was not the only consumer that Defendants made unauthorized

applications of credit for, according to a lawsuit filed in the Eastern District of New York

captioned *Utnicki, et al. v. JP Morgan Chase Bank, N.A., et al.,* Case 1:21-cv-06108-ARR-RER.

**Exhibit II** (*Utnicki* Complaint)..

151.    In November 2020, plaintiffs Robert Utnicki and Dawn Utnicki attempted to trade in

their vehicle at Victory for a less costly vehicle. *Id.,* ¶ 2.

152.    Instead, Victory fabricated and submitted to financial institutions a false credit

application which resulted in Mrs. Utnicki being obligated on a brand new loan for a second

vehicle which she could not afford. *Id.* ¶ 3.

153.    This conduct evinces that Victory has a practice of applying for credit on behalf of

consumers without their authorization, as they did to Ms. Francois.

**Ms. Francois Suffered Emotional Distress Because of Victory's Conduct**

22

154.    When Ms. Francois learned about the identity theft against her which Defendants facilitated, she could not stop crying.

155.    Ms. Francois came to this country for a better life and has tried to do everything right, with the goal of saving her money to buy a house.

156.    Because of the financial impact of Defendants' misconduct, from the negative effect on her credit to the fines incurred by the Vehicle, Ms. Francois now believes she won't be able to buy a home.

157.    Ms. Francois was afraid that she was going to be arrested because the Vehicle was in her name and she could be held responsible for anything done with the Vehicle.

158.    This fear persists to this day.

159.    Ms. Francois had to take time off from work when discovered the identity theft in order to fight it.

160.    Even when she did go into work, she could not focus.

161.    The stress caused her to eat less, and she lost as much as 25 pounds.

162.    She could not sleep and got black bags under her eyes from the lack of sleep.

163.    Because the identity theft was done by her brother-in-law, in conjunction with Defendants, it has caused major family discord and she no longer lives with her husband.

164.    She had to put her stuff in storage due to the sudden strain on her marriage and family life.

## COUNT I (against All Defendants)
### Violations of FCRA §1681b, §1681e, and §1681q, and the subsections thereto

165.    Plaintiff restates, re-alleges, and incorporates herein by reference all foregoing paragraphs as if set forth fully in this Count.

166.    At all times pertinent hereto, the Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

167.    Defendants are each a "person" as that term is defined by 15 U.S.C. § 1681a(b).

168.    At no time applicable to this complaint did Plaintiff have with either of the defendants one of the relationships enumerated under 15 U.S.C. § 1681b(a)(3).

169.    At no time applicable to this complaint did either of the Defendants receive written instructions of the Plaintiff to request her consumer report under 15 U.S.C. § 1681b(a)(2).

170.    Each of the Defendants and its employees are prohibited from obtaining a consumer report under false pretenses pursuant to 15 U.S.C. § 1681q.

171.    Each of the Defendants is required to establish reasonable procedures that would prevent its facilities from being used to obtain a consumer report under false pretenses and as specifically authorized pursuant to 15 U.S.C. § 1681b(f).

172.    Defendants failed to establish procedures that would prevent its facilities from being used to obtain a consumer report under false pretenses and as specifically authorized.

173.    Defendants willfully obtained the information contained in Plaintiff's consumer reports under false pretenses and for a purpose other than one of the specifically enumerated purposes.

### COUNT II (against All Defendants)
### Negligence & Gross Negligence

174.    Plaintiff incorporates the foregoing paragraphs as if the same were set forth at length

herein.

175.    By way of example and not limitation, Defendants' negligence consists of the following: (a) facilitating credit applications to finance the Sale of the Vehicle without Plaintiff's authorization; (b) failing to provide prompt notice to the creditors, potential creditors, and government agencies of the fraud they facilitated once put on notice; (c) failing to employ and follow reasonable procedures to prevent identity theft and improper and unauthorized use of credit information and (d) overall negligence in the selling and financing of vehicles, and establishing the business structure for the same.

176.    Defendants' actions evince a reckless disregard for the rights of others and smack of intentional wrongdoing.

177.    Upon information and belief, Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

178.    As a result of Defendants' above mentioned conduct, Plaintiff sustained and continues to sustain the losses and damages as set forth above.

179.    The conduct of Defendants was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, damages and harm to Plaintiff that are outlined more fully above and, as a result, Defendants are liable to compensate the Plaintiff for the full amount of actual and compensatory damages, punitive damages, as well as such other relief, permitted under the law.

180.    Defendants acted with wanton disregard for Plaintiff's rights close to criminality and malicious in nature.

## **JURY DEMAND**

181.    Plaintiff demands a trial by jury.

### **PRAYER**

182.    For these reasons, plaintiff asks for judgment against defendants for the following:

  a. Statutory damages under the FCRA of not less than $100 and no more than $1,000, or actual damages, whichever is greater pursuant to 15 U.S.C. § 1681n.

  b. Actual, exemplary, and punitive damages within the jurisdictional limits of the court;

  c. Attorney fees and costs;

  d. Prejudgment and post-judgment interest as allowed by law;

  e. All other relief, in law and in equity, both special and general, to which plaintiff may be justly entitled.

Dated: Brooklyn, NY     Respectfully submitted,
August 29, 2022

/s/_____
Emma Caterine
THE LAW OFFICE OF AHMAD KESHAVARZ
16 Court St., Suite 2600
Brooklyn, BY 11241
Phone: (718) 522-7900
Fax: (877) 496-7809
Email: Emma@newyorkconsumerattorney.com


/s/_____
Ahmad Keshavarz
THE LAW OFFICE OF AHMAD KESHAVARZ
16 Court St., Suite 2600
Brooklyn, BY 11241
Phone: (718) 522-7900
Fax: (877) 496-7809
Email: Ahmad@newyorkconsumerattorney.com

# C E R T I F I C A T E   O F   S E R V I C E

I hereby certify that on this day I served the above referenced document to the parties listed below via ECF:


      H. Nicholas Goodman
      Nicholas Goodman & Associates, PLLC
      *Attorneys for Defendants*
      333 Park Avenue South, Suite 3A
      New York, N.Y. 10010
      **ngoodman@ngoodmanlaw.com**

Date:  August 29, 2022
      Brooklyn, NY
/s/
Emma Caterine
Attorney for Plaintiff