UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
 FARAH JEAN FRANCOIS,

                                         Plaintiff,              Case No. 1:22-cv-4447

         - against -                                            (Hon. Jed S. Rakoff)

VICTORY AUTO GROUP LLC d/b/a
VICTORY MITSUBISHI, SPARTAN
AUTO GROUP LLC d/b/a VICTORY
MITSUBISHI, STAVROS ORSARIS,
YESSICA VELLEJO, DAVID PEREZ,
DIANE ARGYROPOULOS, and
PHILIP ARGYROPOULOS

                                         Defendants.
-------------------------------------------------------------------X


                 MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
                      MOTION TO FOR SUMMARY JUDGMENT


                              H. Nicholas Goodman
                                Patrick L. Selvey
                              NICHOLAS GOODMAN & ASSOCIATES, PLLC
                              *Attorneys for Defendants*
                              VICTORY AUTO GROUP LLC
                              d/b/a VICTORY MITSUBISHI,
                              SPARTAN AUTO GROUP LLC
                              d/b/a VICTORY MITSUBISHI,
                              STAVROS ORSARIS, YESSICA VELLEJO,
                              DAVID PEREZ, DIANE ARGYROPOULOS,
                              and PHILIP ARGYROPOULOS
                              333 Park Avenue South, Suite 3A
                              New York, New York 10010
                              (212) 227-9003

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

PROCEDURAL HISTORY AND STATEMENT OF FACTS .................................... 1

ARGUMENT ............................................................................................................. 3

    I.        PLAINTIFF'S AC COUNT II, SOUNDING IN NEGLIGENCE, FAILS BECAUSE PLAINTIFF CANNOT SUBSTANTIATE HER CLAIM FOR ECONOMIC DAMAGES 3

        A.        Emotional Distress is Not Recoverable Under Plaintiff's Negligence Cause of Action    4

        B.        Plaintiff Has Not Produced Any Admissible Evidence to Support her Claims for Economic Damages Flowing from Defendants' Alleged Negligence ................................... 4

            The Capital One Loan ........................................................................................ 4

            Tickets, Tolls, Violations, and other Bills ......................................................... 4

            Storage and Moving Expenses ........................................................................... 5

            Credit Score and Denial of Credit ...................................................................... 6

    II.        ALTERNATIVELY, PLAINTIFF FAILED TO MITIGATE HER DAMAGES 8

    III.        PLAINTIFF CANNOT ESTABLISH ACTUAL DAMAGES UNDER THE FCRA    10

    IV.        PLAINTIFF CANNOT ESTABLISH THAT ANY DEFENDANT KNOWINGLY AND WILLFULLY OBTAINED PLAINTIFF'S CREDIT REPORT UNDER FALSE PRETENSES SO AS TO WARRANT AN AWARD OF DAMAGES UNDER 15 U.S.C. § 1681N .................................................................................................. 14

    V.        SHOULD THIS COURT NOT DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT IN ITS ENTIRETY, THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS' VICTORY AUTO GROUP, LLC, PHILIP ARGYROPOULOS, AND DIANE ARGYROPOULOS ...................................................... 18

        A.        Victory Auto Group, LLC .................................................................................. 18

        B.        Philip Argyropoulos ........................................................................................... 20

        C.        Diane Argyropoulos ........................................................................................... 23

CONCLUSION ........................................................................................................ 24

# TABLE OF AUTHORITIES

Cases

*Brown v. Weir*, 95 A.D. 78 (2d Dep't 1904)....................................................................... 9

*Casella v. Equifax Credit Information Services,* 56 F.3d 469 (2d Cir. 1995) ............................ 11

*Clarke v. Fid. & Cas. Co. of New York*, 55 Misc. 2d 327 (Sup. Ct. 1967)................................... 9

*Mortise v. United States,* 102 F.3d 693 (1996) ............................................................... 4

*Olsen v. U.S. Fid. & Guar. Co.*, 230 N.Y. 31 (1920) .......................................................

*Seward Park Hous. Corp. v. Greater New York Mut. Ins. Co.*, 43 A.D.3d 23 (1st Dep't 2007)..... 9

*Shostack v. Diller,* 2015 WL 5535808 (S.D.N.Y. September 16, 2015, Cott, M.J.) .......................

Statutes

## PRELIMINARY STATEMENT

By her First-Amended Complaint (the "AC"), Plaintiff FARAH JEAN FRANCOIS ("Plaintiff") alleges that on or around May 30, 2020, and June 29, 2020, Defendants VICTORY AUTO GROUP LLC d/b/a VICTORY MITSUBISHI ("Victory Auto"), SPARTAN AUTO GROUP LLC d/b/a VICTORY MITSUBISHI ("Spartan"), STAVROS ORSARIS ("Orsaris"), YESSICA VALLEJO ("Vallejo"), DAVID PEREZ ("Perez"), DIANE ARGYROPOULOS ("Diane"), and PHILIP ARGYROPOULOS ("Philip"), (sometimes collectively "Defendants") facilitated the sale of a motor vehicle by the dealership operating as Victory Mitsubishi to her brother-in-law, Emmanuel Laforest ("Laforest"), who had stolen her identity. In the process of that transaction, Plaintiff alleges that one or more of the Defendants (a) "pulled" Plaintiff's credit report under false pretenses in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq* (the "FCRA") and (b) negligently submitted credit applications in Plaintiff's name and obtained financing under her name for a BMW automobile (the "Vehicle") and titled it in her name without her knowledge or authorization. She seeks actual, statutory and punitive damages.

As set forth in detail below, there exists neither factual nor legal basis for Plaintiff's claims against Philip, Diane, and Victory Auto and they are entitled to summary judgment. Plaintiff's claims against the remaining Defendants are subject to dismissal due to Plaintiff's inability to establish any Defendant's culpable state of mind and Plaintiff's inability to establish any recoverable actual damages.

Defendants now move this Court for summary judgment dismissing Plaintiff's AC.

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

The procedural history of this action is fully set forth in the Affirmation of H. Nicholas Goodman dated February 24, 2023, and in the relevant material facts appear in Defendants'

Statement of Material Facts, both submitted herewith. Defendants incorporate same by reference as though more completely set forth herein.

However, a certain fundamental reality about this case bears emphasis: the viability of Plaintiff's action rests on the credibility of her brother-in-law Emmanuel Laforest ("Laforest"), an admitted identity thief and convicted criminal, a man Plaintiff herself characterizes as a liar who cannot be trusted about anything. Exhibit "D," at 65:4-15. As set forth and referenced in Defendants' Statement of Material Facts, to accomplish his acquisition of the Vehicle, Laforest stole Plaintiff's driver's license, stole her W-2 out of the mail, obtained her social security number apparently without her knowledge, and later stole her green card. Exhibit "D," at 41:24-43:2, 53:22-54:15.

Laforest appeared at Victory Mitsubishi on May 30, 2020, with all the documentation and confidential personal information needed to support an inquiry into Plaintiff's credit history and ultimately to secure financing for the Vehicle purchase. That documentation and information provided a good faith reason to believe there existed a legitimate purpose to obtain Plaintiff's credit report. That Spartan personnel were duped by the polished conman Laforest speaks at most to some degree of negligence; the record herein cannot remotely support a finding that any Defendant knowingly and willfully obtained Plaintiff's credit report under false pretenses. Thus, Plaintiff cannot recover damages for willful noncompliance under 15 U.S.C. §1681n.

Meanwhile, Plaintiff's actual damage claims find no support in the record. Plaintiff has produced no substantiation for her alleged economic damages, thus nullifying her negligence count. And the emotional distress Plaintiff did apparently suffer was simply not a proximate result of the appearance of a handful of arguably improper credit inquiries on her credit report.

Accordingly, this Court should dismiss Plaintiff's AC in its entirety.

2

**ARGUMENT**

I.     **PLAINTIFF'S AC COUNT II, SOUNDING IN NEGLIGENCE, FAILS BECAUSE PLAINTIFF CANNOT SUBSTANTIATE HER CLAIM FOR ECONOMIC DAMAGES**

Plaintiff pleads a laundry list of damages but during discovery failed to produce any evidence substantiating economic loss. To begin, Plaintiff recently withdrew all claims for "damage to credit or credit score" by way of her Third Amended Rule 26(a)(1) Disclosures dated February 8, 2023 ("Third Amended Disclosures"). Exhibit "L." That withdrawal on its face forecloses most of Plaintiff's economic damage claims to the extent her alleged expenditures related to alleged damage to her credit or credit score. That includes "postage for dispute letters, costs of copies, costs for credit monitoring, credit scores and credit reports, and other related costs," including the only arguably substantiated cost, $13.62[1] of postage cost she claims to have incurred for mailing letters to two CRAs (but see below).

Plaintiff also cites dispute letters to "debt collectors, insurance companies, government agencies, and credit reporting agents" but has provided exactly zero substantiation of expenditures for same. She also claims "$977.96 of outstanding violations accrued by the fraudulently sold Vehicle" but again offers no documentation whatsoever that she paid that sum or any part of it.

Remaining is Plaintiff's emotional distress claims. But her distress was obviously (and understandably) attributable exclusively to the threats and harassment Laforest and his colleagues subjected her to after she reported him to the police. Exhibit "D," at 59:11-60:19, 88:5-92:13, 94:14-25, 108:11-110:15, 220:19-221:5; 230:18-232:13. Regardless, such damages are not recoverable under Plaintiff's negligence Count as a matter of law.

---

[1] Upon information and belief, the actual number is $13.42, deriving from receipts for two certified letters each in the amount of $6.71. Exhibit "A."

### A.    Emotional Distress is Not Recoverable Under Plaintiff's Negligence Cause of Action

This Court will recall Defendants' motion to dismiss herein in which they asserted that Plaintiff cannot recover emotional distress damages under her negligence Count. Dkt. Nos. 39-40. By Your Honor's Memorandum Order dated January 24, 2023, Your Honor agreed that under the facts of this action, Plaintiff cannot recover for her emotional distress in negligence. Dkt. No. 46, p. 7 *citing Mortise v. United States,* 102 F.3d 693, 696 (1996).

Plaintiff's Count II therefore cannot stand unless Plaintiff establishes some quantum of economic loss. As Your Honor noted, "[t]o survive summary judgment, [Plaintiff] will need to adduce some evidence of real injury…" Dkt. No. 46, p. 10. Discovery has established that she cannot do so.

### B.    Plaintiff Has Not Produced Any Admissible Evidence to Support her Claims for Economic Damages Flowing from Defendants' Alleged Negligence

As stated, in discovery Plaintiff produced documentation of a grand total of $13.42 Plaintiff claims to have spent on postage. But for several reasons she cannot recover even that sum under Count II or for that matter under Count I.

The Capital One Loan

The Capital One loan taken out in Plaintiff's name to finance the Vehicle purchase was rescinded and removed from Plaintiff's credit record long ago. Exhibit "D," at 101:28; Exhibit "E"; Dkt. No. 26-19. Plaintiff admitted under oath that she never paid a dime towards the Capital One loan. Exhibit "D," at 132:19-24, 135:25-136:7. When asked if she had paid any portion of that loan, she responded "No. Why would I pay something I did not do?" *Id.*

Tickets, Tolls, Violations, and other Bills

While Plaintiff meticulously documented numerous parking tickets, tolls, moving violations, and related debts Laforest incurred while operating the Vehicle, Plaintiff produced no

proof that she paid a single dime to clear any of those violations. At her deposition, Plaintiff both admitted not paying anything toward those fines and penalties but also claimed not to remember whether she had paid them. Exhibit "D," at 140:20-141:4, 141:13-143:21, 145:3-14. Regardless, nowhere in the four thousand unorganized pages of Plaintiff's document dump herein is a single receipt, cancelled check, or other evidence of payment in satisfaction of any of the debts incurred by Laforest with the Vehicle.

Plaintiff did testify that, just as she had filed the Affidavit of Fictitious Account with Capital One, she had also undertaken to contest her responsibility for the fines and fees incurred by Laforest. Although she claimed that process was still ongoing as of her deposition, by all accounts her efforts have already succeeded, or certainly will succeed if they have not already. Exhibit "D," at 145:8-148:9; Dkt. Nos. 26-20 and 26-21.

Thus, Plaintiff has not and cannot document any economic loss relating to Laforest's use of the Vehicle. At this point any assertion that she may incur such a loss in the future would be purely speculative as a matter of law, particularly given Plaintiff's adamant intention not to pay for anything she did not do. In sum, Plaintiff has not established the existence of any remaining debt in her name related to the Vehicle, while her success in contesting any remaining fines or fees is assured, especially with the aid of her expert counsel.

<u>Storage and Moving Expenses</u>

While Plaintiff testified that she incurred the expense of moving certain of her possessions into storage incidental to Defendants' alleged negligence, a purported causal connection that does not withstand scrutiny,[2] she again offered no documentation of any related expenses, no receipts,

---

[2] Plaintiff testified explicitly that did so due to persistent threats she from Laforest and his associates after she reported him to the police. Exhibit "D," at 162:23-163:18. There is simply no world in which threats and harassment from Plaintiff's brother-in-law were proximately caused by any act or omission of any Defendant herein. See Section III, *infra*.

no cancelled checks, nothing. She could not even remember the amounts she claims to have expended. Exhibit "D," at 163:19-164:12.

<u>Credit Score and Denial of Credit</u>

As stated, Plaintiff has formally withdrawn her "claims for damage to credit or credit score." Exhibit "L." However, the full extent of this withdrawal bears emphasis. See below. Parenthetically, this Court should note that Plaintiff boasted a credit score of an astonishing 780 prior to Laforest's identity theft. In a word, that is impossible and calls into question Plaintiff's credibility in general. On May 30, 2020, Plaintiff's Transunion credit score was 577, and her Experian credit score was 565. Exhibit "B." On June 11, 2021, Plaintiff's Experian credit score had dipped to 492, even though the Capital One loan had already been removed from her report. Exhibit "E." By the time Plaintiff attempted to obtain financing for a new vehicle on June 29, 2022,[3] her score was back up to 584. Dkt. No. 26-33.

<u>Printing, Copying, and Postage</u>

Again, when asked at her deposition to specify the amount she spent out of pocket on printing, copying, and postage, Plaintiff testified not only that she didn't remember, but that she did not have any receipts of same. Exhibit "D," at 160:19-162:21.

But as stated, lurking among Plaintiff's document dump were exactly two receipts upon which Plaintiff might attempt to establish out of pocket postage expenses, specifically receipts for two certified mailings, each for $6.71, of letters dated May 12, 2022, but both mailed on May 25, 2022. Exhibit "A." These letters to the Dispute Departments of Experian and TransUnion LLC requested the removal from Plaintiff's credit reports of the "hard inquiries" made in conjunction

---

[3] The timing of Plaintiff's applications for vehicle loans on May 27, 2022, and June 29, 2022, coinciding with the May 30, 2022, filing of this action, suggesg that Plaintiff may have intentionally applied for financing for a luxury vehicle she did not need, want, or hope to qualify for in order to create rejections to enhance her damages claim herein.

with the purchase of the Vehicle. Given her testimony that she had no receipts or knowledge of any amounts spent, it is by no means clear that Plaintiff herself, as opposed to her counsel or some other party, incurred these expenses. Regardless, Plaintiff cannot recover this miniscule sum because documents submitted in support of her AC demonstrate that these letters did not address a legitimate item of damage and because she failed to mitigate her damages (Section II, *infra*).

The two letters were mailed on May 25, 2022. Therein, Plaintiff asked Experian to remove two inquiries made by CAPITAL ONE on May 30, 2020, and June 29, 2020, and one inquiry made by TRUST DEALER SERVICES May 30, 2020. Dkt. No. 26-24. She asked TransUnion to remove two inquires each from CAPITAL ONE AUTO FINANCE and JPMCB AUTO FINANCE on May 30, 2020, and June 29, 2020, and one from VICTORY MITSUBISHI VIA CBCVICTORY MITSUBISHI made May 30, 2020. Dkt. No. 26-23.

As argued above, because these credit inquiries at issue related to the sale and financing of the Vehicle and Plaintiff sought their removal ostensibly to repair her credit record, Plaintiff withdrew any claim for these expenses when she formally withdrew all claims for "damage to credit or credit score." Exhibit "L."

In any event, these letters did not address a harm that Plaintiff had suffered or would ever suffer. Exhibit "V" annexed to Plaintiff's own AC, a printout of the Experian webpage explains the impact of "Hard Inquiries" on a consumer's credit score as follows:

How Long Does a Hard Inquiry Last?

***A hard inquiry will stay on your credit report for two years***. While lenders can see all inquiries made during that time, the ***inquiries only directly affect your credit score for one year at most***.

That means that when you apply for a credit card, for instance, you may initially see a small drop in your credit score. Overtime, that impact will diminish, and with responsible credit behavior, you'll recover from the drop fairly quickly.

Dkt. No. 26-22, p. 4. (emphasis added).

Thus, on May 25, 2022, the subject hard inquires dated May 30 and June 29 of 2020 were not only just a few days away from falling off Plaintiff's credit reports automatically, those hard inquiries had not affected Plaintiff's credit score for at least a year. Indeed, these two letters, obviously written by a professional, most likely Plaintiff's counsel, appear to have been a misguided effort to establish quantifiable injury for litigation.[4] Plaintiff's counsel filed this action a mere five days after they were mailed, on the very last day of the limitations period. Dkt. No. 1.

Thus, Plaintiff's only documented postage expense was not only formally withdrawn, it related to a non-existent harm. And as set forth below, Plaintiff could easily have mitigated those and any other economic damages she might have suffered by failed to document, but she refused to do so.

## II.   ALTERNATIVELY,   PLAINTIFF   FAILED   TO   MITIGATE   HER DAMAGES

To the extent Plaintiff did suffer any economic damages proximately related to any Defendant's wrongdoing, those damages were wholly avoidable had Plaintiff only cooperated with Defendants to unwind the Vehicle sale.

As this Court is no doubt aware, one who is injured by the wrongful act or omission of another is required to exercise reasonable efforts to avoid, minimize, or lessen the resulting injury and will be denied recovery for any loss or injury chargeable to the injured party's failure to do so. *Olsen v. U.S. Fid. & Guar. Co.*, 230 N.Y. 31, 128 N.E. 908 (1920); *Den Norske Ameriekalinje Actiesselskabet v. Sun Printing & Publ'g Ass'n*, 226 N.Y. 1, 122 N.E. 463 (1919).

---

[4] Plaintiff's native language is Haitian French Creole, (Exhibit "D," at 7:17-23), and the letters demonstrate a much higher mastery of the English language than Plaintiff's deposition testimony. Moreover, while Plaintiff claimed to have been unable to recall precisely when she retained her attorneys herein, that the letters were mailed a mere five days before her counsel filed her Complaint means she was almost certainly represented by counsel at the time.

This rule applies to both actions for breach of contract and tort actions. *Clarke v. Fid. & Cas. Co. of New York*, 55 Misc. 2d 327, 285 N.Y.S.2d 503 (Sup. Ct. 1967), *holding modified on other grounds by Seward Park Hous. Corp. v. Greater New York Mut. Ins. Co.*, 43 A.D.3d 23, 836 N.Y.S.2d 99 (1st Dep't 2007). If a plaintiff, through negligence or willfulness, allows enhancement of those damages, the increased loss falls upon her. *Brown v. Weir*, 95 A.D. 78, 88 N.Y.S. 479 (2d Dep't 1904).

Here, by Plaintiff's own accounting, Spartan made numerous efforts to work with her to unwind the sale of the Vehicle once Plaintiff brought Laforest's identity theft to light. Exhibit "D," at 77:4-79:2, 86:19-25. Plaintiff admits that the dealership called her many times, but that she ultimately blocked every number associated with the dealership.[5] Exhibit "D," at 86:19-25. Orsaris testified that he called Plaintiff seeking her cooperation in unwinding the sale which would have cleared the Capital One loan from Plaintiff's credit report. Exhibit "F," at 170:12-172:2; Orsaris Affidavit, ¶¶ 3-8. But Orsaris needed the Vehicle's title to do so and while at one point Plaintiff promised to produce it, she then terminated her cooperation. Exhibit "D," at 95:11-97:25.

Having already reacquired the Vehicle from Laforest, Orsaris could well have provided Plaintiff meaningful further assistance. Orsaris Affidavit, ¶ 3-6. While Plaintiff was limited to mailing letters to Capital One and CRAs, Spartan's long-standing relationship with Capital One provided Orsaris with a much more expedient route to rescinding the loan, rectifying Plaintiff's credit and perhaps even clearing the hard inquiries from her credit report. Orsaris Affidavit, ¶ 7.

---

[5] Ironically, Plaintiff complains that she "did not hear anything more from Victory or Capital One" for months after her visit to the NYPD 70th Precinct on September 25, 2020, (Dkt. No. 26, ¶ 78), but of course she would have heard from them had she not blocked their telephone numbers.

Plaintiff's failure to take reasonable steps to mitigate her alleged damages, not any act or omission of Spartan, led Plaintiff to expend unnecessary time, energy and perhaps money to rescind the loan and remove her name from the Vehicle's title. Orsaris Affidavit, ¶ 8.

In light of the foregoing, Plaintiff's Count II for common law negligence should be dismissed in its entirety.

### III.   PLAINTIFF CANNOT ESTABLISH ACTUAL DAMAGES UNDER THE FCRA

As set forth above, Plaintiff cannot substantiate economic damages. As to her claimed emotional distress, that distress did not proximately flow from the reports of pre-screening credit pulls at issue.

Defendants have not identified any cases directly addressing an FCRA claim for emotional damage caused by nothing more than a consumer's knowledge that allegedly impermissible hard inquiries were temporarily listed on the consumer's credit report. But the leading Second Circuit case, *Casella v. Equifax Credit Information Services,* 56 F.3d 469 (2d Cir. 1995), comes close and provides important guidance. There, after the plaintiff discovered an inaccurate entry on his credit report maintained by two CRAs stating that he owed past due child support, he sued the CRAs. The District Court granted the CRAs summary judgment and the 2d Circuit affirmed in an opinion addressing the recovery of emotional damages under the FCRA.

Of significance herein, the 2d Circuit noted "Casella's argument boils down to the bare contention that he is entitled to damages for pain and suffering simply because he *knew* of an inaccurate and potentially damaging item in his credit report." *Id.* at 475 (emphasis in original). The 2d Circuit held that Casella had not met his burden to establish emotional damages because he failed to show that any creditor or any other person learned of the derogatory information

reported. *Id.* Thus, the plaintiff failed to establish "causation between the harm [he] alleged and [defendants'] alleged violations of the FCRA." *Id.* at 474-475.

Similarly here, Plaintiff, who has withdrawn her claims for damage to credit or credit score, apparently seeks emotional distress damages solely because she came to learn of the subsequently deleted hard inquiry listed on her credit report. Applying *Casella,* this Court should reject Plaintiff's claim outright.

Plaintiff's emotional harm claim fails under the well-recognized general principles of causation enunciated in *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339 (1928) and in several reported FCRA cases. *See, e.g., Wenning v. On-Site Manager, Inc.,* 2016 WL 3538379 * 23 (S.D.N.Y., Engelmayer, J.)("any harm must be traceable to the inaccurate, FCRA-violating information, not just to the report that contained that information or to inaccurate data within the same report") *and Schmit v. Trans Union LLC,* 2004 WL 785098 *4 (N.D. Ill. April 12, 2004)(plaintiff failed to establish causal relationship where she provided no evidence that her stress was due to defendant's FCRA violation and not the burden of loan payments, her son's failed agreement with car dealership, or the resulting state court litigation); *see also, Crabill v. Trans Union, L.L.C.,* 259 F.3d 662, 664 (7th Cir. 2001)("[w]ithout a causal relation between the violation of the statute and the loss of credit, or some other harm, a plaintiff cannot obtain an award of 'actual damages'…")(internal citations omitted) *and Spector v. Equifax Information Services,* 338 F. Supp. 2d 378, 383-384 (D. Conn. 2004)(no evidence linking CRA's failure to disclose violation with any of plaintiff's alleged emotional damage).

Instances in which emotional distress has been found causally related to an FCRA violation stand in stark contrast to the facts and circumstances herein. For example in *Cortez v. Trans Union, LLC,* 617 F.3d 688 (3d Cir. 2010), the Court of Appeals upheld a jury award arising from the

plaintiff's claim that she "suffered considerable anxiety, emotional distress, and humiliation as a result of being associated with a government list that includes people who are identified as terrorists" after the defendant CRA failed to remove an improper OFAC alert on plaintiff's credit report, and even refused to acknowledge that the information even existed. *Id.* at 720.

Again, the District Court in *Williams v. First Advantage LNS Screening Solutions, Inc.*, upheld a jury award for emotional distress damages based on plaintiff's testimony that he was "highly upset" when he was denied employment after the defendant CRA erroneously reported another person's criminal record on plaintiff's background check report on two different occasions. 238 F. Supp. 3d 1333, 1350 (N.D. Fla. 2017), *aff'd in part, rev'd in part and remanded sub nom. Williams v. First Advantage LNS Screening Sols. Inc*, 947 F.3d 735 (11th Cir. 2020); *see also Stevenson v. TRW, Inc.*, 987 F.2d 288, 297 (5th Cir. 1993)(plaintiff was denied credit three times and experienced considerable embarrassment from having to discuss his problems with business associates and creditors); *and Pinner v. Schmidt*, 805 F.2d 1258, 1265 (5th Cir. 1986)(embarrassment resulting from three credit denials and from lengthy dealings with credit bureau), *cert. denied*, 483 U.S. 1022, 107 S.Ct. 3267, 97 L.Ed.2d 766 (1987).

Here, Plaintiff suffered no credit damage at all, nor did a CRA release unfounded derogatory information about her. Instead, she testified in detail to the fear, stress, and anxiety she experienced as a direct result of the verbal abuse and threats she received from Laforest and his associates after she went to the police. Exhibit "D," at 59:11-60:19, 88:5-92:13, 94:14-25, 108:11-110:15, 220:19-221:5; 230:18-232:13. That fear culminated with her moving out of Brooklyn at the end of 2020 after a "big fight" with her husband and her father-in-law about Laforest. Exhibit "D," at 15:22-17:4.

Again, Plaintiff testified that the day Laforest was arrested, January 11, 2021, (Dkt. No.

26-16), she received text messages from an unknown number "saying you will never come back to Brooklyn," and "saying a lot of bad words which is -- that is the reason that made me change everything" and which caused Plaintiff to be afraid. Exhibit "D," at 59:11-60:19. It is no wonder then that Plaintiff did not even suggest that her emotional upset was related to or result from the appearance of several arguably improper credit inquiries in her credit report. Exhibit "D."

These tumultuous events occurred from September 2020 reaching a peak in January 2021. But during that entire period Plaintiff was not aware that her credit report showed the "hard pulls" made during the Vehicle sale. She did not discover that fact until June 11, 2021. Dkt. No. 26 ¶ 106.

Plaintiff also claims to have lost sleep because she was afraid that Laforest might do something illegal with the Vehicle or get into a serious accident while driving the Vehicle and that she would be responsible because the Vehicle was titled in her name. Exhibit "D," at 230:18-232:13. But that distress was necessarily short lived since Plaintiff claims to have discovered Laforest's fraud on September 11, 2020, (Dkt. No. 26, ¶ 66), and Laforest returned the Vehicle to the dealership on September 26, 2020, (Exhibit "C"), a fact about which Plaintiff was promptly informed. Exhibit "D," at 86:8-18. In any event, that sleep loss was surely not a proximate result of the report of credit inquiries on her credit report, a facts about which she was unaware.

Simply put, even assuming for argument's sake that the dealership pulled Plaintiff's credit report under false pretenses, there exists no actionable proximate connection between that credit pull and the reporting of same and Plaintiff's emotional distress as a matter of law.

## IV.   PLAINTIFF CANNOT ESTABLISH THAT ANY DEFENDANT KNOWINGLY AND WILLFULLY OBTAINED PLAINTIFF'S CREDIT REPORT UNDER FALSE PRETENSES SO AS TO WARRANT AN AWARD OF DAMAGES UNDER 15 U.S.C. § 1681N

Plaintiff seeks recovery of damages 15 U.S.C. § 1681n for an alleged violation of 15 U.S.C. § 1681 q. Dkt. No. 26, ¶ 170. That latter section reads in its entirety:

> Any person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses shall be fined under title 18, imprisoned for not more than 2 years, or both.

Under cases reported in civil actions construing this section, some of which are cited below, the question of whether a person obtained information with false pretenses turns on whether that person had a permissible purpose for doing so. The statutory list of permissible purposes appears at § 1681b(a)(3) and provides in pertinent part that credit information may be provided:

> (3) To a person which it has reason to believe—
>
> (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or
> ***
> (F) otherwise has a legitimate business need for the information—
>
> (i) in connection with a business transaction that is initiated by the consumer; [6]

Here, Spartan obviously intended to use the information it obtained about Plaintiff in connection with a credit transaction concerning the Plaintiff and/or Spartan had a legitimate business need to verify Plaintiff's identity and qualification for financing. *See, Bickley v. Dish Network, LLC*, 751 F.3d 724 (6th Cir. 2014).

---

[6] While § 1681b(a)(3) by its terms appears to apply only to CRAs, its "reason to believe" standard has been held to apply to FCRA "users" as well. *Korotki v. Attorney Serv. Corp.,* 931 F.Supp. 1269, 1276 (D.Md.1996) ("so long as a user has reason to believe that a permissible purpose exists, that user may obtain a consumer report without violating the FCRA").

While Plaintiff submits that she was not present at the dealership with Laforest, she does not dispute that Laforest appeared there not only with her actual physical driver's license in hand, but also with her valid social security number and employment information, all of which the credit pull verified. Exhibit "D," at 78:6-79:2. Critically, Plaintiff's address on the driver's license Laforest presented matched Laforest's driver's license address exactly, substantiating a close familial relationship and greatly enhancing the likelihood that Plaintiff approved the transaction.

Under these circumstances, a good faith conclusion that Plaintiff herself consented to the credit check was certainly reasonable. In the language of § 1681b(a)(3), Laforest's convincing showing gave Spartan personnel adequate reason to believe they had a permissible purpose for obtaining Plaintiff's credit information.

Several reported FCRA cases arising out of identity theft are instructive herein. For example, in *Bickley*, an individual impersonating the plaintiff applied for services with Dish Network who then pulled of plaintiff's credit report. The Sixth Circuit found that Dish Network had a permissible purpose to do so, writing:

> We reject the contention that a company, dealing with an imposter purporting to be the consumer, should be held liable when the company attempts in good-faith to verify the consumer's identity and eligibility for commercial services.

751 F.3d at 732; *accord, Randall v. Dish Network,* 2018 W.L. 3235543 (E.D.N.Y., Spatt, J.)(finding no liability under § 1681q if the requester obtained the consumer credit report for a separate, legitimate purpose independent of an improper purpose for the request); *see also, Glanton v. DirectTV, LLC,* 172 F.Supp.3d 890 (D.S.C. March 23, 2016), *Kennedy v. Victoria's Secret,* 2004 WL 2186613 (E.D.La. September 29, 2004), and *Graziano v. TRW, Inc.,* 877 F. Supp. 53 (D. Mass. February 17, 1995).

Closer to home, in *Shostack v. Diller,* 2015 WL 5535808 (S.D.N.Y. September 16, 2015, Cott, M.J.),* an imposter applied for a mortgage using plaintiff's identity resulting in defendant Lending Tree pulling plaintiff's credit report. Magistrate Cott concluded:

> …Lending Tree's actions were permissible in so far as they related to the receipt of a mortgage application from a person purporting to be Dave Shostack. At the time Lending Tree ran Shostack's credit report, it had no reason to know that he had not authorized the transaction.

2015 WL 5535808 * 10.

Further, as Magistrate Cott explained, to recover under § 1681n, Plaintiff must demonstrate a willful failure to comply with the requirements of the FCRA. That in turn requires a showing of the requester's culpable state of mind, specifically that the requester knowingly or recklessly engaged in conduct entailing "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco Ins. Co. of America v. Burr,* 127 U.S. 47, 49 (2007) *quoting Farmer v. Brennan,* 511 U.S. 825, 836 (1994).

On the record herein, Plaintiff cannot hope to meet her burden. She certainly cannot be heard to do so by invoking the testimony of Laforest, the man who admitted stealing her identity, the man she identified as a serial liar, the man about whom she stated "you can't believe anything he says" because "most of the time he is lying." Exhibit "D," at 65:4-15.[7] Thus, to have any hope of establishing willfulness, Plaintiff must rely on her own personal knowledge, the testimony of other witnesses and any potentially relevant documents.

In that regard, Plaintiff will likely invoke her own assertion that the younger of the two men she claims to have spoken with at the dealership in September of 2020 (presumably Orsaris), told her that Laforest had come to the dealership alone. Exhibit "D," at 79:3-12. That dramatically conflicts with Orsaris's testimony (as well as that of Perez and Vallejo, whose testimony on this

---

[7] Notably, and suspiciously, Plaintiff chose not to name Laforest as a Defendant in this action.

16

and other points was duplicative and thus not submitted herewith), who testified repeatedly that Laforest was accompanied either by Plaintiff or a woman who resembled her, (*see, e.g.,* Exhibit "F," at 107:15-108:16; 140-25-142:24, 143:18-144:6, 157:7-18, 159:13-22, 214:4-21).  In any event, putting aside questions of credibility and admissibility, this self-serving statement cannot, standing alone, create an issue of fact that Spartan personnel acted with the requisite state of mind to sustain a finding of willful misconduct. Given the extensive documentation of Plaintiff's identity Laforest presented, Spartan had a good faith reason to believe it had a permissible purpose to obtain Plaintiff's credit report even if Laforest appeared alone. The situation simply did not present them with an "unjustifiably high risk of harm."

Spartan's policy governing its Sales and Finance Managers prohibited pulling a customer's credit report unless that customer was present in person and filled out a credit application. Exhibit "K," at 44:12-21; Exhibit "F," at 141:10-21; 142:25-143:17. But again, even assuming, contrary to the consistent testimony of defense witnesses, Laforest came alone, and that Spartan personnel violated internal policy does not lead to the conclusion or even suggest that they acted under false pretenses within the meaning of the FCRA. In that regard, this lawsuit is the first time any Defendant herein was accused of selling a vehicle in the name of an individual without that individual's authorization. Exhibit "F," at 97:3-8; 138:3-14.

None of this is to say that Plaintiff might be able raise an issue of fact as to whether Spartan personnel obtained her credit report as result of negligence. Plaintiff here, like the plaintiff in *Shostack,* did not plead § 1681o, the section that creates civil liability for negligent violations of the FCRA. 2015 WL 5535808 * 11. Nonetheless, while Plaintiff here, like the *Shostack* plaintiff,

might hope to raise an issue of fact precluding summary judgment under § 1681o,[8] imposing liability thereunder would require Plaintiff to prove actual damages proximately resulting from any proven negligence. 2015 WL 5535808 * 11, *citing Braun v. Client Ser vices, Inc.,* 14 F. Supp. 3d 391, 397–98 (S.D.N.Y. March 31, 2014, Karas, J.). As established above, Plaintiff simply cannot do so.

For all the reasons set forth above, this Court should dismiss AC Count I in its entirety, thus bringing this entire case to a merciful end.

### V.   SHOULD THIS COURT NOT DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT IN ITS ENTIRETY, THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS' VICTORY AUTO GROUP, LLC, PHILIP ARGYROPOULOS, AND DIANE ARGYROPOULOS

By correspondence emailed to Plaintiff's counsel on February 10, 2023, Defendants' counsel requested, *inter alia,* that Plaintiff voluntarily discontinue this action as against Victory Auto and Philip to avoid burdening this Court with unnecessary motion practice.[9] Plaintiff's counsel refused, making the following sections of Defendants' motion regrettably necessary. Should this Court grant Philip and Victory Auto summary judgment, this Court should consider awarding Defendants their attorney fees expended on these sections.

#### A.   *Victory Auto Group, LLC*

By her AC, Plaintiff alleges that in 2020 Victory Auto and Spartan functioned "as one common enterprise," that enterprise being the automobile dealership operating under the d/b/a "Victory Mitsubishi." Dkt. No. 26, ¶ 9. That is false, as discovery herein has established. Victory Auto, a New York domestic LLC, initial filing 2004, operated automobile dealerships at addresses

---

[8] But even at that, assuming for argument's sake Laforest came to the dealership alone, Spartan was under no affirmative duty to call Plaintiff to confirm her identity. *Shostack, supra,* at 2015 WL 5535808 * 10.

[9] As this correspondence included a settlement offer subject to FRE § 408 Defendants do not submit it herewith. Defendants will provide a copy of same should this Court request.

other than 4070 Boston Road, Bronx, until it ceased to function in December 2017 or January 2018. Exhibit "K" at 23:20-24:6; 27:24-28:23; Exhibit "H," at 23:24-24:8; 26:3-6; Exhibit "F" at 29:14-16. Victory Auto never used the d/b/a "Victory Mitsubishi." Exhibit "F," at 218:2-10; 29:4-10; Exhibit "K," at 55:8-13; Exhibit "H," at 32:15-19; 49:7-10.

Meanwhile, Spartan, a New York domestic LLC, initial filing December 2016, began operation as a Mitsubishi Motors franchise dealership at 4070 Boston Road in early 2018 under the d/b/a Victory Mitsubishi. Exhibit "K," at 27:24-28:2; Exhibit "H," at 26:3-10. At all times relevant herein Spartan operated Victory Mitsubishi where the transactions at issue herein occurred, as evidenced by, among other evidence, various agreements Spartan entered. For example, on January 30, 2018, Mitsubishi Motors entered a Dealer Sales and Service Agreement (the "Franchise Agreement"), with Spartan, not Victory Auto, for the dealership at 4070 Boston Road. Dkt. No. 26-30. On October 21, 2019, Credit Bureau Connect entered a "Subscriber Application" with Spartan, not Victory Auto, to provide, among other things, services related to consumer credit reports (the "CBC Agreement"). Exhibit "I." On January 23, 2018, Capitol One Auto Finance entered a Dealer Agreement to provide certain banking services to Spartan Auto Group, LLC d/b/a Victory Mitsubishi, not Victory Auto (the "Capital One Agreement"). Exhibit "J."

Moreover, Spartan, not Victory Auto, employed the individual Defendants allegedly involved in the transactions at issue, to wit Orsaris, Vallejo and Perez. Exhibit "K" at 70:5-8; Exhibit "F" at 39:9 –40:4.

The Rule 56.1 Statement filed by counsel in an another now resolved litigation and annexed to the AC as Exhibit "CC," does not contradict this overwhelming evidence. Dkt. No. 26-29. Both Philip and Diane testified to the inaccuracy of the vague wording therein, specifically that Victory

Auto, Spartan and "Victory Mitsubishi" all "collectively operate a new car dealership." Exhibit "K," at 38:7-20; Exhibit "H," at 26:7-10.

In sum, on the record before this Court, and no matter the poor wording of an attorney in another case, Victory Auto simply cannot be vicariously liable to Plaintiff for the acts of the individuals who may have pulled Plaintiff's credit report because Victory Auto did not employ, supervise, or direct them, and in fact it had ceased operations altogether years before the transactions at issue herein.

Accordingly, Victory Auto is entitled to summary judgment dismissing the AC as against it as a matter of law.

### B.    *Philip Argyropoulos*

Plaintiff alleges that "Mr. and Mrs. Argyropoulos"[10] are both personally liable to Plaintiff for jointly constructing a supposedly illicit automobile dealership "business model," and more specifically for "setting up the policies and procedures that facilitated" Laforest's theft of Plaintiff's identity. Dkt. No. 26, ¶¶ 26-38. But aside from the absence of precedent for individual FCRA liability for constructing a "business model," discovery established that Philip has no ownership interest in Spartan and nothing at all to do with Spartan's policies and procedures in general, much less its policies and procedures regarding credit pulls.[11]

The record is crystal clear: at all times relevant Diane alone owned Spartan. Exhibit "K" at 55:23-56:13; 62:16-23; Exhibit "H," at 35:3-6; 40:8-18; 42:18-43:6; Exhibit "F" at 61:14-21. Philip had no ownership interest in, and receives no compensation from, Spartan. Exhibit "H," at

---

[10] While Philip and Diane remain legally married, they are and have been separated. Exhibit "K," at 10:19-21.

[11] And contrary to Plaintiff's allegation of Defendants' "systematic conduct," this action is the first and only time any of the named Defendants have been accused of anything like what Plaintiff herein alleges. Exhibit "F," at 97:3-8; 138:3-14.

32:9-11; 40:8-18; Exhibit K," at 37:3-18; 62:16-23. The above referenced CBC Agreement and Capital One Agreement were executed by Diane. Exhibits "I" and "J." The vague reference to an ownership interest of Philip appearing in the above-mentioned Rule 56.1 Statement is another inaccuracy of no moment herein. Exhibit "K," at 37:3-15.

Throughout the seemingly interminable depositions perpetrated on Defendants in this action, Plaintiff's counsel obsessed over an apparent inconsistency about Spartan's ownership appearing in the above referenced Franchise Agreement. Dkt. No. 26-30.  Under the heading "Ownership of Dealer" that Agreement stated "Percentage of Ownership" as Diane 30% and Philip 70%. But both Diane and Philip testified that this inaccurate representation was made with Mitsubishi's approval, if not outright recommendation, for the limited purpose of making the initial franchise award to Spartan. Exhibit "K," at 60:4-62:15; Exhibit "H," at 47:2-54:7. Mitsubishi finally got around to changing the ownership percentage in September 2022 to accurately reflect Diane's sole ownership of Spartan. Exhibit "G," p. 18.

Meanwhile, Philip has never had any management role whatsoever with Spartan. Not only did he not participate in any of the transactions at issue herein, he did not even know about those transactions until Plaintiff's lawsuit was brought to his attention. Exhibit "H," at 17:3-7; 60:10-23. He did not supervise Spartan employees, (Exhibit "K," at 73:13–74:6), and he was not consulted about hiring or firing decisions. Exhibit "H," at 30:6-10. In fact, Philip did not even recognize the names Yessica Vallejo and David Perez. Exhibit "H," at17:23-25; 18:11-13.

More to the point, Philip never provided advice to Diane or Orsaris about running the dealership. Exhibit "H," at 72:8-11. He was not aware of Spartan's policies for pulling customer's credit, much less did he set or help set those policies. Exhibit "H," at 38:11-14; 72:12-20.

Finally, exasperated by counsel's incessant badgering, Philip declared "[w]hat part of I don't run the dealership do you not understand?" Exhibit "H," at 71:15-23. But undeterred counsel continued eliciting this response: "I have zero information about anything that the dealership does." Exhibit "H," at 72:12-17.

All that said, even if Philip had an ownership interest in and/or a management role at Spartan at any time relevant, he still could not be vicariously liable for a Spartan employee pulling Plaintiff's credit report under false pretenses. It is well established that "[a]bsent 'special circumstances it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents.'" *Shostack v. Diller, supra,* quoting *Meyer v. Holley,* 537 U.S. 280, 286 (2003); *see also Watson v. Caruso,* 424 F.Supp.3d 231, 250-251 (D. Conn., 2019, Haight, J.)(without indication corporation's principal was involved in alleged wrongdoing, she was not subject to individual liability on employee's FCRA claims).

Thus, given the complete absence evidence that Philip himself somehow participated in pulling Plaintiff's credit report without a permissible purpose, he cannot be personally liable for that alleged act. Like both Plaintiff and Defendants herein, the *Shostack* plaintiff was the victim of identity theft and pleaded a cause of action under § 1681n. 2015 WL 5535808 * 9. But as stated, Magistrate Cott found that because Plaintiff did not allege that any of the individual defendants there participated in any alleged wrongdoing, they could not be individually liable. *Shostack,* 2015 WL 5535808 * 9-11.

The tortured discovery proceedings herein failed to unearth any evidentiary support for Plaintiff's allegations against Philip individually, allegations that at this point are being pursued in bad faith.

Accordingly, this Court should grant Philip summary judgment dismissing Plaintiff's Complaint against him.

### C.      *Diane Argyropoulos*

As established above, at all times relevant herein Diane was the sole owner of Spartan, but under the caselaw cited, that alone does not expose her to liability for the alleged acts of Spartan employees. Further, it is undisputed that Diane did not participate in the transactions that resulted the sale of the Vehicle or specifically in pulling Plaintiff's credit report. She also did not supervise or direct the Spartan employees are alleged to have done so, having left that supervisory role to Spartan's General Manager, Stavros Orsaris. Exhibit "K," at 73:13–74:6. Indeed, Diane rarely appeared at the dealership in 2020 due to the COVID pandemic, and when she did, she only went to her office at 4101 Boston Road, and she did not visit the sales floor. Exhibit "K," at 77:14-78:16; 154:6-155:2.

Defendants have located no precedent for a corporate manager's individual liability for setting or failing to enforce policies and procedures that arguably resulted in an FCRA violation. Besides, Spartan's policies and procedures were set strictly to *avoid* identity theft. *See,* Section IV above and Exhibit "K," at 44:12-21; Exhibit "F," at 141:10-21; 142:25-143:17.

In any event, Diane did not set Spartan's policies and procedures or nor did she undertake to enforce them. While she signed the Capital One and CBC Agreements pledging adherence with the FCRA and the avoidance of identity theft, as stated she left the actual formation and enforcement of those policies and procedures to her General Manager. Exhibit "K," at 43:3-13; 73:13–74:6.

Accordingly, under the above cited precedent, Diane cannot be liable to Plaintiff herein and this Court should grant her summary judgment dismissing the AC as against her.

## <u>CONCLUSION</u>

For all the reasons set forth above, Defendants request that this Court enter an Order, pursuant to Federal Rule of Civil Procedure ("FRCP") Rule 56, granting Defendants Summary Judgment and dismissing Counts I and II of Plaintiff's First-Amended Complaint as to all Defendants or, in the alternative, granting partial Summary Judgment dismissing Count II of Plaintiff's First-Amended Complaint in its entirety and dismissing Counts I and II thereof as against Victory Auto, Philip, and Diane, and limiting scope of the trial of Count I of Plaintiff's Amended Complaint to the scope of Plaintiff's recoverable damages, together with such other and further relief as this Court deems just and proper.

Dated: New York, New York
February 24, 2023

BY: _____

H. Nicholas Goodman
Patrick L. Selvey