**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X
**FARAH JEAN FRANCOIS,**

                **Plaintiff,**

- against -

**VICTORY AUTO GROUP LLC d/b/a**
**VICTORY MITSUBISHI, SPARTAN**
**AUTO GROUP LLC d/b/a VICTORY**
**MITSUBISHI, STAVROS ORSARIS,**
**YESSICA VALLEJO, DAVID PEREZ,**
**DIANE ARGYROPOULOS, and**
**PHILIP ARGYROPOULOS**

                **Defendants.**
-------------------------------------------------------------------------X

Case No. 1:22-cv-4447

STATEMENT OF
MATERIAL FACTS

          PLEASE TAKE NOTICE that, **VICTORY AUTO GROUP LLC d/b/a VICTORY MITSUBISHI** ("Victory Auto"), **SPARTAN AUTO GROUP LLC d/b/a VICTORY MITSUBISHI** ("Spartan Auto"), **STAVROS ORSARIS** ("Orsaris"), **YESSICA VALLEJO** ("Vallejo"), **DAVID PEREZ** ("Perez"), **DIANE ARGYROPOULOS** ("Diane") and **PHILIP ARGYROPOULOS** ("Philip") (collectively "Defendants"), by their attorneys, Nicholas Goodman & Associates, PLLC, hereby assert, pursuant to Local Civil Rule 56.1, that the material facts as to which there is no genuine issue to be tried are as follows:

          1.     Victory Auto Group, LLC ("Victory Auto") began operating car dealerships in 2004 or 2005 until is ceased operations in late 2017 or early 2018. Exhibit "K," at 23:20-24:6; 27:24-28:23; Exhibit "H," at 23:24-24:8; 26:3-6; Exhibit "F," at 29:14-16.

          2.     Victory Auto never operated a Mitsubishi Motors franchise and never operated under the d/b/a "Victory Mitsubishi." Exhibit "F," at 218:2-10; 29:4-10; Exhibit "K," at 55:8-13; Exhibit "H," at 32:15-19; 49:7-10.

          3.     Spartan Auto Group, LLC ("Spartan") began operation as a Mitsubishi Motors franchise at 4070 Boston Road, Bronx, New York, under the d/b/a Victory Mitsubishi in early 2018. Exhibit "K," at

27:24-28:2; Exhibit "F," at 24:8-11; Exhibit "H," at 26:7-10.

4. Victory Auto and Spartan never operated collectively. Exhibit "K," at 38:7-20.

5. The vague reference to an ownership interest of Philip appearing in the Rule 56.1 Statement annexed to Plaintiff's Amended Complaint as Exhibit "CC" is another inaccuracy of no moment herein. Exhibit "K," at 37:3-15.

6. At all times relevant herein, Diane was the sole owner of Spartan. Exhibit "K," at 55:23-56:13; 62:16-23; Exhibit "H," at 35:3-6; 40:8-18; 42:18-43:6; Exhibit "F," at 61:14-21.

7. Philip does not hold, and has not at any time relevant ever held, an ownership interest in Spartan. Exhibit "H," at 32:9-11; 40:8-18; Exhibit K," at 37:3-18; 62:16-23.

8. While Philip and Diane are legally married, they are and have been separated at all relevant times herein. Exhibit "K," at 10:19-21.

9. On January 30, 2018, Mitsubishi Motors entered a Dealer Sales and Service Agreement (the "Franchise Agreement"), with Spartan. Dkt. No. 26-30.

10. While the Franchise Agreement listed Philip as a majority owner of Spartan, this inaccurate representation was made with Mitsubishi's knowledge and approval for the limited purpose of making the initial franchise award to Spartan. Exhibit "K," at 60:4-62:15; Exhibit "H," at 47:2-54:7.

11. On or about September 20, 2022, Diane and Mitsubishi Motors executed a revised Franchise Agreement which accurately reflected Diane's 100% ownership stake in Spartan. Exhibit "G," p. 18.

12. On October 21, 2019, Credit Bureau Connect entered a "Subscriber Application" with Spartan, to provide, among other things, services to obtain consumer credit reports (the "CBC Agreement"). Exhibit "I."

13. On January 23, 2018, Capitol One Auto Finance entered a Dealer Agreement to provide certain banking services to Spartan Auto Group, LLC d/b/a Victory Mitsubishi, (the "Capital One Agreement"). Exhibit "J."

14. At all times relevant herein, Vallejo and Perez were employed by Spartan. Exhibit "K," at 70:5-8; Exhibit "F," at 39:9 –40:4.

15. Philip had no role whatsoever in the transactions at issue and specifically did not participate in pulling Plaintiff's credit report, nor was he aware that that had happened until this lawsuit was brought to his attention. Exhibit "H," at 17:3-7; 60:10-23.

16. Philip had no role in Spartan's management and did not set, enforce, or even know about Spartan's policies for pulling credit reports concerning potential customers. Exhibit "H," at 38:11-14; 72:12-20; Exhibit "K," at 42:21–44:11; Exhibit "F," at 59:4–61:3.

17. Philip was not consulted about hiring or firing decisions at Spartan. Exhibit "H," at 30:6-10.

18. Philip did not even recognize the names Yessica Vallejo and David Perez. Exhibit "H," at 17:23-25; 18:11-13.

19. Philip never provided advice to Diane or Stavros about running the dealership. Exhibit "H," at 72:8-11.

20. Diane did not supervise or direct Spartan's sales and finance managers who were authorized to pull customers' credit reports, she left the enforcement of policies and the supervisory role to Spartan's General Manager, Stavros Orsaris. Exhibit "K," at 43:3-13; 73:13–74:6.

21. Diane did not go to Spartan's 4070 Boston Road location for a year after the onset of the COVID pandemic and only traveled to her office at 4101 Boston Road to take papers home. Exhibit "K," at 77:14-78:16; 154:6-155:2.

22. Spartan policy required customers to fill out and sign a credit application in person and show photo ID to a manager before pulling a credit report. Exhibit "K," at 44:12-21; Exhibit "F," at 141:10-21; 142:25-143:17.

23. Spartan never engaged in remote or online sales at any time. Exhibit "F," at 72:21-73:4, 149:4-21.

24. Laforest returned the Vehicle to the dealership on September 26, 2020. Exhibit "C."

25. This lawsuit is the first time any Defendant has been accused of selling a vehicle to an individual without his or her authorization. Exhibit "F," at 97:3-8; 138:3-14.

**Plaintiff's Deposition Testimony**

26. Plaintiff married Stanley Laforest on June 14, 2018. Exhibit "D," at 18:7-13.

27. In or around May of 2018, Plaintiff moved into Stanley Laforest's familial home located at 2914 Farragut Road, Brooklyn ("Farragut Road"), where she resided at the time of the events and transactions at issue herein until she moved out at the end of 2020. Exhibit "D," at 14:3-18; 127:2-7.

28. Plaintiff resided at Farragut Road with her husband, and her husband's mother, father, and grandmother. Exhibit "D," at 14:19-15:9.

29. Plaintiff's brother-in-law, Emmanuel Laforest ("Laforest"), also resided at Farragut Road. Exhibit "D," at 15:10-21.

30. Plaintiff claims she first met Laforest in person in January of 2022, when she nearly called the police on him after her green card was mailed to Farragut Road (despite the fact that Plaintiff testified she had since moved out) and Laforest apparently intercepted and stole it. Exhibit "D," at 41:24-43:8.

31. Plaintiff moved out of Farragut Road after a "big fight" with her husband and her father-in-law about Laforest after she claims to have first discovered that Laforest had stolen her identity to purchase a 2017 BMW 5 Series ("the Vehicle"). Exhibit "D," at 15:22-17:4. Plaintiff wanted to go to the police, but

4

her husband and father-in-law resisted to protect Laforest. *Id.*

32. Plaintiff received mail at Farragut Road where her husband's grandmother would typically retrieve mail from the home's single mailbox. Exhibit "D," at 19:21-20:19.

33. Plaintiff applied for a new class of driver's license in late 2019 or 2020 because she planned to work for Uber, but never received the license in the mail. Exhibit "D," at 24:22-27:8.

34. Plaintiff worked for Gary Null's Uptown Whole Food from January 2014 through September 2018, at which point she became a teller and then a customer service representative at TD Bank, where she was employed until November or December of 2020. Exhibit "D," at 34:23-38:6.

35. Plaintiff testified that she first learned of Laforest's theft of her identity on or about September 11, 2020, when she received the title to the Vehicle in the mail. Exhibit "D," at 45:17-47:13. Upon realizing that the Vehicle was titled in her name, she asked her husband if had had purchased the Vehicle, which he denied. *Id.* At that point, Plaintiff discovered for the first time that Laforest was operating the BMW motor vehicle he acquired in some four months earlier, but when Laforest's grandfather asked him, Laforest denied purchasing the BMW in Plaintiff's name. At that point Plaintiff stated that she was going to the police. *Id.*

36. Laforest then called Plaintiff, admitted that he had her driver's license, and promised that he would return her ID and remove her name from the title of the Vehicle and work it out. Exhibit "D," at 45:17-47:13; 49:16-50:19.

37. Plaintiff testified that Laforest's grandfather warned her that Laforest "open everybody's mail," and stated that Laforest stole her ID and W-2 from Null's Whole Food in the mail and kept it for himself. Exhibit "D," at 53:22-54:15.

38. Plaintiff reported Laforest to the NYPD on September 25, 2020, for "ID Theft." Dkt. No. 26-6.

39. Laforest was arrested on January 11, 2021. Dkt. No. 26-16.

40. Laforest had been in jail for "a lot of things," he had cases other than the case brought by Plaintiff, he was "always in trouble with the cops." Exhibit "D," at 43:9-44:10.

41. According to Plaintiff, Laforest was "definitely lying" when he testified that he found her driver's license on the floor of the Farragut Road apartment. Exhibit "D," at 57:10-17.

42. According to Plaintiff, Laforest also lied about paying parking tickets associated with the Vehicle. Exhibit "D," at 58:24-59:4.

43. The day that Laforest was arrested in conjunction with the theft of Plaintiff's identity, Plaintiff testified that she received text messages from an unknown number "saying you will never come back to Brooklyn," and "saying a lot of bad words which is -- that is the reason that made me change everything" and which caused Plaintiff to be afraid. Exhibit "D," at 59:11-60:19.

44. Plaintiff emphatically characterized Laforest as a liar, and stating that "you can't believe anything he says" because "most of the time he is lying." Exhibit "D," at 65:4-15.

45. After receiving the title to the Vehicle in the mail and learning what Laforest had done, Plaintiff went to the Victory Mitsubishi dealership at 4070 Boston Road, Bronx, with her uncle and met with an unknown individual who Plaintiff described as "a little fat," "a Spanish guy," who "had a beard." Exhibit "D," at 67:8-59:12.

46. After reviewing her information, this person told her she would need to come in again the following Thursday. Exhibit "D," at 71:5-72:12. Plaintiff returned that Thursday and was introduced to a young man who "looks like he was a Spanish guy." Exhibit "D," at 75:13-23.

47. The young man told Plaintiff that he was "very sorry for what happened," and showed her a copy of her ID and Laforest's ID that Victory Mitsubishi had on file in connection with the sale of the

6

Vehicle. Exhibit "D," at 77:4-9.

48. The young man told Plaintiff he was going to fix her problem, and showed Plaintiff documentation of the Vehicle sale, including documents containing Plaintiff's information including a photo of her ID and her social security number. Exhibit "D," at 78:6-79:2.

49. When Plaintiff asked how he had a copy of her ID, as she had never received it in the mail, the young man told her that "this is the person who come to buy the car." Exhibit "D," at 79:3-12.

50. The young man then asked that Plaintiff give him the title to the Vehicle so that he could fix the situation, take the Vehicle back, pay off the loan, and remove everything in Plaintiff's name, but Plaintiff refused to give him the title saying that she did not trust that he would help her. Exhibit "D," at 80:10-82:10.

51. Plaintiff testified that she took photographs of the papers at the dealership,[1] then went to the police and shared those pictures so the police could process her report of Laforest's identity theft. Exhibit "D," at 83:6-84:19.

52. The police had Plaintiff identify Laforest's picture and told her that they would pursue her claim against him; the police later called and confirmed that they had arrested Laforest. Exhibit "D," at 84:20-85:19.

53. Plaintiff blocked every number related to anyone from the Victory Mitsubishi dealership because they kept calling asking her to return the title to the Vehicle, stating that she "was blocking every number [she] did not know because [she] was scared." Exhibit "D," at 86:19-25.

54. Plaintiff was afraid because she "don't know if it was him, if it was Emmanual [sic] friend had been texting me. I don't know. I was scared and all I wanted to do is block everyone who deals with that because I did not want nobody to wait for me on the street and end up doing something to me." Exhibit

---

[1] Notably, Plaintiff never produced any such photographs despite Defendants duly requesting the production of same.

"D," at 94:14-25.

55. Laforest's friends called and texted her repeatedly with threats, "calling and then saying telling me that's not going to stop, that's not going to stay like that," and telling her things like "don't come back to Brooklyn." Exhibit "D," at 108:11-110:15.

56. At that point Plaintiff had not seen her credit report showing that her credit report had been pulled on May 30, 2020, a fact she first discovered on June 11, 2021. Dkt. No. 26 ¶ 106.

57. Plaintiff admitted that her emotional stress was caused by Laforest, by his threats and his theft of her mail and her identity. Exhibit "D," at 220:19-221:5.

58. Ultimately, while Plaintiff testified that someone from the dealership called her and told her that they had the car and just needed the title in order to take care of everything, Plaintiff simply said "yeah, okay" but then never accepted another call from or spoke to anyone at the dealership again, despite the fact that the dealership attempted to call her again after that, because she believed that they were lying to her. Exhibit "D," at 95:11-97:25.

59. On or about September 23, 2020, Plaintiff submitted an Affidavit of Fictitious Account in conjunction with her fraud claim with Capital One. Exhibit "D," at 125:6-126:25; Dkt. No. 26-5.

60. Plaintiff was the beneficiary of a restraining order preventing Laforest from coming into contact with her due to a series of threatening phone calls which caused Plaintiff to be "scared to go to work because [she didn't] want them to come to my job." Exhibit "D," at 88:5-92:13.

61. Despite Plaintiff's deposition testimony that she "don't know if [the Capital One Loan] is still open," credit reports Plaintiff produced in discovery show that the Capital One loan was cancelled and removed from her credit report entirely. Exhibit "D," at 101:28; Exhibit "E."

62. While Plaintiff's Affidavit of Fictitious Account stated that she had to pay $29,462.81 as a result of her identity theft, Plaintiff never paid any amount toward the loan, stating "No. Why would I pay

something that I did not do?" and "I did not pay anything [to Capital One]." Exhibit "D," at 132:19-24, 135:25-136:7.

63.     When asked to identify "every dollar that you spent out of your pocket that you claim was a result of what the dealership did in this lawsuit," Plaintiff responded simply "I don't remember." Exhibit "D," at 140:20-141:4.

64.     Plaintiff did not pay anything out of pocket to satisfy any of the parking violations incurred by Laforest with the Vehicle. Exhibit "D," at 141:13-17.

65.     Plaintiff did not pay anything out of pocket to satisfy any of the toll violations incurred by Laforest while driving the Vehicle. Exhibit "D," at 141:13-143:21.

66.     When asked whether she paid anything out of pocket for any of the moving violations incurred by Laforest's use of the Vehicle, she testified that she did not remember. Exhibit "D," at 145:3-14.

67.     Plaintiff does not remember how much she spent on postage, printing, and copying in her efforts to contest charges incurred by Laforest, and does not have any receipts to document any such expenditures. Exhibit "D," at 160:19-162:21.

68.     Plaintiff's counsel produced two receipts, each for $6.71, for certified mail dated May 25, 2022, (Exhibit "A"), representing the cost of mailing two letters, one to the Dispute Department of Experian and one to the Dispute Department of TransUnion LLC, requesting that those entities remove a total of seven inquiries from Plaintiff's credit report dating from May 30, 2020, and June 29, 2020. Dkt. Nos. 26-23 and 26-24.

69.     When asked how much she spent putting her belongings in storage, Plaintiff testified as follows:

Q.     Okay, thank you.
       Now, one of your claims in this case is that you had to, quote, put your stuff in storage. Do you know that to be one of your claims in this lawsuit?
A.     Yea, because I was scared about that. Because Emmanuel was so mad and then his

> friend, when they been calling me on the phone and calling me and then giving me that and then calling me on blocked numbers, my husband was scared. He said you have to go to your friend or go to your family. And then all that thing we get, my bed, all my stuff from my room. I couldn't bring everything back to me uncle because I was not living there anymore and I have to put everything in storage.

Exhibit "D," at 162:23-163:18.

70. Plaintiff admitted that she "put her stuff in storage" because Laforest or his associates threatened her and she had to move out of Brooklyn. Exhibit "D," at 164:8-12.

71. Plaintiff left her belongings in storage for three or four months, but she did not know how much she spent on storage, and she does not have any receipts to support that claim. Exhibit "D," at 163:19-164:7.

72. Plaintiff testified that her credit was damaged as a result of allegations in her Complaint, claiming to have obtained a credit score of 780; however, Plaintiff only offered the fact that she had qualified for an American Express credit card to support that claim, stating "[t]o get American Express, your credit have to be good. Exhibit "D," at 166:6-168:13.

73. On May 30, 2020, Plaintiff's "EXPERIAN/FAIR ISAAC AUTO LOAN MODEL 08" Credit Score was 565, and her "FICO AUTO SCORE 8" was 577. Exhibit "B."

74. On June 11, 2021, Plaintiff's Experian "FICO SCORE 8" was 492, but the Capital One auto loan for the Vehicle was not listed on her credit report at that time and there were several unrelated accounts with delinquent payments listed. Exhibit "D," at 175:22-176:14; Exhibit "E."

75. As of June 29, 2022, when she applied for a vehicle loan from PenFed Credit Union ("PenFed") which was ultimately denied, Plaintiff's listed credit score was 584. Dkt. No. 26-33.

**[Remainder of page intentionally left blank]**

76. Plaintiff did not suffer harm to her credit or credit score as a result of the Defendants alleged actions. Exhibit "L."

Dated: New York, New York
February 24, 2023

    Yours, etc.
    NICHOLAS GOODMAN & ASSOCIATES, PLLC

BY: _____
H. Nicholas Goodman
*Attorneys for Defendants*
VICTORY AUTO GROUP LLC
d/b/a VICTORY MITSUBISHI,
SPARTAN AUTO GROUP LLC
d/b/a VICTORY MITSUBISHI,
STAVROS ORSARIS, YESSICA VELLEJO,
DAVID PEREZ, DIANE ARGYROPOULOS,
and PHILIP ARGYROPOULOS
333 Park Avenue South, Suite 3A
New York, New York 10010
(212) 227-9003
ngoodman@ngoodmanlaw.com

*Via ECF*
Emma Caterine
Ahmad Keshavarz
THE LAW OFFICE OF
  AHMAD KESHAVARZ
16 Court Street, Suite 2600
Brooklyn, New York 11241
(917) 945-9848
emma@newyorkconsumerattorney.com
ahmad@newyorkconsumerattorney.com

11