1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ------------------------------X

4   FARAH JEAN FRANCOIS,

5                     Plaintiff,

6          -against-              Case "No.":
                                  1:22-cv-4447-JSR
7   VICTORY AUTO GROUP LLC d/b/a
    VICTORY MITSUBISHI, SPARTAN
8   AUTO GROUP LLC d/b/a VICTORY
    MITSUBISHI, STAVROS ORSARIS,
9   YESSICA VALLEJO, DAVID PEREZ,
    DIANE ARGYROPOULOS, and
10  PHILIP ARGYROPOULOS,

11                    Defendants.

12  ------------------------------X

13

14          REMOTE DEPOSITION of STAVROS ORSARIS, a

15   30(b)1 and 30(b)(6) witness herein, witness

16   located in the Law Office of Nicholas Goodman,

17   held on November 23, 2022, commencing at 10:00

18   a.m., and before Helene Gruber, a certified

19   shorthand reporter and notary public within and

20   for the state of New York.

21

22

23

24

25



```
1

2   A P P E A R A N C E S :

3

4   THE LAW OFFICE OF AHMAD KESHAVARZ

5   Attorneys for Plaintiff

6         16 Court Street, #2600

7         Brooklyn, New York 11241

8   BY:    EMMA CATERINE, ESQ.

9          AHMAD KESHAVARZ, ESQ.

10

11  NICHOLAS GOODMAN & ASSOCIATES

12  Attorneys for Defendants

13        333 Park Avenue South

14        New York, New York  10010

15  BY:    NICHOLAS GOODMAN, ESQ.

16         PATRICK SELVEY, ESQ.

17

18

19

20

21

22

23

24

25
```



1

2

3                  S T I P U L A T I O N S

4

5           IT IS HEREBY STIPULATED AND AGREED,

6    by and between the attorneys for the respective

7    parties, as follows:

8           All objections, except as to the form

9    of the questions, shall be reserved to the time

10   of the trial.

11          The within examination may be signed

12   and sworn to before any Notary Public with the

13   same force and effect as if signed and sworn to

14   before the court.

15          Filing of the original transcript of

16   the examination is waived.

17

18

19

20

21

22

23

24

25



```
 1                    S. Orsaris
 2              (The parties stipulate to the witness
 3    being sworn in remotely.)
 4              COURT REPORTER:  Please state your
 5    name and business address.
 6              THE WITNESS:  Stavros Orsaris, 4070
 7    Boston Road, Bronx, New York  10475.
 8                  STAVROS ORSARIS,
 9    Having first been duly sworn, was examined and
10    testified as follows:
11                    EXAMINATION
12    BY MS. CATERINE:
13        Q.   Mr. Orsaris, thank you for your time
14    today.  Could you please state your full name
15    for the record?
16        A.   Stavros Orsaris.
17        Q.   Have you ever gone by any other names
18    or aliases?
19        A.   No.
20        Q.   Have you ever had your deposition
21    taken before?
22        A.   No.
23        Q.   Have you ever testified in a court
24    hearing before?
25        A.   No.
```



```
 1                    S. Orsaris
 2        Q.   Have you ever testified in an
 3   administrative hearing before?
 4        A.   No.
 5        Q.   If you don't understand a question,
 6   will you please ask me to rephrase the
 7   question?
 8        A.   Yes, no problem.
 9        Q.   If I ask you a question and you don't
10   ask me to rephrase the question, is it
11   reasonable to assume that you understood the
12   question?
13             MR. GOODMAN:  Object to the form.
14   You could answer.
15        A.   If I don't ask to rephrase it, then I
16   don't need it rephrased.
17        Q.   During the course of the deposition,
18   as you just heard, your attorney may be making
19   certain objections such as objection to form.
20   Unless instructed not to answer, you are still
21   required to answer the question.  Do you
22   understand?
23        A.   Yes.
24        Q.   And will you please orally answer all
25   questions, not nod or make remarks like uh-huh
```

Case 1:22-cv-04447-JSR   Document 52-7   Filed 02/24/23   Page 6 of 223

STAVROS ORSARIS  30(b)(6)30(b) 1                    November 23, 2022
FARAH J. FRANCOIS vs VICTORY AUTO GROUP LLC                         6

```
1                      S. Orsaris
2   so there is a clear transcript for the court
3   reporter?
4        A.   Of course.
5        Q.   And that is a great example of an
6   oral answer.
7             How old are you, Mr. Orsaris?
8        A.   Twenty-eight.
9        Q.   What is your date of birth?
10       A.   XX-XX-1994.
11       Q.   How tall are you?
12       A.   5'7.
13       Q.   And how much do you weigh?
14       A.   165 pounds.
15       Q.   Were you about that weight in May of
16  2020?
17       A.   Yes.
18       Q.   I see that you have a shaved head at
19  the moment.  Did you have hair in May of 2020?
20       A.   No.
21       Q.   Where do you currently reside?
22            MR. GOODMAN:  Objection.  We gave a
23  business address.  You don't need the
24  residential address.
25       Q.   What county do you currently reside
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                    S. Orsaris
 2   in?
 3        A.   New York City.
 4        Q.   Do you live in the borough of
 5   Manhattan?
 6        A.   Yes.
 7        Q.   What steps did you take in
 8   preparation for your deposition today?
 9        A.   I met with my attorney last
10   Wednesday.
11        Q.   And when you say your attorney, are
12   you referring to Nicholas Goodman?
13        A.   Yes.
14        Q.   Did you review any documents in
15   preparation for your deposition today?
16        A.   Yes.
17        Q.   What documents did you review?
18        A.   The documents that had been submitted
19   by both sides.
20        Q.   Do you understand that today you are
21   testifying both as yourself and as the 30(b)(6)
22   representative of Spartan Auto Group LLC?
23        A.   Yes.
24        Q.   What is your understanding of what it
25   means to testify as a 30(b)(6) witness for
```



```
 1                      S. Orsaris
 2    Spartan Auto Group LLC?
 3            MR. GOODMAN:  Object to the form.
 4    You can answer if you understand.
 5        A.   I don't understand.
 6        Q.   Did you speak with anyone else
 7    besides Mr. Goodman in preparation for your
 8    deposition today?
 9        A.   No.
10        Q.   What is your understanding of this
11    lawsuit?
12            MR. GOODMAN:  Object to the form.
13    You can answer if you understand.
14        A.   I don't understand.
15        Q.   Sure.  Let me rephrase the question.
16    Do you know what you are going to be testifying
17    about today?
18        A.   Yes.
19            MR. GOODMAN:  Object to the form.
20        Q.   You might want to pause so that your
21    attorney can make objections before you state
22    your answer just so we have a clear transcript.
23            MR. GOODMAN:  Thank you, yes.  That's
24    appropriate.  Do that.
25        Q.   And I believe your answer was "yes,"
```



```
 1                      S. Orsaris
 2    correct?
 3         A.   Yes.
 4         Q.   What is your understanding?
 5         A.   I don't have the most thorough
 6    understanding.
 7         Q.   That's all right.  I just want your
 8    understanding.
 9              MR. GOODMAN:  Understanding about
10    what?  I'm sorry.  What was the question?
11    Understanding about this lawsuit?
12              MS. CATERINE:  That's right.
13              MR. GOODMAN:  Go ahead.
14         A.   A potential allegation about an FCRA
15    violation.
16         Q.   Do you understand that this case is
17    about the sale and financing of a vehicle in
18    the name of Farah Jean Francois?
19         A.   Yes.
20         Q.   And prior to your preparation for the
21    deposition in this case, had you reviewed any
22    of the documents related to this case?
23              MR. GOODMAN:  Object to the form.  Go
24    ahead.
25         A.   I didn't review any additional
```



```
1                   S. Orsaris
2    documents prior to my preparation for this
3    deposition.
4         Q.   Would that include electronic
5    documents like computer screens such as for the
6    computer program Dealertrack?
7         A.   I don't understand the question.
8         Q.   Sure.  Let me rephrase.  In
9    preparation for your deposition today, did you
10   look at any computer screens such as for the
11   program Dealertrack?
12        A.   No.
13        Q.   Have you searched for documents in
14   relation to this case?
15             MR. GOODMAN:  Object to the form.
16   You can answer.
17        A.   Yes.
18        Q.   And you produced those documents to
19   your attorney, Mr. Goodman, correct?
20             MR. GOODMAN:  Object to the form.  Go
21   ahead.
22        A.   Yes.
23        Q.   And did those documents include
24   electronic documents such as screenshots and
25   emails?
```



```
 1                    S. Orsaris
 2              MR. GOODMAN:  Object to form.  Go
 3   ahead.
 4        A.    Screenshots and emails -- I mean my
 5   emails with screenshots, to my understanding.
 6        Q.    So you didn't search for emails?
 7        A.    That's not what I am saying.  I had
 8   nothing in my email.
 9        Q.    So you searched your emails and there
10   was nothing relating to this case; is that
11   correct?
12        A.    Correct.
13        Q.    When you said you searched emails,
14   are you referring to your email at the
15   dealership?
16        A.    Yes.
17        Q.    What is that email address?
18        A.    My first name at Mitsubishi.com,
19   Stavros@mitsubishi.com.
20        Q.    What other emails were searched in
21   relation to this case?
22        A.    No other emails were searched.
23        Q.    Have you searched for text messages
24   in relation to this case?
25        A.    Yes.
```



```
1                        S. Orsaris
2         Q.   I want you to take a look at what was
3    previously marked as Exhibit 25 Bates stamped
4    Defendants' 70 through 72.  The Bates stamp is
5    a little small so that is a little hard to see,
6    but it is screenshots of text messages on an
7    iPhone.
8         A.   Okay, I have those.
9         Q.   And were these the text messages that
10   were located in your search for text messages
11   in relation to this case?
12        A.   Yes.
13        Q.   And are these from your personal cell
14   phone?
15        A.   Yes.
16        Q.   And what is your cell phone number?
17        A.   (347)593-4394.  My personal cell
18   phone is also used for work.  I only have one
19   phone number.
20             MR. KESHAVARZ:  Can you say that
21   again?
22             THE WITNESS:  (347)593-4394.
23        Q.   Was that cell phone provided to you
24   by Victory Mitsubishi?
25        A.   No.
```



```
 1                     S. Orsaris

 2       Q.   Who is the cell phone provider?

 3       A.   Verizon.

 4       Q.   Does Victory Mitsubishi pay for the

 5  bills related to the cell phone usage?

 6       A.   No.

 7       Q.   So it is a personal cell phone; you

 8  just use it for work as well as for personal?

 9       A.   Yes.

10       Q.   Were there any other text messages

11  related to this case with this cell phone?

12            MR. GOODMAN:  Object to the form.  Go

13  ahead if you understand it.

14       A.   No.

15       Q.   You didn't text Philip Argyropoulos

16  about this case?

17            MR. GOODMAN:  Over my objection, go

18  ahead.

19       A.   No.

20       Q.   You didn't text Diane Argyropoulos

21  about this case?

22            MR. GOODMAN:  Objection.  Go ahead.

23       A.   No.

24       Q.   Did you text Chris Orsaris about this

25  case?
```



```
1                    S. Orsaris

2            MR. GOODMAN:  Objection.  Go ahead.

3      A.   No.

4      Q.   Did you text David Perez about this

5   case?

6            MR. GOODMAN:  Objection.  Go ahead.

7      A.   No.

8      Q.   And I think I know the answer, but

9   did you text Yessica Vallejo about this case?

10           MR. GOODMAN:  Objection.  Go ahead.

11     A.   No.

12     Q.   In addition to the email you

13  mentioned earlier -- I believe it is

14  Stavros@victorymitsubishi.com; is that correct?

15     A.   Yes.

16     Q.   In addition to that email, do you use

17  any other emails in relation to your work at

18  Mitsubishi?

19     A.   No.

20     Q.   Are emails to

21  Stavros@victorymitsubishi.com forwarded to any

22  other email in-boxes?

23     A.   No.

24     Q.   Do you have the application WhatsApp

25  on your cell phone?
```



```
1                    S. Orsaris

2              MR. GOODMAN:  Note my objection.  Go

3    ahead.

4         A.   Not at the moment.

5         Q.   You have in the past?

6              MR. GOODMAN:  Objection.  Is that a

7    question?

8         Q.   Have you had it in the past?

9         A.   Maybe 2017 and 2018.

10        Q.   Do you have any other messaging apps

11   on your phone such as Signal?

12        A.   No.

13        Q.   Telegram?

14        A.   No.

15        Q.   Have you searched your telephone

16   records and bills for dates of calls related to

17   this case?

18        A.   Yes.

19        Q.   Have those records been produced?

20             MR. GOODMAN:  Object to the form.

21   Produced by whom to whom?  I don't understand

22   the question.

23        Q.   Have those records been produced to

24   your attorney, Mr. Goodman?

25        A.   Yes.
```



```
 1                    S. Orsaris
 2            MS. CATERINE:  I call for the
 3    production of those records, please.
 4            MR. GOODMAN:  Take it under
 5    advisement.
 6       Q.   Do you recall when the phone calls
 7    were that were in relation to this case?
 8       A.   Yes.
 9       Q.   Around when were those phone calls?
10       A.   From my cell phone?
11       Q.   Correct.
12       A.   In September.
13            MR. GOODMAN:  Of what year?
14            THE WITNESS:  Of 2020.
15       Q.   Mr. Orsaris, did you graduate from
16    high school?
17       A.   Yes.
18       Q.   Where did you go to high school?
19       A.   I spent time at Manhasset High School
20    and graduated from Bayside High School.
21       Q.   When did you graduate?
22       A.   In 2012.
23       Q.   What was the reason why you changed
24    high schools?
25       A.   Move.
```



```
 1                    S. Orsaris
 2        Q.   Do you have any post high school
 3   education?
 4        A.   Yes.
 5        Q.   Did you go to college?
 6        A.   Yes.
 7        Q.   Where did you go to college?
 8        A.   Baruch College.
 9        Q.   Did you graduate?
10        A.   Yes.
11        Q.   What was your degree in?
12        A.   I have a bachelor's in finance and
13   investments.
14        Q.   Did you go to any school after you
15   graduated from Baruch College?
16        A.   No.
17        Q.   What year did you graduate?
18        A.   2016.
19        Q.   What did you do after you graduated
20   from Baruch College?
21        A.   I was working as an export finance
22   consultant.
23        Q.   Where were you working?
24        A.   At a consulting firm called CC
25   Solutions.
```



```
 1                        S. Orsaris
 2         Q.   Did you start there in 2016?
 3         A.   I initially started as an intern in
 4    2015 and was hired as a full-time consultant in
 5    2016.
 6         Q.   How long did you work there?
 7         A.   About a year and a half.
 8         Q.   So you left in 2018; is that correct?
 9         A.   No.
10         Q.   2017?
11         A.   No.
12         Q.   When did you leave?
13         A.   2016.
14         Q.   I see.  You were including your time
15    as an intern?
16         A.   Yes.  It was a paid internship.
17         Q.   What did you do after working at that
18    consulting firm?
19         A.   Automotive retail sales.
20         Q.   Why did you leave that consulting
21    firm?
22         A.   The United States Export Import Bank
23    did not receive funding by the federal
24    government, and there was a lapse which led to
25    my change in career.
```



1              S. Orsaris

2      Q.   Where was your next job?

3      A.   At a Mitsubishi store in Larchmont,

4  New York.

5      Q.   What did you do there?

6      A.   Automotive retail sales.

7      Q.   What was your title?

8      A.   I was a manager.  I started in sales

9  but became a manager.

10     Q.   And you may have said this before,

11 but when did you start there?

12     A.   Summer of 2016.

13          MR. GOODMAN:  '16 or '17?

14          THE WITNESS:  '16.

15     Q.   And when did you stop working there?

16     A.   I was transferred to the Bronx store,

17 Victory Auto Group, in November 2016.

18     Q.   And that's where you currently work,

19 correct?

20     A.   I do not work for Victory Auto Group,

21 no.

22     Q.   But that's the same location,

23 correct, the 4070 Boston Road location?

24     A.   No.

25     Q.   I apologize.  Where is that location?



```
1                        S. Orsaris

2        A.    4101 Boston Road.

3        Q.    Going back to when you were at

4   Larchmont, Larchmont Mitsubishi, what were your

5   responsibilities while working there?

6        A.    Managing sales folks, salespeople, in

7   addition to overseeing sales.

8        Q.    Were you involved with the financing

9   of vehicles while working at Larchmont?

10            MR. GOODMAN:  Form.  Go ahead.

11       A.    No.

12       Q.    Did you pull credit reports while

13  working at Larchmont Mitsubishi?

14       A.    Yes.

15       Q.    What was the purpose for you pulling

16  credit reports?

17       A.    For our clientele to purchase a car.

18       Q.    You were using the credit reports to

19  make assessments of clients; is that correct?

20            MR. GOODMAN:  Object to form.  Go

21  ahead.

22       A.    I was not making assessments, no.

23       Q.    I see.  Maybe you can clarify for me,

24  then.  What was the purpose of the credit

25  reports?  What was done with them?
```



```
1                      S. Orsaris
2        A.   They were reviewed.
3        Q.   By someone else?
4        A.   Yes.
5        Q.   I see.  And so you got transferred
6   from Larchmont Mitsubishi to Victory Auto
7   Group, and what is your title at Victory Auto
8   Group when you start there?
9        A.   Sales manager.
10       Q.   How long did you work at Victory Auto
11  Group?
12       A.   Until the opening of Victory
13  Mitsubishi.
14       Q.   And when was that?
15       A.   February of 2018.
16       Q.   And you are referring to the 4070
17  Boston Road location; is that correct?
18       A.   Yes.
19       Q.   Who owned Victory Mitsubishi when it
20  opened?
21            MR. GOODMAN:  Object to form.
22       A.   Diane Argyropoulos.
23       Q.   How do you know that?
24            MR. GOODMAN:  Object to form.  You
25  can answer if you understand.
```



```
 1                    S. Orsaris

 2       A.    I don't know the specifics of how I

 3   knew, but I do know.

 4       Q.    Who owned Victory Auto Group?

 5             MR. GOODMAN:  Object to form.

 6       Q.    While you were working there?

 7       A.    I don't know.

 8       Q.    Who was your supervisor at Victory

 9   Auto Group?

10       A.    Diane Argyropoulos.

11       Q.    If I understand you correctly, the

12   Victory Mitsubishi store is opening, and Diane

13   asks you to go work at the Victory Mitsubishi

14   store; is that correct?

15             MR. GOODMAN:  Object to form.

16   Mischaracterizes testimony.  You can answer if

17   you understand.

18       A.    Can you rephrase the question,

19   please?

20       Q.    Sure.  Let's put it this way:  Did

21   you apply to work at the Victory Mitsubishi

22   store?

23             MR. GOODMAN:  Object to form again.

24   If you understand, go ahead.

25       A.    I verbally applied.
```



```
 1                      S. Orsaris
 2        Q.   But you didn't fill out an
 3   application; is that correct?
 4        A.   I filled out a lot of paperwork when
 5   I started working there.
 6             MS. CATERINE:  Strike the
 7   nonresponsive portion.
 8        Q.   Did you fill out an application to
 9   work at Victory Mitsubishi?
10        A.   Define "application."  I don't
11   understand the question.
12        Q.   Have you ever filled out an
13   employment application before?
14             MR. GOODMAN:  Object to the form.
15        A.   Plenty.
16        Q.   Did you fill out an employment
17   application to go work at Victory Mitsubishi?
18             MR. GOODMAN:  Object to the form.
19   You can answer.
20        A.   I don't know.
21        Q.   Did you fill out an employment
22   application to work at Larchmont Mitsubishi?
23             MR. GOODMAN:  Object to the form.  Go
24   ahead.
25        A.   I don't recall.
```



1                    S. Orsaris

2        Q.    Have you ever been arrested?

3        A.    No.

4              MR. GOODMAN:  Objection.  Don't

5     answer that.  You did answer.  You got to let

6     me have a few seconds.

7              Completely inappropriate question.

8        Q.    You said you started at Victory

9     Mitsubishi in February of 2018; is that

10    correct?

11       A.    Yes.

12       Q.    What was your position when you

13    started?

14       A.    Sales manager.

15       Q.    Did that position change?

16       A.    Yes.

17       Q.    What did that position change to?

18       A.    General manager.

19       Q.    Is that your current position?

20       A.    Yes.

21       Q.    Who is Chris Orsaris?

22       A.    My father.

23       Q.    Does Chris Orsaris work at Victory

24    Mitsubishi?

25             MR. GOODMAN:  Object to the form.



```
1                    S. Orsaris
2    You could answer.
3         A.   No.
4         Q.   Did he work at Victory Mitsubishi in
5    the past?
6              MR. GOODMAN:  Object to form.  Go
7    ahead.
8         A.   No.
9         Q.   Did he work at Victory Auto Group?
10             MR. GOODMAN:  Object to the form.  Go
11   ahead.
12        A.   I don't recall.
13        Q.   Did he work at Larchmont Mitsubishi?
14             MR. GOODMAN:  Object to the form.
15        A.   No.
16        Q.   Just for my clarity, you said he did
17   not work at Victory Mitsubishi and you don't
18   recall if he worked at Victory Auto Group; is
19   that correct?
20             MR. GOODMAN:  Still object to the
21   form.  You could answer.
22        A.   Yes.
23        Q.   When you were hired at Larchmont
24   Mitsubishi, did you have a background check
25   done on you?
```



```
 1                    S. Orsaris

 2        A.    I don't know.

 3        Q.    Did you sign or otherwise fill out a

 4   form which authorized Larchmont Mitsubishi to

 5   run a background check on you?

 6        A.    I don't know.

 7        Q.    Did Larchmont Mitsubishi call or

 8   otherwise contact any of your prior employers

 9   in evaluating your job application?

10             MR. GOODMAN:  Object to form.  No

11   testimony about an application.  Go ahead.

12        A.    I don't know.

13        Q.    Your current title is general manager

14   at Victory Mitsubishi, correct?

15        A.    Yes.

16        Q.    As general manager, do you evaluate

17   job applications?

18        A.    Yes.

19        Q.    And in the process of evaluating job

20   applications, do you run background checks on

21   applicants?

22        A.    I do not.  I am not the one that does

23   that.

24        Q.    Is Philip Argyropoulos involved in

25   the process of job applications at Victory
```



```
 1                      S. Orsaris
 2    Mitsubishi?
 3              MR. GOODMAN:  Object to the form.
 4         A.   No.
 5         Q.   Is Diane Argyropoulos involved in the
 6    process?
 7              MR. GOODMAN:  Object to the form.
 8         A.   No.
 9         Q.   Is anyone else besides yourself
10    involved in the process of evaluating job
11    applications at Victory Mitsubishi?
12              MR. GOODMAN:  Object to the form.  Go
13    ahead.
14         A.   No.
15         Q.   What information do you ask for on
16    job applications?
17         A.   A resume.
18         Q.   Any other information?
19         A.   If they have a driver's license.
20         Q.   And that would be for jobs like
21    porters that require driving, correct?
22              MR. GOODMAN:  Require what?  I'm
23    sorry.
24              MS. CATERINE:  Driving a vehicle.
25         A.   Yes.
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                      S. Orsaris
 2        Q.   Do you ask for a driver's license for
 3    jobs that do not require driving of vehicles?
 4        A.   No.
 5        Q.   Do you require references to former
 6    employers in job applications?
 7        A.   No.
 8        Q.   When you worked at Victory Auto
 9    Group, did it do business under any other names
10    other than Victory Auto Group?
11             MR. GOODMAN:  Object to the form.  Go
12    ahead.
13        A.   I don't understand the question.
14        Q.   Do you know what a d/b/a is?
15        A.   Yes.
16        Q.   Were there any d/b/a's for Victory
17    Auto Group while you worked there?
18        A.   Victory Auto Group.
19             MR. GOODMAN:  She is saying any
20    other.
21             THE WITNESS:  No.
22        Q.   And Victory Mitsubishi is a d/b/a,
23    correct?
24        A.   Current d/b/a, yes.
25        Q.   And that is the d/b/a of Spartan Auto
```



```
1                    S. Orsaris

2    Group?

3         A.   Yes.

4         Q.   And did Victory Auto Group ever use

5    the d/b/a Victory Mitsubishi?

6              MR. GOODMAN:  I am sorry.  Can you

7    read that back or rephrase it?

8              (Record read.)

9              MR. GOODMAN:  Go ahead.

10        A.   No.

11        Q.   Did Victory Auto Group ever use the

12   d/b/a Bronx Suzuki?

13        A.   I don't know.

14        Q.   Is Victory Auto Group still in

15   operation?

16        A.   No.

17        Q.   When did it cease operations?

18             MR. GOODMAN:  Object to the form as

19   to what "operation" means, but go ahead.

20        A.   The inception of Victory Mitsubishi.

21        Q.   I see.  And so was the physical

22   location closed, the 4101 Boston Road location,

23   I think you said?

24        A.   Yes.

25        Q.   Including yourself, did the employees
```



```
1                    S. Orsaris
2    who worked at Victory Auto Group go to work at
3    Victory Mitsubishi?
4              MR. GOODMAN:  Object to form.  Go
5    ahead.
6         A.   Yes.
7         Q.   Do you know the reason that Victory
8    Mitsubishi was opened and operations were moved
9    to there?
10             MR. GOODMAN:  Form.  Go ahead.
11        A.   Operations were not moved over there.
12        Q.   I'm sorry?  You said operations were
13   not moved over there?
14        A.   Yes.
15        Q.   Could you clarify for me, then, what
16   happened with this movement of the employees
17   from Victory Auto Group to Victory Mitsubishi?
18   What was that?
19             MR. GOODMAN:  Object to form.  Go
20   ahead.
21        A.   Diane Argyropoulos purchased LaSorsa
22   Mitsubishi and was able to move the point, as
23   we use, to 4070 Boston Road.
24        Q.   Let me ask a different question.  Why
25   weren't the operations of Victory Auto Group
```



```
1                      S. Orsaris
2    continued alongside Victory Mitsubishi?
3              MR. GOODMAN:  Object to the form.  If
4    you understand.
5         A.   I don't know.
6         Q.   That would be a question I would have
7    to ask Diane; is that right?
8              MR. GOODMAN:  Objection.  Go ahead.
9         A.   I don't know.
10        Q.   What are the different jobs at
11   Victory Mitsubishi?
12             MR. GOODMAN:  You are talking about
13   presently?  The time frame currently?
14             MS. CATERINE:  Currently.
15             MR. GOODMAN:  Go ahead.
16        A.    Porter, sales, service, writers,
17   service technicians, service manager, various
18   receptionists, business development center
19   associates, business development center
20   manager, finance manager, sales manager,
21   general manager, accounts payable, billing,
22   warranty administration or administrator,
23   controller.
24        Q.   As general manager, are you the
25   supervisor of all the other positions that you
```



```
1                        S. Orsaris
2      just listed?
3           A.    Yes.
4           Q.    Who is your supervisor?
5           A.    Diane.
6           Q.    What is her title?
7           A.    Owner.
8           Q.    Is Victory Mitsubishi divided into
9      different departments that you oversee?
10          A.    Yes.
11          Q.    What are the different departments?
12          A.    Sales, service.
13          Q.    Let's talk about the sales
14     department.  Who are the people with
15     supervisory authority in the sales department?
16               MR. GOODMAN:  Object to the form.
17     Also, again, just to clarify, are we talking
18     presently?
19               MS. CATERINE:  Presently.
20               MR. GOODMAN:  Go ahead.
21          A.    Myself.
22          Q.    Anyone else?
23          A.    No.
24          Q.    So the sales manager doesn't have
25     supervisory authority; is that correct?
```



```
 1                    S. Orsaris
 2        A.   No.
 3             MR. GOODMAN:  Yes, that's correct;
 4   no, he doesn't or she doesn't?
 5             THE WITNESS:  The sales managers do
 6   not have supervisory authority.
 7        Q.   But they do supervise employees; is
 8   that correct?
 9             MR. GOODMAN:  Object to form.  Go
10   ahead.
11        A.   Yes.
12        Q.   But they don't have the power to, for
13   example, hire or fire employees; is that
14   correct?
15        A.   Yes.
16        Q.   What are the responsibilities of the
17   sales manager generally?
18        A.   Overseeing the sales process.
19        Q.   The entire sales process?
20        A.   The beginning such as showing of the
21   vehicle.
22        Q.   When you say "the beginning," when
23   does the beginning of the sales process end?
24        A.   When there's intent to purchase a
25   vehicle.
```



```
 1                      S. Orsaris
 2        Q.   I see.  And what happens then?
 3        A.   I then get involved.
 4        Q.   I am sorry.  I didn't hear that.
 5        A.   I am then involved.
 6        Q.   Is anyone else involved at that point
 7   besides yourself?
 8        A.   The finance manager.
 9        Q.   And who is currently the finance
10   manager?
11        A.   Currently?
12        Q.   Yes.
13        A.   I have five.
14        Q.   You have five finance managers.  Who
15   are the finance managers?
16        A.   Yessica Vallejo, Joseph Gerbino,
17   Andris Guzman, Tae Kim, Walter Mesa.
18        Q.   When you were going through the
19   different jobs of the dealership, you mentioned
20   sales associate; is that right?
21        A.   Yes.
22        Q.   How many sales associates are there
23   at the dealership currently?
24        A.   Twenty.
25        Q.   How many sales managers are there at
```



```
1                     S. Orsaris
2    the dealership?
3         A.    Three.
4         Q.    And how many employees are in the
5    service department?
6         A.    Twenty.
7         Q.    How many employees are in the finance
8    department?
9         A.    Five.
10        Q.    Do all of the employees you listed
11   off work at the 4070 Boston Road location?
12        A.    I don't understand the question.
13        Q.    Sure.  Let me rephrase the question.
14   Is the work of Victory Mitsubishi done at any
15   other location other than the 4070 Boston Road
16   location?
17             MR. GOODMAN:  Object to form.  Go
18   ahead.
19        A.    Sales is at 4070 Boston Road.
20        Q.    Is that the full answer?
21        A.    Yeah.
22             MR. GOODMAN:  You have to say "yes."
23        A.    Yes.
24             MS. CATERINE:  Could you read back
25   the answer?
```



1                      S. Orsaris

2       A.   Sales occur at 4070 Boston Road.

3            MR. GOODMAN:  She was asking the

4    court reporter to read it back.

5            MS. CATERINE:  I think you pretty

6    much gave it back to me verbatim.

7       Q.   What about the other operations?

8    Where do those occur?

9       A.   The service department is a block

10   down.

11      Q.   Do you know the address off the top

12   of your head?

13      A.   3530 Noell Avenue.

14      Q.   What about the finance department?

15      A.   As I stated before, sales is at 4070

16   Boston Road.

17      Q.   I see.  When you say "sales," that

18   includes the finance, correct?

19      A.   Yes.

20      Q.   Who has offices at the 4070 location?

21           MR. GOODMAN:  Object to the form.

22   You mean who by name, or who by title, or what?

23   Object to the form.

24           MS. CATERINE:  By name and by title.

25      A.   Myself and each of the five prior



```
 1                      S. Orsaris
 2    listed finance managers.
 3         Q.   So the sales managers do not have
 4    offices; is that correct?
 5         A.   Yes, they do not have offices.
 6         Q.   Does anyone else besides you and the
 7    finance managers have an office?
 8         A.   No.
 9         Q.   So Diane does not have an office at
10    the 4070 location?
11         A.   No.
12              MR. GOODMAN:  No, she doesn't or no,
13    that's correct?
14              THE WITNESS:  No, she doesn't, but
15    she is free to use my office.
16         Q.   So when she is doing work at Victory
17    Mitsubishi, she uses your office; is that
18    correct?
19         A.   If the work is not remote, yes.
20         Q.   I think what you are implying, then,
21    if I understand you correctly, is that she does
22    work for Victory Mitsubishi remotely; is that
23    correct?
24         A.   Occasionally.
25         Q.   What are her main responsibilities at
```



```
 1                    S. Orsaris
 2   Victory Mitsubishi?
 3           MR. GOODMAN:  Object to form.
 4       A.   I don't know all of them.
 5       Q.   I'm sorry.  What was that after you
 6   said "I don't know"?
 7       A.   I don't know all of her
 8   responsibilities.
 9       Q.   You don't know all of her
10   responsibilities.  What are the ones you do
11   know?
12       A.   Management of the dealer financing.
13       Q.   Who files taxes for Victory
14   Mitsubishi?
15           MR. GOODMAN:  Object to form.
16       A.   My controller.
17       Q.   Does your controller work with Diane
18   to do that?
19           MR. GOODMAN:  Object to form.  Go
20   ahead.  You can answer.
21       A.   Yes.
22       Q.   Are you involved in that process as
23   well?
24       A.   No.
25       Q.   Is Philip Argyropoulos involved in
```



```
1                      S. Orsaris

2     that process?

3          A.    I don't know.

4          Q.    Does Victory Mitsubishi sell any

5     vehicles through the internet?

6               MR. GOODMAN:  Object to the form.  Go

7     ahead if you understand.

8          A.    No.

9          Q.    How do you receive your paycheck from

10    Victory Mitsubishi?

11         A.    I get a paycheck.

12         Q.    A physical paycheck?

13         A.    Yes.

14         Q.    Who cuts the paycheck?

15              MR. GOODMAN:  Object to form.  Go

16    ahead.

17         A.    My controller.

18              MS. CATERINE:  Let me rephrase the

19    question.

20         Q.    On the paycheck, who does it say the

21    payment is from?

22              MR. GOODMAN:  Who is the payor on the

23    check.

24         A.    Spartan Auto Group.

25         Q.    And has it been Spartan Auto Group as
```



```
 1                    S. Orsaris
 2   long as you have been working at Victory
 3   Mitsubishi?
 4        A.   Yes.
 5        Q.   Who was the payor when you were
 6   working at Victory Auto Group?
 7        A.   Victory Auto Group.
 8        Q.   Who was the payor when you were
 9   working at Larchmont Mitsubishi?
10        A.   Larchmont Mitsubishi.
11        Q.   Did the payor ever change when you
12   were working at any of those three jobs?
13             MR. GOODMAN:  Object to form.  I
14   think his testimony -- go ahead.
15        A.   I already answered.  No.
16        Q.   Is Larchmont Mitsubishi still in
17   operation?
18             MR. GOODMAN:  If you know.  Object to
19   the form.
20        A.   No.
21        Q.   When did it close?
22        A.   I don't know.
23        Q.   Was Larchmont Mitsubishi owned by
24   Diane Argyropoulos?
25             MR. GOODMAN:  Object to form.
```



```
 1                      S. Orsaris
 2        A.   I don't know.
 3        Q.   I think your prior testimony, if I
 4    recall correctly, is that you were transferred
 5    from Larchmont Mitsubishi to Victory Auto
 6    Group; is that correct?
 7        A.   Yes.
 8        Q.   And whose decision was that?
 9        A.   Diane.
10        Q.   Have you ever fired an employee for
11    cause as general manager of Victory Mitsubishi?
12             MR. GOODMAN:  Objection, but go
13    ahead.
14        A.   I don't understand the question.
15        Q.   Sure.  Have you ever terminated
16    someone's employment at Victory Mitsubishi?
17        A.   Yes.
18        Q.   Was there ever an instance where you
19    terminated someone's employment at Victory
20    Mitsubishi based on the employee's wrongful
21    conduct?
22             MR. GOODMAN:  Object to the form.  If
23    you understand, you can answer.
24        A.   I don't understand the question.
25        Q.   Do you understand the term "lay off"
```



```
 1                    S. Orsaris
 2   in the context of terminating someone's
 3   employment?
 4        A.   No.
 5        Q.   For what reasons would you terminate
 6   someone's employment at Victory Mitsubishi?
 7        A.   Tardiness, performance.  That's it.
 8        Q.   What sort of metrics do you use to
 9   evaluate an employee's performance?
10        A.   I don't use any specific metric.
11        Q.   Do you track the number of sales made
12   by sales associates?
13        A.   When they are not in training.
14        Q.   How about with sales managers?
15        A.   There is no metric.
16        Q.   You don't track sales by sales
17   managers?
18        A.   No.
19        Q.   Do you track sales by finance
20   managers?
21        A.   No.
22        Q.   Have you ever terminated someone's
23   employment at Victory Mitsubishi based on
24   allegations of fraud?
25             MR. GOODMAN:  Object to form.  You
```



```
1                    S. Orsaris
2    can answer.
3         A.   No.
4         Q.   Do you know of anyone who was
5    terminated from Victory Mitsubishi because of
6    allegations of fraud?
7              MR. GOODMAN:  Object to form.  You
8    could answer.
9         A.   That has never happened.
10        Q.   And you can be sure of that because
11   you worked there since it started in February
12   of 2018, correct?
13        A.   Yes.  I am very certain.
14        Q.   Do you have a base salary?
15        A.   Yes.
16        Q.   Do you receive a commission?
17        A.   No.
18             MR. GOODMAN:  Objection to form.  Go
19   ahead.  You answered.
20        Q.   Again, try to pause before you answer
21   the question because I have a hard time hearing
22   when you and your attorney are speaking at the
23   same time.  Could you repeat your answer?
24        A.   "No."
25             MR. GOODMAN:  Emma, we have been
```



```
1                    S. Orsaris
2    going an hour.  When you reach a point that is
3    comfortable, if we could take a five-minute
4    break.
5             MS. CATERINE:  Let's take it now.
6             (A recess was taken.)
7        Q.   I always forget to say this during
8    depositions, but if you need a break at any
9    point, Mr. Orsaris, just feel free to say so.
10   Whenever you want a break for lunch, just let
11   me know when you want to do that.  I am happy
12   to put in any breaks.
13       A.   No problem.
14       Q.   Have you ever worked with Chris
15   Orsaris at any car dealership?
16            MR. GOODMAN:  Object to form.  You
17   could answer.
18       A.   No.
19       Q.   Do you know if anyone has ever had
20   their employment terminated relating to
21   allegations of fraud at Victory Auto Group?
22            MR. GOODMAN:  Object to form.  Go
23   ahead.  You could answer.
24       A.   Can you rephrase that question,
25   please?
```



1                    S. Orsaris

2        Q.    Sure.

3             MR. GOODMAN:  You are distinguishing

4   between Spartan Auto Group and Victory Auto?

5   Is that -- go ahead.  I'm sorry.

6        Q.    So we talked earlier about how you

7   said no one has ever been fired from Victory

8   Mitsubishi because of allegations of fraud; is

9   that correct?

10        A.    Yes.

11        Q.    What about Victory Auto Group?

12        A.    Yes, no one has been terminated for

13   allegations of fraud there either.

14        Q.    Remind me when you started at Victory

15   Auto Group?

16        A.    November of 2016.

17        Q.    And Victory Auto Group had been

18   operating for a few years by that time; is that

19   correct?

20             MR. GOODMAN:  Object to form.  Go

21   ahead.

22        A.    I don't know.

23        Q.    You don't know.  So is it fair to say

24   that you wouldn't know about all of the

25   employees who were terminated at Victory Auto



STAVROS ORSARIS  30(b)(6)30(b) 1                    November 23, 2022
FARAH J. FRANCOIS vs VICTORY AUTO GROUP LLC                    46

```
 1                    S. Orsaris
 2   Group and the reasons for their termination; is
 3   that correct?
 4             MR. GOODMAN:  Objection.  Assumes
 5   there were terminations, but go ahead.
 6        A.   I don't know.
 7        Q.   What about Larchmont Mitsubishi; was
 8   anyone ever fired from Larchmont Mitsubishi
 9   because of allegations of fraud?
10        A.   No.
11        Q.   Do you know when Larchmont Mitsubishi
12   started?
13        A.   No.
14        Q.   And you said you received a
15   commission, correct?
16             MR. GOODMAN:  "No."  Objection.
17        Q.   You said "no."  I'm sorry.  Help me
18   jog my memory.  What was your testimony on that
19   issue?
20        A.   I do not receive commission.
21        Q.   Do you receive any other form of
22   compensation besides your salary?
23        A.   No.
24        Q.   So you don't receive bonuses, for
25   example?
```



```
1                    S. Orsaris
2        A.   I do not receive bonuses.
3        Q.   You don't receive any share of
4   profits?
5        A.   No.
6        Q.   Do finance managers at Victory
7   Mitsubishi receive commissions?
8        A.   Yes.
9        Q.   How are their commissions calculated?
10       A.   A portion of the deal's gross profit.
11       Q.   How are commissions for sales
12  managers calculated?
13       A.   Based on the number of overall sales.
14       Q.   Do you have targets for sales
15  managers in regards to the number of sales that
16  they make?
17       A.   No.
18       Q.   Do you have targets for finance
19  managers in regards to the gross profits that
20  they earn for the dealership?
21       A.   No.
22       Q.   Have you ever represented yourself to
23  a consumer as the owner of Victory Mitsubishi?
24       A.   No.
25       Q.   Has any consumer ever mistaken you as
```



```
 1                      S. Orsaris
 2    the owner of Victory Mitsubishi perhaps because
 3    of your position as the general manager?
 4              MR. GOODMAN:  Object to the form of
 5    that question.  I don't know if that's
 6    acceptable to answer, but go ahead.
 7         A.   I don't know.
 8         Q.   Do you have an ownership interest in
 9    Victory Mitsubishi?
10         A.   No.
11         Q.   Have you ever had an ownership
12    interest in Victory Mitsubishi?
13         A.   No.
14         Q.   What drew you from working in
15    import-export to going to auto sales?
16              MR. GOODMAN:  Object to form.  I
17    think it is asked and answered, but go ahead.
18         A.   I worked with my grandfather at a
19    mechanic's shop to get myself through college.
20         Q.   I see.  What is your grandfather's
21    name?
22         A.   Peter Orsaris.
23         Q.   And what shop were you working at?
24         A.   Orsaris Auto Center.
25         Q.   Did Chris Orsaris work at that shop
```



```
 1                    S. Orsaris
 2   as well?
 3              MR. GOODMAN:  Object to form.  Go
 4   ahead.
 5        A.   I don't know.
 6        Q.   Did they sell cars there?
 7        A.   No.
 8        Q.   If I understand you correctly, when
 9   you could no longer work at the consulting
10   firm, you drew from your past experience
11   working at this auto body shop and applied to
12   work at Larchmont Mitsubishi; is that correct?
13              MR. GOODMAN:  Object to form.
14        A.   Auto repair, but yes.
15        Q.   Sorry.  I am not a car person so I am
16   going to be screwing up the terms left and
17   right here.
18              Who is David Perez?
19        A.   A prior sales manager.
20        Q.   When did he start?
21        A.   At the inception of Victory
22   Mitsubishi at 4070 Boston Road.
23        Q.   Was he working at Victory Auto Group
24   before then?
25        A.   I don't know.
```



```
 1                      S. Orsaris
 2        Q.   When he started at the inception of
 3   Victory Mitsubishi, what was his position?
 4        A.   Sales consultant.
 5        Q.   Is that different from a sales
 6   associate, or am I confusing the terms?
 7        A.   They are synonymous with each other.
 8        Q.   Did he have any other titles while
 9   working at Victory Mitsubishi?
10        A.   Sales consultant, and then sales
11   manager.   That's it.
12        Q.   When did he become a sales manager?
13        A.   Spring of 2018.
14        Q.   And what was the basis for his
15   promotion?
16             MR. GOODMAN:   Object to form.   Go
17   ahead.
18        A.   Performance.
19        Q.   He was good at selling cars; is that
20   correct?
21        A.   Yes.
22        Q.   And you knew that based on the number
23   of cars he sold; is that correct?
24        A.   Yes.
25        Q.   What were his main responsibilities
```



1                   S. Orsaris

2    as sales manager?

3         A.   Assisting with the initial part of a

4    sale.

5         Q.   And what would that initial part

6    entail?

7         A.   Greeting of our clientele, assigning

8    a sales consultant, understanding wants and

9    needs of a potential client, and then if there

10   is intent to purchase, he usually turned it

11   over to me.

12        Q.   And you were his supervisor, correct?

13        A.   Yes.

14        Q.   How did you supervise his work?

15             MR. GOODMAN:   Object to form.   Go

16   ahead.

17        A.   I sat right next to him.

18        Q.   That makes it pretty easy.

19             Was one of his responsibilities

20   pulling the credit reports of consumers?

21             MR. GOODMAN:   Objection to form,

22   "responsibilities," but go ahead.

23        A.   Yes.

24        Q.   And he would pull consumer's credit

25   reports using the information in a credit



```
1                    S. Orsaris
2    application, correct?
3         A.   Yes.
4         Q.   And the credit application would have
5    been filled out by a consumer with the help of
6    a sales associate; is that correct?
7         A.   Not the last part.  Consumer would
8    fill out the credit application.
9         Q.   I see.  And who would give the
10   application to the consumer?
11        A.   The application was given by myself
12   or David to the sales consultant, and we would
13   oversee completing the application.
14        Q.   So if a consumer had questions about
15   a credit application, if they said "Oh, I don't
16   have this information.  Do you need this," who
17   would they ask that to?
18             MR. GOODMAN:  Object to form.  Go
19   ahead.
20        A.   They would notify the salesperson of
21   that.  The salesperson would immediately get
22   myself or David Perez involved to provide a
23   clear answer to the consumer.
24        Q.   Would Mr. Perez review a consumer's
25   driver's license prior to pulling a credit
```



```
1                    S. Orsaris
2    application?
3         A.   Yes.
4         Q.   Who else besides Mr. Perez would pull
5    consumer's credit applications?
6              MR. GOODMAN:  Again, time frame.
7         Q.   During the time that Mr. Perez worked
8    at the dealership?
9              MR. GOODMAN:  Go ahead.
10        A.   Myself.
11        Q.   Anyone else?
12        A.   The finance team does have the
13   ability, but they do not.  Either myself or
14   David Perez are the ones to pull consumer
15   credit.
16        Q.   Why don't the finance managers do
17   that?
18        A.   No reason.
19        Q.   It's just not part of their job, is
20   what you are saying?
21        A.   I am extremely involved in every sale
22   and potential sale at Victory, so it's my
23   preference.
24        Q.   I see.  So if a consumer's credit
25   report is pulled, you would know about it; is
```



1                      S. Orsaris

2    that correct?

3              MR. GOODMAN:  Object to the form.  Go

4    ahead.

5         A.   Yes.

6         Q.   When you pulled a consumer's credit

7    report, would you review that consumer's

8    driver's license prior to pulling the credit

9    report?

10        A.   Yes.

11        Q.   Would you ever, for example, have a

12   sales associate tell you, "Oh, I reviewed the

13   consumer's driver's license and then pulled the

14   credit report" without yourself having reviewed

15   the consumer's driver's license?

16        A.   No.  I met every potential client

17   prior to pulling any credit.

18        Q.   And that would be the case with David

19   Perez as well, correct?

20        A.   It was an 80/20 split between myself

21   and David Perez.

22        Q.   By that you mean he pulled the credit

23   reports about 80 percent of the time?

24        A.   No.

25        Q.   Please explain what you mean.



```
1                        S. Orsaris

2          A.   I pulled 80 percent of the credit,

3    and prior to pulling credit, I met with every

4    customer.

5          Q.   I see.  And he pulled the other

6    20 percent?

7          A.   And he met every customer prior to

8    doing so.

9          Q.   Who is Yessica Vallejo?

10         A.   I answered that already, but she is a

11   finance manager.

12         Q.   When did she start working at Victory

13   Mitsubishi?

14         A.   At inception.

15         Q.   Did she work at Victory Auto Group?

16         A.   Yes.

17         Q.   Did she work at Larchmont Mitsubishi?

18         A.   No.

19         Q.   When she was working at Victory Auto

20   Group, what was her title?

21         A.   Finance manager.

22         Q.   When did she start at Victory Auto

23   Group?

24         A.   I can't recall.

25         Q.   Was it before you had started at
```



```
 1                    S. Orsaris
 2   Victory Auto Group?
 3        A.   Yes.
 4        Q.   Did she have any other titles while
 5   working at Victory Auto Group other than
 6   finance manager?
 7        A.   Yes.
 8        Q.   What were those titles?
 9        A.   A funder.
10        Q.   What is that?  What is a funder?
11        A.   Helps finalize the contracts between
12   the consumer and the lender.
13        Q.   And that position would be supervised
14   by the finance manager; is that correct?
15        A.   Yes.
16        Q.   Are there funders working at Victory
17   Mitsubishi?
18        A.   No.
19        Q.   Why not?
20        A.   Not needed.
21        Q.   Who made the decision that they were
22   not needed; you or Diane?
23             MR. GOODMAN:  Object to form.  Go
24   ahead.
25        A.   I would say both.
```



```
1                    S. Orsaris

2         Q.   And that has been the case since the

3    inception of Victory Mitsubishi; is that

4    correct?

5         A.   Yes.

6         Q.   So what happened to the funders who

7    worked at Victory Auto Group when Victory Auto

8    Group ceased operations and Victory Mitsubishi

9    was started?  Were they just laid off?

10             MR. GOODMAN:  Object to form.  Go

11   ahead.

12        A.   No.

13        Q.   What happened to them?

14        A.   There was only one funder, Yessica

15   Vallejo, and she was promoted to finance

16   manager, and the funder ceased to exist.

17        Q.   What were her main responsibilities

18   as a funder?

19             MR. GOODMAN:  Asked and answered.  Go

20   ahead.

21        A.   Preparing the mailing of contracts to

22   the finance institutions that financed the

23   loan.

24        Q.   And what are her main

25   responsibilities as finance manager?
```



```
1                      S. Orsaris
2         A.    Working with the customer, explaining
3     and going over all local, state, and federal
4     disclosures, as well as in addition to customer
5     service making sure folks are happy with their
6     cars, and budgets were met.
7         Q.    And you are her supervisor at Victory
8     Mitsubishi, correct?
9         A.    Yes.
10        Q.    And how do you supervise her work?
11        A.    I don't understand the question.
12        Q.    How did you evaluate her performance
13    as a finance manager?
14        A.    Nothing really in specific other than
15    just general feedback that I received from
16    clients and financial institutions about her
17    work.
18        Q.    So finance institutions will provide
19    you feedback about her work?
20        A.    Yes.  They love her.
21        Q.    Sorry.  What was that?
22        A.    They love her.  They love working
23    with her.
24        Q.    Oh, good.  And that feedback is
25    provided by email or phone calls, or how is it
```



```
 1                      S. Orsaris

 2    provided?

 3         A.    Phone calls.

 4         Q.    Who is Philip Argyropoulos?

 5         A.    Diane's husband.

 6         Q.    And he is your boss, correct?

 7              MR. GOODMAN:  Object to the form.  Go

 8    ahead.

 9         A.    No.

10         Q.    Has he ever been your boss?

11              MR. GOODMAN:  Object to form.

12         A.    No.

13         Q.    Has he ever given you instructions

14    while you have worked at Victory Mitsubishi?

15              MR. GOODMAN:  Object to the form.  Go

16    ahead.

17         A.    No.

18         Q.    Has he ever given you instructions

19    while you worked at Victory Auto Group?

20              MR. GOODMAN:  Object to the form.  Go

21    ahead.

22         A.    No.

23         Q.    Has he ever given you instructions

24    while you worked at Larchmont Mitsubishi?

25              MR. GOODMAN:  Object to form.  Go
```



1                    S. Orsaris

2    ahead.

3         A.   No.

4         Q.   Has he ever been present in meetings

5    between you and Diane Argyropoulos?

6              MR. GOODMAN:  Note my objection.  You

7    can go ahead.

8         A.   No.

9         Q.   Has he ever been cc'd on emails

10   between you and Diane Argyropoulos?

11             MR. GOODMAN:  Object to form.  Go

12   ahead.

13        A.   No.

14        Q.   Have you ever communicated with

15   Philip Argyropoulos about Victory Mitsubishi?

16             MR. GOODMAN:  Object to form.

17        A.   No.

18        Q.   Has Philip Argyropoulos come to

19   Victory Mitsubishi on a regular basis?

20             MR. GOODMAN:  Object to form.  Go

21   ahead.

22        A.   No.

23        Q.   Has Mr. Argyropoulos ever come into

24   the Victory Mitsubishi dealership?

25             MR. GOODMAN:  Objection.  I am not



```
 1                    S. Orsaris

 2   sure where this is going.  This is getting

 3   pretty far afield here, but go ahead.

 4        A.   I don't know.

 5             MS. CATERINE:  Please just make

 6   objections to form.  We don't need the speaking

 7   objections, please.

 8             MR. GOODMAN:  I don't mean to be --

 9   let's go ahead.

10             MS. CATERINE:  Let me be clear, I am

11   not going to tolerate speaking objections, and

12   I will get the judge on the phone if they

13   continue.

14        Q.   Who is Diane Argyropoulos?

15        A.   I answered this question already, but

16   she is the owner.

17        Q.   And she has been the owner since the

18   inception, correct?

19             MR. GOODMAN:  Asked and answered.  Go

20   ahead.

21        A.   Yes.

22        Q.   And you said she was the owner of

23   Victory Auto Group, correct?

24             MR. GOODMAN:  Object to the form.

25   Asked and answered.  Go ahead.
```



```
 1                    S. Orsaris
 2        A.   I don't know.
 3        Q.   And you mentioned that she did remote
 4   work for Victory Mitsubishi.  Is that done from
 5   her residence?
 6        A.   I don't know.
 7        Q.   Do you know what city she resides in?
 8        A.   No.
 9        Q.   Have you ever had meetings with Ms.
10   Argyropoulos in person?
11        A.   Yes.
12        Q.   Where would those meetings take
13   place?
14        A.   4070 Boston Road.
15        Q.   Would they ever take place in a
16   different location?
17        A.   No.
18        Q.   About how often does she come to the
19   Victory Mitsubishi dealership in person?
20        A.   Frequently.
21        Q.   Every week?
22        A.   Multiple times per week, yes.
23        Q.   Was that the case with Victory Auto
24   Group?
25        A.   Yes.
```



```
1                      S. Orsaris
2         Q.   Has she ever told you about
3    consulting with her husband, Philip
4    Argyropoulos, about decisions related to
5    Victory Mitsubishi?
6              MR. GOODMAN:  Object to the form.  If
7    you understand -- I do not -- go ahead.
8              MS. CATERINE:  This is the last
9    chance I am giving regarding speaking
10   objections.  If you give speaking objections
11   again, I am getting the judge on the phone.
12             MR. GOODMAN:  I would appreciate
13   that.  Let's get him on the phone now.
14             (Pause in the proceedings.)
15        Q.   How did the Mitsubishi dealership
16   adapt to the COVID pandemic?
17             MR. GOODMAN:  Object to the form.
18        A.   We followed all local, state, and
19   federal regulations.
20        Q.   Were the decisions about how to
21   comply with those decisions and regulations,
22   were those decisions made by Philip
23   Argyropoulos?
24        A.   No.
25        Q.   Were those decisions made by Diane
```



```
1                      S. Orsaris

2    Argyropoulos?

3         A.    No.

4         Q.    Who made those decisions?

5         A.    Myself.

6         Q.    Did you consult with Diane when

7    making those decisions?

8         A.    I notified her of the decisions that

9    I made.

10        Q.    Let's take it one step at a time.

11   What happened when the shut-down order was

12   given?

13             MR. GOODMAN:  Object to the form.

14   You can answer.

15        A.    We were essential.

16        Q.    By that you mean you were able to

17   continue operations because you were considered

18   to be essential workers; is that correct?

19        A.    Yes.

20        Q.    Did the operations change in any way

21   during that time immediately following the

22   shutdown order?

23        A.    Four days after the shutdown order

24   was in place, automotive retail sales was

25   considered as essential, and we had operated
```



```
 1                      S. Orsaris
 2    following the guidelines that they wanted us
 3    to.
 4         Q.   What were those guidelines generally?
 5         A.   Appointment only with intent to
 6    purchase.
 7         Q.   And how were appointments made?
 8         A.   People would call and make
 9    appointments for cars.
10         Q.   Could appointments be made online?
11         A.   You could request to speak to someone
12    to make an appointment.
13         Q.   I see.  But the actual making of an
14    appointment would only occur over the phone; is
15    that correct?
16         A.   Yes.
17         Q.   And who would handle those phone
18    calls making appointments?
19         A.   My business development center
20    associates.
21         Q.   About how many of them are there?
22              MR. GOODMAN:  Are there now or --
23              MS. CATERINE:  Were there at the
24    time.
25         A.   Two or three.
```



1              S. Orsaris

2        Q.   By May 30, 2020, what were the

3   current states of operation at Victory

4   Mitsubishi?

5              MR. GOODMAN:   Object to the form of

6   the question.

7        A.   Similar to what it was while

8   everything was shut down.

9        Q.   Just walk me through things.  If I

10  was a customer coming in, I had made an

11  appointment and was coming in on May 30, 2020,

12  what would happen?

13       A.   You would check in with either David

14  or myself.  You were assigned a sales

15  consultant, and you were shown the car that you

16  were interested in.

17             Should you want to proceed forward,

18  you sit down, may be a good time to ask

19  questions if you are a client, get answers to

20  those questions, receive a greeting by myself,

21  always, and opportunity to answer questions.

22       Q.   I am sorry to interrupt you, but I

23  believe this is the court calling.

24             (Conference call with court.)

25             MS. CATERINE:   Could you read back



```
 1                    S. Orsaris

 2    the last couple of sentences?

 3              (Record read.)

 4        A.    And then from there, the customer

 5    would begin the financing process of the

 6    vehicle, which would include completion of the

 7    credit application.  Obviously, also collecting

 8    of the ID or the driver's license of the

 9    individual, which would ultimately be passed

10    back to me, and specifically during that period

11    of time, the majority of it, 98 percent of it,

12    was to me.

13        Q.    Let me just ask you, so I fill out a

14    credit application, and you pull my credit

15    report.  What happens next?  Let's assume I

16    have great credit, the best credit you have

17    ever seen, perfect, 850, whatever.

18        A.    I mean, just before we pull it,

19    there's a verification of who is in front of

20    us, but we would just proceed forward.  It

21    doesn't matter what someone's score is.

22              We would take the vehicle of

23    interest, understand what the customer is

24    looking to invest up front, and submit the

25    information that was already verified by
```



```
1                    S. Orsaris
2    myself to the financial institutions, and
3    receive feedback.  Either it's a go or it's
4    not a go, and then we at that point turn it
5    over to the finance manager to discuss the
6    figures.
7              Sometimes I would be the one to
8    discuss the figures, considering that we were
9    short staffed, and that's that.
10        Q.   I know you said it wouldn't really
11   matter what the credit score was necessarily,
12   but what if you pulled someone's credit and
13   they had no credit history at all?
14        A.   It's circumstantial.  You don't need
15   credit history to necessarily purchase a car.
16        Q.   What about to finance a car?
17        A.   I mean financing of a vehicle.
18   That's what I meant.
19        Q.   It would just affect the terms of the
20   financing; is that right?
21        A.   Depends.
22        Q.   Who would the customer talk to about
23   the financing and the finalized terms of the
24   deal?
25              MR. GOODMAN:  Object to form.
```



```
 1                      S. Orsaris
 2        A.    Speaking in reference to that period
 3    of time?
 4        Q.    Yes, during that period of time.
 5        A.    What part of the financing?
 6        Q.    Maybe you could tell me.  Let's start
 7    from the beginning of the process.  Who would
 8    the customer talk to?
 9            MR. GOODMAN:  Object to the form.
10        A.    They would speak to the sales
11    consultant, myself --
12        Q.    No.  Sorry.  Let me clarify.  I am
13    generally not going to interrupt you.  I'm
14    sorry.  I just don't want to make you have to
15    go through all that again.
16            Once a consumer -- once you are
17    making applications to financial institutions
18    and you get responses back from those
19    financial institutions, who is the consumer
20    going to talk to about those responses?
21        A.    The finance manager.
22        Q.    Would you be present for that as
23    well, or just the finance manager?
24        A.    I was present.
25        Q.    Were you always present, or just some
```



```
1                    S. Orsaris

2    times?

3         A.   Yes.  Even now, I try to be present

4    as frequently as possible.  At that time I was

5    definitely present.

6         Q.   What would that conversation look

7    like?

8              MR. GOODMAN:  Form.  Object to form

9    of the question.

10        A.   It would be a discussion of all

11   required city, state, and federal disclosures.

12        Q.   Would you discuss things like monthly

13   payments?

14        A.   That was part of the city, state, and

15   federal regulations.  Yes.

16             MR. GOODMAN:  Let her finish first.

17        Q.   Based on that discussion that there

18   were terms that were agreeable to the consumer,

19   what would happen?

20        A.   We would proceed forward with the

21   sale.

22        Q.   And what would that look like?

23             MR. GOODMAN:  What would that look

24   like?  Objection.  Form.

25        A.   The finance manager would begin
```



```
 1                    S. Orsaris
 2   preparing the paperwork.  The vehicle would be
 3   prepared.  The factory time, literally
 4   additionally for COVID protection, especially
 5   on the interior of the vehicle, and just
 6   registration process.  All those things would
 7   begin kind of simultaneously, for the most
 8   part.
 9        Q.   What sort of paperwork would there be
10   for the final sale?
11        A.   Purchase order, a bill of sale, a
12   retail installment contract, any extended
13   warranties, any additional products that were
14   purchased, all the New York City Department of
15   Consumer Affairs, now DCWP, paperwork as well,
16   in addition to recall sheets, CarMax.  I don't
17   think I am missing anything, but that would be
18   it.
19        Q.   What program would you use to create
20   that paperwork?
21             MR. GOODMAN:  Object to the form.
22        Q.   Or programs, if there is more than
23   one.
24             MR. GOODMAN:  Object to the form.  Go
25   ahead.
```



```
 1                        S. Orsaris
 2        A.    I would say 90 percent would
 3   Dealertrack, and some of the things like a
 4   CarMax would be on my website, CARFAX was on
 5   the website, and the warrantee administration
 6   website.  And that should knock out -- and.
 7              Then -- I apologize.  The DMV
 8   paperwork would be done, verified, on the New
 9   York State Department of Motor Vehicles
10   website.
11              MR. GOODMAN:  I am going to step away
12   for one second.  Stay on the line.
13              (Pause in the proceedings.)
14        Q.    During May of 2020, was Victory
15   Mitsubishi accepting online applications for
16   vehicles?
17              MR. GOODMAN:  Object to the form.
18   You can answer.
19        A.    Online application, what is the
20   definition of that?
21        Q.    Did Victory Mitsubishi have any
22   application process through its website during
23   May of 2020?
24              MR. GOODMAN:  Object to form.  Go
25   ahead.
```



```
 1                    S. Orsaris
 2        A.    Pre-qualification can be done on the
 3   website, but there was no remote sales being
 4   done.
 5        Q.    I am sorry.  What was that
 6   information from the online application used
 7   for?
 8        A.    Pre-qualification.
 9        Q.    Where would that information from the
10   online application go in your computer systems?
11             MR. GOODMAN:  Object to the form.
12        A.    DealerSocket.
13        Q.    Can you search DealerSocket by
14   customer name?
15             MR. GOODMAN:  Object to form.  Time
16   frame?
17        Q.    During May of 2020?
18        A.    Yes.
19        Q.    Could you search it by phone number?
20        A.    Yes.
21        Q.    Could you search it by email address?
22        A.    Yes.
23        Q.    Who trained you in how to use
24   DealerSocket?
25        A.    DealerSocket?  They trained me.
```



1                     S. Orsaris

2        Q.   There is a company called

3   DealerSocket which trained you in how to use

4   the software?

5        A.   Yes.

6        Q.   And who arranged that training?

7        A.   They did.

8        Q.   And that training was arranged when?

9        A.   At the inception of Victory

10   Mitsubishi.

11        Q.   Was that training part of the

12   purchase of DealerSocket software?

13        A.   Yes.

14        Q.   Who arranged for the purchase of the

15   DealerSocket software?

16             MR. GOODMAN:  Object to form.  Go

17   ahead.

18        A.   I did.

19        Q.   Did they use DealerSocket at Victory

20   Auto Group?

21        A.   Yes.

22        Q.   Whose decision was it to use

23   DealerSocket at Victory Auto Group?

24        A.   Diane.

25        Q.   Did they use DealerSocket at



```
 1                     S. Orsaris
 2    Larchmont Mitsubishi?
 3              MR. GOODMAN:  Object to form.
 4         A.   I don't recall.
 5         Q.   Did they use Dealertrack at Larchmont
 6    Mitsubishi?
 7              MR. GOODMAN:  Form.  Objection.
 8         A.   Yes.
 9         Q.   Whose decision was it to use
10    Dealertrack at Larchmont Mitsubishi?
11         A.   Diane.
12         Q.   Who trained you in how to
13    Dealertrack?
14         A.   Dealertrack.
15         Q.   Who arranged for the training by
16    Dealertrack?
17              MR. GOODMAN:  Object to form.
18         A.   I did.
19         Q.   You arranged for the training at
20    Larchmont Mitsubishi?
21         A.   No.
22         Q.   I see.
23         A.   I assumed you were speaking of
24    May 2020 at Victory Mitsubishi, if that could
25    just be stated.
```



1                      S. Orsaris

2        Q.    Sure.  Let me clarify.  Did you

3   receive training on how to use Dealertrack when

4   you worked at Larchmont Mitsubishi?

5        A.    Yes.

6        Q.    Who arranged for that training?

7              MR. GOODMAN:  Object to form.

8        A.    Diane.

9        Q.    That was training put on by

10  Dealertrack as well?

11       A.    Yes.

12       Q.    Did someone from Dealertrack actually

13  come into the dealership to give this training?

14       A.    Yes.

15       Q.    Just to clarify what you might have

16  said in prior testimony, you arranged for a

17  Dealertrack training at Victory Mitsubishi; is

18  that correct?

19             MR. GOODMAN:  Object to form.  Asked

20  and answered.  Go ahead.

21       A.    Yes.

22       Q.    Was that training at the inception of

23  Victory Mitsubishi?

24       A.    Yes.

25       Q.    Have you trained any employees in how



```
 1                    S. Orsaris
 2   to use Dealertrack after that training at the
 3   inception of Victory Mitsubishi?
 4           MR. GOODMAN:  Can I have that
 5   question read back?
 6           (Record read.)
 7      A.   I did not conduct any single or sole
 8   training for any employee.  It was a group
 9   training with myself and also our
10   representative from Dealertrack.
11      Q.   If employees had questions about how
12   to use things in Dealertrack, who would they
13   ask?
14      A.   Dealertrack.
15      Q.   Was there like a help line, or is
16   there currently a help line for getting that
17   assistance?
18      A.   Yes.
19      Q.   And that was the case in May of 2020?
20      A.   Yes.
21      Q.   And the training that Dealertrack put
22   on at the inception of the Victory Mitsubishi,
23   did that include training as to the pulling of
24   credit reports?
25      A.   When using the software, yes.
```



```
 1                     S. Orsaris
 2       Q.   Who was trained in how to use the
 3   Dealertrack software to pull credit reports?
 4            MR. GOODMAN:  Can I hear the question
 5   again?
 6            (Record read.)
 7            MR. GOODMAN:  Go ahead.
 8       A.   Back then or now?  Can I have the
 9   time frame, please?
10       Q.   At the training during the inception
11   of Victory Mitsubishi.
12       A.   Can I just hear the entire question
13   one more time?  I kind of lost track.
14            (Record read.)
15       A.   Myself and the finance managers.
16       Q.   And when did David Perez receive
17   training on how to use Dealertrack to pull
18   credit reports?
19       A.   During his training of becoming a
20   sales manager.
21       Q.   And who gave that training?
22       A.   Dealertrack.
23       Q.   And when was that?
24       A.   Spring of 2018.
25       Q.   And that training would consist of
```



```
 1                    S. Orsaris

 2   showing the employees how to log into

 3   Dealertrack in part, correct?

 4        A.   Yes.

 5        Q.   And showing them how to insert

 6   information from the credit application to pull

 7   the credit report, correct?

 8        A.   Yes.

 9        Q.   Did the training include information

10   about the permissible purposes for pulling

11   credit reports?

12        A.   Yes.

13        Q.   And what was that information?

14             MR. GOODMAN:  Object to form.  Go

15   ahead.

16        A.   Can you rephrase that question?

17        Q.   What information was provided during

18   the training about the permissible purposes for

19   pulling credit reports?

20        A.   You would just have to -- it's part

21   of understanding the local, state, and federal

22   regulation regarding that, and we received

23   training on that.

24        Q.   Did Dealertrack provide any physical

25   documents during these trainings?
```



```
 1                    S. Orsaris
 2        A.   I don't recall.
 3        Q.   Do you have any physical documents
 4   from Dealertrack like a handbook or a manual?
 5        A.   No.
 6        Q.   Do you have any electronic handbooks
 7   or manuals or similar documents such as in a
 8   PDF form?
 9        A.   Not in my possession.
10        Q.   Video recordings are made of the
11   sales of the dealership, correct?
12        A.   Yes.
13        Q.   Are all sales recorded?
14        A.   Yes.
15        Q.   How long are those video recordings
16   retained?
17             MR. GOODMAN:  Object.  Form.  Time
18   frame?
19        A.   Whenever -- when is the time frame?
20   What are we talking?
21        Q.   During May of 2020.
22        A.   Thirty days.
23        Q.   Is that the policy today?
24        A.   No.
25        Q.   What is the policy today?
```



```
 1                    S. Orsaris
 2        A.   Depending where.
 3        Q.   To clarify, how long the video
 4   recordings are retained depends on where they
 5   are made; is that correct?
 6        A.   Presently, there is more -- there is
 7   video or cameras for the lot, for our
 8   merchandise, and then there is video cameras
 9   inside of the finance offices.  Finance offices
10   now go a year back, and the merchandise is 45
11   days.
12        Q.   Why was the policy changed?
13        A.   We were broken into a lot during June
14   of 2020, and most recently in January of 2022
15   six times.
16        Q.   Did you report these break-ins to the
17   police?
18        A.   Yes.
19        Q.   To your knowledge, has anyone been
20   prosecuted for these break-ins?
21        A.   Yes, I think.  At least one instance,
22   I believe they were prosecuted.
23        Q.   Was that one instance for the
24   break-ins in 2020 or the recent break-ins in
25   2022?
```



1                      S. Orsaris

2        A.    I don't have specific knowledge on

3    the 2020 one, but I believe in one of the

4    January 2022 break-ins, I believe they were

5    prosecuted.  They broke into seven places in

6    one evening, and they were arrested.

7        Q.    When was the first of these

8    break-ins?

9        A.    The first evening -- I can't tell you

10   the date specifically -- I would say the first

11   evening of when the city imposed a curfew back

12   in 2020.

13       Q.    I see.

14       A.    That evening or the following

15   evening, something like that.

16       Q.    And when did you change the policy as

17   to the retention of video recordings?

18       A.    February of this year.

19       Q.    And that decision was made by you,

20   Stavros Orsaris?

21       A.    Yes.

22       Q.    Did you consult with Diane on making

23   that decision?

24       A.    I informed her before I made the

25   decision.



1                      S. Orsaris

2        Q.    Was this lawsuit a factor in making

3    that decision?

4        A.    No.  It was before.

5        Q.    What do you mean by before?

6        A.    February of 2021 is when I upgraded

7    all my software.  My office was torn apart,

8    glass everywhere, so I said we have to install

9    more cameras.  This has to stop.

10        Q.    Who made the decision about the

11    retention of video recordings for 30 days back

12    when that policy was in effect?

13        A.    I did.

14        Q.    And did you consult with Diane in

15    making that decision?

16        A.    I informed her that the decision was

17    made.

18        Q.    And what was the basis for making the

19    decision to retain video recordings for 30

20    days?

21        A.    My prior experience at Victory Auto

22    Group and Larchmont Mitsubishi, I never had to

23    refer to any video; never had any issues that

24    led me to leading to.

25        Q.    So if I understand your testimony



```
1                      S. Orsaris
2    correctly, it wasn't necessary to retain video
3    recordings for more than 30 days because you
4    had not had to use those video recordings; is
5    that correct?
6              MR. GOODMAN:  Objection.  Form.
7         A.   You can never really -- I had access
8    and never really felt the need to access my
9    video recordings.  I never was asked to show my
10   video recordings, so I had it for 30 days.
11             MR. GOODMAN:  When you reach a point
12   you are comfortable, if we could take a
13   five-minute break, please.
14        Q.   Sure.  Or we could break for lunch,
15   Mr. Orsaris, if you would like to do that,
16   whatever your preference is, but let me ask a
17   couple of questions.
18             MR. GOODMAN:  That's fine.  Go ahead.
19        Q.   Is it your understanding that a
20   30-day retention of video recordings is
21   standard industry practice?
22             MR. GOODMAN:  Objection.  Form.
23        A.   I have no knowledge as to what the
24   standard industry practice is when it comes to
25   video recordings.
```



```
 1                      S. Orsaris
 2        Q.   Do you know of any dealership that
 3   retains video recordings for longer than 30
 4   days?
 5              MR. GOODMAN:  Objection.  Form.
 6        A.   No.
 7              MR. GOODMAN:  Again, time frame.
 8              MS. CATERINE:  Off the record.
 9              (Discussion off the record.)
10        Q.   You testified earlier, if I
11   understand you correctly, that you had
12   terminated employees based on performance; is
13   that correct?
14              MR. GOODMAN:  Object to form.  Asked
15   and answered.  Go ahead.
16        A.   I could, but maybe one or two
17   instances in which I have.
18        Q.   And what would performance there mean
19   other than the number of sales the employee
20   made?
21        A.   Lack of being able to communicate
22   with customers, management; making sure people
23   are obtaining vehicles that match their wants
24   and needs, listening; and providing good
25   customer service.
```



```
 1                   S. Orsaris
 2        Q.   So something that would count against
 3   performance would be if a customer was upset at
 4   an employee for some reason; would that be
 5   right?
 6             MR. GOODMAN:  Form.  Objection.
 7        A.   I mean, there hasn't been an instance
 8   of that, but that's definitely a possibility,
 9   but there is no specific instance of a customer
10   being upset at a salesperson.
11        Q.   If a customer comes into the
12   dealership upset about something, is there
13   someone who they would be referred to
14   automatically, or is it going to depend on what
15   they are upset about?
16             MR. GOODMAN:  Objection.  Form of the
17   question.
18        A.   Every single upset customer would be
19   referred directly to me.
20             MR. GOODMAN:  Again, time frame.
21        Q.   How often do you work?  What is your
22   general work schedule?
23        A.   Monday through Saturday, open to
24   close.
25        Q.   How many hours is that in total?
```



```
 1                   S. Orsaris
 2        A.   It varies.
 3        Q.   Generally speaking.
 4        A.   Under 70.  Between 60 and 70
 5   depending on the season.  There's a little bit
 6   of seasonality in automotive retail sales.
 7        Q.   Do you get vacation, paid vacation?
 8        A.   Yes.
 9        Q.   How much paid vacation do you get per
10   year?
11        A.   I don't know.  I don't take many
12   vacations.
13        Q.   When was the last vacation you took?
14        A.   May of this year.
15        Q.   How long were you on vacation?
16        A.   Four days.
17        Q.   During that time, if a customer came
18   in with a complaint, who would they speak to?
19             MR. GOODMAN:  Objection.  Go ahead.
20        A.   They would speak to a sales manager
21   that I would allocate.  They would work with
22   me.  I stay connected.
23        Q.   Have you ever represented yourself as
24   the son of the owner of the dealership?
25        A.   No.
```



```
1                      S. Orsaris
2        Q.   Do Philip and Diane Argyropoulos have
3    any children?
4             MR. GOODMAN:  Note my objection.  Go
5    ahead.
6        A.   Yes.
7        Q.   Do they work at the dealership?
8        A.   No.
9        Q.   How many children do they have?
10       A.   Three.
11       Q.   Do they have any sons?
12       A.   No.
13       Q.   So three daughters, correct?
14            MR. GOODMAN:  Asked and answered.  Go
15   ahead.
16       A.   Yes.
17       Q.   Has Chris Orsaris ever come into
18   Victory Mitsubishi?
19       A.   Extremely infrequently.
20       Q.   What were the circumstances of him
21   coming in?
22       A.   Inventory.
23       Q.   What do you mean by "inventory"?
24       A.   Seeing our vehicles.
25       Q.   So as a customer; is that right?
```



```
 1                    S. Orsaris
 2        A.   No.
 3        Q.   No.  Well, could you explain to me,
 4   then?
 5        A.   He assists with inventory decisions.
 6        Q.   But I thought he didn't work at
 7   Victory Mitsubishi.  Why is he assisting with
 8   inventory decisions?
 9             MR. GOODMAN:  Objection.  Form.
10        A.   He does not work for Victory
11   Mitsubishi.
12        Q.   Is that your entire answer?
13        A.   He doesn't work for Victory
14   Mitsubishi, yeah.
15             MS. CATERINE:  Can you read back the
16   question, please?
17             (Record read.)
18             MR. GOODMAN:  Objection to form.
19        A.   We consult -- that's myself, when I
20   use the word "we" -- consult with Chris on our
21   inventory.  He is an independent buyer that we
22   use to purchase vehicles.
23        Q.   I see.  Does he receive compensation
24   for that?
25             MR. GOODMAN:  Object to the form.
```



1                    S. Orsaris

2        A.   I don't know the structure of his

3   compensation.  I do know it's per vehicle

4   purchase.

5        Q.   And who would know that?

6        A.   Diane.

7        Q.   Does Chris perform this service

8   through a company?

9        A.   Yes.

10        Q.   And what is the name of that company?

11        A.   I don't know.

12        Q.   Is there a contract between Chris and

13   Victory Mitsubishi?

14             MR. GOODMAN:  Object to the form.

15        A.   I don't know.

16        Q.   Has Chris provided this service since

17   the inception of Victory Mitsubishi?

18        A.   Yes.

19        Q.   And you are aware of your father's

20   criminal history, correct?

21             MR. GOODMAN:  Object to the form.

22        A.   Yes.

23        Q.   And Diane didn't have any issue with

24   that prior criminal history in retaining his

25   services?



1                         S. Orsaris

2                 MR. GOODMAN:  Object to form.

3          A.    I am not Diane.

4          Q.    So I would have to ask Diane, is what

5     you are saying?

6          A.    Yes.

7          Q.    Were you involved in the decision to

8     retain Chris's services?

9          A.    No.

10         Q.    Did you introduce Chris to Diane?

11                MR. GOODMAN:  Object to form.  Go

12    ahead.

13         A.    No.

14         Q.    Do you know how they met?

15         A.    No.

16         Q.    Do you know when they met?

17         A.    No.

18         Q.    Did Chris provide these services for

19    Victory Auto Group?

20         A.    Yes.

21         Q.    Did Chris provide these services for

22    Larchmont Mitsubishi?

23         A.    I can't recall.

24         Q.    Was Chris Orsaris the one who told

25    you about the open position that you applied



```
 1                    S. Orsaris
 2   for at Larchmont Mitsubishi?
 3             MR. GOODMAN:  Object to form.
 4   Mischaracterizes.  Go ahead.
 5        A.   No.
 6        Q.   When you worked at Larchmont
 7   Mitsubishi, were you given any trainings on
 8   preventing identity theft?
 9        A.   During my training with Dealertrack
10   there was thorough discussion regarding prior
11   to running credit, what you should look out
12   for.
13        Q.   When you say "what to look out for,"
14   you mean -- well, what do you mean by that?
15        A.   Quality of the driver's license,
16   quality of the information that was provided on
17   the credit application, the intuition that is
18   required to kind of see if maybe somebody is
19   trying to do something, you have a criminal in
20   front of you, and keep your eyes peeled.  I was
21   told that can potentially happen.  And then I
22   remember receiving training on the tools that
23   Dealertrack does have to help prevent identity
24   theft.
25        Q.   Were similar trainings given when
```



```
 1                      S. Orsaris
 2    Dealertrack gave trainings at Victory Auto
 3    Group and Victory Mitsubishi?
 4         A.   Yes.
 5         Q.   Does Victory Mitsubishi verify
 6    driver's licenses?
 7              MR. GOODMAN:  Objection to form.
 8         A.   What is your definition of verifying
 9    licenses?
10         Q.   Do you have an answer to the
11    question, or would you like me to rephrase the
12    question?
13         A.   Are you asking me if I scan IDs?
14    Verification, what is the definition of
15    verification in the context of the question you
16    asked?
17         Q.   I know it's natural when you are
18    having a conversation with a person that you
19    might ask them questions, but I just ask you to
20    either answer the question or ask me to
21    rephrase the question.
22              MR. GOODMAN:  Note my objection to
23    that.
24         A.   I verify personally the driver's
25    license to the extent that I could.
```



1                       S. Orsaris

2        Q.   And how do you do that?

3        A.   I actually see the physical ID, the

4    physical driver's license, and the copy, in

5    case there is any watermarks and things like

6    that that should be transferred over.

7    Different states have different watermarks and

8    things like that.  New York State has its own,

9    Connecticut has its own, New Jersey has its

10   own, so on and so forth.

11       Q.   When you are looking at the driver's

12   license, what sort of things are you looking

13   for?  You mentioned quality.  What do you mean

14   by that?

15       A.   Make sure it's real.  That's the

16   first thing that I would do.

17       Q.   And how would you be able to tell

18   that it's real?

19       A.   Every state has its own watermarks or

20   security provisions or security measure on

21   their identification.  New York has its own.

22   They recently changed theirs, and I know how I

23   should be looking at the license to tell

24   whether it is real or not.

25       Q.   Other than confirming that the



1                    S. Orsaris

2    driver's license is real, is there anything

3    else you do in terms of verifying the driver's

4    license?

5         A.   The picture, make sure it matches up

6    with the person that's in the building.

7         Q.   I know this might sound like a silly

8    question, but how do you do that?  Do you hold

9    it up?  What do you do specifically?

10        A.   I could hold it up if I needed to,

11   but I don't recall a situation in which I did.

12        Q.   Would you look at the picture on the

13   driver's license, look at the consumer in front

14   of you, and confirm that it appears to be the

15   same person?

16             MR. GOODMAN:  Object to the form.

17        A.   And then you also cross reference

18   that license, make sure the spelling and

19   everything you put on the credit application is

20   accurate, date of birth.

21             One thing I do pay extra attention

22   to is the address.

23        Q.   What if the address on the driver's

24   license doesn't match the address on the credit

25   application?



1                    S. Orsaris

2        A.    Let's not run the credit just yet.

3   Let's have a conversation with the consumer.

4        Q.    Have there been any instances of

5   identity theft happening at Victory Mitsubishi?

6              MR. GOODMAN:  Object to the form.

7   You can answer.

8        A.    No.

9        Q.    Have police officers ever come into

10  Victory Mitsubishi to speak with you as general

11  manager of Victory Mitsubishi?

12             MR. GOODMAN:  Ever?  Object to form.

13  Go ahead.

14       A.    Yeah.  I was broken into a couple of

15  times.

16       Q.    Other than during those break-ins.

17       A.    I can't recall, no.

18       Q.    Has Diane ever told you that she has

19  spoken with a police officer about something

20  regarding Victory Mitsubishi?

21             MR. GOODMAN:  Object to form.  Go

22  ahead.

23       A.    When we had the break-ins.

24       Q.    Other than the break-ins?

25       A.    Can't recall an instance of her



```
1                       S. Orsaris
2    speaking with me about that.
3         Q.   Did a consumer ever tell you that a
4    vehicle was sold or financed in their name
5    without their authorization?
6              MR. GOODMAN:  Object to the form.
7    You can answer.
8         A.   Other than this case, situation, no.
9         Q.   I would like you to take a look at
10   what I am going to have marked as Exhibit 28,
11   which is Bates stamped Subpoena Responses 463
12   to 484.
13             When I say Bates stamped, that means
14   there is something on the bottom of the page
15   that says Subpoena Responses 463, Subpoena
16   Responses 464, and so on.
17             Just let me know when you have that
18   document in front of you.
19             (Subpoena responses, Bates stamp 463
20   to 484, marked Defendants' Exhibit 28.)
21        A.   I have it in front of me.
22        Q.   What are these documents?
23             MR. GOODMAN:  Take a look at it.
24   Take your time.
25        Q.   Take your time, please.
```



1               S. Orsaris
2          (Pause in the proceedings.)
3     A.   This is the Dealer Sales and Service
4    Agreement between Spartan Auto Group LLC and
5    Mitsubishi of North America.
6     Q.   Were you, Stavros Orsaris, involved
7    with the negotiation or the execution of these
8    agreements?
9     A.   No.
10     Q.   Did you review these documents in
11    preparation for your deposition today?
12     A.   No.
13     Q.   Have you seen these documents prior
14    to today?
15     A.   No.
16     Q.   Turn to the page Subpoena Responses
17    468, please.  Why was this agreement signed by
18    Philip Argyropoulos?
19     A.   You would have to ask Philip
20    Argyropoulos.
21     Q.   So you do not know why it was signed
22    by Philip Argyropoulos; is that correct?
23     A.   I do not know.
24     Q.   What does it say there for his title?
25     A.   I can't make it out.



1                          S. Orsaris

2          Q.   I won't tell on you when I depose him

3     that you can't read his handwriting, but it

4     seems to me from what I could read that it says

5     DLR PRINC.  Does that seem like a reasonable

6     interpretation?

7               MR. GOODMAN:  Object to the form.  Go

8     ahead.

9          A.   I can't say for sure.

10         Q.   It seems like his title here is

11    dealer principal.  Why would his title be

12    listed as dealer principal?

13              MR. GOODMAN:  Object to the form.

14         A.   I don't know.

15         Q.   Go back to the page Bates stamped

16    Subpoena Responses 464, please.

17         A.   Okay.

18         Q.   You see at the top of this page an

19    item that says ownership of dealer?

20         A.   Yeah.

21         Q.   And that lists Diane Argyropoulos and

22    Philip Argyropoulos; is that correct?

23         A.   Yes.

24         Q.   And you previously testified that

25    Diane was the owner of Victory Mitsubishi; is



1                      S. Orsaris

2    that correct?

3         A.   She is the owner of Victory

4    Mitsubishi, yes.

5         Q.   And you previously testified that

6    Philip was not the owner of Victory Mitsubishi;

7    is that correct?

8              MR. GOODMAN:  Object to form.  Go

9    ahead.

10        A.   He is not the owner of Victory

11   Mitsubishi.

12        Q.   So why is he listed here as an owner

13   of Victory Mitsubishi?

14             MR. GOODMAN:  Object to form.

15        A.   I don't know.

16        Q.   His title here is listed as manager.

17   Why is Philip Argyropoulos listed as a manager

18   of Victory Mitsubishi?

19        A.   I don't know.  It is my understanding

20   that Diane Argyropoulos is 100 percent owner of

21   Victory Mitsubishi.

22        Q.   Was that the case when Victory

23   Mitsubishi started?

24             MR. GOODMAN:  Object to form.  Go

25   ahead.



1                   S. Orsaris

2        A.   I don't know.

3        Q.   If I understand your testimony

4   correctly, it has been your understanding that

5   Diane has been the only owner of Victory

6   Mitsubishi; is that correct?

7        A.   Yes.

8        Q.   It says here under the column

9   Involvement in Management, it lists as active

10  for Philip Argyropoulos.  Do you see that?

11       A.   Yes.

12       Q.   And you previously testified that you

13  have not seen Philip Argyropoulos in the

14  dealership; is that correct?

15       A.   Yes.

16       Q.   So why is he listed as actively

17  involved in the management of the dealership

18  when the dealership's general manager has never

19  seen him in the dealership?

20            MR. GOODMAN:  Object to form of the

21  question.

22       A.   Diane is the only one that's

23  involved, is 100 percent owner, is my

24  understanding, of Victory Mitsubishi.

25       Q.   So you don't know why it lists Philip



```
 1                      S. Orsaris
 2     as actively involved in management here?
 3             MR. GOODMAN:  Object to the form.
 4        A.   I don't know why.
 5        Q.   David Perez testified on Monday that
 6     he didn't know Diane Argyropoulos.  Why didn't
 7     he know Diane Argyropoulos?
 8             MR. GOODMAN:  Objection.  Form.
 9     Mischaracterizes.
10        A.   Chain of command.  I was David's
11     direct supervisor.
12        Q.   So Diane doesn't deal with any of the
13     employees of the dealership besides yourself;
14     is that correct?
15             MR. GOODMAN:  Objection.  Form.
16        A.   I managed all the employees of
17     Victory Mitsubishi.
18             MS. CATERINE:  Could you read back
19     the question, please?
20             (Record read.)
21        Q.   Yes or no?
22        A.   Diane has the ability to.  I am sure
23     she has.  I do the majority of the dealing with
24     the employees at Victory Mitsubishi.
25        Q.   Could you turn to the page Bates
```



```
 1                    S. Orsaris

 2    stamped Subpoena Responses 480, please.

 3         A.    Okay.

 4         Q.    This page shows Diane as the sole

 5    owner in the agreement with Mitsubishi on

 6    September 20, 2022, correct?

 7         A.    Yes.

 8         Q.    Do you know when this lawsuit was

 9    filed?

10         A.    Not the specific date, but the month.

11         Q.    What is your understanding?

12         A.    May.

13         Q.    The ownership was changed in this

14    agreement because of the lawsuit, correct?

15              MR. GOODMAN:  Object to form.  Also

16    argumentative, but objection.

17         A.    The answer is definitively no.

18         Q.    I thought you said you weren't

19    involved with the negotiation and execution of

20    this agreement, of these agreements.  Excuse

21    me.

22              MR. GOODMAN:  Object to form.

23         A.    I have strong relationships with many

24    folks at Mitsubishi.  I don't have these

25    contracts, but I understand what's going on.  I
```



```
1                    S. Orsaris

2    have a very strong relationship with senior

3    management team at Mitsubishi North America.

4         Q.   You say that, but you didn't seem to

5    be aware that Philip Argyropoulos was listed as

6    an owner and active manager of the dealer in

7    prior agreements.

8              MR. GOODMAN:  Object to the form.

9         Q.   Why is that?

10             MR. GOODMAN:  Objection.  Form.

11        A.   What is your question again?  Can you

12   rephrase it?

13        Q.   If you are aware based on your

14   relationships with Mitsubishi senior management

15   team, why were you not aware that Philip

16   Argyropoulos was listed as an owner and active

17   manager of Spartan Auto Group LLC?

18             MR. GOODMAN:  Object to the form of

19   the question.

20        A.   I manage the general operation, and

21   the relationship between Mitsubishi and Spartan

22   Auto Group LLC, I don't think that ever came up

23   in conversation.

24        Q.   What do you remember about the

25   investigation and subsequent lawsuit against
```



```
1                      S. Orsaris
2     Victory Auto Group by the New York Attorney
3     General?
4              MR. GOODMAN:  Note my objection.  At
5     this point if you want to call it a talking
6     objection, you can, but we probably should call
7     the court.  That subject is the subject of a
8     motion pending before the Court.  We moved to
9     strike those allegations from the complaint,
10    and I therefore submit that that is not an
11    appropriate line of questioning for this
12    deposition, and particularly this witness.
13             MS. CATERINE:  Sure.  Does anyone
14    remember off the top of their head when the
15    Court says they are not available -- I have it
16    right here.  They are not available
17    between 12:30 and 1:30, so it looks like we
18    probably wouldn't be able to reach them right
19    now.
20             Let's get the Court on the phone
21    after we take our lunch, and for now I will
22    move on, we will return to this issue after
23    lunch.
24             MR. GOODMAN:  Just for clarity, when
25    we talk to the Court, I understand that --
```



1                      S. Orsaris

2    well, I am asking, do you intend to inquire as

3    to the other allegations in the complaint about

4    other --

5              MS. CATERINE:  Let's just do all of

6    them.  I actual am not sure whether I am going

7    to, but just in case it does come up for

8    questioning somehow, let's just put that all

9    before the Court together at the same time.

10        Q.   Mr. Orsaris, what do you remember

11   about the Farah Jean Francois account?

12             MR. GOODMAN:  Object to the form.  Go

13   ahead.

14        A.   Repeat the question, please.

15        Q.   Let me rephrase the question.  Well,

16   did you not hear me, or did you want me to

17   rephrase?

18        A.   I didn't hear you.

19             MS. CATERINE:  Read it back, please.

20             (Record read.)

21             MR. GOODMAN:  Was the question "case"

22   or "account"?

23             MS. CATERINE:  I believe I said

24   "account."

25             MR. GOODMAN:  The form objection was



1                          S. Orsaris

2      based on the word "account."  If it is case, I

3      have no objection.

4           A.   Was it account?

5           Q.   It was account.

6                MR. GOODMAN:  Object to form if

7      that's going to stand as the question.

8                MS. CATERINE:  Yes.

9           A.   I have recollection, a little bit of

10     recollection, of the day they bought the car;

11     our conversations with them when they came back

12     to re-sign; and, in addition, I vividly

13     remember when she visited the dealership to let

14     us know something happened.

15          Q.   When you say "when they came in," who

16     are you referring to?

17          A.   In which part?

18          Q.   Let's start from the beginning.

19          A.   I remember this vehicle being sold in

20     the beginning.  I have a recollection of them

21     visiting the facility again in June, and then I

22     have a recollection of when she came in

23     September.

24                MS. CATERINE:  Could you read back my

25     question, please.



```
1                    S. Orsaris
2              (Record read.)
3      A.   Emmanuel Laforest and what I would
4  presume is Farah Francois.
5      Q.   When was that?
6      A.   May 30th and -- I don't have the
7  paper in front of me, but I think June 29th is
8  when they came back again.
9      Q.   So it was two people, Emmanuel
10 Laforest and Farah Jean Francois; is that
11 correct?
12             MR. GOODMAN:  Object to form.
13     A.   My recollection of the documentation
14 that I collected that day, and my policies and
15 procedures that I have inside Victory
16 Mitsubishi, those two were present, yes.
17     Q.   Do you remember seeing them, or you
18 are just basing this on your review of the
19 documentation?
20     A.   Based on the visit in September.  I
21 do have a recollection of events that occurred
22 on 5/30 and 6/29.
23     Q.   I am not sure that answered my
24 question.  Do you remember seeing Emmanuel
25 Laforest on May 30th, 2020?
```



```
1                       S. Orsaris
2         A.    I don't have a specific recollection
3    of him being there, but based on the policies
4    and procedures that I have in place, the
5    documentation that was collected, two people
6    were present, which I would presume is Emmanuel
7    Laforest and Farah Francois.
8         Q.    Did you ever see Mr. Laforest outside
9    of May 30th and June 29th?
10        A.    No.
11              MR. GOODMAN:   Object to form.   Go
12   ahead.   He answered.
13        Q.    What does Mr. Laforest look like?
14        A.    I can't describe him.
15        Q.    Do you remember anything about him
16   physically?
17        A.    No.
18        Q.    Do you remember the first time that
19   Mr. Laforest contacted Victory Mitsubishi?
20        A.    I wasn't involved when he initially
21   inquired about the car before May 30th.
22        Q.    And who was involved with that?
23        A.    One of our business development
24   center associates that he was speaking to when
25   he inquired about a car.
```



```
1                        S. Orsaris
2        Q.   How did they communicate?
3        A.   Via phone, like a phone call, in
4   addition to text messages.
5        Q.   How many phone calls were there?
6        A.   I can't recall, but may have been a
7   few.
8        Q.   How do you know that they spoke with
9   him on the phone?
10       A.    Information is on DealerSocket.
11       Q.   How do you see that on DealerSocket?
12            MR. GOODMAN:  Object to the form.
13       A.    Search the name.
14       Q.   So you searched Emmanuel Laforest,
15  and what would come up when you searched for
16  Emmanuel Laforest?
17            MR. GOODMAN:  Object to the form.
18       A.    The customer profile.
19       Q.   What does the customer profile
20  include?
21       A.    All communication.
22       Q.   And that would include phone calls?
23       A.    Phone calls, text messages, emails,
24  and general emails about our inventory, the
25  vehicle that they were interested in, the
```



```
 1                    S. Orsaris
 2   initial lead when they inquired about the car,
 3   where they found the vehicle, which website, so
 4   on and so forth.
 5        Q.   All right, great.
 6             MS. CATERINE:  We are going to call
 7   for the production of the customer profiles on
 8   DealerSocket of Emmanuel Laforest, Farah Jean
 9   Francois, Jami Singer, and any other customer
10   profiles related to the sale of the vehicle.
11             MR. GOODMAN:  Take it under
12   advisement.  I believe it has been disclosed.
13             THE WITNESS:  That has been sent.
14             MR. GOODMAN:  But to the extent that
15   they weren't -- I am pretty sure they were --
16   take it under advisement.
17        Q.   Victory Mitsubishi accepts online
18   applications for cars from websites like
19   cars.com and Edmunds, correct?
20             MR. GOODMAN:  Object to form.  Go
21   ahead.
22        A.   On an application as in filling out
23   personal credit information, to my knowledge,
24   no.
25        Q.   What about leads?
```



1                      S. Orsaris

2          A.   For a first name, optional last name,

3    phone number or email.

4          Q.   Are there any other websites that

5    provide leads to Victory Mitsubishi?

6               MR. GOODMAN:  Other than --

7          Q.   Other than cars.com and Edmunds?

8          A.   CarGurus.  TrueCar as well, and

9    Capital One has a listing on their own website.

10   That's all I can recall at the time.  I don't

11   know if there's another one.

12              MS. CATERINE:  Off the record.

13              (Discussion off the record.)

14         Q.   What do you remember about the leads

15   that Victory Mitsubishi received from Mr.

16   Laforest?

17              MR. GOODMAN:  Object to form.  Go

18   ahead.

19         A.   I do not review the leads that come

20   into the dealership, so I did not review that

21   lead.

22         Q.   Did you review the leads in

23   preparation for your deposition today?

24         A.   No.

25         Q.   When Victory Mitsubishi receives a



1                    S. Orsaris

2    lead from one of these websites, what happens

3    generally?

4         A.   The DealerSocket software will notify

5    the business development center team at Victory

6    Mitsubishi that so and so has contacted for

7    information and has potential interest in a

8    vehicle, and then our team would call, gauge

9    interest, especially during that period of

10   time; see if they have any level of intent to

11   purchase.  Have a conversation, answer any

12   questions, and write them in whenever worked

13   best for them.

14             MS. CATERINE:  I am about to get into

15   another document, so I think we should go ahead

16   and break for lunch.

17             (A luncheon recess was taken.)

18        Q.   What do you remember about the

19   investigation and subsequent lawsuit against

20   Victory Auto Group by the New York Attorney

21   General?

22        A.   I have -- I don't know.  I was in

23   college when it was going on.

24        Q.   Were you provided notice of the order

25   in the New York Attorney General lawsuit on



1                    S. Orsaris

2    August 10, 2018?

3         A.   By who?

4         Q.   Again, Mr. Orsaris, if you could

5    please just answer the question or ask me to

6    rephrase the question.

7              MR. GOODMAN:  Object to the form of

8    that question.

9         A.   I don't know.

10        Q.   You don't know if you were ever

11   provided notice of that order?

12             MR. GOODMAN:  Asked and answered.

13   Object to form.

14        A.   I don't recall.

15        Q.   When did you learn about the

16   stipulation to settle that lawsuit entered into

17   on April 4, 2019?

18             MR. GOODMAN:  Object to the form of

19   the question.

20        A.   I don't recall.

21        Q.   Were you aware of this settlement

22   prior to this deposition?

23             MR. GOODMAN:  Object to the form.  Go

24   ahead.

25        A.   Yes.



1                        S. Orsaris

2        Q.    Did you review the settlement in

3    preparation for your deposition today?

4        A.    No.

5        Q.    Were you aware that the settlement

6    allowed a confession of judgment to be entered

7    against Philip Argyropoulos personally if

8    defendants failed to make payments pursuant to

9    the stipulation?

10            MR. GOODMAN:  Objection.  Form.

11        A.    I don't know.

12        Q.    You don't know if you were aware of

13    that or not?

14            MR. GOODMAN:  Objection.  Form.

15        A.    I don't know.

16        Q.    Why would Mr. Argyropoulos agree to

17    allow a confession of judgment to be entered

18    against him personally if Victory Auto Group

19    failed to make payments pursuant to the

20    settlement stipulation with the New York

21    Attorney General?

22            MR. GOODMAN:  Objection.  Form.

23        A.    I am not Phil Argyropoulos, so I do

24    not know.

25        Q.    Were you questioned by the New York



```
1                      S. Orsaris
2    Attorney General's office in the course of the
3    investigation of the lawsuit?
4         A.   No.
5         Q.   Do you know anyone who was questioned
6    in the course of the investigation or the
7    lawsuit?
8              MR. GOODMAN:  Object to form.
9              MS. CATERINE:  Strike that question.
10        Q.   Were you aware of anyone being
11   questioned in the course of the investigation
12   or lawsuit by the New York Attorney General?
13        A.   No.
14             MR. GOODMAN:  Object to form.  You've
15   got to let me object.
16        A.   No, I was not aware.
17        Q.   Were any employees at Victory
18   Mitsubishi fired based on the results of the
19   investigation or lawsuit by the New York
20   Attorney General?
21             MR. GOODMAN:  Object to form.
22        A.   No.
23        Q.   Did Diane ever speak to you about the
24   investigation and lawsuit by the New York
25   Attorney General?
```



```
1                      S. Orsaris
2              MR. GOODMAN:  Objection.  Form.
3         A.   No.
4         Q.   Would you take a look at Exhibit 19,
5    Bates stamped Defendants 49 through 69.
6              COURT REPORTER:  Off the record.
7              (Discussion off the record.)
8         Q.   Mr. Orsaris, what is this document?
9         A.   It is a printout of the customer
10   profile that we have for Farah Francois.
11        Q.   How do you know that?
12        A.   I was the -- I know what the
13   DealerSocket customer profile looks like.
14        Q.   So the customer profile on
15   DealerSocket is going to have work notes at the
16   top like this document does, correct?
17        A.   It takes the profile and spits it out
18   in this form, produces it in this form; all the
19   communication.
20        Q.   I see.  So there is some sort of
21   print function on DealerSocket, and you do
22   that, and then it gives you this document?
23        A.   Yes.
24        Q.   When you print a customer profile on
25   DealerSocket, does it give you options of how
```



```
1                    S. Orsaris

2     much of the profile you can print?

3          A.   No.

4          Q.   No.  There's just a single option to

5     print; is that right?

6          A.   Yes.

7          Q.   At the top of this first page it

8     says, "Assigned to:  All good luck."  What does

9     that mean?

10         A.   Generalized -- after a certain point,

11    the customer profile kind of hits this where it

12    received the emails it received, and just

13    trying to have some sort of repeat business, so

14    there is no one assigned to this customer

15    profile anymore.

16              On a normal basis, if someone were

17    to respond to one of these emails, it would

18    generally lead to it being assigned to a

19    person that works for the business development

20    center.

21         Q.   So, for example, if we look at the

22    entry on August 24, 2022 at 3:27 p.m., that has

23    SYS written next to the time stamp, and then

24    the next entry down has Nicole Gonzalez written

25    next to the time stamp.  Would that indicate
```

```
1                    S. Orsaris
2     that at on August 22, 2022, the account was
3     assigned to Nicole Gonzalez?
4         A.   Nicole Gonzalez is an assistant
5     business development center manager, and in
6     these emails it says her name throughout the
7     entire time, so that's why it says her name on
8     it.  She's the one that produces these
9     generalized emails and assigns these emails to
10    be sent.
11        Q.   Is there a way to see who was
12    assigned to the Farah Francois account
13    throughout its history on DealerSocket?
14             MR. GOODMAN:  Object to the form.
15    You can answer.
16        A.   It was assigned to someone until a
17    purchase.  That's how it works.  When the time
18    hits the generalized section, like it is in
19    now, it just receives periodic emails every so
20    often.
21        Q.   I think the answer to that question
22    is no, there wasn't a way to see who was
23    assigned to the account on DealerSocket in the
24    past; is that correct?
25             MR. GOODMAN:  Object to the form as
```



```
1                    S. Orsaris

2    to "assigned," but go ahead.

3         A.   The team is assigned to it, the

4    entire team is assigned to it.  No singular

5    person, per se.

6         Q.   I guess I am a little confused,

7    because we have this thing at the top that says

8    assigned to, and there would be individual

9    employees who would follow that assigned to,

10   correct?

11             MR. GOODMAN:  Object to form.  Go

12   ahead.

13        A.   Yes, but the DealerSocket system is

14   smart enough to know people's schedules so they

15   can change.  If someone is required the next

16   day, and that person is not here and scheduled

17   to work, the DealerSocket system is smart

18   enough to switch to another person so the other

19   person can follow up with a conversation saying

20   "Hey, you were in here to buy a car yesterday,"

21   so on and so forth.

22        Q.   Is there any way to look at a history

23   of who DealerSocket or anyone else assigns the

24   account to throughout its history?

25             MR. GOODMAN:  Object to form?
```



1                    S. Orsaris

2        A.   I don't know.

3        Q.   I think you testified previously that

4   phone calls would be listed on the customer

5   profile; is that correct?

6        A.   Yeah.  Yes.

7        Q.   I don't remember seeing any phone

8   calls listed on this customer profile.

9        A.   It's definitely there.

10        Q.   Could you point it out to me, please?

11        A.   Sure.  Page 68 and how a phone call

12   was made.

13        Q.   Let me clarify.  This appears to be

14   the customer profile for Sarah J.  I am talking

15   about the first customer profile for Farah

16   Francois.

17        A.   Sarah J is a typo.

18             MR. GOODMAN:  What page are we on?

19             THE WITNESS:  68.

20             MR. GOODMAN:  This packet doesn't

21   have a 68.

22             THE WITNESS:  Right here.  That is

23   the same customer.

24        Q.   I see.  But in regards to before

25   these phone calls, just dealing with the first



```
1                    S. Orsaris

2    customer profile, and again understanding it

3    may actually refer to the same customer, but

4    looking at the first customer profile, does

5    this list any phone calls?

6         A.    Absolutely.

7         Q.    Where?

8         A.    62, 60.

9         Q.    Okay.  I see here an entry on

10   April 20, 2020, an outbound call made by Tameka

11   Richards.  Who is Tameka Richards?

12        A.    Business development center agent.

13        Q.    How long has Ms. Richards worked at

14   Victory Mitsubishi?

15        A.    I don't know dates.

16        Q.    Has it been more than a year?

17             MR. GOODMAN:  As of today?

18   Objection.

19        Q.    Actually, does she still work at

20   Victory Mitsubishi?

21        A.    Yes.

22        Q.    Around when did she start working at

23   Victory Mitsubishi?

24        A.    Sometime in 2019.

25        Q.    I see here on this entry it says
```



```
1                    S. Orsaris

2     "Listen to call.  DealerSocket call

3     management," and then there is a URL.  What is

4     that referring to?

5          A.   Calls are recorded.  I don't know how

6     long, but these calls were recorded, and you

7     can potentially listen to them.  I don't know

8     the storage date.

9          Q.   Did you retrieve any phone call

10    recordings and produce them to your attorney

11    for this lawsuit?

12         A.   I believe I turned over voice mails

13    left by Farah in September of 2020.

14         Q.   Do you recall if there were any

15    recordings that you could not access, including

16    but not limited to the recording reflected by

17    this document?

18         A.   I don't recall.

19         Q.   If you could go to the next page,

20    this is Defendants' 63, and this entry dated

21    April 19 reflects a lead, correct?

22         A.   Yes.

23         Q.   And this lead refers to someone with

24    the name Milano Banik.  Who is Milano Banik?

25         A.   I don't know.
```



```
 1                    S. Orsaris
 2        Q.   Do you recognize the email for Milano
 3   Banik?
 4        A.   Yes.
 5        Q.   Where do you recognize that email
 6   address from?
 7        A.   The same email that was used when
 8   Emmanuel Laforest inquired about the car before
 9   he came in and purchased on May of 2020.
10        Q.   Is that unusual, for two different
11   names to be associated with the same email
12   address?
13             MR. GOODMAN:  Object to form.
14        A.   I wouldn't call it unusual.
15        Q.   So based on this entry, and then the
16   outbound call entry we were talking about
17   before, that outbound call was made following
18   up on this lead; is that correct?
19        A.   Yes.
20        Q.   What generally would Ms. Richards
21   leave in a voice message when calling to follow
22   up on a lead?
23             MR. GOODMAN:  Object to the form.  Go
24   ahead.
25        A.   Something to the effect of, Hi.  This
```



1                    S. Orsaris

2    is Tameka.  I received an inquiry on so and so

3    vehicle.  You can call back at whatever the

4    number is to schedule an appointment to stop by

5    and see one of our cars, whichever vehicle it

6    was.

7         Q.   And then I see an entry here, this is

8    back on Defendants' 62, an entry on April 20,

9    2020 at 11:25 a.m. that says no vmail.  What

10   does no vmail mean?

11        A.   No voice mail.

12        Q.   And this entry was put in by

13   Ms. Richards, correct?

14        A.   Yes.

15        Q.   Why is there an entry saying no

16   vmail, but there is also an entry saying that

17   she left a message?

18        A.   If you see carwars, which is the tool

19   that they use to record, whenever it hits a

20   voice mail -- the system is not smart enough to

21   know the voice mail is full.  If there is no

22   voice mail, they just know that the phone

23   wasn't picked up.  Obviously, someone who

24   doesn't pick up the phone, typically a voice

25   mail is typically required, something we should



```
 1                        S. Orsaris
 2    do so people can call us back.
 3         Q.   So the next entry has a message.  Was
 4    this the message that was sent by Ms. Richards
 5    by email as referenced in an earlier entry.
 6         A.   No.  By text.
 7         Q.   By text message.
 8         A.   Yes.
 9         Q.   And that would have been a text
10    message to the phone provided in the
11    information lead, correct?
12         A.   Yes.
13         Q.   And then the next couple of entries
14    refer to different emails that were
15    automatically sent, it appears, and they all
16    have unqualified in the subject line.  What
17    does that refer to?
18              MR. GOODMAN:  Where are we, what
19    page?
20              MS. CATERINE:  This is starting on
21    page Defendants' 62, the top entry, and then
22    going backwards to Defendants' 61.
23         A.   The DealerSocket system is smart
24    enough to know when someone is not responding.
25    This is not qualified as an active lead, and
```



```
1                    S. Orsaris

2    that is why it is using the word unqualified.

3         Q.   And on Defendants' 61 we see another

4    lead.  Actually, let's go to the part of the

5    lead that is on Defendants' 60.  You will see

6    at the very top of the entry starting "This

7    customer recently submitted an internet lead

8    with the details listed below.  A duplicate

9    sales opportunity may now exist.  The best

10   practice is to merge the new opportunity into

11   this opportunity."  What does this refer to?

12        A.   The prior lead and this lead merging

13   into the same profile.

14        Q.   Could you explain what that means

15   exactly?

16        A.   There is either a common number or

17   email, and when there is a common number or

18   email, it's going to link together

19   automatically, which is why when we produced

20   this document, it is linked together.

21        Q.   So the system flags it when a lead is

22   submitted with the same email address or the

23   same phone number; is that correct?

24             MR. GOODMAN:  Object to the form.  Go

25   ahead.
```



```
 1                     S. Orsaris
 2        A.    It links it together so we can in
 3   some instances make inferences that you have
 4   been interested in some of our cars.  Why don't
 5   you check out the initial car or second car or
 6   third car, because folks do inquire multiple
 7   times before they come in.
 8        Q.    If I were to pull up the Farah Jean
 9   Francois customer profile in DealerSocket, I
10   know it's not going to quite look like this,
11   but I would be able to see the different
12   submitted leads in the system, correct?
13             MR. GOODMAN:  Object to the form.
14        A.    Possibly.  I wouldn't say maybe on
15   the same page, but possibly.
16             MR. GOODMAN:  Can we take a minute
17   here?  I want to talk to my client for a
18   second.
19             MS. CATERINE:  Sure.
20             (A recess was taken.)
21        A.    So this is the customer profile for
22   Farah Francois that initially started actually
23   as Emmanuel Laforest, and considering that
24   Emmanuel Laforest purchased a car through his
25   sister-in-law, obviously when the purchase is
```



```
1                    S. Orsaris

2    made, whoever makes the purchase kind of takes

3    over.  They report it on the record how her

4    name appeared on this.

5              MR. GOODMAN:  By counsel, if I could,

6    you, Emma, had previously asked if he looked at

7    the Farah Francois profile.  There is no

8    separate profile.  It's the same profile.  I

9    think that's where --

10             THE WITNESS:  There's only one, yes.

11        Q.   Is there a customer profile for Jami

12   Singer?

13        A.   No.  The customer profile should be

14   looked at as a transaction profile.  I think

15   it's a little bit easier to understand in that

16   regard.

17        Q.   During May 30th, if I recall

18   correctly, you said the dealership was only

19   assisting customers by appointment, they were

20   only making sales of vehicles by appointment;

21   is that correct?

22        A.   Yes.

23        Q.   Where in this customer profile does

24   it show Mr. Laforest making an appointment at

25   Victory Mitsubishi?
```



1                      S. Orsaris

2        A.    You see it in the text messages that

3    occurred between Emmanuel Laforest and one of

4    the business development center associates

5    stating he was coming in.

6        Q.    We are going to get to those, but I

7    have a couple more questions for you about this

8    document.  On Defendants' 67, do you see on the

9    bottom right corner it says 23/23?

10       A.    Yes.

11       Q.    And that is referring to all of the

12   pages in the printout from DealerSocket,

13   correct?

14       A.    Yes.

15       Q.    Can I assume those text messages you

16   were just referring to would not have been part

17   of this printout; is that correct?

18       A.    It would not have been part of this

19   printout, but considering there was a

20   conversation back and forth, they were stored

21   separately, and I was able to produce those.

22       Q.    So those text messages would not have

23   been part of the customer profile; that would

24   have been a separate thing in DealerSocket?

25       A.    It is part of the customer profile



1                        S. Orsaris

2    when you print the work notes, but it does not

3    print every single back-to back-text message.

4    You have to click on them and print those.

5         Q.   Got you.  So this work note section

6    of the customer profile wouldn't necessarily

7    reflect all of the communications such as text

8    messages?

9         A.   A singular text will appear, but a

10   conversational text, the system will put it in

11   a different section, and which I already

12   produced for this situation.

13            MS. CATERINE:  Could you read back my

14   question, please.

15            (Record read.)

16        Q.   Is that yes or no?

17        A.   If a singular text is sent, it will

18   show.  If multiple texts are sent, it will not

19   show on the work notes section.

20        Q.   Other than the multiple text messages

21   that you just referred to, are there any other

22   communications which would not be reflected in

23   the customer profile in DealerSocket?

24        A.   No.

25        Q.   If you could turn to Defendants' 66,



```
1                    S. Orsaris
2    please.  In the bottom right corner of this
3    page you will see it says 19 out of 23.  Why
4    are the pages 20, 21 and 22 not present in this
5    customer profile?
6         A.   They were present.  I scanned this to
7    my email after printing it, and my scanner did
8    not print those three pages or four pages --
9    three pages.
10        Q.   Do you still have the physical pages?
11        A.   No, unfortunately.
12        Q.   Can you still re-create this printout
13   on DealerSocket?
14        A.   This exact paperwork, no.  I have
15   done my best to produce additional
16   documentation over time as it was requested.
17        Q.   We will get to that as well, but --
18             MS. CATERINE:  Could you read back
19   the answer.
20             (Record read.)
21        Q.   So when you say "this exact
22   paperwork," what do you mean?
23        A.   At the present time, if you were to
24   ask me to reproduce this, it would be hard to
25   do so.  Because of the amount of time that we
```



```
 1                      S. Orsaris

 2    were in the profile, I think it unlinked the

 3    initial lead by Milano Banik.

 4         Q.   I see.  Why would that happen?

 5         A.   I don't know.  It created a contact

 6    in Dealertrack -- DealerSocket -- I apologize

 7    -- and we found out about it too late and were

 8    unable to reverse it.

 9         Q.   Have you contacted DealerSocket about

10    this issue?

11         A.   Via phone.

12         Q.   Did you send them any emails about

13    this issue?

14         A.   No.

15         Q.   Let's go to Exhibit 20 marked

16    Defendants' 113.  It's a single page.

17         A.   I have it.

18         Q.   What is this document?

19         A.   When we were asked to try to find the

20    information between pages 19 to 23, I did my

21    best to try to dig as deep as I can in

22    DealerSocket, and I had these entries, so

23    trying to provide the information that was

24    requested.

25         Q.   How did you retrieve these entries?
```



1                        S. Orsaris

2        A.   Clicking on the back-end tools that

3   would take the customer profile and kind of

4   condense it, and then I went to the section

5   that was missing, screen-shotted it and

6   provided it.

7        Q.   I see.  So Defendants' 113 was part

8   of a condensed form of the customer profile

9   that we were looking at earlier; is that

10   correct?

11        A.   It was a section of more of an

12   overview of the profile which has some events

13   such as you see here, text messages.

14        Q.   Could you still produce that overview

15   today from DealerSocket?

16        A.   I believe so, yes.

17        MS. CATERINE:  We call for the

18   production of the entire overview, please.

19        MR. GOODMAN:  Take it under

20   advisement.

21        Q.   If we could go to what was previously

22   marked as Exhibit 18 Bates stamped Defendants'

23   42 through 48.

24        A.   I have it.

25        Q.   Mr. Orsaris, what is this document?



```
1                      S. Orsaris

2         A.    The text message section that gets

3    created when you actually receive responses to

4    your texts that you send out.

5         Q.    And this is what you were referring

6    to when you were talking about the text

7    messages that would not be reflected in the

8    work notes section that we were looking at

9    before; is that correct?

10        A.    Yes.

11        Q.    I guess I'm a little confused,

12   though, about -- I don't see any entry in the

13   work notes that we were looking at before,

14   May 30th, 2020.  I understand it wouldn't

15   reflect all the text messages, but shouldn't

16   there be at least one entry on May 30, 2020,

17   showing the first text message?

18        A.    I presume that the system would mark

19   it in a different section, which I produced,

20   when there is multiple texts going back and

21   forth.  The consumer responded, and considering

22   the consumer responded, it puts it in a

23   different section.

24        Q.    When did Emmanuel Laforest first come

25   to Victory Mitsubishi in person?
```



1                       S. Orsaris

2        A.    May 30th of 2020.

3        Q.    What time did he come in?

4        A.    I don't recall.

5        Q.    Is there any document that would show

6    or give you a rough idea of when he came in?

7        A.    Sometime after he asked me what's the

8    address or asked -- not me, but Victory what

9    the address is.

10       Q.    To be clear, you are referring to the

11   document Bates stamped Defendants' 45 and the

12   text message time stamped May 30th at

13   1:55 p.m.; is that correct?

14       A.    Yes.

15       Q.    So sometime after 1:55 p.m., correct?

16       A.    Yes.

17       Q.    And about how long was he at the

18   dealership?

19       A.    I don't recall.

20       Q.    Is there any document that would give

21   you a rough idea of how long he was at the

22   dealership?

23       A.    Not to my knowledge, no.

24       Q.    What do you remember about May 30th,

25   2020?



```
1                    S. Orsaris

2              MR. GOODMAN:  Object to form.  Go

3    ahead.

4         A.   I don't have really a recollection of

5    any specific -- anything specific.  More so the

6    overall month.

7         Q.   Sure.  And that's because it was more

8    than two years ago now, isn't that correct?

9              MR. GOODMAN:  Object to form.

10        A.   Yes.

11        Q.   Do you remember what you ate for

12   breakfast that day?

13             MR. GOODMAN:  Objection.  Come on.

14   Object to the form.

15        A.   No.

16        Q.   Do you remember what you ate for

17   lunch that day?

18             MR. GOODMAN:  Objection.

19        A.   No.

20        Q.   So pretty much your understanding of

21   what happened when Mr. Laforest came into the

22   dealership on May 30th is based upon your

23   review of the documents; is that correct?

24             MR. GOODMAN:  Object to form.  Also

25   asked and answered.  Go ahead.
```



1                        S. Orsaris

2        A.    No, that's not the case.

3        Q.    Explain to me how that's not the

4   case.

5        A.    In September when Ms. Farah Francois

6   visited the facility and explained to me what

7   happened, obviously it was only four months

8   prior, so it was pretty easy for me to remember

9   some of the events that happened in May and

10  June, and obviously everything that happened in

11  September.

12            It was a pretty significant event --

13  this is the first and only time something like

14  that happened to me.  I held on to that.

15       Q.    So if I understand you correctly, you

16  are saying that when Ms. Francois came in and

17  spoke with you in September of 2020, at that

18  time you remembered what happened on May 30th,

19  2020; is that correct?

20            MR. GOODMAN:  Object to form.  Go

21  ahead.

22       A.    And also what happened in June as

23  well.

24       Q.    And I take it you remember your

25  conversation with Ms. Francois in September of



```
 1                      S. Orsaris
 2    2020; is that right?
 3         A.   Yes.
 4              MR. KESHAVARZ:  Can we take a break,
 5    please?
 6              MS. CATERINE:  That's fine with me.
 7              (A recess was taken.)
 8         Q.   So your understanding of what
 9    happened on May 30th, 2020, with Mr. Laforest
10    is based on your review of the documents,
11    correct?
12              MR. GOODMAN:  Objection.  Form.
13    Mischaracterizes.  Go ahead.
14         A.   No.
15         Q.   What is it based on?
16              MR. GOODMAN:  Asked and answered.
17    Go ahead.
18         A.   When Ms. Farah brought the situation
19    to my attention in September, I had at that
20    time a more vivid recollection, and I held on
21    to a lot of the events that happened in May and
22    June considering, again, this is the first and
23    only time we have had an identity theft
24    situation going on, so considering it's
25    significant, I was able to retain the
```



1                      S. Orsaris

2    information.

3         Q.   What information did you retain?

4         A.   Mostly the conversations that

5    occurred in June, and the sale date in May.  I

6    remember actually seeing the vehicle getting

7    cleaned, and the office, when they sat down in

8    the office with Yessica Vallejo, and in June

9    again when they sat down with Yessica, my

10   finance manager, for the second time.

11        Q.   So you remember all of that, but you

12   don't remember what Mr. Laforest looks like,

13   correct?

14        A.   I don't want to inaccurately describe

15   how he looks.

16        Q.   Do you remember what he looks like or

17   not?

18             MR. GOODMAN:  Asked and answered.

19   Argumentative.  Go ahead.

20        A.   Vaguely.

21        Q.   What is that vague recollection of

22   what he looks like?

23        A.   Taller than me, relatively slim,

24   darker complexion.

25        Q.   So after arranging an appointment at



1                    S. Orsaris
2     Victory Mitsubishi, Emmanuel Laforest comes
3     into the dealership.  What happens when he
4     comes in?
5             MR. GOODMAN:  Object to the form.
6        A.   He came in with Ms. Francois,
7     inquired about a vehicle, potentially test
8     drove it, looked at the car, had intent to
9     purchase, and it led to a purchase.
10       Q.   Let's go through that step by step.
11    What is your basis for believing that he came
12    in with Farah Jean Francois?
13       A.   Store policy is you cannot run
14    someone's credit without them being present in
15    the building.  We had a physical ID, which my
16    store policy at the time would be me holding on
17    to both his and Ms. Francois's ID or driver's
18    license, and all of the, like I said, policies
19    and procedures that we have in place.  I am
20    certain that Mr. Emmanuel Laforest was with
21    what I presume is Ms. Farah Francois.
22       Q.   Just to give a quick summary, it is
23    because of your store policies and because you
24    have a copy of her driver's license; is that
25    correct?



1                    S. Orsaris

2              MR. GOODMAN:  Object to form.

3    Mischaracterizes.  Go ahead.

4         A.   It's definitely a little bit deeper

5    than that.  There are rules that are in place,

6    city, state and federal regulations that we

7    follow and adhere to day in and day out.  It is

8    impossible that Emmanuel was by himself, and it

9    is impossible that I would presume that Ms.

10   Francois wasn't there.  She was definitively

11   there, or someone I would presume was her was

12   there.

13        Q.   So because of the store policy, it is

14   impossible that you would ever pull someone's

15   credit report without them physically being

16   there; is that correct?

17             MR. GOODMAN:  Objection to form.  Go

18   ahead.

19        A.   I recall being called into the office

20   by Yessica Vallejo for the down payment for the

21   vehicle, and I remember two individuals being

22   Emmanuel Laforest and the other being what I

23   presume is Farah Francois inside the office

24   when I was counting the down payment.

25        Q.   That's useful information, but I am



```
 1                  S. Orsaris
 2    not sure that answered my question.
 3          MS. CATERINE:  Could you read back
 4    the question, madam court reporter?
 5          (Record read.)
 6       A.   More than store policy.  I had a
 7    physical copy of her ID.  I touched her ID
 8    myself, and there were two people, at least two
 9    people present in the building, one that was
10    Emmanuel Laforest, and the other I would
11    presume is Farah Francois.
12          I remember the store policy as well
13    being that I would make sure, I would verify
14    myself, her date of birth, making sure the
15    people in the building are who they said they
16    are, and that all parties are present inside
17    the building before the pulling of the credit.
18       Q.   I think you mentioned before that
19    because you had a credit application with both
20    Emmanuel's and Ms. Francois's information, that
21    was part of the basis for your belief that
22    there were two individuals; is that correct?
23       A.   In addition to --
24       Q.   In addition to.
25       A.   I have a recollection of counting the
```



1                    S. Orsaris

2    down payment after they said they were going to

3    purchase the vehicle, inside the office, and I

4    recall two people being there, one that was

5    Emmanuel Laforest, and the other that I would

6    presume is Farah Francois.

7         Q.   Who was the first people to speak

8    with Mr. Laforest?

9         A.   Either David or myself.

10        Q.   So you don't know if it was you or

11   David; it just would have been either you or

12   David based on the store policy at the time; is

13   that correct?

14        A.   Yes.  They were checked in, and the

15   only two people that can check a customer into

16   the building to notify our team that they are

17   in the building is either David or myself.

18        Q.   When you say "checked in," what does

19   that mean?

20        A.   When an appointment is made, we

21   complete the appointment with a showroom visit,

22   which we print a guest sheet, and we assign a

23   sales consultant to the transaction, and then

24   sit and have a conversation and figure out what

25   the customer is looking to do that day, so on



```
1                    S. Orsaris
2    and so forth.
3          Q.   Would there be a record made of the
4    time that they were checked in?
5          A.   Do you have the guest sheet?  I don't
6    think there's a time stamp on that guest sheet.
7    I'm not 100 percent sure.
8          Q.   We will get to that later.
9               Would the guest sheet show who was
10   the first person to speak with Mr. Laforest?
11         A.   Depends on the notations on the guest
12   sheet.
13         Q.   So it could show it?
14         A.   Any handwritten things on the guest
15   sheet.  Guest sheets have writing of different
16   notes at times.
17         Q.   So it could have it handwritten on
18   it?
19         A.   It could be on the guest sheet
20   itself.  Sales consultants that work there and
21   have finished training typically would show up
22   in the top right of the guest sheet.
23         Q.   Would that be the person who would
24   print out the guest sheet, so if the
25   salesperson was listed as David Perez, for
```



1                     S. Orsaris

2      example, would he have been the one who would

3      have printed that out?

4           A.   Not necessarily.

5           Q.   But if he was listed as the

6      salesperson, he was the one who was first to

7      speak with Mr. Laforest; would that be right?

8           A.   No.  It was either myself or David

9      Perez.

10          Q.   So whoever is listed as the

11     salesperson on the guest sheet didn't

12     necessarily speak to Mr. Laforest first,

13     correct?

14          A.   Yes.

15          Q.   Did you speak with Mr. Perez about

16     this case?

17               MR. GOODMAN:  Objection as to form.

18          A.   No.

19          Q.   Do you recall speaking to Mr. Perez

20     about Ms. Francois's issues in September of

21     2020?

22               MR. GOODMAN:  Objection.  Privilege.

23     If you are asking for a conversation that

24     September, no objection.  If you are asking

25     some other time frame, there may be a privilege



1                      S. Orsaris

2    objection if counsel was present.

3          MS. CATERINE:  Sure.

4       Q.   Go ahead if you have an answer.

5          MR. GOODMAN:  Well, I understood the

6    question to be about September of 2020.

7          MS. CATERINE:  It was September of

8    2020.

9          MR. GOODMAN:  Then no objection.

10      A.   I don't recall.

11      Q.   And Mr. Laforest filled out a credit

12   application, correct?

13      A.   His portion, yes.

14      Q.   And that was a paper application?

15      A.   I believe he also provided the

16   information online.

17      Q.   So he provided his information

18   online, he filled out a paper application.  The

19   online application, that was what he did prior

20   to going into the dealership, correct?

21      A.   Yes.

22      Q.   And this was sent to him by text

23   message, correct?

24      A.   Yes.

25      Q.   And then the paper application he



```
 1                    S. Orsaris
 2   filled out when he arrived in the store on
 3   May 30th, correct?
 4        A.   Yes.
 5        Q.   Did he fill out any other
 6   applications?
 7        A.   No.
 8        Q.   And Mr. Laforest filled out the paper
 9   application for Farah Jean Francois, correct?
10           MR. GOODMAN:  Objection to form.
11        A.   Repeat the question, if you don't
12   mind.
13           (Record read.)
14        A.   No.
15        Q.   How do you know that?
16        A.   Per policy and procedures that are in
17   place.  Everyone in the building knows that a
18   credit application and the portion that someone
19   is filling out is for themselves and themselves
20   only; strict policy.
21        Q.   So you did not see the credit
22   application being filled out, correct?
23        A.   I don't have a specific recollection,
24   but my desk faces the sales floor, and if I
25   were to see someone completing an application
```



```
 1                    S. Orsaris
 2    for someone else, I would immediately
 3    intervene.
 4         Q.   During the year 2020, did you have
 5    customers come to the dealership saying that
 6    they were there to buy a car for another person
 7    who didn't want to come into the dealership
 8    because of COVID-19?
 9              MR. GOODMAN:   Object to form.   Go
10    ahead.
11         A.   No.  I did not do one single remote
12    sale in my entire --
13         Q.   And did you -- sorry.  Were you
14    finished?  I'm not sure.
15         A.   I was finished.
16         Q.   I understand you are saying you
17    didn't do any remote sales, but did anyone ever
18    attempt to buy a vehicle on behalf of another
19    person because that person did not want to come
20    to the dealership because of COVID-19?
21         A.   No.
22         Q.   After the credit application was
23    filled out, credit reports were pulled for
24    Emmanuel Laforest and for Farah Jean Francois,
25    correct?
```



```
 1                   S. Orsaris
 2        A.    Between those events, David or myself
 3   verified that the people on the IDs were
 4   present in the building.
 5             MR. GOODMAN:  Listen to the question
 6   and answer her question, okay?
 7        Q.    Who pulled their credit reports?  We
 8   will get to the documents later, but do you
 9   have any independent recollection of who pulled
10   the credit reports?
11        A.    Either David or myself.
12        Q.    It would have been either you or
13   David; no one else?
14        A.    I don't think anyone else would do
15   it.
16        Q.    I am sorry.  You seemed to be very
17   certain earlier.  You were talking about how it
18   was impossible.  Now you are saying you don't
19   think.  Are you certain, or is that probably
20   the case?
21        A.    I am definitively certain that the
22   only two people that would run credit on that
23   day is David Perez and myself.
24        Q.    Did anyone at Victory Mitsubishi
25   speak with Ms. Francois on May 30th?
```



1                          S. Orsaris

2          A.    Either David or myself, and

3    definitively Yessica.

4          Q.    If I told you that Mr. Laforest said

5    that he was told not to call Ms. Francois until

6    after the deal was done, how would you respond?

7          A.    That is preposterous and impossible.

8          Q.    If I told you that he had testified

9    that he came to the dealership on May 30th

10   alone, how would you respond?

11         A.    It's inaccurate information.

12         Q.    And you have no independent

13   recollection of speaking to Ms. Francois on

14   May 30th, correct?

15         A.    I do remember congratulating them

16   after I collected the down payment.

17         Q.    Around what time was that?

18         A.    I don't have a recollection of the

19   time.

20         Q.    Was it still light out, was the sun

21   setting?

22         A.    I don't recall.

23         Q.    Where were you standing when you

24   congratulated them?

25         A.    In Yessica Vallejo's office.



1                        S. Orsaris

2        Q.   And you were standing, or were you

3   sitting?

4        A.   I don't recall.

5        Q.   Were they standing, or were they

6   sitting?

7        A.   They were sitting.

8        Q.   Did you shake their hands?

9        A.   No.

10        Q.   You probably weren't shaking a lot of

11   hands at that time, were you?  Were you doing

12   the fist bump thing or anything like that, the

13   elbow bump?

14        A.   Early pandemic, no.

15             MR. GOODMAN:  When you reach a point,

16   can we take five minutes, if you want to keep

17   going a little bit, or maybe we can do it now?

18        Q.   What did Ms. Francois look like?

19        A.   Lady of darker complexion than

20   myself, shorter than me, slim.  An inch or two

21   shorter than me and slim.

22        Q.   Do you remember anything about her

23   hair?

24        A.   No, I don't recall.

25        Q.   Do you remember anything about her



```
1                      S. Orsaris
2    voice?
3         A.   I don't recall.
4         Q.   And so you don't recall speaking to
5    Ms. Francois other than congratulating her when
6    you took the down payment; is that correct?
7         A.   I don't have a specific recollection,
8    but either David or myself had a conversation
9    with them prior to running the credit.
10        Q.   So when you took the down payment --
11   and how much was the down payment?
12        A.   Total down payment was $9,000.
13        Q.   So when you took the down payment,
14   what did you do when you took the down payment?
15        A.   Store policy is to immediately
16   receive and put away the down payment in the
17   safe.
18        Q.   And where is the safe?
19        A.   In my office.
20        Q.   So you take the down payment, and you
21   go from Ms. Vallejo's office to your office
22   immediately per store policy, correct?
23        A.   Yes.
24        Q.   And you put the money in the safe.
25   What else do you do in regards to the down
```



```
1                     S. Orsaris

2   payment?

3        A.   Receive it.

4        Q.   So you print a receipt?

5        A.   Yes.

6        Q.   And you gave that printed receipt to

7   the Mr. Laforest, correct?

8        A.   Yes.  Well -- yes.

9        Q.   Sorry.  That was "yes"?

10       A.   To both of them.  Yeah.  I don't

11   recall who held on to it.

12       Q.   And you would do that as soon as you

13   printed the receipt, correct, correct?

14       A.   Yes.

15            MS. CATERINE:  Let's take a

16   five-minute break, please.

17            (A recess was taken.)

18            MS. CATERINE:  Mr. Goodman, in

19   regards to the depositions, if we have Mr.

20   Argyropoulos on Monday starting at 2:00 p.m.,

21   could he be available again at 2:00 p.m. the

22   following day on Tuesday, and then we push

23   Diane's deposition to Friday?

24            MR. GOODMAN:  The reason that he

25   wanted to do Monday instead of Tuesday was a
```



1                        S. Orsaris

2    conflict he had on Tuesday, so as I am sitting

3    here now, I believe the answer is no; however,

4    I will undertake to inquire of him if there is

5    any possible way we could -- having said that,

6    I am also pointing out that we offered him for

7    five hours on Monday.  If you need him to come

8    back, it would only be for two hours, so I will

9    ask him if we can find two hours on Tuesday for

10   him.  I will make that inquiry so we can try to

11   adhere to your suggestion.  I am not opposed to

12   it.  I have to ask him.

13            MR. KESHAVARZ:  Do you think Patrick

14   can make a call while we are doing this?

15            MR. GOODMAN:  I am not going to be

16   able to do it while this deposition is going

17   on, and I would like to complete this

18   deposition.  It is the day before Thanksgiving.

19   I have to be somewhere this evening, and I

20   would like to proceed.  We can get it figured

21   out.

22            MR. KESHAVARZ:  I would like to get

23   it figured out now and on the record.

24            MR. GOODMAN:  We are not going to be

25   able to -- I want to go forward with this



1                     S. Orsaris

2    deposition.

3              MR. KESHAVARZ:  You said you would

4    like to start at 2:00.  Does that mean he can

5    start a little bit earlier than 2:00?

6              MR. GOODMAN:  No.  He said he is

7    available, I don't know what it said in the

8    email, but the answer is he is available

9    at 2:00.  We will be available on Monday,

10   November 28, from 2:00 p.m. to 7:00 p.m.

11             MR. KESHAVARZ:  If we are able to

12   switch things around, is the wife available on

13   Friday, the 2nd?

14             MR. GOODMAN:  I'll find out.  I don't

15   know at this point.

16             MR. KESHAVARZ:  You can't find out

17   now?  Patrick can't make a quick call?

18             MR. GOODMAN:  No, I can't.  Can we

19   please proceed with the deposition?

20             MR. KESHAVARZ:  They are court

21   ordered so it would be nice to get this

22   resolved.

23             MR. GOODMAN:  Okay.  Let's go.

24        Q.   Mr. Orsaris, did Mr. Laforest obtain

25   financing for the vehicle on May 30th, 2020?



1                    S. Orsaris

2          MR. GOODMAN:  Object to form.

3     A.   No.

4     Q.   Did he leave the dealership that day

5  with the vehicle?

6     A.   Yes.

7     Q.   So a consumer can leave Victory

8  Mitsubishi with a vehicle prior to arranging

9  financing?

10         MR. GOODMAN:  Object to form.  Go

11  ahead.

12     A.   There was financing arranged.

13     Q.   I am sorry.  I thought you said there

14  wasn't financing arranged on May 30th.

15     A.   There was financing arranged under

16  what I presume the person he was with,

17  Ms. Farah Francois, or the person that was

18  impersonating her.

19     Q.   I see.  So the financing wasn't for

20  Mr. Laforest; it was for Farah Jean Francois on

21  May 30th?

22     A.   Yes.

23     Q.   And that financing was from Capital

24  One, correct?

25     A.   Correct.



```
1                     S. Orsaris

2        Q.   And what documents were given to Mr.

3   Laforest that day?

4        A.   The documents that were given to them

5   that day were the signed retail installment

6   contract, bill of sale, purchase order, in

7   addition to maybe a copy of the CARFAX, copy of

8   the signed warranty; things of that nature.

9        Q.   And those were all in Ms. Francois'

10  name?

11       A.   Yes.

12       Q.   They weren't in Mr. Laforest's name,

13  correct?

14       A.   No.

15       Q.   Around what time did Mr. Laforest

16  leave with the vehicle on May 30th?

17       A.   I don't have a recollection of the

18  specific time.

19       Q.   Do you recall generally what time it

20  was?  Was it nighttime?

21       A.   Maybe the afternoon into nighttime,

22  but I don't know.

23            MR. GOODMAN:  Emma, about

24  scheduling -- I am not trying to be

25  difficult -- can you please send an email of
```



```
1                    S. Orsaris

2    your exact proposal for what the schedule would

3    be after Phil on Monday from 2:00 to 7:00?

4    Just send an email so I will be able to convey

5    exactly what you are looking for.

6         Q.   And May 30th was the only time that

7    Mr. Laforest came into Victory Mitsubishi,

8    correct?

9         A.   No.

10        Q.   What other time did he come into

11   Victory Mitsubishi?

12        A.   June 29 of that year.

13        Q.   And why did he come into the

14   dealership on June 29 of that year?

15        A.   To re-sign the contracts between Ms.

16   Francois and Capital One.  He came back in with

17   what I presume was Ms. Francois.

18        Q.   The contracts were only in her name.

19   Why did he come in?

20        A.   He was one of the drivers of the

21   vehicle, so they both came, what I presume was

22   Ms. Francois.

23        Q.   Why were they re-signing on

24   June 29th?

25        A.   Because in the early part of the
```



```
1                    S. Orsaris

2    pandemic there were a lot of underwriting and

3    program guideline changes, which Capital One

4    had a structural change of some sort, and they

5    required us to invite the customers back into

6    the building to re-sign.

7         Q.    How were customers contacted about

8    this re-signing?

9         A.    We called from the store phone.

10        Q.    Is that call reflected on

11   DealerSocket?

12        A.    No.

13        Q.    Why not?

14        A.    Because the business development

15   center did not call them in.  Either myself or

16   Yessica spoke to them and invited them back in.

17        Q.    Do you have any document reflecting

18   that phone call?

19        A.    We do not.

20        Q.    Who provides the phone service for

21   the phone at Victory Mitsubishi?

22        A.    We use Vonage Business.

23        Q.    Can you spell that, please?

24        A.    V-o-n-a-g-e.  They have a business

25   service that we use.
```



```
 1                    S. Orsaris
 2       Q.   When you get bills from Vonage, do
 3  they give you an itemized list of calls made?
 4       A.   No.
 5       Q.   Do you have an online account with
 6  Vonage for the dealership?
 7            MR. GOODMAN:  I am going to object to
 8  form.  Go ahead.
 9       A.   I am sure there is a billing page
10  where we pay.
11       Q.   Would you be able to look up online
12  the calls that were made with your account?
13       A.   No.
14       Q.   Did you try looking for a record of
15  this phone call?
16       A.   The phone calls that are made are not
17  recorded, and it's not like a cell phone where
18  you can produce your records.  It is VoIP,
19  voice over IP.
20       Q.   Can you explain what that is?
21       A.   I don't know the formal definition,
22  but I believe it's voice over IP, which is more
23  like an internet-based phone.
24       Q.   So it's sort of similar to like
25  Google Voice; is that right?
```



```
 1                    S. Orsaris
 2            MR. GOODMAN:  Object to the form.  Go
 3    ahead.
 4       A.   I would assume there is some sort of
 5    similarities, but -- probably a few.
 6       Q.   What happened after Mr. Laforest left
 7    Victory Mitsubishi with the vehicle on
 8    May 30th?
 9            MR. GOODMAN:  Object to the form.
10       A.   Can you rephrase it, please?
11       Q.   I will restate the question.  Some of
12    the documents we are going to look at say the
13    sale was on June 29 rather than May 30th.  Why
14    was that?
15       A.   When they came back, we had to redo
16    the paperwork at the instruction of Capital
17    One, which essentially means the sale date is
18    06/29.
19       Q.   Had you ever sold a vehicle to a
20    consumer and then arranged financing for the
21    vehicle after the consumer had left Victory
22    Mitsubishi with the vehicle?
23            MR. GOODMAN:  Object to the form.  Go
24    ahead.
25       A.   No.
```



```
1                      S. Orsaris
2        Q.   Were you present at this alleged
3   re-signing on June 29, 2020?
4        A.   I was present at the dealership, yes.
5        Q.   And the re-signing happened in Ms.
6   Vallejo's office, correct?
7        A.   Yes.
8        Q.   Were you in her office during the
9   re-signing?
10       A.   I don't recall.
11       Q.   Do you remember Ms. Francois coming
12  to Victory Mitsubishi in September?
13       A.   Yes.
14       Q.   Did she seem upset?
15       A.   Yes.
16       Q.   Was she crying?
17       A.   No.
18       Q.   How did she seem upset?
19       A.   She probably seemed more confused
20  than upset as to how this unraveled.
21       Q.   Where did you speak with Ms. Francois
22  in the dealership?
23       A.   In my office.
24       Q.   Who else spoke with Ms. Francois at
25  the dealership on that day?
```



1                        S. Orsaris

2          A.    Potentially the receptionist.

3          Q.    Anyone else?

4          A.    No.

5          Q.    Prior to your preparation for this

6     deposition today, did you talk to Yessica

7     Vallejo about Ms. Francois coming into the

8     dealership in September?

9               MR. GOODMAN:   Objection.  Form and

10    potentially privilege.  If such a conversation

11    happened, and if it happened in the presence of

12    counsel, then I will assert privilege.

13              MR. KESHAVARZ:   Just so I understand

14    what you are saying, if the conversation

15    happened?  You are asserting privilege if the

16    conversation happened?

17              MR. GOODMAN:   I am only going to deal

18    with one attorney here.

19              MR. KESHAVARZ:   I just didn't

20    understand what you were saying.

21              MR. GOODMAN:   Well, that's okay.  I

22    said what I said, and I'm going to --

23         Q.    Do you understand Mr. Goodman's

24    instructions, Mr. Orsaris?

25         A.    I don't.



```
 1                    S. Orsaris
 2              MS. CATERINE:  Do you want to take a
 3    second to explain the privilege issue to him?
 4              MR. GOODMAN:  What I am saying is she
 5    is asking whether you had a conversation in
 6    preparation for this deposition.  That's how I
 7    understand the question; if you had a
 8    conversation with Yessica about Farah coming
 9    into Yessica's office.  If you had that
10    conversation with Yessica, and I was there if
11    it was in preparation while there was an
12    attorney there, then I am asserting privilege.
13              If you had that conversation without
14    us there, then I am not.
15              THE WITNESS:  I did not have any
16    conversation -- I don't recall a conversation
17    with Yessica Vallejo about this outside the
18    presence of my attorney.
19         Q.   How about with David Perez?
20              MR. GOODMAN:  Same instruction --
21    actually, what is your question?  Conversation
22    about anything, about a specific topic?
23              MS. CATERINE:  Sorry.  Let me clarify
24    the question.
25         Q.   Subject to the instructions given by
```



```
1                    S. Orsaris
2    Mr. Goodman to not divulge any conversations
3    had in front of your attorneys, did you speak
4    with Yessica Vallejo prior to the preparation
5    for this deposition about Ms. Francois coming
6    into the dealership in September of 2020?
7              MR. GOODMAN:  Object to form, but you
8    can answer that.
9         A.   I don't recall.
10        Q.   Prior to your preparation for this
11   deposition, did you ever talk to David Perez
12   about Ms. Francois coming into the dealership
13   in September of 2020?
14             MR. GOODMAN:  Object to form.  Go
15   ahead.
16        A.   I don't recall.
17        Q.   Mr. Perez no longer works at Victory
18   Mitsubishi, correct?
19        A.   He does not work for Victory
20   Mitsubishi at this time, no.
21        Q.   And when did his employment end?
22        A.   June of 2021.
23        Q.   Why did his employment end?
24        A.   He resigned.
25        Q.   Did he put in a two weeks' notice?
```



1                       S. Orsaris

2          A.   There was definitely some time before

3     he left.  I don't know the exact time he

4     notified us he was leaving.

5          Q.   Prior to your preparation for this

6     deposition, did you speak to Philip

7     Argyropoulos about Ms. Francois coming into the

8     dealership in September of 2020?

9          A.   No.

10         Q.   And Mr. Laforest brought the vehicle

11    back to Victory Mitsubishi in September of

12    2020, correct?

13         A.   Not to Victory Mitsubishi in terms of

14    the premise.  A block or two down.

15         Q.   Yes.  That's what I was about to ask

16    you.

17              And he notified you that he brought

18    it a block or two down by text message,

19    correct?

20         A.   We spoke on the phone beforehand.  He

21    was afraid I was going to call the police on

22    him, so he said he is going to leave it in a

23    nearby area and let me know where.

24         Q.   And were you going to call the police

25    on him?



1                         S. Orsaris

2          A.    I didn't think about it.  He did

3    bring me the car.  I didn't see him.

4          Q.    Did you call the police in regards to

5    any of what has transpired with Farah Jean

6    Francois and Emmanuel Laforest and the Victory

7    Mitsubishi dealership?

8          A.    No, but I did tell Ms. Francois that

9    I would work with law enforcement if she

10   requested or if they needed to.

11         Q.    And were you ever contacted by law

12   enforcement?

13         A.    No.

14         Q.    Were you ever contacted by the Kings

15   County District Attorney's Office?

16         A.    No.

17         Q.    Was anyone at Victory Mitsubishi

18   contacted by either the police or the Kings

19   County District Attorney's Office regarding

20   Farah Jean Francois or Emmanuel Laforest?

21         A.    To my knowledge, no.

22         Q.    How did Mr. Laforest have your phone

23   number?

24         A.    Ms. Francois gave me the number when

25   she notified me of the situation in September,



```
 1                    S. Orsaris

 2    and I called him a few times; got him on the

 3    phone.

 4         Q.   So you called him first, correct?

 5         A.   Yes.

 6         Q.   Do you remember what day you called

 7    him?

 8         A.   The same day that Ms. Farah came in.

 9    I don't know the date off the top of my head.

10         Q.   And you still have the same cell

11    phone that you used to call him?

12              MR. GOODMAN:  What was the question?

13         A.   The cell phone or something --

14              (Record read.)

15         Q.   The same physical cell phone?

16         A.   No.

17         Q.   Did you have the same cell phone

18    provider at that time that you have today?

19         A.   Yes.

20              MS. CATERINE:  I am going to call for

21    the production of phone records showing phone

22    calls in September of 2020 for Mr. Orsaris'

23    personal cell phone.

24              MR. GOODMAN:  Take it under

25    advisement.
```



```
1                       S. Orsaris

2        Q.   Who retrieved the vehicle and brought

3    it back to you at Victory Mitsubishi?

4        A.   After I received the video, I walked

5    to where the vehicle was, and I drove the

6    vehicle back to the dealership.

7        Q.   Who processed the unwinding of the

8    deal with Capital One?

9             MR. GOODMAN:  Object to the form.

10   You can answer.

11       A.   I don't know.

12       Q.   Have you ever unwound a deal before

13   while working at Victory Mitsubishi?

14            MR. GOODMAN:  Object to the form.

15   You could answer.

16       A.   Yes.

17       Q.   What does that process entail?

18       A.   The person in the building.  We agree

19   to unwind the sale; buyer's remorse, potential

20   mechanical issue or mismanagement of needs.  We

21   would n, and they would give us -- they would

22   reassign the contract, and the terminology is

23   flat cancel, and then you get a specific amount

24   that you have to send in a check to the lender,

25   and that the deal has unwound.
```



```
 1                    S. Orsaris
 2            If the vehicle is registered, they
 3     get back the plates.  If there was a title, if
 4     the vehicle was registered and titled, that
 5     would be to give them the plates for them to
 6     surrender them to the Department of Motor
 7     Vehicle, and I would need the title to the
 8     vehicle.
 9        Q.   How did this process proceed in
10     regards to the vehicle in this case?
11        A.   Spoke to -- when I spoke to Ms.
12     Francois in September, I said, "Can you just
13     give me Emmanuel's number?  When I retrieve the
14     vehicle and I have the car, you can come back
15     in and let's process the cancellation."
16            I recovered the vehicle.  I am not
17     sure how long it was out there, but I tried to
18     call Ms. Francois from my personal cell phone,
19     and I tried to call from the dealership, and I
20     never got ahold of her.
21        Q.   And because you never got ahold of
22     her, you never proceeded with this flat cancel
23     process; is that correct?
24        A.    No.  There would be some sort of
25     signature required in order for me to be able
```



```
 1                    S. Orsaris
 2    to do so.
 3         Q.   Has the vehicle been sold?
 4         A.   No.
 5         Q.   It's still in your possession?
 6         A.   Yes.
 7         Q.   In the Mitsubishi lot?  Where is it
 8    being stored?
 9         A.   In an area where vehicles that are
10    not available for sale.
11         Q.   And that area is in the Mitsubishi
12    lot?
13         A.   Not easily accessible by anyone, but
14    yes.
15              MS. CATERINE:  I am going to call for
16    production of a picture or documents sufficient
17    to show the vehicle in the lot in that
18    location.
19              MR. GOODMAN:  Take it under
20    advisement.
21         Q.   What is your understanding of the
22    current status of the loan regarding the
23    vehicle?
24         A.   I don't know.  I would imagine by now
25    it was canceled by Capital One.
```



1                        S. Orsaris

2          Q.   You say you would imagine, but you

3     don't actually know one way or the other; is

4     that correct?

5          A.   I do know by the details associated

6     with the case, yes.  The vehicle is off her

7     credit.  She is not responsible for the car

8     anymore.

9          Q.   Did Capital One contact you about

10    that?

11         A.   No.

12         Q.   Capital One contact anyone at the

13    dealership about that?

14         A.   No.

15         Q.   Why not?

16              MR. GOODMAN:   Object to form.

17         A.   I thought they were going to.  After

18    I did not hear from Ms. Farah, I thought they

19    were going to, and they never did.

20         Q.   What happened to the down payment

21    made by Mr. Laforest?

22         A.   It's still there, still at the

23    dealership in the sense of never got refunded

24    to anyone.

25         Q.   When you say it's still there at the



```
 1                    S. Orsaris
 2   dealership, do you mean it's still in cash in
 3   your safe?
 4        A.   No.  I mean it has never been
 5   refunded.
 6        Q.   So what happens -- I know you said
 7   you take the cash and you put it in the safe.
 8   What happens after that?
 9             MR. GOODMAN:  You mean as to the
10   cash, what happens?
11             MS. CATERINE:  That's it.
12        A.   The next morning it's dropped off by
13   myself to the controller, who would prepare it
14   for our banking, and they would just bring all
15   the deposits to the bank.
16        Q.   And so that's what happened with the
17   down payment in this case, correct?
18        A.   Yes.
19        Q.   Did Victory Mitsubishi have an
20   internal investigation about this incident?
21             MR. GOODMAN:  Object to form.  Go
22   ahead.
23        A.   Maybe pull the deal jacket to review
24   to understand how this happened.  It was
25   conducted by myself to try to understand what
```



1                    S. Orsaris

2    happened that day.

3         Q.   When did that happen?

4         A.   As Ms. Farah notified me in

5    September.

6         Q.   Did you speak with Philip

7    Argyropoulos about the review you did?

8         A.   No.

9         Q.   Did you speak with Diane Argyropoulos

10   about this review that you did?

11        A.   I don't recall.

12        Q.   I think you mentioned before, if I

13   recall correctly, something along the lines of

14   saying this was a big deal for you because this

15   had never happened before.  Is that correct?

16        A.   Yes.

17        Q.   So if it was such a big deal, why

18   didn't you speak with the owner about it?

19        A.   Because I had an arrangement with Ms.

20   Francois.

21             MR. GOODMAN:  Also, objection.  He

22   didn't say he didn't speak to the owner.  He

23   said "I don't recall."

24        Q.   What arrangement are you referring

25   to?



```
1                       S. Orsaris
2       A.    I was going to -- she told me it was
3    her brother-in-law.  I said okay.  I'm going to
4    get the vehicle back, and you are going to come
5    back in, and we are going to cancel out the
6    loan, and she said okay.
7       Q.    You mentioned that she told you that
8    it was her brother-in-law.  Are you saying that
9    that was some sort of sympathetic reason to be
10   discreet, or what did you mean by that?
11             MR. GOODMAN:  Object to form.
12      A.    I don't know what that means.  Can
13   you rephrase your question?
14      Q.    Sure.  I guess I'm just wondering why
15   you said that she told you it was her
16   brother-in-law in response to my question about
17   asking why you didn't talk to Diane about this.
18      A.    That's what she told me that day.
19   She told me that was her brother-in-law.
20      Q.    I would like you to look at what was
21   previously marked as Exhibit 21, Bates stamped
22   Defendants' 1 through, I believe, 36.
23      A.    I have it.
24      Q.    What is this document?
25      A.    The contents inside the deal jacket.
```



```
 1                    S. Orsaris
 2        Q.    I am sorry.  I didn't catch all of
 3   that.
 4        A.    This is the contents, the paperwork
 5   that was inside of the deal jacket.
 6        Q.    And this first page Bates stamped
 7   Defendants' 1, this would be like the cover of
 8   the deal jacket, correct?
 9        A.    Yes.
10        Q.    Who filled the cover of the deal
11   jacket out?  Who made these handwritten
12   notations?
13        A.    The Capital One was 632, stock
14   number, the phone number is Yessica.  The title
15   clerk or the -- the title clerk is the 716, and
16   then JSE-8212, it looks like my handwriting,
17   which is the plate number.
18        Q.    Why did you write the license plate
19   number on the deal jacket?
20        A.    For ease of reference.
21        Q.    Why was a different phone number
22   being written on this jacket but was then
23   crossed out to write Mr. Laforest's phone
24   number?
25        A.    I don't know.
```



```
 1                      S. Orsaris
 2        Q.   What does the stamp on here that says
 3   posted mean?
 4        A.   When the deal is costed out by
 5   accounts payable or our accounting department.
 6        Q.   What does that -- I think you said
 7   costed out?
 8        A.   Yes.  Like the finalization of
 9   putting it into our record in terms of the
10   purchaser, the warranty clause, costing out the
11   sale.  After everything is all said and done,
12   cost out the sale and put it into storage.
13        Q.   If you go to what was previously
14   marked as Exhibit 18 Bates stamped Defendants'
15   42 through 48.
16        A.   Is that the text messages?
17        Q.   Yes.
18        A.   Got it.
19        Q.   At the bottom of the first page Bates
20   stamped Defendants' 42, it says, "You'll be
21   good to go.  You just have to come in with
22   proof of income, proof of address, and
23   license."
24             What does "You'll be good to go"
25   mean?
```



```
 1                    S. Orsaris
 2        A.   They should be able to purchase a
 3   car.
 4        Q.   What kind of proof of income does
 5   Victory Mitsubishi want from consumers?
 6        A.   It depends if they are employed, a
 7   paystub, or if they are self-employed, the last
 8   three months of bank statements or their 1099s,
 9   tax returns.
10        Q.   You don't recall seeing any proof of
11   income in the deal jacket; is that correct?
12   Feel free to review the document.
13        A.   If it wasn't -- if it's not inside
14   the deal jacket, that means it was probably not
15   required -- it was not required by the
16   financial institution in this transaction.
17        Q.   If you could go back to the text
18   messages and look at the page Bates stamped
19   Defendants' 43.
20        A.   Okay.
21        Q.   It says here, "As per management
22   credit application received need 2,000 to 3,000
23   down or co-buyer."  Do you see that?
24        A.   Yes.
25        Q.   Who is the management being referred
```



```
 1                    S. Orsaris
 2   to here?
 3        A.   Myself.
 4        Q.   Had you reviewed the online
 5   application submitted by Mr. Laforest, or was
 6   that just based on your general rules that the
 7   text message says "as per management"?
 8        A.   I reviewed.
 9        Q.   Let's go to what was previously
10   marked as Defendant's 23, Bates stamped
11   Defendants' 92, single page.
12             MR. GOODMAN:  I am not finding a 92,
13   single page.  What is it?
14             MS. CATERINE:  It is a credit
15   application form, bunch of fields, first name.
16             (Discussion off the record.)
17        Q.   If you could turn to Defendants' 92,
18   the last page.
19        A.   Yes.
20        Q.   What is this document, the last page?
21        A.   This is a screenshot of when you are
22   about to pull someone's credit, so you take the
23   handwritten credit application, fill it out
24   over here on Dealertrack.
25        Q.   So if someone logs into Dealertrack
```



```
 1                    S. Orsaris
 2    to process a credit application, this would be
 3    the form they would fill in, correct?
 4        A.   Yes.
 5        Q.   On May 30, 2020, who at Mitsubishi
 6    could access this form?
 7        A.   Myself, David Perez, and the finance
 8    managers.  David Perez and myself were the ones
 9    that were running credit.
10        Q.   This form would have been used to run
11    the credit of Mr. Laforest, correct?
12             MR. GOODMAN:  Object to form.  Go
13    ahead.
14        A.   Yes.
15        Q.   And who filled out this form for Mr.
16    Laforest?
17        A.   Either myself or David Perez.
18        Q.   And who filled out this form for Ms.
19    Francois?
20        A.   Either myself or David Perez.
21        Q.   Do you see the check box on this form
22    that says "I have customer permission to pull a
23    credit report" and so on?
24        A.   Yes.
25        Q.   Why does this form have that check
```



```
 1                    S. Orsaris

 2   box?

 3        A.   Because you need to have permission

 4   to pull credit for permissible purpose.

 5        Q.   What was the process for whether you

 6   could check that check box?

 7        A.   A handwritten completed credit

 8   application and a conversation by David Perez

 9   or myself to make sure you were you and you

10   were looking to purchase a vehicle, your intent

11   to purchase a car.

12        Q.   If you could go to what was

13   previously marked as Exhibit 26.  This is Bates

14   stamped subpoena responses 557, and is also

15   Bates stamped DTI 49.

16             What is this document?

17        A.   Dealer or Dealertrack history of when

18   we ran Emmanuel Laforest's credit.

19        Q.   Prior to your preparation for this

20   deposition today, had you seen this document?

21        A.   I can't recall.

22        Q.   Is this a document you can access

23   from Dealertrack?

24        A.   I don't know.

25        Q.   Generally speaking, for a consumer,
```



```
 1                      S. Orsaris
 2    can you access the screen on Dealertrack that
 3    lists the history of credit pulls like this
 4    screen does?
 5             MR. GOODMAN:  Object to the form.  Go
 6    ahead.
 7        A.   I don't know.
 8        Q.   Based on that response, I think I
 9    know the answer, but have you ever retrieved a
10    screen like this for a consumer with the
11    Dealertrack program?
12        A.   No.
13        Q.   Do you know that Dealertrack was
14    tracking that information?
15        A.   I don't know.
16        Q.   So starting at the bottom, the first
17    entry says "deal jacket created."  Do you see
18    that?
19        A.   Yes.
20        Q.   Next to that entry is the name D.
21    Perez, and that refers to David Perez, correct?
22        A.   Yes.
23        Q.   Based on that entry, and the
24    following entries, you believe it was Mr. Perez
25    who pulled the credit reports of Emmanuel
```



```
 1                    S. Orsaris

 2    Laforest?

 3         A.   Yes.

 4         Q.   Because if it had been you who pulled

 5    the credit report, it would presumably say S.

 6    Orsaris, correct?

 7         A.   Yes.

 8         Q.   There is a time stamp here of

 9    4:38 p.m. on May 30 for the deal jacket being

10    created.  Does that seem like a likely time at

11    which on or around that time Mr. Perez spoke

12    with Emmanuel Laforest for the first time at

13    the dealership?

14         MR. GOODMAN:  Object to form.  If you

15    could indulge me, I am curious about the time

16    zone for that time, but object to form.

17         A.   I don't know.

18         Q.   Do you have any document which would

19    show any other time for when Mr. Laforest's

20    credit was pulled other than 4:39 p.m.?

21         A.   I do not have another document.

22         Q.   Based on this screen, would it be

23    reasonable to presume that there is a similar

24    screen for the pulling of Ms. Francois' credit

25    report?
```



1                      S. Orsaris

2        A.    I am sure there is.

3        Q.    Well, I can represent to you that

4    Dealertrack has not produced such a screen.

5    Why do you think that's the case?

6              MR. GOODMAN:  Object to form.  Go

7    ahead.

8        A.    Human error.  An error, maybe.  I

9    don't know.  You have to ask Dealertrack.

10       Q.    Is there any other way to pull a

11   consumer's credit report other than Dealertrack

12   at Victory Mitsubishi?

13       A.    No.

14       Q.    Do the finance managers use any other

15   software other than Dealertrack?

16       A.    No.

17       Q.    You will see on this document it says

18   time stamped June 20 at 3:08 a.m., adverse

19   action recommended.  Why did it take so long

20   for an adverse action to be recommended for Mr.

21   Laforest?

22             MR. GOODMAN:  Object to the form.

23       A.    It is the system, Dealertrack system.

24   It's a Dealertrack setting where it says D

25   system.



1                         S. Orsaris

2          Q.    Could you look at the exhibit

3     previously marked as Exhibit 21, Defendants'

4     1 through 36.

5          A.    That's the deal jacket.

6          Q.    Could you turn to Defendants' 2.

7     This is the credit application you were

8     referring to earlier that was filled out on

9     May 30, correct?

10         A.    Yes.

11         Q.    And the handwritten notations above

12    the applicant information that say 10,000 down,

13    3095, 3385, who made those handwritten

14    notations?

15         A.    Anything on the left-hand side it

16    looks like David Perez's handwriting.  On the

17    right-hand side it looks like Yessica's in

18    terms of the notations.

19         Q.    What does the 0/0 mean?

20         A.    You would have to ask David, but I

21    presume the credit score of Emmanuel Laforest.

22         Q.    Based on that, Mr. Laforest was going

23    to have some issues obtaining financing,

24    correct?

25         A.    Depending on the collateral.



```
1                      S. Orsaris
2         Q.   And the 10,000 down written here,
3    would that be how much Mr. Laforest had offered
4    to put down, or how much he would need to put
5    down in order to obtain financing?
6         A.   Probably what he wanted to put down.
7    That is David Perez's handwriting.  I don't
8    know for certain.
9         Q.   What does the 3385 that I believe you
10   said was written by Yessica Vallejo, what does
11   that refer to?
12        A.   The stock number of the vehicle under
13   purchase.
14        Q.   And I see also in blue ink there is a
15   checkmark next to Nulls Whole Food.  Was that
16   also made by Yessica Vallejo?
17        A.   I can't say for sure.  I don't know.
18        Q.   And what would that checkmark
19   indicate?
20        A.   You have to ask Yessica.
21        Q.   How would you verify employment
22   information provided in this application?
23             MR. GOODMAN:  Object to the form.  Go
24   ahead.
25        A.   During the credit application
```



```
 1                       S. Orsaris
 2   process, you ask who their employer is, make
 3   sure they list it.  There is a declaration on
 4   the bottom that the information that they are
 5   writing on this document is accurate.  There's
 6   a signature there for Emmanuel, and for what I
 7   presume was Ms. Farah.
 8        Q.   If you could go to the next page,
 9   please.
10        A.   Yes.
11        Q.   What is this document?
12        A.   The receipt.
13        Q.   The receipt for what?
14        A.   $8,600.
15        Q.   And what was that payment for?
16        A.   That was the first collection of the
17   deposit, the down payment.
18        Q.   When you say "the first collection,"
19   what do you mean?
20        A.   We receipted $8,600 initially, and
21   there was $400 later on.  We receipted that as
22   well.
23        Q.   You said you receipted the $400 as
24   well?
25        A.   I assume so.
```



```
 1                      S. Orsaris
 2        Q.   Has that been produced?
 3        A.   No.  I looked for it, couldn't find
 4   it, so it could have been human error while
 5   inputting.
 6        Q.   Where would the human error be; in
 7   the receipt or the places such as the retail
 8   installment contract that lists the down
 9   payment as $9,000?
10             MR. GOODMAN:  Object to the form.  Go
11   ahead.
12        A.   The receipt.
13        Q.   And there is a time stamp for this
14   receipt that says May 30th, 2020, 20:04.  Do
15   you see that?
16        A.   Yes.
17        Q.   Would that time stamp be accurate?
18             MR. GOODMAN:  Object to form.
19        A.   Yes.
20        Q.   So this down payment was receipted at
21   about 8:04 p.m., correct?
22        A.   Yes.
23        Q.   When you said the human error would
24   likely be in the receipt, this was a receipt
25   prepared by you, correct?
```



1                    S. Orsaris

2        A.    Yes.

3        Q.    So it was likely your error, correct?

4             MR. GOODMAN:   Objection.   That

5    mischaracterizes.   Object to the form.

6        Q.    You can answer.

7        A.    I don't recall exactly what happened.

8    My understanding, it must have been a human

9    error.   David Perez holds those receipts, and

10   so does the finance managers.

11            MR. GOODMAN:   I think he is saying

12   there may be another error in the --

13            MS. CATERINE:   I understand.   His

14   testimony can speak for itself.

15       Q.    I thought you had testified that you

16   remembered collecting the down payment and

17   receipting it; isn't that correct?

18       A.    I collected the initial part of the

19   down payment, and it is store policy to

20   immediately put it inside the safe.   If someone

21   has $400, in this case $400 later on, be it an

22   hour, half hour, 15 minutes, it doesn't matter.

23   The initial portion, I receipted it.

24       Q.    I see.   So you are saying someone

25   else may have receipted the $400, and that may



1                         S. Orsaris

2    have been misplaced or lost or something like

3    that?

4         A.   Yes.

5         Q.   But I seem to recall that you

6    remembered receiving $9,000 in a down payment.

7    Isn't that right?

8              MR. GOODMAN:  Object to form.

9         A.   I collected the biggest portion of

10   the down payment.

11        Q.   So your testimony isn't that you

12   collected $9,000, but you collected a large

13   portion of $9,000; is that correct?

14        A.   I don't recall being the one that

15   collected that last $400.  It could be

16   possible.  I don't recall.

17        Q.   And you can't recall because this was

18   over two years ago, so your memory is not going

19   to be great?

20             MR. GOODMAN:  Object to form.

21        A.   I just don't recall.

22        Q.   Let's look at what was previously

23   marked as Exhibit 27, Bates stamped Subpoena

24   Responses 566, also Bates stamped DTI 58.

25             MR. GOODMAN:  566?



```
1                      S. Orsaris

2             MS. CATERINE:   Subpoena Responses

3     566, single page.

4         Q.   What is this document?

5         A.   Similar document to what we just went

6     over a few minutes ago for Jami Singer.

7         Q.   Who is Jami Singer?

8         A.   I don't know.

9         Q.   Let's turn to Exhibit 25 Bates

10    stamped Defendants' 70 through 72, the iPhone

11    screenshots.

12        A.   I have it.

13        Q.   When were these screenshots made?

14        A.   Around the beginning when we were

15    requested to produce documentation at some

16    point early on.

17        Q.   And they were made with the phone

18    that you had in September of 2020; is that

19    correct?

20        A.   That is not correct.  My current

21    phone, I save every text message ever sent.

22        Q.   So the text messages from your old

23    phone were imported into your new phone; is

24    that right?

25        A.   All text messages are saved in
```



```
1                      S. Orsaris

2    iCloud, so I don't use the terminology

3    transported over.  I save it in iCloud, the

4    date I received the text messages.

5         Q.   Do you see the driver's license here?

6         A.   Yes.

7         Q.   Do you see it is the driver's license

8    of someone named Jami Singer?

9         A.   Yes.

10        Q.   Why was Mr. Laforest texting you a

11   picture of the driver's license and Social

12   Security number of Jami Singer?

13        A.   After my first conversation with him,

14   he told me what happened, and then he requested

15   to move the loan over to her name.

16        Q.    Let's go back to the document we

17   were just looking at, the one Bates stamped

18   subpoena responses 566.

19        A.   Okay.

20        Q.   And so this document indicates that

21   Ms. Singer's credit was run on May 30th,

22   correct?

23        A.   Yes.

24        Q.   And it was run by Yessica Vallejo,

25   correct?
```



```
1                      S. Orsaris
2        A.   Yes.
3        Q.   I thought you said that only you or
4   David Perez would be running consumer's credit
5   reports?
6             MR. GOODMAN:  Object to the form.
7   Mischaracterizes his testimony.  You can
8   answer.
9        A.   Definite mischaracterization.  I did
10  state very early that finance managers do have
11  the appropriate training to run credit.
12       Q.   But I think you said something along
13  the lines of you were certain that on May 30th,
14  the only people who would be running consumers'
15  credit reports would be you and Mr. Perez.
16  Isn't that correct?
17            MR. GOODMAN:  Object to form.
18       A.   99 percent the credit was ran by me
19  or David.  Again, I said very early on, all of
20  my finance managers have the appropriate
21  training to run credit.
22       Q.   Why would Ms. Vallejo run the credit
23  in this case if normally it would be you or Mr.
24  Perez?
25            MR. GOODMAN:  Object to form.
```



```
 1                    S. Orsaris
 2        A.   I don't know.
 3        Q.   Prior to preparation for your
 4   deposition today, were you aware that Ms.
 5   Vallejo had run the credit of Ms. Singer on
 6   May 30, 2020?
 7        A.   I was not -- I don't know.
 8        Q.   And you said that you recalled two
 9   people coming into the dealership, correct?
10        A.   We ran Jami Singer's credit.  That
11   means she was present inside the building.
12             MS. CATERINE:  Strike the
13   nonresponsive answer to the question.
14        Q.   Did you previously testify that you
15   remember two people coming into the dealership,
16   Emmanuel Laforest and someone who you assumed
17   was Farah Jean Francois?
18        A.   Keep the same answer.  If the credit
19   was run, she was in the building.
20             MS. CATERINE:  Can you please
21   instruct your witness to answer the question?
22             MR. GOODMAN:  No, I won't do that,
23   but I will ask him to listen to --
24             MS. CATERINE:  Please read back the
25   question.
```



1                     S. Orsaris

2              (Record read.)

3        A.    I testified that I remember them

4    inside the office, two people inside of the

5    office when I collected the down payment.

6        Q.    Okay, great.  Not three people?

7        A.    Inside of the office discussing the

8    transaction, it was two people.

9        Q.    Since Jami Singer's credit was run by

10   Ms. Vallejo, there should be a credit

11   application for her, correct?

12              MR. GOODMAN:  Object to the form.  Go

13   ahead.

14       A.    If she did not purchase a car, we did

15   not create a deal jacket, and we did not store

16   her credit application.

17       Q.    Sorry.  What was the end of your

18   answer?

19       A.    We did not create a deal jacket, and

20   therefore we did not store any credit

21   application.  It doesn't even say here that we

22   submitted her to a lender.

23       Q.    Would you have any records regarding

24   Ms. Singer such as in Dealertrack?

25              MR. GOODMAN:  Object to form.  Go



```
 1                      S. Orsaris
 2   ahead.
 3         A.   I don't know.
 4              MS. CATERINE:  Call for the
 5   production of all records in Victory
 6   Mitsubishi's possession, custody or control
 7   regarding Jami Singer.
 8              MR. GOODMAN:  Take it under
 9   advisement.
10         Q.   Do you ever ask the consumer if they
11   can get a co-applicant?
12              MR. GOODMAN:  Object to the form.  Go
13   ahead.
14         A.   Yes.
15         Q.   Did you ask Mr. Laforest if he could
16   get a co-applicant?
17         A.   Either myself or David Perez did.  I
18   don't recall which one of us did.
19         Q.   And you determined that Jami Singer
20   was not a suitable co-applicant, correct?
21              MR. GOODMAN:  Object to the form.
22   Mischaracterizes.
23         Q.   Mr. Laforest wanted Jami Singer to be
24   a co-applicant, correct?
25              MR. GOODMAN:  Object to the form.
```



1                          S. Orsaris

2          A.   To my knowledge, he wanted his

3     sister-in-law to be the co-applicant.

4          Q.   And that is based on the credit

5     application, correct?

6          A.   That's what he told me in September.

7          Q.   Let me ask you, if Mr. Laforest

8     applied for credit with Ms. Singer and then

9     applied for credit with Ms. Francois and then

10    obtained the vehicle, would the credit

11    application with Ms. Singer as the co-applicant

12    be retained?

13               MR. GOODMAN:   Objection to the form.

14    Go ahead.

15         A.   There was no application submitted

16    with Ms. Jami Singer being an applicant or

17    co-applicant.   There was credit pulled, as you

18    can see from this document, but there was no

19    submission.

20         Q.   So why was her credit pulled?

21         A.   I can't recall.

22         Q.   What reason would there be for credit

23    to be pulled at Victory Mitsubishi if a

24    consumer had not filled out a credit

25    application?



                        S. Orsaris

1

2          A.    In order for us to run credit at

3     Victory Mitsubishi, you have to fill out a

4     credit application.

5          Q.    So Ms. Singer did fill out a credit

6     application?

7          A.    I would presume so.  I ran her

8     credit, it seems, or someone in my building

9     when I say "I" ran her credit.

10         Q.    And you don't know if she filled out

11    that application with a co-applicant, correct?

12         A.    I can't say for certain.

13              MR. GOODMAN:  Emma, we are about to

14    hit 5:00 o'clock, which is seven hours.  If we

15    add half an hour for lunch --

16              MS. CATERINE:  Off the record,

17    please.

18              (A recess was taken.)

19         Q.    Let's take a look at an exhibit which

20    I am having marked as Exhibit 29.  This was not

21    previously marked.  It is Bates stamped

22    Subpoena Responses 515 through Subpoena

23    Responses 533.

24              (Subpoena Responses 515 through

25    Subpoena Responses 533 marked Exhibit 29.)



1                       S. Orsaris

2        Q.   Mr. Orsaris, what is this document?

3        A.   The first one?

4             MR. GOODMAN:  The whole thing.

5        A.   Submissions under her name, Ms. Farah

6   Francois' name.

7        Q.   What is the first page of the

8   document?

9        A.   An approval from Capital One Auto

10  Finance in Ms. Farah Jean Francois' name.

11       Q.   And do you see the row where it says

12  approval date and it gives the approval date as

13  May 30, 2020, 3:59 p.m.?

14       A.   Yes.

15       Q.   Do you remember the document we

16  looked at before where it showed Mr. Laforest's

17  credit being run at 4:38 p.m.?

18       A.   You have to make sure it is on the

19  record that these time stamps are questionable

20  in the sense of time zones.

21       Q.   We can discuss that in a second, but

22  do you recall the document that shows

23  4:38 p.m.?

24       A.   Sure, yes.

25       Q.   So your explanation for why this



1                     S. Orsaris

2    approval comes before Mr. Laforest's credit was

3    run is time zone difference; is that right?

4              MR. GOODMAN:  Object to form.  Go

5    ahead.

6        A.   I think there is clear indication in

7    Dealertrack that the time stamps are inaccurate

8    if you look at the credit pulls.  It even says

9    extremely late times, which is just inaccurate.

10   The time stamps are not accurate.

11       Q.   What do you mean?  I'm sorry.  Could

12   you --

13       A.   These time stamps throughout the

14   various documents that Dealertrack gave in the

15   subpoena are not accurate.  They are all over

16   the place.

17       Q.   What do you mean they are all over

18   the place?

19       A.   They are at different times.

20       Q.   What about them being at different

21   times shows that they are inaccurate?

22       A.   It later states that they ran Farah

23   Jean Francois' credit very late that night or

24   something like that, and that's just not true.

25       Q.   Can you point to where in the



```
 1                    S. Orsaris
 2   documents it shows that?
 3        A.   In her credit report, Defendants' 37,
 4   it says that her credit pull time was at
 5   8:55 p.m., which is after this document that
 6   you just asked me to pull, and that credit
 7   inquiry would have been here, and it is not, so
 8   Dealertrack is having a time issue with the
 9   time stamps, and I would like to put that on
10   the record.
11        Q.   Hold on.  We are going to get to
12   that.  So you are referring to the document
13   Bates stamped Defendants' 37 which was
14   previously marked Exhibit 22, Defendants' 37
15   through 40.  Where on this page does it show
16   the time that the credit report was pulled?
17        A.   Defendants' 38 has the time.  I
18   apologize.
19        Q.   That's okay.  So you are referring to
20   the time stamp on bureau pull date, and it says
21   May 30, 2020, 8:55 p.m.  That's what you are
22   referring to, correct?
23        A.   Yes.
24        Q.   And you said Dealertrack, correct?
25        A.   This is all Dealertrack, yes.
```



```
1                    S. Orsaris

2        Q.    This Experian credit report is from

3    Dealertrack, correct?

4        A.    Yes.

5        Q.    Why do you think this time is

6    inaccurate?

7        A.    It would show the pulls or

8    submissions that were in Subpoena Response 515.

9    It clearly says in Subpoena Response 515

10   3:59 p.m., and if I pulled the credit

11   afterwards, it would have been listed as a

12   credit inquiry, and it's not, so there is a

13   clear indication that the time stamps are not

14   reliable in Dealertrack software.

15       Q.    Hold on.  You are going to have to go

16   a little bit slower for me.  What is step one

17   here?

18       A.    On subpoena response 515, you see on

19   5/30/2020 at 3:59 p.m., we submitted the loan

20   application to Capital One.

21       Q.    Yes.

22            MR. GOODMAN:  Let her -- go ahead.

23       A.    On Defendant's 38 on her credit

24   report, it says that we pulled it at 8:55 p.m.

25            Then if the time stamps on
```



Case 1:22-cv-04447-JSR   Document 52-7   Filed 02/24/23   Page 204 of 223

STAVROS ORSARIS  30(b)(6)30(b) 1                    November 23, 2022
FARAH J. FRANCOIS vs VICTORY AUTO GROUP LLC                          204

```
1                      S. Orsaris
2    Dealertrack software are correct, the credit
3    inquiry on Capital One Auto Finance would have
4    shown on the inquiry section of Defendants'
5    37.
6         Q.   Interesting.  So a possible
7    explanation for the time difference was
8    different time zone, correct?
9              MR. GOODMAN:  That's kind of
10   something I said.
11        A.   I use the word time zone, but I
12   really don't know why that is, but I would
13   really like to state if I ran the credit at
14   eight p.m., it would have shown in submissions
15   that you see throughout the subpoena response
16   515, 553 and everything else.
17        Q.   Unless her credit report was pulled
18   more than once, correct?
19        A.   If I had pulled it at 8:55 p.m., it
20   would have shown the inquiries.
21        Q.   Sure, but it could have been pulled
22   earlier, correct?
23        A.   It was definitively pulled before.
24        Q.   Sure.  That credit report was pulled
25   at 8:55 p.m., at least according to the Bates
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                    S. Orsaris
 2   stamp, but a credit report would have been
 3   pulled earlier than that, correct?
 4        A.   No.  It would list Victory Mitsubishi
 5   as a credit inquiry.
 6        Q.   What would list Victory Mitsubishi as
 7   a credit inquiry?
 8        A.   On Defendants' 37, if I pulled her
 9   credit multiple times, which there is
10   absolutely no reason to ever do that, it would
11   list Victory Mitsubishi as a credit inquiry.
12        Q.   You mean like it does on Defendants'
13   39?
14        A.   Yes.  So the TransUnion will show it.
15   The TransUnion shows it.  The TransUnion gives
16   an in-time report.
17             Again, if I ran the bureaus multiple
18   times, I would have seen on the TransUnion --
19   I see where you are going -- on the TransUnion
20   it would have shown all the submissions on
21   Subpoena Responses 515 all the way over.  This
22   report was not pulled multiple times.  I want
23   to make sure you are clear.
24             MS. CATERINE:  I am going to mark
25   another exhibit as Exhibit 30.  This is Bates
```



```
 1                    S. Orsaris
 2    stamped Subpoena Responses 513.  This one is a
 3    single page.  I double checked.  It really is a
 4    single page.
 5               (Subpoena Responses 513 marked
 6    Defendants' Exhibit 30.)
 7         A.   Yes, I have this.
 8         Q.   What is this document?
 9         A.   Dealertrack has software to help make
10    sure that the person that is in front of you is
11    really them.
12         Q.   I think I recall seeing a check box
13    for red flag/OFAC on that credit report form
14    that we looked at earlier; is that correct?
15         A.   Yes.  It's not a clickable thing,
16    though.  It is automatically clicked.
17         Q.   I thought that was the case.  And do
18    you see the time stamp here of May 30, 2020,
19    16:55:48?
20         A.   Yes.
21         Q.   And do you think that time stamp is
22    inaccurate?
23         A.   I don't know.  I don't recall the
24    time that we worked this transaction.
25         Q.   And this is a Dealertrack document,
```



1                     S. Orsaris

2    correct?

3         A.   Dealertrack provided this document.

4    I don't know if this is proprietary Dealertrack

5    software or an outsourced software to run.

6         Q.   That's fine.  Going back to the

7    credit application filled out in May, the phone

8    number was the same for both Mr. Laforest and

9    Ms. Francois.  Why was that?

10             MR. GOODMAN:  You are talking about

11   this subpoena --

12             MS. CATERINE:  This would be

13   Defendant's 2 from the deal jacket.

14        A.   I don't know why that phone number is

15   listed there.

16        Q.   If you see co-applicants who have the

17   same phone number, are you going to ask them

18   about that?

19        A.   The box says home phone number, and

20   they have the same address as well.  I didn't

21   have any reason to specifically ask them for a

22   cell phone number, and they have the same

23   address for about seven years and five months.

24        Q.   When Mr. Laforest returned to the

25   dealership for the re-signing, another credit



```
 1                      S. Orsaris
 2    application was done, correct?
 3         A.    Another handwritten credit
 4    application?
 5         Q.    No.  Just another credit application.
 6               MR. GOODMAN:  Object to the form.  Go
 7    ahead.
 8         A.    The initial credit application is
 9    stored and can be reused.
10         Q.    Could you take a look at what was
11    previously marked as Exhibit 21, Bates stamped
12    Defendants' 19 through 21.
13               MR. GOODMAN:  Where is it?
14               MS. CATERINE:  It is in the deal
15    jacket.
16         Q.    What is this document?
17         A.    Printout of a document submitted, the
18    credit application form that was used.
19         Q.    Why was this credit application used
20    when you said the May credit application was
21    stored and could have been used again?
22         A.    This is definitively -- this is the
23    same credit application.
24         Q.    It is?
25         A.    I am confused where you are going.
```



1                   S. Orsaris

2     Can you rephrase the question?

3          Q.   If this is the same credit

4     application, why does it say time at address

5     ten years rather than as you previously read

6     seven years?

7          A.   I don't know, but that does not have

8     any meaningful difference to Capital One, so I

9     wouldn't know why it would be different.

10         Q.   Why is the employment information

11    different in this application than on the May

12    application?

13         A.   What's different?

14         Q.   You do not see anything different?

15         A.   Are you referring to the salary?

16         Q.   I am.

17         A.   If I am not mistaken, the after-tax

18    amounts were listed as the gross income on the

19    handwritten credit application.  Lenders want

20    to look at the gross income before any taxes,

21    deductions; not the after-tax amount.

22         Q.   So that is a gross income on the May

23    application, and then in this application, it's

24    the pre-tax income.

25         A.   I think May was post-tax income, this



```
1                       S. Orsaris
2     is pre-tax income.  Lenders want to work with
3     the pre-tax income.
4          Q.    There is a work phone number listed
5     here.  Where did that information come from?
6     It's not in the May application.
7          A.    If there is anything missing, the
8     finance team at Victory Mitsubishi posed to the
9     customer and asked them what is -- whatever is
10    missing.
11             So I would presume that Yessica left
12    her office and went to Farah Jean In May and
13    asked her what the work phone number is, and
14    maybe she asked to confirm the credit
15    information prior to submitting it.
16         Q.    Did Victory Mitsubishi call this work
17    phone number to confirm Ms. Francois'
18    employment?
19         A.    No.
20         Q.    How do you know that?
21         A.    It would probably be indicated
22    somewhere if they did.  In this transaction,
23    there was no requirement by Capital One for us
24    to produce or ask the customer to produce
25    income documentation.
```



```
 1                      S. Orsaris
 2        Q.   Why was it -- were you finished?
 3        A.   I think it is important to put on the
 4   record, usually that means they are making some
 5   sort of internal notation that the person may
 6   be working there.  That's why they didn't ask
 7   us for any income documentation.
 8             MR. GOODMAN:  What did you just say?
 9             THE WITNESS:  Lenders have tools to
10   determine the -- know whose people's employers
11   are, or potentially.
12        Q.   Why wasn't Emmanuel Laforest a
13   co-applicant on this application?
14             MR. GOODMAN:  You are looking at
15   Defendants' 19, right?
16             MS. CATERINE:  Yes.
17        A.   Emmanuel Laforest is not listed as a
18   co-applicant at the request -- I would imagine
19   it would have been at the request of both
20   parties, both folks that were there that day.
21   Emmanuel Laforest, and who would I presume is
22   Farah Jean Francois, or an impersonator of
23   Farah Jean Francois.
24        Q.   Isn't that strange, that they would
25   have submitted an application together, and
```



1                     S. Orsaris

2    then Mr. Laforest would request to not be on

3    the vehicle?

4         A.    I did not say it was just Emmanuel

5    Laforest.  It could have been Ms. Farah

6    Francois.  They may have potentially asked "Can

7    I have the lowest possible payment," and they

8    live together.

9         Q.    Can you turn to Defendants' 9 in

10   Exhibit 21.

11        A.    Okay.

12        Q.    The signatures for Victory Mitsubishi

13   here, whose signatures are those?

14        A.    To the left is Yessica Vallejo, and

15   the biller at the time.

16        Q.    The biller, you said?

17        A.    The person that prepared the

18   registration paperwork.

19        Q.    And what was that person's name?

20        A.    Based off these signatures, I don't

21   know.

22        Q.    Do you see the dates written in here

23   6/29/20?

24        A.    Yes.

25        Q.    Those appear to be in the same



```
 1                        S. Orsaris
 2    handwriting, correct?
 3              MR. GOODMAN:  Object to form.  Same
 4    as what?
 5         A.   I'm sorry.  What was the question?
 6         Q.   The two writings of 6/29/20 appear to
 7    be in the same handwriting, correct?
 8              MR. GOODMAN:  Object to the form.  Go
 9    ahead.
10         A.   I guess so.
11         Q.   Can you turn to Defendants' 13,
12    please.  What is this document?
13         A.   The warranty contract.
14         Q.   And who filled this out?
15         A.   Yessica Vallejo.
16         Q.   And the email address listed for Ms.
17    Francois here is francois@gmail.com.  That's
18    not Ms. Francois' email address, correct?
19         A.   I don't know.
20         Q.   Did Victory Mitsubishi try emailing
21    that email address?
22         A.   No.
23         Q.   I would take you to take a look at
24    what I am marking as Exhibit 31, Bates stamped
25    Francois 3906 to 3907.
```



```
1                      S. Orsaris

2              (Document Bates 3906 - 3097 marked

3    Defendants' Exhibit 31.)

4        Q.   Are you familiar with this website,

5    email-checker.net?

6        A.   No.

7        Q.   Does Victory Mitsubishi verify emails

8    provided by consumers?

9        A.   They can verify with the consumer,

10   but we don't verify with a tool like that.

11       Q.   Who at Victory Mitsubishi made up

12   this fake email address?

13            MR. GOODMAN:  Object to the form.

14   That's crazy.  Objection.

15       Q.   Go ahead and answer the question.

16       A.   It is our process to ask the customer

17   what is your email address, and we put down

18   whatever is provided by the customer, in this

19   case what we presume is Farah Jean Francois, or

20   whoever was impersonating Farah Jean Francois

21   gave us that email.

22       Q.   Why was it a different email address

23   that was previously provided to you such as in

24   the May credit application?  I might be

25   mistaken.  Maybe it wasn't given in the May
```



1                      S. Orsaris

2    credit application.

3         A.   I don't see an email in the May

4    credit application.

5         Q.   Turn, if you could, please, to

6    Defendants' 10.  Do you see the email address

7    listed here Alpo0220@gmail.com?

8         A.   Yes.

9         Q.   I believe you previously testified

10   that you recognize this email address as the

11   email address affiliated with the transaction,

12   correct?

13             MR. GOODMAN:  Object to form.

14        A.   That is the email address that was

15   given when we were completing this document.

16        Q.   Again, why is there a different email

17   address on the service contract, the

18   Francois@gmail.com email address?

19        A.   You would have to ask Emmanuel

20   Laforest and you can ask Farah Jean Francois,

21   but I don't know why they would provide me with

22   two different email addresses.

23             MR. GOODMAN:  You have three minutes

24   to go.

25             MR. KESHAVARZ:  Can we go off the



```
 1                    S. Orsaris
 2   record for a quick second, please?
 3            (Discussion off the record.)
 4        Q.   Mr. Orsaris, you said Verizon was
 5   your cell phone provider, correct?
 6        A.   Yes.
 7        Q.   Was Chris Orsaris in the office when
 8   Ms. Francois spoke with you in September 2020?
 9            MR. GOODMAN:  Object to form.  Go
10   ahead.
11        A.   No.
12        Q.   Do any father and son work at the
13   dealership?
14            MR. GOODMAN:  Object to form.  Go
15   ahead.
16        A.   No.
17        Q.   You mentioned a CARFAX report, and I
18   didn't see one in the deal jacket.  Was a
19   CARFAX report produced?
20        A.   We have an account with CARFAX.  It's
21   producible at any time.  I don't know if it was
22   produced at that time.
23            MS. CATERINE:  We call for the
24   production of any CARFAX report to the extent
25   that it exists.
```



1                    S. Orsaris

2              MR. GOODMAN:  Take it under

3    advisement.

4         Q.   And you said employees from Victory

5    Auto Group to Victory Mitsubishi, but

6    operations did not move from Victory Auto Group

7    to Victory Mitsubishi.  What did you mean by

8    that?

9              MR. GOODMAN:  Object to the form.

10   Mischaracterizes.  Go ahead.

11        A.   A new car dealership versus a premier

12   dealership are two different operations.  We

13   became a new car franchise, so of course

14   operations ceased.

15        Q.   Any other change besides that?

16             MR. GOODMAN:  Object to the form.

17        A.   Installation of Mitsubishi as a

18   franchise.  Of course a lot of changes, but

19   when Mitsubishi signs up, Mitsubishi is around.

20        Q.   So Diane did not have a Mitsubishi

21   franchise prior to Victory Mitsubishi; is that

22   correct?

23             MR. GOODMAN:  Object to the form.

24        A.   I don't know the structure of

25   Larchmont Mitsubishi, so I don't know.



800.211.DEPO (3376)
EsquireSolutions.com

1                      S. Orsaris

2        Q.    But Victory Auto Group was not a

3    Victory Mitsubishi franchise; is that correct?

4        A.    No.

5              MR. GOODMAN:  No, that is not

6    correct?

7              THE WITNESS:  No, that is not

8    correct.

9              Victory Auto Group is not a

10   Mitsubishi franchise.

11             MR. GOODMAN:  You are over time now,

12   and I would not be difficult now if Ahmad had

13   not done what he did yesterday.

14             We are not ordering the transcript.

15             (Time noted:  5:42 p.m.)

16

17   Subscribed to and sworn    _____

18   To before me this         Stavros Orsaris

19   ____ day of _____,20  .

20

21   _____

22   Notary Public

23

24

25



```
 1
 2                   INDEX TO TESTIMONY
 3    WITNESS                  BY                   PAGE
 4    Stavros Orsaris       Ms. Caterine             4
 5
 6                   INDEX TO EXHIBITS
 7    DEFENDANTS'      DESCRIPTION                   PAGE
 8    Exhibit 28    Subpoena responses 463 to 484    97
 9    Exhibit 29    Subpoena Responses 515 to 533   199
10    Exhibit 30    Subpoena Responses 513          206
11    Exhibit 31    Document Bates 3906 - 3097      214
12
13             DOCUMENTS AND INFORMATION REQUESTS
14    DESCRIPTION                                   PAGE
15    Records re:  dates of calls related to case   15
16    Customer profiles on DealerSocket of         111
      Emmanuel Laforest, Farah Jean Francois,
17    Jami Singer, and any other customer profiles
      related to the sale of the vehicle
18
      Production of entire overview from           134
19    DealerSocket
20    Phone records showing phone calls in         169
      September of 2020 for Mr. Orsaris' personal
21    cell phone
22    Picture or documents sufficient to show the  172
      vehicle in the lot
23
      All records in Victory Mitsubishi's          197
24    possession, custody or control regarding
      Jami Singer
25
```



1

2                         CERTIFICATION

3          I, HELENE GRUBER, a New York State

4    certified shorthand reporter, hereby certify that

5    the foregoing transcript is a

6    complete, true and accurate transcript in the

7    matter of Francois v. Victory Auto Group et al

8    held on November 23, 2022.

9          I further certify that this

10   proceeding was reported by me and that the

11   foregoing transcript was prepared under my

12   direction.

13

14

15

16   Date: December 3, 2022

17

18

19

20

21

22                    _____

23

24                    HELENE GRUBER

25



1

2    Our Assignment No.   J8893716

3    Case Caption: Francois

4    vs.  Victory Auto Group et al

5    DECLARATION UNDER PENALTY OF PERJURY

6        I declare under penalty of perjury

7    that I have read the entire transcript of

8    my Deposition taken in the captioned matter

9    or the same has been read to me, and

10   the same is true and accurate, save and

11   except for changes and/or corrections, if

12   any, as indicated by me on the DEPOSITION

13   ERRATA SHEET hereof, with the understanding

14   that I offer these changes as if still under

15   oath.

16   _____

17   Stavros Orsaris

18   Subscribed and sworn to on the _____ day of

19   _____, 20_____ before me,

20

21   _____

22   Notary Public,

23   in and for the State of _____

24

25



1

2                DEPOSITION ERRATA SHEET

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20

21

22   SIGNATURE:_____DATE:_____

23            Stavros Orsaris

24

25



STAVROS ORSARIS  30(b)(6)30(b) 1                     November 23, 2022
FARAH J. FRANCOIS vs VICTORY AUTO GROUP LLC                      223

```
 1

 2                    DEPOSITION ERRATA SHEET

 3    Page No._____Line No._____Change to:_____

 4    _____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    _____

 8    Reason for change:_____

 9    Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21

22    SIGNATURE:_____DATE:_____

23              Stavros Orsaris

24

25
```

