1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ------------------------------X

4   FARAH JEAN FRANCOIS,

5                      Plaintiff,

6          -against-                    Case "No.":
                                        1:22-cv-4447-JSR
7   VICTORY AUTO GROUP LLC d/b/a
    VICTORY MITSUBISHI, SPARTAN
8   AUTO GROUP LLC d/b/a VICTORY
    MITSUBISHI, STAVROS ORSARIS,
9   YESSICA VALLEJO, DAVID PEREZ,
    DIANE ARGYROPOULOS, and
10  PHILIP ARGYROPOULOS,

11                     Defendants.

12  ------------------------------X

13

14         REMOTE DEPOSITION of PHILIP ARGYROPOULOS, a

15  30(b)1 and 30(b)(6) witness herein, witness

16  located in New York, held on November 28, 2022,

17  commencing at 2:05 p.m., and before Helene Gruber,

18  a certified shorthand reporter and notary public

19  within and for the state of New York.

20

21

22

23

24

25



```
 1
 2   A P P E A R A N C E S:
 3   THE LAW OFFICE OF AHMAD KESHAVARZ
 4   Attorneys for Plaintiff
 5          16 Court Street, #2600
 6          Brooklyn, New York 11241
 7   BY:    EMMA CATERINE, ESQ.
 8
 9   NICHOLAS GOODMAN & ASSOCIATES
10   Attorneys for Defendants
11          333 Park Avenue South
12          New York, New York  10010
13   BY:    NICHOLAS GOODMAN, ESQ.
14
15
16
17
18
19
20
21
22
23
24
25
```



1

2

3                 S T I P U L A T I O N S

4

5          IT IS HEREBY STIPULATED AND AGREED,

6   by and between the attorneys for the respective

7   parties, as follows:

8          All objections, except as to the form

9   of the questions, shall be reserved to the time

10   of the trial.

11          The within examination may be signed

12   and sworn to before any Notary Public with the

13   same force and effect as if signed and sworn to

14   before the court.

15          Filing of the original transcript of

16   the examination is waived.

17

18

19

20

21

22

23

24

25



1          P. Argyropoulos

2          COURT REPORTER:  Please state your

3   name and business address.

4          THE WITNESS:  Philip Argyropoulos,

5   3018 Broadway, Astoria, New York  11106.

6          (The parties stipulate to the witness

7   being sworn in remotely.)

8             PHILIP ARGYROPOULOS,

9   Having first been duly sworn, was examined and

10  testified as follows:

11              EXAMINATION

12  BY MS. CATERINE:

13      Q.   Good afternoon.  Could you please

14  state your full name for the record?

15      A.   Philip Argyropoulos.

16      Q.   Have you gone by any other names or

17  aliases?

18          MR. GOODMAN:  Phil, you can answer

19  the question.

20          THE WITNESS:  I said "no."

21      Q.   Sorry I didn't hear you.

22      A.   Okay.

23      Q.   So I notice some of the documents

24  spell your last name in different ways.  Does

25  it have different spellings, or are those



```
 1                    P. Argyropoulos
 2   misspellings?
 3        A.   It does not.  There is only one
 4   spelling.
 5        Q.   Have you had your deposition taken
 6   before?
 7        A.   Yes.
 8        Q.   What was the nature of the suit?
 9        A.   I don't remember.  It was a long time
10   ago.
11        Q.   About how long ago?
12        A.   Over ten years, maybe fifteen.
13        Q.   What was your role in the case?
14        A.   I don't remember.
15        Q.   Were you a defendant or a plaintiff?
16        A.   Don't remember.  I don't remember.
17   I'm sure both.
18        Q.   Have you testified in a court
19   proceeding?
20        A.   In open court?
21        Q.   Yes, sir.
22        A.   No.
23        Q.   Did you testify in the lawsuit by the
24   New York Attorney General against Victory Auto
25   Group LLC?
```



1                    P. Argyropoulos

2            MR. GOODMAN:  Object to the form, as

3    to "testify," but go ahead.

4        A.   No.

5            MS. CATERINE:  Since he is not in

6    your office, Nicholas, should I email him

7    exhibits, or how would you like to do those?

8            MR. GOODMAN:  You can email both of

9    us.  I have already emailed him, forwarded him,

10   your email with the supplemental exhibits.  If

11   there are other exhibits, then you will need to

12   email them.

13           MS. CATERINE:  This one was in the

14   supplemental.

15           Let's start with Exhibit 34, please.

16           (Affidavit in support of respondent's

17   motion marked Defendants' Exhibit 34.)

18           MR. GOODMAN:  Just to verify we are

19   on the same exhibit, this is the affidavit in

20   support of respondent's motion in the State

21   Attorney General case?

22           MS. CATERINE:  Yes.

23           MR. GOODMAN:  Phil, do you have that

24   in front of you?

25           THE WITNESS:  I have it.



```
 1                    P. Argyropoulos

 2        Q.    What is this document?

 3        A.    It's a document about a case.

 4        Q.    And this document was prepared by

 5   your attorney in this case, correct?

 6        A.    Yes.   I thought the questions today

 7   had to do with some sort of alleged fraud.

 8   What does this case -- why am I being asked

 9   about this case?

10        Q.    If you go to the page stamped

11   Francois 1452.

12             THE WITNESS:  Nick, can you jump in

13   here?  I don't know what that means.

14             MR. GOODMAN:  What what means?  Go to

15   1452?

16             THE WITNESS:  What is 1452?

17             MR. GOODMAN:  I am sorry, Emma.  I am

18   just trying to explain to him.  It is on the

19   bottom of the page.  That's a Bates stamp

20   number.

21             THE WITNESS:  I see what you are

22   saying.  I got it.

23        Q.    So you state in this affidavit you

24   were only occasionally at Victory Auto Group.

25   What did you mean by that?
```



```
1                   P. Argyropoulos

2        A.    Again, why am I being asked about

3   this case?  We are not -- the subject matter of

4   this deposition has nothing to do with this

5   case, so can you tell me why you are asking

6   about this case?

7              MS. CATERINE:  Strike the

8   nonresponsive answer to the question.

9        Q.    Can you please answer the question,

10  sir?

11       A.    I am an attorney.  Did you hear that

12  part at the beginning of the deposition?  I am

13  asking you why are you asking about an

14  unrelated case, and why would I need to answer

15  that question?

16       Q.    Are you going to answer the question?

17       A.    I don't see a reason to unless my

18  attorney directs me to.  This case has nothing

19  to do with your action.

20             MR. GOODMAN:  Well, I mean, by

21  counsel, I think the witness would certainly

22  appreciate an explanation of the connection

23  between the State Attorney General case and the

24  case that we are here about.  I would also

25  appreciate that.
```



1                       P. Argyropoulos

2             I would also point out that inquiry

3      about the State Attorney General action is the

4      subject of a pending motion before Judge Rakoff

5      to strike references to it from the pleading.

6             Having said that, I did not object,

7      and I don't see -- I think that we should go

8      forward and answer these preliminary questions.

9      If it gets any further, we will take whatever

10     action is appropriate, but for now, I would

11     suggest, Phil, that you just go ahead and

12     answer the question.

13        A.    Please state the question again.

14        Q.    Sure.  In this affidavit you state

15     that you were only occasionally at the Victory

16     Auto Group dealership.  What did you mean by

17     that?

18        A.    Exactly what it says.  I was only

19     occasionally there.

20        Q.    How often does that mean?  Were you

21     there every week?

22        A.    No.

23        Q.    Every month?

24        A.    Maybe two, three times a year.

25        Q.    And that was the dealership at 4070



```
 1                    P. Argyropoulos
 2    Boston Road; is that correct?
 3              MR. GOODMAN:  Object to the form, and
 4    time frame.
 5         A.   Correct.
 6              MR. GOODMAN:  Was that an answer to
 7    the question?  I am not clear what happened on
 8    the record here.
 9         A.   Do you want to ask it again?
10         Q.   Did you say "yes"?
11         A.   I said "yes."
12         Q.   Are you aware that one of your former
13    employees testified in a deposition in another
14    case that you were at the dealership every
15    Saturday?
16         A.   I am not aware of that.
17         Q.   But you deny that; is that correct?
18         A.   Yes.
19              MR. GOODMAN:  Again, object to form
20    as to time frame.  When are we talking about?
21         Q.   If you could take a look at
22    Exhibit 35, please.
23              (Stipulation of settlement and order
24    marked Defendants' Exhibit 35.)
25              MR. GOODMAN:  Hang on.  Let me --
```



1                      P. Argyropoulos

2                 MS. CATERINE:  Go ahead.  If at this

3     point you want to get the Court on the phone as

4     to the pending motion to strike, just let me

5     know.

6                 MR. GOODMAN:  No.  I am going to wait

7     to hear the questions and preserve the

8     potential of objecting and getting the Court on

9     the line if that turns necessary, but we can

10    proceed.

11                MS. CATERINE:  Okay.

12                MR. GOODMAN:  Just to be clear, this

13    is stipulation of settlement and order in the

14    State Attorney General action?

15                MS. CATERINE:  That's correct.

16                MR. GOODMAN:  Go ahead.

17        Q.   What is this document?

18                MR. GOODMAN:  Object to form.  Go

19    ahead.

20        A.   Exactly what it says, stipulation of

21    settlement and order.

22        Q.   On the page marked Francois 3682,

23    where it talks about a judgment being asserted

24    against you personally and individually if the

25    respondents default, do you see that?



1                    P. Argyropoulos

2        A.   I do.

3        Q.   Why did you agree to have a judgment

4   entered against you personally if the

5   dealership defaulted?

6             MR. GOODMAN:  Object to form.  You

7   can answer.

8        A.   That was part of the settlement

9   negotiation.

10        Q.   If I ask you a question during this

11   deposition today and you do not understand it,

12   will you please ask me to rephrase the

13   question?

14        A.   Yes, I will.

15        Q.   If I ask a question and you don't ask

16   me to rephrase, is it reasonable to assume you

17   understood the question?

18        A.   Yes.

19        Q.   And I know you are an attorney so you

20   probably don't need a reminder, but if you

21   could please orally answer rather than nodding

22   or saying "uh huh."  Do you understand?

23        A.   Yes, I think I do.

24        Q.   How old are you?

25        A.   Sixty-nine.



1                    P. Argyropoulos

2        Q.   What is your date of birth?

3        A.   I don't think I want to put that on

4   the record.

5             MR. GOODMAN:  If we can leave a blank

6   in the transcript or we can communicate it

7   outside the record, if necessary, that's fine.

8             MS. CATERINE:  That's fine.

9        Q.   What is your height, sir?

10            MR. GOODMAN:  Same thing with the

11  other depositions.  I don't think we need to

12  get into that.  I will accept service of the

13  subpoena for trial purposes or otherwise.

14            MS. CATERINE:  So there have been

15  persons identified by height by a number of

16  different witnesses, so we are just trying to

17  include or exclude people based on those

18  descriptions.

19            MR. GOODMAN:  Well, I object and

20  suggest that you would have to have more of a

21  foundation for the potential that this witness

22  was one of those people before we get into his

23  height and weight.

24            MS. CATERINE:  I mean, that might be

25  the case for introducing it into evidence, but

```
1                    P. Argyropoulos
2    I don't think that would be the case for
3    discovery in a deposition.
4         A.   It's okay.  I'm sick.  I don't feel
5    good.  I think I have the flu.  Let's move on.
6         Q.   Sorry to hear that.
7         A.   This is obviously not the way a
8    deposition is done, but let's do it.  5'11 and
9    3/4.  Do you want my weight?
10        Q.   Yes, please.
11        A.   220.  Do you want my hair color?
12   Gray.  You want my shoe size?
13        Q.   That's not necessary.  Thank you.
14        A.   I want to move along.  I don't feel
15   good today.
16        Q.   What phone numbers do you use in
17   connection with the Victory Auto Group or
18   Spartan Auto Group dealerships?
19        A.   I don't know what that means.
20             MR. GOODMAN:  Objection to form.
21        A.   I use, what does that mean, I use
22   phone numbers?  My office phone number, the
23   dealership's phone number?  What does it mean?
24        Q.   Sure.  Let me rephrase the question.
25   When you are conducting business for the
```



1                    P. Argyropoulos

2    Victory Mitsubishi dealership, what phone do

3    you use?

4              MR. GOODMAN:  Objection.

5         A.   I don't conduct business for the

6    dealership.  My phone is my office number.

7         Q.   What is that number?

8         A.   (718) 777-1777.

9         Q.   Is that a landline?

10        A.   Yes.

11        Q.   Where do you currently reside?

12        A.   New York.

13        Q.   The County of New York?

14        A.   Manhattan and Nassau and Suffolk.

15        Q.   Do you use any virtual phone

16   providers like Google Voice or WhatsApp?

17             MR. GOODMAN:  Object to form.  Go

18   ahead.

19        A.   No.

20        Q.   What is your email address?

21        A.   Phila@argylaw.com.

22        Q.   Do you use any other email addresses?

23        A.   No.

24        Q.   Do you use a cell phone other than

25   for personal use?



1                    P. Argyropoulos

2        A.    No.

3        Q.    What steps did you take to prepare

4   for your deposition today?

5        A.    Just reviewed some old documentation.

6        Q.    And when did you do that?

7        A.    This morning.

8        Q.    And what were those documents?

9        A.    Ownership documents.

10       Q.    What is your understanding about this

11   case?

12            MR. GOODMAN:  Object to form.

13       A.    The question is way too general.  I

14   don't understand that question.

15       Q.    Sure.  Do you understand what the

16   subject matter of this lawsuit is about?

17            MR. GOODMAN:  Object to form.

18       A.    From what I know, it's some sort of

19   frivolous claim about some sort of fraud that

20   never occurred.

21       Q.    Prior to your deposition -- excuse

22   me.  Prior to your preparation for the

23   deposition in this case, had you reviewed the

24   documents that you reviewed this morning?

25       A.    No.  In the past, I reviewed it,



1                 P. Argyropoulos

2     sure.

3          Q.    When were you first aware of Ms.

4     Francois' allegation that she had been the

5     victim of identity theft?

6          A.    Month or two ago when I was told by

7     Mr. Goodman that I was supposed to be deposed.

8          Q.    Have you searched for any documents

9     in relation to this case?

10              MR. GOODMAN:  Object to the form.

11     You can answer.

12          A.    Too general a question.  You have to

13     explain what you mean by that.

14          Q.    Have you searched your emails for

15     emails about this case?

16          A.    No.

17          Q.    Have you searched for text messages

18     about Ms. Francois or the fraud against her?

19          A.    No.

20          Q.    Have you communicated with Stavros

21     Orsaris about this case?

22          A.    No.

23          Q.    Have you communicated with Yessica

24     Vallejo about this case?

25          A.    No.  I don't even know who that is.



```
1                  P. Argyropoulos
2       Q.   Have you communicated with Diane
3   Argyropoulos about this case?
4            MR. GOODMAN:  Note my objection.  Go
5   ahead.
6       A.   Just as far as telling her I had a
7   deposition today.
8       Q.   Have you communicated with Chris
9   Orsaris about this case?
10      A.   No.
11      Q.   Have you communicated with David
12  Perez about this case?
13      A.   Don't know who that is.
14      Q.   Let me know if you need to get a
15  water or take a break.
16      A.   I will.  Thank you.
17      Q.   Where did you graduate from high
18  school?
19      A.   Bronx Science.
20      Q.   What year was that?
21      A.   I don't remember.  I'm old.
22      Q.   Fair enough.  Where did you go to law
23  school?
24      A.   University of Bridgeport.
25      Q.   When did you graduate from there?
```



```
 1                    P. Argyropoulos
 2        A.    I think it was 80 -- late 80s.
 3        Q.    Have you been practicing law since
 4   that time?
 5        A.    Since I was admitted I have been
 6   practicing.
 7        Q.    When were you admitted?
 8        A.    1990.
 9        Q.    When did you get involved in the
10   business of car dealerships?
11        A.    2004.
12        Q.    What got you interested in it?
13        A.    I was approached by a friend/client
14   and asked if I would be an investor in a
15   dealership.
16        Q.    What was the name of that friend?
17        A.    Nick.  I don't remember his last
18   name.
19             MR. GOODMAN:  It wasn't me.
20             MS. CATERINE:  Fair enough.
21        Q.    Was this for the Laremont Mitsubishi
22   dealership?
23             MR. GOODMAN:  Object to form.  You
24   mean Larchmont?
25        A.    Larchmont, and the answer is no.
```



1                    P. Argyropoulos

2        Q.   But you were an owner of the

3   Larchmont Mitsubishi dealership, correct?

4             MR. GOODMAN:  Object to form.

5        A.   Yes.

6        Q.   When did you become an owner of that

7   dealership?

8        A.   About 2012, '13, or '14.

9        Q.   Larchmont Mitsubishi was a d/b/a,

10  correct?

11       A.   Yes.

12       Q.   And what was the LLC that was

13  operating the dealership?

14       A.   Victory Motors LLC.

15       Q.   When was Victory Motors LLC founded?

16       A.   Not sure.  '12 or '13.

17       Q.   When was Victory Auto Group LLC

18  founded?

19       A.   2004, 2005.

20       Q.   Were you a founding member of Victory

21  Auto Group LLC?

22             MR. GOODMAN:  Object to form.

23       A.   Yes.

24       Q.   What was the first dealership that

25  Victory Auto Group LLC operated?



1                    P. Argyropoulos

2        A.    Bronx Suzuki.

3        Q.    Where was Bronx Suzuki?

4              MR. GOODMAN:   You want a street

5    address?   Object to form.

6        A.    The same place where Victory

7    Mitsubishi is now.

8        Q.    And that's 4070 Boston Road?

9        A.    Correct.

10       Q.    Starting in 2004, what were your

11   responsibilities as an owner of Victory Auto

12   Group LLC?

13       A.    Nothing.   I was just an investor,

14   like I said.

15       Q.    So you provided capital for the

16   dealership?

17       A.    Yes.

18       Q.    Did you do anything else for the

19   dealership other than provide capital?

20       A.    No.  Maybe some legal advice,

21   occasional legal advice.   That's it.

22       Q.    Did you have a retainer with Victory

23   Auto Group?

24       A.    No.  It was gratis.

25       Q.    Has any customer ever made a



1                    P. Argyropoulos

2    complaint against Victory Mitsubishi that they

3    were ripped off by Victory Mitsubishi?

4              MR. GOODMAN:  Object to form.  Again,

5    time frame.

6              THE WITNESS:  I wouldn't know the

7    answer anyway.  The answer is I don't know.

8         Q.   Has any consumer ever alleged that

9    Victory Mitsubishi deceived them other than in

10   the instant lawsuit in the sales --

11             MR. GOODMAN:  Object -- sorry.  Go

12   ahead.

13        Q.   -- in the sales or financing of a

14   vehicle?

15             MR. GOODMAN:  Object to form.

16        A.   I do not know.

17        Q.   Have there ever been any complaints

18   by a government entity that Victory Mitsubishi

19   defrauded or deceived consumers in the sales or

20   financing of vehicles?

21             MR. GOODMAN:  Object to the form of

22   the question.

23        A.   Other than the AG action you asked me

24   about, I don't know.

25        Q.   This friend of yours who provided the



1              P. Argyropoulos

2     opportunity to be an owner of Victory Auto

3     Group LLC, was he also a founding member of the

4     LLC?

5          A.   It was a 50-50 partnership.

6          MR. GOODMAN:   Wasn't the testimony he

7     was about Victory -- was it Victory Auto Group

8     or Victory some other LLC?

9          MS. CATERINE:   Victory Motors LLC.

10    That was the one founded in 2012, correct?

11         A.   That's correct.

12         Q.   Is the ownership split still 50-50

13    with Victory Auto Group LLC today?

14         A.   With the original partner, Nick?

15         Q.   Yes.

16         A.   No.  He surrendered his ownership in

17    2008.

18         Q.   Did a new partner step in?

19         A.   No.

20         Q.   So you were the owner entirely in

21    Victory Auto Group at that point; is that

22    correct?

23         A.   That is correct.

24         Q.   Are you still the sole owner of

25    Victory Auto Group today?



```
 1                    P. Argyropoulos
 2               MR. GOODMAN:  Object to form.  Go
 3     ahead.
 4          A.   Victory Auto Group is not operating
 5     since 2018, but I don't know if it has been
 6     dissolved yet.  I haven't dissolved it.  I
 7     don't know if the accountants dissolved it, but
 8     it is a non-operational company.
 9          Q.   So up until, I believe you said,
10     2018, up until then, were you the sole owner of
11     Victory Auto Group LLC?
12               MR. GOODMAN:  Object to form.
13          A.   Yes.
14          Q.   Sorry?
15          A.   I said "yes."
16               MR. GOODMAN:  What was the answer?
17               THE WITNESS:  Yes.
18          Q.   If you could take a look at
19     Exhibit 36, please.
20               (Local Rule 56.1 statement marked
21     Defendants' Exhibit 36.)
22          Q.   What is this document?
23               MR. GOODMAN:  Object to form.  You
24     can answer.
25          A.   I don't know what this is.
```



1                    P. Argyropoulos

2       Q.   Do you recall this lawsuit against

3   you by Anthony Nelson?

4       A.   Yes.

5       Q.   Prior to your preparation for this

6   deposition today, had you ever reviewed this

7   document?

8       A.   I don't remember.  It's possible.

9       Q.   Do you see paragraph 1 on this first

10  page marked Francois 1001?

11      A.   Yes.

12      Q.   Is the statement in that paragraph

13  correct?

14           MR. GOODMAN:  Object to form.  You

15  can answer.

16      A.   What was the date of this document?

17      Q.   I believe the date is at the top

18  there.

19      A.   Hang on a second.  November 11 of

20  '20.  It says is -- okay.  What is your

21  question?

22      Q.   Is that statement correct?

23      A.   It's correct to the extent of Spartan

24  Auto Group operated the dealership at that

25  address on that date.  Victory Auto Group was



```
 1                    P. Argyropoulos
 2    not in business on that date.
 3         Q.   So when did Victory Auto Group cease
 4    to operate the dealership at that address?
 5         A.   End of '17, maybe into the first
 6    month of '18 at most.
 7         Q.   And that's because Spartan Auto Group
 8    was created and took over operation of the
 9    dealership; is that correct?
10         A.   Correct.
11              MR. GOODMAN:  Object to form.  What
12    was the answer?
13              THE WITNESS:  "Correct."
14         Q.   Who is Chris Orsaris?
15              MR. GOODMAN:  Object to form.
16         A.   Chris is the buyer/inventory manager
17    of Spartan Auto Group.
18         Q.   How long have you known Chris
19    Orsaris?
20         A.   24, 25 years.
21         Q.   If I am doing my math correctly, you
22    knew him prior to your involvement with Victory
23    Auto Group LLC; is that correct?
24         A.   Yes.
25         Q.   How did you know Mr. Orsaris?
```



1                    P. Argyropoulos

2        A.    We had mutual friends.

3        Q.    Did Mr. Orsaris do work for Victory

4    Auto Group LLC?

5              MR. GOODMAN:  Object to form.

6        A.    I think he did for a short while.

7    Not sure.  I think so.

8        Q.    And was it similar to the work that

9    he does for Spartan Auto Group LLC?

10       A.    Yes.

11       Q.    Could you explain to me what exactly

12   it is he does as a buyer for Victory

13   Mitsubishi?

14       A.    He buys the cars from the auction.

15       Q.    So he buys cars at auction to be sold

16   at Victory Mitsubishi; is that correct?

17       A.    Correct.

18       Q.    Are you aware of Mr. Orsaris'

19   criminal history?

20       A.    Yes, I am.

21       Q.    Who made the decision to hire Mr.

22   Orsaris at Victory Auto Group LLC?

23       A.    Diane and -- Diane.

24       Q.    You didn't have any involvement in

25   that decision?



1                      P. Argyropoulos

2              MR. GOODMAN:  Object to form.

3         A.   I don't remember.  She might have

4    asked me what I thought about bringing him

5    aboard.  It's possible.

6         Q.   For Spartan Auto Group LLC, who made

7    the decision to hire Mr. Orsaris?

8              MR. GOODMAN:  Object to form.

9         A.   Diane.

10        Q.   Did she ask for your input with that

11   decision?

12             MR. GOODMAN:  Object to form.

13        A.   She may have.

14             MR. GOODMAN:  Can you hang on one

15   second?  I am going to be off screen for one

16   second.

17             MS. CATERINE:  Sure.

18             (Pause in the proceedings.)

19        Q.   How would you describe Mr. Orsaris'

20   appearance?

21             MR. GOODMAN:  Appearance?

22             MS. CATERINE:  Yes.

23             MR. GOODMAN:  Talking about Chris

24   Orsaris?

25             MS. CATERINE:  Yes, Chris Orsaris'



1              P. Argyropoulos

2    appearance in terms of height and weight.

3              MR. GOODMAN:  Object to form.  Go

4    ahead.

5         A.   I don't know.  Maybe 5'7, 150, 160.

6    Sometimes clean shaven, sometimes beard.  I

7    don't see him that much.

8         Q.   When was the last time you saw him,

9    approximately?

10        A.   It was about a week or so at a party.

11        Q.   Is he a salaried employee at Victory

12   Mitsubishi?

13        A.   I don't know that.

14        Q.   Would he have been working for

15   Victory Mitsubishi in September of 2020?

16             MR. GOODMAN:  Object to form.

17        A.   Yes.

18        Q.   Have you ever met with him at the

19   dealership?

20        A.   It's possible.  I can't specifically

21   remember.

22        Q.   What is the job application process

23   at Victory Mitsubishi?

24        A.   I don't know.

25             MR. GOODMAN:  Object to form.



1                    P. Argyropoulos

2        A.   I have no clue.

3        Q.   Who would set the job application

4   process at Victory Mitsubishi?

5        A.   No idea.

6        Q.   Are you consulted in regards to

7   hiring decisions?

8             MR. GOODMAN:  Object to form.  Go

9   ahead.

10        A.   No, I am not.

11        Q.   What information does Victory

12   Mitsubishi ask for in job applications?

13        A.   I already answered that.  I don't

14   know about applications.  Now you are asking me

15   about what's in it?  I have no idea.

16        Q.   How often do you go into the

17   dealership in person?

18             MR. GOODMAN:  Objection.  Form.

19        A.   Two or three times a year.

20        Q.   Did how often you came in change

21   because of the COVID-19 pandemic?

22        A.   Repeat that question.  I didn't

23   understand that question.

24        Q.   Sure.  A lot of people have switched

25   to doing more remote work because of the



1                    P. Argyropoulos

2    COVID-19 pandemic, generally starting in the

3    year 2020.  Was that the case for you in

4    regards to the dealership?

5         A.   In what way?  Do you mean did I go

6    there during COVID?

7         Q.   Sure.  Let's go with that question

8    first.

9         A.   I don't remember going there at all

10   during the height of COVID, let's say.

11        Q.   So you don't recall going there in

12   the year 2020?

13        A.   Correct.

14        Q.   Who runs payroll at Victory

15   Mitsubishi?

16             MR. GOODMAN:  Object to form.

17        A.   Either Diane or the controller.

18        Q.   Who would be the payor for employees

19   at Victory Mitsubishi?

20        A.   Payor meaning who?  What company?

21        Q.   Yes.

22        A.   I have no idea.

23        Q.   Do some employees have a different

24   payor than others?

25        A.   I have no idea.



1              P. Argyropoulos

2       Q.   When is the last time you received

3   compensation for your role as an owner at

4   Victory Auto Group?

5       A.   I don't receive -- oh, as an owner?

6   I wouldn't recall.

7       Q.   Would it be sometime around 2017?

8       A.   I don't remember.

9       Q.   How about at Spartan Auto Group?

10      A.   Again, I wouldn't remember.  I am not

11  an owner so I don't receive any compensation.

12      Q.   But you were an owner of --

13      A.   I don't remember.  I don't remember

14  when there was a payment made to me.

15      Q.   Both Spartan Auto Group and Victory

16  Auto Group did business under the name

17  Mitsubishi, correct?

18      A.   Victory Auto Group never had a d/b/a

19  of Victory Mitsubishi.  It had other d/b/a's.

20      Q.   What are those d/b/a's?

21      A.   I don't recall.  Bronx Suzuki was one

22  of them that I remember.  It might have also

23  been Victory Suzuki.  Don't get confused.

24      Q.   Did Victory Motors ever operate under

25  the name Victory Mitsubishi?



1                    P. Argyropoulos

2        A.    Yes, they did, until they closed.

3        Q.    When was that?

4        A.    I don't remember.  I think it was in

5    '17.

6        Q.    During the shutdown of Victory Auto

7    Group and the opening of Spartan Auto Group,

8    was there any change of managers or employees

9    at that time at the dealership?

10       A.    I wouldn't know that.

11       Q.    Have you ever fired an employee of

12   Victory Mitsubishi?

13       A.    Not me.

14       Q.    Who would make those decisions?

15       A.    Diane or the general manager.

16       Q.    Has an employee ever been fired for

17   engaging in fraud?

18             MR. GOODMAN:  Object to the form.

19       A.    I don't know, but I am sure, I am

20   sure that they have.

21             MR. GOODMAN:  Just so I am clear,

22   Emma, you are asking -- the question you are

23   asking is framed as Victory Mitsubishi, which

24   is a d/b/a, so I guess I am just trying to

25   clarify for myself.  I object to the form as to



1                    P. Argyropoulos

2    whether you are asking for any of the specific

3    LLCs we have been talking about.

4              Having said that, go ahead.

5         Q.   Did you collect a salary at Victory

6    Auto Group LLC?

7         A.   I don't think so.  I don't remember.

8         Q.   Did you collect a salary at Spartan

9    Auto Group LLC?

10        A.   When?

11        Q.   At any time.

12        A.   I think I was at one point salaried,

13   but I don't remember exactly if it was for

14   legal fees for consulting.

15             MR. GOODMAN:  She is asking salary.

16        A.   It's possible.

17        Q.   Do you receive any other compensation

18   from Spartan Auto Group LLC other than a

19   salary?

20        A.   I think I get free oil changes.

21        Q.   That's nice.

22        A.   Yeah.

23        Q.   Did you receive any other

24   compensation other than a salary at Victory

25   Auto Group LLC?



1                    P. Argyropoulos

2        A.    No, I don't think so.

3        Q.    Who is Diane Argyropoulos?

4        A.    The owner of the company.

5              MR. GOODMAN:  Which company?

6        A.    Spartan Auto Group.

7        Q.    Was she an owner of Victory Auto

8    Group LLC?

9        A.    No.

10       Q.    Was she a manager at Victory Auto

11   Group LLC?

12       A.    Yes.

13       Q.    When did she start as a manager at

14   Victory --

15       A.    Both were November of 2008.  She took

16   over the operation of all automobile sales.

17       Q.    And she is your wife, correct?

18       A.    Correct.

19       Q.    When were you married?

20       A.    '83.

21       Q.    When she started as a manager of

22   Victory Auto Group, was she a salaried

23   employee?

24       A.    I don't remember if she took salary

25   or 1099.  I'm not sure.



1                    P. Argyropoulos

2        Q.   Did she receive a commission at that

3   time?

4             MR. GOODMAN:  Object to form.

5        A.   No, no commission.

6        Q.   I believe you testified she is an

7   owner of Spartan Auto Group LLC; is that

8   correct?

9        A.   Yes.  She is currently the sole

10  owner.

11       Q.   At the start of Spartan Auto Group

12  LLC, was she an owner?

13       A.   She was not.

14       Q.   In May of 2020, was she an owner of

15  Spartan Auto Group LLC?

16       A.   Which one?

17       Q.   Spartan Auto Group LLC.

18       A.   Yes.  She was 100 percent owner.

19       Q.   How often does she go to the

20  dealership in person?

21       A.   Every day, sometimes Saturdays,

22  sometimes Sundays too.

23       Q.   Does Victory Mitsubishi have a

24  separate building other than the one at 4070

25  Boston Road where it conducts business?



1                        P. Argyropoulos

2              MR. GOODMAN:  Object to form.

3        A.   It has other locations for offices

4   for other operations, let's say.

5        Q.   What are those addresses?

6        A.   I don't know.  I don't know them

7   offhand.  I know there is at least two to three

8   other structures.  There is also some storage

9   yards, but I don't know the addresses.

10       Q.   How did the Victory Mitsubishi

11  dealership adapt to the COVID-19 pandemic?

12             MR. GOODMAN:  Object to form.

13       A.   They had to follow government

14  guidelines that were put in place with respect

15  to selling cars.

16       Q.   And the decisions about how to comply

17  with those guidelines, were they made by you?

18       A.   No.

19       Q.   Were they made by Diane?

20       A.   I am assuming either Diane or Stavros

21  made those decisions, but for the rest of the

22  deposition, you know, any question you are

23  going to ask me about decision making at

24  Spartan Auto Group, you are going to get the

25  same answer.  I don't operate the place.  I



1                    P. Argyropoulos

2    don't know what they do there.  I am just

3    trying to save the world some time.

4         Q.   I understand.  And who is Stavros?

5         A.   Stavros is the GM.

6         Q.   And how long has he been the GM?

7         A.   I think six years maybe, five, six

8    years.

9         Q.   Who made the decision to hire him?

10        A.   I think Diane.

11        Q.   Who sets the policies as to the

12   pulling of credit records at Victory

13   Mitsubishi?

14        A.   I don't know.  Diane or Stavros.

15        Q.   Who set the policies regarding

16   identity verification at Victory Mitsubishi?

17        A.   I don't know.

18        Q.   And there was a policy during the

19   COVID-19 pandemic to allow the sale of vehicles

20   to consumers in the name of other consumers who

21   were not at the dealership, correct?

22             MR. GOODMAN:  Object to form.

23        A.   I don't know what that means.

24        Q.   Let me rephrase the question.

25   Because of the COVID-19 pandemic, some people



1                    P. Argyropoulos

2    didn't want to go out to places in person to

3    make purchases.

4         A.   Right.

5         Q.   So did the dealership allow people to

6    purchase a vehicle without being in the

7    dealership themselves?

8              MR. GOODMAN:  Object to the form of

9    the question.

10        A.   I don't know that.

11        Q.   Has there ever been identity theft at

12   Victory Mitsubishi?

13             MR. GOODMAN:  Object to form.

14        A.   I don't know.

15        Q.   Was there ever identity theft at

16   Victory Auto Group?

17        A.   Don't know.

18        Q.   Have you ever spoken with any police

19   officers in regards to Victory Auto Group LLC?

20             MR. GOODMAN:  Object to form.

21        A.   I don't believe so.

22        Q.   Have you ever spoken with any police

23   officers in regards to Spartan Auto Group LLC?

24             MR. GOODMAN:  Objection to form.

25        A.   I don't --



1                    P. Argyropoulos

2        Q.    Sorry.  I didn't catch the answer.

3        A.    I do not believe so.

4        Q.    What is the business structure of

5    Victory Mitsubishi?

6              MR. GOODMAN:  Object to form.

7        A.    The one that is currently operating?

8        Q.    Yes.

9        A.    Victory Mitsubishi is a New York

10   State d/b/a filed in Albany for the entity

11   known as Spartan Auto Group LLC.

12       Q.    Who is the current owner?

13       A.    Diane.

14       Q.    And you said she was sole owner,

15   correct?

16       A.    Yes.

17       Q.    Who were the owners in May of 2020?

18       A.    Diane, solo.

19       Q.    If you take a look at Exhibit 37

20   please.

21             (2016 Schedule K-1 marked

22   Defendants' Exhibit 37.)

23       A.    Sure.

24             MR. GOODMAN:  2016 K-1.

25       Q.    It is marked Francois 3519.  It's a



1                    P. Argyropoulos

2    single page.

3         A.   Got it.

4         Q.   Did you fill out this document or

5    have this document filled out on your behalf?

6         A.   I don't know.  I don't know where

7    this document came from.  It is K-1 from '16.

8    The information on here that is accurate is

9    that I was the owner, 99 percent.  That's

10   correct.

11        Q.   Who owned the other 1 percent?

12        A.   I don't know.  It might have been an

13   entity.  It's a tax thing the accountant

14   doesn't want you to own 100 percent.  He wants

15   you to put 1 percent in some other name for the

16   way he filed taxes, something like that.  I

17   don't know.

18        Q.   In addition to for tax purposes, is

19   it also for liability purposes?

20             MR. GOODMAN:  Object to form.

21        A.   How would that even be answered?

22   Liability purposes meaning what?  That

23   99 percent absolves you of liability?  You know

24   that doesn't.  That's not true.

25        Q.   Let me rephrase the question.  For



1              P. Argyropoulos

2   purposes of liability in regards to torts

3   allegedly committed by the LLC?

4        A.   You are an attorney.  You know that

5   answer.  You could be 1 percent owner and be

6   fully liable jointly and severally.  Come on,

7   come on.

8        Q.   Similar forms were filed for Victory

9   Auto Group and Spartan Auto Group in 2020; is

10  that correct?

11           MR. GOODMAN:  Object to form.

12       A.   Similar forms like what?

13       Q.   Similar K-1 forms.

14       A.   In 2020, there would be only one K-1

15  filed.  In 2020, there would be one K-1 filed.

16       Q.   That would be for Spartan Auto Group?

17       A.   That is correct.

18       Q.   What would that K-1 reflect the

19  ownership to be?

20           MR. GOODMAN:  Object to form.  Asked

21  and answered.  Go ahead.

22       A.   It was answered already on three

23  different occasions, actually.

24           MS. CATERINE:  Could you read back

25  the question, please?



```
 1                  P. Argyropoulos
 2             (Record read.)
 3             MR. GOODMAN:  You could answer it.
 4    It is the same answer.  Go ahead.
 5        A.   Diane owns the company.  Diane is the
 6    sole owner.
 7             MS. CATERINE:  This is a previously
 8    marked document.
 9             Should I just email this to you and
10    then you can forward?
11             MR. GOODMAN:  It is 28.
12             MS. CATERINE:  What is it?
13             MR. GOODMAN:  The Bates stamps.
14             MS. CATERINE:  It is Bates stamped
15    Subpoena Responses 463 to 484.
16             MR. GOODMAN:  I have all of those.
17    They are all in the conference room.
18             Let's take a five-minute break right
19    now, and I can gather those, and we will be
20    ready to go in five or ten minutes, if that's
21    okay.
22             MS. CATERINE:  It's fine with me.
23             (A recess was taken.)
24        Q.   What are these documents?
25             MR. GOODMAN:  Object to form.  Go
```



```
1                    P. Argyropoulos
2    ahead, take your time, Phil.  There are
3    several --
4         A.   Can't you just ask me a specific
5    question about a specific document?  It is 28
6    pages.  What do you want me to do?  Do you want
7    me to sit here for half an hour?
8              You are familiar with these
9    documents.  It's your case.
10             MR. GOODMAN:  Phil, let's just wait
11   for a question and --
12             THE WITNESS:  Sorry.  It just seems
13   like we are wasting a lot of time here.
14        Q.   What are the documents?
15        A.   You didn't hear anything I just said.
16             MR. GOODMAN:  Let's go ahead, Phil,
17   and just answer.
18             I object to the form.
19        A.   I don't know what they are.  I don't
20   know what they are.
21        Q.   Are you a signatory to these
22   documents?
23        A.   I might be.  I have to look at them.
24   Too many pages to look at.
25        Q.   If you could turn to --
```



1                   P. Argyropoulos

2          A.   If you ask specific questions the way

3    it is supposed to be done at depositions, then

4    I will answer.

5          Q.   If you could turn to the page marked

6    Subpoena Responses 468, please.

7          A.   What page is that, please?

8               MR. GOODMAN:   468, Bates stamped

9    Number 468.  It is the sixth page, 468.

10              THE WITNESS:   I don't have anything

11   Bates stamped here.  I am looking at page 6.

12         Q.   That's your signature right there?

13         A.   Yes, it is.

14         Q.   And what is your title there?

15         A.   Dealer principal.

16         Q.   What does dealer principal mean?

17         A.   It means you are the individual that

18   was awarded a franchise by a manufacturer.

19         Q.   If you turn to the page Bates

20   stamped -- sorry.  You said yours aren't Bates

21   stamped.  Page 8 of the PDF.

22              MS. CATERINE:   Just for the record,

23   this is Bates stamped 470.

24         A.   Page 8.  Okay.  I'm on that.

25         Q.   Do you see that this agreement is



1              P. Argyropoulos

2    dated March 1st, 2021?

3         A.   I see that, yes.

4         Q.   And the prior agreement, if you turn

5    to the previous page, do you see that is dated

6    January 30th, 2018?

7         A.   Yes.

8         Q.   Were there any agreements entered

9    into by Spartan Auto Group with Mitsubishi

10   Motors for dealer sales and service agreement

11   between these two agreements?

12        A.   I don't understand the question.

13        Q.   Sure.  So these are both dealer sales

14   and service agreements, correct?

15        A.   Yes.

16        Q.   Are there any other dealer sales and

17   service agreements between Spartan Auto Group

18   and Mitsubishi Motors --

19        A.   I don't believe so.

20        Q.   So the January 30, 2018, agreement

21   would have been governing on May 30, 2020; is

22   that correct?

23        A.   May 30th of 2020?

24        Q.   Yes.

25        A.   I think so, yes.



1                    P. Argyropoulos

2        Q.    If you go to page 2 of your PDF,

3    Bates stamped 464.

4        A.    Okay.

5        Q.    Do you see here a bulleted item

6    number 3, ownership of dealer?

7        A.    Yes, I do.

8        Q.    And Diane's title is listed as member

9    here.  Why is that?

10            MR. GOODMAN:  Object to form.

11       A.    I don't know.  I guess because I had

12   a higher percentage ownership.

13       Q.    And your title is listed as manager.

14   Why is that?

15            MR. GOODMAN:  Object to form.

16       A.    Usually in these situations from a

17   legal standpoint, manager usually means

18   managing member, and member is just a standard

19   member that has ownership.

20       Q.    And so that is --

21       A.    It doesn't mean manager in the sense

22   of the word.

23       Q.    Sure.  So in this case, this is just

24   referring to you being a managing member rather

25   than --

1                    P. Argyropoulos

2        A.    Correct.

3               MR. GOODMAN:  Let her finish the

4    question.

5        Q.    And there is a column here

6    involvement in management (active or inactive,)

7    and it lists you as active.  What does that

8    mean?

9               MR. GOODMAN:  Object to the form.

10       A.    I don't know what it means in their

11   context.  You would have to ask Mitsubishi.

12   They knew I was never there.

13       Q.    Did you consult with an attorney

14   before signing this agreement?

15              MR. GOODMAN:  Object to form.

16       A.    No.

17       Q.    You say they knew that you were never

18   there.  How did they know that?

19       A.    They just knew that I wasn't there.

20   They knew I was not operating the dealership.

21   They never called me.  They called Diane.

22       Q.    Was that because you had communicated

23   that to Mitsubishi Motors to --

24       A.    Not necessarily.  They knew that.

25   They knew that I had a full-time law practice.



```
 1                    P. Argyropoulos
 2    I did not run the dealership.
 3         Q.   Have you been working with Mitsubishi
 4    Motors since you started getting involved with
 5    car dealerships in 2004?
 6         A.   To whatever extent needed, yes.
 7         Q.   Did Victory Auto Group LLC operate
 8    Mitsubishi franchises?
 9              MR. GOODMAN:  Object to the form.
10         A.   No.
11         Q.   Did Victory Motors LLC operate
12    Mitsubishi franchises?
13         A.   Yes.
14         Q.   If you could take a look at the page
15    Bates stamped Subpoena Responses 480, it would
16    be page 18 of the PDF, and this page shows
17    Diane as the sole owner in the agreement with
18    Mitsubishi on September 20, 2022, correct?
19         A.   You have to look for the date, but I
20    am assuming yes.  Yes, correct.
21         Q.   Was Diane ever previously listed as
22    the manager with 100 percent ownership prior to
23    this agreement?
24              MR. GOODMAN:  Object to form.
25         A.   I don't think so.
```



1            P. Argyropoulos

2       Q.   So why did you relinquish your

3   ownership and Diane became a full owner between

4   2021 and 2022?

5            MR. GOODMAN:  Objection.  Form.

6       A.   Actually, between 2008 and 2022, it

7   was always the intention of making her a full

8   owner, but you can't do that unless you are

9   qualified to be a dealer principal, and in

10  order to do that, you have to have some years

11  under your belt involved in an automobile

12  dealership for new cars, so it took a while

13  before we could request that she take over the

14  complete ownership.

15      Q.   I see.  And that's a requirement

16  imposed by Mitsubishi?

17      A.   By all new car manufacturers.

18      Q.   Is that a requirement by law?

19      A.   It's not by law.  In order to be

20  awarded a franchise or be an owner of a

21  franchise -- I mean a dealer principal, I

22  should say, you have to have a certain

23  amount -- it's not written anywhere -- of

24  experience for them to approve you and grant

25  you a dealership.



1                    P. Argyropoulos

2              In this case, Diane came in with no

3    experience in '08, so, you know, we let her

4    run the store all those years until such time

5    that it was a good time knowing that she would

6    be approved as an owner, which she was.

7              And the request -- your document

8    says September '22, I believe.  That request

9    was made back in '16, in December of '16 when

10   we first went to contract to buy the Bronx

11   franchise, but they never sent the

12   application.  They sat on it and whatnot.  It

13   was not like it was a problem.  It wasn't

14   urgent.

15        Q.   I see.  And what changed?

16        A.   In what way?

17        Q.   Why had they previously sat on it,

18   for example, in the 2018 and 2021 agreements

19   but then approved her for full ownership as a

20   dealer principal in the '22 agreement?

21        A.   No.  She was already -- she was

22   already an owner in '18.  They wanted her in as

23   a small percentage.  That's why she had the

24   30 percent.  They wanted her to have a small

25   percentage, and then we should reach out to



1                    P. Argyropoulos

2    them to get her to be a full-time owner.

3              I had no interest in being an owner.

4    I had a law practice.  I wasn't involved.

5    There was no point in me being an owner of the

6    company.

7         Q.   Did you sell your share of ownership

8    to her?

9         A.   No.

10        Q.   Was it gifted to her?

11        A.   It was transferred over.

12        Q.   And when did that happen?

13        A.   In '18.  So in '19, she became a full

14   owner.

15        Q.   So why does the 2021 agreement still

16   list her as a 30 percent owner?

17        A.   Well, one has nothing to do with the

18   other.  One is a franchise agreement.  They

19   don't, you know, need you to prove anything.

20   It is just sloppiness, basically.

21        Q.   So they --

22        A.   From a legal standpoint, she owned

23   the company as of 2019, for all intents and

24   purposes.

25        Q.   So the representation on page 9 of



1                     P. Argyropoulos

2     your PDF, Bates stamp Subpoena Responses 471,

3     the representation here that Diane was a

4     30 percent owner on March 1st, 2021, that

5     representation is not accurate; is that

6     correct?

7          A.   It's accurate to the extent of she

8     was a 30 percent owner of a franchise.

9          Q.   I guess you are going to have to

10    explain this to me because I am not super

11    familiar with this.

12         A.   A sales and service agreement is

13    basically the issuance of a franchise.  That

14    franchise was issued by Mitsubishi to Phil and

15    Diane.  That's it.  There's really nothing else

16    to explain.

17         Q.   So --

18         A.   So in their eyes, as far as the

19    dealer sales and service agreement, the

20    franchise agreement was 70/30, because that's

21    what they wanted.  They want her to have some

22    ownership.

23         Q.   So Diane owned 30 percent of the

24    franchise even though she was a full owner of

25    the Spartan Auto Group LLC?  Is that what you



1                    P. Argyropoulos

2    are saying?

3         A.   Correct, depending on the dates;

4    yeah.

5         Q.   And you said she became a full owner

6    of the Spartan Auto Group LLC sometime in '19?

7         A.   In '19.

8         Q.   And what prompted that?

9              MR. GOODMAN:  Object to form.

10        A.   What I told you before.  We wanted

11   to -- I didn't want any part of the company.  I

12   didn't run it.  I didn't do anything.  She ran

13   it for a long time.

14        Q.   Is that because of the New York

15   Attorney General action?

16        A.   No.  That case was settled.  What

17   does that have to do with the price of tea in

18   China?

19        Q.   Sorry?

20        A.   It has nothing to do with it.  What

21   does the AG action have to do with it?  Why

22   would you even throw that out?

23             You worried I am hiding my assets?

24   I have a ton of assets.  How about that.  You

25   happy now?  It's on the record.  Yea.



1              P. Argyropoulos

2              MR. GOODMAN:  Okay.  Let's just move

3    forward.

4              (Dealer Sales and Service Agreement

5    marked Defendants' Exhibit 38.)

6         Q.   If you could open Exhibit 38.  This

7    was one of the new exhibits that was emailed to

8    you earlier today, the Victory Motors

9    Mitsubishi agreement Bates stamped Francois

10   3504 to Francois 3514.

11        A.   All right.  What's the question?

12        Q.   If you could turn to page 3505,

13   please.

14        A.   I'm there.

15        Q.   So bullet item number 4, Management

16   of Dealer, do you see that?

17        A.   Yes.

18        Q.   Has this provision been the same or

19   substantially similar in the other agreements

20   that you have entered into with Mitsubishi

21   Motors?

22        A.   I don't know.

23              MR. GOODMAN:  Object to form.

24              THE WITNESS:  When are we going to

25   get questions about the case, Nicholas?



1                    P. Argyropoulos

2         Q.    Sorry.   Do you want to take a second

3    to talk to your attorney?

4         A.    No.   I'm just wondering when you are

5    going to start asking questions about your

6    case.   You are asking questions about a closed

7    dealership agreement, so where is your

8    foundation on that?   What is it based on?   What

9    are you looking to find out?   Or are we just

10   wasting time?

11             MR. GOODMAN:   Can we take another

12   couple of minutes here?   Let me talk to my

13   client.

14             MS. CATERINE:   Sure.

15             (A recess was taken.)

16        Q.    Do you still have that section of the

17   agreement up?

18        A.    Yes.   Go ahead.

19        Q.    As far as you are aware, has this

20   section of the agreement changed --

21        A.    I don't -- sorry.   Finish your

22   question.

23        Q.    -- since the version of the agreement

24   in 2014?

25             MR. GOODMAN:   Object to form.



```
 1                    P. Argyropoulos

 2        A.   I don't know.

 3        Q.   Is this a standard form agreement?

 4        A.   I don't know.

 5        Q.   If you could open Exhibit 39, which

 6   is Bates stamped Francois 3714 to 3722.

 7             (Dealer development plan marked

 8   Defendants' Exhibit 39.)

 9             MR. GOODMAN:  Give me a minute,

10   because I didn't have that one up.  Hold on.

11             MS. CATERINE:  That's fine.  Take

12   your time.

13             (Pause in the proceedings.)

14             MR. GOODMAN:  That's the dealership

15   development plan?

16             MS. CATERINE:  Yes.

17             MR. GOODMAN:  Do you have that, Phil?

18             THE WITNESS:  Got it.

19        Q.   I know you probably have never seen

20   this specific dealer development plan, but the

21   agreements you signed with Mitsubishi for the

22   Victory Mitsubishi dealership had similar

23   dealer development plans, correct?

24        A.   This is for a different dealership.

25   This is for Grand Automotive.
```



1                    P. Argyropoulos

2        Q.   Let me be more specific.   Turn to the

3   page marked Francois 3716.

4        A.   Okay.

5        Q.   Did the dealer development plan for

6   Victory Mitsubishi have similar operating

7   requirements as this one?

8            MR. GOODMAN:   Object to form.   There

9   is no foundation or testimony that there was a

10   development plan for Victory, but go ahead.

11        A.   I have no idea.

12        Q.   As far as you are aware, the dealer

13   development plan for Victory Mitsubishi would

14   have had personnel requirements listing the

15   same managers as the one on this page; is that

16   correct?

17            MR. GOODMAN:   Object to form.

18        A.   That is not correct.   I am not aware

19   of that.

20        Q.   What do you remember about the

21   investigation and subsequent lawsuit against

22   Victory Motors LLC and Victory Auto Group by

23   the New York Attorney General?

24        A.   I don't remember anything.

25        Q.   Were you questioned by investigators



1                    P. Argyropoulos

2    from the New York Attorney General's office in

3    the course of the investigation or the lawsuit?

4              MR. GOODMAN:  Object to form.

5         A.   I don't remember.

6         Q.   Were any employees of the dealerships

7    fired based on the results of the investigation

8    or the lawsuit?

9              MR. GOODMAN:  Object to form.

10        A.   If I remember correctly, everyone was

11   fired.

12        Q.   Everyone at Victory Motors LLC and

13   Victory Auto Group LLC?

14        A.   That's correct.

15        Q.   When did that happen?

16        A.   I don't remember.

17        Q.   Who made that decision?

18        A.   Diane.

19        Q.   What do you remember about the Farah

20   Jean Francois account?

21             MR. GOODMAN:  Object to form.

22        A.   I don't remember anything about it.

23   Are you talking about the AG case?

24             MR. GOODMAN:  No.

25        Q.   No.  I am talking about this lawsuit



1             P. Argyropoulos

2    was brought by Farah Jean Francois.

3        A.   Oh, oh.

4        Q.   What do you remember about her

5    account?

6             MR. GOODMAN:  Object to form,

7    "account," but go ahead.

8             THE WITNESS:  Yeah.  I don't know

9    what she means by her account.

10       Q.   What do you remember about the sale

11   and financing of the vehicle in the name of

12   Farah Jean Francois?

13       A.   I remember nothing because I was not

14   involved with anything with this person.

15       Q.   When were you first aware that there

16   were allegations by a consumer that a sale and

17   financing of a vehicle had happened without her

18   authorization?

19             MR. GOODMAN:  Object to form.

20       A.   Also previously asked and answered.

21   I answered that.  I said I didn't know anything

22   about it until I was told I had to go to a

23   deposition.

24       Q.   Who is Emmanuel Laforest?

25       A.   No idea.



1              P. Argyropoulos

2        Q.   Are you aware that this lawsuit

3    concerns allegation of someone stealing the

4    identity of Farah Jean Francois?

5              MR. GOODMAN:  Objection.  Form.

6    Asked and answered.  Go ahead.

7        A.   I was told by my attorney.

8        Q.   And the person who stole Ms.

9    Francois' identity, when did he first come to

10   Victory Mitsubishi?

11             MR. GOODMAN:  Objection.  Form.

12       A.   The person who stole it?  You don't

13   know who stole anything.  Can you ask that

14   question differently, please?

15       Q.   Do you not understand the question?

16       A.   That's correct, I don't understand.

17       Q.   The person who is alleged to have

18   stolen Ms. Francois' identity is named Emmanuel

19   Laforest.  When did Emmanuel Laforest first

20   come to Victory Mitsubishi?

21       A.   I don't know.  I am not at the

22   dealership.

23       Q.   Are video recordings made at the

24   dealership?

25       A.   I don't know.



1                    P. Argyropoulos

2        Q.    Who would know that?

3        A.    The people that run it.

4        Q.    And when you say "the people who run

5   it," you are referring to --

6        A.    The people I have consistently

7   referred to, Diane and Stavros.

8        Q.    Who was the first person to speak to

9   Mr. Laforest?

10       A.    I do not know.  I do not operate the

11   dealership.  I was never there.

12       Q.    Except for the two to three times a

13   year you go to the dealership; is that right?

14       A.    That is right.

15       Q.    Is that a certain day that you always

16   go to the dealership, or is it based on need?

17       A.    It's not based on anything.  It's

18   whenever I feel like it.

19       Q.    What brings you to the dealership?

20       A.    Maybe I am passing by.  Maybe I was

21   in court in Westchester and I stopped by to say

22   hello.  Maybe I stopped by to have someone look

23   at my car.

24       Q.    When you stop in to say hello, you

25   are saying hello to Stavros and Diane and the



1                    P. Argyropoulos

2    other people who work at the dealership; is

3    that right?

4         A.    That's usually who you say hello to.

5         Q.    What is Dealertrack?

6         A.    I have no idea.

7         Q.    Have you ever attended any trainings

8    put on at the Victory Mitsubishi dealership

9    regarding identity theft or credit reporting?

10        A.    No.

11        Q.    Did you ever attend such trainings

12   that occurred at Victory Auto Group LLC?

13        A.    No.

14        Q.    Do you know if such trainings occur?

15        A.    I don't know if they occur or not.

16        Q.    Who at Victory Mitsubishi

17   communicated with Ms. Francois?

18        A.    I don't know.

19             MR. GOODMAN:  Objection.

20             THE WITNESS:  Sorry, Nick.

21        Q.    Did you speak with Ms. Francois on

22   May 30, 2020?

23        A.    No.

24        Q.    Do you know if anyone at the Victory

25   Mitsubishi dealership spoke with Ms. Francois



```
 1                    P. Argyropoulos

 2    on May 30, 2020?

 3         A.   I do not know.

 4         Q.   Do you know why documents from

 5    Victory Mitsubishi would give two different

 6    dates for the sale of a vehicle such as

 7    May 30th, 2020, and June 29, 2020?

 8              MR. GOODMAN:  Object to form.

 9         A.   I do not know.

10         Q.   Were you aware of Victory Mitsubishi

11    having consumers come to the dealership to

12    re-sign documents as to financing provided by

13    Capital One?

14              MR. GOODMAN:  Object to form.

15         A.   I do not know.

16         Q.   Does Victory Mitsubishi sell vehicles

17    to consumers and then arrange for financing for

18    the vehicle after the consumer has left Victory

19    Mitsubishi with the vehicle?

20              MR. GOODMAN:  Object to form.

21         A.   I do not know.

22         Q.   In your experience with the auto

23    dealership industry, is that a practice which

24    would be risky?

25              MR. GOODMAN:  Object to form.
```



1                     P. Argyropoulos

2        A.   I do not know.

3        Q.   Do you recall a consumer coming to

4   the Victory Mitsubishi dealership in September

5   of 2020 making a complaint about identity

6   theft?

7        A.   I am never there, so the answer is

8   no.

9        Q.   Has Stavros Orsaris ever relayed to

10  you a complaint by a consumer regarding

11  identity theft?

12       A.   No.

13       Q.   Has Diane ever informed of you a

14  complaint by a consumer regarding identity

15  theft?

16       A.   No.

17       Q.   Are you aware that Victory Mitsubishi

18  has retained the down payment for the vehicle

19  which was purchased and later returned to the

20  dealership in this case?

21       A.   I do not know.

22       Q.   Did Victory Mitsubishi have an

23  internal investigation about this incident?

24       A.   I do not know.  I don't operate the

25  dealership.  I do not know.



1                    P. Argyropoulos

2        Q.    If you could open -- this was

3   previously marked as Exhibit 32.  This was the

4   one-page marked Subpoena Responses 326.

5              (Pause in the proceedings.)

6        Q.    Prior to your preparation for this

7   deposition today, had you ever reviewed this

8   document before?

9        A.    No.

10       Q.    Do you see the section titled

11  Narrative?

12       A.    Yes.

13       Q.    Do you have any reason to believe

14  that the statements in that section titled

15  Narrative are untrue or inaccurate?

16             MR. GOODMAN:  Object to form.

17       A.    I don't know.

18       Q.    What is the procedure for Victory

19  Mitsubishi if there is an allegation of

20  identity theft?

21       A.    I don't know.

22             MR. GOODMAN:  Object to form.

23       A.    I am not in the dealership.  I do not

24  operate the dealership.  I do not know for

25  those reasons.



```
1                    P. Argyropoulos
2         Q.   Who would set that procedure?
3         A.   I do not know.  I do not run the
4    dealership.
5         Q.   So we looked at the K-1 filing for
6    Victory Auto Group LLC, and we looked at these
7    franchise agreements with Mitsubishi Motors,
8    and you had explained to me that the Mitsubishi
9    agreements reflected percentage of ownership of
10   the franchise.  Am I recalling that correctly?
11        A.   Correct.
12        Q.   And so in terms of percent of the
13   ownership of the LLCs, would that be reflected
14   by the K-1 filing such as the one we looked at
15   previously?
16        A.   That's correct.
17        Q.   And so the K-1 filing should show
18   that Diane became the sole owner of Spartan
19   Auto Group LLC in 2019; is that correct?
20        A.   Correct.
21             MR. GOODMAN:  What was the answer?
22             THE WITNESS:  "Correct."
23        Q.   And we could open the document
24   previously marked Exhibit 13, Bates stamped
25   Subpoena Responses 485 to 489.
```



1                     P. Argyropoulos

2              MR. GOODMAN:   That starts at page 24

3     of whatever I sent you.

4              (Pause in the proceedings.)

5         Q.   Have you ever received a spreadsheet

6     the same or similar to this spreadsheet from

7     Mitsubishi Motors?

8         A.   No.

9         Q.   And if you look at the fourth page of

10    this document, there is a column titled Opening

11    Comments, and different cells containing

12    descriptions of complaints.  Are you familiar

13    with any of the complaints contained in this

14    spreadsheet?

15        A.   No.

16             No objection?  No, I am not.

17        Q.   If you look at the complaint three

18    rows from the bottom which starts "Cust

19    daughter is upset that," and so on, if you

20    could just take a second and read that to

21    yourself, please.

22        A.   Okay, I read it.

23        Q.   Are you familiar with this complaint?

24        A.   No, because I answered that also.  I

25    am not familiar with the spreadsheet or any of



```
1                   P. Argyropoulos
2    the complaints thereon.
3         Q.   This complaint refers to Victory
4    Mitsubishi putting a vehicle in the customer's
5    mother's name --
6         A.   You don't need to explain it to me.
7    Is there a question?  Do you have a question?
8    Is there a question?  This is a deposition.  I
9    don't need you to explain documents to me.  You
10   have a question?  Ask the question and I will
11   answer it.
12        Q.   Does it concern you that Victory
13   Mitsubishi is alleged to have put a vehicle in
14   the name of a customer's mother instead of that
15   customer?
16             MR. GOODMAN:  Object to form.
17        A.   That doesn't concern me at all
18   because that has to be resolved.  Every
19   complaint is resolved.
20        Q.   What do you mean by that, every
21   complaint is resolved?
22        A.   I don't mean anything by it.  These
23   are allegations that have to play themselves
24   out.  I don't have to explain that to you.
25        Q.   Can you take a look at the first
```



1                    P. Argyropoulos

2     page, this is the one marked Subpoena Responses

3     485.

4              MR. GOODMAN:  That is 24 of 28 on

5     what I sent you.

6          A.   I see it.

7          Q.   Do you see the column here titled

8     Final DISP?

9          A.   I do.

10         Q.   Based on the items in this column

11    that say unresolved or unsatisfied, does that

12    change your answer to the previous question?

13         A.   Not at all.

14              MR. GOODMAN:  Object to the form.

15         A.   Not at all.

16         Q.   I will represent to you the original

17    opening date for the complaint regarding the

18    mother that we were talking about earlier is

19    dated May 11th, 2022.  Does it concern you that

20    this complaint was made so recently?

21              MR. GOODMAN:  Object to form.

22         A.   These are complaints that are

23    pending.  It does not concern me unless there

24    is a resolution unfavorable.

25              And I don't own the business, so



1              P. Argyropoulos
2   technically it doesn't concern me at all.
3        Q.   Chris Orsaris is the father of
4   Stavros Orsaris; is that correct?
5        A.   I believe so.
6        Q.   Do you know of any other father and
7   son who work at Victory Mitsubishi?
8        A.   I don't.
9        Q.   When you first learned of the
10  allegations made by Ms. Francois, what steps
11  did you take to determine if the allegations
12  were true?
13       A.   I took no steps at all.  I don't run
14  the dealership.
15       Q.   Have you recommended the firing or
16  disciplining of any employees in regards to the
17  complaint by Ms. Francois?
18            MR. GOODMAN:  Object to form.  Go
19  ahead.
20       A.   What part of I don't run the
21  dealership do you not understand?  Which part
22  is it that you don't understand?  You want me
23  to say it differently?
24       Q.   Sure, but you speak with Diane --
25       A.   You keep asking questions about the



1              P. Argyropoulos

2    operation of the dealership.  I keep answering

3    the questions the same way.  I don't know.  I

4    do not run the dealership.  I do not own the

5    dealership.  Are you going to spend all these

6    hours asking me questions where you know the

7    answer is going to be the same?

8        Q.   Have you ever provided advice to

9    Diane or Stavros as to the running of the

10   Victory Mitsubishi dealership?

11       A.   No.

12       Q.   Did Victory Mitsubishi sell a vehicle

13   to Emmanuel Laforest on May 30, 2020?

14       A.   Here we go again.  I do not run the

15   dealership.  I do not own the dealership.  I

16   have zero information about anything that the

17   dealership does.

18            Go ahead --

19            MR. GOODMAN:  And specifically asked

20   and answered about Emmanuel Laforest.

21       Q.   Have you at any time tried to contact

22   Farah Jean Francois?

23       A.   I do not run the dealership.  I do

24   not own the dealership.  I do nothing with

25   respect to the dealership.



1              P. Argyropoulos

2              MS. CATERINE:  Strike the

3    nonresponsive answer to the question.

4        Q.   Have you at any time tried to contact

5    Farah Jean Francois?

6        A.   No.

7        Q.   Are you aware of anything that

8    Victory Mitsubishi did wrong in the sale and

9    financing of the vehicle in the name of Farah

10   Jean Francois?

11             MR. GOODMAN:  Object to form.

12       A.   They did wrong?  What kind of

13   question is that?  Am I aware of something they

14   did wrong?  Did you really seriously ask that

15   question?  That's assuming I am going to take

16   the position to say there was something wrong

17   done when I told you I don't run the

18   dealership, I have nothing to do with the

19   dealership, I don't own the dealership.

20       Q.   And you take no position as to

21   whether anything was done wrong?

22             MR. GOODMAN:  Object to the form.

23       Q.   Are you going to answer?

24             MR. GOODMAN:  Take no position?  I

25   don't know how he could answer that.



1              P. Argyropoulos

2              Go ahead.

3        A.    No.  I don't run the dealership and I

4    don't own the dealership.

5              THE WITNESS:  There has to be a way

6    to stop this line of questioning from a legal

7    standpoint, Nick.  I mean, I have been

8    practicing 30 years.  This is insane.

9              MR. GOODMAN:  Emma, listen.  I am

10   trying to be very patient here and let this go

11   and let you ask your questions.  At this point

12   it really is reaching a point at which I am

13   going to have to contemplate a motion to

14   terminate or limit the deposition because we

15   are just -- this would be under the federal

16   rules, we are talking about 30(c)(A), to be

17   specific subdivision 3, that does allow the

18   termination of a deposition when it becomes

19   harassing or so far off base that it doesn't

20   produce any discoverable information.

21             I am not there at this minute, but we

22   are going to get there very soon because as

23   much as I want to allow this to go forward, the

24   witness is correct that he has answered over

25   and over and over again that he doesn't know



1                     P. Argyropoulos

2    anything about the operation of the dealership,

3    so let's continue.

4              Why don't we take a five-minute

5    break, but I am really asking you to seriously

6    consider how far we are going to keep going,

7    because I will make that motion if I have to

8    make it, so let's take a break.

9              MS. CATERINE:  Okay.

10             (A recess was taken.)

11             MR. GOODMAN:  By counsel, I

12   previously referred to a rule of Federal Rules

13   of Civil Procedure, and I misquoted it.  It is

14   Rule 30, and the subdivision is (d)(3) which

15   concerns and allows for a motion to terminate

16   or limit a deposition when it is not being

17   conducted in good faith or in a manner that

18   unreasonably annoys, embarrasses, or oppresses

19   the deponent or a party, and that is what I may

20   invoke subject to ongoing questioning.

21             MS. CATERINE:  Understood.  I think

22   we should be finishing up shortly.

23       Q.   I just wanted to go back to, you had

24   mentioned, you had referred to the firing of

25   employees of Victory Auto Group LLC and Victory



1              P. Argyropoulos

2    Motors after the New York Attorney General

3    lawsuit.  Is that right?

4         A.   Everyone who was involved in selling

5    that product was fired.  That's what Diane told

6    me.

7         Q.   I see.  Everyone who was involved

8    with -- it was a window etching product; is

9    that right?

10        A.   That's right, that was not authorized

11   by Diane to be sold.

12        Q.   Do you know which employees those

13   were?

14        A.   I do not.

15        Q.   And what conversations with Diane

16   have you had about this lawsuit or the issues

17   addressed in this lawsuit?

18             MR. GOODMAN:  Objection.  Form, and

19   this may implicate privilege.  If you can limit

20   it to a question whether there were

21   conversations, that might be appropriate.

22             MS. CATERINE:  Let's start there

23   then.

24        Q.   Did you understand that?

25        A.   What's the question?



1              P. Argyropoulos

2        Q.    The question is, have you had

3    conversations with Diane regarding this lawsuit

4    or the subject of this lawsuit?

5        A.    No, not that I remember.

6        Q.    Thank you so much for your time.

7             MS. CATERINE:  Do you have any

8    questions, Nicholas?

9             MR. GOODMAN:  No, nothing.

10            (Time noted:  4:17 p.m.)

11

12   Subscribed to and sworn   _____

13   To before me this        Philip Argyropoulos

14   ____ day of _____,20  .

15

16   _____

17   Notary Public

18

19

20

21

22

23

24

25



1

2                     INDEX TO TESTIMONY

3      WITNESS                BY                      PAGE

4      Philip Argyropoulos   Ms. Caterine            4

5

6                     INDEX TO EXHIBITS

7      DEFENDANTS'         DESCRIPTION              PAGE

8      Exhibit 34      Affidavit in support of        6

9                      respondent's motion

10     Exhibit 35      Stipulation of settlement and  10

11                     order

12     Exhibit 36      Local Rule 56.1 statement      24

13     Exhibit 37      2016 Schedule K-1              40

14     Exhibit 38      Dealer Sales and Service       55

15                     Agreement

16     Exhibit 39      Dealer development plan        57

17

18

19

20

21

22

23

24

25



1

2                    CERTIFICATION

3         I, HELENE GRUBER, a New York State

4  certified shorthand reporter, hereby certify that

5  the foregoing transcript is a

6  complete, true and accurate transcript in the

7  matter of Francois v. Victory Auto Group held on

8  November 28, 2022.

9         I further certify that this

10  proceeding was reported by me and that the

11  foregoing transcript was prepared under my

12  direction.

13

14

15

16  Date: December 6, 2022

17

18

19

20

21

22                                     

23      _____

24               HELENE GRUBER

25

1

2    Our Assignment No.  J8893948

3    Case Caption: Francois

4    vs.  Victory Auto Group

5    DECLARATION UNDER PENALTY OF PERJURY

6        I declare under penalty of perjury

7    that I have read the entire transcript of

8    my Deposition taken in the captioned matter

9    or the same has been read to me, and

10   the same is true and accurate, save and

11   except for changes and/or corrections, if

12   any, as indicated by me on the DEPOSITION

13   ERRATA SHEET hereof, with the understanding

14   that I offer these changes as if still under

15   oath.

16   _____

17   Philip Argyropoulos

18   Subscribed and sworn to on the _____ day of

19   _____, 20____ before me,

20

21   _____

22   Notary Public,

23   in and for the State of _____

24

25



```
 1
 2                    DEPOSITION ERRATA SHEET
 3    Page No._____Line No._____Change to:_____
 4    _____
 5    Reason for change:_____
 6    Page No._____Line No._____Change to:_____
 7    _____
 8    Reason for change:_____
 9    Page No._____Line No._____Change to:_____
10    _____
11    Reason for change:_____
12    Page No._____Line No._____Change to:_____
13    _____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20
21
22    SIGNATURE:_____DATE:_____
23           Philip Argyropoulos
24
25
```



```
 1

 2              DEPOSITION ERRATA SHEET

 3    Page No._____Line No._____Change to:_____

 4    _____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    _____

 8    Reason for change:_____

 9    Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21

22    SIGNATURE:_____DATE:_____

23            Philip Argyropoulos

24

25
```

