```
 1
 2            UNITED STATES DISTRICT COURT
 3           SOUTHERN DISTRICT OF NEW YORK
 4   -------------------------------------------X
 5   FARAH JEAN FRANCOIS,
 6                           Plaintiff,
 7   -against-          Case No. 1:22-c-4447-JSR
 8   VICTORY AUTO GROUP LLC d/b/a VICTORY
 9   MITSUBISHI, SPARTAN AUTO GROUP LLC d/b/a
10   VICTORY MITSUBISHI, STAVROS ORSARIS, YESSICA
11   VALLEJO, DAVID PEREZ, DIANE ARGYROPOULOS, and
12   PHILIP ARGYROPOULOS,
13                           Defendants.
14   ---------------------------------------------
15       VIDEOTELECONFERENCED DEPOSITION OF:
16                DIANE ARGYROPOLOUS
17              New York, New York
18           Friday, December 9, 2022
19
20
21
22
23   Reported by:
     Aydil M. Torres, CSR
24   JOB NO. J8950423
25
```



```
 1

 2

 3

 4

 5              December 9, 2022

 6              10:01 a.m.

 7

 8

 9        VTC deposition of

10   DIANE ARGYROPOLOUS, held at the

11   offices of Nicholas Goodman &

12   Associates, PLLC, 333 Park Avenue

13   South, New York, New York, pursuant

14   to Notice, before Aydil M. Torres,

15   a Notary Public of the State of

16   New York.

17

18

19

20

21

22

23

24

25
```



```
 1

 2   A P P E A R A N C E S:

 3

 4      LAW OFFICES OF AHMAD KESHAVARZ

 5      Attorneys for Plaintiff

 6          16 Court Street, #2600 Brooklyn

 7          New York, New York 11241

 8      BY:  EMMA CATERINE, ESQ.

 9

10

11

12      NICHOLAS GOODMAN & ASSOCIATES, PLLC

13      Attorneys for Defendants

14          333 Park Avenue South, Suite 3A

15          New York, New York 10010

16      BY:  H. NICHOLAS GOODMAN, ESQ.

17

18      ALSO PRESENT:

19          Patrick Selvey, Esq.

20          Ahmad Keshavarz, Esq.

21

22

23

24

25
```



DIANE ARGYROPOLOUS                                December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2          S T I P U L A T I O N S

3

4       IT IS HEREBY STIPULATED AND AGREED

5     by and between the attorneys for the

6     respective parties herein, that filing,

7     sealing and certification and the

8     same are hereby waived and that the

9     questioning attorney shall provide counsel

10    for the witness examined herein with a copy

11    of this examination at no charge.

12

13      IT IS FURTHER STIPULATED AND AGREED

14    that all objections, except as to the

15    form of the question shall be reserved

16    to the time of the trial.

17

18      IT IS FURTHER STIPULATED AND AGREED

19    that the within deposition may be signed

20    and sworn to before any officer authorized

21    to administer an oath, with the same force

22    and effect as if signed and sworn to before

23    the Court.

24

25



DIANE ARGYROPOLOUS                                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

```
 1
 2              THE REPORTER:  My name is
 3         Aydil M. Torres a New York State
 4         notary public and certified
 5         shorthand reporter.  This
 6         deposition is being held via
 7         videoconferencing equipment.  The
 8         witness and reporter are not in the
 9         same room.  The witness will be
10         sworn in remotely pursuant to
11         agreement of all parties.  The
12         parties stipulate that the
13         testimony is being given as if the
14         witness was sworn in person.
15  D I A N E   A R G Y R O P O L O U S,
16           called as a witness, having been
17           duly sworn by a Notary Public, was
18           examined and testified as follows:
19              THE REPORTER:  Please state
20         your name and spell it for the
21         record.
22              THE WITNESS:  Diane
23         Argyropoulos.  D-I-A-N-E,
24         A-R-G-Y-R-O-P-O-U-L-O-S.
25              THE REPORTER:  Please state
```



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2           your address for the record.
3                   THE WITNESS:  4101 Boston
4           Road, Bronx, New York 10466.
5    EXAMINATION BY
6    MS. CATERINE:
7        Q.   Good morning.
8        A.   Good morning.
9        Q.   Ms. Argyropoulos, have you ever
10   gone by any other names or aliases?
11       A.   My maiden name.
12       Q.   What is that?
13       A.   Papadakos.
14       Q.   Could you spell that, please?
15       A.   P-A-P-A-D-A-K-O-S.
16       Q.   Some of the documents in this case
17   have "Argyropoulos" spelled differently.
18           Do you ever spell it differently or
19   are those just misspellings?
20       A.   It's misspelled.
21       Q.   Okay.  I am sure probably often.
22       A.   It's a long name.
23       Q.   Have you ever had your deposition
24   taken before?
25       A.   "Have" I -- sorry, can you rephrase



```
 1
 2   that?
 3        Q.   Sure.  Have you ever had a
 4   deposition taken before?
 5        A.   Yes.
 6        Q.   And what was the nature of that
 7   deposition?
 8        A.   The Nelson case.
 9        Q.   Any other depositions, besides that
10   one?
11        A.   I don't recall.  I don't think so.
12   I don't recall any.
13        Q.   And were you testifying as an
14   individual or as a corporate representative
15   in that case?
16        A.   Corporate representative, yeah.
17        Q.   Okay.  Have you ever testified in a
18   court proceeding?
19        A.   Yes.
20        Q.   Which court proceeding did you
21   testify in?
22        A.   It was about the Etch.
23        Q.   The New York Attorney General case;
24   is that correct?
25        A.   Yes, yes.
```



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

```
 1
 2                    MR. GOODMAN:  You have to
 3            let her finish the question.  So
 4            the court reporter can't take down
 5            two people at once.
 6                    THE WITNESS:  Sorry.
 7       Q.   It's all right.  It's natural to do
 8  that in conversation.  Just try to -- try to
 9  remember that.
10            What do you remember about that
11  case?
12                    MR. GOODMAN:  Object to the
13            form; go ahead.
14       A.   I remember that my general manager
15  was selling a product.  I was not aware that
16  we were going to have a problem with that.
17  Once it came to my attention, I fired him and
18  everybody else who was selling this product.
19       Q.   What was the name of that general
20  manager?
21       A.   Scott.
22       Q.   Last name?
23       A.   I don't recall.  It's been too many
24  years.
25       Q.   That's all right.  And what were
```



1
2    the names of the other employees who you
3    fired?
4         A.    Danny.  I don't...
5         Q.    If you don't remember, don't guess.
6    Just tell me what you remember.
7         A.    Danny.  That's all I remember.
8         Q.    Okay.  All right.  Let's take a
9    look at Exhibit 35, which is Bates-stamped
10   Francois 3679 to Francois 3684.
11                    MR. GOODMAN:  Emma, what's
12              the subject matter of those?
13                    MS. CATERINE:  That's the
14              stipulation of settlement for the
15              New York Attorney General lawsuit.
16                    MR. GOODMAN:  All right.
17              Let me go through what I have here.
18                    MS. CATERINE:  Yeah, sure.
19                    MR. GOODMAN:  It's probably
20              here somewhere, so -- I don't think
21              I have that out on the table for
22              whatever reason.  I can get it
23              printed pretty quickly, if we need
24              to do that.
25                    MS. CATERINE:  No, that's



DIANE ARGYROPOLOUS                              December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2            all right.  We will just see if we
3            can ask these questions without the
4            document in front of us.
5                 MR. GOODMAN:  Okay.
6       Q.   Ms. Argyropoulos, what do you
7   remember about how the New York Attorney
8   General lawsuit was resolved?
9                 MR. GOODMAN:  Object to the
10            form; go ahead.
11      A.   I remember that it was settled and
12  we paid back everything that we charged.
13      Q.   Do you recall a provision in the
14  settlement, where it stated that if the
15  respondents failed to make payments on the
16  settlement, that a judgment would be entered
17  against Phillip R. Argyropoulos, personally?
18      A.   Yes.
19      Q.   And Philip Argyropoulos is your
20  husband, correct?
21      A.   We're separated.
22      Q.   I see.  Why was the settlement --
23  why did the settlement have this provision
24  for personal -- for a judgment against him,
25  personally, rather than against you?



DIANE ARGYROPOLOUS                              December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

```
 1
 2                    MR. GOODMAN:  Object to
 3          form.
 4      A.   I don't really know why, to be
 5   honest.  I am the one who appeared to the
 6   court.  Phil was not there.  I mean, to me,
 7   at the time, it didn't really matter because
 8   I knew we were paying back that money, so I
 9   was not concerned about a judgment.
10      Q.   So I know you have taken a
11   deposition before, but let's just go over a
12   couple of basics, just to refresh your
13   memory.
14           If you don't understand a question,
15   will you please ask me to rephrase the
16   question?
17      A.   Yes.
18      Q.   If I ask a question and you don't
19   ask me to rephrase the question, is it
20   reasonable to assume that you understood the
21   question?
22                    MR. GOODMAN:  Object to
23          form.
24      A.   Yes.
25      Q.   During the course of your
```



1
2   deposition, your attorney may be making
3   certain objections, as he just did, such as
4   objection to form.  Unless instructed not to
5   answer, do you understand that you are still
6   required to answer the question?
7         A.   Yes.
8         Q.   And for the court reporter, and for
9   the record, do you understand that you should
10  please orally answer, not nod, or say things,
11  like, "uh-huh"?
12        A.   Yes.  I may do that, though, by
13  accident.
14        Q.   That's all right.  If you forget,
15  that's totally fine.  How old are you?
16        A.   Fifty-four.
17        Q.   And where do you currently reside?
18               MR. GOODMAN:  No street
19          address.  Just where, generally.
20        A.   Nassau County.
21        Q.   What steps did you take in
22  preparation for your deposition today?
23        A.   I spoke to my attorneys.
24        Q.   And when you say your "attorneys,"
25  are you referring to Mr. Goodman and Mr.



1
2   Selvey?
3        A.   Yes.
4        Q.   Did you speak with anyone else, in
5   preparation for your deposition today?
6        A.   I did.  I spoke to --
7                  MR. GOODMAN:  Just wait for
8           the question.
9        Q.   Please, go ahead.
10           Who did you speak with?
11       A.   Stavros.
12       Q.   Anyone else?
13       A.   Vena.
14       Q.   And who is that?  What is that
15   person's full name?
16       A.   Vena Singh.
17       Q.   Okay, who is Vena Singh?
18       A.   My BDC manager.
19                  MR. GOODMAN:  By counsel,
20           it's Bibi Singh, you may know her
21           as.
22                  MS. CATERINE:  Sorry, I
23           couldn't hear that.
24                  MR. GOODMAN:  You will see
25           her name on documents that you have



DIANE ARGYROPOLOUS                           December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2                exchanged as Bibi, B-I-B-I, Singh.
3                     MS. CATERINE:   Okay.
4         Q.   And when did you speak to
5    Ms. Singh?
6         A.   This week.
7         Q.   When did you speak to Stavros?
8         A.   This week as well.
9         Q.   What documents have you reviewed,
10   in preparation for this deposition?
11        A.   What documents?   The CBC documents.
12        Q.   Okay.   Anything else?
13        A.   The reviews.
14        Q.   Okay.   What is your understanding
15   of what this lawsuit is about?
16                     MR. GOODMAN:   Object to
17             form.
18        A.   I'm understanding that the customer
19   is saying that she was not present for the
20   loan.
21        Q.   And prior to your preparation for
22   the deposition in this case, had you reviewed
23   documents about Farah Jean Francois?
24        A.   No.
25        Q.   And by "documents," I also mean



DIANE ARGYROPOLOUS                     December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2    electronic documents, like computer screens.
3            Did you ever review any computer
4    screens for electronic documents about Farah
5    Jean Francois, prior to your preparation for
6    this deposition?
7            A.   Yes.
8            Q.   And was that the screens on
9    Dealertrack?
10           A.   No.
11           Q.   Could you explain to me what you
12   reviewed?
13           A.   The document -- when the lawsuit
14   came in, I reviewed those documents.
15           Q.   I see.  Do you have a login for
16   Dealertrack?
17           A.   Yes.
18           Q.   When was the last time you logged
19   into Dealtertrack?
20           A.   A few days ago.
21           Q.   Do you login to Dealtertrack as a
22   regular part of conducting the business of
23   Victory Mitsubishi?
24           A.   Yes.
25           Q.   And do you ever pull credit reports



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2   in Dealtertrack?

3         A.   No.

4         Q.   What do you, generally, use

5   Dealtertrack for in the ordinary course of

6   your business?

7         A.   To receipt -- the money that comes

8   in, to make sure we get all the credit cards.

9   Accounts payable.  It's more office side.

10        Q.   I see.  Some of the prior witnesses

11  have testified about a "back office" at

12  Victory Mitsubishi.  Is that the same thing

13  as what you just referenced as "office side"?

14                MR. GOODMAN:  Object to

15           form.

16                Go ahead.

17        A.   I am not understanding about the

18  "back office."

19        Q.   Sure, that's okay.  I'm not either.

20  That's why I was asking.  But that's okay.

21           Have you searched for e-mails

22  related to Farah Jean Francois?

23        A.   No.

24        Q.   Okay.  Do you ever use a personal

25  e-mail address to conduct business at Victory



1

2  Mitsubishi?

3        A.   I do, yes.

4        Q.   And what is that e-mail address?

5        A.   Diane@VictoryMitsubishi.com.

6        Q.   Do you use any other e-mail

7  addresses to conduct business at Victory

8  Mitsubishi?

9        A.   No.

10       Q.   Do you ever use any messaging apps,

11 like WhatsApp or Signal to conduct business

12 at Victory Mitsubishi?

13       A.   No.

14       Q.   Do you ever use your personal cell

15 phone to conduct business at Victory

16 Mitsubishi?

17       A.   Can you rephrase that question?

18       Q.   Sure.  Let me -- how -- when you

19 need to make phone calls in the ordinary

20 course of your business at Victory

21 Mitsubishi, what phone do you use?

22       A.   The business phone.

23       Q.   Do you ever use a personal cell

24 phone?

25                   MR. GOODMAN:  Objection.



1

2       Q.   For that purpose.

3       A.   Yes, if I am not at work.

4       Q.   Okay.  And what is your cell phone

5  number?

6               MR. GOODMAN:  Okay,

7           objection.  We can leave a blank in

8           the transcript and put it in,

9           please.

10              MS. CATERINE:  Okay.

11  TO BE FURNISHED: _____

12  _____

13      Q.   Did you graduate from high school?

14      A.   Yes.

15      Q.   Where did you go to high school?

16      A.   Fort Hamilton.

17      Q.   When did you graduate?

18      A.   Oh, boy.

19      Q.   Approximately.

20      A.   In the eighties.

21      Q.   Okay.

22      A.   Goodness, I haven't thought of

23  that.

24      Q.   Did you go to any school after high

25  school?



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2          A.   Yes.
3          Q.   And what was that?
4          A.   Saint Francis College.
5          Q.   And when did you graduate from
6     Saint Francis College?
7          A.   '92, '93.
8          Q.   And what was your degree in?
9          A.   Business.
10         Q.   Did you have any schooling, after
11    graduating from Saint Francis?
12         A.   No.
13         Q.   What did you do for employment,
14    after graduating from Saint Francis?
15         A.   I worked at a family business.
16         Q.   An what was the nature of that
17    business?
18         A.   A restaurant.
19         Q.   And how long did you do that for?
20         A.   Five years.
21         Q.   Okay.  When did you marry Phillip
22    Argyropoulos?
23         A.   1993.
24         Q.   And when did you first meet Chris
25    Orsaris?



1

2          A.    2016.

3          Q.    Okay.  And how did you meet?

4          A.    Mutual friend.

5          Q.    And what was the nature of your

6     meeting; was it social or business?

7          A.    Social.

8          Q.    And when did you first meet Stavros

9     Orsaris?

10         A.    2016, as well.

11         Q.    Okay.  And do you know Chris

12    Orsaris, Junior?

13         A.    Yes.

14         Q.    When did you meet Chris Orsaris,

15    Junior?

16         A.    Last year.  Last -- either last

17    year or two years ago.  I don't remember.

18         Q.    Okay.  Does Chris Orsaris ever

19    refer to himself as "Chris Orsaris, Senior,"

20    or is he just "Chris Orsaris," and his son is

21    "Chris Orsaris, Junior"?

22         A.    I have never noticed.

23         Q.    Okay.

24         A.    I am not sure.

25         Q.    That's fine.



1

2          Have you ever met a George Orsaris?

3     A.   George Orsaris?  No, I don't think

4  so.  No.

5     Q.   Okay.  What about Peter Orsaris?

6     A.   Yes.

7     Q.   Sorry, did you say --

8     A.   Yes.

9     Q.   -- "yes"?  Okay.

10         And when did you meet Peter

11  Orsaris?

12     A.   I believe in 2016, '17.  Around

13  that time.

14     Q.   Okay.  And what about James

15  Orsaris?

16     A.   James is his -- who's that?

17     Q.   If you don't know, that's fine.

18     A.   I mean -- okay.

19              MR. GOODMAN:  If you don't

20         know, you don't know.

21     A.   I am not sure.  I don't know.

22     Q.   That's fine.

23         Have you ever met anyone named

24  James Orsaris?

25     A.   No.  Not James but...



1
2          Q.   And I apologize because I am
3    probably going to butcher the pronunciation
4    for this one, but have you ever met Elfaria
5    Orsaris?
6          A.   Elfaria?  I don't know that name,
7    Elfaria.
8          Q.   Okay.
9          A.   No.
10         Q.   And do you have any children?
11         A.   Yes.
12         Q.   Do any of your children work at
13   Victory Mitsubishi?
14         A.   No.
15         Q.   What is CPMW Consultants,
16   Incorporated?
17         A.   Don't know.
18         Q.   Okay.  What is PSCA Management,
19   LLC?
20         A.   Don't know.
21         Q.   Okay.  What is Victory Cars East?
22         A.   A dealership in Huntington.
23         Q.   Do you have any relationship to
24   that dealership?
25                    MR. GOODMAN:  Object to



1
2              form.
3       A.   Yes.
4       Q.   What is the nature of your
5  relationship to that dealership?
6       A.   I am a partner.
7       Q.   And who is your partner for that
8  dealership?
9                   MR. GOODMAN:  You can
10             answer.
11      A.   Stavros Orsaris and John Kekis.
12      Q.   What is Dream Car Gallery?
13      A.   A dealership.
14      Q.   And do you have any relationship to
15 that dealership?
16      A.   No.
17      Q.   Do you know who owns and operates
18 that dealership?
19      A.   No.
20      Q.   So how did you first get involved
21 in the business of auto dealerships?
22      A.   My husband opened it up in 2005 as
23 an investor, as a silent partner.
24      Q.   And when you say, "opened it up,"
25 what are you referring to, specifically?



```
 1
 2        A.   With the partner.
 3        Q.   Let me rephrase.
 4        A.   Okay.
 5        Q.   What dealership was opened up?
 6        A.   Victory Auto Group.
 7        Q.   Okay.  And where was it operating
 8   at that time?
 9        A.   4101 Boston Road, Bronx, New York.
10        Q.   And when did you start working at
11   that dealership?
12                  MR. GOODMAN:  Object to
13             form.
14                  Go ahead.
15        A.   October of 2008.
16        Q.   And what were you doing at that
17   time, at the dealership?
18        A.   Learning the business.
19        Q.   Were you receiving a salary at that
20   time?
21        A.   I don't recall.  I don't think so.
22        Q.   Okay.  And about how long were you
23   in this period of learning the business?
24        A.   I don't recall the accurate time
25   frame.
```



1

2      Q.   That's okay.  If you -- do you have

3   a general time frame sense; a few years, five

4   years, ten years?

5      A.   I want to say, five years.

6      Q.   Okay.  And after that period, what

7   did you do at the dealership?

8      A.   I -- let's see.  I do payables,

9   make sure we collect all deposits, I do

10  payroll, I pay all the bills.

11     Q.   And is that still the nature of

12  your work today?

13     A.   Yes.

14     Q.   And do you have a title?

15            MR. GOODMAN:  Today or --

16         object to form.  Time frame.

17     Q.   Sorry, go ahead.

18     A.   For which time frame?

19     Q.   What was your title once you

20  started doing this accounts payable-type

21  work?

22     A.   In what year?

23     Q.   Well, why don't you tell me.

24         What year did you start doing this?

25     A.   2008.



Q. All right. What was your title at that time?
A. Accounts payable.
Q. Okay. And what is your -- what was your title in 2020?
A. Owner.
Q. And what's your title today?
A. Owner.
Q. Have you ever had any other titles, besides accounts payable and owner?
A. People refer to me as different things, as an office manager or -- at the end the day, it's all the same. So you can say, "office manager."
Q. Okay. Have you ever worked for any other dealerships, besides Victory Auto Group?
A. No. I need to take that back.
Q. That's fine.
A. Yeah, sorry. And Victory Mitsubishi.
MR. GOODMAN: And currently?
THE WITNESS: Victory Mitsubishi. Spartan Auto Group,



```
1
2              right.
3      Q.    Have you ever been arrested?
4      A.    No.
5                  MR. GOODMAN:  Object to
6              form.  Go ahead.
7      Q.    Has anyone ever made a complaint
8   against Victory Mitsubishi that they were
9   defrauded by Victory Mitsubishi?
10                 MR. GOODMAN:  Object to the
11             form.
12     A.    Anybody made a claim?  I don't
13  recall.
14     Q.    Has any consumer ever alleged that
15  Victory Mitsubishi deceived them or treated
16  them unfairly in the sale or financing of a
17  vehicle?
18                 MR. GOODMAN:  Object to the
19             form; go ahead.
20     A.    In the Etch product.
21     Q.    Okay.  Any other instances, besides
22  that one?
23     A.    I don't recall any other ones.
24     Q.    And when did you start working at
25  Victory Mitsubishi?
```



DIANE ARGYROPOLOUS                        December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2          A.    2018.

3          Q.    Okay.  And was that at the opening

4     of Victory Mitsubishi?

5          A.    Yes.

6          Q.    And who made the decision to open

7     Victory Mitsubishi?

8                    MR. GOODMAN:  Object to

9            form.

10         A.    I did.

11         Q.    And why did you decide to open

12    Victory Mitsubishi?

13         A.    I wanted a new car franchise at

14    that location.

15         Q.    And around the same time Victory

16    Auto Group was closed, correct?

17         A.    Correct.

18         Q.    And why was Victory Auto Group

19    closed?

20         A.    Because when you open a new car

21    franchise, you have to assume one name.  So I

22    had to close that name to replace it with

23    Victory Mitsubishi.

24         Q.    Okay.  And were the employees at

25    Victory Mitsubishi the same as the employees



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2   at Victory Auto Group?

3                     MR. GOODMAN:   Object to

4         form.

5        A.   Some were, yes.

6        Q.   And Stavros Orsaris was an employee

7   at both, correct?

8        A.   Yes.

9        Q.   And was David Perez an employee at

10  both?

11       A.   I don't remember if he was with

12  Victory Auto Group.

13       Q.   Okay.

14       A.   But he was with Victory Mitsubishi.

15       Q.   Was Yessica Vallejo an employee at

16  both?

17       A.   I don't remember if she was for

18  Victory Auto Group.

19       Q.   Okay.  Prior to you assuming the

20  title of owner, you testified you had a title

21  of accounts payable; is that right?

22  Something like that?

23       A.   Something like that.  Office

24  manager, uh-huh.

25       Q.   Okay.  Did you apply for that



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2   position?
3        A.   Did I?
4                  MR. GOODMAN:   Object to
5             form; go ahead.
6        A.   I didn't apply.  My husband told me
7   we need to take over the business, and I went
8   to work.  So not really, no.
9        Q.   Okay.  Why did -- why did you need
10  to take over the business?
11                 MR. GOODMAN:   Object to
12            form.
13       A.   My previous partner was stealing
14  from the company.
15       Q.   What was that partner's name?
16       A.   Nick.  I don't recall his last
17  name.
18       Q.   Okay.  And when did you find out
19  that he was stealing from the company?
20       A.   The summer of 2008.
21       Q.   Were there ever criminal charges
22  pressed against him?
23       A.   I am not sure.
24       Q.   Okay.  What training have you
25  received in -- for running an auto



1

2  dealership?

3       A.   Can you rephrase that question?

4       Q.   Sure.  What trainings have you

5  received to do your work at Victory

6  Mitsubishi?

7       A.   Dealertrack training on the

8  accounting side, compliance training.  That's

9  it.

10      Q.   Okay.  Who put on the compliance

11  training?

12      A.   Dealertrack.

13      Q.   And what subjects were covered in

14  the compliance training?

15      A.   Security...so many years ago.

16  Security to make sure you are logged in when

17  you are on the DMS system, that it allows you

18  only a few minutes, if you don't login, it

19  turns it off for security purposes to make

20  sure documents are filed securely away, deal

21  jackets are locked up, and no one has access

22  to peoples personal information, payroll

23  records, things like that.

24      Q.   And when did you receive this

25  training?



1

2      A.   Maybe ten years ago.  It's been a

3  long time.

4      Q.   Did that training include training

5  as to compliance with the Fair Credit

6  Reporting Act?

7      A.   No.  Not with me.

8      Q.   Okay.  Did that training cover

9  anything in regards to credit reporting?

10     A.   Not with me.

11     Q.   I know that you said the opening of

12  Victory Mitsubishi coincided with the closing

13  of Victory Auto Group, but Victory Auto

14  Group, in fact, still exists; is that

15  correct?

16     A.   Victory Auto Group does not exist,

17  no.

18     Q.   Let's look at Exhibit 36, which is

19  Bates-stamped Francois 1001 to 1013.

20               MR. GOODMAN:  What is it,

21          Emma, just the subject matter of

22          the pages?

23               MS. CATERINE:  This is the

24          56.1 statement in the Nelson/Diane

25          Argyropoulos, et al. case.



1

2                    MR. GOODMAN:  Okay.  You

3              will have to give me a minute here.

4              That's another one we don't have on

5              the table here, so I will have to

6              go out and get it, if necessary.

7                    MS. CATERINE:  Yeah, I think

8              we need to get that.  We should

9              have that one in front of her for

10             these questions.

11                   MR. GOODMAN:  Okay, no

12             problem.  Give me a couple -- it

13             will take three or four minutes.

14                   MS. CATERINE:  Okay, that's

15             fine.

16                   THE WITNESS:  Can I take a

17             break?

18                   MS. CATERINE:  Yeah.

19                   (Whereupon, a recess was

20             taken at this time.)

21   BY MS. CATERINE:

22       Q.   Before we get to the document,

23   actually, a few follow-up questions.

24             Who is your cell phone provider,

25   Ms. Argyropoulos?



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2          A.    AT&T.
3          Q.    And was that your cell phone
4     provider in 2020?
5          A.    I believe so.
6          Q.    Have you searched your cell phone
7     for calls or text messages, in regards to
8     this case?
9          A.    No.
10         Q.    Have you searched your cell phone
11    for calls or text messages on or around May
12    30, 2020?
13         A.    Not understanding the question.
14               Regarding?
15         Q.    Regarding this case.
16         A.    No.
17         Q.    Have you used your cell phone to
18    conduct business related to Farah Jean
19    Francois or the vehicle in this case?
20         A.    No.
21         Q.    Okay.  Now, let's look at Exhibit
22    36, Bates-stamped Francois 1001 to 1013.
23               What is this document?
24         A.    The Nelson case.
25         Q.    Did you review this document, prior



1
2   to its filing?
3        A.   Yes.
4        Q.   And do you verify that everything
5   in this document is true, to the best of your
6   knowledge?
7        A.   No.  Not true.
8        Q.   Why not?
9        A.   The first one is not true.
10        Q.   And you're referring to the first
11   paragraph?
12        A.   Yes.
13        Q.   And how is that statement not true?
14        A.   Phillip Argyropoulos does not work
15   for the office -- for the dealership.
16               MR. GOODMAN:  Are you
17          talking about paragraph one or
18          paragraph --
19               THE WITNESS:  Oh, paragraph
20          one.
21        Q.   Oh, you are referring to the
22   unnumbered paragraph?
23        A.   Yeah.  Yes.
24        Q.   Okay.  And if you go down below the
25   header that says, "Background," there's a



1

2   paragraph numbered number 1.

3       A.   Yes.

4       Q.   It says, "Defendant Victory Auto

5   Group, LLC, Spartan Auto Group, LLC, Victory

6   Mitsubishi collectively operate a new car

7   lease dealership at the address 4070 Boston

8   Road, Bronx, New York."

9       A.   Which is not --

10              MR. GOODMAN:  Let her finish

11          the --

12              THE WITNESS:  Sorry, I made

13          a mistake.

14      Q.   -- "in which plaintiff admits to in

15  his EEOC charge."  Is that statement

16  accurate?

17      A.   No.

18      Q.   How is it inaccurate?

19      A.   Victory Auto Group, LLC was not

20  operating as a new car dealership.

21      Q.   Was it operating at that time?

22              MR. GOODMAN:  Which "time"?

23          Object to form.

24      A.   What time frame?

25      Q.   This would be November 13, 2020.



1

2      A.   It was not.

3      Q.   And if you could go down to go to

4  the next page, paragraph numbered number two,

5  it says, "The Defendants, Diane Argyropoulos,

6  Phillip Argyropoulos, Chris Orsaris, Alex

7  Letice -- I apologize if I am mispronouncing

8  that -- "all individuals who either own

9  and/or work with the corporate defendants and

10  have all appeared in this lawsuit."

11          Is that statement accurate?

12      A.   No.

13      Q.   How is that statement inaccurate?

14      A.   Phillip Argyropoulos did not work

15  or own the company.

16      Q.   When you say, "the company," which

17  company are you referring to?

18      A.   Spartan Auto Group.

19      Q.   Okay.  Is there anything else

20  inaccurate about that statement?

21      A.   Chris Orsaris and Alex Letice are

22  not owners of the company.

23      Q.   Okay.  What does Chris Orsaris do

24  at Spartan Auto Group?

25                  MR. GOODMAN:  Object to the



1
2          form.  Also, time frame.
3     Q.   In 2020.
4     A.   Buying vehicles.
5     Q.   Okay.  And who is Alex Letice?
6     A.   A salesperson.
7     Q.   Okay.  I know that you said that
8  the paragraph numbered one was not accurate.
9          As of November 2020, was there ever
10 a time in which the dealership was
11 collectively operated by Victory Auto Group
12 and Spartan Auto Group?
13               MR. GOODMAN:  Object to the
14          form.
15    A.   Time frame?
16               MR. GOODMAN:  Ever.
17               THE WITNESS:  Ever?
18    Q.   Ever.
19               MR. GOODMAN:  Collectively.
20    A.   No.
21    Q.   Okay.  Let's take a look at Exhibit
22 40, what was previously marked as Exhibit 40.
23 Defendant's 93 to 112.
24               MR. GOODMAN:  That one is
25          the CBC?



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

```
 1
 2                    MS. CATERINE:  Yes.
 3                    MR. GOODMAN:  Okay, we have
 4         it.
 5    Q.   What is this document?
 6                    THE WITNESS:  This one.
 7                    MR. GOODMAN:  Yeah.
 8    A.   This is documents applying to use
 9  Credit Bureau Connection to run credit.  It's
10  an agreement.
11    Q.   And how did you learn of Credit
12  Bureau Connection and the services they
13  provide?
14    A.   I don't recall how I learned about
15  them individually.  I don't know.
16    Q.   Is it just something that you
17  picked up in -- when -- in learning the
18  business between 2008 and 2018?
19    A.   Yes, it was one of the companies
20  that was mentioned that was good.
21    Q.   Okay.  And what does Credit Bureau
22  Connection do?
23                    MR. GOODMAN:  Object to
24         form.
25    Q.   For auto dealerships, specifically.
```



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2          A.    Run credit for customers.

3          Q.    Did you fill out this document?

4          A.    Yes.

5          Q.    Why was this document filled out by

6    you, rather than someone at Victory

7    Mitsubishi who works with credit reports,

8    such as a finance manager?

9                     MR. GOODMAN:   Object to the

10               form.

11         A.    It has to be the owner filling it

12   out.

13         Q.    I see.

14         A.    It's an agreement.

15         Q.    The estimate of "monthly inquiries"

16   here is "1,000."  Do you see that on the

17   first page?

18         A.    Yes.

19         Q.    Is that accurate?

20                    MR. GOODMAN:   Object to

21               form.

22         A.    It's an average.

23         Q.    Okay.  And the agreement says here

24   that, "credit information will be used to,

25   quote, 'evaluate the credit of customers for



1

2   consumer loans or lease,' end quote."

3           How does that work?

4       A.   It's -- it runs the customer's

5   credit and it -- to see if a customer is able

6   to purchase a vehicle, if they have the

7   credit.  It's all computerized.

8       Q.   Who at Victory Mitsubishi runs the

9   credit of consumers?

10                  MR. GOODMAN:  Object to

11              form; time frame.

12      A.   Time frame?

13      Q.   In 2020.

14      A.   There was a few of the managers.  I

15  don't recall which managers were there at the

16  time.  I could name the couple that I do

17  know.

18      Q.   Okay, go ahead, please.

19      A.   Stavros Orsaris, Yessica Vallejo,

20  Joe Grabino.  I don't recall everybody at

21  that time.

22      Q.   That's okay.  Were sales associates

23  allowed to run consumers credits?

24      A.   No.

25      Q.   Was anyone else, besides managers,



1
2   allowed to run a consumer's credit?
3        A.   No.
4        Q.   Turning to the page marked
5   Defendant's 94, and the third bullet point,
6   it says at the end that Victory Mitsubishi,
7   quote, "Will obtain the consumer's written
8   authorization to request such information
9   relating to that consumer," end quote.
10  Referring to credit reports, "How does
11  Victory Mitsubishi obtain written
12  authorization"?
13                  MR. GOODMAN:  Object to form
14          time frame.
15       Q.   In 2020.
16       A.   There's an application the customer
17  fills out, signs it, and gives it to a
18  manager to run the credit.
19       Q.   Who created that application form?
20       A.   I don't recall.
21       Q.   And who creates the policies,
22  generally, to comply with this agreement
23  between Victory Mitsubishi and CBC?
24                  MR. GOODMAN:  Object to the
25          form; go ahead.



 1

 2          A.    Can you rephrase the question?

 3          Q.    Sure.  So in this agreement between

 4    Victory Mitsubishi and CBC, your Victory

 5    Mitsubishi, is agreeing to do things, in

 6    return for receiving the services of CBC; is

 7    that accurate?

 8          A.    Yes.

 9          Q.    And who determines how to comply

10    with this agreement at Victory Mitsubishi?

11                     MR. GOODMAN:   Object to

12                form; go ahead.

13          A.    Stavros.

14          Q.    Okay.  Do you make any decisions,

15    in terms of complying with this agreement, at

16    Victory Mitsubishi?

17          A.    Can you rephrase the question?

18          Q.    Sure.  So you say, Stavros makes

19    decisions.  Does he consult with you about

20    those decisions?

21          A.    Meaning, during the time or to

22    understand the policy of CBC?  I am still not

23    understanding.

24          Q.    Sure, let me be very --

25          A.    Yes.



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2          Q.   Let me just try to be as direct

3    here as I can.

4               Were you involved, in 2020, with

5    establishing policies and procedures at

6    Victory Mitsubishi for credit reporting?

7                    MR. GOODMAN:   Object to the

8               form; go ahead.

9          A.   I explained to Stavros how it has

10   to be handled and the regulations on it.

11   That was my only involvement with that.

12         Q.   Okay.  What do employees at Victory

13   Mitsubishi have to do, prior to pulling a

14   credit report for a consumer?

15                   MR. GOODMAN:   Object to the

16              form.

17         Q.   In 2020.

18         A.   The customer has to have an

19   application and proof of ID.

20         Q.   And who is that presented to?

21         A.   To one of the managers.

22         Q.   An employees have to login to

23   Dealtertrack, in order to pull a credit

24   report; is that correct?

25         A.   Yes.



1

2       Q.   Do sales associates or -- excuse

3   me.  Are sales associates able to log into

4   Dealtertrack?

5       A.   No.

6       Q.   Who at Victory Mitsubishi -- not

7   names, but rather titles -- are able to log

8   into Dealtertrack?

9       A.   Managers and finance managers.

10      Q.   And how many managers and finance

11  managers were there at Victory Mitsubishi in

12  2020?

13      A.   That's hard for me to answer that

14  because it was during COVID, and there was a

15  lot of regulations.  So we had different

16  sales crew at the time.  So I would say,

17  maybe, at that time, three or four people.

18      Q.   Okay.  Is Chris Orsaris a manager?

19              MR. GOODMAN:  Object to

20          form.

21      A.   No.

22      Q.   Does Chris Orsaris have a login for

23  Dealtertrack?

24              MR. GOODMAN:  Object to

25          form.  Time frame.



1

2          A.    Time frame?

3          Q.    2020.

4          A.    I believe he does because he is the

5     buyer, and that's -- he has to check the

6     inventory.

7          Q.    Are credit reports ever pulled at

8     Victory Mitsubishi with software, other than

9     Dealertrack?

10         A.    What kind -- can you rephrase the

11    question?

12         Q.    Sure.  So you testified that

13    Dealertrack is used to pull credit reports.

14         A.    Yes.

15         Q.    Is there any other way to pull

16    credit reports at Victory Mitsubishi, besides

17    Dealertrack?

18         A.    Yes, there is.

19         Q.    And what is that method?

20         A.    A customer could apply online.

21    There's everything -- it's a soft pool,

22    actually, so it does not effect their credit.

23    And there's all the documents that they would

24    have to fill out electronically and sign.

25         Q.    Okay.  Besides the soft pull, is



DIANE ARGYROPOLOUS                                December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2   there any other way that credit reports are
3   pulled at Victory Mitsubishi?
4        A.   No.
5        Q.   Are you familiar with a program
6   called T-A-L-X?
7        A.   No.
8        Q.   How is income information verified
9   at Victory Mitsubishi?
10       A.   I don't work the floor.  I don't
11  know.
12       Q.   Okay.  If you turn to Defendant's
13  96 on Exhibit 40.
14                THE WITNESS:
15            This one?
16                MR. GOODMAN:  Yeah, yes.
17       Q.   There's a signature at the bottom
18  of someone named David Daniel who's listed as
19  a "compliance manager."
20            Who is David Daniel?
21       A.   He worked for Credit Bureau
22  Connection.
23       Q.   And when was the last time you
24  spoke to David Daniel?
25       A.   Couple of years ago.  I am assuming



1

2  when I signed these documents.

3       Q.   Okay.  Let's go to Exhibit 41,

4  please, Bates-stamped Defendant's 73 to 82.

5                 MR. GOODMAN:  We got it.

6       Q.   Okay, what is that document?

7       A.   Capital One dealer agreement.

8       Q.   And did you fill out this

9  agreement?

10      A.   I don't -- I don't recall filling

11 this out, no.

12      Q.   If you can turn to the page marked

13 Defendant's 75.  At the bottom, there's a

14 signature line which says, "initial here,"

15 and then there are initials.

16           Are those your initials?

17      A.   Yes.

18      Q.   Based on that, do you believe that

19 you filled out this document?

20                 MR. GOODMAN:  Object to

21           form.

22      Q.   Sorry?  Excuse me?

23      A.   I signed the document.

24      Q.   Okay.  Let's go back to the first

25 page of the document, please.  There's



1

2  something here which says, "floor plan

3  provider," and it's filled in with "AFC."

4          What does that mean?

5      A.   That's who owns the vehicles.  It's

6  a bank.

7      Q.   I see.  Do you know what "AFC"

8  stands for?

9      A.   I don't remember.

10     Q.   Okay.  And under "contacts," we

11 have Chris Orsaris listed as "general

12 manager" and "general sales manager."

13          Why is Chris Orsaris listed here as

14 both "general manager" and "general sales

15 manager"?

16                 MR. GOODMAN:  Object to the

17         form.

18     A.   He is the one who had the

19 relationship with Capital One Bank for us to

20 get the bank.

21     Q.   I see.  When you say, "he was the

22 one with the relationship with Capital One

23 Bank," was that based on his prior auto

24 dealership experience?

25                 MR. GOODMAN:  Object to the



1
2            form.
3       A.   I would say, yes, to that.
4       Q.   And under "primary credit," slash
5   "call back contact," there's someone named
6   "Edwin Feables."  Who is Edwin Feables?
7       A.   He was a finance manager at the
8   time.
9       Q.   And Mr. Feables no longer works for
10  Victory Mitsubishi; is that correct?
11      A.   Yes.
12      Q.   And when did Mr. Feables stop
13  working at Victory Mitsubishi?
14      A.   I don't recall the year.
15      Q.   And was Mr. Feables fired?
16      A.   No.  No.
17      Q.   And there's someone here listed
18  under C-O-A-F-A-S-M, named "Ken McGhee."
19           Who is Ken McGhee?
20      A.   Capital One's bank rep.
21      Q.   Okay.  Have you ever spoken with
22  Ken McGhee?
23      A.   Yes.
24      Q.   When was the last time you spoke
25  with Mr. McGhee?



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2          A.   Last week.

3          Q.   And in that conversation last week,

4    was anything discussed about this case, Farah

5    Jean Francois, or the vehicle?

6          A.   No.

7          Q.   How regularly do you speak with

8    Mr. McGhee?

9          A.   Can't really say.  Whenever he

10   stops by to say hello to me.  Maybe once a

11   month, once every two months.

12         Q.   And, in general, what's the nature

13   of those conversations?  What are they about?

14         A.   With me, generally, last week, he

15   just wanted to tell me when he is sending

16   things for Christmas to the employees as a

17   thank you, as a lunch.  He does -- yeah, very

18   rarely.  He usually goes to the showroom.  My

19   office is across the street, though.

20         Q.   I see.  And then there's someone

21   here listed under "C-O-A-F-R-S-M, Robert

22   Montgomery."  Who is Robert Montgomery?

23         A.   He worked for Capital One.

24         Q.   You testified that you have an

25   office at the 4101 Boston Road address; is



1
2    that correct?
3        A.   Yes.
4        Q.   Who else has an office at that
5    address?
6        A.   My comptroller, bookkeeper,
7    accounts payable, two DMV girls, and customer
8    relations.  And then another person who takes
9    pictures of the vehicles.  And myself, of
10   course.
11       Q.   Does Chris Orsaris have an office
12   at that address?
13       A.   No.
14       Q.   Does Chris Orsaris have an office
15   at the 4070 Boston Road address?
16       A.   No.
17       Q.   Where does Chris Orsaris work out
18   of?
19            MR. GOODMAN:  Object to
20            form.
21       A.   On his computer, I guess, from
22   home.
23       Q.   And has he been doing that since
24   the pandemic, or is that just, sort of,
25   always been the way that he has worked?



1

2       A.   That's always been the way he

3   worked.

4       Q.   I see.  And if you turn to

5   Defendant's 77 of the document, you will see

6   that Stavros Orsaris is listed as a "managing

7   member."  Why is Stavros Orsaris listed as a

8   "managing member"?

9                 MR. GOODMAN:  Object to

10           form.

11      A.   I don't know.

12      Q.   Okay.  And on the next page, Maria

13  -- I apologize if I'm mispronouncing -- Maria

14  Sores is listed as "comptroller."

15           Is Maria Sores still the

16  comptroller at Victory Mitsubishi?

17      A.   Yes.

18      Q.   How does the hiring of people work

19  at Victory Mitsubishi?

20                 MR. GOODMAN:  Object to the

21           form.

22      Q.   Generally, in 2020.

23                 MR. GOODMAN:  Still object

24           to form.

25      A.   In what department?



1

2        Q.   Well, I guess that, sort of,

3   answers the question.  Let's talk about that.

4             How is that divided, in terms of

5   hiring, by department?

6        A.   Management.

7        Q.   Okay.  And so is hiring for the

8   jobs at the 4101 location, and the hiring for

9   the 4070 location, are those different?

10       A.   Yes.

11       Q.   Who is in charge of the hiring for

12  the 4070 location?

13       A.   Stavros.

14       Q.   And are you involved in the process

15  of hiring people for the 4070 location?

16       A.   No.

17       Q.   Is Phillip Argyropoulos involved in

18  hiring the people at the 4070 location?

19       A.   No.

20       Q.   Is Chris Orsaris involved in hiring

21  of people at the 4070 location?

22       A.   No.

23       Q.   Do you have your own office at the

24  4070 location?

25       A.   I do not.



1

2        Q.   Does Phillip Argyropoulos have his

3   own office at the 4070 location?

4        A.   No.

5        Q.   Victory Mitsubishi is a d/b/a,

6   correct?

7        A.   Correct, yes.

8        Q.   And besides Spartan Auto Group,

9   what other companies has Victory Mitsubishi

10  been used as a d/b/a for?

11                 MR. GOODMAN:   Object to the

12            form.  Go ahead.

13       A.   Victory Motors.

14       Q.   And where did Victory Motors

15  operate?

16       A.   Largemont.

17       Q.   Did Victory Motors operate anywhere

18  else, besides Largemont?

19       A.   No.

20       Q.   Did Victory Auto Group ever use the

21  d/b/a Victory Mitsubishi?

22       A.   No.

23       Q.   Who are the current owners of

24  Victory Mitsubishi?

25       A.   I am.



1

2          Q.   Are there any other owners of

3    Victory Mitsubishi?

4          A.   No.

5          Q.   When Victory Mitsubishi was opened,

6    who were the owners?

7          A.   I was.

8          Q.   Anyone else?

9          A.   When it opened?  I don't recall.

10         Q.   How about in May of 2020, were

11   there any owners, besides yourself, in May of

12   2020?

13         A.   No.

14         Q.   Let's take a look at what is going

15   to be marked Exhibit 45.  This is one of the

16   new exhibits I sent this morning.  It's

17   schedule K-1 forms, Bates-stamped Francois

18   3531 to Francois 3538.

19                    MR. GOODMAN:  You should

20           have those over there.  The K-1s.

21         Q.   All right, just let me know when

22   you have those forms in front of you, please.

23         A.   I have them.

24         Q.   Okay.  What are these documents?

25         A.   K-1s.



1

2      Q.   Sorry, I couldn't --

3      A.   K-1.  The K-1 forms.

4      Q.   And who filled out these documents?

5      A.   The accountant.

6      Q.   Okay.  Was there a different

7   accountant for Victory Motors and Victory

8   Auto Group, LLC?

9      A.   At what year?

10      Q.   Let's start within 2016.

11      A.   In 2016, no.

12      Q.   Who fills out the K-1 forms for

13   Victory Mitsubishi?

14              MR. GOODMAN:  Objection;

15        form.

16      A.   The accountant.

17      Q.   And who is the accountant?

18      A.   Allan.

19      Q.   What's the last name?

20      A.   Digsberg.

21      Q.   And on the K-1 forms for Victory

22   Mitsubishi, are you listed as the partner?

23      A.   For Victory Mitsubishi?

24      Q.   Uh-huh.

25      A.   The owner.



1
2          Q.   The owner.
3          A.   I don't see any documents here for
4    Victory Mitsubishi.
5          Q.   There aren't any.  We don't have
6    any, as of yet.
7          A.   Okay.
8          Q.   And so for those K-1 documents for
9    Victory Mitsubishi, would those show the
10   percentage of your ownership?
11         A.   I am not sure.
12         Q.   Okay.  And returning to the
13   documents, actually, in front of you, if you
14   turn to the page marked Francois 3535, it
15   will be for the year 2016.
16         A.   Yes.
17         Q.   And this document appears to list
18   your ownership in Victory Auto Group, LLC, as
19   "one percent"; is that accurate?
20         A.   I believe so.
21         Q.   Okay.  And was that your ownership
22   in Victory Auto Group, LLC, up until it
23   ceased operations?
24         A.   No.
25         Q.   How did it change?



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2        A.   To thirty percent.  I just don't

3    know the year.

4        Q.   That's fine.  Let's go to Exhibit

5    28, please.

6                   MR. GOODMAN:  Bates stamps?

7                   MS. CATERINE:  Bates stamps

8              is subpoena responses 463 to 484.

9              These are the franchise agreements

10             with Mitsubishi.

11                   THE WITNESS:  I have it?

12                   MR. GOODMAN:  Yeah, should

13             be there.

14       Q.   Okay, could you explain to me what

15   this document is?

16       A.   I don't have it in front of me.

17       Q.   Oh, I'm sorry.

18                   MR. GOODMAN:  That's okay.

19                   MS. CATERINE:  It has the

20             Mitsubishi logo at the top.  It's

21             titled "Dealer Sales and Service

22             Agreement."

23                   MR. GOODMAN:  Okay, so we

24             have, starting at 463?

25                   MS. CATERINE:  Uh-huh.



1

2                    MR. GOODMAN:  Yeah.

3                    THE WITNESS:  Okay.

4      Q.   And so what is this document?

5      A.   It's the dealer agreement with

6  Mitsubishi.

7      Q.   And what is the purpose of this

8  agreement with Mitsubishi?

9                    MR. GOODMAN:  Object to

10            form.

11      A.   Ownership.

12      Q.   Okay.

13      A.   Of Mitsubishi, the franchise.

14      Q.   And let's turn to the page

15  Bates-stamped subpoena responses 464.

16      A.   Okay.

17      Q.   And here it listed your percentage

18  of ownership as "thirty percent."  Is that

19  what you were talking about, in terms of your

20  ownership changing to thirty percent?

21      A.   No.  You asked me for Victory Auto

22  Group.

23      Q.   I see.  So this is -- this is for

24  Spartan Auto Group, correct?

25      A.   Correct.



DIANE ARGYROPOLOUS                                December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2          Q.   And is this accurate, that you are

3     a thirty percent owner in January 30, 2018?

4                    MR. GOODMAN:  Object to

5               form; go ahead.

6          A.   It's accurate.  And the reason why

7     -- should I explain?

8                    MR. GOODMAN:  Yeah, go

9               ahead.

10         A.   The reason why it was thirty

11    percent, Mitsubishi knew I owned Spartan Auto

12    Group, that Phillip did not own Spartan Auto

13    Group.  But to get me to one hundred percent,

14    he had to slowly change to thirty percent

15    Mitsubishi, so I could be approved as 100

16    percent owner of Mitsubishi.

17         Q.   And I know that you don't work at

18    Mitsubishi, but what is your understanding of

19    why that was required?

20                   MR. GOODMAN:  Object to the

21              form.

22         A.   There's an -- they have approvals.

23    I am not sure, exactly, what it was.  We did

24    as we were told from Mitsubishi.

25         Q.   Okay.  So this -- this, sort of,



1

2   transition of franchise ownership process,

3   was something that Victory Mitsubishi had

4   recommended to you; is that correct?

5        A.   Mitsubishi Motors recommended to

6   me.

7        Q.   Oh, sorry.  Yes, yes.

8        A.   Mitsubishi Motors recommended it to

9   us, knowing that I only owned Spartan Auto

10  Group.

11       Q.   Okay.  And when did Mitsubishi

12  Motors recommend this to you?

13       A.   When we first did our application

14  with them.  So I believe in 2018, around that

15  time.

16       Q.   Okay.  Why was it that you were

17  moving towards you operating the franchise

18  solely, and Phillip no longer being involved?

19                 MR. GOODMAN:  Object to

20            form.  Lots of objections to form.

21            Go ahead.

22       A.   Because I owned Spartan Auto Group.

23  So he had zero interest to that.

24       Q.   Sure.  Sure.  Let me rephrase the

25  question.



1

2          With the closing of Victory Auto

3   Group, LLC, is Phillip involved in the auto

4   dealership business any longer?

5                    MR. GOODMAN:  Object to

6            form; go ahead.

7       A.   No.

8       Q.   And why did he cease his

9   involvement in auto dealerships?

10                   MR. GOODMAN:  Object to

11           form.

12      A.   He never was involved.  He didn't

13  work at the dealership.

14      Q.   Sure.  Let me rephrase.

15          Why did he cease investing in auto

16  dealerships?

17      A.   Ask him that question.

18      Q.   Do you have any -- do you have any

19  understanding of why he did?

20      A.   I -- I -- I run day-to-day

21  operation.  I am there.  He is not.  He is an

22  attorney.  So he has no responsibilities of

23  it.  So I don't know.  You should ask him

24  that question.

25      Q.   Okay.  And if you turn to the page



1
2   marked subpoena responses 47 --
3        A.   I got it.
4        Q.   -- you will notice in the bottom
5   left corner, the agreement date is listed as
6   "March 1st, 2021."  Were there any other
7   dealer sales and service agreements between
8   January 30, 2018, and March 1st, 2021?
9        A.   I'm not sure.
10       Q.   Okay.  If there are not any other
11  dealership agreements between these two
12  agreements, is it reasonable to assume that
13  the January 30, 2018, agreement, governed in
14  May of 2020?
15                 MR. GOODMAN:  Object to
16            form.
17       A.   I don't know.
18       Q.   If you could please turn to
19  subpoena responses 48.
20       A.   Okay.
21       Q.   You will notice in the bottom left
22  corner, the agreement date is listed as
23  "September 20, 2022."  And this agreement in
24  September 20, 2022, is the first to list you
25  as a 100 percent franchise owner; is that



DIANE ARGYROPOLOUS                         December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2    correct?
3         A.   It was something that was -- yes,
4    but it was something that --
5                     MR. GOODMAN:  Just say,
6              "yes."
7                     THE WITNESS:  Yes.
8                     MR. GOODMAN:  Can I see the
9              page?  Just that page.
10                    Yeah, okay, go ahead.
11        Q.   If you can take a look at Exhibit
12   38, please, which is Bates-stamped Francois
13   3504 to 3514.
14                    MR. GOODMAN:  What is the
15             subject?
16                    MS. CATERINE:  It's the
17             Mitsubishi dealer sales and service
18             agreement for Victory Motors, LLC.
19                    MR. GOODMAN:  Oh, boy.  I
20             don't think we have that one out.
21             Yeah, that one I will have to
22             retrieve.  What were the Bates
23             stamps?
24                    MS. CATERINE:  It is
25             Francois 3504 to 3514.



1

2                    MR. GOODMAN:  Okay, I will

3            have to go get that one.  You want

4            to -- let's take a five-minute

5            break, and I will pull it up.

6                    MS. CATERINE:  Sure, that's

7            fine.

8                    (Whereupon, a recess was

9            taken at this time.)

10  BY MS. CATERINE:

11      Q.   If you could turn to the page

12  Bates-stamped Francois 3505.

13           And do you see the provision number

14  four, "management of dealer"?

15      A.   Yes.

16      Q.   Is this provision, essentially, the

17  same in the Mitsubishi dealership agreements

18  that you are familiar with?

19                    MR. GOODMAN:  Object to the

20            form.

21      A.   I am not sure.

22      Q.   On a day-to-day basis, who are you

23  working with at Victory Mitsubishi?

24                    MR. GOODMAN:  Object to

25            form; time frame.



1

2        Q.   In 2020.

3        A.   In 2020, I was really not going to

4   work because of COVID, so I worked remotely.

5        Q.   Okay.  Working remotely.  Who would

6   you speak with on a day-to-day basis?

7        A.   Maria Sores and Arifacan.

8        Q.   How often would you speak to

9   Stavros Orsaris at that time?

10       A.   I would say, once a day.

11       Q.   Okay.  Was there anyone in May of

12   2020, working at Victory Mitsubishi, with the

13   last name Ventura?

14       A.   I don't -- I don't recall.

15       Q.   Okay.  How many auto salespeople

16  were working at Victory Mitsubishi in May of

17  2020?

18                 MR. GOODMAN:  Object to the

19             form.  You mean -- object to form;

20             go ahead.

21       A.   In what department?

22       Q.   Sure.  Let me rephrase the

23  question.  How many sales associates were

24  working at Victory Mitsubishi in May of 2020?

25       A.   Just sales?  Salespeople?



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2          Q.   Yes.

3          A.   Hard for me to answer because of

4     the time with COVID.  I really don't know.  I

5     was not present.

6          Q.   So was it changing a lot at that

7     time?

8          A.   It was not that it was changing.

9     It's because of COVID, you know, there was

10    rules and regulations, so we had different

11    shifts to keep everybody far away from each

12    other.  So I really don't know because I was

13    not there at all.

14         Q.   And who set that up, the, you know,

15    having different employees during different

16    shifts for COVID prevention reasons?

17         A.   Stavros.

18         Q.   How many managers were there at

19    Victory Mitsubishi in sales and financing, in

20    May of 2020?

21                   MR. GOODMAN:  Object to

22              form.

23         A.   I don't remember the amount.  I

24    don't know.

25         Q.   Okay.  Did you receive a salary for



1
2   your work at Victory Mitsubishi, in May of
3   2020?
4         A.   I don't -- "salary"?  I don't -- I
5   believe I did.  But not salary.  I don't get
6   paid salary.  So, no, I did not.
7         Q.   Okay.  How does your compensation
8   work at Victory Mitsubishi?
9         A.    I cut myself a check whenever I
10  can, but it's not really a salary, just
11  ownership.
12        Q.   Sure.  When you say you're -- you
13  cut yourself a check, what company is the
14  payor for that check?
15        A.   Rephrase that question.
16        Q.   Let me just put it this way:  When
17  you say you "cut" yourself a check, what does
18  that mean, practically?
19             Who is the payment going from and
20  to?
21        A.   Spartan to me.  Spartan Auto Group
22  pays me.
23        Q.   Okay.  What is the company payor
24  for the paychecks of the employees at Victory
25  Mitsubishi?



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2       A.   I don't know the name of the

3  company, offhand.  It's on-site payroll

4  company we use.

5       Q.   But are the payments for employees

6  at Victory Mitsubishi, are those coming from

7  Spartan Auto Group?

8       A.   Yes.

9       Q.   And would that include Chris

10  Orsaris?

11      A.   He is a buyer, yes.

12      Q.   Is he a salaried employee?

13      A.   No.

14      Q.   Is he paid based on commission?

15      A.   He is paid based on -- I wouldn't

16  say commissions.  Depending on the vehicles

17  he buys as a buyer's fees.

18      Q.   Got you.  And how is his buyer's

19  fee agreed on?

20                 MR. GOODMAN:  Object to the

21           form.

22      A.   Can you rephrase that question?

23      Q.   Sure.  Who determines what his

24  buyer's fee is at Victory Mitsubishi?

25      A.   It's a flat fee, basically, more or



1
2  less, depending on the vehicle.  The
3  comptroller does -- she's the one who pays
4  him.
5      Q.   Okay.  So you previously testified
6  that Stavros Orsaris worked at Victory
7  Mitsubishi, prior to working at Spartan Auto
8  Group, correct?
9      A.   Yes.
10     Q.   Would the company that was cutting
11 his paycheck have changed at that time when
12 he went from working for Victory Auto Group,
13 to working at Spartan Auto Group?
14     A.   I don't know.
15     Q.   When you were working at Victory
16 Auto Group, were you working at the 4101
17 Boston Road location?
18     A.   Yes.
19     Q.   During the change from Victory Auto
20 Group to Spartan Auto Group, other than the
21 change in the company name, were there any
22 other changes for you as an individual?
23     A.   I became the owner.
24     Q.   In terms of work that you were
25 doing on a daily basis, was there any change?



1
2       A.   No.
3       Q.   Have you fired anyone at Victory
4   Mitsubishi?
5       A.   I don't think so, no.
6       Q.   Do you know of any one who has been
7   fired at Victory Mitsubishi?
8       A.   Do I know anyone that has been
9   fired?
10      Q.   Let me withdraw that question.
11           Who makes the decisions at Victory
12  Mitsubishi on whether to terminate peoples
13  employment?
14      A.   Which department?
15      Q.   In sales and financing.
16      A.   Stavros.
17      Q.   Has Stavros ever fired an employee,
18  based on allegations of them defrauding
19  consumers?
20                  MR. GOODMAN:   Object to the
21           form.
22      A.   No.
23      Q.   Who is David Perez?
24      A.   Manager.
25      Q.   Did you make the decision to hire



1
2   Mr. Perez?
3         A.    No.
4         Q.    Who made that decision?
5         A.    Stavros.
6         Q.    When did Mr. Perez start working at
7   Victory Mitsubishi?
8         A.    I don't know.
9         Q.    What were his responsibilities as a
10  sales manager at Victory Mitsubishi?
11        A.    I don't know.  I am assuming
12  whatever Stavros directed him to do.
13        Q.    Does anyone supervise the sales and
14  finance managers, besides Stavros?
15        A.    No.
16        Q.    What interactions do you have with
17  those sales and financing departments, in
18  their ordinary course of your work?
19                    MR. GOODMAN:  Object to
20            form.
21        A.    What do you mean?
22        Q.    So, sort of, day-to-day basis of
23  doing your job, what sort of interactions do
24  you have with people who work in sales and
25  financing?



1

2        A.   I occasionally go to the sales

3   room, just to say a quick hello to everybody.

4   Not much.  I don't -- they don't come to me.

5   I don't go to them.  Everything goes through

6   Stavros or my comptroller, Maria.

7        Q.   How did Victory Mitsubishi adapt to

8   the COVID-19 pandemic?

9                   MR. GOODMAN:  Object to the

10            form.

11       A.   We followed all the regulations

12   that were required.

13       Q.   And who decided how to comply with

14   those regulations?

15       A.   Stavros.  You know, a lot of

16   business owners had to get creative during

17   those early days of COVID-19, to continue

18   sales and stay afloat.

19       Q.   How did your operations change

20   during those first few months of the

21   pandemic?

22       A.   We had our customers come in by

23   appointments.  We had everybody spread out.

24   Made sure everybody was safe.  That's it.

25       Q.   Okay.  So when the shut down order



1

2  was given by the New York State government,

3  did you layoff any employees, even

4  temporarily?

5      A.   When it was shut down, we were

6  closed for a few weeks.  Everybody got laid

7  off.

8      Q.   And you said that lasted for a few

9  weeks?

10     A.   I believe it was two weeks that we

11 were supposed to close for.

12     Q.   By May 30, 2020, were there any

13 employees who were still laid off?

14     A.   Maybe.  I don't -- I don't

15 remember.

16     Q.   Okay.  By May 30, of 2020, other

17 than the measures you had previously

18 explained of appointment only, and social

19 distancing, besides those measures, had the

20 operations at Victory Mitsubishi changed in

21 any way?

22             MR. GOODMAN:  Object to

23        form.

24     A.   No, just safety, masking, you know,

25 every -- no, nothing -- nothing changed.



1

2        Q.   Okay.  And would that be the same

3   in -- on June 29, 2020?

4        A.   On June 19?

5        Q.   June 29, 2020.

6        A.   Same thing.

7        Q.   Okay.  How about in September 19,

8   2020?

9        A.   Same thing.

10        Q.   Okay.  When did the vehicle

11   lay-away program at Victory Mitsubishi start?

12        A.   What does that mean?

13        Q.   The vehicle lay-away program.

14             MR. GOODMAN:  Vehicle

15        lay-away program.  Go ahead.

16        A.   I don't know what that means.

17        Q.   Okay.  What was the remote process

18   Victory Mitsubishi had during COVID-19?

19             MR. GOODMAN:  Object to

20        form.

21        A.   We did not do any remote sales, nor

22   did any customers apply for remote sales.  It

23   was a marketing company we used that did that

24   for promotion.  No customer reached out for

25   that, nor did we ever do any of that.  It was



DIANE ARGYROPOLOUS                                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2   marketing.
3        Q.   Could you tell me what the term
4   "remote process" and "home delivery" means?
5                  MR. GOODMAN:   Object to
6           form.
7        A.   We didn't do it, so I really cannot
8   tell you the terms.
9        Q.   So your testimony is that Victory
10  Mitsubishi did not have people buy and
11  finance cars remotely during the COVID-19
12  pandemic?
13       A.   Yes, correct.
14       Q.   So during the COVID-19 pandemic,
15  what was the general process of the
16  purchasing and financing of a car?
17          How would that work?
18       A.   I don't work on the sales floor, so
19  I can't really tell you that.  I can assume,
20  but I can't tell you what.
21       Q.   I don't want you to assume.
22       A.   That's why I am saying, I don't
23  work the floor, and during COVID, I didn't go
24  to the dealership for a very long time.
25       Q.   Did you go into the dealership at



1
2   all during the year of 2020?
3        A.   I did.
4        Q.   Why did you go into the dealership
5   during 2020?
6                    MR. GOODMAN:  Did you finish
7            your answer?
8                    THE WITNESS:  I did not.
9        Q.   Sorry, go ahead and finish your
10  answer, please.
11       A.   I did.  But I did not go to the
12  showroom at 4070 for maybe a year.
13       Q.   Okay, sorry.
14       A.   I would go to 4101, to my office.
15  I would take stuff home to continue doing my
16  work.
17       Q.   Got you.  Got you.  During the year
18  of 2020, who was supervising the sales floor
19  at Victory Mitsubishi?
20       A.   Stavros.
21       Q.   Was anyone else in charge of
22  supervising the sales floor at Victory
23  Mitsubishi during that time?
24       A.   No.
25       Q.   Who would supervise, if Stavros was



1
2  sick or on vacation?

3       A.   He doesn't -- he comes at -- he is

4  healthy; knock on wood.  He doesn't get sick,

5  and he doesn't really go on vacation.  I know

6  it sounds crazy, but he just doesn't go on

7  vacation so far, at least.

8       Q.   Who would the first person a

9  customer would talk to on the sales floor be,

10 when they come in to buy a vehicle, in May of

11 2020?

12      A.   I don't know.

13      Q.   Who would help consumers fill out

14 credit applications, in May of 2020, at

15 Victory Mitsubishi?

16      A.   I don't know.

17      Q.   Which Victory Mitsubishi employees

18 were pulling credit reports, in May of 2020?

19                MR. GOODMAN:  Asked and

20           answered.  Go ahead.

21      A.   Only managers run credit at all

22 times.

23      Q.   So that was the case in May of

24 2020, and during other times in Victory

25 Mitsubishi's history; is that correct?



DIANE ARGYROPOLOUS                                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2          A.    Correct.

3          Q.    Are there video cameras in the

4    sales floor at Victory Mitsubishi?

5          A.    Yes.

6          Q.    So video recordings are made of the

7    sales at Victory Mitsubishi, correct?

8                     MR. GOODMAN:   Object to the

9              form; time frame.

10         Q.    In May of 2020?

11         A.    I -- we do have cameras.  I just

12   don't know if they are in every office, but

13   we do have cameras for security purposes.

14         Q.    And what do you mean by "for

15   security purposes"?

16         A.    Break-ins, people trying to steal

17   cars.

18         Q.    Do you have access to the

19   recordings made by those cameras?

20         A.    No.

21         Q.    Who does have access to those

22   recordings?

23         A.    My IT guy and Stavros.

24         Q.    Who is your IT guy?

25         A.    He has a weird name.  I don't



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

 1

 2  remember his name.  I don't know.

 3       Q.   That's all right.

 4                 MS. CATERINE:  Can we just

 5            leave a blank.

 6  TO BE FURNISHED: _____

 7  _____

 8       A.   Yeah, I can get it.

 9                 MR. GOODMAN:  Take it under

10            advisement.

11       Q.   And I won't tell him.

12            Have you ever seen any video

13  recordings made with those cameras?

14       A.   Yes.

15       Q.   What were the circumstances of you

16  reviewing video recordings made on those

17  cameras?

18       A.   It doesn't matter on time frame?

19       Q.   Let's say in 2020.

20       A.   In 2020, we had a break-in when

21  they were rioting, so that's -- the cameras

22  got into the parking lot, and the vehicles

23  that they stole.

24       Q.   Did you report those break-ins and

25  thefts to the police?



1

2          A.   Yes.

3          Q.   Other than break-ins and thefts,

4     have you ever spoken with the police about

5     anything regarding Victory Mitsubishi?

6          A.   No.

7          Q.   And so during -- when you were

8     reviewing those videos of the break-in in

9     2020, were you in someone's office?

10         A.   They sent it to me because I wasn't

11    at the dealership, so, yeah.

12         Q.   I see.  They sent it to you in an

13    e-mail or otherwise somehow digitally?

14         A.   In an e-mail.  My work e-mail.

15         Q.   Other than for break-ins, have you

16    ever been sent video recordings made by

17    cameras at Victory Mitsubishi?

18         A.   No.

19         Q.   Do you recall any instances of

20    identify theft happening at Victory

21    Mitsubishi?

22                   MR. GOODMAN:  Object to the

23              form.

24         A.   What time frame?

25         Q.   During the entire history of the



DIANE ARGYROPOLOUS                                December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2   dealership?
3        A.    Only this one.  Only this case.
4        Q.    Aside from Ms. Francois, has any
5   other consumer told you that a vehicle was
6   sold or financed in their name, without their
7   authorization?
8                    MR. GOODMAN:  Object to the
9             form; go ahead.
10       A.    I saw a review that was written up
11   with Mitsubishi just a few days ago, but we
12   do have video of the customer actually being
13   there and signing all of the documents, and
14   it was resolved immediately.  An
15   eighty-five-year-old woman, which I was on
16   Mitsubishi, which I know you have.
17       Q.    Now might be a good point to break
18   for lunch, if you want to do that.
19                    MR. GOODMAN:  Okay, so we
20             will take half-hour.
21                    MS. CATERINE:  Yeah, that
22             sounds good.  So it's 12:07.  Let's
23             try to be back by 12:37, please.
24                    MR. GOODMAN:  Let's make it
25             12:40, just to round up.



```
 1
 2                    MS. CATERINE:  Sure.
 3                    (Whereupon, a lunch recess
 4          was taken at this time.)
 5   BY MS. CATERINE:
 6        Q.   Ms. Argyropoulos, what is your
 7   understanding of what transpired at Victory
 8   Mitsubishi on May 30, 2020?
 9                    MR. GOODMAN:  Object to
10          form.
11        A.   Customer complaining.
12        Q.   Have you ever seen Farah Jean
13   Francois?
14        A.   No.
15        Q.   Have you ever spoken with Farah
16   Jean Francois, such as over the phone?
17        A.   No.
18        Q.   Have you ever communicated with
19   Farah Jean Francois in any way?
20        A.   No.
21        Q.   Did anyone at Victory Mitsubishi,
22   such as Stavros Orsaris, explain the
23   situation to you in 2020?
24        A.   No.
25        Q.   Why wasn't this situation brought
```



1
2   to your attention in 2020?
3                    MR. GOODMAN:  Object to the
4            form.
5        A.   I am assuming, because he handled
6   it.
7        Q.   So situation like this isn't going
8   to be brought to your attention, if he has it
9   handled; is that correct?
10       A.   Yes.
11                   MR. GOODMAN:  Object to
12           form.
13       Q.   Have you ever seen Emanuel
14   LaForest?
15       A.   No.
16       Q.   Have you ever had any
17   communications with Emanuel LaForest in any
18   way?
19       A.   No.
20       Q.   In 2020, did you communicate
21   directly with any consumers at Victory
22   Mitsubishi?
23       A.   No.
24       Q.   You don't need to look at the
25   Capital One agreement for this, but if you



1

2  would like to look at it, that's fine, of

3  course.  But do you have similar agreements

4  to that Capital One agreement with other

5  creditors?

6              MR. GOODMAN:  Object to the

7         form; you can answer.

8       A.   Similar in what way?  I am not

9  understanding.

10      Q.   Sure.  Does Victory Mitsubishi have

11 agreements with lenders, like the agreement

12 that they have with Capital One?

13      A.   Yes.

14      Q.   Are there any lenders that Victory

15 Mitsubishi submits applications to, that

16 Victory Mitsubishi does not have an agreement

17 with?

18      A.   No.

19              MR. GOODMAN:  Go ahead.

20              THE WITNESS:  Sorry.

21              MR. GOODMAN:  It's fine.

22      Q.   You said that Stavros Orsaris was

23 listed on the Capital One agreement as

24 manager because he had a prior relationship

25 with Capital One; that's your testimony,



```
 1
 2   correct?
 3               MR. GOODMAN:  Objection.
 4               Mischaracterizes.  She said
 5        Chris Orsaris.
 6               MS. CATERINE:  Sorry, did I
 7        say --
 8               MR. GOODMAN:  You said
 9        Stavros.
10               MS. CATERINE:  Chris
11        Orsaris.
12               THE WITNESS:  Yes.
13     Q.   Did Chris Orsaris suggest putting
14   him as manager and sales manager on that
15   agreement?
16               MR. GOODMAN:  Object to
17        form; go ahead.
18     A.   No.
19     Q.   Did you make that decision to put
20   him as manager and sales imageer on that
21   agreement?
22     A.   I don't recall.  I just remember
23   that we got Capital One because of Chris'
24   relationship.
25     Q.   So you don't recall the
```



1

2   circumstances that led to him being listed as

3   the manager, other than his prior

4   relationship with Capital One; is that

5   correct?

6       A.   That would be the only reason,

7   correct.

8       Q.   Did Chris Orsaris work for Victory

9   Auto Group?

10               MR. GOODMAN:   Object to

11          form; go ahead.

12      A.   What time frame?

13      Q.   Ever.  Did he ever work for Victory

14  Auto Group?

15      A.   Yes.

16      Q.   At what time did you work for

17  Victory Auto Group?

18      A.   In 2016.

19      Q.   Okay.  Was that soon after you had

20  first met him in a social capacity, that you

21  had mentioned earlier?

22      A.   Yes.

23      Q.   Was he working as a buyer, like he

24  is for Victory Mitsubishi, currently?

25      A.   Yes.



1

2      Q.   Did Chris Orsaris have to fill out

3   a job application to obtain the position that

4   he had at Victory Auto Group?

5      A.   What kind of application?

6      Q.   Like an employment application.

7      A.   Yes.

8      Q.   And who reviewed that employment

9   application?

10      A.   My comptroller.

11      Q.   Okay.  And did that application ask

12   for any references?

13      A.   I think it does.

14      Q.   Does that application authorize

15   Victory Auto Group to perform a background

16   check on the applicant?

17      A.   I don't -- I am not sure.

18      Q.   Does Victory Mitsubishi perform

19   background checks on employees?

20      A.   No.

21      Q.   Are you aware of Chris Orsaris'

22   criminal history?

23      A.   Yes.

24      Q.   When did you learn of Chris

25   Orsaris' criminal history?



1

2         A.   Many years ago.  I knew when I met
3   him about his history.
4         Q.   How did you come to learn about his
5   history?
6         A.   He is Greek, I am Greek.  It's a
7   small circle.
8         Q.   I see.
9         A.   Yes.
10        Q.   Why did you hire Chris Orsaris,
11  given his criminal history?
12                  MR. GOODMAN:  Objection to
13            form.  Go ahead.
14        A.   He is very good at what he does.
15  Whatever crime he committed, he did his time.
16  He served his time.  You still have to give
17  people chances.
18        Q.   Sure.  Is the vehicle at issue in
19  this case still in the possession of Victory
20  Mitsubishi?
21        A.   I believe so.
22        Q.   Has Victory Mitsubishi attempted to
23  sell the vehicle, since it regained
24  possession of it in September 2020?
25        A.   No.



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2       Q.   Why not?
3       A.   Because Victory Mitsubishi does not
4   own the vehicle.
5       Q.   Who does own the vehicle?
6       A.   I'm assuming the customer.
7   Whatever her -- French Francois.
8       Q.   Francois.
9       A.   Francois.
10      Q.   But you don't know who owns the
11  vehicle?  That's just your guess?
12      A.   Yes.
13      Q.   Has Victory Mitsubishi made any
14  efforts to regain title for the vehicle?
15      A.   No.  Not that I recall.  Not that I
16  know of.
17      Q.   Has Capital One reached out to
18  Victory Mitsubishi to obtain any kind of
19  refund or any other kind of compensation, in
20  regard to the vehicle?
21      A.   Not to me.
22      Q.   Are you aware that Capital One
23  performed an investigation of the identity
24  theft at issue in this case?
25      A.   I don't know.



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2          Q.   What happened to the down payment

3    for the vehicle in this case?

4          A.   I believe she has it.

5          Q.   And let's go to exhibit -- this is

6    going to be marked as Exhibit 43.  It's

7    screenshots of Instagram.

8                    MR. GOODMAN:  Is this 3934?

9                    MS. CATERINE:  Yes, 3934

10             through 3950.

11         Q.   Ms. Argyropoulos, are you familiar

12   with the social media application Instagram?

13         A.   I am.

14         Q.   And do you know who the user

15   Chris.Victory_123 is?

16         A.   No.

17         Q.   Okay.  On this first page, we have

18   a screenshot of a post by a

19   Chris.Victory_123, which appears to be of a

20   logo that reads, "Powered by Victory."

21             Are you familiar with this logo?

22         A.   No.

23                    MR. GOODMAN:  She's on the

24             first page.

25                    THE WITNESS:  All right.



1

2            Yeah, yeah, no.

3       Q.   And under the logo, there's a

4  caption which reads, "It's called branding,"

5  and there are -- other users are tagged,

6  specifically, Victory.Mitsubishi, Victory

7  Cars East, and Dream Car Gallery 760.

8            Are you familiar with any of these

9  Instagram accounts?

10      A.   I know Victory Mitsubishi and

11 Victory Cars East.

12      Q.   And who are those accounts for?

13              MR. GOODMAN:  The question

14           is:  Are you familiar with

15           Instagram accounts of those

16           entities?

17              THE WITNESS:  I mean, I know

18           Victory Mitsubishi has Instagram.

19           Victory Cars East has Instagram.

20      Q.   Who runs the Instagram account for

21 Victory Mitsubishi?

22      A.   My -- BDC manager.  Bibi.

23      Q.   Who runs the Instagram account for

24 Victory Cars East?

25      A.   She does as well, but I believe



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2     that she uses an outside marketing for both.

3     But she's responsible for it.

4         Q.   And what's the name of that outside

5     marketing firm?

6         A.   I don't know.

7                 MS. CATERINE:  Can we just

8             leave a blank in the transcript for

9             that answer, please.

10    TO BE FURNISHED: _____

11    _____

12                 MR. GOODMAN:  We will take

13            it under advisement.

14        Q.   And if you could turn to the page

15    Bates-stamped 3936.  I know it's a little

16    hard to see the Bates stamps on these, but

17    it's the picture of the white car in front of

18    a dealership.

19        A.   Okay.

20        Q.   And the caption for this Instagram

21    post is a lightening emoji, followed by the

22    text "buy Victory."  Do you know what the

23    "buy Victory" here is in reference to?

24        A.   I am not sure.

25        Q.   Okay.  Do you know the store that



1
2   is in this picture?
3         A.    I do.
4         Q.    And what is that store?
5         A.    It's a car dealership.
6         Q.    And where is that dealership?
7         A.    In Long Island.
8         Q.    Who operates that dealership?
9         A.    It's no longer in business.  I
10  don't know the person's name.  But it's no
11  longer in business.
12        Q.    Do you know when it ceased
13  operations?
14        A.    I am not sure.  I don't know.
15        Q.    Okay.  Let's turn to Francois 3938,
16  please.  And is this Instagram account the
17  account for Victory Mitsubishi?
18        A.    It looks like it is.
19        Q.    And you see there's a little circle
20  in the upper left-hand corner of the
21  screenshot with a logo in it, "Victory
22  Mitsubishi"?
23            Are you familiar with this logo?
24        A.    Yes.
25        Q.    Who created this logo?



1

2       A.   I believe Bibi did.

3       Q.   Her last name is Singh, correct?

4       A.   Yes.

5       Q.   Who is Ms. Singh's employer?

6       A.   I am.

7       Q.   So Spartan Auto Group, LLC is her

8   employer?

9       A.   Yes.

10      Q.   Does she work for anyone else,

11  besides Spartan Auto Group?

12      A.   She works for Victory Cars East,

13  and I am not sure if anywhere else.

14      Q.   Okay, let's turn to the next page,

15  please.  It's the screenshot of an

16  advertisement for a "vehicle layaway

17  program."

18           After reviewing this screenshot,

19  does this refresh your recollection as to

20  what the "vehicle layaway program" is?

21      A.   I don't know.  We never had it.  I

22  am assuming whoever was marketing just did

23  that.  I don't know.  We never did a layaway

24  program.

25      Q.   Why would it be marketing, if you



1

2  never did a layaway program?

3      A.   I don't think any customer ever

4  inquired to do one, so I don't think we ever

5  had the opportunity.  So nothing was ever

6  done.

7      Q.   So for clarification, was there a

8  program that was never used, or was there

9  just never a program?

10     A.   Nobody ever approached to use it,

11 so we -- it never happened.

12     Q.   I see.  And who would have set up

13 this program at Victory Mitsubishi?

14              MR. GOODMAN:  Object to

15         form.

16     A.   I am assuming Bibi, with marketing.

17     Q.   When you say, "with marketing," do

18 you mean marketing employees at Victory

19 Mitsubishi or what do you mean?

20     A.   An outside marketing.

21     Q.   Outside.  Is there an agreement

22 between that outside marketing firm and

23 Victory Mitsubishi?

24     A.   I am not sure.

25     Q.   Does the outside marketing firm



DIANE ARGYROPOLOUS                           December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2   have authority to create sales and financing
3   programs at Victory Mitsubishi?
4                    MR. GOODMAN:  Object to the
5            form; go ahead.
6        A.   I am not understanding the
7   question.
8        Q.   Sure.  There's this screenshot of
9   this vehicle layaway program, and it's my
10  understanding, based on your testimony, that
11  this was created by the marketing firm.  So
12  my question is:  Did they have the authority
13  to create new programs for Victory
14  Mitsubishi, like this vehicle layaway
15  program?
16                    MR. GOODMAN:  Object to
17           form; go ahead.
18       A.   Whatever they create gets reviewed
19  by Bibi.  She discusses all marketing with
20  them.
21       Q.   Okay.  So this advertisement and
22  the other advertisements on the Victory
23  Mitsubishi Instagram page, would have been
24  approved by Ms. Singh; is that correct?
25       A.   Correct.



DIANE ARGYROPOLOUS                           December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2        Q.   There's a phone number here at the

3   bottom of this advertisement, (347) 846-0825.

4             What phone number is that?

5        A.   I assume it's one of the phone

6   numbers.  We have many.  I don't know them

7   all by heart.

8        Q.   I see.  Do you know how many phone

9   numbers you have at Victory Mitsubishi?

10       A.   Not offhand, no.

11       Q.   Okay.  Okay, let's turn to Francois

12  3941.  This is an Instagram screenshot of a

13  picture of a woman in a black jacket,

14  standing in front of a red vehicle.

15       A.   Okay.

16       Q.   If you look under the picture, you

17  will see a caption dated March 27, 2020,

18  which reads "back in action.  Please contact

19  us today about our new remote process and

20  home delivery."

21            Does this post refresh your

22  recollection as to what the "new remote

23  process and home delivery" is?

24       A.   We discussed that before.  I told

25  you, we never did it.  So we advertise it,



DIANE ARGYROPOLOUS                                December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2  nobody ever inquired it, so we never sold any

3  cars remotely.

4       Q.   Okay.  Who made the decision to

5  advertise this remote process and home

6  delivery?

7       A.   I am assuming, Bibi and the

8  marketing team.

9       Q.   Okay.  Would she have discussed

10 programs like this remote process and home

11 delivery with anyone else at Victory

12 Mitsubishi, prior to posting about it on

13 Instagram?

14      A.   She might have.

15      Q.   Turn to the next page, please.

16 This is my personal favorite because it's a

17 dog.

18      A.   It's cute.  It's a dog.  I never

19 saw it.  It's cute.

20      Q.   Okay.  And the caption to this one

21 reads, "Did you know that you can now shop,

22 buy, apply for financing for your next new or

23 preowned car or truck SUV at Victory

24 Mitsubishi, all from the convenience of home?

25 Find out more details at" -- and there's a



1

2   URL there.

3        A.    Right.

4        Q.    And what is this Instagram post

5   referring to?

6        A.    The same thing that the page before

7   -- remote sales.  It's the same thing, worded

8   differently.

9        Q.    Okay.

10        A.    The governor allowed remote sales

11   at that time due to COVID.

12        Q.    I see.  Okay.  And if you could

13   turn two pages to -- there's an Instagram

14   screenshot that shows an advertisement of a

15   man on a cell phone with the text, "buy your

16   vehicle from your smartphone, new or

17   preowned.  Get the numbers and make the deal

18   over the phone.  See the vehicle you want

19   using these apps," and it lists a number of

20   different applications.

21            Is this also in reference to the

22   same program that we've been discussing?

23        A.    Yes.

24        Q.    Okay.  And if you could turn to the

25   next page, we have another screenshot that



1

2   reads, "Buy online."  Is this in reference to

3   the same program we've been discussing?

4        A.   Yes.  Sorry.

5        Q.   It's all right.  And if you could

6   turn to the next page, please.  There's a

7   picture of a woman wearing medical scrubs,

8   gloves, and a mask.  It has a caption which

9   reads, "Coronavirus update, for those

10  customers who wish to visit us here at the

11  dealership to look more closely at their new

12  or used vehicle choices, we now have gloves

13  and surgical masks available as an added

14  precaution."

15       Why does this post specify, "for

16  those customers who wish to visit us here at

17  the dealership"?  Don't all customers go to

18  the dealership in person to purchase

19  vehicles?

20            MR. GOODMAN:  Object to the

21       form; go ahead.

22       A.   They do.

23       Q.   So why does the post specify, "for

24  those customers who wish to visit us here"?

25       A.   I don't know.  We did not do any



 1

 2   remote sales, even though by law we were

 3   allowed to do so.  I guess they are still

 4   marketing because you were still legally

 5   allowed to do remote sales and wanting people

 6   to feel comfortable because we did give out

 7   boxes of masks because we bought

 8   thirty-thousand masks, even if the people

 9   didn't buy the cars, for protection, and

10   gloves.  It was just a nice thing we did.

11        Q.   You have referenced a couple of

12   times now that under the emergency orders,

13   that it was permitted to do remote sales of

14   vehicles.  Do you know what the requirements

15   were to perform those remote sales of

16   vehicles?

17        A.   I don't remember.

18        Q.   Do you know if there were any

19   trainings at Victory Mitsubishi on how to do

20   remote sales of vehicles?

21        A.   If we were going to do any remote

22   sales, it was going to be Stavros doing them

23   directly himself.  But no customer ever

24   inquired in it, so we -- we never did it.

25   But he was going to do it himself.



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2       Q.   Okay.  Okay.  Let's turn to the

3   page which has the screenshot that starts

4   with the text, "We are resuming our regular

5   hours."

6                    MR. GOODMAN:  What's the

7            Bates stamp on it?

8                    MS. CATERINE:  This is

9            Francois 3949.

10      A.   Okay.

11      Q.   And if you could just take a second

12  to read the text on that page and just let me

13  know when you are finished.

14      A.   Okay.

15      Q.   What is this post in reference to?

16      A.   If I remember correctly, are hours

17  were modified for the first two weeks.  We

18  were understaffed, so I don't think we were

19  open as early.  I think we started our day

20  later.  But I don't really remember.

21      Q.   And this post is dated June 10,

22  2020.  Was Victory Mitsubishi still only

23  doing sales by appointment on June 10, 2020?

24      A.   I am not sure.

25      Q.   Okay.  If you can turn to the next



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2   page, please.  This page features a
3   screenshot which has the text, "You can do it
4   all from home," dated June 26, 2020."
5          What is the meaning of, "You can do
6   it all from home"?
7                  MR. GOODMAN:  Object to
8          form.
9       A.   Buying a vehicle.
10      Q.   Can you open Exhibit 21, please,
11  which is the deal jacket.  What is this
12  document?
13      A.   On page twenty-one?
14                 MR. GOODMAN:  No, the whole
15         thing.
16                 THE WITNESS:  Oh, whole
17         document.
18      Q.   The whole document.
19                 MR. GOODMAN:  Exhibit 21.
20      A.   The front of it is a deal jacket.
21  The whole document -- I see a credit app.  I
22  see receipt for deposit.  I see a contract
23  for financing the vehicle.  I see a form for
24  registration and titling.  I see the
25  inspection of the vehicle.  I see the



DIANE ARGYROPOLOUS                       December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2    warranty contract.  Capital One funding.  The

3    bill of rights form.  The bill of sale.

4    Information about the vehicle.  The

5    application for the financing, the rate, the

6    driver's license, insurance card, the plate

7    number, MV-50 for registration, a copy of the

8    title for the vehicle.

9         Q.   In the ordinary course of your

10   business working at Victory Mitsubishi, do

11   you review deal jackets for any reason?

12        A.   No.

13        Q.   And we discussed earlier that

14   Victory Mitsubishi has the vehicle, but does

15   not have title to the vehicle at this time.

16           Is there a way for Victory

17   Mitsubishi to obtain title at this time?

18        A.   I am not sure.

19        Q.   Do you know if there's any process

20   underway to obtain title for the vehicle?

21        A.   I don't know any.

22        Q.   Who at Victory Mitsubishi would

23   handle issues with titles for vehicles?

24                  MR. GOODMAN:  Object to the

25             form.



```
 1
 2        A.   What kind of issues?
 3        Q.   Let's just start with making sure
 4   there's a title corresponding to the vehicle.
 5        A.   The vehicles that are owned by
 6   Victory Mitsubishi?
 7        Q.   Yes.
 8        A.   My title clerk.
 9        Q.   And who is that?
10        A.   Areefa.
11        Q.   Last name?
12        A.   Khan.
13        Q.   Could you spell that, please?
14        A.   K-H -- last name?
15        Q.   Both, if you know how.
16        A.   Yes.  A-R-E-E-F-A, last name is
17   K-H-A-N.
18        Q.   Okay, can you open Exhibit 23,
19   please, Bates-stamped Defendant's 85 through
20   92.  It's the screenshots from Dealtertrack.
21                THE WITNESS:  It's not this
22        one?
23                MR. GOODMAN:  No, no.
24                It's this one.
25                THE WITNESS:  Okay.
```



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2      Q.   Okay, starting with this first

3  page, is there a customer selection option

4  when you open Dealertrack?

5      A.   I am not understanding.

6      Q.   Sure.  So the way that you use

7  Dealertrack is a bit different than the way

8  that the sales and financing people use

9  Dealertrack, correct?

10      A.   Yes.

11      Q.   And do you know if the screens look

12  different for you on Dealer Track, than for

13  people on sales and financing?

14      A.   Yes.

15      Q.   Okay.  And are you familiar with a

16  screen like the one on Bates-stamped

17  Defendant's 85, titled "customer selection"?

18      A.   I have the same screen on that.

19      Q.   Okay.  Great.  And if you could

20  turn to the next page, please.  And when you

21  select a customer in customer selection,

22  would a screen like this one show up for you?

23      A.   Yes.

24      Q.   And you will see here there's a

25  field for "sales person one," and it's filled



DIANE ARGYROPOLOUS                              December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2    in with the numbers "999."
3              Who does "999" refer to?
4         A.   There was no salesperson on the
5    deal.
6         Q.   I see.  So 999 is just kind of a --
7    what you would put in if there was no
8    salesperson involved with the deal?
9         A.   Yes.
10        Q.   Okay.  Great.  And who does "A31"
11   refer to in the field titled "F and I
12   manager"?
13        A.   That's the finance manager's.
14        Q.   Do you know who "A31" is?
15        A.   I am not sure.  They all have
16   numbers.  I would have to go to a different
17   screen to see it.
18        Q.   Is there any document, including an
19   electronic document, like a screen you could
20   pull up in Dealertrack, that lists all of the
21   employee identification numbers, like 999,
22   and A31?
23        A.   There may be.
24              MS. CATERINE:  We would call
25              for the production of that



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2              document.
3       A.   I mean...
4                    MS. CATERINE:  To the extent
5              it exists.
6                    MR. GOODMAN:  Taken under
7              advisement.
8       Q.   And if you could turn to the next
9    page, please.  And there's text here that
10   reads, "function," and there's an asterisk
11   and then a yellow box to the right of it.
12             Do you know what that is?
13      A.   I don't know this screen.
14      Q.   Okay.  Remains a mystery.
15                   MR. GOODMAN:  Excuse me.
16      Q.   Let's see.  Could you turn to the
17   page marked Defendant's 90.  It's the one
18   with Progressive Insurance.
19      A.   Okay, got it.
20      Q.   And has Victory Mitsubishi had any
21   communications with Progressive Insurance
22   since the vehicle was returned to the Victory
23   Mitsubishi in September of 2020?
24      A.   I don't know.
25                   MR. GOODMAN:  Object to the



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2              form.  You mean about this vehicle?
3                   MS. CATERINE:  Yes, about
4              this vehicle.
5       A.   I don't know.
6       Q.   Okay.  If you could turn to the
7   next page, please.  And we see accountings of
8   different amounts for the sale of the
9   vehicle, and there's a field for
10  "registration," with the amount 250.
11             What is that?
12      A.   Two --
13                  MR. GOODMAN:  Where is it
14             at?  Oh, I see it.  Okay, go ahead.
15      A.   To register and title the vehicle.
16      Q.   Okay.  And does Victory Mitsubishi
17  keep the registration fee for vehicle sales?
18      A.   It pays DMV to register the cars.
19      Q.   I see.  So that payment goes to the
20  DMV?
21      A.   Correct.
22      Q.   Okay.  And then there's a service
23  contract, which I know you also identified in
24  the deal jacket, and the amount for that is
25  $3,000.  Do you know what happened to that



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2   $3,000, since the return of the vehicle in

3   September 2020?

4        A.   I don't know.

5        Q.   Do you know if the service contract

6   has been refunded?

7        A.   I don't know.

8        Q.   And there's a "document fee" here

9   of $75.  What is the "document fee"?

10       A.   I am not sure.

11       Q.   Okay.  If you could look at the

12  last page, please, Defendant's 92.

13            What is this document?

14       A.   I have never seen it before.

15       Q.   Okay.  If you could open -- let's

16  open what is going to be marked Exhibit 44.

17  This is one of the new documents.  It's

18  Bates-stamped subpoena responses 569 through

19  574.  It's a Dealertrack document.

20                 MR. GOODMAN:  Okay.  Yeah,

21            this might be it.  569 to 574?

22                 MS. CATERINE:  Yeah, six

23            pages.

24       Q.   Prior to your preparation for your

25  deposition today, had you ever seen a



1
2  document like this one, either printed out or
3  on a computer screen?
4      A.   I have seen it on a computer
5  screen.
6      Q.   Okay, what is this document?
7      A.   It's Dealtertrack, on the process
8  of the vehicle.
9      Q.   And who has access to this?
10     A.   Finance managers and Stavros.
11     Q.   And if you could go to the last
12 page of the document, subpoena responses 574,
13 and, actually, before I ask about that, why
14 would the finance managers or Stavros access
15 this document in the ordinary course of their
16 business?
17             MR. GOODMAN:   Object to
18          form; go ahead.
19     A.   To send the application to the
20 bank, so the bank can fund the deal.
21     Q.   Okay.  All right.  And looking at
22 the last page of the document 574, it begins
23 with an entry time stamped "4:54 p.m., Y.
24 Ventura, deal jacket created."
25             Who is Y. Ventura?



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2          A.   I don't know.
3          Q.   Okay.  And what does "deal jacket
4    created" refer to?
5          A.   I am not sure.
6          Q.   So in the ordinary course of your
7    working at Victory Mitsubishi, do you review
8    this document?
9          A.   No.
10         Q.   Okay.  There's an entry further
11   towards the top time stamped 4:58 p.m., which
12   reads, "privacy notice manually signed."
13              Do you know what this refers to?
14         A.   I am not sure.
15         Q.   If you go to the previous page,
16   573, go to the bottom of the page, you will
17   see there's an entry time stamped 4:59, by
18   this Y. Venture, "Trans decision approved."
19   The next entry is time stamped 6:09 p.m., by
20   Jessica Vallejo, and that reads "credit
21   application copied."
22              Do you know why it switched from Y.
23   Ventura to Jessica Vallejo?
24         A.   I don't know.
25         Q.   Do you know why, generally, in the



1

2  sales and financing of a vehicle, why

3  Dealtertrack would have one Victory

4  Mitsubishi employee pulling the credit report

5  and submitting credit application, and then

6  switch to a different Victory Mitsubishi

7  employee?

8                        MR. GOODMAN:   Object to the

9            form.

10       A.   Because the second one gets

11  switched over -- submits the deal to the

12  bank.

13       Q.   Why would that happen, generally?

14       A.   Because they are the finance

15  managers.

16       Q.   Is it due to them being busy or

17  what would be the reason?

18       A.   Just a different responsibility.

19  They are a finance managers.   That's what

20  their job is.

21       Q.   Do only finance managers submit

22  credit applications?

23       A.   No.

24       Q.   Who else submits credit

25  applications, besides finance managers?



1

2          A.    Managers.

3          Q.    Besides Stavros or Orsaris and

4    David Perez, what other managers are there?

5          A.    At what time?

6          Q.    In May of 2020.

7          A.    I think Jason Lewis.

8          Q.    Does Jason Lewis still work at

9    Victory Mitsubishi?

10         A.    Yes.

11         Q.    Okay.  Who are the financing

12   managers at Victory Mitsubishi in May -- on

13   May 30, 2020?

14         A.    I know Yessica, Joe.  I am not sure

15   if anybody else.

16         Q.    Do you know if there's ever been a

17   finance manager with the last name Ventura at

18   Victory Mitsubishi?

19         A.    Maybe.

20         Q.    And if you could turn to the page

21   subpoena responses 572, please.  Do you know

22   what Victory Mitsubishi's hours of operation

23   were on May 30, 2020?

24         A.    No.

25         Q.    Do you know what Victory



1

2  Mitsubishi's hours of operation are

3  currently?  Specifically, for Saturdays.

4       A.   I think it's nine to eight.

5       Q.   Okay.

6       A.   Nine to nine.

7       Q.   Has there ever been a point at

8  which Victory Mitsubishi's hours of operation

9  extended past 10:00 p.m.?

10      A.   I am not sure.

11      Q.   Okay.  And on this page we see a

12 little back and forth here between Ventura

13 and Vallejo, from 6:13 p.m. to 6:48 p.m., and

14 then nothing happens until 10:11 p.m., when

15 there's an entry which reads, "credit

16 application E-signature pending."

17           First, what does "credit

18 application E-signature pending" mean?

19      A.   I don't -- I don't know.

20                MR. GOODMAN:  Let me see

21      that page.

22      Q.   And do you know any reason why

23 there would be entries made in Dealertrack

24 for an account after 10:00 p.m.?

25                MR. GOODMAN:  Object to



DIANE ARGYROPOLOUS                        December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2              form.
3      Q.   Sorry, what was the answer?
4      A.   I don't know.
5      Q.   Okay.  Have you ever seen Yessica
6  Vallejo working at the dealership, after the
7  dealership has closed?
8                   MR. GOODMAN:  Object to
9              form.
10     A.   I am not there.
11     Q.   Fair enough.
12                  MR. GOODMAN:  Emma, if this
13             is a good time, can we take five
14             minutes?
15                  MS. CATERINE:  Yeah, that's
16             fine.  This is a good time.
17                  (Whereupon, a recess was
18             taken at this time.)
19  BY MS. CATERINE:
20     Q.   Let's go to Exhibit 32.  It's a
21  single page, subpoena responses 326.
22                  MR. GOODMAN:  326?
23                  MS. CATERINE:  Yeah.
24                  MR. GOODMAN:  What is it,
25             Emma?



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2              MS. CATERINE:  It's the
3        investigation summary by Capital
4        One.  It has tied in account
5        numbers at the top.
6              MR. GOODMAN:  I know what it
7        is, but I am not -- maybe it's
8        right here.  Okay, I don't -- oh,
9        it might be in that stack.  Yeah, I
10       am not finding it in here.  I would
11       have to print it out.  You might
12       want to ask her if she knows what
13       it is anyway.  If you want me to go
14       print it, I will have to go out and
15       print it.
16             MS. CATERINE:  Before we do
17       that, let's go back to the
18       agreement between Victory
19       Mitsubishi and Capital One.
20             MR. GOODMAN:  That's right
21       there.
22             MS. CATERINE:  Exhibit 41.
23   Q.   And if you could turn to the page
24  Bates-stamped Defendant's 80.  When you have
25  that in front of you --



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2        A.    I am trying to find it.
3        Q.    Okay.
4        A.    Okay, I found it.  Page 80?
5        Q.    Yes.
6        A.    Okay.
7        Q.    Okay.  And do you see the section
8    titled "Fair Credit Reporting Act"?
9        A.    Yes.
10       Q.    And is that your signature under
11   the section titled "Fair Credit Reporting
12   Act"?
13       A.    Yes.
14       Q.    And what is your understanding of
15   what your signature was agreeing to on this
16   page?
17                  MS. CATERINE:  Strike that.
18       Q.    What is your understanding of the
19   effect of your signing this page?
20                  MR. GOODMAN:  Object to
21           form.
22       A.    My understanding -- actually, let
23   me look at this.
24       Q.    Sure.  Take your time.
25       A.    To have the customer and give their



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2  ID and signing the credit app, so their
3  credit could be run to obtain a loan.
4           Sorry, you didn't hear me?
5      Q.   No, no, I heard you.
6           Is Mr. Goodman still there?
7                MR. GOODMAN:  I am here.  I
8           am looking through papers trying to
9           find that out.
10               MS. CATERINE:  Okay, sorry.
11          I just don't want to proceed
12          without you.
13               MR. GOODMAN:  326, Titan
14          account number.  That's the one we
15          were looking for before?
16               MS. CATERINE:  Yeah.
17               MR. GOODMAN:  The
18          investigation initiated -- okay, we
19          found it.  There you go.
20               MS. CATERINE:  Okay, great.
21      Q.   A couple of questions, first,
22  though.
23           For the Capital One document, the
24  paragraph under Fair Credit Reporting Act,
25  that says, "Under the Fair Credit Reporting



1

2    Act, you are either a user of credit

3    information, a consumer reporting agency, or

4    exempt except for disclosure requirements."

5    I didn't read a parenthetical there, but what

6    is your understanding of whether you're a

7    user of credit information, a consumer

8    reporting agency, or exempt?

9         A.   My understanding, they were allowed

10   to run a customer's credit to apply for a

11   loan.

12        Q.   Okay.  And is your understanding

13   that that would make you a user of credit

14   information?

15        A.   Not me, technically, but the

16   company.

17        Q.   Spartan Auto Group is the user?

18        A.   Spartan Auto Group is the user.

19        Q.   And the second bullet point here

20   says, "Should the financing source to whom

21   you submitted the application reject the deal

22   and supply you credit information, you might

23   find yourself being a user of a report and

24   depending on the information received,

25   trigger additional responsibilities."



DIANE ARGYROPOLOUS                     December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2          What is your understanding of what

3    "additional responsibilities" could be

4    triggered under these circumstances?

5          A.   I am not sure.

6          Q.   Okay, let's look at that

7    investigation document, please, the one

8    Bates-stamped subpoena responses 326.

9          Prior to your preparation for this

10   deposition today, had you ever seen this

11   document before?

12         A.   No.

13         Q.   Could you please take a second and

14   read the section titled "narrative" to

15   yourself, and let me know when you are

16   finished?

17         A.   Okay.

18         Q.   Okay.  There are two sentences here

19   I want to ask you about.  The first sentence

20   is the one that says, "During the review of

21   the account, it was discovered that an

22   unknown suspect using the telephone numbers

23   listed above used the victim's name, date of

24   birth, and social security number, on June

25   29, 2020, to purchase a 2017 BMW 5 series for



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2    29,462.81."
3              Do you understand that statement to
4    be accurate?
5                    MR. GOODMAN:   Object to the
6                    form.
7         A.   No.
8         Q.   And what do you understand about
9    that statement to not be accurate?
10        A.   I believe that the customer was
11   actually at the dealership purchasing the car
12   because I discussed this with Stavros.  They
13   got a lot of tickets and they didn't want to
14   claim responsibility.  She came to the
15   dealership.  There was communication with
16   BBC.  We have recording of her.  She did come
17   to the dealership.  So from what I am
18   understanding from Stavros -- I was not
19   there.  I didn't see the customer.  That she
20   was there for -- and they got a lot of
21   tickets, thousands of dollars, and they
22   didn't want to be responsible for them.
23        Q.   And what is your understanding --
24   you mentioned recordings.  What are those
25   recordings?



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2        A.   With BDC calling the customer and

3   speaking to her.

4        Q.   What's BDC?

5        A.   Cust- -- the girls that call the

6   customers to see if the visit was okay, if

7   they came in, or to make appointment for a

8   car.

9        Q.   And do you know the date of those

10  phone calls?

11       A.   I am not sure.

12       Q.   Do you know if those phone calls

13  were before or after the sale of the vehicle?

14       A.   I am not sure.  I believe it was

15  after, though.

16       Q.   Okay.

17       A.   I am pretty sure it was after

18  because they -- and there's a recording.  I

19  believe we still have it.  They asked how the

20  visit went.

21       Q.   Do you know if anyone was ever

22  arrested or criminally charged, in relation

23  to this alleged identity theft?

24       A.   No.  I don't know.

25       Q.   Okay.  Do you know who Emanuel



```
1
2    LaForest is?
3         A.   Until recently, no.  But now I do
4    know who he is.
5         Q.   What's your understanding of who he
6    is?
7         A.   They came together to purchase a
8    car.
9         Q.   And the sentence I just asked you
10   about talked about telephone numbers, name,
11   date of birth and social security number,
12   which are listed above, or the phone number,
13   rather, are listed above.
14            Do you recognize either of the
15   phone numbers listed under "home phone" or
16   "work phone"?
17        A.   No.
18        Q.   And there's a date of birth here
19   for ██████████ 1982.  Do you know anyone
20   with the birth date ██████████ 1982?
21        A.   No.
22        Q.   Okay.  And the last sentence in
23   this narrative reads, "Capital One Auto
24   Finance has begun efforts to recover the
25   funds on the loan."
```



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2          What is your understanding of

3    Capital One's efforts to recover the funds on

4    the loan?

5          A.   I don't think there was any.  I am

6    not aware of Capital One reaching out to

7    Victory Mitsubishi.  I have no knowledge of

8    that.

9          Q.   If that did happen, generally,

10   would that be something that would be

11   communicated to you?

12         A.   Only if it wasn't resolved.  But

13   usually Stavros handles everything.

14         Q.   Okay.  So Stavros would handle it,

15   but if there was some kind of problem or

16   inability for him to resolve it, then he

17   would communicate it to you; is that correct?

18         A.   Correct.

19         Q.   And sorry if I asked this before,

20   but just in the general operation of the

21   business, how often do you talk to Stavros?

22                   MR. GOODMAN:  Object to

23          form.

24         A.   At what time?  What time frame?

25         Q.   In 2020.



DIANE ARGYROPOLOUS                        December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2        A.   In 2020, I spoke to him, I would

3   say, maybe three times a week, maybe once a

4   day.

5        Q.   And what were the nature of those

6   calls?

7        A.   To prepare all the deposits to be

8   sent across the street.  So I would have them

9   either delivered to me or I would show up

10  once in a while to pick up everything to work

11  from home.

12       Q.   When you say, "the deposits," are

13  you referring to the down payments on

14  vehicles?

15       A.   Yes, credit card or cash.

16       Q.   And where are those kept when they

17  are at the 4070 location?

18       A.   In a safe.

19       Q.   Who has access to that safe?

20       A.   Stavros.

21       Q.   Do you have access to that safe?

22       A.   Honestly, no.  We got a new safe,

23  so, no, I do not because I don't go there, to

24  be honest.

25       Q.   I guess it shows the level of trust



1

2    between you.

3         A.   Honestly, no, I don't.

4         Q.   And so once you pick up the down

5    payments, what do you do with them?

6         A.   I close it out in our DMS system,

7    which is Dealtertrack, and I send it to the

8    bank.

9         Q.   And are those kept in, like, a

10   checking account, in an IOLA account?

11            What kind of account are they kept

12   in at the bank?

13        A.   In a checking account.

14        Q.   Are other funds kept in that

15   account, besides down payments?

16        A.   Yes.

17        Q.   And you say you "close it out in

18   the DMS system."  Does that create a record

19   showing that the down payment was deposited

20   in a bank account?

21                 MR. GOODMAN:  Object to

22            form.

23        A.   I mean it -- once a customer gives

24   money, it's already recorded to the deal.  So

25   it follows through, but it gets recorded to



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2    the dealers through the receipt of the money.
3    But, yes, there's a record of making sure all
4    money goes to the bank.
5          Q.   Okay.
6                    MS. CATERINE:  We call for
7               the production of that record in
8               regard to the down payment for this
9               vehicle.
10                   MR. GOODMAN:  Taken under
11              advisement.
12         Q.   Okay, let's look at Exhibit 33.
13   It's a printout of a spreadsheet of
14   complaints from Mitsubishi, Bates-stamped
15   subpoena responses 485 through 489.  And just
16   for the record, I am only describing the
17   documents inasmuch as to help locate them,
18   not to influence the witness in any way.  And
19   just let me know when you have those in front
20   of you.
21         A.   I have them.
22         Q.   Okay, great.
23              What is this document?
24         A.   I am assuming it's an -- I am not
25   sure.  Because if I am getting it, it could



1

2  look different.  But I assume it's something

3  from Mitsubishi.

4                    MR. GOODMAN:  Don't assume.

5           If you know what it is --

6                    THE WITNESS:  Yeah, I am not

7           sure.

8       Q.   Okay.  If you turn to the page

9  stamped subpoena responses 488, you will see

10  there's a column with a bunch of cells that

11  are filled in with text describing different

12  complaints.  And take your time.  Feel free

13  to read all of them.

14           Do you recognize any of the

15  complaints described in this spreadsheet?

16      A.   I recognize one.

17      Q.   Which is the one that you

18  recognize?

19      A.   "Customer daughter upset that her

20  eighty-five-year-old mother's name was on

21  it."

22      Q.   Okay.

23      A.   This is the recent complaint that I

24  actually discussed when I saw this document.

25      Q.   I see.  And who did you discuss



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

```
 1
 2   that with?
 3         A.   Stavros.
 4         Q.   Were your attorneys present for
 5   that discussion?
 6                    MR. GOODMAN:  By counsel,
 7              yes.
 8                    THE WITNESS:  You were
 9              right.  I had to think.  Yes, yes,
10              they were.
11                    MS. CATERINE:  As curious as
12              I am, I will refrain from asking
13              what was said in that conversation.
14                    MR. GOODMAN:  Well, you can
15              ask.
16                    MS. CATERINE:  Oh, I am, I
17              am going to.
18         Q.   What is your understanding of what
19   happened in this case?
20         A.   Okay, I read it, I asked Stavros to
21   come to me across the street, comes to me, I
22   asked him about it, he showed me video of
23   this eighty-five-year-old woman signing all
24   the documents, and it was resolved with the
25   customers.  The daughter had an issue with
```



1
2  the parking spot where she lives, and that's
3  why she made all this nonsense.  But it has
4  been resolved and we do have footage video of
5  this eighty-five-year-old woman signing all
6  documents.  So, to me, there's no issue
7  there.
8       Q.   Okay.  Could you explain to me a
9  little bit about what you mean by, like,
10 "parking spot"?  I am a little confused with
11 what that has to do with anything.
12      A.   Wherever they live had to be on the
13 daughter's name, so the building was able to
14 permit her, but she wound up resolving it.
15 When she resolved it with the building, it
16 went away.  So it was all -- and we do have
17 video of the eighty-five-year-old woman
18 signing all the documents at the dealership.
19      Q.   Do you still have that video?
20      A.   Yes.
21      Q.   Okay.  Are you familiar with any of
22 the other complaints listed on the
23 spreadsheet?
24      A.   No.  No, that one caught my eye, so
25 that's why I asked it, but no.



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2        Q.   Has Mitsubishi Motors ever reached

3   out to you, you, specifically, Diane

4   Argyropoulos, to discuss complaints made

5   against Victory Mitsubishi?

6        A.   No.

7        Q.   Do you know if Mitsubishi Motors

8   has reached out to anyone else, such as

9   Stavros Orsaris, to discuss complaints made

10  against Victory Mitsubishi?

11       A.   Yes.

12       Q.   What is your understanding of those

13  complaints?

14       A.   The one that we just discussed, you

15  know, you have to resolve it.  It doesn't go

16  away.  Mitsubishi wants to know.  And it gets

17  resolved.  A lot of times these customers,

18  you know, wanted a Mercedes and left with a

19  Mitsubishi.  So if you are coming in for -- a

20  little upset, but what are you going to do?

21  Everybody wants something they can't have.

22       Q.   How are Chris Orsaris and Stavros

23  related?

24       A.   Father and son.

25       Q.   Do you know any other father and



1

2   son who work at Victory Mitsubishi?

3        A.   His -- at what time frame?

4        Q.   In May of 2020.

5        A.   Any other in May of 2020?  No, no.

6        Q.   Does anyone else from the Orsaris

7   family work at Victory Mitsubishi, in May of

8   2020?

9                    MR. GOODMAN:  Object to the

10              form.

11       Q.   Anyone else besides Chris Orsaris

12   and Stavros Orsaris?

13       A.   No.  No.

14       Q.   With the complaint -- with the --

15   the elderly woman that you were just

16   discussing, did you actually watch the video

17   recording or did Stavros just describe it to

18   you?

19       A.   I watched it.

20       Q.   Okay.  And had Stavros e-mailed the

21   video recording to you?

22       A.   No, he showed it to me in person.

23       Q.   I see.  Was it, like, on his phone

24   or something?

25       A.   We were at -- we were on a



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2   computer, so I think -- did it -- he was able

3   to download from the computer.

4        Q.   I see.  All right.  And in

5   September of 2020, do you know if there were

6   any other father and son working at Victory

7   Mitsubishi, besides Stavros and Chris

8   Orsaris?

9        A.   No.  No.

10       Q.   At any point --

11       A.   No, there wasn't any.  Sorry.

12       Q.   At any point during the history of

13  Victory Mitsubishi, have there been any

14  fathers and sons working there, besides Chris

15  and Stavros Orsaris?

16       A.   No.

17       Q.   Okay.

18       A.   No.

19       Q.   How long are video recordings kept

20  at Victory Mitsubishi?

21       A.   I am really not sure.  I am really

22  not sure.

23       Q.   Around when did you watch this

24  video recording of the elderly woman

25  regarding the consumer complaint?



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2      A.   A few days ago.

3      Q.   And I believe that complaint is

4  dated May of 2022.  I believe.  Let me

5  actually look at it before I guess.

6              MR. GOODMAN:  That's

7         correct.

8              MS. CATERINE:  Okay.

9      Q.   So is it reasonable to assume,

10 then, that you keep recordings for at least

11 six to seven month?

12             MR. GOODMAN:  Object to

13        form.  Time frame, also, but

14        objection.

15     A.   No, I am assuming -- when was this

16 filed?

17             MR. GOODMAN:  May of 2022.

18             THE WITNESS:  When did the

19        customer buy the car?

20             MR. GOODMAN:  May of '22.

21     A.   Okay, so we still have the

22 recording.  I think it only saves maybe for

23 thirty days.  It doesn't -- it doesn't -- we

24 don't have, like, a six month...

25             MR. GOODMAN:  Do you know



1

2          what the standard is?  If you don't

3          --

4              THE WITNESS:  Yeah, I don't

5          know.  But this was because

6          customer had just purchased the

7          car.  They still had the recording

8          and they went back that day.

9     Q.    Do you know why there aren't any

10  video recordings of the sale of the vehicle

11  in the name of Farah Jean Francois?

12     A.    I don't know.  But two years later,

13  it would no longer be there.

14     Q.    But the vehicle was returned in

15  September of 2020, correct?

16     A.    That's what I heard.

17     Q.    So when there's been an allegation

18  of identity theft, shouldn't video recordings

19  have been preserved at that time?

20     A.    I don't know.  It was a very rough

21  time during COVID for everybody.  So I can't

22  really say.  Everybody had a hard time with

23  COVID, you know, people were a little

24  nervous.

25     Q.    Sure.  When you learned of this



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2    lawsuit, what steps did you take to determine

3    whether the allegations in it were true?

4          A.   I spoke to Stavros, and I trust

5    him, and I believe him.

6          Q.   And around when did you speak to

7    Stavros?

8          A.   Whenever the lawsuit came.  I don't

9    remember the time.

10         Q.   What did you ask him during that

11   conversation?

12         A.   I asked him for the customer's

13   name, who, you know, who prepared the work,

14   you know, ID.  He swears that they both were

15   at the dealership and he had them remove the

16   mask from a distance to make sure it was

17   them.

18         Q.   Did he tell you who pulled

19   Ms. Francois' credit report?

20         A.   He told me -- let me think.  He

21   told me that they were all having lunch or

22   dinner, they were eating, a few of the

23   managers in -- I don't know whose office.  I

24   don't remember whose office.  But they were

25   eating in a manager's office and Yessica is



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2    the one who ran the credit.

3        Q.   Okay.

4                MR. GOODMAN:  Do you need to

5           take that?

6                THE WITNESS:  No, it's okay.

7                MS. CATERINE:  You want to

8           take a break?

9                THE WITNESS:  It's okay.  I

10          will call back.  Thank you.

11       Q.   Have any employees been fired, or

12   otherwise disciplined, in regards to the

13   allegations in this lawsuit?

14       A.   No.

15       Q.   Have you spoken with Yessica

16   Vallejo about the allegations in this

17   lawsuit?

18       A.   I have.

19       Q.   And what was the nature of that

20   conversation?

21                MR. GOODMAN:  Was counsel

22          present for that conversation?  Was

23          it attorney -- either me or Patrick

24          there?

25                THE WITNESS:  When I spoke



DIANE ARGYROPOLOUS                                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

```
 1
 2              to Yessica?
 3                      MR. GOODMAN:  Correct.
 4                      THE WITNESS:  I am trying to
 5              remember.  Were you?
 6                      MR. GOODMAN:  I think so.
 7                      THE WITNESS:  I think you
 8              were there.  You were there.
 9                      MR. GOODMAN:  There may have
10              been another time, but I definitely
11              --
12                      THE WITNESS:  You were there
13              the one time, the only time.  Was
14              she was very upset because Yessica
15              -- I know you met her.  She takes
16              things to heart.  And she said, "I
17              would never do anything that I am
18              not supposed to do."
19                      MR. GOODMAN:  Okay, there's
20              no question pending.
21                      THE WITNESS:  All right, all
22              right, all right, all right.  Okay,
23              never mind.
24        Q.   Was she afraid that you might
25    believe the allegations in the lawsuit?
```



DIANE ARGYROPOLOUS                        December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2                        MR. GOODMAN:  Objection to
3              form.  But also now we're in the
4              privileged conversation.  So I'll
5              direct her not to answer.
6              Privilege.
7        Q.    Okay.  Did Ms. Vallejo mention
8   anyone by the name of Jaime Singer?
9                        MR. GOODMAN:  Objection.
10             Again, you are asking her about a
11             conversation we established --
12                       MS. CATERINE:  Fair enough.
13             Fair enough.
14       Q.    Other than your conversation with
15  Ms. Vallejo, have you had any other
16  communications with her about the lawsuit,
17  such as e-mails?
18                       MR. GOODMAN:  Other than the
19             time that I was there?  That's the
20             question?
21                       Did you have any other
22             conversation, when I was not there,
23             with Yessica, about this case?
24                       THE WITNESS:  No.
25       Q.    Have you, at any point, tried to



```
1
2    contact Ms. Francois?
3         A.   No.
4         Q.   Do you think that Victory
5    Mitsubishi did anything wrong in the sale and
6    financing of the vehicle to Ms. Francois?
7                   MR. GOODMAN:   Object to the
8              form; go ahead.
9         A.   No.
10        Q.   Who is at fault for Ms. Francois'
11   identity being stolen?
12                  MR. GOODMAN:   Objection,
13             form.  Don't answer that.  Who's at
14             fault?  You can answer, if you
15             know.  I mean, object to the form.
16        A.   I don't know.
17        Q.   Okay.
18                  MR. GOODMAN:   It seems --
19             sorry, I am not -- object to form.
20        Q.   Are you aware that Emanuel LaForest
21   has testified in this lawsuit that he
22   purchased Ms. Francois' social security
23   number?
24        A.   No.
25        Q.   Are you aware that Mr. LaForest
```



DIANE ARGYROPOLOUS                        December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2    texted the social security number of another
3    person by the name of Jaime Singer to Stavros
4    Orsaris?
5         A.   No.
6         Q.   Are you aware that Emanuel LaForest
7    texted a picture of Jaime Singer's driver's
8    license to Stavros Orsaris?
9         A.   No.
10        Q.   Knowing what it does now, would
11   Victory Mitsubishi have taken any steps in
12   the sale and financing of a vehicle to
13   Ms. Francois differently than how it did on
14   May 30, and June 29th of 2020?
15                  MR. GOODMAN:  Object to the
16            form.
17        A.   Are you assuming we did something?
18   I am not understanding the question.
19        Q.   From my understanding --
20                  MR. GOODMAN:  No, if you
21            don't understand, that's it.  She
22            will ask another question.
23                  THE WITNESS:  Okay.
24                  MS. CATERINE:  Let's take a
25            ten-minute break.  Hopefully, we



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2           can wrap this up soon.

3                   (Whereupon, a recess was

4           taken at this time.)

5   BY MS. CATERINE:

6       Q.   So when did the Instagram account

7   for Victory Mitsubishi start?

8                   MR. GOODMAN:  Object to

9           form; go ahead.

10      A.   Couple of years ago.  Honestly, I

11  don't remember the date.

12      Q.   Okay, that's fine.  And you said

13  that the post that we looked at earlier were

14  put together by a marketing firm and Bibi

15  Singh; is that correct?

16      A.   Yes.

17      Q.   Who's Ms. Singh's supervisor?

18                  MR. GOODMAN:  Currently?

19                  Object to form.

20      Q.   In 2020.

21      A.   She is a manager.

22      Q.   She is a manager.  So does she not

23  have a supervisor, then?

24      A.   If there's ever needed, she will go

25  to Stavros.  But she is a manager.



DIANE ARGYROPOLOUS                              December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2        Q.   Okay.  So would she have reported
3   these marketing campaigns to Stavros?
4        A.   I would -- I would say they
5   definitely had to discuss it, yes.
6        Q.   And so you mentioned that Chris
7   Orsaris -- I think you called him a "buyer";
8   is that correct?
9        A.   Yes.
10       Q.   What does a buyer do?
11       A.   Buys and sells vehicles.
12       Q.   And where is he buying and selling
13   vehicles?
14       A.   Auction.  Auctions.
15       Q.   Okay, so he is dealing in used
16   vehicles, specifically?
17       A.   Yes.
18       Q.   And are these sold to Victory
19   Mitsubishi one at a time, or in bundles?
20            How does that work?
21       A.   They are sold for the day.  It's an
22   immediate transaction, as he buys.
23       Q.   Got you.  And you said he receives
24   a flat fee for the vehicles, correct?
25       A.   Yes, depending on the vehicles.



1
2   There's different fees.
3        Q.   Okay.  Does he receive any other
4   compensation through Victory Mitsubishi?
5        A.   No.
6        Q.   Do you know if he works for any
7   other companies, besides Victory Mitsubishi?
8        A.   Not to my knowledge.
9        Q.   What is a "floor planner"?
10       A.   A "floor plan"?
11       Q.   A floor planner.
12                 MR. GOODMAN:  "Planner."
13       A.   I don't know.
14       Q.   You don't know.  Okay.
15            Do you know if anyone has a lien on
16   the vehicle in this lawsuit?
17       A.   Yes.
18       Q.   And who has a lien on the vehicle?
19       A.   Capital One.
20       Q.   So as far as you're aware, that
21   lien has not been extinguished; is that
22   correct?
23       A.   Correct, yes.
24       Q.   Where does Chris Orsaris live?
25                 MR. GOODMAN:  Note my



DIANE ARGYROPOLOUS                        December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2              objection.
3        A.    I am not sure.
4        Q.    Okay.  What is a "floor plan"?
5        A.    A "floor plan" is a bank that owns
6   the vehicles, so you pay interest to them,
7   and as you sell them, you payoff the floor
8   plan.  It's a loan.
9        Q.    And that was the ACF or AFC?
10       A.    AFC.
11       Q.    AFC, okay.
12       A.    Yes.
13       Q.    And you talked about recordings of
14   phone calls that were between Ms. Francois
15   and the dealership, correct?
16       A.    Correct.
17       Q.    What dealership employees were
18   speaking to Ms. Francois?
19       A.    I am not sure which employees.
20       Q.    Okay.  How were these recordings
21   made?
22       A.    I think by phone.  I would say, by
23   phone.
24       Q.    So the phones at Victory Mitsubishi
25   can record calls?



1

2        A.   Not all phone calls, no.

3        Q.   Sure.  But they have the capacity

4   to record phone calls; is that correct?

5        A.   A couple of them do, yes.

6        Q.   Okay.  And I know you said they

7   don't record all phone calls.  What is the

8   procedure for recording phone calls?

9        A.   I am not sure.  Bibi handles that.

10       Q.   And she handles that for all of the

11  phones, both at 4070 and the other address,

12  which I am forgetting off the top of my head?

13       A.   Yes, yes.

14       Q.   Are there any other buildings,

15  beside those two that we talked about, for

16  Victory Mitsubishi?

17       A.   For sales?

18       Q.   For any reason.  Storage, anything

19  like that?

20       A.   Yes, there is.

21       Q.   All right.  And what are those?

22  Where are those buildings located?

23       A.   A couple of blocks away.  It's a

24  service center.

25       Q.   Okay.  Anything else, besides the



DIANE ARGYROPOLOUS                              December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2   service center?

3        A.   In what year?

4        Q.   In 2020.

5        A.   I don't think so.

6        Q.   Okay.  When you're collecting --

7   when you are processing down payments on

8   vehicles, what documents are you looking at

9   to do that?  Are you looking at the receipts

10  for the down payments?

11       A.   That's one of the things I am

12  looking at.

13       Q.   Okay.  What else are you looking

14  at, besides the receipts?

15       A.   On Dealertrack, there's a special

16  section for deposits.

17       Q.   I see.  And if a consumer makes

18  separate payments for the down payment, like,

19  you know, for example, at one time making a

20  down payment of $8,000, and another time

21  making a payment of $1,000, would those show

22  up separately, or would it just show up as

23  one payment of $9,000?

24       A.   It would show up one, but with two

25  different dates.



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2          Q.   Okay.  And the checking account you

3     mentioned before, that's with HSBC, correct?

4          A.   Yes.

5          Q.   Do you know anyone who works at

6     Victory Mitsubishi who is about 6'2" tall?

7          A.   No.

8          Q.   In the ordinary course of your

9     work, how often do you speak with finance

10    managers?

11         A.   At what time?

12         Q.   In 2020.

13         A.   Hardly ever.  I wasn't there.

14         Q.   If I recall correctly, you couldn't

15    remember all of the finance managers in 2020

16    off the top of your head.  But in 2020, would

17    you have known the names of all the finance

18    managers?

19         A.   At that time?

20         Q.   Yes.

21         A.   Yes, yes.

22         Q.   Do you know if Capital One has

23    spoken to anyone at Victory Mitsubishi about

24    the vehicle, since September of 2020?

25                   MR. GOODMAN:  Objection;



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2              asked and answered.  Go ahead.

3        A.    No.

4        Q.    Do you know if there have been any

5   e-mails or faxes exchanged between Victory

6   Mitsubishi and Capital One, about the

7   vehicle, since September of 2020?

8        A.    I have no knowledge of that.

9        Q.    You mentioned a Victory Mitsubishi

10  e-mail that you used for your work.  Have you

11  searched that e-mail for information

12  regarding this case?

13       A.    I have.

14       Q.    And did you find any e-mails

15  regarding this case?

16       A.    No.

17       Q.    Are you able to search your cell

18  phone for text messages?

19              MR. GOODMAN:  Object to

20         form; go ahead.

21       A.    What time period?

22       Q.    In 2020.

23       A.    I am.

24              MR. GOODMAN:  You can search

25         now for text messages from 2020?



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2                     THE WITNESS:  No.  Now, I
3           cannot.  No.  Sorry, not now.  I
4           thought she meant in 2020.  I don't
5           give my phone number out, though.
6           The employees have my work number.
7      Q.   And the work number corresponds to
8   a phone in your office?
9      A.   Correct.
10     Q.   Have you provided your attorneys
11  with any phone records?
12     A.   No.
13                    MS. CATERINE:  And I just
14          want to confirm, I know your
15          position, Counsel, in terms of
16          giving out the home address, but
17          can we stipulate that
18          Ms. Argyropoulos will present
19          herself at trial on notice?
20                    MR. GOODMAN:  Well, I will
21          accept any subpoena for trial on
22          her behalf.  I can certainly make
23          that representation.
24                    MS. CATERINE:  Okay.
25          That's all the questions I



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2              have.
3                     MR. GOODMAN:  I just have
4              one question.
5    BY MR. GOODMAN:
6         Q.   Ms. Argyropoulos, you testified
7    that in the year 2020, specifically, on
8    certain dates, you were not in the dealership
9    at all or at least not often.
10             Is there a reason for that?  I
11   mean, we've heard COVID.  But is there
12   anything more specific that kept you away
13   from the dealership?
14                    MS. CATERINE:  Objection to
15             form.
16        A.   No, it was because of COVID that I
17   wasn't going to work every day.
18        Q.   Yeah.
19        A.   It was because of COVID.
20        Q.   Was there any -- your mother at
21   home?
22        A.   Oh, yeah, my mother is
23   eighty-something years old.  So I couldn't
24   take a chance and get COVID, to give it to my
25   mother.  That's the reason I didn't go.



DIANE ARGYROPOLOUS                        December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2   Yeah, because of COVID.  Yeah, yeah, yeah.

3                MR. GOODMAN:  All right, I

4        have no further questions.

5                MS. CATERINE:  All right.  I

6        don't have anymore questions.

7                MR. GOODMAN:  I guess we are

8        done.

9                MS. CATERINE:  Yes.  Before

10        we go -- Ms. Argyropoulos, you are

11        free to go.  Thank you.

12                THE WITNESS:  Thank you.

13                MR. GOODMAN:  You can go.

14        We will stay on.

15                THE WITNESS:  Okay.

16                MS. CATERINE:  Can we have

17        any agreement as to taking the

18        deposition of the Ventura person on

19        Monday?

20                MR. GOODMAN:  Yeah, so I am

21        advised that -- I think it's -- the

22        individual Ventura is no longer

23        employed by -- that's what I have

24        been told.  I inquired for a last

25        known address and contact



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1
2    information.  I have not received
3    it, but I will provide it when
4    available.
5           MR. KESHAVARZ:  Do you know
6    what the first name is?
7           MR. GOODMAN:  No, I do not.
8           MR. KESHAVARZ:  Well, we
9    have to take depositions like next
10   week.  So I don't know why it's so
11   hard to find out where she lives,
12   what her address is, last known
13   address.
14          Why don't you make call and
15   find out?
16          MR. GOODMAN:  I called and
17   they are looking for it.
18          MR. KESHAVARZ:  I know, but
19   we need an answer now.  We can't
20   wait until next week.
21          MR. GOODMAN:  You will not
22   get an answer right now.  You will
23   get an answer as soon as I get an
24   answer.  I am not trying to hold it
25   back from you.  I have made an



1

2   inquiry and I will provide it when

3   I get it.

4           MS. CATERINE:  What other

5   information do you have about this

6   person at this time?

7           MR. GOODMAN:  Not much,

8   other than Y. Ventura.

9           MR. KESHAVARZ:  Well, can we

10  nail down a date for a deposition

11  for our availability and your

12  availability.

13          MS. CATERINE:  For next

14  week.

15          MR. GOODMAN:  When I get an

16  update, it will appear.  You will

17  have to subpoena this individual.

18  That will take time and effort.

19          MR. KESHAVARZ:  That's fine,

20  but when are you available next

21  week?

22          MR. GOODMAN:  I don't know.

23          MR. KESHAVARZ:  Find out.

24          MR. GOODMAN:  Do what --

25          MR. KESHAVARZ:  Let's narrow



1
2  that down now.
3         MR. GOODMAN:  I am not
4  available.  I am available for
5  Jaime Singh and Paquito.
6         MR. KESHAVARZ:  I don't want
7  to hear that when I subpoena her,
8  you are not available for that
9  date.  If you are giving us --
10        MR. GOODMAN:  What's the
11  point?  You will not get --
12        MR. KESHAVARZ:  When are you
13  available?
14        MR. GOODMAN:  You will never
15  get her next week.
16        MR. KESHAVARZ:  Forget about
17  her.  She doesn't work for you.
18  You can't file a motion to squash.
19  I will subpoena as soon as I can.
20  I don't want to hear you are not
21  available that day.  So let's look
22  at attorneys schedules.  I just
23  want it clear.  If you don't want
24  it clear, that's fine.  I don't
25  want to hear you say, "I am not



DIANE ARGYROPOLOUS                                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2               available on that" --

3                        MR. GOODMAN:  I don't want

4               to clear that with you.

5                        MR. KESHAVARZ:  Get that on

6               record.

7                        MR. GOODMAN:  No, we will

8               not get that on record.

9                        MR. KESHAVARZ:  Where's the

10              court reporter?  We never got off

11              record.  Madam court reporter, are

12              we still on the record?

13                       THE REPORTER:  Yes.

14                       MR. KESHAVARZ:  Okay, thank

15              you.

16                       -oOo-
                         (Whereupon, the examination
17              of DIANE ARGYROPOLOUS was adjourned
                at 3:06 p.m.)

18

19                          DIANE ARGYROPOLOUS

20

21      Subscribed and sworn to
        before me this       day
22      of               , 2022.

23

        NOTARY PUBLIC
24

25



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2
     ---------------- I N D E X -----------------
3

4    WITNESS              EXAMINATION BY          PAGE

5    DIANE ARGYROPOLOUS

6                        MS. CATERINE              6

7                        MR. GOODMAN              154

8    ---------------- REQUESTS ------------------

9    Page 109...line 24
     Document that lists all of the employee
10   identification numbers, like 999, and A31

11   Page 130...line 6
     Production of that record in regard to the
12   down payment for this vehicle.

13   ---------------- FURNISH -------------------

14   Page 18...line 11
     Production of cell phone number
15
     Page 81...line 6
16   Name of IT guy

17   Page 94...line 10
     Name of the marketing company
18
     ---------------- EXHIBITS ------------------
19
     DEFENDANT'S                           FOR ID.
20   EXHIBIT 43      Instagram Posts      premarked
     EXHIBIT 44   Dealer Track History   premarked
21   EXHIBIT 45      K-1 Filings          premarked

22
            (Exhibits retained by reporter.)
23

24   --------------------------------------------

25



DIANE ARGYROPOLOUS                         December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2                   C E R T I F I C A T E

3    STATE OF NEW YORK     )
                           : ss.
4    COUNTY OF NEW YORK    )

5

6         I, AYDIL M. TORRES, a Notary Public

7    within and for the State of New York, do

8    hereby certify:

9         That DIANE ARGYROPOLOUS, the witness

10   whose deposition is hereinbefore set forth,

11   was duly sworn by me and that such deposition

12   is a true record of the testimony given by

13   the witness.

14        I further certify that I am not

15   related to any of the parties to this action

16   by blood or marriage, and that I am in no way

17   interested in the outcome of this matter.

18        IN WITNESS WHEREOF, I have hereunto

19   set my hand this 9th day of December, 2022.

20

21
                     
22

23                   AYDIL M. TORRES

24

25

1

2              DEPOSITION ERRATA SHEET

3

4    Our Assignment No.  J8950423

5    Case Caption:  FARAH JEAN FRANCOIS vs.

6    VICTORY AUTO GROUP LLC, ET AL.

7      DECLARATION UNDER PENALTY OF PERJURY

8         I declare under penalty of perjury

9    That I have read the entire transcript of

10   My Deposition taken in the captioned matter

11   Or the same has been read to me, and

12   The same is true and accurate, save and

13   Except for changes and/or corrections, if

14   Any, as indicated by me on the DEPOSITION

15   ERRATA SHEET hereof, with the understanding

16   That I offer these changes as if still under

17   Oath.

18   _____

19              DIANE ARGYROPOLOUS

20   Subscribed and sworn to on the _____ day of

21   _____, 20_____ before me,

22

23   _____

24   Notary Public,

25   In and for the State of _____



DIANE ARGYROPOLOUS                          December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

```
 1
 2              DEPOSITION ERRATA SHEET
 3     Page No._____Line No._____Change
 4     to:_____
 5     _____
 6     Reason for
 7     change:_____
 8     Page No._____Line No._____Change
 9     to:_____
10     _____
11     Reason for
12     change:_____
13     Page No._____Line No._____Change
14     to:_____
15     _____
16     Reason for
17     change:_____
18     Page No._____Line No._____Change
19     to:_____
20     _____
21     Reason for
22     change:_____
23     SIGNATURE:_____DATE:_____
24               DIANE ARGYROPOLOUS
25
```



DIANE ARGYROPOLOUS                            December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC

1

2                    DEPOSITION ERRATA SHEET

3    Page No._____Line No._____Change

4    to:_____

5    _____

6    Reason for

7    change:_____

8    Page No._____Line No._____Change

9    to:_____

10   _____

11   Reason for

12   change:_____

13   Page No._____Line No._____Change

14   to:_____

15   _____

16   Reason for

17   change:_____

18   Page No._____Line No._____Change

19   to:_____

20   _____

21   Reason for

22   change:_____

23   SIGNATURE:_____DATE:_____

24              DIANE ARGYROPOLOUS

25

