**Page 1**

```
 1
 2              UNITED STATES DISTRICT COURT
 3            SOUTHERN DISTRICT OF NEW YORK
 4   -------------------------------------------X
 5   FARAH JEAN FRANCOIS,
 6                          Plaintiff,
 7   -against-        Case No. 1:22-c-4447-JSR
 8   VICTORY AUTO GROUP LLC d/b/a VICTORY
 9   MITSUBISHI, SPARTAN AUTO GROUP LLC d/b/a
10   VICTORY MITSUBISHI, STAVROS ORSARIS, YESSICA
11   VALLEJO, DAVID PEREZ, DIANE ARGYROPOULOS, and
12   PHILIP ARGYROPOULOS,
13                          Defendants.
14   -------------------------------------------
15       VIDEOTELECONFERENCED DEPOSITION OF:
16               YESSICA K. VALLEJO
17               New York, New York
18           Wednesday, November 30, 2022
19
20
21
22
23   Reported by:
     Aydil M. Torres, CSR
24   JOB NO. J8894063
25
```

**Page 2**

```
 1
 2
 3
 4           November 30, 2022
 5             11:08 a.m.
 6
 7
 8
 9       VTC deposition of
10   YESSICA K. VALLEJO, held at the
11   offices of Nicholas Goodman &
12   Associates, PLLC, 333 Park Avenue
13   South, New York, New York, pursuant
14   to Notice, before Aydil M. Torres,
15   a Notary Public of the State of
16   New York.
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2   A P P E A R A N C E S:
 3
 4     LAW OFFICES OF AHMAD KESHAVARZ
 5     Attorneys for Plaintiff
 6        16 Court Street, #2600 Brooklyn
 7        New York, New York 11241
 8     BY:  EMMA CATERINE, ESQ.
 9
10
11
12     NICHOLAS GOODMAN & ASSOCIATES, PLLC
13     Attorneys for Defendants
14        333 Park Avenue South, Suite 3A
15        New York, New York 10010
16     BY:  H. NICHOLAS GOODMAN, ESQ.
17
18     ALSO PRESENT:
19        Patrick Selvey, Esq.
20        Ahmad Keshavarz, Esq.
21
22
23
24
25
```

**Page 4**

```
 1
 2        S T I P U L A T I O N S
 3
 4       IT IS HEREBY STIPULATED AND AGREED
 5   by and between the attorneys for the
 6   respective parties herein, that filing,
 7   sealing and certification and the
 8   same are hereby waived and that the
 9   questioning attorney shall provide counsel
10   for the witness examined herein with a copy
11   of this examination at no charge.
12
13       IT IS FURTHER STIPULATED AND AGREED
14   that all objections, except as to the
15   form of the question shall be reserved
16   to the time of the trial.
17
18       IT IS FURTHER STIPULATED AND AGREED
19   that the within deposition may be signed
20   and sworn to before any officer authorized
21   to administer an oath, with the same force
22   and effect as if signed and sworn to before
23   the Court.
24
25
```

Page 5

1
2      THE REPORTER:  My name is
3  Aydil M. Torres a New York State
4  notary public and certified
5  shorthand reporter.  This
6  deposition is being held via
7  videoconferencing equipment.  The
8  witness and reporter are not in the
9  same room.  The witness will be
10  sworn in remotely pursuant to
11  agreement of all parties.  The
12  parties stipulate that the
13  testimony is being given as if the
14  witness was sworn in person.
15  Y E S S I C A   K.   V A L L E J O,
16      called as a witness, having been
17      duly sworn by a Notary Public, was
18      examined and testified as follows:
19      THE REPORTER:  Please state
20  your name for the record.
21      THE WITNESS:  My name is
22  Yessica K. Vallejo Diaz.
23      THE REPORTER:  Please state
24  your address for the record.
25      MR. GOODMAN:  Business

Page 6

1
2  address.
3      THE WITNESS:  4070 Boston
4  Road.  That's Bronx, New York
5  10475, I believe.  I am really bad
6  with ZIP.  10475.
7  EXAMINATION BY
8  MS. CATERINE:
9      Q.  Good morning, Ms. Vallejo.
10      A.  Good morning.
11      Q.  Have you ever gone by any other
12  names or aliases?
13      A.  No, my name, Yessica K. Vallejo
14  Diaz.
15      Q.  Are you married?
16      A.  No, I am not.  I am divorced.
17      Q.  Okay.  And did you have a different
18  name while you were married?
19      A.  No, same name.
20      Q.  Okay.  Have you ever had your
21  deposition taken before?
22      A.  No.
23      Q.  Have you ever testified in a court
24  proceeding before?
25      A.  No.

Page 7

1      Yessica K. Vallejo
2      Q.  Have you ever testified in an
3  administrative hearing before?
4      A.  No.
5      Q.  If you don't understand my
6  question, will you please ask me to rephrase
7  the question?
8      A.  For sure.
9      Q.  And if I ask you a question and you
10  don't ask me to rephrase the question, is it
11  reasonable to assume that you understood the
12  question?
13      MR. GOODMAN:  Object to the
14      form of the question.  Go ahead.
15      A.  Yeah, I mean, if I don't understand
16  your question, I will ask you to repeat the
17  question.  So that's fine.
18      Q.  Sure.  So if at any point during
19  this deposition, if you are not finished with
20  your answer and I start to ask you another
21  question, please feel free to cut me off, so
22  I can hear your complete answer.  I want to
23  hear your complete answer.
24      Do you understand?
25      A.  Okay.

Page 8

1      Yessica K. Vallejo
2      Q.  And when you testify today, please
3  don't guess at anything.  I just want to know
4  what's within your knowledge, specifically.
5      Do you understand that?
6      A.  Yes.
7      Q.  And during the course of the
8  deposition, your attorney may be making
9  certain objections, such as objection to
10  form.  Unless instructed not to answer, you
11  are still required to answer the question.
12      Do you understand?
13      A.  Yes.
14      Q.  And if you could please answer, as
15  you have been answering, with oral answers
16  and not nodding or saying "uh-huh," so that
17  the court reporter has a clear record.
18      Do you understand?
19      A.  Yes.
20      Q.  What steps did you take -- excuse
21  me?
22      MR. GOODMAN:  Emma, if I
23      could just -- one other suggestion
24      for the rules of a deposition.
25      It's very important to let her --



Page 9

1            Yessica K. Vallejo
2      let Emma finish asking the question
3      first.  The court reporter cannot
4      take down two people at the same
5      time, okay?  So you have to let her
6      finish, and then I may object.  So
7      you have to pay attention to the
8      pace of it because the court
9      reporter can only take one person
10     at a time.  Sorry, Emma, go ahead.
11          MS. CATERINE:  No, that's
12     fine.
13     Q.   As your attorney just said, when
14  we're talking in normal day-to-day life, it's
15  natural for us to interject and talk over
16  each other.  But for this, we want to try to
17  make the job of the court reporter as easy as
18  possible.  So just, you know, take a second.
19  You know, it can even be helpful, you know,
20  to count a couple of seconds in your head,
21  before you answer the question.
22          Do you understand?
23     A.   Yes.
24     Q.   Okay.  How old are you?
25     A.   I am thirty-seven years old.

Page 10

1            Yessica K. Vallejo
2     Q.   And where do you currently reside
3  at?
4          MR. GOODMAN:  You don't have
5     to give a street address.  If you
6     want to state the borough, that's
7     okay.
8     A.   Okay, I live in New Medford,
9  Connecticut.
10    Q.   What steps did you take in
11  preparation for your deposition today?
12    A.   I mean, none.  I came over here,
13  they told me that it was a couple of
14  questions that I have to answer.  That's all.
15    Q.   Okay.  And when you say, "they,"
16  you are referring to your attorneys?
17    A.   I am referring to my supervisor,
18  Stavros Orsaris.
19    Q.   I am sure Mr. Goodman has told you
20  this already, but I am not going to be asking
21  about anything you talked about with your
22  attorneys, because that information is
23  privileged.  I just want to know about the
24  general steps you took to prepare for today's
25  deposition.  Do you understand?

Page 11

1            Yessica K. Vallejo
2     A.   I do.
3     Q.   And other than Mr. Orsaris, who
4  else did you speak with, in preparation for
5  your deposition today?
6     A.   I mean, I had a meeting with my
7  lawyer -- with the lawyers, and that's it.
8     Q.   Okay.  And when did you speak with
9  Mr. Orsaris?
10    A.   About this particular situation?
11    Q.   Yes.
12    A.   I mean, we spoke about it a couple
13  of times.
14    Q.   Sure.  Let's --
15    A.   I don't recall, exactly, the date
16  and time, but he told me, maybe, two weeks --
17  I mean, a week ago, that I had to come in
18  today.
19    Q.   I see.  And what documents have you
20  reviewed, in preparation for this deposition?
21    A.   I took a look at the deal jacket
22  again, so I can refresh my memory about the
23  sale.  Pretty much, that's it.
24    Q.   What is your understanding of --
25  about what this lawsuit is about?

Page 12

1            Yessica K. Vallejo
2          MR. GOODMAN:  Object to the
3     form; you can answer.
4     A.   Well, they explained to me that the
5  customer -- what the customer is saying,
6  basically.  That it's a situation.  She says
7  that she never purchased a vehicle, that she
8  never went to the dealership and, I mean, so
9  on and so forth.  That's the reason why we
10  here today, to find out what really happened
11  on that particular sale.
12    Q.   Okay.  Prior to this lawsuit, have
13  you reviewed the documents in the deal
14  jacket?
15    A.   I didn't review the documents.  I
16  took a look of the documents to see if I can
17  get a better understanding of what's going
18  on.  Remember, this happened over two years
19  ago, so...
20    Q.   Sure.  So you don't have -- do you
21  have any memory of what happened on those
22  days, other than from your review of the
23  documents?
24    A.   Not -- not really, per se, for this
25  sale.



Page 13

Yessica K. Vallejo

1
2    Q.   Okay.  And in addition to the
3 documents in the deal jacket, did you review
4 anything on your computer in the office?
5    A.   No.
6    Q.   Have you searched for any
7 documents, in relation to this lawsuit?
8    A.   No.
9    Q.   You're a finance manager at Victory
10 Mitsubishi; is that correct?
11    A.   Correct.
12    Q.   And as a finance manager, you have
13 access to certain documents and information
14 at Victory Mitsubishi that other employees do
15 not have access to, correct?
16    A.   Explain yourself.
17    Q.   Sure.  In your job as a finance
18 manager, you're required to access certain
19 documents and information that consumers
20 that, for example, the sales associates would
21 not have access to; is that correct?
22    A.   When you say, "certain documents,"
23 what kind of documents that are you
24 specifically talking about?
25    Q.   Well, are there any documents that

Page 14

Yessica K. Vallejo

1
2 you would have access to, that sales
3 associates would not have access to?
4    A.   I mean, it could be any documents.
5 But, I mean, on the process of selling a
6 vehicle, it's plenty of documents.  That's
7 why I am trying to understand what kind of
8 document are you specifically asking me
9 about.
10    Q.   Sure.  So in the -- let me ask you
11 this way:  The sales and financing of a
12 vehicle, would you have access to documents
13 that wouldn't be in the deal jacket?
14    A.   No.  Everything that is in the deal
15 jacket, is what we need in the process of
16 selling a car.  It's nothing extra that I
17 would have access to.  For example, any other
18 manager would have access to.  I don't have
19 privilege access to any information at my
20 job.
21    Q.   Okay.  Have you searched your work
22 e-mail for this lawsuit?
23    A.   No.
24    Q.   What is your work e-mail?
25    A.   It's Yessica, my first name,

Page 15

Yessica K. Vallejo

1
2 Y-E-S-S-I-C-A, @VictoryMitsubishi.com.
3    Q.   Do you know if anyone else has
4 searched your work e-mail?
5    A.   No.
6    Q.   Do you use any other e-mails in the
7 course of your work at Victory Mitsubishi?
8    A.   Not that I recall.
9    Q.   Do you use any messaging
10 application at your work, at Victory
11 Mitsubishi, like WhatsApp or Signal?
12    A.   No.
13    Q.   Have you searched your telephone
14 records or bills for calls or text messages
15 related to this lawsuit?
16    A.   No.
17    Q.   Do you ever use your personal
18 phone, in relation to your work at Victory
19 Mitsubishi?
20    A.   Sometimes.
21    Q.   What do you use it for?
22    A.   To call customers.
23    Q.   Did you graduate from high school?
24    A.   Yes, I did.
25    Q.   Where did you go to high school?

Page 16

Yessica K. Vallejo

1
2    A.   I went to high school in Dominican
3 Republic, which is the -- my country.
4    Q.   I guessed from your name.
5    A.   Good guess.
6    Q.   And when did you graduate from high
7 school?
8    A.   That was long time ago.
9    Q.   It's harder and harder to remember;
10 isn't it?
11    A.   It's very hard to remember.  Oh, my
12 God.  I was seventeen.  So that was, like,
13 fifteen years -- I mean, almost twenty years
14 ago.  That was twenty years.  Maybe 2000.
15    Q.   Okay.
16    A.   2000 -- I mean, I'm sorry.
17    Q.   That sounds about right from my
18 internal math.  And what did you do after you
19 graduated from high school?
20    A.   I went to college.  I got my
21 bachelor's degree on business administration.
22    Q.   Where did you get that degree?
23    A.   On University of Santo Domingo.
24    Q.   When did you graduate from there?
25    A.   I graduate from college, I believe,



Page 17

1          Yessica K. Vallejo
2    in 2009, if I am not mistaken.
3        Q.   Okay.
4        A.   Because I came to this country in
5    2010. So that's about right, yes, 2009.
6        Q.   I see. And when you graduated from
7    college, did you have any other education?
8        A.   After, no. I went to school for
9    language to study English a little bit. I
10   did that for maybe five, six months, yeah.
11       Q.   And what did you do for employment,
12   after graduating from college?
13       A.   I was working for the United
14   Nations.
15            MR. GOODMAN: Let her
16       finish.
17            THE WITNESS: Oh, sorry.
18            MR. GOODMAN: Go ahead.
19       A.   I was working for United Nations in
20   Santo Domingo.
21       Q.   What were you doing for the United
22   Nations?
23       A.   Clerical job. Clerical work.
24       Q.   And what was your employment, after
25   that job at the United Nations?

Page 18

1          Yessica K. Vallejo
2        A.   After that job, I came to the
3    United States. So I got married, I had my
4    son. So I didn't work for a little bit.
5        Q.   Okay. And when did you start
6    working again?
7        A.   After my son was one, I start
8    working in City World Toyota. That was my
9    first dealership that I work at.
10       Q.   Sorry, were you finished?
11       A.   No, I am done. Yeah, I was done.
12       Q.   When did you start?
13            MR. GOODMAN: Sorry, for the
14       record, what was the name of the
15       dealership?
16            THE WITNESS: City World
17       Toyota.
18            MR. GOODMAN: "City World"?
19            THE WITNESS: Uh-huh.
20            MR. GOODMAN: Okay.
21       Q.   When did you start at City World
22   Toyota?
23       A.   I was doing filing. I was the file
24   clerk.
25       Q.   Sure. When did you start working

Page 19

1          Yessica K. Vallejo
2    there?
3        A.   2011, I believe.
4        Q.   Okay. How long did you work there?
5        A.   I work there for maybe, probably,
6    three years. If I recall correctly, around
7    three years, yes.
8        Q.   Okay, so you stopped working there
9    around 2014?
10       A.   Yeah, I -- yeah, I don't have the
11   exact days, but could be around there.
12       Q.   Okay. And why did you stop working
13   there?
14       A.   Because I got a job offer that was
15   paying more money, so I switched companies.
16       Q.   Sure. Where was that job offer?
17       A.   That was in Hyundai of New
18   Rochelle.
19       Q.   Okay. And what did you do at
20   Hyundai of New Rochelle?
21       A.   Accounts payables.
22       Q.   And how long were you working at
23   Hyundai of New Rochelle?
24       A.   About two years, give or take, I
25   believe.

Page 20

1          Yessica K. Vallejo
2        Q.   And what were your main
3    responsibilities working in accounts payable
4    at Hyundai of New Rochelle?
5        A.   We were doing accounts payables,
6    paying the invoices, I was packaging deals to
7    send to the bank, pulling out the DMV
8    paperwork for the lady that register of cars.
9    It was, pretty much, office work. So you do
10   a little bit of everything, you know.
11       Q.   Were you handling consumers credit
12   reports in this job?
13       A.   No.
14       Q.   And when did you stop working at
15   Hyundai of New Rochelle; what year?
16       A.   I don't really recall the years and
17   months and all that. I mean, that's, like,
18   over seven years ago, I guess.
19       Q.   Around, like, 2016/2017?
20       A.   I was there, I think, until 2016,
21   give or take. Then, I got another job offer
22   on -- for Mazda of New Rochelle, and I worked
23   there for a couple of months, and then I
24   found this job that I have right now. I have
25   been here for, I believe, six, seven years



Page 21

1         Yessica K. Vallejo
2   now.
3       Q.   Okay.  And, sorry, what was the --
4   what was the name of the company that you
5   worked at for a few months?
6       A.   Mazda of New Rochelle.
7       Q.   Mazda, okay.  What did you do
8   there?
9       A.   That was finance assistant.
10      Q.   And in that position, were you
11  handling consumers credit reports?
12      A.   No.
13      Q.   And so what year did you start
14  working at Victory Mitsubishi?
15      A.   I believe it was the end of 2016.
16      Q.   Okay.  And were you working at the
17  4070 Boston Road location?
18      A.   Yes.
19      Q.   And what was your title when you
20  started at Victory Mitsubishi?
21      A.   Finance assistant.
22      Q.   Okay.  I have heard a title called
23  "funder," is that the same thing as
24  "financial assistant"?
25      A.   Yes, correct.

Page 22

1         Yessica K. Vallejo
2       Q.   Okay.  And what were your main
3   responsibilities as a financial assistant?
4       A.   Sending all the paperwork to the
5   bank to make sure the deal gets finalized, we
6   get paid from the bank, and then send in the
7   folder to the billing department to make sure
8   the car gets registered and the lien gets
9   perfected.
10      Q.   Were you handling consumers credit
11  reports when you were working in this
12  position?
13      A.   No.
14      Q.   And how did you apply for this
15  position?
16      A.   Indeed.
17      Q.   And you're referring to the website
18  Indeed.com, correct?
19      A.   Correct.
20      Q.   Was there a background check in the
21  job hiring process?
22           MR. GOODMAN:  Object to the
23      form; go ahead.
24      A.   They never told me they did any
25  background check of me, but, I mean, I am

Page 23

1         Yessica K. Vallejo
2   assuming they did because that's what
3   everybody does.
4       Q.   So if I understand, just to
5   clarify, you're saying you are assuming that
6   they did a background check, but you don't
7   know; is that correct?
8       A.   Yes.  I mean, that's something they
9   probably -- you should ask my supervisor
10  because I don't know, to be honest with you.
11      Q.   Sure.  And you're referring to
12  Stavros Orsaris?
13      A.   Correct.
14      Q.   And were you required to provide
15  references for prior employers?
16      A.   I did, yes, and I gave plenty.
17  They have it on record.
18      Q.   Okay.  And do you know if those
19  prior employers were contacted?
20      A.   I don't know.  That's something you
21  should ask my supervisor.
22      Q.   Were you interviewed for this
23  position?
24      A.   Twice.
25      Q.   And who interviewed you?

Page 24

1         Yessica K. Vallejo
2       A.   Stavros Orsaris.
3       Q.   How long were you a financial
4   assistant?
5       A.   Well, if I told you that I did it
6   in Mazda New Rochelle about six months, and
7   before, that I was in Hyundai of New Rochelle
8   for, like, two years, before I got to
9   Victory.  It was around two years and six
10  months, give or take.
11      Q.   Sorry, I should have been more
12  specific with my question.  How long were you
13  a finance assistant in Victory Mitsubishi?
14      A.   A year.
15      Q.   A year.  And what was your title,
16  after financial assistant?
17      A.   Finance manager.
18      Q.   And that's still your title today,
19  correct?
20      A.   Correct.
21      Q.   So if I am doing the math here in
22  my head here correctly, you have been a
23  finance manager since 2018; is that right?
24      A.   That is correct.
25      Q.   Okay.



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
25–28

Page 25

Yessica K. Vallejo

1
2    A.   Give or take, because we don't have
3    exact dates in timing here, so...
4    Q.   Yeah, sure.  You ever worked with
5    someone named Chris Orsaris?
6            MR. GOODMAN:  Objection to
7            form; go ahead.
8    A.   Work directly, you mean?
9    Q.   Well, let's just start with worked
10   in any way.
11           MR. GOODMAN:  Object to the
12           form.
13   A.   Yes.
14   Q.   And what does Chris Orsaris do?
15           MR. GOODMAN:  Object to the
16           form; time frame.
17   A.   Chris Orsaris is Stavros' dad.  I
18   believe what he does, he buy cars, but I do
19   not work directly with Chris Orsaris.
20   Q.   Okay.  How often do you see
21   Mr. Orsaris at the Victory Mitsubishi
22   dealership?
23           MR. GOODMAN:  Object to the
24           form.  Do you mean Chris Orsaris?
25           MS. CATERINE:  Yes, excuse

Page 26

Yessica K. Vallejo

1
2    me.
3    Q.   Chris Orsaris.
4    A.   Maybe once a month.
5    Q.   Okay.  Would that have been the
6    case in September of 2020?
7    A.   I don't understand your question.
8    Q.   Sure.  Let me rephrase the
9    question.
10       Has he ever been in the dealership
11   more often, or less than often, since you
12   have worked there, or has it, pretty much,
13   always been once a month?
14   A.   Well, the dealership is a big
15   facility.  I work in the sales department.
16   So I can't tell you for the times that I see
17   him, per se.
18   Q.   Sure.  That's all I am asking.
19   A.   If it's in premises, if it's around
20   -- I mean, can't tell you because, you know,
21   I am working sales.  So in the sales
22   department, the showroom, per se, I see him,
23   maybe, once a month, twice a month.  But he
24   is not involved on the daily activities, on a
25   daily process of selling cars, per se.

Page 27

Yessica K. Vallejo

1
2    Q.   Okay.  And the investigation and
3    lawsuit by the New York Attorney General
4    happened while you were working as a
5    financial assistant; is that correct?
6    A.   I have no knowledge of that.
7    Q.   When you say you "have no
8    knowledge" of it, do you mean this is the
9    first time you ever heard of it, or you just
10   don't know anything specific about this
11   investigation and lawsuit?
12           MR. GOODMAN:  Object to the
13           form; go ahead.
14   A.   You talking about this case,
15   specific, or you talking about any other
16   case?
17           MR. GOODMAN:  No, she's
18           talking -- sorry.
19           MS. CATERINE:  No, it's all
20           right, I got it.
21   Q.   So let me rephrase the question.
22       Are you aware of any investigation
23   or lawsuit by the New York Attorney General
24   regarding sales at the dealership?
25   A.   No.

Page 28

Yessica K. Vallejo

1
2    Q.   Do you know of anyone who's been
3    fired at the dealership?
4            MR. GOODMAN:  Object to the
5            form.
6    A.   Yeah, people get fired sometimes.
7    Q.   And do you recall the reasons for
8    those people being fired?
9    A.   No.
10           MR. GOODMAN:  Object to the
11           form.  You have to let me --
12           THE WITNESS:  Sorry.
13   A.   No, I mean --
14           MR. GOODMAN:  Just "no."
15           THE WITNESS:  No.
16   Q.   Have you ever been arrested?
17   A.   No.
18           MR. GOODMAN:  Object to the
19           form.
20           THE WITNESS:  It's okay.
21   Q.   Has anyone ever made a complaint
22   against Victory Mitsubishi that they were
23   defrauded by Victory Mitsubishi?
24           MR. GOODMAN:  Object to the
25           form.



Page 29

Yessica K. Vallejo
1
2  A.  I don't know.
3      Q.  Has any consumer ever alleged that
4  Victory Mitsubishi deceived them or treated
5  them unfairly in the sales or financing of a
6  vehicle?
7          MR. GOODMAN:  Object to the
8      form.
9  A.  I don't know.
10     Q.  Has any consumer ever complained to
11 you directly about the sales or financing of
12 a vehicle at Victory Mitsubishi?
13    A.  No, I don't handle complaints,
14 Stavros does.
15     Q.  Have there been any complaints by
16 any government entity that Victory Mitsubishi
17 defrauded or deceived consumers in the sales
18 or financing of vehicles?
19          MR. GOODMAN:  Object to
20      form.
21    A.  I don't know.
22     Q.  And you became a finance manager
23 around 2018, correct?
24    A.  That is correct, give or take,
25 because once again, we don't have specific

Page 30

Yessica K. Vallejo
1
2  date and time.
3      Q.  Sure.  Was that around the time
4  that the company at Victory Mitsubishi
5  switched from Victory Auto Group LLC, to
6  Spartan Auto Group LLC?
7          MR. GOODMAN:  Object to
8      form; go ahead.
9      A.  I have no knowledge of none of that
10 stuff.  That's way above my pay grade.
11     Q.  Sure.  Sure.  Was there any major
12 change that precipitated you becoming finance
13 manager at the dealership, that you're aware
14 of?
15          MR. GOODMAN:  Object to
16      form.
17    A.  I became a finance manager because
18 I had -- I got a promotion.  My supervisor, I
19 am assuming, was happy with my performance,
20 and then I got a promotion.
21     Q.  And you're referring to Stavros
22 Orsaris, correct?
23    A.  That is correct.
24     Q.  So you say you got a promotion.
25      Does that mean you didn't apply for

Page 31

Yessica K. Vallejo
1
2  the finance manager position, it was just
3  given to you as a promotion?
4          MR. GOODMAN:  Objection to
5      form.
6      A.  It was a vacancy in the department
7  and they offered me the job, yes, they did.
8      Q.  Why was there a vacancy in the
9  department?
10          MR. GOODMAN:  Object to the
11      form.
12    A.  I don't recall.
13     Q.  Who was the finance manager who
14 left Victory Mitsubishi that made that
15 vacancy?
16    A.  Sorry, repeat your question again.
17          MR. GOODMAN:  Objection.
18     Q.  Sorry, I phrased that a little all
19 over the place.
20      What was the name of the finance
21 manager who left and created that vacancy
22 that you filled?
23          MR. GOODMAN:  Object to the
24      form.
25    A.  I don't know.  I don't recall.

Page 32

Yessica K. Vallejo
1
2      How you know that somebody actually
3  left?
4      Q.  I don't.  I am just trying to
5  figure it out.  You said there was a vacancy,
6  I assumed, but if you can clarify.
7      A.  Yeah.
8      Q.  Are you saying that the vacancy was
9  created by expansion, or what did you mean
10 by, "there was a vacancy"?
11    A.  I don't recall.  That's what I am
12 trying to explain to you.
13     Q.  Okay, okay.  So just your
14 recollection is that there was a position
15 open for some reason, and you were given it;
16 is that correct?
17          MR. GOODMAN:  Object to the
18      form.  Go ahead.
19    A.  Yes, if you want to put it that
20 way.  It was an opening, they offered the
21 position to me, and then I say, yes, of
22 course.
23     Q.  Okay.  And what training did you
24 take when you became a finance manager?
25    A.  I was trained by Deal Tracker,



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
33–36

Page 33

1          Yessica K. Vallejo
2  which is the platform that we use.
3      Q.  When did that happen?
4      A.  As soon as I got the position.
5      Q.  Same day, same week, same month?
6      A.  I don't recall, but probably, yeah,
7  right away.
8      Q.  What did that training entail?
9      A.  The whole finance process, you
10  know, how to use the platform, and also I got
11  training on the sales floor by Stavros, you
12  know, basically, how the sales process work,
13  how was their process, so on and so forth.
14      Q.  Why did Stavros give you this
15  training on sales, if you were going to be
16  working as a finance manager?
17          MR. GOODMAN:  Object to the
18      form.
19      A.  I did not tell you that he gave me
20  training on sales.  I said he gave me
21  training on how the process works.
22      Q.  Sure.  And why were you given that
23  training on how the process worked?
24          MR. GOODMAN:  Object to the
25      form.

Page 34

1          Yessica K. Vallejo
2      A.  Because I was new to the position,
3  and when somebody new to a position, new job,
4  so on and so forth, you need to get training,
5  in order for you to do your job correctly.
6      Q.  Sure.  I am sorry, I am not
7  phrasing this very well.
8          What I mean is -- let me put it a
9  different way:  As finance manager, you're
10  coming into the process, after the person has
11  already spoken to a sales associate and a
12  sales manager; is that right?
13      A.  Correct.
14      Q.  So why did you need to know about
15  that part of the process when you only come
16  in later?
17          MR. GOODMAN:  Object to the
18      form.
19      A.  I did not tell you that I need to
20  know, per se, about that part of the process,
21  but I do need to understand the process.  You
22  understand what I mean?  Like if I am part of
23  the process, it's just fair for me to
24  understand the whole process.
25      Q.  Okay.

Page 35

1          Yessica K. Vallejo
2      A.  It's just the way it's supposed to
3  be.  You know what has to be done, before the
4  deal gets to me, you know, things like that.
5  It's important.
6      Q.  Sure.  Sure.  So let's take a look
7  at what I am marking as Exhibit 40.
8          MR. GOODMAN:  Can you tell
9      me the Bates stamp number?
10          MS. CATERINE:  Yeah, it's
11      Defendant's 97 through Defendant's
12      112.  Or, no, sorry, Defendant's 93
13      through Defendant's 112.
14          MR. GOODMAN:  Okay, so give
15      us a moment.
16          MS. CATERINE:  Sure.
17          MR. GOODMAN:  Because I have
18      got the papers strewn all over this
19      table.  It starts at 93, right?
20          MS. CATERINE:  Yes.
21          MR. GOODMAN:  What is it,
22      Emma?  What's the actual document?
23          MS. CATERINE:  It's the
24      subscriber application with Credit
25      Bureau Connection.  And, Ms.

Page 36

1          Yessica K. Vallejo
2  Torres, this is e-mailed to you as
3  well.
4          MR. GOODMAN:  Okay, we got
5      it.  Do you have -- here, you just
6      use this one.
7          THE WITNESS:  Uh-huh.
8          MR. GOODMAN:  Okay, we got
9      it, Emma.  But she may need a
10      minute to look at it.  It's several
11      pages.
12          MS. CATERINE:  Sure.
13          Take your time.
14          THE WITNESS:  (Witness
15      peruses exhibit.)
16          MR. GOODMAN:  Do you have
17      another version that the --
18          THE WITNESS:  Oh, all right.
19          MR. GOODMAN:  Okay, we got
20      it.
21      Q.  And, Ms. Vallejo, I think I forgot
22  to say this, but I should say this, since
23  you're new to this deposition thing.  If at
24  any point you need to take a break, and
25  whenever you want to take a break for lunch,



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
37—40

Page 37

Yessica K. Vallejo

1  Yessica K. Vallejo
2  just let me know.  I am happy to accommodate
3  whatever you need.
4        THE WITNESS:  Sure.
5  Q.  Okay.  So what is this document?
6        MR. GOODMAN:  Object to the
7     form; go ahead.
8  A.  I have no knowledge of this
9  document.
10  Q.  So this is your first time ever
11  seeing this document?
12  A.  That is correct.
13  Q.  This document appears to be filled
14  out by Diane Argyropoulos, correct?
15        MR. GOODMAN:  Object to the
16     form.
17  A.  I see Diane's name over here, yes.
18  I don't know if she filled the document out.
19  I mean, I can't say that, because I wasn't
20  there when it was generated.
21  Q.  Sure.  Let me rephrase.
22     It has her electronic signature on
23  it, correct?
24  A.  What page?  Can you see that?
25  Q.  So on the first page Bates-stamped

Page 38

Yessica K. Vallejo

1  Defendant's 93 at the bottom of the page.
2  A.  Yes, I see her electronic signature
3  there.
4  Q.  Okay.  Why was this signed by Mr.
5  Argyropoulos, rather than a finance manager,
6  for example?
7        MR. GOODMAN:  Object to the
8     form.
9  A.  I don't know.
10  Q.  Estimate of monthly inquiries
11  listed here on Defendant's 93 is 1,000.  Do
12  you see that?
13  A.  What page?
14  Q.  The first page marked Defendant's
15  93.  It's kind of in the middle.
16  A.  1,000?
17  Q.  Uh-huh.
18  A.  I can see that, yes.
19  Q.  Okay.  Is that an accurate
20  estimation, in your experience?
21        MR. GOODMAN:  Object to the
22     form.
23  A.  No.
24  Q.  All right.  How many -- how many

Page 39

Yessica K. Vallejo

1  Yessica K. Vallejo
2  inquiries do you think there would be, per
3  month, at the dealership?
4        MR. GOODMAN:  Object to the
5     form.  Time frame?
6  A.  I don't know.  I couldn't tell you.
7  Q.  Sure.  Let me rephrase.  How many
8  -- about how many inquiries do you think --
9  excuse me.
10     About how many credit inquiries are
11  there, per day, at the dealership?
12        MR. GOODMAN:  Object to the
13     form.  You are asking today?
14        MS. CATERINE:  On average.
15        MR. GOODMAN:  Okay, go
16     ahead.
17  A.  I don't know.
18  Q.  Well, you said you don't think the
19  estimation of 1,000 monthly inquiries is
20  accurate; why is that?
21  A.  Because we have a high volume of
22  customers, yeah.  We -- we -- we are pretty
23  busy.  We are pretty busy dealership.  We
24  have a lot of customers.
25  Q.  About how many customers do you

Page 40

Yessica K. Vallejo

1  Yessica K. Vallejo
2  see, per day, at the dealership?
3        MR. GOODMAN:  Object to the
4     form; go ahead.
5  A.  On an average, it could be -- on a
6  busy day, which usually the weekends, it
7  could be, maybe, seven, eight customers.
8  Q.  And if a customer is seeing you,
9  that means that they're at least attempting
10  to get financing for a vehicle; is that
11  correct?
12  A.  That is correct.
13  Q.  How many other finance managers are
14  there besides you?
15  A.  Four more.
16  Q.  And as far as you're aware, do
17  those finance managers see around the same
18  volume of customers as you do?
19  A.  Yeah.  On average, yes.
20  Q.  And still looking at this first
21  page, Defendant's 93, the agreement here says
22  that the credit information will be used to,
23  quote, "evaluate the credit of customers for
24  consumer loans or lease," end quote.
25     How does that work, evaluating the



Page 41

1              Yessica K. Vallejo
2    credit of consumers?
3              MR. GOODMAN:  Object to the
4    form.
5         A.   Well, I am -- we -- per se, we
6    don't do any type of evaluation of credit
7    because we don't provide credit.  The
8    lenders, they provide credit.  So we submit
9    the loan to lenders, they do their
10   evaluation, and they probably have the
11   guidelines and, you know, the ways to know if
12   the customer qualifies or not.
13        Q.   Okay.
14        A.   My job is not to evaluate nobody's
15   credit.
16        Q.   Sure.  When you say, "they," or you
17   may have said "we," I don't recall, but are
18   you referring to finance managers at the
19   dealership, or are you referring to the
20   dealership as a whole?
21             MR. GOODMAN:  Object to the
22   form.
23        A.   When I said, "they," I was
24   referring to the lenders that we use.
25             MR. GOODMAN:  Oh.

Page 42

1              Yessica K. Vallejo
2         Q.   Sure, no, let me rephrase.
3              When you say that -- that you're
4    not evaluating the credit of customers and
5    that's the lenders who are doing that, are
6    you saying that the finance managers don't
7    evaluate the credit of customers, or that the
8    dealership, as a whole, doesn't evaluate the
9    credit of customers?
10             MR. GOODMAN:  Yeah, that's
11        object to form.
12        A.   I am just -- I don't understand
13   your question.
14        Q.   Sure.  Does anyone at the
15   dealership evaluate the credit of customers
16   for consumer loans or leases?
17             MR. GOODMAN:  Object to the
18        form.
19        A.   Before the deal goes to my office,
20   they round the credit, yes, the sales manager
21   round the credit and prepares for submission
22   to the lenders, which is what I do.  They
23   have the process, which is between Stavros
24   and sales manager.  I am talking about me,
25   per se, I do not evaluate or make any

Page 43

1              Yessica K. Vallejo
2    judgment calls on no one's credit report.
3         Q.   Got it.
4         A.   Submit the loan to the lenders, the
5    lender on their discretion, they approve or
6    deny the loan.  Which it has nothing to do
7    with the finance manager, per se.
8         Q.   And does Stavros or any of the
9    sales managers ever tell you what their
10   evaluation of the credit of a customer is
11   when they bring a customer to you?
12             MR. GOODMAN:  Object to the
13        form.
14        A.   No.  Like if they tell me make what
15   judgments about credit and stuff?  No.  No.
16        Q.   If you could turn to the next page,
17   this is Defendant's 94.  In bullet three here
18   it says towards the end that, Victory
19   Mitsubishi will, quote, "obtain a consumer's
20   written authorization to request such
21   information relating to that consumer," end
22   quote, and referring to "credit reports."
23        How does Victory Mitsubishi obtain
24   written authorization for consumers credit
25   reports?

Page 44

1              Yessica K. Vallejo
2         A.   When the customer goes to the
3    dealership, and they are willingly there
4    because they want to purchase a vehicle,
5    then, they handwrite a credit application.
6    That credit application has that customer
7    personal information.  It's signed and dated
8    by the customer.  And that gives
9    authorization for us to pull credit.
10        Q.   You can turn to Defendant's 95,
11   please.  Next page.  And if you look at
12   bullet fifteen on this page, it refers to
13   training in, quote, "proper usage
14   requirements and restriction and security
15   requirements," end quote.  Do you see that?
16        A.   Yes.  That's number fifteen?
17        Q.   Uh-huh.
18             MR. GOODMAN:  Can I see
19        that?
20             Hang on one second.
21             Okay, go ahead.
22        Q.   So employees of Victory Mitsubishi
23   have to log into Dealer Track and fill out a
24   form, prior to pulling a credit report,
25   correct?



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
45—48

Page 45

1          Yessica K. Vallejo
2      A.   You mean to pull the customer's
3   credit report?
4      Q.   Yes.
5      A.   Oh, because my credit report, no.
6   Yes.  Sure.  I mean, we have to type the
7   information, same information that is in the
8   handwriting application sign and dated by the
9   customer.  That's what we type to pull the
10  credit information.
11      Q.   And that would be the security
12  requirements that they are talking about on
13  this page; is that right?
14          MR. GOODMAN:  Object to the
15      form.
16      A.   Well, there's -- you need a
17  handwritten app dated and signed, and you
18  need a picture ID, in order to pull credit.
19  That's how we do it.
20      Q.   And you make a copy of the picture
21  ID; is that correct?
22      A.   That is correct.
23      Q.   And to pull a credit report, an
24  employee has to log into Deal Tracker.
25  There's no other way to pull a credit report;

Page 46

1          Yessica K. Vallejo
2   is that correct?
3      A.   That is correct.
4      Q.   And were you -- specifically, have
5   you ever pulled a credit report at Victory
6   Mitsubishi, other than doing so through Deal
7   Tracker?
8      A.   No.
9      Q.   And going down to Section B1 here,
10  on the same page, Defendant's 95, where it
11  says, "CBC agrees" -- do you see that?
12      A.   Yes.
13      Q.   This provision refers to providing
14  the use of certain services, including one
15  through Equifax called T-A-L-X -- what is
16  T-A-L-X?
17      A.   I don't know.
18      Q.   And on Defendant's 96, which is the
19  next page, at the bottom there's some
20  signatures.  Do you see that?
21      A.   Yes.
22      Q.   And one of those signatures is of a
23  CBC representative named David Daniel who is,
24  apparently, a compliance manager.  When is
25  the last time you spoke to David Daniel?

Page 47

1          Yessica K. Vallejo
2          MR. GOODMAN:  Object to the
3      form.
4      A.   I don't recall.
5      Q.   Have you ever spoken to David
6   Daniel?
7      A.   I don't recall.
8      Q.   Have you received an e-mail from
9   David Daniel?
10      A.   I don't recall.
11      Q.   Now I would like to mark as Exhibit
12  41, the pages Bates-stamped Defendant's 73
13  to 82.
14          MR. GOODMAN:  That's this?
15          MS. CATERINE:  Yeah, it's
16      the Capital One document.
17      Q.   And if you could just take a second
18  to review that document and let me know when
19  you are finished.
20          MR. GOODMAN:  When you are
21      ready, tell her.
22      A.   Yeah, we ready.
23      Q.   Okay.  What is this document?
24      A.   Well, the name of the document is a
25  "dealer information form," but the document,

Page 48

1          Yessica K. Vallejo
2   per se, I don't know what it is.
3      Q.   So prior to being given this
4   document right now, had you ever seen this
5   document?
6      A.   It was on the pile of papers that
7   they gave me.  I seen this document before,
8   yes, but this is not the document that I am
9   familiar with or work with or...
10      Q.   Okay.
11          MR. GOODMAN:  Who gave you?
12      You said "they" gave you.
13          THE WITNESS:  Huh?
14          MR. GOODMAN:  Who gave you?
15          THE WITNESS:  You just gave
16      it to me.  She asked for it.
17          MR. GOODMAN:  Okay, all
18      right.  Sorry, go ahead.
19          MS. CATERINE:  It's all
20      right.
21      Q.   And on page Defendant's 75, toward
22  the bottom, there's handwritten initials.
23      Do you see that?
24      A.   Yes.
25      Q.   Do you recognize those initials?



Page 49

1          Yessica K. Vallejo
2     A.   No.
3     Q.   And if you turn to the next page,
4    Defendant's 76, that's the signature of Diane
5    Argyropoulos there, correct?
6     A.   I don't know.  I don't know her
7    signature.
8     Q.   Okay.  Fair enough.  Let's turn
9    back to the first page marked Defendant's 73.
10         Who is Diane Argyropoulos?
11            MR. GOODMAN:  Object to the
12         form; go ahead.
13     A.   She is the owner of the dealership,
14    I believe.
15     Q.   And has that been the case since
16    you started working there as a financial
17    assistant?
18     A.   Correct.
19     Q.   And Chris Orsaris is listed here as
20    general manager.  Do you see that?
21     A.   I see that.
22     Q.   Is that your understanding, that
23    Chris Orsaris is the general manager at
24    Victory Mitsubishi?
25     A.   No.

Page 50

1          Yessica K. Vallejo
2     Q.   And who is the general manager at
3    Victory Mitsubishi?
4     A.   Stavros Orsaris.
5     Q.   Okay.  And Chris Orsaris is also
6    listed as the general sales manager here.  Is
7    it your understanding that he is the general
8    sales manager?
9            MR. GOODMAN:  Object to
10         form.  Again, time frame, but go
11         ahead.
12     A.   No.  No.
13     Q.   Who is the general sales manager?
14     A.   To my understanding, it's Stavros
15    Orsaris.
16     Q.   Okay.
17     A.   Remember, all these internal
18    paperwork that has to do with ownership, so
19    on and so forth.  I have no access to none of
20    that.  It's way above my pay grade.
21     Q.   Sure.  Sure.  And I am only asking
22    you about what you know about it.
23     A.   Okay.
24     Q.   Who is Edwin Feables?
25     A.   Edwin Feables was a finance manager

Page 51

1          Yessica K. Vallejo
2    he used to work there with us back in -- back
3    in 2018/2019, around there.
4     Q.   Okay.  And why did he leave Victory
5    Mitsubishi?
6            MR. GOODMAN:  Object to
7         form.
8     A.   I don't know.
9     Q.   At the time that he was working at
10    the dealership, was he, generally, the
11    contact for finance companies?
12            MR. GOODMAN:  Object to
13         form.
14     A.   I don't recall.
15     Q.   Is there someone at the dealership,
16    currently, who is the contact for lenders?
17            MR. GOODMAN:  Object to
18         form, but go ahead.
19     A.   Yes.
20     Q.   Who is that?
21     A.   Stavros Orsaris.
22     Q.   If a finance company had to arrange
23    for a deal to be unwound, who would they
24    contact at Victory Mitsubishi?
25            MR. GOODMAN:  Object to

Page 52

1          Yessica K. Vallejo
2         form.
3     A.   Stavros Orsaris.
4     Q.   Who is Ken McGhee?
5     A.   He is the rep for Capital One.
6     Q.   And when was the last time you
7    spoke with Mr. McGhee?
8     A.   I don't really speak to him.  That
9    would be Stavros Orsaris that always take
10    care of bank reps and, you know, anything
11    they going to do with administrative stuff,
12    yeah.
13     Q.   And who is Robert Montgomery?
14     A.   I don't know.
15     Q.   Do you know what C-O-A-F-R-S-M
16    stands for?
17     A.   No.
18     Q.   Have you spoken with anyone at
19    Capital One regarding this lawsuit?
20     A.   No.
21     Q.   And if you could please turn to the
22    page Bates-stamped Defendant's 74, which is
23    the second page of the document.  And if you
24    could look at Section 1, Subsection G,
25    starting with "dealer warrants that" -- do



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
53–56

Page 53

1            Yessica K. Vallejo
2  you see that section?
3      A.   Uh-huh, yes.
4      Q.   How does Victory Mitsubishi ensure
5  that, quote, "all contracts are genuine,
6  signed by persons with full capacity to
7  contract," end quote?
8      A.   We make sure that the customer
9  completed all the process in order to sign a
10  contract.  Like they go to the dealership,
11  they give you handwritten application, signed
12  and dated, they choose the car, they sit down
13  with the finance manager, they go over the
14  numbers, and we, in the best of our ability,
15  try to verify that the customer is actually
16  the person they say they are.
17      Q.   And how do you do that; how do you
18  verify that?
19      A.   When we submit the customer
20  application, the first thing that you can see
21  in Deal Tracker is the red flags.  If the
22  customer have any source of Credit Bureau
23  alert, any consumer alert, any issues with
24  their information, they can, you know, they
25  couldn't be compromised.  We will get alert

Page 54

1            Yessica K. Vallejo
2  from Credit Bureau companies.  So if we get
3  an alert, right, we already know that there's
4  something going on.  We stop the transaction
5  and verify.  If it's no alert, we verify with
6  ID that that person is that person, and then
7  we continue with the process.
8      Q.   You could turn to Defendant's 77,
9  please.  And why is Stavros Orsaris listed on
10  this page as a managing member?
11          MR. GOODMAN:  Object to
12      form.
13      A.   I don't know.
14      Q.   Is Stavros Orsaris an owner of
15  Victory Mitsubishi?
16          MR. GOODMAN:  Object to
17      form.
18      A.   I don't know.
19      Q.   If you could turn to the next page,
20  Defendant's 78, who is Maria Sores?  Sorry if
21  I am mispronouncing that.
22      A.   Her title is next to her name.
23      Q.   Sure.  Do you work with Ms. Sores?
24      A.   No.
25      Q.   Is she still comptroller at Victory

Page 55

1            Yessica K. Vallejo
2  Mitsubishi?
3      A.   I believe she is.
4      Q.   And has she been the comptroller at
5  Victory Mitsubishi as long as you have worked
6  there?
7      A.   I don't recall, to be honest with
8  you.
9      Q.   That's fine.  Who were your
10  supervisors at Victory Mitsubishi?
11      A.   Stavros Orsaris.
12      Q.   Anyone else?
13      A.   No.
14          MR. GOODMAN:  We're going a
15      little over an hour now.  Can we
16      take a ten-minute break?
17          MS. CATERINE:  Sure.
18          MR. GOODMAN:  Please.
19          (Whereupon, a recess was
20      taken at this time.)
21  BY MS. CATERINE:
22      Q.   So let's start with a couple of
23  follow-up questions about something we had
24  discussed earlier.
25          In terms of what information you

Page 56

1            Yessica K. Vallejo
2  have access to at Victory Mitsubishi, would
3  you have the same access as sales managers at
4  the dealership?
5          MR. SELVEY:  Object to form.
6      A.   Yes.
7      Q.   Would you have the same access as
8  Stavros Orsaris?
9          MR. SELVEY:  Object to form.
10      A.   No.
11      Q.   What can he access, that you
12  cannot?
13      A.   I don't know.  But he is general
14  sales manager.  So definitely he has more
15  access than me.
16      Q.   Okay.  And in regards to employees
17  who have been fired at the dealership, were
18  those salespeople that were fired?
19      A.   I don't know.  I mean, I don't
20  understand your question.
21      Q.   Sure.  Who do you remember getting
22  fired at the dealership?
23      A.   I don't remember nothing related to
24  that, to people getting fired.  Hiring --
25  hiring, firing, all that stuff, it's -- it



Page 57

Yessica K. Vallejo

1  has nothing to do with my job.  Firing,
2  hiring, those are things that you need to
3  discuss with Stavros Orsaris.
4       Q.   So you don't -- you don't recall
5  anyone being fired, specifically; is that
6  right?
7       A.   That is correct.
8       Q.   Okay.  And earlier we were talking
9  about the evaluation of consumers credit at
10  Victory Mitsubishi.  Are credit scores used
11  to evaluate consumers credit?
12      A.   We can say so.
13      Q.   And you would be provided what the
14  consumer's credit scores were from the
15  reports that were pulled; is that correct?
16      A.   That is correct.
17      Q.   Would those credit scores be used
18  to help you decide which finance companies
19  you would send a credit application to?
20      A.   Not quite the way you saying it,
21  but remember, I don't know if you know this,
22  every lender, they have their own guidelines.
23      Q.   Right.
24      A.   So we go based on their guidelines.

*Note: lines renumbered as shown.*

Page 57 (column 1)

1        Yessica K. Vallejo
2  has nothing to do with my job.  Firing,
3  hiring, those are things that you need to
4  discuss with Stavros Orsaris.
5       Q.   So you don't -- you don't recall
6  anyone being fired, specifically; is that
7  right?
8       A.   That is correct.
9       Q.   Okay.  And earlier we were talking
10  about the evaluation of consumers credit at
11  Victory Mitsubishi.  Are credit scores used
12  to evaluate consumers credit?
13      A.   We can say so.
14      Q.   And you would be provided what the
15  consumer's credit scores were from the
16  reports that were pulled; is that correct?
17      A.   That is correct.
18      Q.   Would those credit scores be used
19  to help you decide which finance companies
20  you would send a credit application to?
21      A.   Not quite the way you saying it,
22  but remember, I don't know if you know this,
23  every lender, they have their own guidelines.
24      Q.   Right.
25      A.   So we go based on their guidelines.

Page 58

1        Yessica K. Vallejo
2  If a specific lender has a guideline that
3  they will take into consideration a credit
4  score between, let's say -- let's put an
5  example, between 700 and 800, so we already
6  know that we have that qualified customer
7  that qualifies for that specific lender.  So
8  then we send it to that lender.  It's not,
9  per se, that I go there and I choose what
10  lender I want to send the loan to, no,
11  because I am not a lender.  I go based on the
12  lender's guidelines.
13      Q.   And there are some lenders who
14  would automatically decline an application,
15  based on the criteria that you were just
16  talking about; is that correct?
17      A.   Based on their guidelines, which
18  that's the lender, it has nothing to do, per
19  se, with the finance manager, or the
20  dealership.
21      Q.   Sure.  So do you just submit
22  applications to the same finance companies
23  for every consumer, or how do you decide
24  which finance companies you are submitting
25  to?

Page 59

1        Yessica K. Vallejo
2       A.   We go based on the lender's
3  guidelines.
4       Q.   Okay.  Are you involved in the
5  process of hiring people for Victory
6  Mitsubishi?
7       A.   No.
8       Q.   And you have your own office at the
9  4070 Boston Road address; is that correct?
10      A.   That is correct.
11      Q.   And besides the 4070 Boston Road
12  address, do you work from any other
13  locations?
14      A.   No.
15      Q.   But there are other locations for
16  the dealership; is that correct?
17      A.   I don't know.
18      Q.   On a day-to-day basis, regular
19  course of business at your work, who are you
20  working with at Victory Mitsubishi?
21           MR. GOODMAN:  Objection to
22           form; timeline.
23      A.   I work directly with Stavros
24  Orsaris.
25      Q.   Anyone else?

Page 60

1        Yessica K. Vallejo
2       A.   The sales department has
3  salespeople, sales managers, and I have four
4  other finance managers that I, of course,
5  interact during the daily basis.  We have the
6  quoters outside, we have operations manager
7  outside.  Yes, I work with salespeople, other
8  finance managers, and, of course, the sales
9  managers as well.
10      Q.   Okay.
11           MS. CATERINE:  Mr. Goodman,
12           did you hear that last question?
13           Do you need to have it --
14           MR. GOODMAN:  No, that's
15           fine.  Go ahead, that's fine.
16           MS. CATERINE:  Okay.
17      Q.   So let's talk about the salespeople
18  that you work with.  In your -- in the
19  regular course of business at Victory
20  Mitsubishi, what sort of things -- what sort
21  of interactions are you having with
22  salespeople?
23           MR. GOODMAN:  Object to the
24           form.
25      A.   Usually.  My direct interaction is



Page 61

1          Yessica K. Vallejo
2 with Stavros Orsaris and sales managers.
3     Q.  Okay.  And what sort of
4 interactions are you having with the sales
5 managers?
6     A.  If I have any questions about the
7 sale, any questions about the vehicle, you
8 know, I go to them because they are the ones
9 working the sale, the -- that transaction
10 with the customer directly, and also with the
11 salesperson, you know.  Basically, that's to
12 communicate, tell them, you know, if the
13 customer is okay with the numbers, customer
14 is happy with the vehicle, customer has any
15 concerns, they will like to have anything
16 done to the vehicle.  You know, all those
17 things are things that I have to communicate
18 with the sales managers, just to make sure
19 the sale, you know, that we finalize the sale
20 the correct way, customer is happy, so on and
21 so forth, yes.
22     Q.  Okay.  So this would be at the
23 point when -- and correct me if am I wrong
24 here, I am just trying to ascertain -- this
25 would be at the point when the consumer is in

Page 62

1          Yessica K. Vallejo
2 your office, and you are going over finance
3 options, and let's say the consumer wants to
4 know about add-ons for the vehicle, is that
5 something you might ask the sales manager
6 about?
7     A.  Correct, yeah.
8     Q.  Okay, great.  What about
9 Mr. Orsaris, what parts of the sale are you
10 working on with him?
11     A.  Stavros Orsaris?
12     Q.  Yes, yes.  Sorry.
13     A.  Usually, I work the sale more
14 directly with the sales manager.  Stavros is
15 the general sales manager.  So if it's
16 anything that the sales manager cannot make a
17 decision on, then, we go to Stavros.
18     Q.  Okay.  And I will keep calling him
19 "Mr. Orsaris," when I need to specify.
20          Stavros Orsaris has his own office
21 at Victory Mitsubishi; is that correct?
22     A.  That is correct, yes.
23     Q.  And so if you or the sales manager
24 had a question that you need to ask him, you
25 would go to his office and ask him; is that

Page 63

1          Yessica K. Vallejo
2 correct?
3     A.  Well, depending if he's in his
4 office.  We'll look for him.  If he is on the
5 floor, if he on the podium, if he is talking
6 to a customer -- he could be doing different
7 things, you know, or I will find him and ask
8 him whatever I need.
9     Q.  Sure.  Where is he usually?
10          MR. GOODMAN:  Object to the
11     form.
12     A.  He is usually in the podium.
13     Q.  And what is "the podium"?
14     A.  On the sales floor.
15          MR. GOODMAN:  What is it?
16          THE WITNESS:  Sales floor.
17     That's -- that's how it's called,
18     it's called "podium."  It look like
19     a podium.  That's where they all
20     sit down, the sales managers.
21     Q.  So I have never been to Victory
22 Mitsubishi in person myself.  So could you
23 explain to me a little bit of what the set up
24 is of the sales floor?
25     A.  Well, you have the sales floor, you

Page 64

1          Yessica K. Vallejo
2 have the desk for the salespeople, we have a
3 couple of Mitsubishi models on the floors so
4 customer can see the new vehicles, and then
5 we have type of -- it's like a podium, where
6 all the sales managers sit at.  So, usually,
7 Stavros Orsaris is sitting there because,
8 once again, he is the general sales manager,
9 so he is there.
10     Q.  When you say, "because he is the
11 general manager, he is there," is that, like,
12 a good location for him to see everything
13 that's happening in the dealership or --
14     A.  Absolutely.
15     Q.  And is there a computer at this
16 podium?
17          MR. GOODMAN:  Object to the
18     form; go ahead.
19     A.  Yes.
20     Q.  Is there more than one computer?
21     A.  Yes.
22     Q.  Does Stavros Orsaris have his own
23 computer at the podium?
24     A.  Yes.
25     Q.  And do you -- each of the sales



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
65–68

Page 65

Yessica K. Vallejo
1
2 managers have their own computer at the
3 podium?
4      A.   Yes.
5      Q.   And would the sales managers ever
6 log into Mr. Orsaris's computer for any
7 reason?
8      A.   I don't know.
9      Q.   Have you ever logged into
10 Mr. Orsaris's computer?
11     A.   No.
12     Q.   Does Mr. Orsaris have a computer in
13 his office?
14     A.   Yes.
15     Q.   And does anyone at the dealership
16 use tablets, or iPads, electronic devices,
17 like that?
18     A.   I don't know.
19     Q.   So you don't use any devices like
20 that, correct?
21     A.   Nope.
22     Q.   Have you ever seen anyone at the
23 dealership using a device like that?
24     A.   I know Stavros has his laptop.  I
25 mean, I don't know, I really don't know.  I

Page 66

Yessica K. Vallejo
1
2 don't pay attention to those -- I mean, to
3 those things, to be honest with you.
4      Q.   Sure.  When you say, he has his
5 laptop, is that separate from the computer at
6 the podium, and the computer in his office?
7      A.   It's a laptop, yes.
8      Q.   Okay.  So let's talk about the work
9 that you do at Victory Mitsubishi.
10          When does your role in the sales
11 process begin?
12     A.   After the customer agree to
13 purchase a vehicle, they have seen the
14 vehicle, they like the vehicle, they ready to
15 apply for financing for that vehicle that
16 they came in to look for.  That's when the
17 customer goes to my office and we, you know,
18 we take a look of what the lenders have to
19 offer for that particular customer.  We go
20 over the numbers together, we go over their
21 down payment, you know, sales taxes, I ask
22 the customer, "you okay with the car, you
23 happy with the car, did you look the vehicle,
24 we going to apply for financing?"  You know,
25 and then that's basically the process.

Page 67

Yessica K. Vallejo
1
2      Q.   Are you looking at something right
3 now?
4      A.   Yes, at the pen.
5      Q.   So during the beginning of the
6 COVID-19 pandemic, Victory Mitsubishi was
7 only having consumers come in by appointment;
8 is that correct?
9          MR. GOODMAN:  Object to
10          form; go ahead.
11     A.   That is correct.
12     Q.   And during that time, were you ever
13 dealing with consumers, prior to them coming
14 into the dealership by appointment?
15          MR. GOODMAN:  Object to
16          form.  Go ahead.
17     A.   I don't understand the question.
18     Q.   Sure.  Would you ever speak on the
19 phone with a customer, prior to them coming
20 into the dealership by appointment?
21     A.   No.
22     Q.   Would you ever advise anyone at
23 Victory Mitsubishi about what a consumer
24 should bring in, prior to coming to the
25 dealership?

Page 68

Yessica K. Vallejo
1
2          MR. GOODMAN:  Object to
3          form.
4      A.   No.
5      Q.   Do you ever work with the other
6 finance managers on a sale or a deal?
7      A.   Can you be a little bit more
8 specific?
9      Q.   Sure.  Let's say, you have a
10 consumer come into the dealership, and you
11 are entrusted in buying a vehicle, and they
12 want to arrange financing for the vehicle,
13 would there ever be a situation where more
14 than one finance manager would work on
15 arranging that financing?
16     A.   No.
17     Q.   Okay.  So, essentially, each of the
18 finance managers deals with certain
19 customers.  You get a certain customer
20 assigned to you as a finance manager; is that
21 correct?
22     A.   When you say, "a certain customer,"
23 what you trying to imply by that?
24     Q.   Sure.  I think -- actually, I think
25 it's clear.  I will just withdraw that



Page 69

1          Yessica K. Vallejo
2    question.
3          So when, in the sales process, do
4    you start making credit applications to
5    lenders?
6          A.   When the customer is ready to apply
7    for financing.  After the customer look at
8    the vehicle and provide his credit
9    application and ID, and once, again, it's
10   ready to apply for financing.
11         Q.   And so would you send out those
12   applications, before the consumer came into
13   your office?
14              MR. GOODMAN:  Object to
15         form.
16              Go ahead.
17   A.   Yeah.
18         Q.   And so the consumer would come in,
19   and you would discuss with them responses you
20   had received to those applications; is that
21   correct?
22         A.   That is correct.
23         Q.   What sort of things would you
24   discuss with the consumer?
25         A.   Basically, the price of the

Page 70

1          Yessica K. Vallejo
2    vehicle, sales taxes, interest rate, the term
3    of the financing, and how much money you
4    borrowing from the lender.  Basically, what
5    we discuss is the truth in lending part of
6    the contract.
7          Q.   And so would you actually have a
8    contract there ready for them to look at at
9    that stage?
10         A.   The customer is entitled to a blank
11   copy of the retail sales contract.  They have
12   to review, before anything.  Then, if the
13   customer agrees, then, we move on to the next
14   part.
15         Q.   If the consumer wasn't happy with
16   the terms, for example, if they didn't like
17   the interest rate that they were receiving on
18   the deal, what would happen next?
19         A.   Well, if the customer is not okay
20   with the terms and what the lenders have to
21   provide, then, the process stops right there.
22   And we try to look for better financing.  If
23   cannot get any better financing, then, that's
24   all.
25         Q.   When you say, "look for better

Page 71

1          Yessica K. Vallejo
2    financing," do you mean you would send out
3    additional credit applications?
4          A.   Correct.
5          Q.   And let's say you show the customer
6    the retail installment sales contract --
7    that's the document you were talking about,
8    right?
9          A.   Yeah, we can show that, we can show
10   the purchase agreement, the bill of sales.
11   Whatever the customer request, we print and
12   we show them.
13         Q.   Okay.  So you show them these
14   documents and they say, "okay, this looks
15   great" -- what happens then?
16         A.   Then, okay, so if the customer is
17   okay with everything, they make the down
18   payment, usually the sales manager takes care
19   of that, and they go with the salesperson,
20   and they -- they do their insurance, the
21   customer, they do their insurance, you know,
22   to transfer the plates or whatever, and once
23   everything is done, car ready, it's clean,
24   it's inspected and all of that, then, I get
25   all the paperwork, and then I finalize the

Page 72

1          Yessica K. Vallejo
2    deal.  I print the final paperwork with
3    everything correct, and accurate, and then I
4    bring the customer back to my office.  We,
5    once again, review all the paperwork, review
6    the vehicle, and the customer signs the
7    paperwork, and then they go home with their
8    car.
9          Q.   Okay.  Let's talk about the --
10   start with the security deposit.  You said,
11   usually, the sales manager takes the security
12   deposit.  Would you ever take the security
13   deposit; for example, if all the sales
14   managers are busy with other customers?
15         A.   What's the "security deposit"?
16         Q.   Sorry, I am thinking of
17   landlord/tenant.  The down payment.
18         A.   Oh, yes, sales managers take care
19   of the down payment.
20         Q.   Would you ever take care of the
21   down payment, if all the sales managers were
22   busy with other customers?
23         A.   No, never.
24         Q.   Would Stavros Orsaris ever take
25   care of the security -- excuse me.



YESSICA K. VALLEJO                                        November 30, 2022
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC                    73–76

Page 73

1            Yessica K. Vallejo
2       Would Stavros Orsaris ever take
3   care of the down payment?
4       A.  I don't know.
5       Q.  Have you ever seen them take a down
6   payment?
7       A.  I don't recall.
8       Q.  David Perez was a sales manager at
9   Victory Mitsubishi, correct?
10      A.  That is correct.
11      Q.  And if you were working with
12  Mr. Perez on a sale, and the consumer was
13  ready to make their down payment, would he be
14  the person to take the down payment, if he
15  was the sales manager who had been working
16  with the customer?
17      A.  Correct.
18      Q.  And would he also print the receipt
19  for the down payment?
20      A.  I believe so.
21      Q.  And what happens to the down
22  payment?
23      A.  We have a safe.  We put the down
24  payments in the safe.
25      Q.  And where is the safe?

Page 74

1            Yessica K. Vallejo
2       A.  Stavros's office.
3       Q.  Is the door to Stavros's office
4   usually open during the day?
5            MR. GOODMAN:  Object to
6            form.
7       A.  I don't know.
8       Q.  Do you have a key to Stavros'
9   office?
10      A.  No.
11      Q.  Do the sales managers have keys to
12  Stavros' office?
13      A.  I don't know.
14      Q.  Do you know the combination code to
15  the safe?
16      A.  No.
17      Q.  So you can't access the safe; is
18  that correct?
19      A.  That's correct.  I cannot access
20  the safe.
21      Q.  And the sales managers can access
22  the safe to put in the down payments; is that
23  correct?
24      A.  I don't know.  I don't know who
25  puts the money in the safe, who handles the

Page 75

1            Yessica K. Vallejo
2   safe, who have passwords to touch the safe.
3   I have no knowledge of nothing that have to
4   do with the safe.
5       Q.  Okay, are you a salaried employee?
6       A.  I am a commission employee.
7       Q.  Okay.  And do you have a base
8   salary?
9       A.  No.
10      Q.  Okay.  And how does your commission
11  work?
12           MR. GOODMAN:  You can
13           answer.
14      A.  I get paid twelve percent of the
15  total gross of the deal that I do.
16      Q.  What does "total gross of the deal"
17  mean?
18      A.  Total gross profit of the deal.
19      Q.  And I know this is going to sound
20  nitpicking, but that's the profit to Victory
21  Mitsubishi, correct?
22      A.  That is correct.
23      Q.  And what company is the payor of
24  your paycheck?
25      A.  I believe it's ADT.

Page 76

1            Yessica K. Vallejo
2       Q.  Sorry, could you repeat that?
3       A.  I believe it's ADT.
4            MR. GOODMAN:  ADT is a
5            payroll processing.
6            THE WITNESS:  Yes.
7            MR. GOODMAN:  Do you know
8            who actually pays -- the company
9            that pays the money to you?
10           The name, that's what she's
11           asking.
12           THE WITNESS:  Victory
13           Mitsubishi.
14           MR. GOODMAN:  All right.
15      Q.  Do you get a physical paycheck or
16  do you have direct deposit set up?
17      A.  I get my physical paycheck.
18      Q.  And it says, "Victory Mitsubishi"
19  on your paycheck?
20      A.  I don't know.  I will have to go
21  and look at it.
22      Q.  Okay.  If we can just leave a space
23  in the transcript here, and if you can just
24  let us know later on.
25      A.  For sure.

ESQUIRE
DEPOSITION SOLUTIONS

Page 77

Yessica K. Vallejo

1
2    MR. GOODMAN:  Take it under
3    advisement.
4    Q.   So you started working at Victory
5  Mitsubishi as a financial assistant around
6  2017; is that correct?
7         MR. GOODMAN:  Object to
8    form; asked and answered.  Go
9    ahead.
10   A.   Around there.  Remember, I told you
11  that I don't have specific dates in my mind.
12   Q.   Of course.
13   A.   If you need exact date, I can ask
14  my employer to provide that.
15   Q.   No, that's okay.  During your time
16  working at Victory Mitsubishi, was there ever
17  s major change in the employees or managers,
18  you know, a bunch of people getting laid off
19  at the same time, a bunch of people being
20  laid off at the same time, something like
21  that?
22         MR. GOODMAN:  Object to
23    form; go ahead.
24   A.   Not that I recall.
25   Q.   Were there ever any major

Page 78

Yessica K. Vallejo

1
2  restructuring of how the dealership operated?
3         MR. GOODMAN:  Object to
4    form.
5    A.   No.
6    Q.   And you were always working at the
7  4070 Boston Road address, correct?
8    A.   That is correct.
9    Q.   When you were a financial
10  assistant, do you have your own office?
11   A.   Yes.
12   Q.   Is it the same office that you have
13  today?
14   A.   No.
15   Q.   Was this office on the sales floor?
16   A.   No.
17   Q.   Where was it in the dealership?
18   A.   The office was in the accounting
19  office.
20   Q.   Where is the accounting office,
21  generally?
22   A.   It's in the back.  We call it "the
23  back office," yeah.
24   Q.   Is that where Stavros Orsaris's
25  office is?

Page 79

Yessica K. Vallejo

1
2    A.   No.
3    Q.   Where is his office?
4    A.   On the sales floor.
5    Q.   Okay.  Your current office is on
6  the sales floor; is that correct?
7    A.   That is correct.
8    Q.   All of the finance managers have
9  offices on the sales floor, correct?
10   A.   Yes.
11   Q.   Chris Orsaris has an office on the
12  sales floor; is that correct?
13   A.   No, that is not correct.
14   Q.   Is Chris Orsaris's office in the
15  back office?
16         MR. GOODMAN:  Object to
17    form.
18   A.   I don't know where Chris Orsaris's
19  office is.  If he has an office, I have no
20  recollection of that.
21   Q.   Okay.  When you were a financial
22  assistant, were you a paid by commission as
23  well?
24   A.   No.
25   Q.   You were salaried at that time; is

Page 80

Yessica K. Vallejo

1
2  that correct?
3    A.   Correct.
4    Q.   And during your time as a finance
5  manager, has the way you are paid ever
6  changed?
7    A.   No.
8    Q.   Has your commission rate changed in
9  any way?
10   A.   No.
11   Q.   When did David Perez start working
12  at Victory Mitsubishi?
13   A.   I don't know.  I have no
14  recollection of the time.
15   Q.   Did he start working there before
16  you?
17   A.   After me.
18   Q.   After you.  What was his title when
19  he started?
20   A.   He was a salesman.
21   Q.   And she would become a sales
22  manager, correct?
23   A.   You mean "he."
24         MR. GOODMAN:  Yeah, I think
25    you said "she."



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
81–84

Page 81

1           Yessica K. Vallejo
2           MS. CATERINE:  Oh, I meant
3    he.
4           THE WITNESS:  He.  Yes, he
5    got promotion.
6    Q.   When was that?
7    A.   I don't recall the timing.
8    Q.   And who is Phillip Argyropoulos?
9           MR. GOODMAN:  Object to
10          form; go ahead.
11   A.   I believe that's Diane's husband.
12   Q.   And he was an owner of the
13   dealership, correct?
14          MR. GOODMAN:  Object to
15          form.
16   A.   To my understanding, she is.
17   Q.   Was he ever an owner of the
18   dealership?
19          MR. GOODMAN:  Object to
20          form.
21   A.   I don't know.
22   Q.   Have you ever seen Mr. Argyropoulos
23   come into Victory Mitsubishi?
24   A.   No.
25   Q.   Has Mr. Argyropoulos ever given you

Page 82

1           Yessica K. Vallejo
2    instructions about how to do your work at
3    Victory Mitsubishi?
4    A.   No.
5    Q.   Has Mr. Argyropoulos ever been
6    present for meetings at Victory Mitsubishi,
7    including by phone or by Zoom call?
8           MR. GOODMAN:  Object to the
9           form; go ahead.
10   A.   Meetings with me, per se?
11   Q.   Meetings you were present at.
12   A.   No.
13   Q.   Do you know if he has met with
14   anyone else?
15   A.   I don't know.
16   Q.   What work does Mr. Argyropoulos do
17   for Victory Mitsubishi?
18   A.   I don't know.
19   Q.   And who is Diane Argyropoulos?
20          MR. GOODMAN:  Object to
21          form.
22   A.   To my understanding, she is the
23   owner of Victory Mitsubishi.
24   Q.   And is she a manager at Victory
25   Mitsubishi as well?

Page 83

1           Yessica K. Vallejo
2           MR. GOODMAN:  Object to
3    form.
4    A.   To my understanding, she was the
5    owner of Victory Mitsubishi.
6    Q.   So is that "yes" or "no," as to her
7    also being a manager?
8    A.   I only know Diane as the owner of
9    Victory Mitsubishi.  Any other positions, I
10   have no recollection.  I can't tell you
11   because I don't know.
12   Q.   Okay.  Has Diane ever been present
13   at meetings at Victory Mitsubishi, including
14   by phone or by Zoom call?
15          MR. GOODMAN:  Object to
16          form.
17   A.   Meeting that I have been present,
18   no.
19   Q.   Has Stavros Orsaris ever mentioned
20   needing to get Diane's approval for anything
21   at Victory Mitsubishi?
22          MR. GOODMAN:  Objection to
23          form.
24   A.   No.
25   Q.   Has Diane ever given you

Page 84

1           Yessica K. Vallejo
2    instructions as to how to do your work at
3    Victory Mitsubishi?
4    A.   No.
5    Q.   How often do you see Diane at
6    Victory Mitsubishi?
7    A.   Maybe once a month, every two
8    months.
9    Q.   And --
10   A.   I don't see her often.
11   Q.   And what is she coming in to do?
12          MR. GOODMAN:  Object to
13          form.
14   A.   I don't know.
15   Q.   Does she have an office at the
16   dealership?
17   A.   I don't know.  Not on the sales
18   floor.  Remember, I am only in the sales
19   floor, so...
20   Q.   You don't know what happens in the
21   back office?
22   A.   I don't know.  I don't know, you
23   know, how it is.  They owners, so -- she is
24   an owner.  I don't know.
25   Q.   How did the way that Victory



Page 85

1              Yessica K. Vallejo
2  Mitsubishi did business change during the
3  COVID-19 pandemic?
4      A.  The only thing that I can tell you
5  that we changed is that we were working only
6  by appointment, appointment only, and, of
7  course, we applied the COVID-19 protocols,
8  you know, of wearing the mask, using the
9  glass protector, you know, I mean, to protect
10 consumer, customer, and also to protect us
11 because we were working in middle of
12 pandemic, you know, we all have family at
13 home and, you know, we were taking the -- we
14 were -- basically, we were following the CDC
15 guidelines.  But the way we do business was
16 the same way.  The only thing is that we work
17 only by appointment.
18     Q.  And did you have one of these glass
19 protectors in your office?
20     A.  Yes.
21     Q.  And when you had consumers in your
22 office, would you ever ask them to pull down
23 their mask?
24     A.  Sometimes.
25     Q.  And when would you ask them to do

Page 86

1              Yessica K. Vallejo
2  that?
3      A.  If I look at the ID and I can't
4  somehow, you know, believe that the person on
5  the ID doesn't look like the person in front
6  of me.  But usually that process, that
7  verification process is done with the sales
8  manager outside my office.
9      Q.  And that process didn't change
10 during the COVID-19 pandemic; is that
11 correct?
12     A.  No, it was the same process since I
13 start working there.
14     Q.  Okay.  And so when the shutdown
15 order was given at the beginning of the
16 COVID-19 pandemic, were you laid off at any
17 point, even temporarily?
18     A.  When they shut off all the
19 businesses, yeah, we were closed down, I
20 believe, yeah.
21     Q.  And by May 30 of 2020, you were
22 operating by appointment only; is that
23 correct?
24     A.  That is correct.
25     Q.  And how long would you be working

Page 87

1              Yessica K. Vallejo
2  by appointment only?
3      A.  I don't recall.
4      Q.  Was it at least until the end of
5  2020?
6      A.  I really don't recall, to be very
7  honest with you, because I am not the one
8  that made those calls, you know, those are
9  made by my supervisor, which is Stavros.  So
10 I don't know how long they implied that.  I
11 don't know.  I, honestly, don't know.
12     Q.  Okay.  Was it still by appointment
13 only on June 29, 2020?
14     A.  I don't know.
15     Q.  During this time when it was
16 appointment only, who would be the first
17 person at Victory Mitsubishi that a customer
18 would talk to when they came in to buy a
19 vehicle?
20          MR. GOODMAN:  Object to
21     form.
22     A.  It would be probably the sales
23 manager or the salesperson.
24     Q.  Okay.  And when would they have the
25 consumer fill out a credit application?

Page 88

1              Yessica K. Vallejo
2          MR. GOODMAN:  Object to
3     form, but go ahead.
4      A.  I mean, I don't know, to be honest
5  with you.  Probably what I believe is after
6  the customer sees the car they looking for,
7  test drive, look at it, make sure they like
8  it, if they ready to apply for financing,
9  ready to buy, they love the car, they want
10 the car, then, they move on to the next
11 process, which is fill that credit
12 application.
13     Q.  Would you ever help a customer fill
14 out a credit application?
15     A.  No.
16     Q.  Once a customer has filled a credit
17 application, that information is used to pull
18 the customer's credit report; is that
19 correct?
20     A.  That is correct.  If it's signed
21 and dated, yes.
22     Q.  And I think you may have said this
23 before, but would you ever be the one to pull
24 the credit report with the information from
25 the credit application?



Page 89

Yessica K. Vallejo

1
2     MR. GOODMAN:  Objection to
3        form.  Go ahead.
4     A.   Usually, it's David.  It was, I
5  mean, one of the sales managers, David or
6  Stavros.  But I could pull credit too, if
7  it's necessary.
8     Q.   When you say, "if it was
9  necessary," would that be, if, you know,
10  Stavros and David are busy with other
11  customers, and they need someone else to pull
12  the credit report, in a situation like that,
13  would you be the one pulling the credit
14  report?
15     A.   Yes.
16     Q.   Okay.  Would you do that through
17  Deal Tracker, correct?
18     A.   That is correct.
19     Q.   Would there be a record on Deal
20  Tracker showing that a credit report was
21  pulled?
22     A.   Yes.
23     Q.   And would it show the date and time
24  that the credit report was pulled?
25     A.   Correct.

Page 90

Yessica K. Vallejo

1
2     Q.   And as far as you're aware, the
3  date and time shown would be accurate,
4  correct?
5     MR. GOODMAN:  Object to
6        form.
7     A.   There's no way for me to know if
8  it's accurate because it's a system that's a
9  platform.  It could have -- I mean, there
10  could be any errors.  They work on eastern
11  time, I believe.  I mean, they not even in
12  New York.  So maybe the timing might be
13  incorrect.  I mean, it could be anything.  I
14  cannot tell you 100 percent that it's
15  accurate.  That I cannot do.
16     Q.   Okay, sure.  But when you have
17  pulled a credit report, do you ever recall
18  the time and the date shown for the credit
19  pull to be inaccurate?
20     MR. GOODMAN:  Object to
21        form.
22     A.   I don't know.  I never had to go
23  back and double-check timing and dating for
24  any credit pull that I have done, in the
25  years that I have been working at Victory

Page 91

Yessica K. Vallejo

1  Mitsubishi.
2
3     Q.   Okay.  And if a consumer's credit
4  report was pulled, and that consumer had no
5  credit history, what would happen?
6     MR. GOODMAN:  Objection to
7        form; go ahead.
8     A.   What would happen with what
9  specific -- I mean, with what?
10     Q.   Well, what would happen in the
11  process of the sale?
12     A.   I mean, we go along with the sale.
13  It doesn't matter if you have credit or no
14  credits.  We still have lenders that can
15  approve your loan with credit or not credit.
16  The only reason if we did not move forward
17  with that sale is because the customer didn't
18  like the car, didn't like the vehicle, per se
19  so if the customer doesn't like the car,
20  there's no reason for us to submit my loan to
21  the bank because the customer doesn't want to
22  buy.
23     MR. GOODMAN:  Just try to
24        answer the question that she's
25        asking.

Page 92

Yessica K. Vallejo

1
2     Q.   So if a consumer has no credit
3  history, would that change the way that you,
4  for example, submit a credit application?
5     A.   Absolutely not.  Everybody gets
6  treated the same way.  Every application gets
7  worked the same exact way.
8     Q.   If two consumers were applying
9  together, if there's a co-applicant for the
10  credit application, and one of the consumers
11  had no credit history, would you ever advise
12  the other consumer to apply for credit by
13  themselves?
14     A.   No.
15     Q.   And if a consumer had no credit
16  history, would you ever advise them that they
17  may be able to obtain more favorable
18  financing options by getting a co-applicant?
19     A.   No.
20     Q.   Would the sales manager ever advise
21  a consumer to do that?
22     MR. GOODMAN:  Form.
23     A.   I don't know.
24     Q.   Have you ever advised a consumer to
25  get a co-applicant to obtain more favorable



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
93–96

Page 93

1              Yessica K. Vallejo
2    financing?
3              MR. GOODMAN:  Objection to
4         the form; go ahead.
5         A.  No.
6         Q.  And if a consumer had a
7    co-applicant's information, their driver's
8    license, and their social security number,
9    you would pull that co-applicant's credit
10   report as well, correct?
11             MR. GOODMAN:  Object to
12        form.
13        A.  No.
14        Q.  Why not?
15        A.  Because if you go to the dealership
16   with somebody else's information, and that
17   person is not there, we not going to pull
18   their credit.  That's illegal.
19        Q.  Okay.  But in May of 2020, pandemic
20   is going on and you are only able to see
21   consumers by appointment, during this time,
22   customer might not want to have to leave and
23   go get co-applicant to come in person -- so
24   did any consumers ask you to pull the credit
25   report for a co-applicant?

Page 94

1              Yessica K. Vallejo
2              MR. GOODMAN:  Object to
3         form; go ahead.
4         A.  No.
5         Q.  A consumer had a co-applicant's
6    permission to pull a credit report, but the
7    co-applicant was not present at the
8    dealership, could you pull the credit report
9    then?
10             MR. GOODMAN:  Object to
11        form.
12        A.  Absolutely not.  That's illegal.
13   You can't do that.
14        Q.  Video recordings are made of the
15   sales at the dealership, correct?
16             MR. GOODMAN:  Objection; go
17        ahead.
18        A.  I don't know.  Are they?  I don't
19   know.
20        Q.  Are there video cameras at Victory
21   Mitsubishi?
22        A.  Yes, there are.
23        Q.  And where are there video cameras
24   at Victory Mitsubishi?
25        A.  All over the dealership, except the

Page 95

1              Yessica K. Vallejo
2    bathroom.
3         Q.  So there's a video camera in your
4    office; is that correct?
5         A.  That is correct.
6         Q.  And do you control that camera in
7    your office?
8         A.  No.
9              MR. GOODMAN:  Object.
10        Q.  Who does control that camera?
11             MR. GOODMAN:  Object to the
12        form.
13        A.  I don't know.
14        Q.  Has anyone ever come into your
15   office to turn the camera on and off or
16   adjust it in any way?
17        A.  No.
18        Q.  Has anyone ever come into your
19   office to do repairs on the camera?
20             MR. GOODMAN:  Object to
21        form.
22        A.  Not on my presence, so I don't
23   know.
24        Q.  And what happens to the video
25   footage captured by that camera?

Page 96

1              Yessica K. Vallejo
2         A.  I don't know.  I don't control
3    that.
4         Q.  But you have access to that
5    footage, correct?
6         A.  No.
7         Q.  Who does have access to that
8    footage?
9         A.  I don't know.
10             MR. GOODMAN:  Let her
11        finish.
12        Q.  We talked earlier about how
13   different lenders have different requirements
14   for credit applications, correct?
15        A.  Correct.
16        Q.  And do any lenders require video
17   recordings as one of their requirements for
18   credit applications?
19        A.  Not the lenders that I work with,
20   no.
21        Q.  Okay.  Has there ever been identity
22   theft at Victory Mitsubishi while you have
23   been working there?
24             MR. GOODMAN:  Object to
25        form.



Page 97

1        Yessica K. Vallejo
2      A.   No.
3      Q.   Have you ever spoken with any
4  police officers while working at Victory
5  Mitsubishi?
6      A.   No.
7      Q.   Has a consumer ever told you that a
8  vehicle was sold or financed in their name
9  without their authorization?
10     A.   No.
11     Q.   Okay.
12          MS. CATERINE:  I think now
13     might be a good time to break for
14     lunch, if that's something you want
15     to do.
16          MR. GOODMAN:  Yes, that is
17     something we want to do.
18          MS. CATERINE:  How long
19     would you like for lunch, Ms.
20     Vallejo?
21          THE WITNESS:  Two hours.
22          MR. GOODMAN:  I am trying to
23     tell her two o'clock.
24          THE WITNESS:  Sorry, I can't
25     be doing this around three o'clock.

Page 98

1        Yessica K. Vallejo
2  That's the time my son get out of
3  school, so I have to make sure he
4  gets home safe.
5       MR. GOODMAN:  So what I hear
6  her saying is that at around three
7  o'clock, we need to take a break.
8       THE WITNESS:  I can't be
9  doing this around three o'clock.
10      MS. CATERINE:  For how long?
11      THE WITNESS:  For, like,
12  half-hour.
13      MR. GOODMAN:  She needs
14  half-hour break.
15      THE WITNESS:  Three o'clock,
16  that's correct.
17      MR. GOODMAN:  We will have
18  to stop from three to three-thirty.
19  Let's take a shorter break now, if
20  that makes sense.
21      MS. CATERINE:  As long as
22  that gives us enough time to have
23  lunch.  Ms. Vallejo, it's really up
24  to you.
25      MR. GOODMAN:  Let's come

Page 99

1        Yessica K. Vallejo
2  back at ten to two.  That's
3  half-hour, basically.
4       THE WITNESS:  I mean, you
5  guys want to stop now for
6  half-hour?
7       MS. CATERINE:  Yeah.
8       THE WITNESS:  That's fine
9  with me.
10      MS. CATERINE:  Okay.
11      (Whereupon, a lunch recess
12  was taken at 1:23 p.m.)
13      (Time noted:  1:55 p.m.)
14 BY MS. CATERINE:
15     Q.   Ms. Vallejo, you said you used your
16 personal cell phone sometimes to contact
17 customers at Victory Mitsubishi; is that
18 correct?
19     A.   Sometimes.  Very few times.
20     Q.   And what is your cell phone number?
21          MR. GOODMAN:  Okay, I will
22     object.  I will take it under
23     advisement, and we'll -- if we
24     produce it, it will be off the
25     record.

Page 100

1        Yessica K. Vallejo
2       MS. CATERINE:  If she is
3  using it in the course of the
4  dealership, I think I am entitled
5  to it.
6       MR. GOODMAN:  No, you have
7  no foundation that it has anything
8  to do with this case.  There are
9  questions you could ask about that.
10  I will not go further.
11      THE WITNESS:  I never say
12  that I use my phone for this
13  particular transaction.
14      MR. GOODMAN:  Just let her
15  ask the questions.
16     Q.   Do you use the same phone number in
17 May of 2020, as you use today?
18     A.   No.
19     Q.   And when did it change?
20          MR. GOODMAN:  We're talking
21     about your personal -- her personal
22     cell phone number?
23          MS. CATERINE:  Yeah, her
24     personal cell phone number.
25     A.   I think I changed companies, like,



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
101–104

Page 101

Yessica K. Vallejo

1
2 maybe two years ago.  And then that's how I
3 changed my number.
4    Q.   Okay.  And who was your cell phone
5 provider in May of 2020?
6    A.   I don't remember.
7    Q.   And who did your cell phone
8 provider change to?
9    A.   Right now I have AT&T.
10    Q.   Okay.  And that change happened
11 sometime in 2020?
12    A.   I think I changed companies two
13 years ago.
14    Q.   So around November or December of
15 2020?
16    A.   I don't recall.
17    Q.   And have you ever sent text
18 messages in connection with your work?
19    A.   No.
20    Q.   You previously testified that you
21 don't have any personal recollection of Ms.
22 Francois' account; is that correct?
23          MR. GOODMAN:  Object to the
24      form; go ahead.
25    A.   Did -- repeat that question,

Page 102

Yessica K. Vallejo

1
2 please.
3    Q.   Sure.  Do you remember anything
4 about Ms. Francois' account?
5          MR. GOODMAN:  Object to
6      form; go ahead.
7    A.   No, I don't have fully recollection
8 of it.  It was just a regular deal with no
9 hiccups, no red flags, to my knowledge.
10    Q.   When you say, "it was a regular
11 deal with no red flags," to your knowledge,
12 are you referring -- are you saying that
13 based open your review of the documents?
14    A.   I am saying that based on that in
15 the -- in the -- if there would be any red
16 flags about that deal, the deal would have
17 never happened.  So I don't recall any issues
18 with the transaction whatsoever.  At all.
19    Q.   So if I understand you correctly,
20 you are saying, if there had been any red
21 flags in the transaction, that would have
22 been something memorable; is that correct?
23          MR. GOODMAN:  Object to
24      form.
25    A.   No.

Page 103

Yessica K. Vallejo

1
2    Q.   Sorry, could you please clarify?
3    A.   Okay, what I am trying to explain
4 to you is, if during that particular
5 transaction there would have been any red
6 flags, the transaction would have never been
7 completed.  But I need to understand what is
8 that you are trying to imply.  Like what is
9 that that you are telling me that went wrong
10 with the transaction, per se?
11    Q.   Well, I am trying -- what I would
12 like to know is -- I am not asking -- not yet
13 -- about what happened during the
14 transaction.  I am just asking you what you
15 remember.
16    A.   About what it is specific?
17    Q.   About the whole transaction.
18    A.   I sit down with a hundred, plus,
19 customers a month.  It's -- I am not going to
20 tell you here, "I sit down," and tell you
21 that I remember exactly what happened.  Based
22 on the process, our training, the procedures
23 that we have, I can tell you.  I can talk to
24 you about the transaction, based on that.
25 Because it's the same repetitive procedure

Page 104

Yessica K. Vallejo

1
2 for every single customer.  So on that
3 transaction, there was no red flags at all
4 whatsoever.  So that's why I am telling you,
5 it was a simple, regular transaction
6 purchasing a -- customer purchasing a
7 vehicle.  That's it.
8    Q.   And when you say, there are "no red
9 flags," that's based on your review of the
10 deal jacket, correct?
11    A.   That's based on my memory and
12 reviewing the deal jacket, yes.
13    Q.   Well, what is your memory of that?
14    A.   That the customer came in to buy a
15 car and they bought a car.
16    Q.   And what who do you mean by, "the
17 customer"?
18    A.   The customer.
19    Q.   What's their name?
20    A.   The person that purchased the
21 vehicle.  The person in -- in question.  The
22 reason because we're here right now.
23    Q.   Do you remember their name?
24    A.   Her name is Farah Francois.
25    Q.   Okay, so you remember Ms. Francois



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
105–108

Page 105

Yessica K. Vallejo

1  coming into the dealership; is that correct?
2  A.  I don't remember, per se, her
3  coming into the dealership, but there was a
4  person there.  It was a person in the office.
5  If it was not her, it was somebody trying to
6  imperson [sic] her, but it was definitely
7  somebody there.
8  Q.  Well, I guess I am a little bit
9  confused.  What exactly do you remember
10  happening on May 30, 2020?
11  Q.  Well, I guess I am a little bit
12  A.  There was a person there buying a
13  vehicle, and they bought the vehicle, and
14  they went home with their vehicle.
15  Q.  Just one person?
16  A.  It was her and her brother, as they
17  call each other, buying a car.
18  Q.  Was there anyone else?
19  A.  No.
20  Q.  Was that the first time you had
21  ever seen Farah Jean Francois?
22  A.  Yes.
23  Q.  And that was May 30, correct?
24  A.  That was the first time that they
25  went to the dealership.

Page 106

Yessica K. Vallejo

1
2  Q.  And what do you remember about
3  that?
4  MR. GOODMAN:  Object to
5  form.
6  A.  Nothing in particular.  Like I
7  said, it was just another transaction during
8  the day, and customer purchase a vehicle, and
9  went home with their vehicle.
10  Q.  Did you talk to her?
11  A.  I talk to her, I believe, if it was
12  her, or whoever was trying to imperson [sic]
13  her.
14  Q.  Sure, let's leave aside the issue
15  right now about whether it was her or whether
16  it was someone trying to impersonate her.
17  Did you speak with that person?
18  A.  That person was definitely in my
19  office because I cannot sell a vehicle to
20  somebody that is not there.  So...
21  Q.  I understand.
22  A.  Yes.
23  Q.  Sorry, go ahead.
24  A.  If it wasn't her, it was somebody
25  else trying to imperson [sic] her.  That I

Page 107

Yessica K. Vallejo

1  can assure you.
2  can assure you.
3  Q.  Sure.  I understand what the
4  policies are, as you have -- as you have
5  stated them.  What I am asking is, is if you
6  remember talking to her, not whether you knew
7  you would have talked to her.
8  But do you, specifically, remember
9  talking to her?
10  A.  I, specifically, don't recall the
11  sale.  But if they purchased a car, and I was
12  the finance manager, it was somebody there.
13  That I can assure you.
14  Q.  Sure.  So you wouldn't remember
15  what was, specifically, said on that day,
16  correct?
17  A.  No, but based on how sales go, you
18  already know what we discuss.  We discuss the
19  basics of what the finance manager does when
20  they have the customer in front of them.
21  Q.  And what do you remember about her
22  voice?
23  A.  I do not recall her voice.  That
24  was over two years ago.
25  Q.  And do you remember who was in your

Page 108

Yessica K. Vallejo

1
2  office when she came into your office?
3  A.  There was a lady and it was a male.
4  Q.  Was there anyone else who worked at
5  Victory Mitsubishi, in your office, when they
6  came in?
7  A.  No.
8  Q.  And how would you describe her?
9  A.  I cannot describe her.
10  Q.  Okay.  Could you describe the man
11  who was with her?
12  A.  I cannot describe them.
13  Q.  Do you remember anything about them
14  -- the color of their hair, or their race, or
15  height?
16  A.  I remember they were both African
17  American.
18  Q.  Do you remember if they were dark
19  skinned or light skinned?
20  A.  No.
21  MR. GOODMAN:  Object to the
22  form; go ahead.
23  Q.  Do you remember anything about
24  their -- the way they wore their hair?
25  A.  Sorry, repeat the question.



Page 109

Yessica K. Vallejo

1
2     Q.   Do you remember anything about the
3  way they wore their hair?
4     A.   No.
5     Q.   Do you remember if they wore
6  glasses?
7     A.   No.
8     Q.   And on May 30, 2020, they would
9  have been wearing masks, correct?
10    A.   That is correct.
11    Q.   Do you remember what the mask they
12 were wearing looked like?
13    A.   No.
14    Q.   Do you remember if you asked them
15 to pull down their mask?
16    A.   No.
17    Q.   Do you remember if the man had any
18 facial hair?
19    A.   No.
20    Q.   And you were not involved with the
21 transaction until they came into your office;
22 is that correct?
23    A.   That is correct.
24    Q.   And were they brought into your
25 office by someone else at Victory Mitsubishi?

Page 110

Yessica K. Vallejo

1
2     A.   Yeah, by the sales manager, David.
3     Q.   And you remember David bringing
4  them in, or is that based on your review of
5  the documents?
6     A.   Usually the sales manager that
7  works the deal is the one that brings them to
8  the office.
9     Q.   So it's based on your understanding
10 of how things usually work at Victory
11 Mitsubishi; is that correct?
12    A.   That is correct.
13    Q.   Okay.  Do you remember who the
14 first person at Victory Mitsubishi to speak
15 with Mr. LaForest was?
16    A.   No, I don't recall.
17    Q.   Did you look at the credit
18 application filled out by Mr. LaForest?
19    A.   Yes, I did.
20    Q.   And when did you look at it?
21    A.   When it was handed to me by David.
22    Q.   Was that before or after they were
23 brought into your office?
24    A.   Before.
25    Q.   And did you see Mr. LaForest or

Page 111

Yessica K. Vallejo

1
2  Ms. Francois fill out the credit application?
3     A.   No.
4     Q.   Do you remember if Mr. LaForest was
5  approved or denied for any financing?
6     A.   I don't recall.
7     Q.   Do you remember if it was
8  Mr. LaForest or Ms. Francois who handed you
9  the down payment for the vehicle?
10        MR. GOODMAN:  Object to the
11        form.
12    A.   I already told you I don't handle
13 down payments, the sales managers do.
14    Q.   I see.  So it was David Perez who
15 took the down payment; is that correct?
16        MR. GOODMAN:  Object to
17        form.
18    A.   I can't exactly recall who did.  I
19 can tell you it was not me.
20    Q.   Okay.  But based on the general
21 practice --
22    A.   Yes.  Correct.
23        MR. GOODMAN:  Let her
24        finish.
25    Q.   Yeah, sorry.  Let me finish the

Page 112

Yessica K. Vallejo

1
2  question, first.
3        Based on the general practice where
4  the sales manager takes the down payment, you
5  think it would have been David Perez,
6  correct?
7     A.   Correct.
8     Q.   And do you remember if it was
9  Emanuel LaForest or Ms. Francois who handed
10 David Perez the down payment?
11    A.   I don't know.
12    Q.   Do you remember them being given a
13 receipt for the down payment?
14    A.   I don't know.
15    Q.   Do you remember printing a buyer's
16 order and retail installment contract for the
17 sale of the vehicle?
18    A.   Yes, I do.  I probably did.  That's
19 -- that's what my job is.
20    Q.   Sorry, you said you "probably did."
21        Do you remember or do you just
22 think that you probably did?
23    A.   I can tell you that I did because
24 that's my job.  That's why they were in my
25 office for.



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
113–116

Page 113

Yessica K. Vallejo

1
2    Q.   You would have printed them buyer's
3  order and retail installment contract on May
4  30, 2020, correct?
5    A.   Correct.
6    Q.   And financing was secured for the
7  vehicle, correct?
8    A.   Financing is not secured until the
9  bank pays you.
10   Q.   I see.  Let me rephrase.
11       Was conditional approval obtained
12 from a lender on May 30, 2020?
13       MR. GOODMAN:  Object to the
14       form.
15   A.   Correct.
16   Q.   And do you remember which lender
17 that was from?
18   A.   Yes.
19   Q.   Which lender?
20   A.   Capital One.
21   Q.   Is that based on your review of the
22 documents, or do you have an independent
23 recollection of that?
24   A.   That was based on my review of the
25 documents.

Page 114

Yessica K. Vallejo

1
2    Q.   Okay.  And do you remember what
3  documents were given to Emanuel LaForest that
4  day?
5    A.   Documents were given to the
6  customer, the person who purchased the
7  vehicle.
8    Q.   Okay.
9    A.   And, yes, contract, buyer's order,
10 purchase agreement, warranty contract, car
11 fax odometer disclosure, and that's it.  The
12 standard.
13   Q.   Sorry?
14   A.   The same document -- every document
15 they sign, usually we make copy of everything
16 and we give it to the customer for their
17 records.
18   Q.   So you know that those documents
19 were given because they are always given,
20 rather than you having a personal
21 recollection of them being given; is that
22 correct?
23   A.   Correct, they always given.
24   Q.   Okay.  Okay.
25   A.   To every customer.

Page 115

Yessica K. Vallejo

1
2    Q.   And they left Victory Mitsubishi
3  with the vehicle on May 30, correct?
4        MR. GOODMAN:  Object to the
5        form; go ahead.
6    A.   I can't recall, to be honest with
7  you.  But if the paperwork is dated for that
8  day, I am assuming they did.
9    Q.   So you don't know what time they
10 left Victory Mitsubishi, correct?
11   A.   No, because that sale happened
12 almost three years ago.
13       MR. GOODMAN:  "Yes," it's
14       correct you don't know?
15       THE WITNESS:  I don't
16       remember.
17       MR. GOODMAN:  Okay.
18   Q.   And this was the only time that
19 Mr. LaForest came into Victory Mitsubishi,
20 correct?
21   A.   No.
22   Q.   When else did he come into the
23 dealership?
24   A.   They came back to resign.
25   Q.   What do you mean by that, "resign"?

Page 116

Yessica K. Vallejo

1
2    A.   There was something -- I don't -- I
3  can't recollect, exactly, the reason, but
4  they came back to the dealership on the 29 of
5  June.
6    Q.   Okay.  And I know you said you
7  can't recall exactly the reason, but
8  generally, what did they come back to the
9  dealership to do?
10   A.   It could be any reason.  I just
11 don't recall exactly the reason, because they
12 had to resign.  But they did come back
13 because paperwork is dated for 6/29.  Even if
14 we got approval on 30, they came back to
15 resign on that date.
16   Q.   I see.  So because the documents
17 are dated June 29, 2020, it's your
18 understanding that they returned to the
19 dealership on that date, correct?
20   A.   Yes, that was the date we finalized
21 the paperwork.
22   Q.   So it wasn't finalized on May 30,
23 2020?
24       MR. GOODMAN:  Object to the
25       form; go ahead.



Page 117

1         Yessica K. Vallejo
2     A.  Yes, it could be that it was
3   finalized that day, but like I told you, they
4   came back to resign for a reason that I don't
5   recall exactly, but they did come back to the
6   dealership.
7     Q.  During the COVID-19 pandemic, did
8   Capital One ask you to have any consumers
9   return to the dealership to resign documents
10  for the sale of a vehicle?
11    A.  It could be.  The pandemic affected
12  a lot of things in the car business or car
13  industry, per se.  The book values were going
14  up and down, you know, sometimes the
15  structure of the deal changes, the down
16  payment, the customer probably, you know,
17  change the down payment.  That changes the
18  structure of the deal.  So it could be any
19  reason for the customer to have to come back
20  to the dealership and they resign a final
21  contract.  Which is something completely
22  normal.
23    Q.  Okay.  So you say that "could have
24  happened," but do you have any memory of
25  Capital One, specifically, telling you to do

Page 118

1         Yessica K. Vallejo
2   that during the pandemic?
3         MR. GOODMAN:  Object to the
4       form.  I lost the thread here.  Go
5       ahead, if you understand it.
6     A.  Like I said, it's something that
7   can happen not only with Capital One, with
8   any lender.  If there's any reason, even if
9   misspell on name, you have to resign a
10  contract.  So it could be anything.
11    Q.  Sure.
12    A.  Remember, these are approvals with
13  stipulations.  Lender have the final -- the
14  final say in the deals.  We were not the
15  lender.  You understand?  So we don't make
16  any calls, any judgment calls, none of that.
17  Everything we got to by what the lender says.
18    Q.  Sure.  But do you have any memory
19  of Capital One contacting you by e-mail, or
20  letter, or by phone saying, "Hey, you need
21  all of the customers who have received
22  financing through us for vehicles to come
23  back in and resign documents?"  Do you
24  remember anything like that?
25         MR. GOODMAN:  Objection to

Page 119

1         Yessica K. Vallejo
2       form; go ahead.
3     A.  No.
4     Q.  Okay.  And, generally, when a
5   consumer needs to resign documents, what
6   documents are they resigning?
7     A.  Everything.  The loan contract,
8   bill of sale, and buyer's order.
9     Q.  What about credit application?
10    A.  If there's any change on employment
11  or, the customer change their residency or
12  their phone number, then, you resign a credit
13  application.  If everything stated by
14  customer on the credit application is still
15  the same, there's no need to resign a new
16  credit application.  Sometimes if you
17  changing the date, the date of the deal
18  changes because the customer signing on a
19  different date, then, you resign a credit
20  application, but you don't make no change in
21  the credit application without the
22  customers's approval, or customer telling you
23  that there's been a change in that period of
24  time.
25    Q.  Okay.  And if a consumer told you

Page 120

1         Yessica K. Vallejo
2   that they got a raise at their job, for
3   example, would that be a reason why you would
4   fill out another credit application?
5     A.  Absolutely.  Remember, the credit
6   application is a document that the customer
7   is stating states that that's the truth, that
8   they read it and sign it.  So everything
9   written in credit application is being
10  reviewed and signed by the consumer.
11    Q.  And if documents are being resigned
12  for the sale of a vehicle, do you keep the
13  original documents?
14    A.  The original document is been
15  destroyed in front of the customer because
16  that contract is not valid no longer.  You
17  cannot have two contracts for the same sale.
18  So the last contract that the customer signs
19  is final contract.  All the other contracts
20  have been destroyed.  You can't have two
21  contract for same sale.
22    Q.  And you don't keep any copy of
23  those contracts, even with, for example, a
24  stamp that says "void" on it?
25    A.  No.



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
121–124

Page 121

1          Yessica K. Vallejo
2     Q.   Do you make any record or notation,
3  for example, in Deal Tracker, that there was
4  a resigning?
5     A.   Dealer Track has their -- it has
6  their timing, and date in there.  So I am
7  assuming you guys pulled that information
8  already.
9          MR. GOODMAN:  Don't assume.
10     Just answer the question.
11     Q.   I am not sure if the question was
12  answered.
13          MS. CATERINE:  Could you
14     read back the question?
15          (Whereupon, the requested
16     portion was read by the reporter.)
17          THE WITNESS:  That was not
18     the question.
19          MR. GOODMAN:  That was the
20     question.  Answer that question.
21          THE WITNESS:  Yes, they
22     resign.
23          MR. GOODMAN:  No, listen to
24     the question and answer the
25     question.

Page 122

1          Yessica K. Vallejo
2          THE WITNESS:  Okay, I am not
3     understanding the question.
4          MR. GOODMAN:  All right,
5     Emma, can you maybe rephrase it?
6          MS. CATERINE:  Sure.
7     Q.   So in Deal Tracker, would there be
8  anything to show that the there had been
9  documents resigned for a sale of a vehicle?
10     A.   I don't know.
11     Q.   Have you ever made a record or a
12  notation, such as in Deal Tracker, or in the
13  deal jacket, for the sale of a vehicle, that
14  there was a resigning?
15     A.   No.
16     Q.   Have you ever sold a vehicle to a
17  consumer, and then arranged financing for the
18  vehicle, after the consumer had left Victory
19  Mitsubishi with the vehicle?
20     A.   No.
21     Q.   Why not?
22          MR. GOODMAN:  Objection
23     form.
24     A.   Because you cannot leave with a car
25  that you are not approved for.

Page 123

1          Yessica K. Vallejo
2     Q.   Did you submit any new credit
3  applications for the vehicle in this case, on
4  or around June 29, 2020?
5     A.   I don't recall.
6     Q.   Emanuel LaForest testified that he
7  did not come back to the dealership on June
8  29, 2020.  Are you saying that he is lying?
9     A.   Yes, he is lying.
10     Q.   And why would he admit that he came
11  to the dealership on May 30th, admit that he
12  illegally purchased Mr. Francois' social
13  security number, but then lie about returning
14  to the dealership on June 29?
15          MR. GOODMAN:  Object to the
16     form of the question.
17     A.   I don't know.
18     Q.   You don't have any idea?
19          MR. GOODMAN:  Object to the
20     form.
21     A.   I have no type of relationship with
22  this character.  I wouldn't know.
23     Q.   Isn't the truth that no one came
24  into the dealership on June 29th, and you
25  made the signature for this allege resigning?

Page 124

1          Yessica K. Vallejo
2          MR. GOODMAN:  Object to the
3     form.
4     A.   That's absolutely not true.  There
5  was somebody there.  He was there with her,
6  or with the person that tried to imperson
7  her.  I would never put my job in jeopardy
8  because of that.  I would never sign a
9  contract for no one, absolutely no one.  I
10  came to this country ten years ago looking
11  for a better life.  I am local citizen.  I
12  pay my taxes.  I know my rights.  I know the
13  law.  I follow the law, I know what's good
14  and what was wrong.  I would never ever sign
15  a contract for no one.  Absolutely no one.  I
16  don't care if nobody advise me to do it, I
17  wouldn't do it, period.
18     Q.   And what proof do you have that
19  Mr. LaForest was in the dealership on June
20  29, 2020?
21     A.   What proof does he has that he
22  wasn't there?
23          MS. CATERINE:  Strike the
24     nonresponsive answer to the
25     question.



Page 125

Yessica K. Vallejo

1
2      Q.   What proof do you have that
3  Mr. LaForest was in the dealership on June
4  29, 2020?
5      A.   If he wasn't there, she was there,
6  or somebody trying to imperson her.  Because
7  there's paperwork signed.
8      Q.   So you don't know if he was there
9  on June 29th; is that correct?
10     A.   He drove off with the car.  So he
11  definitely -- if he wasn't there, she was
12  there.  They all -- they came together the
13  first time.  They live in the same house,
14  their license have same address, they family
15  members.
16          MS. CATERINE:  Strike the
17          nonresponsive answer to the
18          question.
19     Q.   Do you remember if Mr. LaForest
20  came to the dealership on June 29, 2020?
21          MR. GOODMAN:  Asked and
22          answered.  Object to the form; go
23          ahead.
24     A.   Him, per se, I don't remember.
25     Q.   Okay.  Do you remember Farah Jean

Page 126

Yessica K. Vallejo

1
2  Francois coming to Victory Mitsubishi in
3  September of 2020?
4      A.   September?
5      Q.   Uh-huh.
6      A.   That was after the sale.
7      Q.   Yes.
8      A.   I don't know.
9      Q.   Do you remember, in September of
10  2020, Stavros Orsaris telling you that
11  Ms. Francois had come into the dealership
12  claiming that Mr. LaForest had purchased a
13  vehicle in her name?
14     A.   I don't remember.
15     Q.   Do you remember Stavros Orsaris
16  talking to you about any consumer who had a
17  vehicle purchased in their name without their
18  authorization?
19          MR. GOODMAN:  Object to
20          form.
21     A.   No.
22     Q.   And if you had been the finance
23  manager for the transaction, why did you not
24  speak to Ms. Francois when she came in in
25  September 2020 with questions about the

Page 127

Yessica K. Vallejo

1
2  transaction?
3          MR. GOODMAN:  Object to the
4          form of the question.  That's all
5          messed up, the question.  Go ahead.
6      A.   Because Stavros is the general
7  sales manager, so he the one that handle any
8  customer issues, any complaint, or
9  whatsoever.  Remember, I work for the sales
10  department, so that's -- that's not my role.
11     Q.   Sure.  And so if a customer comes
12  to Stavros with a complaint, and Stavros
13  needs more information in order to answer the
14  customer's questions, he might ask you or the
15  sales manager involved with the sale about
16  what happened; is that correct?
17          MR. GOODMAN:  Object to
18          form.
19     A.   That is correct.
20     Q.   But you do not remember Stavros
21  asking you any questions about the sale of
22  this vehicle in September of 2020; is that
23  correct?
24     A.   That is correct, I don't recall.
25     Q.   Do you remember Mr. LaForest

Page 128

Yessica K. Vallejo

1
2  returning the vehicle to Victory Mitsubishi?
3      A.   No.
4      Q.   And who processed the unwinding of
5  the deal for this vehicle?
6          MR. GOODMAN:  Object to
7          form; go ahead.
8      A.   I don't know.
9      Q.   And I think I may have asked this
10  before, so I apologize if I did, but if a
11  deal is going to be unwound at the
12  dealership, and you were the finance manager
13  for that deal, would you be involved in the
14  process of unwinding the deal?
15          MR. GOODMAN:  Object to
16          form.
17     A.   No, that would be Stavros Orsaris.
18     Q.   Okay.  Besides Stavros Orsaris,
19  have you spoken to anyone at Victory
20  Mitsubishi about this transaction?
21     A.   No.
22     Q.   Have you spoken with David Perez
23  about this transaction?
24     A.   No.
25     Q.   Why does David Perez no longer work



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
129–132

Page 129

Yessica K. Vallejo
1
2  for Victory Mitsubishi?
3            MR. GOODMAN:  Object to the
4       form.
5       A.  I don't know.
6       Q.  What happened to the down payment
7  made by Emanuel LaForest?
8       A.  I don't know.
9       Q.  Did Victory Mitsubishi have an
10  internal investigation about this
11  transaction?
12            MR. GOODMAN:  Object to
13       form.
14       A.  You will have to ask Stavros
15  Orsaris.  That's above my pay grade.
16       Q.  But as far as you're aware, you are
17  not aware of any internal investigation about
18  this transaction at Victory Mitsubishi; is
19  that correct?
20       A.  I don't know.
21       Q.  Okay, so Ms. Vallejo -- am I saying
22  your name correctly?
23       A.  Correct, yes.
24       Q.  I studied French in high school, so
25  I always want to say two Ls, the French way,

Page 130

Yessica K. Vallejo
1
2  rather than the Spanish way.  But I am trying
3  my best.
4       A.  You said it perfectly.
5       Q.  So Chris Orsaris is a buyer at
6  Victory Mitsubishi; is that correct?
7            MR. GOODMAN:  Object to
8       form.
9       A.  To my knowledge, yes, that's what
10  he does.
11       Q.  And did he purchase the vehicle in
12  question in this case for Victory Mitsubishi?
13       A.  I don't know if it was him, per se.
14  I couldn't tell you.  I don't know.
15       Q.  Okay.  How would you describe Chris
16  Orsaris?  What is his physical appearance?
17            MR. GOODMAN:  Objection to
18       form, and time frame, but go ahead.
19       A.  He is short, a little bit of hair.
20  I mean, regular looking man.  Average man.  I
21  don't know what to say, to be honest.
22       Q.  Sure.  Is he white?
23            MR. GOODMAN:  Object to
24       form.
25       A.  Yes.  To my understanding, he

Page 131

Yessica K. Vallejo
1
2  European descent.
3       Q.  Does he have, like, a light brown,
4  caramel-colored skin?
5            MR. GOODMAN:  Object to
6       form.
7       A.  I mean, you can say he is white, I
8  guess.  He -- I don't know.  He tans all the
9  time.  I guess he is caramel, yeah.
10       Q.  Okay.
11            THE WITNESS:  Caramel.  Am I
12       caramel?  I don't know.
13            MR. GOODMAN:  I don't know.
14       Don't ask me.
15            THE WITNESS:  Sorry, I never
16       been asked to describe somebody's
17       -- I mean --
18       Q.  That's fine.  It's a bit of an
19  unusual question.
20       A.  -- somebody's physical appearance.
21       Q.  I would like you to open Exhibit
22  21, what was previously marked as Exhibit 21.
23  This is the deal jacket, Bates-stamped
24  Defendant's 1 through Defendant's 36.
25            MR. GOODMAN:  Okay, we got

Page 132

Yessica K. Vallejo
1
2  it.
3       Q.  So what is this first page
4  Bates-stamped Defendant's 1?
5       A.  This is the front of the deal
6  jacket.
7       Q.  Okay.  So the deal jacket is
8  actually a physical file; is that correct?
9       A.  It's like an envelope, yeah, where
10  you put the paperwork on.
11       Q.  Right.  And this is, like, the
12  cover of the envelope; is that accurate?
13       A.  That is correct.
14       Q.  Okay.  And who filled out -- who
15  made the handwriting on this cover of the
16  deal jacket?
17       A.  That's my handwriting and that's
18  David's in the bottom.
19       Q.  Sorry, since I don't think either
20  me or the court reporter can see exactly
21  where you are pointing, could we just go one
22  by one.  Let's start with the check mark
23  towards the top.  Is that -- was that
24  handwritten by you?
25       A.  That was me.



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
133–136

Page 133

1            Yessica K. Vallejo
2      Q.   And the number 3385, was that
3   written by you?
4      A.   That was me.
5      Q.   And the phone number starting 347,
6   was that you?
7      A.   Yeah, that was me.
8      Q.   And did you also make those
9   cross-outs on the phone number as well?
10      A.   I guess, yes, you can say that
11   because it looks like the number was wrong
12   and then I fix it.
13      Q.   Right.
14      A.   Uh-huh.
15      Q.   The sticker in the top right-hand
16   corner, did you put that onto the cover?
17      A.   No.
18      Q.   Who put that onto the cover?
19      A.   The billing department.
20      Q.   And did the billing department also
21   put on the stamp that says, "posted"?
22      A.   I don't know.
23      Q.   Okay.  And there's handwriting that
24   says -- I believe that says, "sent 7/16."
25      A.   Uh-huh.

Page 134

1            Yessica K. Vallejo
2      Q.   Who wrote that?
3            MR. GOODMAN:  You have to
4         say "yes."
5      A.   Yeah, I see it there.
6      Q.   And who wrote that?
7      A.   I don't know.
8      Q.   What does that mean, "sent 7/16"?
9      A.   I don't know.
10      Q.   Have you ever seen anything like
11   that on the cover of a deal jacket before?
12            MR. GOODMAN:  Object to the
13         form.
14      A.   Usually I don't see the deal jacket
15   after I am done with it, so no.
16      Q.   I see.  So because you don't
17   recognize it, you think it was done after you
18   had had the deal jacket; is that correct?
19      A.   That is correct.  I don't know what
20   was done and who did it -- none of that.
21      Q.   But wouldn't you see the deal
22   jacket again if there was a resigning for the
23   document?
24      A.   Maybe.  But according to what me
25   and you spoke about, the resigning was done

Page 135

1   on 6/29, and this is dated 7/16.  So this is
2   way after the resigning.
3      Q.   So you think that this -- this
4   writing here on the cover of the deal jacket
5   was made after June 29, 2020?
6            MR. GOODMAN:  Object to the
7         form.  You mean the --
8         specifically, the "sent 7/16"
9         writing?
10            MS. CATERINE:  Yes,
11         specifically, the "sent 7/16."
12            THE WITNESS:  You are going
13         based on 7/16.  What it could mean
14         to me, and anybody with a little
15         bit of common sense, July the 16th.
16         So I don't know who put it there.
17         I don't know why it's there.  I
18         don't know the meaning of it.  I
19         don't know.
20      Q.   Well, it's probably intuitive by
21   now that lawyers don't have very much common
22   sense, but --
23            MR. GOODMAN:  Hey, we agree
24         on something, Emma.  That's --

Page 136

1            Yessica K. Vallejo
2   we've reached a good point.
3            THE WITNESS:  You implying
4         that that's not something --
5            MS. CATERINE:  Sorry, that
6         was just a joke.  That was just a
7         joke.
8            THE WITNESS:  Okay, so...
9      Q.   So the handwriting that says
10   "Capital One, 9-K, $632.94," who wrote that?
11      A.   I did.
12      Q.   What does that mean?
13      A.   That means that the lender is
14   Capital One, down payment was $9,000, and the
15   estimate payment was 632.94.
16      Q.   When you say, "estimate payment,"
17   that's the monthly payment for the financing
18   for the vehicle?
19      A.   That is correct.
20      Q.   And who wrote the license plate
21   number at the bottom of this cover?
22      A.   I -- that's David handwriting.  He
23   always confirm the plate number.  He was very
24   detail oriented.  So he always confirmed that
25   the correct plate number was in the correct



YESSICA K. VALLEJO                                    November 30, 2022
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC                   137—140

Page 137
Yessica K. Vallejo
1
2    vehicle, before the customer leave in it.
3        Q.   Do you remember why you had started
4    writing another phone number, and then
5    crossed it out, and wrote the 347 phone
6    number?
7        A.   I didn't start writing another
8    phone number.  You can see in there very
9    clear that it's 347, and it was -- it's -- I
10   made a mistake, probably.  It was 909, but
11   then I confirmed with the customer -- and I
12   must have confirmed with the customer that it
13   was (347) 995-6054.
14       Q.   Okay, but do you see that it looks
15   like you had started writing 9-1, before the
16   347?
17       A.   It was honest mistake.  It must
18   have been -- if you notice, if you can tell,
19   what I am doing there is confirming the phone
20   number for the customer.  If you see on the
21   sticker it says (347) 995-5054.  Usually,
22   what I do is, I ask the customer once again,
23   "what's your cell phone number?"  To confirm
24   and write it down in front of the folder
25   because we human, we can make mistakes.  But

Page 138
Yessica K. Vallejo
1
2    I want to make sure we have a correct contact
3    number for the customer, just in case we need
4    anything.
5        Q.   Okay.  Can you turn to the next
6    page, please.  What is this document?
7        A.   It's a credit application.
8        Q.   And is this the standard credit
9    application of Victory Mitsubishi?
10           MR. GOODMAN:  Object to
11       form.
12       A.   Yes, ma'am.
13       Q.   And it says, "Victory Auto Group"
14   at the top there.  Do you know why it says
15   Victory Auto Group?
16       A.   No.
17       Q.   And the handwriting at the top that
18   says "10,000 down," do you know who wrote
19   that?
20       A.   David.
21       Q.   Okay.  And that refers to the down
22   payment, correct?
23       A.   That is correct.
24       Q.   Why would he have written 10,000,
25   when you wrote 9,000 on the deal jacket

Page 139
Yessica K. Vallejo
1
2    cover?
3        A.   Because $10,000 was probably what
4    the customer said initially that they were
5    going to put down, and then they change their
6    mind to 9,000.
7        Q.   Got you.  So this would have just
8    been a record of what the customer had said
9    to him, rather than any money actually handed
10   over; is that correct?
11       A.   That is correct.
12       Q.   Okay.  And what does the "zero,
13   slash, zero" mean?
14       A.   Zero, slash, zero, credit score.
15       Q.   And the 3385 written in blue ink,
16   who wrote that?
17       A.   Me.
18       Q.   And how do you know that was you;
19   is it because of your handwriting?
20       A.   Because, yeah, that's my
21   handwriting.  That's stock number.
22       Q.   You always wrote the stock number
23   for the car on the credit application?
24       A.   Yes, on top because I have to make
25   sure I am working on correct vehicle.  So I

Page 140
Yessica K. Vallejo
1
2    always write the stock number.
3        Q.   And further down under "employment
4    information" for the co-applicant, there's a
5    check mark written in blue ink.  Do you see
6    that?
7        A.   Uh-huh.
8            MR. GOODMAN:  You have to
9        say "yes."
10           THE WITNESS:  Yes.  Sorry,
11       sorry, yes.
12       Q.   Did you write that as well?
13       A.   I don't know.  It's a check mark.
14   It's...I -- I -- I -- I don't know.  I can't
15   tell you "yes" or "no."  I don't know.
16       Q.   Because this was over two years
17   ago, it's hard to remember, correct?
18           MR. GOODMAN:  Object to the
19       form.
20       A.   I don't know what you are trying to
21   imply by that, but some things are hard to
22   remember.
23           MS. CATERINE:  I do see that
24       it is about three o'clock, so you
25       want to take the break now?



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
141–144

Page 141

1          Yessica K. Vallejo
2          MR. GOODMAN:  We will take a
3    break.  We will try to keep it
4    twenty minutes.
5          THE WITNESS:  Maybe less,
6    maybe less.
7          MS. CATERINE:  Take your
8    time.
9          (Whereupon, a recess was
10         taken at this time.)
11   BY MS. CATERINE:
12         Q.   Could you open what was previously
13   marked as Exhibit 23, Bates-stamped
14   Defendant's 85 through 92.
15         MR. GOODMAN:  What's the --
16         what is it, Emma?
17         MS. CATERINE:  It's the
18         screens -- screenshots and the
19         credit application form.
20         MR. GOODMAN:  Got it.  There
21         you go.  Okay, we're ready.  Okay.
22         I don't know if you want to give
23         the witness time to look at it.
24         Q.   Could you turn to Defendant's 92,
25   please, which is the last page?  And what is

Page 142

1          Yessica K. Vallejo
2    that document?
3          MR. GOODMAN:  Object to
4          form; go ahead.
5          A.   That's a picture of the Deal
6    Tracker screen.
7          Q.   Okay, what is this screen for?
8          A.   It's the screen that you use to
9    pull credit.
10         Q.   Okay.  And this is the same screen
11   that everyone at Victory Mitsubishi would use
12   to pull a credit report; is that correct?
13         A.   That is correct.
14         MR. KESHAVARZ:  What's the
15         Bates stamp number for the page?
16         MS. CATERINE:  92.
17         MR. KESHAVARZ:  Thank you.
18         Sorry.
19         MS. CATERINE:  Sorry, is
20         that audio being picked up in the
21         background?
22         MR. GOODMAN:  I heard
23         something.  I don't know what it
24         was.
25         MS. CATERINE:  Sorry, one

Page 143

1          Yessica K. Vallejo
2    second.
3          (Whereupon, a recess was
4          taken at this time.)
5    BY MS. CATERINE:
6          Q.   Defendant's 92, you would fill in
7    this form with the information from the
8    credit application; is that correct?
9          A.   That is correct.
10         Q.   And if you had a credit application
11   like the one we were just looking at with two
12   people, with applicant and co-applicant, you
13   would pull both of their credit reports; is
14   that correct?
15         A.   If the customer request to, yes.
16         Q.   Okay.  Would there ever be a
17   co-applicant where the co-applicant credit
18   report would not be pulled?
19         MR. GOODMAN:  Object to
20         form; go ahead.
21         A.   It could be.  If at the time of
22   pulling the credit or submitting to the bank,
23   if the customer says, "I want to do the loan
24   under my name alone, just submit under my
25   name," then, we do it that way.

Page 144

1          Yessica K. Vallejo
2          Q.   Okay.  And the section at the
3    bottom where there's a check box and it says,
4    "I have customer permission to pull a credit
5    report," and so on, do you see that?
6          A.   I see that.
7          Q.   Why does this form have that check
8    box?
9          MR. GOODMAN:  Object to
10         form.
11         A.   It's a reminder that before you
12   pull credit, you need to have handwritten
13   credit application signed and dated by the
14   customer.  There's no reason to pull credit,
15   if we don't have what -- we will never pull
16   credit it, if we don't have that.
17         Q.   So when you log in to Deal Tracker
18   to process a credit application, how would
19   you get to this form?  Is there, like, a
20   button you push, or how do you get to it?
21         A.   Remember, I don't pull credit, if
22   it's not necessary.  This is done previous
23   the deal going into my office.  So this is
24   done by the sales managers before.  So on
25   Deal Tracker it says, "pull credit," and then



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
145–148

Page 145

Yessica K. Vallejo

1      you click on it, you get to here.  But this
2      is not before my time with the deal.  This is
3      done previous.  When the customer is in my
4      office, all this process is already done.
5          Q.   Right.  And so if I understand you
6      correctly, if you look into Deal Tracker, as
7      soon as you log in, there's a screen where
8      there's an option to go to this form to pull
9      someone's credit report; is that correct?
10         A.   It is an option, yes.
11         Q.   Okay.  Let's take a look at what
12     was previously marked as Exhibit 26,
13     Bates-stamped subpoena responses 557, single
14     page.
15             MR. GOODMAN:  Okay.
16             MS. CATERINE:  It's the Deal
17         Tracker page for Emanuel LaForest.
18             MR. GOODMAN:  Okay, I got
19         it.  You got it?
20             THE WITNESS:  That's what it
21         is?
22             MR. GOODMAN:  You don't have
23         that over there.
24             THE WITNESS:  I don't think

Page 146

Yessica K. Vallejo

1      so.
2              MR. GOODMAN:  Just use that.
3          That's fine.  Use the one -- use
4          that one.
5              THE WITNESS:  Okay.
6          Q.   Okay.  What is this document?
7              MR. GOODMAN:  Object to the
8          form.
9          A.   I don't know.  This is not a
10     document that I ca familiar with.
11         Q.   So prior to your deposition today,
12     have you ever seen a document like this one,
13     even if it wasn't for Emanuel LaForest, and
14     for a different customer, for example?
15         A.   No.
16         Q.   Sorry, to clarify, you haven't seen
17     a document like this before; is that correct?
18         A.   That is correct.
19         Q.   Okay.  Were you aware Deal Tracker
20     was tracking the times that Victory
21     Mitsubishi employees logged into Deal Tracker
22     and pulled credit?
23         A.   Yeah, everything is timestamp.
24         Q.   And are you able to see those

Page 147

Yessica K. Vallejo

1      timestamps on your end of Deal Tracker?
2          A.   No.
3          Q.   But you are aware there were
4      timestamps being made; is that correct?
5              MR. GOODMAN:  Object to
6          form.
7          A.   Correct.
8          Q.   Is Stavros Orsaris able to see the
9      timestamps?
10             MR. GOODMAN:  Objection to
11         form.
12         A.   I don't know.
13         Q.   How did you know that they were
14     timestamped?
15         A.   Everything has the time and the
16     date when you print paperwork.
17         Q.   I see.
18         A.   If it doesn't have the time, it has
19     the date.
20         Q.   So if you pulled a credit report,
21     for example, it would have the date and time;
22     is that correct?
23             MR. GOODMAN:  Object to the
24         form; go ahead.

Page 148

Yessica K. Vallejo

1          A.   I believe so.
2          Q.   And has there ever been a time that
3      you have printed a document from Deal
4      Tracker, and the timestamp on the document
5      did not appear to be accurate?
6              MR. GOODMAN:  Objection;
7          form.
8          A.   I can't answer that question
9      because I never had to go back and check date
10     and time for any customer in the past,
11     almost, eleven, seven years that I have been
12     working at Victory Mitsubishi.
13         Q.   Okay, but you have printed
14     documents from Deal Tracker, correct?
15         A.   Yes.
16         Q.   And you have noticed that there's a
17     timestamp on those documents, correct?
18         A.   Yes.
19         Q.   And of those times where you saw
20     the timestamp on the printed documents, did
21     it ever appear to be inaccurate?
22         A.   I don't recall.
23         Q.   Okay.
24         A.   I don't recall none of that



Page 149

Yessica K. Vallejo

1  situation happening to me ever.
2  Q.  And on this page, at the bottom,
3  you will see the first entry here from the
4  bottom says, "4:38 p.m., deal jacket created,
5  D. Perez."  What is your understanding of
6  that entry?
7  A.  It's a chronological event.  You
8  can read it here.  The whole-- was complete,
9  ID verification was complete, Credit Bureau
10  report was completed.  We got authorization
11  from the customer.  Then, we pulled the
12  credit.  Then, the deal jacket was created.
13  Q.  You see how the deal jacket is
14  timestamped 4:38 p.m., and the Credit Bureau
15  pull is timestamped 4:39 p.m.?
16  A.  I see that.
17  Q.  So based on that, does it appear
18  this is in reverse chronological order,
19  starting from the bottom?
20  MR. GOODMAN:  Object to
21  form.
22  A.  You have to create a dealer jack-
23  -- the dealer jacket, in order for you to
24  work the deal, though.  So this is accurate.

Page 150

Yessica K. Vallejo

1  He created the deal jacket, and then he got
2  the authorization.  He pulled the bureau --
3  the authorization to pull the bureau is the
4  handwriting app that we have here in the
5  paperwork, signed and dated by the customer.
6  Q.  So you're referring to the
7  application that we just looked at, correct?
8  A.  Yes, you can see here that she
9  signed -- that he signed the credit
10  application.  That's the reason.  Because we
11  pull credit because we have authorization.
12  Q.  Okay.  So why on the screen does it
13  only show Emanuel LaForest, and doesn't list
14  any co-applicant?  The "co-applicant" is
15  blank.
16  MR. GOODMAN:  Object to
17  form.
18  A.  You cannot -- you cannot pull two
19  people credit at the same time, though.  It's
20  impossible.  You have to go one person,
21  first, and then the second one.
22  Q.  Why is there a "co-applicant" field
23  there?
24  A.  I don't know.

Page 151

Yessica K. Vallejo

1  MR. GOODMAN:  Let me see
2  that.
3  Q.  Do you see where that is below
4  Emanuel LaForest?
5  A.  No.
6  MR. GOODMAN:  Well, hold on.
7  I have the document.  We only have
8  one copy.  And I am looking at it
9  now, so it's not in front of the
10  witness.
11  MS. CATERINE:  Sure, that's
12  fine.  Take your time.
13  MR. GOODMAN:  Okay, here.
14  Do you understand?  Is there
15  a question pending?
16  Q.  My question is:  Do you see the
17  co-applicant field below Emanuel LaForest on
18  this page?
19  A.  I see that it says, "co-applicant,"
20  yes.
21  Q.  Okay.  And you don't know why that
22  field is there?
23  MR. GOODMAN:  Object to
24  form.

Page 152

Yessica K. Vallejo

1  A.  No, I don't know.
2  Q.  Do you know why the Credit Bureau
3  "pulled" entry is below the Credit Bureau
4  "authorization received" entry?
5  A.  Below?
6  Q.  Yes, in the order that the entries
7  are in on the document.
8  MR. KESHAVARZ:  Sorry,
9  what's the Bates number?
10  A.  I don't know --
11  MS. CATERINE:  Subpoena
12  responses 557.
13  MR. KESHAVARZ:  Thank you.
14  Q.  Apologies, what was your answer?
15  A.  I don't know.
16  Q.  Okay.  And "D. Perez" refers to
17  David Perez, correct?
18  MR. GOODMAN:  Object to
19  form.
20  A.  That is correct.
21  Q.  And there should be a screen like
22  this for every customer where there's a deal
23  jacket; is that correct?
24  MR. GOODMAN:  Object to the



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
153–156

Page 153

Yessica K. Vallejo
1        Yessica K. Vallejo
2    form of the question.
3    A.   I am assuming, yes.  If you run
4    somebody's credit, if you have -- if the
5    customer is there with the purpose of buying
6    a car, you have authorization to run your
7    credit, you going to be able to do all these
8    things, which is the all fact check, the ID
9    verification, Credit Bureau pull.  This form
10   is very clear; it's showing the process.
11         MR. GOODMAN:  Just answer
12       the question.
13   Q.   And Dealer Track didn't produce a
14   form like this for Farah Jean Francois.  Do
15   you have any idea why there wouldn't be a
16   form like this for Farah Jean Francois?
17         MR. GOODMAN:  Object to the
18       form.
19   A.   I don't know.  I don't work for
20   Deal Tracker.
21   Q.   And on here it says, "June 20,
22   2020, adverse action recommended."  Why did
23   it take so long for an adverse action to be
24   recommended for Mr. LaForest?
25         MR. GOODMAN:  Object to the

Page 154

Yessica K. Vallejo
1        Yessica K. Vallejo
2    form.
3    A.   I don't know.
4    Q.   But I believe you previously
5    testified, correct me if I am wrong, that
6    there was handwriting by David Perez on the
7    credit application showing that Mr. LaForest
8    had no credit history; is that correct?
9    A.   What I told you before was that he
10   had handwrite on the credit application that
11   he had zero credit score, which you can see
12   on the Defendant's Number 2, he wrote a zero,
13   zero credit score.
14   Q.   Okay.  And the zero, slash, zero,
15   is that referring to the credit scores for
16   two different credit bureaus?
17   A.   I don't know if it's referring for
18   two different credit bureaus.  To my
19   understanding, is basically that the customer
20   has zero credit score.
21   Q.   Well, let's say, if the customer
22   doesn't have a zero credit score, would he
23   write in the credit score, like, say, 700,
24   slash, 750?
25   A.   It could be.  It could be that he

Page 155

Yessica K. Vallejo
1        Yessica K. Vallejo
2    was using Experian and TransUnion scores.
3    Q.   Okay.
4    A.   It could be he was using that.
5    Q.   And when Mr. Perez makes
6    handwritten notes like that, that's to show
7    you that the applicant -- showing you what
8    the applicant credit score is; is that
9    correct?
10         MR. GOODMAN:  Object to
11       form.
12   A.   No, that's not correct.
13   Q.   Okay, what --
14   A.   He could be writing those notes for
15   himself.
16   Q.   So he just writes in those notes
17   for himself, it's not to communicate it to
18   anyone else?
19   A.   I don't know.  You will have to ask
20   David Perez.
21   Q.   Mr. LaForest had Victory Mitsubishi
22   run the credit of a woman named Jaime Singer,
23   correct?
24         MR. GOODMAN:  Object to
25       form.

Page 156

Yessica K. Vallejo
1        Yessica K. Vallejo
2    A.   You implying that or you asking me?
3    Q.   I am asking you.
4    A.   I don't know.
5    Q.   Okay.  If you could take a look at
6    Exhibit 27, what's previously marked as
7    Exhibit 27, Bates-stamped subpoena responses
8    566, it's a single page, similar to the page
9    where we were just looking at, but for Jaime
10   Singer.
11   A.   I don't think I have that.
12         MR. GOODMAN:  Yeah, let me
13       get it.
14   A.   I have the page.
15   Q.   Okay.  And this document indicates
16   that you created the deal jacket for
17   Ms. Singer, correct?
18   A.   That is correct.
19   Q.   And it indicates that you pulled
20   the credit report for Ms. Singer, correct?
21   A.   That is correct.
22   Q.   Why did you pull Ms. Singer's
23   credit report?
24         MR. GOODMAN:  Object to
25       form; go ahead.



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
157–160

Page 157

Yessica K. Vallejo

1     A.   I am assuming Ms. Singer was a
2  customer that had a credit application signed
3  and date, and she gave me authorization to
4  pull her credit.  She was in pursuit of
5  buying automobile.
6     Q.   Why did you do this one, rather
7  than David Perez doing it?
8     A.   David Perez was probably busy and
9  they gave me the file to run the credit.
10     Q.   Are you aware that Emanuel LaForest
11  texted Stavros Orsaris the driver's license
12  and social security for Jaime Singer?
13          MR. GOODMAN:  Object to the
14          form.
15     A.   No.
16     Q.   Take a look at what was previously
17  marked as Exhibit 25, Bates-stamped
18  Defendant's 70 through 72.
19          MR. GOODMAN:  Is that your
20          son?  Let's take a break.  She
21          needs to communicate --
22          MS. CATERINE:  How long do
23          you want?
24          MR. GOODMAN:  Just a couple

Page 158

Yessica K. Vallejo

1          --
2          THE WITNESS:  Five minutes.
3          (Whereupon, a recess was
4          taken at this time.)
5  BY MS. CATERINE:
6     Q.   And you have Exhibit 25 in front of
7  you now, correct?
8     A.   I don't know if this is...
9     Q.   Defendant's -- the text messages.
10          MR. GOODMAN:  Yes.
11     A.   There's some -- yes, text messages.
12          MR. GOODMAN:  What's the
13          number at the bottom?  It's hard to
14          read on that one.
15          MS. CATERINE:  It's a bit
16          hard to read.  It should say
17          Defendant's 70 through --
18          THE WITNESS:  Yes, yes,
19          that's what it is.
20     Q.   Okay, great.  Prior to your
21  preparation for this deposition today, had
22  you ever seen this document?
23     A.   No.
24     Q.   Do you know why Emanuel LaForest

Page 159

Yessica K. Vallejo

1  texts this driver's license and social
2  security to Stavros Orsaris?
3     A.   No.
4     Q.   Ms. Singer represented to us that
5  she had given Emanuel LaForest permission on
6  May 30, 2020, to run her credit, although she
7  had not been at the dealership herself.  Do
8  you remember Emanuel LaForest asking you to
9  run Jamie Singer's credit?
10          MR. GOODMAN:  Object to
11          form.
12     A.   No.
13     Q.   You understand that you have been
14  sued as an individual in this lawsuit?
15     A.   I understand.
16     Q.   Do you understand that if these
17  allegations are proven, that a judgment could
18  be attained against you, individually?
19          MR. GOODMAN:  Object to the
20          form.
21     A.   I understand very clearly what we
22  doing here, ma'am.  Also, I understand that
23  not because your client is implying all these
24  things, that means that they are truth.

Page 160

Yessica K. Vallejo

1     Q.   Well, right now we have this
2  document showing that you pulled Ms. Singer's
3  credit report and --
4     A.   That's correct.
5          MR. GOODMAN:  Let her
6          finish.
7     Q.   And Ms. Singer says that she was
8  not there at the dealership that day.  So do
9  you pull credit reports for customers who are
10  not present at the dealership?
11          MR. GOODMAN:  Object to
12          form.
13     A.   If I pull Ms. Singer's credit,
14  which clearly you can see here on May 30 I
15  did, it was because I had handwritten credit
16  application that was given to me and her ID
17  to pull her credit.  Not because I
18  deliberately just pull her credit because I
19  wanted to pull her credit.
20     Q.   Okay.  And so you may not have seen
21  Jamie Singer yourself, you may have just had
22  an application for her and a copy of her
23  driver's license; is that correct?
24          MR. GOODMAN:  Object to the



Page 161

1          Yessica K. Vallejo
2    form.
3         A.  That is correct.  And if I had her
4    ID and her credit application signed, then, I
5    pull her credit.
6         Q.  Okay.  Does anyone else have access
7    to your login information for Deal Tracker?
8         A.  Not to my login, per se, but my
9    computer is there, and -- and my office is
10   there.  So I am login all day long.  As soon
11   as I get to work, until, you know, nighttime,
12   when I usually leave.
13        Q.  Does Stavros Orsaris have the login
14   information for you for Deal Tracker?
15             MR. GOODMAN:  Object to the
16        form.
17        A.  No.  You need a login and password,
18   and I don't share my password with no one.
19        Q.  So if a Deal Tracker document says
20   that you pulled someone's credit report, such
21   as this one, saying that you pulled Jaime
22   Singer's credit report, you could be sure
23   that it was you who pulled her credit report;
24   is that correct?
25             MR. GOODMAN:  Object to

Page 162

1          Yessica K. Vallejo
2    form.
3         A.  I don't know.  But once again, if I
4    pulled her credit report, it's because I got
5    a credit application and an ID from this
6    customer.  Because I would not, under any
7    reason or circumstance, pull no credit for no
8    one without their permission.
9         Q.  Well, you say "if," but if no one
10   else has your login information, why would
11   this document show that you pulled
12   Ms. Singer's credit report, other than if you
13   had, in fact, pulled her credit report?
14             MR. GOODMAN:  She is not
15        saying she didn't.
16        A.  I am not saying she didn't.
17             MS. CATERINE:  Please, don't
18        -- please.  We've been over the
19        speaking objections.
20             MR. GOODMAN:  Yeah, and we
21        have also --
22             MS. CATERINE:  Read back the
23        question.
24             THE WITNESS:  Okay, so let's
25        go back.

Page 163

1          Yessica K. Vallejo
2             MS. CATERINE:  Can you read
3        back the question, Court Reporter?
4             (Whereupon, the requested
5        portion was read by the reporter.)
6             MR. GOODMAN:  Objection,
7        form.  You can answer.
8         A.  You can say that I did, based on
9    this document, pull her credit report, but I
10   am telling you that if I pulled her credit
11   report, it's because I had handwritten credit
12   app, an ID to, in fact, do that.  I do not,
13   under no circumstance, pull credit reports
14   for random customer, for random people, with
15   no authorization.  Do you understand?
16        Q.  Let's try rephrasing the question.
17             Why would this document say that
18   you pulled Ms. Singer's credit report?
19             MR. GOODMAN:  That's the
20        question -- objection to the form.
21        A.  The document will say that I pulled
22   Jaime Singer's credit report because I had in
23   my hand a handwritten credit application with
24   an ID from Jaime Singer, and she was at the
25   dealership, willingly, to purchase an

Page 164

1          Yessica K. Vallejo
2    automobile.  Am I clear?
3         Q.  So you pulled Jamie Singer's credit
4    report, correct?
5         A.  It was pulled after getting a
6    signed credit application and ID from the
7    customer.  It was not pulled willingly.  It
8    was pulled under her authorization, once
9    again.
10        Q.  "Yes" or "no," did you pull Jamie
11   Singer's credit report?
12        A.  Yes.  Yes, ma'am.  Yes, ma'am.  It
13   was pulled.  If it says it was under my
14   login, it was pulled, and that means that she
15   was there, she signed, and gave her ID for us
16   to do it.
17        Q.  Okay, please let me finish the
18   question.  Did you pull Ms. Singer's credit
19   report on May 30, 2020 -- "yes" or "no"?
20        A.  Ma'am, you asking the same question
21   repeatedly.  You harassing me right now.  You
22   know that, right?  You asking me the same
23   question more than once, and I am giving you
24   answer.  I am giving you an answer more than
25   once.  I gave you an answer, and you keep



YESSICA K. VALLEJO                                              November 30, 2022
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC                        165–168

Page 165

1          Yessica K. Vallejo
2   harassing me.
3      Q.   "Yes" or "no"?
4          MR. GOODMAN:  You know,
5      Emma, at this point we are reaching
6      the point that it does fall under
7      30-D-3 harassment.
8          MS. CATERINE:  You want me
9      to get the judge on the phone?
10         THE WITNESS:  Why are you
11     harassing me?
12         MR. GOODMAN:  No, if it
13     continues, I will just terminate,
14     and we will make our motion as
15     allowed under federal rules.
16         MS. CATERINE:  I haven't
17     received --
18         THE WITNESS:  You will not
19     make me change what I tell you.  I
20     am telling my answer.  That's the
21     same answer.  If you ask fifty
22     times, I am going to give you the
23     same answer, ma'am.
24         MS. CATERINE:  Can you
25     please instruct your client to

Page 166

1          Yessica K. Vallejo
2      allow me to speak?
3          THE WITNESS:  You are
4      harassing me.  Who's going to
5      instruct you to stop harassing me?
6      It's harassment.
7          MR. GOODMAN:  Okay, let's go
8      forward.  She has answered "yes," I
9      don't know how many times.  You
10     have exhausted that area.  Can we
11     please move ahead?
12         MS. CATERINE:  Court
13     Reporter, do you have -- do we have
14     an answer of "yes" on the record?
15         (Whereupon, the requested
16     portion was read by the reporter.)
17         MS. CATERINE:  I apologize.
18     I didn't think the question had
19     been finished.
20     Q.   Okay.  And you said that
21  Mr. LaForest and a woman, who at the very
22  least was claiming to be Ms. Francois, were
23  in your office on May 30, 2020, correct?
24         MR. GOODMAN:  Objection,
25     form.

Page 167

1          Yessica K. Vallejo
2          THE WITNESS:  Do you know
3      for a fact that that person wasn't
4      Ms. Francois?
5          MR. GOODMAN:  No, just
6      answer the question.  Listen to the
7      question, answer the question.
8          THE WITNESS:  There was a
9      woman in my office.  I can't tell
10     you if it was her or not.
11         MR. GOODMAN:  That's not the
12     question.
13     Q.   I am not asking you that.
14     A.   Oh.
15         MR. GOODMAN:  Listen to the
16     question and answer the question.
17     A.   Okay, go ahead.
18     Q.   So on May 30, 2020, Mr. LaForest
19  and a woman were in your office together,
20  correct?
21     A.   That is correct.
22     Q.   Let's take a look at what was
23  previously marked Exhibit 29, subpoena
24  responses 515 to 553, please.
25         MR. GOODMAN:  Give me a

Page 168

1          Yessica K. Vallejo
2      minute.
3          MS. CATERINE:  Sure.
4          MR. GOODMAN:  It's this
5      stack over here.  It looks like
6      this.
7          MS. CATERINE:  It's also
8      Bates-stamped DTI 7 through DTI 45.
9      Just look at what you are
10     holding up on the screen.  I think
11     that's it.  It looks like it.
12         MR. GOODMAN:  What's the
13     last Bates stamp number?
14         MS. CATERINE:  The last
15     Bates stamp number, subpoena
16     response 553.
17         MR. GOODMAN:  Okay, we have
18     it.
19         MS. CATERINE:  Okay, great.
20     Q.   So take your time to review the
21  document as much as you would like.  What are
22  these pages of the document?
23         MR. GOODMAN:  Object to the
24     form, but take your time and look
25     at it.  When you are ready, we will



Page 169

1          Yessica K. Vallejo
2     go ahead.
3        A.  This is an approval sheet from the
4     bank.  The first page, of course.  I don't
5     know the rest of the pages.
6        Q.  Sure, just take your time to review
7     the pages.
8          MR. GOODMAN:  Go ahead and
9          look through the whole thing.
10       A.  This is the same page over and over
11    for Capital One.  As per, Chase, it's a
12    decline notice.  Lloyds Bank, decline.  TD,
13    decline notice.  Ally, decline notice.  And
14    then from Capital One, it's a conditional
15    approval, and all the time there's update on
16    the numbers, they refresh the approval, and
17    it looks like they giving you new approval,
18    but it's just update on it.
19       Q.  Okay.  Let's go back to the first
20    page of the document, Bates-stamped subpoena
21    responses 515.
22       A.  Uh-huh.  Okay, I am here.
23       Q.  This would have been a deal -- this
24    approved deal was a response to an
25    application for financing submitted by you

Page 170

1          Yessica K. Vallejo
2     for Farah Jean Francois, correct?
3        A.  Correct.
4        Q.  And if Mr. LaForest and
5     Ms. Francois filled out a credit application
6     together, why weren't applications for
7     financing made in both of their names?
8        A.  It could have been that Ms.
9     Francois requested to do the loan under her
10    name alone.
11       Q.  Okay.  Would there have been -- is
12    there any other reason why you think that
13    would have happened?
14          MR. GOODMAN:  Object to the
15          form.
16       A.  No.
17       Q.  Could you turn to subpoena
18    responses 519, please?
19       A.  Okay.
20       Q.  And this credit denial was a
21    response to an application for financing
22    submitted by you in Ms. Francois' name,
23    correct?
24       A.  Correct.
25       Q.  And how do you know that?

Page 171

1          Yessica K. Vallejo
2        A.  What you mean?  I am looking at it,
3     so do you.
4        Q.  Is there something on the document
5     that shows that you were the one who
6     submitted the credit application?
7        A.  You telling me that you pulled this
8     from Dealer Track, and these are applications
9     that I submitted.  That's what you telling me
10    right now.
11       Q.  Well, I -- I did not mean to tell
12    you that.  I am genuinely asking you, is this
13    something -- is this in response to something
14    you submitted in Ms. Francois' name?
15          MR. GOODMAN:  Object to the
16          form.
17       A.  This is a decline form from a deal
18    that was omitted after this customer came to
19    the dealership and gave her credit
20    application, signed, date, and her ID, to
21    apply for credit, and if you see on the top,
22    it says, "decline by the lender."
23       Q.  Uh-huh.
24       A.  I am assuming all these papers that
25    you gave me are me working the deal.  I

Page 172

1          Yessica K. Vallejo
2     thought you already knew that I was the one
3     that submitted it.
4          MR. GOODMAN:  Okay, her
5          question is, is there anything on
6          this page that shows that it's you
7          that did this?
8          THE WITNESS:  No, it doesn't
9          have my name on it.
10       Q.  Would there be any other document
11    that would show that you were the one who was
12    working the deal?
13       A.  No.
14       Q.  Okay.  But if your name appears,
15    for example, on the retail installment sales
16    contract, could it be assumed that you were
17    the one who was working the deal?
18          MR. GOODMAN:  Object to
19          form.
20       A.  That is correct.
21       Q.  And would there ever be a situation
22    where your name would be on the buyer's order
23    and the sales contract, but another finance
24    manager had been the one submitting the
25    credit applications?



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
173–176

Page 173

Yessica K. Vallejo

1
2    A.   It could be.  It happens sometime
3    if the finance is -- is not there, and I have
4    to finalize for him, I will be the one
5    signing the contract, even if he was the one
6    that submit the deal.  Remember, we are a
7    team with five people, so we work together.
8        Q.   Okay.  And other than the retail
9    installment sales contract, and the buyer's
10   order, would there be any other way to
11   determine who submitted the credit
12   applications?
13       A.   No, the only way is Deal Tracker
14   showing you under whose login was the credit
15   app submitted.
16       Q.   Can you turn to page subpoena
17   response 521, please?
18       A.   Okay.
19       Q.   And under the "reasons" for this
20   credit denial, do you see where it says, "too
21   many inquiries last twelve months"?
22       A.   I see it.
23       Q.   And what do you understand that to
24   mean?
25           MR. GOODMAN:  Objection to

Page 174

Yessica K. Vallejo

1
2    form; go ahead.
3        A.   Too many inquiries last twelve
4    months.
5        Q.   What does "inquiries" mean?
6        A.   That's the times you run your
7    credit.
8        Q.   Okay.
9        A.   It shows in your credit report.
10       Q.   So a consumer can have credit
11   denied based on the number of inquiries on
12   their credit report; is that correct?
13           MR. GOODMAN:  Objection to
14       the form of that question.
15       A.   I am not a credit lender.  I do not
16   provide credit.  I cannot answer that
17   question.
18       Q.   But you have seen denials such as
19   this one, which lists number of inquiries
20   under reasons for the denial; is that
21   correct?
22           MR. GOODMAN:  Objection to
23       the form.
24       A.   I am not a credit lender.  I cannot
25   answer that question.

Page 175

Yessica K. Vallejo

1
2        Q.   You can't answer what you have seen
3    in credit denials?
4        A.   I don't know.  I am not a credit
5    lender.  I don't know the reasons because
6    they deny customers.  It's -- it's -- shows
7    there four reasons, and you asking me about
8    one of them.  I am not credit lender.  I
9    don't know the factors that affect this
10   credit decision, because I am not a lender.
11   You understand?  I mean, I cannot tell you,
12   even if I want to.  I don't know.
13       Q.   Sure.  But have you seen this
14   reason, "too many inquiries last twelve
15   months"?  Have you ever seen it on a credit
16   denial, beside this one?
17       A.   I don't recall.
18       Q.   You don't remember any other
19   instance where one of the reasons was "too
20   many inquiries in the last twelve months"?
21           MR. GOODMAN:  Objection,
22       form.
23       A.   No, you have other declines here
24   for her and none of them say that.  That
25   might be something particularly for this

Page 176

Yessica K. Vallejo

1
2    lender.  I mean, it doesn't mean that every
3    lender uses that reason.  I wouldn't be able
4    to tell you because I am not a credit lender.
5        Q.   When you receive credit denials, do
6    you ever explain to the consumer the reasons
7    listed for why they were denied?
8        A.   Of course.  I give them the paper,
9    this paper.  They can read it, and also they
10   get a letter from the lender explaining the
11   same thing.
12       Q.   So you would have given them -- you
13   would have given Farah Jean Francois this
14   example, all --
15       A.   I would have showed her, of course.
16           MR. GOODMAN:  Let her finish
17       the question.
18           THE WITNESS:  Oh.
19       Q.   You would have given Farah Jean
20   Francois all of the pages of the document
21   that we're currently looking at; is that
22   correct?
23       A.   I would have showed her the
24   reasons, because we have denials with other
25   lenders, you know, and what is the reason,



YESSICA K. VALLEJO                                November 30, 2022
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC           177—180

Page 177
1              Yessica K. Vallejo
2   because we going through the lender that we
3   went through.
4        Q.   Sure.  So would you just have,
5   like, showed her on your computer screen, you
6   know, like turned the computer screen so she
7   can see --
8        A.   Probably.
9        Q.   -- or just read it to her, read
10  what it says?
11       A.   Probably, yes.
12       Q.   Okay.
13       A.   Most customer want to know, you
14  understand, and they entitle to.
15       Q.   Yeah, of course.  And so at some
16  point you explained to consumer that a reason
17  for the credit denial was too many inquiries
18  last twelve months; is that correct?
19            MR. GOODMAN:  Objection,
20         form.
21       A.   The customer got a letter from this
22  lender to her house explaining the reasons of
23  the decline.  Every lender, they send a
24  letter to the customer.  But I probably did
25  show her the reasons because she got

Page 178
1              Yessica K. Vallejo
2   declined, if she asked me to, you know, I
3   would have explained, "the lender, the one
4   that is" -- "is giving us best approval, best
5   rate, is Capital One.  So take into
6   consideration going through this lender," so
7   on and so forth.
8        Q.   If you can turn to the page
9   Bates-stamped subpoena responses 522.
10       A.   Okay, we're here.
11       Q.   And under the reasons for this one,
12  there's something referenced "called
13  SageStream."  What is "SageStream"?
14       A.   I don't know.
15       Q.   Okay.  And you can see under the
16  "comments," there's a timestamp there of "May
17  30, 2020, 5:12 p.m."  Do you have any reason
18  to believe that that timestamp is inaccurate?
19            MR. GOODMAN:  Object to
20         form.
21       A.   I don't know.
22       Q.   Sorry, "yes" or "no," do you have
23  any reason to believe that the timestamp here
24  is inaccurate?
25       A.   I don't know if it's accurate or

Page 179
1              Yessica K. Vallejo
2   not.  I can't answer what you want me to
3   answer.  I have to tell you the truth.  I
4   don't know.
5        Q.   Okay.  It's just not always --
6        A.   If I know, I tell you.  If I don't
7   know, I don't know.
8        Q.   And if you turn to the next page,
9   which is Bates-stamped subpoena responses
10  523, could you explain why there would be
11  another conditional approval from Capital
12  One, and this one is timestamped 5:13 p.m.,
13  when there already was an approval that day
14  from Capital One at an earlier time?
15       A.   This is not a different approval.
16  It's the same exact approval.  It's just that
17  it was an update made on it.  It could've
18  been we update tax, that we update miles on
19  the car.  That is not a different approval.
20  Or we rerun her credit, or we got different
21  approval.  It's exact one.  All these Capital
22  One approvals that you have, they are the
23  same approval.  It's just that all the time
24  there's a change made to the structure of the
25  deal, going to see an update.  And when did

Page 180
1              Yessica K. Vallejo
2   you update the deal, and what time did you
3   update the deal, we didn't rerun her credit
4   again with Capital One.  Capital One has Oral
5   Navigator.  You go there and you work the
6   deal.
7            MR. GOODMAN:  Just answer
8         the question that's asked of you,
9         okay?
10            THE WITNESS:  Okay by me.
11         She said auto calculate /*R.
12       Q.   I am just trying to understand
13  here.
14       A.   No problem.
15       Q.   One of the earlier deals, if you
16  look at the page Bates-stamped subpoena
17  responses 517, the amount approved here is
18  27,550, and then if we go back to the
19  approval we were just looking at --
20            MR. GOODMAN:  523?
21       Q.   -- 523, that one is for the amount
22  25,550.  Could you explain for me why that
23  changed?
24       A.   Okay, so 5/17, you see the same
25  price of the car is $35,000?

ESQUIRE
DEPOSITION SOLUTIONS

Page 181

Yessica K. Vallejo
1
2     Q.   Uh-huh.
3     A.   523, you can see the selling price
4  is $33,000.  So the customer must got a
5  discount from the sales manager, if we lower
6  the pricing, you can see here in the numbers.
7  So that's why now the finance amount is less
8  than 517 now.  It's $2,000 less.
9     Q.   I see.  And so when a sales manager
10  is going to give a discount like this, is
11  that something that you are going to, as the
12  finance manager, discuss with a sales manager
13  giving a discount?
14     A.   If the customer have any concerns
15  about the pricing, then, he -- they speak to
16  the sales manager.  And if there's any update
17  or changes, they communicate that to me.
18     Q.   I see.  So you -- you explain to a
19  customer the best terms you are able to
20  receive, in response to the credit
21  applications.  Consumer's not happy with
22  those terms and asks the sales manager about
23  a discount, and then the sales manager says
24  to you, "okay, we can give that discount,"
25  and you plug it into, I think you called, the

Page 182

Yessica K. Vallejo
1
2  "auto navigator"; is that right?
3     A.   Correct.
4     Q.   Okay.  And what is the Auto
5  Navigator?  Is this something that you access
6  through Deal Tracker, is it -- how does it
7  work?
8     A.   It's like Dealer Track.  It's the
9  same thing.  It's just you do a deal update,
10  you change -- you lower the pricing, just,
11  you know, that's going to get you a better
12  deal also because you are financing less.
13     Q.   And still looking at subpoena
14  responses 523 --
15     A.   Uh-huh.
16     Q.   -- one of the stipulations here is,
17  "must receive contract and have stips
18  complete by June 29, 2020, or app will
19  expire."  Do you see that?
20     A.   Yes.
21     Q.   Is this what you were talking about
22  when we were discussing resigning earlier?
23        MR. GOODMAN:  Object to the
24        form; go ahead.
25     A.   Can you be more specific?

Page 183

Yessica K. Vallejo
1
2     Q.   Is this stipulation about how they
3  must receive the contract and have stips
4  complete by June 29, 2020, is that the reason
5  why there was a resigning on June 29, 2020?
6        MR. GOODMAN:  Object to
7        form; go ahead.
8     A.   I don't know.
9     Q.   Okay.
10        MR. GOODMAN:  Emma, when you
11        come to a place you are okay with,
12        can we take a break?
13        MS. CATERINE:  Yes, I will
14        keep that in mind.  Just let me ask
15        a few more questions.
16        MR. GOODMAN:  Yeah, no
17        problem.
18     Q.   If you could turn to the page
19  Bates-stamped subpoena responses 530.  Just
20  let me know when you have that in front of
21  you.
22     A.   I do.
23     Q.   Okay.  Do you see the decision date
24  here of June 29, 2020, 10:30 a.m.?
25     A.   Yes.

Page 184

Yessica K. Vallejo
1
2     Q.   Why was there a denial on June 29,
3  2020, as opposed to the other denials we've
4  looked at so far, which were on May 30, 2020?
5        MR. GOODMAN:  Object to
6        form; you can answer.
7     A.   Because it was submitted that day
8  to that bank, to that particular lender.
9     Q.   Okay.  So credit applications were
10  submitted on June 29th, as well as May 30th,
11  correct?
12     A.   Correct.
13     Q.   And, in general, each of the
14  approvals and denials here is going to
15  correspond to a credit application, other
16  than what you were talking about earlier,
17  with adjustments to deals with Capital One;
18  is that correct?
19        MR. GOODMAN:  Objection to
20        form of that question.
21     A.   I don't understand the question.
22  Sorry.
23     Q.   Sure, sure.  The only reason why
24  there would be conditional approval or a
25  decline would be in response to a credit



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
185—188

Page 185

Yessica K. Vallejo

1    application; is that correct?
2
3        A.   Correct.
4        Q.   Okay.
5        A.   If this application was submitted
6    again on 6/29, that means the customer
7    authorized us to rework the deal app,
8    resubmit to all lenders that we didn't submit
9    in the first place.
10       Q.   Okay.
11       A.   All the time that application is
12   submitted to the lender is because we have
13   handwritten credit application signed by the
14   customer.  So here in the paperwork, see we
15   have Dealer Track credit app signed by her on
16   26th, which is the same day we resubmit to
17   all lender probably to see if we can get --
18   if we could get better approval for her.
19   Usually this happens when the customer
20   actually requests to reword the deal to get a
21   better interest rate, better terms or
22   whatsoever.
23       Q.   So there should be an additional
24   credit written -- I think you said
25   handwritten credit application on the 29th?

Page 186

Yessica K. Vallejo

1
2        A.   No, I say credit -- Dealer Track
3    credit application.  I see it here.  It's
4    somewhere here.
5        Q.   Okay, well, we'll take a look at
6    that later.  If you could take a look at
7    subpoena responses 552, please, toward the
8    very end.  It's the second-to-last page.
9        A.   Yes.
10       Q.   And this is the approval with the
11   latest Bates-stamped -- or the excuse me, the
12   latest timestamp of June 29, 2020, at 3:31
13   p.m..  Is this the deal that was, in fact,
14   entered into?
15           MR. GOODMAN:  Object to
16       form; go ahead.
17       A.   Yes.
18       Q.   And under the stipulations on this
19   page it says, "multiple approvals for this
20   applicant, first contract in-house fund."
21           What does that mean?
22       A.   That it was more than one approval
23   for her, and whichever first, they getting
24   in-house.  That's the one they going to fund.
25   It could be that the customer change the car,

Page 187

Yessica K. Vallejo

1
2    the miles changed.  So all the time that you
3    do update, the system treats this like you
4    getting a new approval.  But it's the same
5    approval.  It's just you make a change to the
6    application -- even if you change a penny on
7    taxes, it will show like this, like it's
8    brand-new.
9        Q.   Okay.  And also under the
10   stipulations it says, "POI not required based
11   on current deal structure."  And "POI" stands
12   for "proof of income," correct?
13       A.   That is correct.
14       Q.   And that was one of the reasons
15   that this deal was accepted, was that it
16   would not require proof of income, correct?
17           MR. GOODMAN:  Object to
18       form.
19       A.   Not necessarily.
20       Q.   Okay, well, I am just trying to
21   understand why this would have been the deal
22   that would have been entered into, versus,
23   say, the deal on the subpoena responses 550,
24   which does require proof of income.
25       A.   If the deal requires proof of

Page 188

Yessica K. Vallejo

1
2    income or doesn't, it doesn't make a
3    difference because the customer stated on her
4    credit application that she works and she can
5    provide proof of income.
6        Q.   Well, what if --
7        A.   I don't know, exactly, what was the
8    reason because they came back to resign.  I
9    can't recall exactly the reason.  But they
10   came back to resign and we finalize the deal
11   that day.
12       Q.   Sure.  So if a consumer, for
13   example, really wants to get this deal done
14   that day, but they hadn't brought in proof of
15   income, so they would have to, you know, go
16   back and get it and come back a different
17   day, and they are, like, "no, I want to get
18   this done," would that be a reason to go with
19   the deal that doesn't require proof of
20   income?
21           MR. GOODMAN:  Object to
22       form.
23       A.   It could be the reason.
24       Q.   Okay.  And let's go back to the
25   first page of this exhibit, and the timestamp



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
189–192

Page 189

1          Yessica K. Vallejo
2   here for the approval is May 30, 2020, at
3   3:59 p.m.  Do you see that?
4          A.  Yes.
5          Q.  Do you know why Mr. LaForest's
6   credit was shown on the other document that
7   we looked at, being run at 4:38 p.m.,
8   whereas, a credit application was made for
9   Ms. Francois at 4:59 p.m., if they were
10  co-applicants?
11             MR. GOODMAN:  Object to the
12         form of the question.
13         A.  I don't know.
14         Q.  And if you look at what was
15  previously marked as Exhibit 30 --
16             MR. GOODMAN:  Which one?
17             MS. CATERINE:  It's
18         Bates-stamped subpoena responses
19         513.
20             MR. GOODMAN:  Okay.
21         A.  Oh, I have it.
22             MR. GOODMAN:  It's a single
23         page.
24             MS. CATERINE:  Yeah, it says
25         "red flags results" at the top.

Page 190

1          Yessica K. Vallejo
2             MR. GOODMAN:  Yeah.
3          A.  I am listening.
4          Q.  And this is what you had referred
5   to when you mentioned "red flag results"
6   earlier in your deposition, correct?
7             MR. GOODMAN:  Object to the
8         form.
9          A.  That is correct.
10         Q.  And the timestamp for this document
11  is May 30, 2020, at 4:55 p.m.
12            Do you know why this document has
13  that timestamp, but the first credit approval
14  comes earlier, at 3:59 p.m.?
15            MR. GOODMAN:  Object to the
16         form.
17         A.  I don't know.
18         Q.  Do you know why this document says,
19  "social security number not validated"?
20         A.  No.
21         Q.  Do you know why this document says,
22  "phone number not validated"?
23            MR. GOODMAN:  Object to
24         form; go ahead.
25         A.  No.

Page 191

1          Yessica K. Vallejo
2          Q.  Could the reason why it says,
3   "phone number not validated" be that the same
4   phone number was listed for both Emanuel
5   LaForest and Farah Jean Francois on the
6   credit application that we looked at?
7             MR. GOODMAN:  Objection to
8         the form.
9          Q.  And feel free to look at that.
10  It's Bates-stamped Defendant's 2.
11         A.  What credit application?
12  Handwritten credit application?
13         Q.  Yeah, in the deal jacket.
14            MR. GOODMAN:  Second page of
15         the deal jacket.
16            THE WITNESS:  But this is
17         the phone number provided by the
18         customer.
19            MR. GOODMAN:  Okay, just
20         answer the question that she's
21         asking you.
22            THE WITNESS:  We go by
23         whatever the customer provides.
24         Q.  If you have a credit application
25  and there are two applicants, and they list

Page 192

1          Yessica K. Vallejo
2   the same phone number, are you going to ask
3   why they listed the same phone number?
4             MR. GOODMAN:  Object to the
5         form.
6          A.  No.
7          Q.  Okay.
8          A.  Because --
9             MR. GOODMAN:  No, don't
10         "because."  "No."
11            MS. CATERINE:  All right.
12         Do you want to take that break now?
13            MR. GOODMAN:  That would be
14         great now; thank you.
15            MS. CATERINE:  Yeah.
16            (Whereupon, a recess was
17         taken at this time.)
18  BY MS. CATERINE:
19         Q.  If we can go back to the deal
20  jacket, please, and turn to the page
21  Bates-stamped Defendant's 12.  Let me know
22  when you are there.
23         A.  I am there.
24         Q.  And what is this?
25         A.  I don't know.



Page 193

1              Yessica K. Vallejo
2       Q.   You have never seen a document like
3    this one before?
4              MR. GOODMAN:  Object to
5          form.
6       A.   No.
7       Q.   Okay.  Do you know why it's dated
8    July 15, 2020?
9       A.   No.
10      Q.   Okay, do you see here where it
11   says, "origination date, June 29, 2020"?
12      A.   Yes, I see it.
13      Q.   I know you said you hadn't seen
14   this document before, but do you have any
15   understanding what "origination date" could
16   refer to?
17             MR. GOODMAN:  Object to
18         form.
19      A.   No.
20      Q.   Okay.
21             MR. KESHAVARZ:  Exhibit
22         number is that?
23             MS. CATERINE:  It's Exhibit
24         21, and this is Bates-stamped
25         Defendant's 12.

Page 194

1              Yessica K. Vallejo
2              MR. KESHAVARZ:  Thanks.
3              MS. CATERINE:  Yeah.
4       Q.   And towards the bottom, do you see
5    the section labeled "commissions"?
6       A.   Yes.
7       Q.   And it lists a commission of
8    $317.26 for you, Yessica Vallejo; is that
9    correct?
10      A.   That is correct.
11      Q.   And it has an ID here for you of
12   "A31."  What is this "A31 ID"?
13      A.   That's my employer ID.
14      Q.   Okay, is that the ID you use, for
15   example, to login to Deal Tracker?
16      A.   No.
17      Q.   No.  What do you use that ID for?
18      A.   I don't use it for anything.  Per
19   se.
20      Q.   It's used by the dealership, just
21   to identify you; is that correct?
22             MR. GOODMAN:  Object to
23         form.
24      A.   Probably.
25      Q.   Okay.  Have you ever seen that ID

Page 195

1              Yessica K. Vallejo
2    before?
3       A.   Yes.
4              MR. GOODMAN:  Objection.
5              MS. CATERINE:  Sorry.
6       Q.   And where had you seen the A31 ID
7    before?
8       A.   On Deal Tracker.
9       Q.   Okay.  Where on Deal Tracker had
10   you seen it?
11      A.   On the DMS.
12      Q.   What does that stand for?
13      A.   The DMS is the platform where we
14   upload the deals and -- to put all numbers
15   on, login the customer information, and I got
16   to put my name as defined as manager.  So the
17   number that we use, instead of name, is A31.
18   Everybody has a number.
19      Q.   Okay, great.  Did you, in fact,
20   receive a commission of $317.26 for this
21   sale?
22      A.   Yes, I did.
23      Q.   Okay.  And under you, it lists "ID
24   999," and the name is "house sales rep."
25           Who does that refer to?

Page 196

1              Yessica K. Vallejo
2       A.   I don't know.
3       Q.   Are you familiar with any Victory
4    Mitsubishi employee who has ID 999?
5       A.   No.  I don't know anybody's ID.
6       Q.   Other than this document, have you
7    ever seen this ID of 999 before, such as on
8    Deal Tracker?
9       A.   No.
10      Q.   And if you could turn to
11   Defendant's 26, please.  And what is this
12   document?
13      A.   It's a sales worksheet.
14      Q.   And there's a timestamp in the
15   bottom right corner.  It's a little hard to
16   read.  But I will represent for the record
17   that it says, "May 30, 2022, 16:51 p.m."
18           Do you see that?
19      A.   Yeah.
20             MR. GOODMAN:  You have to
21         say, "yes."
22      A.   Yes.
23      Q.   And is that automatically generated
24   when a document is printed?
25             MR. GOODMAN:  Object to



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
197–200

Page 197

1           Yessica K. Vallejo
2     form.
3     A.  I don't know.
4     Q.  Do you ever print, say, sales
5  worksheets?
6     A.  No.
7     Q.  Who prints the sales worksheets?
8     A.  Sales manager.
9     Q.  And based on David Perez being
10  listed on the top right-hand corner, is it
11  reasonable to assume that Mr. Perez was the
12  one who printed this sales worksheet?
13           MR. GOODMAN:  Object to
14       form.
15     A.  I don't know.
16     Q.  And do you know why there's a sales
17  worksheet for Emanuel LaForest, but not for
18  Farah Jean Francois?
19           MR. GOODMAN:  Objection to
20       form.
21     A.  I don't know.
22     Q.  And do you review the sales
23  worksheet at any point during the sales or
24  financing of a vehicle?
25     A.  No.

Page 198

1           Yessica K. Vallejo
2     Q.  And, sorry, I know I am having you
3  hop around this document, but if you could
4  turn back to pages Defendant's 3, please.
5  It's the one that says "receipt" in the upper
6  right-hand corner.
7           MR. GOODMAN:  The third page
8       of the deal jacket?
9           MS. CATERINE:  Yeah, the
10       third page of the deal jacket.
11       Sorry.
12     A.  Uh-huh, okay.
13     Q.  What is this document?
14     A.  This is a receipt.
15     Q.  A receipt for what?
16     A.  For down payment.
17     Q.  And why is this receipt for $8,600,
18  when the down payment was listed as $9,000?
19           MR. GOODMAN:  Objection to
20       the form.
21     A.  I don't know.
22     Q.  And why is the customer listed as
23  Emanuel LaForest, when this down payment was
24  made for the purchase and financing of a
25  vehicle by Farah Jean Francois?

Page 199

1           Yessica K. Vallejo
2           MR. GOODMAN:  Object to the
3       form.
4     A.  I don't know.
5     Q.  And do you see the timestamp here
6  under the date that says, "May 30, 2020, 8:04
7  p.m.?
8     A.  Yes, I see it.
9     Q.  And do you have any reason to
10  believe that that timestamp is inaccurate?
11     A.  I don't know.
12     Q.  And if I recall correctly, the down
13  payment is only made once you have decided on
14  the terms of the sale; is that correct?
15           MR. GOODMAN:  Object to
16       form.
17     A.  After the customer says, "yes,"
18  then whatever given time they made the down
19  payment.
20     Q.  Let me rephrase the question.
21       Does the -- does the down payment
22  happen toward the end of the process of the
23  sale and financing of the vehicle?
24     A.  I don't know.  It's not a specific
25  time for you to make down payment.  You have

Page 200

1           Yessica K. Vallejo
2  to pay before you leave, that's for sure.
3     Q.  Sure, sure.  So if this down
4  payment was made at 8:04 p.m. on May 30th,
5  would it be reasonable to assume that
6  Mr. LaForest didn't leave with the vehicle
7  before 8:04 p.m.?
8           MR. GOODMAN:  Object to
9       form.
10     A.  I don't know.
11     Q.  And Stavros Orsaris testified that
12  he took the down payment, and that the reason
13  why there was this $400 discrepancy is that
14  another employee took the $400 from Mr.
15  LaForest, and forgot to account for it, such
16  as by printing a receipt.  Does that sound
17  accurate?
18           MR. GOODMAN:  Object to the
19       form.  Inaccurate
20       mischaracterization.  Go ahead.
21     A.  I don't know.
22     Q.  Okay.  And if there was an
23  additional $400 down payment, you would not
24  have been the one to take that down payment,
25  because I think you testified earlier, that



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
201—204

Page 201

Yessica K. Vallejo
1
2  it's the sale managers who took the down
3  payments; is that correct?
4      A.  That is correct.  I don't take down
5  payments.
6      Q.  Okay.
7          MR. GOODMAN:  Give me thirty
8  seconds.  I will be right back.
9      Stay on.
10         Okay, sorry about that.
11         MS. CATERINE:  That's all
12  right.
13     Q.  You could take a look at Exhibit
14  23, Bates-stamped Defendant's 85 to 92.  It's
15  screenshots.  And take as long as you need to
16  look at these different screenshots, but what
17  are these screenshots of?
18     A.  That's the DMS.  It's pictures of
19  the DMS screen.
20     Q.  Okay.  And when you open DMS up in
21  Dealer Track, on your computer, is this what
22  the screen would look like?
23     A.  When you -- you go into a deal,
24  yes.
25     Q.  And so these screens are going into

Page 202

Yessica K. Vallejo
1
2  the deal for Farah screen Francois; is that
3  correct?
4      A.  That's what it says in the
5  pictures.
6      Q.  Sure.  And on page Bates-stamped
7  Defendant's 86, it's the second of the
8  screenshots, do you see where it says, "F and
9  I manager," and it says, "A31"?
10     A.  Yes, I see.
11     Q.  And that's referring to you,
12  correct?
13     A.  Correct.
14     Q.  And does that indicate that the
15  credit applications made for this account
16  were made by you?
17     A.  That explain that I am the finance
18  manager in the deal, so I work the deal.
19     Q.  And so since you work the deal, you
20  would have made the credit application; is
21  that correct?
22     A.  I don't make credit applications.
23  I submit the credit application that the
24  customer provides signed and dated.
25     Q.  Sure.  So you submitted the credit

Page 203

Yessica K. Vallejo
1
2  applications provided for this account; is
3  that correct?
4      A.  Correct.
5      Q.  Okay.  And if you could turn to the
6  next page, please, Bates-stamped Defendant's
7  85.
8      A.  Uh-huh, there.
9      Q.  Why is Emanuel LaForest not listed
10  here as a co-buyer?
11         MR. GOODMAN:  Object to
12  form.
13     A.  He did not purchase a vehicle.
14  Farah Francois purchased a vehicle.  That's
15  why she is the only one listed in here.
16     Q.  Well, I understand the financing is
17  in Ms. Francois' name, but the receipt we
18  looked at for the down payment was in Mr.
19  LaForest's name.  So even when he provides
20  the down payment, he is not going to be
21  listed as a co-buyer?
22         MR. GOODMAN:  Object to the
23  form.
24     A.  No, he could have gave his family
25  member the money to buy a car.

Page 204

Yessica K. Vallejo
1
2      Q.  Okay.  And do you see here where it
3  says, "5/30," and then there are a bunch
4  asterisks?
5      A.  Yes.
6      Q.  What does that refer to?
7      A.  That's her date of birth, 5/30.
8      Q.  So it's referring to her date of
9  birth?
10     A.  Correct.
11     Q.  Why doesn't it list the year?
12     A.  We not allowed to see that
13  information.  The deal is capped so nobody
14  can go and look at her information again.
15  It's protected.
16     Q.  I see.  So the asterisks are
17  redacting the year in her birth date; is that
18  correct?
19     A.  Yes.
20     Q.  And below that it says, "function,
21  asterisk," and then there's a little box
22  there.  What is that?
23     A.  I don't know.
24     Q.  Okay.  Could you go to the screen
25  with the Bates stamp Defendant's 89, please.



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
205—208

Page 205

1           Yessica K. Vallejo
2           MR. GOODMAN:  No, it's in...
3           MR. KESHAVARZ:  What's the
4    exhibit number?
5           MS. CATERINE:  This is
6    Exhibit 23.
7           MR. KESHAVARZ:  Thank you.
8           MR. GOODMAN:  Let me see.
9    Yeah, that's the one.
10   A.   Okay.
11   Q.   Who would fill out the fields on
12   this screen?
13   A.   The finance manager.
14   Q.   And so that would be you, correct,
15   for this deal?
16   A.   Correct.
17   Q.   And so why did you put "999" for
18   the "salesperson"?
19   A.   I only put my name on it.  I don't
20   fill out the "salesperson" part.
21   Q.   I see.  Who would have filled out
22   the salesperson part?
23   A.   Sales manager.
24   Q.   Okay.  Do any of these screens --
25   and please take your time looking at all of

Page 206

1           Yessica K. Vallejo
2    them -- do any of these screens show that
3    anyone of Victory Mitsubishi worked on the
4    sale and financing of this vehicle, other
5    than you?
6           MR. GOODMAN:  Object to the
7    form.
8    A.   (Witness peruses exhibit.)
9           MR. GOODMAN:  Could you,
10   Ms. Reporter, read back the
11   question, please.
12          (Whereupon, the requested
13   portion was read by the reporter.)
14          THE WITNESS:  No, it doesn't
15   show.  It doesn't show my name
16   either.
17   Q.   But "A31" refers to you, correct?
18   A.   That's my employer ID number,
19   correct.
20   Q.   And if you could turn back to the
21   deal jacket and look at pages Defendant's 19
22   through 21.
23   A.   Okay.
24   Q.   And what are pages 19 through 21?
25   A.   Credit application.

Page 207

1           Yessica K. Vallejo
2    Q.   And why is there no date next to
3    the signature on the bottom of Defendant's
4    19?
5           MR. GOODMAN:  Object to
6    form.
7    A.   I don't know.
8    Q.   And if you could turn to
9    Defendant's 21, the page with the table
10   labeled "dealer section."
11   A.   Uh-huh.  Okay.
12   Q.   Who would have filled out this
13   dealer section?
14   A.   Me.
15   Q.   And would you fill this out after
16   the signatures on page Defendant's 19?
17   A.   No.
18   Q.   You would have filled it out before
19   it had been signed; is that correct?
20   A.   It's filled out with -- when you
21   submitting the deal to the bank.
22   Q.   And is that before or after the
23   signatures on Defendant's 19?
24          MR. GOODMAN:  Object to
25   form.

Page 208

1           Yessica K. Vallejo
2    A.   You submit deal and then customer
3    signs the credit application from Dealer
4    Track.  The first credit application they
5    sign is their handwritten credit application,
6    which you already have the file.
7    Q.   Uh-huh.
8    A.   This is what we submitted to the
9    bank, which the customer has to sign again.
10   Q.   So if I understand you correctly,
11   this was submitted to Capital One, and then
12   it was signed on June 29th; is that correct?
13          MR. GOODMAN:  Object to
14   form.
15   A.   Yes.  She either signed the 29th or
16   she signed the 30th.  But I believe she
17   signed on the 29th because that was the last
18   one that we send to the bank.
19   Q.   And is there anything on this page
20   that indicates that it was signed on June
21   29th?
22          MR. GOODMAN:  Object to the
23   form; go ahead.
24          By "this form," you are
25   referring to Defendant's 19 and 20?



Page 209

Yessica K. Vallejo

1
2     MS. CATERINE:  You read my
3     mind, I was about to clarify,
4     anything on Defendant's 19 through
5     21.
6     MR. GOODMAN:  Oh, and 21,
7     okay.
8     A.   You can see on the approval that
9  it's from the 29th.  So she signed it on the
10  29th because that's where all paperwork was
11  signed.
12     Q.   So based on previous documents we
13  had looked at that showed an approval date of
14  June 29th, you are assuming that this was
15  signed on June 29th; is that right?
16     A.   Correct.
17     Q.   Okay.  And going back to
18  Defendant's 19, do you know why the salary on
19  this application is $65,000, but the salary
20  in the May application is lower?
21     MR. GOODMAN:  Object to
22     form.
23     A.   That was what the customer stated.
24  She probably state that it was a change in
25  her salary.  She got a salary or whatsoever.

Page 210

Yessica K. Vallejo

1
2     Q.   Okay.  And when a customer tells
3  you that they have received a raise, do you
4  ask for any verification of that information,
5  such as a pay stub?
6     A.   If the bank is not asking for pay
7  stub, I don't ask for pay stub.
8     Q.   Okay.  And do you know why the time
9  at the residence changed on this application
10  from the previous application?
11     A.   The customer says that's the time
12  she was living there.
13     Q.   Do you have any questions about why
14  it changed from, I believe, seven years in
15  May, to ten years in June?
16     A.   I didn't have any reason to
17  question the customer.
18     Q.   Why does the credit application ask
19  for residence information?
20     MR. GOODMAN:  Object to
21     form.
22     A.   I don't know.  I am not a lender.
23     Q.   So your credit application is based
24  on information that the lenders are
25  requesting; is that correct?

Page 211

Yessica K. Vallejo

1
2     A.   That is correct.
3     Q.   And do lenders provide more
4  favorable lending terms if the time at an
5  address is longer?
6     MR. GOODMAN:  Object to
7     form.
8     A.   I don't know.  I am not a lender.
9     Q.   Okay.  And there's a work phone
10  number here listed for the employer.  Did
11  anyone at Victory Mitsubishi call this
12  number?
13     A.   We don't verify employment.  We are
14  not lenders.
15     Q.   Okay.  And an increase in the
16  income in a credit application, such as the
17  increase here from $41,000 to $65,000, could
18  result in better terms from the lender; is
19  that correct?
20     MR. GOODMAN:  Object to
21     form.
22     A.   I don't know.  I am not a lender.
23     Q.   Based on your review of the
24  documents in Exhibit 29, the various credit
25  approvals and denials, are better terms

Page 212

Yessica K. Vallejo

1
2  offered in the June 29th approvals than in
3  the May 30th approvals?  And take your time
4  to look at them.
5     A.   I am not a lender to analyze credit
6  approvals.  That's something that is not -- I
7  can't talk on it because I am not a financial
8  institution or a lending institution.
9     Q.   Do you ever advise customers on
10  what terms would be better for a deal?
11     A.   No.
12     Q.   And so you have no idea if the
13  approvals on June 29th would have better
14  terms than the approvals on May 30th, from
15  Capital One?
16     MR. GOODMAN:  Object to
17     form.
18     A.   I inform the customer the terms.
19  The customer makes their final decision.  I
20  don't advise customers.
21     Q.   Why was Mr. LaForest not on the
22  June credit application, when he was on the
23  May 30th application?
24     MR. GOODMAN:  Objection; go
25     ahead.



Page 213

1                Yessica K. Vallejo
2       A.   He was not on the May 30
3   application.  The loan was always done under
4   Ms. Francois's name.  I don't see that.
5   Where do you see that?  I am sorry.
6       Q.   Defendant's 2, in the deal jacket.
7       A.   Oh, you are talking about the
8   handwritten credit application?
9              MR. GOODMAN:  Correct.
10      Q.   Yes.
11      A.   Yes.  Like I said before, the deal
12  was submitted under Ms. Francois's name only,
13  as customer request.  If the customer request
14  to do the deal under one particular person,
15  that's customer discretion.  I can't comment
16  or ask questions about it.
17      Q.   No, I know you testified that you
18  don't advise consumers as to the terms of
19  financing.  But you testified that different
20  lenders have different guidelines for
21  applications; is that correct?
22      A.   Yes, every lender have their own
23  guidelines.
24      Q.   Do any lenders have guidelines as
25  to income?

Page 214

1                Yessica K. Vallejo
2              MR. GOODMAN:  Objection to
3          form.
4       A.   I don't understand your question.
5       Q.   Do any -- we're talking about the
6   guidelines of lenders.  Are any of those
7   guidelines in reference to the income of
8   applicants?
9       A.   I am not a lender.  I cannot answer
10  you that.  I don't know.
11      Q.   You are not -- I thought you were
12  -- you were familiar with the guidelines that
13  some lenders require, such as credit scores.
14      A.   Every lender --
15             MR. GOODMAN:  Objection,
16         objection.  That's not even a
17         question, but go ahead.
18      A.   Every lender have their guidelines.
19  We submit the application, you get
20  stipulation.  We ask the customer for what
21  the lender is asking for, but I am not a
22  lender, so I cannot tell you how the lender
23  -- what the lender based everything to
24  approve or deny the customer.  I can't tell
25  you because I am in a financial institution.

Page 215

1                Yessica K. Vallejo
2   I am not lender.
3       Q.   I -- sure, I understand that.  But
4   what I am asking, specifically, is, have you
5   ever seen guidelines from a lender
6   referencing the income of an applicant?
7       A.   Yes.
8       Q.   Okay.  And those guidelines would
9   be referencing a minimum income for
10  applicants; is that correct?
11             MR. GOODMAN:  Objection to
12         form.
13      A.   No, that's incorrect.
14      Q.   Okay, could you explain to me what
15  those guidelines would be?
16             MR. GOODMAN:  Objection.
17         Go ahead.
18      A.   The lender will ask for customer
19  proof of income, and then we ask the
20  customer, and then we send it to the lender.
21  That's it.
22      Q.   Could you turn to Defendant's 33,
23  please, in the deal jacket.  It's titled
24  "retail certificate of sale receipt," and the
25  section with the "dealer signature," is that

Page 216

1                Yessica K. Vallejo
2   your signature?
3       A.   Yes.
4       Q.   Okay.  If you can turn to
5   Defendant's 16 in the dealer jacket, please.
6       A.   Uh-huh, okay.
7       Q.   And this is the buyer's order,
8   correct?
9       A.   Bill of sales.
10      Q.   Bill of sales, excuse me.  And your
11  name is listed on this bill of sales because
12  you were the finance manager for this
13  transaction; is that correct?
14      A.   That is correct.
15      Q.   And the sales rep here appears to
16  be "sales house rep."  Who does that appear
17  to be -- refer to?
18      A.   I don't know.
19      Q.   Who would generate this document?
20      A.   Deal Tracker.
21      Q.   Sure.  But who would use Deal
22  Tracker to generate this document?
23      A.   Me.
24      Q.   So why did you put "house sales
25  rep"?



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
217–220

Page 217

1           Yessica K. Vallejo
2       A.   I didn't put "house sales rep" in
3   there.
4       Q.   Okay.
5       A.   I told you before, I don't put the
6   salesperson.  I only put my name on it.
7       Q.   Okay.  And so who would have put in
8   the salesperson?
9       A.   I don't know.  Sales managers.
10  Stavros, not me.
11      Q.   Okay.  If David Perez was the sales
12  manager for this transaction, why wouldn't he
13  be listed as the salesman?
14           MR. GOODMAN:  Object to
15           form.
16      A.   I don't know.
17      Q.   If you could turn to Defendant's 4
18  through 9 in the deal jacket, please.  And
19  after you take a look, if you could tell me
20  what this document is.
21      A.   That's a retail installment
22  contract.
23      Q.   And who signed this contract on
24  Defendant's 4?
25      A.   The customer.

Page 218

1           Yessica K. Vallejo
2       Q.   And there are signatures on
3   Defendant's 4, Defendant's 5, Defendant's 6,
4   Defendant's 7, Defendant's 8, and those are
5   all for the same person, correct?
6       A.   I signed --
7           MR. GOODMAN:  Object to the
8           form.  Let me say my objection.
9           Go ahead.
10      A.   I signed the last page as the
11  "finance manager."  Page number six.
12           MR. GOODMAN:  Page number
13           nine?
14           MS. CATERINE:  I think she
15           is referring to it being the sixth
16           page of the document.
17      Q.   Is that correct, Ms. Vallejo?
18      A.   Yeah, that's correct.
19      Q.   But in the previous pages of the
20  document, those signatures are all for the
21  same person; is that correct?
22      A.   I don't understand your question.
23  You asking me, what, who signed the contract?
24           MR. GOODMAN:  Listen to the
25           question.  Are they the same

Page 219

1           Yessica K. Vallejo
2   person?
3       Q.   Are these signatures all for the
4   same person?
5       A.   Yes, the customer signed her
6   contract.
7       Q.   And do you know -- do you notice
8   how the "F" that begins the signature looks
9   different in each version of the signature?
10           MR. GOODMAN:  Object to the
11           form.
12      A.   No, I am not handwriting expert.  I
13  wouldn't know.
14      Q.   Sure.  I am not asking you to --
15  for your -- for any expert opinion.  But in
16  your opinion, do the signatures look the same
17  or different?
18           MR. GOODMAN:  That is asking
19           her expert opinion.  Object to the
20           form of the question.  You can
21           answer.
22      A.   I am not handwriting expert.  I
23  wouldn't know.  I cannot give you my opinion
24  on something that I have no knowledge of.
25      Q.   You don't have any opinion about

Page 220

1           Yessica K. Vallejo
2   whether the signatures look the same or
3   different?
4           MR. GOODMAN:  Objection to
5           form.  Asked and answered.
6       A.   No, I do not have any opinion about
7   that.
8       Q.   Okay.  And going back to the last
9   page Bates-stamped Defendant's 9, I think you
10  already said those are your signatures there;
11  is that correct?
12      A.   Not all the signatures on the page.
13      Q.   Sure, of course.
14      A.   Only the "dealer" section in the
15  bottom.
16      Q.   And there's -- there's two sets of
17  signatures.  Trying to think of -- this is
18  one of those situations where it would be
19  easier if we were in person.
20           The signatures next to "title" --
21  you see what I am referring to, to the right
22  of "title"?
23      A.   Yeah.  That's not a signature.
24  That's "F and I."
25      Q.   I see.  And you wrote that as well?



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
221–224

Page 221

1          Yessica K. Vallejo
2    A.   Yeah.
3          MR. GOODMAN:  Where?
4          THE WITNESS:  "F and I,"
5    "finance and insurance manager."
6          MR. GOODMAN:  "F and I,"
7    okay.  Okay.
8    Q.   I see.  And the date there next to
9    your signature of 6/29/20, you wrote that,
10   correct?
11         MR. GOODMAN:  Object to
12   form.
13   A.   I believe so, yeah.
14   Q.   And did you write it in, the date,
15   above that also, 6/29/20?
16   A.   Yeah.
17   Q.   And why did you write in the date
18   next to the signature of Farah Jean Francois?
19   A.   Because she didn't date it.
20   Q.   Okay.  And if you could take a look
21   at what is going to be marked Exhibit 42, and
22   this is Bates-stamped Francois 4 through 9.
23         MR. GOODMAN:  Do you have a
24   copy there?  You can use this one.
25   A.   I am listening.

Page 222

1          Yessica K. Vallejo
2    Q.   And what is this document?
3    A.   It's retail installment contract.
4    Q.   How is this contract different than
5    the one that we just looked at?
6          MR. GOODMAN:  Object to
7    form; go ahead.
8    A.   The contract, per se, is not
9    different.  If you compare the numbers, it's
10   the same exact numbers.
11   Q.   Okay, is there anything that's
12   different between the two contracts?
13   A.   This contract is not signed.  It's
14   review copy that we give every customer to
15   review, to sign, before they sign the final
16   contract.
17   Q.   I see.  And if you turn to the last
18   page, Francois 9, the dates here are typed in
19   rather than handwritten.  Why is that?
20   A.   I don't know.  Maybe the system
21   wasn't printing the date.  Sometimes happens.
22   Q.   Okay.  And if a customer came into
23   the dealership after the sale and purchase of
24   a vehicle, and they said, "I want a copy of
25   the contract that I signed," would you give

Page 223

1          Yessica K. Vallejo
2    them a copy of the contract like this,
3    without any signatures, or would you give
4    them a copy with signatures?
5    A.   Absolutely not.  I give them the
6    copies with their signature.  The contract
7    they signed.  If they ask me for the contract
8    -- and, anyways, every customer, they leave
9    with their copies.  They -- the day they
10   purchase, we prepare folder with every
11   document they sign, and we hand them to the
12   customer.  If they come back asking for
13   copies again, we give them same copies they
14   signed, of course.
15   Q.   And this unsigned contract that we
16   were looking at was given to Ms. Francois on
17   September of 2020.  Do you know why she was
18   given this version of the contract?
19         MR. GOODMAN:  Object to the
20   form.
21   A.   I don't know.  It wasn't given by
22   me.  That's for sure.
23   Q.   And going back to the deal jacket,
24   you could turn to page 33, please.  Oh, no,
25   sorry.  We already looked at that one.  Never

Page 224

1          Yessica K. Vallejo
2    mind.
3          Defendant's 29 through 30, excuse
4    me.
5    A.   I am listening.
6    Q.   What are the documents on
7    Defendant's 29 and 30?
8    A.   Vehicle registration, title,
9    application form.
10   Q.   And the signature on Defendant's 29
11   under "New York dealers only," is that your
12   signature?
13   A.   Yeah.
14   Q.   And in Section 1 of this document
15   where it says, "information, like name of
16   primary registrant," would you have filled
17   out this information before it was printed?
18   A.   This is the information that we put
19   in the system, what we loading the deal.  So
20   this information is used to print every
21   specific document.  Everything is going to
22   populate from the same information.
23   Q.   Okay.  So you put the information
24   into Deal Tracker, and then you press a
25   button that says, you know, "print vehicle



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
225–228

Page 225

1    Yessica K. Vallejo
2  registration"?  Is it something like that?
3        MR. GOODMAN:  Object to
4      form.
5    A.  Yeah.  Yes.
6    Q.  Okay.  And if you could turn to
7  Defendant's 13, please.  And what is this
8  document?
9    A.  Service contract.
10    Q.  And who would fill out the service
11  contract?
12    A.  Me.
13    Q.  And is that your signature at the
14  bottom above "seller's representative
15  signature"?
16    A.  Yes.
17    Q.  And at the top there's handwritten
18  "3385, slash, 1757."  Was that written by
19  you?
20    A.  No.
21    Q.  Who wrote that?
22    A.  I don't know.
23    Q.  Okay.  And 3385 is the stock
24  number, correct?
25    A.  Correct.

Page 226

1    Yessica K. Vallejo
2    Q.  And what is "1757"?
3    A.  I don't know.
4    Q.  Okay.  And is this a document like
5  what you were talking about earlier, where
6  you would just generate it using Deal
7  Tracker, or would you fill in each of the
8  individual fields for this document?
9    A.  Yes.
10        MR. GOODMAN:  Which one?
11        THE WITNESS:  What?
12        MR. GOODMAN:  Does it fill
13      in -- does it populate
14      automatically, or do you fill it in
15      yourself?
16        THE WITNESS:  It populates
17      automatically from the information
18      that's on Deal Tracker.
19    Q.  Okay.  If that's the case, why is
20  the e-mail address different here than from
21  the other documents?
22    A.  That e-mail was provided by the
23  customer.  Not everything is populated from
24  Dealer Track.  Some information, it is.  Some
25  is not.  So we have to type it sometimes.  If

Page 227

1    Yessica K. Vallejo
2  that e-mail is there, it's because it was
3  provided by her because the other e-mail we
4  have is her brother's or family member
5  e-mail.
6    Q.  And did anyone at Victory
7  Mitsubishi attempt to e-mail this Farah
8  Francois e-mail address?
9        MR. GOODMAN:  Objection to
10      form.
11    A.  I don't know.
12    Q.  Did the service contract for this
13  vehicle actually get purchased?
14    A.  I don't understand your question.
15    Q.  Sure.  So I see this is a service
16  contract application page, I guess.
17      My question is whether this
18  application was approved, or accepted, or
19  whatever the term may be?
20    A.  I believe it was.
21    Q.  And would there be a document
22  showing whether it was accepted?
23    A.  This will be the only document.
24    Q.  Okay.  If you want to take a break
25  at any point, just let me know.

Page 228

1    Yessica K. Vallejo
2    A.  No, no breaks.
3    Q.  When a deal is unwound, the amount
4  of the vehicle service contract would be
5  refunded, correct?
6        MR. GOODMAN:  Object to
7      form.
8    A.  That is correct.
9    Q.  And do you know if the amount for
10  this vehicle service contract was refunded?
11        MR. GOODMAN:  Object to
12      form.
13    A.  I wouldn't know.
14    Q.  And if it was refunded, that
15  payment would be made to Farah Jean Francois,
16  correct?
17        MR. GOODMAN:  Object to
18      form.
19    A.  No.
20    Q.  Who would that payment get made to?
21    A.  To the lending institution that
22  lend the money to purchase the service
23  contract.
24    Q.  So in this case, that would be
25  Capital One?



Page 229

1           Yessica K. Vallejo
2      A.   That is correct.
3      Q.   And could you take a look at the
4  document previously marked Exhibit 32, a
5  single page Bates-stamped subpoena responses
6  326, COAF, Francois 132.
7      A.   Defendant 32?
8      Q.   No, sorry, subpoena responses 326,
9  and it's a single page.
10         MR. GOODMAN:  Okay, let's
11      see.  Here it is.
12         MS. CATERINE:  At the top it
13      says, "Titan account numbers."
14      A.   Okay.
15      Q.   And prior to your preparation for
16  this deposition today, have you ever seen
17  this document?
18         MR. GOODMAN:  Object to
19      form.
20      A.   No.
21      Q.   And could you take a second to read
22  the "narrative" section to yourself and let
23  me know when you are finished.
24      A.   Okay.
25      Q.   Were you aware, prior to your

Page 230

1           Yessica K. Vallejo
2  preparation for this deposition today, that
3  Capital One had investigated identity theft
4  in relation to this transaction?
5          MR. GOODMAN:  Object to the
6      form.  Assumes things.
7      A.   No.
8      Q.   And do you see where it lists the
9  suspect's date of birth as February 18, 1982?
10      A.   I can see that, yes.
11      Q.   And do you know anyone with the
12  date of birth February 18, 1982?
13      A.   No.
14      Q.   Okay.  Did you speak with any of
15  the law enforcement officers listed under the
16  "law enforcement" section on this page;
17  specifically, Officer Adam Simmons or Officer
18  Jack Murray?
19      A.   No.
20      Q.   And at the end of the narrative
21  section, it says, "Capital One Auto Finance
22  has begun efforts to recover the funds on the
23  loan."  What is that referring to?
24      A.   I don't know.  You will have to ask
25  the person that wrote the narrative.

Page 231

1           Yessica K. Vallejo
2      Q.   Do you know if Capital One has
3  asked Victory Mitsubishi about unwinding the
4  deal in this case?
5      A.   I don't know.
6      Q.   And if you could take a look at
7  what was previously marked Exhibit 33,
8  Bates-stamped subpoena responses 485 to 489.
9          MR. GOODMAN:  Right here.
10         MS. CATERINE:  It's the
11      spreadsheet.
12      A.   Okay.
13      Q.   And prior to preparation for your
14  deposition today, have you ever seen a
15  document the same or similar to this
16  spreadsheet listing complaints against the
17  Victory Mitsubishi dealership?
18         MR. GOODMAN:  Object to the
19      form of that question.
20      A.   No.
21      Q.   And if you could turn to the page
22  Bates-stamped subpoena responses 488.
23      A.   Okay.
24      Q.   And three entries from the bottom
25  there's a complaint which begins, "customer

Page 232

1           Yessica K. Vallejo
2  daughter is upset that" -- you see that?
3      A.   I see that.
4      Q.   And are you familiar with any
5  complaint made to Victory Mitsubishi about a
6  vehicle being put in the name of a customer's
7  mother rather than their name?
8          MR. GOODMAN:  Object to the
9      form; go ahead.
10      A.   No.
11      Q.   And looking at the other complaints
12  listed here, are you familiar with any of
13  these complaints, based on the descriptions
14  provided?
15      A.   No.
16      Q.   And are you aware of Mitsubishi
17  Motors ever contacting Victory Mitsubishi
18  about a customer complaint?
19         MR. GOODMAN:  Object to
20      form.
21      A.   No.  I don't handle complaints.
22      Q.   You know how Chris Orsaris and
23  Stavros Orsaris are related?
24      A.   Chris Orsaris is Stavros Orsaris
25  father.



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
233—236

Page 233

1           Yessica K. Vallejo
2      Q.  And are there any other employees
3  of Victory Mitsubishi who are father and son?
4      A.  Yes.
5      Q.  Who else?
6      A.  Stavros has a brother that works
7  there.
8      Q.  And what's that bother's name?
9      A.  Chris Orsaris, Junior.
10     Q.  And what does he do at Victory
11  Mitsubishi?
12     A.  Sales manager.
13     Q.  And how long has he been a sales
14  manager?
15     A.  Maybe a year.
16     Q.  And about how tall is he?
17     A.  I don't know.
18     Q.  Is he taller than six feet tall?
19     A.  I don't know.
20     Q.  When things are mailed to the
21  Victory Mitsubishi dealership, who receives
22  the mail?
23          MR. GOODMAN:  "Things"?
24      Object to form.
25     A.  I don't know.  I don't receive any

Page 234

1           Yessica K. Vallejo
2  mail myself.
3      Q.  Okay.  When did you learn about the
4  allegations made in this lawsuit?
5      A.  A couple of months ago.  Maybe two,
6  three months ago.  A month ago.  I don't
7  recall.
8      Q.  Okay.  And after learning of the
9  allegations in this lawsuit, what steps did
10  you take to determine if the allegations were
11  true?
12          MR. GOODMAN:  Object to
13      form.
14     A.  I went back to the deal jacket, I
15  look at the forms, that everything was
16  signed, and everything was in order.  I can't
17  tell you for a fact that when they went there
18  to purchase a vehicle she was there or
19  somebody acting like her or try to imperson
20  her, but since the customer is suing the
21  dealership, I am assuming it's going to be an
22  investigation done.  That's why we sitting
23  here right now.  And we are going to get to
24  bottom of what happened, and, I mean,
25  ultimately, the truth of what actually

Page 235

1           Yessica K. Vallejo
2  happened.
3          MR. GOODMAN:  Just answer
4      the question that's asked, okay?
5          THE WITNESS:  I will.
6      Q.  Have you, at any time, tried to
7  contact Ms. Francois?
8      A.  No.
9      Q.  Did you do anything wrong in how
10  you processed the sale and financing of the
11  vehicle to Ms. Francois?
12          MR. GOODMAN:  Objection to
13      the form.  Please go ahead.
14     A.  No, I did not.
15     Q.  And that's based on your -- the
16  review of the deal jacket that you had just
17  mentioned?
18          MR. GOODMAN:  Object to
19      form.
20     A.  No.
21     Q.  What is it based on?
22     A.  On our procedure and our policies,
23  how we treat every sale.  That's what it'd
24  based on.
25     Q.  Okay.  Do you think anyone at the

Page 236

1           Yessica K. Vallejo
2  Victory Mitsubishi dealership did anything
3  wrong, in regards of the sale and financing
4  of the vehicle in the name of Farah Jean
5  Francois?
6          MR. GOODMAN:  Objection to
7      the form.
8      A.  No.
9      Q.  Okay.
10          MS. CATERINE:  Let's take a
11      five-minute break and, hopefully,
12      we can wrap it up soon.
13          MR. GOODMAN:  Okay, so we've
14      now hit seven hours.  We had maybe
15      forty-five minutes of breaks.  So
16      that's it.  That's the time that
17      we're talking about, 6:47.
18          MS. CATERINE:  I understand.
19      I have been keeping track of the
20      time.
21          MR. GOODMAN:  Excellent.  We
22      will take five minutes.
23          (Whereupon, a recess was
24      taken at this time.)
25  BY MS. CATERINE:



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
237–240

Page 237

Yessica K. Vallejo
1
2    Q.  Ms. Vallejo, I believe you had
3  talked about there being CARFAX reports in
4  deal jackets at Victory Mitsubishi; is that
5  right?
6    A.  Yes.  If the customer request a
7  CARFAX, we print it and give it to them.
8         MR. GOODMAN:  Can I have
9         that pen?
10    Q.  Why is there no CARFAX report in
11  the deal jacket in this case?
12    A.  Customer didn't request one.
13    Q.  Do you know any men who work at the
14  Victory Mitsubishi dealership who are 6'2" or
15  taller?
16         MR. GOODMAN:  Object to
17         form.
18    A.  It's a lot of men working in there.
19  I mean, that's not sufficient to describe a
20  person.  It's just -- I don't even know what
21  to answer.
22    Q.  Well, let's just start with, do you
23  know any men who work at the dealership who
24  are 6'2" or taller?  "Yes" or "no"?
25    A.  I don't know.  I don't know their

Page 238

Yessica K. Vallejo
1
2  height.
3    Q.  Could you -- you mentioned Stavros
4  Orsaris' brother.  Could you spell his name
5  for us, please?
6    A.  I don't know how to spell his name.
7  I just know his name Chris.
8    Q.  Chris?
9         MR. GOODMAN:  Chris.
10    Q.  His name is also Chris?
11         MR. GOODMAN:  Answer.
12    A.  Yes.
13    Q.  Okay.  Sorry, I am just trying to
14  -- and does anyone else related to Stavros
15  Orsaris work at the dealership?
16    A.  I don't know.  That's the only
17  person I know.
18    Q.  Okay.
19         MR. KESHAVARZ:  Sorry, so
20         there's a father and brother named
21         Chris?
22         MR. GOODMAN:  Objection.
23         One attorney, please.  Only --
24         MR. KESHAVARZ:  I was just
25         trying to figure it out.  Sounds

Page 239

Yessica K. Vallejo
1
2  like there's a brother and father
3  both named Chris Orsaris; is that
4  right?
5         MR. GOODMAN:  There's no --
6  we're not taking questions from two
7  attorneys.
8    Q.  So how much did you make working at
9  Victory Mitsubishi in 2021?
10         MR. GOODMAN:  Objection.
11  Now we've crossed the line into
12  annoyance, embarrassment, and
13  prejudice, and I will direct the
14  witness not to answer that.
15         THE WITNESS:  Why is that
16  relevant?
17         MR. GOODMAN:  Don't ask any
18  questions.  Just answer if I tell
19  you to.
20         MS. CATERINE:  Can I ask why
21  you think it goes into that realm?
22         MR. GOODMAN:  It's her
23  personal information.
24         MS. CATERINE:  What's
25  personal about it?

Page 240

Yessica K. Vallejo
1
2         MR. GOODMAN:  Her income.
3         MS. CATERINE:  Is income
4  protected under any law or
5  regulation or --
6         MR. GOODMAN:  I am not here
7  to give answers to legal questions.
8  If you want to mark it for a
9  ruling, if you want to take it up
10  with the Court, let's do so.
11         MS. CATERINE:  Let's mark it
12  for the ruling.  It's after hours,
13  so we can't take it up with the
14  Court, but please mark that for a
15  ruling, Court Reporter.
16    Q.  And to clarify, Stavros Orsaris
17  has both a brother and father named Chris
18  Orsaris, correct?
19         MR. GOODMAN:  Object to
20  form.
21         Go ahead.
22    A.  Once again, Stavros has a brother,
23  his name is Chris Orsaris, Junior.  He works
24  there too.
25    Q.  Okay.  Great.



Page 241

1          Yessica K. Vallejo
2      That's all the questions I have.
3          MR. GOODMAN:  Okay,
4      good-bye.
5  Q.  Thank you, Ms. Vallejo.
6  A.  No problem.
7          -oOo-
8          (Whereupon, the examination
9      of YESSICA K. VALLEJO was adjourned
10      at 6:15 p.m.)
11
12
13
14          YESSICA K. VALLEJO
15
16
17  Subscribed and sworn to
18  before me this      day
19  of          , 2022.
20
21
22  NOTARY PUBLIC
23
24
25

Page 242

1
2  ---------------- I N D E X ----------------
3
4  WITNESS        EXAMINATION BY        PAGE
5  YESSICA K. VALLEJO
6              MS. CATERINE        6
7
8  ---------------- EXHIBITS ----------------
9  DEFENDANT'S                FOR ID.
10  EXHIBIT 40    Subscriber App.    premarked
11  EXHIBIT 41    Victory Agreement  premarked
12  EXHIBIT 42    Unsigned Sales     premarked
              Contract
13
      (Exhibits retained by reporter.)
14
15  ---------------------------------------------
16
17
18
19
20
21
22
23
24
25

Page 243

2              C E R T I F I C A T E
3  STATE OF NEW YORK      )
                          : ss.
4  COUNTY OF NEW YORK     )
5
6      I, AYDIL M. TORRES, a Notary Public
7  within and for the State of New York, do
8  hereby certify:
9      That YESSICA K. VALLEJO, the witness
10  whose deposition is hereinbefore set forth,
11  was duly sworn by me and that such deposition
12  is a true record of the testimony given by
13  the witness.
14      I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage, and that I am in no way
17  interested in the outcome of this matter.
18      IN WITNESS WHEREOF, I have hereunto
19  set my hand this 30th day of November, 2022.
20
21
22          Aydil M. Torres
23          AYDIL M. TORRES
24
25

Page 244

2          DEPOSITION ERRATA SHEET
3
4  Our Assignment No.  J8894063
5  Case Caption:  FARAH JEAN FRANCOIS vs.
6  VICTORY AUTO GROUP LLC, ET AL.
7      DECLARATION UNDER PENALTY OF PERJURY
8      I declare under penalty of perjury
9  That I have read the entire transcript of
10  My Deposition taken in the captioned matter
11  Or the same has been read to me, and
12  The same is true and accurate, save and
13  Except for changes and/or corrections, if
14  Any, as indicated by me on the DEPOSITION
15  ERRATA SHEET hereof, with the understanding
16  That I offer these changes as if still under
17  Oath.
18  _____
19          YESSICA K. VALLEJO
20  Subscribed and sworn to on the _____ day of
21  _____, 20_____ before me,
22
23  _____
24  Notary Public,
25  In and for the State of _____



YESSICA K. VALLEJO
FARAH JEAN FRANCOIS V. VICTORY AUTO GROUP LLC

November 30, 2022
245–246

Page 245

```
1
2              DEPOSITION ERRATA SHEET
3    Page No._____Line No._____Change
4    to:_____
5    _____
6    Reason for
7    change:_____
8    Page No._____Line No._____Change
9    to:_____
10   _____
11   Reason for
12   change:_____
13   Page No._____Line No._____Change
14   to:_____
15   _____
16   Reason for
17   change:_____
18   Page No._____Line No._____Change
19   to:_____
20   _____
21   Reason for
22   change:_____
23   SIGNATURE:_____DATE:_____
24            YESSICA K. VALLEJO
25
```

Page 246

```
1
2              DEPOSITION ERRATA SHEET
3    Page No._____Line No._____Change
4    to:_____
5    _____
6    Reason for
7    change:_____
8    Page No._____Line No._____Change
9    to:_____
10   _____
11   Reason for
12   change:_____
13   Page No._____Line No._____Change
14   to:_____
15   _____
16   Reason for
17   change:_____
18   Page No._____Line No._____Change
19   to:_____
20   _____
21   Reason for
22   change:_____
23   SIGNATURE:_____DATE:_____
24            YESSICA K. VALLEJO
25
```

