DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
1—4

**Page 1**

```
1
2              UNITED STATES DISTRICT COURT
3            SOUTHERN DISTRICT OF NEW YORK
4     ------------------------------------------X
5     FARAH JEAN FRANCOIS,
6                            Plaintiff,
7     -against-        Case No. 1:22-c-4447-JSR
8     VICTORY AUTO GROUP LLC d/b/a VICTORY
9     MITSUBISHI, SPARTAN AUTO GROUP LLC d/b/a
10    VICTORY MITSUBISHI, STAVROS ORSARIS, YESSICA
11    VALLEJO, DAVID PEREZ, DIANE ARGYROPOULOS, and
12    PHILIP ARGYROPOULOS,
13                            Defendants.
14    ------------------------------------------
15        VIDEOTELECONFERENCED DEPOSITION OF:
16                 DIANE ARGYROPOLOUS
17               New York, New York
18            Friday, December 9, 2022
19
20
21
22
23    Reported by:
      Aydil M. Torres, CSR
24    JOB NO. J8950423
25
```

**Page 2**

```
1
2
3
4
5              December 9, 2022
6              10:01 a.m.
7
8
9         VTC deposition of
10    DIANE ARGYROPOLOUS, held at the
11    offices of Nicholas Goodman &
12    Associates, PLLC, 333 Park Avenue
13    South, New York, New York, pursuant
14    to Notice, before Aydil M. Torres,
15    a Notary Public of the State of
16    New York.
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1
2    A P P E A R A N C E S:
3
4       LAW OFFICES OF AHMAD KESHAVARZ
5       Attorneys for Plaintiff
6          16 Court Street, #2600 Brooklyn
7          New York, New York 11241
8       BY:  EMMA CATERINE, ESQ.
9
10
11
12       NICHOLAS GOODMAN & ASSOCIATES, PLLC
13       Attorneys for Defendants
14          333 Park Avenue South, Suite 3A
15          New York, New York 10010
16       BY:  H. NICHOLAS GOODMAN, ESQ.
17
18       ALSO PRESENT:
19            Patrick Selvey, Esq.
20            Ahmad Keshavarz, Esq.
21
22
23
24
25
```

**Page 4**

```
1
2          S T I P U L A T I O N S
3
4       IT IS HEREBY STIPULATED AND AGREED
5    by and between the attorneys for the
6    respective parties herein, that filing,
7    sealing and certification and the
8    same are hereby waived and that the
9    questioning attorney shall provide counsel
10   for the witness examined herein with a copy
11   of this examination at no charge.
12
13       IT IS FURTHER STIPULATED AND AGREED
14   that all objections, except as to the
15   form of the question shall be reserved
16   to the time of the trial.
17
18       IT IS FURTHER STIPULATED AND AGREED
19   that the within deposition may be signed
20   and sworn to before any officer authorized
21   to administer an oath, with the same force
22   and effect as if signed and sworn to before
23   the Court.
24
25
```



DIANE ARGYROPOLOUS                                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC                              5—8

Page 5

1
2          THE REPORTER:  My name is
3  Aydil M. Torres a New York State
4  notary public and certified
5  shorthand reporter.  This
6  deposition is being held via
7  videoconferencing equipment.  The
8  witness and reporter are not in the
9  same room.  The witness will be
10  sworn in remotely pursuant to
11  agreement of all parties.  The
12  parties stipulate that the
13  testimony is being given as if the
14  witness was sworn in person.
15  D I A N E   A R G Y R O P O L O U S,
16      called as a witness, having been
17      duly sworn by a Notary Public, was
18      examined and testified as follows:
19          THE REPORTER:  Please state
20  your name and spell it for the
21  record.
22          THE WITNESS:  Diane
23  Argyropoulos.  D-I-A-N-E,
24  A-R-G-Y-R-O-P-O-U-L-O-S.
25          THE REPORTER:  Please state

Page 6

1
2      your address for the record.
3          THE WITNESS:  4101 Boston
4      Road, Bronx, New York 10466.
5  EXAMINATION BY
6  MS. CATERINE:
7      Q.  Good morning.
8      A.  Good morning.
9      Q.  Ms. Argyropoulos, have you ever
10  gone by any other names or aliases?
11      A.  My maiden name.
12      Q.  What is that?
13      A.  Papadakos.
14      Q.  Could you spell that, please?
15      A.  P-A-P-A-D-A-K-O-S.
16      Q.  Some of the documents in this case
17  have "Argyropoulos" spelled differently.
18      Do you ever spell it differently or
19  are those just misspellings?
20      A.  It's misspelled.
21      Q.  Okay.  I am sure probably often.
22      A.  It's a long name.
23      Q.  Have you ever had your deposition
24  taken before?
25      A.  "Have" I -- sorry, can you rephrase

Page 7

1
2  that?
3      Q.  Sure.  Have you ever had a
4  deposition taken before?
5      A.  Yes.
6      Q.  And what was the nature of that
7  deposition?
8      A.  The Nelson case.
9      Q.  Any other depositions, besides that
10  one?
11      A.  I don't recall.  I don't think so.
12  I don't recall any.
13      Q.  And were you testifying as an
14  individual or as a corporate representative
15  in that case?
16      A.  Corporate representative, yeah.
17      Q.  Okay.  Have you ever testified in a
18  court proceeding?
19      A.  Yes.
20      Q.  Which court proceeding did you
21  testify in?
22      A.  It was about the Etch.
23      Q.  The New York Attorney General case;
24  is that correct?
25      A.  Yes, yes.

Page 8

1
2          MR. GOODMAN:  You have to
3      let her finish the question.  So
4      the court reporter can't take down
5      two people at once.
6          THE WITNESS:  Sorry.
7      Q.  It's all right.  It's natural to do
8  that in conversation.  Just try to -- try to
9  remember that.
10          What do you remember about that
11  case?
12          MR. GOODMAN:  Object to the
13      form; go ahead.
14      A.  I remember that my general manager
15  was selling a product.  I was not aware that
16  we were going to have a problem with that.
17  Once it came to my attention, I fired him and
18  everybody else who was selling this product.
19      Q.  What was the name of that general
20  manager?
21      A.  Scott.
22      Q.  Last name?
23      A.  I don't recall.  It's been too many
24  years.
25      Q.  That's all right.  And what were



Page 9

1
2    the names of the other employees who you
3    fired?
4         A.   Danny.  I don't...
5         Q.   If you don't remember, don't guess.
6    Just tell me what you remember.
7         A.   Danny.  That's all I remember.
8         Q.   Okay.  All right.  Let's take a
9    look at Exhibit 35, which is Bates-stamped
10    Francois 3679 to Francois 3684.
11              MR. GOODMAN:  Emma, what's
12         the subject matter of those?
13              MS. CATERINE:  That's the
14         stipulation of settlement for the
15         New York Attorney General lawsuit.
16              MR. GOODMAN:  All right.
17         Let me go through what I have here.
18              MS. CATERINE:  Yeah, sure.
19              MR. GOODMAN:  It's probably
20         here somewhere, so -- I don't think
21         I have that out on the table for
22         whatever reason.  I can get it
23         printed pretty quickly, if we need
24         to do that.
25              MS. CATERINE:  No, that's

Page 10

1
2         all right.  We will just see if we
3         can ask these questions without the
4         document in front of us.
5              MR. GOODMAN:  Okay.
6         Q.   Ms. Argyropoulos, what do you
7    remember about how the New York Attorney
8    General lawsuit was resolved?
9              MR. GOODMAN:  Object to the
10         form; go ahead.
11         A.   I remember that it was settled and
12    we paid back everything that we charged.
13         Q.   Do you recall a provision in the
14    settlement, where it stated that if the
15    respondents failed to make payments on the
16    settlement, that a judgment would be entered
17    against Phillip R. Argyropoulos, personally?
18         A.   Yes.
19         Q.   And Philip Argyropoulos is your
20    husband, correct?
21         A.   We're separated.
22         Q.   I see.  Why was the settlement --
23    why did the settlement have this provision
24    for personal -- for a judgment against him,
25    personally, rather than against you?

Page 11

1
2              MR. GOODMAN:  Object to
3         form.
4         A.   I don't really know why, to be
5    honest.  I am the one who appeared to the
6    court.  Phil was not there.  I mean, to me,
7    at the time, it didn't really matter because
8    I knew we were paying back that money, so I
9    was not concerned about a judgment.
10         Q.   So I know you have taken a
11    deposition before, but let's just go over a
12    couple of basics, just to refresh your
13    memory.
14              If you don't understand a question,
15    will you please ask me to rephrase the
16    question?
17         A.   Yes.
18         Q.   If I ask a question and you don't
19    ask me to rephrase the question, is it
20    reasonable to assume that you understood the
21    question?
22              MR. GOODMAN:  Object to
23         form.
24         A.   Yes.
25         Q.   During the course of your

Page 12

1
2    deposition, your attorney may be making
3    certain objections, as he just did, such as
4    objection to form.  Unless instructed not to
5    answer, do you understand that you are still
6    required to answer the question?
7         A.   Yes.
8         Q.   And for the court reporter, and for
9    the record, do you understand that you should
10    please orally answer, not nod, or say things,
11    like, "uh-huh"?
12         A.   Yes.  I may do that, though, by
13    accident.
14         Q.   That's all right.  If you forget,
15    that's totally fine.  How old are you?
16         A.   Fifty-four.
17         Q.   And where do you currently reside?
18              MR. GOODMAN:  No street
19         address.  Just where, generally.
20         A.   Nassau County.
21         Q.   What steps did you take in
22    preparation for your deposition today?
23         A.   I spoke to my attorneys.
24         Q.   And when you say your "attorneys,"
25    are you referring to Mr. Goodman and Mr.



DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
13–16

Page 13

1
2    Selvey?
3       A.   Yes.
4       Q.   Did you speak with anyone else, in
5    preparation for your deposition today?
6       A.   I did.  I spoke to --
7             MR. GOODMAN:  Just wait for
8       the question.
9       Q.   Please, go ahead.
10            Who did you speak with?
11      A.   Stavros.
12      Q.   Anyone else?
13      A.   Vena.
14      Q.   And who is that?  What is that
15   person's full name?
16      A.   Vena Singh.
17      Q.   Okay, who is Vena Singh?
18      A.   My BDC manager.
19            MR. GOODMAN:  By counsel,
20       it's Bibi Singh, you may know her
21       as.
22            MS. CATERINE:  Sorry, I
23       couldn't hear that.
24            MR. GOODMAN:  You will see
25       her name on documents that you have

Page 14

1
2       exchanged as Bibi, B-I-B-I, Singh.
3             MS. CATERINE:  Okay.
4       Q.   And when did you speak to
5    Ms. Singh?
6       A.   This week.
7       Q.   When did you speak to Stavros?
8       A.   This week as well.
9       Q.   What documents have you reviewed,
10   in preparation for this deposition?
11      A.   What documents?  The CBC documents.
12      Q.   Okay.  Anything else?
13      A.   The reviews.
14      Q.   Okay.  What is your understanding
15   of what this lawsuit is about?
16            MR. GOODMAN:  Object to
17       form.
18      A.   I'm understanding that the customer
19   is saying that she was not present for the
20   loan.
21      Q.   And prior to your preparation for
22   the deposition in this case, had you reviewed
23   documents about Farah Jean Francois?
24      A.   No.
25      Q.   And by "documents," I also mean

Page 15

1
2    electronic documents, like computer screens.
3             Did you ever review any computer
4    screens for electronic documents about Farah
5    Jean Francois, prior to your preparation for
6    this deposition?
7       A.   Yes.
8       Q.   And was that the screens on
9    Dealertrack?
10      A.   No.
11      Q.   Could you explain to me what you
12   reviewed?
13      A.   The document -- when the lawsuit
14   came in, I reviewed those documents.
15      Q.   I see.  Do you have a login for
16   Dealertrack?
17      A.   Yes.
18      Q.   When was the last time you logged
19   into Dealertrack?
20      A.   A few days ago.
21      Q.   Do you login to Dealertrack as a
22   regular part of conducting the business of
23   Victory Mitsubishi?
24      A.   Yes.
25      Q.   And do you ever pull credit reports

Page 16

1
2    in Dealertrack?
3       A.   No.
4       Q.   What do you, generally, use
5    Dealertrack for in the ordinary course of
6    your business?
7       A.   To receipt -- the money that comes
8    in, to make sure we get all the credit cards.
9    Accounts payable.  It's more office side.
10      Q.   I see.  Some of the prior witnesses
11   have testified about a "back office" at
12   Victory Mitsubishi.  Is that the same thing
13   as what you just referenced as "office side"?
14            MR. GOODMAN:  Object to
15       form.
16            Go ahead.
17      A.   I am not understanding about the
18   "back office."
19      Q.   Sure, that's okay.  I'm not either.
20   That's why I was asking.  But that's okay.
21            Have you searched for e-mails
22   related to Farah Jean Francois?
23      A.   No.
24      Q.   Okay.  Do you ever use a personal
25   e-mail address to conduct business at Victory



DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
17–20

Page 17

1
2    Mitsubishi?
3        A.   I do, yes.
4        Q.   And what is that e-mail address?
5        A.   Diane@VictoryMitsubishi.com.
6        Q.   Do you use any other e-mail
7    addresses to conduct business at Victory
8    Mitsubishi?
9        A.   No.
10       Q.   Do you ever use any messaging apps,
11   like WhatsApp or Signal to conduct business
12   at Victory Mitsubishi?
13       A.   No.
14       Q.   Do you ever use your personal cell
15   phone to conduct business at Victory
16   Mitsubishi?
17       A.   Can you rephrase that question?
18       Q.   Sure.  Let me -- how -- when you
19   need to make phone calls in the ordinary
20   course of your business at Victory
21   Mitsubishi, what phone do you use?
22       A.   The business phone.
23       Q.   Do you ever use a personal cell
24   phone?
25           MR. GOODMAN:  Objection.

Page 18

1
2        Q.   For that purpose.
3        A.   Yes, if I am not at work.
4        Q.   Okay.  And what is your cell phone
5    number?
6            MR. GOODMAN:  Okay,
7            objection.  We can leave a blank in
8            the transcript and put it in,
9            please.
10           MS. CATERINE:  Okay.
11   TO BE FURNISHED: _____
12   _____
13       Q.   Did you graduate from high school?
14       A.   Yes.
15       Q.   Where did you go to high school?
16       A.   Fort Hamilton.
17       Q.   When did you graduate?
18       A.   Oh, boy.
19       Q.   Approximately.
20       A.   In the eighties.
21       Q.   Okay.
22       A.   Goodness, I haven't thought of
23   that.
24       Q.   Did you go to any school after high
25   school?

Page 19

1
2        A.   Yes.
3        Q.   And what was that?
4        A.   Saint Francis College.
5        Q.   And when did you graduate from
6    Saint Francis College?
7        A.   '92, '93.
8        Q.   And what was your degree in?
9        A.   Business.
10       Q.   Did you have any schooling, after
11   graduating from Saint Francis?
12       A.   No.
13       Q.   What did you do for employment,
14   after graduating from Saint Francis?
15       A.   I worked at a family business.
16       Q.   An what was the nature of that
17   business?
18       A.   A restaurant.
19       Q.   And how long did you do that for?
20       A.   Five years.
21       Q.   Okay.  When did you marry Phillip
22   Argyropoulos?
23       A.   1993.
24       Q.   And when did you first meet Chris
25   Orsaris?

Page 20

1
2        A.   2016.
3        Q.   Okay.  And how did you meet?
4        A.   Mutual friend.
5        Q.   And what was the nature of your
6    meeting; was it social or business?
7        A.   Social.
8        Q.   And when did you first meet Stavros
9    Orsaris?
10       A.   2016, as well.
11       Q.   Okay.  And do you know Chris
12   Orsaris, Junior?
13       A.   Yes.
14       Q.   When did you meet Chris Orsaris,
15   Junior?
16       A.   Last year.  Last -- either last
17   year or two years ago.  I don't remember.
18       Q.   Okay.  Does Chris Orsaris ever
19   refer to himself as "Chris Orsaris, Senior,"
20   or is he just "Chris Orsaris," and his son is
21   "Chris Orsaris, Junior"?
22       A.   I have never noticed.
23       Q.   Okay.
24       A.   I am not sure.
25       Q.   That's fine.



DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
21–24

Page 21

1
2        Have you ever met a George Orsaris?
3     A.  George Orsaris?  No, I don't think
4  so.  No.
5     Q.  Okay.  What about Peter Orsaris?
6     A.  Yes.
7     Q.  Sorry, did you say --
8     A.  Yes.
9     Q.  -- "yes"?  Okay.
10        And when did you meet Peter
11 Orsaris?
12     A.  I believe in 2016, '17.  Around
13 that time.
14     Q.  Okay.  And what about James
15 Orsaris?
16     A.  James is his -- who's that?
17     Q.  If you don't know, that's fine.
18     A.  I mean -- okay.
19        MR. GOODMAN:  If you don't
20     know, you don't know.
21     A.  I am not sure.  I don't know.
22     Q.  That's fine.
23        Have you ever met anyone named
24 James Orsaris?
25     A.  No.  Not James but...

Page 22

1
2     Q.  And I apologize because I am
3  probably going to butcher the pronunciation
4  for this one, but have you ever met Elfaria
5  Orsaris?
6     A.  Elfaria?  I don't know that name,
7  Elfaria.
8     Q.  Okay.
9     A.  No.
10     Q.  And do you have any children?
11     A.  Yes.
12     Q.  Do any of your children work at
13 Victory Mitsubishi?
14     A.  No.
15     Q.  What is CPMW Consultants,
16 Incorporated?
17     A.  Don't know.
18     Q.  Okay.  What is PSCA Management,
19 LLC?
20     A.  Don't know.
21     Q.  Okay.  What is Victory Cars East?
22     A.  A dealership in Huntington.
23     Q.  Do you have any relationship to
24 that dealership?
25        MR. GOODMAN:  Object to

Page 23

1
2     form.
3     A.  Yes.
4     Q.  What is the nature of your
5  relationship to that dealership?
6     A.  I am a partner.
7     Q.  And who is your partner for that
8  dealership?
9        MR. GOODMAN:  You can
10     answer.
11     A.  Stavros Orsaris and John Kekis.
12     Q.  What is Dream Car Gallery?
13     A.  A dealership.
14     Q.  And do you have any relationship to
15 that dealership?
16     A.  No.
17     Q.  Do you know who owns and operates
18 that dealership?
19     A.  No.
20     Q.  So how did you first get involved
21 in the business of auto dealerships?
22     A.  My husband opened it up in 2005 as
23 an investor, as a silent partner.
24     Q.  And when you say, "opened it up,"
25 what are you referring to, specifically?

Page 24

1
2     A.  With the partner.
3     Q.  Let me rephrase.
4     A.  Okay.
5     Q.  What dealership was opened up?
6     A.  Victory Auto Group.
7     Q.  Okay.  And where was it operating
8  at that time?
9     A.  4101 Boston Road, Bronx, New York.
10     Q.  And when did you start working at
11 that dealership?
12        MR. GOODMAN:  Object to
13     form.
14        Go ahead.
15     A.  October of 2008.
16     Q.  And what were you doing at that
17 time, at the dealership?
18     A.  Learning the business.
19     Q.  Were you receiving a salary at that
20 time?
21     A.  I don't recall.  I don't think so.
22     Q.  Okay.  And about how long were you
23 in this period of learning the business?
24     A.  I don't recall the accurate time
25 frame.

DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
25–28

Page 25

1
2      Q.   That's okay.  If you -- do you have
3  a general time frame sense; a few years, five
4  years, ten years?
5      A.   I want to say, five years.
6      Q.   Okay.  And after that period, what
7  did you do at the dealership?
8      A.   I -- let's see.  I do payables,
9  make sure we collect all deposits, I do
10  payroll, I pay all the bills.
11      Q.   And is that still the nature of
12  your work today?
13      A.   Yes.
14      Q.   And do you have a title?
15          MR. GOODMAN:  Today or --
16      object to form.  Time frame.
17      Q.   Sorry, go ahead.
18      A.   For which time frame?
19      Q.   What was your title once you
20  started doing this accounts payable-type
21  work?
22      A.   In what year?
23      Q.   Well, why don't you tell me.
24          What year did you start doing this?
25      A.   2008.

Page 26

1
2      Q.   All right.  What was your title at
3  that time?
4      A.   Accounts payable.
5      Q.   Okay.  And what is your -- what was
6  your title in 2020?
7      A.   Owner.
8      Q.   And what's your title today?
9      A.   Owner.
10      Q.   Have you ever had any other titles,
11  besides accounts payable and owner?
12      A.   People refer to me as different
13  things, as an office manager or -- at the end
14  the day, it's all the same.  So you can say,
15  "office manager."
16      Q.   Okay.  Have you ever worked for any
17  other dealerships, besides Victory Auto
18  Group?
19      A.   No.  I need to take that back.
20      Q.   That's fine.
21      A.   Yeah, sorry.  And Victory
22  Mitsubishi.
23          MR. GOODMAN:  And currently?
24          THE WITNESS:  Victory
25      Mitsubishi.  Spartan Auto Group,

Page 27

1
2  right.
3      Q.   Have you ever been arrested?
4      A.   No.
5          MR. GOODMAN:  Object to
6      form.  Go ahead.
7      Q.   Has anyone ever made a complaint
8  against Victory Mitsubishi that they were
9  defrauded by Victory Mitsubishi?
10          MR. GOODMAN:  Object to the
11      form.
12      A.   Anybody made a claim?  I don't
13  recall.
14      Q.   Has any consumer ever alleged that
15  Victory Mitsubishi deceived them or treated
16  them unfairly in the sale or financing of a
17  vehicle?
18          MR. GOODMAN:  Object to the
19      form; go ahead.
20      A.   In the Etch product.
21      Q.   Okay.  Any other instances, besides
22  that one?
23      A.   I don't recall any other ones.
24      Q.   And when did you start working at
25  Victory Mitsubishi?

Page 28

1
2      A.   2018.
3      Q.   Okay.  And was that at the opening
4  of Victory Mitsubishi?
5      A.   Yes.
6      Q.   And who made the decision to open
7  Victory Mitsubishi?
8          MR. GOODMAN:  Object to
9      form.
10      A.   I did.
11      Q.   And why did you decide to open
12  Victory Mitsubishi?
13      A.   I wanted a new car franchise at
14  that location.
15      Q.   And around the same time Victory
16  Auto Group was closed, correct?
17      A.   Correct.
18      Q.   And why was Victory Auto Group
19  closed?
20      A.   Because when you open a new car
21  franchise, you have to assume one name.  So I
22  had to close that name to replace it with
23  Victory Mitsubishi.
24      Q.   Okay.  And were the employees at
25  Victory Mitsubishi the same as the employees



DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
29–32

Page 29

1
2  at Victory Auto Group?
3         MR. GOODMAN:  Object to
4      form.
5      A.  Some were, yes.
6      Q.  And Stavros Orsaris was an employee
7  at both, correct?
8      A.  Yes.
9      Q.  And was David Perez an employee at
10  both?
11      A.  I don't remember if he was with
12  Victory Auto Group.
13      Q.  Okay.
14      A.  But he was with Victory Mitsubishi.
15      Q.  Was Yessica Vallejo an employee at
16  both?
17      A.  I don't remember if she was for
18  Victory Auto Group.
19      Q.  Okay.  Prior to you assuming the
20  title of owner, you testified you had a title
21  of accounts payable; is that right?
22  Something like that?
23      A.  Something like that.  Office
24  manager, uh-huh.
25      Q.  Okay.  Did you apply for that

Page 30

1
2  position?
3      A.  Did I?
4         MR. GOODMAN:  Object to
5      form; go ahead.
6      A.  I didn't apply.  My husband told me
7  we need to take over the business, and I went
8  to work.  So not really, no.
9      Q.  Okay.  Why did -- why did you need
10  to take over the business?
11         MR. GOODMAN:  Object to
12      form.
13      A.  My previous partner was stealing
14  from the company.
15      Q.  What was that partner's name?
16      A.  Nick.  I don't recall his last
17  name.
18      Q.  Okay.  And when did you find out
19  that he was stealing from the company?
20      A.  The summer of 2008.
21      Q.  Were there ever criminal charges
22  pressed against him?
23      A.  I am not sure.
24      Q.  Okay.  What training have you
25  received in -- for running an auto

Page 31

1
2  dealership?
3      A.  Can you rephrase that question?
4      Q.  Sure.  What trainings have you
5  received to do your work at Victory
6  Mitsubishi?
7      A.  Dealertrack training on the
8  accounting side, compliance training.  That's
9  it.
10      Q.  Okay.  Who put on the compliance
11  training?
12      A.  Dealertrack.
13      Q.  And what subjects were covered in
14  the compliance training?
15      A.  Security...so many years ago.
16  Security to make sure you are logged in when
17  you are on the DMS system, that it allows you
18  only a few minutes, if you don't login, it
19  turns it off for security purposes to make
20  sure documents are filed securely away, deal
21  jackets are locked up, and no one has access
22  to peoples personal information, payroll
23  records, things like that.
24      Q.  And when did you receive this
25  training?

Page 32

1
2      A.  Maybe ten years ago.  It's been a
3  long time.
4      Q.  Did that training include training
5  as to compliance with the Fair Credit
6  Reporting Act?
7      A.  No.  Not with me.
8      Q.  Okay.  Did that training cover
9  anything in regards to credit reporting?
10      A.  Not with me.
11      Q.  I know that you said the opening of
12  Victory Mitsubishi coincided with the closing
13  of Victory Auto Group, but Victory Auto
14  Group, in fact, still exists; is that
15  correct?
16      A.  Victory Auto Group does not exist,
17  no.
18      Q.  Let's look at Exhibit 36, which is
19  Bates-stamped Francois 1001 to 1013.
20         MR. GOODMAN:  What is it,
21      Emma, just the subject matter of
22      the pages?
23         MS. CATERINE:  This is the
24      56.1 statement in the Nelson/Diane
25      Argyropoulos, et al. case.



Page 33

1
2          MR. GOODMAN:  Okay.  You
3      will have to give me a minute here.
4      That's another one we don't have on
5      the table here, so I will have to
6      go out and get it, if necessary.
7          MS. CATERINE:  Yeah, I think
8      we need to get that.  We should
9      have that one in front of her for
10      these questions.
11          MR. GOODMAN:  Okay, no
12      problem.  Give me a couple -- it
13      will take three or four minutes.
14          MS. CATERINE:  Okay, that's
15      fine.
16          THE WITNESS:  Can I take a
17      break?
18          MS. CATERINE:  Yeah.
19          (Whereupon, a recess was
20      taken at this time.)
21  BY MS. CATERINE:
22      Q.   Before we get to the document,
23  actually, a few follow-up questions.
24          Who is your cell phone provider,
25  Ms. Argyropoulos?

Page 34

1
2      A.   AT&T.
3      Q.   And was that your cell phone
4  provider in 2020?
5      A.   I believe so.
6      Q.   Have you searched your cell phone
7  for calls or text messages, in regards to
8  this case?
9      A.   No.
10      Q.   Have you searched your cell phone
11  for calls or text messages on or around May
12  30, 2020?
13      A.   Not understanding the question.
14      Regarding?
15      Q.   Regarding this case.
16      A.   No.
17      Q.   Have you used your cell phone to
18  conduct business related to Farah Jean
19  Francois or the vehicle in this case?
20      A.   No.
21      Q.   Okay.  Now, let's look at Exhibit
22  36, Bates-stamped Francois 1001 to 1013.
23      What is this document?
24      A.   The Nelson case.
25      Q.   Did you review this document, prior

Page 35

1  to its filing?
2      A.   Yes.
3      Q.   And do you verify that everything
4  in this document is true, to the best of your
5  knowledge?
6      A.   No.  Not true.
7      Q.   Why not?
8      A.   The first one is not true.
9      Q.   And you're referring to the first
10  paragraph?
11      A.   Yes.
12      Q.   And how is that statement not true?
13      A.   Phillip Argyropoulos does not work
14  for the office -- for the dealership.
15          MR. GOODMAN:  Are you
16      talking about paragraph one or
17      paragraph --
18          THE WITNESS:  Oh, paragraph
19      one.
20      Q.   Oh, you are referring to the
21  unnumbered paragraph?
22      A.   Yeah.  Yes.
23      Q.   Okay.  And if you go down below the
24  header that says, "Background," there's a

Page 36

1
2  paragraph numbered number 1.
3      A.   Yes.
4      Q.   It says, "Defendant Victory Auto
5  Group, LLC, Spartan Auto Group, LLC, Victory
6  Mitsubishi collectively operate a new car
7  lease dealership at the address 4070 Boston
8  Road, Bronx, New York."
9      A.   Which is not --
10          MR. GOODMAN:  Let her finish
11      the --
12          THE WITNESS:  Sorry, I made
13      a mistake.
14      Q.   -- "in which plaintiff admits to in
15  his EEOC charge."  Is that statement
16  accurate?
17      A.   No.
18      Q.   How is it inaccurate?
19      A.   Victory Auto Group, LLC was not
20  operating as a new car dealership.
21      Q.   Was it operating at that time?
22          MR. GOODMAN:  Which "time"?
23      Object to form.
24      A.   What time frame?
25      Q.   This would be November 13, 2020.



Page 37
1
2    A.   It was not.
3    Q.   And if you could go down to go to
4   the next page, paragraph numbered number two,
5   it says, "The Defendants, Diane Argyropoulos,
6   Phillip Argyropoulos, Chris Orsaris, Alex
7   Letice -- I apologize if I am mispronouncing
8   that -- "all individuals who either own
9   and/or work with the corporate defendants and
10  have all appeared in this lawsuit."
11       Is that statement accurate?
12   A.   No.
13   Q.   How is that statement inaccurate?
14   A.   Phillip Argyropoulos did not work
15  or own the company.
16   Q.   When you say, "the company," which
17  company are you referring to?
18   A.   Spartan Auto Group.
19   Q.   Okay.  Is there anything else
20  inaccurate about that statement?
21   A.   Chris Orsaris and Alex Letice are
22  not owners of the company.
23   Q.   Okay.  What does Chris Orsaris do
24  at Spartan Auto Group?
25       MR. GOODMAN:  Object to the

Page 38
1
2       form.  Also, time frame.
3    Q.   In 2020.
4    A.   Buying vehicles.
5    Q.   Okay.  And who is Alex Letice?
6    A.   A salesperson.
7    Q.   Okay.  I know that you said that
8   the paragraph numbered one was not accurate.
9       As of November 2020, was there ever
10  a time in which the dealership was
11  collectively operated by Victory Auto Group
12  and Spartan Auto Group?
13       MR. GOODMAN:  Object to the
14       form.
15   A.   Time frame?
16       MR. GOODMAN:  Ever.
17       THE WITNESS:  Ever?
18   Q.   Ever.
19       MR. GOODMAN:  Collectively.
20   A.   No.
21   Q.   Okay.  Let's take a look at Exhibit
22  40, what was previously marked as Exhibit 40.
23  Defendant's 93 to 112.
24       MR. GOODMAN:  That one is
25       the CBC?

Page 39
1
2       MS. CATERINE:  Yes.
3       MR. GOODMAN:  Okay, we have
4   it.
5    Q.   What is this document?
6       THE WITNESS:  This one.
7       MR. GOODMAN:  Yeah.
8    A.   This is documents applying to use
9   Credit Bureau Connection to run credit.  It's
10  an agreement.
11   Q.   And how did you learn of Credit
12  Bureau Connection and the services they
13  provide?
14   A.   I don't recall how I learned about
15  them individually.  I don't know.
16   Q.   Is it just something that you
17  picked up in -- when -- in learning the
18  business between 2008 and 2018?
19   A.   Yes, it was one of the companies
20  that was mentioned that was good.
21   Q.   Okay.  And what does Credit Bureau
22  Connection do?
23       MR. GOODMAN:  Object to
24       form.
25   Q.   For auto dealerships, specifically.

Page 40
1
2    A.   Run credit for customers.
3    Q.   Did you fill out this document?
4    A.   Yes.
5    Q.   Why was this document filled out by
6   you, rather than someone at Victory
7   Mitsubishi who works with credit reports,
8   such as a finance manager?
9       MR. GOODMAN:  Object to the
10      form.
11   A.   It has to be the owner filling it
12  out.
13   Q.   I see.
14   A.   It's an agreement.
15   Q.   The estimate of "monthly inquiries"
16  here is "1,000."  Do you see that on the
17  first page?
18   A.   Yes.
19   Q.   Is that accurate?
20      MR. GOODMAN:  Object to
21      form.
22   A.   It's an average.
23   Q.   Okay.  And the agreement says here
24  that, "credit information will be used to,
25  quote, 'evaluate the credit of customers for



Page 41

1
2    consumer loans or lease,' end quote."
3          How does that work?
4    A.   It's -- it runs the customer's
5    credit and it -- to see if a customer is able
6    to purchase a vehicle, if they have the
7    credit.  It's all computerized.
8    Q.   Who at Victory Mitsubishi runs the
9    credit of consumers?
10         MR. GOODMAN:  Object to
11   form; time frame.
12   A.   Time frame?
13   Q.   In 2020.
14   A.   There was a few of the managers.  I
15   don't recall which managers were there at the
16   time.  I could name the couple that I do
17   know.
18   Q.   Okay, go ahead, please.
19   A.   Stavros Orsaris, Yessica Vallejo,
20   Joe Grabino.  I don't recall everybody at
21   that time.
22   Q.   That's okay.  Were sales associates
23   allowed to run consumers credits?
24   A.   No.
25   Q.   Was anyone else, besides managers,

Page 42

1
2    allowed to run a consumer's credit?
3    A.   No.
4    Q.   Turning to the page marked
5    Defendant's 94, and the third bullet point,
6    it says at the end that Victory Mitsubishi,
7    quote, "Will obtain the consumer's written
8    authorization to request such information
9    relating to that consumer," end quote.
10   Referring to credit reports, "How does
11   Victory Mitsubishi obtain written
12   authorization"?
13         MR. GOODMAN:  Object to form
14   time frame.
15   Q.   In 2020.
16   A.   There's an application the customer
17   fills out, signs it, and gives it to a
18   manager to run the credit.
19   Q.   Who created that application form?
20   A.   I don't recall.
21   Q.   And who creates the policies,
22   generally, to comply with this agreement
23   between Victory Mitsubishi and CBC?
24         MR. GOODMAN:  Object to the
25         form; go ahead.

Page 43

1
2    A.   Can you rephrase the question?
3    Q.   Sure.  So in this agreement between
4    Victory Mitsubishi and CBC, your Victory
5    Mitsubishi, is agreeing to do things, in
6    return for receiving the services of CBC; is
7    that accurate?
8    A.   Yes.
9    Q.   And who determines how to comply
10   with this agreement at Victory Mitsubishi?
11         MR. GOODMAN:  Object to
12         form; go ahead.
13   A.   Stavros.
14   Q.   Okay.  Do you make any decisions,
15   in terms of complying with this agreement, at
16   Victory Mitsubishi?
17   A.   Can you rephrase the question?
18   Q.   Sure.  So you say, Stavros makes
19   decisions.  Does he consult with you about
20   those decisions?
21   A.   Meaning, during the time or to
22   understand the policy of CBC?  I am still not
23   understanding.
24   Q.   Sure, let me be very --
25   A.   Yes.

Page 44

1
2    Q.   Let me just try to be as direct
3    here as I can.
4          Were you involved, in 2020, with
5    establishing policies and procedures at
6    Victory Mitsubishi for credit reporting?
7          MR. GOODMAN:  Object to the
8          form; go ahead.
9    A.   I explained to Stavros how it has
10   to be handled and the regulations on it.
11   That was my only involvement with that.
12   Q.   Okay.  What do employees at Victory
13   Mitsubishi have to do, prior to pulling a
14   credit report for a consumer?
15         MR. GOODMAN:  Object to the
16         form.
17   Q.   In 2020.
18   A.   The customer has to have an
19   application and proof of ID.
20   Q.   And who is that presented to?
21   A.   To one of the managers.
22   Q.   An employees have to login to
23   Dealtertrack, in order to pull a credit
24   report; is that correct?
25   A.   Yes.



DIANE ARGYROPOLOUS                                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC                        45–48

1
2      Q.   Do sales associates or -- excuse
3   me.  Are sales associates able to log into
4   Dealtertrack?
5      A.   No.
6      Q.   Who at Victory Mitsubishi -- not
7   names, but rather titles -- are able to log
8   into Dealtertrack?
9      A.   Managers and finance managers.
10     Q.   And how many managers and finance
11  managers were there at Victory Mitsubishi in
12  2020?
13     A.   That's hard for me to answer that
14  because it was during COVID, and there was a
15  lot of regulations.  So we had different
16  sales crew at the time.  So I would say,
17  maybe, at that time, three or four people.
18     Q.   Okay.  Is Chris Orsaris a manager?
19          MR. GOODMAN:  Object to
20       form.
21     A.   No.
22     Q.   Does Chris Orsaris have a login for
23  Dealtertrack?
24          MR. GOODMAN:  Object to
25       form.  Time frame.

1
2      A.   Time frame?
3      Q.   2020.
4      A.   I believe he does because he is the
5   buyer, and that's -- he has to check the
6   inventory.
7      Q.   Are credit reports ever pulled at
8   Victory Mitsubishi with software, other than
9   Dealtertrack?
10     A.   What kind -- can you rephrase the
11  question?
12     Q.   Sure.  So you testified that
13  Dealtertrack is used to pull credit reports.
14     A.   Yes.
15     Q.   Is there any other way to pull
16  credit reports at Victory Mitsubishi, besides
17  Dealtertrack?
18     A.   Yes, there is.
19     Q.   And what is that method?
20     A.   A customer could apply online.
21  There's everything -- it's a soft pool,
22  actually, so it does not effect their credit.
23  And there's all the documents that they would
24  have to fill out electronically and sign.
25     Q.   Okay.  Besides the soft pull, is

2   there any other way that credit reports are
3   pulled at Victory Mitsubishi?
4      A.   No.
5      Q.   Are you familiar with a program
6   called T-A-L-X?
7      A.   No.
8      Q.   How is income information verified
9   at Victory Mitsubishi?
10     A.   I don't work the floor.  I don't
11  know.
12     Q.   Okay.  If you turn to Defendant's
13  96 on Exhibit 40.
14          THE WITNESS:
15       This one?
16          MR. GOODMAN:  Yeah, yes.
17     Q.   There's a signature at the bottom
18  of someone named David Daniel who's listed as
19  a "compliance manager."
20          Who is David Daniel?
21     A.   He worked for Credit Bureau
22  Connection.
23     Q.   And when was the last time you
24  spoke to David Daniel?
25     A.   Couple of years ago.  I am assuming

1
2   when I signed these documents.
3      Q.   Okay.  Let's go to Exhibit 41,
4   please, Bates-stamped Defendant's 73 to 82.
5          MR. GOODMAN:  We got it.
6      Q.   Okay, what is that document?
7      A.   Capital One dealer agreement.
8      Q.   And did you fill out this
9   agreement?
10     A.   I don't -- I don't recall filling
11  this out, no.
12     Q.   If you can turn to the page marked
13  Defendant's 75.  At the bottom, there's a
14  signature line which says, "initial here,"
15  and then there are initials.
16          Are those your initials?
17     A.   Yes.
18     Q.   Based on that, do you believe that
19  you filled out this document?
20          MR. GOODMAN:  Object to
21       form.
22     Q.   Sorry?  Excuse me?
23     A.   I signed the document.
24     Q.   Okay.  Let's go back to the first
25  page of the document, please.  There's



DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
49–52

Page 49

1
2  something here which says, "floor plan
3  provider," and it's filled in with "AFC."
4        What does that mean?
5      A.   That's who owns the vehicles.  It's
6  a bank.
7      Q.   I see.  Do you know what "AFC"
8  stands for?
9      A.   I don't remember.
10     Q.   Okay.  And under "contacts," we
11  have Chris Orsaris listed as "general
12  manager" and "general sales manager."
13        Why is Chris Orsaris listed here as
14  both "general manager" and "general sales
15  manager"?
16        MR. GOODMAN:  Object to the
17     form.
18     A.   He is the one who had the
19  relationship with Capital One Bank for us to
20  get the bank.
21     Q.   I see.  When you say, "he was the
22  one with the relationship with Capital One
23  Bank," was that based on his prior auto
24  dealership experience?
25        MR. GOODMAN:  Object to the

Page 50

1
2     form.
3      A.   I would say, yes, to that.
4      Q.   And under "primary credit," slash
5  "call back contact," there's someone named
6  "Edwin Feables."  Who is Edwin Feables?
7      A.   He was a finance manager at the
8  time.
9      Q.   And Mr. Feables no longer works for
10  Victory Mitsubishi; is that correct?
11     A.   Yes.
12     Q.   And when did Mr. Feables stop
13  working at Victory Mitsubishi?
14     A.   I don't recall the year.
15     Q.   And was Mr. Feables fired?
16     A.   No.  No.
17     Q.   And there's someone here listed
18  under C-O-A-F-A-S-M, named "Ken McGhee."
19        Who is Ken McGhee?
20     A.   Capital One's bank rep.
21     Q.   Okay.  Have you ever spoken with
22  Ken McGhee?
23     A.   Yes.
24     Q.   When was the last time you spoke
25  with Mr. McGhee?

Page 51

1
2      A.   Last week.
3      Q.   And in that conversation last week,
4  was anything discussed about this case, Farah
5  Jean Francois, or the vehicle?
6      A.   No.
7      Q.   How regularly do you speak with
8  Mr. McGhee?
9      A.   Can't really say.  Whenever he
10  stops by to say hello to me.  Maybe once a
11  month, once every two months.
12     Q.   And, in general, what's the nature
13  of those conversations?  What are they about?
14     A.   With me, generally, last week, he
15  just wanted to tell me when he is sending
16  things for Christmas to the employees as a
17  thank you, as a lunch.  He does -- yeah, very
18  rarely.  He usually goes to the showroom.  My
19  office is across the street, though.
20     Q.   I see.  And then there's someone
21  here listed under "C-O-A-F-R-S-M, Robert
22  Montgomery."  Who is Robert Montgomery?
23     A.   He worked for Capital One.
24     Q.   You testified that you have an
25  office at the 4101 Boston Road address; is

Page 52

1
2  that correct?
3      A.   Yes.
4      Q.   Who else has an office at that
5  address?
6      A.   My comptroller, bookkeeper,
7  accounts payable, two DMV girls, and customer
8  relations.  And then another person who takes
9  pictures of the vehicles.  And myself, of
10  course.
11     Q.   Does Chris Orsaris have an office
12  at that address?
13     A.   No.
14     Q.   Does Chris Orsaris have an office
15  at the 4070 Boston Road address?
16     A.   No.
17     Q.   Where does Chris Orsaris work out
18  of?
19        MR. GOODMAN:  Object to
20     form.
21     A.   On his computer, I guess, from
22  home.
23     Q.   And has he been doing that since
24  the pandemic, or is that just, sort of,
25  always been the way that he has worked?



DIANE ARGYROPOLOUS                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC                  53—56

Page 53

1
2       A.   That's always been the way he
3   worked.
4       Q.   I see.  And if you turn to
5   Defendant's 77 of the document, you will see
6   that Stavros Orsaris is listed as a "managing
7   member."  Why is Stavros Orsaris listed as a
8   "managing member"?
9           MR. GOODMAN:  Object to
10          form.
11      A.   I don't know.
12      Q.   Okay.  And on the next page, Maria
13  -- I apologize if I'm mispronouncing -- Maria
14  Sores is listed as "comptroller."
15          Is Maria Sores still the
16  comptroller at Victory Mitsubishi?
17      A.   Yes.
18      Q.   How does the hiring of people work
19  at Victory Mitsubishi?
20          MR. GOODMAN:  Object to the
21          form.
22      Q.   Generally, in 2020.
23          MR. GOODMAN:  Still object
24          to form.
25      A.   In what department?

Page 54

1
2       Q.   Well, I guess that, sort of,
3   answers the question.  Let's talk about that.
4           How is that divided, in terms of
5   hiring, by department?
6       A.   Management.
7       Q.   Okay.  And so is hiring for the
8   jobs at the 4101 location, and the hiring for
9   the 4070 location, are those different?
10      A.   Yes.
11      Q.   Who is in charge of the hiring for
12  the 4070 location?
13      A.   Stavros.
14      Q.   And are you involved in the process
15  of hiring people for the 4070 location?
16      A.   No.
17      Q.   Is Phillip Argyropoulos involved in
18  hiring the people at the 4070 location?
19      A.   No.
20      Q.   Is Chris Orsaris involved in hiring
21  of people at the 4070 location?
22      A.   No.
23      Q.   Do you have your own office at the
24  4070 location?
25      A.   I do not.

Page 55

1
2       Q.   Does Phillip Argyropoulos have his
3   own office at the 4070 location?
4       A.   No.
5       Q.   Victory Mitsubishi is a d/b/a,
6   correct?
7       A.   Correct, yes.
8       Q.   And besides Spartan Auto Group,
9   what other companies has Victory Mitsubishi
10  been used as a d/b/a for?
11          MR. GOODMAN:  Object to the
12          form.  Go ahead.
13      A.   Victory Motors.
14      Q.   And where did Victory Motors
15  operate?
16      A.   Largemont.
17      Q.   Did Victory Motors operate anywhere
18  else, besides Largemont?
19      A.   No.
20      Q.   Did Victory Auto Group ever use the
21  d/b/a Victory Mitsubishi?
22      A.   No.
23      Q.   Who are the current owners of
24  Victory Mitsubishi?
25      A.   I am.

Page 56

1
2       Q.   Are there any other owners of
3   Victory Mitsubishi?
4       A.   No.
5       Q.   When Victory Mitsubishi was opened,
6   who were the owners?
7       A.   I was.
8       Q.   Anyone else?
9       A.   When it opened?  I don't recall.
10      Q.   How about in May of 2020, were
11  there any owners, besides yourself, in May of
12  2020?
13      A.   No.
14      Q.   Let's take a look at what is going
15  to be marked Exhibit 45.  This is one of the
16  new exhibits I sent this morning.  It's
17  schedule K-1 forms, Bates-stamped Francois
18  3531 to Francois 3538.
19          MR. GOODMAN:  You should
20          have those over there.  The K-1s.
21      Q.   All right, just let me know when
22  you have those forms in front of you, please.
23      A.   I have them.
24      Q.   Okay.  What are these documents?
25      A.   K-1s.

Page 57

1
2    Q.  Sorry, I couldn't --
3    A.  K-1.  The K-1 forms.
4    Q.  And who filled out these documents?
5    A.  The accountant.
6    Q.  Okay.  Was there a different
7  accountant for Victory Motors and Victory
8  Auto Group, LLC?
9    A.  At what year?
10   Q.  Let's start within 2016.
11   A.  In 2016, no.
12   Q.  Who fills out the K-1 forms for
13 Victory Mitsubishi?
14           MR. GOODMAN:  Objection;
15       form.
16   A.  The accountant.
17   Q.  And who is the accountant?
18   A.  Allan.
19   Q.  What's the last name?
20   A.  Digsberg.
21   Q.  And on the K-1 forms for Victory
22 Mitsubishi, are you listed as the partner?
23   A.  For Victory Mitsubishi?
24   Q.  Uh-huh.
25   A.  The owner.

Page 58

1
2    Q.  The owner.
3    A.  I don't see any documents here for
4  Victory Mitsubishi.
5    Q.  There aren't any.  We don't have
6  any, as of yet.
7    A.  Okay.
8    Q.  And so for those K-1 documents for
9  Victory Mitsubishi, would those show the
10 percentage of your ownership?
11   A.  I am not sure.
12   Q.  Okay.  And returning to the
13 documents, actually, in front of you, if you
14 turn to the page marked Francois 3535, it
15 will be for the year 2016.
16   A.  Yes.
17   Q.  And this document appears to list
18 your ownership in Victory Auto Group, LLC, as
19 "one percent"; is that accurate?
20   A.  I believe so.
21   Q.  Okay.  And was that your ownership
22 in Victory Auto Group, LLC, up until it
23 ceased operations?
24   A.  No.
25   Q.  How did it change?

Page 59

1
2    A.  To thirty percent.  I just don't
3  know the year.
4    Q.  That's fine.  Let's go to Exhibit
5  28, please.
6           MR. GOODMAN:  Bates stamps?
7           MS. CATERINE:  Bates stamps
8       is subpoena responses 463 to 484.
9       These are the franchise agreements
10      with Mitsubishi.
11          THE WITNESS:  I have it?
12          MR. GOODMAN:  Yeah, should
13      be there.
14   Q.  Okay, could you explain to me what
15 this document is?
16   A.  I don't have it in front of me.
17   Q.  Oh, I'm sorry.
18          MR. GOODMAN:  That's okay.
19          MS. CATERINE:  It has the
20      Mitsubishi logo at the top.  It's
21      titled "Dealer Sales and Service
22      Agreement."
23          MR. GOODMAN:  Okay, so we
24      have, starting at 463?
25          MS. CATERINE:  Uh-huh.

Page 60

1
2           MR. GOODMAN:  Yeah.
3           THE WITNESS:  Okay.
4    Q.  And so what is this document?
5    A.  It's the dealer agreement with
6  Mitsubishi.
7    Q.  And what is the purpose of this
8  agreement with Mitsubishi?
9           MR. GOODMAN:  Object to
10      form.
11   A.  Ownership.
12   Q.  Okay.
13   A.  Of Mitsubishi, the franchise.
14   Q.  And let's turn to the page
15 Bates-stamped subpoena responses 464.
16   A.  Okay.
17   Q.  And here it listed your percentage
18 of ownership as "thirty percent."  Is that
19 what you were talking about, in terms of your
20 ownership changing to thirty percent?
21   A.  No.  You asked me for Victory Auto
22 Group.
23   Q.  I see.  So this is -- this is for
24 Spartan Auto Group, correct?
25   A.  Correct.



Page 61

2    Q.   And is this accurate, that you are
3  a thirty percent owner in January 30, 2018?
4         MR. GOODMAN:  Object to
5      form; go ahead.
6    A.   It's accurate.  And the reason why
7  -- should I explain?
8         MR. GOODMAN:  Yeah, go
9      ahead.
10    A.   The reason why it was thirty
11  percent, Mitsubishi knew I owned Spartan Auto
12  Group, that Phillip did not own Spartan Auto
13  Group.  But to get me to one hundred percent,
14  he had to slowly change to thirty percent
15  Mitsubishi, so I could be approved as 100
16  percent owner of Mitsubishi.
17    Q.   And I know that you don't work at
18  Mitsubishi, but what is your understanding of
19  why that was required?
20         MR. GOODMAN:  Object to the
21      form.
22    A.   There's an -- they have approvals.
23  I am not sure, exactly, what it was.  We did
24  as we were told from Mitsubishi.
25    Q.   Okay.  So this -- this, sort of,

Page 62

2  transition of franchise ownership process,
3  was something that Victory Mitsubishi had
4  recommended to you; is that correct?
5    A.   Mitsubishi Motors recommended to
6  me.
7    Q.   Oh, sorry.  Yes, yes.
8    A.   Mitsubishi Motors recommended it to
9  us, knowing that I only owned Spartan Auto
10  Group.
11    Q.   Okay.  And when did Mitsubishi
12  Motors recommend this to you?
13    A.   When we first did our application
14  with them.  So I believe in 2018, around that
15  time.
16    Q.   Okay.  Why was it that you were
17  moving towards you operating the franchise
18  solely, and Phillip no longer being involved?
19         MR. GOODMAN:  Object to
20      form.  Lots of objections to form.
21      Go ahead.
22    A.   Because I owned Spartan Auto Group.
23  So he had zero interest to that.
24    Q.   Sure.  Sure.  Let me rephrase the
25  question.

Page 63

2         With the closing of Victory Auto
3  Group, LLC, is Phillip involved in the auto
4  dealership business any longer?
5         MR. GOODMAN:  Object to
6      form; go ahead.
7    A.   No.
8    Q.   And why did he cease his
9  involvement in auto dealerships?
10         MR. GOODMAN:  Object to
11      form.
12    A.   He never was involved.  He didn't
13  work at the dealership.
14    Q.   Sure.  Let me rephrase.
15         Why did he cease investing in auto
16  dealerships?
17    A.   Ask him that question.
18    Q.   Do you have any -- do you have any
19  understanding of why he did?
20    A.   I -- I -- I run day-to-day
21  operation.  I am there.  He is not.  He is an
22  attorney.  So he has no responsibilities of
23  it.  So I don't know.  You should ask him
24  that question.
25    Q.   Okay.  And if you turn to the page

Page 64

2  marked subpoena responses 47 --
3    A.   I got it.
4    Q.   -- you will notice in the bottom
5  left corner, the agreement date is listed as
6  "March 1st, 2021."  Were there any other
7  dealer sales and service agreements between
8  January 30, 2018, and March 1st, 2021?
9    A.   I'm not sure.
10    Q.   Okay.  If there are not any other
11  dealership agreements between these two
12  agreements, is it reasonable to assume that
13  the January 30, 2018, agreement, governed in
14  May of 2020?
15         MR. GOODMAN:  Object to
16      form.
17    A.   I don't know.
18    Q.   If you could please turn to
19  subpoena responses 48.
20    A.   Okay.
21    Q.   You will notice in the bottom left
22  corner, the agreement date is listed as
23  "September 20, 2022."  And this agreement in
24  September 20, 2022, is the first to list you
25  as a 100 percent franchise owner; is that



Page 65

1
2    correct?
3        A.  It was something that was -- yes,
4    but it was something that --
5            MR. GOODMAN:  Just say,
6        "yes."
7            THE WITNESS:  Yes.
8            MR. GOODMAN:  Can I see the
9        page?  Just that page.
10           Yeah, okay, go ahead.
11       Q.  If you can take a look at Exhibit
12   38, please, which is Bates-stamped Francois
13   3504 to 3514.
14           MR. GOODMAN:  What is the
15       subject?
16           MS. CATERINE:  It's the
17       Mitsubishi dealer sales and service
18       agreement for Victory Motors, LLC.
19           MR. GOODMAN:  Oh, boy.  I
20       don't think we have that one out.
21       Yeah, that one I will have to
22       retrieve.  What were the Bates
23       stamps?
24           MS. CATERINE:  It is
25       Francois 3504 to 3514.

Page 66

1
2            MR. GOODMAN:  Okay, I will
3        have to go get that one.  You want
4        to -- let's take a five-minute
5        break, and I will pull it up.
6            MS. CATERINE:  Sure, that's
7        fine.
8            (Whereupon, a recess was
9        taken at this time.)
10   BY MS. CATERINE:
11       Q.  If you could turn to the page
12   Bates-stamped Francois 3505.
13           And do you see the provision number
14   four, "management of dealer"?
15       A.  Yes.
16       Q.  Is this provision, essentially, the
17   same in the Mitsubishi dealership agreements
18   that you are familiar with?
19           MR. GOODMAN:  Object to the
20       form.
21       A.  I am not sure.
22       Q.  On a day-to-day basis, who are you
23   working at Victory Mitsubishi?
24           MR. GOODMAN:  Object to
25       form; time frame.

Page 67

1
2        Q.  In 2020.
3        A.  In 2020, I was really not going to
4    work because of COVID, so I worked remotely.
5        Q.  Okay.  Working remotely.  Who would
6    you speak with on a day-to-day basis?
7        A.  Maria Sores and Arifacan.
8        Q.  How often would you speak to
9    Stavros Orsaris at that time?
10       A.  I would say, once a day.
11       Q.  Okay.  Was there anyone in May of
12   2020, working at Victory Mitsubishi, with the
13   last name Ventura?
14       A.  I don't -- I don't recall.
15       Q.  Okay.  How many auto salespeople
16   were working at Victory Mitsubishi in May of
17   2020?
18           MR. GOODMAN:  Object to the
19       form.  You mean -- object to form;
20       go ahead.
21       A.  In what department?
22       Q.  Sure.  Let me rephrase the
23   question.  How many sales associates were
24   working at Victory Mitsubishi in May of 2020?
25       A.  Just sales?  Salespeople?

Page 68

1
2        Q.  Yes.
3        A.  Hard for me to answer because of
4    the time with COVID.  I really don't know.  I
5    was not present.
6        Q.  So was it changing a lot at that
7    time?
8        A.  It was not that it was changing.
9    It's because of COVID, you know, there was
10   rules and regulations, so we had different
11   shifts to keep everybody far away from each
12   other.  So I really don't know because I was
13   not there at all.
14       Q.  And who set that up, the, you know,
15   having different employees during different
16   shifts for COVID prevention reasons?
17       A.  Stavros.
18       Q.  How many managers were there at
19   Victory Mitsubishi in sales and financing, in
20   May of 2020?
21           MR. GOODMAN:  Object to
22       form.
23       A.  I don't remember the amount.  I
24   don't know.
25       Q.  Okay.  Did you receive a salary for



Page 69

1
2    your work at Victory Mitsubishi, in May of
3    2020?
4        A.  I don't -- "salary"?  I don't -- I
5    believe I did.  But not salary.  I don't get
6    paid salary.  So, no, I did not.
7        Q.  Okay.  How does your compensation
8    work at Victory Mitsubishi?
9        A.  I cut myself a check whenever I
10   can, but it's not really a salary, just
11   ownership.
12       Q.  Sure.  When you say you're -- you
13   cut yourself a check, what company is the
14   payor for that check?
15       A.  Rephrase that question.
16       Q.  Let me just put it this way:  When
17   you say you "cut" yourself a check, what does
18   that mean, practically?
19            Who is the payment going from and
20   to?
21       A.  Spartan to me.  Spartan Auto Group
22   pays me.
23       Q.  Okay.  What is the company payor
24   for the paychecks of the employees at Victory
25   Mitsubishi?

Page 70

1
2        A.  I don't know the name of the
3    company, offhand.  It's on-site payroll
4    company we use.
5        Q.  But are the payments for employees
6    at Victory Mitsubishi, are those coming from
7    Spartan Auto Group?
8        A.  Yes.
9        Q.  And would that include Chris
10   Orsaris?
11       A.  He is a buyer, yes.
12       Q.  Is he a salaried employee?
13       A.  No.
14       Q.  Is he paid based on commission?
15       A.  He is paid based on -- I wouldn't
16   say commissions.  Depending on the vehicles
17   he buys as a buyer's fees.
18       Q.  Got you.  And how is his buyer's
19   fee agreed on?
20           MR. GOODMAN:  Object to the
21       form.
22       A.  Can you rephrase that question?
23       Q.  Sure.  Who determines what his
24   buyer's fee is at Victory Mitsubishi?
25       A.  It's a flat fee, basically, more or

Page 71

1
2    less, depending on the vehicle.  The
3    comptroller does -- she's the one who pays
4    him.
5        Q.  Okay.  So you previously testified
6    that Stavros Orsaris worked at Victory
7    Mitsubishi, prior to working at Spartan Auto
8    Group, correct?
9        A.  Yes.
10       Q.  Would the company that was cutting
11   his paycheck have changed at that time when
12   he went from working for Victory Auto Group,
13   to working at Spartan Auto Group?
14       A.  I don't know.
15       Q.  When you were working at Victory
16   Auto Group, were you working at the 4101
17   Boston Road location?
18       A.  Yes.
19       Q.  During the change from Victory Auto
20   Group to Spartan Auto Group, other than the
21   change in the company name, were there any
22   other changes for you as an individual?
23       A.  I became the owner.
24       Q.  In terms of work that you were
25   doing on a daily basis, was there any change?

Page 72

1
2        A.  No.
3        Q.  Have you fired anyone at Victory
4    Mitsubishi?
5        A.  I don't think so, no.
6        Q.  Do you know of any one who has been
7    fired at Victory Mitsubishi?
8        A.  Do I know anyone that has been
9    fired?
10       Q.  Let me withdraw that question.
11           Who makes the decisions at Victory
12   Mitsubishi on whether to terminate peoples
13   employment?
14       A.  Which department?
15       Q.  In sales and financing.
16       A.  Stavros.
17       Q.  Has Stavros ever fired an employee,
18   based on allegations of them defrauding
19   consumers?
20           MR. GOODMAN:  Object to the
21       form.
22       A.  No.
23       Q.  Who is David Perez?
24       A.  Manager.
25       Q.  Did you make the decision to hire



DIANE ARGYROPOLOUS                                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC                              73–76

Page 73

1
2    Mr. Perez?
3        A.   No.
4        Q.   Who made that decision?
5        A.   Stavros.
6        Q.   When did Mr. Perez start working at
7    Victory Mitsubishi?
8        A.   I don't know.
9        Q.   What were his responsibilities as a
10   sales manager at Victory Mitsubishi?
11       A.   I don't know.  I am assuming
12   whatever Stavros directed him to do.
13       Q.   Does anyone supervise the sales and
14   finance managers, besides Stavros?
15       A.   No.
16       Q.   What interactions do you have with
17   those sales and financing departments, in
18   their ordinary course of your work?
19            MR. GOODMAN:  Object to
20        form.
21       A.   What do you mean?
22       Q.   So, sort of, day-to-day basis of
23   doing your job, what sort of interactions do
24   you have with people who work in sales and
25   financing?

Page 74

1
2        A.   I occasionally go to the sales
3    room, just to say a quick hello to everybody.
4    Not much.  I don't -- they don't come to me.
5    I don't go to them.  Everything goes through
6    Stavros or my comptroller, Maria.
7        Q.   How did Victory Mitsubishi adapt to
8    the COVID-19 pandemic?
9            MR. GOODMAN:  Object to the
10       form.
11       A.   We followed all the regulations
12   that were required.
13       Q.   And who decided how to comply with
14   those regulations?
15       A.   Stavros.  You know, a lot of
16   business owners had to get creative during
17   those early days of COVID-19, to continue
18   sales and stay afloat.
19       Q.   How did your operations change
20   during those first few months of the
21   pandemic?
22       A.   We had our customers come in by
23   appointments.  We had everybody spread out.
24   Made sure everybody was safe.  That's it.
25       Q.   Okay.  So when the shut down order

Page 75

1
2    was given by the New York State government,
3    did you layoff any employees, even
4    temporarily?
5        A.   When it was shut down, we were
6    closed for a few weeks.  Everybody got laid
7    off.
8        Q.   And you said that lasted for a few
9    weeks?
10       A.   I believe it was two weeks that we
11   were supposed to close for.
12       Q.   By May 30, 2020, were there any
13   employees who were still laid off?
14       A.   Maybe.  I don't -- I don't
15   remember.
16       Q.   Okay.  By May 30, of 2020, other
17   than the measures you had previously
18   explained of appointment only, and social
19   distancing, besides those measures, had the
20   operations at Victory Mitsubishi changed in
21   any way?
22            MR. GOODMAN:  Object to
23        form.
24       A.   No, just safety, masking, you know,
25   every -- no, nothing -- nothing changed.

Page 76

1
2        Q.   Okay.  And would that be the same
3    in -- on June 29, 2020?
4        A.   On June 19?
5        Q.   June 29, 2020.
6        A.   Same thing.
7        Q.   Okay.  How about in September 19,
8    2020?
9        A.   Same thing.
10       Q.   Okay.  When did the vehicle
11   lay-away program at Victory Mitsubishi start?
12       A.   What does that mean?
13       Q.   The vehicle lay-away program.
14            MR. GOODMAN:  Vehicle
15        lay-away program.  Go ahead.
16       A.   I don't know what that means.
17       Q.   Okay.  What was the remote process
18   Victory Mitsubishi had during COVID-19?
19            MR. GOODMAN:  Object to
20        form.
21       A.   We did not do any remote sales, nor
22   did any customers apply for remote sales.  It
23   was a marketing company we used that did that
24   for promotion.  No customer reached out for
25   that, nor did we ever do any of that.  It was



Page 77

1
2    marketing.
3        Q.   Could you tell me what the term
4    "remote process" and "home delivery" means?
5            MR. GOODMAN:  Object to
6        form.
7        A.   We didn't do it, so I really cannot
8    tell you the terms.
9        Q.   So your testimony is that Victory
10   Mitsubishi did not have people buy and
11   finance cars remotely during the COVID-19
12   pandemic?
13       A.   Yes, correct.
14       Q.   So during the COVID-19 pandemic,
15   what was the general process of the
16   purchasing and financing of a car?
17           How would that work?
18       A.   I don't work on the sales floor, so
19   I can't really tell you that.  I can assume,
20   but I can't tell you what.
21       Q.   I don't want you to assume.
22       A.   That's why I am saying, I don't
23   work the floor, and during COVID, I didn't go
24   to the dealership for a very long time.
25       Q.   Did you go into the dealership at

Page 78

1
2    all during the year of 2020?
3        A.   I did.
4        Q.   Why did you go into the dealership
5    during 2020?
6            MR. GOODMAN:  Did you finish
7        your answer?
8            THE WITNESS:  I did not.
9        Q.   Sorry, go ahead and finish your
10   answer, please.
11       A.   I did.  But I did not go to the
12   showroom at 4070 for maybe a year.
13       Q.   Okay, sorry.
14       A.   I would go to 4101, to my office.
15   I would take stuff home to continue doing my
16   work.
17       Q.   Got you.  Got you.  During the year
18   of 2020, who was supervising the sales floor
19   at Victory Mitsubishi?
20       A.   Stavros.
21       Q.   Was anyone else in charge of
22   supervising the sales floor at Victory
23   Mitsubishi during that time?
24       A.   No.
25       Q.   Who would supervise, if Stavros was

Page 79

1
2    sick or on vacation?
3        A.   He doesn't -- he comes at -- he is
4    healthy; knock on wood.  He doesn't get sick,
5    and he doesn't really go on vacation.  I know
6    it sounds crazy, but he just doesn't go on
7    vacation so far, at least.
8        Q.   Who would the first person a
9    customer would talk to on the sales floor be,
10   when they come in to buy a vehicle, in May of
11   2020?
12       A.   I don't know.
13       Q.   Who would help consumers fill out
14   credit applications, in May of 2020, at
15   Victory Mitsubishi?
16       A.   I don't know.
17       Q.   Which Victory Mitsubishi employees
18   were pulling credit reports, in May of 2020?
19           MR. GOODMAN:  Asked and
20           answered.  Go ahead.
21       A.   Only managers run credit at all
22   times.
23       Q.   So that was the case in May of
24   2020, and during other times in Victory
25   Mitsubishi's history; is that correct?

Page 80

1
2        A.   Correct.
3        Q.   Are there video cameras in the
4    sales floor at Victory Mitsubishi?
5        A.   Yes.
6        Q.   So video recordings are made of the
7    sales at Victory Mitsubishi, correct?
8            MR. GOODMAN:  Object to the
9        form; time frame.
10       Q.   In May of 2020?
11       A.   I -- we do have cameras.  I just
12   don't know if they are in every office, but
13   we do have cameras for security purposes.
14       Q.   And what do you mean by "for
15   security purposes"?
16       A.   Break-ins, people trying to steal
17   cars.
18       Q.   Do you have access to the
19   recordings made by those cameras?
20       A.   No.
21       Q.   Who does have access to those
22   recordings?
23       A.   My IT guy and Stavros.
24       Q.   Who is your IT guy?
25       A.   He has a weird name.  I don't



DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
81–84

Page 81

1
2  remember his name.  I don't know.
3      Q.   That's all right.
4          MS. CATERINE:  Can we just
5      leave a blank.
6  TO BE FURNISHED: _____
7  _____
8      A.   Yeah, I can get it.
9          MR. GOODMAN:  Take it under
10     advisement.
11     Q.   And I won't tell him.
12         Have you ever seen any video
13  recordings made with those cameras?
14     A.   Yes.
15     Q.   What were the circumstances of you
16  reviewing video recordings made on those
17  cameras?
18     A.   It doesn't matter on time frame?
19     Q.   Let's say in 2020.
20     A.   In 2020, we had a break-in when
21  they were rioting, so that's -- the cameras
22  got into the parking lot, and the vehicles
23  that they stole.
24     Q.   Did you report those break-ins and
25  thefts to the police?

Page 82

1
2      A.   Yes.
3      Q.   Other than break-ins and thefts,
4  have you ever spoken with the police about
5  anything regarding Victory Mitsubishi?
6      A.   No.
7      Q.   And so during -- when you were
8  reviewing those videos of the break-in in
9  2020, were you in someone's office?
10     A.   They sent it to me because I wasn't
11  at the dealership, so, yeah.
12     Q.   I see.  They sent it to you in an
13  e-mail or otherwise somehow digitally?
14     A.   In an e-mail.  My work e-mail.
15     Q.   Other than for break-ins, have you
16  ever been sent video recordings made by
17  cameras at Victory Mitsubishi?
18     A.   No.
19     Q.   Do you recall any instances of
20  identify theft happening at Victory
21  Mitsubishi?
22         MR. GOODMAN:  Object to the
23     form.
24     A.   What time frame?
25     Q.   During the entire history of the

Page 83

1
2  dealership?
3      A.   Only this one.  Only this case.
4      Q.   Aside from Ms. Francois, has any
5  other consumer told you that a vehicle was
6  sold or financed in their name, without their
7  authorization?
8          MR. GOODMAN:  Object to the
9      form; go ahead.
10     A.   I saw a review that was written up
11  with Mitsubishi just a few days ago, but we
12  do have video of the customer actually being
13  there and signing all of the documents, and
14  it was resolved immediately.  An
15  eighty-five-year-old woman, which I was on
16  Mitsubishi, which I know you have.
17     Q.   Now might be a good point to break
18  for lunch, if you want to do that.
19         MR. GOODMAN:  Okay, so we
20     will take half-hour.
21         MS. CATERINE:  Yeah, that
22     sounds good.  So it's 12:07.  Let's
23     try to be back by 12:37, please.
24         MR. GOODMAN:  Let's make it
25     12:40, just to round up.

Page 84

1
2          MS. CATERINE:  Sure.
3          (Whereupon, a lunch recess
4      was taken at this time.)
5  BY MS. CATERINE:
6      Q.   Ms. Argyropoulos, what is your
7  understanding of what transpired at Victory
8  Mitsubishi on May 30, 2020?
9          MR. GOODMAN:  Object to
10     form.
11     A.   Customer complaining.
12     Q.   Have you ever seen Farah Jean
13  Francois?
14     A.   No.
15     Q.   Have you ever spoken with Farah
16  Jean Francois, such as over the phone?
17     A.   No.
18     Q.   Have you ever communicated with
19  Farah Jean Francois in any way?
20     A.   No.
21     Q.   Did anyone at Victory Mitsubishi,
22  such as Stavros Orsaris, explain the
23  situation to you in 2020?
24     A.   No.
25     Q.   Why wasn't this situation brought



DIANE ARGYROPOLOUS                           December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC                    85–88

Page 85

1
2  to your attention in 2020?
3            MR. GOODMAN:  Object to the
4       form.
5       A.  I am assuming, because he handled
6  it.
7       Q.  So situation like this isn't going
8  to be brought to your attention, if he has it
9  handled; is that correct?
10      A.  Yes.
11           MR. GOODMAN:  Object to
12      form.
13      Q.  Have you ever seen Emanuel
14  LaForest?
15      A.  No.
16      Q.  Have you ever had any
17  communications with Emanuel LaForest in any
18  way?
19      A.  No.
20      Q.  In 2020, did you communicate
21  directly with any consumers at Victory
22  Mitsubishi?
23      A.  No.
24      Q.  You don't need to look at the
25  Capital One agreement for this, but if you

Page 86

1
2  would like to look at it, that's fine, of
3  course.  But do you have similar agreements
4  to that Capital One agreement with other
5  creditors?
6            MR. GOODMAN:  Object to the
7       form; you can answer.
8       A.  Similar in what way?  I am not
9  understanding.
10      Q.  Sure.  Does Victory Mitsubishi have
11  agreements with lenders, like the agreement
12  that they have with Capital One?
13      A.  Yes.
14      Q.  Are there any lenders that Victory
15  Mitsubishi submits applications to, that
16  Victory Mitsubishi does not have an agreement
17  with?
18      A.  No.
19           MR. GOODMAN:  Go ahead.
20           THE WITNESS:  Sorry.
21           MR. GOODMAN:  It's fine.
22      Q.  You said that Stavros Orsaris was
23  listed on the Capital One agreement as
24  manager because he had a prior relationship
25  with Capital One; that's your testimony,

Page 87

1
2  correct?
3            MR. GOODMAN:  Objection.
4       Mischaracterizes.  She said
5       Chris Orsaris.
6            MS. CATERINE:  Sorry, did I
7       say --
8            MR. GOODMAN:  You said
9       Stavros.
10           MS. CATERINE:  Chris
11      Orsaris.
12           THE WITNESS:  Yes.
13      Q.  Did Chris Orsaris suggest putting
14  him as manager and sales manager on that
15  agreement?
16           MR. GOODMAN:  Object to
17      form; go ahead.
18      A.  No.
19      Q.  Did you make that decision to put
20  him as manager and sales imageer on that
21  agreement?
22      A.  I don't recall.  I just remember
23  that we got Capital One because of Chris'
24  relationship.
25      Q.  So you don't recall the

Page 88

1
2  circumstances that led to him being listed as
3  the manager, other than his prior
4  relationship with Capital One; is that
5  correct?
6       A.  That would be the only reason,
7  correct.
8       Q.  Did Chris Orsaris work for Victory
9  Auto Group?
10           MR. GOODMAN:  Object to
11      form; go ahead.
12      A.  What time frame?
13      Q.  Ever.  Did he ever work for Victory
14  Auto Group?
15      A.  Yes.
16      Q.  At what time did you work for
17  Victory Auto Group?
18      A.  In 2016.
19      Q.  Okay.  Was that soon after you had
20  first met him in a social capacity, that you
21  had mentioned earlier?
22      A.  Yes.
23      Q.  Was he working as a buyer, like he
24  is for Victory Mitsubishi, currently?
25      A.  Yes.

DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
89–92

Page 89

1
2    Q.   Did Chris Orsaris have to fill out
3  a job application to obtain the position that
4  he had at Victory Auto Group?
5    Q.   What kind of application?
6    Q.   Like an employment application.
7    A.   Yes.
8    Q.   And who reviewed that employment
9  application?
10    A.   My comptroller.
11    Q.   Okay.  And did that application ask
12  for any references?
13    A.   I think it does.
14    Q.   Does that application authorize
15  Victory Auto Group to perform a background
16  check on the applicant?
17    A.   I don't -- I am not sure.
18    Q.   Does Victory Mitsubishi perform
19  background checks on employees?
20    A.   No.
21    Q.   Are you aware of Chris Orsaris'
22  criminal history?
23    A.   Yes.
24    Q.   When did you learn of Chris
25  Orsaris' criminal history?

Page 90

1
2    A.   Many years ago.  I knew when I met
3  him about his history.
4    Q.   How did you come to learn about his
5  history?
6    A.   He is Greek, I am Greek.  It's a
7  small circle.
8    Q.   I see.
9    A.   Yes.
10    Q.   Why did you hire Chris Orsaris,
11  given his criminal history?
12        MR. GOODMAN:  Objection to
13      form.  Go ahead.
14    A.   He is very good at what he does.
15  Whatever crime he committed, he did his time.
16  He served his time.  You still have to give
17  people chances.
18    Q.   Sure.  Is the vehicle at issue in
19  this case still in the possession of Victory
20  Mitsubishi?
21    A.   I believe so.
22    Q.   Has Victory Mitsubishi attempted to
23  sell the vehicle, since it regained
24  possession of it in September 2020?
25    A.   No.

Page 91

1
2    Q.   Why not?
3    A.   Because Victory Mitsubishi does not
4  own the vehicle.
5    Q.   Who does own the vehicle?
6    A.   I'm assuming the customer.
7  Whatever her -- French Francois.
8    Q.   Francois.
9    A.   Francois.
10    Q.   But you don't know who owns the
11  vehicle?  That's just your guess?
12    A.   Yes.
13    Q.   Has Victory Mitsubishi made any
14  efforts to regain title for the vehicle?
15    A.   No.  Not that I recall.  Not that I
16  know of.
17    Q.   Has Capital One reached out to
18  Victory Mitsubishi to obtain any kind of
19  refund or any other kind of compensation, in
20  regard to the vehicle?
21    A.   Not to me.
22    Q.   Are you aware that Capital One
23  performed an investigation of the identity
24  theft at issue in this case?
25    A.   I don't know.

Page 92

1
2    Q.   What happened to the down payment
3  for the vehicle in this case?
4    A.   I believe she has it.
5    Q.   And let's go to exhibit -- this is
6  going to be marked as Exhibit 43.  It's
7  screenshots of Instagram.
8        MR. GOODMAN:  Is this 3934?
9        MS. CATERINE:  Yes, 3934
10      through 3950.
11    Q.   Ms. Argyropoulos, are you familiar
12  with the social media application Instagram?
13    A.   I am.
14    Q.   And do you know who the user
15  Chris.Victory_123 is?
16    A.   No.
17    Q.   Okay.  On this first page, we have
18  a screenshot of a post by a
19  Chris.Victory_123, which appears to be of a
20  logo that reads, "Powered by Victory."
21        Are you familiar with this logo?
22    A.   No.
23        MR. GOODMAN:  She's on the
24      first page.
25        THE WITNESS:  All right.



Page 93

1
2         Yeah, yeah, no.
3      Q.   And under the logo, there's a
4   caption which reads, "It's called branding,"
5   and there are -- other users are tagged,
6   specifically, Victory.Mitsubishi, Victory
7   Cars East, and Dream Car Gallery 760.
8         Are you familiar with any of these
9   Instagram accounts?
10     A.   I know Victory Mitsubishi and
11  Victory Cars East.
12     Q.   And who are those accounts for?
13        MR. GOODMAN:  The question
14     is:  Are you familiar with
15     Instagram accounts of those
16     entities?
17        THE WITNESS:  I mean, I know
18     Victory Mitsubishi has Instagram.
19     Victory Cars East has Instagram.
20     Q.   Who runs the Instagram account for
21  Victory Mitsubishi?
22     A.   My -- BDC manager.  Bibi.
23     Q.   Who runs the Instagram account for
24  Victory Cars East?
25     A.   She does as well, but I believe

Page 94

1
2   that she uses an outside marketing for both.
3   But she's responsible for it.
4      Q.   And what's the name of that outside
5   marketing firm?
6      A.   I don't know.
7         MS. CATERINE:  Can we just
8      leave a blank in the transcript for
9      that answer, please.
10  TO BE FURNISHED: _____
11  _____
12        MR. GOODMAN:  We will take
13     it under advisement.
14     Q.   And if you could turn to the page
15  Bates-stamped 3936.  I know it's a little
16  hard to see the Bates stamps on these, but
17  it's the picture of the white car in front of
18  a dealership.
19     A.   Okay.
20     Q.   And the caption for this Instagram
21  post is a lightening emoji, followed by the
22  text "buy Victory."  Do you know what the
23  "buy Victory" here is in reference to?
24     A.   I am not sure.
25     Q.   Okay.  Do you know the store that

Page 95

1
2   is in this picture?
3      A.   I do.
4      Q.   And what is that store?
5      A.   It's a car dealership.
6      Q.   And where is that dealership?
7      A.   In Long Island.
8      Q.   Who operates that dealership?
9      A.   It's no longer in business.  I
10  don't know the person's name.  But it's no
11  longer in business.
12     Q.   Do you know when it ceased
13  operations?
14     A.   I am not sure.  I don't know.
15     Q.   Okay.  Let's turn to Francois 3938,
16  please.  And is this Instagram account the
17  account for Victory Mitsubishi?
18     A.   It looks like it is.
19     Q.   And you see there's a little circle
20  in the upper left-hand corner of the
21  screenshot with a logo in it, "Victory
22  Mitsubishi"?
23        Are you familiar with this logo?
24     A.   Yes.
25     Q.   Who created this logo?

Page 96

1
2      A.   I believe Bibi did.
3      Q.   Her last name is Singh, correct?
4      A.   Yes.
5      Q.   Who is Ms. Singh's employer?
6      A.   I am.
7      Q.   So Spartan Auto Group, LLC is her
8   employer?
9      A.   Yes.
10     Q.   Does she work for anyone else,
11  besides Spartan Auto Group?
12     A.   She works for Victory Cars East,
13  and I am not sure if anywhere else.
14     Q.   Okay, let's turn to the next page,
15  please.  It's the screenshot of an
16  advertisement for a "vehicle layaway
17  program."
18        After reviewing this screenshot,
19  does this refresh your recollection as to
20  what the "vehicle layaway program" is?
21     A.   I don't know.  We never had it.  I
22  am assuming whoever was marketing just did
23  that.  I don't know.  We never did a layaway
24  program.
25     Q.   Why would it be marketing, if you



DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
97–100

Page 97

1
2  never did a layaway program?
3      A.  I don't think any customer ever
4  inquired to do one, so I don't think we ever
5  had the opportunity.  So nothing was ever
6  done.
7      Q.  So for clarification, was there a
8  program that was never used, or was there
9  just never a program?
10     A.  Nobody ever approached to use it,
11  so we -- it never happened.
12     Q.  I see.  And who would have set up
13  this program at Victory Mitsubishi?
14          MR. GOODMAN:  Object to
15          form.
16     A.  I am assuming Bibi, with marketing.
17     Q.  When you say, "with marketing," do
18  you mean marketing employees at Victory
19  Mitsubishi or what do you mean?
20     A.  An outside marketing.
21     Q.  Outside.  Is there an agreement
22  between that outside marketing firm and
23  Victory Mitsubishi?
24     A.  I am not sure.
25     Q.  Does the outside marketing firm

Page 98

1
2  have authority to create sales and financing
3  programs at Victory Mitsubishi?
4          MR. GOODMAN:  Object to the
5          form; go ahead.
6      A.  I am not understanding the
7  question.
8      Q.  Sure.  There's this screenshot of
9  this vehicle layaway program, and it's my
10  understanding, based on your testimony, that
11  this was created by the marketing firm.  So
12  my question is:  Did they have the authority
13  to create new programs for Victory
14  Mitsubishi, like this vehicle layaway
15  program?
16          MR. GOODMAN:  Object to
17          form; go ahead.
18     A.  Whatever they create gets reviewed
19  by Bibi.  She discusses all marketing with
20  them.
21     Q.  Okay.  So this advertisement and
22  the other advertisements on the Victory
23  Mitsubishi Instagram page, would have been
24  approved by Ms. Singh; is that correct?
25     A.  Correct.

Page 99

1
2      Q.  There's a phone number here at the
3  bottom of this advertisement, (347) 846-0825.
4      What phone number is that?
5      A.  I assume it's one of the phone
6  numbers.  We have many.  I don't know them
7  all by heart.
8      Q.  I see.  Do you know how many phone
9  numbers you have at Victory Mitsubishi?
10     A.  Not offhand, no.
11     Q.  Okay.  Okay, let's turn to Francois
12  3941.  This is an Instagram screenshot of a
13  picture of a woman in a black jacket,
14  standing in front of a red vehicle.
15     A.  Okay.
16     Q.  If you look under the picture, you
17  will see a caption dated March 27, 2020,
18  which reads "back in action.  Please contact
19  us today about our new remote process and
20  home delivery."
21      Does this post refresh your
22  recollection as to what the "new remote
23  process and home delivery" is?
24     A.  We discussed that before.  I told
25  you, we never did it.  So we advertise it,

Page 100

1
2  nobody ever inquired it, so we never sold any
3  cars remotely.
4      Q.  Okay.  Who made the decision to
5  advertise this remote process and home
6  delivery?
7      A.  I am assuming, Bibi and the
8  marketing team.
9      Q.  Okay.  Would she have discussed
10  programs like this remote process and home
11  delivery with anyone else at Victory
12  Mitsubishi, prior to posting about it on
13  Instagram?
14     A.  She might have.
15     Q.  Turn to the next page, please.
16  This is my personal favorite because it's a
17  dog.
18     A.  It's cute.  It's a dog.  I never
19  saw it.  It's cute.
20     Q.  Okay.  And the caption to this one
21  reads, "Did you know that you can now shop,
22  buy, apply for financing for your next new or
23  preowned car or truck SUV at Victory
24  Mitsubishi, all from the convenience of home?
25  Find out more details at" -- and there's a



DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
101–104

Page 101

1
2  URL there.
3      A.   Right.
4      Q.   And what is this Instagram post
5  referring to?
6      A.   The same thing that the page before
7  -- remote sales.  It's the same thing, worded
8  differently.
9      Q.   Okay.
10     A.   The governor allowed remote sales
11  at that time due to COVID.
12     Q.   I see.  Okay.  And if you could
13  turn two pages to -- there's an Instagram
14  screenshot that shows an advertisement of a
15  man on a cell phone with the text, "buy your
16  vehicle from your smartphone, new or
17  preowned.  Get the numbers and make the deal
18  over the phone.  See the vehicle you want
19  using these apps," and it lists a number of
20  different applications.
21         Is this also in reference to the
22  same program that we've been discussing?
23     A.   Yes.
24     Q.   Okay.  And if you could turn to the
25  next page, we have another screenshot that

Page 102

1
2  reads, "Buy online."  Is this in reference to
3  the same program we've been discussing?
4      A.   Yes.  Sorry.
5      Q.   It's all right.  And if you could
6  turn to the next page, please.  There's a
7  picture of a woman wearing medical scrubs,
8  gloves, and a mask.  It has a caption which
9  reads, "Coronavirus update, for those
10  customers who wish to visit us here at the
11  dealership to look more closely at their new
12  or used vehicle choices, we now have gloves
13  and surgical masks available as an added
14  precaution."
15         Why does this post specify, "for
16  those customers who wish to visit us here at
17  the dealership"?  Don't all customers go to
18  the dealership in person to purchase
19  vehicles?
20         MR. GOODMAN:   Object to the
21  form; go ahead.
22     A.   They do.
23     Q.   So why does the post specify, "for
24  those customers who wish to visit us here"?
25     A.   I don't know.  We did not do any

Page 103

1
2  remote sales, even though by law we were
3  allowed to do so.  I guess they are still
4  marketing because you were still legally
5  allowed to do remote sales and wanting people
6  to feel comfortable because we did give out
7  boxes of masks because we bought
8  thirty-thousand masks, even if the people
9  didn't buy the cars, for protection, and
10  gloves.  It was just a nice thing we did.
11     Q.   You have referenced a couple of
12  times now that under the emergency orders,
13  that it was permitted to do remote sales of
14  vehicles.  Do you know what the requirements
15  were to perform those remote sales of
16  vehicles?
17     A.   I don't remember.
18     Q.   Do you know if there were any
19  trainings at Victory Mitsubishi on how to do
20  remote sales of vehicles?
21     A.   If we were going to do any remote
22  sales, it was going to be Stavros doing them
23  directly himself.  But no customer ever
24  inquired in it, so we -- we never did it.
25  But he was going to do it himself.

Page 104

1
2      Q.   Okay.  Okay.  Let's turn to the
3  page which has the screenshot that starts
4  with the text, "We are resuming our regular
5  hours."
6         MR. GOODMAN:   What's the
7  Bates stamp on it?
8         MS. CATERINE:   This is
9  Francois 3949.
10     A.   Okay.
11     Q.   And if you could just take a second
12  to read the text on that page and just let me
13  know when you are finished.
14     A.   Okay.
15     Q.   What is this post in reference to?
16     A.   If I remember correctly, are hours
17  were modified for the first two weeks.  We
18  were understaffed, so I don't think we were
19  open as early.  I think we started our day
20  later.  But I don't really remember.
21     Q.   And this post is dated June 10,
22  2020.  Was Victory Mitsubishi still only
23  doing sales by appointment on June 10, 2020?
24     A.   I am not sure.
25     Q.   Okay.  If you can turn to the next



DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
105–108

Page 105

1
2    page, please.  This page features a
3    screenshot which has the text, "You can do it
4    all from home," dated June 26, 2020."
5            What is the meaning of, "You can do
6    it all from home"?
7            MR. GOODMAN:  Object to
8        form.
9        A.  Buying a vehicle.
10       Q.  Can you open Exhibit 21, please,
11   which is the deal jacket.  What is this
12   document?
13       A.  On page twenty-one?
14           MR. GOODMAN:  No, the whole
15       thing.
16           THE WITNESS:  Oh, whole
17       document.
18       Q.  The whole document.
19           MR. GOODMAN:  Exhibit 21.
20       A.  The front of it is a deal jacket.
21   The whole document -- I see a credit app.  I
22   see receipt for deposit.  I see a contract
23   for financing the vehicle.  I see a form for
24   registration and titling.  I see the
25   inspection of the vehicle.  I see the

Page 106

1
2    warranty contract.  Capital One funding.  The
3    bill of rights form.  The bill of sale.
4    Information about the vehicle.  The
5    application for the financing, the rate, the
6    driver's license, insurance card, the plate
7    number, MV-50 for registration, a copy of the
8    title for the vehicle.
9        Q.  In the ordinary course of your
10   business working at Victory Mitsubishi, do
11   you review deal jackets for any reason?
12       A.  No.
13       Q.  And we discussed earlier that
14   Victory Mitsubishi has the vehicle, but does
15   not have title to the vehicle at this time.
16           Is there a way for Victory
17   Mitsubishi to obtain title at this time?
18       A.  I am not sure.
19       Q.  Do you know if there's any process
20   underway to obtain title for the vehicle?
21       A.  I don't know any.
22       Q.  Who at Victory Mitsubishi would
23   handle issues with titles for vehicles?
24           MR. GOODMAN:  Object to the
25       form.

Page 107

1
2        A.  What kind of issues?
3        Q.  Let's just start with making sure
4    there's a title corresponding to the vehicle.
5        A.  The vehicles that are owned by
6    Victory Mitsubishi?
7        Q.  Yes.
8        A.  My title clerk.
9        Q.  And who is that?
10       A.  Areefa.
11       Q.  Last name?
12       A.  Khan.
13       Q.  Could you spell that, please?
14       A.  K-H -- last name?
15       Q.  Both, if you know how.
16       A.  Yes.  A-R-E-E-F-A, last name is
17   K-H-A-N.
18       Q.  Okay, can you open Exhibit 23,
19   please, Bates-stamped Defendant's 85 through
20   92.  It's the screenshots from Dealertrack.
21           THE WITNESS:  It's not this
22       one?
23           MR. GOODMAN:  No, no.
24       It's this one.
25           THE WITNESS:  Okay.

Page 108

1
2        Q.  Okay, starting with this first
3    page, is there a customer selection option
4    when you open Dealertrack?
5        A.  I am not understanding.
6        Q.  Sure.  So the way that you use
7    Dealertrack is a bit different than the way
8    that the sales and financing people use
9    Dealertrack, correct?
10       A.  Yes.
11       Q.  And do you know if the screens look
12   different for you on Dealer Track, than for
13   people on sales and financing?
14       A.  Yes.
15       Q.  Okay.  And are you familiar with a
16   screen like the one on Bates-stamped
17   Defendant's 85, titled "customer selection"?
18       A.  I have the same screen on that.
19       Q.  Okay.  Great.  And if you could
20   turn to the next page, please.  And when you
21   select a customer in customer selection,
22   would a screen like this one show up for you?
23       A.  Yes.
24       Q.  And you will see here there's a
25   field for "sales person one," and it's filled



Page 109

1
2   in with the numbers "999."
3           Who does "999" refer to?
4       A.   There was no salesperson on the
5   deal.
6       Q.   I see.  So 999 is just kind of a --
7   what you would put in if there was no
8   salesperson involved with the deal?
9       A.   Yes.
10      Q.   Okay.  Great.  And who does "A31"
11  refer to in the field titled "F and I
12  manager"?
13      A.   That's the finance manager's.
14      Q.   Do you know who "A31" is?
15      A.   I am not sure.  They all have
16  numbers.  I would have to go to a different
17  screen to see it.
18      Q.   Is there any document, including an
19  electronic document, like a screen you could
20  pull up in Dealertrack, that lists all of the
21  employee identification numbers, like 999,
22  and A31?
23      A.   There may be.
24           MS. CATERINE:  We would call
25       for the production of that

Page 110

1
2       document.
3       A.   I mean...
4           MS. CATERINE:  To the extent
5       it exists.
6           MR. GOODMAN:  Taken under
7       advisement.
8       Q.   And if you could turn to the next
9   page, please.  And there's text here that
10  reads, "function," and there's an asterisk
11  and then a yellow box to the right of it.
12          Do you know what that is?
13      A.   I don't know this screen.
14      Q.   Okay.  Remains a mystery.
15           MR. GOODMAN:  Excuse me.
16      Q.   Let's see.  Could you turn to the
17  page marked Defendant's 90.  It's the one
18  with Progressive Insurance.
19      A.   Okay, got it.
20      Q.   And has Victory Mitsubishi had any
21  communications with Progressive Insurance
22  since the vehicle was returned to the Victory
23  Mitsubishi in September of 2020?
24      A.   I don't know.
25           MR. GOODMAN:  Object to the

Page 111

1
2       form.  You mean about this vehicle?
3           MS. CATERINE:  Yes, about
4       this vehicle.
5       A.   I don't know.
6       Q.   Okay.  If you could turn to the
7   next page, please.  And we see accountings of
8   different amounts for the sale of the
9   vehicle, and there's a field for
10  "registration," with the amount 250.
11          What is that?
12      A.   Two --
13           MR. GOODMAN:  Where is it
14       at?  Oh, I see it.  Okay, go ahead.
15      A.   To register and title the vehicle.
16      Q.   Okay.  And does Victory Mitsubishi
17  keep the registration fee for vehicle sales?
18      A.   It pays DMV to register the cars.
19      Q.   I see.  So that payment goes to the
20  DMV?
21      A.   Correct.
22      Q.   Okay.  And then there's a service
23  contract, which I know you also identified in
24  the deal jacket, and the amount for that is
25  $3,000.  Do you know what happened to that

Page 112

1
2   $3,000, since the return of the vehicle in
3   September 2020?
4       A.   I don't know.
5       Q.   Do you know if the service contract
6   has been refunded?
7       A.   I don't know.
8       Q.   And there's a "document fee" here
9   of $75.  What is the "document fee"?
10      A.   I am not sure.
11      Q.   Okay.  If you could look at the
12  last page, please, Defendant's 92.
13          What is this document?
14      A.   I have never seen it before.
15      Q.   Okay.  If you could open -- let's
16  open what is going to be marked Exhibit 44.
17  This is one of the new documents.  It's
18  Bates-stamped subpoena responses 569 through
19  574.  It's a Dealertrack document.
20           MR. GOODMAN:  Okay.  Yeah,
21       this might be it.  569 to 574?
22           MS. CATERINE:  Yeah, six
23       pages.
24      Q.   Prior to your preparation for your
25  deposition today, had you ever seen a



DIANE ARGYROPOLOUS
December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC
113–116

Page 113

1
2  document like this one, either printed out or
3  on a computer screen?
4      A.  I have seen it on a computer
5  screen.
6      Q.  Okay, what is this document?
7      A.  It's Dealtertrack, on the process
8  of the vehicle.
9      Q.  And who has access to this?
10     A.  Finance managers and Stavros.
11     Q.  And if you could go to the last
12  page of the document, subpoena responses 574,
13  and, actually, before I ask about that, why
14  would the finance managers or Stavros access
15  this document in the ordinary course of their
16  business?
17         MR. GOODMAN:  Object to
18      form; go ahead.
19     A.  To send the application to the
20  bank, so the bank can fund the deal.
21     Q.  Okay.  All right.  And looking at
22  the last page of the document 574, it begins
23  with an entry time stamped "4:54 p.m., Y.
24  Ventura, deal jacket created."
25         Who is Y. Ventura?

Page 114

1
2      A.  I don't know.
3      Q.  Okay.  And what does "deal jacket
4  created" refer to?
5      A.  I am not sure.
6      Q.  So in the ordinary course of your
7  working at Victory Mitsubishi, do you review
8  this document?
9      A.  No.
10     Q.  Okay.  There's an entry further
11  towards the top time stamped 4:58 p.m., which
12  reads, "privacy notice manually signed."
13         Do you know what this refers to?
14     A.  I am not sure.
15     Q.  If you go to the previous page,
16  573, go to the bottom of the page, you will
17  see there's an entry time stamped 4:59, by
18  this Y. Venture, "Trans decision approved."
19  The next entry is time stamped 6:09 p.m., by
20  Jessica Vallejo, and that reads "credit
21  application copied."
22         Do you know why it switched from Y.
23  Ventura to Jessica Vallejo?
24     A.  I don't know.
25     Q.  Do you know why, generally, in the

Page 115

1
2  sales and financing of a vehicle, why
3  Dealtertrack would have one Victory
4  Mitsubishi employee pulling the credit report
5  and submitting credit application, and then
6  switch to a different Victory Mitsubishi
7  employee?
8         MR. GOODMAN:  Object to the
9      form.
10     A.  Because the second one gets
11  switched over -- submits the deal to the
12  bank.
13     Q.  Why would that happen, generally?
14     A.  Because they are the finance
15  managers.
16     Q.  Is it due to them being busy or
17  what would be the reason?
18     A.  Just a different responsibility.
19  They are a finance managers.  That's what
20  their job is.
21     Q.  Do only finance managers submit
22  credit applications?
23     A.  No.
24     Q.  Who else submits credit
25  applications, besides finance managers?

Page 116

1
2      A.  Managers.
3      Q.  Besides Stavros or Orsaris and
4  David Perez, what other managers are there?
5      A.  At what time?
6      Q.  In May of 2020.
7      A.  I think Jason Lewis.
8      Q.  Does Jason Lewis still work at
9  Victory Mitsubishi?
10     A.  Yes.
11     Q.  Okay.  Who are the financing
12  managers at Victory Mitsubishi in May -- on
13  May 30, 2020?
14     A.  I know Yessica, Joe.  I am not sure
15  if anybody else.
16     Q.  Do you know if there's ever been a
17  finance manager with the last name Ventura at
18  Victory Mitsubishi?
19     A.  Maybe.
20     Q.  And if you could turn to the page
21  subpoena responses 572, please.  Do you know
22  what Victory Mitsubishi's hours of operation
23  were on May 30, 2020?
24     A.  No.
25     Q.  Do you know what Victory



Page 117

1
2    Mitsubishi's hours of operation are
3    currently?  Specifically, for Saturdays.
4        A.  I think it's nine to eight.
5        Q.  Okay.
6        A.  Nine to nine.
7        Q.  Has there ever been a point at
8    which Victory Mitsubishi's hours of operation
9    extended 10:00 p.m.?
10       A.  I am not sure.
11       Q.  Okay.  And on this page we see a
12   little back and forth here between Ventura
13   and Vallejo, from 6:13 p.m. to 6:48 p.m., and
14   then nothing happens until 10:11 p.m., when
15   there's an entry which reads, "credit
16   application E-signature pending."
17           First, what does "credit
18   application E-signature pending" mean?
19       A.  I don't -- I don't know.
20           MR. GOODMAN:  Let me see
21           that page.
22       Q.  And do you know any reason why
23   there would be entries made in Dealertrack
24   for an account after 10:00 p.m.?
25           MR. GOODMAN:  Object to

Page 118

1
2           form.
3        Q.  Sorry, what was the answer?
4        A.  I don't know.
5        Q.  Okay.  Have you ever seen Yessica
6    Vallejo working at the dealership, after the
7    dealership has closed?
8           MR. GOODMAN:  Object to
9           form.
10       A.  I am not there.
11       Q.  Fair enough.
12           MR. GOODMAN:  Emma, if this
13           is a good time, can we take five
14           minutes?
15           MS. CATERINE:  Yeah, that's
16           fine.  This is a good time.
17           (Whereupon, a recess was
18           taken at this time.)
19   BY MS. CATERINE:
20       Q.  Let's go to Exhibit 32.  It's a
21   single page, subpoena responses 326.
22           MR. GOODMAN:  326?
23           MS. CATERINE:  Yeah.
24           MR. GOODMAN:  What is it,
25           Emma?

Page 119

1
2           MS. CATERINE:  It's the
3    investigation summary by Capital
4    One.  It has tied in account
5    numbers at the top.
6           MR. GOODMAN:  I know what it
7    is, but I am not -- maybe it's
8    right here.  Okay, I don't -- oh,
9    it might be in that stack.  Yeah, I
10   am not finding it in here.  I would
11   have to print it out.  You might
12   want to ask her if she knows what
13   it is anyway.  If you want me to go
14   print it, I will have to go out and
15   print it.
16           MS. CATERINE:  Before we do
17   that, let's go back to the
18   agreement between Victory
19   Mitsubishi and Capital One.
20           MR. GOODMAN:  That's right
21   there.
22           MS. CATERINE:  Exhibit 41.
23       Q.  And if you could turn to the page
24   Bates-stamped Defendant's 80.  When you have
25   that in front of you --

Page 120

1
2        A.  I am trying to find it.
3        Q.  Okay.
4        A.  Okay, I found it.  Page 80?
5        Q.  Yes.
6        A.  Okay.
7        Q.  Okay.  And do you see the section
8    titled "Fair Credit Reporting Act"?
9        A.  Yes.
10       Q.  And is that your signature under
11   the section titled "Fair Credit Reporting
12   Act"?
13       A.  Yes.
14       Q.  And what is your understanding of
15   what your signature was agreeing to on this
16   page?
17           MS. CATERINE:  Strike that.
18       Q.  What is your understanding of the
19   effect of your signing this page?
20           MR. GOODMAN:  Object to
21           form.
22       A.  My understanding -- actually, let
23   me look at this.
24       Q.  Sure.  Take your time.
25       A.  To have the customer and give their



Page 121

1
2     ID and signing the credit app, so their
3     credit could be run to obtain a loan.
4            Sorry, you didn't hear me?
5     Q.   No, no, I heard you.
6            Is Mr. Goodman still there?
7            MR. GOODMAN:  I am here.  I
8         am looking through papers trying to
9         find that out.
10           MS. CATERINE:  Okay, sorry.
11        I just don't want to proceed
12        without you.
13           MR. GOODMAN:  326, Titan
14        account number.  That's the one we
15        were looking for before?
16           MS. CATERINE:  Yeah.
17           MR. GOODMAN:  The
18        investigation initiated -- okay, we
19        found it.  There you go.
20           MS. CATERINE:  Okay, great.
21     Q.   A couple of questions, first,
22     though.
23           For the Capital One document, the
24     paragraph under Fair Credit Reporting Act,
25     that says, "Under the Fair Credit Reporting

Page 122

1
2     Act, you are either a user of credit
3     information, a consumer reporting agency, or
4     exempt except for disclosure requirements."
5     I didn't read a parenthetical there, but what
6     is your understanding of whether you're a
7     user of credit information, a consumer
8     reporting agency, or exempt?
9     A.   My understanding, they were allowed
10     to run a customer's credit to apply for a
11     loan.
12     Q.   Okay.  And is your understanding
13     that would make you a user of credit
14     information?
15     A.   Not me, technically, but the
16     company.
17     Q.   Spartan Auto Group is the user?
18     A.   Spartan Auto Group is the user.
19     Q.   And the second bullet point here
20     says, "Should the financing source to whom
21     you submitted the application reject the deal
22     and supply you credit information, you might
23     find yourself being a user of a report and
24     depending on the information received,
25     trigger additional responsibilities."

Page 123

1
2            What is your understanding of what
3     "additional responsibilities" could be
4     triggered under these circumstances?
5     A.   I am not sure.
6     Q.   Okay, let's look at that
7     investigation document, please, the one
8     Bates-stamped subpoena responses 326.
9            Prior to your preparation for this
10     deposition today, had you ever seen this
11     document before?
12     A.   No.
13     Q.   Could you please take a second and
14     read the section titled "narrative" to
15     yourself, and let me know when you are
16     finished?
17     A.   Okay.
18     Q.   Okay.  There are two sentences here
19     I want to ask you about.  The first sentence
20     is the one that says, "During the review of
21     the account, it was discovered that an
22     unknown suspect using the telephone numbers
23     listed above used the victim's name, date of
24     birth, and social security number, on June
25     29, 2020, to purchase a 2017 BMW 5 series for

Page 124

1
2     29,462.81."
3            Do you understand that statement to
4     be accurate?
5            MR. GOODMAN:  Object to the
6         form.
7     A.   No.
8     Q.   And what do you understand about
9     that statement to not be accurate?
10     A.   I believe that the customer was
11     actually at the dealership purchasing the car
12     because I discussed this with Stavros.  They
13     got a lot of tickets and they didn't want to
14     claim responsibility.  She came to the
15     dealership.  There was communication with
16     BBC.  We have recording of her.  She did come
17     to the dealership.  So from what I am
18     understanding from Stavros -- I was not
19     there.  I didn't see the customer.  That she
20     was there for -- and they got a lot of
21     tickets, thousands of dollars, and they
22     didn't want to be responsible for them.
23     Q.   And what is your understanding --
24     you mentioned recordings.  What are those
25     recordings?



DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
125–128

Page 125

1
2      A.   With BDC calling the customer and
3  speaking to her.
4      Q.   What's BDC?
5      A.   Cust- -- the girls that call the
6  customers to see if the visit was okay, if
7  they came in, or to make appointment for a
8  car.
9      Q.   And do you know the date of those
10  phone calls?
11      A.   I am not sure.
12      Q.   Do you know if those phone calls
13  were before or after the sale of the vehicle?
14      A.   I am not sure.  I believe it was
15  after, though.
16      Q.   Okay.
17      A.   I am pretty sure it was after
18  because they -- and there's a recording.  I
19  believe we still have it.  They asked how the
20  visit went.
21      Q.   Do you know if anyone was ever
22  arrested or criminally charged, in relation
23  to this alleged identity theft?
24      A.   No.  I don't know.
25      Q.   Okay.  Do you know who Emanuel

Page 126

1
2  LaForest is?
3      A.   Until recently, no.  But now I do
4  know who he is.
5      Q.   What's your understanding of who he
6  is?
7      A.   They came together to purchase a
8  car.
9      Q.   And the sentence I just asked you
10  about talked about telephone numbers, name,
11  date of birth and social security number,
12  which are listed above, or the phone number,
13  rather, are listed above.
14          Do you recognize either of the
15  phone numbers listed under "home phone" or
16  "work phone"?
17      A.   No.
18      Q.   And there's a date of birth here
19  for February 18, 1982.  Do you know anyone
20  with the birth date February 18, 1982?
21      A.   No.
22      Q.   Okay.  And the last sentence reads, "Capital One Auto
23  this narrative reads, "Capital One Auto
24  Finance has begun efforts to recover the
25  funds on the loan."

Page 127

1
2          What is your understanding of
3  Capital One's efforts to recover the funds on
4  the loan?
5      A.   I don't think there was any.  I am
6  not aware of Capital One reaching out to
7  Victory Mitsubishi.  I have no knowledge of
8  that.
9      Q.   If that did happen, generally,
10  would that be something that would be
11  communicated to you?
12      A.   Only if it wasn't resolved.  But
13  usually Stavros handles everything.
14      Q.   Okay.  So Stavros would handle it,
15  but if there was some kind of problem or
16  inability for him to resolve it, then he
17  would communicate it to you; is that correct?
18      A.   Correct.
19      Q.   And sorry if I asked this before,
20  but just in the general operation of the
21  business, how often do you talk to Stavros?
22          MR. GOODMAN:  Object to
23      form.
24      A.   At what time?  What time frame?
25      Q.   In 2020.

Page 128

1
2      A.   In 2020, I spoke to him, I would
3  say, maybe three times a week, maybe once a
4  day.
5      Q.   And what were the nature of those
6  calls?
7      A.   To prepare all the deposits to be
8  sent across the street.  So I would have them
9  either delivered to me or I would show up
10  once in a while to pick up everything to work
11  from home.
12      Q.   When you say, "the deposits," are
13  you referring to the down payments on
14  vehicles?
15      A.   Yes, credit card or cash.
16      Q.   And where are those kept when they
17  are at the 4070 location?
18      A.   In a safe.
19      Q.   Who has access to that safe?
20      A.   Stavros.
21      Q.   Do you have access to that safe?
22      A.   Honestly, no.  We got a new safe,
23  so, no, I do not because I don't go there, to
24  be honest.
25      Q.   I guess it shows the level of trust



Page 129

1
2  between you.
3      A.  Honestly, no, I don't.
4      Q.  And so once you pick up the down
5  payments, what do you do with them?
6      A.  I close it out in our DMS system,
7  which is Dealertrack, and I send it to the
8  bank.
9      Q.  And are those kept in, like, a
10  checking account, in an IOLA account?
11          What kind of account are they kept
12  in at the bank?
13      A.  In a checking account.
14      Q.  Are other funds kept in that
15  account, besides down payments?
16      A.  Yes.
17      Q.  And you say you "close it out in
18  the DMS system."  Does that create a record
19  showing that the down payment was deposited
20  in a bank account?
21          MR. GOODMAN:  Object to
22      form.
23      A.  I mean it -- once a customer gives
24  money, it's already recorded to the deal.  So
25  it follows through, but it gets recorded to

Page 130

1
2  the dealers through the receipt of the money.
3  But, yes, there's a record of making sure all
4  money goes to the bank.
5      Q.  Okay.
6          MS. CATERINE:  We call for
7      the production of that record in
8      regard to the down payment for this
9      vehicle.
10          MR. GOODMAN:  Taken under
11      advisement.
12      Q.  Okay, let's look at Exhibit 33.
13  It's a printout of a spreadsheet of
14  complaints from Mitsubishi, Bates-stamped
15  subpoena responses 485 through 489.  And just
16  for the record, I am only describing the
17  documents inasmuch as to help locate them,
18  not to influence the witness in any way.  And
19  just let me know when you have those in front
20  of you.
21      A.  I have them.
22      Q.  Okay, great.
23          What is this document?
24      A.  I am assuming it's an -- I am not
25  sure.  Because if I am getting it, it could

Page 131

1
2  look different.  But I assume it's something
3  from Mitsubishi.
4          MR. GOODMAN:  Don't assume.
5      If you know what it is --
6          THE WITNESS:  Yeah, I am not
7      sure.
8      Q.  Okay.  If you turn to the page
9  stamped subpoena responses 488, you will see
10  there's a column with a bunch of cells that
11  are filled in with text describing different
12  complaints.  And take your time.  Feel free
13  to read all of them.
14          Do you recognize any of the
15  complaints described in this spreadsheet?
16      A.  I recognize one.
17      Q.  Which is the one that you
18  recognize?
19      A.  "Customer daughter upset that her
20  eighty-five-year-old mother's name was on
21  it."
22      Q.  Okay.
23      A.  This is the recent complaint that I
24  actually discussed when I saw this document.
25      Q.  I see.  And who did you discuss

Page 132

1
2  that with?
3      A.  Stavros.
4      Q.  Were your attorneys present for
5  that discussion?
6          MR. GOODMAN:  By counsel,
7      yes.
8          THE WITNESS:  You were
9      right.  I had to think.  Yes, yes,
10      they were.
11          MS. CATERINE:  As curious as
12      I am, I will refrain from asking
13      what was said in that conversation.
14          MR. GOODMAN:  Well, you can
15      ask.
16          MS. CATERINE:  Oh, I am, I
17      am going to.
18      Q.  What is your understanding of what
19  happened in this case?
20      A.  Okay, I read it, I asked Stavros to
21  come to me across the street, comes to me, I
22  asked him about it, he showed me video of
23  this eighty-five-year-old woman signing all
24  the documents, and it was resolved with the
25  customers.  The daughter had an issue with



DIANE ARGYROPOLOUS                                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC                              133–136

Page 133

1
2  the parking spot where she lives, and that's
3  why she made all this nonsense.  But it has
4  been resolved and we do have footage video of
5  this eighty-five-year-old woman signing all
6  documents.  So, to me, there's no issue
7  there.
8        Q.   Okay.  Could you explain to me a
9  little bit about what you mean by, like,
10  "parking spot"?  I am a little confused with
11  what that has to do with anything.
12       A.   Wherever they live had to be on the
13  daughter's name, so the building was able to
14  permit her, but she wound up resolving it.
15  When she resolved it with the building, it
16  went away.  So it was all -- and we do have
17  video of the eighty-five-year-old woman
18  signing all the documents at the dealership.
19       Q.   Do you still have that video?
20       A.   Yes.
21       Q.   Okay.  Are you familiar with any of
22  the other complaints listed on the
23  spreadsheet?
24       A.   No.  No, that one caught my eye, so
25  that's why I asked it, but no.

Page 134

1
2        Q.   Has Mitsubishi Motors ever reached
3  out to you, you, specifically, Diane
4  Argyropoulos, to discuss complaints made
5  against Victory Mitsubishi?
6        A.   No.
7        Q.   Do you know if Mitsubishi Motors
8  has reached out to anyone else, such as
9  Stavros Orsaris, to discuss complaints made
10  against Victory Mitsubishi?
11       A.   Yes.
12       Q.   What is your understanding of those
13  complaints?
14       A.   The one that we just discussed, you
15  know, you have to resolve it.  It doesn't go
16  away.  Mitsubishi wants to know.  And it gets
17  resolved.  A lot of times these customers,
18  you know, wanted a Mercedes and left with a
19  Mitsubishi.  So if you are coming in for -- a
20  little upset, but what are you going to do?
21  Everybody wants something they can't have.
22       Q.   How are Chris Orsaris and Stavros
23  related?
24       A.   Father and son.
25       Q.   Do you know any other father and

Page 135

1
2  son who work at Victory Mitsubishi?
3        A.   His -- at what time frame?
4        Q.   In May of 2020.
5        A.   Any other in May of 2020?  No, no.
6        Q.   Does anyone else from the Orsaris
7  family work at Victory Mitsubishi, in May of
8  2020?
9             MR. GOODMAN:  Object to the
10       form.
11       Q.   Anyone else besides Chris Orsaris
12  and Stavros Orsaris?
13       A.   No.  No.
14       Q.   With the complaint -- with the --
15  the elderly woman that you were just
16  discussing, did you actually watch the video
17  recording or did Stavros just describe it to
18  you?
19       A.   I watched it.
20       Q.   Okay.  And had Stavros e-mailed the
21  video recording to you?
22       A.   No, he showed it to me in person.
23       Q.   I see.  Was it, like, on his phone
24  or something?
25       A.   We were at -- we were on a

Page 136

1
2  computer, so I think -- did it -- he was able
3  to download from the computer.
4        Q.   I see.  All right.  And in
5  September of 2020, do you know if there were
6  any other father and son working at Victory
7  Mitsubishi, besides Stavros and Chris
8  Orsaris?
9        A.   No.  No.
10       Q.   At any point --
11       A.   No, there wasn't any.  Sorry.
12       Q.   At any point during the history of
13  Victory Mitsubishi, have there been any
14  fathers and sons working there, besides Chris
15  and Stavros Orsaris?
16       A.   No.
17       Q.   Okay.
18       A.   No.
19       Q.   How long are video recordings kept
20  at Victory Mitsubishi?
21       A.   I am really not sure.  I am really
22  not sure.
23       Q.   Around when did you watch this
24  video recording of the elderly woman
25  regarding the consumer complaint?



DIANE ARGYROPOLOUS                                      December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC                              137–140

Page 137

1
2       A.  A few days ago.
3       Q.  And I believe that complaint is
4   dated May of 2022.  I believe.  Let me
5   actually look at it before I guess.
6           MR. GOODMAN:  That's
7       correct.
8           MS. CATERINE:  Okay.
9       Q.  So is it reasonable to assume,
10  then, that you keep recordings for at least
11  six to seven month?
12          MR. GOODMAN:  Object to
13      form.  Time frame, also, but
14      objection.
15      A.  No, I am assuming -- when was this
16  filed?
17          MR. GOODMAN:  May of 2022.
18          THE WITNESS:  When did the
19      customer buy the car?
20          MR. GOODMAN:  May of '22.
21      A.  Okay, so we still have the
22  recording.  I think it only saves maybe for
23  thirty days.  It doesn't -- it doesn't -- we
24  don't have, like, a six month...
25          MR. GOODMAN:  Do you know

Page 138

1
2       what the standard is?  If you don't
3   --
4           THE WITNESS:  Yeah, I don't
5       know.  But this was because
6       customer had just purchased the
7       car.  They still had the recording
8       and they went back that day.
9       Q.  Do you know why there aren't any
10  video recordings of the sale of the vehicle
11  in the name of Farah Jean Francois?
12      A.  I don't know.  But two years later,
13  it would no longer be there.
14      Q.  But the vehicle was returned in
15  September of 2020, correct?
16      A.  That's what I heard.
17      Q.  So when there's been an allegation
18  of identity theft, shouldn't video recordings
19  have been preserved at that time?
20      A.  I don't know.  It was a very rough
21  time during COVID for everybody.  So I can't
22  really say.  Everybody had a hard time with
23  COVID, you know, people were a little
24  nervous.
25      Q.  Sure.  When you learned of this

Page 139

1
2   lawsuit, what steps did you take to determine
3   whether the allegations in it were true?
4       A.  I spoke to Stavros, and I trust
5   him, and I believe him.
6       Q.  And around when did you speak to
7   Stavros?
8       A.  Whenever the lawsuit came.  I don't
9   remember the time.
10      Q.  What did you ask him during that
11  conversation?
12      A.  I asked him for the customer's
13  name, who, you know, who prepared the work,
14  you know, ID.  He swears that they both were
15  at the dealership and he had them remove the
16  mask from a distance to make sure it was
17  them.
18      Q.  Did he tell you who pulled
19  Ms. Francois' credit report?
20      A.  He told me -- let me think.  He
21  told me that they were all having lunch or
22  dinner, they were eating, a few of the
23  managers in -- I don't know whose office.  I
24  don't remember whose office.  But they were
25  eating in a manager's office and Yessica is

Page 140

1
2   the one who ran the credit.
3       Q.  Okay.
4           MR. GOODMAN:  Do you need to
5       take that?
6           THE WITNESS:  No, it's okay.
7           MS. CATERINE:  You want to
8       take a break?
9           THE WITNESS:  It's okay.  I
10      will call back.  Thank you.
11      Q.  Have any employees been fired, or
12  otherwise disciplined, in regards to the
13  allegations in this lawsuit?
14      A.  No.
15      Q.  Have you spoken with Yessica
16  Vallejo about the allegations in this
17  lawsuit?
18      A.  I have.
19      Q.  And what was the nature of that
20  conversation?
21          MR. GOODMAN:  Was counsel
22      present for that conversation?  Was
23      it attorney -- either me or Patrick
24      there?
25          THE WITNESS:  When I spoke



DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
141–144

Page 141

1
2      to Yessica?
3            MR. GOODMAN:  Correct.
4            THE WITNESS:  I am trying to
5      remember.  Were you?
6            MR. GOODMAN:  I think so.
7            THE WITNESS:  I think you
8      were there.  You were there.
9            MR. GOODMAN:  There may have
10     been another time, but I definitely
11     --
12           THE WITNESS:  You were there
13     the one time, the only time.  Was
14     she was very upset because Yessica
15     -- I know you met her.  She takes
16     things to heart.  And she said, "I
17     would never do anything that I am
18     not supposed to do."
19           MR. GOODMAN:  Okay, there's
20     no question pending.
21           THE WITNESS:  All right, all
22     right, all right, all right.  Okay,
23     never mind.
24     Q.   Was she afraid that you might
25     believe the allegations in the lawsuit?

Page 142

1
2            MR. GOODMAN:  Objection to
3      form.  But also now we're in the
4      privileged conversation.  So I'll
5      direct her not to answer.
6      Privilege.
7      Q.   Okay.  Did Ms. Vallejo mention
8      anyone by the name of Jaime Singer?
9            MR. GOODMAN:  Objection.
10     Again, you are asking her about a
11     conversation we established --
12           MS. CATERINE:  Fair enough.
13     Fair enough.
14     Q.   Other than your conversation with
15     Ms. Vallejo, have you had any other
16     communications with her about the lawsuit,
17     such as e-mails?
18           MR. GOODMAN:  Other than the
19     time that I was there?  That's the
20     question?
21           Did you have any other
22     conversation, when I was not there,
23     with Yessica, about this case?
24           THE WITNESS:  No.
25     Q.   Have you, at any point, tried to

Page 143

2      contact Ms. Francois?
3      A.   No.
4      Q.   Do you think that Victory
5      Mitsubishi did anything wrong in the sale and
6      financing of the vehicle to Ms. Francois?
7            MR. GOODMAN:  Object to the
8      form; go ahead.
9      A.   No.
10     Q.   Who is at fault for Ms. Francois'
11     identity being stolen?
12           MR. GOODMAN:  Objection,
13     form.  Don't answer that.  Who's at
14     fault?  You can answer, if you
15     know.  I mean, object to the form.
16     A.   I don't know.
17     Q.   Okay.
18           MR. GOODMAN:  It seems --
19     sorry, I am not -- object to form.
20     Q.   Are you aware that Emanuel LaForest
21     has testified in this lawsuit that he
22     purchased Ms. Francois' social security
23     number?
24     A.   No.
25     Q.   Are you aware that Mr. LaForest

Page 144

2      texted the social security number of another
3      person by the name of Jaime Singer to Stavros
4      Orsaris?
5      A.   No.
6      Q.   Are you aware that Emanuel LaForest
7      texted a picture of Jaime Singer's driver's
8      license to Stavros Orsaris?
9      A.   No.
10     Q.   Knowing what it does now, would
11     Victory Mitsubishi have taken any steps in
12     the sale and financing of a vehicle to
13     Ms. Francois differently than how it did on
14     May 30, and June 29th of 2020?
15           MR. GOODMAN:  Object to the
16     form.
17     A.   Are you assuming we did something?
18     I am not understanding the question.
19     Q.   From my understanding --
20           MR. GOODMAN:  No, if you
21     don't understand, that's it.  She
22     will ask another question.
23           THE WITNESS:  Okay.
24           MS. CATERINE:  Let's take a
25     ten-minute break.  Hopefully, we



DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
145–148

Page 145

1      can wrap this up soon.
2          (Whereupon, a recess was
3      taken at this time.)
4  BY MS. CATERINE:
5      Q.  So when did the Instagram account
6  for Victory Mitsubishi start?
7          MR. GOODMAN:  Object to
8          form; go ahead.
9      A.  Couple of years ago.  Honestly, I
10  don't remember the date.
11      Q.  Okay, that's fine.  And you said
12  that the post that we looked at earlier were
13  put together by a marketing firm and Bibi
14  Singh; is that correct?
15      A.  Yes.
16      Q.  Who's Ms. Singh's supervisor?
17          MR. GOODMAN:  Currently?
18          Object to form.
19      Q.  In 2020.
20      A.  She is a manager.
21      Q.  She is a manager.  So does she not
22  have a supervisor, then?
23      A.  If there's ever needed, she will go
24  to Stavros.  But she is a manager.

Page 146

1
2      Q.  Okay.  So would she have reported
3  these marketing campaigns to Stavros?
4      A.  I would -- I would say they
5  definitely had to discuss it, yes.
6      Q.  And so you mentioned that Chris
7  Orsaris -- I think you called him a "buyer";
8  is that correct?
9      A.  Yes.
10      Q.  What does a buyer do?
11      A.  Buys and sells vehicles.
12      Q.  And where is he buying and selling
13  vehicles?
14      A.  Auction.  Auctions.
15      Q.  Okay, so he is dealing in used
16  vehicles, specifically?
17      A.  Yes.
18      Q.  And are these sold to Victory
19  Mitsubishi one at a time, or in bundles?
20      How does that work?
21      A.  They are sold for the day.  It's an
22  immediate transaction, as he buys.
23      Q.  Got you.  And you said he receives
24  a flat fee for the vehicles, correct?
25      A.  Yes, depending on the vehicles.

Page 147

1
2  There's different fees.
3      Q.  Okay.  Does he receive any other
4  compensation through Victory Mitsubishi?
5      A.  No.
6      Q.  Do you know if he works for any
7  other companies, besides Victory Mitsubishi?
8      A.  Not to my knowledge.
9      Q.  What is a "floor planner"?
10      A.  A "floor plan"?
11      Q.  A floor planner.
12          MR. GOODMAN:  "Planner."
13      A.  I don't know.
14      Q.  You don't know.  Okay.
15      Do you know if anyone has a lien on
16  the vehicle in this lawsuit?
17      A.  Yes.
18      Q.  And who has a lien on the vehicle?
19      A.  Capital One.
20      Q.  So as far as you're aware, that
21  lien has not been extinguished; is that
22  correct?
23      A.  Correct, yes.
24      Q.  Where does Chris Orsaris live?
25          MR. GOODMAN:  Note my

Page 148

1
2      objection.
3      A.  I am not sure.
4      Q.  Okay.  What is a "floor plan"?
5      A.  A "floor plan" is a bank that owns
6  the vehicles, so you pay interest to them,
7  and as you sell them, you payoff the floor
8  plan.  It's a loan.
9      Q.  And that was the ACF or AFC?
10      A.  AFC.
11      Q.  AFC, okay.
12      A.  Yes.
13      Q.  And you talked about recordings of
14  phone calls that were between Ms. Francois
15  and the dealership, correct?
16      A.  Correct.
17      Q.  What dealership employees were
18  speaking to Ms. Francois?
19      A.  I am not sure which employees.
20      Q.  Okay.  How were these recordings
21  made?
22      A.  I think by phone.  I would say, by
23  phone.
24      Q.  So the phones at Victory Mitsubishi
25  can record calls?



DIANE ARGYROPOLOUS                                    December 09, 2022
FRANCOIS vs VICTORY AUTO GROUP LLC                              149–152

Page 149

1
2      A.   Not all phone calls, no.
3      Q.   Sure.  But they have the capacity
4   to record phone calls; is that correct?
5      A.   A couple of them do, yes.
6      Q.   Okay.  And I know you said they
7   don't record all phone calls.  What is the
8   procedure for recording phone calls?
9      A.   I am not sure.  Bibi handles that.
10      Q.   And she handles that for all of the
11   phones, both at 4070 and the other address,
12   which I am forgetting off the top of my head?
13      A.   Yes, yes.
14      Q.   Are there any other buildings,
15   beside those two that we talked about, for
16   Victory Mitsubishi?
17      A.   For sales?
18      Q.   For any reason.  Storage, anything
19   like that?
20      A.   Yes, there is.
21      Q.   All right.  And what are those?
22   Where are those buildings located?
23      A.   A couple of blocks away.  It's a
24   service center.
25      Q.   Okay.  Anything else, besides the

Page 150

1
2   service center?
3      A.   In what year?
4      Q.   In 2020.
5      A.   I don't think so.
6      Q.   Okay.  When you're collecting --
7   when you are processing down payments on
8   vehicles, what documents are you looking at
9   to do that?  Are you looking at the receipts
10   for the down payments?
11      A.   That's one of the things I am
12   looking at.
13      Q.   Okay.  What else are you looking
14   at, besides the receipts?
15      A.   On Dealertrack, there's a special
16   section for deposits.
17      Q.   I see.  And if a consumer makes
18   separate payments for the down payment, like,
19   you know, for example, at one time making a
20   down payment of $8,000, and another time
21   making a payment of $1,000, would those show
22   up separately, or would it just show up as
23   one payment of $9,000?
24      A.   It would show up one, but with two
25   different dates.

Page 151

1
2      Q.   Okay.  And the checking account you
3   mentioned before, that's with HSBC, correct?
4      A.   Yes.
5      Q.   Do you know anyone who works at
6   Victory Mitsubishi who is about 6'2" tall?
7      A.   No.
8      Q.   In the ordinary course of your
9   work, how often do you speak with finance
10   managers?
11      A.   At what time?
12      Q.   In 2020.
13      A.   Hardly ever.  I wasn't there.
14      Q.   If I recall correctly, you couldn't
15   remember all of the finance managers in 2020
16   off the top of your head.  But in 2020, would
17   you have known the names of all the finance
18   managers?
19      A.   At that time?
20      Q.   Yes.
21      A.   Yes, yes.
22      Q.   Do you know if Capital One has
23   spoken to anyone at Victory Mitsubishi about
24   the vehicle, since September of 2020?
25           MR. GOODMAN:  Objection;

Page 152

1
2           asked and answered.  Go ahead.
3      A.   No.
4      Q.   Do you know if there have been any
5   e-mails or faxes exchanged between Victory
6   Mitsubishi and Capital One, about the
7   vehicle, since September of 2020?
8      A.   I have no knowledge of that.
9      Q.   You mentioned a Victory Mitsubishi
10   e-mail that you used for your work.  Have you
11   searched that e-mail for information
12   regarding this case?
13      A.   I have.
14      Q.   And did you find any e-mails
15   regarding this case?
16      A.   No.
17      Q.   Are you able to search your cell
18   phone for text messages?
19           MR. GOODMAN:  Object to
20           form; go ahead.
21      A.   What time period?
22      Q.   In 2020.
23      A.   I am.
24           MR. GOODMAN:  You can search
25           now for text messages from 2020?



Page 153

2        THE WITNESS: No. Now, I
3    cannot. No. Sorry, not now. I
4    thought she meant in 2020. I don't
5    give my phone number out, though.
6        The employees have my work number.
7    Q.   And the work number corresponds to
8 a phone in your office?
9    A.   Correct.
10   Q.   Have you provided your attorneys
11 with any phone records?
12   A.   No.
13       MS. CATERINE: And I just
14   want to confirm, I know your
15   position, Counsel, in terms of
16   giving out the home address, but
17   can we stipulate that
18   Ms. Argyropoulos will present
19   herself at trial on notice?
20       MR. GOODMAN: Well, I will
21   accept any subpoena for trial on
22   her behalf. I can certainly make
23   that representation.
24       MS. CATERINE: Okay.
25       That's all the questions I

Page 154

2    have.
3        MR. GOODMAN: I just have
4    one question.
5 BY MR. GOODMAN:
6    Q.   Ms. Argyropoulos, you testified
7 that in the year 2020, specifically, on
8 certain dates, you were not in the dealership
9 at all or at least not often.
10       Is there a reason for that? I
11 mean, we've heard COVID. But is there
12 anything more specific that kept you away
13 from the dealership?
14       MS. CATERINE: Objection to
15   form.
16   A.   No, it was because of COVID that I
17 wasn't going to work every day.
18   Q.   Yeah.
19   A.   It was because of COVID.
20   Q.   Was there any -- your mother at
21 home?
22   A.   Oh, yeah, my mother is
23 eighty-something years old. So I couldn't
24 take a chance and get COVID, to give it to my
25 mother. That's the reason I didn't go.

Page 155

2 Yeah, because of COVID. Yeah, yeah, yeah.
3        MR. GOODMAN: All right, I
4    have no further questions.
5        MS. CATERINE: All right. I
6    don't have anymore questions.
7        MR. GOODMAN: I guess we are
8    done.
9        MS. CATERINE: Yes. Before
10   we go -- Ms. Argyropoulos, you are
11   free to go. Thank you.
12       THE WITNESS: Thank you.
13       MR. GOODMAN: You can go.
14   We will stay on.
15       THE WITNESS: Okay.
16       MS. CATERINE: Can we have
17   any agreement as to taking the
18   deposition of the Ventura person on
19   Monday?
20       MR. GOODMAN: Yeah, so I am
21   advised that -- I think it's -- the
22   individual Ventura is no longer
23   employed by -- that's what I have
24   been told. I inquired for a last
25   known address and contact

Page 156

2 information. I have not received
3 it, but I will provide it when
4 available.
5        MR. KESHAVARZ: Do you know
6 what the first name is?
7        MR. GOODMAN: No, I do not.
8        MR. KESHAVARZ: Well, we
9 have to take depositions like next
10 week. So I don't know why it's so
11 hard to find out where she lives,
12 what her address is, last known
13 address.
14       Why don't you make call and
15 find out?
16       MR. GOODMAN: I called and
17 they are looking for it.
18       MR. KESHAVARZ: I know, but
19 we need an answer now. We can't
20 wait until next week.
21       MR. GOODMAN: You will not
22 get an answer right now. You will
23 get an answer as soon as I get an
24 answer. I am not trying to hold it
25 back from you. I have made an



DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
157–160

Page 157

1
2  inquiry and I will provide it when
3  I get it.
4        MS. CATERINE:  What other
5  information do you have about this
6  person at this time?
7        MR. GOODMAN:  Not much,
8  other than Y. Ventura.
9        MR. KESHAVARZ:  Well, can we
10 nail down a date for a deposition
11 for our availability and your
12 availability.
13       MS. CATERINE:  For next
14 week.
15       MR. GOODMAN:  When I get an
16 update, it will appear.  You will
17 have to subpoena this individual.
18 That will take time and effort.
19       MR. KESHAVARZ:  That's fine,
20 but when are you available next
21 week?
22       MR. GOODMAN:  I don't know.
23       MR. KESHAVARZ:  Find out.
24       MR. GOODMAN:  Do what --
25       MR. KESHAVARZ:  Let's narrow

Page 158

1
2  that down now.
3        MR. GOODMAN:  I am not
4  available.  I am available for
5  Jaime Singh and Paquito.
6        MR. KESHAVARZ:  I don't want
7  to hear that when I subpoena her,
8  you are not available for that
9  date.  If you are giving us --
10       MR. GOODMAN:  What's the
11 point?  You will not get --
12       MR. KESHAVARZ:  When are you
13 available?
14       MR. GOODMAN:  You will never
15 get her next week.
16       MR. KESHAVARZ:  Forget about
17 her.  She doesn't work for you.
18 You can't file a motion to squash.
19 I will subpoena as soon as I can.
20 I don't want to hear you are not
21 available that day.  So let's look
22 at attorneys schedules.  I just
23 want it clear.  If you don't want
24 it clear, that's fine.  I don't
25 want to hear you say, "I am not

Page 159

1
2  available on that" --
3        MR. GOODMAN:  I don't want
4  to clear that with you.
5        MR. KESHAVARZ:  Get that on
6  record.
7        MR. GOODMAN:  No, we will
8  not get that on record.
9        MR. KESHAVARZ:  Where's the
10 court reporter?  We never got off
11 record.  Madam court reporter, are
12 we still on the record?
13       THE REPORTER:  Yes.
14       MR. KESHAVARZ:  Okay, thank
15 you.
16       -oOo-
     (Whereupon, the examination
17 of DIANE ARGYROPOLOUS was adjourned
   at 3:06 p.m.)
18
19
                DIANE ARGYROPOLOUS
20
21 Subscribed and sworn to
   before me this        day
22 of              , 2022.
23
   NOTARY PUBLIC
24
25

Page 160

1
2
   --------------- I N D E X -----------------
3
4  WITNESS        EXAMINATION BY        PAGE
5  DIANE ARGYROPOLOUS
6           MS. CATERINE          6
7           MR. GOODMAN           154
8  ---------------- REQUESTS -----------------
9  Page 109...line 24
   Document that lists all of the employee
10 identification numbers, like 999, and A31
11 Page 130...line 6
   Production of that record in regard to the
12 down payment for this vehicle.
13 ---------------- FURNISH -------------------
14 Page 18...line 11
   Production of cell phone number
15
   Page 81...line 6
16 Name of IT guy
17 Page 94...line 10
   Name of the marketing company
18
   ---------------- EXHIBITS ------------------
19
   DEFENDANT'S                         FOR ID.
20 EXHIBIT 43    Instagram Posts    premarked
   EXHIBIT 44    Dealer Track History  premarked
21 EXHIBIT 45    K-1 Filings         premarked
22
       (Exhibits retained by reporter.)
23
24 -------------------------------------------
25



DIANE ARGYROPOLOUS
FRANCOIS vs VICTORY AUTO GROUP LLC

December 09, 2022
161–164

**Page 161**

```
1
2            C E R T I F I C A T E
3   STATE OF NEW YORK    )
                          : ss.
4   COUNTY OF NEW YORK   )
5
6        I, AYDIL M. TORRES, a Notary Public
7   within and for the State of New York, do
8   hereby certify:
9        That DIANE ARGYROPOLOUS, the witness
10  whose deposition is hereinbefore set forth,
11  was duly sworn by me and that such deposition
12  is a true record of the testimony given by
13  the witness.
14       I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage, and that I am in no way
17  interested in the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereunto
19  set my hand this 9th day of December, 2022.
20
21
22
23         AYDIL M. TORRES
24
25
```

**Page 162**

```
1
2          DEPOSITION ERRATA SHEET
3
4   Our Assignment No.  J8950423
5   Case Caption:  FARAH JEAN FRANCOIS vs.
6   VICTORY AUTO GROUP LLC, ET AL.
7     DECLARATION UNDER PENALTY OF PERJURY
8       I declare under penalty of perjury
9   That I have read the entire transcript of
10  My Deposition taken in the captioned matter
11  Or the same has been read to me, and
12  The same is true and accurate, save and
13  Except for changes and/or corrections, if
14  Any, as indicated by me on the DEPOSITION
15  ERRATA SHEET hereof, with the understanding
16  That I offer these changes as if still under
17  Oath.
18  _____
19            DIANE ARGYROPOLOUS
20  Subscribed and sworn to on the _____ day of
21  _____, 20____ before me,
22
23  _____
24  Notary Public,
25  In and for the State of _____
```

**Page 163**

```
1
2          DEPOSITION ERRATA SHEET
3   Page No._____Line No._____Change
4   to:_____
5   _____
6   Reason for
7   change:_____
8   Page No._____Line No._____Change
9   to:_____
10  _____
11  Reason for
12  change:_____
13  Page No._____Line No._____Change
14  to:_____
15  _____
16  Reason for
17  change:_____
18  Page No._____Line No._____Change
19  to:_____
20  _____
21  Reason for
22  change:_____
23  SIGNATURE:_____DATE:_____
24           DIANE ARGYROPOLOUS
25
```

**Page 164**

```
1
2          DEPOSITION ERRATA SHEET
3   Page No._____Line No._____Change
4   to:_____
5   _____
6   Reason for
7   change:_____
8   Page No._____Line No._____Change
9   to:_____
10  _____
11  Reason for
12  change:_____
13  Page No._____Line No._____Change
14  to:_____
15  _____
16  Reason for
17  change:_____
18  Page No._____Line No._____Change
19  to:_____
20  _____
21  Reason for
22  change:_____
23  SIGNATURE:_____DATE:_____
24           DIANE ARGYROPOLOUS
25
```

