**Page 1**

```
1
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    -----------------------------X
4    FARAH JEAN FRANCOIS,
5                    Plaintiff,
6         -against-           Case "No.":
                              1:22-cv-4447-JSR
7    VICTORY AUTO GROUP LLC d/b/a
     VICTORY MITSUBISHI, SPARTAN
8    AUTO GROUP LLC d/b/a VICTORY
     MITSUBISHI, STAVROS ORSARIS,
9    YESSICA VALLEJO, DAVID PEREZ,
     DIANE ARGYROPOULOS, and
10   PHILIP ARGYROPOULOS,
11                  Defendants.
12   -----------------------------X
13
14        REMOTE DEPOSITION of STAVROS ORSARIS, a
15   30(b)1 and 30(b)(6) witness herein, witness
16   located in the Law Office of Nicholas Goodman,
17   held on November 23, 2022, commencing at 10:00
18   a.m., and before Helene Gruber, a certified
19   shorthand reporter and notary public within and
20   for the state of New York.
21
22
23
24
25
```

**Page 2**

```
1
2    A P P E A R A N C E S :
3
4    THE LAW OFFICE OF AHMAD KESHAVARZ
5    Attorneys for Plaintiff
6         16 Court Street, #2600
7         Brooklyn, New York 11241
8    BY:   EMMA CATERINE, ESQ.
9          AHMAD KESHAVARZ, ESQ.
10
11   NICHOLAS GOODMAN & ASSOCIATES
12   Attorneys for Defendants
13        333 Park Avenue South
14        New York, New York  10010
15   BY:   NICHOLAS GOODMAN, ESQ.
16         PATRICK SELVEY, ESQ.
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1
2
3         S T I P U L A T I O N S
4
5         IT IS HEREBY STIPULATED AND AGREED,
6    by and between the attorneys for the respective
7    parties, as follows:
8         All objections, except as to the form
9    of the questions, shall be reserved to the time
10   of the trial.
11        The within examination may be signed
12   and sworn to before any Notary Public with the
13   same force and effect as if signed and sworn to
14   before the court.
15        Filing of the original transcript of
16   the examination is waived.
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1         S. Orsaris
2         (The parties stipulate to the witness
3    being sworn in remotely.)
4         COURT REPORTER:  Please state your
5    name and business address.
6         THE WITNESS:  Stavros Orsaris, 4070
7    Boston Road, Bronx, New York  10475.
8              STAVROS ORSARIS,
9    Having first been duly sworn, was examined and
10   testified as follows:
11             EXAMINATION
12   BY MS. CATERINE:
13        Q.  Mr. Orsaris, thank you for your time
14   today.  Could you please state your full name
15   for the record?
16        A.  Stavros Orsaris.
17        Q.  Have you ever gone by any other names
18   or aliases?
19        A.  No.
20        Q.  Have you ever had your deposition
21   taken before?
22        A.  No.
23        Q.  Have you ever testified in a court
24   hearing before?
25        A.  No.
```



Page 5

S. Orsaris

1
2     Q.   Have you ever testified in an
3  administrative hearing before?
4     A.   No.
5     Q.   If you don't understand a question,
6  will you please ask me to rephrase the
7  question?
8     A.   Yes, no problem.
9     Q.   If I ask you a question and you don't
10  ask me to rephrase the question, is it
11  reasonable to assume that you understood the
12  question?
13       MR. GOODMAN:  Object to the form.
14  You could answer.
15     A.   If I don't ask to rephrase it, then I
16  don't need it rephrased.
17     Q.   During the course of the deposition,
18  as you just heard, your attorney may be making
19  certain objections such as objection to form.
20  Unless instructed not to answer, you are still
21  required to answer the question.  Do you
22  understand?
23     A.   Yes.
24     Q.   And will you please orally answer all
25  questions, not nod or make remarks like uh-huh

Page 6

S. Orsaris

1
2  so there is a clear transcript for the court
3  reporter?
4     A.   Of course.
5     Q.   And that is a great example of an
6  oral answer.
7       How old are you, Mr. Orsaris?
8     A.   Twenty-eight.
9     Q.   What is your date of birth?
10    A.   XX-XX-1994.
11     Q.   How tall are you?
12    A.   5'7.
13     Q.   And how much do you weigh?
14    A.   165 pounds.
15     Q.   Were you about that weight in May of
16  2020?
17    A.   Yes.
18     Q.   I see that you have a shaved head at
19  the moment.  Did you have hair in May of 2020?
20    A.   No.
21     Q.   Where do you currently reside?
22       MR. GOODMAN:  Objection.  We gave a
23  business address.  You don't need the
24  residential address.
25     Q.   What county do you currently reside

Page 7

S. Orsaris

1  in?
2
3     A.   New York City.
4     Q.   Do you live in the borough of
5  Manhattan?
6     A.   Yes.
7     Q.   What steps did you take in
8  preparation for your deposition today?
9     A.   I met with my attorney last
10  Wednesday.
11     Q.   And when you say your attorney, are
12  you referring to Nicholas Goodman?
13    A.   Yes.
14     Q.   Did you review any documents in
15  preparation for your deposition today?
16    A.   Yes.
17     Q.   What documents did you review?
18    A.   The documents that had been submitted
19  by both sides.
20     Q.   Do you understand that today you are
21  testifying both as yourself and as the 30(b)(6)
22  representative of Spartan Auto Group LLC?
23    A.   Yes.
24     Q.   What is your understanding of what it
25  means to testify as a 30(b)(6) witness for

Page 8

S. Orsaris

1
2  Spartan Auto Group LLC?
3       MR. GOODMAN:  Object to the form.
4  You can answer if you understand.
5     A.   I don't understand.
6     Q.   Did you speak with anyone else
7  besides Mr. Goodman in preparation for your
8  deposition today?
9     A.   No.
10     Q.   What is your understanding of this
11  lawsuit?
12       MR. GOODMAN:  Object to the form.
13  You can answer if you understand.
14     A.   I don't understand.
15     Q.   Sure.  Let me rephrase the question.
16  Do you know what you are going to be testifying
17  about today?
18    A.   Yes.
19       MR. GOODMAN:  Object to the form.
20     Q.   You might want to pause so that your
21  attorney can make objections before you state
22  your answer just so we have a clear transcript.
23       MR. GOODMAN:  Thank you, yes.  That's
24  appropriate.  Do that.
25     Q.   And I believe your answer was "yes,"



STAVROS ORSARIS 30(b)(6)30(b) 1                    November 23, 2022
FARAH J. FRANCOIS vs VICTORY AUTO GROUP LLC                 9–12

Page 9

1            S. Orsaris
2    correct?
3        A.   Yes.
4        Q.   What is your understanding?
5        A.   I don't have the most thorough
6    understanding.
7        Q.   That's all right.  I just want your
8    understanding.
9            MR. GOODMAN:  Understanding about
10   what?  I'm sorry.  What was the question?
11   Understanding about this lawsuit?
12           MS. CATERINE:  That's right.
13           MR. GOODMAN:  Go ahead.
14       A.   A potential allegation about an FCRA
15   violation.
16       Q.   Do you understand that this case is
17   about the sale and financing of a vehicle in
18   the name of Farah Jean Francois?
19       A.   Yes.
20       Q.   And prior to your preparation for the
21   deposition in this case, had you reviewed any
22   of the documents related to this case?
23           MR. GOODMAN:  Object to the form.  Go
24   ahead.
25       A.   I didn't review any additional

Page 10

1            S. Orsaris
2    documents prior to my preparation for this
3    deposition.
4        Q.   Would that include electronic
5    documents like computer screens such as for the
6    computer program Dealertrack?
7        A.   I don't understand the question.
8        Q.   Sure.  Let me rephrase.  In
9    preparation for your deposition today, did you
10   look at any computer screens such as for the
11   program Dealertrack?
12       A.   No.
13       Q.   Have you searched for documents in
14   relation to this case?
15           MR. GOODMAN:  Object to the form.
16   You can answer.
17       A.   Yes.
18       Q.   And you produced those documents to
19   your attorney, Mr. Goodman, correct?
20           MR. GOODMAN:  Object to the form.  Go
21   ahead.
22       A.   Yes.
23       Q.   And did those documents include
24   electronic documents such as screenshots and
25   emails?

Page 11

1            S. Orsaris
2            MR. GOODMAN:  Object to form.  Go
3    ahead.
4        A.   Screenshots and emails -- I mean my
5    emails with screenshots, to my understanding.
6        Q.   So you didn't search for emails?
7        A.   That's not what I am saying.  I had
8    nothing in my email.
9        Q.   So you searched your emails and there
10   was nothing relating to this case; is that
11   correct?
12       A.   Correct.
13       Q.   When you said you searched emails,
14   are you referring to your email at the
15   dealership?
16       A.   Yes.
17       Q.   What is that email address?
18       A.   My first name at Mitsubishi.com,
19   Stavros@mitsubishi.com.
20       Q.   What other emails were searched in
21   relation to this case?
22       A.   No other emails were searched.
23       Q.   Have you searched for text messages
24   in relation to this case?
25       A.   Yes.

Page 12

1            S. Orsaris
2        Q.   I want you to take a look at what was
3    previously marked as Exhibit 25 Bates stamped
4    Defendants' 70 through 72.  The Bates stamp is
5    a little small so that is a little hard to see,
6    but it is screenshots of text messages on an
7    iPhone.
8        A.   Okay, I have those.
9        Q.   And were these the text messages that
10   were located in your search for text messages
11   in relation to this case?
12       A.   Yes.
13       Q.   And are these from your personal cell
14   phone?
15       A.   Yes.
16       Q.   And what is your cell phone number?
17       A.   (347)593-4394.  My personal cell
18   phone is also used for work.  I only have one
19   phone number.
20           MR. KESHAVARZ:  Can you say that
21   again?
22           THE WITNESS:  (347)593-4394.
23       Q.   Was that cell phone provided to you
24   by Victory Mitsubishi?
25       A.   No.



Page 13

1              S. Orsaris
2      Q.   Who is the cell phone provider?
3      A.   Verizon.
4      Q.   Does Victory Mitsubishi pay for the
5   bills related to the cell phone usage?
6      A.   No.
7      Q.   So it is a personal cell phone; you
8   just use it for work as well as for personal?
9      A.   Yes.
10     Q.   Were there any other text messages
11  related to this case with this cell phone?
12          MR. GOODMAN:  Object to the form.  Go
13  ahead if you understand it.
14     A.   No.
15     Q.   You didn't text Philip Argyropoulos
16  about this case?
17          MR. GOODMAN:  Over my objection, go
18  ahead.
19     A.   No.
20     Q.   You didn't text Diane Argyropoulos
21  about this case?
22          MR. GOODMAN:  Objection.  Go ahead.
23     A.   No.
24     Q.   Did you text Chris Orsaris about this
25  case?

Page 14

1              S. Orsaris
2          MR. GOODMAN:  Objection.  Go ahead.
3      A.   No.
4      Q.   Did you text David Perez about this
5   case?
6          MR. GOODMAN:  Objection.  Go ahead.
7      A.   No.
8      Q.   And I think I know the answer, but
9   did you text Yessica Vallejo about this case?
10          MR. GOODMAN:  Objection.  Go ahead.
11     A.   No.
12     Q.   In addition to the email you
13  mentioned earlier -- I believe it is
14  Stavros@victorymitsubishi.com; is that correct?
15     A.   Yes.
16     Q.   In addition to that email, do you use
17  any other emails in relation to your work at
18  Mitsubishi?
19     A.   No.
20     Q.   Are emails to
21  Stavros@victorymitsubishi.com forwarded to any
22  other email in-boxes?
23     A.   No.
24     Q.   Do you have the application WhatsApp
25  on your cell phone?

Page 15

1              S. Orsaris
2          MR. GOODMAN:  Note my objection.  Go
3   ahead.
4      A.   Not at the moment.
5      Q.   You have in the past?
6          MR. GOODMAN:  Objection.  Is that a
7   question?
8      Q.   Have you had it in the past?
9      A.   Maybe 2017 and 2018.
10     Q.   Do you have any other messaging apps
11  on your phone such as Signal?
12     A.   No.
13     Q.   Telegram?
14     A.   No.
15     Q.   Have you searched your telephone
16  records and bills for dates of calls related to
17  this case?
18     A.   Yes.
19     Q.   Have those records been produced?
20          MR. GOODMAN:  Object to the form.
21  Produced by whom to whom?  I don't understand
22  the question.
23     Q.   Have those records been produced to
24  your attorney, Mr. Goodman?
25     A.   Yes.

Page 16

1              S. Orsaris
2          MS. CATERINE:  I call for the
3   production of those records, please.
4          MR. GOODMAN:  Take it under
5   advisement.
6      Q.   Do you recall when the phone calls
7   were that were in relation to this case?
8      A.   Yes.
9      Q.   Around when were those phone calls?
10     A.   From my cell phone?
11     Q.   Correct.
12     A.   In September.
13          MR. GOODMAN:  Of what year?
14          THE WITNESS:  Of 2020.
15     Q.   Mr. Orsaris, did you graduate from
16  high school?
17     A.   Yes.
18     Q.   Where did you go to high school?
19     A.   I spent time at Manhasset High School
20  and graduated from Bayside High School.
21     Q.   When did you graduate?
22     A.   In 2012.
23     Q.   What was the reason why you changed
24  high schools?
25     A.   Move.



Page 17

1           S. Orsaris
2      Q.   Do you have any post high school
3   education?
4      A.   Yes.
5      Q.   Did you go to college?
6      A.   Yes.
7      Q.   Where did you go to college?
8      A.   Baruch College.
9      Q.   Did you graduate?
10     A.   Yes.
11     Q.   What was your degree in?
12     A.   I have a bachelor's in finance and
13  investments.
14     Q.   Did you go to any school after you
15  graduated from Baruch College?
16     A.   No.
17     Q.   What year did you graduate?
18     A.   2016.
19     Q.   What did you do after you graduated
20  from Baruch College?
21     A.   I was working as an export finance
22  consultant.
23     Q.   Where were you working?
24     A.   At a consulting firm called CC
25  Solutions.

Page 18

1           S. Orsaris
2      Q.   Did you start there in 2016?
3      A.   I initially started as an intern in
4   2015 and was hired as a full-time consultant in
5   2016.
6      Q.   How long did you work there?
7      A.   About a year and a half.
8      Q.   So you left in 2018; is that correct?
9      A.   No.
10     Q.   2017?
11     A.   No.
12     Q.   When did you leave?
13     A.   2016.
14     Q.   I see.  You were including your time
15  as an intern?
16     A.   Yes.  It was a paid internship.
17     Q.   What did you do after working at that
18  consulting firm?
19     A.   Automotive retail sales.
20     Q.   Why did you leave that consulting
21  firm?
22     A.   The United States Export Import Bank
23  did not receive funding by the federal
24  government, and there was a lapse which led to
25  my change in career.

Page 19

1           S. Orsaris
2      Q.   Where was your next job?
3      A.   At a Mitsubishi store in Larchmont,
4   New York.
5      Q.   What did you do there?
6      A.   Automotive retail sales.
7      Q.   What was your title?
8      A.   I was a manager.  I started in sales
9   but became a manager.
10     Q.   And you may have said this before,
11  but when did you start there?
12     A.   Summer of 2016.
13        MR. GOODMAN:  '16 or '17?
14        THE WITNESS:  '16.
15     Q.   And when did you stop working there?
16     A.   I was transferred to the Bronx store,
17  Victory Auto Group, in November 2016.
18     Q.   And that's where you currently work,
19  correct?
20     A.   I do not work for Victory Auto Group,
21  no.
22     Q.   But that's the same location,
23  correct, the 4070 Boston Road location?
24     A.   No.
25     Q.   I apologize.  Where is that location?

Page 20

1           S. Orsaris
2      A.   4101 Boston Road.
3      Q.   Going back to when you were at
4   Larchmont, Larchmont Mitsubishi, what were your
5   responsibilities while working there?
6      A.   Managing sales folks, salespeople, in
7   addition to overseeing sales.
8      Q.   Were you involved with the financing
9   of vehicles while working at Larchmont?
10        MR. GOODMAN:  Form.  Go ahead.
11     A.   No.
12     Q.   Did you pull credit reports while
13  working at Larchmont Mitsubishi?
14     A.   Yes.
15     Q.   What was the purpose for you pulling
16  credit reports?
17     A.   For our clientele to purchase a car.
18     Q.   You were using the credit reports to
19  make assessments of clients; is that correct?
20        MR. GOODMAN:  Object to form.  Go
21  ahead.
22     A.   I was not making assessments, no.
23     Q.   I see.  Maybe you can clarify for me,
24  then.  What was the purpose of the credit
25  reports?  What was done with them?



Page 21

1            S. Orsaris
2      A.  They were reviewed.
3      Q.  By someone else?
4      A.  Yes.
5      Q.  I see.  And so you got transferred
6  from Larchmont Mitsubishi to Victory Auto
7  Group, and what is your title at Victory Auto
8  Group when you start there?
9      A.  Sales manager.
10     Q.  How long did you work at Victory Auto
11 Group?
12     A.  Until the opening of Victory
13 Mitsubishi.
14     Q.  And when was that?
15     A.  February of 2018.
16     Q.  And you are referring to the 4070
17 Boston Road location; is that correct?
18     A.  Yes.
19     Q.  Who owned Victory Mitsubishi when it
20 opened?
21        MR. GOODMAN:  Object to form.
22     A.  Diane Argyropoulos.
23     Q.  How do you know that?
24        MR. GOODMAN:  Object to form.  You
25 can answer if you understand.

Page 22

1            S. Orsaris
2      A.  I don't know the specifics of how I
3  knew, but I do know.
4      Q.  Who owned Victory Auto Group?
5        MR. GOODMAN:  Object to form.
6      Q.  While you were working there?
7      A.  I don't know.
8      Q.  Who was your supervisor at Victory
9  Auto Group?
10     A.  Diane Argyropoulos.
11     Q.  If I understand you correctly, the
12 Victory Mitsubishi store is opening, and Diane
13 asks you to go work at the Victory Mitsubishi
14 store; is that correct?
15        MR. GOODMAN:  Object to form.
16 Mischaracterizes testimony.  You can answer if
17 you understand.
18     A.  Can you rephrase the question,
19 please?
20     Q.  Sure.  Let's put it this way:  Did
21 you apply to work at the Victory Mitsubishi
22 store?
23        MR. GOODMAN:  Object to form again.
24 If you understand, go ahead.
25     A.  I verbally applied.

Page 23

1            S. Orsaris
2      Q.  But you didn't fill out an
3  application; is that correct?
4      A.  I filled out a lot of paperwork when
5  I started working there.
6        MS. CATERINE:  Strike the
7  nonresponsive portion.
8      Q.  Did you fill out an application to
9  work at Victory Mitsubishi?
10     A.  Define "application." I don't
11 understand the question.
12     Q.  Have you ever filled out an
13 employment application before?
14        MR. GOODMAN:  Object to the form.
15     A.  Plenty.
16     Q.  Did you fill out an employment
17 application to go work at Victory Mitsubishi?
18        MR. GOODMAN:  Object to the form.
19 You can answer.
20     A.  I don't know.
21     Q.  Did you fill out an employment
22 application to work at Larchmont Mitsubishi?
23        MR. GOODMAN:  Object to the form.  Go
24 ahead.
25     A.  I don't recall.

Page 24

1            S. Orsaris
2      Q.  Have you ever been arrested?
3      A.  No.
4        MR. GOODMAN:  Objection.  Don't
5  answer that.  You did answer.  You got to let
6  me have a few seconds.
7        Completely inappropriate question.
8      Q.  You said you started at Victory
9  Mitsubishi in February of 2018; is that
10 correct?
11     A.  Yes.
12     Q.  What was your position when you
13 started?
14     A.  Sales manager.
15     Q.  Did that position change?
16     A.  Yes.
17     Q.  What did that position change to?
18     A.  General manager.
19     Q.  Is that your current position?
20     A.  Yes.
21     Q.  Who is Chris Orsaris?
22     A.  My father.
23     Q.  Does Chris Orsaris work at Victory
24 Mitsubishi?
25        MR. GOODMAN:  Object to the form.



Page 25
1        S. Orsaris
2 You could answer.
3    A.  No.
4    Q.  Did he work at Victory Mitsubishi in
5 the past?
6        MR. GOODMAN:  Object to form.  Go
7 ahead.
8    A.  No.
9    Q.  Did he work at Victory Auto Group?
10        MR. GOODMAN:  Object to the form.  Go
11 ahead.
12    A.  I don't recall.
13    Q.  Did he work at Larchmont Mitsubishi?
14        MR. GOODMAN:  Object to the form.
15    A.  No.
16    Q.  Just for my clarity, you said he did
17 not work at Victory Mitsubishi and you don't
18 recall if he worked at Victory Auto Group; is
19 that correct?
20        MR. GOODMAN:  Still object to the
21 form.  You could answer.
22    A.  Yes.
23    Q.  When you were hired at Larchmont
24 Mitsubishi, did you have a background check
25 done on you?

Page 26
1        S. Orsaris
2    A.  I don't know.
3    Q.  Did you sign or otherwise fill out a
4 form which authorized Larchmont Mitsubishi to
5 run a background check on you?
6    A.  I don't know.
7    Q.  Did Larchmont Mitsubishi call or
8 otherwise contact any of your prior employers
9 in evaluating your job application?
10        MR. GOODMAN:  Object to form.  No
11 testimony about an application.  Go ahead.
12    A.  I don't know.
13    Q.  Your current title is general manager
14 at Victory Mitsubishi, correct?
15    A.  Yes.
16    Q.  As general manager, do you evaluate
17 job applications?
18    A.  Yes.
19    Q.  And in the process of evaluating job
20 applications, do you run background checks on
21 applicants?
22    A.  I do not.  I am not the one that does
23 that.
24    Q.  Is Philip Argyropoulos involved in
25 the process of job applications at Victory

Page 27
1        S. Orsaris
2 Mitsubishi?
3        MR. GOODMAN:  Object to the form.
4    A.  No.
5    Q.  Is Diane Argyropoulos involved in the
6 process?
7        MR. GOODMAN:  Object to the form.
8    A.  No.
9    Q.  Is anyone else besides yourself
10 involved in the process of evaluating job
11 applications at Victory Mitsubishi?
12        MR. GOODMAN:  Object to the form.  Go
13 ahead.
14    A.  No.
15    Q.  What information do you ask for on
16 job applications?
17    A.  A resume.
18    Q.  Any other information?
19    A.  If they have a driver's license.
20    Q.  And that would be for jobs like
21 porters that require driving, correct?
22        MR. GOODMAN:  Require what?  I'm
23 sorry.
24        MS. CATERINE:  Driving a vehicle.
25    A.  Yes.

Page 28
1        S. Orsaris
2    Q.  Do you ask for a driver's license for
3 jobs that do not require driving of vehicles?
4    A.  No.
5    Q.  Do you require references to former
6 employers in job applications?
7    A.  No.
8    Q.  When you worked at Victory Auto
9 Group, did it do business under any other names
10 other than Victory Auto Group?
11        MR. GOODMAN:  Object to the form.  Go
12 ahead.
13    A.  I don't understand the question.
14    Q.  Do you know what a d/b/a is?
15    A.  Yes.
16    Q.  Were there any d/b/a's for Victory
17 Auto Group while you worked there?
18    A.  Victory Auto Group.
19        MR. GOODMAN:  She is saying any
20 other.
21        THE WITNESS:  No.
22    Q.  And Victory Mitsubishi is a d/b/a,
23 correct?
24    A.  Current d/b/a, yes.
25    Q.  And that is the d/b/a of Spartan Auto



Page 29

1          S. Orsaris
2   Group?
3      A.   Yes.
4      Q.   And did Victory Auto Group ever use
5   the d/b/a Victory Mitsubishi?
6          MR. GOODMAN:  I am sorry.  Can you
7   read that back or rephrase it?
8          (Record read.)
9          MR. GOODMAN:  Go ahead.
10     A.   No.
11     Q.   Did Victory Auto Group ever use the
12  d/b/a Bronx Suzuki?
13     A.   I don't know.
14     Q.   Is Victory Auto Group still in
15  operation?
16     A.   No.
17     Q.   When did it cease operations?
18         MR. GOODMAN:  Object to the form as
19  to what "operation" means, but go ahead.
20     A.   The inception of Victory Mitsubishi.
21     Q.   I see.  And so was the physical
22  location closed, the 4101 Boston Road location,
23  I think you said?
24     A.   Yes.
25     Q.   Including yourself, did the employees

Page 30

1          S. Orsaris
2   who worked at Victory Auto Group go to work at
3   Victory Mitsubishi?
4          MR. GOODMAN:  Object to form.  Go
5   ahead.
6      A.   Yes.
7      Q.   Do you know the reason that Victory
8   Mitsubishi was opened and operations were moved
9   to there?
10         MR. GOODMAN:  Form.  Go ahead.
11     A.   Operations were not moved over there.
12     Q.   I'm sorry?  You said operations were
13  not moved over there?
14     A.   Yes.
15     Q.   Could you clarify for me, then, what
16  happened with this movement of the employees
17  from Victory Auto Group to Victory Mitsubishi?
18  What was that?
19         MR. GOODMAN:  Object to form.  Go
20  ahead.
21     A.   Diane Argyropoulos purchased LaSorsa
22  Mitsubishi and was able to move the point, as
23  we use, to 4070 Boston Road.
24     Q.   Let me ask a different question.  Why
25  weren't the operations of Victory Auto Group

Page 31

1          S. Orsaris
2   continued alongside Victory Mitsubishi?
3          MR. GOODMAN:  Object to the form.  If
4   you understand.
5      A.   I don't know.
6      Q.   That would be a question I would have
7   to ask Diane; is that right?
8          MR. GOODMAN:  Objection.  Go ahead.
9      A.   I don't know.
10     Q.   What are the different jobs at
11  Victory Mitsubishi?
12         MR. GOODMAN:  You are talking about
13  presently?  The time frame currently?
14         MS. CATERINE:  Currently.
15         MR. GOODMAN:  Go ahead.
16     A.   Porter, sales, service, writers,
17  service technicians, service manager, various
18  receptionists, business development center
19  associates, business development center
20  manager, finance manager, sales manager,
21  general manager, accounts payable, billing,
22  warranty administration or administrator,
23  controller.
24     Q.   As general manager, are you the
25  supervisor of all the other positions that you

Page 32

1          S. Orsaris
2   just listed?
3      A.   Yes.
4      Q.   Who is your supervisor?
5      A.   Diane.
6      Q.   What is her title?
7      A.   Owner.
8      Q.   Is Victory Mitsubishi divided into
9   different departments that you oversee?
10     A.   Yes.
11     Q.   What are the different departments?
12     A.   Sales, service.
13     Q.   Let's talk about the sales
14  department.  Who are the people with
15  supervisory authority in the sales department?
16         MR. GOODMAN:  Object to the form.
17  Also, again, just to clarify, are we talking
18  presently?
19         MS. CATERINE:  Presently.
20         MR. GOODMAN:  Go ahead.
21     A.   Myself.
22     Q.   Anyone else?
23     A.   No.
24     Q.   So the sales manager doesn't have
25  supervisory authority; is that correct?



Page 33

1          S. Orsaris
2     A.   No.
3          MR. GOODMAN:  Yes, that's correct;
4   no, he doesn't or she doesn't?
5          THE WITNESS:  The sales managers do
6   not have supervisory authority.
7     Q.   But they do supervise employees; is
8   that correct?
9          MR. GOODMAN:  Object to form.  Go
10  ahead.
11    A.   Yes.
12    Q.   But they don't have the power to, for
13  example, hire or fire employees; is that
14  correct?
15    A.   Yes.
16    Q.   What are the responsibilities of the
17  sales manager generally?
18    A.   Overseeing the sales process.
19    Q.   The entire sales process?
20    A.   The beginning such as showing of the
21  vehicle.
22    Q.   When you say "the beginning," when
23  does the beginning of the sales process end?
24    A.   When there's intent to purchase a
25  vehicle.

Page 34

1          S. Orsaris
2     Q.   I see.  And what happens then?
3     A.   I then get involved.
4     Q.   I am sorry.  I didn't hear that.
5     A.   I am then involved.
6     Q.   Is anyone else involved at that point
7   besides yourself?
8     A.   The finance manager.
9     Q.   And who is currently the finance
10  manager?
11    A.   Currently?
12    Q.   Yes.
13    A.   I have five.
14    Q.   You have five finance managers.  Who
15  are the finance managers?
16    A.   Yessica Vallejo, Joseph Gerbino,
17  Andris Guzman, Tae Kim, Walter Mesa.
18    Q.   When you were going through the
19  different jobs of the dealership, you mentioned
20  sales associate; is that right?
21    A.   Yes.
22    Q.   How many sales associates are there
23  at the dealership currently?
24    A.   Twenty.
25    Q.   How many sales managers are there at

Page 35

1          S. Orsaris
2   the dealership?
3     A.   Three.
4     Q.   And how many employees are in the
5   service department?
6     A.   Twenty.
7     Q.   How many employees are in the finance
8   department?
9     A.   Five.
10    Q.   Do all of the employees you listed
11  off work at the 4070 Boston Road location?
12    A.   I don't understand the question.
13    Q.   Sure.  Let me rephrase the question.
14  Is the work of Victory Mitsubishi done at any
15  other location other than the 4070 Boston Road
16  location?
17         MR. GOODMAN:  Object to form.  Go
18  ahead.
19    A.   Sales is at 4070 Boston Road.
20    Q.   Is that the full answer?
21    A.   Yeah.
22         MR. GOODMAN:  You have to say "yes."
23    A.   Yes.
24         MS. CATERINE:  Could you read back
25  the answer?

Page 36

1          S. Orsaris
2     A.   Sales occur at 4070 Boston Road.
3          MR. GOODMAN:  She was asking the
4   court reporter to read it back.
5          MS. CATERINE:  I think you pretty
6   much gave it back to me verbatim.
7     Q.   What about the other operations?
8   Where do those occur?
9     A.   The service department is a block
10  down.
11    Q.   Do you know the address off the top
12  of your head?
13    A.   3530 Noell Avenue.
14    Q.   What about the finance department?
15    A.   As I stated before, sales is at 4070
16  Boston Road.
17    Q.   I see.  When you say "sales," that
18  includes the finance, correct?
19    A.   Yes.
20    Q.   Who has offices at the 4070 location?
21         MR. GOODMAN:  Object to the form.
22  You mean who by name, or who by title, or what?
23  Object to the form.
24         MS. CATERINE:  By name and by title.
25    A.   Myself and each of the five prior

Page 37

1            S. Orsaris
2   listed finance managers.
3        Q.   So the sales managers do not have
4   offices; is that correct?
5        A.   Yes, they do not have offices.
6        Q.   Does anyone else besides you and the
7   finance managers have an office?
8        A.   No.
9        Q.   So Diane does not have an office at
10  the 4070 location?
11        A.   No.
12            MR. GOODMAN:  No, she doesn't or no,
13  that's correct?
14            THE WITNESS:  No, she doesn't, but
15  she is free to use my office.
16        Q.   So when she is doing work at Victory
17  Mitsubishi, she uses your office; is that
18  correct?
19        A.   If the work is not remote, yes.
20        Q.   I think what you are implying, then,
21  if I understand you correctly, is that she does
22  work for Victory Mitsubishi remotely; is that
23  correct?
24        A.   Occasionally.
25        Q.   What are her main responsibilities at

Page 38

1            S. Orsaris
2   Victory Mitsubishi?
3            MR. GOODMAN:  Object to form.
4        A.   I don't know all of them.
5        Q.   I'm sorry.  What was that after you
6   said "I don't know"?
7        A.   I don't know all of her
8   responsibilities.
9        Q.   You don't know all of her
10  responsibilities.  What are the ones you do
11  know?
12        A.   Management of the dealer financing.
13        Q.   Who files taxes for Victory
14  Mitsubishi?
15            MR. GOODMAN:  Object to form.
16        A.   My controller.
17        Q.   Does your controller work with Diane
18  to do that?
19            MR. GOODMAN:  Object to form.  Go
20  ahead.  You can answer.
21        A.   Yes.
22        Q.   Are you involved in that process as
23  well?
24        A.   No.
25        Q.   Is Philip Argyropoulos involved in

Page 39

1            S. Orsaris
2   that process?
3        A.   I don't know.
4        Q.   Does Victory Mitsubishi sell any
5   vehicles through the internet?
6            MR. GOODMAN:  Object to the form.  Go
7   ahead if you understand.
8        A.   No.
9        Q.   How do you receive your paycheck from
10  Victory Mitsubishi?
11        A.   I get a paycheck.
12        Q.   A physical paycheck?
13        A.   Yes.
14        Q.   Who cuts the paycheck?
15            MR. GOODMAN:  Object to form.  Go
16  ahead.
17        A.   My controller.
18            MS. CATERINE:  Let me rephrase the
19  question.
20        Q.   On the paycheck, who does it say the
21  payment is from?
22            MR. GOODMAN:  Who is the payor on the
23  check.
24        A.   Spartan Auto Group.
25        Q.   And has it been Spartan Auto Group as

Page 40

1            S. Orsaris
2   long as you have been working at Victory
3   Mitsubishi?
4        A.   Yes.
5        Q.   Who was the payor when you were
6   working at Victory Auto Group?
7        A.   Victory Auto Group.
8        Q.   Who was the payor when you were
9   working at Larchmont Mitsubishi?
10        A.   Larchmont Mitsubishi.
11        Q.   Did the payor ever change when you
12  were working at any of those three jobs?
13            MR. GOODMAN:  Object to form.  I
14  think his testimony -- go ahead.
15        A.   I already answered.  No.
16        Q.   Is Larchmont Mitsubishi still in
17  operation?
18            MR. GOODMAN:  If you know.  Object to
19  the form.
20        A.   No.
21        Q.   When did it close?
22        A.   I don't know.
23        Q.   Was Larchmont Mitsubishi owned by
24  Diane Argyropoulos?
25            MR. GOODMAN:  Object to form.



Page 41

1            S. Orsaris
2     A.  I don't know.
3     Q.  I think your prior testimony, if I
4  recall correctly, is that you were transferred
5  from Larchmont Mitsubishi to Victory Auto
6  Group; is that correct?
7     A.  Yes.
8     Q.  And whose decision was that?
9     A.  Diane.
10    Q.  Have you ever fired an employee for
11 cause as general manager of Victory Mitsubishi?
12       MR. GOODMAN:  Objection, but go
13 ahead.
14    A.  I don't understand the question.
15    Q.  Sure.  Have you ever terminated
16 someone's employment at Victory Mitsubishi?
17    A.  Yes.
18    Q.  Was there ever an instance where you
19 terminated someone's employment at Victory
20 Mitsubishi based on the employee's wrongful
21 conduct?
22       MR. GOODMAN:  Object to the form.  If
23 you understand, you can answer.
24    A.  I don't understand the question.
25    Q.  Do you understand the term "lay off"

Page 42

1            S. Orsaris
2  in the context of terminating someone's
3  employment?
4     A.  No.
5     Q.  For what reasons would you terminate
6  someone's employment at Victory Mitsubishi?
7     A.  Tardiness, performance.  That's it.
8     Q.  What sort of metrics do you use to
9  evaluate an employee's performance?
10    A.  I don't use any specific metric.
11    Q.  Do you track the number of sales made
12 by sales associates?
13    A.  When they are not in training.
14    Q.  How about with sales managers?
15    A.  There is no metric.
16    Q.  You don't track sales by sales
17 managers?
18    A.  No.
19    Q.  Do you track sales by finance
20 managers?
21    A.  No.
22    Q.  Have you ever terminated someone's
23 employment at Victory Mitsubishi based on
24 allegations of fraud?
25       MR. GOODMAN:  Object to form.  You

Page 43

1            S. Orsaris
2  can answer.
3     A.  No.
4     Q.  Do you know of anyone who was
5  terminated from Victory Mitsubishi because of
6  allegations of fraud?
7       MR. GOODMAN:  Object to form.  You
8  could answer.
9     A.  That has never happened.
10    Q.  And you can be sure of that because
11 you worked there since it started in February
12 of 2018, correct?
13    A.  Yes.  I am very certain.
14    Q.  Do you have a base salary?
15    A.  Yes.
16    Q.  Do you receive a commission?
17    A.  No.
18       MR. GOODMAN:  Objection to form.  Go
19 ahead.  You answered.
20    Q.  Again, try to pause before you answer
21 the question because I have a hard time hearing
22 when you and your attorney are speaking at the
23 same time.  Could you repeat your answer?
24    A.  "No."
25       MR. GOODMAN:  Emma, we have been

Page 44

1            S. Orsaris
2  going an hour.  When you reach a point that is
3  comfortable, if we could take a five-minute
4  break.
5       MS. CATERINE:  Let's take it now.
6       (A recess was taken.)
7     Q.  I always forget to say this during
8  depositions, but if you need a break at any
9  point, Mr. Orsaris, just feel free to say so.
10 Whenever you want a break for lunch, just let
11 me know when you want to do that.  I am happy
12 to put in any breaks.
13    A.  No problem.
14    Q.  Have you ever worked with Chris
15 Orsaris at any car dealership?
16       MR. GOODMAN:  Object to form.  You
17 could answer.
18    A.  No.
19    Q.  Do you know if anyone has ever had
20 their employment terminated relating to
21 allegations of fraud at Victory Auto Group?
22       MR. GOODMAN:  Object to form.  Go
23 ahead.  You could answer.
24    A.  Can you rephrase that question,
25 please?



Page 45

1              S. Orsaris
2    Q.   Sure.
3         MR. GOODMAN:  You are distinguishing
4    between Spartan Auto Group and Victory Auto?
5    Is that -- go ahead.  I'm sorry.
6    Q.   So we talked earlier about how you
7    said no one has ever been fired from Victory
8    Mitsubishi because of allegations of fraud; is
9    that correct?
10   A.   Yes.
11   Q.   What about Victory Auto Group?
12   A.   Yes, no one has been terminated for
13   allegations of fraud there either.
14   Q.   Remind me when you started at Victory
15   Auto Group?
16   A.   November of 2016.
17   Q.   And Victory Auto Group had been
18   operating for a few years by that time; is that
19   correct?
20        MR. GOODMAN:  Object to form.  Go
21   ahead.
22   A.   I don't know.
23   Q.   You don't know.  So is it fair to say
24   that you wouldn't know about all of the
25   employees who were terminated at Victory Auto

Page 46

1              S. Orsaris
2    Group and the reasons for their termination; is
3    that correct?
4         MR. GOODMAN:  Objection.  Assumes
5    there were terminations, but go ahead.
6    A.   I don't know.
7    Q.   What about Larchmont Mitsubishi; was
8    anyone ever fired from Larchmont Mitsubishi
9    because of allegations of fraud?
10   A.   No.
11   Q.   Do you know when Larchmont Mitsubishi
12   started?
13   A.   No.
14   Q.   And you said you received a
15   commission, correct?
16        MR. GOODMAN: "No." Objection.
17   Q.   You said "no." I'm sorry.  Help me
18   jog my memory.  What was your testimony on that
19   issue?
20   A.   I do not receive commission.
21   Q.   Do you receive any other form of
22   compensation besides your salary?
23   A.   No.
24   Q.   So you don't receive bonuses, for
25   example?

Page 47

1              S. Orsaris
2    A.   I do not receive bonuses.
3    Q.   You don't receive any share of
4    profits?
5    A.   No.
6    Q.   Do finance managers at Victory
7    Mitsubishi receive commissions?
8    A.   Yes.
9    Q.   How are their commissions calculated?
10   A.   A portion of the deal's gross profit.
11   Q.   How are commissions for sales
12   managers calculated?
13   A.   Based on the number of overall sales.
14   Q.   Do you have targets for sales
15   managers in regards to the number of sales that
16   they make?
17   A.   No.
18   Q.   Do you have targets for finance
19   managers in regards to the gross profits that
20   they earn for the dealership?
21   A.   No.
22   Q.   Have you ever represented yourself to
23   a consumer as the owner of Victory Mitsubishi?
24   A.   No.
25   Q.   Has any consumer ever mistaken you as

Page 48

1              S. Orsaris
2    the owner of Victory Mitsubishi perhaps because
3    of your position as the general manager?
4         MR. GOODMAN:  Object to the form of
5    that question.  I don't know if that's
6    acceptable to answer, but go ahead.
7    A.   I don't know.
8    Q.   Do you have an ownership interest in
9    Victory Mitsubishi?
10   A.   No.
11   Q.   Have you ever had an ownership
12   interest in Victory Mitsubishi?
13   A.   No.
14   Q.   What drew you from working in
15   import-export to going to auto sales?
16        MR. GOODMAN:  Object to form.  I
17   think it is asked and answered, but go ahead.
18   A.   I worked with my grandfather at a
19   mechanic's shop to get myself through college.
20   Q.   I see.  What is your grandfather's
21   name?
22   A.   Peter Orsaris.
23   Q.   And what shop were you working at?
24   A.   Orsaris Auto Center.
25   Q.   Did Chris Orsaris work at that shop



Page 49

1            S. Orsaris
2   as well?
3          MR. GOODMAN:  Object to form.  Go
4   ahead.
5      A.  I don't know.
6      Q.  Did they sell cars there?
7      A.  No.
8      Q.  If I understand you correctly, when
9   you could no longer work at the consulting
10  firm, you drew from your past experience
11  working at this auto body shop and applied to
12  work at Larchmont Mitsubishi; is that correct?
13         MR. GOODMAN:  Object to form.
14     A.  Auto repair, but yes.
15     Q.  Sorry.  I am not a car person so I am
16  going to be screwing up the terms left and
17  right here.
18         Who is David Perez?
19     A.  A prior sales manager.
20     Q.  When did he start?
21     A.  At the inception of Victory
22  Mitsubishi at 4070 Boston Road.
23     Q.  Was he working at Victory Auto Group
24  before then?
25     A.  I don't know.

Page 50

1            S. Orsaris
2      Q.  When he started at the inception of
3   Victory Mitsubishi, what was his position?
4      A.  Sales consultant.
5      Q.  Is that different from a sales
6   associate, or am I confusing the terms?
7      A.  They are synonymous with each other.
8      Q.  Did he have any other titles while
9   working at Victory Mitsubishi?
10     A.  Sales consultant, and then sales
11  manager.  That's it.
12     Q.  When did he become a sales manager?
13     A.  Spring of 2018.
14     Q.  And what was the basis for his
15  promotion?
16         MR. GOODMAN:  Object to form.  Go
17  ahead.
18     A.  Performance.
19     Q.  He was good at selling cars; is that
20  correct?
21     A.  Yes.
22     Q.  And you knew that based on the number
23  of cars he sold; is that correct?
24     A.  Yes.
25     Q.  What were his main responsibilities

Page 51

1            S. Orsaris
2   as sales manager?
3      A.  Assisting with the initial part of a
4   sale.
5      Q.  And what would that initial part
6   entail?
7      A.  Greeting of our clientele, assigning
8   a sales consultant, understanding wants and
9   needs of a potential client, and then if there
10  is intent to purchase, he usually turned it
11  over to me.
12     Q.  And you were his supervisor, correct?
13     A.  Yes.
14     Q.  How did you supervise his work?
15         MR. GOODMAN:  Object to form.  Go
16  ahead.
17     A.  I sat right next to him.
18     Q.  That makes it pretty easy.
19         Was one of his responsibilities
20  pulling the credit reports of consumers?
21         MR. GOODMAN:  Objection to form,
22  "responsibilities," but go ahead.
23     A.  Yes.
24     Q.  And he would pull consumer's credit
25  reports using the information in a credit

Page 52

1            S. Orsaris
2   application, correct?
3      A.  Yes.
4      Q.  And the credit application would have
5   been filled out by a consumer with the help of
6   a sales associate; is that correct?
7      A.  Not the last part.  Consumer would
8   fill out the credit application.
9      Q.  I see.  And who would give the
10  application to the consumer?
11     A.  The application was given by myself
12  or David to the sales consultant, and we would
13  oversee completing the application.
14     Q.  So if a consumer had questions about
15  a credit application, if they said "Oh, I don't
16  have this information.  Do you need this," who
17  would they ask that to?
18         MR. GOODMAN:  Object to form.  Go
19  ahead.
20     A.  They would notify the salesperson of
21  that.  The salesperson would immediately get
22  myself or David Perez involved to provide a
23  clear answer to the consumer.
24     Q.  Would Mr. Perez review a consumer's
25  driver's license prior to pulling a credit



Page 53

1          S. Orsaris
2  application?
3      A.   Yes.
4      Q.   Who else besides Mr. Perez would pull
5  consumer's credit applications?
6          MR. GOODMAN:  Again, time frame.
7      Q.   During the time that Mr. Perez worked
8  at the dealership?
9          MR. GOODMAN:  Go ahead.
10     A.   Myself.
11     Q.   Anyone else?
12     A.   The finance team does have the
13  ability, but they do not.  Either myself or
14  David Perez are the ones to pull consumer
15  credit.
16     Q.   Why don't the finance managers do
17  that?
18     A.   No reason.
19     Q.   It's just not part of their job, is
20  what you are saying?
21     A.   I am extremely involved in every sale
22  and potential sale at Victory, so it's my
23  preference.
24     Q.   I see.  So if a consumer's credit
25  report is pulled, you would know about it; is

Page 54

1          S. Orsaris
2  that correct?
3          MR. GOODMAN:  Object to the form.  Go
4  ahead.
5      A.   Yes.
6      Q.   When you pulled a consumer's credit
7  report, would you review that consumer's
8  driver's license prior to pulling the credit
9  report?
10     A.   Yes.
11     Q.   Would you ever, for example, have a
12  sales associate tell you, "Oh, I reviewed the
13  consumer's driver's license and then pulled the
14  credit report" without yourself having reviewed
15  the consumer's driver's license?
16     A.   No.  I met every potential client
17  prior to pulling any credit.
18     Q.   And that would be the case with David
19  Perez as well, correct?
20     A.   It was an 80/20 split between myself
21  and David Perez.
22     Q.   By that you mean he pulled the credit
23  reports about 80 percent of the time?
24     A.   No.
25     Q.   Please explain what you mean.

Page 55

1          S. Orsaris
2      A.   I pulled 80 percent of the credit,
3  and prior to pulling credit, I met with every
4  customer.
5      Q.   I see.  And he pulled the other
6  20 percent?
7      A.   And he met every customer prior to
8  doing so.
9      Q.   Who is Yessica Vallejo?
10     A.   I answered that already, but she is a
11  finance manager.
12     Q.   When did she start working at Victory
13  Mitsubishi?
14     A.   At inception.
15     Q.   Did she work at Victory Auto Group?
16     A.   Yes.
17     Q.   Did she work at Larchmont Mitsubishi?
18     A.   No.
19     Q.   When she was working at Victory Auto
20  Group, what was her title?
21     A.   Finance manager.
22     Q.   When did she start at Victory Auto
23  Group?
24     A.   I can't recall.
25     Q.   Was it before you had started at

Page 56

1          S. Orsaris
2  Victory Auto Group?
3      A.   Yes.
4      Q.   Did she have any other titles while
5  working at Victory Auto Group other than
6  finance manager?
7      A.   Yes.
8      Q.   What were those titles?
9      A.   A funder.
10     Q.   What is that?  What is a funder?
11     A.   Helps finalize the contracts between
12  the consumer and the lender.
13     Q.   And that position would be supervised
14  by the finance manager; is that correct?
15     A.   Yes.
16     Q.   Are there funders working at Victory
17  Mitsubishi?
18     A.   No.
19     Q.   Why not?
20     A.   Not needed.
21     Q.   Who made the decision that they were
22  not needed; you or Diane?
23         MR. GOODMAN:  Object to form.  Go
24  ahead.
25     A.   I would say both.



Page 57

1              S. Orsaris
2      Q.  And that has been the case since the
3   inception of Victory Mitsubishi; is that
4   correct?
5      A.  Yes.
6      Q.  So what happened to the funders who
7   worked at Victory Auto Group when Victory Auto
8   Group ceased operations and Victory Mitsubishi
9   was started?  Were they just laid off?
10         MR. GOODMAN:  Object to form.  Go
11   ahead.
12      A.  No.
13      Q.  What happened to them?
14      A.  There was only one funder, Yessica
15   Vallejo, and she was promoted to finance
16   manager, and the funder ceased to exist.
17      Q.  What were her main responsibilities
18   as a funder?
19         MR. GOODMAN:  Asked and answered.  Go
20   ahead.
21      A.  Preparing the mailing of contracts to
22   the finance institutions that financed the
23   loan.
24      Q.  And what are her main
25   responsibilities as finance manager?

Page 58

1              S. Orsaris
2      A.  Working with the customer, explaining
3   and going over all local, state, and federal
4   disclosures, as well as in addition to customer
5   service making sure folks are happy with their
6   cars, and budgets were met.
7      Q.  And you are her supervisor at Victory
8   Mitsubishi, correct?
9      A.  Yes.
10      Q.  And how do you supervise her work?
11      A.  I don't understand the question.
12      Q.  How did you evaluate her performance
13   as a finance manager?
14      A.  Nothing really in specific other than
15   just general feedback that I received from
16   clients and financial institutions about her
17   work.
18      Q.  So finance institutions will provide
19   you feedback about her work?
20      A.  Yes.  They love her.
21      Q.  Sorry.  What was that?
22      A.  They love her.  They love working
23   with her.
24      Q.  Oh, good.  And that feedback is
25   provided by email or phone calls, or how is it

Page 59

1              S. Orsaris
2   provided?
3      A.  Phone calls.
4      Q.  Who is Philip Argyropoulos?
5      A.  Diane's husband.
6      Q.  And he is your boss, correct?
7         MR. GOODMAN:  Object to the form.  Go
8   ahead.
9      A.  No.
10      Q.  Has he ever been your boss?
11         MR. GOODMAN:  Object to form.
12      A.  No.
13      Q.  Has he ever given you instructions
14   while you have worked at Victory Mitsubishi?
15         MR. GOODMAN:  Object to the form.  Go
16   ahead.
17      A.  No.
18      Q.  Has he ever given you instructions
19   while you worked at Victory Auto Group?
20         MR. GOODMAN:  Object to the form.  Go
21   ahead.
22      A.  No.
23      Q.  Has he ever given you instructions
24   while you worked at Larchmont Mitsubishi?
25         MR. GOODMAN:  Object to form.  Go

Page 60

1              S. Orsaris
2   ahead.
3      A.  No.
4      Q.  Has he ever been present in meetings
5   between you and Diane Argyropoulos?
6         MR. GOODMAN:  Note my objection.  You
7   can go ahead.
8      A.  No.
9      Q.  Has he ever been cc'd on emails
10   between you and Diane Argyropoulos?
11         MR. GOODMAN:  Object to form.  Go
12   ahead.
13      A.  No.
14      Q.  Have you ever communicated with
15   Philip Argyropoulos about Victory Mitsubishi?
16         MR. GOODMAN:  Object to form.
17      A.  No.
18      Q.  Has Philip Argyropoulos come to
19   Victory Mitsubishi on a regular basis?
20         MR. GOODMAN:  Object to form.  Go
21   ahead.
22      A.  No.
23      Q.  Has Mr. Argyropoulos ever come into
24   the Victory Mitsubishi dealership?
25         MR. GOODMAN:  Objection.  I am not



STAVROS ORSARIS  30(b)(6)30(b) 1                      November 23, 2022
FARAH J. FRANCOIS vs VICTORY AUTO GROUP LLC            61–64

Page 61

1              S. Orsaris
2  sure where this is going.  This is getting
3  pretty far afield here, but go ahead.
4      A.  I don't know.
5      MS. CATERINE:  Please just make
6  objections to form.  We don't need the speaking
7  objections, please.
8      MR. GOODMAN:  I don't mean to be --
9  let's go ahead.
10     MS. CATERINE:  Let me be clear, I am
11 not going to tolerate speaking objections, and
12 I will get the judge on the phone if they
13 continue.
14     Q.  Who is Diane Argyropoulos?
15     A.  I answered this question already, but
16 she is the owner.
17     Q.  And she has been the owner since the
18 inception, correct?
19     MR. GOODMAN:  Asked and answered.  Go
20 ahead.
21     A.  Yes.
22     Q.  And you said she was the owner of
23 Victory Auto Group, correct?
24     MR. GOODMAN:  Object to the form.
25 Asked and answered.  Go ahead.

Page 62

1              S. Orsaris
2      A.  I don't know.
3      Q.  And you mentioned that she did remote
4  work for Victory Mitsubishi.  Is that done from
5  her residence?
6      A.  I don't know.
7      Q.  Do you know what city she resides in?
8      A.  No.
9      Q.  Have you ever had meetings with Ms.
10 Argyropoulos in person?
11     A.  Yes.
12     Q.  Where would those meetings take
13 place?
14     A.  4070 Boston Road.
15     Q.  Would they ever take place in a
16 different location?
17     A.  No.
18     Q.  About how often does she come to the
19 Victory Mitsubishi dealership in person?
20     A.  Frequently.
21     Q.  Every week?
22     A.  Multiple times per week, yes.
23     Q.  Was that the case with Victory Auto
24 Group?
25     A.  Yes.

Page 63

1              S. Orsaris
2      Q.  Has she ever told you about
3  consulting with her husband, Philip
4  Argyropoulos, about decisions related to
5  Victory Mitsubishi?
6      MR. GOODMAN:  Object to the form.  If
7  you understand -- I do not -- go ahead.
8      MS. CATERINE:  This is the last
9  chance I am giving regarding speaking
10 objections.  If you give speaking objections
11 again, I am getting the judge on the phone.
12     MR. GOODMAN:  I would appreciate
13 that.  Let's get him on the phone now.
14     (Pause in the proceedings.)
15     Q.  How did the Mitsubishi dealership
16 adapt to the COVID pandemic?
17     MR. GOODMAN:  Object to the form.
18     A.  We followed all local, state, and
19 federal regulations.
20     Q.  Were the decisions about how to
21 comply with those decisions and regulations,
22 were those decisions made by Philip
23 Argyropoulos?
24     A.  No.
25     Q.  Were those decisions made by Diane

Page 64

1              S. Orsaris
2  Argyropoulos?
3      A.  No.
4      Q.  Who made those decisions?
5      A.  Myself.
6      Q.  Did you consult with Diane when
7  making those decisions?
8      A.  I notified her of the decisions that
9  I made.
10     Q.  Let's take it one step at a time.
11 What happened when the shut-down order was
12 given?
13     MR. GOODMAN:  Object to the form.
14 You can answer.
15     A.  We were essential.
16     Q.  By that you mean you were able to
17 continue operations because you were considered
18 to be essential workers; is that correct?
19     A.  Yes.
20     Q.  Did the operations change in any way
21 during that time immediately following the
22 shutdown order?
23     A.  Four days after the shutdown order
24 was in place, automotive retail sales was
25 considered as essential, and we had operated



Page 65

1           S. Orsaris
2 following the guidelines that they wanted us
3 to.
4     Q.   What were those guidelines generally?
5     A.   Appointment only with intent to
6 purchase.
7     Q.   And how were appointments made?
8     A.   People would call and make
9 appointments for cars.
10    Q.   Could appointments be made online?
11    A.   You could request to speak to someone
12 to make an appointment.
13    Q.   I see.  But the actual making of an
14 appointment would only occur over the phone; is
15 that correct?
16    A.   Yes.
17    Q.   And who would handle those phone
18 calls making appointments?
19    A.   My business development center
20 associates.
21    Q.   About how many of them are there?
22        MR. GOODMAN:  Are there now or --
23        MS. CATERINE:  Were there at the
24 time.
25    A.   Two or three.

Page 66

1           S. Orsaris
2    Q.   By May 30, 2020, what were the
3 current states of operation at Victory
4 Mitsubishi?
5        MR. GOODMAN:  Object to the form of
6 the question.
7    A.   Similar to what it was while
8 everything was shut down.
9    Q.   Just walk me through things.  If I
10 was a customer coming in, I had made an
11 appointment and was coming in on May 30, 2020,
12 what would happen?
13    A.   You would check in with either David
14 or myself.  You were assigned a sales
15 consultant, and you were shown the car that you
16 were interested in.
17        Should you want to proceed forward,
18 you sit down, may be a good time to ask
19 questions if you are a client, get answers to
20 those questions, receive a greeting by myself,
21 always, and opportunity to answer questions.
22    Q.   I am sorry to interrupt you, but I
23 believe this is the court calling.
24        (Conference call with court.)
25        MS. CATERINE:  Could you read back

Page 67

1           S. Orsaris
2 the last couple of sentences?
3        (Record read.)
4    A.   And then from there, the customer
5 would begin the financing process of the
6 vehicle, which would include completion of the
7 credit application.  Obviously, also collecting
8 of the ID or the driver's license of the
9 individual, which would ultimately be passed
10 back to me, and specifically during that period
11 of time, the majority of it, 98 percent of it,
12 was to me.
13    Q.   Let me just ask you, so I fill out a
14 credit application, and you pull my credit
15 report.  What happens next?  Let's assume I
16 have great credit, the best credit you have
17 ever seen, perfect, 850, whatever.
18    A.   I mean, just before we pull it,
19 there's a verification of who is in front of
20 us, but we would just proceed forward.  It
21 doesn't matter what someone's score is.
22        We would take the vehicle of
23 interest, understand what the customer is
24 looking to invest up front, and submit the
25 information that was already verified by

Page 68

1           S. Orsaris
2 myself to the financial institutions, and
3 receive feedback.  Either it's a go or it's
4 not a go, and then we at that point turn it
5 over to the finance manager to discuss the
6 figures.
7        Sometimes I would be the one to
8 discuss the figures, considering that we were
9 short staffed, and that's that.
10    Q.   I know you said it wouldn't really
11 matter what the credit score was necessarily,
12 but what if you pulled someone's credit and
13 they had no credit history at all?
14    A.   It's circumstantial.  You don't need
15 credit history to necessarily purchase a car.
16    Q.   What about to finance a car?
17    A.   I mean financing of a vehicle.
18 That's what I meant.
19    Q.   It would just affect the terms of the
20 financing; is that right?
21    A.   Depends.
22    Q.   Who would the customer talk to about
23 the financing and the finalized terms of the
24 deal?
25        MR. GOODMAN:  Object to form.

Page 69

S. Orsaris

2    A.   Speaking in reference to that period
3 of time?
4    Q.   Yes, during that period of time.
5    A.   What part of the financing?
6    Q.   Maybe you could tell me.  Let's start
7 from the beginning of the process.  Who would
8 the customer talk to?
9        MR. GOODMAN:  Object to the form.
10    A.   They would speak to the sales
11 consultant, myself --
12    Q.   No.  Sorry.  Let me clarify.  I am
13 generally not going to interrupt you.  I'm
14 sorry.  I just don't want to make you have to
15 go through all that again.
16        Once a consumer -- once you are
17 making applications to financial institutions
18 and you get responses back from those
19 financial institutions, who is the consumer
20 going to talk to about those responses?
21    A.   The finance manager.
22    Q.   Would you be present for that as
23 well, or just the finance manager?
24    A.   I was present.
25    Q.   Were you always present, or just some

Page 70

S. Orsaris

2 times?
3    A.   Yes.  Even now, I try to be present
4 as frequently as possible.  At that time I was
5 definitely present.
6    Q.   What would that conversation look
7 like?
8        MR. GOODMAN:  Form.  Object to form
9 of the question.
10    A.   It would be a discussion of all
11 required city, state, and federal disclosures.
12    Q.   Would you discuss things like monthly
13 payments?
14    A.   That was part of the city, state, and
15 federal regulations.  Yes.
16        MR. GOODMAN:  Let her finish first.
17    Q.   Based on that discussion that there
18 were terms that were agreeable to the consumer,
19 what would happen?
20    A.   We would proceed forward with the
21 sale.
22    Q.   And what would that look like?
23        MR. GOODMAN:  What would that look
24 like?  Objection.  Form.
25    A.   The finance manager would begin

Page 71

S. Orsaris

2 preparing the paperwork.  The vehicle would be
3 prepared.  The factory time, literally
4 additionally for COVID protection, especially
5 on the interior of the vehicle, and just
6 registration process.  All those things would
7 begin kind of simultaneously, for the most
8 part.
9    Q.   What sort of paperwork would there be
10 for the final sale?
11    A.   Purchase order, a bill of sale, a
12 retail installment contract, any extended
13 warranties, any additional products that were
14 purchased, all the New York City Department of
15 Consumer Affairs, now DCWP, paperwork as well,
16 in addition to recall sheets, CarMax.  I don't
17 think I am missing anything, but that would be
18 it.
19    Q.   What program would you use to create
20 that paperwork?
21        MR. GOODMAN:  Object to the form.
22    Q.   Or programs, if there is more than
23 one.
24        MR. GOODMAN:  Object to the form.  Go
25 ahead.

Page 72

S. Orsaris

2    A.   I would say 90 percent would
3 Dealertrack, and some of the things like a
4 CarMax would be on my website, CARFAX was on
5 the website, and the warrantee administration
6 website.  And that should knock out -- and.
7        Then -- I apologize.  The DMV
8 paperwork would be done, verified, on the New
9 York State Department of Motor Vehicles
10 website.
11        MR. GOODMAN:  I am going to step away
12 for one second.  Stay on the line.
13        (Pause in the proceedings.)
14    Q.   During May of 2020, was Victory
15 Mitsubishi accepting online applications for
16 vehicles?
17        MR. GOODMAN:  Object to the form.
18 You can answer.
19    A.   Online application, what is the
20 definition of that?
21    Q.   Did Victory Mitsubishi have any
22 application process through its website during
23 May of 2020?
24        MR. GOODMAN:  Object to form.  Go
25 ahead.



Page 73

S. Orsaris

1
2     A.   Pre-qualification can be done on the
3   website, but there was no remote sales being
4   done.
5     Q.   I am sorry.  What was that
6   information from the online application used
7   for?
8     A.   Pre-qualification.
9     Q.   Where would that information from the
10   online application go in your computer systems?
11       MR. GOODMAN:  Object to the form.
12     A.   DealerSocket.
13     Q.   Can you search DealerSocket by
14   customer name?
15       MR. GOODMAN:  Object to form.  Time
16   frame?
17     Q.   During May of 2020?
18     A.   Yes.
19     Q.   Could you search it by phone number?
20     A.   Yes.
21     Q.   Could you search it by email address?
22     A.   Yes.
23     Q.   Who trained you in how to use
24   DealerSocket?
25     A.   DealerSocket?  They trained me.

Page 74

S. Orsaris

1
2     Q.   There is a company called
3   DealerSocket which trained you in how to use
4   the software?
5     A.   Yes.
6     Q.   And who arranged that training?
7     A.   They did.
8     Q.   And that training was arranged when?
9     A.   At the inception of Victory
10   Mitsubishi.
11     Q.   Was that training part of the
12   purchase of DealerSocket software?
13     A.   Yes.
14     Q.   Who arranged for the purchase of the
15   DealerSocket software?
16       MR. GOODMAN:  Object to form.  Go
17   ahead.
18     A.   I did.
19     Q.   Did they use DealerSocket at Victory
20   Auto Group?
21     A.   Yes.
22     Q.   Whose decision was it to use
23   DealerSocket at Victory Auto Group?
24     A.   Diane.
25     Q.   Did they use DealerSocket at

Page 75

S. Orsaris

1
2   Larchmont Mitsubishi?
3       MR. GOODMAN:  Object to form.
4     A.   I don't recall.
5     Q.   Did they use Dealertrack at Larchmont
6   Mitsubishi?
7       MR. GOODMAN:  Form.  Objection.
8     A.   Yes.
9     Q.   Whose decision was it to use
10   Dealertrack at Larchmont Mitsubishi?
11     A.   Diane.
12     Q.   Who trained you in how to
13   Dealertrack?
14     A.   Dealertrack.
15     Q.   Who arranged for the training by
16   Dealertrack?
17       MR. GOODMAN:  Object to form.
18     A.   I did.
19     Q.   You arranged for the training at
20   Larchmont Mitsubishi?
21     A.   No.
22     Q.   I see.
23     A.   I assumed you were speaking of
24   May 2020 at Victory Mitsubishi, if that could
25   just be stated.

Page 76

S. Orsaris

1
2     Q.   Sure.  Let me clarify.  Did you
3   receive training on how to use Dealertrack when
4   you worked at Larchmont Mitsubishi?
5     A.   Yes.
6     Q.   Who arranged for that training?
7       MR. GOODMAN:  Object to form.
8     A.   Diane.
9     Q.   That was training put on by
10   Dealertrack as well?
11     A.   Yes.
12     Q.   Did someone from Dealertrack actually
13   come into the dealership to give this training?
14     A.   Yes.
15     Q.   Just to clarify what you might have
16   said in prior testimony, you arranged for a
17   Dealertrack training at Victory Mitsubishi; is
18   that correct?
19       MR. GOODMAN:  Object to form.  Asked
20   and answered.  Go ahead.
21     A.   Yes.
22     Q.   Was that training at the inception of
23   Victory Mitsubishi?
24     A.   Yes.
25     Q.   Have you trained any employees in how



Page 77
1              S. Orsaris
2  to use Dealertrack after that training at the
3  inception of Victory Mitsubishi?
4        MR. GOODMAN:  Can I have that
5  question read back?
6        (Record read.)
7     A.  I did not conduct any single or sole
8  training for any employee.  It was a group
9  training with myself and also our
10  representative from Dealertrack.
11     Q.   If employees had questions about how
12  to use things in Dealertrack, who would they
13  ask?
14     A.   Dealertrack.
15     Q.   Was there like a help line, or is
16  there currently a help line for getting that
17  assistance?
18     A.   Yes.
19     Q.   And that was the case in May of 2020?
20     A.   Yes.
21     Q.   And the training that Dealertrack put
22  on at the inception of the Victory Mitsubishi,
23  did that include training as to the pulling of
24  credit reports?
25     A.   When using the software, yes.

Page 78
1              S. Orsaris
2     Q.   Who was trained in how to use the
3  Dealertrack software to pull credit reports?
4        MR. GOODMAN:  Can I hear the question
5  again?
6        (Record read.)
7        MR. GOODMAN:  Go ahead.
8     A.   Back then or now?  Can I have the
9  time frame, please?
10     Q.   At the training during the inception
11  of Victory Mitsubishi.
12     A.   Can I just hear the entire question
13  one more time?  I kind of lost track.
14        (Record read.)
15     A.   Myself and the finance managers.
16     Q.   And when did David Perez receive
17  training on how to use Dealertrack to pull
18  credit reports?
19     A.   During his training of becoming a
20  sales manager.
21     Q.   And who gave that training?
22     A.   Dealertrack.
23     Q.   And when was that?
24     A.   Spring of 2018.
25     Q.   And that training would consist of

Page 79
1              S. Orsaris
2  showing the employees how to log into
3  Dealertrack in part, correct?
4     A.   Yes.
5     Q.   And showing them how to insert
6  information from the credit application to pull
7  the credit report, correct?
8     A.   Yes.
9     Q.   Did the training include information
10  about the permissible purposes for pulling
11  credit reports?
12     A.   Yes.
13     Q.   And what was that information?
14        MR. GOODMAN:  Object to form.  Go
15  ahead.
16     A.   Can you rephrase that question?
17     Q.   What information was provided during
18  the training about the permissible purposes for
19  pulling credit reports?
20     A.   You would just have to -- it's part
21  of understanding the local, state, and federal
22  regulation regarding that, and we received
23  training on that.
24     Q.   Did Dealertrack provide any physical
25  documents during these trainings?

Page 80
1              S. Orsaris
2     A.  I don't recall.
3     Q.   Do you have any physical documents
4  from Dealertrack like a handbook or a manual?
5     A.   No.
6     Q.   Do you have any electronic handbooks
7  or manuals or similar documents such as in a
8  PDF form?
9     A.   Not in my possession.
10     Q.   Video recordings are made of the
11  sales of the dealership, correct?
12     A.   Yes.
13     Q.   Are all sales recorded?
14     A.   Yes.
15     Q.   How long are those video recordings
16  retained?
17        MR. GOODMAN:  Object.  Form.  Time
18  frame?
19     A.   Whenever -- when is the time frame?
20  What are we talking?
21     Q.   During May of 2020.
22     A.   Thirty days.
23     Q.   Is that the policy today?
24     A.   No.
25     Q.   What is the policy today?



Page 81

1            S. Orsaris
2      A.   Depending where.
3      Q.   To clarify, how long the video
4  recordings are retained depends on where they
5  are made; is that correct?
6      A.   Presently, there is more -- there is
7  video or cameras for the lot, for our
8  merchandise, and then there is video cameras
9  inside of the finance offices.  Finance offices
10  now go a year back, and the merchandise is 45
11  days.
12      Q.   Why was the policy changed?
13      A.   We were broken into a lot during June
14  of 2020, and most recently in January of 2022
15  six times.
16      Q.   Did you report these break-ins to the
17  police?
18      A.   Yes.
19      Q.   To your knowledge, has anyone been
20  prosecuted for these break-ins?
21      A.   Yes, I think.  At least one instance,
22  I believe they were prosecuted.
23      Q.   Was that one instance for the
24  break-ins in 2020 or the recent break-ins in
25  2022?

Page 82

1            S. Orsaris
2      A.   I don't have specific knowledge on
3  the 2020 one, but I believe in one of the
4  January 2022 break-ins, I believe they were
5  prosecuted.  They broke into seven places in
6  one evening, and they were arrested.
7      Q.   When was the first of these
8  break-ins?
9      A.   The first evening -- I can't tell you
10  the date specifically -- I would say the first
11  evening of when the city imposed a curfew back
12  in 2020.
13      Q.   I see.
14      A.   That evening or the following
15  evening, something like that.
16      Q.   And when did you change the policy as
17  to the retention of video recordings?
18      A.   February of this year.
19      Q.   And that decision was made by you,
20  Stavros Orsaris?
21      A.   Yes.
22      Q.   Did you consult with Diane on making
23  that decision?
24      A.   I informed her before I made the
25  decision.

Page 83

1            S. Orsaris
2      Q.   Was this lawsuit a factor in making
3  that decision?
4      A.   No.  It was before.
5      Q.   What do you mean by before?
6      A.   February of 2021 is when I upgraded
7  all my software.  My office was torn apart,
8  glass everywhere, so I said we have to install
9  more cameras.  This has to stop.
10      Q.   Who made the decision about the
11  retention of video recordings for 30 days back
12  when that policy was in effect?
13      A.   I did.
14      Q.   And did you consult with Diane in
15  making that decision?
16      A.   I informed her that the decision was
17  made.
18      Q.   And what was the basis for making the
19  decision to retain video recordings for 30
20  days?
21      A.   My prior experience at Victory Auto
22  Group and Larchmont Mitsubishi, I never had to
23  refer to any video; never had any issues that
24  led me to leading to.
25      Q.   So if I understand your testimony

Page 84

1            S. Orsaris
2  correctly, it wasn't necessary to retain video
3  recordings for more than 30 days because you
4  had not had to use those video recordings; is
5  that correct?
6            MR. GOODMAN:  Objection.  Form.
7      A.   You can never really -- I had access
8  and never really felt the need to access my
9  video recordings.  I never was asked to show my
10  video recordings, so I had it for 30 days.
11            MR. GOODMAN:  When you reach a point
12  you are comfortable, if we could take a
13  five-minute break, please.
14      Q.   Sure.  Or we could break for lunch,
15  Mr. Orsaris, if you would like to do that,
16  whatever your preference is, but let me ask a
17  couple of questions.
18            MR. GOODMAN:  That's fine.  Go ahead.
19      Q.   Is it your understanding that a
20  30-day retention of video recordings is
21  standard industry practice?
22            MR. GOODMAN:  Objection.  Form.
23      A.   I have no knowledge as to what the
24  standard industry practice is when it comes to
25  video recordings.



Page 85

1          S. Orsaris
2      Q.   Do you know of any dealership that
3   retains video recordings for longer than 30
4   days?
5          MR. GOODMAN: Objection. Form.
6      A.   No.
7          MR. GOODMAN:  Again, time frame.
8          MS. CATERINE:  Off the record.
9          (Discussion off the record.)
10     Q.   You testified earlier, if I
11  understand you correctly, that you had
12  terminated employees based on performance; is
13  that correct?
14         MR. GOODMAN:  Object to form.  Asked
15  and answered.  Go ahead.
16     A.   I could, but maybe one or two
17  instances in which I have.
18     Q.   And what would performance there mean
19  other than the number of sales the employee
20  made?
21     A.   Lack of being able to communicate
22  with customers, management; making sure people
23  are obtaining vehicles that match their wants
24  and needs, listening; and providing good
25  customer service.

Page 86

1          S. Orsaris
2      Q.   So something that would count against
3   performance would be if a customer was upset at
4   an employee for some reason; would that be
5   right?
6          MR. GOODMAN:  Form. Objection.
7      A.   I mean, there hasn't been an instance
8   of that, but that's definitely a possibility,
9   but there is no specific instance of a customer
10  being upset at a salesperson.
11     Q.   If a customer comes into the
12  dealership upset about something, is there
13  someone who they would be referred to
14  automatically, or is it going to depend on what
15  they are upset about?
16         MR. GOODMAN:  Objection. Form of the
17  question.
18     A.   Every single upset customer would be
19  referred directly to me.
20         MR. GOODMAN:  Again, time frame.
21     Q.   How often do you work?  What is your
22  general work schedule?
23     A.   Monday through Saturday, open to
24  close.
25     Q.   How many hours is that in total?

Page 87

1          S. Orsaris
2      A.   It varies.
3      Q.   Generally speaking.
4      A.   Under 70.  Between 60 and 70
5   depending on the season.  There's a little bit
6   of seasonality in automotive retail sales.
7      Q.   Do you get vacation, paid vacation?
8      A.   Yes.
9      Q.   How much paid vacation do you get per
10  year?
11     A.   I don't know.  I don't take many
12  vacations.
13     Q.   When was the last vacation you took?
14     A.   May of this year.
15     Q.   How long were you on vacation?
16     A.   Four days.
17     Q.   During that time, if a customer came
18  in with a complaint, who would they speak to?
19         MR. GOODMAN:  Objection. Go ahead.
20     A.   They would speak to a sales manager
21  that I would allocate.  They would work with
22  me.  I stay connected.
23     Q.   Have you ever represented yourself as
24  the son of the owner of the dealership?
25     A.   No.

Page 88

1          S. Orsaris
2      Q.   Do Philip and Diane Argyropoulos have
3   any children?
4          MR. GOODMAN:  Note my objection.  Go
5   ahead.
6      A.   Yes.
7      Q.   Do they work at the dealership?
8      A.   No.
9      Q.   How many children do they have?
10     A.   Three.
11     Q.   Do they have any sons?
12     A.   No.
13     Q.   So three daughters, correct?
14         MR. GOODMAN:  Asked and answered.  Go
15  ahead.
16     A.   Yes.
17     Q.   Has Chris Orsaris ever come into
18  Victory Mitsubishi?
19     A.   Extremely infrequently.
20     Q.   What were the circumstances of him
21  coming in?
22     A.   Inventory.
23     Q.   What do you mean by "inventory"?
24     A.   Seeing our vehicles.
25     Q.   So as a customer; is that right?



Page 89

1          S. Orsaris
2     A.  No.
3     Q.  No.  Well, could you explain to me,
4  then?
5     A.  He assists with inventory decisions.
6     Q.  But I thought he didn't work at
7  Victory Mitsubishi.  Why is he assisting with
8  inventory decisions?
9          MR. GOODMAN:  Objection.  Form.
10     A.  He does not work for Victory
11  Mitsubishi.
12     Q.  Is that your entire answer?
13     A.  He doesn't work for Victory
14  Mitsubishi, yeah.
15          MS. CATERINE:  Can you read back the
16  question, please?
17          (Record read.)
18          MR. GOODMAN:  Objection to form.
19     A.  We consult -- that's myself, when I
20  use the word "we" -- consult with Chris on our
21  inventory.  He is an independent buyer that we
22  use to purchase vehicles.
23     Q.  I see.  Does he receive compensation
24  for that?
25          MR. GOODMAN:  Object to the form.

Page 90

1          S. Orsaris
2     A.  I don't know the structure of his
3  compensation.  I do know it's per vehicle
4  purchase.
5     Q.  And who would know that?
6     A.  Diane.
7     Q.  Does Chris perform this service
8  through a company?
9     A.  Yes.
10     Q.  And what is the name of that company?
11     A.  I don't know.
12     Q.  Is there a contract between Chris and
13  Victory Mitsubishi?
14          MR. GOODMAN:  Object to the form.
15     A.  I don't know.
16     Q.  Has Chris provided this service since
17  the inception of Victory Mitsubishi?
18     A.  Yes.
19     Q.  And you are aware of your father's
20  criminal history, correct?
21          MR. GOODMAN:  Object to the form.
22     A.  Yes.
23     Q.  And Diane didn't have any issue with
24  that prior criminal history in retaining his
25  services?

Page 91

1          S. Orsaris
2          MR. GOODMAN:  Object to form.
3     A.  I am not Diane.
4     Q.  So I would have to ask Diane, is what
5  you are saying?
6     A.  Yes.
7     Q.  Were you involved in the decision to
8  retain Chris's services?
9     A.  No.
10     Q.  Did you introduce Chris to Diane?
11          MR. GOODMAN:  Object to form.  Go
12  ahead.
13     A.  No.
14     Q.  Do you know how they met?
15     A.  No.
16     Q.  Do you know when they met?
17     A.  No.
18     Q.  Did Chris provide these services for
19  Victory Auto Group?
20     A.  Yes.
21     Q.  Did Chris provide these services for
22  Larchmont Mitsubishi?
23     A.  I can't recall.
24     Q.  Was Chris Orsaris the one who told
25  you about the open position that you applied

Page 92

1          S. Orsaris
2  for at Larchmont Mitsubishi?
3          MR. GOODMAN:  Object to form.
4  Mischaracterizes.  Go ahead.
5     A.  No.
6     Q.  When you worked at Larchmont
7  Mitsubishi, were you given any trainings on
8  preventing identity theft?
9     A.  During my training with Dealertrack
10  there was thorough discussion regarding prior
11  to running credit, what you should look out
12  for.
13     Q.  When you say "what to look out for,"
14  you mean -- well, what do you mean by that?
15     A.  Quality of the driver's license,
16  quality of the information that was provided on
17  the credit application, the intuition that is
18  required to kind of see if maybe somebody is
19  trying to do something, you have a criminal in
20  front of you, and keep your eyes peeled.  I was
21  told that can potentially happen.  And then I
22  remember receiving training on the tools that
23  Dealertrack does have to help prevent identity
24  theft.
25     Q.  Were similar trainings given when



Page 93

S. Orsaris

1  Dealertrack gave trainings at Victory Auto
2  Group and Victory Mitsubishi?
3
4     A.  Yes.
5     Q.  Does Victory Mitsubishi verify
6  driver's licenses?
7        MR. GOODMAN:  Objection to form.
8     A.  What is your definition of verifying
9  licenses?
10     Q.  Do you have an answer to the
11  question, or would you like me to rephrase the
12  question?
13     A.  Are you asking me if I scan IDs?
14  Verification, what is the definition of
15  verification in the context of the question you
16  asked?
17     Q.  I know it's natural when you are
18  having a conversation with a person that you
19  might ask them questions, but I just ask you to
20  either answer the question or ask me to
21  rephrase the question.
22        MR. GOODMAN:  Note my objection to
23  that.
24     A.  I verify personally the driver's
25  license to the extent that I could.

Page 94

S. Orsaris

1
2     Q.  And how do you do that?
3     A.  I actually see the physical ID, the
4  physical driver's license, and the copy, in
5  case there is any watermarks and things like
6  that that should be transferred over.
7  Different states have different watermarks and
8  things like that.  New York State has its own,
9  Connecticut has its own, New Jersey has its
10  own, so on and so forth.
11     Q.  When you are looking at the driver's
12  license, what sort of things are you looking
13  for?  You mentioned quality.  What do you mean
14  by that?
15     A.  Make sure it's real.  That's the
16  first thing that I would do.
17     Q.  And how would you be able to tell
18  that it's real?
19     A.  Every state has its own watermarks or
20  security provisions or security measure on
21  their identification.  New York has its own.
22  They recently changed theirs, and I know how I
23  should be looking at the license to tell
24  whether it is real or not.
25     Q.  Other than confirming that the

Page 95

S. Orsaris

1  driver's license is real, is there anything
2  else you do in terms of verifying the driver's
3  license?
4     A.  The picture, make sure it matches up
5  with the person that's in the building.
6     Q.  I know this might sound like a silly
7  question, but how do you do that?  Do you hold
8  it up?  What do you do specifically?
9     A.  I could hold it up if I needed to,
10  but I don't recall a situation in which I did.
11     Q.  Would you look at the picture on the
12  driver's license, look at the consumer in front
13  of you, and confirm that it appears to be the
14  same person?
15        MR. GOODMAN:  Object to the form.
16     A.  And then you also cross reference
17  that license, make sure the spelling and
18  everything you put on the credit application is
19  accurate, date of birth.
20        One thing I do pay extra attention
21  to is the address.
22     Q.  What if the address on the driver's
23  license doesn't match the address on the credit
24  application?
25

Page 96

S. Orsaris

1
2     A.  Let's not run the credit just yet.
3  Let's have a conversation with the consumer.
4     Q.  Have there been any instances of
5  identity theft happening at Victory Mitsubishi?
6        MR. GOODMAN:  Object to the form.
7  You can answer.
8     A.  No.
9     Q.  Have police officers ever come into
10  Victory Mitsubishi to speak with you as general
11  manager of Victory Mitsubishi?
12        MR. GOODMAN:  Ever?  Object to form.
13  Go ahead.
14     A.  Yeah.  I was broken into a couple of
15  times.
16     Q.  Other than during those break-ins.
17     A.  I can't recall, no.
18     Q.  Has Diane ever told you that she has
19  spoken with a police officer about something
20  regarding Victory Mitsubishi?
21        MR. GOODMAN:  Object to form.  Go
22  ahead.
23     A.  When we had the break-ins.
24     Q.  Other than the break-ins?
25     A.  Can't recall an instance of her



Page 97

1              S. Orsaris
2 speaking with me about that.
3     Q.   Did a consumer ever tell you that a
4 vehicle was sold or financed in their name
5 without their authorization?
6         MR. GOODMAN:  Object to the form.
7 You can answer.
8     A.   Other than this case, situation, no.
9     Q.   I would like you to take a look at
10 what I am going to have marked as Exhibit 28,
11 which is Bates stamped Subpoena Responses 463
12 to 484.
13         When I say Bates stamped, that means
14 there is something on the bottom of the page
15 that says Subpoena Responses 463, Subpoena
16 Responses 464, and so on.
17         Just let me know when you have that
18 document in front of you.
19         (Subpoena responses, Bates stamp 463
20 to 484, marked Defendants' Exhibit 28.)
21     A.   I have it in front of me.
22     Q.   What are these documents?
23         MR. GOODMAN:  Take a look at it.
24 Take your time.
25     Q.   Take your time, please.

Page 98

1              S. Orsaris
2         (Pause in the proceedings.)
3     A.   This is the Dealer Sales and Service
4 Agreement between Spartan Auto Group LLC and
5 Mitsubishi of North America.
6     Q.   Were you, Stavros Orsaris, involved
7 with the negotiation or the execution of these
8 agreements?
9     A.   No.
10    Q.   Did you review these documents in
11 preparation for your deposition today?
12    A.   No.
13    Q.   Have you seen these documents prior
14 to today?
15    A.   No.
16    Q.   Turn to the page Subpoena Responses
17 468, please.  Why was this agreement signed by
18 Philip Argyropoulos?
19    A.   You would have to ask Philip
20 Argyropoulos.
21    Q.   So you do not know why it was signed
22 by Philip Argyropoulos; is that correct?
23    A.   I do not know.
24    Q.   What does it say there for his title?
25    A.   I can't make it out.

Page 99

1              S. Orsaris
2     Q.   I won't tell on you when I depose him
3 that you can't read his handwriting, but it
4 seems to me from what I could read that it says
5 DLR PRINC.  Does that seem like a reasonable
6 interpretation?
7         MR. GOODMAN:  Object to the form.  Go
8 ahead.
9     A.   I can't say for sure.
10    Q.   It seems like his title here is
11 dealer principal.  Why would his title be
12 listed as dealer principal?
13        MR. GOODMAN:  Object to the form.
14    A.   I don't know.
15    Q.   Go back to the page Bates stamped
16 Subpoena Responses 464, please.
17    A.   Okay.
18    Q.   You see at the top of this page an
19 item that says ownership of dealer?
20    A.   Yeah.
21    Q.   And that lists Diane Argyropoulos and
22 Philip Argyropoulos; is that correct?
23    A.   Yes.
24    Q.   And you previously testified that
25 Diane was the owner of Victory Mitsubishi; is

Page 100

1              S. Orsaris
2 that correct?
3     A.   She is the owner of Victory
4 Mitsubishi, yes.
5     Q.   And you previously testified that
6 Philip was not the owner of Victory Mitsubishi;
7 is that correct?
8         MR. GOODMAN:  Object to form.  Go
9 ahead.
10    A.   He is not the owner of Victory
11 Mitsubishi.
12    Q.   So why is he listed here as an owner
13 of Victory Mitsubishi?
14        MR. GOODMAN:  Object to form.
15    A.   I don't know.
16    Q.   His title here is listed as manager.
17 Why is Philip Argyropoulos listed as a manager
18 of Victory Mitsubishi?
19    A.   I don't know.  It is my understanding
20 that Diane Argyropoulos is 100 percent owner of
21 Victory Mitsubishi.
22    Q.   Was that the case when Victory
23 Mitsubishi started?
24        MR. GOODMAN:  Object to form.  Go
25 ahead.



STAVROS ORSARIS  30(b)(6)30(b) 1
FARAH J. FRANCOIS vs VICTORY AUTO GROUP LLC

November 23, 2022
101–104

Page 101

1           S. Orsaris
2      A.   I don't know.
3      Q.   If I understand your testimony
4  correctly, it has been your understanding that
5  Diane has been the only owner of Victory
6  Mitsubishi; is that correct?
7      A.   Yes.
8      Q.   It says here under the column
9  Involvement in Management, it lists as active
10  for Philip Argyropoulos.  Do you see that?
11      A.   Yes.
12      Q.   And you previously testified that you
13  have not seen Philip Argyropoulos in the
14  dealership; is that correct?
15      A.   Yes.
16      Q.   So why is he listed as actively
17  involved in the management of the dealership
18  when the dealership's general manager has never
19  seen him in the dealership?
20      MR. GOODMAN:  Object to form of the
21  question.
22      A.   Diane is the only one that's
23  involved, is 100 percent owner, is my
24  understanding, of Victory Mitsubishi.
25      Q.   So you don't know why it lists Philip

Page 102

1           S. Orsaris
2  as actively involved in management here?
3      MR. GOODMAN:  Object to the form.
4      A.   I don't know why.
5      Q.   David Perez testified on Monday that
6  he didn't know Diane Argyropoulos.  Why didn't
7  he know Diane Argyropoulos?
8      MR. GOODMAN:  Objection.  Form.
9  Mischaracterizes.
10      A.   Chain of command.  I was David's
11  direct supervisor.
12      Q.   So Diane doesn't deal with any of the
13  employees of the dealership besides yourself;
14  is that correct?
15      MR. GOODMAN:  Objection.  Form.
16      A.   I managed all the employees of
17  Victory Mitsubishi.
18      MS. CATERINE:  Could you read back
19  the question, please?
20      (Record read.)
21      Q.   Yes or no?
22      A.   Diane has the ability to.  I am sure
23  she has.  I do the majority of the dealing with
24  the employees at Victory Mitsubishi.
25      Q.   Could you turn to the page Bates

Page 103

1           S. Orsaris
2  stamped Subpoena Responses 480, please.
3      A.   Okay.
4      Q.   This page shows Diane as the sole
5  owner in the agreement with Mitsubishi on
6  September 20, 2022, correct?
7      A.   Yes.
8      Q.   Do you know when this lawsuit was
9  filed?
10      A.   Not the specific date, but the month.
11      Q.   What is your understanding?
12      A.   May.
13      Q.   The ownership was changed in this
14  agreement because of the lawsuit, correct?
15      MR. GOODMAN:  Object to form.  Also
16  argumentative, but objection.
17      A.   The answer is definitively no.
18      Q.   I thought you said you weren't
19  involved with the negotiation and execution of
20  this agreement, of these agreements.  Excuse
21  me.
22      MR. GOODMAN:  Object to form.
23      A.   I have strong relationships with many
24  folks at Mitsubishi.  I don't have these
25  contracts, but I understand what's going on.  I

Page 104

1           S. Orsaris
2  have a very strong relationship with senior
3  management team at Mitsubishi North America.
4      Q.   You say that, but you didn't seem to
5  be aware that Philip Argyropoulos was listed as
6  an owner and active manager of the dealer in
7  prior agreements.
8      MR. GOODMAN:  Object to the form.
9      Q.   Why is that?
10      MR. GOODMAN:  Objection.  Form.
11      A.   What is your question again?  Can you
12  rephrase it?
13      Q.   If you are aware based on your
14  relationships with Mitsubishi senior management
15  team, why were you not aware that Philip
16  Argyropoulos was listed as an owner and active
17  manager of Spartan Auto Group LLC?
18      MR. GOODMAN:  Object to the form of
19  the question.
20      A.   I manage the general operation, and
21  the relationship between Mitsubishi and Spartan
22  Auto Group LLC, I don't think that ever came up
23  in conversation.
24      Q.   What do you remember about the
25  investigation and subsequent lawsuit against



Page 105

1           S. Orsaris
2   Victory Auto Group by the New York Attorney
3   General?
4           MR. GOODMAN:  Note my objection.  At
5   this point if you want to call it a talking
6   objection, you can, but we probably should call
7   the court.  That subject is the subject of a
8   motion pending before the Court.  We moved to
9   strike those allegations from the complaint,
10  and I therefore submit that that is not an
11  appropriate line of questioning for this
12  deposition, and particularly this witness.
13          MS. CATERINE:  Sure.  Does anyone
14  remember off the top of their head when the
15  Court says they are not available -- I have it
16  right here.  They are not available
17  between 12:30 and 1:30, so it looks like we
18  probably wouldn't be able to reach them right
19  now.
20          Let's get the Court on the phone
21  after we take our lunch, and for now I will
22  move on, we will return to this issue after
23  lunch.
24          MR. GOODMAN:  Just for clarity, when
25  we talk to the Court, I understand that --

Page 106

1           S. Orsaris
2   well, I am asking, do you intend to inquire as
3   to the other allegations in the complaint about
4   other --
5           MS. CATERINE:  Let's just do all of
6   them.  I actual am not sure whether I am going
7   to, but just in case it does come up for
8   questioning somehow, let's just put that all
9   before the Court together at the same time.
10      Q.  Mr. Orsaris, what do you remember
11  about the Farah Jean Francois account?
12          MR. GOODMAN:  Object to the form.  Go
13  ahead.
14      A.  Repeat the question, please.
15      Q.  Let me rephrase the question.  Well,
16  did you not hear me, or did you want me to
17  rephrase?
18      A.  I didn't hear you.
19          MS. CATERINE:  Read it back, please.
20          (Record read.)
21          MR. GOODMAN:  Was the question "case"
22  or "account"?
23          MS. CATERINE:  I believe I said
24  "account."
25          MR. GOODMAN:  The form objection was

Page 107

1   based on the word "account."  If it is case, I
2   have no objection.
3       A.  Was it account?
4       Q.  It was account.
5           MR. GOODMAN:  Object to form if
6   that's going to stand as the question.
7           MS. CATERINE:  Yes.
8       A.  I have recollection, a little bit of
9   recollection, of the day they bought the car;
10  our conversations with them when they came back
11  to re-sign; and, in addition, I vividly
12  remember when she visited the dealership to let
13  us know something happened.
14      Q.  When you say "when they came in," who
15  are you referring to?
16      A.  In which part?
17      Q.  Let's start from the beginning.
18      A.  I remember this vehicle being sold in
19  the beginning.  I have a recollection of them
20  visiting the facility again in June, and then I
21  have a recollection of when she came in
22  September.
23          MS. CATERINE:  Could you read back my
24  question, please.

Page 108

1           S. Orsaris
2           (Record read.)
3       A.  Emmanuel Laforest and what I would
4   presume is Farah Francois.
5       Q.  When was that?
6       A.  May 30th and -- I don't have the
7   paper in front of me, but I think June 29th is
8   when they came back again.
9       Q.  So it was two people, Emmanuel
10  Laforest and Farah Jean Francois; is that
11  correct?
12          MR. GOODMAN:  Object to form.
13      A.  My recollection of the documentation
14  that I collected that day, and my policies and
15  procedures that I have inside Victory
16  Mitsubishi, those two were present, yes.
17      Q.  Do you remember seeing them, or you
18  are just basing this on your review of the
19  documentation?
20      A.  Based on the visit in September.  I
21  do have a recollection of events that occurred
22  on 5/30 and 6/29.
23      Q.  I am not sure that answered my
24  question.  Do you remember seeing Emmanuel
25  Laforest on May 30th, 2020?



Page 109

1            S. Orsaris
2      A.   I don't have a specific recollection
3   of him being there, but based on the policies
4   and procedures that I have in place, the
5   documentation that was collected, two people
6   were present, which I would presume is Emmanuel
7   Laforest and Farah Francois.
8      Q.   Did you ever see Mr. Laforest outside
9   of May 30th and June 29th?
10     A.   No.
11          MR. GOODMAN:  Object to form.  Go
12   ahead.  He answered.
13     Q.   What does Mr. Laforest look like?
14     A.   I can't describe him.
15     Q.   Do you remember anything about him
16   physically?
17     A.   No.
18     Q.   Do you remember the first time that
19   Mr. Laforest contacted Victory Mitsubishi?
20     A.   I wasn't involved when he initially
21   inquired about the car before May 30th.
22     Q.   And who was involved with that?
23     A.   One of our business development
24   center associates that he was speaking to when
25   he inquired about a car.

Page 110

1            S. Orsaris
2      Q.   How did they communicate?
3      A.   Via phone, like a phone call, in
4   addition to text messages.
5      Q.   How many phone calls were there?
6      A.   I can't recall, but may have been a
7   few.
8      Q.   How do you know that they spoke with
9   him on the phone?
10     A.   Information is on DealerSocket.
11     Q.   How do you see that on DealerSocket?
12          MR. GOODMAN:  Object to the form.
13     A.   Search the name.
14     Q.   So you searched Emmanuel Laforest,
15   and what would come up when you searched for
16   Emmanuel Laforest?
17          MR. GOODMAN:  Object to the form.
18     A.   The customer profile.
19     Q.   What does the customer profile
20   include?
21     A.   All communication.
22     Q.   And that would include phone calls?
23     A.   Phone calls, text messages, emails,
24   and general emails about our inventory, the
25   vehicle that they were interested in, the

Page 111

1            S. Orsaris
2   initial lead when they inquired about the car,
3   where they found the vehicle, which website, so
4   on and so forth.
5      Q.   All right, great.
6          MS. CATERINE:  We are going to call
7   for the production of the customer profiles on
8   DealerSocket of Emmanuel Laforest, Farah Jean
9   Francois, Jami Singer, and any other customer
10   profiles related to the sale of the vehicle.
11          MR. GOODMAN:  Take it under
12   advisement.  I believe it has been disclosed.
13          THE WITNESS:  That has been sent.
14          MR. GOODMAN:  But to the extent that
15   they weren't -- I am pretty sure they were --
16   take it under advisement.
17     Q.   Victory Mitsubishi accepts online
18   applications for cars from websites like
19   cars.com and Edmunds, correct?
20          MR. GOODMAN:  Object to form.  Go
21   ahead.
22     A.   On an application as in filling out
23   personal credit information, to my knowledge,
24   no.
25     Q.   What about leads?

Page 112

1            S. Orsaris
2      A.   For a first name, optional last name,
3   phone number or email.
4      Q.   Are there any other websites that
5   provide leads to Victory Mitsubishi?
6          MR. GOODMAN:  Other than --
7      Q.   Other than cars.com and Edmunds?
8      A.   CarGurus.  TrueCar as well, and
9   Capital One has a listing on their own website.
10   That's all I can recall at the time.  I don't
11   know if there's another one.
12          MS. CATERINE:  Off the record.
13          (Discussion off the record.)
14     Q.   What do you remember about the leads
15   that Victory Mitsubishi received from Mr.
16   Laforest?
17          MR. GOODMAN:  Object to form.  Go
18   ahead.
19     A.   I do not review the leads that come
20   into the dealership, so I did not review that
21   lead.
22     Q.   Did you review the leads in
23   preparation for your deposition today?
24     A.   No.
25     Q.   When Victory Mitsubishi receives a



Page 113

S. Orsaris

1  lead from one of these websites, what happens
2  generally?
4      A.   The DealerSocket software will notify
5  the business development center team at Victory
6  Mitsubishi that so and so has contacted for
7  information and has potential interest in a
8  vehicle, and then our team would call, gauge
9  interest, especially during that period of
10  time; see if they have any level of intent to
11  purchase.  Have a conversation, answer any
12  questions, and write them in whenever worked
13  best for them.
14      MS. CATERINE:  I am about to get into
15  another document, so I think we should go ahead
16  and break for lunch.
17      (A luncheon recess was taken.)
18      Q.   What do you remember about the
19  investigation and subsequent lawsuit against
20  Victory Auto Group by the New York Attorney
21  General?
22      A.   I have -- I don't know.  I was in
23  college when it was going on.
24      Q.   Were you provided notice of the order
25  in the New York Attorney General lawsuit on

Page 114

S. Orsaris

1  August 10, 2018?
3      A.   By who?
4      Q.   Again, Mr. Orsaris, if you could
5  please just answer the question or ask me to
6  rephrase the question.
7      MR. GOODMAN:  Object to the form of
8  that question.
9      A.   I don't know.
10      Q.   You don't know if you were ever
11  provided notice of that order?
12      MR. GOODMAN:  Asked and answered.
13  Object to form.
14      A.   I don't recall.
15      Q.   When did you learn about the
16  stipulation to settle that lawsuit entered into
17  on April 4, 2019?
18      MR. GOODMAN:  Object to the form of
19  the question.
20      A.   I don't recall.
21      Q.   Were you aware of this settlement
22  prior to this deposition?
23      MR. GOODMAN:  Object to the form.  Go
24  ahead.
25      A.   Yes.

Page 115

S. Orsaris

1
2      Q.   Did you review the settlement in
3  preparation for your deposition today?
4      A.   No.
5      Q.   Were you aware that the settlement
6  allowed a confession of judgment to be entered
7  against Philip Argyropoulos personally if
8  defendants failed to make payments pursuant to
9  the stipulation?
10      MR. GOODMAN:  Objection.  Form.
11      A.   I don't know.
12      Q.   You don't know if you were aware of
13  that or not?
14      MR. GOODMAN:  Objection.  Form.
15      A.   I don't know.
16      Q.   Why would Mr. Argyropoulos agree to
17  allow a confession of judgment to be entered
18  against him personally if Victory Auto Group
19  failed to make payments pursuant to the
20  settlement stipulation with the New York
21  Attorney General?
22      MR. GOODMAN:  Objection.  Form.
23      A.   I am not Phil Argyropoulos, so I do
24  not know.
25      Q.   Were you questioned by the New York

Page 116

S. Orsaris

1
2  Attorney General's office in the course of the
3  investigation of the lawsuit?
4      A.   No.
5      Q.   Do you know anyone who was questioned
6  in the course of the investigation or the
7  lawsuit?
8      MR. GOODMAN:  Object to form.
9      MS. CATERINE:  Strike that question.
10      Q.   Were you aware of anyone being
11  questioned in the course of the investigation
12  or lawsuit by the New York Attorney General?
13      A.   No.
14      MR. GOODMAN:  Object to form.  You've
15  got to let me object.
16      A.   No, I was not aware.
17      Q.   Were any employees at Victory
18  Mitsubishi fired based on the results of the
19  investigation or lawsuit by the New York
20  Attorney General?
21      MR. GOODMAN:  Object to form.
22      A.   No.
23      Q.   Did Diane ever speak to you about the
24  investigation and lawsuit by the New York
25  Attorney General?



Page 117

1          S. Orsaris
2          MR. GOODMAN:  Objection.  Form.
3     A.   No.
4     Q.   Would you take a look at Exhibit 19,
5  Bates stamped Defendants 49 through 69.
6          COURT REPORTER:  Off the record.
7          (Discussion off the record.)
8     Q.   Mr. Orsaris, what is this document?
9     A.   It is a printout of the customer
10  profile that we have for Farah Francois.
11     Q.   How do you know that?
12     A.   I was the -- I know what the
13  DealerSocket customer profile looks like.
14     Q.   So the customer profile on
15  DealerSocket is going to have work notes at the
16  top like this document does, correct?
17     A.   It takes the profile and spits it out
18  in this form, produces it in this form; all the
19  communication.
20     Q.   I see.  So there is some sort of
21  print function on DealerSocket, and you do
22  that, and then it gives you this document?
23     A.   Yes.
24     Q.   When you print a customer profile on
25  DealerSocket, does it give you options of how

Page 118

1          S. Orsaris
2  much of the profile you can print?
3     A.   No.
4     Q.   No.  There's just a single option to
5  print; is that right?
6     A.   Yes.
7     Q.   At the top of this first page it
8  says, "Assigned to:  All good luck."  What does
9  that mean?
10     A.   Generalized -- after a certain point,
11  the customer profile kind of hits this where it
12  received the emails it received, and just
13  trying to have some sort of repeat business, so
14  there is no one assigned to this customer
15  profile anymore.
16          On a normal basis, if someone were
17  to respond to one of these emails, it would
18  generally lead to it being assigned to a
19  person that works for the business development
20  center.
21     Q.   So, for example, if we look at the
22  entry on August 24, 2022 at 3:27 p.m., that has
23  SYS written next to the time stamp, and then
24  the next entry down has Nicole Gonzalez written
25  next to the time stamp.  Would that indicate

Page 119

1          S. Orsaris
2  that at on August 22, 2022, the account was
3  assigned to Nicole Gonzalez?
4     A.   Nicole Gonzalez is an assistant
5  business development center manager, and in
6  these emails it says her name throughout the
7  entire time, so that's why it says her name on
8  it.  She's the one that produces these
9  generalized emails and assigns these emails to
10  be sent.
11     Q.   Is there a way to see who was
12  assigned to the Farah Francois account
13  throughout its history on DealerSocket?
14          MR. GOODMAN:  Object to the form.
15  You can answer.
16     A.   It was assigned to someone until a
17  purchase.  That's how it works.  When the time
18  hits the generalized section, like it is in
19  now, it just receives periodic emails every so
20  often.
21     Q.   I think the answer to that question
22  is no, there wasn't a way to see who was
23  assigned to the account on DealerSocket in the
24  past; is that correct?
25          MR. GOODMAN:  Object to the form as

Page 120

1          S. Orsaris
2  to "assigned," but go ahead.
3     A.   The team is assigned to it, the
4  entire team is assigned to it.  No singular
5  person, per se.
6     Q.   I guess I am a little confused,
7  because we have this thing at the top that says
8  assigned to, and there would be individual
9  employees who would follow that assigned to,
10  correct?
11          MR. GOODMAN:  Object to form.  Go
12  ahead.
13     A.   Yes, but the DealerSocket system is
14  smart enough to know people's schedules so they
15  can change.  If someone is required the next
16  day, and that person is not here and scheduled
17  to work, the DealerSocket system is smart
18  enough to switch to another person so the other
19  person can follow up with a conversation saying
20  "Hey, you were in here to buy a car yesterday,"
21  so on and so forth.
22     Q.   Is there any way to look at a history
23  of who DealerSocket or anyone else assigns the
24  account to throughout its history?
25          MR. GOODMAN:  Object to form?



Page 121

S. Orsaris

1
2     A.   I don't know.
3     Q.   I think you testified previously that
4  phone calls would be listed on the customer
5  profile; is that correct?
6     A.   Yeah.  Yes.
7     Q.   I don't remember seeing any phone
8  calls listed on this customer profile.
9     A.   It's definitely there.
10    Q.   Could you point it out to me, please?
11    A.   Sure.  Page 68 and how a phone call
12  was made.
13    Q.   Let me clarify.  This appears to be
14  the customer profile for Sarah J.  I am talking
15  about the first customer profile for Farah
16  Francois.
17    A.   Sarah J is a typo.
18        MR. GOODMAN:  What page are we on?
19        THE WITNESS:  68.
20        MR. GOODMAN:  This packet doesn't
21  have a 68.
22        THE WITNESS:  Right here.  That is
23  the same customer.
24    Q.   I see.  But in regards to before
25  these phone calls, just dealing with the first

Page 122

S. Orsaris

1
2  customer profile, and again understanding it
3  may actually refer to the same customer, but
4  looking at the first customer profile, does
5  this list any phone calls?
6     A.   Absolutely.
7     Q.   Where?
8     A.   62, 60.
9     Q.   Okay.  I see here an entry on
10  April 20, 2020, an outbound call made by Tameka
11  Richards.  Who is Tameka Richards?
12    A.   Business development center agent.
13    Q.   How long has Ms. Richards worked at
14  Victory Mitsubishi?
15    A.   I don't know dates.
16    Q.   Has it been more than a year?
17        MR. GOODMAN:  As of today?
18  Objection.
19    Q.   Actually, does she still work at
20  Victory Mitsubishi?
21    A.   Yes.
22    Q.   Around when did she start working at
23  Victory Mitsubishi?
24    A.   Sometime in 2019.
25    Q.   I see here on this entry it says

Page 123

S. Orsaris

1
2  "Listen to call.  DealerSocket call
3  management," and then there is a URL.  What is
4  that referring to?
5     A.   Calls are recorded.  I don't know how
6  long, but these calls were recorded, and you
7  can potentially listen to them.  I don't know
8  the storage date.
9     Q.   Did you retrieve any phone call
10  recordings and produce them to your attorney
11  for this lawsuit?
12    A.   I believe I turned over voice mails
13  left by Farah in September of 2020.
14    Q.   Do you recall if there were any
15  recordings that you could not access, including
16  but not limited to the recording reflected by
17  this document?
18    A.   I don't recall.
19    Q.   If you could go to the next page,
20  this is Defendants' 63, and this entry dated
21  April 19 reflects a lead, correct?
22    A.   Yes.
23    Q.   And this lead refers to someone with
24  the name Milano Banik.  Who is Milano Banik?
25    A.   I don't know.

Page 124

S. Orsaris

1
2     Q.   Do you recognize the email for Milano
3  Banik?
4     A.   Yes.
5     Q.   Where do you recognize that email
6  address from?
7     A.   The same email that was used when
8  Emmanuel Laforest inquired about the car before
9  he came in and purchased on May of 2020.
10    Q.   Is that unusual, for two different
11  names to be associated with the same email
12  address?
13        MR. GOODMAN:  Object to form.
14    A.   I wouldn't call it unusual.
15    Q.   So based on this entry, and then the
16  outbound call entry we were talking about
17  before, that outbound call was made following
18  up on this lead; is that correct?
19    A.   Yes.
20    Q.   What generally would Ms. Richards
21  leave in a voice message when calling to follow
22  up on a lead?
23        MR. GOODMAN:  Object to the form.  Go
24  ahead.
25    A.   Something to the effect of, Hi.  This



Page 125

S. Orsaris

1  is Tameka.  I received an inquiry on so and so
2  vehicle.  You can call back at whatever the
3  number is to schedule an appointment to stop by
4  and see one of our cars, whichever vehicle it
5  was.
6      Q.   And then I see an entry here, this is
7  back on Defendants' 62, an entry on April 20,
8  2020 at 11:25 a.m. that says no vmail.  What
9  does no vmail mean?
10     A.   No voice mail.
11     Q.   And this entry was put in by
12  Ms. Richards, correct?
13     A.   Yes.
14     Q.   Why is there an entry saying no
15  vmail, but there is also an entry saying that
16  she left a message?
17     A.   If you see carwars, which is the tool
18  that they use to record, whenever it hits a
19  voice mail -- the system is not smart enough to
20  know the voice mail is full.  If there is no
21  voice mail, they just know that the phone
22  wasn't picked up.  Obviously, someone who
23  doesn't pick up the phone, typically a voice
24  mail is typically required, something we should

Page 126

S. Orsaris

1  do so people can call us back.
2      Q.   So the next entry has a message.  Was
3  this the message that was sent by Ms. Richards
4  by email as referenced in an earlier entry.
5      A.   No.  By text.
6      Q.   By text message.
7      A.   Yes.
8      Q.   And that would have been a text
9  message to the phone provided in the
10  information lead, correct?
11     A.   Yes.
12     Q.   And then the next couple of entries
13  refer to different emails that were
14  automatically sent, it appears, and they all
15  have unqualified in the subject line.  What
16  does that refer to?
17         MR. GOODMAN:  Where are we, what
18  page?
19         MS. CATERINE:  This is starting on
20  page Defendants' 62, the top entry, and then
21  going backwards to Defendants' 61.
22     A.   The DealerSocket system is smart
23  enough to know when someone is not responding.
24  This is not qualified as an active lead, and

Page 127

S. Orsaris

1  that is why it is using the word unqualified.
2      Q.   And on Defendants' 61 we see another
3  lead.  Actually, let's go to the part of the
4  lead that is on Defendants' 60.  You will see
5  at the very top of the entry starting "This
6  customer recently submitted an internet lead
7  with the details listed below.  A duplicate
8  sales opportunity may now exist.  The best
9  practice is to merge the new opportunity into
10  this opportunity."  What does this refer to?
11     A.   The prior lead and this lead merging
12  into the same profile.
13     Q.   Could you explain what that means
14  exactly?
15     A.   There is either a common number or
16  email, and when there is a common number or
17  email, it's going to link together
18  automatically, which is why when we produced
19  this document, it is linked together.
20     Q.   So the system flags it when a lead is
21  submitted with the same email address or the
22  same phone number; is that correct?
23         MR. GOODMAN:  Object to the form.  Go
24  ahead.

Page 128

S. Orsaris

1      A.   It links it together so we can in
2  some instances make inferences that you have
3  been interested in some of our cars.  Why don't
4  you check out the initial car or second car or
5  third car, because folks do inquire multiple
6  times before they come in.
7      Q.   If I were to pull up the Farah Jean
8  Francois customer profile in DealerSocket, I
9  know it's not going to quite look like this,
10  but I would be able to see the different
11  submitted leads in the system, correct?
12         MR. GOODMAN:  Object to the form.
13     A.   Possibly.  I wouldn't say maybe on
14  the same page, but possibly.
15         MR. GOODMAN:  Can we take a minute
16  here?  I want to talk to my client for a
17  second.
18         MS. CATERINE:  Sure.
19         (A recess was taken.)
20     A.   So this is the customer profile for
21  Farah Francois that initially started actually
22  as Emmanuel Laforest, and considering that
23  Emmanuel Laforest purchased a car through his
24  sister-in-law, obviously when the purchase is



Page 129

S. Orsaris

1 made, whoever makes the purchase kind of takes
2 over.  They report it on the record how her
3 name appeared on this.
5     MR. GOODMAN:  By counsel, if I could,
6 you, Emma, had previously asked if he looked at
7 the Farah Francois profile.  There is no
8 separate profile.  It's the same profile.  I
9 think that's where --
10     THE WITNESS:  There's only one, yes.
11     Q.   Is there a customer profile for Jami
12 Singer?
13     A.   No.  The customer profile should be
14 looked at as a transaction profile.  I think
15 it's a little bit easier to understand in that
16 regard.
17     Q.   During May 30th, if I recall
18 correctly, you said the dealership was only
19 assisting customers by appointment, they were
20 only making sales of vehicles by appointment;
21 is that correct?
22     A.   Yes.
23     Q.   Where in this customer profile does
24 it show Mr. Laforest making an appointment at
25 Victory Mitsubishi?

Page 130

S. Orsaris

1
2     A.   You see it in the text messages that
3 occurred between Emmanuel Laforest and one of
4 the business development center associates
5 stating he was coming in.
6     Q.   We are going to get to those, but I
7 have a couple more questions for you about this
8 document.  On Defendants' 67, do you see on the
9 bottom right corner it says 23/23?
10     A.   Yes.
11     Q.   And that is referring to all of the
12 pages in the printout from DealerSocket,
13 correct?
14     A.   Yes.
15     Q.   Can I assume those text messages you
16 were just referring to would not have been part
17 of this printout; is that correct?
18     A.   It would not have been part of this
19 printout, but considering there was a
20 conversation back and forth, they were stored
21 separately, and I was able to produce those.
22     Q.   So those text messages would not have
23 been part of the customer profile; that would
24 have been a separate thing in DealerSocket?
25     A.   It is part of the customer profile

Page 131

S. Orsaris

1
2 when you print the work notes, but it does not
3 print every single back-to back-text message.
4 You have to click on them and print those.
5     Q.   Got you.  So this work note section
6 of the customer profile wouldn't necessarily
7 reflect all of the communications such as text
8 messages?
9     A.   A singular text will appear, but a
10 conversational text, the system will put it in
11 a different section, and which I already
12 produced for this situation.
13     MS. CATERINE:  Could you read back my
14 question, please.
15     (Record read.)
16     Q.   Is that yes or no?
17     A.   If a singular text is sent, it will
18 show.  If multiple texts are sent, it will not
19 show on the work notes section.
20     Q.   Other than the multiple text messages
21 that you just referred to, are there any other
22 communications which would not be reflected in
23 the customer profile in DealerSocket?
24     A.   No.
25     Q.   If you could turn to Defendants' 66,

Page 132

S. Orsaris

1
2 please.  In the bottom right corner of this
3 page you will see it says 19 out of 23.  Why
4 are the pages 20, 21 and 22 not present in this
5 customer profile?
6     A.   They were present.  I scanned this to
7 my email after printing it, and my scanner did
8 not print those three pages or four pages --
9 three pages.
10     Q.   Do you still have the physical pages?
11     A.   No, unfortunately.
12     Q.   Can you still re-create this printout
13 on DealerSocket?
14     A.   This exact paperwork, no.  I have
15 done my best to produce additional
16 documentation over time as it was requested.
17     Q.   We will get to that as well, but --
18     MS. CATERINE:  Could you read back
19 the answer.
20     (Record read.)
21     Q.   So when you say "this exact
22 paperwork," what do you mean?
23     A.   At the present time, if you were to
24 ask me to reproduce this, it would be hard to
25 do so.  Because of the amount of time that we



STAVROS ORSARIS  30(b)(6)30(b) 1
FARAH J. FRANCOIS vs VICTORY AUTO GROUP LLC

November 23, 2022
133—136

Page 133
S. Orsaris
1
2  were in the profile, I think it unlinked the
3  initial lead by Milano Banik.
4      Q.  I see.  Why would that happen?
5      A.  I don't know.  It created a contact
6  in Dealertrack -- DealerSocket -- I apologize
7  -- and we found out about it too late and were
8  unable to reverse it.
9      Q.  Have you contacted DealerSocket about
10 this issue?
11     A.  Via phone.
12     Q.  Did you send them any emails about
13 this issue?
14     A.  No.
15     Q.  Let's go to Exhibit 20 marked
16 Defendants' 113.  It's a single page.
17     A.  I have it.
18     Q.  What is this document?
19     A.  When we were asked to try to find the
20 information between pages 19 to 23, I did my
21 best to try to dig as deep as I can in
22 DealerSocket, and I had these entries, so
23 trying to provide the information that was
24 requested.
25     Q.  How did you retrieve these entries?

Page 134
S. Orsaris
1
2      A.  Clicking on the back-end tools that
3  would take the customer profile and kind of
4  condense it, and then I went to the section
5  that was missing, screen-shotted it and
6  provided it.
7      Q.  I see.  So Defendants' 113 was part
8  of a condensed form of the customer profile
9  that we were looking at earlier; is that
10 correct?
11     A.  It was a section of more of an
12 overview of the profile which has some events
13 such as you see here, text messages.
14     Q.  Could you still produce that overview
15 today from DealerSocket?
16     A.  I believe so, yes.
17     MS. CATERINE:  We call for the
18 production of the entire overview, please.
19     MR. GOODMAN:  Take it under
20 advisement.
21     Q.  If we could go to what was previously
22 marked as Exhibit 18 Bates stamped Defendants'
23 42 through 48.
24     A.  I have it.
25     Q.  Mr. Orsaris, what is this document?

Page 135
S. Orsaris
1
2      A.  The text message section that gets
3  created when you actually receive responses to
4  your texts that you send out.
5      Q.  And this is what you were referring
6  to when you were talking about the text
7  messages that would not be reflected in the
8  work notes section that we were looking at
9  before; is that correct?
10     A.  Yes.
11     Q.  I guess I'm a little confused,
12 though, about -- I don't see any entry in the
13 work notes that we were looking at before,
14 May 30th, 2020.  I understand it wouldn't
15 reflect all the text messages, but shouldn't
16 there be at least one entry on May 30, 2020,
17 showing the first text message?
18     A.  I presume that the system would mark
19 it in a different section, which I produced,
20 when there is multiple texts going back and
21 forth.  The consumer responded, and considering
22 the consumer responded, it puts it in a
23 different section.
24     Q.  When did Emmanuel Laforest first come
25 to Victory Mitsubishi in person?

Page 136
S. Orsaris
1
2      A.  May 30th of 2020.
3      Q.  What time did he come in?
4      A.  I don't recall.
5      Q.  Is there any document that would show
6  or give you a rough idea of when he came in?
7      A.  Sometime after he asked me what's the
8  address or asked -- not me, but Victory what
9  the address is.
10     Q.  To be clear, you are referring to the
11 document Bates stamped Defendants' 45 and the
12 text message time stamped May 30th at
13 1:55 p.m.; is that correct?
14     A.  Yes.
15     Q.  So sometime after 1:55 p.m., correct?
16     A.  Yes.
17     Q.  And about how long was he at the
18 dealership?
19     A.  I don't recall.
20     Q.  Is there any document that would give
21 you a rough idea of how long he was at the
22 dealership?
23     A.  Not to my knowledge, no.
24     Q.  What do you remember about May 30th,
25 2020?



Page 137

1           S. Orsaris
2           MR. GOODMAN:  Object to form.  Go
3   ahead.
4       A.  I don't have really a recollection of
5   any specific -- anything specific.  More so the
6   overall month.
7       Q.  Sure.  And that's because it was more
8   than two years ago now, isn't that correct?
9           MR. GOODMAN:  Object to form.
10      A.  Yes.
11      Q.   Do you remember what you ate for
12  breakfast that day?
13          MR. GOODMAN:  Objection.  Come on.
14  Object to the form.
15      A.  No.
16      Q.   Do you remember what you ate for
17  lunch that day?
18          MR. GOODMAN:  Objection.
19      A.  No.
20      Q.  So pretty much your understanding of
21  what happened when Mr. Laforest came into the
22  dealership on May 30th is based upon your
23  review of the documents; is that correct?
24          MR. GOODMAN:  Object to form.  Also
25  asked and answered.  Go ahead.

Page 138

1           S. Orsaris
2       A.  No, that's not the case.
3       Q.  Explain to me how that's not the
4   case.
5       A.  In September when Ms. Farah Francois
6   visited the facility and explained to me what
7   happened, obviously it was only four months
8   prior, so it was pretty easy for me to remember
9   some of the events that happened in May and
10  June, and obviously everything that happened in
11  September.
12          It was a pretty significant event --
13  this is the first and only time something like
14  that happened to me.  I held on to that.
15      Q.  So if I understand you correctly, you
16  are saying that when Ms. Francois came in and
17  spoke with you in September of 2020, at that
18  time you remembered what happened on May 30th,
19  2020; is that correct?
20          MR. GOODMAN:  Object to form.  Go
21  ahead.
22      A.  And also what happened in June as
23  well.
24      Q.  And I take it you remember your
25  conversation with Ms. Francois in September of

Page 139

1           S. Orsaris
2   2020; is that right?
3       A.  Yes.
4           MR. KESHAVARZ:  Can we take a break,
5   please?
6           MS. CATERINE:  That's fine with me.
7           (A recess was taken.)
8       Q.  So your understanding of what
9   happened on May 30th, 2020, with Mr. Laforest
10  is based on your review of the documents,
11  correct?
12          MR. GOODMAN:  Objection.  Form.
13  Mischaracterizes.  Go ahead.
14      A.  No.
15      Q.  What is it based on?
16          MR. GOODMAN:  Asked and answered.
17  Go ahead.
18      A.  When Ms. Farah brought the situation
19  to my attention in September, I had at that
20  time a more vivid recollection, and I held on
21  to a lot of the events that happened in May and
22  June considering, again, this is the first and
23  only time we have had an identity theft
24  situation going on, so considering it's
25  significant, I was able to retain the

Page 140

1           S. Orsaris
2   information.
3       Q.  What information did you retain?
4       A.  Mostly the conversations that
5   occurred in June, and the sale date in May.  I
6   remember actually seeing the vehicle getting
7   cleaned, and the office, when they sat down in
8   the office with Yessica Vallejo, and in June
9   again when they sat down with Yessica, my
10  finance manager, for the second time.
11      Q.  So you remember all of that, but you
12  don't remember what Mr. Laforest looks like,
13  correct?
14      A.  I don't want to inaccurately describe
15  how he looks.
16      Q.  Do you remember what he looks like or
17  not?
18          MR. GOODMAN:  Asked and answered.
19  Argumentative.  Go ahead.
20      A.  Vaguely.
21      Q.  What is that vague recollection of
22  what he looks like?
23      A.  Taller than me, relatively slim,
24  darker complexion.
25      Q.  So after arranging an appointment at



Page 141

1          S. Orsaris
2  Victory Mitsubishi, Emmanuel Laforest comes
3  into the dealership.  What happens when he
4  comes in?
5          MR. GOODMAN:  Object to the form.
6      A.  He came in with Ms. Francois,
7  inquired about a vehicle, potentially test
8  drove it, looked at the car, had intent to
9  purchase, and it led to a purchase.
10     Q.  Let's go through that step by step.
11  What is your basis for believing that he came
12  in with Farah Jean Francois?
13     A.  Store policy is you cannot run
14  someone's credit without them being present in
15  the building.  We had a physical ID, which my
16  store policy at the time would be me holding on
17  to both his and Ms. Francois's ID or driver's
18  license, and all of the, like I said, policies
19  and procedures that we have in place.  I am
20  certain that Mr. Emmanuel Laforest was with
21  what I presume is Ms. Farah Francois.
22     Q.  Just to give a quick summary, it is
23  because of your store policies and because you
24  have a copy of her driver's license; is that
25  correct?

Page 142

1          S. Orsaris
2          MR. GOODMAN:  Object to form.
3  Mischaracterizes.  Go ahead.
4      A.  It's definitely a little bit deeper
5  than that.  There are rules that are in place,
6  city, state and federal regulations that we
7  follow and adhere to day in and day out.  It is
8  impossible that Emmanuel was by himself, and it
9  is impossible that I would presume that Ms.
10  Francois wasn't there.  She was definitively
11  there, or someone I would presume was her was
12  there.
13     Q.  So because of the store policy, it is
14  impossible that you would ever pull someone's
15  credit report without them physically being
16  there; is that correct?
17         MR. GOODMAN:  Objection to form.  Go
18  ahead.
19     A.  I recall being called into the office
20  by Yessica Vallejo for the down payment for the
21  vehicle, and I remember two individuals being
22  Emmanuel Laforest and the other being what I
23  presume is Farah Francois inside the office
24  when I was counting the down payment.
25     Q.  That's useful information, but I am

Page 143

1          S. Orsaris
2  not sure that answered my question.
3          MS. CATERINE:  Could you read back
4  the question, madam court reporter?
5          (Record read.)
6      A.  More than store policy.  I had a
7  physical copy of her ID.  I touched her ID
8  myself, and there were two people, at least two
9  people present in the building, one that was
10  Emmanuel Laforest, and the other I would
11  presume is Farah Francois.
12         I remember the store policy as well
13  being that I would make sure, I would verify
14  myself, her date of birth, making sure the
15  people in the building are who they said they
16  are, and that all parties are present inside
17  the building before the pulling of the credit.
18     Q.  I think you mentioned before that
19  because you had a credit application with both
20  Emmanuel's and Ms. Francois's information, that
21  was part of the basis for your belief that
22  there were two individuals; is that correct?
23     A.  In addition to --
24     Q.  In addition to.
25     A.  I have a recollection of counting the

Page 144

1          S. Orsaris
2  down payment after they said they were going to
3  purchase the vehicle, inside the office, and I
4  recall two people being there, one that was
5  Emmanuel Laforest, and the other that I would
6  presume is Farah Francois.
7      Q.  Who was the first people to speak
8  with Mr. Laforest?
9      A.  Either David or myself.
10     Q.  So you don't know if it was you or
11  David; it just would have been either you or
12  David based on the store policy at the time; is
13  that correct?
14     A.  Yes.  They were checked in, and the
15  only two people that can check a customer into
16  the building to notify our team that they are
17  in the building is either David or myself.
18     Q.  When you say "checked in," what does
19  that mean?
20     A.  When an appointment is made, we
21  complete the appointment with a showroom visit,
22  which we print a guest sheet, and we assign a
23  sales consultant to the transaction, and then
24  sit and have a conversation and figure out what
25  the customer is looking to do that day, so on



STAVROS ORSARIS  30(b)(6)30(b) 1
FARAH J. FRANCOIS vs VICTORY AUTO GROUP LLC

November 23, 2022
145–148

Page 145

S. Orsaris

1 and so forth.
2 Q. Would there be a record made of the
3 time that they were checked in?
4 A. Do you have the guest sheet? I don't
5 think there's a time stamp on that guest sheet.
6 I'm not 100 percent sure.
7 Q. We will get to that later.
8 Would the guest sheet show who was
9 the first person to speak with Mr. Laforest?
10 A. Depends on the notations on the guest
11 sheet.
12 Q. So it could show it?
13 A. Any handwritten things on the guest
14 sheet. Guest sheets have writing of different
15 notes at times.
16 Q. So it could have it handwritten on
17 it?
18 A. It could be on the guest sheet
19 itself. Sales consultants that work there and
20 have finished training typically would show up
21 in the top right of the guest sheet.
22 Q. Would that be the person who would
23 print out the guest sheet, so if the
24 salesperson was listed as David Perez, for

Page 146

S. Orsaris

1 example, would he have been the one who would
2 have printed that out?
3 A. Not necessarily.
4 Q. But if he was listed as the
5 salesperson, he was the one who was first to
6 speak with Mr. Laforest; would that be right?
7 A. No. It was either myself or David
8 Perez.
9 Q. So whoever is listed as the
10 salesperson on the guest sheet didn't
11 necessarily speak to Mr. Laforest first,
12 correct?
13 A. Yes.
14 Q. Did you speak with Mr. Perez about
15 this case?
16 MR. GOODMAN: Objection as to form.
17 A. No.
18 Q. Do you recall speaking to Mr. Perez
19 about Ms. Francois's issues in September of
20 2020?
21 MR. GOODMAN: Objection. Privilege.
22 If you are asking for a conversation that
23 September, no objection. If you are asking
24 some other time frame, there may be a privilege

Page 147

S. Orsaris

1 objection if counsel was present.
2 MS. CATERINE: Sure.
3 Q. Go ahead if you have an answer.
4 MR. GOODMAN: Well, I understood the
5 question to be about September of 2020.
6 MS. CATERINE: It was September of
7 2020.
8 MR. GOODMAN: Then no objection.
9 A. I don't recall.
10 Q. And Mr. Laforest filled out a credit
11 application, correct?
12 A. His portion, yes.
13 Q. And that was a paper application?
14 A. I believe he also provided the
15 information online.
16 Q. So he provided his information
17 online, he filled out a paper application. The
18 online application, that was what he did prior
19 to going into the dealership, correct?
20 A. Yes.
21 Q. And this was sent to him by text
22 message, correct?
23 A. Yes.
24 Q. And then the paper application he

Page 148

S. Orsaris

1 filled out when he arrived in the store on
2 May 30th, correct?
3 A. Yes.
4 Q. Did he fill out any other
5 applications?
6 A. No.
7 Q. And Mr. Laforest filled out the paper
8 application for Farah Jean Francois, correct?
9 MR. GOODMAN: Objection to form.
10 A. Repeat the question, if you don't
11 mind.
12 (Record read.)
13 A. No.
14 Q. How do you know that?
15 A. Per policy and procedures that are in
16 place. Everyone in the building knows that a
17 credit application and the portion that someone
18 is filling out is for themselves and themselves
19 only; strict policy.
20 Q. So you did not see the credit
21 application being filled out, correct?
22 A. I don't have a specific recollection,
23 but my desk faces the sales floor, and if I
24 were to see someone completing an application



STAVROS ORSARIS  30(b)(6)30(b) 1
FARAH J. FRANCOIS vs VICTORY AUTO GROUP LLC
November 23, 2022
149–152

Page 149

S. Orsaris

1  for someone else, I would immediately
2  intervene.
3
4      Q.   During the year 2020, did you have
5  customers come to the dealership saying that
6  they were there to buy a car for another person
7  who didn't want to come into the dealership
8  because of COVID-19?
9          MR. GOODMAN:  Object to form.  Go
10  ahead.
11      A.   No.  I did not do one single remote
12  sale in my entire --
13      Q.   And did you -- sorry.  Were you
14  finished?  I'm not sure.
15      A.   I was finished.
16      Q.   I understand you are saying you
17  didn't do any remote sales, but did anyone ever
18  attempt to buy a vehicle on behalf of another
19  person because that person did not want to come
20  to the dealership because of COVID-19?
21      A.   No.
22      Q.   After the credit application was
23  filled out, credit reports were pulled for
24  Emmanuel Laforest and for Farah Jean Francois,
25  correct?

Page 150

S. Orsaris

1
2      A.   Between those events, David or myself
3  verified that the people on the IDs were
4  present in the building.
5          MR. GOODMAN:  Listen to the question
6  and answer her question, okay?
7      Q.   Who pulled their credit reports?  We
8  will get to the documents later, but do you
9  have any independent recollection of who pulled
10  the credit reports?
11      A.   Either David or myself.
12      Q.   It would have been either you or
13  David; no one else?
14      A.   I don't think anyone else would do
15  it.
16      Q.   I am sorry.  You seemed to be very
17  certain earlier.  You were talking about how it
18  was impossible.  Now you are saying you don't
19  think.  Are you certain, or is that probably
20  the case?
21      A.   I am definitively certain that the
22  only two people that would run credit on that
23  day is David Perez and myself.
24      Q.   Did anyone at Victory Mitsubishi
25  speak with Ms. Francois on May 30th?

Page 151

S. Orsaris

1
2      A.   Either David or myself, and
3  definitively Yessica.
4      Q.   If I told you that Mr. Laforest said
5  that he was told not to call Ms. Francois until
6  after the deal was done, how would you respond?
7      A.   That is preposterous and impossible.
8      Q.   If I told you that he had testified
9  that he came to the dealership on May 30th
10  alone, how would you respond?
11      A.   It's inaccurate information.
12      Q.   And you have no independent
13  recollection of speaking to Ms. Francois on
14  May 30th, correct?
15      A.   I do remember congratulating them
16  after I collected the down payment.
17      Q.   Around what time was that?
18      A.   I don't have a recollection of the
19  time.
20      Q.   Was it still light out, was the sun
21  setting?
22      A.   I don't recall.
23      Q.   Where were you standing when you
24  congratulated them?
25      A.   In Yessica Vallejo's office.

Page 152

S. Orsaris

1
2      Q.   And you were standing, or were you
3  sitting?
4      A.   I don't recall.
5      Q.   Were they standing, or were they
6  sitting?
7      A.   They were sitting.
8      Q.   Did you shake their hands?
9      A.   No.
10      Q.   You probably weren't shaking a lot of
11  hands at that time, were you?  Were you doing
12  the fist bump thing or anything like that, the
13  elbow bump?
14      A.   Early pandemic, no.
15          MR. GOODMAN:  When you reach a point,
16  can we take five minutes, if you want to keep
17  going a little bit, or maybe we can do it now?
18      Q.   What did Ms. Francois look like?
19      A.   Lady of darker complexion than
20  myself, shorter than me, slim.  An inch or two
21  shorter than me and slim.
22      Q.   Do you remember anything about her
23  hair?
24      A.   No, I don't recall.
25      Q.   Do you remember anything about her



Page 153

1          S. Orsaris
2   voice?
3      A.  I don't recall.
4      Q.  And so you don't recall speaking to
5   Ms. Francois other than congratulating her when
6   you took the down payment; is that correct?
7      A.  I don't have a specific recollection,
8   but either David or myself had a conversation
9   with them prior to running the credit.
10     Q.  So when you took the down payment --
11  and how much was the down payment?
12     A.  Total down payment was $9,000.
13     Q.  So when you took the down payment,
14  what did you do when you took the down payment?
15     A.  Store policy is to immediately
16  receive and put away the down payment in the
17  safe.
18     Q.  And where is the safe?
19     A.  In my office.
20     Q.  So you take the down payment, and you
21  go from Ms. Vallejo's office to your office
22  immediately per store policy, correct?
23     A.  Yes.
24     Q.  And you put the money in the safe.
25  What else do you do in regards to the down

Page 154

1          S. Orsaris
2   payment?
3      A.  Receive it.
4      Q.  So you print a receipt?
5      A.  Yes.
6      Q.  And you gave that printed receipt to
7   the Mr. Laforest, correct?
8      A.  Yes.  Well -- yes.
9      Q.  Sorry.  That was "yes"?
10     A.  To both of them.  Yeah.  I don't
11  recall who held on to it.
12     Q.  And you would do that as soon as you
13  printed the receipt, correct, correct?
14     A.  Yes.
15     MS. CATERINE:  Let's take a
16  five-minute break, please.
17     (A recess was taken.)
18     MS. CATERINE:  Mr. Goodman, in
19  regards to the depositions, if we have Mr.
20  Argyropoulos on Monday starting at 2:00 p.m.,
21  could he be available again at 2:00 p.m. the
22  following day on Tuesday, and then we push
23  Diane's deposition to Friday?
24     MR. GOODMAN:  The reason that he
25  wanted to do Monday instead of Tuesday was a

Page 155

1          S. Orsaris
2   conflict he had on Tuesday, so as I am sitting
3   here now, I believe the answer is no; however,
4   I will undertake to inquire of him if there is
5   any possible way we could -- having said that,
6   I am also pointing out that we offered him for
7   five hours on Monday.  If you need him to come
8   back, it would only be for two hours, so I will
9   ask him if we can find two hours on Tuesday for
10  him.  I will make that inquiry so we can try to
11  adhere to your suggestion.  I am not opposed to
12  it.  I have to ask him.
13     MR. KESHAVARZ:  Do you think Patrick
14  can make a call while we are doing this?
15     MR. GOODMAN:  I am not going to be
16  able to do it while this deposition is going
17  on, and I would like to complete this
18  deposition.  It is the day before Thanksgiving.
19  I have to be somewhere this evening, and I
20  would like to proceed.  We can get it figured
21  out.
22     MR. KESHAVARZ:  I would like to get
23  it figured out now and on the record.
24     MR. GOODMAN:  We are not going to be
25  able to -- I want to go forward with this

Page 156

1          S. Orsaris
2   deposition.
3      MR. KESHAVARZ:  You said you would
4   like to start at 2:00.  Does that mean he can
5   start a little bit earlier than 2:00?
6      MR. GOODMAN:  No.  He said he is
7   available, I don't know what it said in the
8   email, but the answer is he is available
9   at 2:00.  We will be available on Monday,
10  November 28, from 2:00 p.m. to 7:00 p.m.
11     MR. KESHAVARZ:  If we are able to
12  switch things around, is the wife available on
13  Friday, the 2nd?
14     MR. GOODMAN:  I'll find out.  I don't
15  know at this point.
16     MR. KESHAVARZ:  You can't find out
17  now?  Patrick can't make a quick call?
18     MR. GOODMAN:  No, I can't.  Can we
19  please proceed with the deposition?
20     MR. KESHAVARZ:  They are court
21  ordered so it would be nice to get this
22  resolved.
23     MR. GOODMAN:  Okay.  Let's go.
24     Q.  Mr. Orsaris, did Mr. Laforest obtain
25  financing for the vehicle on May 30th, 2020?



Page 157

S. Orsaris

1
2        MR. GOODMAN:  Object to form.
3    A.   No.
4    Q.   Did he leave the dealership that day
5  with the vehicle?
6    A.   Yes.
7    Q.   So a consumer can leave Victory
8  Mitsubishi with a vehicle prior to arranging
9  financing?
10        MR. GOODMAN:  Object to form.  Go
11  ahead.
12    A.   There was financing arranged.
13    Q.   I am sorry.  I thought you said there
14  wasn't financing arranged on May 30th.
15    A.   There was financing arranged under
16  what I presume the person he was with,
17  Ms. Farah Francois, or the person that was
18  impersonating her.
19    Q.   I see.  So the financing wasn't for
20  Mr. Laforest; it was for Farah Jean Francois on
21  May 30th?
22    A.   Yes.
23    Q.   And that financing was from Capital
24  One, correct?
25    A.   Correct.

Page 158

S. Orsaris

1
2    Q.   And what documents were given to Mr.
3  Laforest that day?
4    A.   The documents that were given to them
5  that day were the signed retail installment
6  contract, bill of sale, purchase order, in
7  addition to maybe a copy of the CARFAX, copy of
8  the signed warranty; things of that nature.
9    Q.   And those were all in Ms. Francois'
10  name?
11    A.   Yes.
12    Q.   They weren't in Mr. Laforest's name,
13  correct?
14    A.   No.
15    Q.   Around what time did Mr. Laforest
16  leave with the vehicle on May 30th?
17    A.   I don't have a recollection of the
18  specific time.
19    Q.   Do you recall generally what time it
20  was?  Was it nighttime?
21    A.   Maybe the afternoon into nighttime,
22  but I don't know.
23        MR. GOODMAN:  Emma, about
24  scheduling -- I am not trying to be
25  difficult -- can you please send an email of

Page 159

S. Orsaris

1
2  your exact proposal for what the schedule would
3  be after Phil on Monday from 2:00 to 7:00?
4  Just send an email so I will be able to convey
5  exactly what you are looking for.
6    Q.   And May 30th was the only time that
7  Mr. Laforest came into Victory Mitsubishi,
8  correct?
9    A.   No.
10    Q.   What other time did he come into
11  Victory Mitsubishi?
12    A.   June 29 of that year.
13    Q.   And why did he come into the
14  dealership on June 29 of that year?
15    A.   To re-sign the contracts between Ms.
16  Francois and Capital One.  He came back in with
17  what I presume was Ms. Francois.
18    Q.   The contracts were only in her name.
19  Why did he come in?
20    A.   He was one of the drivers of the
21  vehicle, so they both came, what I presume was
22  Ms. Francois.
23    Q.   Why were they re-signing on
24  June 29th?
25    A.   Because in the early part of the

Page 160

S. Orsaris

1
2  pandemic there were a lot of underwriting and
3  program guideline changes, which Capital One
4  had a structural change of some sort, and they
5  required us to invite the customers back into
6  the building to re-sign.
7    Q.   How were customers contacted about
8  this re-signing?
9    A.   We called from the store phone.
10    Q.   Is that call reflected on
11  DealerSocket?
12    A.   No.
13    Q.   Why not?
14    A.   Because the business development
15  center did not call them in.  Either myself or
16  Yessica spoke to them and invited them back in.
17    Q.   Do you have any document reflecting
18  that phone call?
19    A.   We do not.
20    Q.   Who provides the phone service for
21  the phone at Victory Mitsubishi?
22    A.   We use Vonage Business.
23    Q.   Can you spell that, please?
24    A.   V-o-n-a-g-e.  They have a business
25  service that we use.



Page 161

S. Orsaris

1
2     Q.   When you get bills from Vonage, do
3  they give you an itemized list of calls made?
4     A.   No.
5     Q.   Do you have an online account with
6  Vonage for the dealership?
7        MR. GOODMAN:  I am going to object to
8  form. Go ahead.
9     A.   I am sure there is a billing page
10  where we pay.
11     Q.   Would you be able to look up online
12  the calls that were made with your account?
13     A.   No.
14     Q.   Did you try looking for a record of
15  this phone call?
16     A.   The phone calls that are made are not
17  recorded, and it's not like a cell phone where
18  you can produce your records.  It is VoIP,
19  voice over IP.
20     Q.   Can you explain what that is?
21     A.   I don't know the formal definition,
22  but I believe it's voice over IP, which is more
23  like an internet-based phone.
24     Q.   So it's sort of similar to like
25  Google Voice; is that right?

Page 162

S. Orsaris

1
2        MR. GOODMAN:  Object to the form.  Go
3  ahead.
4     A.   I would assume there is some sort of
5  similarities, but -- probably a few.
6     Q.   What happened after Mr. Laforest left
7  Victory Mitsubishi with the vehicle on
8  May 30th?
9        MR. GOODMAN:  Object to the form.
10     A.   Can you rephrase it, please?
11     Q.   I will restate the question.  Some of
12  the documents we are going to look at say the
13  sale was on June 29 rather than May 30th.  Why
14  was that?
15     A.   When they came back, we had to redo
16  the paperwork at the instruction of Capital
17  One, which essentially means the sale date is
18  06/29.
19     Q.   Had you ever sold a vehicle to a
20  consumer and then arranged financing for the
21  vehicle after the consumer had left Victory
22  Mitsubishi with the vehicle?
23        MR. GOODMAN:  Object to the form.  Go
24  ahead.
25     A.   No.

Page 163

S. Orsaris

1
2     Q.   Were you present at this alleged
3  re-signing on June 29, 2020?
4     A.   I was present at the dealership, yes.
5     Q.   And the re-signing happened in Ms.
6  Vallejo's office, correct?
7     A.   Yes.
8     Q.   Were you in her office during the
9  re-signing?
10     A.   I don't recall.
11     Q.   Do you remember Ms. Francois coming
12  to Victory Mitsubishi in September?
13     A.   Yes.
14     Q.   Did she seem upset?
15     A.   Yes.
16     Q.   Was she crying?
17     A.   No.
18     Q.   How did she seem upset?
19     A.   She probably seemed more confused
20  than upset as to how this unraveled.
21     Q.   Where did you speak with Ms. Francois
22  in the dealership?
23     A.   In my office.
24     Q.   Who else spoke with Ms. Francois at
25  the dealership on that day?

Page 164

S. Orsaris

1
2     A.   Potentially the receptionist.
3     Q.   Anyone else?
4     A.   No.
5     Q.   Prior to your preparation for this
6  deposition today, did you talk to Yessica
7  Vallejo about Ms. Francois coming into the
8  dealership in September?
9        MR. GOODMAN:  Objection.  Form and
10  potentially privilege.  If such a conversation
11  happened, and if it happened in the presence of
12  counsel, then I will assert privilege.
13        MR. KESHAVARZ:  Just so I understand
14  what you are saying, if the conversation
15  happened?  You are asserting privilege if the
16  conversation happened?
17        MR. GOODMAN:  I am only going to deal
18  with one attorney here.
19        MR. KESHAVARZ:  I just didn't
20  understand what you were saying.
21        MR. GOODMAN:  Well, that's okay.  I
22  said what I said, and I'm going to --
23     Q.   Do you understand Mr. Goodman's
24  instructions, Mr. Orsaris?
25     A.   I don't.



STAVROS ORSARIS  30(b)(6)30(b) 1                                    November 23, 2022
FARAH J. FRANCOIS vs VICTORY AUTO GROUP LLC                              165–168

Page 165

S. Orsaris

1
2      MS. CATERINE:  Do you want to take a
3  second to explain the privilege issue to him?
4      MR. GOODMAN:  What I am saying is she
5  is asking whether you had a conversation in
6  preparation for this deposition.  That's how I
7  understand the question; if you had a
8  conversation with Yessica about or Farah coming
9  into Yessica's office.  If you had that
10 conversation with Yessica, and I was there if
11 it was in preparation while there was an
12 attorney there, then I am asserting privilege.
13      If you had that conversation without
14 us there, then I am not.
15      THE WITNESS:  I did not have any
16 conversation -- I don't recall a conversation
17 with Yessica Vallejo about this outside the
18 presence of my attorney.
19     Q.   How about with David Perez?
20      MR. GOODMAN:  Same instruction --
21 actually, what is your question?  Conversation
22 about anything, about a specific topic?
23      MS. CATERINE:  Sorry.  Let me clarify
24 the question.
25     Q.   Subject to the instructions given by

Page 166

S. Orsaris

1
2  Mr. Goodman to not divulge any conversations
3  had in front of your attorneys, did you speak
4  with Yessica Vallejo prior to the preparation
5  for this deposition about Ms. Francois coming
6  into the dealership in September of 2020?
7      MR. GOODMAN:  Object to form, but you
8  can answer that.
9     A.   I don't recall.
10     Q.   Prior to your preparation for this
11 deposition, did you ever talk to David Perez
12 about Ms. Francois coming into the dealership
13 in September of 2020?
14      MR. GOODMAN:  Object to form.  Go
15 ahead.
16     A.   I don't recall.
17     Q.   Mr. Perez no longer works at Victory
18 Mitsubishi, correct?
19     A.   He does not work for Victory
20 Mitsubishi at this time, no.
21     Q.   And when did his employment end?
22     A.   June of 2021.
23     Q.   Why did his employment end?
24     A.   He resigned.
25     Q.   Did he put in a two weeks' notice?

Page 167

S. Orsaris

1
2     A.   There was definitely some time before
3  he left.  I don't know the exact time he
4  notified us he was leaving.
5     Q.   Prior to your preparation for this
6  deposition, did you speak to Philip
7  Argyropoulos about Ms. Francois coming into the
8  dealership in September of 2020?
9     A.   No.
10     Q.   And Mr. Laforest brought the vehicle
11 back to Victory Mitsubishi in September of
12 2020, correct?
13     A.   Not to Victory Mitsubishi in terms of
14 the premise.  A block or two down.
15     Q.   Yes.  That's what I was about to ask
16 you.
17      And he notified you that he brought
18 it a block or two down by text message,
19 correct?
20     A.   We spoke on the phone beforehand.  He
21 was afraid I was going to call the police on
22 him, so he said he is going to leave it in a
23 nearby area and let me know where.
24     Q.   And were you going to call the police
25 on him?

Page 168

S. Orsaris

1
2     A.   I didn't think about it.  He did
3  bring me the car.  I didn't see him.
4     Q.   Did you call the police in regards to
5  any of what has transpired with Farah Jean
6  Francois and Emmanuel Laforest and the Victory
7  Mitsubishi dealership?
8     A.   No, but I did tell Ms. Francois that
9  I would work with law enforcement if she
10 requested or if they needed to.
11     Q.   And were you ever contacted by law
12 enforcement?
13     A.   No.
14     Q.   Were you ever contacted by the Kings
15 County District Attorney's Office?
16     A.   No.
17     Q.   Was anyone at Victory Mitsubishi
18 contacted by either the police or the Kings
19 County District Attorney's Office regarding
20 Farah Jean Francois or Emmanuel Laforest?
21     A.   To my knowledge, no.
22     Q.   How did Mr. Laforest have your phone
23 number?
24     A.   Ms. Francois gave me the number when
25 she notified me of the situation in September,



Page 169

S. Orsaris

1  and I called him a few times; got him on the
2  phone.
3
4     Q.  So you called him first, correct?
5     A.  Yes.
6     Q.  Do you remember what day you called
7  him?
8     A.  The same day that Ms. Farah came in.
9  I don't know the date off the top of my head.
10    Q.  And you still have the same cell
11 phone that you used to call him?
12       MR. GOODMAN:  What was the question?
13    A.  The cell phone or something --
14       (Record read.)
15    Q.  The same physical cell phone?
16    A.  No.
17    Q.  Did you have the same cell phone
18 provider at that time that you have today?
19    A.  Yes.
20       MS. CATERINE:  I am going to call for
21 the production of phone records showing phone
22 calls in September of 2020 for Mr. Orsaris'
23 personal cell phone.
24       MR. GOODMAN:  Take it under
25 advisement.

Page 170

S. Orsaris

1
2     Q.  Who retrieved the vehicle and brought
3  it back to you at Victory Mitsubishi?
4     A.  After I received the video, I walked
5  to where the vehicle was, and I drove the
6  vehicle back to the dealership.
7     Q.  Who processed the unwinding of the
8  deal with Capital One?
9        MR. GOODMAN:  Object to the form.
10 You can answer.
11    A.  I don't know.
12    Q.  Have you ever unwound a deal before
13 while working at Victory Mitsubishi?
14       MR. GOODMAN:  Object to the form.
15 You could answer.
16    A.  Yes.
17    Q.  What does that process entail?
18    A.  The person in the building.  We agree
19 to unwind the sale; buyer's remorse, potential
20 mechanical issue or mismanagement of needs.  We
21 would n, and they would give us -- they would
22 reassign the contract, and the terminology is
23 flat cancel, and then you get a specific amount
24 that you have to send in a check to the lender,
25 and that the deal has unwound.

Page 171

S. Orsaris

1
2     If the vehicle is registered, they
3  get back the plates.  If there was a title, if
4  the vehicle was registered and titled, that
5  would be to give them the plates for them to
6  surrender them to the Department of Motor
7  Vehicle, and I would need the title to the
8  vehicle.
9     Q.  How did this process proceed in
10 regards to the vehicle in this case?
11    A.  Spoke to -- when I spoke to Ms.
12 Francois in September, I said, "Can you just
13 give me Emmanuel's number?  When I retrieve the
14 vehicle and I have the car, you can come back
15 in and let's process the cancellation."
16    I recovered the vehicle.  I am not
17 sure how long it was out there, but I tried to
18 call Ms. Francois from my personal cell phone,
19 and I tried to call from the dealership, and I
20 never got ahold of her.
21    Q.  And because you never got ahold of
22 her, you never proceeded with this flat cancel
23 process; is that correct?
24    A.  No.  There would be some sort of
25 signature required in order for me to be able

Page 172

S. Orsaris

1
2  to do so.
3     Q.  Has the vehicle been sold?
4     A.  No.
5     Q.  It's still in your possession?
6     A.  Yes.
7     Q.  In the Mitsubishi lot?  Where is it
8  being stored?
9     A.  In an area where vehicles that are
10 not available for sale.
11    Q.  And that area is in the Mitsubishi
12 lot?
13    A.  Not easily accessible by anyone, but
14 yes.
15       MS. CATERINE:  I am going to call for
16 production of a picture or documents sufficient
17 to show the vehicle in the lot in that
18 location.
19       MR. GOODMAN:  Take it under
20 advisement.
21    Q.  What is your understanding of the
22 current status of the loan regarding the
23 vehicle?
24    A.  I don't know.  I would imagine by now
25 it was canceled by Capital One.



Page 173

1          S. Orsaris
2      Q.   You say you would imagine, but you
3    don't actually know one way or the other; is
4    that correct?
5      A.   I do know by the details associated
6    with the case, yes.  The vehicle is off her
7    credit.  She is not responsible for the car
8    anymore.
9      Q.   Did Capital One contact you about
10   that?
11     A.   No.
12     Q.   Capital One contact anyone at the
13   dealership about that?
14     A.   No.
15     Q.   Why not?
16          MR. GOODMAN:  Object to form.
17     A.   I thought they were going to.  After
18   I did not hear from Ms. Farah, I thought they
19   were going to, and they never did.
20     Q.   What happened to the down payment
21   made by Mr. Laforest?
22     A.   It's still there, still at the
23   dealership in the sense of never got refunded
24   to anyone.
25     Q.   When you say it's still there at the

Page 174

1          S. Orsaris
2    dealership, do you mean it's still in cash in
3    your safe?
4      A.   No.  I mean it has never been
5    refunded.
6      Q.   So what happens -- I know you said
7    you take the cash and you put it in the safe.
8    What happens after that?
9          MR. GOODMAN:  You mean as to the
10   cash, what happens?
11          MS. CATERINE:  That's it.
12     A.   The next morning it's dropped off by
13   myself to the controller, who would prepare it
14   for our banking, and they would just bring all
15   the deposits to the bank.
16     Q.   And so that's what happened with the
17   down payment in this case, correct?
18     A.   Yes.
19     Q.   Did Victory Mitsubishi have an
20   internal investigation about this incident?
21          MR. GOODMAN:  Object to form.  Go
22   ahead.
23     A.   Maybe pull the deal jacket to review
24   to understand how this happened.  It was
25   conducted by myself to try to understand what

Page 175

1          S. Orsaris
2    happened that day.
3      Q.   When did that happen?
4      A.   As Ms. Farah notified me in
5    September.
6      Q.   Did you speak with Philip
7    Argyropoulos about the review you did?
8      A.   No.
9      Q.   Did you speak with Diane Argyropoulos
10   about this review that you did?
11     A.   I don't recall.
12     Q.   I think you mentioned before, if I
13   recall correctly, something along the lines of
14   saying this was a big deal for you because this
15   had never happened before.  Is that correct?
16     A.   Yes.
17     Q.   So if it was such a big deal, why
18   didn't you speak with the owner about it?
19     A.   Because I had an arrangement with Ms.
20   Francois.
21          MR. GOODMAN:  Also, objection.  He
22   didn't say he didn't speak to the owner.  He
23   said "I don't recall."
24     Q.   What arrangement are you referring
25   to?

Page 176

1          S. Orsaris
2      A.   I was going to -- she told me it was
3    her brother-in-law.  I said okay.  I'm going to
4    get the vehicle back, and you are going to come
5    back in, and we are going to cancel out the
6    loan, and she said okay.
7      Q.   You mentioned that she told you that
8    it was her brother-in-law.  Are you saying that
9    that was some sort of sympathetic reason to be
10   discreet, or what did you mean by that?
11          MR. GOODMAN:  Object to form.
12     A.   I don't know what that means.  Can
13   you rephrase your question?
14     Q.   Sure.  I guess I'm just wondering why
15   you said that she told you it was her
16   brother-in-law in response to my question about
17   asking why you didn't talk to Diane about this.
18     A.   That's what she told me that day.
19   She told me that was her brother-in-law.
20     Q.   I would like you to look at what was
21   previously marked as Exhibit 21, Bates stamped
22   Defendants' 1 through, I believe, 36.
23     A.   I have it.
24     Q.   What is this document?
25     A.   The contents inside the deal jacket.



STAVROS ORSARIS  30(b)(6)30(b) 1                                        November 23, 2022
FARAH J. FRANCOIS vs VICTORY AUTO GROUP LLC                             177–180

Page 177

1           S. Orsaris
2     Q.   I am sorry.  I didn't catch all of
3   that.
4     A.   This is the contents, the paperwork
5   that was inside of the deal jacket.
6     Q.   And this first page Bates stamped
7   Defendants' 1, this would be like the cover of
8   the deal jacket, correct?
9     A.   Yes.
10    Q.   Who filled the cover of the deal
11  jacket out?  Who made these handwritten
12  notations?
13    A.   The Capital One was 632, stock
14  number, the phone number is Yessica.  The title
15  clerk or the -- the title clerk is the 716, and
16  then JSE-8212, it looks like my handwriting,
17  which is the plate number.
18    Q.   Why did you write the license plate
19  number on the deal jacket?
20    A.   For ease of reference.
21    Q.   Why was a different phone number
22  being written on this jacket but was then
23  crossed out to write Mr. Laforest's phone
24  number?
25    A.   I don't know.

Page 178

1           S. Orsaris
2     Q.   What does the stamp on here that says
3   posted mean?
4     A.   When the deal is costed out by
5   accounts payable or our accounting department.
6     Q.   What does that -- I think you said
7   costed out?
8     A.   Yes.  Like the finalization of
9   putting it into our record in terms of the
10  purchaser, the warranty clause, costing out the
11  sale.  After everything is all said and done,
12  cost out the sale and put it into storage.
13    Q.   If you go to what was previously
14  marked as Exhibit 18 Bates stamped Defendants'
15  42 through 48.
16    A.   Is that the text messages?
17    Q.   Yes.
18    A.   Got it.
19    Q.   At the bottom of the first page Bates
20  stamped Defendants' 42, it says, "You'll be
21  good to go.  You just have to come in with
22  proof of income, proof of address, and
23  license."
24         What does "You'll be good to go"
25  mean?

Page 179

1           S. Orsaris
2     A.   They should be able to purchase a
3   car.
4     Q.   What kind of proof of income does
5   Victory Mitsubishi want from consumers?
6     A.   It depends if they are employed, a
7   paystub, or if they are self-employed, the last
8   three months of bank statements or their 1099s,
9   tax returns.
10    Q.   You don't recall seeing any proof of
11  income in the deal jacket; is that correct?
12  Feel free to review the document.
13    A.   If it wasn't -- if it's not inside
14  the deal jacket, that means it was probably not
15  required -- it was not required by the
16  financial institution in this transaction.
17    Q.   If you could go back to the text
18  messages and look at the page Bates stamped
19  Defendants' 43.
20    A.   Okay.
21    Q.   It says here, "As per management
22  credit application received need 2,000 to 3,000
23  down or co-buyer."  Do you see that?
24    A.   Yes.
25    Q.   Who is the management being referred

Page 180

1           S. Orsaris
2   to here?
3     A.   Myself.
4     Q.   Had you reviewed the online
5   application submitted by Mr. Laforest, or was
6   that just based on your general rules that the
7   text message says "as per management"?
8     A.   I reviewed.
9     Q.   Let's go to what was previously
10  marked as Defendant's 23, Bates stamped
11  Defendants' 92, single page.
12         MR. GOODMAN:  I am not finding a 92,
13  single page.  What is it?
14         MS. CATERINE:  It is a credit
15  application form, bunch of fields, first name.
16         (Discussion off the record.)
17    Q.   If you could turn to Defendants' 92,
18  the last page.
19    A.   Yes.
20    Q.   What is this document, the last page?
21    A.   This is a screenshot of when you are
22  about to pull someone's credit, so you take the
23  handwritten credit application, fill it out
24  over here on Dealertrack.
25    Q.   So if someone logs into Dealertrack



Page 181

1            S. Orsaris
2   to process a credit application, this would be
3   the form they would fill in, correct?
4       A.  Yes.
5       Q.  On May 30, 2020, who at Mitsubishi
6   could access this form?
7       A.  Myself, David Perez, and the finance
8   managers. David Perez and myself were the ones
9   that were running credit.
10      Q.  This form would have been used to run
11  the credit of Mr. Laforest, correct?
12          MR. GOODMAN:  Object to form.  Go
13  ahead.
14      A.  Yes.
15      Q.  And who filled out this form for Mr.
16  Laforest?
17      A.  Either myself or David Perez.
18      Q.  And who filled out this form for Ms.
19  Francois?
20      A.  Either myself or David Perez.
21      Q.  Do you see the check box on this form
22  that says "I have customer permission to pull a
23  credit report" and so on?
24      A.  Yes.
25      Q.  Why does this form have that check

Page 182

1            S. Orsaris
2   box?
3       A.  Because you need to have permission
4   to pull credit for permissible purpose.
5       Q.  What was the process for whether you
6   could check that check box?
7       A.  A handwritten completed credit
8   application and a conversation by David Perez
9   or myself to make sure you were you and you
10  were looking to purchase a vehicle, your intent
11  to purchase a car.
12      Q.  If you could go to what was
13  previously marked as Exhibit 26.  This is Bates
14  stamped subpoena responses 557, and is also
15  Bates stamped DTI 49.
16          What is this document?
17      A.  Dealer or Dealertrack history of when
18  we ran Emmanuel Laforest's credit.
19      Q.  Prior to your preparation for this
20  deposition today, had you seen this document?
21      A.  I can't recall.
22      Q.  Is this a document you can access
23  from Dealertrack?
24      A.  I don't know.
25      Q.  Generally speaking, for a consumer,

Page 183

1            S. Orsaris
2   can you access the screen on Dealertrack that
3   lists the history of credit pulls like this
4   screen does?
5           MR. GOODMAN:  Object to the form.  Go
6   ahead.
7       A.  I don't know.
8       Q.  Based on that response, I think I
9   know the answer, but have you ever retrieved a
10  screen like this for a consumer with the
11  Dealertrack program?
12      A.  No.
13      Q.  Do you know that Dealertrack was
14  tracking that information?
15      A.  I don't know.
16      Q.  So starting at the bottom, the first
17  entry says "deal jacket created."  Do you see
18  that?
19      A.  Yes.
20      Q.  Next to that entry is the name D.
21  Perez, and that refers to David Perez, correct?
22      A.  Yes.
23      Q.  Based on that entry, and the
24  following entries, you believe it was Mr. Perez
25  who pulled the credit reports of Emmanuel

Page 184

1            S. Orsaris
2   Laforest?
3       A.  Yes.
4       Q.  Because if it had been you who pulled
5   the credit report, it would presumably say S.
6   Orsaris, correct?
7       A.  Yes.
8       Q.  There is a time stamp here of
9   4:38 p.m. on May 30 for the deal jacket being
10  created.  Does that seem like a likely time at
11  which on or around that time Mr. Perez spoke
12  with Emmanuel Laforest for the first time at
13  the dealership?
14          MR. GOODMAN:  Object to form.  If you
15  could indulge me, I am curious about the time
16  zone for that time, but object to form.
17      A.  I don't know.
18      Q.  Do you have any document which would
19  show any other time for when Mr. Laforest's
20  credit was pulled other than 4:39 p.m.?
21      A.  I do not have another document.
22      Q.  Based on this screen, would it be
23  reasonable to presume that there is a similar
24  screen for the pulling of Ms. Francois' credit
25  report?



STAVROS ORSARIS  30(b)(6)30(b) 1                                    November 23, 2022
FARAH J. FRANCOIS vs VICTORY AUTO GROUP LLC                              185–188

Page 185

S. Orsaris

1
2   A.   I am sure there is.
3   Q.   Well, I can represent to you that
4   Dealertrack has not produced such a screen.
5   Why do you think that's the case?
6        MR. GOODMAN:  Object to form.  Go
7   ahead.
8   A.   Human error.  An error, maybe.  I
9   don't know.  You have to ask Dealertrack.
10  Q.   Is there any other way to pull a
11  consumer's credit report other than Dealertrack
12  at Victory Mitsubishi?
13  A.   No.
14  Q.   Do the finance managers use any other
15  software other than Dealertrack?
16  A.   No.
17  Q.   You will see on this document it says
18  time stamped June 20 at 3:08 a.m., adverse
19  action recommended.  Why did it take so long
20  for an adverse action to be recommended for Mr.
21  Laforest?
22       MR. GOODMAN:  Object to the form.
23  A.   It is the system, Dealertrack system.
24  It's a Dealertrack setting where it says D
25  system.

Page 186

S. Orsaris

1
2   Q.   Could you look at the exhibit
3   previously marked as Exhibit 21, Defendants'
4   1 through 36.
5   A.   That's the deal jacket.
6   Q.   Could you turn to Defendants' 2.
7   This is the credit application you were
8   referring to earlier that was filled out on
9   May 30, correct?
10  A.   Yes.
11  Q.   And the handwritten notations above
12  the applicant information that say 10,000 down,
13  3095, 3385, who made those handwritten
14  notations?
15  A.   Anything on the left-hand side it
16  looks like David Perez's handwriting.  On the
17  right-hand side it looks like Yessica's in
18  terms of the notations.
19  Q.   What does the 0/0 mean?
20  A.   You would have to ask David, but I
21  presume the credit score of Emmanuel Laforest.
22  Q.   Based on that, Mr. Laforest was going
23  to have some issues obtaining financing,
24  correct?
25  A.   Depending on the collateral.

Page 187

S. Orsaris

1
2   Q.   And the 10,000 down written here,
3   would that be how much Mr. Laforest had offered
4   to put down, or how much he would need to put
5   down in order to obtain financing?
6   A.   Probably what he wanted to put down.
7   That is David Perez's handwriting.  I don't
8   know for certain.
9   Q.   What does the 3385 that I believe you
10  said was written by Yessica Vallejo, what does
11  that refer to?
12  A.   The stock number of the vehicle under
13  purchase.
14  Q.   And I see also in blue ink there is a
15  checkmark next to Nulls Whole Food.  Was that
16  also made by Yessica Vallejo?
17  A.   I can't say for sure.  I don't know.
18  Q.   And what would that checkmark
19  indicate?
20  A.   You have to ask Yessica.
21  Q.   How would you verify employment
22  information provided in this application?
23       MR. GOODMAN:  Object to the form.  Go
24  ahead.
25  A.   During the credit application

Page 188

S. Orsaris

1
2   process, you ask who their employer is, make
3   sure they list it.  There is a declaration on
4   the bottom that the information that they are
5   writing on this document is accurate.  There's
6   a signature there for Emmanuel, and for what I
7   presume was Ms. Farah.
8   Q.   If you could go to the next page,
9   please.
10  A.   Yes.
11  Q.   What is this document?
12  A.   The receipt.
13  Q.   The receipt for what?
14  A.   $8,600.
15  Q.   And what was that payment for?
16  A.   That was the first collection of the
17  deposit, the down payment.
18  Q.   When you say "the first collection,"
19  what do you mean?
20  A.   We receipted $8,600 initially, and
21  there was $400 later on.  We receipted that as
22  well.
23  Q.   You said you receipted the $400 as
24  well?
25  A.   I assume so.



Page 189

1              S. Orsaris
2      Q.  Has that been produced?
3      A.  No.  I looked for it, couldn't find
4  it, so it could have been human error while
5  inputting.
6      Q.  Where would the human error be; in
7  the receipt or the places such as the retail
8  installment contract that lists the down
9  payment as $9,000?
10         MR. GOODMAN:  Object to the form.  Go
11  ahead.
12     A.  The receipt.
13     Q.  And there is a time stamp for this
14  receipt that says May 30th, 2020, 20:04.  Do
15  you see that?
16     A.  Yes.
17     Q.  Would that time stamp be accurate?
18         MR. GOODMAN:  Object to form.
19     A.  Yes.
20     Q.  So this down payment was receipted at
21  about 8:04 p.m., correct?
22     A.  Yes.
23     Q.  When you said the human error would
24  likely be in the receipt, this was a receipt
25  prepared by you, correct?

Page 190

1              S. Orsaris
2      A.  Yes.
3      Q.  So it was likely your error, correct?
4          MR. GOODMAN:  Objection.  That
5  mischaracterizes.  Object to the form.
6      Q.  You can answer.
7      A.  I don't recall exactly what happened.
8  My understanding, it must have been a human
9  error.  David Perez holds those receipts, and
10  so does the finance managers.
11         MR. GOODMAN:  I think he is saying
12  there may be another error in the --
13         MS. CATERINE:  I understand.  His
14  testimony can speak for itself.
15     Q.  I thought you had testified that you
16  remembered collecting the down payment and
17  receipting it; isn't that correct?
18     A.  I collected the initial part of the
19  down payment, and it is store policy to
20  immediately put it inside the safe.  If someone
21  has $400, in this case $400 later on, be it an
22  hour, half hour, 15 minutes, it doesn't matter.
23  The initial portion, I receipted it.
24     Q.  I see.  So you are saying someone
25  else may have receipted the $400, and that may

Page 191

1              S. Orsaris
2  have been misplaced or lost or something like
3  that?
4      A.  Yes.
5      Q.  But I seem to recall that you
6  remembered receiving $9,000 in a down payment.
7  Isn't that right?
8          MR. GOODMAN:  Object to form.
9      A.  I collected the biggest portion of
10  the down payment.
11     Q.  So your testimony isn't that you
12  collected $9,000, but you collected a large
13  portion of $9,000; is that correct?
14     A.  I don't recall being the one that
15  collected that last $400.  It could be
16  possible.  I don't recall.
17     Q.  And you can't recall because this was
18  over two years ago, so your memory is not going
19  to be great?
20         MR. GOODMAN:  Object to form.
21     A.  I just don't recall.
22     Q.  Let's look at what was previously
23  marked as Exhibit 27, Bates stamped Subpoena
24  Responses 566, also Bates stamped DTI 58.
25         MR. GOODMAN:  566?

Page 192

1              S. Orsaris
2          MS. CATERINE:  Subpoena Responses
3  566, single page.
4      Q.  What is this document?
5      A.  Similar document to what we just went
6  over a few minutes ago for Jami Singer.
7      Q.  Who is Jami Singer?
8      A.  I don't know.
9      Q.  Let's turn to Exhibit 25 Bates
10  stamped Defendants' 70 through 72, the iPhone
11  screenshots.
12     A.  I have it.
13     Q.  When were these screenshots made?
14     A.  Around the beginning when we were
15  requested to produce documentation at some
16  point early on.
17     Q.  And they were made with the phone
18  that you had in September of 2020; is that
19  correct?
20     A.  That is not correct.  My current
21  phone, I save every text message ever sent.
22     Q.  So the text messages from your old
23  phone were imported into your new phone; is
24  that right?
25     A.  All text messages are saved in



STAVROS ORSARIS  30(b)(6)30(b) 1                      November 23, 2022
FARAH J. FRANCOIS vs VICTORY AUTO GROUP LLC                      193–196

Page 193

S. Orsaris

1
2    iCloud, so I don't use the terminology
3    transported over.  I save it in iCloud, the
4    date I received the text messages.
5        Q.   Do you see the driver's license here?
6        A.   Yes.
7        Q.   Do you see it is the driver's license
8    of someone named Jami Singer?
9        A.   Yes.
10       Q.   Why was Mr. Laforest texting you a
11   picture of the driver's license and Social
12   Security number of Jami Singer?
13       A.   After my first conversation with him,
14   he told me what happened, and then he requested
15   to move the loan over to her name.
16       Q.   Let's go back to the document we
17   were just looking at, the one Bates stamped
18   subpoena responses 566.
19       A.   Okay.
20       Q.   And so this document indicates that
21   Ms. Singer's credit was run on May 30th,
22   correct?
23       A.   Yes.
24       Q.   And it was run by Yessica Vallejo,
25   correct?

Page 194

S. Orsaris

1
2        A.   Yes.
3        Q.   I thought you said that only you or
4    David Perez would be running consumer's credit
5    reports?
6        MR. GOODMAN:  Object to the form.
7    Mischaracterizes his testimony.  You can
8    answer.
9        A.   Definite mischaracterization.  I did
10   state very early that finance managers do have
11   the appropriate training to run credit.
12       Q.   But I think you said something along
13   the lines of you were certain that on May 30th,
14   the only people who would be running consumers'
15   credit reports would be you and Mr. Perez.
16   Isn't that correct?
17       MR. GOODMAN:  Object to form.
18       A.   99 percent the credit was ran by me
19   or David.  Again, I said very early on, all of
20   my finance managers have the appropriate
21   training to run credit.
22       Q.   Why would Ms. Vallejo run the credit
23   in this case if normally it would be you or Mr.
24   Perez?
25       MR. GOODMAN:  Object to form.

Page 195

S. Orsaris

1
2        A.   I don't know.
3        Q.   Prior to preparation for your
4    deposition today, were you aware that Ms.
5    Vallejo had run the credit of Ms. Singer on
6    May 30, 2020?
7        A.   I was not -- I don't know.
8        Q.   And you said that you recalled two
9    people coming into the dealership, correct?
10       A.   We ran Jami Singer's credit.  That
11   means she was present inside the building.
12       MS. CATERINE:  Strike the
13   nonresponsive answer to the question.
14       Q.   Did you previously testify that you
15   remember two people coming into the dealership,
16   Emmanuel Laforest and someone who you assumed
17   was Farah Jean Francois?
18       A.   Keep the same answer.  If the credit
19   was run, she was in the building.
20       MS. CATERINE:  Can you please
21   instruct your witness to answer the question?
22       MR. GOODMAN:  No, I won't do that,
23   but I will ask him to listen to --
24       MS. CATERINE:  Please read back the
25   question.

Page 196

S. Orsaris

1
2    (Record read.)
3        A.   I testified that I remember them
4    inside the office, two people inside of the
5    office when I collected the down payment.
6        Q.   Okay, great.  Not three people?
7        A.   Inside of the office discussing the
8    transaction, it was two people.
9        Q.   Since Jami Singer's credit was run by
10   Ms. Vallejo, there should be a credit
11   application for her, correct?
12       MR. GOODMAN:  Object to the form.  Go
13   ahead.
14       A.   If she did not purchase a car, we did
15   not create a deal jacket, and we did not store
16   her credit application.
17       Q.   Sorry.  What was the end of your
18   answer?
19       A.   We did not create a deal jacket, and
20   therefore we did not store any credit
21   application.  It doesn't even say here that we
22   submitted her to a lender.
23       Q.   Would you have any records regarding
24   Ms. Singer such as in Dealertrack?
25       MR. GOODMAN:  Object to form.  Go


ESQUIRE
DEPOSITION SOLUTIONS

Page 197

1          S. Orsaris
2    ahead.
3        A.  I don't know.
4            MS. CATERINE:  Call for the
5    production of all records in Victory
6    Mitsubishi's possession, custody or control
7    regarding Jami Singer.
8            MR. GOODMAN:  Take it under
9    advisement.
10       Q.  Do you ever ask the consumer if they
11   can get a co-applicant?
12           MR. GOODMAN:  Object to the form.  Go
13   ahead.
14       A.  Yes.
15       Q.  Did you ask Mr. Laforest if he could
16   get a co-applicant?
17       A.  Either myself or David Perez did.  I
18   don't recall which one of us did.
19       Q.  And you determined that Jami Singer
20   was not a suitable co-applicant, correct?
21           MR. GOODMAN:  Object to the form.
22   Mischaracterizes.
23       Q.  Mr. Laforest wanted Jami Singer to be
24   a co-applicant, correct?
25           MR. GOODMAN:  Object to the form.

Page 198

1          S. Orsaris
2        A.  To my knowledge, he wanted his
3    sister-in-law to be the co-applicant.
4        Q.  And that is based on the credit
5    application, correct?
6        A.  That's what he told me in September.
7        Q.  Let me ask you, if Mr. Laforest
8    applied for credit with Ms. Singer and then
9    applied for credit with Ms. Francois and then
10   obtained the vehicle, would the credit
11   application with Ms. Singer as the co-applicant
12   be retained?
13           MR. GOODMAN:  Objection to the form.
14   Go ahead.
15       A.  There was no application submitted
16   with Ms. Jami Singer being an applicant or
17   co-applicant.  There was credit pulled, as you
18   can see from this document, but there was no
19   submission.
20       Q.  So why was her credit pulled?
21       A.  I can't recall.
22       Q.  What reason would there be for credit
23   to be pulled at Victory Mitsubishi if a
24   consumer had not filled out a credit
25   application?

Page 199

1          S. Orsaris
2        A.  In order for us to run credit at
3    Victory Mitsubishi, you have to fill out a
4    credit application.
5        Q.  So Ms. Singer did fill out a credit
6    application?
7        A.  I would presume so.  I ran her
8    credit, it seems, or someone in my building
9    when I say "I" ran her credit.
10       Q.  And you don't know if she filled out
11   that application with a co-applicant, correct?
12       A.  I can't say for certain.
13           MR. GOODMAN:  Emma, we are about to
14   hit 5:00 o'clock, which is seven hours.  If we
15   add half an hour for lunch --
16           MS. CATERINE:  Off the record,
17   please.
18           (A recess was taken.)
19       Q.  Let's take a look at an exhibit which
20   I am having marked as Exhibit 29.  This was not
21   previously marked.  It is Bates stamped
22   Subpoena Responses 515 through Subpoena
23   Responses 533.
24           (Subpoena Responses 515 through
25   Subpoena Responses 533 marked Exhibit 29.)

Page 200

1          S. Orsaris
2        Q.  Mr. Orsaris, what is this document?
3        A.  The first one?
4            MR. GOODMAN:  The whole thing.
5        A.  Submissions under her name, Ms. Farah
6    Francois' name.
7        Q.  What is the first page of the
8    document?
9        A.  An approval from Capital One Auto
10   Finance in Ms. Farah Jean Francois' name.
11       Q.  And do you see the row where it says
12   approval date and it gives the approval date as
13   May 30, 2020, 3:59 p.m.?
14       A.  Yes.
15       Q.  Do you remember the document we
16   looked at before where it showed Mr. Laforest's
17   credit being run at 4:38 p.m.?
18       A.  You have to make sure it is on the
19   record that these time stamps are questionable
20   in the sense of time zones.
21       Q.  We can discuss that in a second, but
22   do you recall the document that shows
23   4:38 p.m.?
24       A.  Sure, yes.
25       Q.  So your explanation for why this



Page 201

1              S. Orsaris
2  approval comes before Mr. Laforest's credit was
3  run is time zone difference; is that right?
4          MR. GOODMAN:  Object to form.  Go
5  ahead.
6      A.  I think there is clear indication in
7  Dealertrack that the time stamps are inaccurate
8  if you look at the credit pulls.  It even says
9  extremely late times, which is just inaccurate.
10  The time stamps are not accurate.
11      Q.  What do you mean?  I'm sorry.  Could
12  you --
13      A.  These time stamps throughout the
14  various documents that Dealertrack gave in the
15  subpoena are not accurate.  They are all over
16  the place.
17      Q.  What do you mean they are all over
18  the place?
19      A.  They are at different times.
20      Q.  What about them being at different
21  times shows that they are inaccurate?
22      A.  It later states that they ran Farah
23  Jean Francois' credit very late that night or
24  something like that, and that's just not true.
25      Q.  Can you point to where in the

Page 202

1              S. Orsaris
2  documents it shows that?
3      A.  In her credit report, Defendants' 37,
4  it says that her credit pull time was at
5  8:55 p.m., which is after this document that
6  you just asked me to pull, and that credit
7  inquiry would have been here, and it is not, so
8  Dealertrack is having a time issue with the
9  time stamps, and I would like to put that on
10  the record.
11      Q.  Hold on.  We are going to get to
12  that.  So you are referring to the document
13  Bates stamped Defendants' 37 which was
14  previously marked Exhibit 22, Defendants' 37
15  through 40.  Where on this page does it show
16  the time that the credit report was pulled?
17      A.  Defendants' 38 has the time.  I
18  apologize.
19      Q.  That's okay.  So you are referring to
20  the time stamp on bureau pull date, and it says
21  May 30, 2020, 8:55 p.m.  That's what you are
22  referring to, correct?
23      A.  Yes.
24      Q.  And you said Dealertrack, correct?
25      A.  This is all Dealertrack, yes.

Page 203

1              S. Orsaris
2      Q.  This Experian credit report is from
3  Dealertrack, correct?
4      A.  Yes.
5      Q.  Why do you think this time is
6  inaccurate?
7      A.  It would show the pulls or
8  submissions that were in Subpoena Response 515.
9  It clearly says in Subpoena Response 515
10  3:59 p.m., and if I pulled the credit
11  afterwards, it would have been listed as a
12  credit inquiry, and it's not, so there is a
13  clear indication that the time stamps are not
14  reliable in Dealertrack software.
15      Q.  Hold on.  You are going to have to go
16  a little bit slower for me.  What is step one
17  here?
18      A.  On subpoena response 515, you see on
19  5/30/2020 at 3:59 p.m., we submitted the loan
20  application to Capital One.
21      Q.  Yes.
22          MR. GOODMAN:  Let her -- go ahead.
23      A.  On Defendant's 38 on her credit
24  report, it says that we pulled it at 8:55 p.m.
25          Then if the time stamps on

Page 204

1              S. Orsaris
2  Dealertrack software are correct, the credit
3  inquiry on Capital One Auto Finance would have
4  shown on the inquiry section of Defendants'
5  37.
6      Q.  Interesting.  So a possible
7  explanation for the time difference was
8  different time zone, correct?
9          MR. GOODMAN:  That's kind of
10  something I said.
11      A.  I use the word time zone, but I
12  really don't know why that is, but I would
13  really like to state if I ran the credit at
14  eight p.m., it would have shown in submissions
15  that you see throughout the subpoena response
16  515, 553 and everything else.
17      Q.  Unless her credit report was pulled
18  more than once, correct?
19      A.  If I had pulled it at 8:55 p.m., it
20  would have shown the inquiries.
21      Q.  Sure, but it could have been pulled
22  earlier, correct?
23      A.  It was definitively pulled before.
24      Q.  Sure.  That credit report was pulled
25  at 8:55 p.m., at least according to the Bates



Page 205

1            S. Orsaris
2   stamp, but a credit report would have been
3   pulled earlier than that, correct?
4        A.   No.  It would list Victory Mitsubishi
5   as a credit inquiry.
6        Q.   What would list Victory Mitsubishi as
7   a credit inquiry?
8        A.   On Defendants' 37, if I pulled her
9   credit multiple times, which there is
10  absolutely no reason to ever do that, it would
11  list Victory Mitsubishi as a credit inquiry.
12       Q.   You mean like it does on Defendants'
13  39?
14       A.   Yes.  So the TransUnion will show it.
15  The TransUnion shows it.  The TransUnion gives
16  an in-time report.
17       Again, if I ran the bureaus multiple
18  times, I would have seen on the TransUnion --
19  I see where you are going -- on the TransUnion
20  it would have shown all the submissions on
21  Subpoena Responses 515 all the way over.  This
22  report was not pulled multiple times.  I want
23  to make sure you are clear.
24       MS. CATERINE:  I am going to mark
25  another exhibit as Exhibit 30.  This is Bates

Page 206

1            S. Orsaris
2   stamped Subpoena Responses 513.  This one is a
3   single page.  I double checked.  It really is a
4   single page.
5        (Subpoena Responses 513 marked
6   Defendants' Exhibit 30.)
7        A.   Yes, I have this.
8        Q.   What is this document?
9        A.   Dealertrack has software to help make
10  sure that the person that is in front of you is
11  really them.
12       Q.   I think I recall seeing a check box
13  for red flag/OFAC on that credit report form
14  that we looked at earlier; is that correct?
15       A.   Yes.  It's not a clickable thing,
16  though.  It is automatically clicked.
17       Q.   I thought that was the case.  And do
18  you see the time stamp here of May 30, 2020,
19  16:55:48?
20       A.   Yes.
21       Q.   And do you think that time stamp is
22  inaccurate?
23       A.   I don't know.  I don't recall the
24  time that we worked this transaction.
25       Q.   And this is a Dealertrack document,

Page 207

1            S. Orsaris
2   correct?
3        A.   Dealertrack provided this document.
4   I don't know if this is proprietary Dealertrack
5   software or an outsourced software to run.
6        Q.   That's fine.  Going back to the
7   credit application filled out in May, the phone
8   number was the same for both Mr. Laforest and
9   Ms. Francois.  Why was that?
10       MR. GOODMAN:  You are talking about
11  this subpoena --
12       MS. CATERINE:  This would be
13  Defendant's 2 from the deal jacket.
14       A.   I don't know why that phone number is
15  listed there.
16       Q.   If you see co-applicants who have the
17  same phone number, are you going to ask them
18  about that?
19       A.   The box says home phone number, and
20  they have the same address as well.  I didn't
21  have any reason to specifically ask them for a
22  cell phone number, and they have the same
23  address for about seven years and five months.
24       Q.   When Mr. Laforest returned to the
25  dealership for the re-signing, another credit

Page 208

1            S. Orsaris
2   application was done, correct?
3        A.   Another handwritten credit
4   application?
5        Q.   No.  Just another credit application.
6        MR. GOODMAN:  Object to the form.  Go
7   ahead.
8        A.   The initial credit application is
9   stored and can be reused.
10       Q.   Could you take a look at what was
11  previously marked as Exhibit 21, Bates stamped
12  Defendants' 19 through 21.
13       MR. GOODMAN:  Where is it?
14       MS. CATERINE:  It is in the deal
15  jacket.
16       Q.   What is this document?
17       A.   Printout of a document submitted, the
18  credit application form that was used.
19       Q.   Why was this credit application used
20  when you said the May credit application was
21  stored and could have been used again?
22       A.   This is definitively -- this is the
23  same credit application.
24       Q.   It is?
25       A.   I am confused where you are going.



Page 209

S. Orsaris

1
2 Can you rephrase the question?
3      Q.   If this is the same credit
4 application, why does it say time at address
5 ten years rather than as you previously read
6 seven years?
7      A.   I don't know, but that does not have
8 any meaningful difference to Capital One, so I
9 wouldn't know why it would be different.
10     Q.   Why is the employment information
11 different in this application than on the May
12 application?
13     A.   What's different?
14     Q.   You do not see anything different?
15     A.   Are you referring to the salary?
16     Q.   I am.
17     A.   If I am not mistaken, the after-tax
18 amounts were listed as the gross income on the
19 handwritten credit application. Lenders want
20 to look at the gross income before any taxes,
21 deductions; not the after-tax amount.
22     Q.   So that is a gross income on the May
23 application, and then in this application, it's
24 the pre-tax income.
25     A.   I think May was post-tax income, this

Page 210

S. Orsaris

1
2 is pre-tax income.  Lenders want to work with
3 the pre-tax income.
4      Q.   There is a work phone number listed
5 here.  Where did that information come from?
6 It's not in the May application.
7      A.   If there is anything missing, the
8 finance team at Victory Mitsubishi posed to the
9 customer and asked them what is -- whatever is
10 missing.
11         So I would presume that Yessica left
12 her office and went to Farah Jean In May and
13 asked her what the work phone number is, and
14 maybe she asked to confirm the credit
15 information prior to submitting it.
16     Q.   Did Victory Mitsubishi call this work
17 phone number to confirm Ms. Francois'
18 employment?
19     A.   No.
20     Q.   How do you know that?
21     A.   It would probably be indicated
22 somewhere if they did.  In this transaction,
23 there was no requirement by Capital One for us
24 to produce or ask the customer to produce
25 income documentation.

Page 211

S. Orsaris

1
2      Q.   Why was it -- were you finished?
3      A.   I think it is important to put on the
4 record, usually that means they are making some
5 sort of internal notation that the person may
6 be working there.  That's why they didn't ask
7 us for any income documentation.
8      MR. GOODMAN:  What did you just say?
9      THE WITNESS:  Lenders have tools to
10 determine the -- know whose people's employers
11 are, or potentially.
12     Q.   Why wasn't Emmanuel Laforest a
13 co-applicant on this application?
14     MR. GOODMAN:  You are looking at
15 Defendants' 19, right?
16     MS. CATERINE:  Yes.
17     A.   Emmanuel Laforest is not listed as a
18 co-applicant at the request -- I would imagine
19 it would have been at the request of both
20 parties, both folks that were there that day.
21 Emmanuel Laforest, and who would I presume is
22 Farah Jean Francois, or an impersonator of
23 Farah Jean Francois.
24     Q.   Isn't that strange, that they would
25 have submitted an application together, and

Page 212

S. Orsaris

1
2 then Mr. Laforest would request to not be on
3 the vehicle?
4      A.   I did not say it was just Emmanuel
5 Laforest.  It could have been Ms. Farah
6 Francois.  They may have potentially asked "Can
7 I have the lowest possible payment," and they
8 live together.
9      Q.   Can you turn to Defendants' 9 in
10 Exhibit 21.
11     A.   Okay.
12     Q.   The signatures for Victory Mitsubishi
13 here, whose signatures are those?
14     A.   To the left is Yessica Vallejo, and
15 the biller at the time.
16     Q.   The biller, you said?
17     A.   The person that prepared the
18 registration paperwork.
19     Q.   And what was that person's name?
20     A.   Based off these signatures, I don't
21 know.
22     Q.   Do you see the dates written in here
23 6/29/20?
24     A.   Yes.
25     Q.   Those appear to be in the same



Page 213

1          S. Orsaris
2    handwriting, correct?
3          MR. GOODMAN:  Object to form.  Same
4    as what?
5      A.  I'm sorry.  What was the question?
6      Q.  The two writings of 6/29/20 appear to
7    be in the same handwriting, correct?
8          MR. GOODMAN:  Object to the form.  Go
9    ahead.
10     A.  I guess so.
11     Q.  Can you turn to Defendants' 13,
12   please.  What is this document?
13     A.  The warranty contract.
14     Q.  And who filled this out?
15     A.  Yessica Vallejo.
16     Q.  And the email address listed for Ms.
17   Francois here is francois@gmail.com.  That's
18   not Ms. Francois' email address, correct?
19     A.  I don't know.
20     Q.  Did Victory Mitsubishi try emailing
21   that email address?
22     A.  No.
23     Q.  I would take you to take a look at
24   what I am marking as Exhibit 31, Bates stamped
25   Francois 3906 to 3907.

Page 214

1          S. Orsaris
2          (Document Bates 3906 - 3097 marked
3    Defendants' Exhibit 31.)
4      Q.  Are you familiar with this website,
5    email-checker.net?
6      A.  No.
7      Q.  Does Victory Mitsubishi verify emails
8    provided by consumers?
9      A.  They can verify with the consumer,
10   but we don't verify with a tool like that.
11     Q.  Who at Victory Mitsubishi made up
12   this fake email address?
13         MR. GOODMAN:  Object to the form.
14   That's crazy.  Objection.
15     Q.  Go ahead and answer the question.
16     A.  It is our process to ask the customer
17   what is your email address, and we put down
18   whatever is provided by the customer, in this
19   case what we presume is Farah Jean Francois, or
20   whoever was impersonating Farah Jean Francois
21   gave us that email.
22     Q.  Why was it a different email address
23   that was previously provided to you such as in
24   the May credit application?  I might be
25   mistaken.  Maybe it wasn't given in the May

Page 215

1          S. Orsaris
2    credit application.
3      A.  I don't see an email in the May
4    credit application.
5      Q.  Turn, if you could, please, to
6    Defendants' 10.  Do you see the email address
7    listed here Alpo0220@gmail.com?
8      A.  Yes.
9      Q.  I believe you previously testified
10   that you recognize this email address as the
11   email address affiliated with the transaction,
12   correct?
13         MR. GOODMAN:  Object to form.
14     A.  That is the email address that was
15   given when we were completing this document.
16     Q.  Again, why is there a different email
17   address on the service contract, the
18   Francois@gmail.com email address?
19     A.  You would have to ask Emmanuel
20   Laforest and you can ask Farah Jean Francois,
21   but I don't know why they would provide me with
22   two different email addresses.
23         MR. GOODMAN:  You have three minutes
24   to go.
25         MR. KESHAVARZ:  Can we go off the

Page 216

1          S. Orsaris
2    record for a quick second, please?
3          (Discussion off the record.)
4      Q.  Mr. Orsaris, you said Verizon was
5    your cell phone provider, correct?
6      A.  Yes.
7      Q.  Was Chris Orsaris in the office when
8    Ms. Francois spoke with you in September 2020?
9          MR. GOODMAN:  Object to form.  Go
10   ahead.
11     A.  No.
12     Q.  Do any father and son work at the
13   dealership?
14         MR. GOODMAN:  Object to form.  Go
15   ahead.
16     A.  No.
17     Q.  You mentioned a CARFAX report, and I
18   didn't see one in the deal jacket.  Was a
19   CARFAX report produced?
20     A.  We have an account with CARFAX.  It's
21   producible at any time.  I don't know if it was
22   produced at that time.
23         MS. CATERINE:  We call for the
24   production of any CARFAX report to the extent
25   that it exists.



Page 217

1          S. Orsaris
2          MR. GOODMAN:  Take it under
3    advisement.
4          Q.   And you said employees from Victory
5    Auto Group to Victory Mitsubishi, but
6    operations did not move from Victory Auto Group
7    to Victory Mitsubishi.  What did you mean by
8    that?
9          MR. GOODMAN:  Object to the form.
10   Mischaracterizes.  Go ahead.
11         A.   A new car dealership versus a premier
12   dealership are two different operations.  We
13   became a new car franchise, so of course
14   operations ceased.
15         Q.   Any other change besides that?
16         MR. GOODMAN:  Object to the form.
17         A.   Installation of Mitsubishi as a
18   franchise.  Of course a lot of changes, but
19   when Mitsubishi signs up, Mitsubishi is around.
20         Q.   So Diane did not have a Mitsubishi
21   franchise prior to Victory Mitsubishi; is that
22   correct?
23         MR. GOODMAN:  Object to the form.
24         A.   I don't know the structure of
25   Larchmont Mitsubishi, so I don't know.

Page 218

1          S. Orsaris
2          Q.  But Victory Auto Group was not a
3    Victory Mitsubishi franchise; is that correct?
4          A.  No.
5          MR. GOODMAN:  No, that is not
6    correct?
7          THE WITNESS:  No, that is not
8    correct.
9          Victory Auto Group is not a
10   Mitsubishi franchise.
11         MR. GOODMAN:  You are over time now,
12   and I would not be difficult now if Ahmad had
13   not done what he did yesterday.
14         We are not ordering the transcript.
15         (Time noted:  5:42 p.m.)
16
17   Subscribed to and sworn  _____
18   To before me this       Stavros Orsaris
19   _____ day of _____,20  .
20
21   _____
22   Notary Public
23
24
25

Page 219

1
2                    INDEX TO TESTIMONY
3    WITNESS                 BY                  PAGE
4    Stavros Orsaris    Ms. Caterine             4
5
6                    INDEX TO EXHIBITS
7    DEFENDANTS'       DESCRIPTION               PAGE
8    Exhibit 28   Subpoena responses 463 to 484   97
9    Exhibit 29   Subpoena Responses 515 to 533  199
10   Exhibit 30   Subpoena Responses 513         206
11   Exhibit 31   Document Bates 3906 - 3097     214
12
13         DOCUMENTS AND INFORMATION REQUESTS
14   DESCRIPTION                                 PAGE
15   Records re:  dates of calls related to case  15
16   Customer profiles on DealerSocket of        111
     Emmanuel Laforest, Farah Jean Francois,
17   Jami Singer, and any other customer profiles
     related to the sale of the vehicle
18
     Production of entire overview from          134
19   DealerSocket
20   Phone records showing phone calls in        169
     September of 2020 for Mr. Orsaris' personal
21   cell phone
22   Picture or documents sufficient to show the 172
     vehicle in the lot
23
     All records in Victory Mitsubishi's         197
24   possession, custody or control regarding
     Jami Singer
25

Page 220

1
2               CERTIFICATION
3       I, HELENE GRUBER, a New York State
4    certified shorthand reporter, hereby certify that
5    the foregoing transcript is a
6    complete, true and accurate transcript in the
7    matter of Francois v. Victory Auto Group et al
8    held on November 23, 2022.
9       I further certify that this
10   proceeding was reported by me and that the
11   foregoing transcript was prepared under my
12   direction.
13
14
15
16   Date: December 3, 2022
17
18
19
20
21
22
23   _____
24         HELENE GRUBER
25



Page 221

```
 1
 2   Our Assignment No.  J8893716
 3   Case Caption: Francois
 4   vs.  Victory Auto Group et al
 5   DECLARATION UNDER PENALTY OF PERJURY
 6       I declare under penalty of perjury
 7   that I have read the entire transcript of
 8   my Deposition taken in the captioned matter
 9   or the same has been read to me, and
10   the same is true and accurate, save and
11   except for changes and/or corrections, if
12   any, as indicated by me on the DEPOSITION
13   ERRATA SHEET hereof, with the understanding
14   that I offer these changes as if still under
15   oath.
16   _____
17   Stavros Orsaris
18   Subscribed and sworn to on the _____ day of
19   _____, 20____ before me,
20
21   _____
22   Notary Public,
23   in and for the State of _____
24
25
```

Page 223

```
 1
 2            DEPOSITION ERRATA SHEET
 3   Page No._____Line No._____Change to:_____
 4   _____
 5   Reason for change:_____
 6   Page No._____Line No._____Change to:_____
 7   _____
 8   Reason for change:_____
 9   Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21
22   SIGNATURE:_____DATE:_____
23            Stavros Orsaris
24
25
```

Page 222

```
 1
 2            DEPOSITION ERRATA SHEET
 3   Page No._____Line No._____Change to:_____
 4   _____
 5   Reason for change:_____
 6   Page No._____Line No._____Change to:_____
 7   _____
 8   Reason for change:_____
 9   Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20
21
22   SIGNATURE:_____DATE:_____
23            Stavros Orsaris
24
25
```

