

575 E. Locust Ave., Suite 103  Fresno, CA 93720
Phone (800) 448-0183  Fax (559) 226-2256
www.creditbureauconnection.com

**CONFIDENTIAL**

# SUBSCRIBER APPLICATION
(Please type or print)

Company Name: Spartan Auto Group LLC            Date of Application: 10/21/2019

DBA (if applic.): Victory Mitsubishi             Main/Sales Phone #: (718) 515-4660

Physical Address: 4070 Boston Road               Business Phone #: (718) 515-2277

  BRONX, NY  10475                               Fax Phone #: (718) 515-6440

Billing Address (if different): 4070 Boston Road, BRONX, NY  10475

Company Website URL: https://www.victorymitsubishi.com/        No Website: ☐

Describe the nature of the company's business: Vehicle Sales

Type:  ☒ Auto-New   ☐ Auto-Used   ☐ R.V.   ☐ Motorcycle   ☐ Other: _____

Describe how Credit Information will be used: To evaluate the credit of customers for consumer loans or leases

Business Classification:  ☐ Corporation   ☒ LLC   ☐ Partnership   ☐ Sole Proprietor   ☐ _____
*(For TransUnion service, if Partnership or Sole Proprietor, must supply copy of owner's government issued photo ID and by signing below you are providing written consent to obtain a copy of your personal credit report)*

Federal Tax ID: 814895257        Est. # of Monthly Inquiries: 1000    Time in Business: 1 / 9
                                                                          (years/months)

Desired Credit Reports:   ☒ Experian          ☒ TransUnion         ☐ Equifax         ☐ Clarity
                          ☐ Experian PreQual  ☐ TransUnion PreQual ☐ Equifax PreQual ☐ TWN

Primary Contact: Diane Argyropoulos              Email Address: diane@VICTORYMITSUBISHI.COM

Title: member                                    Phone Number: (718) 515-2277

Additional Contact: Maria Soures                 Email Address: marias@VICTORYMITSUBISHI.COM

Title: _____                                  Phone Number: (718) 515-2277

Accts. Payable Contact: Melissa Gaj              Email Address: melissa@victoryautogroup.com

                                                 Phone Number: (718) 515-2277

On-site Contact: _____                        Email Address: _____

                                                 Phone Number: _____

**The following must be completed by an authorized representative of the company**

I certify that the above information is complete and accurate. This Subscriber Application is submitted together with an executed Subscriber Service Agreement and Subscriber guarantees full and prompt payment of all sums due.

Authorized Officer: diane argyropoulos           Title: member

Signature: *diane argyropoulos*                  Date: 10/24/2019

Email Address: diane@VICTORYMITSUBISHI.COM       DOB: _____



**CONFIDENTIAL**

575 E. Locust Ave., Suite 103  Fresno, CA 93720
Phone (800) 448-0183  Fax (559) 226-2256
www.creditbureauconnection.com

# SUBSCRIBER SERVICE AGREEMENT

This Subscriber Service Agreement and the attached exhibits (together, the "**Agreement**") entered into on  10/21/2019  by Credit Bureau Connection, Inc., hereinafter known as "**CBC**", and  Spartan Auto Group LLC / Victory Mitsubishi  ("**Subscriber**") (CBC and Subscriber are collectively referred to herein as the "**Parties**" and individually as a "**Party**"), agree as follows:

CBC may provide various information services, which may include but are not limited to: credit reports, credit scores, credit report related products, consumer reports, liens and judgements data, motor vehicle data, employment or income verification reports, third party data services, credit report compliance products such as: Red Flag Rules, identity verification, OFAC screening, risk based pricing exception notice disclosures, adverse action notices, Military Lending Act screening, and other related compliance products, as well as software products, software interfaces, and other related software services; individually and collectively referred to as "**Information Services**".  The Subscriber agrees to the terms and conditions set forth in this Agreement.  If there is a conflict between the general terms and conditions of this Agreement and any exhibit, the provisions of the exhibit will govern and control.  This Agreement applies to every kind of information, software or service provided by CBC to Subscriber, even if a given type of service or information is not specifically referred to in this Agreement or is not currently provided by CBC, unless the service is furnished pursuant to a separate written agreement with CBC.

A:  THE SUBSCRIBER AGREES:
1. To comply with all applicable federal, state and local laws, statutes, regulations, and rules, including the applicable provisions of the Fair Credit Reporting Act ("**FCRA**"), as amended by the Fair and Accurate Credit Transaction Act and the Gramm-Leach Bliley Act ("**GLBA**"), in ordering and using the Information Services.  In the event:  (a) the Subscriber changes its physical location or ownership, (b) has any changes to the information on the Subscriber's Application, or (c) no longer meets the criteria for CBC to provide the Information Services, Subscriber will notify CBC in writing within ten (10) days of such change and new vetting information may be required, and a new third party physical inspection, if applicable, may be required (separate fee may apply),
2. The nature of its business is      Vehicle Sales     .
3. To request information only for the Subscriber's exclusive use, as an end-user, and the Subscriber certifies that it has a permissible purpose and inquiries will be made only for the purpose of, and for no other purpose, in connection with a credit or consumer transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of the consumer, and will obtain the consumer's written authorization to request such information relating to that consumer.
4. Use of the Information Services shall be only for legitimate business purposes relating to Subscriber's business and as otherwise governed by the Agreement.  Subscriber shall not use the Information Services for marketing purposes (unless specifically identified separately, with the exception of LexisNexis data which may not be used for marketing purposes).resell or broker the Information Services to any third party, or shall not use the Information Services for personal (non-business) purposes.  If CBC determines or reasonably suspects that Subscriber is improperly using the Information Services as outlined in this Agreement, CBC reserves the right to suspend or terminate Subscriber's service with CBC.
5. It will not use the Information Services to obtain credit or consumer reports for employment purposes.  Employees are forbidden to attempt to use the Information Services to obtain reports on themselves, associates, or any other person except in the exercise of their official duties.
6. THE FCRA PROVIDES THAT ANY PERSON WHO KNOWINGLY AND WILLFULLY OBTAINS INFORMATION ON A CONSUMER FROM A CONSUMER REPORTING AGENCY UNDER FALSE PRETENSES SHALL BE FINED UNDER TITLE 18, OR IMPRISONED NOT MORE THAN TWO YEARS OR BOTH.
7. If it uses Information Services that includes Experian's Precise ID or other similar identity verification products ("**ID Services**"), that they will only be used to protect or prevent actual or potential fraud in accordance with the GLBA.  Also, Subscriber agrees it will not request, use, or resell any such ID Services for any other purpose, regardless of whether permitted by law.
8. Some of the Information Services may include:  (a) "nonpublic personal information" as defined by GLBA and related state laws, (b) "personal information" as defined in the Drivers Privacy Protection Act (**"DPPA"**) and related state laws, or (c) motor vehicle records data ("**MVRD**"); Subscriber shall not obtain and/or use GLBA data or DPPA data or MVRD via the Information Services in a manner that would violate GLBA or DPPA, or any similar state or local laws, regulations, rules, or restrictions.
9. The Information Services may include OFAC information from various sources not maintained or controlled by CBC.  This database of specially designated nationals and blocked persons is maintained by the United States Treasury Department, Office of Foreign Asset Control (**"OFAC"**).  Matching of names to the OFAC list is based on very limited identification information.  An OFAC hit or match does not necessarily indicate that the consumer that was inquired about is the same person referenced by the OFAC search results.  Subscriber acknowledges that any adverse action taken against a consumer must be taken based on a complete investigation of the consumer by the Subscriber and not based solely on the OFAC information provided via the Information Services.  Additionally, the Subscriber, not CBC, is responsible for any adverse action taken against a consumer as a result of the OFAC screening process.
10. In the event the Subscriber uses the Information Services for compliance with any laws, regulations, or similar requirements, including but not limited to the Red Flags Rules under the FCRA, the regulations pursuant to OFAC, Military Lending Act Covered Borrower status checks, or other similar requirements (**"Applicable Law"**), Subscriber shall be solely responsible for such compliance, including without limitation the sufficiency of the Information Services for such purposes, as well as the selection of criteria or data used in the Information Services.  In addition to all other disclaimers in this Agreement, CBC hereby disclaims any express or implied warranty or other assurance that the Subscriber's use of the Information Services will be sufficient to comply with Applicable Law, whether or not CBC has been apprised of such use.  CBC shall not be deemed to have rendered to Subscriber any legal advice, including with respect to the Subscriber's selection of criteria or data used for compliance with Applicable Law.  Subscriber agrees to use the Information Services in compliance with Applicable Law.
11. If Subscriber is provided access to MVRD from CBC, without in any way limiting Subscriber's obligations to comply with all state and federal laws governing use of MVRD, the following restrictions apply:  (a) Subscriber shall not use any MVRD provided by CBC, or portions of information contained therein, to create or update a file that Subscriber uses to develop its own source of driving history information, (b) Subscriber shall complete any state forms that CBC is legally or contractually bound to obtain from Subscriber before providing Subscriber with MVRD, and (c) CBC (and/or third-party vendors) may conduct reasonable and periodic audits of Subscriber's use of MVRD and Subscriber must be able to substantiate the reason for each MVRD order as a result of an audit request.



CONFIDENTIAL

**575 E. Locust Ave., Suite 103  Fresno, CA 93720**
**Phone (800) 448-0183  Fax (559) 226-2256**
**www.creditbureauconnection.com**

12. To hold in strict confidence the consumer report received by Subscriber and not sell or otherwise distribute a copy to any other party, except as permitted or required by any law or other lawful order.  However, this restriction shall not prohibit Subscriber from discussing with the subject of the report, who is the subject of an adverse action, the content of the report as it relates to the reasons for the adverse action.
13. To not reproduce, republish, reverse engineer, or otherwise transfer for any commercial purposes CBC's software programs or computer applications.  CBC and/or its third party data providers shall retain all right, title, and interest under applicable contractual, copyright, patent, trademark, trade secret and related laws in and to the Information Services and the data and information that they provide.  Subscriber shall use such materials in a manner consistent with the terms and conditions herein, and shall notify CBC of any threatened or actual infringement of CBC's rights.  CBC or CBC's data provider shall own Subscriber's search inquiry data used to access the Information Services and may use such data for any purpose consistent with applicable federal, state and local laws, rules and regulations.
14. Will not name CBC or refer to its use of the Information Services in any press releases, advertisements, promotional, or marketing materials, without the expressed written consent of CBC.
15. Prior to allowing access to the Information Services, to inform and train employees of Subscriber's obligations under this Agreement, including, but not limited to proper usage requirements and restrictions, and security requirements.
16. A third party physical inspection may be required to assure FCRA compliance by verifying the Subscriber's business is legitimate and meets FCRA requirements.  CBC will inform the Subscr ber if a physical inspection will be necessary and coordinate with the inspection company.  Subscriber will pay CBC, if applicable, as outlined in the attached Fee Schedule, an on-site compliance inspection fee prior to CBC issuing Information Services access.
17. Upon reasonable notice, CBC directly or through a third party, may audit Subscriber's procedures related to this Agreement in order to confirm that they adequately protect against the improper use of Information Services and that Subscriber is in compliance with the Access Security Requirements and other requirements as outlined in this Agreement.  Subscriber agrees to fully cooperate in connection with such audits and to make all changes reasonably requested by CBC to assure against unauthorized access of the Information Services and for Subscr ber to comply with the requirements of this Agreement.
18. To pay in full upon receipt of invoice or statement for the services rendered during the previous monthly period according to the current CBC Fee Schedule in effect.  All payments shall be due 15 days after receipt of the invoice.  Past due amounts shall accrue interest at the rate 1.5% per month with a late fee of $20.00 imposed on any payment not paid by the corresponding due date.  Any unpaid balances over 60 days may cause Subscriber's access codes and/or Information Services to be suspended until payment is received in full by CBC.  If collection efforts are required, Subscriber shall pay all costs of collection including attorney fees.
19. In the event little or no products or services are rendered, to pay each month the minimum monthly billing amount according to the current Fee Schedule in effect.
20. To implement and maintain a comprehensive information security program written in one or more readily access ble parts and that contains administrative, technical, and physical safeguards that are appropriate to the Subscriber's size and complexity, the nature and scope of its activities, and the sensitivity of the information provided to the Subscr ber by CBC; and that such safeguards shall include the elements set forth in 16 C.F.R. § 314.4 and shall be reasonably designed to (a) insure the security and confidentiality of the information provided by CBC, (b) protect against any anticipated threats or hazards to the security or integrity of such information, and (c) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any consumer.

B:  CBC AGREES:
1. To provide the Subscriber access to Experian, TransUnion, Clarity Services, LexisNexis, and/or Equifax, including Equifax's affiliate TALX Corporation (the **"Consumer Reporting Agencies"** or "**CRA's**") credit and consumer reporting service on individuals as agreed to in the Fee Schedule, once the Subscriber on-boarding and vetting process is completed and approved by the CRA's and CBC.
2. To provide the Subscriber with Information Services as identified on the attached Fee Schedule, or subsequent agreement, exhibit, or Fee Schedule.
3. That it represents and warrants that it will implement and maintain physical, electronic and procedural safeguards as may be reasonably required based on established commercial practices and the CRA's to safeguard all information and data relating to the transactions contemplated by this Agreement.
4. That it will provide Information Services "**Uptime**" service levels that meet or exceed the industry standard service levels, with Uptime defined as the total annual hours the Information Services are available to Subscriber, excluding occasional pre-scheduled after-hours maintenance periods.  CBC shall not be responsible for downtime in connection with any failure or deficiency caused by or associated with:  (a) circumstances beyond CBC's reasonable control, (b) CRA outages or outages elsewhere on the internet outside of CBC's hosting infrastructure that prevents Subscriber access, (c) Subscriber's hardware or software not provided by CBC or internet access interruptions, or (d) domain name server issues outside the direct control of CBC.

C:  IT IS MUTUALLY AGREED BY SUBSCRIBER AND CBC:
1. None of the Parties shall, at any time, represent that it is the authorized agent or representative of the other.
2. The CRA's and CBC shall use good faith in attempting to obtain credit or consumer information and provide Information Services from sources deemed reliable, but do not guarantee the accuracy of information reported or provided, and in no event shall the CRA's or CBC be held liable in any manner whatsoever for any loss or injury to Subscriber resulting from the obtaining or furnishing of such information, and further that Subscriber agrees to hold the CRA's, CBC, and their respective affiliates, officers, directors, employees, agents, suppliers, and third party contractors harmless and indemnify and defend them from any and all claims, losses, and damages arising out of alleged liability of failure of the Subscriber to keep and perform any of its obligations descr bed herein.
3. THE INFORMATION SERVICES ARE PROVIDED TO SUBSCRIBER "AS-IS" WITHOUT ANY WARRANTY OF ANY NATURE, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR THAT SUBSCRIBER WILL BE ABLE TO ACCESS INFORMATION SERVICES THROUGH IT ON AN UNINTERRUPTED BASIS OR FREE FROM DEFECTS, COMPUTER VIRUSES, OR OTHER SITUATIONS THAT MAY CAUSE LOSS OF INFORMATION OR DISABLE SUBSCRIBER'S COMPUTER SOFTWARE OR EQUIPMENT.
4. This Agreement shall remain in force and effect and the Subscriber agrees to use CBC as their sole provider of credit reports for a minimum of two years from the date hereof.  Thereafter, this Agreement shall automatically renew for successive one year terms, on the same basis as set forth herein, unless written notice is received by CBC at least sixty days prior to the end of the term.  However, that with just cause such as delinquency or violation of the terms of this contract or a legal requirement, the CRA's or CBC may upon its election discontinue serving the Subscriber and cancel this Agreement immediately.



**575 E. Locust Ave., Suite 103  Fresno, CA 93720**
**Phone (800) 448-0183  Fax (559) 226-2256**
**www.creditbureauconnection.com**

**CONFIDENTIAL**

5. Notwithstanding anything to the contrary in this Agreement, no Party shall be liable for damages for delay in performance hereunder arising out of causes beyond its control and without fault by such Party which, with the observance of reasonable care and standards common in the network management industry, could not have been avoided, including interruptions of telecommunications or network services provided by third parties, credit bureau outages, acts of God, war, governmental acts, vandalism, terrorism, fires, floods, epidemics, strikes or labor disturbances (but not including delays caused by subcontractors or suppliers).

6. Termination of this Agreement will not: (a) release or otherwise affect Subscriber's obligation to pay CBC in full for any fees per CBC's Fee Schedule, late charges, attorney fees and collection costs incurred to and including the date of termination; (b) terminate or otherwise affect the disclaimers, limitations of liability contained in this Agreement, release of claims, use and protection of data and CBC's Information Services, audit rights, CBC's use and ownership of Subscriber's search inquiry data, and data security; which will survive termination of this Agreement, and/or (c) waive or otherwise affect Subscriber's obligation to indemnify and defend under Section C.2. of this Agreement, which will survive termination of this Agreement.  Governing law shall survive any termination of the license to use CBC's Information Services.

7. This Agreement and the exhibits hereto constitute the entire understanding of the Parties with respect to the subject matter of this Agreement and supersede all prior understandings, whether written or oral, between the Parties.

8. That each Party may have access to confidential information of the disclosing party (**"Disclosing Party"**) relating to the Disclosing Party's business including, without limitation, technical, financial, strategies and related information, computer programs, algorithms, know-how, processes, ideas, inventions (whether patentable or not), trade secrets, and other information (written or oral), and in the case of CBC, product information, pricing information, and data and processes contained in the Information Services, and other business information (**"Confidential Information"**).  Confidential Information shall not include information that: (a) is or becomes (through no improper action or inaction by the Receiving Party generally known to the public, (b) was in the Receiving Party's possession or known prior to receipt from the Disclosing Party, (c) was lawfully disclosed to Receiving Party by a third-party and received in good faith and without any duty of confidentiality by the Receiving Party or the third-party, or (d) was independently developed without use of any Confidential Information of the Disclosing Party by employees of the Receiving Party who have had no access to such Confidential Information.  Each receiving party (**"Receiving Party"**) agrees not to divulge any Confidential Information or information derived therefrom to any third-party and shall protect the confidentiality of the Confidential Information with the same degree of care it uses to protect the confidentiality of its own confidential information and trade secrets, but in no event less than a reasonable degree of care.  Notwithstanding the foregoing, the Receiving Party may disclose Confidential Information solely to the extent required by subpoena, court order, or other governmental authority, provided that the Receiving Party shall give the Disclosing party prompt written notice of such subpoena, court order or other governmental authority so as to allow the Disclosing party to have an opportunity to obtain a protective order to prohibit or restrict such disclosure at its sole cost and expense.  Confidential Information disclosed pursuant to subpoena, court order or other governmental authority shall otherwise remain subject to the terms applicable to Confidential Information.  Each party's obligations with respect to Confidential Information shall continue for the term of this Agreement and for a period of five (5) years thereafter, provided however, that with respect to trade secrets, each party's obligations shall continue for so long as such Confidential Information continues to constitute a trade secret.

9. This Agreement shall be interpreted and governed in accordance with the laws of the State of California, without reference to its principles of conflict of laws.  Subscriber irrevocably consents to the exclusive jurisdiction and venue of the federal and state courts in Fresno County, California with respect to all disputes in connection with this Agreement.  If any court or other jurisdiction declares any provision of this Agreement to be illegal or invalid or unenforceable, the legality and validity and enforceability of the remaining parts, terms, or provisions will not be affected thereby and the illegal or invalid or unenforceable part, term, or provision will be deemed not to be part of, and severable from, the remaining portions of this Agreement.

10. Nothing in this Agreement shall be constituted as making CBC a consumer credit reporting agency for purposes of the Fair Credit Reporting Act and companion state statutes.

11. With respect to personally identifiable information regarding consumers, CBC has established a Data Privacy Policy (**"DPP"**), which may be modified from time to time, recognizing the importance of appropriate privacy protections for consumer data, and the Subscriber agrees it will comply with the DPP or Subscriber's own comparable privacy policy or practices.  A copy of CBC's DPP is available upon request.

12. That CBC reserves the right to change the Fee Schedule from time to time, but no change in such Fee Schedule shall become effective without providing the Subscriber thirty (30) days prior written notice.

13. CBC reserves the right to amend this Agreement and the Fee Schedule and Subscriber agrees to comply with changes to the Information Services usage requirements and other provisions of this Agreement as CBC shall make from time to time via written notice to Subscriber.  CBC may impose restrictions and/or prohibitions on the Subscriber's use of the Information Services or certain data as a result of a modification in policy, a modification of third-party agreements, a modification in industry standards, a security change, or a change in law or regulation, or the interpretation thereof.  This Agreement is complete and may not be altered or amended unless in writing.  This Agreement shall not be binding on either Party until it is accepted by CBC.

The undersigned Subscriber's authorized representative does hereby jointly and severally unconditionally guarantee any and all of the indebtedness of the Subscriber heretofore, now, or hereafter made, incurred or created, together with all costs and reasonable attorney's fees incurred in the enforcement of this continuing guaranty.  By the signature below, authorization is given to check business credit relationships and payment performance of Subscriber, or principals in the case of a sole proprietorship, LLC or where adequate business information concerning payment performance is not readily available.

| Accepted by: Authorized Representative Signature | Printed Name | Title | Date |
|---|---|---|---|
| *diane argyropoulos* | diane argyropoulos | member | 10/24/2019 |

**Spartan Auto Group LLC / Victory Mitsubishi**
Company Name / DBA (Subscriber)

| Address | City | State | Zip |
|---|---|---|---|
| 4070 Boston Road | BRONX | NY | 10475 |

| Accepted by: CBC Representative Signature | Printed Name | Title | Date |
|---|---|---|---|
| *David Daniel* | David Daniel | Compliance Manager | 10/24/2019 |



575 E. Locust Ave., Suite 103  Fresno, CA 93720
Phone (800) 448-0183  Fax (559) 226-2256
www.creditbureauconnection.com

**CONFIDENTIAL**

# ACCESS SECURITY REQUIREMENTS

We must work together to protect the privacy and information of consumers.  The following information security measures are designed to reduce unauthorized access to consumer information.  It is the Subscribers responsibility to implement these controls.  If you do not understand these requirements or need assistance, it is your responsibility to employ an outside service provider to assist you.  The CRA's reserve the right to make changes to these Access Security Requirements without prior notification.  The information provided herewith provides minimum baselines for information security.  In accessing the CRA's services, you agree to follow these security requirements.  These requirements are applicable to all systems and devices used to access, transmit, process, or store CRA data:

1. **Implement Strong Access Control Measures**

    1.1 All credentials such as subscriber code number, subscriber code passwords, user names/identifiers (user IDs) and user passwords must be kept confidential and must not be disclosed to an unauthorized party.  No one from the CRA's will ever contact you and request your credentials.
    1.2 If using third party or proprietary system to access the CRA's systems, ensure that the access must be preceded by authenticating users to the application and/or system (i.e. application based authentication, Active Directory, etc.) utilized for accessing the CRA's data/systems.
    1.3 If the third party or third party software or proprietary system or software, used to access the CRA's data/systems, is replaced or no longer in use, the passwords should be changed immediately.
    1.4 Create a unique user ID for each user to enable individual authentication and accountability for access to the CRA's infrastructure.  Each user of the system access software must also have a unique logon password.
    1.5 User IDs and passwords shall only be assigned to authorized individuals based on least privilege necessary to perform job responsibilities.
    1.6 User IDs and passwords must not be shared, posted, or otherwise divulged in any manner.
    1.7 Develop strong passwords that are:
    - Not easily guessable (i.e. your name or company name, repeating numbers and letters or consecutive numbers and letters)
    - Contain a minimum of eight (8) alpha/numeric characters for standard user accounts
    - For interactive sessions (i.e. non system-to-system) ensure that passwords are changed periodically (every 90 days is recommended)
    1.8 Passwords (i.e. subscriber code passwords, user password) must be changed immediately when:
    - Any system access software is replaced by another system access software or is no longer used
    - The hardware on which the software resides is upgraded, changed or disposed
    - Any suspicion of password being disclosed to an unauthorized party (see section 4.3 for reporting requirements)
    1.9 Ensure that passwords are not transmitted, displayed or stored in clear text; protect all end user (i.e. internal and external) passwords using, for example, encryption or a cryptographic hashing algorithm also known as "one-way" encryption. When using encryption, ensure that strong encryption algorithm are utilized (i.e. AES 256 or above).
    1.10 Implement password protected screensavers with a maximum fifteen (15) minute timeout to protect unattended workstations.  Systems should be manually locked before being left unattended.
    1.11 Active logins to credit and consumer information systems must be configured with a 30 minute inactive session timeout.
    1.12 Ensure that personnel who are authorized access to credit and consumer information have a business need to access such information and understand these requirements to access such information are only for the permissible purposes listed in the Permissible Purpose Information section of your membership application.
    1.13 You must NOT install Peer-to-Peer file sharing software on systems used to access, transmit or store CRA data.
    1.14 Ensure that your employees do not access their own credit and consumer reports or those reports of any family member(s) or friend(s) unless it is in connection with a credit or consumer transaction or for another permissible purpose.
    1.15 Implement a process to terminate access rights immediately for users who access the CRA's credit and consumer information when those users are terminated or when they have a change in their job tasks and no longer require access to that credit or consumer information.
    1.16 Implement a process to perform periodic user account reviews to validate whether access is needed as well as the privileges assigned.
    1.17 Implement a process to periodically review user activities and account usage, ensure the user activities are consistent with the individual job responsibility, business need, and in line with contractual obligations.
    1.18 Implement physical security controls to prevent unauthorized entry to your facility and access to systems used to obtain credit or consumer information.  Ensure that access is controlled with badge readers, other systems, or devices including authorized lock and key.

2. **Maintain a Vulnerability Management Program**

    2.1 Keep operating system(s), firewalls, routers, servers, personal computers (laptop and desktop) and all other systems current with appropriate system patches and updates.
    2.2 Configure infrastructure such as firewalls, routers, personal computers (laptops and desktops), and similar components to industry best security practices, including disabling unnecessary services or features, removing or changing default passwords, IDs and sample files/programs, and enabling the most secure configuration features to avoid unnecessary risks.
    2.3 Implement and follow current best security practices for computer virus detection scanning services and procedures:
    - Use, implement and maintain a current, commercially available anti-virus software on all systems, if applicable anti-virus technology exists.  Anti-virus software deployed must be capable to detect, remove, and protect against all known types of malicious software such as viruses, worms, spyware, adware, Trojans, and root-kits.
    - Ensure that all anti-virus software is current, actively running, and generating audit logs; ensure that anti-virus software is enabled for automatic updates and performs scans on a regular basis.
    - If you suspect an actual or potential virus infecting a system, immediately cease accessing the system and do not resume the inquiry process until the virus has been eliminated.

Case 1:22-cv-04447-JSR   Document 53-8   Filed 03/15/23   Page 6 of 20

**CONFIDENTIAL**

**cbc**
credit bureau connection

575 E. Locust Ave., Suite 103  Fresno, CA 93720
Phone (800) 448-0183  Fax (559) 226-2256
www.creditbureauconnection.com

## ACCESS SECURITY REQUIREMENTS (continued)

3. **Protect Data**

   3.1 Develop and follow procedures to ensure that data is protected throughout its entire information lifecycle (from creation, transformation, use, storage and secure destruction) regardless of the media used to store the data (i.e., tape, disk, paper, etc.).
   3.2 The CRA's data is classified Confidential and must be secured in accordance with the requirements in this document at a minimum.
   3.3 Procedures for transmission, disclosure, storage, destruction and any other information modalities or media should address all aspects of the lifecycle of the information.
   3.4 Encrypt all CRA data and information when stored electronically on any system including but not limited to laptops, tablets, personal computers, servers, databases using strong encryption such AES 256 or above.
   3.5 CRA data must not be stored locally on smart tablets and smart phones such as iPads, iPhones, Android based devices, etc.
   3.6 When using smart tablets or smart phones to access CRA data, ensure that such devices are protected via device pass-code.
   3.7 Applications utilized to access CRA data via smart tablets or smart phones must protect data while in transmission such as SSL protection and/or use of VPN, etc.
   3.8 Only open email attachments and links from trusted sources and after verifying legitimacy.
   3.9 When no longer in use, ensure that hard-copy materials containing CRA data are crosscut shredded, incinerated, or pulped such that there is reasonable assurance the hard-copy materials cannot be reconstructed.
   3.10 When no longer in use, electronic media containing CRA data is rendered unrecoverable via a secure wipe program in accordance with industry-accepted standards for secure deletion, or otherwise physically destroying the media (for example, degaussing).

4. **Maintain an Information Security Policy**

   4.1 Develop and follow a security plan to protect the confidentiality and integrity of personal consumer information as required under the GLB Safeguard Rule.
   4.2 Suitable to complexity and size of the organization, establish and publish information security and acceptable user policies identifying user responsibilities and addressing requirements in line with this document and applicable laws and regulations.
   4.3 Establish processes and procedures for responding to security violations, unusual or suspicious events and similar incidents to limit damage or unauthorized access to information assets and to permit identification and prosecution of violators.  *If you believe CRA data may have been compromised, immediately notify the CRA within twenty-four (24) hours or per agreed contractual notification timeline (See also Section 8).*
   4.4 The FACTA Disposal Rules requires that you implement appropriate measures to dispose of any sensitive information related to credit and consumer reports and records that will protect against unauthorized access or use of that information.
   4.5 Implement and maintain ongoing mandatory security training and awareness sessions for all staff to underscore the importance of security in your organization.
   4.6 When using third party service providers (i.e. application service providers) to access, transmit, store or process CRA data, ensure that service provider is compliant with Experian Independent Third Party Assessment (EI3PA) program, and registered in the CRA's list of compliant service providers.  If the service provider is in process of becoming compliant, it is your responsibility to ensure the service provider is engaged with the CRA and exception is granted in writing. *Approved certifications in lieu of EI3PA can be requested.*

5. **Build and Maintain a Secure Network**

   5.1 Protect internet connections with dedicated, industry-recognized firewalls that are configured and managed using industry best security practices.
   5.2 Internal private Internet Protocol (IP) addresses must not be publicly accessible or natively routed to the internet.  Network address translation (NAT) technology should be used.
   5.3 Administrative access to firewalls and servers must be performed through a secure internal wired connection only.
   5.4 Any stand alone computers that directly access the internet must have a desktop firewall deployed that is installed and configured to block unnecessary/unused ports, services, and network traffic.
   5.5 Change vendor defaults including but not limited to passwords, encryption keys, SNMP strings, and any other vendor defaults.
   5.6 For wireless networks connected to or used for accessing or transmission of CRA data, ensure that networks are configured and firmware on wireless devices updated to support strong encryption (for example, IEEE 802.11i) for authentication and transmission over wireless networks.
   5.7 When using service providers (i.e. software providers) to access CRA systems, access to third party tools/services must require multi-factor authentication.

6. **Regularly Monitor and Test Networks**

   6.1 Perform regular tests on information systems (port scanning, virus scanning, internal/external vulnerability scanning).  Ensure that issues identified via testing are remediated according to the issue severity (i.e. fix critical issues immediately, high severity in 15 days, etc.).
   6.2 Ensure that audit trails are enabled and active for systems and applications used to access, store, process, or transmit CRA data; establish a process for linking all access to such systems and applications.  Ensure that security policies and procedures are in place to review security logs on daily or weekly basis and that follow-up to exceptions is required.
   6.3 Use current best practices to protect telecommunications systems and any computer system or network device(s) used to provide services hereunder to access the CRA's systems and networks.  These controls should be selected and implemented to reduce the risk of infiltration, hacking, access penetration or exposure to an unauthorized third party by:
      - protecting against intrusions;
      - securing the computer systems and network devices;
      - and protecting against intrusions of operating systems or software.



575 E. Locust Ave., Suite 103  Fresno, CA 93720
Phone (800) 448-0183  Fax (559) 226-2256
www.creditbureauconnection.com

## ACCESS SECURITY REQUIREMENTS (continued)

7. **Mobile and Cloud Technology**

    7.1   Storing CRA data on mobile devices is prohibited.  Any exceptions must be obtained from CRA's in writing; additional security requirements will apply.
    7.2   Mobile applications development must follow industry known secure software development standard practices such as OWASP and OWASP Mobile Security Project adhering to common controls and addressing top risks.
    7.3   Mobile applications development processes must follow secure software assessment methodology which includes appropriate application security testing (i.e. static, dynamic analysis, penetration testing) and ensuring vulnerabilities are remediated.
    7.4   Mobility solution server/system should be hardened in accordance with industry and vendor best practices such as Center for Internet Security (CIS) benchmarks, NIS, NSA, DISA and/or other.
    7.5   Mobile applications and data shall be hosted on devices through a secure container separate from any personal applications and data.  See details below. Under no circumstances is CRA data to be exchanged between secured and non-secured applications on the mobile device.
    7.6   In case of non-consumer access, that is, commercial/business-to-business (B2B) users accessing CRA data via mobile applications (internally developed or using a third party application), ensure that multi-factor authentication and/or adaptive/risk-based authentication mechanisms are utilized to authenticate users to application.
    7.7   When using cloud providers to access, transmit, store, or process CRA data ensure that:
    - Appropriate due diligence is conducted to maintain compliance with applicable laws and regulations and contractual obligations
    - Cloud providers must have gone through independent audits and are compliant with one or more of the following standards, or a current equivalent as approved/recognized by the CRA's:
        o ISO 27001
        o PCI DSS
        o EI3PA
        o SSAE 16 – SOC 2 or SOC3
        o FISMA
        o CAI / CCM assessment

8. **General**

    8.1   The CRA's may from time to time audit the security mechanisms you maintain to safeguard access to CRA information, systems and electronic communications.  Audits may include examination of systems security and associated administrative practices.
    8.2   In cases where you are accessing CRA information and systems via third party software, you agree to make available to the CRA upon request, audit trail information and management reports generated by the vendor software, regarding your individual authorized users.
    8.3   You are responsible for and ensure that third party software, which accesses CRA information systems, is secure, and protects this vendor software against unauthorized modification, copy and placement on systems which have not been authorized for its use.
    8.4   You shall conduct software development (for software which accesses CRA information systems; this applies to both in-house or outsourced software development) based on the following requirements:
    - Software development must follow industry known secure software development standard practices such as OWASP adhering to common controls and addressing top risks.
    - Software development processes must follow secure software assessment methodology which includes appropriate application security testing (i.e. static, dynamic analysis, penetration testing) and ensuring vulnerabilities are remediated.
    - Software solution server/system should be hardened in accordance with industry and vendor best practices such as Center for Internet Security (CIS) benchmarks, NIS, NSA, DISA and/or other.
    8.5   Reasonable access to audit trail reports of systems utilized to access CRA systems shall be made available to CRA upon request, for example during breach investigation or while performing audits.
    8.6   Data requests from you to the CRA must include the IP address of the device from which the request originated (i.e. the requesting Subscriber's IP address), where applicable.
    8.7   You shall report actual security violations or incidents that impact the CRA to the CRA within twenty-four (24) hours or per agreed contractual notification timeline.  You agree to provide notice to the CRA of any confirmed security breach that may involve data related to the contractual relationship, to the extent required under and in compliance with applicable law (In the case of Experian, telephone notification is preferred at 800-295-4305; email notification will be sent to regulatorycompliance@experian.com).
    8.8   You acknowledge and agree you (a) have received a copy of these requirements, (b) have read and understand the obligations described in the requirements, (c) will communicate the contents of the applicable requirements contained herein, and any subsequent updates hereto, to all employees that shall have access to CRA services, systems or data, and (d) will abide by the provisions of these requirements when accessing CRA data.
    8.9   You understand that use of CRA networking and computing resources may be monitored and audited by the CRA's, without further notice.
    8.10  You acknowledge and agree to be respons ble for all activities of your employees/authorized users, and for assuring that mechanisms to access CRA services or data are secure and in compliance with its membership agreement.
    8.11  When using third party service providers to access, transmit, or store CRA data, additional documentation may be required by the CRA.

**Record Retention**: The Federal Equal Opportunities Act states that a creditor must preserve all written or recorded information connected with an application for 5 years.  In keeping with the ECOA, you are required to retain the credit application and, if applicable, a purchase agreement for a period of not less than 5 years.  When conducting an investigation, particularly following a consumer complaint that your company impermissibly accessed their credit or consumer report, you will be contacted and requested to provide a copy of the original application signed by the consumer or, if applicable, a copy of the sales contract.

"Under Section 621 (a) (2) (A) of the FCRA, any person that violates any of the provisions of the FCRA may be liable for a civil penalty of not more than $2,500 per violation."

Revised 8/19                                    **DEFENDANTS 99**



575 E. Locust Ave., Suite 103  Fresno, CA 93720
Phone (800) 448-0183  Fax (559) 226-2256
www.creditbureauconnection.com

**CONFIDENTIAL**

# CREDIT RISK SCORE ADDENDUM (Experian and TransUnion Service)

THIS CREDIT RISK SCORE ADDENDUM ("Addendum") is entered into by and between the "Subscriber" identified in the Subscriber Service Agreement ("Agreement") and CBC in connection with the Agreement entered into by Subscriber and CBC. The term "credit reports" is used in this Addendum with the meaning assigned to such term in the Agreement. The Parties agree as follows:

1. Subscriber is a credit grantor that purchases credit reports from CBC pursuant to the Agreement in connection with credit transactions involving the consumer subjects of such credit reports. As an enhancement to the basic credit report, CBC has offered Subscriber the opportunity to purchase one or more credit risk scores provided by the CRA's.

2. Subscriber agrees to pay CBC the applicable fee for each score obtained. All score fees are due in the same manner and subject to the same terms and conditions as the fees in the Agreement. CBC may change fees upon written notice.

3. Subscriber recognizes that all credit risk scores offered hereunder are statistical scores and may not be predictive as to any particular individual. No such score is intended to characterize any individual as to credit capability. Subscriber recognizes that factors other than the credit risk score or scores selected must be considered in making a credit decision, including the credit report, the individual credit application, economic factors, and various other pertinent factors.

4. A statement of the factors that significantly contributed to the credit risk score may accompany the score. If so, such information may be disclosed to the consumer as the reason for taking adverse action, as required by Regulation B. However, the credit risk score itself is proprietary and may not be used as the reason for adverse action under Regulation B. In addition, under the Fair Credit Reporting Act, credit risk scores are not considered part of the consumer's file. Accordingly, Subscriber agrees not to disclose the actual credit risk score to the consumer, unless otherwise required by law.

5. SUBSCRIBER HAS MADE ITS OWN ANALYSIS OF THE CREDIT RISK SCORE OR SCORES ELECTED BY SUBSCRIBER, INCLUDING THE STATISTICAL RELIABILITY AND THE UTILITY OF USING SUCH SCORES IN CONNECTION WITH SUBSCRIBERS' CREDIT DECISION, AND NEITHER CBC, FAIR ISAAC, OR ANY OTHER SCORE PROVIDER SHALL BE LIABLE FOR ANY LOSS, COSTS, DAMAGES, OR EXPENSE TO SUBSCRIBER RESULTING FROM THE USE OF THE SCORE, OR THE INACCURACY THEREOF. IN NO EVENT SHALL ANY SUCH PERSON BE LIABLE TO SUBSCRIBER FOR ANY INCIDENTAL, INDIRECT, PUNITIVE, CONSEQUENTIAL, OR ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND THE TOTAL AGGREGATE LIABILITY OF CBC, FAIR ISAAC, ANY WAY RELATED TO THE USE OF ANY CREDIT RISK SCORE SHALL NOT EXCEED THE SURCHARGE PAID BY SUBSCRIBER IN CONNECTION WITH THE SCORE TO WHICH THE CLAIM RELATES.

6. This Addendum shall remain in effect until one Party provides the other Party with written notice of termination. In addition, in the event the Agreement is terminated, this Addendum shall automatically terminate. No termination shall affect Subscriber's responsibility to pay the surcharge for the credit risk scores ordered prior to the effective date of termination or the limitation of liability set forth in Section 5 above.

7. This Addendum states the entire understanding of the Parties as to the subject matter hereof and supersedes all prior correspondence, documentation, or representations, and may not be amended, except by a written agreement signed by both Parties, and in the case of CBC, an authorized officer of CBC must sign such agreement. In the event that a specific provision of the Addendum is inconsistent with the terms of the Agreement, the terms of this Addendum shall control. In all other respect, this Addendum shall not supersede the Agreement.

# CREDIT RISK SCORE ADDENDUM (TransUnion Classic Risk Score Service)

1. Based on an agreement with TransUnion LLC ("TransUnion") and Fair Isaac Corporation ("Fair Isaac") ("Reseller Agreement"), CBC has access to a unique and proprietary statistical credit scoring service jointly offered by TransUnion and Fair Isaac which evaluates certain information in the credit reports of individual consumers from TransUnion's data base ("Classic") and provides a score which rank orders consumers with respect to the relative likelihood that United States consumers will repay their existing or future credit obligations satisfactorily over the twenty four (24) month period following scoring (the "Classic Score").

2. Subscriber, from time to time, may desire to obtain Classic Scores from TransUnion via an on-line mode in connection with consumer credit reports.

3. Subscriber has previously represented and now, again represents that it is an automotive dealer and has a permissible purpose for obtaining consumer reports, as defined by Section 604 of the Federal Fair Credit Reporting Act (15 USC 1681b) including, without limitation, all amendments thereto ("FCRA").

4. Subscriber certifies that it will request Classic Scores pursuant to procedures prescribed by CBC from time to time only for the permissible purpose certified above, and will use the Classic Scores obtained for no other purpose.

5. Subscriber will maintain copies of all written authorizations for a minimum of three (3) years from the date of inquiry.

6. Subscriber agrees that it shall use each Classic Score only for a one-time use and only in accordance with its permissible purpose under the FCRA.

7. With just cause, such as delinquency or violation of the terms of this contract or a legal requirement, CBC may, upon its election, discontinue serving the Subscriber and cancel this Agreement, in whole or in part (e.g., the services provided under this Addendum only) immediately.

8. Subscriber recognizes that factors other than the Classic Score may be considered in making a credit decision. Such other factors include, but are not limited to, the credit report, the individual account history, and economic factors.

9. TransUnion and Fair Isaac shall be deemed third party beneficiaries under this Addendum.



575 E. Locust Ave., Suite 103  Fresno, CA 93720
Phone (800) 448-0183  Fax (559) 226-2256
www.creditbureauconnection.com

**CONFIDENTIAL**

10. Up to five score reason codes, or if applicable, exclusion reasons, are provided to Subscriber with Classic Scores. These score reason codes are designed to indicate the reasons why the individual did not have a higher Classic Score, and may be disclosed to consumers as the reasons for taking adverse action, as required by the Equal Credit Opportunity Act ("ECOA") and its implementing Regulation ("Reg. B"). However, the Classic Score itself is proprietary to Fair Isaac, may not be used as the reason for adverse action under Reg. B and, accordingly, shall not be disclosed to credit applicants or any other third party, except: (1) to credit applicants in connection with approval/disapproval decisions in the context of bona fide credit extension transactions when accompanied with its corresponding score reason codes; or (2) as clearly required by law. Subscriber will not publicly disseminate any results of the validations or other reports derived from the Classic Scores without Fair Isaac and TransUnion's prior written consent.

11. In the event Subscriber intends to provide Classic Scores to any agent, Subscriber may do so provided, however, that Subscriber first enters into a written agreement with such agent that is consistent with Subscriber's obligations under this Agreement. Moreover, such agreement between Subscriber and such agent shall contain the following obligations and acknowledgments of the agent: (1) Such agent shall utilize the Classic Scores for the sole benefit of Subscriber and shall not utilize the Classic Scores for any other purpose including for such agent's own purposes or benefit; (2) That the Classic Score is proprietary to Fair Isaac and, accordingly, shall not be disclosed to the credit applicant or any third party without TransUnion and Fair Isaac's prior written consent except (a) to credit applicants in connection with approval/disapproval decisions in the context of bona fide credit extension transactions when accompanied with its corresponding score reason codes; or (b) as clearly required by law; (3) Such Agent shall not use the Classic Scores for model development, model validation, model benchmarking, reverse engineering, or model cal bration; (4) Such agent shall not resell the Classic Scores; and (5) Such agent shall not use the Classic Scores to create or maintain a database for itself or otherwise.

12. Subscriber acknowledges that the Classic Scores provided under this Agreement which utilize an individual's consumer credit information will result in an inquiry being added to the consumer's credit file.

13. Subscriber shall be responsible for compliance with all applicable federal or state legislation, regulations and judicial actions, as now or as may become effective including, but not limited to, the FCRA, the ECOA, and Reg. B, to which it is subject.

14. The information including, without limitation, the consumer credit data, used in providing Classic Scores under this Agreement were obtained from sources considered to be reliable. However, due to the possibilities of errors inherent in the procurement and compilation of data involving a large number of individuals, neither the accuracy nor completeness of such information is guaranteed. Moreover, in no event shall TransUnion, Fair Isaac, nor their officers, employees, affiliated companies or bureaus, independent contractors or agents be liable to Subscriber for any claim, injury or damage suffered directly or indirectly by Subscr ber as a result of the inaccuracy or incompleteness of such information used in providing Classic Scores under this Agreement and/or as a result of Subscriber's use of Classic Scores and/or any other information or serviced provided under this Agreement.

15. Fair Isaac, the developer of Classic, warrants that the scoring algorithms as delivered to TransUnion and used in the computation of the Classic Score ("Models") are empirically derived from TransUnion's credit data and are a demonstrably and statistically sound method of rank-ordering candidate records with respect to the relative likelihood that United States consumers will repay their existing or future credit obligations satisfactorily over the twenty four (24) month period following scoring when applied to the population for which they were developed, and that no scoring algorithm used by Classic uses a "prohibited basis" as that term is defined in the Equal Credit Opportunity Act (ECOA) and Regulation B promulgated thereunder. Classic provides a statistical evaluation of certain information in TransUnion's files on a particular individual, and the Classic Score indicates the relative likelihood that the consumer will repay their existing or future credit obligations satisfactorily over the twenty four (24) month period following scoring relative to other individuals in TransUnion's database. The score may appear on a credit report for convenience only, but is not a part of the credit report nor does it add to the information in the report on which it is based.

16. THE WARRANTIES SET FORTH IN SECTION 15 ARE THE SOLE WARRANTIES MADE UNDER THIS ADDENDUM CONCERNING THE CLASSIC SCORES AND ANY OTHER DOCUMENTATION OR OTHER DELIVERABLES AND SERVICES PROVIDED UNDER THIS AGREEMENT; AND NEITHER FAIR ISAAC NOR TRANSUNION MAKE ANY OTHER REPRESENTATIONS OR WARRANTIES CONCERNING THE PRODUCTS AND SERVICES TO BE PROVIDED UNDER THIS AGREEMENT OTHER THAN AS SET FORTH IN THIS ADDENDUM. THE WARRANTIES AND REMEDIES SET FORTH IN SECTION 15 ARE IN LIEU OF ALL OTHERS, WHETHER WRITTEN OR ORAL, EXPRESS OR IMPLIED (INCLUDING, WITHOUT LIMITATION, WARRANTIES THAT MIGHT BE IMPLIED FROM A COURSE OF PERFORMANCE OR DEALING OR TRADE USAGE). THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

17. IN NO EVENT SHALL ANY PARTY BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES INCURRED BY THE OTHER PARTIES AND ARISING OUT OF THE PERFORMANCE OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO LOSS OF GOOD WILL AND LOST PROFITS OR REVENUE, WHETHER OR NOT SUCH LOSS OR DAMAGE IS BASED IN CONTRACT, WARRANTY, TORT, NEGLIGENCE, STRICT LIABILITY, INDEMNITY, OR OTHERWISE, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

18. THE FOREGOING NOTWITHSTANDING, WITH RESPECT TO SUBSCRIBER, IN NO EVENT SHALL THE AFORESTATED LIMITATIONS OF LIABILITY, SET FORTH ABOVE IN SECTION 17, APPLY TO DAMAGES INCURRED BY TRANSUNION AND/OR FAIR ISAAC AS A RESULT OF: (A) GOVERNMENTAL, REGULATORY OR JUDICIAL ACTION(S) PERTAINING TO VIOLATIONS OF THE FCRA AND/OR OTHER LAWS, REGULATIONS AND/OR JUDICIAL ACTIONS TO THE EXTENT SUCH DAMAGES RESULT FROM SUBSCRIBER'S BREACH, DIRECTLY OR THROUGH SUBSCRIBER'S AGENT(S), OF ITS OBLIGATIONS UNDER THIS AGREEMENT.

19. ADDITIONALLY, NEITHER TRANSUNION NOR FAIR ISAAC SHALL BE LIABLE FOR ANY AND ALL CLAIMS ARISING OUT OF OR IN CONNECTION WITH THIS ADDENDUM BROUGHT MORE THAN ONE (1) YEAR AFTER THE CAUSE OF ACTION HAS ACCRUED. IN NO EVENT SHALL TRANSUNION'S AND FAIR ISAAC'S AGGREGATE TOTAL LIABILITY, IF ANY, UNDER THIS AGREEMENT, EXCEED THE AGGREGATE AMOUNT PAID, UNDER THIS ADDENDUM, BY SUBSCRIBER DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING ANY SUCH CLAIM, OR TEN THOUSAND DOLLARS ($10,000.00), WHICHEVER AMOUNT IS LESS.

20. This Addendum may be terminated automatically and without notice: (1) in the event of a breach of the provisions of this Addendum by Subscriber; (2) in the event the agreement(s) related to Classic between TransUnion, Fair Isaac and CBC are terminated or expire; (3) in the event the requirements of any law, regulation or judicial action are not met, (4) as a result of changes in laws, regulations or regulatory or judicial action, that the requirements of any law, regulation or judicial action will not be met; and/or (5) the use of the Classic Service is the subject of litigation or threatened litigation by any governmental entity.



**CONFIDENTIAL**

575 E. Locust Ave., Suite 103  Fresno, CA 93720
Phone (800) 448-0183  Fax (559) 226-2256
www.creditbureauconnection.com

# CREDIT RISK SCORE ADDENDUM (Experian/Fair Isaac Model)

For purposes of this Agreement, the term "Experian/Fair, Isaac Model" means the application of a risk model developed by Experian and Fair, Isaac and Company which employs a proprietary algorithm and which, when applied to credit information relating to individuals with whom the Subscriber has, or contemplates entering into, a credit relationship with, will result in a numerical score (the "Score"); the purpose of the models being to rank said individuals in order of the risk of unsatisfactory payment. The Parties agree as follows:

1. Subscriber warrants that it has a "permissible purpose" under the Fair Credit Reporting Act, as it may be amended from time to time, to obtain the information derived from the Experian/Fair, Isaac Model.

2. Subscriber's use of the Scores and reason codes are limited solely to use in its own business with no right to transfer or otherwise sell, license, sublicense or distr bute said Scores or reason codes to third parties.

3. Subscriber will maintain internal procedures to minimize the risk of unauthorized disclosure and agrees that such Scores and reason codes will be held in strict confidence and disclosed only to those of its employees with a "need to know" and to no other person.

4. Notwithstanding any contrary provision of the Agreement, Subscriber may disclose the Scores provide to Subscriber under this Agreement to credit applicants, when accompanied by the corresponding reason codes, in the context of bona fide lending transactions and decisions only.

5. Subscriber will comply with all applicable laws and regulations in using the Scores and reason codes purchased from CBC.

6. Subscriber, along with its employees, agents or subcontractors, is prohibited from using the trademarks, service marks, logos, names or any other proprietary designations, whether registered or unregistered, of Experian Information Solutions, Inc. or Fair, Isaac and Company, or the affiliates of either of them, or of any other party involved in the provision of the Experian/Fair, Isaac Model without such entity's prior written consent.

7. Subscriber will not in any manner, directly or indirectly, attempt to discover or reverse engineer any confidential and proprietary criteria developed or used by Experian/Fair, Isaac in performing the Experian/Fair, Isaac Model.

8. Experian/Fair, Isaac warrants that the Experian/Fair, Isaac Model is empirically derived and demonstrably and statistically sound and that to the extent the population to which the Experian/Fair, Isaac Model is applied is similar to the population sample on which the Experian/Fair Isaac Model was developed, the Experian/Fair, Isaac Model score may be relied upon by CBC and/or the Subscr ber to rank consumers in the order of the risk of unsatisfactory payment such consumers might present to Subscr ber. Experian/Fair, Isaac further warrants that so long as it provides the Experian/Fair, Isaac Model, it will comply with regulations promulgated from time to time pursuant to the Equal Opportunity Act, 15 USC Section 1691 *et seq.* THE FOREGOING WARRANTIES ARE THE ONLY WARRANTIES EXPERIAN/FAIR, ISAAC HAVE GIVEN CBC AND/OR SUBSCRIBER WITH RESPECT TO THE EXPERIAN/FAIR, ISAAC MODEL AND SUCH WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, EXPERIAN/FAIR, ISAAC MIGHT HAVE GIVEN CBC AND/OR SUBSCRIBER WITH RESPECT THERETO, INCLUDING, FOR EXAMPLE, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. CBC's and Subscr ber's rights under the foregoing Warranty are expressly conditioned upon each respective Subscriber's periodic revalidation of the Experian/Fair, Isaac Model in compliance with the requirements of Regulation B as it may be amended from time to time (12 CFR Section 202 *et seq.*).

9. Subscriber agrees the aggregate liability of Experian/Fair, Isaac is limited to the lesser of (a) the fees paid by CBC to Experian/Fair, Isaac for the Subscriber's usage of the Experian/Fair, Isaac Model as agreed upon in writing by CBC and Experian, Fair Isaac of this Agreement for the Experian/Fair, Isaac Model resold to the Subscr ber during the six (6) month period immediately preceding the Subscriber's claim, or (b) the fees paid by the Subscriber to CBC under this Agreement during said six (6) month period, and excluding any liability of Experian/Fair, Isaac for incidental, indirect, special or consequential damages of any kind.



**CONFIDENTIAL**

575 E. Locust Ave., Suite 103  Fresno, CA 93720
Phone (800) 448-0183  Fax (559) 226-2256
www.creditbureauconnection.com

# END USER CERTIFICATION OF COMPLIANCE
## California Civil Code - Section 1785.14(a)

Section 1785.14(a), as amended, states that a consumer credit reporting agency does not have reasonable grounds for believing that a consumer credit report will only be used for a permissible purpose unless all of the following requirements are met:

Section 1785.14(a)(1) states: "If a prospective user is a retail seller, as defined in Section 1802.3, and intends to issue credit to a consumer who appears in person on the basis of an application for credit submitted in person, the consumer credit reporting agency shall, with a reasonable degree of certainty, match at least three categories of identifying information within the file maintained by the consumer credit reporting agency on the consumer with the information provided to the consumer credit reporting agency by the retail seller.  The categories of identifying information may include, but are not limited to, first and last name, month and date of birth, driver's license number, place of employment, current residence address, previous residence address, or social security number.  The categories of information shall not include mother's maiden name."

Section 1785.14(a)(2) states:  "If the prospective user is a retail seller, as defined in Section 1802.3, and intends to issue credit to a consumer who appears in person on the basis of an application for credit submitted in person, the retail seller must certify, in writing, to the consumer credit reporting agency that it instructs its employees and agents to inspect a photo identification of the consumer at the time the application was submitted in person. This paragraph does not apply to an application for credit submitted by mail."

Section 1785.14(a)(3) states:  "If the prospective user intends to extend credit by mail pursuant to a solicitation by mail, the extension of credit shall be mailed to the same address as on the solicitation unless the prospective user verifies any address change by, among other methods, contacting the person to whom the extension of credit will be mailed."

In compliance with Section 1785.14(a) of the California Civil Code, the Subscriber identified in the Subscriber Service Agreement ("End User") hereby certifies to Consumer Reporting Agency as follows: (Please circle)

End User _____ a retail seller, as defined in Section 1802.3 of the California Civil Code ("Retail Seller") and issues credit to consumers who appear in person on the basis of applications for credit submitted in person ("Point of Sale").

End User also certifies that if End User is a Retail Seller who conducts Point of Sale transactions, End User will, beginning on or before July 1, 1998, instruct its employees and agents to inspect a photo identification of the consumer at the time an application is submitted in person.

End User also certifies that it will only use the appropriate End User code number designated by Consumer Reporting Agency for accessing consumer reports for California Point of Sale transactions conducted by Retail Seller.

If End User is not a Retail Seller who issues credit in Point of Sale transactions, End User agrees that if it, at any time hereafter, becomes a Retail Seller who extends credit in Point of Sale transactions, End User shall provide written notice of such to Consumer Reporting Agency prior to using credit reports with Point of Sale transactions as a Retail Seller, and shall comply with the requirements of a Retail Seller conducting Point of Sale transactions, as provided in this certification.

**Subscriber agrees to comply with all applicable provisions of the California Credit Reporting Agencies Act as described above.**

# DEATH MASTER FILE USAGE ACKNOWLEDGEMENT

Many services containing CRA information also contain information from the Death Master File as issued by the Social Security Administration ("DMF"). Pursuant to Section 203 of the Bipartisan Budget Act of 2013 and 15 C.F.R. § 1110.102 that, consistent with its applicable FCRA or GLB use of CRA information, the Subscriber's use of deceased flags or other indicia within the CRA information is restricted to legitimate fraud prevention or business purposes in compliance with applicable laws, rules, regulations, or fiduciary duty, as such business purposes are interpreted under 15 C.F.R. §1110.102(a)(1); and the Subscriber will not take any adverse action against any consumer without further investigation to verify the information from the deceased flags or other indicia within the CRA information.



**CONFIDENTIAL**

575 E. Locust Ave., Suite 103  Fresno, CA 93720
Phone (800) 448-0183  Fax (559) 226-2256
www.creditbureauconnection.com

# Vermont Fair Credit Reporting Statute, 9 V.S.A. § 2480a (2016)

**§ 2480a. Consumer consent**

(a) A person shall not obtain the credit report of a consumer unless:
   (1) the report is obtained in response to the order of a court having jurisdiction to issue such an order; or
   (2) the person has secured the consent of the consumer, and the report is used for the purpose consented to by the consumer.
(b) Credit reporting agencies shall adopt reasonable procedures to assure maximum possible compliance with subsection (a) of this section.
(c) Nothing in this section shall be construed to affect:
   (1) the ability of a person who has secured the consent of the consumer pursuant to subdivision (a)(2) of this section to include in his or her request to the consumer permission to also obtain credit reports, in connection with the same transaction or extension of credit, for the purpose of reviewing the account, increasing the credit line on the account, for the purpose of taking collection action on the account, or for other legitimate purposes associated with the account; and
   (2) the use of credit information for the purpose of prescreening, as defined and permitted from time to time by the Federal Trade Commission.

## VERMONT RULES *** CURRENT THROUGH DECEMBER 2016 ***
## AGENCY 06. OFFICE OF THE ATTORNEY GENERAL
## SUB-AGENCY 031. CONSUMER PROTECTION DIVISION
## CHAPTER 012. Consumer Fraud--Fair Credit Reporting
## RULE CF 112 FAIR CREDIT REPORTING
## CVR 06-031-012, CF 112.03 (2016)
## CF 112.03 CONSUMER CONSENT

(a) A person required to obtain consumer consent pursuant to 9 V.S.A. §§ 2480a and 2480g shall obtain said consent in writing if the consumer has made a written application or written request for credit, insurance, employment, housing or governmental benefit. If the consumer has applied for or requested credit, insurance, employment, housing or governmental benefit in a manner other than in writing, then the person required to obtain consumer consent pursuant to 9 V.S.A. §§ 2480e and 2480g shall obtain said consent in writing or in the same manner in which the consumer made the application or request. The terms of this rule apply whether the consumer or the person required to obtain consumer consent initiates the transaction.

(b) Consumer consent required pursuant to 9 V.S.A. §§ 2480a and 2480g shall be deemed to have been obtained in writing if, after a clear and adequate written disclosure of the circumstances under which a credit report or credit reports may be obtained and the purposes for which the credit report or credit reports may be obtained, the consumer indicates his or her consent by providing his or her signature.

(c) The fact that a clear and adequate written consent form is signed by the consumer after the consumer's credit report has been obtained pursuant to some other form of consent shall not affect the validity of the earlier consent.

**Subscriber agrees to comply with all applicable provisions of the Vermont Fair Credit Reporting Act ("VFCRA") as in effect from time to time. Specifically, Subscriber agrees to order credit reports (as defined by the VFCRA) relating to Vermont consumers only after Subscriber has received prior written consumer consent in accordance with 9 V.S.A.§ 2480a and applicable Vermont rules. Subscriber acknowledges that it has received and reviewed such statute and rules.**



CONFIDENTIAL

575 E. Locust Ave., Suite 103  Fresno, CA 93720
Phone (800) 448-0183  Fax (559) 226-2256
www.creditbureauconnection.com

# NOTICE TO USERS OF CONSUMER REPORTS: OBLIGATIONS OF USERS UNDER THE FCRA

The Fair Credit Reporting Act (FCRA), 15 U.S.C. 1681-1681y, requires that this notice be provided to inform users of consumer reports of their legal obligations. State law may impose additional requirements. The text of the FCRA is set forth in full at the Consumer Financial Protection Bureau's (CFPB) website at www.consumerfinance.gov/learnmore.  At the end of this section is a list of United States Code citations for the FCRA.  Other information about user duties is also available at the CFPB's website.  **Users must consult the relevant provisions of the FCRA for details about their obligations under the FCRA.**

The first section of this summary sets forth the responsibilities imposed by the FCRA on all users of consumer reports. The subsequent sections discuss the duties of users of reports that contain specific types of information, or that are used for certain purposes, and the legal consequences of violations. If you are a furnisher of information to a consumer reporting agency (CRA), you have additional obligations and will receive a separate notice from the CRA descr bing your duties as a furnisher.

I.   **OBLIGATIONS OF ALL USERS OF CONSUMER REPORTS**
   A.   **Users Must Have a Permissible Purpose**
   Congress has limited the use of consumer reports to protect consumers' privacy. All users must have a permissible purpose under the FCRA to obtain a consumer report. Section 604 of the FCRA contains a list of the permissible purposes under the law. These are:
   - As ordered by a court or a federal grand jury subpoena. *Section 604(a)(1)*
   - As instructed by the consumer in writing. *Section 604(a)(2)*
   - For the extension of credit as a result of an application from a consumer, or the review or collection of a consumer's account. *Section 604(a)(3)(A)*
   - For employment purposes, including hiring and promotion decisions, where the consumer has given written permission. *Sections 604(a)(3)(B) and 604(b)*
   - For the underwriting of insurance as a result of an application from a consumer. *Section 604(a)(3)(C)*
   - When there is a legitimate business need, in connection with a business transaction that is initiated by the consumer. *Section 604(a)(3)(F)(I)*
   - To review a consumer's account to determine whether the consumer continues to meet the terms of the account. *Section 604(a)(3)(F)(ii)*
   - To determine a consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status. *Section 604(a)(3)(D)*
   - For use by a potential investor or servicer, or current insurer, in a valuation or assessment of the credit or prepayment risks associated with an existing credit obligation. *Section 604(a)(3)(E)*
   - For use by state and local officials in connection with the determination of child support payments, or modifications and enforcement thereof. *Sections 604(a)(4) and 604(a)(5)*
   - In addition, creditors and insurers may obtain certain consumer report information for the purpose of making "prescreened" unsolicited offers of credit or insurance.  *Section 604(c).*  The particular obligations of users of this "prescreened" information are described in Section VII below.

   B.   **Users Must Provide Certifications**
   Section 604(f) of the FCRA prohibits any person from obtaining a consumer report from a consumer reporting agency (CRA) unless the person has certified to the CRA the permissible purpose(s) for which the report is being obtained and certifies that the report will not be used for any other purpose.

   C.   **Users Must Notify Consumers When Adverse Actions Are Taken**
   The term "adverse action" is defined very broadly by Section 603 of the FCRA. "Adverse actions" include all business, credit, and employment actions affecting consumers that can be considered to have a negative impact as defined by Section 603(k) of the FCRA -- such as denying or canceling credit or insurance, or denying employment or promotion.  No adverse action occurs in a credit transaction where the creditor makes a counteroffer that is accepted by the consumer.
   1.   **Adverse Actions Based on Information Obtained From a CRA**
   If a user takes any type of adverse action as defined by the FCRA that is based at least in part on information contained in a consumer report, Section 615(a) requires the user to notify the consumer. The notification may be done in writing, orally, or by electronic means. It must include the following:
   - The name, address, and telephone number of the CRA (including a toll-free telephone number, if it is a nationwide CRA) that provided the report.
   - A statement that the CRA did not make the adverse decision and is not able to explain why the decision was made.
   - A statement setting forth the consumer's right to obtain a free disclosure of the consumer's file from the CRA if the consumer makes a request within 60 days.
   - A statement setting forth the consumer's right to dispute directly with the CRA the accuracy or completeness of any information provided by the CRA.
   2.   **Adverse Actions Based on Information Obtained From Third Parties Who Are Not Consumer Reporting Agencies**
   If a person denies (or increases the charge for) credit for personal, family, or household purposes based either wholly or partly upon information from a person other than a CRA, and the information is the type of consumer information covered by the FCRA, Section 615(b)(1) of the FCRA requires that the user clearly and accurately disclose to the consumer his or her right to be told the nature of the information that was relied upon if the consumer makes a written request within 60 days of notification. The user must provide the disclosure within a reasonable period of time following the consumer's written request.


3. **Adverse Actions Based on Information Obtained From Affiliates**
   If a person takes an adverse action involving insurance, employment, or a credit transaction initiated by the consumer, based on information of the type covered by the FCRA, and this information was obtained from an entity affiliated with the user of the information by common ownership or control, Section 615(b)(2) requires the user to notify the consumer of the adverse action. The notification must inform the consumer that he or she may obtain a disclosure of the nature of the information relied upon by making a written request within 60 days of receiving the adverse action notice. If the consumer makes such a request, the user must disclose the nature of the information not later than 30 days after receiving the request. (Information that is obtained directly from an affiliated entity relating solely to its transactions or experiences with the consumer, and information from a consumer report obtained from an affiliate are not covered by Section 615(b)(2).)

D. **Users Have Obligations When Fraud and Active Duty Military Alerts are in Files**
   When a consumer has placed a fraud alert, including one relating to identity theft, or an active duty military alert with a nationwide consumer reporting agency as defined in Section 603(p) and resellers, Section 605A(h) imposes limitations on users of reports obtained from the consumer reporting agency in certain circumstances, including the establishment of a new credit plan and the issuance of additional credit cards.  For initial fraud alerts and active duty alerts, the user must have reasonable policies and procedures in place to form a belief that the user knows the identity of the applicant or contact the consumer at a telephone number specified by the consumer; in the case of extended fraud alerts, the user must contact the consumer in accordance with the contact information provided in the consumer's alert.

E. **Users Have Obligations When Notified of an Address Discrepancy**
   Section 605(h) requires nationwide CRAs, as defined in Section 603(p), to notify users that request reports when the address for a consumer provided by the user in requesting the report is substantially different from the addresses in the consumer's file. When this occurs, users must comply with regulations specifying the procedures to be followed.  Federal regulations are available at www.consumerfinance.gov/learnmore.

F. **Users Have Obligations When Disposing of Records**
   Section 628 requires that all users of consumer report information have in place procedures to properly dispose of records containing this information.  Federal regulations have been issued that cover disposal.

II. **CREDITORS MUST MAKE ADDITIONAL DISCLOSURES**
If a person uses a consumer report in connection with an application for, or a grant, extension, or provision of, credit to a consumer on material terms that are materially less favorable than the most favorable terms available to a substantial proportion of consumers from or through that person, based in whole or in part on a consumer report, the person must provide a risk-based pricing notice to the consumer in accordance with regulations prescribed by the CFPB.

Section 609(g) requires a disclosure by all persons that make or arrange loans secured by residential real property (one to four units) and that use credit scores.

These persons must provide credit scores and other information about credit scores to applicants, including the disclosure set forth in Section 609(g)(1)(D) ("Notice to the Home Loan Applicant").

III. **OBLIGATIONS OF USERS WHEN CONSUMER REPORTS ARE OBTAINED FOR EMPLOYMENT PURPOSES**
   A. **Employment Other Than in the Trucking Industry**
      If information from a CRA is used for employment purposes, the user has specific duties, which are set forth in Section 604(b) of the FCRA. The user must:
      - Make a clear and conspicuous written disclosure to the consumer before the report is obtained, in a document that consists solely of the disclosure that a consumer report may be obtained.
      - Obtain from the consumer prior written authorization.  Authorization to access reports during the term of employment may be obtained at the time of employment.
      - Certify to the CRA that the above steps have been followed, that the information being obtained will not be used in violation of any federal or state equal opportunity law or regulation, and that, if any adverse action is to be taken based on the consumer report, a copy of the report and a summary of the consumer's rights will be provided to the consumer.
      - Before taking an adverse action, the user must provide a copy of the report to the consumer as well as the summary of the consumer's rights. (The user should receive this summary from the CRA).  A Section 615(a) adverse action notice should be sent after the adverse action is taken.
      An adverse action notice also is required in employment situations if credit information (other than transactions and experience data) obtained from an affiliate is used to deny employment.  *Section 615(b)(2)*

   B. **Employment in the Trucking Industry**
      Special rules apply for truck drivers where the only interaction between the consumer and the potential employer is by mail, telephone, or computer.  In this case, the consumer may provide consent orally or electronically, and an adverse action may be made orally, in writing, or electronically.  The consumer may obtain a copy of any report relied upon by the trucking company by contacting the company.

IV. **OBLIGATIONS WHEN INVESTIGATIVE CONSUMER REPORTS ARE USED**
Investigative consumer reports are a special type of consumer report in which information about a consumer's character, general reputation, personal characteristics, and mode of living is obtained through personal interviews by an entity or person that is a consumer reporting agency.  Consumers who are the subjects of such reports are given special rights under the FCRA. If a user intends to obtain an investigative consumer report, Section 606 of the FCRA requires the following:
- The user must disclose to the consumer that an investigative consumer report may be obtained.  This must be done in a written disclosure that is mailed, or otherwise delivered, to the consumer at some time before or not later than three days after the date on which the report was first requested. The disclosure must include a statement informing the consumer of his or her right to request additional disclosures of the nature and scope of the investigation as described below, and the summary of consumer rights required by Section 609 of the FCRA. (The summary of consumer rights will be provided by the CRA that conducts the investigation.)


- The user must certify to the CRA that the disclosures set forth above have been made and that the user will make the disclosure described below.
- Upon the written request of a consumer made within a reasonable period of time after the disclosures required above, the user must make a complete disclosure of the nature and scope of the investigation. This must be made in a written statement that is mailed, or otherwise delivered, to the consumer no later than five days after the date on which the request was received from the consumer or the report was first requested, whichever is later in time.

### V. SPECIAL PROCEDURES FOR EMPLOYEE INVESTIGATIONS

Section 603(x) provides special procedures for investigations of suspected misconduct by an employee or for compliance with Federal, state or local laws and regulations or the rules of a self-regulatory organization, and compliance with written policies of the employer. These investigations are not treated as consumer reports so long as the employer or its agent complies with the procedures set forth in Section 603(x), and a summary describing the nature and scope of the inquiry is made to the employee if an adverse action is taken based on the investigation.

### VI. OBLIGATIONS OF USERS OF MEDICAL INFORMATION

Section 604(g) limits the use of medical information obtained from consumer reporting agencies (other than payment information that appears in a coded form that does not identify the medical provider). If the information is to be used for an insurance transaction, the consumer must give consent to the user of the report or the information must be coded. If the report is to be used for employment purposes – or in connection with a credit transaction (except as provided in federal regulations) – the consumer must provide specific written consent and the medical information must be relevant. Any user who receives medical information shall not disclose the information to any other person (except where necessary to carry out the purpose for which the information was disclosed, or as permitted by statute, regulation, or order).

### VII. OBLIGATIONS OF USERS OF "PRESCREENED" LISTS

The FCRA permits creditors and insurers to obtain limited consumer report information for use in connection with unsolicited offers of credit or insurance under certain circumstances. *Sections 603(l), 604(c), 604(e), and 615(d).* This practice is known as "prescreening" and typically involves obtaining from a CRA a list of consumers who meet certain pre-established criteria. If any person intends to use prescreened lists, that person must (1) before the offer is made, establish the criteria that will be relied upon to make the offer and to grant credit or insurance, and (2) maintain such criteria on file for a three-year period beginning on the date on which the offer is made to each consumer. In addition, any user must provide with each written solicitation a clear and conspicuous statement that:

- Information contained in a consumer's CRA file was used in connection with the transaction.
- The consumer received the offer because he or she satisfied the criteria for credit worthiness or insurability used to screen for the offer.
- Credit or insurance may not be extended if, after the consumer responds, it is determined that the consumer does not meet the criteria used for screening or any applicable criteria bearing on credit worthiness or insurability, or the consumer does not furnish required collateral.
- The consumer may prohibit the use of information in his or her file in connection with future prescreened offers of credit or insurance by contacting the notification system established by the CRA that provided the report. The statement must include the address and toll-free telephone number of the appropriate notification system.

In addition, the CFPB has established the format, type size, and manner of the disclosure required by Section 615(d), with which users must comply. The relevant regulation is 12 CFR 1022.54.

### VIII. OBLIGATIONS OF RESELLERS

**A. Disclosure and Certification Requirements**

Section 607(e) requires any person who obtains a consumer report for resale to take the following steps:
- Disclose the identity of the end-user to the source CRA.
- Identify to the source CRA each permissible purpose for which the report will be furnished to the end-user.
- Establish and follow reasonable procedures to ensure that reports are resold only for permissible purposes, including procedures to obtain:
  (1) the identity of all end-users;
  (2) certifications from all users of each purpose for which reports will be used; and
  (3) certifications that reports will not be used for any purpose other than the purpose(s) specified to the reseller. Resellers must make reasonable efforts to verify this information before selling the report.

**B. Reinvestigations by Resellers**

Under Section 611(f), if a consumer disputes the accuracy or completeness of information in a report prepared by a reseller, the reseller must determine whether this is a result of an action or omission on its part and, if so, correct or delete the information. If not, the reseller must send the dispute to the source CRA for reinvestigation. When any CRA notifies the reseller of the results of an investigation, the reseller must immediately convey the information to the consumer.

**C. Fraud Alerts and Resellers**

Section 605A(f) requires resellers who receive fraud alerts or active duty alerts from another consumer reporting agency to include these in their reports.

### IX. LIABILITY FOR VIOLATIONS OF THE FCRA

Failure to comply with the FCRA can result in state or federal enforcement actions, as well as private lawsuits. *Sections 616, 617, and 621.* In addition, any person who knowingly and willfully obtains a consumer report under false pretenses may face criminal prosecution. *Section 619.*

Case 1:22-cv-04447-JSR  Document 53-8  Filed 03/15/23  Page 16 of 20



**575 E. Locust Ave., Suite 103  Fresno, CA 93720**
**Phone (800) 448-0183  Fax (559) 226-2256**
**www.creditbureauconnection.com**

CONFIDENTIAL

**The CFPB's website, www.consumerfinance.gov/learnmore, has more information about the FCRA, including publications for businesses and the full text of the FCRA.**
**Citations for FCRA sections in the U.S. Code, 15 U.S.C. § 1681 et seq.:**
Section 602 15 U.S.C. 1681
Section 603 15 U.S.C. 1681a
Section 604 15 U.S.C. 1681b
Section 605 15 U.S.C. 1681c
Section 605A 15 U.S.C. 1681cA
Section 605B 15 U.S.C. 1681cB
Section 606 15 U.S.C. 1681d
Section 607 15 U.S.C. 1681e
Section 608 15 U.S.C. 1681f
Section 609 15 U.S.C. 1681g
Section 610 15 U.S.C. 1681h
Section 611 15 U.S.C. 1681i
Section 612 15 U.S.C. 1681j
Section 613 15 U.S.C. 1681k
Section 614 15 U.S.C. 1681l
Section 615 15 U.S.C. 1681m
Section 616 15 U.S.C. 1681n
Section 617 15 U.S.C. 1681o
Section 618 15 U.S.C. 1681p
Section 619 15 U.S.C. 1681q
Section 620 15 U.S.C. 1681r
Section 621 15 U.S.C. 1681s
Section 622 15 U.S.C. 1681s-1
Section 623 15 U.S.C. 1681s-2
Section 624 15 U.S.C. 1681t
Section 625 15 U.S.C. 1681u
Section 626 15 U.S.C. 1681v
Section 627 15 U.S.C. 1681w
Section 628 15 U.S.C. 1681x
Section 629 15 U.S.C. 1681y

Revised 8/19          DEFENDANTS_108
16 of



575 E. Locust Ave., Suite 103 Fresno, CA 93720
Phone (800) 448-0183 Fax (559) 226-2256
www.creditbureauconnection.com

**CONFIDENTIAL**

# SUBSCRIBER SERVICE AGREEMENT
## APPLICATION CHECKLIST and ACKNOWLEDGEMENT

You have elected to use certain products and/or services that fall under the federal Fair Credit Reporting Act guidelines. Please use this checklist as a guide to ensure that you have read, completed, and acknowledge the requirements as previously set forth. By signing below, you accept and acknowledge you have completed all of the requirements in this checklist.

- ❑ **Membership Application** (Page 1 – Completely filled in and signed)
- ❑ **Subscriber Service Agreement** (Page 2, 3 & 4 – Completely filled in and signed)
- ❑ **Access Security Requirements** (Page 5, 6 & 7 – Please read carefully)
- ❑ **Credit Risk Score Addendum – Experian and TransUnion Service** (Page 8 – Please read carefully)
- ❑ **Credit Risk Score Addendum – TransUnion Classic Risk Score Service** (Page 8 & 9 – Please read carefully)
- ❑ **Credit Risk Score Addendum – Experian/Fair, Isaac Model** (Page 10 – Please read carefully)
- ❑ **End User Certification of Compliance - California Civil Code - Section 1785.14(a)** (Page 11 – Please read carefully)
- ❑ **Death Master File Usage Acknowledgement** (Page 11 – Please read carefully)
- ❑ **Vermont Fair Credit Reporting Statute, 9 V.S.A. § 2480e (1999)** (Page 12 – Please read carefully)
- ❑ **Notice to Users of Consumer Reports: Obligations of Users Under FCRA** (Page 13, 14, 15, & 16 – Please read carefully)
- ❑ **Fee Schedule (Exhibit A) attached** (Please read carefully and sign)
- ❑ **If applicable, the Experian/TransUnion Consumer Services Schedule Pre-Qualification (Exhibit B) attached** (Please read carefully)
- ❑ **If applicable, the Employment Verification Service Addendum (Exhibit C) attached** (Please read carefully and sign)
- ❑ **If applicable, the Equifax Pre-Qualification Terms and Conditions (Exhibit D) attached** (Please read carefully)
- ❑ **If applicable, you will receive a separate email to complete the Equifax Broker Subscriber Agreement** (Please read carefully)
- ❑ **To provide a copy of a current DMV license, business license, or Articles of Incorporation** (Please provide separately)
- ❑ **For TransUnion service, if Subscriber is a Partnership or Sole Proprietor, provide a copy of owner's government issued photo ID** (Please provide separately)
- ❑ **For TransUnion service, if Subscriber in business less than one (1) year, provide two of the following items:** (Please provide separately)
    - Copy of utility or telephone bill in the business name for service at the principal place of business
    - Copy of lease or proof of property ownership by business at the Subscriber's principal place of business
    - Copy of bank statement addressed to Subscriber at its principal place of business
    - Proof of commercial insurance under the business name shown on the Subscriber Application
- ❑ **For TransUnion service, provide a letter of intent on company letterhead, signed by an officer, owner, or authorized manager of the company. See separate letter of intent instructions.** (Please provide separately)

This agreement was signed electronically, the following is part of that digital signature.
Company Name / DBA: Spartan Auto Group LLC / Victory Mitsubishi
Signer: diane argyropoulos
Title: member
IP Address: 173.220.248.123
Date/Time: 10/24/2019 10:56:03 PDT
Browser Info: Mozilla/5.0 (Windows NT 10.0; WOW64; Trident/7.0; rv:11.0) like Gecko

The person signing below represents and warrants that he or she (1) has the necessary authority to bind the principal(s) to this Agreement in its entirety, and (2) that he or she has read and understands all of the terms, conditions, and notifications on the prior pages of this Agreement and agrees to the terms of this Agreement as written on behalf of his or her organization or business. The undersigned also acknowledges and agrees facsimile or electronic signatures can be construed as valid and binding marks.

| Accepted by: | *diane argyropoulos* | diane argyropoulos | member | 10/24/2019 |
|---|---|---|---|---|
| | Authorized Representative Signature | Printed Name | Title | Date |

Spartan Auto Group LLC / Victory Mitsubishi
Company Name / DBA (Subscriber)

| 4070 Boston Road | BRONX | NY | 10475 |
|---|---|---|---|
| Address | City | State | Zip |

Revised 8/19

**DEFENDANTS 109**



**CONFIDENTIAL**

575 E. Locust Ave., Suite 103  Fresno, CA 93720
Phone (800) 448-0183  Fax (559) 226-2256
www.creditbureauconnection.com

# LETTER OF INTENT INSTRUCTIONS FOR TRANSUNION SERVICE

Please provide a separate letter of intent that meets all of the following requirements:

- ☐ Must be printed on company letterhead
- ☐ Verify the company address on the letter of intent matches the address on the Subscriber Agreement
- ☐ Describe the nature of the company's business
- ☐ Describe the intended use for the credit report services
- ☐ Describe the anticipated monthly credit report volume
- ☐ State whether the company anticipates its credit report access to be primarily local, regional, or national
- ☐ Must be signed by an officer, owner, or authorized manager of the company

**SAMPLE LETTER OF INTENT**

(DO NOT SEND IN THIS PAGE, THE LETTER OF INTENT MUST BE PRINTED ON COMPANY LETTERHEAD)

[Date]

Credit Bureau Connection
575 E. Locust Ave., Suite 103
Fresno, CA  93720

Re: Letter of Intent for Credit Report Service

Dear Credit Bureau Connection:

Our company is an automobile dealership and we have a permissible purpose for obtaining consumer credit reports in connection with the sale or lease of motor vehicles.  We will access credit reports and consumer credit information for the above purpose only.  Our anticipated monthly volume of credit report requests is _____.   We anticipate our access to be primarily _____ [local, regional, or national].

Regards,

_____
[Name]
[Title - must be an officer, owner, or authorized manager]
[Company name]

Revised 7/16

**DEFENDANTS 110**

**cbc** credit bureau connection

**CONFIDENTIAL**

## FEE SCHEDULE
("Exhibit A")

| | New Account Fees | One-Time Fee |
|---|---|---|
| X | CBC eCREDIT REPORT AND COMPLIANCE WEB-BASED SOFTWARE NEW ACCOUNT SETUP FEE | Waived |
| X | ON-SITE 3rd PARTY INSPECTION FEE | Waived |
| | **Monthly Subscription Fees** | **Monthly Fee** |
| X | CBC eCREDIT COMPLETE CREDIT REPORT AND COMPLIANCE WEB-BASED SOFTWARE | Waived |
| ☐ | eVAULT - LONG-TERM ELECTRONIC COMPLIANCE, DOCUMENT REPOSITORY, AND AUDIT TRAIL LOG | N/A |
| X | DEALERTRACK CREDIT APPLICATION PUSH - *ID# 647415* | Waived |
| ☐ | ROUTEONE CREDIT APPLICATION PUSH | N/A |
| X | 3rd PARTY INTEGRATION PLATFORM - *DEALERTRACK* | Waived |
| | **Credit Bureau Reports, Scoring Models, and Other Report Options** | **Fee** |
| X | EXPERIAN CREDIT PROFILE REPORT | $1.93 |
| X | EXPERIAN SCORE MODEL(S) - *FICO AUTO V8* | $0.25/ea |
| X | TRANSUNION CREDIT PROFILE REPORT | $2.47 |
| X | TRANSUNION SCORE MODEL(S) - *FICO AUTO SCORE 8* | $0.25/ea |
| ☐ | EQUIFAX CREDIT PROFILE REPORT | N/A |
| ☐ | EQUIFAX SCORE MODEL(S) | N/A |
| ☐ | EXPERIAN PREQUALIFICATION PROFILE REPORT | N/A |
| ☐ | EXPERIAN PREQUALIFICATION SCORE MODEL(S) | N/A |
| ☐ | TRANSUNION PREQUALIFICATION PROFILE REPORT | N/A |
| ☐ | TRANSUNION PREQUALIFICATION SCORE MODEL(S) | N/A |
| ☐ | EQUIFAX PREQUALIFICATION PROFILE REPORT | N/A |
| ☐ | EQUIFAX PREQUALIFICATION SCORE MODEL(S) | N/A |
| ☐ | CLARITY CREDIT PROFILE REPORT with CLARITY AUTO RISK SCORE | N/A |
| ☐ | MILITARY LENDING ACT (MLA) COVERED BORROWER INQUIRY PER REPORT | N/A |
| ☐ | AUTOMATED INCOME AND EMPLOYMENT CHECK (AIC) | N/A |
| ☐ | CONSUMER LIENS AND JUDGMENT DATA INQUIRY PER REPORT | N/A |
| ☐ | CBC AUTO FINANCE SUMMARY WITH APR ESTIMATOR | N/A |
| | **Compliance Solution Products** | **Fee** |
| ☐ | TIER 1 COMPLETE COMPLIANCE SUITE | N/A |
| ☐ | eVERIFY RED FLAGS RULE CHECK INTELLIGENT FRAUD DETECTION REPORT HEADER | N/A |
| ☐ | COMPLIANCE MANAGEMENT TOOLS AND REPORTING | N/A |
| ☐ | COMPREHENSIVE MULTIPLE CHOICE OUT OF WALLET QUESTIONS | N/A |
| ☐ | ADVANCED RISK-BASED PRICING RULE CREDIT SCORE DISCLOSURE EXCEPTION NOTICE | N/A |
| ☐ | OFAC COMPLETE CHECK WITH CBC CLEAR FUNCTION | N/A |
| ☐ | SYNTHETIC IDENTITY FRAUD PREVENTION CHECK AND WARNING INDICATOR | N/A |
| | **Additional Products and Services** | **Fee** |
| ☐ | ADVERSE ACTION LETTER FULFILLMENT MAIL HOUSE | N/A |
| ☐ | eCREDIT ONLINE APPLICATION AND LEAD GENERATION TOOL PER WEBSITE | N/A |
| ☐ | eQUALIFY ONLINE PREQUALIFICATION WEB APPLICATION PER WEBSITE | N/A |
| ☐ | eZ FORM-FILL WEB APPLICATION ADD-ON PER WEBSITE | N/A |
| ☐ | EQUIFAX "THE WORK NUMBER" INCOME AND EMPLOYMENT VERIFICATION | N/A |
| ☐ | COMPLIANCE DASHBOARD WITH MULTI ROOFTOP COMPLIANCE ALERT MANAGEMENT SYSTEM | N/A |
| X | AUTOMATIC 30-DAY LOOKBACK ON CREDIT REPORT RE-PULLS | Included |
| X | PROFESSIONAL TRAINING AND SUPPORT | Included |

Notes: (1) Transaction fees are for an individual credit report.
(2) Transaction fees are per request, including "no hits" (a "no hit" is returned when here is insufficient credit data for a specific applicant).
(3) Minimum monthly billing of $25.00/month each for Adverse Action fulfillment, Experian and TransUnion, and $50.00/month for Clarity and Equifax.
(4) Prices do not include the Credit Reporting Agencies FACT Act cost recovery surcharges ($0.13/ea Equifax, TransUnion, and Experian single hard pull reports), additional or enhanced scoring services, additional fraud product options, state or local taxes if applicable, Colorado surcharges, Puerto Rico surcharges.
(5) For each FICO® score enabled, a FICO® score surcharge of $0.95 on Equifax, Experian, and TransUnion hard pull credit reports will be assessed per single report.
(6) A $60.00 fee will be charged in the event the on-site inspection is canceled by the customer, or the customer "no-shows" for the on-site inspection.
(7) A subscriber code service fee of $14.95/month per bureau will be assessed on accounts with Equifax, Experian, and TransUnion credit report activity.
(8) Monthly activity invoices are delivered electronically via email; if a paper invoice is necessary, a $10.00/invoice paper billing fee will be applied.
(9) If you choose to pay your monthly invoice by credit card, a 3% credit card convenience fee will be added to your charge, o herwise we accept payments via ACH, check, or directly from your electronic invoice at no charge.

I AGREE TO PAY THE CHARGES AS STATED N THE FEE SCHEDULE ABOVE AND ACKNOWLEDGE THERE MAY BE ADDITIONAL CHARGES NCURRED FOR SERVICES IDENTIF ED IN THE NOTES SECTION BELOW THE FEE SCHEDULE.

| diane argyropoulos | Victory Mitsubishi |
|---|---|
| (Printed Name) | (Company Name) |
| *diane argyropoulos* | 10/24/2019 |
| (Signature) | (Date) |

**DEFENDANTS 111**



**CONFIDENTIAL**

**CONFIDENTIAL & PROPRIETARY**

Dealer's Credit Bureau codes for:



**Date:** 10/21/2019

**Dealership Name:** Victory Mitsubishi

**Dealer Address:** 4070 Boston Road
BRONX, NY  10475

**DealerTrack ID:** 647415

---

**Equifax** (CBI)
Access Code:

_____
Member Number

***Credit Bureau Connection will fill in the codes and email to DealerTrack

_____
Security Code

---

**Experian** (TRW)
Access Code:

_____
Preamble Code

_____
Subscriber Code

_____
Password

---

**TransUnion** (TRU)
Access Code:

_____  _____  _____  _____  _____
Market  Sub-Market  Industry  Member Code  Password

---

By my signature below, I hereby authorize DealerTrack to use the codes described above for DealerTrack Credit Bureaus.  Please fax this form back to **559-226-2256**

Signature: *diane argyropoulos*

Print Name: diane argyropoulos

575 E. Locust Ave., Suite 103    •    Fresno, CA 93720
Phone:  (800) 448-0183    •    Fax:  (559) 226-2256    •    www.creditbureauconnection.com

**DEFENDANTS 112**