**Page 1**

```
 1        UNITED STATES DISTRICT COURT
 2               for the
 3        SOUTHERN DISTRICT OF NEW YORK
   --------------------------------------------
 4
   FARAH JEAN FRANCOIS,
 5
              Plaintiff,
 6
         vs.          Civil Action No.: 1:22-CV-4447-JSR
 7
   VICTORY AUTO GROUP LLC d/b/a
 8 VICTORY MITSUBISHI, et al.,
 9              Defendants.
10 --------------------------------------------
11
12
13      DEPOSITION of EMMANUEL LAFOREST, taken on
14 Tuesday, October 25, 2022, at 2:12 p.m., at
15 Brooklyn, New York, before Keith Taylor, Digital
16 Reporter and Notary Public of the State of New York.
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1             APPEARANCES OF COUNSEL
 2 On behalf of Plaintiff, Farah Jean Francois:
 3      EMMA CATERINE, ESQ.
        AHMAD KESHAVARZ, ESQ.
 4      LAW OFFICES OF AHMAD KESHAVARZ
        16 Court Street
 5      Suite 2600
        Brooklyn, New York 11241
 6      718-522-7900
        emma@newyorkconsumerattorney.com
 7      ahmad@newyorkconsumerattorney.com
        APPEARED IN PERSON
 8
 9 On behalf of Defendants, Victory Auto Group LLC
   d/b/a Victory Mitsubishi, et al.:
10
        PATRICK L. SELVEY, ESQ.
11      NICHOLAS GOODMAN & ASSOCIATES, PLLC
        333 Park Avenue South
12      Suite 3A
        New York, New York 10010
13      212-227-9003
        pselvey@ngoodmanlaw.com
14      APPEARED IN PERSON
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              INDEX OF EXAMINATION
 2 EXAMINATION                                    PAGE
 3 Stipulations                                     5
 4 Direct Examination by Ms. Caterine               7
 5 Further Examination by Mr. Keshavarz            56
 6 Redirect Examination by Ms. Caterine            69
 7 Further Examination by Mr. Keshavarz            74
 8 Further Direct Examination by Ms. Caterine      76
 9 Cross-Examination by Mr. Selvey                 77
10 Further Examination by Mr. Keshavarz           136
11 Recross-Examination by Mr. Selvey              140
12 Certificate of Digital Reporter                152
13 Certificate of Transcriptionist               153
14 Deposition Errata Sheet                        154
15              INDEX OF EXHIBITS
16 PLAINTIFF'S        DESCRIPTION                 PAGE
17 Exhibit 1   Subpoena                            12
18 Exhibit 2   E-mail Chains                       13
19 Exhibit 3   Text Messages                       19
20 Exhibit 4   Online Credit Application           21
21 Exhibit 5   Credit Bureau Form                  21
22 Exhibit 6   Dealership Application              28
23 Exhibit 7   Driver's License of Ms. Francois    30
24 Exhibit 8   Sales Worksheet                     32
25 Exhibit 9   Receipt of 5-30-2020                33
```

**Page 4**

```
 1              INDEX TO EXHIBITS
 2 PLAINTIFF'S        DESCRIPTION                 PAGE
 3 Exhibit 10  Victory Mitsubishi Application      36
 4 Exhibit 11  Application                         41
 5 Exhibit 12  Retail Installment Contract         42
 6 Exhibit 13  Retail Certificate of Sales Receipt 44
 7 Exhibit 14  Vehicle Registration                45
 8 Exhibit 15  Notice of Unpaid Violation          47
 9 Exhibit 16  Text Messages                       50
10 Exhibit 17  Case Details Summary                56
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022

5—8

Page 5

1    IT IS HEREBY STIPULATED AND AGREED,
2    by and between counsel for the respective
3    parties hereto, that the filing, sealing
4    and certification of the within deposition
5    shall be and the same are hereby waived;
6        IT IS FURTHER STIPULATED AND AGREED
7    that all objections, except as to the form
8    of the question, shall be reserved to the
9    time of the trial;
10       IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be signed
12   before any Notary Public with the same
13   force and effect as if signed and sworn to
14   before the Court.
15
16
17
18
19
20
21
22
23
24
25

Page 6

1                    E. Laforest
2        THE REPORTER:  We are going on the record.
3    The time is 2:12 p.m. Eastern Standard Time.  Good
4    afternoon.  My name is Keith Taylor and I'm the state
5    of New York notary and reporter assigned by Esquire
6    Deposition Solutions.  I request all parties stipulate
7    and agree that this will be the deposition of Emmanuel
8    Laforest in the case of Farah Jean Francois v. Victory
9    Auto Group, LLC, doing business as Victory Mitsubishi.
10       Before going on the record, the witness
11   positively identified himself to me as Emmanuel
12   Laforest by ID card issued by the state of New York,
13   and the witness is presently located in Brooklyn, New
14   York.  Counsel, will you please state your appearance
15   for your -- for the record, your firm, who you
16   represent, and that you agree to stipulate that I may
17   place this witness under oath and report this
18   proceeding.
19       MS. CATERINE:  Emma Caterine, Law Office of
20   Ahmad Keshavarz for the plaintiff, Farah Jean Francois.
21       MR. KESHAVARZ:  And Ahmad Keshavarz, Law
22   Office of Ahmad Keshavarz.  We so stipulate.
23       MR. SELVEY:  Patrick Selvey, Nicholas Goodman
24   & Associates for the defendants, so stipulate.
25       THE REPORTER:  I will now swear in the

Page 7

1                    E. Laforest
2    witness.  Mr. -- Mr. Laforest, please raise your right
3    hand.
4            EMMANUEL LAFOREST,
5    having been first duly sworn, testified as follows:
6        THE REPORTER:  Counsel, you may begin.
7            DIRECT EXAMINATION
8    BY MS. CATERINE:
9        Q.  All right.  Mr. -- is it Laforest, or Laforey,
10   or how do you pronounce it?
11       A.  Laforest.
12       Q.  Laforest.  All right.  Mr. Laforest, did you
13   go to a Victory Mitsubishi dealership?
14       A.  Yes.
15       Q.  And when you went to the Victory Mitsubishi
16   dealership, was anyone with you?
17       A.  No.  I was by myself.
18       MR. SELVEY:  Objection.  Can we clarify
19   what --
20       MR. KESHAVARZ:  No.  Objection.  Form.  That's
21   all you get to say.  Go ahead.
22       MS. CATERINE:  So --
23       MR. KESHAVARZ:  Did you get the answer?
24   BY MS. CATERINE:
25       Q.  So do you remember the date you went to the

Page 8

1                    E. Laforest
2    Victory Mitsubishi dealership?
3        A.  No, I'm not sure.  It was a while ago.  I
4    think it was, like, in 2020, if I'm not mistaken.
5        Q.  Uh-huh.  And you went to the dealership to
6    purchase a vehicle in the name of Ms. Francois; is that
7    correct?
8        A.  Yeah.  Correct.
9        Q.  And if I told you that you went to the
10   dealership on May 30th, 2020, does that sound right to
11   you?
12       A.  Yeah, I think so.
13       Q.  And then you went again on June 29th, 2020.
14   Does that sound right?
15       A.  No.  I didn't go back -- I didn't go back at
16   all.
17       Q.  I see.  So you only went one time?
18       A.  Yeah.
19       Q.  On May 30th?
20       A.  Yeah.
21       Q.  Okay.  And you never went to the dealership
22   again, just that one time on May 30th?
23       A.  I went back in September to the return to car.
24       Q.  Right.  And that was around September 17th.
25   Does that sound right?



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
9—12

Page 9

1              E. Laforest
2      A. Yeah.
3      Q. So could you describe for me what happened, in
4  your own words, when you went to the dealership on May
5  30?
6      A. When we went to dealership, they ran my
7  credit.  And then they ran her credit and they said
8  they could do to car under her name.  And I said okay.
9  And after that, I spoke to her and she said it was okay
10  because -- but I mean, some of the car was going -- was
11  going to be paid -- fully paid off.  Well -- and then I
12  guess she just changed her mind.
13      Q. Okay.  How did you decide to go to this
14  dealership in particular?
15      A. What do you mean?
16      Q. What -- what was it -- what brought you to the
17  dealership?  Did you see, like, an ad or what -- what
18  brought you to that dealership specifically?
19      A. I just knew about it.
20      Q. Okay.  Did you go to any other dealerships
21  before then, looking to purchase a vehicle?
22      A. Yeah, I went to one.
23      Q. And do you recall the name of that dealership?
24      A. Somewhere -- somewhere on Kings Highway.  I'm
25  not too sure.

Page 10

1              E. Laforest
2      Q. Okay.  Did you submit any forms online to the
3  Victory Mitsubishi dealership?
4      A. No.
5      Q. Did you use the website Edmunds or cars.com?
6      A. No.  I think -- I think they made me use --
7  they made me fill out application when I was at the
8  store, online.  But I didn't fill it on my own online.
9      Q. I see.  Was it -- did they hand you, like, a
10  tablet to fill out the application or did you do it --
11      A. No, I think they sent me the link on the -- on
12  my phone -- on my phone.
13      Q. Okay.  Who did you talk to at the dealership
14  when you were there?
15      A. I don't remember.
16      Q. Do you remember if it was a -- do you remember
17  what the person was like?  Was it a man, was it a
18  woman?
19      A. It was a -- I spoke to a man.  He was, like,
20  slender, tall, like, about six-something -- 6'2,
21  caramel skin.
22      Q. Does the name David Perez sound familiar?
23      A. No.  I don't remember the name.
24      Q. And what did this person say to you?
25      A. Not much.  We was just looking for a car and

Page 11

1              E. Laforest
2  then he ran -- he ran my -- like I said, he ran the
3  credit scores and then he told me -- he gave me the car
4  that -- that I got approved for and that was it really.
5  It wasn't really much set up, that -- it was just a
6  whole bunch of paperwork and time wasted.
7      Q. Did they tell you that you were being recorded
8  when you were filling out the paperwork?
9      A. No.
10      Q. Okay.  Did you see any recording equipment,
11  like, a --
12      A. Cameras, no.
13      Q. -- camera or anything like that?
14      A. Yeah, I wasn't really paying attention, so no,
15  I didn't.
16      Q. Okay.  Was there any -- like a ball on a
17  computer screen?  You know, like, a webcam?
18      A. No, I doubt it.
19      Q. Okay.  Did you notice any signs warning that
20  you could be recorded while you were at the dealership?
21      A. No.
22      Q. Okay.  At any point if you need a break to go
23  to the bathroom or get a glass of water --
24      A. All right.
25      Q. -- just let me now.  Have you ever gone by any

Page 12

1              E. Laforest
2  other names or aliases?
3      A. No.
4      Q. Where do you currently reside?
5      A. On 2914 Farragut Road, Brooklyn.
6      Q. And what is your phone number?
7      A. (718) 213-0288.
8      Q. And what is your e-mail address?
9      A. It's mjack9849@gmail.com [sic].
10      MR. SELVEY:  Okay.  Would you spell that for
11  record?
12      THE WITNESS:  M-J -- no, wait.
13  M-A-C-K-L-O-W-0-2-2-0 at gmail.com.
14      MR. SELVEY:  Can you state the -- the phone
15  number again, please?
16      THE WITNESS:  (718) 213-0288.
17      MR. SELVEY:  Thanks.
18      MS. CATERINE:  And I'm going to be marking the
19  first exhibit, Exhibit 1.  I'm going to try to do these
20  in order.
21      (Plaintiff's Exhibit 1 was marked for
22  identification.)
23  BY MS. CATERINE:
24      Q. Okay.  All right.  Mr. Laforest, if you can
25  take a look at this.  Do you recognize this document?

EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
13–16

Page 13

1               E. Laforest
2     A.  This the subpoena they sent me, right?
3     Q.  Yes.  Do you see the section with the check
4  mark which says "production" and calls for the
5  documents you have about this case?
6     A.  I don't have no documents about this case.
7     Q.  Okay.  How do you know Farah Jean Francois?
8     A.  I mean, she's a friend of the family.
9     Q.  When did you first meet?
10    A.  I mean, she comes by all the time to pick up
11  Mel [phonetic] and stuff like that.
12    Q.  Was it around 2017?
13    A.  It could be.  I'm not too sure.  I don't
14  remember.
15    Q.  Are you currently employed?
16    A.  Yes.
17    Q.  Where are you employed?
18    A.  HouseCalls Home Care.
19       MR. SELVEY:  Sorry, can you say that again?
20       THE WITNESS:  HouseCalls Home Care.
21       MS. CATERINE:  I'm going to be marking this as
22  Exhibit 2.
23       (Plaintiff's Exhibit 2 was marked for
24  identification.)
25  BY MS. CATERINE:

Page 14

1               E. Laforest
2     Q.  All right.  Mr. Laforest, if you could take a
3  look -- I'm sorry, Mr. Laforest, if you could take a
4  look at these documents.
5     A.  These are e-mails, right?
6     Q.  Do you recognize them?
7     A.  Not really, no.
8     Q.  Could you turn to the last page of the
9  document and read the text under the header,
10  "Information from the Submitted Lead?"
11    A.  Read the -- which part?
12    Q.  I'm just going to state for the record that
13  I'm pointing to the text that I've asked the deponent
14  to read.  If you could just look at that.
15    A.  I've -- I never applied for no cars.com.
16    Q.  So you've never used the website cars.com to
17  submit an application?
18    A.  No.
19    Q.  Did you have any contact with the Victory
20  Mitsubishi dealership on October 21st, 2019?
21    A.  No.
22    Q.  Did you have any contact with the dealership
23  prior to October 21st, 2019?
24    A.  Not at all.
25    Q.  Do you know Yessica Vallejo?

Page 15

1               E. Laforest
2     A.  Who?
3     Q.  I'll take that as a no.  Do you know -- do you
4  know Yessica Vallejo?
5     A.  No.
6     Q.  Do you know a Stavros Orsaris?
7     A.  (No verbal response.)
8       MR. KESHAVARZ:  You have to answer verbally.
9       THE WITNESS:  Oh, no.  No.
10  BY MS. CATERINE:
11    Q.  Yeah, sorry.
12    A.  This was in 2019?
13    Q.  (Audio interruption).
14    A.  No, I don't know the person.
15    Q.  But if you could take a look at that
16  information, again on this page --
17    A.  Which one?
18    Q.  -- the e-mail address listed there, that was
19  an e-mail address which you used, correct?
20    A.  Correct.
21    Q.  And that is a phone number that you used,
22  correct?
23    A.  I don't know this one.  It could an old
24  number, but I don't know.  I don't think so.
25    Q.  Okay.  Who is Milano Banack [phonetic]?

Page 16

1               E. Laforest
2     A.  I don't know (audio interruption).
3     Q.  Okay.
4       MR. KESHAVARZ:  I couldn't hear your answer.
5  I didn't hear your answer.
6       THE WITNESS:  Oh, no, I don't know who this is
7  either.
8       MR. KESHAVARZ:  You don't know who Milano
9  Banack is?  Is that the answer?
10       THE WITNESS:  Yes.
11       MR. KESHAVARZ:  Okay.  I'm sorry.
12  BY MS. CATERINE:
13    Q.  Okay.  If you could turn to seventh page of
14  the document.  Do you see -- do you see where on that
15  page there is a -- what appears to be another credit
16  application --
17    A.  Yeah, I'm looking at it.
18    Q.  -- a car application from cars.com.  Did you
19  submit an application on cars.com on or around April
20  19th, 2020?
21    A.  No.  I didn't submit this paper.
22       MR. KESHAVARZ:  I can't hear you.
23       THE WITNESS:  I did not submit this paper, no.
24       MR. KESHAVARZ:  But did you submit an
25  application to cars.com at all?



EMMANUEL LAFOREST                                          October 25, 2022
FRANCOIS vs VICTORY AUTO GROUP, LLC                        17–20

Page 17
1              E. Laforest
2       THE WITNESS:  No.
3       MR. KESHAVARZ:  No.  Okay.  Thank you.
4  BY MS. CATERINE:
5       Q.  Okay.  If you could go to Page 4 of the
6  document -- are you looking at Page 4?
7       A.  I'm looking at it.
8       Q.  Okay.  And did you submit an application on
9  edmunds.com on or around April 28th, 2020?
10      A.  Yeah, this could have been on Facebook.
11      Q.  I see.  And the phone number here, is that
12  your phone number?
13      A.  Yes.  That's my old number.
14      Q.  Do you know why your e-mail is used in the
15  prior applications that you didn't recognize?
16      A.  I'd guess either my brother or my cousin,
17  because they tried to use my name before.
18      Q.  And when you say they tried to use your --
19  your name before, what -- what was that for?
20      A.  You know, like, get a car, or credit cards, or
21  whatever.
22      Q.  So when you went to the Victory Mitsubishi
23  dealership on May 30th, that was the first time you
24  went to the dealership in person?
25      A.  Yes.

Page 18
1              E. Laforest
2       Q.  And you say that you knew about the
3  dealership.  How do you know about it?
4       A.  You know, people talk about it.
5       Q.  And what do you mean by that?
6       A.  Like, they say if you want to get a car, just
7  go to Victory.
8       Q.  So does -- does that mean that it has a
9  reputation for being a -- a place that will lend cars
10  to people, regardless if they have bad credit or
11  something like that?
12      A.  It means they got decent cars.
13      Q.  And you went to the dealership by yourself?
14      A.  Yeah.  Correct.
15      Q.  Were you wearing a mask?
16      A.  I think so.  I don't remember.
17      Q.  Did anyone at the dealership ask you to pull
18  down your mask at any point, to verify your identity?
19      A.  I'm not too sure I was wearing a mask.  I'm
20  not -- I'm not too sure.
21      Q.  Okay.
22      MR. KESHAVARZ:  I'm sorry for interrupting.
23  You said May 30th was the first time you went to the
24  dealership.  Did you ever go to the dealership after
25  May 30th or was that the only time?

Page 19
1              E. Laforest
2       THE WITNESS:  The only time I went after May
3  30th was to return the car.
4       MR. KESHAVARZ:  Okay.  Thank you.  Sorry for
5  interrupting.
6       MS. CATERINE:  I'm going to introduce the next
7  exhibit, Exhibit 3.
8       (Plaintiff's Exhibit 3 was marked for
9  identification.)
10  BY MS. CATERINE:
11      Q.  Do you recognize this document, Mr. Laforest?
12      A.  Yeah, this is the one where they sent me the
13  link.
14      Q.  What prompted that first text message?
15      A.  You're talking about the link?
16      Q.  Uh-huh.
17      A.  They told me -- they said that I had to do the
18  application on the -- in the store.
19      Q.  Okay.
20      A.  And they sent me the link.
21      Q.  So they told you -- you had given them your
22  phone number, and they sent you --
23      A.  And they sent me the link, yeah.
24      Q.  Okay.
25      MR. SELVEY:  Off the record, I guess.  I just

Page 20
1              E. Laforest
2  need clarification.
3       MR. KESHAVARZ:  Stay on the record.
4       MR. SELVEY:  Okay, fine.  Does he have the
5  same copy of this document that I have?  Because this
6  one is missing -- I guess, the blue didn't print
7  online.  Does his include that link?
8       MR. KESHAVARZ:  It's just a photocopy.
9       MR. SELVEY:  Yeah.  No, I know.  I'm wondering
10  what he's looking at it.
11      MS. CATERINE:  Yes.
12      MR. SELVEY:  He's looking at a more legible
13  copy of that, then?
14      MS. CATERINE:  Yeah.
15      MR. SELVEY:  Okay.  Yeah.  Perfect.
16      MS. CATERINE:  Sorry.  I didn't realize it
17  didn't --
18      MR. SELVEY:  No, no.  I have it digitally here,
19  too.  It's our production after all.
20  BY MS. CATERINE:
21      Q.  Okay.  Do you know why it has the initials
22  "FF" right there next to the text message that says, "I
23  just did it"?
24      A.  I'm not tot sure.
25      Q.  Is it because it was in the name of Farah Jean



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
21–24

Page 21

1         E. Laforest
2 Francois?
3     A. I'm not too sure.  I never seen that like that
4 before, so I don't know.
5     MS. CATERINE:  Okay.  And I'm going to mark
6 Exhibit 4.
7     (Plaintiff's Exhibit 4 was marked for
8 identification.)
9 BY MS. CATERINE:
10    Q. Do you recognize this document?
11    A. It's the application, right?
12    Q. You tell me.
13    A. I don't remember seeing this.
14    Q. So that's not the form that you had
15 submitted -- seen then?
16    A. No, I don't think so.
17    Q. But it appears to have the information that
18 you provided to them.
19    A. I see that.  Yeah, but it's not my form they
20 gave me.  They never gave me this form.
21    MS. CATERINE:  Okay.  Mark this as Exhibit 5,
22 please.
23    (Plaintiff's Exhibit 5 was marked for
24 identification.)
25    MR. KESHAVARZ:  I'm sorry, I didn't hear.  Did

Page 22

1         E. Laforest
2 you say the Exhibit 3 was the information that they
3 gave you or that you provided to the dealership, it
4 just wasn't in that format?
5     MR. SELVEY:  It was Exhibit 4.
6     MS. CATERINE:  No, Exhibit 4.
7     MR. KESHAVARZ:  Exhibit 4.
8     THE WITNESS:  Yeah, I -- I wasn't ever given
9 this.
10    MR. KESHAVARZ:  Was that the information that
11 you provided to the dealership, even if it wasn't in
12 that format?
13    THE WITNESS:  Yeah.
14    MR. KESHAVARZ:  Okay.  Thanks.
15 BY MS. CATERINE:
16    Q. Do you recognize Exhibit 5?
17    A. No, I never got this neither.
18    Q. If you could go back to Exhibit 3, please, the
19 text messages, and go to the second page.
20    Do you see where it says, "as per management
21 credit application received need 2,000 to 3,000 down or
22 co-buyer"?
23    A. Yes, I do.
24    Q. Is this when you decided to use Ms. Francois's
25 identity to purchase the vehicle?

Page 23

1         E. Laforest
2     A. No, I wasn't going to -- I was going to use my
3 girlfriend's.  But the guy that actually -- he was
4 just, like, no, we'll just use her and I said, okay.  I
5 thought -- because like I said, I thought it was -- I
6 thought it was going to be -- I was just trying to use
7 that for co-buyer.
8     Q. You said the -- the guy suggested to use --
9 you mean the -- the person at the dealership suggested
10 using Ms. Francois's identity to purchase the vehicle?
11    A. Correct.
12    Q. And further down on this page there's a text
13 message that says, "I'm coming from Brooklyn, but I
14 want to make sure I'll be driving off the lot with the
15 car, though."
16    A. Yeah.
17    Q. Based on this text message, do you think these
18 text messages were sent before you came to the
19 dealership?
20    A. I am pretty sure it was before.  I'm not
21 too -- I'm not too sure.
22    Q. In that case, do you remember what prompted
23 you to get these text messages and send text messages
24 back?
25    A. Repeat that again.

Page 24

1         E. Laforest
2     Q. Sure.  Let me rephrase.  So you had mentioned
3 before that you had filled out an application on
4 Facebook?
5     A. Yeah.  That was on Edmund.
6     Q. On Edmund's right.
7     A. Edmund's.
8     Q. And so after you filled out that application,
9 is that when you got a text message from the
10 dealership?
11    A. I don't think I -- when I did this
12 application?
13    Q. Uh-huh.
14    A. I don't know about a text.  I was in the
15 store.  Unless they made me do it twice, because when I
16 went to the Mitsubishi, they said definitely made me do
17 at the store.
18    Q. Okay.
19    MR. KESHAVARZ:  I couldn't hear your answer.
20 They definitely made you what?
21    THE WITNESS:  They made me do an application
22 at the store -- I mean, at the -- at the dealership.
23    MR. KESHAVARZ:  Like a handwritten
24 application?
25    THE WITNESS:  No.  Online application.



EMMANUEL LAFOREST                                    October 25, 2022
FRANCOIS vs VICTORY AUTO GROUP, LLC                        25–28

Page 25

1          E. Laforest
2          MR. KESHAVARZ:  Thank you.
3  BY MS. CATERINE:
4      Q.  And why did you want to drive off the lot with
5  a car that day?
6      A.  I needed to get a car.  I had the money for
7  it.
8      Q.  Was there some urgent reason why you needed
9  the car?  Did you to take a trip somewhere or was it
10  for work or --
11      A.  It was for work and family purposes.
12      Q.  If you could go to the third page of the
13  exhibit, please?  Do you see the text that says, "and
14  my pay stub is online"?
15      A.  Yeah.  That's on my phone.  I've got to go --
16  I got to go on the website to get to my pay stub.
17      Q.  I see.  And could you pull those up on your
18  phone right now?
19      A.  No, not right now.
20      Q.  And you say here -- you're asking if they can
21  print it at the office and they say, yes.  How -- did
22  you wind up printing your pay stub at their office?
23      A.  I'm pretty sure I did.
24      Q.  And how did you provide that pay stub to them?
25      A.  I think I had -- I think I had a screenshot of

Page 26

1          E. Laforest
2  them and I think I had text messaged or e-mailed it.
3  No, I don't remember.
4      Q.  Do you still have those text messages with the
5  dealership?
6      A.  That's on my old phone.
7      Q.  On your old phone?
8      A.  I mean, do you need it?
9      Q.  Do you still have your old phone?
10      A.  I still have it.
11      Q.  If we could arrange to get those, you could
12  send them to me by --
13      A.  This case got dismissed already.  Am I going
14  to get in trouble for this?
15      Q.  This is -- this is not your -- this is not the
16  criminal case against you.  This is a civil action by
17  Ms. Francois against the dealership.
18      A.  Okay.  So they're not going to reopen that
19  case or nothing like that?
20      Q.  I -- I -- can we go off the record for a
21  second?
22      MR. KESHAVARZ:  We should probably keep this
23  off the -- on the record, I think.
24  BY MS. CATERINE:
25      Q.  Oh.  Yeah, on the record.  So when I spoke

Page 27

1  with the Kings County district attorney, they stated
2  that the matter against you had been sealed.  That's
3  all I know about that case against you.  So I can't
4  make any representations about anything about your
5  case.  I don't know anything about your case because
6  the file is sealed.
7
8      MR. SELVEY:  I -- I will say based on the
9  allegations in Ms. Francois's complaint as they involve
10  you, this matter could resolve in civil or criminal
11  prosecution against you in the future.  I'm not saying
12  it will --
13      MR. KESHAVARZ:  Are you advising him on this?
14      MR. SELVEY:  No.  I'm -- I'm saying that based
15  on my position, my client may have seek -- have to seek
16  recourse against Mr. Laforest, depending on what --
17  he -- he asked a question.  I -- I assumed that you
18  guys had spoken with him beforehand and advised him of
19  his rights and potential exposure in this.  I --
20      THE WITNESS:  No.  Do I got to get a lawyer?
21      MR. SELVEY:  You can.  There --
22      MS. CATERINE:  You can get a lawyer as -- as
23  you -- you remember when you first spoke with me, I
24  told you that you could get a lawyer.
25      THE WITNESS:  Yeah.

Page 28

1          E. Laforest
2      MR. KESHAVARZ:  What's the next question?
3      MS. CATERINE:  All right.  Can you please mark
4  this as Exhibit 6.
5      (Plaintiff's Exhibit 6 was marked for
6  identification.)
7  BY MS. CATERINE:
8      Q.  Do you recognize this document, Mr. Laforest?
9      A.  Yeah.  I think that's the application.
10      Q.  And you were given this document to fill out
11  at the dealership?
12      A.  Correct.
13      Q.  And you filled out this document by yourself,
14  correct?
15      A.  Correct.
16      Q.  Did someone at the dealership tell you how to
17  fill this document out?
18      A.  The person that was working with me.
19      Q.  And that was the same person who suggested
20  having Ms. Francois as the co-applicant; is that
21  correct?
22      A.  Correct.
23      Q.  Where did you get Ms. Francois's information
24  for filling out this application?
25      A.  It was at my house.



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
29–32

Page 29

E. Laforest

2    Q.  And you had brought it with you to the
3  dealership?
4    A.  Yeah.  Correct.
5    Q.  And the phone number here for both you and for
6  Ms. Francois is (347) 995-5054.
7    A.  That's correct.
8    Q.  Whose phone number is that?
9    A.  That was mine.
10    Q.  And why didn't you use that phone number on
11  the application you submitted through Edmund's?
12    A.  Because I -- I had a different number at the
13  time.
14    Q.  It says in this application that Ms. Francois
15  had been at the 2914 Farragut Road address for seven
16  years and five months.  Ms. Francois had not been
17  living at that address for more than seven years; is
18  that correct?
19    A.  I guess.  I'm not too sure.  I don't know how
20  long she lived at that address.
21    Q.  Why did you write that she had been living
22  there for more than seven years?
23    A.  I don't remember putting that there.
24    Q.  I'm sorry?
25    A.  I said, I don't remember putting that there.

Page 30

E. Laforest

2    Q.  Okay.  Is that your handwriting?
3    A.  Looks like it, yeah.
4    Q.  Was the -- was it the person at the dealership
5  who was helping you to fill out that application who
6  suggested putting that there?
7    A.  I'm not too sure.  It was a while ago.
8    Q.  And do you see the signature at the bottom of
9  the application next to co-applicant?
10    A.  Are you talking about this right here?
11    Q.  Yes, that signature (audio interruption).
12    A.  Yeah.  That -- that's not my signature.
13    Q.  All right.  Who signed that?
14    A.  I'm not too sure.
15    Q.  But you did not sign that?
16    A.  No.
17    Q.  And Ms. Francois was not with you, correct?
18    A.  Correct.  She wasn't -- she's not -- she was
19  not with me at the dealership.
20    Q.  And so she did not sign that, correct?
21    A.  No.
22        MS. CATERINE:  Can you mark this as Exhibit 7.
23        THE REPORTER:  Yes.
24        (Plaintiff's Exhibit 7 was marked for
25    identification.)

Page 31

E. Laforest

2  BY MS. CATERINE:
3    Q.  Do you recognize this document?
4    A.  It is my ID.
5    Q.  And you had Ms. Francois's driver's license
6  with you at the dealership; is that correct?
7    A.  Correct.
8    Q.  And how did you obtain Ms. Francois's driver's
9  license?
10    A.  It was given to me.
11    Q.  And who gave it to you?
12    A.  I'd rather not say.  It was given to me so I
13  can give to her.
14    Q.  Sorry?
15    A.  It was given to me so I can give to her.
16    Q.  It was given to you so you could give it to
17  her?
18    A.  Yeah.
19    Q.  So I'm sorry, I guess I'm a little confused
20  here.  So someone gave it to you and told you to give
21  it to her?
22    A.  Correct.
23    Q.  Okay.  And you had it at the dealership with
24  you, so this was before you gave it to her, correct?
25    A.  Correct.

Page 32

E. Laforest

2    Q.  But did you eventually give her the license?
3    A.  Yeah.
4    Q.  And why don't you want to identify the person
5  who gave you the license?
6    A.  I'd just the rather not say.
7    Q.  Did anyone at the dealership ask you to call
8  Ms. Francois at any point while you were filling out
9  this application?
10    A.  No.
11    Q.  Did the dealership ask you why you had put
12  your phone number for both yourself and for her in the
13  application?
14    A.  No.
15        MS. CATERINE:  Mark this as Exhibit 8, please.
16        (Plaintiff's Exhibit 8 was marked for
17    identification.)
18  BY MS. CATERINE:
19    Q.  Do you recognize this document?
20    A.  No.  I didn't receive this.
21    Q.  Okay.  And when you went to the dealership on
22  May 30th, did you put $10,000 down?
23    A.  I put damn near -- almost put, like, around, I
24  want to say 8,900, around there.
25    Q.  Okay.  And what happened to that money?  Did



EMMANUEL LAFOREST                                          October 25, 2022
FRANCOIS vs VICTORY AUTO GROUP, LLC                        33–36

Page 33

E. Laforest

2  you -- was that money returned to you?
3      A. No.
4      Q. Do you know what happened to the money?
5      A. No.
6      Q. As far as you are aware, the dealership still
7  has that money?
8      A. Uh-huh.
9      MR. KESHAVARZ: You have to say yes or no.
10     THE WITNESS: Yes.
11  BY MS. CATERINE:
12     Q. Why does this worksheet only list your
13  information and not Ms. Francois's information?
14     A. I'm not too sure.
15     MS. CATERINE: Mark this as Exhibit 9, please.
16     (Plaintiff's Exhibit 9 was marked for
17  identification.)
18  BY MS. CATERINE:
19     Q. Do you recognize this document?
20     A. Yeah. They gave me this.
21     Q. And what is it?
22     A. A receipt.
23     Q. And it's a receipt for the down payment?
24     A. Correct.
25     Q. The credit application which was marked as

Page 34

E. Laforest

2  Exhibit 5 -- oh no, I'm sorry, Exhibit 6, lists your
3  income as $31,000 a year; is that correct?
4      A. Correct.
5      Q. How did you get $8,600 in cash?
6      A. Saved.
7      Q. Sorry?
8      A. Saved.
9      Q. Okay.
10     THE REPORTER: Sorry, what was the answer?
11     MS. CATERINE: Saved.
12     THE REPORTER: Okay.
13  BY MS. CATERINE:
14     Q. You said in the text messages that we were
15  looking at before that you wanted to leave the
16  dealership with a vehicle that day. Did you leave the
17  dealership with a vehicle on May 30th?
18     A. Yes.
19     Q. When was the next time you heard from the
20  dealership after leaving with the vehicle?
21     A. After me and Farah spoke on the phone and she
22  told me everything was okay. Probably like -- I mean
23  I'm not too sure if it was a couple of weeks later or a
24  month later. I guess she ended up going to the
25  dealership and then the dealership ended up calling me.

Page 35

E. Laforest

2      MR. SELVEY: Sorry. Could you -- I didn't
3  catch -- you talked to who?
4      THE WITNESS: I said after I spoke to Farah on
5  the phone, she told me everything was okay. And I told
6  her by December the -- the car was going to be finished
7  being paid off or settled, right. She would have no
8  problem. And then I guess, like, a month or two later,
9  a couple of weeks later, I'm not too sure of when, the
10  dealership ended up calling me because she ended up
11  going to the dealership.
12  BY MS. CATERINE:
13     Q. So when you say you had this phone -- this is
14  a conversation over the phone with Ms. Francois?
15     A. We had - we had several conversations.
16     Q. Okay. And this was after you had left the
17  dealership with the vehicle?
18     A. Correct.
19     Q. If you could go back to Exhibit 2 and go to
20  the second page of the document, please.
21     A. Here?
22     Q. Yes. And do you recognize the information
23  under "information from the submitted lead?"
24     A. No.
25     Q. Is that your e-mail address?

Page 36

E. Laforest

2      A. That's my e-mail address.
3      Q. And is that your phone number?
4      A. No.
5      Q. And the vehicle information there, is that the
6  information for the vehicle that you purchased on May
7  30th?
8      A. I don't remember the VIN number, but the model
9  number is the same.
10     Q. Okay. The vehicle you purchased was the 2017
11  BMW?
12     A. I don't know why that number is there and I
13  never put that name there, but this is -- it's Victory
14  Mitsubishi.
15     Q. Uh-huh. And you testified earlier that you
16  did not go to the dealership on June 29th, 2020,
17  correct?
18     A. You said June 29th, 2020?
19     Q. Uh-huh.
20     A. No, I don't think I did.
21     MS. CATERINE: Okay. This can be marked as
22  Exhibit 10, please.
23     (Plaintiff's Exhibit 10 was marked for
24  identification.)
25     MR. SELVEY: I assume you'll scan it.



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
37–40

Page 37

1              E. Laforest
2         MS. CATERINE:  Yeah, yeah.  We'll scan it.
3   BY MS. CATERINE:
4      Q.  All right.  Mr. Laforest, do you recognize
5   this document?
6      A.  No, I -- I ain't never seen this one before.
7      Q.  So you didn't fill out this application?
8      A.  No.  I ain't never seen that before.
9      Q.  Do you know why it says the Ms. Francois lived
10  at the 2914 Farragut Road address for ten years?
11     A.  I can't tell you that and I promise you, I
12  ain't never seen that before.  And they never gave me a
13  statement -- or showed me the statement before.
14     Q.  Is that your phone number listed under home
15  phone?
16     A.  Yeah, it is.
17     Q.  And do you see where Ms. Francois's employment
18  information is listed?
19     A.  Yeah, I see where it's at.
20     Q.  So let's go back to Exhibit 6.  Do you see
21  where Ms. Francois's employment information is listed
22  here?
23     A.  Yeah.
24     Q.  How did you get that employment information?
25     A.  This information?

Page 38

1              E. Laforest
2      Q.  Uh-huh.
3      A.  From the mail.
4      Q.  Sorry, from who?
5      A.  I said from her mail.  From her mail.
6      Q.  From her mail.
7      A.  Yeah, it was -- it was in front of her mail.
8   And it just said Null's Whole Foods, so I just assumed
9   that that's why she wrote that.
10     Q.  I see.  So the mail that was delivered to her
11  at the 2019 [sic] Farragut Road address?
12     A.  Yeah.
13     Q.  Why were you looking at her mail?
14     A.  I mean, I'm the only one that likes to grab
15  the mail and bring it upstairs.
16     Q.  I see.  So in your normal process where you
17  would get the mail from the mailbox for everyone who
18  lived there, you saw that she worked at Null's Whole
19  Foods?
20     A.  Yeah, right.
21     Q.  How did you know she was a manager?
22     A.  I didn't -- I guess I guessed.  I'm not too
23  sure.  I don't remember.
24     Q.  Okay.  And for her salary there, did you guess
25  at that, as well?

Page 39

1              E. Laforest
2      A.  Yes.
3      Q.  Okay.  If we could turn -- if you could turn
4   back to Exhibit 10, do you see where it lists her
5   employment -- employment information here?
6      A.  Yeah, I'm looking at it.
7      Q.  And it says that her salary is $65,000.  Did
8   you know that her salary was $65,000?
9      A.  I told you I never seen the paper, so no.  You
10  see I put 41,000 here.  Obviously, I didn't know at
11  all.
12     Q.  Okay.  Why were you not on this application
13  like you were on the May 30th application?
14     A.  Which application?
15     Q.  Sorry.  Excuse me.  Why are -- so you're on
16  the application marked Exhibit 6, correct?
17     A.  Say it again.
18     Q.  You're -- you're on this application -- the
19  application marked Exhibit 6, correct?
20     A.  Yes.
21     Q.  Why weren't you a co-applicant on the
22  application marked Exhibit 10?
23     A.  I don't know.  Like I told you, I never seen
24  this before.
25     Q.  Okay.  You mentioned that someone at the

Page 40

1              E. Laforest
2   dealership suggested adding Ms. Francois as a
3   co-applicant, correct?
4      A.  Correct.
5      Q.  And did that person advise you that you would
6   be more likely to obtain credit if Ms. Francois applied
7   by herself?
8      A.  He said just use her name because she was
9   already -- she already got approved.  You're better off
10  just using her name.
11     Q.  And how did he find out that she had already
12  been approved?
13     A.  Oh, because he took her information down
14  because I told her I was -- I was -- I'm using someone
15  else's, as well.  I was using my girlfriend because she
16  said I could use it or whatever.  And when I was
17  pulling out the ID, he seen her so he was, like, do you
18  know her.
19         I'm, like, I got her information, but I would
20  have to talk to her or whatever.  He said, well, let me
21  just run her name down and see if she gets approved.
22  If she gets approved, then we'll see if we can go from
23  there and that's how it happened.
24     Q.  Okay.  Do you know who signed this
25  application?



EMMANUEL LAFOREST                                          October 25, 2022
FRANCOIS vs VICTORY AUTO GROUP, LLC                        41–44

Page 41

1             E. Laforest
2     A. I'm not too sure.
3     Q. And on Page 3 of the application, it says that
4  $9,000 in cash was put down. Do you see that?
5     A. No, where? Oh, I see it right there.
6     Q. And you didn't put down $9,000 in cash,
7  correct?
8     A. No, correct.
9        MS. CATERINE: Can you mark this page as
10 Exhibit 11, please.
11       (Plaintiff's Exhibit 11 was marked for
12 identification.)
13 BY MS. CATERINE:
14    Q. Do you recognize this document?
15    A. No.
16    Q. Do you need a second look? Do you see the
17 name Yessica Vallejo?
18    A. Yeah, I see it.
19    Q. And you previously testified that you didn't
20 know who Yessica Vallejo is --
21    A. No, I don't.
22    Q. -- is that correct?
23    A. That's correct.
24    Q. Did you at any point sign something in
25 Ms. Francois's name while you were at the dealership?

Page 42

1             E. Laforest
2     A. No. Anything I signed was under my name.
3     Q. Did they have you sign any iPad, or tablet, or
4  anything like that?
5     A. I don't remember.
6        MS. CATERINE: Okay. Can you print --
7        MR. KESHAVARZ: I can show it to him. I'm
8  about to print this out if I can figure out the --
9        MR. SELVEY: Can I see it?
10       MR. KESHAVARZ: Yeah. This is from
11 dealership's website. It says it's Stavros. Do you
12 recognize this guy?
13       THE WITNESS: I didn't even see this guy when
14 I was there.
15       MR. KESHAVARZ: Okay. Thanks. I can print
16 this out and mark it Exhibit 12.
17 BY MS. CATERINE:
18    Q. Did you see anyone else at the dealership make
19 a signature in Ms. Francois's name while you were
20 there?
21    A. No.
22       MS. CATERINE: Mark this exhibit as Exhibit
23 12, please.
24       (Plaintiff's Exhibit 12 was marked for
25 identification.)

Page 43

1             E. Laforest
2        MR. SELVEY: That's -- is that a couple of
3  pages or is it --
4        MS. CATERINE: Oh, it's five pages.
5  BY MS. CATERINE:
6     Q. Do you recognize this document?
7     A. I never seen these before.
8     Q. Sorry?
9     A. I said I never seen these before neither.
10 They never gave me these.
11    Q. Other than the documents that you looked at so
12 far, did the dealership give you any other documents?
13    A. They gave me a receipt.
14    Q. Was that the receipt we looked at previously?
15    A. Yeah, the receipt had 8,600 on it. They
16 gave me an application and a couple of other paperwork,
17 but that was -- that was it.
18    Q. So they didn't give you any document
19 resembling the one you're looking at right now?
20    A. No.
21    Q. And they didn't give you any document that
22 looked like Exhibit 11, correct?
23    A. No, I didn't get that either.
24       MS. CATERINE: Mark this as Exhibit 13,
25 please.

Page 44

1             E. Laforest
2        (Plaintiff's Exhibit 13 was marked for
3  identification.)
4  BY MS. CATERINE:
5     Q. Do you recognize this document?
6     A. No.
7     Q. Do you see the field on this document that
8  says "date of sale" and it's filled in with May 30th,
9  2020?
10    A. The date of inspection or sales? Oh, I see
11 date of sale, yeah.
12    Q. And based on that, do you believe this
13 document is referring to the sale of the vehicle to you
14 on May 30th, 2020?
15    A. I'm guessing.
16    Q. When the vehicle was sold to you on May 30th,
17 2020, did the dealership tell you that the vehicle was
18 being sold to you?
19    A. Yeah. They told me -- because I told him
20 we're just doing a -- a co-application.
21    Q. So they didn't tell you that the vehicle would
22 only be in Ms. Francois's name; is that correct?
23    A. Yeah. They -- they ain't tell it to me like
24 that.
25    Q. Do you know who signed this document?



EMMANUEL LAFOREST                          October 25, 2022
FRANCOIS vs VICTORY AUTO GROUP, LLC                45–48

Page 45

E. Laforest

1
2    A. I'm not too sure. But I know -- but they did
3  tell me -- they was like -- something about the
4  insurance or something like that. And then they said
5  the title was going to be under my name and hers.
6    Q. And do you know if the title was in fact put
7  in both of your names?
8    A. I never received a title. I guess before -- I
9  don't know if the car -- the title never came. But I
10  know when she ended up going Victory Mitsubishi, like,
11  I -- I don't even know who I was speaking to, but he
12  had called my phone.
13      He was, like, can you just bring back the car
14  so they can reverse the transaction. And I told him
15  okay. I'm going to call back next -- the first thing
16  that -- the next morning.
17      MS. CATERINE: And mark this as Exhibit 14,
18  please.
19      (Plaintiff's Exhibit 14 was marked for
20  identification.)
21  BY MS. CATERINE:
22    Q. Do you recognize this document?
23    A. No.
24    Q. And this document has your phone number and
25  e-mail address, correct?

Page 46

E. Laforest

1
2    A. Correct.
3      MS. CATERINE: Did you get that response?
4  BY MS. CATERINE:
5    Q. And since you -- it's your testimony today
6  that you didn't fill out this document, correct?
7    A. No, I didn't fill out this document.
8    Q. And so do you presume that the dealership
9  filled out this document?
10    A. I mean, somebody filled it out. I just know I
11  didn't fill it out.
12    Q. If the dealership filled out this document,
13  why would they put Ms. Francois's name, but then use
14  your phone number and e-mail address?
15    A. I guess because I had my phone -- my phone
16  number for both on this application.
17    Q. Let's turn back to that application, Exhibit
18  6. What's the e-mail address for Ms. Francois?
19    A. I don't see no e-mail address.
20    Q. Okay. Did you give the dealership
21  Ms. Francois's e-mail address?
22    A. No.
23      MS. CATERINE: Would you mark this as Exhibit
24  16, please.
25      THE REPORTER: 15.

Page 47

E. Laforest

1
2      MS. CATERINE: 16, right?
3      THE REPORTER: No, I believe --
4      MS. CATERINE: Oh no, 15. I'm sorry.
5      (Plaintiff's Exhibit 15 was marked for
6  identification.)
7  BY MS. CATERINE:
8    Q. Do you recognize these documents,
9  Mr. Laforest?
10    A. Yeah, I recognize these.
11    Q. And where do you recognize them from?
12    A. They're parking tickets. They're parking
13  tickets -- I mean, like, traffic tickets -- traffic
14  tickets.
15    Q. And when did you first see these documents?
16    A. Don't remember first seeing them, but I paid
17  most of them. She knows that. I spoke to her about
18  that. That's one of the reasons why we spoke on the
19  phone.
20    Q. I see. And you paid for these tickets because
21  you were the one who incurred them with the vehicle; is
22  that correct?
23    A. Correct.
24    Q. But they were in Ms. Francois's name, correct?
25    A. Correct.

Page 48

E. Laforest

1
2    Q. And when you received these tickets, did you
3  still believe that the vehicle had been sold to you
4  jointly?
5    A. Honestly, at that point after I spoke to her I
6  wasn't really thinking much of it, you know. But I was
7  waiting -- I was waiting for the title to come in but I
8  never did see the title.
9    Q. Did you find it odd that the tickets were in
10  Ms. Francois's name rather than yours?
11    A. Yeah, a little bit.
12    Q. Did you call the dealership at any point about
13  these tickets?
14    A. No. I usually just call for the title.
15    Q. You called the -- did you call the dealership
16  about the title?
17    A. I think I might have one time.
18    Q. Do you recall -- do you recall around when you
19  called them?
20    A. It was after a couple of months. But they
21  usually told me -- they told me it was it would take I
22  think, like, 90 days or something like that.
23    Q. And so if it was 90 days from May 30th when
24  the vehicle was sold to you, you were expecting to
25  receive the title around the end of July; is that



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
49–52

Page 49

1            E. Laforest
2  correct?
3      A.  Yeah, about there.  Around there.
4      Q.  And you didn't receive the title around that
5  time --
6      A.  No.
7      Q.  -- is that correct?
8      A.  That's correct.
9      Q.  But you didn't make any more calls to the
10  dealership asking about the title?
11      A.  No.  Because after they called me, he told me
12  kind of just he -- he said he wants to make this
13  headache go away, and can I just bring the car back so
14  they can reverse it.  And I said okay.
15      Q.  And who were you speaking with?
16      A.  From what he sounded -- he sounded like a
17  white guy, honestly.  I'm not too sure.
18      Q.  Okay.  And when you say, "make this headache
19  go away," are you referring to Ms. Francois's
20  complaint?
21      A.  I'm guessing that's what he was referring to.
22  I'm not too sure what he was referring to.  He just
23  told me that over the phone.  I told him okay, I'll
24  just bring the car back.
25          MS. CATERINE:  Mark this as Exhibit 16,

Page 50

1            E. Laforest
2  please.
3          (Plaintiff's Exhibit 16 was marked for
4  identification.)
5  BY MS. CATERINE:
6      Q.  The person you said you were speaking with at
7  the dealership who referred to "making the headache go
8  away," was that the same person who you spoke to when
9  you went into the dealership on May 30th?
10      A.  No.  The person I was speaking to when I went
11  to the dealership, he was a -- he was young, but this
12  guy sounded a little older.
13      Q.  Okay.  And this person just called you out of
14  the blue?  You just got a call and --
15      A.  He called me and he said Farah was there.  I
16  was confused to why she was there because we already
17  spoke, like, we -- before.  So I guess she wanted to
18  know what was going on and he was just like, listen,
19  just bring the car back.  I want -- I want to make this
20  headache go away or whatever.  And he said, I'll just
21  reverse the transaction.
22          And then he -- he also told that I could just
23  come down after -- after -- he said after he made it go
24  away, he'll just -- instead of reversing all the money,
25  he'll put me in a different car, but that never

Page 51

1            E. Laforest
2  happened.
3      Q.  Okay.  Do you recognize Exhibit 16?
4      A.  Yes, this is the person I told you I tried
5  to -- this is my -- my female friend.
6      Q.  Like your --
7          MR. SELVEY:  I'm sorry.  Can you repeat that
8  answer?  I -- I didn't hear it.
9          THE WITNESS:  This is the -- this is the
10  person that said I could use her name.  This is the
11  main reason why I went down to the dealer.
12  BY MS. CATERINE:
13      Q.  I see, the drive -- you're referring to the
14  driver's license, right?
15      A.  Yeah.
16      Q.  And so that picture of the driver's license,
17  you were providing that to the dealership because you
18  were planning on applying for the --
19      A.  Yeah, me and get were going to co-sign.
20      Q.  -- you and her together?  Okay.
21      A.  Yeah.  But they said they couldn't do it on
22  her.
23      Q.  And do you have that phone number that you
24  were texting with?
25      A.  Which one that --

Page 52

1            E. Laforest
2      Q.  The -- whichever number you were, you know,
3  texting her with.
4      A.  That's all on my old phone.
5      Q.  Okay.  Do you still have that phone?
6      A.  Yeah, I have that phone.
7      Q.  So you could obtain that -- you can find out
8  what that phone number is?
9      A.  Uh-huh.
10      Q.  All right.  And the driver's license is for a
11  person named Jami Singer?
12      A.  Jami Singer.  Yeah.
13      Q.  Was that --
14      A.  Should I spell Singer?
15      Q.  Sure.  It's --
16      A.  Singer.  Singer.  S-I-N-G-E-R.
17          MS. CATERINE:  And if you can make a note,
18  Court Reporter, that the following number should be
19  redacted in the transcripts.
20  BY MS. CATERINE:
21      Q.  Mr. Laforest, Do you see the text below the
22  picture of the driver's license that says --
23      A.  Yeah.  That's -- that's Jami's Social.
24      Q.  Okay.  It's a third-party Social Security
25  number.  I'm just -- I'm just making a note in the

ESQUIRE
DEPOSITION SOLUTIONS

EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
53–56

Page 53

1          E. Laforest
2  transcript to do so.  So you and the dealership were
3  planning on having a vehicle sold in Ms. Singer's name;
4  is that correct?
5      A.  It was supposed to be under me and -- me
6  and -- it was supposed to be -- she was supposed to be
7  my co-applicant.
8      Q.  And this -- and these text messages were sent
9  on September 25th, 2020, correct?
10     A.  Correct.
11     Q.  And so were you planning on getting another
12  vehicle besides the one you had purchased on May 30th?
13     A.  I don't -- to be honest with you, I don't
14  really remember which vehicle we applied for with this
15  one.  It just actually when I got down there, he said
16  he's going to do -- I had to do an application again.
17  He ran this again and he was, like, she wasn't able to.
18        He asked me if I had somebody else and he
19  asked me about the -- the other -- basically Farah's
20  ID.  And I was like, well, just check and let me see.
21  And then when he came back, he was like, you-all got
22  approved on the -- and he said you-all got approved but
23  this is the car that I got approved for it.
24        And I was like -- I was a little hesitant,
25  like, do you mind if I -- let me just come back.  He

Page 54

1          E. Laforest
2  was like, no, no.  It's going to go away.  You might as
3  well just hop on it, get it, and speak to her later.
4  And I said, all right.
5      Q.  Going on to the next page on that exhibit, you
6  texted the dealership a video.
7      A.  A video.  This is when I -- he told me just
8  park the car and leave the keys in the car.  So I sent
9  them the video and I said this is where the car was at.
10  And he told me okay.
11     Q.  And he told you to do this over the phone?
12     A.  Yes, ma'am.
13     Q.  Like he -- you -- you spoke with him over the
14  phone.  You called him.
15     A.  Yeah, this is when he called me.
16     Q.  Right.
17     A.  This is when he called me telling me bring the
18  car back, whatever, whatever.  And I told him okay.
19     Q.  And since these text messages were on
20  September 26th, is it fair to assume that your phone
21  conversation with the person at the dealership was on
22  September 26th?
23     A.  It happened, then, on the 25th because I told
24  him -- he called me.  I sent -- I went back -- I
25  brought the car that day after -- the morning after.

Page 55

1          E. Laforest
2      Q.  Other than what we've talked about so far, do
3  you recall anything else that the person from the
4  dealership said to you during that phone conversation
5  on September 25th?
6      A.  No.  Maybe -- like I said, he said Farah was
7  here or whatever.  He asked me [inaudible 01:10:14] and
8  I told him yeah.  Then he was, like, well -- he said
9  something about -- about just -- like I said, he just
10  said something about, you know what, she's giving me a
11  headache.  Just, you know, bring the car back so I can
12  make this headache go away and I'll put you in another
13  car.  And I told him okay.  But he was, like, just
14  bring another co-applicant.
15     Q.  And if you go to the last page of that
16  exhibit, there's a contact card sent by you for
17  Ms. Francois.  Do you see that?
18     A.  Yeah.
19     Q.  And --
20     A.  Because he was asking me to tell her to come
21  back to the store I guess to reverse the transaction.
22  But I don't know if she ever went or not.
23     Q.  Okay.  So he asked you to provide her contact
24  information so they --
25     A.  Yeah.  Yeah.  He got -- he contacted her.

Page 56

1          E. Laforest
2      Q.  So the dealership knew that they didn't have a
3  phone number that they could reach Ms. Francois at,
4  correct?
5      A.  I'm not too sure, because she went there.  So
6  I don't know if she gave them the number or not.
7      Q.  Okay.  But the dealership knew that the phone
8  number that you had put for her in the application was
9  not her phone number, correct?
10     A.  Yeah.
11        MS. CATERINE:  Okay.  And if we could mark
12  this as Exhibit 18, please.
13        THE REPORTER:  17.
14        MS. CATERINE:  17, I'm sorry.  I changed the
15  order of exhibits and got myself all messed up.
16        (Plaintiff's Exhibit 17 was marked for
17  identification.)
18        FURTHER EXAMINATION
19  BY MR. KESHAVARZ:
20     Q.  Before we go on, let me just ask if -- I'm
21  Ahmad Keshavarz.  I'm the other lawyer.  Nice to meet
22  you, sir.  So when you went to the dealership, the
23  person you spoke with, how would you describe them
24  again?
25     A.  The person I spoke with?



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
57–60

Page 57

1              E. Laforest
2      Q. Yeah, when you went in person.
3      A. That did everything --
4      Q. Sorry?
5      A. That did everything for me?
6      Q. Yes.
7      A. He was slim, caramel skin. He was, like,
8  about 6'2.
9      Q. All right. Do you have any idea about how old
10  he was? A young guy, old guy?
11     A. 32, 33, 34, around there.
12     Q. Uh-huh. Do you remember, did he ever give you
13  a card?
14     A. Yeah. But that's long gone. Yeah.
15     Q. Do you remember if his name was David Perez?
16     A. He didn't look Spanish. I don't -- I don't
17  remember. I can't tell you.
18     Q. Did you say he did or didn't look Spanish?
19     A. No, he didn't look Spanish.
20     Q. Okay. So if I understand what you -- you were
21  saying, you were going through an ID for -- I guess she
22  was your girlfriend?
23     A. Jami, yeah.
24     Q. Yeah. And then when you were going through
25  the IDs, you -- the dealership, Victory dealership

Page 58

1              E. Laforest
2  saw --
3      A. He noticed the other one.
4      Q. He noticed the ID for Ms. Francois.
5      A. So he ran her name with mine. He was, like,
6  well, she didn't get approved and if -- if she did, I'd
7  have to put way more money down. So I'm, like, I don't
8  have it. And he was, like, how about the other person?
9  I'm just, like, we can check to see. After he checked
10  he was, like, yeah, you definitely got approved. If
11  you want it -- he said if you want it, you can go off
12  the lot or whatever with it.
13          I was a little hesitant because I'm going
14  to -- honestly, I really wanted to ask her first. But
15  I'm pretty sure if I asked if, she would have been okay
16  with at -- in the very beginning. But he was, like,
17  no, just go. Just do it later or whatever. So they
18  got the car and -- and I drove off the lot with it.
19     Q. So when they ran her credit report, you never
20  told the dealership that she gave you permission to buy
21  a car in her name or to pull a credit check?
22     A. He didn't even ask. I guess they was just so
23  happy that they was making a sale. He didn't even
24  bother to ask me none -- not of that.
25     Q. So you never told him that, hey, Ms. Francois

Page 59

1  says it's okay to run her credit? You never said
2  anything like that?
3      A. We never spoke on that. That's all he just --
4  he just was, like, can we use her name. I said okay.
5  I said just check. I said just check and let's see.
6      Q. All right.
7      A. And it went through.
8      Q. All right. So Ms. Francois didn't know
9  anything about you going to the dealership when you did
10  on May 30th; is that right?
11     A. No. She wasn't aware yet.
12     Q. Yeah. When was the first time that you ever
13  talked to her about the purchase of this car in her
14  name?
15     A. It was a couple of weeks after.
16     Q. Okay. When -- at the dealership they told you
17  that it was going to be a joint purchase.
18     A. Yeah. They definitely told me. After she got
19  approved, she said -- he said you-all got approved and
20  I said okay.
21     Q. They said it would be a joint purchase for you
22  and Ms. Francois.
23     A. He said -- yeah. He said my name will be on
24  the title.
25

Page 60

1              E. Laforest
2      Q. Okay. And so then the first time you talked
3  to Ms.-- to your knowledge, the first time Ms. Francois
4  knew anything about the sale when -- was when you
5  talked to her a few weeks later?
6      A. Yeah. She had -- I think she had called my
7  brother. I don't -- honestly I don't even know what
8  happen. I know she had called my brother. And she
9  ended up calling me, and then we spoke, and she was,
10  like, well, you should have never did that. You should
11  have at least told me. And I told her yeah. And then
12  she was, like, all right. She had no problem with
13  that.
14          And I told her, by December the car is going
15  to fully be paid for. And she said all right. She was
16  cool with it. A couple of weeks later, maybe like a
17  month later, I'm guessing she ended up going to the
18  dealership. And that's when the guy called me.
19     Q. All right. So then you're thinking if the guy
20  called you from dealership around September 25th,
21  that -- that's when -- that's when the dealership
22  called you?
23     A. Yeah.
24     Q. So then you -- you think you talked to
25  Ms. Francois around August?



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
61–64

Page 61

E. Laforest

1
2    A. I would say so. Yeah. Like --
3    Q. Okay.
4    A. -- around there.
5    Q. And did she call you or did you call her?
6    A. No, she ended up calling me.
7    Q. What did she tell you when she called you?
8    A. She just was asking me, like, why -- like why
9    did I use her name or whatever. And I told her, like,
10   I didn't really mean to use it. The guy, just like --
11   it just happened. And she was, like -- well, she said
12   it was okay and don't worry about it. It ain't going
13   to be no problem as long as -- as long as I pay
14   whatever I had to pay.
15        That's when I ended up paying all the parking
16   tickets. And then she -- and I was always up to date
17   with my payments, so she was, like, all right. And I
18   told her by December, it would have been finished --
19   like it would have been off -- off the thing. I'm
20   going to finish paying it off. And she agreed. So
21   it's -- I guess, I don't know, sometime after that, I
22   guess she just changed her mind. I'm not too sure.
23   Q. So let me get the years right. When you went
24   to talking with the person at the dealership in
25   September 25th, do you mean you would have paid off the

Page 62

E. Laforest

1
2    car that December?
3    A. Yeah. That December. The car was already
4    going to be been paid off for. I only owed them, like,
5    close to, like, 26,900, around there.
6    Q. Okay. So what was your understanding about
7    how much you had to pay -- how many more payments you
8    had to make for the car? What was your understanding?
9    A. When I -- when I put the money down or
10   whatever, he said he would call this around 28,000.
11   Yeah. So based off of that, I only owed 22,000. But
12   when he had gave me a paper, he was, like, he circle
13   the balance. And it went from 20 to, like, almost 29,
14   yeah.
15        And then I asked him about that. He was,
16   like, yeah, that's a whole bunch of fees or whatever.
17   And then he took the paper back. And then he was,
18   like, well, this is what you're going to pay every
19   month, which was, like, 601, and that was it.
20   Q. So he told you, you have to pay 601 and -- and
21   then did he tell you about how much the loan would be?
22   A. No.
23   Q. All right. Did he say you would be taking --
24   getting a loan out in your name or a loan would be
25   taken out in Ms. Francois's name?

Page 63

E. Laforest

1
2    A. He said something about the bank. Well, he
3    said -- yeah, basically that's what he was telling me.
4    He was, like, the bank would have to put the rest.
5    Q. Okay. Did he tell you that the loan would be
6    Ms. Francois's name or your name?
7    A. He said both of our names.
8    Q. Okay. And so he told you that price --
9    initially he told you the price was 20,000. But then
10   he said the price was 29,000 because of additional
11   fees?
12   A. Yeah, something like that.
13   Q. Did he say you had to buy an extended warranty
14   program?
15   A. Warranty? He didn't say nothing like that.
16   He didn't say nothing about no warranty.
17   Q. So when you left the dealership, you thought
18   there was $29,000 left to pay on the vehicle after you
19   put the money down, was that your understanding?
20   A. Yeah.
21   Q. And that you have to pay about 601 a month?
22   A. 601. That's much I was paying, 601. Yeah.
23   Q. And did you actually make your payments?
24   A. Yeah.
25   Q. Who does make the payments to?

Page 64

E. Laforest

1
2    A. Capital One.
3    Q. How did you make those payments?
4    A. I went to the teller. Some of them --
5    sometimes I went to the teller, sometimes I paid it
6    online.
7    Q. Do you have any of those receipts?
8    A. I got a -- I think I should have a couple of
9    those.
10   Q. Would it surprise you to -- to learn that
11   Capital One says they never got any money for this car?
12   A. That's a lie. I got receipts.
13   Q. You have them with you?
14   A. I can get them.
15   Q. All right. Well, tell me about that. You
16   went to the -- so how many payments did you make in
17   person and then online?
18   A. All of them. Like about -- I made, like,
19   about four or five payments.
20   Q. Of 601 each?
21   A. Yeah.
22   Q. And out of those four or five payments, how
23   much were in person at a teller?
24   A. Like twice.
25   Q. And how many of those were online?



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
65–68

Page 65

1              E. Laforest
2     A.  Like four or five.
3     Q.  All right.  Well, I sound surprised because
4  it's my -- my understanding is that they're saying they
5  never got any payments.
6     A.  Trust me, I have to show you the receipt.
7     Q.  So you have receipts --
8     A.  I'm confident about that.
9     Q.  You have receipts from when you went to the
10  teller.
11     A.  Yeah.  I keep my receipts.
12     Q.  All right.  Well, can you -- can you get them
13  to us?
14     A.  Yeah, that's not a problem.
15     Q.  Or you can even just take a picture of them --
16     A.  How could Capital One tell you that?
17     Q.  I don't know.  Why would the car dealership
18  say, get a car in -- in Ms. Francois's name, right?
19  Something is going on here, right?  We're just trying
20  to figure out what it was.  And that's basically what
21  this all -- I mean, that's what we're trying to figure
22  out.  So -- all right.  Can you take a picture of those
23  and text that to us?
24     A.  That's not a problem.  I'm going to show --
25  I'm going to get it to you right away.

Page 66

1              E. Laforest
2     Q.  All right.  Did they -- did you get e-mails
3  from Capital One to verify the payments?
4     A.  Yeah, I probably did.
5     Q.  How did you get access online to the -- you
6  have access online to the account?
7     A.  No, I just called them by phone.
8     Q.  Okay.  So -- so how does that work?
9     A.  You call Capital One, you give them the
10  account number.  Once you -- once you type in that
11  account number, it tells you how much you owe, how you
12  can pay, and stuff like that.
13     Q.  The account number for the car loan?
14     A.  Yeah.
15     Q.  How did you get the account number for the car
16  loan?
17     A.  I -- I think it was with the information the
18  guy gave to me.
19     Q.  When you were there on May 30th or when?
20     A.  It was some type of paperwork they had gave me
21  and it was on there.
22     Q.  All right.
23     A.  I made my first payment when I went to the --
24  when I went to the -- when I went to Capital One to
25  make the payment, they gave me the account number on

Page 67

1              E. Laforest
2  the -- on the bill, I -- with the receipt.  They --
3  they stapled it together.
4     Q.  All right.  And you have those documents?
5     A.  I have them.
6     Q.  All right.  That's one of the things -- have
7  it.  All right.  Now --
8     MR. SELVEY:  We would request to the extent
9  that you do acquire those, that you share them.
10  BY MR. KESHAVARZ:
11     Q.  Yeah, okay.  All right.  So -- that's
12  interesting.  So you have access -- so did you have to
13  create an account?
14     A.  You said Capital One never -- said I never
15  made one payment?
16     Q.  That's my understanding.  So that's why I'm
17  real interested in -- if you have any proof of payments
18  that's news to me.  So I'd be interested in finding that.
19  Now, how did you get online --
20     A.  So if -- if I showed you the receipt, what
21  would happen?
22     Q.  Oh, I -- I'm not your attorney.  I can't
23  represent you.  But I'm just trying to find -- I'm just
24  trying to find out the facts.  You know, I'm just
25  trying to find out what happened.  All right.  So how

Page 68

1              E. Laforest
2  did you get online access to make the payments?
3     A.  I told you, I didn't go online.
4     Q.  Oh, there was phone call, excuse me.  That's
5  what you told me.  All right.  So what papers did the
6  dealership -- how many pieces of paper did the
7  dealership give you when you left?
8     A.  Something like an envelope with the receipt, a
9  couple of papers with my name on it.  Some of the
10  papers had the VIN number on it with my name on it,
11  address, and that was it, really.  It wasn't really
12  that much papers they had gave me.
13     Q.  Well, did they give you papers that are not in
14  front of you as an exhibit?
15     A.  I mean, like, two or three.
16     Q.  Okay.  What do you remember those pages were?
17     A.  It was about the -- they had my name on it
18  with the VIN number, my address, Social, and they said
19  Victory Mitsubishi on it.
20     Q.  Did it have anything about financial
21  information, like, your income or anything like that?
22     A.  No.
23     Q.  No.  Okay.  Was there anything else, like, a
24  long, thin piece of paper, like, 17 inches, 18 inches
25  long?



EMMANUEL LAFOREST

October 25, 2022

FRANCOIS vs VICTORY AUTO GROUP, LLC

69–72

Page 69

1           E. Laforest
2     A. No.
3     Q. All right. Do you still have those papers?
4     A. I have to look for them. I'm not too sure.
5     Q. If you have them, can you text them to us?
6     A. No problem.
7         MR. KESHAVARZ: All right. Okay. Do you have
8 any other questions before?
9         MS. CATERINE: Yeah.
10          FURTHER DIRECT EXAMINATION
11 BY MS. CATERINE:
12    Q. Jami Singer, are you still in touch with her?
13    A. Uh-huh.
14    Q. Do you have her phone number?
15    A. Maybe.
16    Q. Could we get her phone number, please?
17    A. I'd have to ask her.
18        MR. KESHAVARZ: Is the information that's on
19 her driver's license current, as far as you know?
20 BY MS. CATERINE:
21    Q. Is that her residence?
22    A. Yeah.
23    Q. And did you -- yeah, did you --
24        MR. KESHAVARZ: Oh, before you get to that,
25 when do you think you could come -- when can we take a

Page 70

1           E. Laforest
2 look at the phone? We just need -- when we get to the
3 phone, can you just text them with the pictures that
4 show the texts.
5        THE WITNESS: All right. No problem. No
6 problem.
7 BY MS. CATERINE:
8    Q. Thanks. All right. And now Exhibit 17.
9 Okay. I know this might be difficult to talk about,
10 Mr. Laforest, so take your time. Do you recognize this
11 document?
12    A. This is the day when I got arrested for it.
13    Q. And when you got arrested, what was your
14 understanding of why you were being arrested?
15    A. At first I didn't know anything. I didn't
16 know what was going on until the detective -- when the
17 cop that came and got me asked me, did you get a car
18 under somebody else's name. And that's when I
19 understood what was going on. But then, in the end,
20 the car was already returned. That's why I thought
21 everything went back to normal, you know.
22    Q. So you got arrested. The detective asked you
23 if you had ever gotten a car in someone else's name.
24 And what did you say to the detective?
25    A. I didn't say much. I just said okay. And I

Page 71

1           E. Laforest
2 just -- he just cuffed me and he took me.
3    Q. And what happened after that?
4    A. What do you mean?
5    Q. What happened in terms of being arrested? Did
6 you -- did you -- were you prosecuted?
7    A. I went to the precinct. I guess he called
8 Farah and spoke with -- he spoke to Farah or whatever.
9 And then they checked to see that the car was returned
10 and everything. So I ended up going to court in, you
11 know, like, November of 2021. The case got dismissed.
12    Q. Okay. And do you know why it was dismissed?
13    A. The lawyer didn't tell me much. He just said
14 you don't got to go to court no more and I said okay.
15    Q. And was -- do you recall the name of your
16 lawyer?
17    A. No, I don't remember his name.
18    Q. Was it a legal --
19    A. Yeah. It was a --
20    Q. -- services attorney?
21    A. -- legal defendant. It was a legal aid.
22    Q. Legal Aid Society. Other than this arrest,
23 have you ever been arrested before?
24    A. For this.
25    Q. Other than this time, are there any other

Page 72

1           E. Laforest
2 times you've been arrested?
3    A. You mean for this -- for, like, cars?
4    Q. For anything.
5    A. I mean, I guess a couple of times when I was,
6 like, younger.
7    Q. And what were you arrested for?
8    A. Like -- like weed and stuff like that.
9    Q. Have you ever been arrested for identity --
10 anything to do with identity theft?
11    A. Yeah, once.
12    Q. And what were the circumstances of that?
13    A. Just receiving stolen property.
14    Q. And what was the stolen property?
15    A. Repeat that again. What was the stolen --
16    Q. What was the stolen property?
17    A. A MacBook or two.
18    Q. I see. And where did you get those MacBooks
19 from?
20    A. I don't remember. It's been -- that was a
21 long time ago.
22    Q. About how many years?
23    A. Like 2011.
24    Q. Did Victory Mitsubishi ask you if you had a
25 criminal record?



EMMANUEL LAFOREST                                    October 25, 2022
FRANCOIS vs VICTORY AUTO GROUP, LLC                        73–76

Page 73

1                E. Laforest
2       A.  No.  Did they ask you that?
3       Q.  No, it's my question.  Do you know if they ran
4   a criminal background check on you?
5       A.  No, I'm not too sure.  They didn't say nothing
6   about it, though.
7       Q.  If the defendants in this case say that the
8   identity theft against Ms. Francois was all your fault
9   and that they had no role in it, how would you respond
10  to that?
11      A.  That's a lie, because I told him everything
12  what it was.  It's not like I went there and I didn't
13  tell him what it was.  I told him what it was.  They --
14  they just wanted a sale so they got a sale.
15      Q.  Do you think the defendants did anything wrong
16  here?
17      A.  Who are the defendants, Victory Mitsubishi?
18      Q.  Yes.
19      A.  I mean, I can't go to any other car lot and do
20  that so --
21      Q.  And when you say, you "can't go to any other
22  car lot and do that," you mean --
23      A.  They would have asked me to bring the person
24  in.
25          MR. SELVEY:  I'm going to object to that.

Page 74

1                E. Laforest
2   Objections are reserved.
3          FURTHER EXAMINATION
4   BY MR. KESHAVARZ:
5       Q.  Did they ever ask you to bring her in?
6       A.  I'm telling you they didn't even ask nothing.
7   They just -- once they seen it was approved, everybody
8   was just happy.  Once I pulled out the money, it was,
9   like, they stopped asking questions.
10      Q.  Did you talk to anyone -- besides who you've
11  been addressing, that one person who's 6'2", did you
12  talk to anyone else at the dealership that you
13  remember?
14      A.  A lady that was taking the money.  It was some
15  lady there that was taking the money.
16      Q.  Did she hand write a receipt for you or print
17  it?
18      A.  No, they printed it out, like, the copy that
19  you showed me.
20      Q.  And is that -- well, what does that woman look
21  like?
22      A.  She was, like, light-skinned.  Like, I think
23  she was Spanish.  I'm not too sure.
24      Q.  Do you know how -- about how tall she was?
25      A.  No.  She was sitting down the whole time.  I

Page 75

1                E. Laforest
2   didn't really see her get up.
3       Q.  Do you know about how old she was?
4       A.  I'll say, like, middle forties, probably.  I
5   don't know.
6       Q.  And do you have any idea how much she might
7   weigh?  Was she overweight, or thin, or --
8       A.  She was medium-build for sure.
9          MR. KESHAVARZ:  Okay.  All right.  Sorry for
10  jumping in.
11          MS. CATERINE:  Oh, it's fine.
12  BY MR. KESHAVARZ:
13      Q.  Anyone else at the dealership you spoke with
14  other than her?
15      A.  No.  That was it.  I mean, it was just -- it
16  was the guy that was showing me around that did
17  everything and then she finalized everything and then
18  that was it.
19      Q.  Do you know if there were any security cameras
20  at the dealership?  I know -- we know there's security
21  cameras at the dealership anyway.
22      A.  I don't know.
23      Q.  No, you don't know one way or the other?
24      A.  I really wasn't paying attention to those
25  cameras.

Page 76

1                E. Laforest
2       Q.  Okay.
3       A.  I mean, if it's a dealership, then I don't
4   know -- you-all haven't been there?
5          FURTHER DIRECT EXAMINATION
6   BY MS. CATERINE:
7       Q.  We haven't had the pleasure.  When you
8   purchased the vehicle on May 30th, did they tell you at
9   that time that you were going be making payments to
10  Capital One?
11      A.  Did they tell me when?  May -- I think June
12  was going to be my first payment.  June -- June was my
13  first payment.
14      Q.  And you knew the financing was through Capital
15  One?
16      A.  Yeah.  He told me that.
17      Q.  And did they hand you any papers that had
18  Capital One written on them?
19      A.  I think one of the papers with my name, and
20  date of birth on it, and the VIN number had it.
21          MS. CATERINE:  I'm sorry.  Could you read back
22  that last testimony, please?
23          THE WITNESS:  About what?
24          MS. CATERINE:  Oh, I'm -- I'm talking to the
25  court reporter.  I'm sorry.



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
77–80

Page 77

1              E. Laforest
2        THE REPORTER:  From him?
3        MS. CATERINE:  Yes, please.
4   (The previous question and answer were played back.)
5        THE REPORTER:  I'm sorry.  Did you want after
6   that?
7        MS. CATERINE:  Yeah.  Thanks.
8        THE REPORTER:  I'm sorry.
9        MS. CATERINE:  That's all right.
10        (The previous answer was read back.)
11        MS. CATERINE:  Okay.  That's fine.  Do you
12   have any other questions?
13        MR. KESHAVARZ:  I was going to see if I
14   could -- what's the name of the other one?
15        MS. CATERINE:  [inaudible 01:33:04] .
16        MR. KESHAVARZ:  Okay.  All right.  Okay.
17   Well, the attorney from the dealership can ask some
18   questions if he has some.
19        MR. SELVEY:  Oh, yeah.  I definitely do.
20        MR. KESHAVARZ:  He represents the car
21   dealership.
22        THE WITNESS:  Okay.
23              CROSS-EXAMINATION
24   BY MR. SELVEY:
25        Q.  Good afternoon, Mr. Laforest.  My name is

Page 78

1              E. Laforest
2   Patrick Selvey.  As I have stated, I represent the
3   defendants in this action, Victory defendants, the
4   individually named defendants.  You've heard some names
5   thrown about.  They are some of them, if not all of
6   them, individually named in Ms. Francois's complaint.
7   Just some background to start.  When did you first
8   speak with Ms. Caterine here?
9        A.  Who?
10        Q.  Emma.  I believe she called you; is that
11   correct?
12        A.  Yeah.  She -- I don't know.  I forgot when she
13   called me.  Probably, like, a month ago or so.
14        Q.  And how long did you speak with her then?
15        A.  Probably a minute -- a minute or two.
16        Q.  All right.  And what did you talk about?
17        A.  The subpoena that when -- when I first
18   received it, I ended up calling the number.
19        Q.  Okay.  And what did she tell you about the
20   subpoena?
21        A.  That it was a just the motion -- I mean, a
22   deposition.  They needed my testimony.
23        Q.  All right.  And she told you needed to appear
24   today?
25        A.  Yeah.

Page 79

1              E. Laforest
2        Q.  Or I guess not today.  It would have been a
3   different day then.
4        A.  Yeah, but we ended up rescheduling it for
5   today.
6        Q.  Right.  Had you previously been scheduled for
7   a different day?
8        A.  Yeah.
9        Q.  And did you show up for that deposition?
10        A.  I wasn't able to make it.
11        Q.  All right.  What happened then?
12        A.  I had to go to work.
13        Q.  Okay.  Did you speak with Emma anytime after
14   that first time?
15        A.  I think we had text and then we had set up a
16   date for a Thursday.  But then it was rescheduled until
17   today, the 25th.
18        Q.  Did you speak to her on the phone at any
19   point?
20        A.  No.
21        Q.  And when you were text messaging her, did you
22   discuss anything other than scheduling your deposition?
23        A.  No.
24        Q.  Okay.  Going back to May 30th of 2020, you
25   said that was the first time you went to Victory

Page 80

1              E. Laforest
2   Mitsubishi in person?
3        A.  Yeah.
4        Q.  And you said you went -- you said you went in
5   person with someone else; that's correct?
6        A.  No.  I said I went by myself.
7        Q.  Yeah.  In person by yourself?
8        A.  Yeah.
9        Q.  So correct me, my notes say that you said, "we
10   went to the dealership, they ran my credit, they ran
11   her credit.  They said that they could put the car
12   under her name."
13        A.  Yeah, no.  That was -- you sure I said we --
14   we went to the dealership?
15        Q.  I -- I specifically noted it, because I was
16   curious who you were talking about.  But now you're
17   saying that you went to the dealership by yourself on
18   May 30th?
19        A.  Yeah.
20        Q.  And you're saying you did not go with Farah
21   Francois?
22        A.  No.
23        Q.  And you did not go with Jami Singer?
24        A.  No.
25        Q.  You said you had IDs on that date.  How many



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
81–84

Page 81

E. Laforest

1   IDs did you have with you?
2
3        A.  I just had mines.  Jami text me that ID and I
4   had Farah's.
5        Q.  Okay.  But you said you were planning on
6   getting the car under --
7        A.  Under Jami, jointly.
8        Q.  Jointly under your name and Jami's name?
9        A.  Yeah.
10       Q.  But you said she didn't come with you?
11       A.  No.
12       Q.  All right.  And you said you're still in
13  contact with Jami?
14       A.  Yeah.
15       Q.  How -- how are you -- when did you last
16  communicate with Jami?
17       A.  Probably, like, yesterday.
18       Q.  And how did you communicate with her?  Was
19  that on -- on the phone, text message, Facebook,
20  something else?
21       A.  Text message.
22       Q.  Text message.  All right.  And so you do have
23  her -- her phone number?
24       A.  Correct.
25       Q.  All right.  Could you please provide that for

Page 82

E. Laforest

1
2   the record?
3        A.  Why?
4        Q.  We need to communicate with her.
5        A.  For what?
6        Q.  She's a witness of, potentially a crime, but
7   certainly the allegations set forth in the plaintiff's
8   complaint.
9        A.  It's (347) 401-4158.
10       Q.  All right.  And so prior to 5-30-2020, you --
11  you spoke with Ms. Singer about your need for a car for
12  work?
13       A.  We did.  We spoke about it.  She had no
14  problem doing it for me.
15       Q.  All right.  And what was it that she had
16  agreed to do exactly?
17       A.  Either put the car under her name or be a
18  co-applicant.
19       Q.  And were you two going to share the car or was
20  it just going to be your --
21       A.  She already had her own car.  It was going to
22  be my car.
23       Q.  All right.  I'm just going to ask if you could
24  let me finish my sentence before you answer.  I know
25  sometimes you can predict what I'm going to say.  But

Page 83

E. Laforest

1
2   for the records, so he can make sure to get everything
3   down on a transcript later, it's important that we
4   don't talk over each other.
5        So I'm going to try and let you finish if you
6   could try and wait until I'm done talking.  It's --
7   it's hard because it seems like a conversation, but
8   because he's trying to put it down in writing it --
9   it's better that way, all right?
10       A.  (No verbal response.)
11       Q.  Thank you.  So she already had a car.  She
12  didn't need a car?
13       A.  No.
14       Q.  All right.  And then, was she going to be
15  making any payments on that car or was she just going
16  to be using her name and her credit?
17       A.  It'd be just her name and credit.  I would
18  have been paying for it.
19       Q.  Okay.  And when did you -- when did you decide
20  that -- sorry, strike that.
21       When did she first agree to co-sign the
22  application for that car?
23       A.  The minute I asked her.
24       Q.  All right.  And was that on May 30, 2020, or
25  some time before that?

Page 84

E. Laforest

1
2        A.  It was some time before that.
3        Q.  So you went to the dealership.  You had your
4   driver's license, and you had Farah Francois's driver's
5   license, and that's all, correct?
6        A.  Correct.
7        Q.  All right.  And Jami Singer did not go with
8   you?
9        A.  No.
10       Q.  Did you discuss going with her before you went
11  in all by yourself?
12       A.  When I had called her she said if she had to
13  come, she'll just come.
14       Q.  Okay.  Was she -- was she in the area?
15       A.  No.  She lives in Brooklyn.
16       Q.  Did it occur to you that she might need to be
17  there to co-sign for a loan?
18       A.  If she had to, she said she would have came.
19       Q.  Before you went to the dealership on -- on May
20  30, did you have any reason to think that you would be
21  able to purchase a car in her name without her being
22  there?
23       A.  Usually when you apply for a car, you can just
24  do the application online or go to the store.  But
25  other than that, they'll let you know if -- they'll let



EMMANUEL LAFOREST                                        October 25, 2022
FRANCOIS vs VICTORY AUTO GROUP, LLC                      85–88

Page 85

E. Laforest

1  you know if you've got to bring the person in or not.
2
3     Q.  So walk me through the conversation when you
4  first got to the dealership.  You -- you came in and
5  you told -- you said you were talking to a -- a man and
6  you told him, I want to buy a car jointly in me and my
7  girlfriend's name?
8     A.  No.  First I said I wanted to finance the car
9  under my name.
10    Q.  Okay.
11    A.  But that wasn't going to go.  So he said get a
12  co-applicant, that's why I asked.  But I already had
13  asked Jami a while ago and she said okay.  So I texted
14  her.  She sent me the -- her Social and everything, so
15  I gave it to him.  And he went inside to go do the
16  application.
17    Q.  All right.  I'm just trying to get a timeline
18  together here.  So did you know you needed a
19  co-applicant before or after you visited the dealership
20  in person on May 30th?
21    A.  I found out after he ran the application --
22  when he ran the application.
23    Q.  And was that -- was that before or after you
24  came down in person to the -- to the dealership?
25    A.  I'm not too sure.  But I know he did it again

Page 86

E. Laforest

1  when I got to the dealership.
2
3     Q.  Okay.  So after you decided that you needed a
4  co-applicant, you had already talked to Jami?
5     A.  Yeah.
6     Q.  And she had already agreed to it?
7     A.  Yeah.
8     Q.  Okay.  And did she -- is that when she sent
9  you her driver's license and Social Security number?
10    A.  Yeah.
11    Q.  And was that in the text message that was
12  previously marked as Plaintiff's Exhibit 16?
13    A.  No.  This is --- this is way after.
14    Q.  This is way after.  This is -- this is marked
15  September 25th, 2020.  All right.  So --
16    A.  Yeah.
17    Q.  All right.  We'll get back to that.  So going
18  back -- going back to the day on 5-30 when you were
19  there in person.  You were there in person, you told
20  the guy you wanted to finance a vehicle in your name
21  and Jami's name.  And did they tell you they couldn't
22  do that because of her credit, because of your credit,
23  something else?
24    A.  They said because of her credit.
25    Q.  Because of your credit?

Page 87

E. Laforest

1
2     A.  Because of her credit.
3     Q.  Because of her credit?
4     A.  Yeah.
5     Q.  Did they say anything about your credit at the
6  time?
7     A.  No.
8     Q.  All right.  Did you ever fill out an
9  application or give them any information about Jami
10  during that application period?
11    A.  They had the -- I gave them the information.
12  That's how they ran her credit.
13    Q.  Okay.  Did you ever fill out an application
14  with Jami's credit on it?
15    A.  Say that again?
16    Q.  Did you ever fill out an application with
17  Jami's information on it?
18    A.  Pretty sure I think I wrote it down when
19  they -- when I -- when I was doing the thing.  I'm not
20  too sure.  I don't really remember.
21    Q.  Okay.  So you think you would have done it in
22  person as opposed to submitting it online?
23    A.  Say that again?
24    Q.  So we have somewhere in the stack of exhibits
25  here, I forget which one it is, there's a -- there's

Page 88

E. Laforest

1
2  some information that was submitted on a credit
3  application that you said was through the -- the
4  website that they provided you a link for; is that
5  right?
6     A.  Yeah.
7     Q.  Okay.  Did you ever submit any of Jami's
8  information through that website?
9     A.  It's possible.  I'm not -- I don't remember.
10    Q.  Okay.  Prior to visiting the car dealership on
11  May 30th, did you ever speak with Farah Francois about
12  co-signing or co-applicant -- co-application for a
13  loan?
14    A.  You said before?
15    Q.  Before.
16    A.  No.  I told you no.
17    Q.  All right.  And could you just remind me, what
18  is your relationship with Ms. Francois?
19    A.  She's a friend of the family's.
20    Q.  All right.  But no relation?
21    A.  What do you mean, like she's my aunt or
22  something?
23    Q.  Well, it's my understanding that she was at
24  one point married to your brother; is that correct or
25  incorrect?



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
89–92

Page 89

1        E. Laforest
2        A.  Who told you that?
3        Q.  The plaintiff.
4        A.  Oh, I -- I never -- I don't know nothing
5    anything about that.
6        Q.  Okay.  So she -- as far as you're aware, she
7    was never married --
8        A.  I don't know nothing about that.
9        Q.  All right.  Do you have a brother?
10       A.  Yeah.
11       Q.  What's your brother's name?
12       A.  Stanley [phonetic].
13       Q.  Stanley.  Is that Stanley Laforest?
14       A.  Yeah.
15       Q.  All right.  And where does he live?
16       A.  He lives with his girlfriend now.  I'm not too
17   sure where they stay.
18       Q.  Where did he live --
19       A.  Somewhere on Ocean.
20       Q.  Okay.  But where did he live at the -- at the
21   time that this was all happening back in 2020?
22       A.  2914 Farragut.
23       Q.  Same address as you?
24       A.  Yeah.
25       Q.  Who else lived there at the time?

Page 90

1        E. Laforest
2        A.  My mother and father.
3        Q.  Is that your mother and father's home?
4        A.  Yeah.  No, that's my grandmother's.
5        Q.  Okay.
6        A.  But it's a -- it's a family house.
7        Q.  Okay.  Is that where you grew up?
8        A.  Yeah.
9        Q.  Is that where Stanley grew up?
10       A.  Yeah.
11       Q.  All right.  How old is Stanley?  Is he older
12   or younger than you?
13       A.  He's older.
14       Q.  All right.  How old is he?
15       A.  I think he is about 36, 37 now.
16       Q.  Okay.  As far as far as you're aware, he was
17   never married to Farah Francois?
18       A.  As far as I was -- as far as I'm aware.
19       Q.  Would -- would that be something you would
20   expect to be aware of if your brother got married?
21       A.  I would have known.
22       Q.  Okay.  Did -- you said -- you said
23   Ms. Francois received mail at your Farragut home
24   address; is that correct?
25       A.  Yeah.

Page 91

1        E. Laforest
2        Q.  Do you know what the reason for that was?
3        A.  Nope.
4        Q.  Do you know if she had permission from Stanley
5    to do that?
6        A.  I'm not too sure.
7        Q.  Do you know if she have permission from your
8    parents to do that?
9        A.  I'm not sure.
10       Q.  All right.  So you said she's a family friend.
11   Was she -- was she your friend, was she Stanley's
12   friend, your parents' friend, something else?
13       A.  She was staying with my mother -- my parents
14   and I think she knew my grandmother.  I'm not too sure.
15       Q.  Okay.  How long has she had been a part of
16   your -- your family circle like that?
17       A.  For a while.
18       Q.  But you -- did I hear earlier around 2017
19   maybe, or earlier than that, or after that?
20       A.  It could be earlier.  It was a while ago.
21       Q.  Okay.  Do you know how she came to be -- be a
22   part of that?
23       A.  I think they -- they was dating, her and
24   Stanley.
25       Q.  Her and Stanley were dating.  Do you know when

Page 92

1        E. Laforest
2    that was?
3        A.  No, I'm not too sure.
4        Q.  Okay.  And sorry if I asked this.  Did she
5    ever -- she ever reside at that address for any period
6    of time?
7        A.  Like stayed there?
8        Q.  Yeah.
9        A.  I mean, I wasn't always there all the time, so
10   I'm not too sure if she ever was there for a period of
11   time or not.
12       Q.  Okay.  During any of the times that you were
13   staying there --
14       A.  Did I ever -- I'd see her, but she'd come and
15   go.
16       Q.  Okay.  Would she -- would she spend the night?
17       A.  I wouldn't know.
18       Q.  Did you ever observe her to be there, like,
19   early in the morning or late in the evening?
20       A.  Yeah.  Probably like in -- late in the
21   evening.
22       Q.  Okay.
23       A.  Coming and going.
24       Q.  But you're not sure if she ever stayed the
25   night?



Page 93

E. Laforest

A. No.
Q. Would that be something that your parents would permit?
A. I think they wouldn't really mind.
Q. Okay. Now you said on the day of 5-30-2020, when you were in the dealership, you had Ms. Francois's driver's license on you; is that correct?
A. Correct.
Q. Was that in your wallet?
A. Yeah.
Q. All right. And how did you obtain her driver's license?
A. It was given to me. Well, sometimes, like, they leave them out, outside or whatever, and they'll pick it up. But it was, like, near the doorway and I found it there. First, I didn't know who it was for but then I just recognized the name and I'm -- I've realized that this -- she gets mail there all the time.
Q. Sorry. So you received her driver's license in the mail?
A. No. It was on the floor in the house.
Q. You found it on the floor at your Farragut --
A. Yeah.
Q. Okay. So before you said someone gave it you.

Page 94

E. Laforest

So did someone give it to you or did you find it on the floor?
A. I found it on floor.
Q. Okay. And when did you find it on the floor?
A. For -- it had to be a while. Way before I even thought about getting a car.
Q. So would that -- that have been in May of 2020, April, something else?
A. No. Probably, like, I'll say 2019.
Q. Okay. So at least five or six months prior to --
A. Yeah. It was a while ago.
Q. Okay. So when you testified earlier that someone gave it to you and told you to bring it to her, was that not true?
A. I was going to bring it to her regardless.
Q. But when you said -- so correct me if I'm wrong. My understanding from my notes is that you -- you told Emma earlier that someone gave it to you to give to her and you didn't want to tell Emma who it was that a given it to you. You said you'd rather not say. Do you remember saying that?
A. Yeah, I remember saying that.
Q. All right. Why did you say that?

Page 95

E. Laforest

A. I don't know.
Q. All right. So I'm just going to ask you -- it can't be the case that someone gave it to you and asked you to give the ID to Farah and that you found it on the floor months before you went and bought the car. So which one is true and which one is a lie?
A. I found it.
Q. You found it. Okay. You found it some six months before. Did you ever tell Farah that you found her ID?
A. I didn't have her number at the time.
Q. Okay. Did you ever tell Stanley you found Farah's ID?
A. No, I told my father.
Q. Okay. And what did he said to you?
A. He said he was going to call her when she come pick up her mail.
Q. All right. And that was some -- that was back in 2019?
A. Yeah. Like around, like, the end of the 2019.
Q. All right. And did you do anything else to try and get it back to her between 2019 when you found it and --
A. No.

Page 96

E. Laforest

Q. -- when he said -- sorry. Let me finish my question, if you don't mind. Between finding it in 2019 and going to the dealership in May of 2020, did you do anything else, other than speak to your father about it, in order to get it back to her?
A. No. Once my father told me that he was going to call her, I just left it at -- I left it at that.
Q. All right. Were you residing at the Farragut address during that period of time?
A. Yes.
Q. All right. Did you see Farah at any point during that time?
A. No.
Q. All right. Do you know whether she and Stanley were dating during that time you had her ID?
A. (No verbal response.)
Q. All right. You said you do not know why she continued to receive mail at that address?
A. No.
Q. Do you know where she was living at the time?
A. No.
MR. SELVEY: It's nice and warm in here.
MS. CATERINE: It's at 69.
MR. KESHAVARZ: It's at 61 now.

EMMANUEL LAFOREST                                    October 25, 2022
FRANCOIS vs VICTORY AUTO GROUP, LLC                  97–100

Page 97
E. Laforest
1
2       MS. CATERINE:  It does that every time we're
3  doing a deposition here in the summer.
4  BY MR. SELVEY:
5       Q.  All right.  I'm going to refer you back to
6  what was previously marked as Plaintiff's Exhibit 6.
7  If you could find that in the stack there.  It's a
8  single page that says "Victory Credit Application,"
9  looking at the applicant and co-applicant fields --
10 columns.
11      A.  Yeah.
12      Q.  All right.  So you said -- did you say that
13 this was all filled out in your handwriting?
14      A.  Yes, except for the signature.
15      Q.  Except for the signature.  Except for the
16 co-applicant signature at the bottom?
17      A.  Yeah.
18      Q.  Everything else was your handwriting?
19      A.  Correct.
20      Q.  All right.  Do you see underneath the name in
21 the co-applicant field there's a Social Security
22 number?  Do you see that there?
23      A.  Where?
24      Q.  It's on the right-hand side, under the name
25 Farah Jean Francois.  The line below that there.

Page 98
E. Laforest
1
2       A.  Yeah, I see it.
3       Q.  All right.  There's a Social Security number
4  in that field, correct?
5       A.  Yeah.
6       Q.  How did you know Ms. Francois's Social
7  Security number?
8       A.  I made somebody look for it for me.
9       Q.  You made somebody look for it for you?
10      A.  Yeah.
11      Q.  Who did you make look for it for you?
12      A.  I don't know them personally.
13      Q.  When did you do that?
14      A.  The day I was about to go get the vehicle.
15      Q.  So on May 30th, 2020 --
16      A.  Yeah.
17      Q.  -- you had someone find her Social Security
18 number?
19      A.  Yeah.
20      Q.  Was that someone -- you don't remember who it
21 was?
22      A.  No.  It's anonymous.  I don't know the person.
23      Q.  Someone online?
24      A.  Yeah.
25      Q.  All right.  Did you -- did you pay that person

Page 99
E. Laforest
1
2  to get her Social Security number?
3       A.  No.
4       Q.  Was it someone that you knew previously or was
5  it someone that you found after seeking them out
6  specifically for the purpose of getting Ms. Francois's
7  Social Security number?
8       A.  It was just somebody that people usually use.
9  My man gave me his number and he just did it for me.
10      Q.  So how did you communicate with this person?
11      A.  Through Telegram.
12      Q.  Telegram.  That's an app?
13      A.  Yeah.
14      Q.  All right.  And was that on your old phone?
15      A.  Yeah.  But that account is old right now.
16      Q.  All right.  Do you still have access to that
17 account?
18      A.  I got to see if I login to see.
19      Q.  Okay.  I'm going to ask that you -- that you
20 preserve that and -- and if you are able to, to please
21 provide those messages to -- to me and to Ms. Caterine.
22      Why did you have that person look up
23 Ms. Francois's Social Security number before you went
24 to dealership that day?
25      A.  Because I wanted to see if she was going to

Page 100
E. Laforest
1
2  get approved.
3       Q.  Okay.  So when you went to the dealership that
4  day, you were already planning on using Ms. Francois's
5  information?
6       A.  No.  I was planning on using Jami's
7  information.
8       Q.  Okay.  Then why did you have someone look up
9  Ms. Francois's Social Security number so you could put
10 it on the credit application?
11      A.  Because I was -- I wanted to see, but I was
12 hesitant at first.  I wasn't even going to go through
13 with it.
14      Q.  Okay.  But you planned, just in case you
15 needed to, to have that information so that you could
16 use that information for that card -- for the credit
17 application?
18      A.  Yeah, but I was going to ask her, as well.
19      Q.  All right.  But so if Jami -- if Jami had
20 worked out, you wouldn't have needed to use her credit
21 information?
22      A.  No, not at all.
23      Q.  All right.  But you -- you knew that there was
24 a possibility that Jami's information wouldn't qualify
25 you for a loan; is that right?



EMMANUEL LAFOREST                                    October 25, 2022
FRANCOIS vs VICTORY AUTO GROUP, LLC                  101–104

Page 101

1                E. Laforest
2      A.  No, I wasn't too sure.
3      Q.  Wasn't too sure.  So you -- as a back up, you
4  prepared to have the information for Ms. Francois
5  available in case you needed to use her name to get
6  this loan; is that right?
7      A.  I wouldn't say that.
8      Q.  Okay.  Then why did you get the Social
9  Security number at the time?
10     A.  I wasn't really thinking back then.
11     Q.  Did you go -- did you have other people's
12  Social Security numbers at that time?
13     A.  No.
14     Q.  Is it your -- was it your common practice to
15  just get the Social Security numbers of any other
16  person that you knew?
17     A.  No.
18     Q.  Was it specifically for the purpose of making
19  this credit application ahead of time that you got that
20  Social Security number from someone, that you knew a
21  guy, who knew a guy about?
22     A.  No, not really.
23     Q.  So the reason I'm asking about all of this is
24  because earlier you testified that you went in there to
25  make the application in your and Jami's name, and that

Page 102

1                E. Laforest
2  the person you were dealing with just happened to see
3  Ms. Francois's ID and suggested that you -- instead of
4  applying under your name and Jami's name, that you try
5  applying under Ms. Francois's name.  Is that about what
6  you testified to earlier?
7      A.  No, he said --
8          MS. CATERINE:  Objection to form.
9          THE WITNESS:  He said as a -- he said, use her
10  as a co-applicant.
11  BY MR. SELVEY:
12     Q.  Okay.  But -- but he -- so your -- your
13  testimony is that you did not suggest Ms. Francois, but
14  that the person you were dealing with saw the ID while
15  you --
16     A.  He asked me do I have anyone else --
17          MS. CATERINE:  Objection to form.
18  BY MR. SELVEY:
19     Q.  Can you please let me finish the question?  We
20  can't get the answer out if I don't get the question,
21  all right?  So correct me if I'm mistaken.  I
22  understood your testimony before to be that you pulled
23  the -- your -- you pulled your ID and Ms. Francois's ID
24  out of your pocket at some point during the
25  interaction.  The person you were interacting with at

Page 103

1                E. Laforest
2  Mitsubishi saw her ID and then suggested, oh hey, do
3  you know that person?  Let's put her on the credit
4  application as a co-applicant.  Is that a fair and
5  accurate recollection of your testimony?
6      A.  Yeah.
7          MS. CATERINE:  Objection to the form.
8  BY MR. SELVEY:
9      Q.  Okay.  So you're telling me that, even though
10  you had previously asked someone to find Ms. Francois's
11  Social Security number for you in case you needed to
12  use it as a credit application on a -- as a
13  co-applicant, that it was not your idea to put her name
14  down on that co-applicant field; is that correct?
15     A.  Yeah.  It wasn't -- I was -- I was a little
16  hesitant on using her.  I -- I wanted to ask her first.
17  But once he told me it went through, I just said, all
18  right, just go -- just go on with it.
19     Q.  All right.  Why didn't you ask Ms. Francois if
20  you could use her name as a co-applicant before you
21  went to dealership?
22     A.  I thought she would have been okay with.
23     Q.  Why didn't you ask her?  You said you didn't
24  want to do it unless you asked her.  So I'm asking you,
25  why didn't you ask her before you went?

Page 104

1                E. Laforest
2      A.  When she got approved, I was just -- I was --
3  I got happy.
4      Q.  That's not -- that's not an answer to my
5  question, though.  Do you understand the question I'm
6  asking?
7      A.  You said why didn't I ask her.
8      Q.  Why didn't you ask her, if you were -- if you
9  were expecting to maybe use her as a co-applicant for a
10  vehicle loan, why didn't you call her before you went
11  to dealership that day?
12     A.  Because I wasn't using her.  I told you I was
13  using Jami Singer.
14     Q.  But you thought you might have to use her,
15  correct?
16     A.  Yeah, that was a thought.
17     Q.  Okay.  So why didn't you just call her just in
18  case -- in case Jami didn't work out?
19     A.  Honestly, everything was so fast.  I didn't
20  have a chance to because once she didn't work out, he
21  was like, why don't I try to use her.  I'm like, give
22  it a shot.  Once he got -- once I got approved, he was
23  like -- I told him to hold on.  But he was like, oh,
24  no, you might as well just get it right now and get it
25  done and over and just, you know, speak to that lady --

EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
105–108

Page 105

1          E. Laforest
2  speak to that person later.  She's a family friend.
3  She'll understand.  And I said -- I just ran with that.
4  I said okay.
5          Q.  Well, how did -- how did he know who
6  Ms. Francois was?
7          A.  Because they asked me who that was.
8          Q.  Okay.  And you -- and what did you tell them?
9          A.  I told them a friend of the family.
10         Q.  Okay.  Did he -- did he ask you why you had
11  her ID?
12         A.  No.
13         Q.  Did you tell him why you had her ID?
14         A.  I was never asked so I just didn't say
15  anything.
16         Q.  And you're sure that Jami didn't go you -- go
17  with you to the car dealership that time?
18         A.  I'm pretty sure.
19         Q.  So if I talk to her on the phone, she's going
20  to say no, I didn't go Victory Mitsubishi with --
21         A.  I'm pretty sure -- I'm pretty sure.
22         Q.  Okay.  Have you talked to her about this case?
23         A.  I mean, she you knows I got arrested, but we
24  never really spoke on this.
25         Q.  Okay.

Page 106

1          E. Laforest
2          A.  Because once she didn't work out, there was
3  nothing else to talk about.
4          Q.  Going back to -- to when you were arrested,
5  just want to get, again, an accurate timeline for that.
6  So we're referring -- I guess this is -- this is
7  Plaintiff's Exhibit 17.  So this arrest summary here
8  says incident date June 29, 2020.  Is that accurate?
9          A.  Are you asking if that's when she made the
10  police report?
11         Q.  I'm asking you if this incident date June
12  29 --
13         A.  I didn't get arrested on June 29th, so I'm not
14  too sure.
15         Q.  Okay.  And you were arrested on January 11th,
16  2021; is that correct?
17         A.  Correct.
18         Q.  Okay.  And at that point -- at that point you
19  already returned the vehicle and you'd already spoken
20  with Ms. Francois about everything you thought was
21  all -- all sealed up?
22         MS. CATERINE:  Objection to form.
23         THE WITNESS:  All right.
24  BY MR. SELVEY:
25         Q.  I'm sorry.  Were you done with your answer?

Page 107

1          E. Laforest
2          A.  Huh?
3          Q.  Were you done with your answer?
4          A.  Yeah, the car was already returned ever since
5  September --
6          Q.  Okay.
7          A.  -- of 2020.
8          Q.  Sure.  Are you still in a relationship with
9  Ms. Singer, or are you just friends, or something else?
10         A.  We're friends.
11         Q.  Okay.  And so you said they -- they told you
12  that your co-application with Ms. Singer wouldn't work
13  because of -- sorry, did you say your credit or her
14  credit?
15         A.  They said it was -- they said it was her
16  credit.
17         Q.  Her credit.  Okay.  So your credit was okay,
18  but not enough enough.
19         A.  Not enough, yeah.
20         Q.  Okay.  And her credit was bad or just not
21  enough to help you?
22         A.  I'm not too sure.
23         Q.  Okay.  And was that -- that was even with
24  the -- the 8,600 down?
25         A.  Yeah.

Page 108

1          E. Laforest
2          Q.  You said you got the 8,600 from saving; is
3  that correct?
4          A.  Correct.
5          Q.  How long did it take you to save up that
6  deposit?
7          A.  Probably about five, six months.
8          Q.  All right.  And do you -- do you pay rent
9  living at your parents or are you basically --
10         A.  Yeah, now I pay rent because my -- both my
11  parents just passed away so --
12         Q.  Okay.  So -- but at the time, were you paying
13  rent?
14         A.  Yeah.
15         MR. KESHAVARZ:  I'm sorry about your parents,
16  though.
17         MR. SELVEY:  Oh, yes.  Sorry -- sorry about
18  that.
19         MR. KESHAVARZ:  We're sorry about their
20  passing.
21         THE WITNESS:  Oh, thank you.
22  BY MR. SELVEY:
23         Q.  Sorry.  Did you say you were paying rent back
24  then?
25         A.  Yeah.



EMMANUEL LAFOREST                                    October 25, 2022
FRANCOIS vs VICTORY AUTO GROUP, LLC                  109–112

Page 109

E. Laforest

2    Q.  And how much were you paying back then?
3    A.  Like, I was giving to my mom about, like,
4  what, 400 per month.  Yeah.
5    Q.  Okay.  And so -- so sorry, how long did you
6  say it took you to save up that -- that 8,600?
7    A.  Like about -- like five, six months.
8    Q.  All right.  And during that time, was -- was
9  it your intention that you were saving up for the
10  deposit on a car?
11    A.  At first I was just saving.  I was just
12  saving.  Then I was like, I'm going to just get a car
13  with it.
14    Q.  Okay.  And when did you decide you -- you
15  wanted to get a car, about?
16    A.  Oh, because I was also doing this construction
17  job in Jersey.  And, like, the -- I needed it for the
18  transportation.
19    Q.  All right.  And -- and when -- what -- about
20  when was that, if you recall?
21    A.  I was working there ever since about 2018.
22    Q.  Okay.  So you -- you were planning on -- wait,
23  sorry.  You were working in -- on a -- on a
24  construction job in New Jersey in 2018 and that's when
25  you decided you wanted a car?

Page 110

E. Laforest

2    A.  No, I already had car.  I had like a -- like a
3  little bullshit car.
4    Q.  Sorry, so when did you decide that you wanted
5  to use the money you'd saved up to buy a car?
6    A.  When the money was saved up.
7    Q.  Okay.  But I'm just trying to figure out how
8  is that related to the -- to the job in New Jersey?
9    A.  Oh, just for me to commute.  Like for me to go
10  back-and-forth.
11    Q.  Okay.  So --
12    A.  I live in Brooklyn.  I had to go to Jersey.
13    Q.  Right.  You were -- but you were -- so you
14  were still working that.  It wasn't 2018.  You were
15  still working that job in 2020?
16    A.  I had two jobs.
17    Q.  Right.  But one of them was the New Jersey
18  job?
19    A.  Yeah.
20    Q.  Okay.
21    A.  That was construction.
22    Q.  Got it.  When did you first speak to Farah
23  about -- strike that.
24    Did -- did there come a time where you
25  returned Farah's ID to her or do you still have it

Page 111

E. Laforest

2  today?
3    A.  No.  It was returned.
4    Q.  All right.  When did you return it to her?
5    A.  A couple of weeks after I got the car.
6    Q.  All right.  So that would be in June of 2020?
7    A.  Yeah.  Like around June.  Maybe June,
8  beginning of July.  It was around there.
9    Q.  Okay.  Had you spoken with Farah about
10  returning her ID at that point, or did you happen to
11  run into her, or something else?
12    A.  No.  We had a -- we had a long conversation.
13  We spoke about the car.  We spoke about everything.
14  And then she said she was going to come pick up her ID
15  and the rest of her mail, she said.  And she just came
16  and got it --
17    Q.  All right.
18    A.  -- the next day.
19    Q.  So you -- so you had a conversation with her.
20  This was a couple of weeks - this was some time in June
21  end -- end of June, beginning of July you spoke with
22  her?
23    A.  Yeah.
24    Q.  And she called you?
25    A.  Yeah.  No, she called my father and then my

Page 112

E. Laforest

2  father gave her my number.  Then yeah, we ended up
3  having a conversation.
4    Q.  And did -- and did she tell you -- what was
5  the first thing she said to you when she called?
6    A.  She just wanted to know why I didn't ask her.
7  And then I told her what happened.  And then she wanted
8  to know, like, why would the dealership allow that.
9  And I was just telling her I don't know, but I'm going
10  to finish paying for it in December.  And then she said
11  she was okay with it.
12    Q.  Did she tell you how she came to learn that
13  you had taken out a loan in her name?
14    A.  No.  We never spoke on that.
15    Q.  All right.  Do you know if she told -- told
16  your dad?
17    A.  I'm not too sure.
18    Q.  And you're sure that this conversation took
19  place in June or at the latest in July of 2020; is that
20  correct?
21    MR. KESHAVARZ:  Objection.  Form.
22    MR. SELVEY:  Objection to preserve.
23    THE WITNESS:  I'm not too sure.  I know we
24  spoke -- that we spoke weeks later.
25  BY MR. SELVEY:



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
113–116

Page 113

E. Laforest

1
2     Q. Weeks, not months?
3     A. Weeks, months, I can't really -- I can't
4  pinpoint it.  It was so long ago, but I know we spoke.
5     Q. Okay.  Do you remember what the weather was
6  like when she came by to get her mail and the ID?
7     A. It was late.  She usually would come, like,
8  late night.
9     Q. Okay.  Was it still warm or -- or was it
10  getting cooler?
11     A. No, it was still warm.
12     Q. Okay.
13     A. Because she had her ID before I returned the
14  car.
15     Q. All right.  And you had returned the car in --
16     A. In September.
17     Q. September 25th?
18     A. Yes.
19     Q. All right.  So you spoke with her.  What else
20  did you speak about on that -- when you spoke with her
21  in that June, July conversation?
22     A. We spoke about the car.  Then she had told me
23  something about someone was using her credit card or
24  whatever, did I know anybody that would be around the
25  house that's taking her mail.  That's about it.

Page 114

E. Laforest

1
2        What we really spoke about was when I was
3  going to finish paying it, and the tickets, and then
4  that was it.  And I told her by December, it's going to
5  be really paid in full.  She said it was okay.  And
6  that was the last time we really spoke.
7     Q. All right.  Did you ever use Ms. Francois's
8  personal information for any other purpose?
9     A. No.
10     Q. Did you ever open a credit card in her name?
11     A. No.
12     Q. Bank account?
13     A. No.
14     Q. Take out any other loans?
15     A. Nope.
16     Q. All right.  Do you know if anybody else in the
17  house did?
18     A. I wouldn't be able to tell.
19     Q. Has anyone ever accused you of doing that with
20  Ms. Francois's information, whether it be Ms. Francois
21  or someone else?
22     A. No.  She asked me, but I told her no.  Then
23  they said she was going to go to the cops.  And I said
24  go ahead, because I didn't use it.  And then she said
25  she found out what happened.

Page 115

E. Laforest

1
2     Q. All right.  After -- after you spoke with her
3  that first time, some weeks after you got the car, but
4  before you returned the car, did you have any other
5  conversations with Ms. Francois other than when you saw
6  her to give her the ID?
7     A. She did ask my brother if he wanted the car,
8  but he said no.  And then that was it.
9     Q. So she asked -- she asked family if he
10  wanted --
11     A. If he wanted the car.
12     Q. -- the car in her name?
13     A. Yeah.
14     Q. And when did she do that?
15     A. That was -- that was the -- the day before I
16  got -- well, that was the day -- that was the same day
17  when I had to go return the car.
18     Q. Okay.  And --
19     A. Around -- I think the day when she went to
20  the -- the Victory Mitsubishi.
21     Q. Do you know -- do you know why she asked your
22  brother if he wanted the car at that point?
23     A. I didn't care at that point.  I just wanted to
24  get rid of it.  It was -- it was just too much.
25     Q. What -- what was too much about it at that

Page 116

E. Laforest

1
2  point?
3     A. It just became headache.  She told me one
4  thing and then a different story.  I was like, you know
5  what, forget about it.  And then my father who was the
6  one who told me she was like, she just asked Stan if he
7  wanted the car and he told her no.
8     Q. Okay.  So you -- you heard from your father
9  that she had reached out to your brother to ask if he
10  wanted your car?
11     A. Yeah.
12     Q. And at that point, did you have any reason to
13  think that she was unhappy with the situation or did
14  you still think that she was fine with the vehicle loan
15  in her name?
16        MR. KESHAVARZ: Objection.  Form.
17        THE WITNESS: I wouldn't be able to tell you.
18  BY MR. SELVEY:
19     Q. Okay.  So you spoke with her end of June,
20  beginning of July and she was okay with situation,
21  correct?
22        MR. KESHAVARZ: Objection.  Form.
23        MR. SELVEY: What's your objection?
24        MR. KESHAVARZ: He said --
25        MR. SELVEY: Objections are reserved, but like

EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
117–120

Page 117

E. Laforest

1  if you have a problem with the way I'm asking a
2  question, I'm happy to rephrase it.
4       MS. CATERINE:  Don't.  Don't.
5       MR. SELVEY:  I'm inviting it.  You're welcome
6  to.
7       MS. CATERINE:  All right.
8       MR. KESHAVARZ:  I think you said that he --
9  correct me if I'm wrong.  I mean, my understanding was
10 that it was after the fact, she didn't know anything
11 about it.  And then she said that you said you'd pay
12 off the car, right?
13      THE WITNESS:  That's correct.
14      MR. KESHAVARZ:  But it wasn't like she was
15 like, oh, I'm glad that you took the car out in my
16 name.  She didn't say anything like that, did she?
17      THE WITNESS:  No.
18      MR. KESHAVARZ:  And she didn't say oh, it's --
19 it's fine with me that you took out a loan in my name.
20 She never said anything like that, did she?
21      THE WITNESS:  No.
22      MR. KESHAVARZ:  Is that a yes or no?
23      THE WITNESS:  No.  She wasn't --
24      MR. KESHAVARZ:  Okay.  But --
25      THE WITNESS:  -- she wasn't down until after a

Page 118

E. Laforest

1
2  while.  Like, after we spoke.  She was -- after we
3  spoke, she was okay with it.
4       MR. KESHAVARZ:  But by okay, meaning --
5       THE WITNESS:  In the beginning, no.  She did
6  not know.  She didn't know what was going on until we
7  finally spoke.  And then she said she was okay with it.
8       MR. KESHAVARZ:  By okay with it, she said she
9  was okay with it because you were going to pay off the
10 car?
11      THE WITNESS:  Yeah.  I was going to pay off
12 the car.
13      MR. KESHAVARZ:  And you were going to pay off
14 the -- and that was -- that was around -- after you
15 returned the car, you -- you told her that you --
16      THE WITNESS:  No, this was before I returned
17 the car.
18      MR. KESHAVARZ:  You spoke on the phone.
19      THE WITNESS:  We spoke.  I had the car.  I was
20 driving the car for, like, months.  And then once,
21 like, around, I'm going to say like around -- because I
22 think she went to to the dealership twice.
23      MR. KESHAVARZ:  Uh-huh.
24      THE WITNESS:  And then the first time she
25 went, the guy had called me.  He was, like, well, she

Page 119

E. Laforest

1
2  came to the dealership, what happened.  I was like, I
3  spoke to her.  He was like, yeah I spoke to her, too or
4  whatever, and then she left.
5       And then when I had to return the car, I think
6  she went back there again.  But this was -- she -- she
7  went there again.  But I don't know if she went with
8  people or somebody.  She went -- she -- he just said,
9  she's over here with her people or whatever.  And
10 that's when he was like, I want to get rid of this
11 headache.  Just please return the car so I can reverse
12 the transaction.
13      MR. KESHAVARZ:  Okay.
14      THE WITNESS:  And I told him okay.
15      MR. KESHAVARZ:  When you say she was fine with
16 it, she just wanted to get the car in a different name,
17 right?
18      THE WITNESS:  Yeah.  That's basically --
19 that's what it was.  Either -- or pay it off under her
20 name.
21      MR. KESHAVARZ:  All right.  So that's what you
22 meant by she was fine.  She just wanted to get it out
23 of her name.
24      THE WITNESS:  Yeah.  But she said she's cool
25 with it as long as I paid it off too, though.  As long

Page 120

E. Laforest

1
2  as it was paid off by December, she said it was -- it
3  was going to be okay.
4       MR. KESHAVARZ:  And she said that to you, so
5  we're talking about dates before --
6       THE WITNESS:  This was right after -- this was
7  after I got the car.  I'm in possession of the car now.
8  We spoke.  I still have the car.  I never returned the
9  car.  I still had the car.  I was driving it for a
10 while.  I was going back and forth from work, picking
11 up my kids, bringing them back home.  And then all --
12 all of a sudden, the dealership calls me and I'm
13 hearing she's at the dealership.
14      MR. SELVEY:  All right.  I think we've -- I
15 think we've clarified enough.  I can continue.
16      MR. KESHAVARZ:  Well, no. If you have more
17 follow-up questions, that's fine, but I don't think
18 we're going to have an objection to form anymore.  I
19 think we've clarified the basis now.
20 BY MR. SELVEY:
21      Q.  Thanks.  So after that first conversation
22 where she said she was cool with it under the
23 understanding that you were going to pay the car off by
24 December, did you speak with her again at any point
25 before you returned the car in September?



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
121–124

Page 121

E. Laforest

2   A.  No.
3   Q.  Okay.  So --
4   A.  I just thought everything was okay.
5   Q.  So you spent from approximately June, July,
6   through September, believing that Farah was fine with
7   the whole situation as it existed, and expected to pay
8   off the car by December?
9       MR. KESHAVARZ:  Objection to the form of the
10  question.
11  BY MR. SELVEY:
12  Q.  Okay.  You can answer.
13  A.  Yeah.  She never called me.  She didn't give
14  me no reason why she had a problem with anything.
15  Q.  All right.  Did you hear from anyone else
16  other than Farah that she might have a problem during
17  that time?
18  A.  No.  Everybody that we -- she spoke to my
19  mother, my father, me, my brother, and everything was
20  okay.
21  Q.  Okay.  So you interacted with her not about
22  the car in that intervening period, is that what you're
23  saying?
24  A.  No, that whole period when we had a -- when we
25  was have -- when we was having a conversation,

Page 122

E. Laforest

2   everybody was there.  My -- my father was there, my
3   mother was there, and my brother was there, when we was
4   talking about it.
5   Q.  And this was -- this was the one you had weeks
6   after the --
7   A.  Yeah, after our first call.
8   Q.  So this was an in-person conversation?
9   A.  No, she was on the phone.
10  Q.  But were -- so who -- who was -- when you say
11  your -- that your family was there, what do you mean by
12  that?
13  A.  My mother, father, my brother and me.
14  Q.  You were all -- were you on speaker phone?
15  A.  She was on the speaker phone.  And that's when
16  she said, it's not -- it's not a problem.  It's okay.
17  Just -- you feel me, just finish paying it by December.
18  Everything is going to be all right.  And I said okay.
19  I haven't -- I ain't speak to her ever since then.
20  Q.  Okay.
21  A.  And then she ended up -- she would call my
22  father every day and I guess that's when she asked him
23  if -- asked my brother if he wanted the car.
24  Q.  Wait.  So she asked your brother -- that
25  was -- that was in September?

Page 123

E. Laforest

2   A.  That's when I still had the car.  No.  She
3   asked my -- my brother if I wanted the car -- if I
4   didn't want to -- she had asked my brother that around
5   August.  Because in September, that's when she went to
6   Victory.
7   Q.  Was that the first time that she went to
8   Victory?
9       MR. KESHAVARZ:  Objection.  Form.
10  BY MR. SELVEY:
11  Q.  As far as you know?
12  A.  As far as I know that was the first time she
13  went to Victory -- down to Victory.
14  Q.  Okay.  You said she went to Victory twice,
15  though?
16  A.  Yeah.  She went there the first time, I guess,
17  to find out how was I able to do that.  And then the
18  second time, I guess, I don't know.  I don't know if
19  someone put that in her head, but the second time, she
20  was a little bit more angry and that's when he called
21  me telling me, like, to bring back the car.
22  Q.  Okay.  Let's go back to the -- to the person
23  you communicated with on Telegram.  Had you ever used
24  that person to acquire anybody else's Social Security
25  other than Ms. Francois's?

Page 124

E. Laforest

2   A.  No, that was, like, my first time using him.
3   Q.  Was there any other time after that you used
4   him?
5   A.  First time is the only time.  First time, only
6   time.
7   Q.  All right.  Did he give you any other
8   information about Ms. Francois or just her Social
9   Security?
10  A.  No, that was just it.
11  Q.  Do you know how he found out her Social
12  Security number?
13  A.  No.  I didn't ask.
14  Q.  Okay.  So you said -- you said that when you
15  finally brought the car back at the end of September,
16  that you did it because the whole thing was a headache;
17  is that correct?
18  A.  That's what the guy at Victory Mitsubishi said
19  to me.
20  Q.  Okay.  Victory Mitsubishi said it was a
21  headache.  How did you feel about the situation at that
22  point?
23  A.  I just wanted to get rid of the car.  Just
24  like, you know, forget it.
25  Q.  Why did you want to get rid of the car at that



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
125–128

Page 125

1                E. Laforest
2  point?
3      A.  Because it was a hassle.  She tells me one
4  thing and does another.  So I was like -- when the guy
5  told me just bring back the car and let him just get
6  rid of this headache and then he also told me he'll put
7  me in another vehicle so I mean, I'm going to return
8  the car.
9      Q.  And that's when you sent the text message with
10  Jami's --
11      A.  Yeah.  So he could run the -- our credit to
12  see if he could, like, get me, like, a Honda or
13  something.
14      Q.  Okay.  Because her credit wasn't good enough
15  for the BMW, but you thought it might be good enough
16  for a cheaper car?
17      A.  That's what he told me.  He was like --
18      Q.  Okay.
19      A.  -- he could put me in something different, but
20  it's not going to be the same car.
21      Q.  And then when you did bring the car back,
22  though, you didn't -- you didn't get another car; is
23  that correct?
24      A.  No.
25      Q.  In fact, you dropped the vehicle off with the

Page 126

1                E. Laforest
2  keys in it up the block; is that correct?
3      A.  On Hollers, yeah.
4      Q.  Why -- why would you drop the car off on the
5  street instead of bring it back in different --
6      A.  Because the man I was speaking to told me to
7  park it up right there.  He said just park in any open
8  parking.  Just park it and just leave the keys in
9  there.
10      Q.  All right.  He didn't tell you to come back to
11  the dealership and he'd hook you up with a Honda?
12      A.  No.  He didn't tell me nothing like that.
13      Q.  I thought -- I thought you told you that he
14  would put you in another car?
15      A.  That's what he said, right?  But that's not
16  what happened.
17      Q.  Okay.  So I'm looking at Plaintiff's 16, the
18  text messages.  So I have September 25, 2020, at what
19  looks like 4:10 p.m. to me when you sent a text message
20  with Jami's ID and Social; is that right?
21      A.  Yeah.
22      Q.  Okay.  And then the next message I see is
23  September 26, 2020.  I can't quite make out -- I think
24  it's 12-something?
25      A.  Yeah.  That's when I returned the car.

Page 127

1                E. Laforest
2      Q.  That's when you returned the car.  So help me
3  make sense of the timeline, how this happened.  So you
4  spoke with the person at Victory on September 25th for
5  the first time?
6      A.  Correct.  That's when he called me.  No, it
7  had to have been, like, the second time he had
8  called me.  Because the first time he didn't tell me to
9  return the car or nothing like that.  He told me she
10  came, she was asking questions, and she left.
11      The second time when -- when he called me, I
12  could -- I could hear it in her voice, she sounded like
13  she was agitated.  I don't know what was going on.  And
14  then he was like just bring - he's like just bring the
15  car back so I can get rid of this headache and I'll
16  reverse the transaction.  And he told me he'll put me
17  in something new for the fact that I had put all that
18  money down on -- on the BMW.
19      Q.  Okay.  So was that -- was that like September
20  24th, September 23rd something else?
21      A.  It must have been September 25th, because I
22  sent - I sent the Jami -- her ID on September 25th.
23  So I'm assuming that that time when he told me to bring
24  back the car was September 25th.
25      Q.  Okay.

Page 128

1                E. Laforest
2      A.  But I didn't return the car until the next
3  day.
4      Q.  Right.  Okay.  So the first time you heard
5  from -- from the guy at Victory was on the 25th?
6      A.  It had to be the 25th.  No, not the first
7  time.  It had to have been the second time, because
8  that's when he told me to return the car.  The first
9  time --
10      Q.  When was the first time?
11      A.  Had to have been maybe, like, two weeks
12  before.  I'm not too sure really.
13      Q.  Okay.  So around September 10th, give or take?
14      A.  Could be.
15      Q.  Okay.  And at that point was -- was Farah in
16  the dealership as far as you're aware?
17      A.  She already had left.
18      Q.  She already --
19      A.  She did, but she'd been there.
20      Q.  Okay.  And so he called you and said, hey, I
21  need you to bring the car back, but we'll put you in a
22  new car for your trouble with --
23      A.  That was the second time.  That was the second
24  time.
25      Q.  So what did he tell you the first time?



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
129–132

Page 129

E. Laforest

2    A. The first time he told me she came and she was
3  asking questions, then she left.  And he asked me if I
4  spoke to her.  I told him yeah, I spoke to her already.
5  I was a little confused.  So but I didn't call her
6  then.  I left after it alone.  Maybe I felt she just
7  maybe wanted to know a little bit more information or
8  whatever.  And then she -- when she went back there
9  again, that's when he called me.
10    Q. Okay.  That's -- so the second time he called
11  you was September 25th?
12    A. Yeah.
13    Q. And that's when he said, hey, she's here
14  again.  Why don't you just bring me the car back, this
15  is getting into a headache, we'll put you in a
16  different car?
17    A. Correct.
18    Q. All right.  So you sent him the ID and then
19  the next day, when did you speak with him next?
20    A. When I brought the car back, the main person
21  that had called me, wasn't there.
22    Q. Okay.
23    A. It was somebody else that's -- that was on the
24  phone that said -- yeah, when I brought the car
25  somebody else was on the phone.  He was like, just park

Page 130

E. Laforest

2  it there.  He was like he going to -- well, he was
3  going to call me back later.  He's going to run this or
4  whatever.  But he never called me.
5        And then on the 28th was when he was like --
6  well, he called me again.  He was like, where is -- he
7  was looking for her.  And I guess she's not going to --
8  I don't know if she ever went back to the Victory
9  Mitsubishi.  I don't know.  But he told me that he was
10  looking for her.  But he was like, yeah, does she know
11  you brought the car back?  And I was like, yeah, I told
12  my father to tell her.  And after that I never heard
13  from nobody.
14    Q. All right.  Did you ever reach out to Victory
15  Mitsubishi after you brought the car back on the 26th?
16    A. The only thing we spoke about was getting in
17  contact with Farah.
18    Q. And that was that text message where you sent
19  him the contact --
20    A. Yeah, I sent him her contact info.
21    Q. And that was on September 28th?
22    A. Yeah.
23    Q. So other than that, was that -- was that a
24  phone call?
25    A. No, I just -- he text -- he called -- I think

Page 131

E. Laforest

2  he had called me.  I'm not too sure.  All I know is I
3  text him the contact and he said okay.  And that was
4  it.
5    Q. All right.  Because -- I ask because it's just
6  it's -- there's no -- there's no request text message,
7  so I'm just asking how he asked you to --
8    A. He must called me, yeah.
9    Q. Okay.  And do you know if he said anything
10  else other than do you have her contact info?
11    A. No.  That's all he asked for.
12    Q. Did he tell you he was trying to reach her?
13    A. Yeah, basically that's why I gave him --
14  that's why I gave him the contact number.
15    Q. All right.  Did he tell you why he was trying
16  to reach her?
17    A. No.  He didn't tell me.
18    Q. And after that, did you make any effort to
19  communicate with anybody at Victory Mitsubishi
20  following sending that contact card?
21    A. Not the -- the guy that spoke to me about the
22  whole bring the car in, he just said, just bring the
23  car.  And that's it, you're finished.  And so I never
24  called no more.  I didn't even bother asking about the
25  other car.  I just left it alone.

Page 132

E. Laforest

2    Q. Just trying to clarify these text messages in
3  Plaintiff's 16, these are all with the same phone
4  number; is that correct?
5    A. You're talking about September?
6    Q. Yeah, the one with the ID and --
7    A. Yeah, it's all the same phone.
8    Q. Okay.  And so that's the -- that's the person
9  who you spoke with who told you he'd put you in a new
10  car?
11      MR. KESHAVARZ:  Objection to form.
12      THE WITNESS:  Are you talking about that 995
13  number?
14  BY MR. SELVEY:
15    Q. What?
16    A. Are you talking about that 347-995 number?
17    Q. The number that you texted Jami's ID and
18  Social to?
19    A. Yeah, that's the person that I was texting.
20    Q. And that's the person you -- is that the same
21  number who you spoke to the person --
22    A. That was the person that -- when I went to go
23  bring them the car back the second day, after the --
24  after the first person called me on the phone.  That's
25  the person I spoke to.



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
133-136

Page 133

E. Laforest
2    Q.  Sorry.  Say it again.
3    A.  All right.  When I first got the phone call
4  about her -- the second phone call that I had got when
5  I -- when I returned to call on the 26th --
6    Q.  Yeah.
7    A.  -- when I was -- when I returned the car on
8  the 26th, I spoke to somebody different.
9    Q.  Than the first time?
10   A.  Yeah.  This is the -- when I sent the -- when
11  I sent the ID, that's the same person that I sent the
12  ID to.  The person that I -- when I -- when I brought
13  the car back and I parked, this is the same person I
14  sent the ID to.
15   Q.  All right.  And that's the same person --
16   A.  I sent ID to, the video, and Farah's contact
17  to.
18   Q.  And that's the same person who told you he'd
19  put you in, like, a Honda or something, or that's a
20  different person?
21   A.  No, the person that called me and told me he
22  wanted to get rid of the headache, he is the one that
23  told me he'll put me in something different.
24   Q.  Okay.  So this is -- this is the other guy?
25   A.  Yeah.

Page 134

E. Laforest
2    Q.  Okay.  Got it.  So why did you send that
3  person Jami's ID and Social?
4    A.  Because he asked for it.
5    Q.  Did he said it was because he was going to put
6  you in a new car, or did he tell you something else, or
7  why did he ask for it?
8    A.  Because I had the conversation with him.  I
9  told him what's going to go -- what was going to happen
10  with the other car.  He was like, just send me the --
11  the information.  So I sent it to him.  Then a couple
12  of days later, he asked me for her -- I guess -- for
13  her number, so I sent him that number.  But he never
14  spoke about the car, so I just left it alone.
15   Q.  All right.  Why didn't you follow up with
16  Victory about getting another car?
17   A.  I just wanted to leave it alone, honestly.  I
18  just wanted to say forget about it.
19   Q.  All right.  Well, you -- you had -- you had
20  put down $8,600 as a -- as a down payment, correct?
21   A.  Yeah.
22   Q.  And you testified earlier that you had been
23  making monthly payments of $601 per month --
24   A.  Yeah.
25   Q.  -- at least four or five of them, correct?

Page 135

E. Laforest
2    A.  Correct.
3    Q.  So you had already invested over $10,000.
4    A.  Yeah.  But once I found out that my name
5  wasn't going to be on the title, it was all her, what
6  like -- what would be the purpose of that?  She's
7  already -- she's already asking my brother if he wants
8  the car.
9    Q.  Well, what -- what I'm trying to understand is
10  if -- if the person at Victory offered you the
11  opportunity to roll that over into a new car --
12   A.  He didn't say nothing about rolling it over.
13  What he said was -- he said something about reversing
14  the transaction and he'll -- he'll try to -- he'll put
15  me in a new car.  But -- because for the fact that I
16  put so much money down.
17   Q.  Right.  So reversing the transaction, did you
18  understand that to mean that you would get your money
19  back or did you understand that they would keep your
20  money if the transaction was reversed?
21   A.  He didn't say nothing about giving me no
22  money.  He just said he'll put me in a new car.
23   Q.  Okay.  Did he say anything about what would
24  happen to your deposit in that situation?
25   A.  No.

Page 136

E. Laforest
2    Q.  All right.  Did you ever ask what would happen
3  to your deposit?
4    A.  No.
5    Q.  All right.  I'm just trying to -- maybe you
6  can explain if I just ask you what -- what made it so
7  that you were willing to leave over $10,000 in deposit
8  and equity in cash money in some circumstances that you
9  gave them on the table and just walk away?
10   A.  Because one, I didn't want to get in trouble
11  no more and I was just tired.  I was just -- I just
12  left it alone.
13   Q.  Okay.  And you were worried about getting in
14  trouble because you used Ms. Francois's information to
15  take out a vehicle without her knowledge?
16   A.  I mean, when we spoke about it, she told me it
17  was okay.  I wasn't -- that's not what I was thinking
18  at the time.  I was, like, okay, once I finish paying
19  it off maybe she'll sign off the title to me or
20  whatever.  But that's not how it played out.
21       MR. SELVEY:  Can we take a -- a quick break
22  considering we've been here for --
23       MR. KESHAVARZ:  Yeah.  Just real quick.
24       THE WITNESS:  How long is this going to be?
25       FURTHER EXAMINATION



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
137—140

Page 137

1              E. Laforest
2   BY MR. KESHAVARZ:
3      Q.  I just have one or two more questions, sir.
4   But so I just want to clarify, the texting of Jami's
5   driver's license, it had a phone number that you texted
6   it to.  Do you know whether or not that was the same
7   phone number as the person from the dealership who
8   talked to you around September 25th?
9      A.  It was two different voices.
10     Q.  Two different voices.
11     A.  When I -- when I brought the car -- you're
12  talking about the person that told me to bring the car
13  back, right?
14     Q.  Yes.
15     A.  And then the person that when I parked the car
16  and I called?
17     Q.  Yes.
18     A.  It's two different people.  It's two different
19  people.
20     Q.  All right.  So what I'm trying to figure out
21  is -- oh, so the -- the text with Jami's driver's
22  license, that is after you returned the car?
23     A.  Yes, this is after I returned the car.
24     Q.  Oh.  Oh, I get it.  Okay.  But -- so the
25  person who you described as a white guy, maybe on the

Page 138

1              E. Laforest
2   phone who said about bringing the --
3      A.  Jami Singer's ID was on the day he had called
4   me about returning the car.  He called me and I've
5   done -- I sent -- I sent him the ID and the Social.
6   And then the next day -- the next morning, I returned
7   this car.  I went out there and returned this car.  I
8   returned the car on the 26th.
9      Q.  All right.  So did you text Jami's ID before
10  or after your returned the car?  I'm trying to
11  understand.
12     A.  The day that he told me that he was going to
13  put me in a new car, that's when I -- I texted the ID
14  and the Social.
15     Q.  So but that was after you returned it because
16  he told you, you were getting in --
17     A.  Yeah.  He was trying to tell me he would put
18  me in a new car.  I ended up -- I just ended up
19  texting.  Like, because I was going to end up returning
20  it that same day, but I had to go pick up my son.  So
21  he's like, just come in the morning time and return the
22  car.
23     Q.  Okay.  But after you returned the car, that's
24  when you texted that driver's license of Jami or was it
25  before you turned in the car?

Page 139

1              E. Laforest
2      A.  This was before -- before I turned -- before I
3   returned the car.
4      Q.  How much before?
5      A.  A day.
6      Q.  A day before?
7      A.  Yeah.  A day.
8      Q.  Okay.  But the person who told you on the
9   phone to bring the car back in, that was the person who
10  you said sounded like a white guy or am I getting,
11  like, people mixed up?
12     A.  Yeah.  He sounded like a white guy.
13     Q.  Okay.  Now, was the phone number that he used
14  on your caller ID that he called you with?
15     A.  It was, like, a 606 number.
16     Q.  Okay.  And that number was different than the
17  number that you texted the photo to?
18     A.  Yes.
19     MR. KESHAVARZ:  Okay.  My point -- that's
20  what -- what I was trying to find out.  I -- I don't
21  have any more questions.
22     MR. SELVEY:  I -- I have a few, but I would
23  like to take a break, if that's all right?
24     THE WITNESS:  How long is that going to be?
25     MR. SELVEY:  Just -- I just need to go to the

Page 140

1              E. Laforest
2   bathroom.
3      THE WITNESS:  How many questions?
4      MR. SELVEY:  I -- I don't have, like, a number
5   of questions.  I just have a few more questions to
6   follow up on.
7      MR. KESHAVARZ:  The 5:00 meeting, is that
8   going to be on Zoom?
9      MS. CATERINE:  Yes.
10     MR. KESHAVARZ:  We have a 5:00 meeting with a
11  client via Zoom.
12     MR. SELVEY:  Okay.  Yeah.
13     MR. KESHAVARZ:  Is there any way you could
14  just wrap this up?
15     MR. SELVEY:  I -- I can try.  I'm not sure.  I
16  guess that's --
17     THE REPORTER:  The time is 4:40 p.m.  Eastern
18  Time and we're off the record.
19     (A recess was taken.)
20     THE REPORTER:  Time is 4:44 p.m.  Eastern
21  Time.  We're back on the record.
22         RECROSS-EXAMINATION
23  BY MR. SELVEY:
24     Q.  All right.  Mr. Laforest, I'm going to try and
25  get through this as quickly as possible for you.  I



Page 141

1           E. Laforest
2   know everybody wants to get out of here.  Getting back
3   to the -- the criminal case in this situation, what --
4   did you ever learn why the case was discontinued?
5       A.  What you mean, dismissed?
6       Q.  Yes.
7       A.  I don't know.  My lawyer didn't tell me much.
8   I was going back to court for like -- like the whole
9   2021.
10      Q.  Okay.  Were you -- so you were arraigned?
11      A.  I was arraigned.  I got DOT.
12      Q.  Okay.  And --
13      A.  I was going back and forth to court because
14  when they came and got me, my son was -- my -- I had
15  left my son by himself and my grandmother had to come
16  and come pick him up.
17      Q.  Okay.  But then at some point you're lawyer
18  just told you that the case was dismissed?
19      A.  Yeah.  I was supposed to go to court in
20  November of 2021.  And he said they -- they dismissed
21  the case and sealed it.
22      Q.  All right.  Did you ever speak with Farah
23  about that case?
24      A.  No.  I was just -- I wasn't allowed to, so --
25      Q.  Okay.  Do you know if she was a cooperating

Page 142

1           E. Laforest
2   witness in that case?
3       A.  When they first arrested me the detective had
4   called her and they spoke.  I don't know what they
5   really spoke about.  But then he came downstairs.  He
6   was like, I -- I found out that you returned the car or
7   whatever so I didn't want to DNT [phonetic] you and you
8   just got to go -- you got to report back to court on --
9   on the date that they had it on the desk appearance
10  ticket.
11      Q.  Okay.  But -- so do you know if -- if
12  Ms. Francois was a complaining witness in that case?
13      A.  Not too sure.  My lawyer never really spoke on
14  her so I don't know.
15      Q.  But did they tell you not to communicate with
16  her about the case?
17      A.  Yeah.
18      Q.  All right.  Was there anybody else they told
19  you not to communicate with about the case?
20      A.  No.  It was just her.
21      Q.  Just her.  Okay.  Did you ever speak with
22  Ms. Francois about this case?
23      A.  Which case?
24      Q.  The case that we're here for today?
25      A.  This deposition?

Page 143

1           E. Laforest
2       Q.  This -- this deposition.
3       A.  No.
4       Q.  When was the last time you spoke with Farah?
5       A.  The last time I spoke to her is when we agreed
6   on me paying for the car in December.
7       Q.  Okay.  And that was -- that was the June, July
8   conversation.
9       A.  Yeah.
10      Q.  You didn't talk to her at all after that?
11          MR. KESHAVARZ:  Objection to the form of the
12  question.
13          THE WITNESS:  No.
14  BY MR. SELVEY:
15      Q.  Okay.  Okay.  Have you ever been convicted of
16  forgery or misuse of private documents?
17      A.  Yeah, in 2011.
18      Q.  2011.  Where was that?
19      A.  It was in Ohio.
20      Q.  Ohio.  And what was the result of that
21  conviction?
22      A.  I did 12 months.
23      Q.  In Ohio?
24      A.  Yeah.  I mean, 11 months.
25      Q.  Do you have any other criminal convictions in

Page 144

1           E. Laforest
2   Ohio?
3       A.  No.
4       Q.  What about Maryland?
5       A.  Yeah.
6       Q.  What -- what criminal convictions do you have
7   in Maryland?
8       A.  I have to think.  I think it was -- I forgot
9   what they charged me with.
10      Q.  All right.  Did you ever plead guilty to
11  forgery in Maryland?
12      A.  Yeah.  I think it was that, yeah.
13      Q.  All right.  What -- and briefly, what were the
14  circumstances of that?
15      A.  They gave me four months.
16      Q.  What was the -- what was the subject matter
17  that you pled guilty to forgery about?  What -- what
18  were -- what were you accused of forging?
19      A.  I wasn't accused.  My friend was accused, and
20  I was in the car with him, and it was traveler's
21  checks.
22      Q.  Okay.  And did you have anything to do with
23  that?
24      A.  No.
25      Q.  All right.  But you pledge guilty and -- and



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
145–148

Page 145

1              E. Laforest
2  were sentenced to four months?
3      A.  Yeah.
4      Q.  Okay.  We ever convicted of driving under the
5  influence of alcohol in Maryland?
6      A.  I think they dropped that one.
7      Q.  All right.  So if I told you that there was
8  disposition of guilty in 2017, would you say that that
9  was inaccurate?
10     A.  2017?  In 2017, I came home from Maryland.
11     MR. KESHAVARZ:  You came home from?
12     THE WITNESS:  Maryland.
13  BY MR. SELVEY:
14     Q.  Right.  But -- but again, if I -- if I told
15  you that there was a disposition date of guilty in
16  January of 2017 from a charge that was filed in 2014,
17  and the disposition was guilty, would you have any
18  recollection of that?
19     A.  No.
20     Q.  What about a possession of marijuana in
21  Maryland?
22     A.  Yes, I had weed on me.
23     Q.  All right.  How about reckless driving?
24     A.  I think so.  I'm not too sure.
25     Q.  Okay.  What about driving on a revoked

Page 146

1              E. Laforest
2  license?
3      A.  Yeah.
4      Q.  All right.  And negligent driving?
5      A.  What's negligence driving, like --
6      Q.  Just driving -- driving negligently, I assume.
7      A.  I'm not too sure.
8      Q.  You don't remember that?  All right.  What
9  about following too closely to another vehicle?
10     A.  Probably.
11     Q.  Unsafe lane changing?
12     A.  No.
13     Q.  How about making false statements to a -- a
14  police officer?
15     A.  Yeah, most of them charges got dropped.
16     Q.  Okay.  How about you receiving stolen property
17  in New Jersey?
18     A.  Yeah, that -- that got dropped.
19     Q.  That got dropped?
20     A.  Yeah.
21     Q.  So if I mentioned a disposition of guilty and
22  a disposition date of February 6th, 2013, in Hudson
23  county, would that refresh your recollection at all?
24     A.  No.
25     Q.  No?

Page 147

1              E. Laforest
2      A.  That was for Ohio.  Ohio had to come and pick
3  me up from there.
4      Q.  So that was related to the theft charge that
5  you did --
6      A.  In Ohio.
7      Q.  -- 11 months for in Ohio?
8      A.  Yeah, Ohio had to come pick me up from there.
9      Q.  Okay.  Okay.  So the New Jersey charge is
10  ancillary to that?
11     A.  Yeah.
12     Q.  Okay.  And what were the circumstances?  You
13  said something involving a MacBook; is that correct?
14     A.  Yes that was in Ohio.
15     Q.  All right.  And -- and were you guilty of that
16  offense?
17     A.  What, the MacBook?
18     Q.  Yeah.
19     A.  Yeah.
20     Q.  What happened there?
21     A.  Huh?
22     Q.  What happened there?
23     A.  I mean, I was young, trying to get money.
24     Q.  All right.  So -- so what happened in a little
25  more detail?  I don't want to press the issue.  I know

Page 148

1              E. Laforest
2  we're pressed for time.
3      A.  The girl that I was with ended up telling on
4  me.  She was in the store.  She got arrested and ended
5  up telling on me.
6      Q.  So is that retail theft or --
7      A.  Yeah.  Retail.
8      Q.  Okay.  All right.  Do you have any current
9  criminal charges pending?
10     A.  I just got a DUI that I'm going to a program
11  for.
12     Q.  And what is that program?
13     A.  Realization Center.
14     Q.  All right.  And so that's for the arrest on
15  February 18, of 2022?
16     A.  Correct.
17     Q.  All right.  And you were charged there with
18  operating a vehicle under the influence of drugs or
19  alcohol?
20     A.  Yeah.  But they had dropped it because I
21  was -- I was parked, though.
22     Q.  Okay.  Well, have they dropped it or are you
23  going to a program?
24     A.  No, I'm going to a program.
25     Q.  Okay.  So if you complete the program, they've



EMMANUEL LAFOREST
FRANCOIS vs VICTORY AUTO GROUP, LLC

October 25, 2022
149–152

Page 149

E. Laforest

1
2  promised to drop those charges?
3     A.  Yeah.
4     Q.  Okay.  But then, currently, those charges are
5  still pending -- pending your completion of the
6  program?
7     A.  Yeah.
8     Q.  Okay.  And you have a -- I see a prior
9  conviction for operating a vehicle under the influence
10  in New York City -- or New York State, rather?
11     A.  Yes.
12     Q.  All right.  That's in 2017?
13     A.  Yeah.
14     Q.  And you pled guilty to that?
15     A.  Yeah.  But that's dismissed.  I don't mean --
16  that case is all good.
17     Q.  Yeah.  It was 2017.  I just -- I'm just
18  confirming my -- my notes.  And you're sure you were
19  alone when you went to Victory Mitsubishi in --
20     A.  I am -- I am certain on that.
21     Q.  All right.  You sure you didn't bring your
22  girlfriend who pretended to be Farah Jean Francois?
23     A.  I got no girlfriend.  I got cameras.
24        MR. SELVEY:  Okay.  All right.  I think that's
25  all I have for you.

Page 150

E. Laforest

1
2        THE WITNESS:  Okay.
3        MR. KESHAVARZ:  There wasn't anything in
4  Florida -- no arrests or charges in Florida?
5        THE WITNESS:  No.
6        MR. SELVEY:  All right.  I appreciate your
7  time.
8        THE WITNESS:  Thank you.
9        MR. KESHAVARZ:  Sorry, we have to run.  We
10  have a 5:00 call.
11        THE WITNESS:  (Audio interruption).
12        MS. CATERINE:  No.
13        MR. SELVEY:  While we're sitting here, I'm
14  going to assume that you-all scanned --
15        MR. KESHAVARZ:  Or e-mail, yeah.
16        THE REPORTER:  Transcript orders.  You going
17  to get the original?
18        MS. CATERINE:  We don't need a physical copy
19  of the transcript, just --
20        MR. KESHAVARZ:  We also have to get -- you
21  still owe us a document response to our objections we
22  reserved.
23        THE REPORTER:  Mr. Selvey, are you going to
24  take a transcript order?
25        MR. SELVEY:  Oh, yeah, I think so.  That will

Page 151

E. Laforest

1
2  be -- that will be good.  You have four minutes until
3  your call.
4        MR. KESHAVARZ:  Sure.
5        THE REPORTER:  The time is 4:54 p.m. Eastern
6  Time.  We are off the record.
7        (The deposition concluded at 4:54 p.m.)

Page 152

1              CERTIFICATE OF DIGITAL REPORTER
2
3        I, Keith Taylor, a Digital Reporter
4  and Notary Public in and for the State of New York,
5  do hereby certify:
6
7        That the foregoing witness was duly
8  sworn; that the proceeding took place before me at
9  the time and place herein set forth; that the
10  testimony and proceedings were accurately captured
11  with annotations by me during the proceeding.
12
13        I further certify that I am not related
14  to any of the parties to this action by blood or
15  marriage and that I am in no way interested in the
16  outcome of this matter.
17
18        IN WITNESS THEREOF, I have hereunto set
19  my hand this 7th day of November 2022.
20
21
22        *Keith Taylor*
23        Keith Taylor
        Notary Commission New York/01TA6432580
24        Commission Expires: May 2, 2026
25



*800.211.DEPO (3376)*
*EsquireSolutions.com*

## Page 153

```
1                  CERTIFICATE OF TRANSCRIPTIONIST
2
3
4             I, Jesika Knight, Legal Transcriptionist,
5    do hereby certify:
6             That the foregoing is a complete and true
7    transcription of the original digital audio recording
8    of the testimony and proceedings captured in the
9    above-entitled matter.  As the transcriptionist, I
10   have reviewed and transcribed the entirety of the
11   original digital audio recording of the proceeding to
12   ensure a verbatim record to the best of my ability.
13            I further certify that I am neither attorney
14   for nor a relative or employee of any of the parties
15   to the action; further, that I am not a relative or
16   employee of any attorney employed by the parties
17   hereto, nor financially or otherwise interested in the
18   outcome of this matter.
19            IN WITNESS THEREOF, I have hereunto set my
20   hand this 7th day of November 2022.
21
22
23   _____
          Jesika Knight
24
25
```

## Page 154

```
1                  DEPOSITION ERRATA SHEET
2
3    Assignment No. J8796531
4    Case Caption: FARAH JEAN FRANCOIS vs. VICTORY AUTO
5    GROUP LLC d/b/a VICTOYR MITSUBISHI, ET AL
6
7           DECLARATION UNDER PENALTY OF PERJURY
8
9        I declare under penalty of perjury that I have
10   read the entire transcript of my deposition taken in
11   the above-captioned matter or the same has been read
12   to me, and the same is true and accurate, save and
13   except for changes and/or corrections, if any, as
14   indicated by me on the DEPOSITION ERRATA SHEET
15   hereof, with the understanding that I offer these
16   changes as if still under oath.
17
18        Signed on the _____ day of _____,
19   20__.
20
21
22   _____
     EMMANUEL LAFOREST
23
24
25
```

## Page 155

```
1    DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
     SIGNATURE:_____DATE:_____
24
          EMMANUEL LAFOREST
25
```

## Page 156

```
1    DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
     SIGNATURE:_____DATE:_____
24
          EMMANUEL LAFOREST
25
```

