**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
FARAH JEAN FRANCOIS,

                                                        **Case No.: 1:22-cv-4447-JSR**

                          **Plaintiff,**

            -against-

**VICTORY AUTO GROUP LLC d/b/a**
**VICTORY MITSUBISHI,**
**SPARTAN AUTO GROUP LLC d/b/a**
**VICTORY MITSUBISHI,**
**STAVROS ORSARIS,**
**YESSICA VALLEJO,**
**DAVID PEREZ,**
**DIANE ARGYROPOULOS, and**
**PHILIP ARGYROPOULOS,**

                          **Defendants.**
------------------------------------------------------------------------X


**PLAINTIFF'S COUNTERSTATEMENT TO DEFENDANTS' LOCAL RULE 56.1**
**STATEMENT OF MATERIAL FACTS AND PLAINTIFF'S SUPPLEMENTAL**
**STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT**

1

**PLAINTIFF'S COUNTERSTATEMENT TO DEFENDANTS' STATEMENT OF
MATERIAL FACTS**

The following statements were submitted by Defendants Victory Auto Group LLC d/b/a Victory Mitsubishi, Spartan Auto Group LLC d/b/a Victory Mitsubishi, Stavros Orsaris, Yessica Vallejo, David Perez, Diane Argyropoulos, and Philip Argyropoulos as their Local Civil Rule 56.1 Statement in support of their Motion for Summary Judgment. Plaintiff asserts that the following material facts are disputed as follows:

1. Victory Auto Group, LLC ("Victory Auto") began operating car dealerships in 2004 or 2005 until is ceased operations in late 2017 or early 2018. Exhibit "K," at 23:20-24:6; 27:24-28:23; Exhibit "H," at 23:24-24:8; 26:3-6; Exhibit "F," at 29:14-16.

**RESPONSE: DISPUTED IN PART.** The date that Victory began operations is not disputed. However, Plaintiff disputes that Victory ceased operations in late 2017 or early 2018 – rather, Victory continued operations under its alter ego Spartan. The addresses, 4070 Boston Road and 4101 Boston Road, have remained the same. *See Keshavarz Decl.* [**Exhibit A** (David Perez Deposition Transcript "Perez Trans.") 43:18-44:05; **Exhibit B** (Yessica Vallejo Deposition Transcript "Vallejo Trans.") 78:06-08; **Exhibit C** (Diane Argyropoulos Deposition Transcript "Diane Trans.") 71:15-18]. The dealership continued to be run by Stavros Orsaris as supervised by Diane Argyropoulos. *See Keshavarz Decl.* [**Exhibit D** (Stavros Orsaris Deposition Transcript "Orsaris Trans.") 21:09-23:20]. There was no major restructuring of how the dealership

2

operated. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 77:25-78:05]. Defendants saw it as one continuous employment at Victory Mitsubishi rather than being employed by Victory Auto and then being employed by Spartan. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 20:20-25; **Exhibit B** Vallejo Trans. 30:03-20]. All of the employees who worked at Victory Auto Group went on to work at Spartan. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 29:25-30:06; **Exhibit C** Diane Trans. 88:13-25]. Diane Argyropoulos admitted that the reason why Victory Auto Group was closed and Spartan Auto Group was opened was because "when you open a new car franchise, you have to assume one name. So I had to close that name to replace it with Victory Mitsubishi." *See Keshavarz Decl.* [**Exhibit C** Diane Argyropoulos Trans. 28:18-23]. Forms under prior alter egos continued to be used, such as the credit application with the header "Victory Auto Group" and the Vehicle Inspection Report listing the facility name as "Bronx Suzuki" rather than either Victory Auto or Spartan Auto. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 2 and 11, **Exhibit B** Vallejo Trans. 138:13-16]. Instagram social media accounts for the different dealerships are run by the same person, the BDC manager of Victory, "Bibi" Singh. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 93:20-94:03]. Ms. Singh also created the "Victory" logo used by the various dealerships. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 95:19-96:13; **Exhibit F** Instagram Screenshots, FRANCOIS 3934, 3938]. D/b/a are used interchangeably by different companies run by Diane Argyropoulos. *See Keshavarz Decl.* [**Exhibit C** Diane Argyropoulos Trans. 55:05-13].

2.   Victory Auto never operated a Mitsubishi Motors franchise and never operated

under the d/b/a "Victory Mitsubishi."

**RESPONSE: DISPUTED.** Plaintiff disputes this assertion, as Victory operated as a Mitsubishi Motors franchise under its alter ego Spartan and operated with the d/b/a "Victory Mitsubishi." The addresses, 4070 Boston Road and 4101 Boston Road, have remained the same. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 43:18-44:05; **Exhibit B** Vallejo Trans. 78:06-08; **Exhibit C** Diane Argyropoulos Trans. 71:15-18]. The dealership continued to be run by Stavros Orsaris as supervised by Diane Argyropoulos. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 21:09-23:20]. There was no major restructuring of how the dealership operated. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 77:25-78:05]. Defendants saw it as one continuous employment at Victory Mitsubishi rather than being employed by Victory Auto and then being employed by Spartan. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 20:20-25; **Exhibit B** Vallejo Trans. 30:03-20]. All of the employees who worked at Victory Auto Group went on to work at Spartan. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 29:25-30:06; **Exhibit C** Diane Trans. 88:13-25]. Diane Argyropoulos admitted that the reason why Victory Auto Group was closed and Spartan Auto Group was opened was because "when you open a new car franchise, you have to assume one name. So I had to close that name to replace it with Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit C** Diane Argyropoulos Trans. 28:18-23]. Forms under prior alter egos continued to be used, such as the credit application with the header "Victory Auto Group" and the Vehicle Inspection Report listing the facility name as "Bronx Suzuki" rather than either Victory Auto or Spartan Auto. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 2 and 11, **Exhibit B** Vallejo Trans. 138:13-16]. Instagram social media accounts for the different dealerships are

4

run by the same person, the BDC manager of Victory, "Bibi" Singh. *See Keshavarz Decl.*

[**Exhibit C** Diane Trans. 93:20-94:03]. Ms. Singh also created the "Victory" logo used by the

various dealerships. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 95:19-96:13; **Exhibit F**

Instagram Screenshots, FRANCOIS 3934, 3938]. D/b/a are used interchangeably by different

companies run by Diane Argyropoulos. *See Keshavarz Decl.* [**Exhibit C** Diane Argyropoulos

Trans. 55:05-13].


    3.    Spartan Auto Group, LLC ("Spartan") began operation as a Mitsubishi Motors

franchise at 4070 Boston Road, Bronx, New York, under the d/b/a Victory

Mitsubishi in early 2018. Exhibit "K," at 27:24-28:2; Exhibit "F," at 24:8-11;

Exhibit "H," at 26:7-10.

**RESPONSE:** No dispute.


    4.    Victory Auto and Spartan never operated collectively. Exhibit "K," at 38:7-20.

**RESPONSE: DISPUTED IN PART.** Disputed to the degree that Spartan is the alter ego of

Victory. The addresses, 4070 Boston Road and 4101 Boston Road, have remained the same. *See*

*Keshavarz Decl.* [**Exhibit A** Perez Trans. 43:18-44:05; **Exhibit B** Vallejo Trans. 78:06-08;

**Exhibit C** Diane Trans. 71:15-18]. The dealership continued to be run by Stavros Orsaris as

supervised by Diane Argyropoulos. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 21:09-

23:20]. There was no major restructuring of how the dealership operated. *See Keshavarz Decl.*

[**Exhibit B** Vallejo Trans. 77:25-78:05]. Defendants saw it as one continuous employment at

Victory Mitsubishi rather than being employed by Victory Auto and then being employed by Spartan. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 20:20-25; **Exhibit B** Vallejo Trans. 30:03-20]. All of the employees who worked at Victory Auto Group went on to work at Spartan. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 29:25-30:06; **Exhibit C** Diane Trans. 88:13-25]. Diane Argyropoulos admitted that the reason why Victory Auto Group was closed and Spartan Auto Group was opened was because "when you open a new car franchise, you have to assume one name. So I had to close that name to replace it with Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 28:18-23]. Forms under prior alter egos continued to be used, such as the credit application with the header "Victory Auto Group" and the Vehicle Inspection Report listing the facility name as "Bronx Suzuki" rather than either Victory Auto or Spartan Auto. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 2 and 11, **Exhibit B** Vallejo Trans. 138:13-16]. Instagram social media accounts for the different dealerships are run by the same person, the BDC manager of Victory, "Bibi" Singh. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 93:20-94:03]. Ms. Singh also created the "Victory" logo used by the various dealerships. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 95:19-96:13; **Exhibit F** (Instagram Screenshots), FRANCOIS 3934, 3938]. D/b/a are used interchangeably by different companies run by Diane Argyropoulos. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 55:05-13].

5. The vague reference to an ownership interest of Philip appearing in the Rule 56.1 Statement annexed to Plaintiff's Amended Complaint as Exhibit "CC" is another inaccuracy of no moment herein. Exhibit "K," at 37:3-15.

**RESPONSE: DISPUTED.** Mr. Argyropoulos' self-serving statement has no corroboration. The

document speaks for itself.

6.   At all times relevant herein, Diane was the sole owner of Spartan. Exhibit "K," at

55:23-56:13; 62:16-23; Exhibit "H," at 35:3-6; 40:8-18; 42:18-43:6; Exhibit "F,"

at 61:14-21.

**RESPONSE:** Plaintiff disputes inasmuch as Spartan was the alter ego of Victory, which was not

solely owned by Ms. Argyropoulos. The addresses, 4070 Boston Road and 4101 Boston Road,

have remained the same. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 43:18-44:05; **Exhibit B**

Vallejo Trans. 78:06-08; **Exhibit C** Diane Trans. 71:15-18]. The dealership continued to be run

by Stavros Orsaris as supervised by Diane Argyropoulos. *See Keshavarz Decl.* [**Exhibit D**

Orsaris Trans. 21:09-23:20]. There was no major restructuring of how the dealership operated.

*See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 77:25-78:05]. Defendants saw it as one

continuous employment at Victory Mitsubishi rather than being employed by Victory Auto and

then being employed by Spartan. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 20:20-25;

**Exhibit B** Vallejo Trans. 30:03-20]. All of the employees who worked at Victory Auto Group

went on to work at Spartan. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 29:25-30:06;

**Exhibit C** Diane Trans. 88:13-25]. Diane Argyropoulos admitted that the reason why Victory

Auto Group was closed and Spartan Auto Group was opened was because "when you open a

new car franchise, you have to assume one name. So I had to close that name to replace it with

Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 28:18-23]. Forms under prior

7

alter egos continued to be used, such as the credit application with the header "Victory Auto Group" and the Vehicle Inspection Report listing the facility name as "Bronx Suzuki" rather than either Victory Auto or Spartan Auto. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 2 and 11, **Exhibit B** Vallejo Trans. 138:13-16]. Instagram social media accounts for the different dealerships are run by the same person, the BDC manager of Victory, "Bibi" Singh. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 93:20-94:03]. Ms. Singh also created the "Victory" logo used by the various dealerships. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 95:19-96:13; **Exhibit F** (Instagram Screenshots), FRANCOIS 3934, 3938]. D/b/a are used interchangeably by different companies run by Diane Argyropoulos. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 55:05-13].

7. Philip does not hold, and has not at any time relevant ever held, an ownership interest in Spartan. Exhibit "H," at 32:9-11; 40:8-18; Exhibit K," at 37:3-18; 62:16-23.

**RESPONSE:** Plaintiff disputes inasmuch as Spartan was the alter ego of Victory. The addresses, 4070 Boston Road and 4101 Boston Road, have remained the same. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 43:18-44:05; **Exhibit B** Vallejo Trans. 78:06-08; **Exhibit C** Diane Trans. 71:15-18]. The dealership continued to be run by Stavros Orsaris as supervised by Diane Argyropoulos. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 21:09-23:20]. There was no major restructuring of how the dealership operated. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 77:25-78:05]. Defendants saw it as one continuous employment at Victory Mitsubishi rather than

being employed by Victory Auto and then being employed by Spartan. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 20:20-25; **Exhibit B** Vallejo Trans. 30:03-20]. All of the employees who worked at Victory Auto Group went on to work at Spartan. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 29:25-30:06; **Exhibit C** Diane Trans. 88:13-25]. Diane Argyropoulos admitted that the reason why Victory Auto Group was closed and Spartan Auto Group was opened was because "when you open a new car franchise, you have to assume one name. So I had to close that name to replace it with Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 28:18-23]. Forms under prior alter egos continued to be used, such as the credit application with the header "Victory Auto Group" and the Vehicle Inspection Report listing the facility name as "Bronx Suzuki" rather than either Victory Auto or Spartan Auto. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 2 and 11, **Exhibit B** Vallejo Trans. 138:13-16]. Instagram social media accounts for the different dealerships are run by the same person, the BDC manager of Victory, "Bibi" Singh. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 93:20-94:03]. Ms. Singh also created the "Victory" logo used by the various dealerships. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 95:19-96:13; **Exhibit F** (Instagram Screenshots), FRANCOIS 3934, 3938]. D/b/a are used interchangeably by different companies run by Diane Argyropoulos. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 55:05-13].

8. While Philip and Diane are legally married, they are and have been separated at all relevant times herein. Exhibit "K," at 10:19-21.

**RESPONSE:** No dispute.

9. On January 30, 2018, Mitsubishi Motors entered a Dealer Sales and Service Agreement (the "Franchise Agreement"), with Spartan. Dkt. No. 26-30.

**RESPONSE:** No dispute.

10. While the Franchise Agreement listed Philip as a majority owner of Spartan, this inaccurate representation was made with Mitsubishi's knowledge and approval for the limited purpose of making the initial franchise award to Spartan. Exhibit "K," at 60:4-62:15; Exhibit "H," at 47:2-54:7.

**RESPONSE: DISPUTED.** No corroboration has been presented that this representation was inaccurate, that this inaccuracy was known by Mitsubishi, and that this inaccuracy was approved by Mitsubishi. Defendants' self-serving statements should not be given preclusive weight over the plain meaning of an agreement that the parties do no dispute was duly executed and valid. Parole evidence may not be used to go outside the four corners of the contract. *See Keshavarz Decl.* [**Exhibit G** (Mitsubishi Franchise Agreements)]. Notably, Defendant Stavros Orsaris testified that he "manage[s] the general operation, and the relationship between Mitsubishi and Spartan Auto Group LLC' and stated that he did not know why the agreement listed Philip Argyropoulos as an owner and manager and that he didn't "think that ever came up in conversation." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 104:13-23].

11. On or about September 20, 2022, Diane and Mitsubishi Motors executed a revised

10

Franchise Agreement which accurately reflected Diane's 100% ownership stake in

Spartan. Exhibit "G," p. 18.

**RESPONSE:** No dispute.

12. On October 21, 2019, Credit Bureau Connect entered a "Subscriber Application"

with Spartan, to provide, among other things, services to obtain consumer credit

reports (the "CBC Agreement"). Exhibit "I."

**RESPONSE:** No dispute.

13. On January 23, 2018, Capitol One Auto Finance entered a Dealer Agreement to

provide certain banking services to Spartan Auto Group, LLC d/b/a Victory

Mitsubishi, (the "Capital One Agreement"). Exhibit "J."

**RESPONSE:** No dispute.

14. At all times relevant herein, Vallejo and Perez were employed by Spartan. Exhibit

"K," at 70:5-8; Exhibit "F," at 39:9 –40:4.

**RESPONSE:** No dispute.

15. Philip had no role whatsoever in the transactions at issue and specifically did not

participate in pulling Plaintiff's credit report, nor was he aware that that had

happened until this lawsuit was brought to his attention. Exhibit "H," at 17:3-7;

60:10-23

**RESPONSE:** No dispute.

16. Philip had no role in Spartan's management and did not set, enforce, or even know about Spartan's policies for pulling credit reports concerning potential customers. Exhibit "H," at 38:11-14; 72:12-20; Exhibit "K," at 42:21–44:11; Exhibit "F," at 59:4–61:3.

**RESPONSE:** No dispute.

17. Philip was not consulted about hiring or firing decisions at Spartan. Exhibit "H," at 30:6-10.

**RESPONSE:** No dispute.

18. Philip did not even recognize the names Yessica Vallejo and David Perez. Exhibit "H," at 17:23-25; 18:11-13.

**RESPONSE:** No dispute.

19. Philip never provided advice to Diane or Stavros about running the dealership. Exhibit "H," at 72:8-11.

**RESPONSE:** No dispute.

20. Diane did not supervise or direct Spartan's sales and finance managers who were authorized to pull customers' credit reports, she left the enforcement of policies and the supervisory role to Spartan's General Manager, Stavros Orsaris. Exhibit "K," at 43:3-13; 73:13–74:6.

**RESPONSE:** This self-serving testimony is contradicted by the binding testimony of Stavros Orsaris as the corporate representative of Spartan as well as the documentary evidence. As owner, Diane Argyropoulos manages dealer financing. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 37:25-38:12; **Exhibit C** Diane Trans. 25:06-13]. This management included making the decision to no longer have "funders" after Defendant Yessica Vallejo became a finance manager. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 56:16-57:16]. Diane Argyropoulos was also the only person at Victory Mitsubishi who received compliance training from Dealertrack. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 31:04-09]. This training focused on security of Victory's computer systems. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 31:13-23]. With regards to credit reporting in 2020, Diane Argyropoulos "explained to Stavros how it was to be handled and the regulations on it." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 44:04-11]. During the COVID-19 pandemic when Diane Argyropoulos was working remotely, she spoke with Stavros Orsaris once a day. *See Keshavarz Decl.* [**Exhibit C** Diane Argyropoulos Trans. 67:08-10]. Diane Argyropoulos was the signatory of Victory's contract with Credit Bureau Connection (CBC) which states that Victory Mitsubishi will "obtain a consumer's written authorization to request [credit reports] relating to that consumer." *See Keshavarz Decl.* [**Exhibit H** (CBC Subscriber Agreement), DEFENDANTS 94].

21. Diane did not go to Spartan's 4070 Boston Road location for a year after the onset of the COVID pandemic and only traveled to her office at 4101 Boston Road to take papers home. Exhibit "K," at 77:14-78:16; 154:6-155:2.

**RESPONSE:** While Plaintiff does not dispute this assertion, for the sake of clarity outside of the time during the COVID-19 pandemic Ms. Argyropoulos would be physically present at the dealership multiple times per week, both when it was Victory Auto Group and when it was Spartan Auto Group. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 62:18-25].

22. Spartan policy required customers to fill out and sign a credit application in person and show photo ID to a manager before pulling a credit report. Exhibit "K," at 44:12-21; Exhibit "F," at 141:10-21; 142:25-143:17.

**RESPONSE: DISPUTED.** Mischaracterizes cited testimony and is contradicted by documentary evidence and other testimony. The testimony of Stavros Orsaris only states that (1) "you cannot run someone's credit without being present in the building" (**Exhibit D** Trans. 141:13-15) and (2) "my store policy at the time would be me holding on to both his and Ms. Francois' ID or driver's license" (**Exhibit D** Trans. 141:16-18). The specificity of this testimony is crucial because Mr. Orsaris is claiming, not that a manager would verify that the consumer matched their photo ID, but that specifically Mr. Orsaris would. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 143:13-17] ("I would verify myself, her date of birth, making sure the people in the building are who they said they are, and that all parties are present inside the building before

14

the pulling of the credit"). This alleged policy is contradicted by the testimony of Mr. Orsaris'

co-defendants (**Exhibit A** Perez Trans. 150:08-17 (testifying that David Perez as well as Stavros

Orsaris would confirm consumer identities)). Mr. Orsaris also contradicted himself subsequently

by stating that "David [Perez] or myself verified that the people on the IDs were present in the

building." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 150:02-04]. This alleged policy is also

contradicted by the documents from Dealertrack, which show that David Perez did ID

Verification for Emmanuel Laforest (**Exhibit I** (Laforest Dealertrack)), Yessica Vallejo did ID

Verification for Jami Singer (**Exhibit J** (Singer Dealertrack)), and most egregiously that an

unknown person did the ID Verification for Farah Jean Francois using the Dealertrack login of

furloughed employee Yosmaily Ventura (**Exhibit K (**Francois Dealertrack), SUBPOENA

RESPONSES 574; **Exhibit L** (Affidavit of Yosmaily Ventura "Ventura Affidavit")).

> 23. Spartan never engaged in remote or online sales at any time. Exhibit "F," at 72:21-
> 73:4, 149:4-21.

**RESPONSE:** Stavros Orsaris' self-serving statements are contradicted by the plain meaning of

advertisements which Defendant Diane Argyropoulos admits were used by Victory. *See*

*Keshavarz Decl.* [**Exhibit F** (Instagram Screenshots), FRANCOIS 3939-3950; **Exhibit C** Diane

Trans. 76:22-24, 98:21-25]. Diane Argyropoulos admitted that there was a remote sales program.

*See Keshavarz Decl.* [**Exhibit C** Diane Trans. 97:07-11]. The program was set up by Bibi Singh.

*See Keshavarz Decl.* [**Exhibit C** Diane Trans. 97:12-16; 98:21-25]. Diane Argyropoulos testified

that any remote sales would happen directly through Stavros Orsaris. *See Keshavarz Decl.*

[**Exhibit C** Diane Trans. 103:18-25, 146:02-05].

      24. Laforest returned the Vehicle to the dealership on September 26, 2020. Exhibit "C."

**RESPONSE:** No dispute.

      25. This lawsuit is the first time any Defendant has been accused of selling a vehicle to an individual without his or her authorization. Exhibit "F," at 97:3-8; 138:3-14.

**RESPONSE:** Defendant's self-serving testimony is contradicted by the evidentiary record. *See Keshavarz Decl.* [**Exhibit M** (Utnicki Complaint)[1]]. Complaints on the website Cars.com regarding Victory include accusations that "They applied for a new loan on 9/10 without my knowledge and without me being there…After that on 9/10 and 9/11 someone tried to open a credit card with my information!" (FRANCOIS 3961), "representative ask me to fill out application pre - approve form, I've been told that it's just the form and they not gonna check my score…Few minutes later receive hard inquiry on my score" (FRANCOIS 4016), "they ran my credit. I should have known not to give them my info before looking at the car, but I thought they might have run a soft credit check" (FRANCOIS 4024), "they asked my social security because

---

1 Plaintiff introduces the Utnicki Complaint to impeach Defendants' claim that they have never been accused of selling a vehicle to an individual without his or her authorization, not for the truth of the matter asserted in the Utnicki Complaint.

of pandemic…Now last 2-3 days I am getting alert about my credit score changes. Please be very careful to give any of your personal information to this dealership" (FRANCOIS 4067), and "After repeatedly telling them not to run my credit with any banks because i was already pre approved by MCU they ran my credit with 11 banks" (FRANCOIS 4069). *See Keshavarz Decl.* [**Exhibit N** (Cars.com Complaints)].

26. Plaintiff married Stanley Laforest on June 14, 2018. Exhibit "D," at 18:7-13.

**RESPONSE:** No dispute.

27. In or around May of 2018, Plaintiff moved into Stanley Laforest's familial home located at 2914 Farragut Road, Brooklyn ("Farragut Road"), where she resided at the time of the events and transactions at issue herein until she moved out at the end of 2020. Exhibit "D," at 14:3-18; 127:2-7.

**RESPONSE:** No dispute.

28. Plaintiff resided at Farragut Road with her husband, and her husband's mother, father, and grandmother. Exhibit "D," at 14:19-15:9.

**RESPONSE:** No dispute.

29. Plaintiff's brother-in-law, Emmanuel Laforest ("Laforest"), also resided at

Farragut Road. Exhibit "D," at 15:10-21.

**RESPONSE: DISPUTED.** Misrepresents Plaintiff's testimony. The section cited for the

proposition actually states:

> 10 Q. Emmanuel Laforest?
> 11 A. Yes.
> 12 Q. That is your husband's brother?
> 13 A. Yes.
> 14 Q. And so he had a bedroom in that
> 15 house, correct, Emmanuel Laforest?
> 16 A. He had a bedroom. Like he
> 17 never had a bedroom. We was planning to
> 18 rent the room. Since I moved in, I never
> 19 met him. He was coming at 2:00 a.m.,
> 20 3:00 a.m. in the morning; he was already
> 21 gone.

Further, Ms. Francois never saw Emmanuel Laforest at 2914 Farragut Road. *See Keshavarz*

*Decl.* [**Exhibit O** (Farah Jean Francois Deposition Transcript "Francois Trans"). 17:08-12]:

> 8 A. Basically, we say that he was
> 9 living in the street because he was never
> 10 in the house. He never come in the house.
> 11 We never saw him. If you ask him if he saw
> 12 me when he was there, he will tell you no.

30. Plaintiff claims she first met Laforest in person in January of 2022, when she

nearly called the police on him after her green card was mailed to Farragut Road

(despite the fact that Plaintiff testified she had since moved out) and Laforest

apparently intercepted and stole it. Exhibit "D," at 41:24-43:8.

**RESPONSE:** No dispute.

31. Plaintiff moved out of Farragut Road after a "big fight" with her husband and her father-in-law about Laforest after she claims to have first discovered that Laforest had stolen her identity to purchase a 2017 BMW 5 Series ("the Vehicle"). Exhibit "D," at 15:22-17:4. Plaintiff wanted to go to the police, but her husband and father-in-law resisted to protect Laforest. Id.

**RESPONSE:** No dispute.

32. Plaintiff received mail at Farragut Road where her husband's grandmother would typically retrieve mail from the home's single mailbox. Exhibit "D," at 19:21-20:19.

**RESPONSE:** No dispute.

33. Plaintiff applied for a new class of driver's license in late 2019 or 2020 because she planned to work for Uber, but never received the license in the mail. Exhibit "D," at 24:22-27:8.

**RESPONSE: DISPUTED IN PART**.

When asked when she obtained her new driver's license she testified, "2020, because my driver's license was expired, and I went to Department of Motor Vehicles to get a new one." *See* Keshavarz Decl. [**Exhibit O** Francois Trans. 24:22-25:05]. Otherwise, no dispute.

19

34. Plaintiff worked for Gary Null's Uptown Whole Food from January 2014 through September 2018, at which point she became a teller and then a customer service representative at TD Bank, where she was employed until November or December of 2020. Exhibit "D," at 34:23-38:6.

**RESPONSE:** No dispute.

35. Plaintiff testified that she first learned of Laforest's theft of her identity on or about September 11, 2020, when she received the title to the Vehicle in the mail. Exhibit "D," at 45:17-47:13. Upon realizing that the Vehicle was titled in her name, she asked her husband if had had purchased the Vehicle, which he denied. Id. At that point, Plaintiff discovered for the first time that Laforest was operating the BMW motor vehicle he acquired in some four months earlier, but when Laforest's grandfather asked him, Laforest denied purchasing the BMW in Plaintiff's name. At that point Plaintiff stated that she was going to the police. Id.

**RESPONSE:** No dispute.

36. Laforest then called Plaintiff, admitted that he had her driver's license, and promised that he would return her ID and remove her name from the title of the Vehicle and work it out. Exhibit "D," at 45:17-47:13; 49:16-50:19.

**RESPONSE: DISPUTED IN PART.** While Laforest may have made such representations to Ms. Francois, the cited testimony shows that she rejected them and told Mr. Laforest that she would be going to the police. *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 49:16-50:19].

37. Plaintiff testified that Laforest's grandfather warned her that Laforest "open everybody's mail," and stated that Laforest stole her ID and W-2 from Null's Whole Food in the mail and kept it for himself. Exhibit "D," at 53:22-54:15.

**RESPONSE:** No dispute.

38. Plaintiff reported Laforest to the NYPD on September 25, 2020, for "ID Theft." Dkt. No. 26-6.

**RESPONSE:** No dispute.

39. Laforest was arrested on January 11, 2021. Dkt. No. 26-16.

**RESPONSE:** No dispute.

40. Laforest had been in jail for "a lot of things," he had cases other than the case brought by Plaintiff, he was "always in trouble with the cops." Exhibit "D," at 43:9-44:10.

**RESPONSE:** No dispute.

41. According to Plaintiff, Laforest was "definitely lying" when he testified that he found her driver's license on the floor of the Farragut Road apartment. Exhibit "D," at 57:10-17.

**RESPONSE:** No dispute.

42. According to Plaintiff, Laforest also lied about paying parking tickets associated with the Vehicle. Exhibit "D," at 58:24-59:4.

**RESPONSE:** No dispute.

43. The day that Laforest was arrested in conjunction with the theft of Plaintiff's identity, Plaintiff testified that she received text messages from an unknown number "saying you will never come back to Brooklyn," and "saying a lot of bad words which is -- that is the reason that made me change everything" and which caused Plaintiff to be afraid. Exhibit "D," at 59:11-60:19.

**RESPONSE:** No dispute.

44. Plaintiff emphatically characterized Laforest as a liar, and stating that "you can't believe anything he says" because "most of the time he is lying." Exhibit "D," at 65:4-15.

**RESPONSE: DISPUTED**. Defendants' counsel stated "you can't believe anything he says," and Plaintiff responded to that leading question by clarifying that "most of the time he is lying" and further specifying "I can't tell you how he gets the mail." In other words, Ms. Francois was attempting to distinguish between statements of Emmanuel Laforest that were clearly lies, that she was not married to Stanley Laforest, and statements which she did not know the veracity of.

45. After receiving the title to the Vehicle in the mail and learning what Laforest had done, Plaintiff went to the Victory Mitsubishi dealership at 4070 Boston Road, Bronx, with her uncle and met with an unknown individual who Plaintiff described as "a little fat," "a Spanish guy," who "had a beard." Exhibit "D," at 67:8-59:12.

**RESPONSE:** No dispute.

46. After reviewing her information, this person told her she would need to come in again the following Thursday. Exhibit "D," at 71:5-72:12. Plaintiff returned that Thursday and was introduced to a young man who "looks like he was a Spanish guy." Exhibit "D," at 75:13-23.

**RESPONSE:** No dispute.

47. The young man told Plaintiff that he was "very sorry for what happened," and showed her a copy of her ID and Laforest's ID that Victory Mitsubishi had on file in connection with the sale of the Vehicle. Exhibit "D," at 77:4-9.

**RESPONSE:** No dispute.

48. The young man told Plaintiff he was going to fix her problem, and showed Plaintiff documentation of the Vehicle sale, including documents containing Plaintiff's information including a photo of her ID and her social security number. Exhibit "D," at 78:6-79:2.

**RESPONSE:** No dispute.

49. When Plaintiff asked how he had a copy of her ID, as she had never received it in the mail, the young man told her that "this is the person who come to buy the car." Exhibit "D," at 79:3-12.

**RESPONSE:** This is a blatant mischaracterization of Plaintiff's testimony. Plaintiff's cited testimony in full is as follows:

3 Q. All right. He showed you the
4 picture or he showed you a copy of your
5 driver's license and Emmanual's driver's
6 license. What was the information that you
7 had about that?
8 A. First of all, I said this is
9 the driver's license I never received from
10 the DMV. How could you guys that? He said
11 that this is the person who come to buy the
12 car.

Ms. Francois was responding to a question about being shown her license and Laforest's license, and her statement was clearly in reference to his license. Her testimony immediately after goes

24

on to further elaborate that this was the case, as she refers to Laforest coming into the dealership

by himself with her ID:

```
13 Q. Okay. And go ahead. What is
14 the next conversation that you had?
15 A. And then I was mad. I said
16 what you guys did is not good. He was
17 telling me it is COVID. I said I
18 understand a person buys the car online.
19 Because I am customer service; I can do an
20 account online. We do not have power to
21 control that. But the person come in
22 person to do this, but you do not see me.
23 And it is my ID and you guys still sell him
24 that. He said it was one of my employees
25 that did that.
```

*See Keshavarz Decl.* [**Exhibit O** Francois Trans. 79:13-25].

50. The young man then asked that Plaintiff give him the title to the Vehicle so that he could fix the situation, take the Vehicle back, pay off the loan, and remove everything in Plaintiff's name, but Plaintiff refused to give him the title saying that she did not trust that he would help her. Exhibit "D," at 80:10-82:10.

**RESPONSE:** No dispute but would note the title was branded with a lien from Capital One. It was not a clear title.

51. Plaintiff testified that she took photographs of the papers at the dealership, then went to the police and shared those pictures so the police could process her report of Laforest's identity theft. Exhibit "D," at 83:6-84:19.

25

**RESPONSE:** No dispute.

    52. The police had Plaintiff identify Laforest's picture and told her that they would pursue her claim against him; the police later called and confirmed that they had arrested Laforest. Exhibit "D," at 84:20-85:19.

**RESPONSE:** No dispute.

    53. Plaintiff blocked every number related to anyone from the Victory Mitsubishi dealership because they kept calling asking her to return the title to the Vehicle, stating that she "was blocking every number [she] did not know because [she] was scared." Exhibit "D," at 86:19-25.

**RESPONSE:** No dispute, but would note the title was branded with a lien from Capital One. It was not a clear title.

    54. Plaintiff was afraid because she "don't know if it was him, if it was Emmanual [sic] friend had been texting me. I don't know. I was scared and all I wanted to do is block everyone who deals with that because I did not want nobody to wait for me on the street and end up doing something to me." Exhibit "D," at 94:14-25.

**RESPONSE: DISPUTED.** Mischaracterizes Plaintiff's testimony. Plaintiff was clearly testifying about being afraid of both Defendants and Emmanuel Laforest:

8 Q. Okay. When is the last time
9 you had any conversation with anyone at the
10 dealership?
11 A. For the dealership it was in
12 2020 because nobody ever called me or said
13 anything else.
14 Q. I think you testified that you
15 blocked their number?
16 A. Yeah, I blocked there son
17 number because sometimes he called me in
18 the number and sometimes he called me at
19 different number. I don't know if it was
20 him, if it was Emmanual friend had been
21 texting me. I don't know. I was scared
22 and all I wanted to do is block everyone
23 who deals with that because I did not want
24 nobody to wait for me on the street and end
25 up doing something to me.
2 Q. Did you think someone from the
3 dealership was going to wait for you on the
4 street?
5 A. Maybe the guy who did that was
6 there if it was a friend doing that with
7 him with people ID and information. If
8 they did that, what could they not do?

*See Keshavarz Decl.* [**Exhibit O** Francois Trans. 94:08-95:08].

She confirmed that she was referring to both the Defendants and Emmanuel Laforest towards the

end of the deposition:

15 A. No. That's what I said early,
16 I didn't know who texted me. It can be the
17 dealership, it can be Emmanuel. I don't
18 know who specifically was calling me,
19 that's why I was afraid.

*See Keshavarz Decl.* [**Exhibit O** Francois Trans. 242:15-19].

Crucially, Plaintiff understood that Defendants had done the unauthorized financing and sale with Emmanuel Laforest, and thus she did not trust and was afraid of the Defendants: "Maybe the guy who did that was there if it was a friend doing that with him with people ID and information. If they did that, what could they not do?". *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 86:19-87:11, 95:02-08; **Exhibit P** (Affidavit of Farah Jean Francois in Opposition ("Francois Aff.") ¶ 27].

> 55. Laforest's friends called and texted her repeatedly with threats, "calling and then saying telling me that's not going to stop, that's not going to stay like that," and telling her things like "don't come back to Brooklyn." Exhibit "D," at 108:11-110:15.

**RESPONSE: DISPUTED IN PART.** Mischaracterizes Plaintiff's testimony. Plaintiff was testifying as to the stress of calls related to the identity theft in general, both from the Defendants and from Emmanuel Laforest and his associates:

4 A. I was really stressing. All I
5 remember was my job was too much calling.
6 My bos was telling me take one week stay
7 home and fix about that, which that was too
8 much for me.
9 Q. When was it that your boss told
10 you to take a week?
11 A. It was when they were like
12 calling me up, right, September or October
13 the dealer was calling me, Emmanual was
14 calling me, and his friend was calling me.
15 I don't even answer Capital One, the one
16 was calling me most.

*See Keshavarz Decl.* [**Exhibit O** Francois Trans. 108:04-16].

As Plaintiff testified, some of the calls concerned the alleged money she owed, which would

clearly not be Emmanuel Laforest or his friends: "I was scared because someone been calling me

and been telling me that I never pay nothing. I didn't know if I have to pay or not pay. All I

know is that was my name on it and that was coming to me that I have to pay that money, which

I never got that loan." *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 132:07-16].

When Plaintiff testified about emotional distress related to phone calls, she consistently referred

to the sum total of all the parties calling her, especially Capital One and Defendant Stavros

Orsaris:

15 Q. How is it that you almost lost
16 your job?
17 A. Like I said early, because they
18 been calling me and then I was customer
19 service worker at the time and then my
20 phone I have to answer. Capital One was
21 calling me and then the dealer's son was
22 texting me, calling me about to send the
23 title and my boss saw me answer phone and
24 then I was with customer in front of me and
25 he said you're going to have to take one
2 week and we're going to have to request you
3 to stop coming for one week to figure out
4 to what happened to you and to deal with
5 that and then when you feel you're able to
6 coming back to work, you can coming back to
7 work.
8 Q. Nobody ever actually told you
9 you might lose your job over this, correct?
10 In fact, they actually accommodated you to

29

11 give you the opportunity to deal with it;
12 is that correct?
13 MR. KESHAVARZ: Objection to
14 form.
15 A. That's not what it is. Because
16 if they stop me they will replace me with
17 someone because I could not be able to do
18 my job.
19 Q. Did anybody tell you that, that
20 they might replace you with someone?
21 A. Yeah, because I was crying.
22 Because every time Capital One calling me
23 and if I'm coming back, I went to the
24 bathroom crying and then my assistant was
25 seeing me crying and then my boss was
2 asking her why Farah been crying, you know
3 Farah have a customer, if she not able to
4 do the job, she have to let us know.
5 Q. But you were able to do the
6 job, correct?
7 A. I was not 100 able to do the
8 job because I was more concerned about what
9 Capital One going to do. Because every
10 time they say, okay, they're going to call
11 me back, they will call me back, which that
12 was about that.

*See Keshavarz Decl.* [**Exhibit O** Francois Trans. 216:15-218:12, 239:17-240:07]

56. At that point Plaintiff had not seen her credit report showing that her credit report

had been pulled on May 30, 2020, a fact she first discovered on June 11, 2021.

Dkt. No. 26 ¶ 106.

**RESPONSE:** No dispute.

30

57. Plaintiff admitted that her emotional stress was caused by Laforest, by his threats and his theft of her mail and her identity. Exhibit "D," at 220:19-221:5.

**RESPONSE: DISPUTED.** Complete mischaracterization of Plaintiff's testimony, substituting Defendants' legal argument in their Memorandum of Law for what Plaintiff actually testified. Defendants conveniently overlook the large volume of testimony by Plaintiff as to how Defendants conduct caused her emotional distress. "I said no Capital One be calling me at the job. I have being stressing. I have to answer them because they think I don't want to pay them." *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 80:22-25]. "[W]hat they did to me is not fair putting me in stress and make me almost lose my job by crying because I come to this country to get a better life to help my family, not to be doing what they are doing to people." *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 81:10-15]. "I had been received letter from Capital One and when I called company Capital One I received letter from ATM – MTA. And then also from parking ticket, a lot of tickets. It was driving my crazy." *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 99:16-22]. "Did Emmanuel apply for Capital One or you? The dealership put my name in Capital One without checking the people who is coming to do things. Because he was not online…I know that Emmanuel was coming with the ID and sitting in front of them and they see, they see my ID, they see a woman on that." *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 150:19-151:05]. Ms. Francois even testified that her emotional distress was caused more by the Defendants than by Emmanuel Laforest: "[T]he basic people who did more, who damaged all that is the dealership, because the dealership is supposed to be – whoever the customer come to your store with somebody ID, you're not supposed to accept that person if that person in not in

31

person who signed." *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 155:03-09]. She testified

similarly towards the end of her deposition:

5 A. If the dealership was not doing
6 that and Capital One would not have all the
7 $30,000 money, I would continue with my
8 life, the life I had before. I would never
9 be stressed, never crying and never almost
10 losing my job for that. That would never
11 happen.

*See Keshavarz Decl.* [**Exhibit O** Francois Trans. 242:05-11].

Ms. Francois also suffered emotional distress from Capital One calling her to pay the loan for the

vehicle:"I was scared because someone been calling me and been telling me that I never pay

nothing. I didn't know if I have to pay or not pay. All I know is that was my name on it and that

was coming to me that I have to pay that money, which I never got that loan." *See Keshavarz*

*Decl.* [**Exhibit O** Francois Trans. 132:07-16, 134:14-18].

58. Ultimately, while Plaintiff testified that someone from the dealership called her

and told her that they had the car and just needed the title in order to take care of

everything, Plaintiff simply said "yeah, okay" but then never accepted another call

from or spoke to anyone at the dealership again, despite the fact that the dealership

attempted to call her again after that, because she believed that they were lying to

her. Exhibit "D," at 95:11-97:25.

**RESPONSE:** No dispute.

59. On or about September 23, 2020, Plaintiff submitted an Affidavit of Fictitious

Account in conjunction with her fraud claim with Capital One. Exhibit "D," at
125:6-126:25; Dkt. No. 26-5.

**RESPONSE:** No dispute.

60. Plaintiff was the beneficiary of a restraining order preventing Laforest from
coming into contact with her due to a series of threatening phone calls which
caused Plaintiff to be "scared to go to work because [she didn't] want them to
come to my job." Exhibit "D," at 88:5-92:13.

**RESPONSE:** No dispute.

61. Despite Plaintiff's deposition testimony that she "don't know if [the Capital One
Loan] is still open," credit reports Plaintiff produced in discovery show that the
Capital One loan was cancelled and removed from her credit report entirely.
Exhibit "D," at 101:28; Exhibit "E."

**RESPONSE: Disputed in part.** None of the evidence cited shows that the Capital One loan
"was cancelled," only that is was not listed on her Experian credit report. To the contrary,
Defendants testified that a "flat cancel" – that is the return of the vehicle to the dealership and the
dealership refunds the money it was paid by the finance company for the loan --  never happened
on the financing for the Vehicle despite the Vehicle now being in Victory Mitsubishi's
possession. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 171:21-172:02; **Exhibit C** Diane
Trans. 90:18-21]. Otherwise no dispute.

62. While Plaintiff's Affidavit of Fictitious Account stated that she had to pay $29,462.81 as a result of her identity theft, Plaintiff never paid any amount toward the loan, stating "No. Why would I pay something that I did not do?" and "I did not pay anything [to Capital One]." Exhibit "D," at 132:19-24, 135:25-136:7.

**RESPONSE: DISPUTED IN PART.** Mischaracterizes Plaintiff's testimony. As Ms. Francois testified, "I was scared because someone been calling me and been telling me that I never pay nothing. I didn't know if I have to pay or not pay. All I know is that was my name on it and that was coming to me that I have to pay that money, which I never got that loan." *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 132:07-16, 134:14-18]. In other words, at the time that Ms. Francois filled out the Affidavit, she did not know if she was legally obligated for the $29,462.81 even if she knew that she did not incur it and ultimately would not pay anything.

63. When asked to identify "every dollar that you spent out of your pocket that you claim was a result of what the dealership did in this lawsuit," Plaintiff responded simply "I don't remember." Exhibit "D," at 140:20-141:4.

**RESPONSE:** No dispute that Plaintiff's testimony is accurately stated.

64. Plaintiff did not pay anything out of pocket to satisfy any of the parking violations incurred by Laforest with the Vehicle. Exhibit "D," at 141:13-17.

**RESPONSE:** Disputed inasmuch as Plaintiff had to pay the cost of sending dispute letters in regards to the parking violations, and lost time for having to make these disputes, but not

34

disputed inasmuch as Plaintiff has not at this time paid any money towards the fraudulently incurred parking violations. *See Keshavarz Decl.* [**Exhibit Q** (Dispute Letters for Violations)]. However, unpaid parking tickets led to the suspension of her driver's license. *See Keshavarz Decl.* [**Exhibit R** (DMV Abstract)].

> 65. Plaintiff did not pay anything out of pocket to satisfy any of the toll violations incurred by Laforest while driving the Vehicle. Exhibit "D," at 141:13-143:21.

**RESPONSE:** Disputed inasmuch as Plaintiff had to pay the cost of sending dispute letters in regards to the toll violations, and lost time for having to make these disputes, but not disputed inasmuch as Plaintiff has not paid any money towards the fraudulently incurred toll violations. *See Keshavarz Decl.* [**Exhibit Q** (Dispute Letters for Violations)]

> 66. When asked whether she paid anything out of pocket for any of the moving violations incurred by Laforest's use of the Vehicle, she testified that she did not remember. Exhibit "D," at 145:3-14.

**RESPONSE:** Disputed inasmuch as Plaintiff had to pay the cost of sending dispute letters in regards to the moving violations, and lost time in making the disputes. *See Keshavarz Decl.* [ **Exhibit Q** (Dispute Letters for Violations)]

> 67. Plaintiff does not remember how much she spent on postage, printing, and copying in her efforts to contest charges incurred by Laforest, and does not have any receipts to document any such expenditures. Exhibit "D," at 160:19-162:21.

**RESPONSE:** Disputed inasmuch as two receipts for mailings were produced, as admitted by Defendants in the next paragraph of their 56.1 statement. *See Keshavarz Decl.* [ Certified Mail Receipts].

> 68. Plaintiff's counsel produced two receipts, each for $6.71, for certified mail dated May 25, 2022, (Exhibit "A"), representing the cost of mailing two letters, one to the Dispute Department of Experian and one to the Dispute Department of TransUnion LLC, requesting that those entities remove a total of seven inquiries from Plaintiff's credit report dating from May 30, 2020, and June 29, 2020. Dkt. Nos. 26-23 and 26-24.

**RESPONSE:** No dispute.

> 69. When asked how much she spent putting her belongings in storage, Plaintiff testified as follows:

Q. Okay, thank you.

Now, one of your claims in this case is that you had to, quote, put your stuff in storage. Do you know that to be one of your claims in this lawsuit?

A. Yea, because I was scared about that. Because Emmanuel was so mad and then his friend, when they been calling me on the phone and calling me and then giving me that and then calling me on blocked numbers, my husband was scared. He said you have to go to your friend or go to your family. And then all that thing we get, my bed, all my stuff from my room. I couldn't bring everything back to me uncle because I was not living there anymore and I have to put everything in storage.

Exhibit "D," at 162:23-163:18.

**RESPONSE:** No dispute.

70. Plaintiff admitted that she "put her stuff in storage" because Laforest or his associates threatened her and she had to move out of Brooklyn. Exhibit "D," at 164:8-12.

**RESPONSE:** No dispute.

71. Plaintiff left her belongings in storage for three or four months, but she did not know how much she spent on storage, and she does not have any receipts to support that claim. Exhibit "D," at 163:19-164:7.

**RESPONSE:** No dispute.

72. Plaintiff testified that her credit was damaged as a result of allegations in her Complaint, claiming to have obtained a credit score of 780; however, Plaintiff only offered the fact that she had qualified for an American Express credit card to support that claim, stating "[t]o get American Express, your credit have to be good. Exhibit "D," at 166:6-168:13.

**RESPONSE:** No dispute.

73. On May 30, 2020, Plaintiff's "EXPERIAN/FAIR ISAAC AUTO LOAN MODEL 08" Credit Score was 565, and her "FICO AUTO SCORE 8" was 577. Exhibit "B."

**RESPONSE:** No dispute.

74. On June 11, 2021, Plaintiff's Experian "FICO SCORE 8" was 492, but the Capital One auto loan for the Vehicle was not listed on her credit report at that time and there were several unrelated accounts with delinquent payments listed. Exhibit "D," at 175:22-176:14; Exhibit "E."

**RESPONSE:** No dispute.

75. As of June 29, 2022, when she applied for a vehicle loan from PenFed Credit Union ("PenFed") which was ultimately denied, Plaintiff's listed credit score was 584. Dkt. No. 26-33.

**RESPONSE:** No dispute.

76. Plaintiff did not suffer harm to her credit or credit score as a result of the Defendants alleged actions. Exhibit "L."

**RESPONSE:** No dispute.

**DEFENDANTS' ADDITIONAL FACTS ALLEGED IN THEIR MEMORANDUM OF LAW AND NOT IN THEIR 56.1 STATEMENT**

77. Plaintiff's native language is Haitian French Creole. Exhibit D: 07:17-23. [Def. MOL p. 8, fn. 4]

**RESPONSE:** No dispute.

78. Laforest returned the Vehicle to the dealership on September 26, 2020, a fact

38

about which Plaintiff was promptly informed.  Exhibit D 86:08-18 [Def. MOL p. 13].

**RESPONSE:** No dispute as to Mr. Laforest returning the Vehicle on September 26, 2020.

79. Although Farah Jean Francois claimed that process of disputing the fines and tickets against her was still ongoing as of her deposition, by all accounts her efforts have already succeeded, or certainly will succeed if they have not already. Exhibit D 145:08-148:09. [Def. MOL p. 5].

**RESPONSE: DISPUTED.** Defendants' vague and speculative "by all account her efforts have already succeeded, or certainly will succeed if they have not already" is not supported by the cited testimony.

80. Farah Jean Francois testified in detail to the fear, stress, and anxiety she experienced as a direct result of the verbal abuse and threats she received from Laforest and his associates after she went to the police. Exhibit D 230:18-232:13. [Def. MOL p. 12].

**RESPONSE: DISPUTED.** Plaintiff clearly testified repeatedly during her deposition about the direction connection between Defendants' unauthorized financing and sale of the Vehicle in her name and her emotional distress. "I said no Capital One be calling me at the job. I have being stressing. I have to answer them because they think I don't want to pay them." *See Keshavarz*

39

*Decl.* [**Exhibit O** Francois Trans. 80:22-25]. "[W]hat they did to me is not fair putting me in stress and make me almost lose my job by crying because I come to this country to get a better life to help my family, not to be doing what they are doing to people." *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 81:10-15]. "I had been received letter from Capital One and when I called company Capital One I received letter from ATM – MTA. And then also from parking ticket, a lot of tickets. It was driving my crazy." *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 99:16-22]. "Did Emmanuel apply for Capital One or you? The dealership put my name in Capital One without checking the people who is coming to do things. Because he was not online…I know that Emmanuel was coming with the ID and sitting in front of them and they see, they see my ID, they see a woman on that." *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 150:19-151:05]. Ms. Francois even testified that her emotional distress was caused more by the Defendants than by Emmanuel Laforest: "[T]he basic people who did more, who damaged all that is the dealership, because the dealership is supposed to be – whoever the customer come to your store with somebody ID, you're not supposed to accept that person if that person in not in person who signed." *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 155:03-09]. She testified similarly towards the end of her deposition:

5 A. If the dealership was not doing
6 that and Capital One would not have all the
7 $30,000 money, I would continue with my
8 life, the life I had before. I would never
9 be stressed, never crying and never almost
10 losing my job for that. That would never
11 happen.

*See Keshavarz Decl.* [**Exhibit O** Francois Trans. 242:05-11].

Ms. Francois also suffered emotional distress from Capital One calling her to pay the loan for the vehicle: "I was scared because someone been calling me and been telling me that I never pay nothing. I didn't know if I have to pay or not pay. All I know is that was my name on it and that was coming to me that I have to pay that money, which I never got that loan." *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 132:07-16].

When Plaintiff testified about emotional distress related to phone calls, she consistently referred to the sum total of all the parties calling her, especially Capital One and Defendant Stavros Orsaris:

15 Q. How is it that you almost lost
16 your job?
17 A. Like I said early, because they
18 been calling me and then I was customer
19 service worker at the time and then my
20 phone I have to answer. Capital One was
21 calling me and then the dealer's son was
22 texting me, calling me about to send the
23 title and my boss saw me answer phone and
24 then I was with customer in front of me and
25 he said you're going to have to take one
2 week and we're going to have to request you
3 to stop coming for one week to figure out
4 to what happened to you and to deal with
5 that and then when you feel you're able to
6 coming back to work, you can coming back to
7 work.
8 Q. Nobody ever actually told you
9 you might lose your job over this, correct?
10 In fact, they actually accommodated you to
11 give you the opportunity to deal with it;
12 is that correct?
13 MR. KESHAVARZ: Objection to

14 form.
15 A. That's not what it is. Because
16 if they stop me they will replace me with
17 someone because I could not be able to do
18 my job.
19 Q. Did anybody tell you that, that
20 they might replace you with someone?
21 A. Yeah, because I was crying.
22 Because every time Capital One calling me
23 and if I'm coming back, I went to the
24 bathroom crying and then my assistant was
25 seeing me crying and then my boss was
2 asking her why Farah been crying, you know
3 Farah have a customer, if she not able to
4 do the job, she have to let us know.
5 Q. But you were able to do the
6 job, correct?
7 A. I was not 100 able to do the
8 job because I was more concerned about what
9 Capital One going to do. Because every
10 time they say, okay, they're going to call
11 me back, they will call me back, which that
12 was about that.

*See Keshavarz Decl.* [**Exhibit O** Francois Trans. 216:15-218:12, 239:17-240:07]

81. Stavros Orsaris testified repeatedly that Laforest was accompanied either by Plaintiff or a woman who resembled her. Exhibit F 107:15-108:16; 140:25-141:09; 141:22-142:24; 143:18-144:06; 157:07-18; 170:12-172:02; 214:04-21. [Def. MOL p. 17].

**RESPONSE:** Defendant's self-serving testimony is contradicted by his own testimony, his lack of credibility, the testimony of others, and by the evidentiary record. Only a small portion of the cited testimony by Stavros Orsaris consists of supposed memories of Emmanuel Laforest with

42

another person at the dealership (Trans. 142:19-24; 143:25-144:06); most of the cited testimony is tautological, that because "There are rules that are in place, city, state and federal regulations" that "It is impossible that Emmanuel was by himself, and it is impossible that I would presume that Ms. Francois wasn't there." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 142:04-12]. Some of this testimony even strongly inferred that Mr. Orsaris did not actually recollect Emmanuel Laforest and Farah Jean Francois (or someone pretending to be her) coming in but instead that he concluded that was the case based on his "recollection of the documentation that I collected that day, and my policies and procedures that I have inside Victory Mitsubishi." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 108:09-16]. "I don't have a specific recollection of [Emmanuel Laforest] being there, but based on the policies and procedures that I have in place, the documentation that was collected, two people were present, which I would presume is Emmanuel Laforest and Farah Francois." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 109:02-07].

The testimony of Stavros Orsaris is contradicted by the admission of Chris Orsaris, representing Victory Mitsubishi, to Farah Jean Francois and Papito Momplaisir; Mr. Momplaisir testified that Ms. Francois asked Chris and Stavros Orsaris "how did you sell someone a car under my name while I wasn't there," and Chris Orsaris responded that "it was pandemic, and they came in with your ID. And we though you give him your ID to come in and buy the car." *See Keshavarz Decl.* [**Exhibit S** (Papito Momplaisir Deposition Transcript ("Momplaisir Trans.")) 86:13-23, 87:03-09]. This testimony is corroborated by Emmanuel Laforest, who has every interest in testifying

that Ms. Francois was actually with him to exculpate himself from his criminal conduct. *See Keshavarz Decl.* [**Exhibit T** (Emmanuel Laforest Deposition Transcript ("Laforest Trans.")) 07:15-17; 80:16-24].

And further, Defendants' testimony as to their ability to recollect details from what happened on May 30, 2020 puts these self-serving statements into question.  Stavros Orsaris only "vaguely" recalls what Emmanuel Laforest looks like. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 109:13-17; 140:11-20]. Stavros Orsaris did not remember what time Emmanuel Laforest came into Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 136:03-04]. Stavros Orsaris could not recall who spoke to Emmanuel Laforest first, and only assumed it was himself or Mr. Perez based on the store policy at the time. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 144:07-17]. Stavros Orsaris does not recall the credit application being filled out. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 148:08-23]. Overall, Stavros Orsaris did not have "a recollection of…anything specific" from May 30, 2020 because it was more than two years ago at the time of his deposition. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 136:24-137:19]. Defendant David Perez does not remember "anything about the sale and financing of the vehicle as to Miss Francois," including not remembering meeting Ms. Francois and not recalling seeing her driver's license, even after reviewing documents in preparation for his deposition. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 133:10-24]. His sole basis for contending that she was at Victory on May 30, 2020 is "a signed credit app with her license." *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 134:12-17; 135:02-03]. Mr. Perez even testified that "never met her,"

which provides a strong inference that she was not at the dealership when the documents show that Mr. Perez spoke with Emmanuel Laforest and pulled his credit reports. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 179:24-180:05]. Yessica Vallejo did not remember anything about the account because she "sit[s] down with a hundred, plus, customers a month" and bases her testimony about the transaction on "the process, our training, the procedures that we have." *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 102:03-103:23; 106:18-20; 107:10-24; 110:03-08; 112:20-25; 115:09-12].

> 82. Finally, exasperated by counsel's incessant badgering, Philip Argyropoulos declared "[w]hat part of I don't run the dealership do you not understand?" Exhibit H 71:15-23. [Def. MOL p. 22].

**RESPONSE:** No dispute.

**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS IN OPPOSITION**

***The Parties***

83. Defendant Diane Argyropoulos is the owner of Victory Mitsubishi. [**Exhibit D** Orsaris Trans. 32:04-07].

84. While Ms. Argyropoulos confirmed that her title is "owner," she testified that "People refer to me as different things, as an office manager or – at the end of the day, it's all the same." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 26:12-15].

85. As owner, Diane Argyropoulos manages dealer financing. [**Exhibit D** Orsaris Trans. 37:25-38:12; **Exhibit C** Diane Trans. 25:06-13].

86. This management included making the decision to no longer have "funders" after Defendant Yessica Vallejo became a finance manager. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 56:16-57:16].

87. Diane Argyropoulos was also the only person at Victory Mitsubishi who received compliance training from Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 31:04-09]

88. Diane Argyropoulos last spoke with David Daniel, the compliance manager at Credit Bureau Connection ("CBC"), when signing Victory's subscriber agreement with CBC. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 47:17-48:02].

89. With regards to credit reporting in 2020, Diane Argyropoulos "explained to Stavros how it was to be handled and the regulations on it." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 44:04-11].

90. This training focused on security of Victory's computer systems. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 31:13-23].

91. This compliance training happened "Maybe ten years ago." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 31:24-32:03].

92. During the COVID-19 pandemic when Diane Argyropoulos was working remotely, she spoke with Stavros Orsaris once a day. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 67:08-10].

93. Diane Argyropoulos does not collect a salary, but instead "cut[s] [her]self a check whenever [she] can, but it's not really a salary, just ownership." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 69:04-22]..

94. Defendant Stavros Orsaris has the title of "General Manager" at Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 24:17-20].

95. Stavros Orsaris is the supervisor of all the employees at Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 31:10-32:03].

96. Stavros Orsaris does not supervise Yessica Vallejo's work as finance manager other than conveying "general feedback that I received from clients and financial institutions about her work." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 58:10-17].

97. Stavros Orsaris is supervised by Diane Argyropoulos as owner of Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 32:04-07].

98. While Stavros Orsaris is the "direct supervisor" who does "the majority of the dealing with the

employees," Diane Argyropoulos "has the ability to" and "has" dealt with employees directly. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 102:12-24]..

99. Chris Orsaris is the father of Stavros Orsaris. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 24:21-22; **Exhibit B** Vallejo Trans. 25:14-17].

100. There is disagreement between the Defendants and conflicts with the documentary record as to what Chris Orsaris' role, if any, is at Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 24:23-25:08, 44:14-18; **Exhibit B** Vallejo Trans. 26:04, 130:05-10; **Exhibit C** Diane Trans. 37:23-38:04, 147:06-08].

101. Stavros Orsaris testified that Chris Orsaris does not work at and has not worked at Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 24:23-25:08].

102. Stavros Orsaris testified that Chris Orsaris is "an independent buyer that we use to purchase vehicles." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 89:19-22].

103. Diane Argyropoulos testified that she does not know of any other companies that Chris Orsaris works for besides Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 147:06-08].

104. Yessica Vallejo testified that Chris Orsaris comes into Victory Mitsubishi "Maybe once a month." *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 26:04].

105. The Victory Mitsubishi agreement with Capital One lists Chris Orsaris as the general manager and the general sales manager. *See Keshavarz Decl.* [**Exhibit U** (Capital One

Agreement), DEFENDANTS 73].

106.    Diane Argyropoulos testified that he is listed this way because he "had the relationship with Capital One Bank for us to get the bank." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 49:13-50:03].

107.    Diane Argyropoulos could not explain why Stavros Orsaris is listed as a managing member on the agreement. *See Keshavarz Decl.* [**Exhibit U** (Capital One Agreement), DEFENDANTS 77; **Exhibit C** Diane Trans. 53:04-11].

108.    Diane Argyropoulos speaks with Capital One's representative, Ken McGhee, about once a month. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 50:17-51:11].

109.    Diane Argyropoulos first met Stavros Orsaris and Chris Orsaris through a mutual friend in 2016. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 19:24-20:10].

110.    Diane Argyropoulos also runs a dealership in Huntington, New York named Victory Cars East with Stavros Orsaris and John Kekis. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 22:21-23:11].

111.    Chris Orsaris receives a "buyer's fees" for his work for Victory. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 70:15-71:04].

112.    On or around March 26, 2010, Chris Orsaris was indicted by grand jury for 80 counts of forging checks,  one count of conspiracy to commit mail fraud and wire fraud, 80 counts of engaging in unlawful monetary transactions, and two counts of false statement. *See Keshavarz*

*Decl.* [**Exhibit V** (Chris Orsaris Indictment)].

113.    In short, as general manager of an auto dealership known as Major World, Chris Orsaris was accused of forging commission checks from Major World to himself, bought a yacht, and then falsely reported that the yacht was stolen to make an insurance claim for $112,965.71. *See Keshavarz Decl.* [**Exhibit V** (Chris Orsaris Indictment)].

114.    On or around December 19, 2013, Chris Orsaris pled guilty to Conspiracy to Launder Money, and was sentenced to a term of incarceration of 85 months. *See Keshavarz Decl.* [**Exhibit W** (Chris Orsaris Criminal Judgment)].

115.    Chris Orsaris was also ordered to make restitution of $14,337,412.25 to Major Automotive Companies, Incorporated and Ace American Insurance Company. *See Keshavarz Decl.* [**Exhibit W** (Chris Orsaris Criminal Judgment), FRANCOIS 4082].

116.    Lastly, Chris Orsaris was ordered to forfeit (1) $750,000, the proceeds of the sale of his apartment in Trump Tower, (2) $408,000, the rental income from his lease of the apartment in Trump Tower, (3) $65,527.21, the proceeds of the sale of his apartment in Miami Beach, Florida, (4) all funds in his HSBC Bank accounts, both in his name and in the name of CPMW Consultants, Inc., (5) all interest  in "Major Ford," and (6) an additional money judgment of $750,000. *See Keshavarz Decl.* [**Exhibit W** (Chris Orsaris Criminal Judgment), FRANCOIS 4084-4087].

117.    Stavros Orsaris is aware of his father's criminal history. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 90:19-22].

118.    Diane Argyropoulos knew about Chris Orsaris' criminal history prior to him being hired by Victory. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 89:21-90:03].

119.    When asked why she hired him despite this history, she testified that he "is very good at what he does." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 90:10-17].

120.    Stavros Orsaris evaluates job applications for Victory Mitsubishi but does not run background checks on applicants. *See Keshavarz Trans.* [**Exhibit D** Orsaris Trans. 26:16-23; 27:09-14; **Exhibit C** Diane Trans. 89:18-20].

121.    The only thing that Stavros Orsaris evaluates with job applications for sales associates, sales managers, and finance managers is a resume – no references to former employers are required. *See Keshavarz Trans.* [**Exhibit D** Orsaris Trans. 27:15-28:07].

122.    Stavros Orsaris has sole authority to hire and fire Victory Mitsubishi employees in the sales department. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 32:14-33:15].

123.    Defendant Yessica Vallejo is a finance manager at Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 34:14-17; **Exhibit B** Vallejo Trans. 13:09-11].

124.    Ms. Vallejo is one of five finance managers. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 34:14-17].

125.    There are six offices in the 4070 Boston Road building at Victory Mitsubishi – one for Stavros Orsaris and one for each of the finance managers, including Yessica Vallejo. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 36:20-25].

126.    Finance managers receive a commission of 12% of the gross profit of their deals. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 47:06-13; **Exhibit B** Vallejo Trans. 75:05-18].

127.    Defendant David Perez was a sales manager at Victory Mitsubishi during the sale of the Vehicle. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 45:02-06; 71:02-18].

128.    As sales manager, Mr. Perez's only supervisor was Stavros Orsaris. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 125:23-126:03]

129.    As sales manager, Mr. Perez had the responsibility of pulling credit reports for consumers, which he would then convey to the finance managers. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 71:02-18].

130.    Consumers would not be brought to Mr. Perez as the sales manager – he would only deal with them directly if he had questions for them such as if the consumer has specific instructions about what creditor they want to use and that creditor was not going to "work out." *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 76:10-77:06].

131.    Mr. Perez would look at the credit reports for "any negative accounts, negative or any previous autos that went bad or any late payments," and based on that information would "let the customer know what I'm going to require, what I'm not going to require," and then would "give it to the finance manager, and the finance manager runs it to the bank." *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 97:08-99:22].

132.    80% of Mr. Perez's income as a sales manager was based on commissions from the number of cars sold. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 119:19-120:02; 121:05-20].

133.    There are currently 3 sales managers at Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 34:25-35:03].

134.    Yosmaily Ventura was an employee at Victory Mitsubishi who was furloughed on or around March 16, 2020, and was not working at Victory Mitsubishi on May 30, 2020. *See Keshavarz Decl.* [**Exhibit L** (Ventura Affidavit)].

### *Victory Mitsubishi's Policies and Procedures for Sales and Financing*

135.    The system used by Victory Mitsubishi to process sales and financing of vehicles, including the Vehicle in this case, is called Dealertrack. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 100:13-14].

136.    Defendant David Perez admitted that he recognized the tabs ("summary, archive, application, credit decisions, contract, after market compliance, documents, and ID verifications") and the "History" in the documents produced by Dealertrack. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 235:15-236:17; **Exhibit I** (Laforest Dealertrack)].

137.    Diane Argyropoulos testified that she had seen the screen before and that the finance managers and Stavros Orsaris had access to it. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 112:24-113:10].

138.    Ms. Argyropoulos elaborated that they would access it to "send the [credit] application to the bank, so the bank can fund the deal." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 113:13-20].

139.    Stavros Orsaris and Yessica Vallejo both testified that they couldn't recall seeing this screen

and did not know if they had access to it. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 182:19-24; **Exhibit B** Vallejo Trans. 146:10-19].

140. Employees must login to use Dealertrack, and once logged in their actions on the software are tracked. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 100:13-15; **Exhibit C** Diane Trans. 44:22-25].

141. Every employee has an ID associated with them on Dealertrack. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 109:15-17].

142. The ID for Yessica Vallejo is 8031. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 12].

143. Defendant David Perez testified that he "wouldn't know" if he had an ID number. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 196:08-22].

144. Chris Orsaris has a login for Dealertrack. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 45:22-46:06].

145. Clicking into a customer name on Dealertrack brings up that customer's digital "deal jacket," where "in one centralized location, you can see all the latest activity around the customer." *See Keshavarz Decl.* [**Exhibit X** (Dealertrack User Guide), SUBPOENA RESPONSES 600].

146. The sales manager would enter in the consumer's information using the filled-out credit application. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 100:13-16].

147.    Victory has no written policies about how and when to pull credit reports. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 92:09-15].

148.    However, Victory has a contract with Capital One, signed by Diane Argyropoulos, which states that the "dealer warrants that all contracts are genuine, signed by person with full capacity to contract." *See Keshavarz Decl.* [**Exhibit U** (Capital One Agreement), DEFENDANTS 74; **Exhibit C** Diane Trans. 120:18-121:03].

149.    Victory also has a contract with CBC which states that Victory Mitsubishi will "obtain a consumer's written authorization to request [credit reports] relating to **that** consumer." *See Keshavarz Decl.* [**Exhibit H** (CBC Subscriber Agreement), DEFENDANTS 94] [emphasis added].

150.    The CBC Subscriber Agreement also states that the credit reports obtained will only be used "in connection with a credit or consumer transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of the consumer, and will obtain the consumer's written authorization to request such information relating to that consumer." *See Keshavarz Decl.* [**Exhibit H** (CBC Subscriber Agreement), DEFENDANTS 94].

151.    The form that Victory would use on Dealertrack to run credit reports has a check box that says "I have customer permission to pull a credit report," which Stavros Orsaris (as corporate representative of Spartan) confirmed existed because Defendants "need to have permission to pull credit for permissible purpose." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 182:03-04].

152.    Ms. Vallejo had "no knowledge" of the CBC subscriber agreement. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 37:05-12].

153.    However, Ms. Vallejo testified that she understood that pulling the credit report of a consumer when "that person is not there" is "illegal." *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 93:15-18].

154.    Sales associates do not have access to run or look at people's credit through Dealertrack. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 71:24-72:03; 226:15-22; **Exhibit C** Diane Trans. 41:22-24].

155.    Instead, the standard sales process is that the sales associate will go over the credit application with the consumer. Then the sales associate brings the filled out credit application to the sales manager, who obtains the consumer's credit report. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 94:09-15].

156.    Defendant David Perez testified that only him and Stavros Orsaris were authorized to pull credit reports on May 30, 2020. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 226:07-14; 227:18-23].

157.    Defendant Stavros Orsaris, both as an individual and as corporate representative of Defendant Spartan, stated that he was "definitely certain that the only two people that would run credit on [May 30, 2020] is David Perez and myself." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 53:04-23; 150:21-23]. This is clearly false, as Yessica Vallejo pulled the credit report of Jami Singer on May 30, 2020. *See Keshavarz Decl.* [**Exhibit J** (Singer Dealertrack)].

158.    Mr. Perez then testified that Defendant Yessica Vallejo was also authorized to pull credit reports but that it was not normal and would happen if him or Stavros Orsaris weren't available. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 231:14-232:07].

159.    Yessica Vallejo testified that she would pull consumer credit reports "if it was necessary," meaning if Stavros Orsaris and David Perez were busy with other customers. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 89:08-15].

160.    Credit reports would be pulled by the sales manager without the consumer in front of him – the verification that the consumer is the same person as on the photo ID used for the credit pull is performed by a sales associate, not by the sales manager. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 77:19-21; 78:14-23].

161.    After the sales manager pull the credit reports and reviews them, he brings the deal jacket to the finance manager. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 103:02-15].

162.    The finance manager would use the credit reports to see which consumer "qualifies" for certain lenders based on their "guidelines," which require a range of credit scores like "between 700 and 800," and based on these guidelines they would decide which finance companies to submit credit applications to. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 57:25-58:12, 58:21-59:03].

163.    Stavros Orsaris testified that "we would just proceed forward. It doesn't matter what someone's [credit] score is." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 67:13-21].

164.    Stavros Orsaris confirmed that would be the case even with no credit history at all: "You

don't need credit history to necessarily purchase a car." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 68:10-15].

165.    The credit reports are not normally printed out and put in the deal jacket. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 110:19-21].

166.    Only the finance managers would submit credit applications for consumers. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 99:23-100:02].

167.    Generally the finance manager would not run the consumer's credit reports. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 104:25-105:04].

168.    The consumer would wait at the dealership for the finance manager to tell the sales manager whether the consumer was approved or not for financing. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 106:08-11; 107:12-15].

169.    Once the finance manager has an "approval," the consumer sits down with the finance manager to go over their options: the payment, the interest rate, and the contract. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 101:18-102:19; 107:17-19].

170.    Stavros Orsaris would also be present in the finance manager's office "as frequently as possible," and during the time period at issue, he "was definitely present." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 69:22-70:05].

171.    If the finance manager does not get an approval, she may tell the sales manager to tell the consumer that the financing and sale cannot move forward unless they get a co-applicant. *See*

*Keshavarz Decl.* [**Exhibit A** Perez Trans. 108:21-109:03].

172.   The finance manager uses Dealertrack to create the buyer's order and retail installment agreement. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 114:18-22; **Exhibit D** Orsaris Trans. 71:09-72:03].

173.   As a result of the COVID-19 shutdown order, Victory Mitsubishi was operating by appointment only. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 129:20-130:15; **Exhibit D** Orsaris Trans. 65:04-06].

174.   Decisions about how Victory Mitsubishi adapted to the COVID-19 pandemic were made by Stavros Orsaris, who would then notify Diane Argyropoulos of the decisions. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 63:15-64:09].

175.   Defendant David Perez testified that, due to the COVID-19 shutdown, Stavros Orsaris would have been "the one to confirm the identity of anyone signing a credit application or bringing in a driver's license" from at least May 2020 through June 2020. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 136:14-20].

176.   Stavros Orsaris himself testified that "98 percent of" "collecting of the ID or the driver's license of the individual" would be done by him. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 67:04-12].

177.   He further testified that during this time only him and Mr. Stavros were allowed to confirm the identity of consumers, and that specifically Defendant Yessica Vallejo was not allowed to confirm the identity of consumers. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 150:08-17].

59

178. Stavros Orsaris testified that "if the address on the driver's license doesn't match the address on the credit application," they would "not run the credit just yet" and instead "have a conversation with the consumer." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 95:23-96:03].

179. No record was made when the identity of a consumer was confirmed in this way. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 148:22-149:05].

180. During this time, video recordings were made of all sales, but they were only retained for thirty days. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 80:10-22].

181. Victory Mitsubishi would sell around 250 to 270 cars per month. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 132:12-16].

182. There is conflicting evidence regarding if a Victory Mitsubishi employee has ever been terminated because of allegations of fraud – Stavros Orsaris (as an individual and corporate representative of Spartan) testified that he was "very certain" that no one has been terminated from Victory Mitsubishi based on allegations of fraud, whereas Diane Argyropoulos testified that she "fired [the general manager] and everybody else who was selling this [etching] product" which led to a lawsuit against Victory Mitsubishi by the New York Attorney General. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 43:04-13; 45:11-13; **Exhibit C** Diane Trans. 07:22-08:18].

183. That lawsuit, *New York v. Victory Motors, LLC, et al.,* Index No. 70684/2017, was against two companies: Victory Motors, LLC, doing business as Victory Mitsubishi, Larchmont, New York, and Victory Auto Group, LLC, doing business as Victory Suzuki, Bronx, New York. *See*

60

*Keshavarz Decl.* [**Exhibit Y** (NY AG Stipulation), FRANCOIS 3679].

184.   The Lawsuit was settled by the respondents through a stipulation which had the following pertinent provisions: (1) "Respondents are found  to have engaged in deceptive business practices in violation of GBL § 349, and to have repeatedly and persistently engaged in fraud pursuant to Executive Law § 63(12)," (2) failure to pay pursuant to the stipulation would result in a Confession of Judgment being entered against Philip Argyropoulos as "Respondents' majority managing member," and (3) "Respondents represent that they closed their dealerships in 2018 and that they are no longer in operation." *See Keshavarz Decl.* [**Exhibit Y** (NY AG Stipulation), FRANCOIS 3679-3680, 3682].

185.   When asked about why Philip Argyropoulos made the Confession of Judgment for this Stipulation, Ms. Argyropoulos testified as follows:

·4· · · · A.· ·I don't really know why, to be

·5· ·honest.· I am the one who appeared to the

·6· ·court.· Phil was not there.· I mean, to me,

·7· ·at the time, it didn't really matter because

·8· ·I knew we were paying back that money, so I

·9· ·was not concerned about a judgment.

*See Keshavarz Decl.* [**Exhibit C** Diane Trans. 11:04-09]

186.   Diane Argyropoulos also testified that she stepped into a management role because the "previous partner was stealing from the company." *See Keshavarz Decl.* [**Exhibit C** Diane Argyropoulos Trans. 30:06-14].

187.    Stavros Orsaris testified that any upset customer would be referred directly to him. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 86:11-19].

*The Identity Theft, Unauthorized Credit Pulls, Unauthorized Financing, and Unauthorized Sale*

188.    On May 30, 2020, Mr. Laforest went into Victory Mitsubishi alone. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 07:15-17; 80:16-24].

189.    Plaintiff Farah Jean Francois was at a surprise birthday party on May 30, 2020 at 19 Montrose, South Orange, New Jersey being thrown by her friend Darline Dumel, and she spent the night at that address. *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 234:13-236:11; **Exhibit P** Francois Aff. ¶ 4].

190.    Emmanuel Laforest does not recall if he was wearing a mask or if anyone asked him to pull down his mask to verify his identity. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 18:17-20].

191.    He went to Victory Mitsubishi because "people talk about it": "they say if you want to get a car, just go to Victory." *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 18:02-07].

192.    Mr. Laforest first spoke with a man who he described as "slender, tall, like about six-something – 6'2, caramel skin" – while the practices of Victory Mitsubishi suggest that this may have been a sales associate, no Defendant could testify as to who the sales associate was and none of the associated documents disclose a sales associate for the transaction. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 10:19-21; 57:07-11; **Exhibit A** Perez Trans. 94:02-07].

193.    A number of documents refer to a "House sales rep" or "House sales rep 999". *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 12].

194.    David Perez and Yessica Vallejo denied knowing what the "999" ID referred to. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 195:20-196:05; 205:24-206:03; **Exhibit B** Vallejo Trans. 196:06-09].

195.    Diane Argyropoulos testified that it means that "There was no salesperson on the deal." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 108:24-109:09].

196.    The Sales Worksheet indicates that Mr. Laforest spoke with Defendant David Perez on or around 2:16 PM, with Mr. Laforest telling Mr. Perez that he wanted a 2017 BMW 7 Series, VIN #WBA7F2C51HG421273 ("the Vehicle"), that he could put up to $10,000 as a down payment, and that he did not have another vehicle to trade in. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 26; **Exhibit A** Perez Trans. 216:21-24].

197.    There is no similar Sales Worksheet for Farah Jean Francois, and Yessica Vallejo could not explain why that was the case. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 197:16-21].

198.    Mr. Perez denied that the handwriting on the Sales Worksheet was his, but could not explain why it had his name as the salesperson and could not say whose handwriting it was. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 214:19-25; 215:15-20].

199.    In order to do so, Victory Mitsubishi had Mr. Laforest fill out a credit application, which he did by himself. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 2; **Exhibit T** Laforest Trans. 28:10-18].

200.    Mr. Laforest did not forge Ms. Francois' signature on the application, and Ms. Francois also did not sign the credit application because she was not present at the dealership. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 30:08-21; 97:12-19].

201.    However, Mr. Laforest did not see who signed Ms. Francois' name to the credit application. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 42:18-21].

202.    Mr. Laforest's testimony is corroborated by the difference in the dates for the signatures – Mr. Laforest wrote out "MAY 30, 2020" for the date, whereas the person who forged Ms. Francois' signature wrote out "05/30/2020" in distinctly different handwriting (i.e. Mr. Laforest's "0"s are the same height as his numbers, whereas the signor of Ms. Francois' name had "0"s smaller than the other numbers). *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 2].

203.    Mr. Laforest guessed at her current employment (incorrectly) based on her mail, as well as guessing at her position and her salary. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 38:22-25-39:02].

204.    This incorrect income information for Ms. Francois did not cause the transaction to be flagged or otherwise prevented by Victory Mitsubishi – Victory Mitsubishi does not verify employment or income unless the finance company requires them to do so. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 190:06-12; **Exhibit D** Orsaris Trans. 187:21-188:07, 210:16-25].

205.    Mr. Laforest's credit reports were pulled by Defendant David Perez at 4:39 p.m. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 09:06-07].

206.    Mr. Laforest essentially had no credit to obtain financing of the Vehicle, as indicated by the handwritten notation "0/0" made by Defendant David Perez in the top left corner of the credit application. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 186:05-24; **Exhibit D** Orsaris Trans. 186:19-21; **Exhibit E** (Deal Jacket), DEFENDANTS 2].

207.    Defendant Yessica Vallejo testified that if two consumers were applying together, if there's a co-applicant for the credit application, and one of the consumers had no credit history, Victory Mitsubishi would not advise the consumer to apply for credit by herself. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 92:08-14].

208.    Nevertheless, Victory Mitsubishi ran the credit of the Plaintiff Farah Jean Francois at 4:55 p.m. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 09:07; **Exhibit K** (Francois Dealertrack), SUBPOENA RESPONSES 513; **Exhibit A** Perez Trans. 224:07-16].

209.    When asked what the reason was for this to happen, Ms. Vallejo had no answer. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 170:11-16].

210.    It is unclear which individual employee of Victory Mitsubishi pulled the credit report. Stavros Orsaris' assertion that "the only two people that would run credit on that day is David Perez and myself" is clearly false in light of Jam Singer's credit reports being pulled by Yessica Vallejo. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 150:21-23; **Exhibit J** (Singer Dealertrack)]. While the Dealertrack history for Farah Jean Francois shows the credit reports were pulled by Yosmaily Ventura, Defendants and Ms. Ventura herself have represented that she was furloughed and not working at Victory Mitsubishi on May 30, 2020. *See Keshavarz Decl.* [**Exhibit L** (Ventura Affidavit)]. However, the assertion by Defendants that only sales managers and finance managers were authorized to pull credit reports appears to be true given the known credit pulls were by David Perez, a sales manager, and Yessica Vallejo, a finance manager. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 181:07-08; **Exhibit I** (Laforest Dealertrack); **Exhibit J** (Singer Dealertrack)]. Given that David Perez, Stavros Orsaris, and Yessica Vallejo have all

65

testified to having worked on the transaction, and only one finance manager would work on each transaction, there is a dispute of fact as to whether the credit report was in fact pulled by David Perez, Stavros Orsaris, or Yessica Vallejo. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 68:09-16].

211. Despite Stavros Orsaris not disclosing the identity of the person who pulled Ms. Francois' credit report during his own deposition, Diane Argyropoulos testified that Stavros Orsaris told her that "Yessica is the one who ran the credit" because the other managers "were eating in a manager's office." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 139:18-140:02].

212. While Stavros Orsaris told Diane Argyropoulos this, Ms. Argyropoulos did not know (and thus Stavros Orsaris did not tell her) that Emmanuel Laforest had texted the social security number and driver's license of Jami Singer to Stavros Orsaris. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 143:25-144:09].

213. Given that the credit pull was done with Yosmaily Ventura's log-in, this means that either (1) another employee was given Ms. Ventura's log-in credentials and willfully used them to pull the credit reports without revealing their own identity or (2) Dealertrack was left logged in with Ms. Ventura's credentials, allowing another employee to either knowingly or with reckless disregard use Ms. Ventura's credentials to pull the credit reports without revealing their own identity. *See Keshavarz Decl.* [**Exhibit L** (Ventura Affidavit)].

214. The use of Ms. Ventura's log-in also constitutes a breach of the "proper usage requirements and restriction and security requirements" of the CBC Subscriber Agreement, as acknowledged by Ms. Vallejo that "to pull a credit report, an employee has to log into Deal

66

Tracker [sic]." *See Keshavarz Decl.* [**Exhibit H** (CBC Subscriber Agreement), DEFENDANTS 94; **Exhibit B** Vallejo Trans. 45:23-46:03].

215.    Ms. Vallejo suggested that such breaches may go beyond the use of Ventura's log-in, because while she testified that she does not share her password with anyone, she leaves herself logged into Dealertrack on her computer "all day long" when asked if anyone else has access to her login information. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 161:06-18].

216.    This testimony conflicts with testimony by Diane Argyropoulos that "it allows you only a few minutes, if you don't login, it turns it off for security purposes to make sure documents are filed securely away, deal jackets are locked up, and no one has access to peoples personal information, payroll records, things like that." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 31:15-23].

217.    Victory Mitsubishi did not obtain Ms. Francois' authorization prior to pulling her credit reports, and apparently did not even ask about it:

> 19      Q.  So when they ran her credit report, you never
> 20    told the dealership that she gave you permission to buy
> 21    a car in her name or to pull a credit check?
> 22      A.  He didn't even ask.  I guess they was just so
> 23    happy that they was making a sale.  He didn't even
> 24    bother to ask me none -- not of that.

*See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 58:19-24; 59:09-12; 88:10-16].

218.    Defendant David Perez testified that he "wouldn't know" whether a "similar Social Security number on file" code on a consumer's credit report would raise any red flags. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 256:07-14].

219.    Mr. Laforest claims that he intended to purchase the Vehicle as a "co-buyer" with his "girlfriend." *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 23:02-03].

220.    This is corroborated by the fact that Defendant Yessica Vallejo pulled Jami Singer's credit reports at 6:07 p.m., which Ms. Vallejo did despite Ms. Singer not being present at Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit J** (Singer Dealertrack); **Exhibit Z** (Jami Singer Deposition Transcript "Singer Trans.") 04:24-05:01, 08:06-11].

221.    Ms. Vallejo admitted that she may not have seen Jami Singer herself prior to pulling her credit report and may have done so based on a credit application with her information and a copy of her driver's license. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 160:21-161:05].

222.    It was also corroborated by Ms. Singer having authorized Mr. Laforest to do so in May of 2020, and her offering to go to the dealership if they needed her to sign anything. *See Keshavarz Decl.* [**Exhibit Z** Singer Trans. 04:19-23, 05:16-19; **Exhibit T** Laforest Trans. 82:10-18; 84:10-85:02].

223.    Jami Singer has never been to the dealership in person. *See Keshavarz Decl.* [**Exhibit Z** Singer Trans. 04:24-05:01, 08:06-11].

224.    On May 30, 2020, Ms. Singer was with her family. She knew this more than 2 years later because before her deposition she was looking for photos of her cousin who recently passed away, and saw photos she had taken of her nieces and nephews on May 30, 2020. *See Keshavarz Decl.* [**Exhibit Z** Singer Trans. 08:20-22, 09:16-23, 10:01-05, 17:10-24].

225.    While Ms. Singer had in fact authorized Emmanuel Laforest to have her credit report pulled, the pulling of her credit report without her being present and without Victory Mitsubishi

contacting her demonstrates Victory Mitsubishi's willingness to pull the credit reports of others based on the representations of Emmanuel Laforest. *See Keshavarz Decl.* [**Exhibit Z** Singer Trans. 13:14-22, 21:03-06].

226.   Mr. Laforest told Ms. Singer that she would not be able to finance the car with him, and that was the last thing he told her on May 30, 2020. *See Keshavarz Decl.* [**Exhibit Z** Singer Trans. 07:13-19].

227.   Mr. Laforest claims that it was Victory Mitsubishi who suggested going forward with the purchase and financing of the Vehicle under the name of Farah Jean Francois because "she already got approved. You're better off just using her name." *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 23:02-11; 28:19-22; 40:05-23].

228.   Mr. Laforest claims that he told Victory Mitsubishi that he "would have to talk to" Ms. Francois if they were going to use her information for the transaction, but that Victory Mitsubishi told him "let me just run her name down and see if she gets approved. *See Keshavarz Dec.* [**Exhibit T** Laforest Trans. 40:05-23; 104:19-105:04].

229.   Mr. Laforest claimed that he was "a little hesitant" but that Victory Mitsubishi told him that the Vehicle would be "going to go away" and to "speak to her later." *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 53:24-54:04; 103:09-18].

230.   This timeline, of pulling Mr. Laforest's credit and only pulling Ms. Francois' after determining that Mr. Laforest had no credit history, is corroborated by the timestamps from the Dealertrack documents showing the pull of Mr. Laforest's credit reports at 4:39 PM and the pull of Ms. Francois' credit reports at 4:55 PM, and by Defendant David Perez stating that when he

processed the credit application filled out by Emmanuel Laforest, he did not have Ms. Francois'
credit reports pulled. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 187:12-23].

231.    Yessica Vallejo testified that "you cannot pull two people credit at the same time," but
could not explain why there is then a co-applicant field in Dealertrack and why it was blank for
the Dealertrack history for Emmanuel Laforest. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans.
150:13-25].

232.    No one at Victory Mitsubishi asked Mr. Laforest to call Ms. Francois. *See Keshavarz
Decl.* [**Exhibit T** Laforest Trans. 32:07-10].

233.    No one at Victory Mitsubishi asked Mr. Laforest why he had put his phone number for
both himself and for Ms. Francois in the credit application. *See Keshavarz Decl.* [**Exhibit T**
Laforest Trans. 29:05-09; 32:11-14].

234.    At 6:09 p.m., the credit application was "copied" from the user of Yosmaily Ventura's ID
to Yessica Vallejo. *See Keshavarz Decl.* [**Exhibit K** (Francois Dealertrack), SUBPOENA
RESPONSES 573].

235.    Diane Argyropoulos did not know why this switch happened, but knows that generally it
will happen when the sales manager gives the account to the finance manager to submit to banks.
*See Keshavarz Decl.* [**Exhibit C** Diane Trans. 114:19-115:20].

236.    Mr. Laforest claims that he was told the Vehicle was being sold to him and that Ms.
Francois was just a co-applicant. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 44:16-24;
59:17-25].

237.    Mr. Laforest thought that the title for the Vehicle was going to be under his name and

Ms. Francois'. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 45:04-05; 59:17-25].

238.     However, Mr. Laforest admits that he illegally obtained Ms. Francois' Social Security number and other identification information prior to going to Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 29:02-04; 31:05-07; 98:06-99:18].

239.     Mr. Laforest made a downpayment of $8,600, and was given a receipt for this down payment. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 32:21-24; 33:19-34:08; **Exhibit E** (Deal Jacket), DEFENDANTS 3].

240.     Emmanuel Laforest is listed as the customer on the receipt, and the timestamp of the receipt is 8:04 PM. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 3].

241.  The receipt was generated with Deleartrack, as indicated in the bottom left corner with the text "© 2016 DEALERTRACK TECHNOLOGIES – Dealership Application Group." *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 3].

242.     This downpayment was never returned to Mr. Laforest despite him returning the Vehicle to Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 32:25-33:10; 135:17-22; **Exhibit D** Orsaris Trans. 173:20-174:18].

243.     The downpayment is still in the possession of Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 173:20-174:18].

244.     Mr. Laforest was never given the Buyer's Order or Sales Contract for the Vehicle. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 43:06-20].

245.     On June 20, 2020, adverse action recommendations were generated for Mr. Laforest and Ms. Singer. *See Keshavarz Decl.* [**Exhibit I** (Laforest Dealertrack); **Exhibit J** (Singer

Dealertrack)].

246.    Defendants had no explanation for why the adverse action recommendation only was generated on June 20, 2020. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 259:17-21].

### June 29, 2020

247.    On June 29, 2020, neither of the alleged purchasers of the Vehicle returned to Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 08:13-16].

248.    Mr. Laforest did not fill out the June 29, 2020 application and had never seen it before. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 37:04-13].

249.    Ms. Vallejo could not remember if Mr. Laforest came to Victory Mitsubishi on June 29, 2020. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 125:19-24].

250.    Defendant David Perez had never seen a form like the June 29, 2020 application. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 213:05-07; **Exhibit E** (Deal Jacket), DEFENDANTS 22].

251.    Stavros Orsaris claimed that the June 29, 2020 application and the May 30, 2020 application were "the same credit application," and while he could not explain the differences between them he testified that they were not "any meaningful difference to Capital One." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 208:22-210:15].

252.    Stavros Orsaris claimed that the June 29, 2020 agreement was signed because "in the early part of the pandemic there were a lot of underwriting and program guideline changes, which Capital One had a structural change of some sort, and they required us to invite the customers back into the building to re-sign." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans.

159:25-160:06; 162:15-18]. This claim is not credible. Yessica Vallejo, the actual signatory of the June 29, 2020 contract, could not confirm it. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 115:24-116:15, 118:18-119:03]. No documents were produced evidencing this requirement from Defendants despite them being requested. No documents were produced evidencing this requirement from Capital One, despite this third party producing 194 pages of documents. *See Keshavarz Decl.* [**Exhibit AA** (Capital One Document Production)].

253.     In fact, Capital One produced no documents showing communications between Victory Mitsubishi and Capital One on or around May 30, 2020, only on June 29, 2020 and thereafter, and Capital One's notes about the account only show activity on June 29, 2020. *See Keshavarz Decl.* [**Exhibit AA** (Capital One Document Production), SUBPOENA RESPONSES 147, 189, 191, 193, 240, 242, 256, 274, 276, 278, 327-328].

254.     Similarly the Dealertrack history for Farah Jean Francois shows that everything was still showing as "Pending" at 10:11 p.m. on May 30, 2020, and it was only on June 29, 2020 at 6:46 p.m. that Yessica Vallejo booked the contract and the Vehicle was marked as sold. *See Keshavarz Decl.* [**Exhibit K** (Francois Dealertrack), SUBPOENA RESPONSES 569, 572].

255.     And perhaps most importantly, there were more credit applications and denials on June 29, 2020 – if the signing on June 29, 2020 was merely a resigning of a deal entered into on May 30, 2020, there would be no reason to continue working the deal. *See Keshavarz Decl.* [**Exhibit BB** (Financing Arrangements) SUBPOENA RESPONSES 530-552; **Exhibit B** Vallejo Trans. 184:02-12].

256.     The more plausible explanation as demonstrated by the documents is that the financing

deal offered by Capital One for the Vehicle required contracts and stipulations by June 29, 2020, "or app will expire," and thus that was the date those documents were submitted despite the Vehicle being sold to Emmanuel Laforest on May 30, 2020. *See Keshavarz Decl.* [**Exhibit AA** Capital One Production, SUBPOENA RESPONSES 523].

257.   Ms. Vallejo could neither confirm nor deny that this was the reason for the signing of the documents on June 29, 2020. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 183:02-08].

258.   The Cap Sheet for the transaction lists the "Origination Date" as "6/29/20." *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 12].

259.   Based on the difference in formatting between the May 30, 2020 application and the June 29, 2020 application, and the information being typed in rather than handwritten, it appears the June 29, 2020 application was created through the Dealertrack program. *See Keshavarz Decl.* [**Exhibit X** (Dealertrack User Guide), SUBPOENA RESPONSES 576-584].

260.   Ms. Francois' income information on the June 29, 2020 application was changed from the amount guessed at by Mr. Laforest, $41,000, to $65,000. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 19].

261.   The $65,000 figure was not provided to Victory Mitsubishi by Mr. Laforest *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 39:07-11].

262.   The final deal accepted for the financing of the Vehicle by Capital One had no requirements for proof of income ("POI"). *See Keshavarz Decl.* [**Exhibit BB** (Financing Arrangements), SUBPOENA RESPONSES 552; **Exhibit B** Vallejo Trans. 187:09-13].

263.   The prior approval, which was not accepted, required proof of income. *See Keshavarz*

*Decl.* [**Exhibit BB** (Financing Arrangements), SUBPOENA RESPONSES 550].

264.    Ms. Vallejo admitted that not having proof of income could be the basis for accepting a deal if proof of income was not available. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 188:12-23].

265.    Mr. Laforest did not make a downpayment of $9,000 as stated in the June 29, 2020 application. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 41:03-08].

266.    Given that Mr. Laforest and Ms. Francois were not at Victory on June 29, 2020 and given Ms. Vallejo's admission to making both of the handwritten dates of "6/29/20" next to the signatures, it appears that Defendant Yessica Vallejo forged the signatures on the contract. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 213:06-10, 221:08-16].

267.    The Service Contract has an email which does not exist. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 13].

268.    Ms. Vallejo earned a commission of $317.26 from the sale. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 12; **Exhibit B** Vallejo Trans. 195:19-22].

### *Discovery of the Fraud and Resulting Economic Damages*

269.    Ms. Francois first learned of the unauthorized sale and financing of the Vehicle in her name in September of 2020 when she received the title for the Vehicle in the mail. *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 51:13-15, 64:12-15, 83:03-05].

270.    Ms. Francois only learning of the sale and financing of the Vehicle in September is corroborated by the testimony of Papito Momplaisir:

16 So she was telling me -- well,

17 I was telling her, hey, you cannot be doing
18 this, getting those tickets. And I was
19 like -- then she showed me. I met her, she
20 showed me the papers. And when I looked at
21 the papers, and I was like, BMW? Do you
22 have a BMW? And she was like, BMW? No. I
23 don't know anything about a BMW. Then from
24 there I told her let me check.

*See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 55:03-24].

271.    Farah Jean Francois and Papito Momplaisir went to Victory Mitsubishi two times in September of 2020. *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 67:15-20, 73:12-17; **Exhibit S** Momplaisir Trans. 60:12-61:05].

272.    The first time they went to Victory Mitsubishi, they were there about 2-3 hours. *See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 62:04-07].

273.    Ms. Francois and Mr. Momplaisir were told that "the department that supposed to give you those answers are closed right now. If you don't mind, you could come back in a couple of days." *See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 67:22-25].

274.    After having sold and financed a vehicle in her name, this treatment upset Ms. Francois, as observed by Mr. Momplaisir:

4 A. Farah said, after all that time
5 we waited and you -- now you're going to
6 tell us the office is closed. We've been
7 here for like more than three hours, you
8 know? And the guy said, well, I'm sorry,
9 but the department is closed. You guys
10 have to come back another day.

*See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 68:04-10].

275.    When Ms. Francois and Mr. Momplaisir went back to Victory Mitsubishi on September

24, they were again made to wait for a long time, which caused further distress to Ms. Francois:

10 A. So we went to sit down. After
11 a while, was taking a long time. Then --
12 then Farah starting to get a little bit --
13 you know, aggravated. You know? Because
14 of the situation. And then she start
15 talking a little bit loud. Then they tell
16 her, oh, oh, we coming. We coming now.
17 Just one minute and you going to talk to
18 someone. Then –

*See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 74:10-18].

276.    Eventually they were taken to an office and introduced to someone who told them that he

was "the son of the owner." *See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 75:04-19;

**Exhibit O** Francois Trans. 75:09-76:02, 77:22-78:03; **Exhibit P** Francois Aff.¶ 3].

277.    The "owner" being referred to must have been Chris Orsaris, as Stavros Orsaris and his

brother Chris Orsaris Jr. are the only sons of another person who works at Victory Mitsubishi,

Chris Orsaris, and the owner on paper, Diane Argyropoulos, only has daughters and has no sons.

*See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 88:02-16, 216:12-16; **Exhibit B** Vallejo Trans.

232:22-233:09; **Exhibit C** Diane Trans. 22:10-14; 134:25-135:13; 136:04-16].

278.    Notably, a complaint on Cars.com also refers to Chris Orsaris as "Owner Of Victory."

*See Keshavarz Decl.* [**Exhibit N** (Cars.com Complaints), FRANCOIS 4034-4035].

279.    It is unclear why Mr. Orsaris told Ms. Francois and Mr. Momplaisir that he was the son

of the owner, whether it was because Chris Orsaris has a greater role at Victory Mitsubishi than

testified to by the Defendants (and as suggested by Victory Mitsubishi's contract with Capital

One) or if it was because Stavros Orsaris was trying falsely represent Chris Orsaris as the owner to Ms. Francois and Mr. Momplaisir to hide the identity of Diane Argyropoulos. *See Keshavarz Decl.* [**Exhibit U** (Capital One Agreement), DEFENDANTS 73].

280.    Eventually Stavros Orsaris told Ms. Francois and Mr. Momplaisir "that's a little bit too much for me, I have to get my dad on this" and brought Chris Orsaris to the office. *See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 78:17-22; **Exhibit O** Francois Trans. 77:22-78:03].

281.    Mr. Momplaisir affirmatively identified pictures of Chris Orsaris and Stavros Orsaris as the men he spoke to that day. Mr. Momplaisir, although he does not recall which said he was the father and which said he was the son. *See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 116:02-117:03].

282.    Ms. Francois also affirmatively identified pictures of Chris Orsaris and Stavros Orsaris. *See Keshavarz Decl.* [**Exhibit P** Francois Aff.¶¶ 2-3].

283.    Chris Orsaris showed Ms. Francois and Mr. Momplaisir the deal jacket, but took it away after Ms. Francois took pictures of some of the documents in it. *See Keshavarz Decl.* [ **Exhibit S** Momplaisir Trans. 81:14-19, 83:22-84:05; **Exhibit O** Francois Trans. 78:14-79:02].

284.    Chris Orsaris offered to pay for the car in exchange for the title. *See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 84:08-25, 85:05-10].

285.    Ms. Francois asked Chris and Stavros Orsaris "how did you sell someone a car under my name while I wasn't there," and Chris Orsaris responded that "a man will [sic] come here with your ID, we thought that you ***gave him*** the ID to come and buy the car." *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 79:13-25, 80:11-14, 153:04-10, 156:20-157:21; **Exhibit S**

Momplaisir Trans. 86:13-23, 87:03-09].

286.    Ms. Francois also testified that Chris and Stavros Orsaris made this admission: "Like I said to them, you guys have to show the police the video when I went there, because I never been there. They said, okay, it's fine, we know you never been there." *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 153:04-10].

287.    Ms. Francois was then given an unsigned copy of the contract by Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit CC** (Unsigned Sales Contract)].

288.    Yessica Vallejo had no explanation for this, as customers would always be given signed copies, both at the sale and if they came back and asked for copies. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 223:05-22].

289.    On or around September 25, 2020, Mr. Laforest spoke with Victory Mitsubishi over the phone, and Mr. Orsaris told Mr. Laforest that "he wants to make this headache go away, and can [Mr. Laforest] just bring the car back so they can reverse it." *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 49:11-14].

290.    Victory Mitsubishi then offered to "put [Mr. Laforest] in a different car" "instead of reversing all the money." *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 50:22-25; 55:06-14].

291.    This claim by Mr. Laforest is corroborated by his text message on September 25, 2020 of Jami Singer's driver's license and Social Security number to Defendant Stavros Orsaris for the purpose of applying for another car. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 51:03-22; Trans. 52:21-23; 53:02-07; **Exhibit DD** (Texts Between Emmanuel Laforest and Stavros Orsaris)].

292.    This was done without either Mr. Laforest or any of the Defendants notifying Jami Singer. *See Keshavarz Decl.* [**Exhibit Z** Singer Trans. 12:08-11, 13:14-22].

293.    Stavros Orsaris confirmed that the reason Emmanuel Laforest texted him the driver's license and Social Security number was "to move the loan over to her name." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 193:13-15].

294.    Mr. Laforest testified that he texted Mr. Orsaris the driver's license and Social Security number "[b]ecause he asked for it." *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 134:02-04].

295.    Victory Mitsubishi told Mr. Laforest that Ms. Singer's credit wouldn't be able to get him financing for a Vehicle. *See Keshavarz Dec.* [**Exhibit T** Laforest Trans. 51:21-22].

296.    On September 26, 2020, Mr. Laforest drove the Vehicle to a street near Victory Mitsubishi per the dealership's request and told Mr. Orsaris to pick it up. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 08:24-09:02; 126:04-16; 128:02-03].

297.    Despite Mr. Laforest returning the Vehicle due to identity theft and texting him the driver's license and Social Security number of another consumer, Mr. Orsaris did not even think about calling the police. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 167:24-168:08].

298.    On January 11, 2021, Mr. Laforest was arrested. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 70:08-12; 106:15-17].

299.    The arresting officer asked Mr. Laforest "[D]id you get a car under somebody else's name." *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 70:13-21].

300.    Mr. Laforest went to court in November of 2021 and the case was dismissed and sealed for unknown reasons. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 71:05-11; 141:19-21].

301.    Plaintiff wrote three separate dispute letters that she mailed certified mail return receipt requested in regards to various tickets incurred by the Vehicle. *See Keshavarz Decl.* [**Exhibit Q** (Dispute Letters)].

302.    The first dispute letter was to Credit Collection Services and Progressive Max Insurance Company – Credit Collection Services had alleged that Ms. Francois owed Progressive Max Insurance Company debts of $3,908.66 and $2,476.40 in regards to the Vehicle. *See Keshavarz Decl.* [**Exhibit Q** (Dispute Letters), FRANCOIS 185-196].

303.    The second dispute letter was to Transworld Systems Inc. and MTA Bridges and Tunnels – Transworld Systems Inc. had alleged that Ms. Francois owed MTA Bridges and Tunnels for 9 separate violations incurred with the Vehicle. *See Keshavarz Decl.* [**Exhibit Q** (Dispute Letters), FRANCOIS 197-218].

304.    The third dispute letter was the New York State Department of Motor Vehicles, requesting an Illegal Registration indactor on the Vehicle and its license plate and removal of Ms. Francois' name from the DMV records listing her as the registrant. *See Keshavarz Decl.* [**Exhibit Q** (Dispute Letters), FRANCOIS 219-241].

305.    As of March 14, 2023, there is $340.25 of outstanding toll violations. *See Keshavarz Decl.* [**Exhibit EE** (Outstanding Tolls)].

306.    Ms. Francois learned that her driver's license had been suspended on January 11, 2022 due to the fees and fines incurred by Emmanuel Laforest when she was pulled over by the police while driving on the highway to get to work. *See Keshavarz Decl.* [**Exhibit P** Francois Aff. ¶ 12; **Exhibit R** (DMV License Abstract)].

307.    Ms. Francois was afraid that she would be arrested for driving on a suspended license. *See Keshavarz Decl.* [**Exhibit P** Francois Aff. ¶ 13].

308.    Ms. Francois worked in Queens and there's no train close to her job because it is a private nursing home, so she needs to drive to get to work. *See Keshavarz Decl.* [**Exhibit P** Francois Aff. ¶ 14].

309.    Ms. Francois had to take Uber to get to work. Sometimes it would cost as much as $86, especially because of the $10 toll. *See Keshavarz Decl.* [**Exhibit P** Francois Aff. ¶ 15].

310.    Ms. Francois had to take off from work, for which she was not paid, to fight the consequences of Victory Mitsubishi impermissibly pulling and using her credit report and getting a loan in her name with Capital One. *See Keshavarz Decl.* [**Exhibit P** Francois Aff. ¶ 16].

311.    She had to take off time from work to (1) go the DMV multiple times to try to fight the suspension of her driver's license and the multiple fines; (2) return to the DMV again when they said she needed more paperwork from the police; and (3) go to the police repeatedly to learn what to get from the dealership about the fraudulent loan, bring a photo from the dealership to the police to press charges against Emmanuel Laforest, get additional papers for the DMV, get papers for her dispute to Capital One for the fraudulent loan, and get papers for her written disputes to the MTA. *See Keshavarz Decl.* [**Exhibit P** Francois Aff. ¶ 16].

312.    On or around June 29, 2021, Ms. Francois sent Victory Mitsubishi a letter requesting written confirmation that she would not be liable for the debt. *See Keshavarz Decl.* [**Exhibit FF** (Letter to Victory and Capital One)].

313.    She never received a response from Victory Mitsubishi to this letter. *See Keshavarz Decl.*

[**Exhibit P** Francois Aff. ¶ 28].

314.    Capital One did respond to the letter on or around July 26, 2021. *See Keshavarz Decl.* [**Exhibit AA** (Capital One Production), SUBPOENA RESPONSES 329].

315.    At an unknown date, Capital One apparently initiated an investigation into the identity theft that happened to Farah Jean Francois. *See Keshavarz Decl.* [**Exhibit AA** (Capital One Production), SUBPOENA RESPONSES 326].

316.    Defendants' impermissible obtaining of Plaintiff's credit report was published by TransUnion as a "Regular Inquiry" to "SYNCBAMAZON" on November 26, 2020, to "STATEWIDE COMMERCIAL VIA PREMIUM CREDIT BUREAU" on January 13, 2021, and to Capital One on July 5, 2021. *See Keshavarz Decl.* [**Exhibit GG** (TransUnion Credit Report), FRANCOIS 174].

317.    Defendants' impermissible use of Plaintiff's credit report to apply for financing was published via the credit pulls by "CAPITAL ONE AUTO FINANCE" and "JPMCB AUTO FINANCE" triggered by those applications on May 30 and June 29, 2020, which similarly were published by TransUnion as "Regular Inquiries" to "SYNCBAMAZON" on November 26, 2020, to "STATEWIDE COMMERCIAL VIA PREMIUM CREDIT BUREAU" on January 13, 2021, and to Capital One on July 5, 2021. *See Keshavarz Decl.* [**Exhibit GG** (TransUnion Credit Report), FRANCOIS 174].

318.    Similar publication of the credit pulls triggered by Defendants were published via Equifax. *See Keshavarz Decl.* [**Exhibit HH** (Equifax Credit Report), FRANCOIS 82].

319.    A "flat cancel" – that is the return of the vehicle to the dealership and the dealership

refunds the money it was paid by the finance company for the loan -- never happened on the financing for the Vehicle despite the Vehicle now being in Victory Mitsubishi's possession. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 171:21-172:02; **Exhibit C** Diane Trans. 90:18-21].

320.    When the bank receives assignment of the loan, it pays the dealership the "amount financed," here $29,462.81.  The dealership never "unwound" the deal with the bank and thus still has the $29,462.81 paid by the bank.   . *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 170:7-173:15]

321.    Victory Mitsubishi retained the amount of the loan of $29,462.81 The Retail Installment Contract assigned the loan to Capital One "without recourse." Stavros Orsaris confirmed that there had not been a "flat cancel," -- that is the return of the vehicle to the dealership and the dealership refunds the money it was paid by the finance company for the loan - despite the Vehicle now being in Victory Mitsubishi's possession. Capital One had not contacted the Defendants about it, and he did not know the status of the loan other than (he assumes) Ms. Francois no longer being responsible for it. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 9; **Exhibit D** Orsaris Trans. 170:07-173:14].

322.    Victory Mitsubishi also has retained the downpayment made by Emmanuel Laforest despite the return of the Vehicle, which Victory Mitsubishi remains in possession of. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 172:03-06, 173:20-174:18].

### *Ms. Francois' Emotional Distress Caused by Defendants*

323.    Ms. Francois' emotional distress was clearly caused by the impermissible credit pulls, as testified to by Papito Momplaisir:

10 A. By that time she was more
11 worried about the credit, the money that
12 she owes, all those things under her name.
13 She was worried about that than the car.

*See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 90:10-13].

324.    Ms. Francois could not stop crying every day for months because of the stress for the results of the fraud committed by Victory Mitsubishi, enabled and assisted by the fraud of Emmanuel Laforest. *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 81:10-15; **Exhibit P** Francois Aff. ¶ 5].

325.    Ms. Francois came to this country for a better life and she has tried to do everything right, with the goal of saving her money to buy a house. *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 81:10-15; **Exhibit P** Francois Aff. ¶ 6]

326.    Ms. Francois' emotional distress was so pervasive and severe she was worried that it would lead to her losing her job at TD Bank – stress caused by the dealership contacting her and Capital One contacting her for payment:

15 Q. How is it that you almost lost
16 your job?
17 A. Like I said early, because they
18 been calling me and then I was customer
19 service worker at the time and then my
20 phone I have to answer. Capital One was
21 calling me and then the dealer's son was
22 texting me, calling me about to send the
23 title and my boss saw me answer phone and
24 then I was with customer in front of me and
25 he said you're going to have to take one
2 week and we're going to have to request you
3 to stop coming for one week to figure out
4 to what happened to you and to deal with

5 that and then when you feel you're able to
6 coming back to work, you can coming back to
7 work.
8 Q. Nobody ever actually told you
9 you might lose your job over this, correct?
10 In fact, they actually accommodated you to
11 give you the opportunity to deal with it;
12 is that correct?
13 MR. KESHAVARZ: Objection to
14 form.
15 A. That's not what it is. Because
16 if they stop me they will replace me with
17 someone because I could not be able to do
18 my job.
19 Q. Did anybody tell you that, that
20 they might replace you with someone?
21 A. Yeah, because I was crying.
22 Because every time Capital One calling me
23 and if I'm coming back, I went to the
24 bathroom crying and then my assistant was
25 seeing me crying and then my boss was
2 asking her why Farah been crying, you know
3 Farah have a customer, if she not able to
4 do the job, she have to let us know.
5 Q. But you were able to do the
6 job, correct?
7 A. I was not 100 able to do the
8 job because I was more concerned about what
9 Capital One going to do. Because every
10 time they say, okay, they're going to call
11 me back, they will call me back, which that
12 was about that.

*See Keshavarz Decl.* [**Exhibit O** Francois Trans. 216:15-218:12, 239:17-240:07; **Exhibit P**

Francois Aff. ¶¶ 17-22]

327.    The emotional distress caused Ms. Francois to eat less, and she lost approximately 25

pounds. *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 226:16-227:12; **Exhibit P** Francois

Aff. ¶ 9].

328.   The emotional distress caused Ms. Francois sleeplessness. *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 230:18-231:07, 231:16-232:07].

329.   The lack of sleep caused her to get black bag under her eyes. *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 232:16-233:13; **Exhibit P** Francois Aff. ¶ 10].

330.   Mr. Laforest adamantly denies that he is solely to blame for the identity theft and resulting harm to Ms. Francois:

```
 7     Q.  If the defendants in this case say that the
 8  identity theft against Ms. Francois was all your fault
 9  and that they had no role in it, how would you respond
10  to that?
11      A.  That's a lie, because I told him everything
12  what it was.  It's not like I went there and I didn't
13  tell him what it was.  I told him what it was.  They --
14  they just wanted a sale so they got a sale.
15      Q.  Do you think the defendants did anything wrong
16  here?
17      A.  Who are the defendants, Victory Mitsubishi?
18      Q.  Yes.
19      A.  I mean, I can't go to any other car lot and do
20  that so --
21      Q.  And when you say, you "can't go to any other
22  car lot and do that," you mean --
23      A.  They would have asked me to bring the person
24  in.
```

*See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 73:07-24]


Dated: Brooklyn, New York
        March 16, 2023

        Respectfully submitted,
        /s/

By:

_____

Ahmad Keshavarz
The Law Office of Ahmad Keshavarz
ATTORNEY FOR PLAINTIFF
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax:    (877) 496-7809
Email: Ahmad@newyorkconsumerattorney.com