UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

FARAH JEAN FRANCOIS,

                                                   Case No.: 1:22-cv-4447-JSR

                          Plaintiff,

       -against-

VICTORY AUTO GROUP LLC d/b/a
VICTORY MITSUBISHI,
SPARTAN AUTO GROUP LLC d/b/a
VICTORY MITSUBISHI,
STAVROS ORSARIS,
YESSICA VALLEJO,
DAVID PEREZ,
DIANE ARGYROPOULOS, and
PHILIP ARGYROPOULOS,

                          Defendants.

----------------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    **INTRODUCTION** ............................................................................................ 1

II.   **STATEMENT OF FACTS** ............................................................................. 2

III.  **ARGUMENT** ................................................................................................... 4

   *A.   The Rule 56 Standard for Summary Judgment* ................................................ 4

   *B.   Plaintiff Has Established Damages Sufficient for Her Claim for Negligence against Defendants.* ................................................................................................................. 4

      i.    Plaintiff Has Produced Admissible Evidence to Support Her Claims for Economic Damages Flowing from Defendants' Alleged Negligence ................................... 4

   *C.   Defendants' Claims Regarding Mitigation Lack Foundation or Are Speculative.* ............. 5

   *D.   Plaintiff Has Established Actual Damages under the FCRA for Her Substantial Garden Variety Emotional Distress as Well as Her Economic Damages* ............................... 7

      i.    *Casella* is of limited applicability to this case. ........................................... 7

      ii.   Defendants' impermissible obtaining and use of Plaintiff's consumer reports emotional distress ........................................................................................ 9

   *E.   There Is a Question of Fact for the Jury that Defendants Willfully Pulled Plaintiff's Credit Reports Without Authorization.* ...................................................................... 13

      i.    The allegation that Ms. Francois in fact came to the dealership with Emmanuel Laforest lacks any credibility. ..................................................................... 15

      ii.   Even if there was an "impostor" of Ms. Francois, Defendants' reckless disregard for only pulling and using credit reports permissibly renders their conduct willful. ................. 16

      iii.  The most plausible explanation for the unauthorized sale and financing of the Vehicle is that Defendants willfully pulled and used Ms. Francois' credit reports, knowing that such access and use was impermissible. ...................................................................... 19

   *F.   Plaintiff Has Established Bases for Liability for Victory Auto Group, LLC and Diane Argyropoulos.* ......................................................................................................... 22

      i.    Victory Auto Group, LLC................................................................................ 22

      ii.   Philip Argyropoulos........................................................................................ 24

      iii.  Diane Argyropoulos ...................................................................................... 24

IV.  **CONCLUSION** .............................................................................................. 25

**<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Alexander v. Textron Fin. Corp.*, 2009 WL 169076, at *3 (S.D. Miss. Jan. 26, 2009) ...............16

*Ali v. Vikar Management Ltd.,* 984 F.Supp. 492, 498 (S.D.N.Y. 1998) ..................................13, 15

*American Protein Corp. v. AB Volvo,* 844 F.2d 56, 60 (2d Cir. 1988)................................... 22-23

*Anderson v. Frederick Ford Mercury, Inc.,* 694 F. Supp. 2d 324, 332 (D. Del. 2010)................16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) .......4

*Bakker v. McKinnon,* 152 F.3d 1007, 1013 (8th Cir. 1998) ...........................................................10

*Breese v. TRIADvantage Credit Servs., Inc.,* 393 F. Supp. 2d 819, 821 (D. Minn. 2005) ...........16

*Casella v. Equifax,* 56 F.3d 469 (2d Cir. 1995) ......................................................................... 7-9

*Edeh v. Equifax Info. Servs., LLC,* 974 F. Supp. 2d 1220, 1245 (D.Minn. 2013) ........................14

*Edge v. Prof'l Claims Bureau, Inc.*, 64 F.Supp.2d 115, 118 (E.D.N.Y. 1999).......................14, 17

*Graham v. CSC Credit Servs., Inc.,* 306 F. Supp. 2d 873, 879 (D. Minn. 2004) .........................14

*Heagerty v. Equifax Info. Servs. LLC,* 447 F. Supp. 3d 1328 (N.D. Ga. 2020)..............................9

*Kennedy v. Victoria's Secret Stores, Inc.,* 2004 WL 2186613, at *3 (E.D. La. Sept. 29, 2004) ...17

*Kirno Hill Corp. v. Holt,* 618 F.2d 982, 985 (2d Cir.1980)...........................................................22

*Mar. Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.*, 689 F. Supp. 1340, 1348 (S.D.N.Y. 1988) ..............................................................................................................................................22

*Mathews v. Verizon Commc'ns Inc.*, No. CV 19-21442, 2020 WL 5201407, at *9 (D.N.J. Sept. 1, 2020) ..............................................................................................................................................10

*Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 47 (2d Cir. 1997).......................................13

*Petras v. Navy Federal Credit Union,* 2022 WL 526138, at *6 (D. Nev. Feb. 22, 2022). 14-15, 17

*Popik v. American Intern. Mortg. Co.,* 936 F.Supp. 173, 176-177 (S.D.N.Y. 1996) ....................14

*Reilly v. Vivint Solar,* 2021 WL 261084, at *8 (D. N.J. Jan. 26, 2021)........................................15

*Ritchie v. Northern Leasing Systems Inc.,* 14 F. Supp. 3d 229, 244 (E.D.N.Y. 2014) ............ 15-17

*Safeco Ins. Co. of Am. V. Burr,* 551 U.S. 47, 57-58 (2007).....................................................14, 17

*Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd.*, 401 F. Supp. 3d 433, 440 (S.D.N.Y. 2018) ..............................................................................................................................................23

*Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) ...........................................................................4

*Stonehart v. Rosenthal,* 2001 WL 910771, at *4 (S.D.N.Y. Aug. 13, 2001)................................17

*Thomas v. RJM Acquisition LLC,* 2014 WL 23676, at *3 (E.D.N.Y. Feb. 24, 2014) ..................15

*Wenning v. On-Site Manager, Inc.,* 2016 WL 3538379, at *22 (S.D.N.Y. Jun. 22, 2016) ....... 9-10

*Williams v. USAA Savings Bank,* 2022 WL 16951665, at *8.........................................................*14*

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,* 933 F.2d 131, 139 (2d Cir. 1991)22

*Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967, 973–974 (4th Cir. 1987) ..............................................................................................................................................24

**Statutes**

15 U.S.C. § 1681 *et seq*................................................................................................... *passim*

## I.      INTRODUCTION

Defendants motion for summary judgment on a number of matters in this case, and notably, barely address the facts of their violations under the Fair Credit Reporting Act (FCRA). When the full factual record is laid out, a new story emerges. The evidence tells the story of an auto dealership, Victory Mitsubishi, that willfully made unauthorized pulls of the consumer reports of Farah Jean Francois.[1] The purpose for these pulls was simple – greed. Victory Mitsubishi is a dealership that values moving its inventory and making money more than preventing identity theft. It has hired a person with a history of fraud in the auto industry, a fact that its General Manager attempted to hide. It uses deception and unabashedly encourages identity theft. During the COVID-19 pandemic it either performed illegal online sales of vehicles or misrepresented to consumers that it would perform such illegal sales. It forges authorizations and even whole credit applications. It is a clever scheme – if and when the unauthorized transaction is discovered and disputed, it can plead victim, undo the transaction, and pin the blame on the individual it actually sold the vehicle to, all while retaining the benefit of the unauthorized transaction. That's what happened here – Emmanuel Laforest got arrested, whereas Defendants got the Vehicle back, kept the $8,600 given to them by Mr. Laforest, and Yessica Vallejo made a commission for the sale of the Vehicle.

Defendants' deception carried into their defense of the instant case, with the different Defendants contradicting both themselves, each other, and the documentary evidence during their depositions. They did not produce the documents which actually show who pulled the consumer reports, despite at least some Defendants claiming to have access to them. Perhaps they did so in the hope of muddying the waters enough to obscure how willful their misconduct

---

[1] The FCRA uses the term "consumer report" for the colloquial term "credit report." The terms will be used interchangeably here as, for example, the deposition transcripts used the term "credit report."

1

towards Ms. Francois was and how it caused her emotional distress – however, Defendants have only succeeded in creating disputes of fact as to the issues, and a jury is needed to parse the credibility of the various parties as well as the documentary evidence.

## II.   STATEMENT OF FACTS

The following facts correspond to Plaintiffs' Local Rule 56.1 Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment ("Pl. 56.1"), based on exhibits attached to the corresponding March 15, 2023 Declaration of Ahmad Keshavarz ("Keshavarz Decl"). Both documents are filed in opposition to Defendants' Motion for Summary Judgment [Dkt. Nos. 49-52].

On May 30, 2020, Emmanuel Laforest went into Victory Mitsubishi alone. Pl. 56.1 ¶ 188. Victory Mitsubishi had Mr. Laforest fill out a credit application. *Id.* ¶ 199. Defendant David Perez, at that time a sales manager at Victory Mitsubishi, pulled his credit report. *Id.* ¶ 205. Mr. Laforest essentially had no credit to obtain financing of the Vehicle. *Id.* ¶ 206. Mr. Laforest tried to have his friend Jami Singer be a co-applicant, and Victory Mitsubishi pulled her credit. *Id.* ¶ 220. But her credit was apparently not good enough either, so Mr. Laforest offered Victory Mitsubishi the driver's license and Social Security number of his sister-in-law, the Plaintiff Farah Jean Francois. *Id.* ¶ 238. Despite Ms. Francois not being present and not otherwise authorizing it, Victory Mitsubishi pulled her credit reports on May 30, 2020 at the behest of Emmanuel Laforest. *Id.* ¶¶ 208-233. Her credit reports were obtained using the computer login for a former employee Yosmaily Ventura, hiding the actual individual at Victory Mitsubishi who pulled her credit report.  *Id.* ¶¶ 210-211. Mr. Laforest made a downpayment of $8,600 for the Vehicle sold in Ms. Francois' name. *Id.* ¶ 239.

The financing deal offered by Capital One for the Vehicle required contracts and

stipulations by June 29, 2020, or the application would expire, and thus Victory Mitsubishi forged Farah Jean Francois' signature and submitted additional credit applications and the contract for the sale and financing of the Vehicle on June 29, 2020. *Id.* ¶¶ 247-268.

Ms. Francois learned of the unauthorized sale and financing of the Vehicle in her name in September of 2020 when she received the title for the Vehicle in the mail. *Id.* ¶¶ 269-270. Ms. Francois and her uncle, Papito Momplaisir, went to Victory Mitsubishi two times in September of 2020 to determine what happened, and on the second date met with Chris Orsaris and Defendant Stavros Orsaris. *Id.* ¶¶ 271-277. Chris Orsaris was identified by Victory Mitsubishi to Ms. Francois and Mr. Momplaisir as the "owner." *Id.* ¶¶ 276-279. What Chris Orsaris' role is at Victory Mitsubishi is disputed among the Defendants and the documents. *Id.* ¶¶ 100-106. Chris Orsaris has a criminal record, pleading guilty to Conspiracy to Launder Money for forging commission checks when he worked as general manager at an auto dealership called Major World. *Id.* ¶¶ 112-119. Chris Orsaris told Ms. Francois and Mr. Momplaisir: "a man will [sic] come here with your ID, we thought that you ***gave him*** the ID to come and buy the car." *Id.* ¶ 285.

Mr. Laforest texted Stavros Orsaris the driver's license and Social Security number of Jami Singer on September 25, 2020, thinking he would return the Vehicle in Ms. Francois' name and have it put in Jami Singer's name instead. *Id.* ¶¶ 289-294. But instead, Mr. Laforest left the Vehicle for Stavros Orsaris to pick up nearby Victory Mitsubishi. *Id.* ¶ 296. Mr. Orsaris did not even think about calling the police. *Id.* ¶ 297.

Plaintiff wrote three separate dispute letters in regards to various tickets incurred in her name by the Vehicle. *Id.* ¶¶ 301-304. As of March 14, 2023, there is $340.25 of outstanding toll violations. *Id.* ¶ 305. Ms. Francois also had her driver's license suspended on January 11, 2022.

*Id.* ¶ 306. The impermissible use of her credit reports to obtain the Capital One loan in her name caused her substantial emotional distress. *Id.* ¶¶ 57, 80, 323-329

### III.    ARGUMENT

#### A.  The Rule 56 Standard for Summary Judgment

"Summary judgment is warranted when, after construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009); Fed.R.Civ.P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

#### B.  Plaintiff Has Established Damages Sufficient for Her Claim for Negligence against Defendants.

##### i.  Plaintiff Has Produced Admissible Evidence to Support Her Claims for Economic Damages Flowing from Defendants' Alleged Negligence

###### 1.  The Capital One Loan

Plaintiff does not assert that she suffered an economic damage from the Capital One loan made in her name in that the bank has ultimately released her from the loan.

###### 2.  Tickets, Lost Wages, License Suspension and more

As Defendants have stated, Plaintiff did not pay any of the tickets, tolls, or violations incurred with the Vehicle. However, Plaintiff has economic damages flowing from these tickets, tolls, and violations with the Vehicle: (1) lost wages and lost time (Pl. 56.1 ¶¶ 310-311); (2) suspension of her driver's license for 11 months resulting in expenses for Uber and the subway to have to go to and from work (*Id.* ¶¶ 306-309; (3) the outstanding obligations (*Id.* ¶ 305); (4)

postage for mailing disputes and supporting documents to fight these charges to the DMV, MTA, and debt collector (*Id.* ¶¶ 64-66, 301-304).

Plaintiff has produced 3 dispute letters with supporting documents that she mailed and for she which she paid postage. Pl. 56.1 ¶¶ 301-304. The first dispute letter was to Credit Collection Services and Progressive Max Insurance Company – Credit Collection Services had alleged that Ms. Francois owed Progressive Max Insurance Company debts of $3,908.66 and $2,476.40 in regards to the Vehicle. *Id.* ¶ 302. The second dispute letter was to Transworld Systems Inc. and MTA Bridges and Tunnels – Transworld Systems Inc. had alleged that Ms. Francois owed MTA Bridges and Tunnels for 9 separate violations incurred with the Vehicle. *Id.* ¶ 303. The third dispute letter was the New York State Department of Motor Vehicles, requesting an Illegal Registration indactor on the Vehicle and its license plate and removal of Ms. Francois' name from the DMV records listing her as the registrant. *Id.* ¶ 304. Ms. Francois has said under oath that she did pay for postage. How much it costs to mail a letter with twenty four pages of attached documents is something that can be objectively established by, for example, looking at the mailing rates from the post office. More immediately, as of yesterday, the MTA still has $340.25 in outstanding charges and penalties, with a threat of DMV Suspension (*Id.* ¶ 305).

### 3. Storage and Moving Expenses, and Postage to Credit Reporting Agencies.

Plaintiff withdraws her claims for economic damages related to her storage and moving expenses, and as to the postage for the dispute letters to Experian and Transunion.

### C. Defendants' Claims Regarding Mitigation Lack Foundation or Are Speculative.

Defendants' claims regarding mitigation lack foundation or are speculative. Victory wants the title for its own benefit, not for the benefit of Ms. Francois. Defendants present no evidence, other than their self-serving testimony, that the title received by Plaintiff was necessary

to unwind the sale. But even if it were necessary, the unwinding of the sale or "flat cancel" as Defendants call it (¶ 319) was not what would help Ms. Francois, it would just help the Defendants to be able to resell the Vehicle, whereas what she needed was her name off of the loan and removed from New York Department of Motor Vehicles registration. Defendants do not argue, and upon information and belief cannot argue, that they needed Plaintiff's assistance to call the police (Pl. 56.1 ¶ 297), to tell Capital One that the loan was fraudulent and needed to be repurchased (*Id.* ¶ 313), or to write to the New York Department of Vehicles. But they did not, and thus Ms. Francois had to do so herself. Pl. 56.1 ¶¶ 301-304, 312, 314.

Defendants' claim about their "long-standing relationship with Capital One" is notably because Defendant Diane Argyropoulos testified that this relationship was through felon Chris Orsaris, falsely represented as Victory Mitsubishi's manager in the dealership's agreement with Capital One. Pl. 56.1 ¶ 105-106. The conjecture that this relationship would have provided "a much more expedient route" is empty speculation, particularly when the basis for that relationship is a man who pled guilty to laundering money through an auto dealership. *Id.* ¶ 114.

What is not speculation is that Defendants' hands were not tied if they were genuinely interested in helping Ms. Francois. On or around June 29, 2021, Ms. Francois sent Victory Mitsubishi a letter requesting written confirmation that she would not be liable for the debt. *Id.* ¶ 312. She never received a response from Victory Mitsubishi to this letter. *Id.* ¶ 313. Capital One, which in fact did wish to help, quickly responded to the letter on or around July 26, 2021. *Id.* ¶ 314. Capital One also initiated an investigation into the identity theft. *Id.* ¶ 315. Defendants did nothing of the kind. Defendants did not call the police, even after Emmanuel Laforest text Stavros Orsaris the driver's license and Social Security number of another consumer, Jami Singer, that he wanted Defendants to pull the consumer report of. *Id.* ¶ 297.

### D. Plaintiff Has Established Actual Damages under the FCRA for Her Substantial Garden Variety Emotional Distress as Well as Her Economic Damages

Defendants violated the FCRA prohibition in 15 U.S.C. § 1692b(f): "A person shall not use or obtain a consumer report for any purpose" other than ones enumerated. Defendants violated this FCRA provisions because they "obtain[ed]" and "use[d]" Ms. Francois' consumer report to obtain a fraudulent loan with Capital One, causing substantial garden variety emotional distress as well as the economic damages outlined in the prior section on negligence damages.

The pulling of the consumer reports is the predicate first step for obtaining financing in Defendants' sales and financing of vehicles (Pl. 56.1 ¶ 155), followed by the use of the consumer reports to determine who to send credit applications to (*Id.* ¶162). As such, the impermissible pull of Ms. Francois' consumer reports led to the unauthorized financing and sale of the Vehicle, and the impermissible use of her consumer reports led to submitting credit applications to Capital One which resulted in a loan in her name without her authorization. It was this direct consequence of Defendants' FCRA violations that caused Ms. Francois' emotional distress – the conduct of Emmanuel Laforest only facilitated the FCRA violations and later added additional stress to the stress caused by Defendants. These emotional distress damages are recoverable under the FCRA, as are the economic damages outlined under the negligence section,

### i. *Casella* is of limited applicability to this case.

While *Casella v. Equifax,* 56 F.3d 469 (2d Cir. 1995) is one of the most important FCRA cases in the Second Circuit, it has limited applicability to the present case, which becomes apparent on a close reading. In *Casella,* the plaintiff in short accused the credit reporting agencies Equifax and TransUnion of preparing a "credit report containing false and defamatory information, and that they had refused either to delete the information or to include a statement of dispute in his credit file after he notified them of the inaccuracy." *Id.* at 470. The plaintiff

sought actual damages for his emotional distress in reaction the false and defamatory information being included in his consumer report, even though he provided no proof that this false and defamatory information was published to anyone else. *Id.* at 474-475. The Second Circuit essentially held that plaintiff could not recover his emotional distress because of "a lack of causation" – it could not reasonably be inferred that plaintiff was distressed over consumer reports that no one saw. *Id.*

The present case is distinguishable because (1) the Defendants are users of consumer reports rather than consumer reporting agencies and (2) the Defendants violated the FCRA by impermissibly obtaining and impermissibly using Plaintiff's consumer report rather than publishing inaccurate information. *Casella* regarded causation of emotional distress by credit reporting agencies publishing inaccurate information in consumer reports – this case regards causation of emotional distress by a consumer report user impermissibly pulling and using the consumer reports to obtain financing in her name without her authorization. Since this case involves completely different actors and completely different violations of the FCRA, *Casella* is only applicable as to the basic principle of torts that a plaintiff cannot recover for a damage unless it was caused by the tortious conduct.[2] Likewise, the FCRA cases cited by Defendants (Mtn. pp. 11, 12) are not cases for impermissibly "obtain[ing]" and "use[using]" consumer reports in violation of 15 U.S.C. § 1692b(f).  Instead the cases are for violations of different provisions of the FCRA, *inter alia*, mandatory disclosures, association with a terrorist watch list, erroneous reporting of criminal history, or other credit reporting errors.

Plaintiff previously claimed credit damages for prospective creditors viewing her credit report and credit scores after Victory's hard credit pulls and denying her extensions of credit, but

---

[2] In any event, Defendants' impermissible obtaining and use of Plaintiff's credit reports was published to others, so even if *Casella*'s publication requirement was applicable it would be satisfied here. Pl. 56.1 ¶¶ 316-318.

has withdrawn those claims ss noted by Defendants (Mtn. 6).

        ii.   <u>Defendants' impermissible obtaining and use of Plaintiff's consumer</u>
            <u>reports  emotional distress.</u>

While *Casella* is largely not applicable to this case, Plaintiff of course still must establish that Defendants' conduct caused her emotional distress in order for her to recover damages. Under the FCRA liability for both negligent and willful violations is equal to, in pertinent part, "any actual damages sustained by the consumer as a result of the failure." 15 U.S.C. §§ 1681n and 1681o. As such, the question is whether there is any material dispute of fact as to whether Ms. Francois was caused emotional distress by Defendants impermissibly pulling and using her credit reports to obtain financing without her authorization.

The case law within the Second Circuit does not provide much guidance on how courts have evaluated whether impermissible pulls and uses of credit reports have caused damages. Second Circuit cases on causation under the FCRA concerns cases like *Casella* of whether an inaccurate credit report caused emotional distress. *See Wenning v. On-Site Manager, Inc.,* 2016 WL 3538379, at *22 (S.D.N.Y. Jun. 22, 2016) (collecting cases). There are some principles of causation that would also apply to when impermissibly obtaining and using a credit report causes emotional distress. While a credit denial is not required to obtain emotional distress under the FCRA, a claim for emotional damages would be "buttressed by any connection to an objective adverse event akin to a denial of credit." *Wenning v. On-Site Manager, Inc.,* 2016 WL 3538379, at *22 (S.D.N.Y. Jun. 22, 2016).

Outside of the Second Circuit, cases on impermissible pulls demonstrate how the causation issues in *Casella* are not applicable to these kind of FCRA claims. In one impermissible disclosure case, *Heagerty v. Equifax Info. Servs. LLC*, 447 F. Supp. 3d 1328 (N.D. Ga. 2020), the court held that the invasion of the plaintiff's privacy by the credit pull caused the

emotional distress, and plaintiff's testimony of this was sufficient to create an issue of material fact. *Id.* at 1341-1343. The 8th Circuit similarly has held that even where the plaintiffs "were not able to produce any actual out-of-pocket expenses or costs incurred as a result of appellant's willful conduct," that plaintiffs' testimony "about how they felt when appellant obtained their credit reports and violated their privacy" was sufficient to uphold an award of actual damages for emotional distress. *Bakker v. McKinnon,* 152 F.3d 1007, 1013 (8th Cir. 1998). In other words, the plaintiffs in *Bakker* did not need to establish that their emotional distress was caused by any kind of monetary cost or credit damage resulting from the FCRA violations, just that the emotional distress caused by the FCRA violations, in that case the violation of their privacy. *Id.* And similar to the "an objective adverse event akin to a denial of credit" cited in *Wenning,* 2016 WL 3538379, at *22, the District Court of New Jersey held that "repeated efforts" "to remedy the situation with Defendant's inquiries into his credit" could reasonably be found to have caused the plaintiff emotional distress. *Mathews v. Verizon Commc'ns Inc.*, No. CV 19-21442, 2020 WL 5201407, at *9 (D.N.J. Sept. 1, 2020). Similar to this case, impermissible credit pulls of the plaintiff in *Mathews* led to him being told that a Verizon account had been opened in his name, and his repeated efforts to stop Verizon from pulling and using his credit reports to open an account in his name were sufficient to establish causation of emotional distress. *Id.* at *1.

      1.  The impermissible obtaining and using of her consumer reports resulted in a fraudulent debt of $30,000, causing substantial emotional distress.

The "objective adverse event akin to a denial of credit" (*Wenning v. On-Site Manager, Inc.,* 2016 WL 3538379, at *22) in this case is not the denial of credit, but rather the unauthorized financing in Ms. Francois' name through the impermissible use of her consumer reports. Defendants' standard procedure for financing vehicles is to begin by pulling a consumer's consumer reports (*Id.* ¶ 131, 155), and Ms. Francois was no exception.  As such, the

unauthorized financing and sale of the Vehicle in her name, and the emotional distress that resulted from it, was a result of the impermissible credit pulls. But even more directly applicable to the unauthorized financing was the impermissible use of the consumer reports. Consumer reports, and especially credit scores, are used by Defendants to determine which creditors to send applications based on those creditors' guidelines (*Id.* ¶ 131). Defendant David Perez testified that he would look at the consumer reports for "any negative accounts, negative or any previous autos that went bad or any late payments" and based on that information would "let the customer know what I'm going to require, what I'm not going to require," and then would "give it to the finance manager, and the finance manager runs it to the bank." Pl. 56.1 ¶ 131. Defendants' Subscriber Agreement with CBC states that the consumer reports obtained will only be used "in connection with a credit or consumer transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of the consumer, and will obtain the consumer's written authorization to request such information relating to that consumer." *Id.* ¶ 150. There's no dispute of fact that Ms. Francois' consumer reports were pulled for the first of these two authorized uses "a credit or consumer transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to."

And it is beyond dispute that the Capital One loan made without Ms. Francois' authorization through the impermissible use of her consumer reports caused her emotional distress. Ms. Francois repeatedly testified about her distress regarding Capital One's communications, as well as communications regarding tickets and violations, to her alleging that she owed a debt due to the Defendants' impermissible use of her credit reports: "I said no Capital One be calling me at the job. I have being stressing. I have to answer them because they think I

don't want to pay them" (Pl. 56.1 ¶¶ 57, 80); "[W]hat they did to me is not fair putting me in stress and make me almost lose my job by crying because I come to this country to get a better life to help my family, not to be doing what they are doing to people" (Pl. 56.1 ¶¶ 57, 80); "I had been received letter from Capital One and when I called company Capital One I received letter from ATM – MTA. And then also from parking ticket, a lot of tickets. It was driving my crazy" (Pl. 56.1 ¶¶ 57, 80); "[T]he basic people who did more, who damaged all that is the dealership, because the dealership is supposed to be – whoever the customer come to your store with somebody ID, you're not supposed to accept that person if that person in not in person who signed." (Pl. 56.1 ¶¶ 57, 80); "If the dealership was not doing that and Capital One would not have all the $30,000 money, I would continue with my life, the life I had before. I would never be stressed, never crying and never almost losing my job for that. That would never happen." (Pl. 56.1 ¶¶ 57, 80).

Moreover, the false pretenses by which Defendants pulled Plaintiff's credit reports made her suspicious that they had worked with Emmanuel Laforest, heightening her distress over the situation she was in and specifically over Defendants' attempts to call her: "Maybe the guy who did that was there if it was a friend doing that with him with people ID and information. If they did that, what could they not do?" *Id.* ¶ 54.

### 2. Laforest contribution to the emotional distress.

Defendants argue that Plaintiff cannot establish that their FCRA violations caused her emotional distress because, beyond a dispute of fact, that emotional distress was in fact caused soley by Laforest. First, Defendants plainly misrepresent the facts and especially Plaintiff's testimony, where she consistently described her emotional distress as being caused by both Defendants and Laforest in conjunction. *Id.* ¶ 54, 57, 80, 326.

Defendants' arguments are similar to those of the defendant in *Marchisio v. Carrington Mortgage Services, LLC,* 919 F.3d 1288 (11th Cir. 2019). The district court had held that "any emotional distress suffered as a result of Defendant's actions had begun before Defendant's FCRA violation in November 2013." *Id.* at 1304. The 11th Circuit disagreed, holding that the district court had neglected to "evaluate whether Defendant's subsequent FCRA violation 'exacerbated again' their emotional distress." *Id.* Because the plaintiff had testified that the FCRA violation "added stress" and "made things much worse," the court held that there was a genuine issue of material fact concerning emotional distress. *Id.*

However, it is even more clear in this case than in *Marchisio,* as the FCRA violations were the initial cause of Plaintiff's emotional distress rather than subsequent additional stress. Id. ¶ 39, 57, 80, 269, 311, 323-329.  To the contrary, the phone calls which may have been made by Laforest and his associates came after Ms. Francois' distress about Capital One calling her in regards to the unauthorized loan had already begun. Plaintiff clearly testified that Defendants' FCRA violations were the source of her distress and that the threatening phone calls from Laforest's associates were just added stress and made things much worse, particularly with the poignant rhetorical question directed to Defendants: "Did Emmanuel apply for Capital One or you?" Pl. 56.1 ¶¶ 57, 80. The answer of course is that Defendants, not Emmanuel Laforest, impermissibly pulled Ms. Francois' credit reports and then impermissibly used them to apply for financing from Capital One..

### E.  There Is a Question of Fact for the Jury that Defendants Willfully Pulled Plaintiff's Credit Reports Without Authorization.

"Section 1681n of the FCRA provides a cause of action against any consumer reporting agency or user who willfully fails to comply with any provision of the FCRA." *Ali v. Vikar Management Ltd.,* 984 F.Supp. 492, 498 (S.D.N.Y. 1998). "[C]ivil liability attaches under 15

U.S.C. § 1681n for violations of § 1681q." *Id. citing Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 47 (2d Cir. 1997). Even without a showing of actual damages, "a consumer can still recover punitive and statutory damages under section 1681n, if he can show the defendant willfully failed to comply with the FCRA." *E.g. Williams v. USAA Savings Bank,* 2022 WL 16951665, at *8 *quoting Graham v. CSC Credit Servs., Inc.,* 306 F. Supp. 2d 873, 879 (D. Minn. 2004). "Under the FCRA, willfulness encompasses both knowing and reckless violations of the statute." *Williams,* 2022 WL 16941665, at *8 *citing Safeco Ins. Co. of Am. V. Burr,* 551 U.S. 47, 57-58 (2007). The Supreme Court held that reckless disregard "is not only a violation under a reasonable reading of the statute's terms, but shows that the [defendant] ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco,* 551 U.S. at 69. Willfulness does not require a showing of "malice or evil motive." *Williams,* 2022 WL 16941665, at *4 *quoting Edeh v. Equifax Info. Servs., LLC,* 974 F. Supp. 2d 1220, 1245 (D.Minn. 2013).

"[T]o survive summary judgment on a willful non-compliance claim, a plaintiff must set forth affirmative evidence demonstrating 'conscious disregard' or 'deliberate and purposeful' actions necessary to make out a claim for willful noncompliance under the FCRA.'" *Williams,* 2022 WL 16941665, at *4 *quoting Edeh,* 974 F. Supp. 2d at 1245. For impermissible pull claims, if defendants cannot establish a permissible purpose for the pull for which there is no dispute of fact (*see e.g. Edge v. Professional Claims Bureau, Inc.,* 64 F.Supp.2d 115, 118 (E.D.N.Y. 1999)), then courts "routinely find that the question of willfulness turns on factual determinations best left for a jury." *Petras v. Navy Federal Credit Union,* 2022 WL 526138, at *6 (D. Nev. Feb. 22, 2022) (collecting cases); *see also Popik v. American Intern. Mortg. Co.,* 936 F.Supp. 173, 176-177 (S.D.N.Y. 1996) (collecting cases). In *Petras*, the plaintiff was the victim of identity

theft and disputed a Chase account fraudulently opened in his name on his credit report, and Chase rejected his dispute. *Id.* at *1. The court in *Petras* found that "A reasonable juror could infer from Defendant's failure to interview a single witness, for instance, that it acted in reckless disregard of its duty to conduct a reasonable investigation." *Id.* at *6. A subscriber agreement has been used to demonstrate an agreement by the defendant to only pull credit for permissible purposes under the FCRA. *Ali,* 994 F.Supp. at 500 ("Vikar further certified that it would request and use information from TRW solely in connection with transactions involving the consumers. Vikar clearly failed to abide by these certifications"). Forgery of a signature on a credit application that is the basis for the pull of a credit report has been enough to create a dispute of fact to survive summary judgment. *Reilly v. Vivint Solar,* 2021 WL 261084, at *8 (D. N.J. Jan. 26, 2021).

There are essentially three stories that arise from the conflicting evidence, documents as well as deposition testimony, about the pulling of Farah Jean Francois' credit reports. Defendants proffer two of these stories, and Plaintiff (as well as third party witnesses) proffer the third.

### i. The allegation that Ms. Francois in fact came to the dealership with Emmanuel Laforest lacks any credibility.

The first story is that Farah Jean Francois went with Emmanuel Laforest and willingly signed the credit application, consenting to Defendants pulling her credit report. This version of events would of course have Defendants pulling the credit reports for a permissible purpose, a complete defense to any claim under 15 U.S.C. § 1681b. *See e.g. Ritchie v. Northern Leasing Systems Inc.,* 14 F. Supp. 3d 229, 244 (E.D.N.Y. 2014) *quoting Thomas v. RJM Acquisition LLC,* 2014 WL 23676, at *3 (E.D.N.Y. Feb. 24, 2014) ("a showing of a permissible purpose is a complete defense").

This story has no credibility. When Plaintiff and her uncle Papito Momplaisir went to the

dealership in September 2020, Chris Orsaris and Stavros Orsaris admitted that Emmanuel Laforest came alone: "*a man* will [sic] come here with your ID, we thought that you *gave him* the ID to come and buy the car." Pl. 56.1 ¶ 285 (emphasis added). Ms. Francois testified that they made this same admission: "Like I said to them, you guys have to show the police the video when I went there, because I never been there. They said, okay, it's fine, we know you never been there." *Id.* ¶ 286.

Emmanuel Laforest, who has every incentive to lie and say that Farah Jean Francois was in fact with him that day buying the Vehicle (and thus that he had not violated the law), testified instead that he went to Victory Mitsubishi alone on May 30, 2020. *Id.* ¶ 188. Ms. Francois meanwhile testified that she was at a surprise birthday party in New Jersey on May 30, 2020, which is corroborated by photographic evidence. *Id.* ¶ 189.

> ii.  Even if there was an "impostor" of Ms. Francois, Defendants' reckless disregard for only pulling and using credit reports permissibly renders their conduct willful.

Defendants' second story is that Emmanuel Laforest had a woman with him who claimed to be Farah Jean Francois, an impostor, and thus while Farah Jean Francois had not authorized the pulling of a credit report that Defendants had done so with the intent of a permissible purpose under § 1681b. As noted in *Ritchie*, for this argument to provide a complete defense "depends on the resolution of a disputed factual issue in their favor." *Ritchie,* 14 F. Supp. 3d at 245. The court in *Ritchie* noted decisions ruling in favor of this argument involved "finding no dispute over the existence of a debt or credit transaction, which finding allowed the courts to conclude that the defendants had a permissible purpose to access a credit report in connection with attempts to collect on the debt." *Id.* at 245-246 *citing Anderson v. Frederick Ford Mercury, Inc.,* 694 F. Supp. 2d 324, 332 (D. Del. 2010); *Alexander v. Textron Fin. Corp.*, 2009 WL 169076, at *3

(S.D. Miss. Jan. 26, 2009); *Breese v. TRIADvantage Credit Servs., Inc.*, 393 F. Supp. 2d 819, 821 (D. Minn. 2005); *Kennedy v. Victoria's Secret Stores, Inc.*, 2004 WL 2186613, at *3 (E.D. La. Sept. 29, 2004); *Stonehart v. Rosenthal,* 2001 WL 910771, at *4 (S.D.N.Y. Aug. 13, 2001); *Edge v. Prof'l Claims Bureau, Inc.*, 64 F.Supp.2d 115, 118 (E.D.N.Y. 1999). Unlike those cases, the complaint in *Ritchie* "specifically alleges that Plaintiff did not complete a credit transaction with Defendants…and it also alleges that Defendants knowingly did not intend to collect on a valid debt." *Ritchie,* 14 F. Sup. 3d at 245. Here, there is a dispute, with evidence suggesting that Defendants willfully pulled the credit reports of Plaintiff without a permissible purpose, most notably the testimony of Emmanuel Laforest. Pl. 56.1 ¶ 188. Critically, the dealership did not disclose the salesperson who dealt with Emmanaul Laforest. Defendants testified it was their standard practice to have a sales associate greet consumers as they came in (*Id.* ¶ 155), and Mr. Laforest testified that he was greeted by a person who he described as "slender, tall, like about six-something – 6'2, caramel skin," who remains unidentified by Defendants. *Id.* ¶ 192. If there was an unknown woman pretending to be Ms. Francois (and other than Defendants' self-serving testimony, the evidence does not show that there was), the salesperson who first spoke with Emmanuel Laforest would be a person with direct knowledge of who, if anyone, was at the dealership with Mr. Laforest.

However, even if there were no dispute of fact that an impostor had claimed to be Farah Jean Francois, Plaintiff's claim for willfulness could prevail with this second story because of the evidence of Defendants' reckless disregard for ensuring that consumers are who they claim to be. *Safeco,* 551 U.S. at 69. Similar to *Petras,* 2022 WL 526138, at *6, a jury could reasonably infer that Defendants recklessly disregarded their duty to only pull and use credit reports for permissible purposes. Hiring at Victory Mitsubishi is conducted by Stavros Orsaris, who does

not run background checks on applicants and does not ask for references to former employers. Pl. 56.1 ¶¶ 120-122. Victory Mitsubishi does not verify employment or income information unless the finance company requires them to do so, and the false information provided for Ms. Francois' employment could have alerted them to the fraud. *Id.* ¶ 204. Defendants have no written policies about how and when to pull credit reports. *Id.* ¶ 147. However, Defendants are all aware that they have an obligation to only pull credit reports for consumers who have authorized it. *Id.* ¶¶ 148-153. David Perez testified that credit reports would be pulled by the sales manager without the consumer in front of him, and that identity verification would be done by a sales associate. *Id.* ¶ 160. While he subsequently testified that Stavros Orsaris would check the IDs on May 30, 2020, no record was made when the identity of a consumer was confirmed to corroborate this. *Id.* ¶ 179. If the use of Ms. Ventura's Dealertrack credentials was not willfully hiding who was pulling the credit report, it was in reckless disregard of security protocols, specifically the CBC Subscriber Agreement. *Id.* ¶ 214. Ms. Vallejo suggested that such breaches may go beyond the use of Ms. Ventura's log-in, because she testified that she leaves herself logged into Dealertrack on her computer "all day long" when asked if anyone else has access to her login information. *Id.* ¶ 215.

One of the most egregious examples of Defendants' reckless disregard for their obligation to not obtain and use credit reports for impermissible purposes is the employment of Chris Orsaris. *Id.* ¶¶ 100-119. Defendants appear to be aware how egregious this is, as they have given conflicting testimony, both conflicting with each other and with the documentary record, as to what Chris Orsaris' role, if any, is at Victory Mitsubishi, with his son Stavros Orsaris testifying that Chris Orsaris does not work at and has not worked at Victory Mitsubishi. *Id.* ¶¶ 100-107, 111. To the contrary, Chris Orsaris is listed as the general manager and the general

sales manager in Victory Mitsubishi's agreement with Capital One, which Diane Arygropoulos testified was because he "had the relationship with Capital One Bank for us to get the bank." *Id*. ¶¶ 105, 106. On or around March 26, 2010, Chris Orsaris was indicted by grand jury for 80 counts of forging checks, one county of conspiracy to commit mail fraud and wire fraud, 80 counts of engaging in unlawful monetary transactions, and two counts of false statement, all in regards to his work as general manager of an auto dealership known as Major World. *Id*. ¶¶ 112-116. On or around December 19, 2013, Chris Orsaris pled guilty to Conspiracy to Launder Money, and was sentenced to a term of incarceration of 85 months, as well as being order to make restitution of over $14 million. *Id*. Diane Argyropoulos knew about Chris Orsaris' criminal history prior to him being hired by Victory, and testified that she hired him despite this history because he "is very good at what he does." *Id*. ¶¶ 118, 119. Defendants not only hired Chris Orsaris, they gave him a log-in to Dealertrack, which gives Chris Orsaris access to information such as credit reports. *Id*. ¶ 144, 138.

        iii.   The most plausible explanation for the unauthorized sale and financing of the Vehicle is that Defendants willfully pulled and used Ms. Francois' credit reports, knowing that such access and use was impermissible.

Plaintiff has demonstrated by the evidence that the most plausible explanation of how the Vehicle was sold and financed in Ms. Francois' name without her authorization is that Defendants willfully pulled Plaintiff's credit report without her authorization to finance and sell a car in her name to Emmanuel Laforest, who came to the dealership alone. Again, when Plaintiff and her uncle Papito Momplaisir went to the dealership in September 2020, Chris Orsaris and Stavros Orsaris admitted that Emmanuel Laforest came alone: "***a man*** will [sic] come here with your ID, we thought that you ***gave him*** the ID to come and buy the car. "(emphasis added). *Id*. ¶ 285. Ms. Francois testified that they made this same admission: "Like I

said to them, you guys have to show the police the video when I went there, because I never been there. They said, okay, it's fine, we know you never been there." Id. ¶ 286.

Emmanuel Laforest testified that he went into Victory Mitsubishi alone. He testified that he had Defendants pull the credit reports of both Ms. Francois and of a third consumer, Jami Singer. Pl. 56.1 ¶ 220. These pulls are corroborated by documents from Dealertrack. Crucially, these documents were produced by Dealertrack, not Defendants, despite some Defendants testifying that they had access to them. *Id.* ¶¶ 136-138. Defendants misrepresented who pulled consumers' credit reports in general on May 30, 2020 (*Id.* ¶ 157), and used the Dealertrack login of former employee Yosmaily Ventura (DE 47) to hide who actually pulled Ms. Francois' credit report. In sum, there is a strong inference that Defendants actively sought and continue to seek to hide who pulled Ms. Francois' credit report impermissibly.

The third story is also the only one with a plausible explanation for why the Vehicle was sold on May 30, 2020 but the contracts were signed on June 29, 2020. *Id.* ¶¶ 247-268. Defendants had conflicting explanations for why the contract for the Vehicle was signed on June 29, 2020: Stavros Orsaris claimed that Capital One was requiring them to have all customers resign, whereas Ms. Vallejo could not recall. *Id*. ¶¶ 255, 256. Capital One produced no documents for this alleged resigning requirement or, for that matter, for anything on May 30, 2020. *Id*. Despite the Vehicle allegedly being sold on May 30, 2020, Dealertrack instead shows that it was only "Pending" at 10:11 p.m. on May 30, 2020, and that Yessica Vallejo booked the contract and the Vehicle was marked as sold on June 29, 2020 at 6:46 p.m. *Id*. ¶ 254.

Most importantly, Ms. Vallejo did not deny that the actual reason for the signing on June 29, 2020 was that the financing deal offered by Capital One for the Vehicle required contracts and stipulations by June 29, 2020 "or app will expire." *Id*. ¶¶ 256, 257. Whether Emmanuel

Laforest had promised Defendants that he would get Ms. Francois to authorize the credit pulls, sale, and financing *post hoc* or Defendants had told Mr. Laforest (as he testified) to not get Ms. Francois' permission until after the sale, the documents support an inference that Defendants simply ran out of time and, not wanting to give up a lucrative sale, forged the signature that they needed by June 29, 2020. *Id.* ¶ 256.

The final deal accepted for the financing of the Vehicle by Capital One had no requirements for proof of income, while the prior approval which was not accepted had required proof of income. *Id.* ¶ 262, 263. Yessica Vallejo admitted that not having proof of income could be the basis for accepting a deal if proof of income was not available. *Id.* ¶ 264. The June 29, 2020 application also misrepresented the downpayment as $9,000. *Id.* ¶ 265. It appears that Ms. Vallejo forged Ms. Francois' signatures on the June 29, 2020 contract based on the handwritten dates of 6/29/20 next to the signatures and Mr. Laforest and Ms. Francois not being at the dealership on June 29, 2020. *Id.* ¶ 266. The Service Contract for the sale has an email which does not exist. *Id.* ¶ 267.

Ms. Francois was given an unsigned copy of the contract for the Vehicle, which Ms. Vallejo had no explanation for since standard procedure is to provide a signed copy. Pl. 56.1 ¶ 287. This could support an inference that Defendants did not want to show Ms. Francois her forged signatures. Emmanuel Laforest texted Stavros Orsaris the driver's license and Social Security number of Jami Singer, which Stavros Orsaris did not report to the police and admitted was done "to move the loan over to [Jami Singer's] name." *Id.* ¶ 293. Lastly, Defendants are also the only parties who benefitted from the unauthorized financing and sale. While Mr. Laforest returned the Vehicle and got arrested, Defendants retained his downpayment of $8,600 and Ms. Vallejo earned a commission of $317.26 from the sale. *Id.* ¶¶ 268, 322.

### F.  Plaintiff Has Established Bases for Liability for Victory Auto Group, LLC and Diane Argyropoulos.

i.  <u>Victory Auto Group, LLC.</u>

When the corporate form is used "to perpetrate a fraud, or so dominate and disregard the corporate form that the corporation primarily transacts their personal business, the Court may pierce the corporate veil and impose liability directly." *Mar. Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.*, 689 F. Supp. 1340, 1348 (S.D.N.Y. 1988) *citing Kirno Hill Corp. v. Holt,* 618 F.2d 982, 985 (2d Cir.1980). Under New York law, a number of factors are considered to determine whether a corporation is merely an "alter ego" of another corporation or individual and thus that all of the entities are essentially "one whole entity": "(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991). "[D]isregarding corporate separateness is a remedy that 'differs with the circumstances of each case.'" *Id. quoting American Protein Corp. v. AB Volvo,* 844 F.2d 56, 60 (2d Cir. 1988). The question that is ultimately put before the jury is a balancing test of whether "the policy behind the presumption of corporate independence and limited shareholder liability—encouragement of business

development—is outweighed by the policy justifying disregarding the corporate form—the need to protect those who deal with the corporation." *Wm. Passalacqua Builders, Inc.,* 933 F.2d at 139. An extensive review of the factual record is needed to make a determination of whether the corporate form should be disregarded. *Id.* at 139-140; *see also American Protein*, 844 F.2d at 59 ("the issue of corporate disregard is generally submitted to the jury"). "Courts are not required to find that every factor is present, and no one factor is dispositive." *Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd.*, 401 F. Supp. 3d 433, 440 (S.D.N.Y. 2018).

Victory Auto Group LLC is just one of a number of corporations owned and used by Diane Argyropoulos to run an automobile dealership at 4070 and 4101 Boston Road in the Bronx. Pl. 56.1 ¶ 1. Specifically there is no meaningful difference between Victory Auto Group LLC and its "successor" Spartan Auto Group LLC. The addresses, 4070 Boston Road and 4101 Boston Road, have remained the same. *Id.* The dealership continued to be run by Stavros Orsaris as supervised by Diane Argyropoulos. *Id.* There was no major restructuring of how the dealership operated. *Id.* Defendants saw it as one continuous employment at Victory Mitsubishi rather than being employed by Victory Auto and then being employed by Spartan. *Id.* All of the employees who worked at Victory Auto Group went on to work at Spartan. *Id.* Diane Argyropoulos admitted that the reason why Victory Auto Group was closed and Spartan Auto Group was opened was because "when you open a new car franchise, you have to assume one name. So I had to close that name to replace it with Victory Mitsubishi." *Id.* Forms under prior alter egos continued to be used by Spartan, such as the credit application with the header "Victory Auto Group" and the Vehicle Inspection Report listing the facility name as "Bronx Suzuki" rather than either Victory Auto or Spartan Auto. *Id.* Instagram social media accounts for the different dealerships are run by the same person, the BDC manager of Victory, "Bibi" Singh.

*Id.* Ms. Singh also created the "Victory" logo used by the various dealerships. *Id.* D/b/a are used interchangeably by different companies run by Diane Argyropoulos. *Id.*

Accordingly, there is a dispute of material fact as to whether Victory Auto Group, LLC is merely an alter ego of Spartan Auto Group, LLC, and thus should be liable for Spartan's negligence and violations of the FCRA.

### ii.  Philip Argyropoulos.

While Plaintiff continues to suspect involvement by Mr. Argyropoulos beyond his ownership based on the documentary evidence (*see* ), it is conceded that there is insufficient evidence to establish liability against him.

### iii.  Diane Argyropoulos

An employer can be liable for the FCRA violations of her employees where she is negligent in the selection or supervision of employees or has policies permitting or encouraging violations of the FCRA. *Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967, 973–974 (4th Cir. 1987). In *Yohay*, a credit union was found liable for its employee's FCRA violation where anyone using credit union's computers had access to consumer reports, and credit union posted no guidelines for obtaining them.

Diane Argyropoulos signed Victory's subscriber agreement with CBC. Pl. 56.1 ¶ 88. She also was the only person at Victory Mitsubishi who received training on compliance, specifically with a focus on security of the computer systems, which Ms. Argyropoulos testified happened "Maybe ten years ago." *Id.* ¶¶ 87, 90-91. With regards to credit reporting in 2020, Ms. Argyropoulos "explained to Stavros how it was to be handled and the regulations on it." *Id.* ¶ 89. In general, she supervises Stavros Orsaris, who is the "direct supervisor" of the other employees, but Diane Argyropoulos also "has the ability to" and "has" dealt with employees directly. *Id.* ¶¶ 97-98. As the owner of Victory, Ms. Argyropoulos failed to set policies and practices which

would prevent impermissible access and use of credit reports.

## IV.   CONCLUSION

Plaintiff thus requests that Defendants' Motion for Summary Judgment be denied.

Dated: Brooklyn, New York
       March 27, 2023

<div style="margin-left:40%">

Respectfully submitted,
/s/
Ahmad Keshavarz
ATTORNEY FOR PLAINTIFF
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax:    (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com

</div>