**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X

FARAH JEAN FRANCOIS,

**Plaintiff,**

- against -

VICTORY AUTO GROUP LLC d/b/a
VICTORY MITSUBISHI, SPARTAN
AUTO GROUP LLC d/b/a VICTORY
MITSUBISHI, STAVROS ORSARIS,
YESSICA VALLEJO, DAVID PEREZ,
DIANE ARGYROPOULOS, and
PHILIP ARGYROPOULOS

**Defendants.**

Case No. 1:22-cv-4447

**COUNTERSTATEMENT**
<u>**OF MATERIAL FACTS**</u>

-------------------------------------------------------------------------X

   PLEASE TAKE NOTICE that, **VICTORY AUTO GROUP LLC d/b/a VICTORY MITSUBISHI** ("Victory Auto"), **SPARTAN AUTO GROUP LLC d/b/a VICTORY MITSUBISHI** ("Spartan Auto"), **STAVROS ORSARIS** ("Orsaris"), **YESSICA VALLEJO** ("Vallejo"), **DAVID PEREZ** ("Perez"), **DIANE ARGYROPOULOS** ("Diane") and **PHILIP ARGYROPOULOS** ("Philip") (collectively "Defendants"), by their attorneys, Nicholas Goodman & Associates, PLLC, hereby respond, pursuant to Local Civil Rule 56.1, to the purported material facts asserted by Plaintiff in her eighty-eight (88) page Supplemental Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment that includes forty-three (43) pages and 247 paragraphs of "Additional Facts in Opposition." Defendants submit that Plaintiff's filing, which contains extensive argumentation in an apparent attempt to evade this Court's briefing page limitations, violates both the letter and spirit of Local Civil Rule 56.1 and should not be considered. Nonetheless, at this Court's direction, Defendants respond as follows:

   83.  Defendant Diane Argyropoulos is the owner of Victory Mitsubishi. [**Exhibit D** Orsaris Trans. 32:04-07].

**RESPONSE:** Defendants do not dispute that Diane Argyropoulos (hereinafter "Diane") is the owner of Spartan Auto Group, LLC d/b/a Victory Mitsubishi.

84.     While Ms. Argyropoulos confirmed that her title is "owner," she testified that "People refer to me as different things, as an office manager or – at the end the day, it's all the same." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 26:12-15].

**RESPONSE:** While Defendants do not dispute that Diane so testified, her only official position with Spartan is owner.

85.     As owner, Diane Argyropoulos manages dealer financing. [**Exhibit D** Orsaris Trans. 37:25-38:12; **Exhibit C** Diane Trans. 25:06-13].

**RESPONSE:** No dispute.

86.     This management included making the decision to no longer have "funders" after Defendant Yessica Vallejo became a finance manager. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 56:16-57:16].

**RESPONSE:** Disputed, this purported fact is not material. Further, Orsaris testified that the "funder" decision was made by both he and Diane.

87.     Diane Argyropoulos was also the only person at Victory Mitsubishi who received compliance training from Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 31:04-09].

**RESPONSE:** Disputed. As clearly indicated in the cited deposition testimony, Diane received compliance training from DealerTrack, not Victory Mitsubishi.

88.     Diane Argyropoulos last spoke with David Daniel, the compliance manager at Credit Bureau Connection ("CBC"), when signing Victory's subscriber agreement with CBC. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 47:17-48:02].

**RESPONSE:** No dispute except this purported fact is not material.

2

89.     With regards to credit reporting in 2020, Diane Argyropoulos "explained to Stavros how it was to be handled and the regulations on it." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 44:04-11].

**RESPONSE:** No dispute.

90.     This training focused on security of Victory's computer systems. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 31:13-23].

**RESPONSE:** Disputed. Security was one of several topics covered as per the cited testimony.

91.     This compliance training happened "Maybe ten years ago." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 31:24-32:03].

**RESPONSE:** No dispute.

92.     During the COVID-19 pandemic when Diane Argyropoulos was working remotely, she spoke with Stavros Orsaris once a day. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 67:08-10].

**RESPONSE:** No dispute.

93.     Diane Argyropoulos does not collect a salary, but instead "cut[s] [her]self a check whenever [she] can, but it's not really a salary, just ownership." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 69:04-22].

**RESPONSE:** No dispute.

94.      Defendant Stavros Orsaris has the title of "General Manager" at Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 24:17-20].

**RESPONSE:** No dispute.

95.     Stavros Orsaris is the supervisor of all the employees at Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 31:10-32:03].

**RESPONSE:** No Dispute.

96.     Stavros Orsaris does not supervise Yessica Vallejo's work as finance manager other than conveying "general feedback that I received from clients and financial institutions about her work." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 58:10-17].

**RESPONSE:** Disputed. Orsaris' supervision of Vallejo included gathering feedback.

97.     Stavros Orsaris is supervised by Diane Argyropoulos as owner of Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 32:04-07].

**RESPONSE:** Disputed in part. As owner of Spartan, Diane left all management decisions relevant herein to Orsaris. *See* paragraphs "94" and "95" above.

98.     While Stavros Orsaris is the "direct supervisor" who does "the majority of the dealing with the employees," Diane Argyropoulos "has the ability to" and "has" dealt with employees directly. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 102:12-24].

**RESPONSE:** No dispute.

99.     Chris Orsaris is the father of Stavros Orsaris. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 24:21-22; **Exhibit B** Vallejo Trans. 25:14-17].

**RESPONSE:** No dispute.

100.    There is disagreement between the Defendants and conflicts with the documentary record as to what Chris Orsaris' role, if any, is at Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 24:23-25:08, 44:14-18; **Exhibit B** Vallejo Trans. 26:04, 130:05-10; **Exhibit C** Diane Trans. 37:23-38:04, 147:06-08].

**RESPONSE:** Disputed. This is not a material fact, but an observation by counsel as to the existence of a disputed issue of fact. Further, the record establishes Chris Orsaris' functioned only as a buyer of used vehicles and manager of inventory for Spartan. Exhibit "F," at 88:17-90:4; Exhibit "K," at 45:22-46:6, 70:9-71:4, 146:6-14.

101.    Stavros Orsaris testified that Chris Orsaris does not work at and has not worked at Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 24:23-25:08].

**RESPONSE:** Disputed in part. Orsaris testified that Chris Orsaris "an independent buyer that we use to purchase vehicles." [**Exhibit D** Orsaris Trans. 89:19-22]

102.    Stavros Orsaris testified that Chris Orsaris is "an independent buyer that we use to purchase vehicles." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 89:19-22].

**RESPONSE:** No dispute.

103.    Diane Argyropoulos testified that she does not know of any other companies that Chris Orsaris works for besides Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 147:06-08].

**RESPONSE:** No dispute.

104.    Yessica Vallejo testified that Chris Orsaris comes into Victory Mitsubishi "Maybe once a month." *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 26:04].

**RESPONSE:** No dispute.

105.    The Victory Mitsubishi agreement with Capital One lists Chris Orsaris as the general manager and the general sales manager. *See Keshavarz Decl.* [**Exhibit U** (Capital One Agreement), DEFENDANTS 73].

**RESPONSE:** Disputed in part. Extensive testimony established that Chris Orsaris did not at any time relevant function as Spartan's general sales manager. Exhibit "F," at 88:17-90:4; Exhibit "K," at 45:22-46:6, 49:10-20, 70:9-71:4, 146:6-14.

106.    Diane Argyropoulos testified that he is listed this way because he "had the relationship with Capital One Bank for us to get the bank." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 49:13-50:03].

**RESPONSE:** No dispute.

107.     Diane Argyropoulos could not explain why Stavros Orsaris is listed as a managing member on the agreement. *See Keshavarz Decl.* [**Exhibit U** (Capital One Agreement), DEFENDANTS 77; **Exhibit C** Diane Trans. 53:04-11].

**RESPONSE:** No dispute.

108.     Diane Argyropoulos speaks with Capital One's representative, Ken McGhee, about once a month. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 50:17-51:11].

**RESPONSE:** Disputed in part, this is not a material fact, and Diane testified she speaks with McGhee "whenever he stops by" and "maybe once a month, once every two months."

109.     Diane Argyropoulos first met Stavros Orsaris and Chris Orsaris through a mutual friend in 2016. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 19:24-20:10].

**RESPONSE:** No dispute.

110.     Diane Argyropoulos also runs a dealership in Huntington, New York named Victory Cars East with Stavros Orsaris and John Kekis. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 22:21-23:11].

**RESPONSE:** Disputed, this purported fact is not material.

111.     Chris Orsaris receives a "buyer's fees" for his work for Victory. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 70:15-71:04].

**RESPONSE:** No dispute.

112.     On or around March 26, 2010, Chris Orsaris was indicted by grand jury for 80 counts of forging checks, one count of conspiracy to commit mail fraud and wire fraud, 80 counts of engaging in unlawful monetary transactions, and two counts of false statement. *See Keshavarz Decl.* [**Exhibit V** (Chris Orsaris Indictment)].

**RESPONSE:** Objection, disputed – these purported facts are not material and serve purpose at this juncture other than prejudice. Further, indictment charges, much less 13-year-old indictment charges, are not

admissible facts.

113.     In short, as general manager of an auto dealership known as Major World, Chris Orsaris was accused of forging commission checks from Major World to himself, bought a yacht, and then falsely reported that the yacht was stolen to make an insurance claim for $112,965.71. *See Keshavarz Decl.* [**Exhibit V** (Chris Orsaris Indictment)].

**RESPONSE:** Objection, disputed – this purported fact is not material and serves no purpose at this juncture other than prejudice. Further, indictment charges, much less 13-year-old indictment charges are not admissible.

114.     On or around December 19, 2013, Chris Orsaris pled guilty to Conspiracy to Launder Money, and was sentenced to a term of incarceration of 85 months. *See Keshavarz Decl.* [**Exhibit W** (Chris Orsaris Criminal Judgment)].

**RESPONSE:** Objection, disputed –these purported facts are not material and serve no purpose at this juncture other than prejudice. Further, sentences of incarceration are not admissible.

115.     Chris Orsaris was also ordered to make restitution of $14,337,412.25 to Major Automotive Companies, Incorporated and Ace American Insurance Company. *See Keshavarz Decl.* [**Exhibit W** (Chris Orsaris Criminal Judgment), FRANCOIS 4082].

**RESPONSE:** Objection, disputed – this purported fact is not material and serves no purpose at this juncture other than prejudice.

116.     Lastly, Chris Orsaris was ordered to forfeit (1) $750,000, the proceeds of the sale of his apartment in Trump Tower, (2) $408,000, the rental income from his lease of the apartment in Trump Tower, (3) $65,527.21, the proceeds of the sale of his apartment in Miami Beach, Florida, (4) all funds in his HSBC Bank accounts, both in his name and in the name of CPMW Consultants, Inc., (5) all interest in "Major Ford," and (6) an additional money judgment of $750,000. *See Keshavarz Decl.* [**Exhibit W** (Chris

Orsaris Criminal Judgment), FRANCOIS 4084-4087].

**RESPONSE:** Objection, disputed – these purported facts are not material and serve no purpose at this juncture other than prejudice.  Further, a sentence of restitution is not admissible.

117.    Stavros Orsaris is aware of his father's criminal history. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 90:19-22].

**RESPONSE:** No dispute.

118.    Diane Argyropoulos knew about Chris Orsaris' criminal history prior to him being hired by Victory. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 89:21-90:03].

**RESPONSE:** No dispute.

119.    When asked why she hired him despite this history, she testified that he "is very good at what he does." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 90:10-17].

**RESPONSE:** Disputed in part. Plaintiff deceptively cut out the rest of Diane's answer in which she stated "[w]hatever crime he committed, he did his time. He served his time. You still have to give people chances."

120.    Stavros Orsaris evaluates job applications for Victory Mitsubishi but does not run background checks on applicants. *See Keshavarz Trans.* [**Exhibit D** Orsaris Trans. 26:16-23; 27:09-14; **Exhibit C** Diane Trans. 89:18-20].

**RESPONSE:** No dispute.

121.    The only thing that Stavros Orsaris evaluates with job applications for sales associates, sales managers, and finance managers is a resume – no references to former employers are required. *See Keshavarz Trans.* [**Exhibit D** Orsaris Trans. 27:15-28:07].

**RESPONSE:** Disputed in part, this purported fact is not material. Further, Orsaris testified that he may ask for a driver's license, and hiring decisions necessarily include evaluation of a host of factors.

122.    Stavros Orsaris has sole authority to hire and fire Victory Mitsubishi employees in the sales department. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 32:14-33:15].

**RESPONSE:** No dispute.

123.    Defendant Yessica Vallejo is a finance manager at Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 34:14-17; **Exhibit B** Vallejo Trans. 13:09-11].

**RESPONSE:** No dispute.

124.    Ms. Vallejo is one of five finance managers. *See Keshavarz Decl*. [**Exhibit D** Orsaris Trans. 34:14-17].

**RESPONSE:** No dispute.

125.    There are six offices in the 4070 Boston Road building at Victory Mitsubishi – one for Stavros Orsaris and one for each of the finance managers, including Yessica Vallejo. *See Keshavarz Decl*. [**Exhibit D** Orsaris Trans. 36:20-25].

**RESPONSE:** No dispute.

126.    Finance managers receive a commission of 12% of the gross profit of their deals. *See Keshavarz Decl*. [**Exhibit D** Orsaris Trans. 47:06-13; **Exhibit B** Vallejo Trans. 75:05-18].

**RESPONSE:** No dispute.

127.    Defendant David Perez was a sales manager at Victory Mitsubishi during the sale of the Vehicle. *See Keshavarz Decl*. [**Exhibit A** Perez Trans. 45:02-06; 71:02-18].

**RESPONSE:** No dispute.

128.    As sales manager, Mr. Perez's only supervisor was Stavros Orsaris. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 125:23-126:03]

**RESPONSE:** No dispute.

129.    As sales manager, Mr. Perez had the responsibility of pulling credit reports for consumers, which he would then convey to the finance managers. *See Keshavarz Decl*. [**Exhibit A** Perez Trans. 71:02-18].

**RESPONSE:** No dispute.

130.    Consumers would not be brought to Mr. Perez as the sales manager – he would only deal with them directly if he had questions for them such as if the consumer has specific instructions about what creditor they want to use and that creditor was not going to "work out." *See Keshavarz Decl*. [**Exhibit A** Perez Trans. 76:10-77:06].

**RESPONSE:** No dispute.

131.    Mr. Perez would look at the credit reports for "any negative accounts, negative or any previous autos that went bad or any late payments," and based on that information would "let the customer know what I'm going to require, what I'm not going to require," and then would "give it to the finance manager, and the finance manager runs it to the bank." *See Keshavarz Decl*. [**Exhibit A** Perez Trans. 97:08-99:22].

**RESPONSE:** Disputed. Plaintiff mischaracterizes this testimony to suggest that Mr. Perez would give the credit reports to the finance manager, and that the finance manager would then run it to the bank. In the quoted testimony, the "it" in the phrase "give it to the finance manager…" was the credit application and information provided by the customer, not the credit report itself. *See Keshavarz Decl.* **Exhibit "A,"** at 95:21-97:24. Victory never provided credit reports it obtained to any financial institution, only the three-page credit application, (Dkt. No. 53-5, pp. 19-21), which is why JCMP and Capital One performed independent pulls of Plaintiff's credit subsequent to the applications. Dkt. No. 54, ¶ 317; Dkt. No. 53-36, FRANCOIS 174; Dkt. No. 53-37, FRANCOIS 82.

132.     80% of Mr. Perez's income as a sales manager was based on commissions from the number of cars sold. *See Keshavarz Decl*. [**Exhibit A** Perez Trans. 119:19-120:02; 121:05-20].

**RESPONSE:** No dispute.

133.     There are currently 3 sales managers at Victory Mitsubishi. *See Keshavarz Decl*. [**Exhibit D** Orsaris Trans. 34:25-35:03].

**RESPONSE:** No dispute.

134.     Yosmaily Ventura was an employee at Victory Mitsubishi who was furloughed on or around March 16, 2020, and was not working at Victory Mitsubishi on May 30, 2020. *See Keshavarz Decl.* [**Exhibit L** (Ventura Affidavit)].

**RESPONSE:** No dispute, except that Plaintiff badly mischaracterizes the document, a Stipulation executed by counsel for Spartan, as an Affidavit executed by Yosmaily Ventura. *See Keshavarz Decl.* **Exhibit "L."**

135.     The system used by Victory Mitsubishi to process sales and financing of vehicles, including the Vehicle in this case, is called Dealertrack. *See Keshavarz Decl*. [**Exhibit A** Perez Trans. 100:13-14].

**RESPONSE:** No dispute.

136.     Defendant David Perez admitted that he recognized the tabs ("summary, archive, application, credit decisions, contract, after market compliance, documents, and ID verifications") and the "History" in the documents produced by Dealertrack. *See Keshavarz Decl*. [**Exhibit A** Perez Trans. 235:15-236:17; **Exhibit I** (Laforest Dealertrack)].

**RESPONSE:** No dispute.

137.     Diane Argyropoulos testified that she had seen the screen before and that the finance managers and Stavros Orsaris had access to it. *See Keshavarz Decl*. [**Exhibit C** Diane Trans. 112:24-113:10].

**RESPONSE:** No dispute that Diane has seen the general Dealertrack screens, the pages and interfaces used for processing vehicle transactions.

138.     Ms. Argyropoulos elaborated that they would access it to "send the [credit] application to the bank, so the bank can fund the deal." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 113:13-20].

**RESPONSE:** No dispute.

139.     Stavros Orsaris and Yessica Vallejo both testified that they couldn't recall seeing this screen and did not know if they had access to it. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 182:19-24; **Exhibit B** Vallejo Trans. 146:10-19].

**RESPONSE:** Objection, disputed – this purported fact is not material. Further, it is not clear what "this screen" refers to, either in the above paragraph or the cited deposition testimony.

140.     Employees must login to use Dealertrack, and once logged in their actions on the software are tracked. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 100:13-15; **Exhibit C** Diane Trans. 44:22-25].

**RESPONSE:** No dispute.

141.     Every employee has an ID associated with them on Dealertrack. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 109:15-17].

**RESPONSE:** No dispute.

142.     The ID for Yessica Vallejo is 8031. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 12].

**RESPONSE:** No dispute.

143.     Defendant David Perez testified that he "wouldn't know" if he had an ID number. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 196:08-22].

**RESPONSE:** No dispute.

144.     Chris Orsaris has a login for Dealertrack. *See Keshavarz Decl*. [**Exhibit C** Diane Trans. 45:22-46:06].

**RESPONSE:** Disputed in part. Chris Orsaris had a Dealertrack login for the sole purpose of tracking Spartan's inventory.

145.     Clicking into a customer name on Dealertrack brings up that customer's digital "deal jacket," where "in one centralized location, you can see all the latest activity around the customer." *See Keshavarz Decl*. [**Exhibit X** (Dealertrack User Guide), SUBPOENA RESPONSES 600].

**RESPONSE:** No dispute, except that this fact is not material.

146.     The sales manager would enter in the consumer's information using the filled-out credit application. *See Keshavarz Decl*. [**Exhibit A** Perez Trans. 100:13-16].

**RESPONSE:** No dispute.

147.     Victory has no written policies about how and when to pull credit reports. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 92:09-15].

**RESPONSE:** Disputed in part. Spartan's contract with Capital One functions in part as a written policy about how and when to pull credit reports.

148.     However, Victory has a contract with Capital One, signed by Diane Argyropoulos, which states that the "dealer warrants that all contracts are genuine, signed by person with full capacity to contract." *See Keshavarz Decl.* [**Exhibit U** (Capital One Agreement), DEFENDANTS 74; **Exhibit C** Diane Trans. 120:18-121:03].

**RESPONSE:** No dispute.

149.     Victory also has a contract with CBC which states that Victory Mitsubishi will "obtain a consumer's written authorization to request [credit reports] relating to that consumer." *See Keshavarz Decl*. [**Exhibit H** (CBC Subscriber Agreement), DEFENDANTS 94] [emphasis added].

13

**RESPONSE:** No dispute.

150.     The CBC Subscriber Agreement also states that the credit reports obtained will only be used "in connection with a credit or consumer transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of the consumer, and will obtain the consumer's written authorization to request such information relating to that consumer." *See Keshavarz Decl.* [**Exhibit H** (CBC Subscriber Agreement), DEFENDANTS 94].

**RESPONSE:** No dispute.

151.     The form that Victory would use on Dealertrack to run credit reports has a check box that says "I have customer permission to pull a credit report," which Stavros Orsaris (as corporate representative of Spartan) confirmed existed because Defendants "need to have permission to pull credit for permissible purpose." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 182:03-04].

**RESPONSE:** No dispute.

152.     Ms. Vallejo had "no knowledge" of the CBC subscriber agreement. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 37:05-12].

**RESPONSE:** No dispute.

153.     However, Ms. Vallejo testified that she understood that pulling the credit report of a consumer when "that person is not there" is "illegal." *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 93:15-18].

**RESPONSE:** No dispute.

154.     Sales associates do not have access to run or look at people's credit through Dealertrack. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 71:24-72:03; 226:15-22; **Exhibit C** Diane Trans. 41:22-24].

**RESPONSE:** No dispute.

155.    Instead, the standard sales process is that the sales associate will go over the credit application with the consumer. Then the sales associate brings the filled out credit application to the sales manager, who obtains the consumer's credit report. *See Keshavarz Decl*. [**Exhibit A** Perez Trans. 94:09-15].

**RESPONSE:** No dispute.

156.    Defendant David Perez testified that only him [sic] and Stavros Orsaris were authorized to pull credit reports on May 30, 2020. *See Keshavarz Decl*. [**Exhibit A** Perez Trans. 226:07-14; 227:18-23].

**RESPONSE:** Objection, disputed. This statement does not even purport to be an undisputed fact, as Plaintiff identifies the testimony of David Perez that corrects and modifies this testimony below (see Paragraph "158," *see also* Paragraph "167.")

157.    Defendant Stavros Orsaris, both as an individual and as corporate representative of Defendant Spartan, stated that he was "definitely certain that the only two people that would run credit on [May 30, 2020] is David Perez and myself." See Keshavarz Decl. [Exhibit D Orsaris Trans. 53:04-23; 150:21-23]. This is clearly false, as Yessica Vallejo pulled the credit report of Jami Singer on May 30, 2020. *See Keshavarz Decl.* [**Exhibit J** (Singer Dealertrack)].

**RESPONSE:** Objection, disputed. This statement does not even purport to be an undisputed fact, and contains improper conjecture and opinion testimony from Plaintiff's counsel and as such does not require a response.

158.    Mr. Perez then testified that Defendant Yessica Vallejo was also authorized to pull credit reports but that it was not normal and would happen if him or Stavros Orsaris weren't available. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 231:14-232:07].

**RESPONSE:** No dispute.

159.    Yessica Vallejo testified that she would pull consumer credit reports "if it was necessary," meaning if Stavros Orsaris and David Perez were busy with other customers. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 89:08-15].

**RESPONSE:** No dispute.

160.    Credit reports would be pulled by the sales manager without the consumer in front of him – the verification that the consumer is the same person as on the photo ID used for the credit pull is performed by a sales associate, not by the sales manager. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 77:19-21; 78:14-23].

**RESPONSE:** Disputed in part. The cited testimony does not preclude the possibility that a sales manager might pull a credit report with the consumer in front of him or her.

161.    After the sales manager pull the credit reports and reviews them, he brings the deal jacket to the finance manager. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 103:02-15].

**RESPONSE:** No dispute, except to the extent that the following Paragraph appears to imply that the deal jacket would include a copy of the credit report as implied by the following Paragraph which would not be the case. *See* Paragraph "165," *infra*.

162.    The finance manager would use the credit reports to see which consumer "qualifies" for certain lenders based on their "guidelines," which require a range of credit scores like "between 700 and 800," and based on these guidelines they would decide which finance companies to submit credit applications to. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 57:25-58:12, 58:21-59:03].

**RESPONSE:** No dispute, except to the extent that the preceding Paragraph appears to imply that the deal jacket would include a copy of the credit report as implied by the following Paragraph which would not be the case. *See* Paragraph "165," *infra*.

163.    Stavros Orsaris testified that "we would just proceed forward. It doesn't matter what someone's [credit] score is." *See Keshavarz Decl*. [**Exhibit D** Orsaris Trans. 67:13-21].

**RESPONSE:** No dispute.

164.    Stavros Orsaris confirmed that would be the case even with no credit history at all: "You don't need credit history to necessarily purchase a car." *See Keshavarz Decl*. [**Exhibit D** Orsaris Trans. 68:10-15].

**RESPONSE:** No dispute.

165.    The credit reports are not normally printed out and put in the deal jacket. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 110:19-21].

**RESPONSE:** No dispute.

166.    Only the finance managers would submit credit applications for consumers. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 99:23-100:02].

**RESPONSE:** No dispute.

167.    Generally the finance manager would not run the consumer's credit reports. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 104:25-105:04].

**RESPONSE:** No dispute.

168.    The consumer would wait at the dealership for the finance manager to tell the sales manager whether the consumer was approved or not for financing. *See Keshavarz Decl*. [**Exhibit A** Perez Trans. 106:08-11; 107:12-15].

**RESPONSE:** No dispute, except to clarify that Spartan Auto did not extend credit or financing to consumers directly, only facilitate applications to other lenders on customers behalf. DE 53-2, 40:20-43:7.

169.    Once the finance manager has an "approval," the consumer sits down with the finance manager to go over their options: the payment, the interest rate, and the contract. *See Keshavarz Decl.*

[**Exhibit A** Perez Trans. 101:18-102:19; 107:17-19].

**RESPONSE:** No dispute, except to clarify that Spartan Auto did not extend credit or financing to consumers directly, only facilitate applications to other lenders on customers behalf. DE 53-2, 40:20-43:7.

170.    Stavros Orsaris would also be present in the finance manager's office "as frequently as possible," and during the time period at issue, he "was definitely present." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 69:22-70:05].

**RESPONSE:** No dispute.

171.    If the finance manager does not get an approval, she may tell the sales manager to tell the consumer that the financing and sale cannot move forward unless they get a co-applicant. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 108:21-109:03].

**RESPONSE:** No dispute.

172.    The finance manager uses Dealertrack to create the buyer's order and retail installment agreement. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 114:18-22; **Exhibit D** Orsaris Trans. 71:09-72:03].

**RESPONSE:** No dispute.

173.    As a result of the COVID-19 shutdown order, Victory Mitsubishi was operating by appointment only. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 129:20-130:15; **Exhibit D** Orsaris Trans. 65:04-06].

**RESPONSE:** No dispute that at times relevant herein, Spartan operated by appointment only.

174.    Decisions about how Victory Mitsubishi adapted to the COVID-19 pandemic were made by Stavros Orsaris, who would then notify Diane Argyropoulos of the decisions. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 63:15-64:09].

**RESPONSE:** No dispute.

175.    Defendant David Perez testified that, due to the COVID-19 shutdown, Stavros Orsaris would have been "the one to confirm the identity of anyone signing a credit application or bringing in a driver's license" from at least May 2020 through June 2020. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 136:14-20].

**RESPONSE:** No dispute.

176.    Stavros Orsaris himself testified that "98 percent of" "collecting of the ID or the driver's license of the individual" would be done by him. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 67:04-12].

**RESPONSE:** No dispute.

177.    He further testified that during this time only him [sic] and Mr. Stavros were allowed to confirm the identity of consumers, and that specifically Defendant Yessica Vallejo was not allowed to confirm the identity of consumers. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 150:08-17].

**RESPONSE:** No dispute, except to clarify that the "He" in this sentence refers to David Perez, not Stavros Orsaris, which is unclear from context given that the preceding paragraph refers to testimony by Orsaris.

178.    Stavros Orsaris testified that "if the address on the driver's license doesn't match the address on the credit application," they would "not run the credit just yet" and instead "have a conversation with the consumer." *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 95:23-96:03].

**RESPONSE:** No dispute.

179.    No record was made when the identity of a consumer was confirmed in this way. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 148:22-149:05].

**RESPONSE:** No dispute.

180.    During this time, video recordings were made of all sales, but they were only retained for thirty days. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 80:10-22].

**RESPONSE:** No dispute.

181.    Victory Mitsubishi would sell around 250 to 270 cars per month. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 132:12-16].

**RESPONSE:** No dispute.

182.    There is conflicting evidence regarding if a Victory Mitsubishi employee has ever been terminated because of allegations of fraud – Stavros Orsaris (as an individual and corporate representative of Spartan) testified that he was "very certain" that no one has been terminated from Victory Mitsubishi based on allegations of fraud, whereas Diane Argyropoulos testified that she "fired [the general manager] and everybody else who was selling this [etching] product" which led to a lawsuit against Victory Mitsubishi by the New York Attorney General. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 43:04-13; 45:11-13; **Exhibit C** Diane Trans. 07:22-08:18].

**RESPONSE:** Disputed. This does not even purport to be a material "undisputed fact." In any event this mischaracterizes the testimony cited. Orsaris was addressing Spartan d/b/a Victory Mitsubishi, whereas the AG case was against Victory Motors, LLC and Victory Auto Group, LLC, brought prior to Spartan's existence as per the next Paragraph.

183.    That lawsuit, New York v. Victory Motors, LLC, et al., Index No. 70684/2017, was against two companies: Victory Motors, LLC, doing business as Victory Mitsubishi, Larchmont, New York, and Victory Auto Group, LLC, doing business as Victory Suzuki, Bronx, New York. *See Keshavarz Decl.* [**Exhibit Y** (NY AG Stipulation), FRANCOIS 3679].

**RESPONSE:** Defendants do not dispute the identity of the parties to the lawsuit and assert that that reality, among other factors, makes that lawsuit immaterial herein.

184.    The Lawsuit was settled by the respondents through a stipulation which had the following pertinent provisions: (1) "Respondents are found to have engaged in deceptive business practices in violation of GBL § 349, and to have repeatedly and persistently engaged in fraud pursuant to Executive

Law § 63(12)," (2) failure to pay pursuant to the stipulation would result in a Confession of Judgment being entered against Philip Argyropoulos as "Respondents' majority managing member," and (3) "Respondents represent that they closed their dealerships in 2018 and that they are no longer in operation." *See Keshavarz Decl.* [**Exhibit Y** (NY AG Stipulation), FRANCOIS 3679-3680, 3682].

**RESPONSE:** Defendants do not dispute the terms of the lawsuit settlement and assert those terms, among other factors, makes that settlement immaterial herein.

185.    When asked about why Philip Argyropoulos made the Confession of Judgment for this Stipulation, Ms. Argyropoulos testified as follows:

4    A.  I don't really know why, to be
5    honest.· I am the one who appeared to the
6    court.· Phil was not there.· I mean, to me,
7    at the time, it didn't really matter because
9    was not concerned about a judgment.

*See Keshavarz Decl.* [**Exhibit C** Diane Trans. 11:04-09]

**RESPONSE:** Defendants do not dispute the terms of the lawsuit settlement and assert those terms, among other factors, makes the settlement terms immaterial herein.

186.    Diane Argyropoulos also testified that she stepped into a management role because the "previous partner was stealing from the company." *See Keshavarz Decl.* [**Exhibit C** Diane Argyropoulos Trans. 30:06-14].

**RESPONSE:** Disputed, this purported fact is not material.

187.    Stavros Orsaris testified that any upset customer would be referred directly to him. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 86:11-19].

**RESPONSE:** No dispute.

188.    On May 30, 2020, Mr. Laforest went into Victory Mitsubishi alone. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 07:15-17; 80:16-24].

**RESPONSE:** Seriously disputed. *See, e.g.,* Exhibit "F," at 106:10-108:4, 108:23-1097, 141:10-142:24. Moreover, Plaintiff herself testified that Laforest is a liar who cannot be trusted,[1] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

189.    Plaintiff Farah Jean Francois was at a surprise birthday party on May 30, 2020 at 19 Montrose, South Orange, New Jersey being thrown by her friend Darline Dumel, and she spent the night at that address. *See Keshavarz Decl*. [**Exhibit O** Francois Trans. 234:13-236:11; **Exhibit P** Francois Aff. ¶ 4].

**RESPONSE:** Disputed in part as Defendants have consistently asserted that someone resembling Plaintiff was present at Spartan's dealership on May 30, 2020.

190.    Emmanuel Laforest does not recall if he was wearing a mask or if anyone asked him to pull down his mask to verify his identity. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 18:17-20].

**RESPONSE:** No dispute, except that this testimony is irrelevant, wholly immaterial to the motion at hand, and Plaintiff herself testified that Laforest is a liar who cannot be trusted,[2] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

191.    He went to Victory Mitsubishi because "people talk about it": "they say if you want to get a car, just go to Victory." *See Keshavarz Decl*. [**Exhibit T** Laforest Trans. 18:02-07].

**RESPONSE:** No dispute that Laforest so testified, but Plaintiff herself testified that Laforest is a liar who cannot be trusted,[3] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

---

[1] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).
[2] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).
[3] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

192.    Mr. Laforest first spoke with a man who he described as "slender, tall, like about six-something – 6'2, caramel skin" – while the practices of Victory Mitsubishi suggest that this may have been a sales associate, no Defendant could testify as to who the sales associate was and none of the associated documents disclose a sales associate for the transaction. *See Keshavarz Decl*. [**Exhibit T** Laforest Trans. 10:19-21; 57:07-11; **Exhibit A** Perez Trans. 94:02-07].

**RESPONSE:** Objection, disputed. This paragraph contains improper attorney conjecture and speculation inappropriate for a Rule 56.1 Statement of Fact. Further, Plaintiff herself testified that Laforest is a liar who cannot be trusted,[4] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

193.    A number of documents refer to a "House sales rep" or "House sales rep 999". *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 12].

**RESPONSE:** No dispute.

194.    David Perez and Yessica Vallejo denied knowing what the "999" ID referred to. *See Keshavarz Decl*. [**Exhibit A** Perez Trans. 195:20-196:05; 205:24-206:03; **Exhibit B** Vallejo Trans. 196:06-09].

**RESPONSE:** No dispute.

195.    Diane Argyropoulos testified that it means that "There was no salesperson on the deal." *See Keshavarz Decl*. [**Exhibit C** Diane Trans. 108:24-109:09].

**RESPONSE:** No dispute.

196.    The Sales Worksheet indicates that Mr. Laforest spoke with Defendant David Perez on or around 2:16 PM, with Mr. Laforest telling Mr. Perez that he wanted a 2017 BMW 7 Series, VIN

---

[4] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

#WBA7F2C51HG421273 ("the Vehicle"), that he could put up to $10,000 as a down payment, and that he did not have another vehicle to trade in. *See Keshavarz Decl*. [**Exhibit E** (Deal Jacket), DEFENDANTS 26; **Exhibit A** Perez Trans. 216:21-24].

**RESPONSE:** No dispute.

197.    There is no similar Sales Worksheet for Farah Jean Francois, and Yessica Vallejo could not explain why that was the case. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 197:16-21].

**RESPONSE:** No dispute.

198.    Mr. Perez denied that the handwriting on the Sales Worksheet was his, but could not explain why it had his name as the salesperson and could not say whose handwriting it was. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 214:19-25; 215:15-20].

**RESPONSE:** No dispute.

199.    In order to do so, Victory Mitsubishi had Mr. Laforest fill out a credit application, which he did by himself. *See Keshavarz Decl*. [**Exhibit E** (Deal Jacket), DEFENDANTS 2; **Exhibit T** Laforest Trans. 28:10-18].

**RESPONSE:** Objection, disputed. This statement makes no sense and Defendants cannot adequately respond to it.

200.    Mr. Laforest did not forge Ms. Francois' signature on the application, and Ms. Francois also did not sign the credit application because she was not present at the dealership. *See Keshavarz Decl*. [**Exhibit T** Laforest Trans. 30:08-21; 97:12-19].

**RESPONSE:** Disputed, there is no competent evidence of forgery on the records and Plaintiff herself testified that Laforest is a liar who cannot be trusted,[5] and thus Plaintiff should not be heard to rely on his

---

[5] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

testimony herein. Exhibit "D," at 65:4-15.

201.    However, Mr. Laforest did not see who signed Ms. Francois' name to the credit application. *See Keshavarz Decl*. [**Exhibit T** Laforest Trans. 42:18-21].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted,[6] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

202.    Mr. Laforest's testimony is corroborated by the difference in the dates for the signatures – Mr. Laforest wrote out "MAY 30, 2020" for the date, whereas the person who forged Ms. Francois' signature wrote out "05/30/2020" in distinctly different handwriting (i.e. Mr. Laforest's "0"s are the same height as his numbers, whereas the signor of Ms. Francois' name had "0"s smaller than the other numbers). *See Keshavarz Decl*. [**Exhibit E** (Deal Jacket), DEFENDANTS 2].

**RESPONSE:** Disputed. This paragraph constitutes improper attorney conjecture, legal argument, and speculation inappropriate for a Rule 56.1 Statement of Fact. Plaintiff has not offered the opinion of a handwriting expert in this case.

203.    Mr. Laforest guessed at her current employment (incorrectly) based on her mail, as well as guessing at her position and her salary. *See Keshavarz Decl*. [**Exhibit T** Laforest Trans. 38:22-25-39:02].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted,[7] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15. Further, Plaintiff had in fact previously worked for Null's Whole Foods. Exhibit "F," at 34:23-35:4.

---

[6] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

[7] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

204.    This incorrect income information for Ms. Francois did not cause the transaction to be flagged or otherwise prevented by Victory Mitsubishi – Victory Mitsubishi does not verify employment or income unless the finance company requires them to do so. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 190:06-12; **Exhibit D** Orsaris Trans. 187:21-188:07, 210:16-25].

**RESPONSE:** No dispute, except to note that the employment information set forth on the credit application matched Plaintiff's employer information as set forth in credit report even as of June 11, 2021. Exhibit "E," p. 2. Further, Spartan was under no legal obligation to confirm Plaintiff's employment status prior to pulling her credit report.

205.    Mr. Laforest's credit reports were pulled by Defendant David Perez at 4:39 p.m. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 09:06-07].

**RESPONSE:** Disputed in part. Plaintiff herself testified that Laforest is a liar who cannot be trusted,[8] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15. Further, it is not clear which time zone the time stamps on various documents herein refer to.

206.    Mr. Laforest essentially had no credit to obtain financing of the Vehicle, as indicated by the handwritten notation "0/0" made by Defendant David Perez in the top left corner of the credit application. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 186:05-24; **Exhibit D** Orsaris Trans. 186:19-21; *Exhibit E* (Deal Jacket), DEFENDANTS 2].

**RESPONSE:** No dispute.

207.    Defendant Yessica Vallejo testified that if two consumers were applying together, if there's a co-applicant for the credit application, and one of the consumers had no credit history, Victory Mitsubishi would not advise the consumer to apply for credit by herself. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans.

---

[8] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

92:08-14].

**RESPONSE:** No dispute.

208.   Nevertheless, Victory Mitsubishi ran the credit of the Plaintiff Farah Jean Francois at 4:55 p.m. *See Keshavarz Decl*. [**Exhibit T** Laforest Trans. 09:07; **Exhibit K** (Francois Dealertrack), SUBPOENA RESPONSES 513; **Exhibit A** Perez Trans. 224:07-16].

**RESPONSE:** Disputed. This paragraph contains improper attorney conjecture and speculation inappropriate for a Rule 56.1 Statement of Fact. Further, Plaintiff herself testified that Laforest is a liar who cannot be trusted[9] and thus cannot be heard to rely on his testimony in opposition to the instant motion. Exhibit "D," at 65:4-15. Further, it is not clear which time zone the time stamps on various documents herein refer to.

209.   When asked what the reason was for this to happen, Ms. Vallejo had no answer. *See Keshavarz Decl*. [**Exhibit B** Vallejo Trans. 170:11-16].

**RESPONSE:** No dispute.

210.   It is unclear which individual employee of Victory Mitsubishi pulled the credit report. Stavros Orsaris' assertion that "the only two people that would run credit on that day is David Perez and myself" is clearly false in light of Jam Singer's credit reports being pulled by Yessica Vallejo. *See Keshavarz Decl*. [**Exhibit D** Orsaris Trans. 150:21-23; Exhibit J (Singer Dealertrack)]. While the Dealertrack history for Farah Jean Francois shows the credit reports were pulled by Yosmaily Ventura, Defendants and Ms. Ventura herself have represented that she was furloughed and not working at Victory Mitsubishi on May 30, 2020. *See Keshavarz Decl*. [**Exhibit L** (Ventura Affidavit)]. However, the assertion by Defendants that only sales managers and finance managers were authorized to pull credit reports appears

---

[9] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d)

to be true given the known credit pulls were by David Perez, a sales manager, and Yessica Vallejo, a finance manager. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 181:07-08; **Exhibit I** (Laforest Dealertrack); **Exhibit J** (Singer Dealertrack)]. Given that David Perez, Stavros Orsaris, and Yessica Vallejo have all testified to having worked on the transaction, and only one finance manager would work on each transaction, there is a dispute of fact as to whether the credit report was in fact pulled by David Perez, Stavros Orsaris, or Yessica Vallejo. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 68:09-16].

**RESPONSE:** Disputed. This assertion of myriad different facts in a single paragraph, many of which are disputed, while citing to a host of different sources, many of which do not support the supposed facts set forth therein violates Rule 56.1 and makes it impossible to formulate a cogent response. Further, the Stipulation executed by counsel for Spartan is badly misidentified as an Affidavit executed by Yosmaily Ventura. *See Keshavarz Decl.* **Exhibit "L."** Finally, Plaintiff herself testified that Laforest is a liar who cannot be trusted,[10] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

211.    Despite Stavros Orsaris not disclosing the identity of the person who pulled Ms. Francois' credit report during his own deposition, Diane Argyropoulos testified that Stavros Orsaris told her that "Yessica is the one who ran the credit" because the other managers "were eating in a manager's office." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 139:18-140:02].

**RESPONSE:** Disputed. Orsaris was not lying or hiding information as opposed to simply not remembering a conversation he had years prior.

212.    While Stavros Orsaris told Diane Argyropoulos this, Ms. Argyropoulos did not know (and thus Stavros Orsaris did not tell her) that Emmanuel Laforest had texted the social security number and

---

[10] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

driver's license of Jami Singer to Stavros Orsaris. *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 143:25-144:09].

**RESPONSE:** Disputed. This paragraph contains attorney improper conjecture, argument, and speculation inappropriate for a Rule 56.1 Statement.

213.    Given that the credit pull was done with Yosmaily Ventura's log-in, this means that either (1) another employee was given Ms. Ventura's log-in credentials and willfully used them to pull the credit reports without revealing their own identity or (2) Dealertrack was left logged in with Ms. Ventura's credentials, allowing another employee to either knowingly or with reckless disregard use Ms. Ventura's credentials to pull the credit reports without revealing their own identity. *See Keshavarz Decl.* [**Exhibit L** (Ventura Affidavit)].

**RESPONSE:** Objection, disputed. This paragraph contains attorney improper conjecture, legal argument, and speculation inappropriate for a Rule 56.1 Statement of Fact, and is based on nothing more than Plaintiff's counsel's opinion as to the facts, not any admissible evidence or testimony herein. Further, Defendants object to the form of this supposed assertion of fact, as Plaintiff mischaracterizes the document cited, a Stipulation executed by counsel for Spartan, as an Affidavit executed by Yosmaily Ventura. *See Keshavarz Decl.* **Exhibit "L."**

214.    The use of Ms. Ventura's log-in also constitutes a breach of the "proper usage requirements and restriction and security requirements" of the CBC Subscriber Agreement, as acknowledged by Ms. Vallejo that "to pull a credit report, an employee has to log into Deal Tracker [sic]." *See Keshavarz Decl.* [**Exhibit H** (CBC Subscriber Agreement), DEFENDANTS 94; **Exhibit B** Vallejo Trans. 45:23-46:03].

**RESPONSE:** Objection, disputed. This paragraph constitutes improper attorney conjecture, legal argument, and speculation inappropriate for a Rule 56.1 Statement, and is based on nothing more than Plaintiff's counsel's opinion as to the facts, not any admissible evidence or testimony herein.

215.    Ms. Vallejo suggested that such breaches may go beyond the use of Ventura's log-in, because while she testified that she does not share her password with anyone, she leaves herself logged into Dealertrack on her computer "all day long" when asked if anyone else has access to her login information. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 161:06-18].

**RESPONSE:** Disputed. This paragraph constitutes improper attorney conjecture, legal argument, and speculation inappropriate for a Rule 56.1 Statement which far exceeds the scope of the cited testimony.

216.    This testimony conflicts with testimony by Diane Argyropoulos that "it allows you only a few minutes, if you don't login, it turns it off for security purposes to make sure documents are filed securely away, deal jackets are locked up, and no one has access to peoples personal information, payroll records, things like that." *See Keshavarz Decl.* [**Exhibit C** Diane Trans. 31:15-23].

**RESPONSE:** Disputed. This statement does not even purport to be an undisputed fact, and thus constitutes improper attorney conjecture and legal argument inappropriate for a Rule 56.1 Statement of Fact.

217.    Victory Mitsubishi did not obtain Ms. Francois' authorization prior to pulling her credit reports, and apparently did not even ask about it:

```
19    Q. So when they ran her credit report, you never
20  told the dealership that she gave you permission to buy
21  a car in her name or to pull a credit check?
22    A. He didn't even ask.· I guess they was just so
23  happy that they was making a sale.· He didn't even
24  bother to ask me none -- not of that.
```

*See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 58:19-24; 59:09-12; 88:10-16].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted,[11] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15. In any event, this

---

[11] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

testimony is heavily disputed. *See, e.g.,* Exhibit "F," at 106:10-109:7, 141:10-144:6; Exhibit "K," at 44:12-21; Dkt. No. 53-1, at 135:5-144:20; Dkt. No. 53-2, at 94:5-13, 160:2-164:2.

218.    Defendant David Perez testified that he "wouldn't know" whether a "similar Social Security number on file" code on a consumer's credit report would raise any red flags. *See Keshavarz Decl*. [**Exhibit A** Perez Trans. 256:07-14].

**RESPONSE:** No dispute.

219.    Mr. Laforest claims that he intended to purchase the Vehicle as a "co-buyer" with his "girlfriend." *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 23:02-03].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted,[12] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

220.    This is corroborated by the fact that Defendant Yessica Vallejo pulled Jami Singer's credit reports at 6:07 p.m., which Ms. Vallejo did despite Ms. Singer not being present at Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit J** (Singer Dealertrack); **Exhibit Z** (Jami Singer Deposition Transcript "Singer Trans.") 04:24-05:01, 08:06-11].

**RESPONSE:** Disputed. Vallejo testified explicitly that she would not have pulled Ms. Singer's credit if she were not present at the dealership. Dkt. No. 53-2, at 94:5-13, 160:2-164:2. Further, it is not clear which time zone the time stamps on various documents herein refer to.

221.    Ms. Vallejo admitted that she may not have seen Jami Singer herself prior to pulling her credit report and may have done so based on a credit application with her information and a copy of her driver's license. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 160:21-161:05].

**RESPONSE:** Disputed in part. Vallejo would have pulled Singer's credit report if her identity had been

---

[12] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

verified by a salesperson. Dkt. No. 53-2, at 94:5-13, 160:2-164:2.

222.    It was also corroborated by Ms. Singer having authorized Mr. Laforest to do so in May of 2020, and her offering to go to the dealership if they needed her to sign anything. *See Keshavarz Decl.* [**Exhibit Z** Singer Trans. 04:19-23, 05:16-19; **Exhibit T** Laforest Trans. 82:10-18; 84:10-85:02].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted[13] and thus cannot be heard to rely on his testimony in opposition to the instant motion. Exhibit "D," at 65:4-15.

223.    Jami Singer has never been to the dealership in person. *See Keshavarz Decl.* [**Exhibit Z** Singer Trans. 04:24-05:01, 08:06-11].

**RESPONSE:** Disputed. Defendants testified repeatedly that it is against Victory policy to pull someone's credit without the applicant's presence at the dealership. *See, e.g.* Exhibit "F," at 106:10-109:7, 141:10-144:6; Exhibit "K," at 44:12-21; Dkt. No. 53-1, at 135:5-144:20; Dkt. No. 53-2, at 94:5-13, 160:2-164:2.

224.    On May 30, 2020, Ms. Singer was with her family. She knew this more than 2 years later because before her deposition she was looking for photos of her cousin who recently passed away, and saw photos she had taken of her nieces and nephews on May 30, 2020. *See Keshavarz Decl.* [**Exhibit Z** Singer Trans. 08:20-22, 09:16-23, 10:01-05, 17:10-24].

**RESPONSE:** No dispute that Ms. Singer so testified, except to note that Singer's testimony does not eliminate the possibility that someone impersonating her was present with Laforest at Spartan's dealership.

225.    While Ms. Singer had in fact authorized Emmanuel Laforest to have her credit report pulled, the pulling of her credit report without her being present and without Victory Mitsubishi contacting her demonstrates Victory Mitsubishi's willingness to pull the credit reports of others based on the representations of Emmanuel Laforest. *See Keshavarz Decl.* [**Exhibit Z** Singer Trans. 13:14-22, 21:03-06].

---

[13] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d)

**RESPONSE:** Objection. This paragraph constitutes improper attorney conjecture, legal argument, and speculation inappropriate for a Rule 56.1 Statement of Fact which far exceeds the scope of the cited testimony.

226.    Mr. Laforest told Ms. Singer that she would not be able to finance the car with him, and that was the last thing he told her on May 30, 2020. *See Keshavarz Decl.* [**Exhibit Z** Singer Trans. 07:13-19].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted,[14] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

227.    Mr. Laforest claims that it was Victory Mitsubishi who suggested going forward with the purchase and financing of the Vehicle under the name of Farah Jean Francois because "she already got approved. You're better off just using her name." *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 23:02-11; 28:19-22; 40:05-23].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted,[15] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

228.    Mr. Laforest claims that he told Victory Mitsubishi that he "would have to talk to" Ms. Francois if they were going to use her information for the transaction, but that Victory Mitsubishi told him "let me just run her name down and see if she gets approved. *See Keshavarz Dec*. [**Exhibit T** Laforest Trans. 40:05-23; 104:19-105:04].

---

[14] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

[15] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted,[16] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15. In any event, this testimony is repeatedly disputed by Defendants. *See, e.g.* Exhibit "F," at 106:10-109:7, 141:10-144:6; Exhibit "K," at 44:12-21; Dkt. No. 53-1, at 135:5-144:20; Dkt. No. 53-2, at 94:5-13, 160:2-164:2.

229.    Mr. Laforest claimed that he was "a little hesitant" but that Victory Mitsubishi told him that the Vehicle would be "going to go away" and to "speak to her later." *See Keshavarz Decl*. [**Exhibit T** Laforest Trans. 53:24-54:04; 103:09-18].

**RESPONSE:** Disputed. See response to Paragraph "228," above.

230.    This timeline, of pulling Mr. Laforest's credit and only pulling Ms. Francois' after determining that Mr. Laforest had no credit history, is corroborated by the timestamps from the Dealertrack documents showing the pull of Mr. Laforest's credit reports at 4:39 PM and the pull of Ms. Francois' credit reports at 4:55 PM, and by Defendant David Perez stating that when he processed the credit application filled out by Emmanuel Laforest, he did not have Ms. Francois' credit reports pulled. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 187:12-23].

**RESPONSE:** Objection. This paragraph constitutes improper attorney conjecture, legal argument, and speculation inappropriate for a Rule 56.1 Statement of Fact. Plaintiff herself testified that Laforest is a liar who cannot be trusted,[17] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15. Further, it is not clear which time zone the time stamps on various documents herein refer to. Further still, Dealertrack records indicate that Singer's credit was pulled at 6:07p.m., which directly

---

[16] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

[17] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

undermines Laforest's testimonial timeline wherein Singer's credit was pulled before Plaintiff's and rejected. *Compare* Paragraph "220," above, *with* Dkt. No. 53-22, at 104:17-107:19.

231.    Yessica Vallejo testified that "you cannot pull two people credit at the same time," but could not explain why there is then a co-applicant field in Dealertrack and why it was blank for the Dealertrack history for Emmanuel Laforest. *See Keshavarz Decl*. [**Exhibit B** Vallejo Trans. 150:13-25].

**RESPONSE:** Disputed to the extent this paragraph implies that the presence of a co-applicant field is evidence contrary to Vallejo's testimony, which Defendants dispute and constitutes improper attorney conjecture, legal argument, and speculation inappropriate for a Rule 56.1 Statement of Fact.

232.    No one at Victory Mitsubishi asked Mr. Laforest to call Ms. Francois. *See Keshavarz Decl*. [**Exhibit T** Laforest Trans. 32:07-10].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted,[18] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

233.    No one at Victory Mitsubishi asked Mr. Laforest why he had put his phone number for both himself and for Ms. Francois in the credit application. *See Keshavarz Decl*. [**Exhibit T** Laforest Trans. 29:05-09; 32:11-14].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted,[19] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

234.    At 6:09 p.m., the credit application was "copied" from the user of Yosmaily Ventura's ID to Yessica Vallejo. *See Keshavarz Decl*. [**Exhibit K** (Francois Dealertrack), SUBPOENA RESPONSES 573].

---

[18] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

[19] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

**RESPONSE:** Objection. This paragraph constitutes improper attorney conjecture and speculation inappropriate for a Rule 56.1 Statement and is not supported by the evidence cited in support of same. Further, it is not clear which time zone the time stamps on various documents herein refer to.

235.    Diane Argyropoulos did not know why this switch happened, but knows that generally it will happen when the sales manager gives the account to the finance manager to submit to banks. *See Keshavarz Decl*. [**Exhibit C** Diane Trans. 114:19-115:20].

**RESPONSE:** No dispute.

236.    Mr. Laforest claims that he was told the Vehicle was being sold to him and that Ms. Francois was just a co-applicant. *See Keshavarz Decl*. [**Exhibit T** Laforest Trans. 44:16-24; 59:17-25].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted,[20] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

237.    Mr. Laforest thought that the title for the Vehicle was going to be under his name and Ms. Francois'. *See Keshavarz Decl*. [**Exhibit T** Laforest Trans. 45:04-05; 59:17-25].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted[21] and thus cannot be heard to rely on his testimony in opposition to the instant motion. Exhibit "D," at 65:4-15.

238.    However, Mr. Laforest admits that he illegally obtained Ms. Francois' Social Security number and other identification information prior to going to Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 29:02-04; 31:05-07; 98:06-99:18].

---

[20] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

[21] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d)

**RESPONSE:** No dispute, except Plaintiff herself testified that Laforest is a liar who cannot be trusted,[22] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

239.    Mr. Laforest made a downpayment of $8,600, and was given a receipt for this down payment. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 32:21-24; 33:19-34:08; **Exhibit E** (Deal Jacket), DEFENDANTS 3].

**RESPONSE:** Disputed in part as the total downpayment was $9,000.00.

240.    Emmanuel Laforest is listed as the customer on the receipt, and the timestamp of the receipt is 8:04 PM. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 3].

**RESPONSE:** No dispute.

241.    The receipt was generated with Dealertrack [sic], as indicated in the bottom left corner with the text "© 2016 DEALERTRACK TECHNOLOGIES – Dealership Application Group." *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 3].

**RESPONSE:** No dispute.

242.    This downpayment was never returned to Mr. Laforest despite him returning the Vehicle to Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 32:25-33:10; 135:17-22; **Exhibit D** Orsaris Trans. 173:20-174:18].

**RESPONSE:** Disputed to the extent this omits the fact that Laforest never returned to the dealership, instead leaving the car on the street some distance away, (Exhibit "C," p. 2; Exhibit "F," at 167:10-23; Dkt. No. 53-22, at 125:21-126:3), nor did he even ask Spartan to return the downpayment which is, upon information and belief, being held on advice of counsel pending the outcome of this litigation. Dkt. No. 53-22, at 135:23-136:12.

---

[22] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

243.    The downpayment is still in the possession of Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 173:20-174:18].

**RESPONSE:** Disputed to the extent this omits the fact that Laforest never asked Spartan to return the downpayment that is upon information and belief being held on advice of counsel pending the outcome of this litigation.

244.    Mr. Laforest was never given the Buyer's Order or Sales Contract for the Vehicle. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 43:06-20].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted[23] and thus cannot be heard to rely on his testimony in opposition to the instant motion. Exhibit "D," at 65:4-15. Further, Yessica Vallejo testified that all customers are provided copies of the sales documents upon the completion of a sale. Dkt. No. 53-2, at 112:15-113:5.

245.    On June 20, 2020, adverse action recommendations were generated for Mr. Laforest and Ms. Singer. *See Keshavarz Decl.* [**Exhibit I** (Laforest Dealertrack); **Exhibit J** (Singer Dealertrack)].

**RESPONSE:** Disputed, this purported fact is not material.

246.    Defendants had no explanation for why the adverse action recommendation only was generated on June 20, 2020. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 259:17-21].

**RESPONSE:** Disputed, this purported fact is not material, and disputed to the extent this implies that the date of the adverse action recommendation was out of the ordinary or implies wrongdoing.

247.    On June 29, 2020, neither of the alleged purchasers of the Vehicle returned to Victory Mitsubishi. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 08:13-16].

---

[23] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d)

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted,[24] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15. Further, Yessica Vallejo testified that Plaintiff and Laforest returned to the dealership to execute the revised retail installment contract on June 29, 2020. Dkt. No. 53-2, at 116:16-117:6, 123:23-124:17.

248.   Mr. Laforest did not fill out the June 29, 2020 application and had never seen it before. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 37:04-13].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted,[25] and thus Plaintiff should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15. And see next Paragraph and response.

249.   Ms. Vallejo could not remember if Mr. Laforest came to Victory Mitsubishi on June 29, 2020. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 125:19-24].

**RESPONSE:** Disputed. Vallejo testified previously that "he was there with her, or with the person that tried to imperson[ate] her." *See* Dkt. No. 53-2, at 123:23-124:17.

250.   Defendant David Perez had never seen a form like the June 29, 2020 application. *See Keshavarz Decl.* [**Exhibit A** Perez Trans. 213:05-07; **Exhibit E** (Deal Jacket), DEFENDANTS 22].

**RESPONSE:** Disputed, this purported fact is not material. Further, the citations in no way support the "fact." The document at issue, BATES stamped DEFENDANTS 22, was not a "June 29, 2020 application" at all, but is simply a NADA® Wholesale Value (Trade) estimate for the Vehicle which speaks for itself.

---

[24] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

[25] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d).

251. Stavros Orsaris claimed that the June 29, 2020 application and the May 30, 2020 application were "the same credit application," and while he could not explain the differences between them he testified that they were not "any meaningful difference to Capital One." *See Keshavarz Decl*. [**Exhibit D** Orsaris Trans. 208:22-210:15].

**RESPONSE:** No dispute that Orsaris so testified but this testimony is not material.

252. Stavros Orsaris claimed that the June 29, 2020 agreement was signed because "in the early part of the pandemic there were a lot of underwriting and program guideline changes, which Capital One had a structural change of some sort, and they required us to invite the customers back into the building to re-sign." *See Keshavarz Decl*. [**Exhibit D** Orsaris Trans. 159:25-160:06; 162:15-18]. This claim is not credible. Yessica Vallejo, the actual signatory of the June 29, 2020 contract, could not confirm it. *See Keshavarz Decl.* [**Exhibit B** Vallejo Trans. 115:24-116:15, 118:18-119:03]. No documents were produced evidencing this requirement from Defendants despite them being requested. No documents were produced evidencing this requirement from Capital One, despite this third party producing 194 pages of documents. *See Keshavarz Decl*. [**Exhibit AA** (Capital One Document Production)].

**RESPONSE:** Objection. This paragraph constitutes palpably improper attorney conjecture, legal argument and conclusions of law, and speculation inappropriate for a Rule 56.1 Statement. Further, the rampant speculation of Plaintiff's counsel exceeds the scope of the cited evidence, and fails to offer adequate support for the so-called facts set forth.

253. In fact, Capital One produced no documents showing communications between Victory Mitsubishi and Capital One on or around May 30, 2020, only on June 29, 2020 and thereafter, and Capital One's notes about the account only show activity on June 29, 2020. *See Keshavarz Decl*. [**Exhibit AA** (Capital One Document Production), SUBPOENA RESPONSES 147, 189, 191, 193, 240, 242, 256, 274, 276, 278, 327-328].

**RESPONSE:** Objection, this paragraph constitutes palpably improper attorney conjecture, blatant legal argument and conclusions of law, and speculation inappropriate for a Rule 56.1 Statement, and is disputed to the extent Plaintiff seeks to imply, by the absence of documents in response to her subpoena, that Capital One did not communicate with Defendants regarding the sale and financing of the Vehicle on May 30, 2020. To the contrary, the Dealertrack history submitted by Plaintiff herself demonstrates that Defendants submitted the deal to Capital One on May 30, 2020, (Dkt. No. 53-11, pp. 4-60), and at minimum Plaintiff's dispute letters to the credit reporting agencies and her credit reports confirm that Capital One pulled Plaintiff's credit on both May 30, 2020, and June 29, 2020, confirming the presence of transactions on both dates. Dkt. No. 26-23, Dkt. No. 26-24, Dkt. No. 53-36, p. 11, Dkt. No. 53-37, p. 34.

254.    Similarly the Dealertrack history for Farah Jean Francois shows that everything was still showing as "Pending" at 10:11 p.m. on May 30, 2020, and it was only on June 29, 2020 at 6:46 p.m. that Yessica Vallejo booked the contract and the Vehicle was marked as sold. *See Keshavarz Decl.* [**Exhibit K** (Francois Dealertrack), SUBPOENA RESPONSES 569, 572].

**RESPONSE:** Objection. This paragraph constitutes palpably improper attorney conjecture, blatant legal argument and conclusions of law, and speculation inappropriate for a Rule 56.1 Statement and disputed to the extent Plaintiff seeks to imply that the "Pending" status on Dealertrack contradicts Defendants' deposition testimony regarding the need to re-sign loans due to changing terms, (*See, e.g.,* Dkt. No. 53-2, at 116:16-118:17; and Exhibit "F," at 159:10-160:9, 162:6-18.), but the totality of the deposition testimony demonstrates that these facts are entirely consistent with each other and there is no contradiction to be found on the facts cited. Further, it is not clear which time zone the time stamps on various documents herein refer to.

255.    And perhaps most importantly, there were more credit applications and denials on June 29, 2020 – if the signing on June 29, 2020 was merely a resigning of a deal entered into on May 30, 2020, there

would be no reason to continue working the deal. *See Keshavarz Decl*. [**Exhibit BB** (Financing

Arrangements) SUBPOENA RESPONSES 530-552; **Exhibit B** Vallejo Trans. 184:02-12].

**RESPONSE:** Objection. This paragraph constitutes palpably improper attorney conjecture, blatant legal

argument and conclusions of law, and speculation inappropriate for a Rule 56.1 Statement. Indeed, one can

just as easily draw the opposite conclusion, namely that Capital One, prior to memorializing a revised

financing agreement nearly one month after the initial application, sought to confirm that Plaintiff's credit

remained unchanged and that she had not been on a credit spree thus increasing the risk of the proposed

loan. But again, such speculation and legal argument has no place in a Rule 56.1 Statement.

256.    The more plausible explanation as demonstrated by the documents is that the financing deal

offered by Capital One for the Vehicle required contracts and stipulations by June 29, 2020, "or app will

expire," and thus that was the date those documents were submitted despite the Vehicle being sold to

Emmanuel Laforest on May 30, 2020. *See Keshavarz Decl*. [**Exhibit AA** Capital One Production,

SUBPOENA RESPONSES 523].

**RESPONSE:** Objection, this is pure attorney argument. See response to Paragraph "255," above.

257.    Ms. Vallejo could neither confirm nor deny that this was the reason for the signing of the

documents on June 29, 2020. *See Keshavarz Decl*. [**Exhibit B** Vallejo Trans. 183:02-08].

**RESPONSE:** Disputed to the extent that Plaintiff asserts that Defendants were unable to provide a reason

for the signing of documents on June 29, 2020. While Ms. Vallejo did not have an independent recollection

as to why the documents were signed in June, she did provide an educated guess as to why that might have

happened based on her review of the documents and her knowledge and experience with finance companies,

(Dkt. No. 53-2, at 116:16-118:17), and Stavros Orsaris testified very clearly as to the reasons this would

have happened. Exhibit "F," at 159:10-160:9, 162:6-18.

258.    The Cap Sheet for the transaction lists the "Origination Date" as "6/29/20." *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 12].

**RESPONSE:** No dispute except that this purported fact is not material.

259.    Based on the difference in formatting between the May 30, 2020 application and the June 29, 2020 application, and the information being typed in rather than handwritten, it appears the June 29, 2020 application was created through the Dealertrack program. *See Keshavarz Decl.* [**Exhibit X** (Dealertrack User Guide), SUBPOENA RESPONSES 576-584].

**RESPONSE:** Objection. This Paragraph constitutes improper attorney conjecture and speculation inappropriate for a Rule 56.1 Statement.

260.    Ms. Francois' income information on the June 29, 2020 application was changed from the amount guessed at by Mr. Laforest, $41,000, to $65,000. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 19].

**RESPONSE:** Objection. This paragraph constitutes improper attorney conjecture, commentary, and speculation inappropriate for a Rule 56.1 Statement.

261.    The $65,000 figure was not provided to Victory Mitsubishi by Mr. Laforest *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 39:07-11].

**RESPONSE:** Objection, attorney conjecture and disputed as Plaintiff herself testified that Laforest is a liar who cannot be trusted[26] and thus should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15. Moreover, Vallejo explicitly stated that the $65,000 figure was provided by the customer. Dkt. No. 53-2, at 209:17-25.

---

[26] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d)

262.    The final deal accepted for the financing of the Vehicle by Capital One had no requirements for proof of income ("POI"). *See Keshavarz Dec*l. [**Exhibit BB** (Financing Arrangements), SUBPOENA RESPONSES 552; **Exhibit B** Vallejo Trans. 187:09-13].

**RESPONSE:** No dispute, except that this fact is not material.

263.    The prior approval, which was not accepted, required proof of income. *See Keshavarz Decl.* [**Exhibit BB** (Financing Arrangements), SUBPOENA RESPONSES 550].

**RESPONSE:** No dispute, except as to the assertion that the prior approval was "not accepted." This assertion is not supported by the evidence, and is in fact confusing and ambiguous as to its meaning such that Defendants are unable to adequately respond to same.

264.    Ms. Vallejo admitted that not having proof of income could be the basis for accepting a deal if proof of income was not available. *See Keshavarz Decl*. [**Exhibit B** Vallejo Trans. 188:12-23].

**RESPONSE:** No dispute, except to clarify that the underlying evidence cited is a general, hypothetical question and was not asked with regard to any of the actual facts at issue herein.

265.    Mr. Laforest did not make a downpayment of $9,000 as stated in the June 29, 2020 application. *See Keshavarz Decl*. [**Exhibit T** Laforest Trans. 41:03-08].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted[27] and thus should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15. Moreover, this fact is explicitly disputed by other sworn testimony. *See, e.g.*, Exhibit "F," at 153:10-12.

266.    Given that Mr. Laforest and Ms. Francois were not at Victory on June 29, 2020 and given Ms. Vallejo's admission to making both of the handwritten dates of "6/29/20" next to the signatures, it appears that Defendant Yessica Vallejo forged the signatures on the contract. *See Keshavarz Decl*. [**Exhibit**

---

[27] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d)

**B** Vallejo Trans. 213:06-10, 221:08-16].

**RESPONSE:** Objection. This paragraph constitutes palpably improper attorney conjecture, blatant legal argument and conclusions of law, and wild speculation in contradiction to sworn testimony, and its inclusion in a Rule 56.1 Statement wholly inappropriate. *See, e.g.,* Dkt. No. 53-2, at 123:23-124:17.

267.    The Service Contract has an email which does not exist. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 13].

**RESPONSE:** No dispute.

268.    Ms. Vallejo earned a commission of $317.26 from the sale. *See Keshavarz Decl.* [**Exhibit E** (Deal Jacket), DEFENDANTS 12; **Exhibit B** Vallejo Trans. 195:19-22].

**RESPONSE:** No dispute.

269.    Ms. Francois first learned of the unauthorized sale and financing of the Vehicle in her name in September of 2020 when she received the title for the Vehicle in the mail. *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 51:13-15, 64:12-15, 83:03-05].

**RESPONSE:** Disputed. Laforest testified that he discussed the that he discussed the purchase of the Vehicle with Plaintiff in June or July 2020, and promised to pay it off the loan by December 2020 *to which Plaintiff agreed* – that being well before she claims to have discovered the Vehicle's purchase for the first time in September 2020. Dkt. No. 53-22, at 110:22-112:11. To the extent that Plaintiff seeks to rely on Laforest's testimony, she cannot present facts in contradiction to that testimony as undisputed.

270.    Ms. Francois only learning of the sale and financing of the Vehicle in September is corroborated by the testimony of Papito Momplaisir:

16 So she was telling me -- well,
17 I was telling her, hey, you cannot be doing
18 this, getting those tickets. And I was
19 like -- then she showed me. I met her, she
20 showed me the papers. And when I looked at
21 the papers, and I was like, BMW? Do you

22 have a BMW? And she was like, BMW? No. I
23 don't know anything about a BMW. Then from
24 there I told her let me check.

*See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 55:03-24].

**RESPONSE:** Disputed, legal argument. Further, Laforest testified that he discussed the purchase of the

Vehicle with Plaintiff in June or July 2020, and promised to pay it off the loan by December 2020 *to which*

*Plaintiff agreed* – that being well before she claims to have discovered the Vehicle's purchase for the first

time in September 2020. Dkt. No. 53-22, at 110:22-112:11. To the extent that Plaintiff seeks to rely on

Laforest's testimony, she cannot present facts in contradiction to that testimony as undisputed.

271.    Farah Jean Francois and Papito Momplaisir went to Victory Mitsubishi two times in

September of 2020. *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 67:15-20, 73:12-17; **Exhibit S**

Momplaisir Trans. 60:12-61:05].

**RESPONSE:** Disputed, Orsaris testified that Plaintiff came to the dealership only once.

272.    The first time they went to Victory Mitsubishi, they were there about 2-3 hours. *See*

*Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 62:04-07].

**RESPONSE:** Disputed, this purported fact is not material.

273.    Ms. Francois and Mr. Momplaisir were told that "the department that supposed to give you

those answers are closed right now. If you don't mind, you could come back in a couple of days." *See*

*Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 67:22-25].

**RESPONSE:** Disputed, this purported fact is not material.

274.    After having sold and financed a vehicle in her name, this treatment upset Ms. Francois, as

observed by Mr. Momplaisir:

4 A. Farah said, after all that time
5 we waited and you -- now you're going to
6 tell us the office is closed. We've been
7 here for like more than three hours, you

8 know? And the guy said, well, I'm sorry,
9 but the department is closed. You guys
10 have to come back another day.

*See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 68:04-10].

**RESPONSE:** Disputed, this purported fact is not material.

275.    When Ms. Francois and Mr. Momplaisir went back to Victory Mitsubishi on September 24,

they were again made to wait for a long time, which caused further distress to Ms. Francois:

10 A. So we went to sit down. After
11 a while, was taking a long time. Then --
12 then Farah starting to get a little bit --
13 you know, aggravated. You know? Because
14 of the situation. And then she start
15 talking a little bit loud. Then they tell
16 her, oh, oh, we coming. We coming now.
17 Just one minute and you going to talk to
18 someone. Then –

*See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 74:10-18].

**RESPONSE:** Disputed, this purported fact is not material.

276.    Eventually they were taken to an office and introduced to someone who told them that he

was "the son of the owner." *See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 75:04-19; **Exhibit O**

Francois Trans. 75:09-76:02, 77:22-78:03; **Exhibit P** Francois Aff.¶ 3].

**RESPONSE:** Disputed. To the extent that it is even relevant, this testimony was explicitly refuted by

Stavros Orsaris at his deposition, who testified that he has never represented himself as the son of the owner

of the dealership. Exhibit "F," at 87:23-25.

277.    The "owner" being referred to must have been Chris Orsaris, as Stavros Orsaris and his

brother Chris Orsaris Jr. are the only sons of another person who works at Victory Mitsubishi, Chris Orsaris,

and the owner on paper, Diane Argyropoulos, only has daughters and has no sons. *See Keshavarz Decl.*

[**Exhibit D** Orsaris Trans. 88:02-16, 216:12-16; **Exhibit B** Vallejo Trans. 232:22-233:09**; Exhibit C** Diane

Trans. 22:10-14; 134:25-135:13; 136:04-16].

**RESPONSE:** Objection. This paragraph constitutes improper attorney conjecture, legal argument, and speculation inappropriate for a Rule 56.1 Statement. Disputed - this testimony was explicitly refuted by Stavros Orsaris at his deposition, who testified that he has never represented himself as the son of the owner of the dealership. Exhibit "F," at 87:23-25.

278.    Notably, a complaint on Cars.com also refers to Chris Orsaris as "Owner Of Victory." *See Keshavarz Decl*. [**Exhibit N** (Cars.com Complaints), FRANCOIS 4034-4035].

**RESPONSE:** Disputed. The cited evidence constitutes inherently untrustworthy and inadmissible hearsay, wholly improper for inclusion in Rule 56.1 Statement.

279.    It is unclear why Mr. Orsaris told Ms. Francois and Mr. Momplaisir that he was the son of the owner, whether it was because Chris Orsaris has a greater role at Victory Mitsubishi than testified to by the Defendants (and as suggested by Victory Mitsubishi's contract with Capital One) or if it was because Stavros Orsaris was trying falsely represent Chris Orsaris as the owner to Ms. Francois and Mr. Momplaisir to hide the identity of Diane Argyropoulos. *See Keshavarz Decl*. [**Exhibit U** (Capital One Agreement), DEFENDANTS 73].

**RESPONSE:** Objection. This paragraph constitutes blatantly improper attorney conjecture, legal argument, and rampant speculation inappropriate for a Rule 56.1 Statement. *See also* responses to Paragraphs "276" and "277" above.

280.    Eventually Stavros Orsaris told Ms. Francois and Mr. Momplaisir "that's a little bit too much for me, I have to get my dad on this" and brought Chris Orsaris to the office. *See Keshavarz Decl*. [**Exhibit S** Momplaisir Trans. 78:17-22; **Exhibit O** Francois Trans. 77:22-78:03].

**RESPONSE:** Disputed, Stavros Orsaris testified at his deposition that he has never represented himself as the son of the owner of the dealership, (Exhibit "F," at 87:23-25), and that his father was not present when

he met with Plaintiff. Exhibit "F," at 216:7-11.

281.     Mr. Momplaisir affirmatively identified pictures of Chris Orsaris and Stavros Orsaris as the men he spoke to that day. Mr. Momplaisir, although he does not recall which said he was the father and which said he was the son. *See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 116:02-117:03].

**RESPONSE:** Disputed. This testimony was explicitly refuted by Stavros Orsaris at his deposition, who testified that he has never represented himself as the son of the owner of the dealership, (Exhibit "F," at 87:23-25), and that his father was not present when he met with Plaintiff. Exhibit "F," at 216:7-11.

282.     Ms. Francois also affirmatively identified pictures of Chris Orsaris and Stavros Orsaris. *See Keshavarz Decl.* [**Exhibit P** Francois Aff.¶¶ 2-3].

**RESPONSE:** Disputed. This testimony was explicitly refuted by Stavros Orsaris at his deposition, who testified that he has never represented himself as the son of the owner of the dealership, (Exhibit "F," at 87:23-25), and that his father was not present when he met with Plaintiff. Exhibit "F," at 216:7-11.

283.     Chris Orsaris showed Ms. Francois and Mr. Momplaisir the deal jacket, but took it away after Ms. Francois took pictures of some of the documents in it. *See Keshavarz Decl.* [ **Exhibit S** Momplaisir Trans. 81:14-19, 83:22-84:05; **Exhibit O** Francois Trans. 78:14-79:02].

**RESPONSE:** Disputed. Stavros testified that Chris Orsaris was not present at the meeting with Plaintiff. Exhibit "F," at 216:7-11.

284.     Chris Orsaris offered to pay for the car in exchange for the title. *See Keshavarz Decl*. [**Exhibit S** Momplaisir Trans. 84:08-25, 85:05-10].

**RESPONSE:** Disputed. Stavros testified that Chris Orsaris was not present at the meeting with Plaintiff. Exhibit "F," at 216:7-11.

285.     Ms. Francois asked Chris and Stavros Orsaris "how did you sell someone a car under my name while I wasn't there," and Chris Orsaris responded that "a man will [sic] come here with your ID, we

thought that you gave him the ID to come and buy the car.*" See Keshavarz Decl*. [**Exhibit O** Francois

Trans. 79:13-25, 80:11-14, 153:04-10, 156:20-157:21; **Exhibit S** Trans. 86:13-23, 87:03-09].

**RESPONSE:** Disputed. Stavros Orsaris repeatedly testified that he did not, and would not, sell a car to

someone without the person being present at the dealership. Exhibit "F," at 149:16-21. Additionally, Stavros

testified that Chris Orsaris was not present at the meeting with Plaintiff. Exhibit "F," at 216:7-11.

286.     Ms. Francois also testified that Chris and Stavros Orsaris made this admission: "Like I said

to them, you guys have to show the police the video when I went there, because I never been there. They

said, okay, it's fine, we know you never been there." *See Keshavarz Decl*. [**Exhibit O** Francois Trans.

153:04-10].

**RESPONSE:** Disputed. This states a conclusion of law, improper for a Rule 56.1 Statement, and which

Defendants in any event dispute on a number of grounds. Further, Stavros Orsaris repeatedly testified that

he did not, and would not, sell a car to someone without the person being present at the dealership. Exhibit

"F," at 149:16-21.

287.     Ms. Francois was then given an unsigned copy of the contract by Victory Mitsubishi. *See

Keshavarz Decl*. [**Exhibit CC** (Unsigned Sales Contract)].

**RESPONSE:** Disputed, this purported fact is not material.

288.     Yessica Vallejo had no explanation for this, as customers would always be given signed

copies, both at the sale and if they came back and asked for copies. *See Keshavarz Decl*. [**Exhibit B** Vallejo

Trans. 223:05-22].

**RESPONSE:** No dispute, except that this fact is not material.

289.     On or around September 25, 2020, Mr. Laforest spoke with Victory Mitsubishi over the

phone, and Mr. Orsaris told Mr. Laforest that "he wants to make this headache go away, and can [Mr.

Laforest] just bring the car back so they can reverse it.*" See Keshavarz Decl*. [**Exhibit T** Laforest Trans.

49:11-14].

**RESPONSE:** Disputed in part. Plaintiff herself testified that Laforest is a liar who cannot be trusted[28] and thus should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

290.    Victory Mitsubishi then offered to "put [Mr. Laforest] in a different car" "instead of reversing all the money." *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 50:22-25; 55:06-14].

**RESPONSE:** Disputed, this purported fact is neither relevant nor material to any point of law here at issue. Further, Plaintiff herself testified that Laforest is a liar who cannot be trusted[29] and thus should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

291.    This claim by Mr. Laforest is corroborated by his text message on September 25, 2020 of Jami Singer's driver's license and Social Security number to Defendant Stavros Orsaris for the purpose of applying for another car. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 51:03-22; Trans. 52:21-23; 53:02-07; **Exhibit DD** (Texts Between Emmanuel Laforest and Stavros Orsaris)].

**RESPONSE:** Objection. Corroboration is counsel's conclusion, not a fact, and the text cited does not corroborate the assertion that Spartan made any offer to Laforest as opposed to Laforest making an unsolicited request to Spartan. Disputed, this purported fact is not material. Further, Plaintiff herself testified that Laforest is a liar who should not be trusted and thus cannot be heard to rely on his testimony herein. Exhibit "D," at 65:4-15.

292.    This was done without either Mr. Laforest or any of the Defendants notifying Jami Singer. *See Keshavarz Decl.* [**Exhibit Z** Singer Trans. 12:08-11, 13:14-22].

---

[28] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d)

[29] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d)

**RESPONSE:** See response to Paragraph "291" above.

293.    Stavros Orsaris confirmed that the reason Emmanuel Laforest texted him the driver's license and Social Security number was "to move the loan over to her name." *See Keshavarz Decl*. [**Exhibit D** Orsaris Trans. 193:13-15].

**RESPONSE:** Disputed in part. The testimony reads "…then [Laforest] *requested* to move the loan over to her name." Defendants dispute any implication that any such action would have been taken based solely on Laforest's request.

294.    Mr. Laforest testified that he texted Mr. Orsaris the driver's license and Social Security number "[b]ecause he asked for it." *See Keshavarz Decl*. [**Exhibit T** Laforest Trans. 134:02-04].

**RESPONSE:** See response to Paragraph "291" above.

295.    Victory Mitsubishi told Mr. Laforest that Ms. Singer's credit wouldn't be able to get him financing for a Vehicle. *See Keshavarz Dec*. [**Exhibit T** Laforest Trans. 51:21-22].

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted[30] and thus should not be heard to rely on his testimony in opposition to the instant motion. Exhibit "D," at 65:4-15. Further, this testimony is recited out of context and out of order to imply that Orsaris attempted to "move the loan over to her name," when in fact this testimony related to Laforest's initial attempt to obtain financing for the Vehicle back in May. *See* Dkt. No. 53-22, at 51:3-54:4.

296.    On September 26, 2020, Mr. Laforest drove the Vehicle to a street near Victory Mitsubishi per the dealership's request and told Mr. Orsaris to pick it up. *See Keshavarz Decl*. [**Exhibit T** Laforest Trans. 08:24-09:02; 126:04-16; 128:02-03].

---

[30] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d)

**RESPONSE:** Objection, disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted[31] and thus should not be heard to rely on his testimony herein. Exhibit "D," at 65:4-15. Further, Orsaris testified that it was Laforest who decided to leave the vehicle on the street rather than return it to the vehicle as he was afraid that Orsaris would call the police. Exhibit "F," at 167:10-23.

297.    Despite Mr. Laforest returning the Vehicle due to identity theft and texting him the driver's license and Social Security number of another consumer, Mr. Orsaris did not even think about calling the police. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 167:24-168:08].

**RESPONSE:** Disputed. Orsaris clearly testified that he told Plaintiff he would work with law enforcement at her request; Defendants object to the implication that Defendants had any right or obligation to contact law enforcement in the first instance to report the alleged theft of Plaintiff's identity at the time, but no law enforcement officials ever contacted anyone at Victory regarding these events. *See* Exhibit "F," at 167:24-168:21.

298.    On January 11, 2021, Mr. Laforest was arrested. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 70:08-12; 106:15-17].

**RESPONSE:** No dispute.

299.    The arresting officer asked Mr. Laforest "[D]id you get a car under somebody else's name." *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 70:13-21].

**RESPONSE:** No dispute.

300.    Mr. Laforest went to court in November of 2021 and the case was dismissed and sealed for unknown reasons. *See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 71:05-11; 141:19-21].

---

[31] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d)

**RESPONSE:** No dispute, except the discontinuance of the case implies that Plaintiff either requested that or ceased to cooperate with law enforcement.

301.    Plaintiff wrote three separate dispute letters that she mailed certified mail return receipt requested in regards to various tickets incurred by the Vehicle. *See Keshavarz Decl*. [**Exhibit Q** (Dispute Letters)].

**RESPONSE:** Disputed. The evidence submitted consists of only letters, no evidence that (a) Plaintiff actually mailed them or (b) that Plaintiff herself incurred the cost of mailing when they might have been mailed from her place of employment, by her attorneys, or through some other means. Otherwise, the documents speak for themselves.

302.    The first dispute letter was to Credit Collection Services and Progressive Max Insurance Company – Credit Collection Services had alleged that Ms. Francois owed Progressive Max Insurance Company debts of $3,908.66 and $2,476.40 in regards to the Vehicle. *See Keshavarz Decl*. [**Exhibit Q** (Dispute Letters), FRANCOIS 185-196].

**RESPONSE:** Disputed. The evidence submitted consists of only letters, no evidence that (a) Plaintiff actually mailed them or (b) that Plaintiff herself incurred the cost of mailing when they might have been mailed from her place of employment, by her attorneys, or through some other means. Otherwise, the documents speak for themselves.

303.    The second dispute letter was to Transworld Systems Inc. and MTA Bridges and Tunnels – Transworld Systems Inc. had alleged that Ms. Francois owed MTA Bridges and Tunnels for 9 separate violations incurred with the Vehicle. *See Keshavarz Decl*. [**Exhibit Q** (Dispute Letters), FRANCOIS 197-218].

**RESPONSE:** Disputed. The evidence submitted consists of only letters, no evidence that (a) Plaintiff actually mailed them or (b) that Plaintiff herself incurred the cost of mailing when they might have been

mailed from her place of employment, by her attorneys, or through some other means. Otherwise, the documents speak for themselves.

304.    The third dispute letter was the New York State Department of Motor Vehicles, requesting an Illegal Registration indactor [sic] on the Vehicle and its license plate and removal of Ms. Francois' name from the DMV records listing her as the registrant. *See Keshavarz Decl*. [**Exhibit Q** (Dispute Letters), FRANCOIS 219-241].

**RESPONSE:** Disputed. The evidence submitted consists of only letters, no evidence that (a) Plaintiff actually mailed them or (b) that Plaintiff herself incurred the cost of mailing when they might have been mailed from her place of employment, by her attorneys, or through some other means. Otherwise, the documents speak for themselves.

305.    As of March 14, 2023, there is $340.25 of outstanding toll violations. *See Keshavarz Decl*. [**Exhibit EE** (Outstanding Tolls)].

**RESPONSE:** Disputed. This paragraph relies on evidence that was not previously exchanged during discovery and that is otherwise completely unauthenticated, and therefore inadmissible. *See* FRCP Rule 37(c)(1). Further, Plaintiff testified that she has no intention of paying for any fines or penalties incurred by Laforest. Exhibit "D," at 141:13-23.

306.    Ms. Francois learned that her driver's license had been suspended on January 11, 2022 due to the fees and fines incurred by Emmanuel Laforest when she was pulled over by the police while driving on the highway to get to work. *See Keshavarz Decl*. [**Exhibit P** Francois Aff. ¶ 12; **Exhibit R** (DMV License Abstract)].

**RESPONSE:** Disputed. This paragraph relies on evidence that was not previously exchanged during discovery and that is otherwise completely unauthenticated, and therefore inadmissible. *See* FRCP Rule 37(c)(1). Moreover, Plaintiff's affidavit so stating is a self-serving sham that purports to add categories of

damages not previously testified to or otherwise disclosed. Finally, even if considered, the DMV License Abstract submitted in support of this paragraph establishes only that Plaintiff's license was suspended for failure to appear and answer a summons; it does not demonstrate whether that summons was the result of Laforest's conduct as opposed to Plaintiff's own driving, and does not otherwise demonstrate that the suspension as the result of any conduct other than Plaintiff's own failure to answer a valid summons.

307.     Ms. Francois was afraid that she would be arrested for driving on a suspended license. *See Keshavarz Decl*. [**Exhibit P** Francois Aff. ¶ 13].

**RESPONSE:** Disputed. This paragraph relies on evidence that was not previously exchanged during discovery and that is otherwise completely unauthenticated, and therefore inadmissible. *See* FRCP Rule 37(c)(1). Moreover, Plaintiff's affidavit is a self-serving sham, and purports to add categories of damages not previously testified to or otherwise disclosed at her deposition or during discovery.

308.     Ms. Francois worked in Queens and there's no train close to her job because it is a private nursing home, so she needs to drive to get to work. *See Keshavarz Decl*. [**Exhibit P** Francois Aff. ¶ 14].

**RESPONSE:** Disputed. This paragraph relies on evidence that was not previously exchanged during discovery and that is otherwise completely unauthenticated, and therefore inadmissible. *See* FRCP Rule 37(c)(1). Plaintiff's affidavit is a self-serving sham, and purports to add categories of damages not previously testified to or otherwise disclosed at her deposition or during discovery.

309.     Ms. Francois had to take Uber to get to work. Sometimes it would cost as much as $86, especially because of the $10 toll. *See Keshavarz Decl*. [**Exhibit P** Francois Aff. ¶ 15].

**RESPONSE:** Disputed. This paragraph relies on evidence that was not previously exchanged during discovery and that is otherwise completely unauthenticated, and therefore inadmissible. *See* FRCP Rule 37(c)(1). Plaintiff's affidavit is a sham, and purports to add categories of damages not previously testified to or otherwise disclosed at her deposition or during discovery. Further, Plaintiff's sham affidavit does not

56

quantify her alleged damages or annex receipts or other proof of expenses.

310.   Ms. Francois had to take off from work, for which she was not paid, to fight the consequences of Victory Mitsubishi impermissibly pulling and using her credit report and getting a loan in her name with Capital One. *See Keshavarz Decl*. [**Exhibit P** Francois Aff. ¶ 16].

**RESPONSE:** Disputed. This paragraph relies on evidence that was not previously exchanged and that is otherwise completely unauthenticated, and therefore inadmissible. *See* FRCP Rule 37(c)(1). Plaintiff's affidavit is a sham, and purports to add categories of damages not previously testified to or otherwise disclosed at her deposition or during discovery. At her deposition, Plaintiff testified only as follows:

> Q:   I'm sorry. Did you lose any pay? Did you lose anything form your paycheck, any salary for the time that you say that you took off, that one week you took off and maybe another day or two, if I understood you correctly?
> A.   Yeah, if you did not go to work, if you don't have any sick days, which they are not going to pay you. I already took one week, *it is my sick days. That one week that I take it is my sick days.* After that, you call out, call out which you're not going to get paid. And I was not focused on that. All I was focused on was to figure out to fix those things.
>
> Q.   So, how much money did you lose as a result of not working on those days?
> A.   I don't know. I don't remember.
>
> Q.   Are you claiming that in this case?
>        Are you alleging damages in this case for the amount you say that you weren't paid for the time you took off from TD Bank?
> A.   I don't know. I don't know.

Exhibit "D," at 224:25-226:7 (Attorney interjections omitted).

311.   She had to take off time from work to (1) go the DMV multiple times to try to fight the suspension of her driver's license and the multiple fines; (2) return to the DMV again when they said she needed more paperwork from the police; and (3) go to the police repeatedly to learn what to get from the dealership about the fraudulent loan, bring a photo from the dealership to the police to press charges against Emmanuel Laforest, get additional papers for the DMV, get papers for her dispute to Capital One for the fraudulent loan, and get papers for her written disputes to the MTA. *See Keshavarz Decl*. [**Exhibit P** Francois Aff. ¶ 16].

**RESPONSE:** Disputed. This paragraph relies on evidence that was not previously exchanged and that is otherwise completely unauthenticated, and therefore inadmissible. *See* FRCP Rule 37(c)(1). Plaintiff's affidavit is a self-serving sham, and purports to add categories of damages not previously testified to or otherwise disclosed at her deposition or during discovery.

312.    On or around June 29, 2021, Ms. Francois sent Victory Mitsubishi a letter requesting written confirmation that she would not be liable for the debt. *See Keshavarz Decl*. [**Exhibit FF** (Letter to Victory and Capital One)].

**RESPONSE:** No dispute.

313.    She never received a response from Victory Mitsubishi to this letter. *See Keshavarz Decl*. [**Exhibit P** Francois Aff. ¶ 28].

**RESPONSE:** Disputed to the extent this implies that Spartan had a duty to respond and to clarify that by this time Plaintiff testified that she had blocked all of Defendants' telephone numbers and had refused to otherwise engage with Defendants. Exhibit "D," at 86-19-25; Dkt. No. 54, ¶ 53. Defendants dispute that Plaintiff's failure to receive a response to the letter from Spartan was the fault of anyone but Plaintiff herself.

314.    Capital One did respond to the letter on or around July 26, 2021. *See Keshavarz Decl*. [**Exhibit AA** (Capital One Production), SUBPOENA RESPONSES 329].

**RESPONSE:** No dispute, except that this purported fact is neither relevant nor material to any point of law here at issue.

315.    At an unknown date, Capital One apparently initiated an investigation into the identity theft that happened to Farah Jean Francois. *See Keshavarz Decl*. [**Exhibit AA** (Capital One Production), SUBPOENA RESPONSES 326].

**RESPONSE:** No dispute, except that this purported fact is not material.

316.    Defendants' impermissible obtaining of Plaintiff's credit report was published by

TransUnion as a "Regular Inquiry" to "SYNCBAMAZON" on November 26, 2020, to "STATEWIDE COMMERCIAL VIA PREMIUM CREDIT BUREAU" on January 13, 2021, and to Capital One on July 5, 2021. *See Keshavarz Decl*. [**Exhibit GG** (TransUnion Credit Report), FRANCOIS 174].

**RESPONSE:** Disputed in part. This paragraph constitutes palpably improper attorney opinion and conclusions of law inappropriate for a Rule 56.1 Statement. Defendants do not dispute that Plaintiff's credit reports were published and contained accurate representations of Plaintiff's credit history at that time. Plaintiff has withdrawn her claim for damages resulting therefrom.

317.    Defendants' impermissible use of Plaintiff's credit report to apply for financing was published via the credit pulls by "CAPITAL ONE AUTO FINANCE" and "JPMCB AUTO FINANCE" triggered by those applications on May 30 and June 29, 2020, which similarly were published by TransUnion as "Regular Inquiries" to "SYNCBAMAZON" on November 26, 2020, to "STATEWIDE COMMERCIAL VIA PREMIUM CREDIT BUREAU" on January 13, 2021, and to Capital One on July 5, 2021. *See Keshavarz Decl.* [**Exhibit GG** (TransUnion Credit Report), FRANCOIS 174].

**RESPONSE:** Objection. This paragraph constitutes palpably improper attorney conjecture, opinion, and conclusions of law inappropriate for a Rule 56.1 Statement. Moreover, this paragraph assumes facts not in evidence and is not supported by the documents cited to support it. To wit, there is no basis in the record whatsoever for the assertion that Plaintiff's credit report was ever used "to apply for financing." Rather, Plaintiff's credit report was pulled by Defendants as a pre-screening mechanism to determine for which financing programs Plaintiff might be eligible, (Dkt. No. 53-2, at 57:9-59:3); the credit application submitted to Capital One and JPMCB did not "use" or contain any information obtained from Plaintiff's credit reports. Dkt. No. 53-2, at 206:20-208:18; Dkt. No. 53-1, at 211:25-212:4; Dkt. No. 53:4, at 208:10-18; Dkt. No. 53.5, pp. 19-21.

318.    Similar publication of the credit pulls triggered by Defendants were published via Equifax. *See Keshavarz Decl*. [**Exhibit HH** (Equifax Credit Report), FRANCOIS 82].

**RESPONSE:** See response to Paragraph "317," above.

319.    A "flat cancel" – that is the return of the vehicle to the dealership and the dealership refunds the money it was paid by the finance company for the loan -- never happened on the financing for the Vehicle despite the Vehicle now being in Victory Mitsubishi's possession. *See Keshavarz Decl*. [**Exhibit D** Orsaris Trans. 171:21-172:02; **Exhibit C** Diane Trans. 90:18-21].

**RESPONSE:** No dispute, except to point out that Plaintiff's refusal to return the title to the Vehicle has rendered the Vehicle currently unmarketable and that the Vehicle remains on Spartan's lot marked "not for sale," (Exhibit "F" at 172:3-14), on the advice of counsel subject Capital One reconciling the loan with Spartan.

320.    When the bank receives assignment of the loan, it pays the dealership the "amount financed," here $29,462.81. The dealership never "unwound" the deal with the bank and thus still has the $29,462.81 paid by the bank. *See Keshavarz Decl*. [**Exhibit D** Orsaris Trans. 170:7-173:15]

**RESPONSE:** Disputed to the extent this implies that Spartan profited from the sale of the Vehicle; Plaintiff's refusal to return the title to the Vehicle has rendered the Vehicle currently unmarketable and that the Vehicle remains on Spartan's lot marked "not for sale," (Exhibit "F" at 172:3-14), and the downpayment funds held aside on the advice of counsel subject to Capital One reconciling the loan with Spartan.

321.    Victory Mitsubishi retained the amount of the loan of $29,462.81 The Retail Installment Contract assigned the loan to Capital One "without recourse." Stavros Orsaris confirmed that there had not been a "flat cancel," -- that is the return of the vehicle to the dealership and the dealership refunds the money it was paid by the finance company for the loan - despite the Vehicle now being in Victory Mitsubishi's possession. Capital One had not contacted the Defendants about it, and he did not know the status of the

loan other than (he assumes) Ms. Francois no longer being responsible for it. *See Keshavarz Decl.* [**Exhibit E (Deal Jacket), DEFENDANTS 9; Exhibit D** Orsaris Trans. 170:07-173:14].

**RESPONSE:** See response to Paragraph "320" above.

322.    Victory Mitsubishi also has retained the downpayment made by Emmanuel Laforest despite the return of the Vehicle, which Victory Mitsubishi remains in possession of. *See Keshavarz Decl.* [**Exhibit D** Orsaris Trans. 172:03-06, 173:20-174:18].

**RESPONSE:** Disputed to the extent that Laforest never returned to the dealership, instead leaving the car on the street some distance away, (Exhibit "C," p. 2; Exhibit "F," at 167:10-23; Dkt. No. 53-22, at 125:21-126:3), nor did he even ask Spartan to return the downpayment which is, upon information and belief, being held on advice of counsel pending the outcome of this litigation. Dkt. No. 53-22, at 135:23-136:12

323.    Ms. Francois' emotional distress was clearly caused by the impermissible credit pulls, as testified to by Papito Momplaisir:

10 A. By that time she was more
11 worried about the credit, the money that
12 she owes, all those things under her name.
13 She was worried about that than the car.

*See Keshavarz Decl.* [**Exhibit S** Momplaisir Trans. 90:10-13].

**RESPONSE:** Objection. This paragraph contains improper attorney opinion and conjecture inappropriate for a Rule 56.1 Statement, and disputed since evidence cited does not support the contention that Plaintiff's supposed emotional distress was "clearly caused by the impermissible credit pulls," as (a) those pulls did not impact Plaintiff's credit and (b) the quoted testimony connects Plaintiff's distress to the money owed pursuant to the Capital One loan, not the fact that Defendants had pulled her credit in a pre-screening capacity prior to facilitating that loan.

324.    Ms. Francois could not stop crying every day for months because of the stress for the results of the fraud committed by Victory Mitsubishi, enabled and assisted by the fraud of Emmanuel Laforest. *See*

*Keshavarz Decl.* [**Exhibit O** Francois Trans. 81:10-15; **Exhibit P** Francois Aff. ¶ 5].

**RESPONSE:** Objection. This paragraph constitutes improper attorney conjecture, legal argument, and speculation inappropriate for a Rule 56.1 Statement. Further, this paragraph relies on evidence that was not previously exchanged during discovery and that is otherwise completely unauthenticated, and is therefore inadmissible. *See* FRCP Rule 37(c)(1). Plaintiff's affidavit is a sham, and purports to add categories of damages not previously testified to or otherwise disclosed at her deposition or during discovery.

325.    Ms. Francois came to this country for a better life and she has tried to do everything right, with the goal of saving her money to buy a house. *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 81:10-15; **Exhibit P** Francois Aff. ¶ 6]

**RESPONSE:** Disputed, this purported fact is not material. Further, Plaintiff's claim that her financial goal is to purchase a house is in conflict with her apparent attempts to purchase a luxury vehicle in or around June of 2022. *See* Dkt. No. 40-1.

326.    Ms. Francois' emotional distress was so pervasive and severe she was worried that it would lead to her losing her job at TD Bank – stress caused by the dealership contacting her and Capital One contacting her for payment:

15 Q. How is it that you almost lost
16 your job?
17 A. Like I said early, because they
18 been calling me and then I was customer
19 service worker at the time and then my
20 phone I have to answer. Capital One was
21 calling me and then the dealer's son was
22 texting me, calling me about to send the
23 title and my boss saw me answer phone and
24 then I was with customer in front of me and
25 he said you're going to have to take one
2 week and we're going to have to request you
3 to stop coming for one week to figure out
4 to what happened to you and to deal with
5 that and then when you feel you're able to
6 coming back to work, you can coming back to

7 work.
8 Q. Nobody ever actually told you
9 you might lose your job over this, correct?
10 In fact, they actually accommodated you to
11 give you the opportunity to deal with it;
12 is that correct?
13 MR. KESHAVARZ: Objection to
14 form.
15 A. That's not what it is. Because
16 if they stop me they will replace me with
17 someone because I could not be able to do
18 my job.
19 Q. Did anybody tell you that, that
20 they might replace you with someone?
21 A. Yeah, because I was crying.
22 Because every time Capital One calling me
23 and if I'm coming back, I went to the
24 bathroom crying and then my assistant was
25 seeing me crying and then my boss was
2 asking her why Farah been crying, you know
3 Farah have a customer, if she not able to
4 do the job, she have to let us know.
5 Q. But you were able to do the
6 job, correct?
7 A. I was not 100 able to do the
8 job because I was more concerned about what
9 Capital One going to do. Because every
10 time they say, okay, they're going to call
11 me back, they will call me back, which that
12 was about that.

*See Keshavarz Decl.* [**Exhibit O** Francois Trans. 216:15-218:12, 239:17-240:07; **Exhibit P** Francois Aff.

¶¶ 17-22]

**RESPONSE:** Disputed to the extent this testimony implies that the May 30, 2020, credit pulls as opposed

to subsequent events not proximately caused by the credit pulls resulted in Plaintiff's distress.

327. The emotional distress caused Ms. Francois to eat less, and she lost approximately 25

pounds. *See Keshavarz Decl.* [**Exhibit O** Francois Trans. 226:16-227:12; **Exhibit P** Francois Aff. ¶ 9].

**RESPONSE:** Disputed. The cited statements are not supported by any admissible medical evidence and in

the latter case appear in a sham affidavit submitted after the close of discovery.

328.     The emotional distress caused Ms. Francois sleeplessness. *See Keshavarz Decl*. [**Exhibit O** Francois Trans. 230:18-231:07, 231:16-232:07].

**RESPONSE:** Disputed to the extent this testimony improperly implies that the May 30, 2020, credit pulls proximately resulted in Plaintiff's distress. Further this purported fact is not supported by medical or corroborating evidence.

329.     The lack of sleep caused her to get black bag under her eyes. *See Keshavarz Decl*. [**Exhibit O** Francois Trans. 232:16-233:13; **Exhibit P** Francois Aff. ¶ 10].

**RESPONSE:** Disputed to the extent this testimony improperly implies that the May 30, 2020, credit pulls proximately resulted in Plaintiff's distress. Further this purported fact is not supported by medical or corroborating evidence.

330.     Mr. Laforest adamantly denies that he is solely to blame for the identity theft and resulting harm to Ms. Francois:

```
7    Q.  If the defendants in this case say that the
·8  identity theft against Ms. Francois was all your fault
·9  and that they had no role in it, how would you respond
10  to that?
11    A. That's a lie, because I told him everything
12  what it was.· It's not like I went there and I didn't
13  tell him what it was.· I told him what it was.· They --
14  they just wanted a sale so they got a sale.
15    Q. Do you think the defendants did anything wrong
16  here?
17    A. Who are the defendants, Victory Mitsubishi?
18    Q. Yes.
19    A. I mean, I can't go to any other car lot and do
20  that so --
21    Q. And when you say, you "can't go to any other
22  car lot and do that," you mean --
23    A. They would have asked me to bring the person
24  in.
```

*See Keshavarz Decl.* [**Exhibit T** Laforest Trans. 73:07-24]

**RESPONSE:** Disputed. Plaintiff herself testified that Laforest is a liar who cannot be trusted[32] and thus should not be heard to rely on his testimony in opposition to the instant motion. Exhibit "D," at 65:4-15.

Dated: New York, New York
March 28, 2023

Yours, etc.
NICHOLAS GOODMAN & ASSOCIATES, PLLC

BY: _____

H. Nicholas Goodman
*Attorneys for Defendants*
VICTORY AUTO GROUP LLC
d/b/a VICTORY MITSUBISHI,
SPARTAN AUTO GROUP LLC
d/b/a VICTORY MITSUBISHI,
STAVROS ORSARIS, YESSICA VELLEJO,
DAVID PEREZ, DIANE ARGYROPOULOS,
and PHILIP ARGYROPOULOS
333 Park Avenue South, Suite 3A
New York, New York 10010
(212) 227-9003
ngoodman@ngoodmanlaw.com

***Via ECF***
Emma Caterine
Ahmad Keshavarz
THE LAW OFFICE OF
  AHMAD KESHAVARZ
16 Court Street, Suite 2600
Brooklyn, New York 11241
(917) 945-9848
emma@newyorkconsumerattorney.com
ahmad@newyorkconsumerattorney.com

---

[32] Notably, while Plaintiff purported to dispute this fact in her Counterstatement to Defendants Statement of Material Facts, (Dkt. No. 54, at 22-23), she failed to offer any citation to evidence in support of that dispute, this rendering her dispute deficient pursuant to Local Rule 56.1(d)