**Page 1**

1   UNITED STATES DISTRICT COURT
2   SOUTHERN DISTRICT OF NEW YORK
3   1:2022-cv-04447 (JSR)
4   - - - - - - - - - - - - - - - - - - - -x
5   FARAH JEAN FRANCOIS,
6                   Plaintiff,
7     -against-
8   VICTORY AUTO GROUP LLC d/b/a VICTORY MITSUBISHI,
    SPARTAN AUTO GROUP LLC d/b/a VICTORY MITSUBISHI,
9   JOHN DOE 1-6 and PHILIP ARGYROPOULOS,
10                  Defendants.
11  - - - - - - - - - - - - - - - - - - - -x
12
            Zoom deposition
13          November 21, 2022
            11:00 a.m.
14
15
16      DEPOSITION of DAVID PEREZ, the NON-PARTY WITNESS for
17  the DEFENDANT VICTORY MITSUBISHI, in the above-entitled
18  action, held at the above time and place, taken before
19  Sindee J. Baum, a Shorthand Reporter and Notary Public
20  of the State of New York, pursuant to the Federal Rules
21  of Civil Procedure and stipulations between Counsel.
22
23
24
25

**Page 2**

1   APPEARANCES: (All appearing via Zoom)
2
        LAW OFFICES OF AHMAD KESHAVARZ
3       Attorneys for Plaintiff
            16 Court Street, 26th Floor
4           Brooklyn, New York 11241-1026
5       BY: AHMAD KESHAVARZ, ESQ.
            Ahmad@newyorkconsumerattorney.com
6
7   NICHOLAS GOODMAN & ASSOCIATES PLLC
    Attorneys for Defendant
8       333 Park Avenue South, Ste. 3A
        New York, New York 10010
9
    BY: NICHOLAS GOODMAN, ESQ.
10      Ngoodman@ngoodmanlaw.com
11
12  Also Present:
13  Caterine Emma, Esq.
14  Patrick Selvey, Esq.
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1                   STIPULATIONS
2
3      IT IS HEREBY STIPULATED AND AGREED, by and among
4   counsel for the respective parties hereto, that the
5   filing, sealing and certification of the within
6   deposition shall be and the same are hereby waived;
7      IT IS FURTHER STIPULATED AND AGREED that all
8   objections, except as to form of the question, shall be
9   reserved to the time of the trial;
10     IT IS FURTHER STIPULATED AND AGREED that the within
11  deposition may be signed before any Notary Public with
12  the same force and effect as if signed and sworn to
13  before the Court.
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1   D A V I D  P E R E Z, the Witness herein, having first
2   been duly sworn by the Notary Public, was examined and
3   testified as follows:
4   EXAMINATION BY
5   THE STENOGRAPHER:
6      Q.  Please state your full name for the record.
7      A.  David Perez.
8      Q.  What is your current address?
9      A.  REDACTED
10  BY MR. KESHAVARZ:
11     Q.  Good morning, Mr. Perez.  Thank you for your time
12  this morning.
13     A.  Good morning.
14     Q.  I'm Ahmad Keshavarz.  I represent Farah Jean
15  Francois in this lawsuit.  Let me go over a few ground
16  rules.  First of all, you gave your name to the court
17  reporter.
18       What is your full legal name?
19     A.  David Perez.
20     Q.  No middle initial?
21       No, you know, anything like that?
22     A.  Correct.
23     Q.  Have you ever gone by any other name, other than
24  David Perez?
25     A.  No.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
5–8

**Page 5**

DAVID PEREZ

1
2   Q.  No aliases in the past?
3   A.  No.
4   Q.  Have you ever had your deposition taken before?
5   A.  No.
6   Q.  Let me go over a few ground rules, please.
7       If you don't understand a question I'm asking,
8   will you please ask me to rephrase?
9   A.  No problem.
10  Q.  If I ask you a question and you don't ask me to
11  rephrase, is it reasonable to assume that you understood
12  the question?
13      MR. GOODMAN:  Object to form.
14      Go ahead and answer, if you understand.
15  A.  Yes.
16  Q.  Yes?  Okay.
17      During the course of the deposition, Mr. Goodman
18  might make certain objections, particularly, what's
19  called objection form.  And you don't need to worry
20  about what that means.  But if that happens, you're
21  still required to go ahead and answer the question.
22      Do you understand that?
23  A.  Yes.
24  Q.  It is important for you to articulate clearly an
25  answer.  It's normal to nod a head or shake your head or

**Page 6**

DAVID PEREZ

1
2   say "Uh-huh."  But since the court reporter is taking
3   notes, will you please try to verbalize your answers?
4   A.  I understand.
5   Q.  What is your age, sir?
6   A.  I am 32 years old.
7   Q.  What's your date of birth?
8   Redacted
9   Q.  Social Security?
10      MR. GOODMAN:  Objection.  We can provide
11  that to you separately.  I don't want that printed in
12  the transcript.
13      MR. KESHAVARZ:  That's fair enough.
14      Let's go off the record for a second.
15      (Whereupon, an off-the-record discussion was
16      held.)
17  Q.  Now, during — I just asked for your Social
18  Security number off the record, and your attorney has
19  refused to produce it; is that right?
20      Wouldn't let you answer the question, correct?
21  A.  I'm sorry.  I couldn't understand.
22      MR. KESHAVARZ:  Well, Mr. Goodman, could you
23  just e-mail it to me later today?
24      MR. GOODMAN:  I'll e-mail you later today
25  yes.

**Page 7**

DAVID PEREZ

1
2       MR. KESHAVARZ:  Perfect.  That's fine.
3   Q.  This might sound odd and, maybe, somewhat
4   insulting, but I have to ask.
5       What is your height?
6       MR. GOODMAN:  Objection.  If you need this
7   information for the service of the subpoena, we'll
8   accept service of the subpoena.
9       MR. KESHAVARZ:  You can instruct him not to
10  answer if it's abusive or you can say objection to the
11  form of the question.  You can say either one — one or
12  the other.
13      MR. GOODMAN:  Okay.  I don't need to hear
14  from you what I can or can't do.  I'll make my own
15  record, thank you.  I just told you that we will
16  certainly volunteer to accept a subpoena.  The only
17  reason you can ask for his height and other descriptive
18  information is for that purpose.
19      MR. KESHAVARZ:  There may be other purposes.
20  Q.  So Mr. Perez, will you tell me your height or
21  will you not tell me your height?
22      MR. GOODMAN:  We go off the record, and
23  he'll provide it.
24      (Whereupon, an off-the-record discussion was
25  held.)

**Page 8**

DAVID PEREZ

1
2   Q.  What's your current address?
3       MR. GOODMAN:  Objection.
4       Don't answer.
5       MR. KESHAVARZ:  Basis?
6       MR. GOODMAN:  I don't need to state basis.
7       MR. KESHAVARZ:  So you'll accept a notice of
8   subpoena — notice for trial, notice on yourself?
9       I don't need to serve a subpoena for trial
10  or —
11      MR. GOODMAN:  As previously stated, yes,
12  that is correct.
13      MR. KESHAVARZ:  Okay.
14  Q.  And was your address today the same as it was in
15  May 2020?
16      MR. GOODMAN:  Objection.  You mean the
17  address he gave at the beginning of his deposition?
18      MR. KESHAVARZ:  His personal address.
19      MR. GOODMAN:  You want to know if it was the
20  same then as it is now?
21      Go ahead.
22  A.  No.
23  Q.  What was it then?
24      MR. GOODMAN:  You're talking about his
25  residence address now.



Page 9

DAVID PEREZ

1
2  Q. In May 2020, what was your address?
3      MR. GOODMAN:  You don't have to give a
4  residence address --
5      MR. KESHAVARZ:  Is that a no?
6      I'm sorry?
7      MR. GOODMAN:  -- in 2020.
8      MR. KESHAVARZ:  I'm sorry?
9  Q. What was your -- Mr. Perez, what was your
10  residence address in May of 2020?
11      MR. GOODMAN:  Objection.
12      Don't answer.
13      MR. KESHAVARZ:  I need this information for
14  many reasons that are not just related to the notice of
15  a deposition or subpoena.
16      So what's the basis for the objection?
17      MR. GOODMAN:  The basis for the objection is
18  it's personal information as his personal residence.  If
19  you want to have a discussion after this deposition,
20  when we discuss -- provide his Social Security number
21  and other information, I'm going to listen.  But lets
22  move on with the deposition.
23      MR. KESHAVARZ:  So when you provide his
24  Social Security number in an e-mail later today,
25  will you provide his current and prior address?

Page 10

DAVID PEREZ

1
2      MR. GOODMAN:  I'll take it under advisement.
3      MR. KESHAVARZ:  Okay.  Mark it for a ruling.
4  Q. You understand, Mr. Perez, that you're under
5  oath?
6      You understand that, right?
7  A. I understand.
8  Q. Now, your answers today are just as if you were
9  in front of a judge and you're testifying at trial.
10      You understand that?
11  A. I understand.
12  Q. Now, when I indicate I want an item marked for
13  ruling, that means that I'm going to ask the court to
14  compel an answer, take whatever steps are necessary.
15      Do you understand that?
16  A. I understand.
17  Q. I'm going to mark this issue about whether you
18  provide your residential address for a ruling.
19      Despite the objection of Mr. Goodman, will you
20  tell me your current address -- residential address and
21  address on May 20th, 2022; yes or no?
22      MR. GOODMAN:  Note my objection.  I direct
23  him not to answer.
24  Q. Go ahead.
25      You can answer the question.

Page 11

DAVID PEREZ

1
2      Go ahead.
3  A. No, I won't provide the address.
4      MR. KESHAVARZ:  Mark it for a ruling with
5  the court.
6  Q. What's your cell number?
7      MR. GOODMAN:  Objection.
8  Q. Go ahead.
9      MR. KESHAVARZ:  What?
10      MR. GOODMAN:  What's what?
11      What do you need his current cell number
12  for?
13      Can you please tell me --
14      MR. KESHAVARZ:  Well, there are many cell
15  numbers that are referenced in documents.
16      (Simultaneous cross talk.)
17      MR. GOODMAN:  -- with his private
18  information.
19      MR. KESHAVARZ:  Right.  But there are cell
20  phone numbers that are referenced in document
21  production.  I need it.
22      Are you going to instruct not to answer?
23      MR. GOODMAN:  Yes.
24      MR. KESHAVARZ:  Okay.  Let's get the judge
25  on the phone.

Page 12

DAVID PEREZ

1
2      (Whereupon, an off-the-record discussion was
3  held.)
4      THE COURT:  Thank you for holding, Counsel.
5  This is Harry Larson, Judge Jed S. Rakoff's law clerk.
6      Who's on the line?
7      MR. KESHAVARZ:  Yes.  We're on a deposition
8  transcript -- we're on the record.
9      Would you like me to go off the record?
10      THE COURT:  Yes.
11      (Whereupon, an off-the-record discussion was
12  held.)
13  Q. Whatever the phone number you have, was it the
14  same in May 2020 as it is today?
15  A. Yes.
16      MR. GOODMAN:  We're back on the record,
17  correct, court reporter?
18      THE STENOGRAPHER:  Yes.  Once Mr. Keshavarz
19  started questioning, I went back on the record.
20  Q. And it's the same phone provider from May 2020 to
21  present; is that right?
22  A. No.
23  Q. So it's the same phone number, but a different
24  phone provider; is that right?
25  A. Correct.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
13–16

---

Page 13

DAVID PEREZ

1
2   Q.  Who was the provider in May and June of 2020?
3       MR. GOODMAN:  You can answer.  Go ahead.
4   A.  Sprint.
5   Q.  And is that also true in September of 2020?
6   A.  Yes.
7   Q.  And what's the current -- when did it change,
8   approximately?
9   A.  I don't remember.
10  Q.  Who' the current provider?
11      MR. GOODMAN:  You can answer.  Go ahead.
12  A.  AT&T.
13  Q.  Did you have the same cell phone number in
14  January 1, 2019?
15      MR. GOODMAN:  Objection.  Relevance.
16      What does that have to do with anything?
17      MR. KESHAVARZ:  Relevance is not an
18  objection.
19      MR. GOODMAN:  Thank you.
20      Mr. Perez, don't answer the question.
21      Put it on your list.
22      MR. KESHAVARZ:  Communications in 2019 are
23  in production.
24      MR. GOODMAN:  Ask him if he was involved in
25  this.

---

Page 14

DAVID PEREZ

1
2       MR. KESHAVARZ:  You're going to instruct him
3   not to answer?
4       MR. GOODMAN:  Yes, I am.  You're free to ask
5   him what his involvement was in any communication in
6   January 2019.  I'm not going to object to that.
7   Q.  Did you have the same phone number provider 2019
8   -- in January 1, 2019 -- excuse me.
9       Did you have the phone number in January 1, 2019,
10  as you currently have?
11  A.  Yes.
12  Q.  The same cell phone provider in January 1, 2019,
13  as you did in May and June of 2020?
14  A.  Yes.
15  Q.  Okay.  Great.
16      Do you use any virtual phone numbers, like,
17  Google Voice or WhatsApp or anything like that?
18      MR. GOODMAN:  Did he use personally or
19  business?
20      What was the question?
21      MR. KESHAVARZ:  You say object form, and
22  that's it.
23  Q.  Will you just please answer the question?
24      Did you use a virtual phone number, such as,
25  Google Voice or WhatsApp from January 1, 2019, to

---

Page 15

DAVID PEREZ

1
2   present?
3       MR. GOODMAN:  Object to the form.
4       You can answer, if you understand.
5       MR. KESHAVARZ:  You say objection to form,
6   and that's it.
7       MR. GOODMAN:  Don't tell me what to say.
8   Let's just not do that.
9   Q.  Go ahead.
10  A.  Yes, I do.
11  Q.  Which providers?
12  A.  WhatsApp.
13  Q.  Any other?
14  A.  No.
15  Q.  Did you use WhatsApp in May through September of
16  2020?
17  A.  Yes.
18  Q.  Did you use it up until present?
19      MR. GOODMAN:  Object to the form.
20      Go ahead.
21  A.  Yes.
22  Q.  Did you use WhatsApp to communicate with any
23  customers at a dealership you worked at from January 1,
24  2019, to present?
25  A.  Not that I can recall.

---

Page 16

DAVID PEREZ

1
2   Q.  Do you use text messages from WhatsApp from
3   January 1, 2019, forward for work you did at a
4   dealership?
5       MR. GOODMAN:  Object to the form.
6       Go ahead.
7   A.  Not that I can recall.
8   Q.  Did you use text messages for work you've done at
9   a dealership from January 1, 2019, to present?
10  A.  Not that I can recall.
11  Q.  Do you use -- have you ever used a cell phone for
12  your work at a car dealership from January 1, 2019, to
13  present?
14      MR. GOODMAN:  Object to the form.
15      Go ahead.
16  A.  Not that I can recall.
17  Q.  So if you had a communication with a consumer to
18  purchase a vehicle, you would -- you don't recall if you
19  ever used your cell phone?
20      MR. GOODMAN:  Object to the form.  He
21  answered.  Asked and answered, also.
22  Q.  Go ahead, you can answer.
23  A.  I have a store phone that I use.
24  Q.  What's the store phone?
25  A.  The phone number for the store.

---



DAVID PEREZ                                    November 21, 2022
FRANCOIS V. VICTORY AUTO GROUP                          17–20

Page 17

DAVID PEREZ

2    Q.  The front office?

3         MR. GOODMAN:  Objection to the form.

4    A.  Correct.

5    Q.  You never used any other phone for work while at

6    a dealership from January 1, 2019, to present; is that

7    right?

8         MR. GOODMAN:  Asked and answered.

9         Go ahead.

10   A.  No.

11   Q.  Why not?

12        MR. GOODMAN:  Why not?

13        Object to the form.

14        Go ahead.

15   A.  I don't want customers having my personal phone

16   number.

17   Q.  And then I know you said you didn't use WhatsApp

18   for messaging.  You weren't sure.  I apologize if I

19   asked this question.

20        Do you use WhatsApp for calls related to work at

21   a car dealership from January 1, 2019, to present?

22        MR. GOODMAN:  Asked and answered.

23        Go ahead.

24   A.  No.  Not that I can recall.

25   Q.  Okay.  Great.

Page 18

DAVID PEREZ

2        Do you have e-mail?

3         MR. GOODMAN:  Does he have e-mail?  That's a

4    question?

5    Q.  You can answer.

6         MR. GOODMAN:  Go ahead.

7         Do you have e-mail?

8         Whatever that means.

9    A.  Yes.

10   Q.  What e-mail -- have you ever used an e-mail

11   address in connection with work at a car dealership?

12   A.  Yeah.

13   Q.  From January 1, 2019, to present, what e-mail

14   addresses have you used in connection with any work

15   you've done at a dealership?

16   A.  E-mail provided by the store.

17   Q.  What e-mail address did you use in connection

18   with work while you worked at Victory Mitsubishi?

19   A.  DavidP@victorymitsubishi.com.

20   Q.  Did you ever use an e-mail in connection with

21   work while you were at Victory Mitsubishi, other than

22   the one you just provided?

23        MR. GOODMAN:  What's that?

24   A.  Could you repeat the question?

25        MR. GOODMAN:  Yeah, I didn't get that.

Page 19

DAVID PEREZ

2    Q.  Other than the e-mail you just provided, did you

3    use any other e-mail address in connection with work

4    while working at Victory Mitsubishi?

5    A.  No.

6    Q.  Do you have your work e-mail address while you

7    were working at Victory Mitsubishi forwarded to your

8    personal e-mail address?

9    A.  No.

10   Q.  When you used a work number -- strike that.

11        Was it the same phone number that you gave out

12   while you were working at -- while you worked at Victory

13   Mitsubishi for customers to call you?

14   A.  I don't understand the question.

15   Q.  What phone numbers would you give out for

16   customers to contact you while you worked at Victory

17   Mitsubishi?

18        MR. GOODMAN:  Object to the form.

19        Go ahead.

20   A.  The one provided by the store.

21   Q.  Which was what, if you remember?

22   A.  I don't recall.

23   Q.  But it was always the same number that you

24   provided, correct?

25   A.  Correct.

Page 20

DAVID PEREZ

2    Q.  And was that the number for the front office or

3    was that a direct number to you?

4    A.  Well, it was an extension.

5    Q.  So they -- you gave a general phone number and

6    you had an extension number that someone could type in

7    to reach you.

8        Is that what you're saying?

9    A.  That is correct.

10   Q.  Now, were phone calls recorded from -- phone

11   calls recorded that were made or received at Victory

12   Mitsubishi?

13        MR. GOODMAN:  Time frame?

14   Q.  When did you work at Victory Mitsubishi?

15   A.  I'm sorry.  I don't understand.

16   Q.  When did you work at Victory Mitsubishi?

17   A.  Oh, 2018.

18   Q.  January 2018?

19   A.  January -- no, sorry.  April 2018.

20   Q.  Until -- you started working at Victory

21   Mitsubishi in April 2018, correct?

22   A.  That is correct.

23   Q.  And when did you cease working at Victory

24   Mitsubishi?

25   A.  June 2021.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
21–24

Page 21

1          DAVID PEREZ
2    Q.  Do you remember when in June 2021?
3    A.  No.  I don't recall.
4    Q.  Why did you cease working at Victory Mitsubishi?
5         MR. GOODMAN:  Go ahead.
6    A.  I got a better job offer.
7    Q.  To where?
8    A.  My current job.
9    Q.  Which is where?
10   A.  The 144-20 Hillside Avenue.
11   Q.  And what dealership is that?
12   A.  Power Motors.
13   Q.  Power motors.  All right.
14       What steps did you take to prepare for your
15   deposition today?
16   A.  Sorry?
17   Q.  What steps did you take in preparation for your
18   deposition today?
19   A.  Well, I met with Nicholas.
20   Q.  Nicholas Goodman?
21   A.  Yes.  With Nicholas Goodman.
22   Q.  When did you meet with Mr. Goodman?
23   A.  Thursday this month.  Last week.  I don't
24   remember the date.
25   Q.  So you met with Mr. Goodman in preparation for

Page 22

1          DAVID PEREZ
2    your deposition today.
3        And you met with him on Thursday, November 17th;
4    is that correct?
5    A.  If that's the date, yes.
6    Q.  And how long was the meeting for?
7    A.  I don't know.
8    Q.  Was it more than an hour?
9    A.  A little bit more.
10   Q.  More than two hours?
11   A.  No.
12   Q.  Was anyone else in the room when you were
13   speaking with Mr. Goodman?
14   A.  Yes.
15   Q.  Who else was in the room when you spoke with
16   Mr. Goodman on Thursday, November 17th?
17   A.  Mr. Patrick.
18   Q.  Patrick Selvey, also counsel, correct?
19   A.  Yes.
20   Q.  Was anyone else in the room on Thursday, November
21   17th?
22   A.  Yes.
23   Q.  Who else?
24   A.  Stavros.
25   Q.  Can you spell that for the court reporter,

Page 23

1          DAVID PEREZ
2    please?
3    A.  I don't know the spelling.
4    Q.  Do you have an approximation?
5         MR. GOODMAN:  By counsel, S-T-A-V-R-O-S
6    O-R-S-A-R-I-S.
7    Q.  Stavros Orsaris.
8        And who is Stavros Orsaris?
9    A.  He's my former boss.
10   Q.  Anyone else in the room?
11   A.  No.
12   Q.  Anyone listening by phone?
13   A.  No.
14   Q.  Did you have any other meetings, other than that
15   November 17th meeting in preparation for your deposition
16   today?
17   A.  No.
18   Q.  Did you review documents in preparation for your
19   deposition today?
20   A.  Yes.
21   Q.  What documents did you review in preparation for
22   your deposition today?
23   A.  The deal jacket.
24   Q.  What is a deal jacket?
25   A.  That's when a customer purchases a vehicle and we

Page 24

1          DAVID PEREZ
2    put all pertinent information in there, like, credit
3    apps, licenses, bank account tracks, receipts.  Stuff
4    like that.  DMV.
5    Q.  Can you back up?
6        Let's take it one step at a time.
7        What was in the deal jacket for the deal that --
8    what was the deal jacket that you reviewed?
9        Let's take one at a time, again, please.
10        MR. GOODMAN:  Object to the form.
11        Do you mean identify the transaction that
12   was in the deal jacket?
13   A.  Farah Fowler.
14        MR. GOODMAN:  What?
15        THE WITNESS:  The --
16        MR. GOODMAN:  You mean Farah Francois?
17   Q.  Let me ask you a different way.
18        You started saying what documents are typically
19   in the deal jacket.  But you went faster than I can take
20   notes on.
21        So can you go a little slower and tell me what's,
22   typically, in the deal jacket?
23   A.  Bill of sale, the bank contract, receipts of any
24   money given, DMV, license for the purchaser, as well as,
25   credit app.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
25–28

Page 25
1           DAVID PEREZ
2    Q.  When you say DMV, what do you mean?
3    A.  Any documents that are needed for DMV.
4    Q.  What typical documents related to the DMV are in
5    the file jacket?
6    A.  I wouldn't know.
7    Q.  A deal jacket, excuse me.
8        You wouldn't know?
9    A.  No, I wouldn't know.
10   Q.  How many pages were in the deal jacket that you
11   reviewed in preparation for your deposition?
12   A.  I wouldn't know.  I wasn't counting.
13   Q.  What documents?
14       Was the bill of sale in that deal jacket for
15   Ms. Francois?
16       Strike that.  Let me rephrase that.
17       Was there a bill of sale in the deal jacket that
18   you reviewed in preparation for your deposition today?
19   A.  Don't recall.
20   Q.  Was there a bank contract in the deal jacket that
21   you reviewed in preparation for your deposition today?
22       MR. GOODMAN:  Object to form.
23       Go ahead.
24   A.  Don't recall.
25   Q.  Were there any receipts for any money given or

Page 26
1           DAVID PEREZ
2    received in the deal jacket that you reviewed in
3    preparation for your deposition today?
4    A.  Yes.
5    Q.  What receipts for money given or received for was
6    there in the deal jacket that you reviewed in
7    preparation for your deposition today?
8    A.  I don't understand the question.
9    Q.  You said receipts were in the deal jacket that
10   you reviewed in preparation for your deposition today;
11   is that correct?
12   A.  Correct.
13   Q.  What receipts were in the deal jacket that you
14   reviewed in preparation for your deposition today?
15       MR. GOODMAN:  Object to form.
16       Go ahead.
17       Do you understand?
18   A.  Was the money that they put down.
19   Q.  And the receipt was for money that was put down
20   in the transaction, correct?
21   A.  Correct.
22   Q.  And by deal jacket, you mean the deal jacket for
23   Farah Francois; is that correct?
24   A.  That is correct.
25   Q.  And how much money was put down, per the receipts

Page 27
1           DAVID PEREZ
2    in the deal jacket?
3    A.  Don't recall.
4    Q.  Were there any DMV documents in the deal jacket
5    that you reviewed in preparation for your deposition
6    today?
7    A.  Don't recall.
8    Q.  Was there any -- were there any licenses in the
9    deal jacket that you reviewed in preparation for your
10   deposition today?
11   A.  Yes.
12   Q.  What licenses were in the deal jacket for the
13   deposition -- for the deal jacket that you reviewed in
14   preparation for your deposition today?
15   A.  Farrah.
16   Q.  There was a photocopy of the driver's license for
17   Farah Francois in the deal jacket that you reviewed in
18   preparation for your deposition today; is that correct?
19   A.  Yes.
20   Q.  Were there any other driver's licenses or any
21   other licenses in the deal jacket?
22   A.  I don't understand.
23   Q.  You said there was a license for a driver's
24   license for Farah Francois in the deal jacket that you
25   reviewed in preparation for your deposition today; is

Page 28
1           DAVID PEREZ
2    that correct?
3    A.  Yes.
4    Q.  Was there license for anyone else, other than
5    Ms. Francois in the deal jacket that you reviewed in
6    preparation for your deposition today?
7    A.  Yes.
8    Q.  How many other licenses were in the deal jacket?
9    A.  One more.
10   Q.  And who was that license for?
11   A.  I don't recall the name.
12   Q.  Was it Emmanuel Laforest?
13   A.  Yes.
14   Q.  And by license, you mean his New York City
15   driver's license; is that right?
16       MR. GOODMAN:  New York State.
17   A.  New York State.
18   Q.  Correct.  Okay.
19       Were there any credit applications in the deal
20   jacket that you reviewed?
21   A.  Yes.
22   Q.  Tell me about it.
23       Was it a screen shot?
24       Was that a signed document?
25       What was it?



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
29–32

Page 29

DAVID PEREZ

1
2    A. I don't understand the question.
3    Q. When you say it was a credit application that you
4  reviewed, what does it look like?
5        Does it look like a computer screen?
6        Does it look like a document that's filled out by
7  hand?
8        What do you mean by credit application?
9    A. Document filled out by hand.
10   Q. How many credit applications were there in the
11  deal jacket?
12   A. One paper, two apps.
13   Q. When you say one paper, what do you mean?
14   A. One piece of paper.
15   Q. Is that a screenshot when you say two written
16  apps?
17   A. No, sir. One credit app.
18       Sorry, one paper, two applications.
19   Q. I understand what a credit application is.
20       When you say one paper, I don't understand what
21  you mean by one paper.
22       What do you mean by that?
23   A. One sheet of paper.
24   Q. A blank sheet of paper?
25   A. No, sir. One sheet of paper with an application

Page 30

DAVID PEREZ

1
2  for a buyer and co-buyer.
3    Q. I see.
4        Were there any other documents in the deal jacket
5  for Miss Francois that you reviewed?
6    A. I don't believe so.
7    Q. Or even, if you didn't review it, were there any
8  other documents in the deal jacket, other than what you
9  testified to?
10   A. I don't recall.
11   Q. And did you review the documents in the deal
12  jacket when you spoke with your attorney last Thursday?
13   A. Yes.
14   Q. All right. Great.
15       And you're represented by Mr. Goodman and
16  Mr. Selvey in this case; is that right?
17   A. Yes.
18   Q. Did you retain them as your attorneys or were
19  they retained for you?
20       MR. GOODMAN: Objection to the form.
21       If you understand, you can answer.
22   A. I don't understand.
23   Q. Well, how did you meet Mr. Goodman?
24       Maybe, let's start that way. That's a better way
25  to approach it.

Page 31

DAVID PEREZ

1
2        MR. GOODMAN: How did he meet --
3        MR. KESHAVARZ: Let me strike that.
4    Q. How did you retain Mr. Goodman to represent you
5  in this action?
6        MR. GOODMAN: Object to form.
7        Go ahead.
8    A. I was contacted by him.
9    Q. You didn't have any contact with Mr. Goodman
10  before he contacted you to represent you; is that
11  correct?
12   A. That is correct.
13   Q. Do you have a written retainer agreement with
14  Mr. Goodman?
15       MR. GOODMAN: You can answer.
16   A. No.
17   Q. Do you have any written agreement with
18  Mr. Goodman?
19   A. No.
20   Q. Did you pay Mr. Goodman anything to retain you in
21  this matter?
22       MR. GOODMAN: Objection.
23       Don't answer.
24       MR. KESHAVARZ: Basis?
25       MR. GOODMAN: No basis.

Page 32

DAVID PEREZ

1
2    Q. Are you going to answer the question, Mr. Perez.
3        MR. GOODMAN: No. Put it on your list for
4  later. We'll discuss it.
5        MR. KESHAVARZ: That's fine.
6    Q. I'm just asking Mr. Perez, will you answer the
7  question or no?
8    A. No.
9        MR. KESHAVARZ: Mark it for a ruling.
10   Q. Now, do you know if there's insurance coverage
11  that might be covering any of the claims in any
12  judgments entered against you in this case?
13       MR. GOODMAN: Objection. That's been dealt
14  with by the court as a matter of law, that questions
15  about insurance are not relevant and not part of this
16  case, at this point.
17       Given the prior rules of the court, don't
18  answer the question.
19   Q. Are you going to take your attorney's advice and
20  not answer?
21       MR. GOODMAN: Could you take your hand away
22  from your mouth?
23       I can't understand you.
24   Q. Are you not answering the question?
25       MR. GOODMAN: It's not -- I'm telling you,



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

Page 33

DAVID PEREZ

1  as a matter of law, the insurance issue is off the table
2  and not part of this case.  So it's not an appropriate
3  question to ask.  And on that ground, we object, and I
4  direct the witness not to answer.
5  Q.  And are you going to take your attorney's advice
6  and not answer the question?
7  A.  Yes.  I'm going to take his advice.
8     MR. KESHAVARZ:  Mark it for a ruling.
9  Q.  Let's go through your education and training.
10    Did you go to high school?
11  A.  Yes, I did.
12  Q.  When did you graduate from high school?
13  A.  2008.
14  Q.  I won't tell you how old that makes me feel.
15    When did you start working in the field of car
16  dealerships?
17  A.  2013.
18  Q.  What did you do between, for employment, between
19  2008 and 2013?
20  A.  Worked various jobs.
21  Q.  Unrelated to automobiles?
22  A.  Unrelated.
23  Q.  Unrelated to financing, at all?
24  A.  No.

Page 34

DAVID PEREZ

1  Q.  What was your first job in relation to
2  automobiles?
3  A.  2013.
4  Q.  No.
5     What was it?
6     I'm sorry.
7     Where did you work?
8  A.  At a car dealership in Queens.
9  Q.  Which car dealership in Queens did you work
10  beginning in 2013?
11  A.  Hillside Motors.
12  Q.  There were two Hillside Motors, if I remember
13  correctly.
14    Do you remember the address of the Hillside
15  Motors that you worked in in 2013?
16  A.  No, I don't remember it.
17  Q.  Do you remember the full name of the Hillside
18  Motors dealership that you worked in in Queens in 2013?
19  A.  No.
20  Q.  When in 2013 did you begin working at Hillside?
21  A.  Don't remember.
22  Q.  And when did you cease working at Hillside?
23  A.  2014 some time.
24  Q.  Did you have a title while you worked at

Page 35

DAVID PEREZ

1  Hillside?
2  A.  Yes.
3  Q.  Was it the same title you had the entire time
4  that you worked there?
5  A.  I don't understand.
6  Q.  What was your title when you first started
7  working at Hillside?
8  A.  Oh, sales associate.
9  Q.  Were you still a sales associate when you left in
10  2014?
11  A.  Yes.
12  Q.  What was your main responsibility as a sales
13  associate at Hillside when you worked there from 2014?
14  A.  Showed customers vehicles, gather their -- take
15  them for test drives, gather their information, give it
16  to the manager, and that's it.
17  Q.  I apologize.  There was a question I meant to ask
18  you before.  So I'm just going to skip back.  You have a
19  beard today.
20    Did you have a beard between May 2020 and
21  September 2020?
22  A.  I don't remember.
23  Q.  That's fine.
24    Did you gather information for financing while

Page 36

DAVID PEREZ

1  you worked as a sale associate?
2  A.  Yes.
3  Q.  What information would you gather for financing?
4  A.  The credit app.
5  Q.  Well, let me go through it one at a time.
6     After you left Hillside in 2014 -- why did you
7  leave, first of all?
8  A.  Better opportunity.
9  Q.  Where did you go when you left Hillside?
10  A.  Nemet Hyundai.
11  Q.  Can you spell that?
12  A.  N as in Nancy, E as in Edward, M as in Mary, E as
13  in Edward, T as in Thomas.  Hyundai, that's H as in
14  Harry, Y-U-N as in Nancy, D-A-I.
15  Q.  And you worked at Nemet Hyundai beginning 2014;
16  is that correct?
17    Oh, let me rephrase that.
18    When did you start working at Nemet Hyundai?
19  A.  I don't recall.
20  Q.  Because you said you worked at Hillside from 2013
21  to 2014, correct?
22  A.  Yeah.
23  Q.  And did you go straight from Hillside to Nemet
24  Hyundai?



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
37–40

Page 37

1            DAVID PEREZ
2    A.  Yes.
3    Q.  If you left Hillside in 2014, does that mean you
4  started at Nemet Hyundai in 2014?
5    A.  Yes.
6    Q.  When did you work at Nemet Hyundai until?
7    A.  You're asking for a month?
8        I don't --
9    Q.  A year.  Give me a year.
10    A.  How long?
11    Q.  Yeah.  You started in 2014.
12        What year did you leave -- cease working there?
13    A.  2015, maybe.  Yeah, 2015.
14    Q.  And what was your title at Nemet Hyundai?
15    A.  Sales associate.
16    Q.  And did you have the same responsibilities at
17  Nemet Hyundai as you did at Hillside?
18    A.  Yes.
19    Q.  Where did you work from after you left Nemet --
20  strike that.
21        Why did you cease working at Nemet Hyundai?
22    A.  Better opportunity.
23    Q.  Did you have -- let me skip back.
24        When you were at Hillside, did you have -- were
25  any complaints against you by customers about the work

Page 38

1            DAVID PEREZ
2  you were doing?
3        MR. GOODMAN:  Object to the form.
4        Go ahead.
5    A.  No.
6    Q.  No one complained that you acted in some sort of
7  deceptive manner or unfair manner?
8        No consumer ever indicated that?
9        MR. GOODMAN:  Objection to form.
10        Go ahead.
11    A.  No.
12    Q.  And while you worked at Nemet Hyundai, were there
13  any complaints that you did anything improper in
14  relation to any customer --
15        MR. GOODMAN:  Objection to form.
16        Go ahead.
17    Q.  -- in the sales or financing of a vehicle?
18        MR. GOODMAN:  Object to form.
19        Go ahead.
20    A.  No.
21    Q.  Why did you -- and you left Nemet to pursue
22  another opportunity, right?
23    A.  That is correct.
24    Q.  You weren't fired?
25    A.  No.

Page 39

1            DAVID PEREZ
2    Q.  And you weren't fired from Hillside, either?
3    A.  I was not fired.
4    Q.  When you left Nemet Hyundai in 2015, where did
5  you go?
6    A.  Great Neck Nissan.
7    Q.  And where is Great Neck Nissan?
8    A.  Great Neck, New York.
9    Q.  You're talking from someone from Brooklyn.
10  Anything outside of Brooklyn is -- and you started
11  working at Great Neck -- I'm sorry.
12        Great Neck what?
13    A.  Nissan.
14    Q.  Nissan.  Thank you.
15        And you started working at Great Neck Nissan in
16  2015 when you left Nemet?
17    A.  Yes.
18    Q.  And when did you work -- when did you work there
19  until?
20        What year?
21    A.  Some time in 2016.
22    Q.  And what was your title at Great Neck Nissan?
23    A.  Sales associate.
24    Q.  Did you have the same responsibilities,
25  basically, at Great Neck Nissan as you did at Nemet and

Page 40

1            DAVID PEREZ
2  Hillside?
3    A.  Yes.
4    Q.  While you worked at Great Neck Nissan, were there
5  any complaints about any customers alleging that you
6  dealt with them unfairly or deceptively in the sales and
7  financing of vehicles?
8        MR. GOODMAN:  Objection to form.
9        Go ahead.
10    A.  No.
11    Q.  Why did you leave Great Neck Nissan?
12    A.  Better opportunity.
13    Q.  Were you terminated at Great Neck Nissan?
14    A.  No, I was not.
15    Q.  Where did you work next after you left Great Neck
16  Nissan?
17    A.  Went back to Nemet Hyundai.
18    Q.  So you went back to Nemet Hyundai in 2016; is
19  that right?
20    A.  That is correct.
21    Q.  And when did you work -- you worked at Nemet
22  Hyundai again from 2016 until when?
23    A.  I want to say, like, towards, like, the end of
24  2016.  I don't recall.
25    Q.  Late 2016?



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
41—44

Page 41

1              DAVID PEREZ
2    A.  Yeah.
3    Q.  From September, October, November?
4        Something like that?
5    A.  Something like that.  I don't recall.
6    Q.  And were you -- what was your title at Nemet
7    Hyundai when you went back?
8    A.  Sales associate.
9    Q.  Did you have the same responsibilities,
10   basically, as a sales associate when you went back as
11   when you left?
12   A.  Yes.
13   Q.  Were there any complaints about your treatment of
14   any customers while you worked there, in terms of being
15   deceptive or unfair in the sales or financing of
16   vehicles?
17       MR. GOODMAN:  Object to form.
18       Go ahead.
19   A.  No.
20   Q.  And where did you go after you left Nemet Hyundai
21   in late 2016?
22   A.  White Plains Hyundai.
23   Q.  And when did you work at White Plains Hyundai?
24   A.  Like, 20- -- ending of 2017.
25   Q.  End of 2017?

Page 42

1              DAVID PEREZ
2    A.  Uh-huh.
3    Q.  You have to say "Yes" or "No" for the court
4    reporter.
5    A.  Yes.
6    Q.  And were you sales associate there, as well?
7    A.  Yes, I was.
8    Q.  And were your job responsibilities, essentially,
9    the same at White Plains Hyundai as all the other
10   dealerships you previously worked at?
11   A.  Yes.
12   Q.  And where did you -- were there any complaints
13   while you worked at White Plains Hyundai that you
14   treated any customers unfairly or deceptively in the
15   sales or financing of vehicles?
16       MR. GOODMAN:  Object to form.
17       Go ahead.
18   A.  No.
19   Q.  Where did you go when you ceased working --
20   strike that.
21       Were you terminated when you left White Plains
22   Hyundai?
23   A.  No, I was not.
24   Q.  Why did you leave?
25   A.  Better opportunity.

Page 43

1              DAVID PEREZ
2    Q.  Where did you go after you left White Plains
3    Hyundai at the end of 2017?
4    A.  Victory Mitsubishi.
5    Q.  And you worked at Victory Mitsubishi at the end
6    of 2017 until June -- until when?
7    A.  June 2021.
8        MR. GOODMAN:  Did you want to correct
9    something about when you started at Victory?
10       You started to say something.
11       THE WITNESS:  No.
12       MR. GOODMAN:  Okay.  Sorry.
13   Q.  So you started working at Victory on June -- the
14   end of 2017.
15       And you worked there continuously until June
16   2021; is that correct?
17   A.  That is correct.
18   Q.  And what was the address of the -- that you
19   worked out of at Victory?
20   A.  4070 Boston Road, Bronx, New York 10477, if I'm
21   not mistaken.
22   Q.  Tell me the name of the street again.
23       4070, what was the street?
24   A.  Boston Road.
25   Q.  Boston?

Page 44

1              DAVID PEREZ
2    A.  B-O-S-T-O-N.
3    Q.  And that was the same address the entire time you
4    worked there; is that right?
5    A.  Correct.
6    Q.  And what was your title at the dealership back
7    then at Victory Mitsubishi?
8    A.  For a time, I was a sales associate.
9    Q.  For what period of time?
10   A.  Yes.
11   Q.  For what period of time?
12   A.  I want to say, like, five, six months.
13   Q.  Is that five or six months when you first started
14   working until the end of 2017?
15   A.  From when I first started working, yes.
16   Q.  And were your responsibilities as a sales
17   associate for the five or six months -- that was your
18   title at Victory Mitsubishi beginning in the end of
19   2017.
20       Were those responsibilities the same as at the
21   prior dealerships?
22   A.  Yes.
23   Q.  Your title -- and after five or six months at
24   Victory Mitsubishi, your title changed?
25   A.  Yes, it did.



DAVID PEREZ

FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022

45–48

Page 45

DAVID PEREZ

1
2   Q.  What did your title change to?
3   A.  Sales manager.
4   Q.  And did your -- you were the sales manager from
5   2018 until you left in June 2021?
6   A.  That's correct.
7   Q.  Now, were there ever any complaints that you
8   treated any consumer inappropriately or deceptively in
9   the sales or financing of any vehicle while you worked
10  at Victory Mitsubishi from the end of 2017 to June 2021?
11      MR. GOODMAN:  Object to form.
12      Go ahead.
13  A.  No that I know of.
14  Q.  Were you the only person with the name Perez who
15  worked at Victory Mitsubishi from the end of 2017
16  through June 2021?
17  A.  Not that I recall.
18  Q.  You don't recall anyone else with the last name
19  Perez during that time period; is that right?
20  A.  That is correct.
21  Q.  So let's take it one at a time.
22      When you're sales associate for the five to six
23  month, what are your responsibilities as a sales
24  associate for that period of time?
25      MR. GOODMAN:  Asked and answered.

Page 46

DAVID PEREZ

1
2       You asked him if it was the same as the
3   other dealerships, and he said --
4       MR. KESHAVARZ:  Right.  But I didn't go into
5   a lot of detail with the other dealerships, so.  I
6   didn't go into any particular amount of detail with
7   other dealerships, so.
8   Q.  While you worked at Victory Mitsubishi as a sales
9   associate, what were the main responsibilities?
10  A.  Show customers the car, take them on a test
11  drive, if I have to, gather information and give it to
12  the manager.
13  Q.  When you worked at Hillside -- sorry, I apologize
14  for jumping back -- were any of the transactions
15  recorded -- sales or financing of the vehicles get
16  recorded?
17      MR. GOODMAN:  Object to the form.
18      Recorded in what manner?
19      MR. KESHAVARZ:  In any way.
20  Q.  Video?
21      Audio?
22      Were there any recordings, at all, while you
23  worked at Hillside?
24  A.  I wouldn't know.
25  Q.  Why wouldn't you know?

Page 47

DAVID PEREZ

1
2       MR. GOODMAN:  Object to form.
3       Go ahead.
4   A.  I don't know if the owner was recording or not.
5   Q.  As far as you know, while you worked at Nemet
6   Hyundai were there any video or audio recordings of any
7   of the customer transactions at that dealership?
8   A.  I wouldn't know.
9   Q.  While you worked at Great Neck Nissan for 2015 to
10  2016, were there ever any audio or video recordings of
11  consumers at the dealership?
12  A.  I wouldn't know.
13  Q.  While you worked at Nemet Hyundai for 2016 to
14  late 2016, were there any audio or video recordings of
15  any of the customers there?
16  A.  I wouldn't know.
17  Q.  Or any of the staff there?
18      Do you know if they recorded those?
19      MR. GOODMAN:  Object to form.
20      Go ahead.
21  A.  I wouldn't know.
22  Q.  Same thing for White Plains Hyundai from late
23  2016 to end of 2017, were there any audio or video
24  recordings at the dealership then?
25  A.  I wouldn't know.

Page 48

DAVID PEREZ

1
2   Q.  At Victory Mitsubishi, for any period of time
3   from end of 2017 through June of 2021, were there ever
4   any audio or video recordings of anyone at the
5   dealership?
6       MR. GOODMAN:  Object to the form.
7       Go ahead.
8   A.  Yes.
9   Q.  Tell me about that.
10      MR. GOODMAN:  Object to the form.  Calls for
11  narrative.  Object to the form of that question.
12  Q.  You can answer.
13  A.  There's cameras in the offices.
14  Q.  And which offices?
15  A.  Finance.
16  Q.  There's cameras -- video and audio recordings?
17  A.  I wouldn't know.
18  Q.  But you see video cameras in the finance office,
19  correct?
20  A.  That is correct.
21  Q.  And there, at least, video recordings at the
22  finance office, correct?
23      MR. GOODMAN:  Objection.
24      Go ahead.
25  A.  I wouldn't know.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
49–52

Page 49

DAVID PEREZ

1
2    Q.  So where else are there cameras in the
3    dealership, other than the finance office?
4    A.  I'm sorry.  I didn't understand the question.
5    Q.  You said there were video cameras in the finance
6    office of the dealership when you worked end of 2017
7    through June 2020; is that correct?
8    A.  That's correct.
9    Q.  Where else are there -- were there video cameras
10   at Victory Mitsubishi when you worked there?
11          MR. GOODMAN:  If anywhere.
12          Object to form.
13          Go ahead.
14   A.  I would say, pretty much, anywhere.
15   Q.  So --
16          MR. GOODMAN:  He wasn't done with his
17   answer.
18          Go ahead.
19   Q.  I apologize.
20          Go ahead.
21   A.  On the lot looking at the cars.  And then just,
22   like, in the main showroom.
23   Q.  When you were talking with customers, were those
24   transactions being recorded -- video recorded?
25          MR. GOODMAN:  Object to form.

Page 50

DAVID PEREZ

1
2          Go ahead.
3    A.  I wouldn't know.
4    Q.  But if you're in the dealership, physically in
5    the dealership -- you walk into the dealership.  You
6    talk about the sales and financing of a vehicle.
7          That entire process, there'd be a video
8    recording; is that right?
9          MR. GOODMAN:  Object to form.
10         Go ahead.
11   A.  I wouldn't know.
12   Q.  Let me rephrase that.
13         From when a consumer walked into the dealership
14   and goes through all the financing, there would be a
15   video camera capable of taking videos during that whole
16   process, right?
17         MR. GOODMAN:  Objection to form.
18         Go ahead.
19   A.  Yes.
20   Q.  And do you know why -- strike that.
21         And were those video cameras used, at any point,
22   in the dealership?
23         MR. GOODMAN:  Were they used?
24         Object to form.
25         Go ahead.

Page 51

DAVID PEREZ

1
2          MR. KESHAVARZ:  Strike that.
3    Q.  Well, you have video cameras.  I assume video
4    cameras were recording videos at the dealership.  They
5    weren't just there for looks.
6          MR. GOODMAN:  Object to form.
7          If you know.
8    A.  That's above my pay grade.  I don't know.
9    Q.  Well, why are the cameras there, if they're not
10   recording anything, as far as, you know?
11         MR. GOODMAN:  Object to form.
12   A.  I don't know.
13   Q.  Did you believe you were ever being recorded,
14   video recorded, while you worked at the dealership?
15         MR. GOODMAN:  Object to form.
16         Go ahead.
17   A.  Yeah.
18   Q.  When did you believe that?
19         For the entire time you worked there from 2017 to
20   June 2021?
21   A.  Yes.
22   Q.  And why did you believe that?
23         MR. GOODMAN:  Objection.
24         Go ahead.
25   A.  Because I see the camera up there.

Page 52

DAVID PEREZ

1
2    Q.  And did you believe that you were also being
3    audio recorded?
4          MR. GOODMAN:  Objection.
5          Go ahead.
6    A.  I wouldn't know.
7    Q.  But did you feel -- if someone's recording you by
8    video, did you feel -- and you feel like you were being
9    recorded, because they were there, did you believe that
10   you were also being audio recorded, at the same time?
11         MR. GOODMAN:  Objection.
12         Go ahead.
13   A.  No.
14         MR. GOODMAN:  Hey, Ahmad.  When you reach a
15   point that you're comfortable, I could use a five-minute
16   break, the witness and I.
17         MR. KESHAVARZ:  Okay.  You want to take a
18   break for five minutes?
19         MR. GOODMAN:  Right now.  Yeah, that's fine.
20         MR. KESHAVARZ:  It's 12:13.
21         MR. GOODMAN:  We'll come back at 12:20.
22         MR. KESHAVARZ:  12:20 it is.
23         (A recess was taken at 12:14 p.m.)
24   Q.  You mentioned main showroom.
25         Are there any other showrooms at the dealership?



DAVID PEREZ                                          November 21, 2022
FRANCOIS V. VICTORY AUTO GROUP                               53–56

Page 53
DAVID PEREZ

1

2    A. Sorry.  I don't understand the question.

3    Q. You mentioned -- you said there were cameras in

4    the main showroom; is that right?

5    A. Yeah.  In the building.

6    Q. When you said main showroom, I want to know if

7    there were other showrooms or no?

8    A. No.

9    Q. Who would know about what was recorded at the

10   dealership while you worked there, if it wasn't you?

11        MR. GOODMAN:  Object to form.

12        Go ahead.

13   A. Stavros.

14   Q. Anyone else?

15   A. Not that I know of.

16   Q. How do you know he would know?

17        MR. GOODMAN:  Object to form.

18        Go ahead.

19   A. He's my boss.

20   Q. I know.

21        But how do you know he would know about the video

22   recordings at the dealership?

23        MR. GOODMAN:  You're asking him for the

24   processes of Stavros' mind?

25        Objection.

Page 54
DAVID PEREZ

1

2        MR. KESHAVARZ:  No.  I mean, you said he

3    knows because he's your boss, but Emma's my boss and she

4    doesn't know everything about me.

5    Q. So I'm just wondering what about him being your

6    boss makes you think that he knows about the video

7    recording?

8        Is he the top person in the whole office?

9        Is that what you're saying?

10   A. Yes.

11        MR. GOODMAN:  Objection.

12        Go ahead.

13   A. He's everyone's boss.

14        THE WITNESS:  I don't understand the

15   question.

16        MR. GOODMAN:  Don't worry about it.

17   Q. So let's go through that.  You started talking

18   about what you did as a sales associate when you began

19   working at Mitsubishi.

20        You started talking to customers as soon as they

21   walked in; is that right?

22   A. That is correct.

23   Q. What else, just when you're sales associate?

24        Why don't you just start from the beginning of

25   the process to the end of the process.

Page 55
DAVID PEREZ

1

2        What would you do, and how would how change when

3    you were a sales manager?

4        MR. GOODMAN:  The process of selling a

5    vehicle?

6        Is that the process you're talking about?

7        Objection to form.

8    Q. Your role as a sales associate, what was your

9    role?

10        You know, walk me through the steps when a

11   customer comes in and a customer leaves with a car while

12   you were a sales associate at the dealership.

13        MR. GOODMAN:  Asked and answered.

14        Go ahead.

15   A. They would walk in.  I'd greet them, check them

16   in, find out what kind of vehicle they were looking for,

17   show them the car.  Then go on a test drive, if they

18   wanted a test drive.  Gather their information, as far

19   as, a credit app, and give it to the manager.  And from

20   there, he takes over.

21   Q. By manager, do you mean sales manager?

22        Do you mean general manager.

23        What do you mean by manager?

24   A. Sales manager, general manager -- the manager.

25   Q. Well, when you started working there as an

Page 56
DAVID PEREZ

1

2    associate, who were the managers of the dealership?

3    A. Stavros.

4    Q. Anyone else?

5    A. No.

6    Q. There are no other managers at the dealership

7    from end of 2017 through June 2021, other than Stavros;

8    is that right?

9        MR. GOODMAN:  Object to the form.

10   A. Hold on.

11        What was the question?

12   Q. So you -- you said -- well, currently, Stavros is

13   the manager of the dealership, correct?

14   A. Okay.

15        MR. GOODMAN:  Currently, you don't work

16   there.

17   A. One, I don't work there.  But two, you asked me

18   when I was a sales associate.  So I answered when I was

19   a sales associate.

20   Q. When you were a sales associate, Stavros Orsaris,

21   what was his title?

22   A. Manager.

23   Q. General manager or sales manager or something

24   else?

25   A. All I knew is he was my manager.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
57–60

Page 57

DAVID PEREZ

1
2    Q.  Were there any other managers at the dealership
3   when you first started working there?
4        MR. GOODMAN:  Object to the form.
5        Go ahead.
6    A.  Yes.
7    Q.  What other managers worked at the dealership when
8   you started working there?
9    A.  The finance manager.
10   Q.  And who was that?
11   A.  Don't remember.
12   Q.  Who was the finance manager when you left?
13   A.  We had Yessica.  And that's all I can remember.
14   Q.  So as far as you remember, the finance manager
15  when you left was Yessica Vallejo; is that right?
16   A.  That's correct.
17       MR. KESHAVARZ:  For the court reporter,
18  Y-E-S-S-I-C-A V-A-L-L-E-J-O.
19   Q.  Other than when you first started working there,
20  other than the sales manager and Mr. Stavros -- no,
21  Stavros Orsaris, were there any other managers at the
22  dealership when you first started working there?
23       MR. GOODMAN:  Object -- asked and answered.
24       Go ahead.
25   A.  Stavros was my manager.

Page 58

DAVID PEREZ

1
2    Q.  Well, you said there was a finance manager when
3   you started working there, correct?
4    A.  Yeah.
5    Q.  What other managers were there?
6        People with -- whose title was -- let me put it
7   to you this way.
8        Who was above you when you were working as a
9   sales associate at the dealership, at Victory
10  Mitsubishi, when you first started?
11   A.  Stavros.
12   Q.  Anybody else above you?
13   A.  And the finance manager.
14   Q.  Anyone else above you?
15   A.  No.
16   Q.  Okay.  Got it.
17       And when did Stavros Orsaris -- right, am I
18  saying that right?
19   A.  Stavros Orsaris.
20   Q.  When did Mr. Stavros leave Victory Mitsubishi, as
21  far as, you can recall?
22       MR. GOODMAN:  When did he leave, Stavros?
23       MR. KESHAVARZ:  Yeah.
24       MR. GOODMAN:  What's the question?
25       I'm sorry.

Page 59

DAVID PEREZ

1
2    Q.  You said he was manager when you started.
3        He's not currently -- he wasn't the manager when
4   you left, was he?
5    A.  Yeah.
6    Q.  Oh, I'm sorry.
7        He's the boss.  Okay.  When you say he's the
8   boss, he makes all the decisions at the dealership.
9        Is that what you mean?
10       MR. GOODMAN:  Object to form.
11   A.  I don't know.
12   Q.  Well, when you say he's the boss, what do you
13  mean?
14   A.  He's my boss and finance.
15   Q.  So who else worked there at the dealership when
16  you first started working there?
17       You have Stavros.  You have the finance manager
18  whose name you don't remember.
19       Who else worked at the dealership?
20   A.  And other sales associates.
21   Q.  Do you know how many, about?
22   A.  Back then?
23       No.
24   Q.  When you left, do you know about how many sales
25  associates there were?

Page 60

DAVID PEREZ

1
2    A.  No.
3    Q.  Were there two?
4        Were there 20?
5        Were there ten?
6        Give me an idea.
7        MR. GOODMAN:  If you know.  Don't guess.
8        MR. KESHAVARZ:  Strike that.
9    Q.  Were there more than two sales associates when
10  you left the dealership?
11   A.  Yes.
12   Q.  Were there more than ten sales associates when
13  you left the dealership?
14   A.  Yes.
15   Q.  Were there more than 20 sales associates when you
16  left the dealership?
17   A.  No.
18   Q.  So there was somewhere between 10 to 20 sales
19  associate when you left the dealership, correct?
20   A.  That is correct.
21   Q.  And were there about 10 to 20 sales associates
22  when you started working at the dealership?
23   A.  No.
24   Q.  Were there more or less?
25   A.  I would say less.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
61–64

Page 61

DAVID PEREZ

1
2    Q.  Somewhere between five and ten sales associates
3    when you started working at the dealership?
4    A.  Yes.
5    Q.  Other than sales associates, what other -- well,
6    when you left, what other titles were there for people,
7    other than sales associates, manager and finance
8    manager?
9    A.  No other.
10   Q.  There wasn't a comptroller?
11   A.  I wouldn't know.
12   Q.  Have you ever heard that term before?
13   A.  I wouldn't know, sir.
14   Q.  And when you started working at the dealership,
15   was there anybody else who worked there, other than
16   Stavros as the manager, a finance manager and somewhere
17   between five and ten associates?
18        Were those about all the people who worked at the
19   dealership when you started there?
20   A.  Yes, that is correct.
21        MR. GOODMAN:  You got to tell him.
22   A.  Oh, porters, like, the people that clean the
23   cars.
24   Q.  Okay.  How many porters were there?
25   A.  One.

Page 62

DAVID PEREZ

1
2    Q.  And there was a porter there when you first
3    started and also when you left?
4    A.  There was one when I started.  And they hired
5    more.
6    Q.  How many porters were there when you left?
7    A.  Four.
8    Q.  Other than the manager Stavros, finance manager,
9    other sales associates and the porter, were there any
10   other persons who worked at the dealership when you
11   left?
12   A.  There's service.
13   Q.  Service is, like, car repairs?
14   A.  Yeah.
15   Q.  So they're mechanics there?
16   A.  Yes.
17   Q.  About how many?
18   A.  I'm sorry?
19   Q.  About how many people worked in service when you
20   left?
21   A.  I want to say between 10 and 20.
22   Q.  Anyone else work in the dealership when you left,
23   other than Stavros, a finance manager, other sales
24   associates, the four porters and 10 to 20 service
25   people?

Page 63

DAVID PEREZ

1
2    A.  That's it.
3    Q.  And when you started working there, other than
4    Stavros, a finance manager, five to ten associates and
5    one porter and service people, were those all the people
6    who worked at the dealership when you started?
7        MR. GOODMAN:  That you know of.
8    A.  Yes.
9    Q.  And when you started, about 10 to 20 service
10   people?
11   A.  I would assume.  I don't know.  I don't work for
12   service.
13   Q.  Any other change in the -- how many finance
14   managers were there while you worked there?
15        MR. GOODMAN:  Asked and answered.
16        Go ahead.
17   A.  One.
18   Q.  No, no, no.
19        I mean, did that person -- I know there was one
20   person who started working as the finance manager when
21   you started working there, that you can't recall the
22   name, correct?
23   A.  Correct.
24   Q.  Was that a man or a woman?
25   A.  It's a man.

Page 64

DAVID PEREZ

1
2    Q.  And then when you left, there was a Yessica
3    Vallejo; is that right?
4    A.  Yes.
5    Q.  Was there any other finance manager at Victory
6    Mitsubishi while you worked there?
7    A.  Don't recall.
8    Q.  Did Mr. Orsaris have any family members who
9    worked at the dealership, at some point?
10   A.  Don't recall.
11   Q.  Do you know a person named Chris, maybe, Orsaris.
12        Do you know the name of someone named Chris who
13   worked in the dealership while you were there?
14   A.  Don't recall.
15   Q.  All right.  Fine.
16        So after five to six months, you became a sales
17   manager, correct?
18   A.  Correct.
19   Q.  And was your title sales manager from late
20   2017/early 2018 all the way through to when you left
21   June 2021, when you left, was your title sales manager
22   the entire time?
23   A.  I don't understand.
24   Q.  Sure.  You were a sales associate for five or six
25   months when you first started there, right?



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
65–68

Page 65
DAVID PEREZ

1
2    A.  Correct.
3    Q.  And then you became a sales manager, correct?
4    A.  Correct.
5    Q.  And were you a sales manager the rest of the time
6    you were there?
7    A.  Yes.
8    Q.  Who was the sales manager when you first started
9    working at the dealership?
10    A.  Stavros.
11    Q.  And was he both the sales manager and the manager
12    for the whole dealership when you first started working
13    there?
14    A.  I don't understand the question.
15    Q.  Stavros is the main person at the dealership.
16    He's the main manager right now, right?
17    He runs the dealership?
18    A.  I wouldn't know.
19        MR. GOODMAN:  Objection to form.
20    A.  I wouldn't know.
21    Q.  While you worked at the dealership, was he the
22    main manager?
23    A.  Yes.
24    Q.  When you worked at the dealership, was he the
25    person in charge of the dealership?

Page 66
DAVID PEREZ

1
2    A.  Yes.
3    Q.  And there was a Philip Argyropoulos.
4    Do you know how to say the last name, Mr. Perez?
5    A.  I wouldn't know who that is.
6    Q.  You wouldn't know who Philip Argyropoulos is?
7    A.  No.
8    Q.  You've never heard that name before?
9    A.  I've heard the name.
10    Q.  And what is your understanding about who he is,
11    who Philip Argyropoulos is?
12        MR. GOODMAN:  Objection to form.
13        Go ahead.
14    A.  I've just heard the name.  I don't know.
15    Q.  He owns the dealership, Victory Mitsubishi,
16    correct?
17    A.  I wouldn't know, sir.
18    Q.  Do you know a Diane Argyropoulos?
19        MR. GOODMAN:  Do you know -- object to form.
20        Go ahead.
21    A.  I've heard the name.
22    Q.  And is she owner at the dealership, as well?
23        MR. GOODMAN:  Object to form.
24    A.  I wouldn't know, sir.
25    Q.  And in what context have you heard of the name of

Page 67
DAVID PEREZ

1
2    Diane and Philip Argyropoulos?
3    In what context did you hear them?
4    A.  I don't understand.
5    Q.  Sure.  You said you heard the name.
6    Tell me about the context in which you heard the
7    name.
8    You're at a bar drinking, you're at work, they
9    said, I need to get sign-off on Mr. Argyropoulos.
10    Tell me the context you said you heard the names.
11    A.  In conversation.
12    Q.  Where?
13    Who?
14    A.  Stavros.
15    Q.  And did Stavros have to get permission from
16    Mr. and Mrs. Argyropoulos for some items?
17        MR. GOODMAN:  Object to form.
18    A.  I don't know.
19    Q.  What did Stavros tell you about Mr. and
20    Mrs. Argyropoulos?
21        MR. GOODMAN:  Objection.
22    A.  That he has to speak to them.
23    Q.  Why?
24    A.  Wouldn't know.
25    Q.  About what?

Page 68
DAVID PEREZ

1
2    A.  Wouldn't know.
3    Q.  What were you speaking to Stavros Orsaris about
4    when?
5        MR. GOODMAN:  Objection.
6        Go ahead.
7    A.  Going out.
8    Q.  About what?
9    A.  Us going out on a weekend.  What we were going to
10    do on the weekend.
11    Q.  Oh, by we you mean who?
12    A.  Myself and Stavros.
13    Q.  So you socially went out with Stavros Orsaris?
14    A.  I'm sorry?
15    Q.  You went out socially with Stavros?
16    A.  No, no, no, no.  You're not understanding.
17    Q.  What do you mean?
18    A.  What I'm going to do separate from whatever he's
19    going to do.  We were just talking about our weekend
20    plans.
21    Q.  Did have to sign-off from Argyropoulos about you
22    taking off on the weekend?
23        MR. GOODMAN:  Objection.
24    A.  I wouldn't know.
25        MR. GOODMAN:  Ridiculous.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
69–72

Page 69

DAVID PEREZ

1
2    Q. If there were any complaints at the dealership,
3    would Stavros say he had to communicate with
4    Argyropoulos?
5    A. I wouldn't know.
6    Q. Have you ever met, to your knowledge, Mr. and
7    Mrs. Argyropoulos?
8    A. Wouldn't know, sir.
9    Q. You don't know if you've ever seen them before?
10   A. I don't know who they are.
11   Q. But you know the name was mentioned by Stavros
12   Orsaris on some occasions to you, correct?
13        MR. GOODMAN: Asked and answered.
14   A. Yes.
15   Q. But you're saying you don't know?
16        MR. GOODMAN: Objection.
17   Q. You don't know who they are, is that what you
18   mean?
19        MR. GOODMAN: Asked and answered. Move on
20   to something relevant here, please.
21   Q. You can answer the question.
22   A. I don't know who they are, sir.
23   Q. In what other context did Stavros use the names
24   Mr. and Mrs. Argyropoulos, other than weekend plans?
25        MR. GOODMAN: Asked and answered.

Page 70

DAVID PEREZ

1
2        Don't answer again.
3        We're not going to repeat every question.
4    Q. Other than weekend plans, in what other context?
5        MR. GOODMAN: He said that was the only
6    context.
7        How many times -- go ahead, please.
8        Go ahead.
9    A. That was the only time where he ever mentioned.
10   Q. On that one occasion?
11   A. Yes.
12   Q. When was that?
13   A. Huh?
14   Q. When was that?
15   A. When did he mention them?
16   Q. Yes.
17   A. When we were talking about our weekend plans.
18   Q. The day you left?
19        When you first started working there?
20        About when?
21   A. Oh, I don't recall.
22   Q. Okay. That's fine.
23        So what were your -- when you became a finance --
24   excuse me, sales manager, how did your responsibilities
25   change from when you were an associate salesman?

Page 71

DAVID PEREZ

1
2    A. So my job as a sales manager, I had to guide the
3    sales people on the sale, like, if they had any
4    questions. Help them out, you know, by answering them.
5    Answer any question that the customers had. As well as,
6    run credit and stuff.
7    Q. If they run credit and stuff, what is the other
8    stuff?
9    A. Pretty much, after I ran the credit, I had to
10   give it to the finance manager to let them know, you
11   know, what vehicle the customer was interested in, let
12   them know the credit was ran, how much they're looking
13   to put down.
14   Q. Anything else?
15   A. No.
16   Q. Those were your major responsibilities as a sales
17   manager?
18   A. That's it.
19   Q. Kind of sounds -- I haven't heard you say
20   anything as a sales manager that's different than a
21   sales associate.
22        In what way are they different?
23        They sound the same to me.
24   A. Sales associate, well, the biggest difference
25   with a sales associate would be that as a sales

Page 72

DAVID PEREZ

1
2    associate, I didn't have access to run or look at
3    people's credit.
4    Q. Do you know why that is?
5    A. Well, my experience, because we're not allowed
6    to.
7    Q. Do you know why sales associates are not allowed
8    to run people's credit?
9    A. Privacy laws.
10   Q. What's your understanding -- when you say privacy
11   laws, what do you mean by that leads you to your belief
12   that a sales associate --
13        MR. KESHAVARZ: I have someone at my door.
14   You don't have to go off -- you can stay online.
15        One second.
16   Q. You were saying that it's your belief that the
17   sales associates don't have -- aren't supposed to pull
18   credit reports because of privacy laws.
19        What do you mean by that?
20   A. Well, from when I first started and the training
21   that I got, I was told that I wasn't allowed to know or
22   look at people's credit.
23   Q. Well, as a sales associate, would you give the
24   consumer an idea about what the price of the vehicle
25   would be?



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
73–76

Page 73

DAVID PEREZ

1
2   A.  No.
3   Q.  As a sales associate, you wouldn't give -- you
4   wouldn't tell the consumer about what the price of a
5   vehicle would be?
6   A.  That was my manager's job.
7   Q.  So -- okay.
8       Did you ask -- as a sales associate, did you ask
9   the customer about how much they can put down?
10  A.  How much they were going to put down, yes.
11  That's one of the things I had to ask.
12  Q.  What else did you have to ask, as a sales
13  associate?
14  A.  If they needed help with the insurance.  If they
15  had, like, an insurance company, so I could provide them
16  with the VIN number of the vehicle.  When were they were
17  looking to take the car home, whether today, tomorrow, a
18  week from now.
19  Q.  Well, anything else?
20      Any other information you would gather as a sales
21  associate?
22  A.  No.
23  Q.  Now, the cars that the dealership had had prices
24  on their windows, right?
25  A.  Yes.

Page 74

DAVID PEREZ

1
2   Q.  So when the customer asked you, as a sales
3   associate, how much a car cost, you would tell them what
4   the window sticker price was, didn't you?
5   A.  No.
6   Q.  Well, okay.
7       So if a customer asked you, as a sales associate,
8   what the price is, you wouldn't tell them?
9       MR. GOODMAN:  Asked and answered.  Same
10  question three different ways.
11  Q.  Go ahead.
12  A.  No, I wouldn't.  My sales manager does.
13  Q.  And would you tell -- did you ask the consumer
14  about how much they could pay per month?
15  A.  No.
16  Q.  You wouldn't ask?
17  A.  No.
18  Q.  So, physically, where did the sales associates
19  meet with customers?
20      Is there a table where they can talk to the
21  customers or are they, pretty much, standing the whole
22  time?
23  A.  No.  We sit down at a desk.
24  Q.  Where is the desk?
25  A.  In the show room.

Page 75

DAVID PEREZ

1
2   Q.  Where the video cameras are?
3       MR. GOODMAN:  Object to form.
4       Go ahead.
5   A.  In the showroom.
6   Q.  And how much time would you the sales associates
7   normally spend with the customer before they had to go
8   up to the sales manager?
9   A.  Varies.
10  Q.  After they picked out a car they wanted, how long
11  between then and when they speak to the sales manager?
12      MR. GOODMAN:  Object to form.
13      Go ahead.
14  A.  It varies.
15  Q.  Varies in -- basically, what's the range?
16      In what way does it vary, in general terms?
17  A.  Depending, I mean, depends on how busy we are, if
18  they're looking or just pricing, if they're waiting for
19  finance.  It all depends.
20  Q.  Did the dealership regularly sell vehicles for
21  cash, in addition to financing?
22  A.  Yes.
23  Q.  And so when you became sales manager, did you
24  have an office?
25  A.  No.

Page 76

DAVID PEREZ

1
2   Q.  You just had another desk on the sales floor?
3   A.  Podium.
4   Q.  Did you have a chair?
5   A.  Yes.
6   Q.  Did customers sit down when they were talking to
7   you while you were at the podium as a sales manager?
8   A.  No.
9   Q.  So what would happen?
10      What would -- so would the sales associate take a
11  customer to you, physically, or forward you the
12  information?
13  A.  No.
14  Q.  No to which one?
15  A.  They wouldn't take a customer to me.
16  Q.  Did you deal with customers directly as a regular
17  part of your job as a sales manager?
18  A.  If I had questions for them, yes.
19  Q.  But, typically, would you meet with them in a
20  typical sale with financing?
21  A.  Again, depends if I had questions or not.
22  Q.  What would you have questions about, typically
23  speaking?
24  A.  About the car they were just buying; if they
25  wanted a different one; if their credit, if they give



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
77–80

Page 77

1                DAVID PEREZ
2 specific instructions; you know, like, they say, I only
3 want to want to go through so and so. I would have to
4 relay that information to my finance manager. My
5 finance manner would then tell me, hey, this doesn't
6 look like it's going to work out.
7        I would go back to the customer and say, hey, you
8 know, this might not work out. Can we do something
9 else?
10    Q. Would you be the person that would go back to the
11 customer?
12    A. Either myself or the sales associate.
13    Q. Typically, would it be you or the sales associate
14 or just varies?
15    A. It varies on what it is.
16    Q. And -- but as the sales manager, you'd be the one
17 that would run the credit; is that right?
18    A. Yes.  I run the credit first.
19    Q. But you wouldn't have the consumer in front of
20 you when you ran the credit; is that right?
21    A. No, I wouldn't have the consumer in front of me.
22    Q. Would you have a physical piece of identification
23 with you when you ran someone's credit report?
24    A. Yes.  It's required by law.
25    Q. What document would you have?

Page 78

1                DAVID PEREZ
2       When you say the identification, you mean a
3 driver's license?
4    A. Driver's license, New York State ID and the
5 physical red credit app with their signature on it.
6    Q. Well, how do you know that person who's at the
7 dealership is the same person who you have the ID for?
8    A. I'm not understanding the question.
9    Q. So if you get an ID and you run a credit report,
10 you don't know if that same person is the person at the
11 dealership; is that right?
12       MR. GOODMAN:  Object to form.
13    A. So I would know, if it's them or not.
14    Q. What do you mean?
15    A. Because we're all trained to make sure that the
16 customer sitting in front of us, that's giving us that
17 credit app, matches the license.
18    Q. But you don't do that?
19       MR. GOODMAN:  Object to the form.
20       Go ahead.
21    A. No.
22    Q. Why not?
23    A. Because that's the salesperson's job.
24    Q. And who made the decision that you don't have to
25 see the person, that customer whose credit report you're

Page 79

1                DAVID PEREZ
2 pulling, who made that decision?
3       MR. GOODMAN:  Object to form.
4    A. It's been like that since 2013.
5    Q. So I guess -- you answered this question before,
6 but I guess I didn't understand it.  So let me ask it
7 again.
8       How would know that the person -- strike that.
9       You wouldn't know -- you, personally, wouldn't
10 know if the person who's physically at the dealership is
11 the same person whose credit report you're pulling.
12       You personally wouldn't know that, right?
13       MR. GOODMAN:  Object to form.
14    A. We would know, because we verify the person
15 that's sitting there matches the ID, sir.
16    Q. By we you mean the sales associate?
17    A. Correct.
18    Q. And how do you know that that sales associate
19 does that?
20    A. Because they're trained to.
21    Q. They're supposed to?
22    A. They're trained to.
23    Q. But if the sales associate gave you a driver's
24 license of someone who wasn't there, then, typically,
25 you wouldn't know if that person was, in fact, at the

Page 80

1                DAVID PEREZ
2 dealership, right?
3       MR. GOODMAN:  Object to form.
4       Go ahead.
5    A. They would be fired.
6    Q. But what I'm asking is, if a sales associate
7 gives you a driver's license and says this person wants
8 to buy a car, you wouldn't know, yourself, if that
9 person was, in fact, at the dealership or not, right?
10       MR. GOODMAN:  Object to form.
11       Go ahead.
12    A. Yes, we would, sir.  We verify information.
13    Q. But you, personally, wouldn't know.
14       MR. GOODMAN:  Objection.
15    A. We verify information, sir.
16    Q. The sales associate -- you're saying, the sales
17 associate is trained to verify that the person in front
18 of them is the person who's giving the driver's license;
19 is that right?
20    A. That's correct.
21    Q. But when -- is it the sales associate that brings
22 over the driver's license to you?
23    A. That is correct.
24    Q. But you personally, standing there in your
25 podium, you run the credit report -- you run the credit



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
81–84

Page 81

1              DAVID PEREZ
2    report while standing at that podium, right?
3          MR. GOODMAN:  Objection.
4          Go ahead.
5    A.  Yes.
6    Q.  But you, personally, Mr. Perez, you're running
7    someone's credit report.  Someone gives -- your sales
8    associate gives you a license, you personally,
9    Mr. Perez, wouldn't know if that person's actually at
10   the dealership.
11        You personally wouldn't know; is that right?
12   A.  I would.
13   Q.  Because the associate is --  you're inferring
14   that, because the associate is giving you the license.
15        Is that the basis for it?
16   A.  No.  The associate's giving me a signed credit
17   app with the person's license.
18   Q.  But that doesn't tell me if the person is there.
19        Other than -- so you're saying, if there is a
20   signed credit app and there's a driver's license given
21   to you, you're assuming that the person whose driver's
22   license is the person at the dealership.
23        Your just assuming that, right?
24   A.  I'm not assuming that, sir.
25   Q.  You don't know personally if that's true, right?

Page 82

1              DAVID PEREZ
2    A.  Yes, I would.
3    Q.  Huh?
4    A.  I would know.
5    Q.  How would you know from your own personal
6    knowledge that the person who came to the dealership,
7    signed a credit application and gave a driver's license
8    is the same person who's at the dealership?
9          How would you personally know that?
10   A.  Because from my experience, I wouldn't give
11   somebody my Social Security number and my ID to go run
12   the credit, in my experience.
13   Q.  Any other basis for believing that the person
14   whose driver's license the --
15        (Simultaneous cross talk.)
16   Q.  Wait.  Wait for the question.
17        Do you have any other basis for believing that
18   the person whose driver's license and signed credit
19   application given to you by the associate is actually at
20   the dealership?
21        You have any other basis for believing that,
22   other than what you just testified to in the last
23   question?
24   A.  Yes, sir.  They're trained.
25   Q.  Any other basis?

Page 83

1              DAVID PEREZ
2    A.  When you say basis, you mean?
3    Q.  Any other basis for you to believe that the
4    person at the dealership is the same person whose
5    driver's license is given to you and signed credit
6    application?
7          Other than the training of the sales associate,
8    that is the only basis you have for believing the person
9    at the dealership is the same person as the driver's
10   license, right?
11        MR. GOODMAN:  Object to form.
12   A.  Well, also, we go and talk to them.
13   Q.  Well, assuming you go talk to him or her.
14        But, typically, you don't, right?
15        MR. GOODMAN:  Objection.  Mischaracterizes.
16   Form.
17   Q.  Go ahead, you can answer.
18   A.  We go and talk to them when we have to, sir.
19   Q.  But for a typical deal, you wouldn't go and meet
20   with the consumer in a typical deal, right?
21        MR. GOODMAN:  Objection to form, what's
22   typical.
23   Q.  You can answer.
24   A.  If it's a cash deal, no.
25   Q.  If it's a financing deal, typically, you wouldn't

Page 84

1              DAVID PEREZ
2    go and see the customer personally, right?
3          MR. GOODMAN:  Object to form.
4    A.  If I have to, sir.
5    Q.  If you have to.
6          But, typically, you don't, right?
7          MR. GOODMAN:  Object to form.
8    A.  I have to all the time.
9    Q.  So you have to -- so are you saying now that in
10   every sales transaction with financing, that you have to
11   go did physically meet the person --
12   A.  No.
13   Q.  -- who's signing the contract and bringing the
14   driver's license; yes or no?
15   A.  No, sir.  In a typical deal --
16   Q.  Yes.
17   A.  -- wouldn't have to.  In a typical deal, there's
18   always something that needs to be asked that I have to
19   go and ask.
20   Q.  Such as?
21   A.  Well, the bank may ask if they have proof of
22   residence or proof of income or if they can do more
23   money down.
24   Q.  Any other reason you would typically go and
25   physically see the consumer?



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
85–88

Page 85

DAVID PEREZ

1
2    A.  No.
3    Q.  Now, you said if salesmen gave you a driver's
4    license and signed credit application for someone who is
5    not physically at the dealership, that they would be
6    fired.
7        How do you know that?
8    A.  How do I know?
9    Q.  That they would be fired.
10   A.  Because that has happened before.
11   Q.  When has it happened before?
12   A.  At my previous jobs at Victory.
13   Q.  And you said jobs.
14       So your at Victory Mitsubishi, there are prior
15   instances where the sales associate was fired because
16   they used the driver's license and signed credit
17   application of someone who wasn't actually physically at
18   the dealership; is that correct?
19   A.  That's correct.
20   Q.  How many times has that happened?
21   A.  How many times has someone been fired?
22   Q.  Let me rephrase the question.
23       How many times, while you were at Victory
24   Mitsubishi, has a sales associate or anyone been fired
25   for the sales associate giving you a credit application

Page 86

DAVID PEREZ

1
2    and driver's license for someone who was actually not at
3    the dealership?
4        How many times has that happened?
5    A.  I don't recall.
6    Q.  More than twice?
7    A.  I don't recall.
8    Q.  So -- well, it happened at least once, right?
9        MR. GOODMAN:  Talking about at Victory or at
10   previous --
11   Q.  At Victory Mitsubishi, when was, if ever, was
12   someone fired for a transaction going forward when the
13   consumer was, in fact, not at the dealership --
14       MR. GOODMAN:  Object to the form.
15   Q.  -- but the driver's license and credit app for
16   somebody else was used?
17   A.  We wouldn't go through the transaction.  We'll
18   catch it beforehand.
19   Q.  I understand.
20       You said in one instance a sales associate was
21   fired for doing that, right?
22   A.  Previously, yes.
23   Q.  At Victory Mitsubishi, right?
24   A.  I told you at my previous jobs.
25   Q.  Well, one previous job was at Victory Mitsubishi.

Page 87

DAVID PEREZ

1
2        So when you were at Victory Mitsubishi, was a
3    sales associate ever fired for giving a driver's license
4    and signed credit application for a consumer, in fact,
5    not the one at the dealership; yes or no?
6    A.  Not that I can recall.
7    Q.  So it might have happened, but you're not sure.
8        It might have happened at Victory Mitsubishi, but
9    you're not sure; is that correct?
10       MR. GOODMAN:  Object to form.
11       Go ahead.
12   A.  Not that I can recall.
13   Q.  So it might have happened, but you're just not
14   sure; is that correct?
15       MR. GOODMAN:  Object to form.
16   A.  Not that I can recall, sir.
17   Q.  I know.  Not that I recall -- let me be very
18   specific.
19       Are you saying that someone at Victory Mitsubishi
20   could have been fired while you were working there for
21   using a credit application and driver's license for a
22   customer who, in fact, was not the customer at the
23   dealership?
24       You said that could have happened while you were
25   at the dealership; yes or no?

Page 88

DAVID PEREZ

1
2        MR. GOODMAN:  Object to form.
3    Mischaracterizes testimony.
4        Go ahead.
5    Q.  Yes or no?
6    A.  No.  No.
7    Q.  Now, you said at other dealerships, plural.
8    A.  Correct.
9    Q.  What other dealerships was someone fired for
10   using -- running credit on someone who was, in fact, not
11   at the dealership?
12       MR. GOODMAN:  Object to form.
13       Go ahead.
14   A.  I wouldn't know.
15   Q.  Well, you said it happened at -- you said people
16   were fired at other dealerships for doing that.
17       Do you remember that testimony?
18   A.  That's what I was told.
19   Q.  From whatever source, from what you were told by
20   someone or some other source, at which dealerships was
21   someone at the dealership fired for pulling a credit
22   report for a customer who was actually not at the
23   dealership?
24   A.  You're misunderstanding what I'm saying.
25   Q.  Go ahead.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
89–92

Page 89

DAVID PEREZ

1
2    A.  When we're trained to gather the information as
3    sales associates, we are told, if we gather the
4    information of someone that's not physically here, and
5    we run the credit or do anything with that, we will get
6    fired.
7        Q.  Okay.
8        A.  The years that I sold cars, I never grabbed
9    somebody's information that wasn't there.  If they
10   wanted to run their credit, they would have to come into
11   the dealership.
12       Q.  But sometimes that hasn't happened, right, at the
13   dealerships you worked with?
14       A.  That never happened, sir.
15       Q.  I'm sorry?
16       A.  At any of the dealerships I've ever worked at,
17   it's never happened.  We don't run credit without the
18   person being physically there.
19       Q.  So you're saying, at none of the dealerships
20   you've worked at, it's never happened that any employee
21   of the dealership has ever had a credit pulled on a
22   consumer who is not the actually consumer physically at
23   the dealership?
24       You're saying that never happened at any of the
25   dealerships you've worked at; is that right?

Page 90

DAVID PEREZ

1
2        MR. GOODMAN:  Object to form.
3        Go ahead.
4    A.  That I know of, no.
5        Q.  And you said training.
6        Who gives the training at Victory Mitsubishi for
7    associates, in terms of credit reports?
8        MR. GOODMAN:  Time frame?
9        Q.  While you worked there.
10       A.  The sales managers.
11       Q.  And that would be you.
12       A.  Correct.
13       Q.  Anyone else?
14       A.  No.
15       Q.  And did you ever give them instruction in
16   writing?
17       Strike that.  Let me rephrase that.
18       How do you give trainings to sales associates to
19   make sure that they don't break the law, if any?
20       MR. GOODMAN:  Object to form.
21       Go ahead.
22       A.  I would train them every day.  They would have a
23   -- they will have a two- to three-week trial period.
24       Q.  Yes.
25       And then what?

Page 91

DAVID PEREZ

1
2    A.  Go over the rules, what they're supposed to do,
3    not supposed to do.  After that, they would -- what we
4    call straddle or follow a seasoned sales rep so they
5    know what to ask for, what to do with their information
6    and what not to do.
7        Q.  Okay.
8        Anything else, in terms of training to make sure
9    that associates aren't breaking the law --
10       MR. GOODMAN:  Object to form.
11       Q.  -- such as pulling someone's credit report who's
12   not there?
13       A.  No.
14       Q.  Are any trainings in writing?
15       A.  No.
16       Q.  As far as you know, while you worked at Victory
17   Mitsubishi, was there ever any written document given to
18   any of the staff at the dealership about not improperly
19   pulling someone's credit report?
20       A.  The employee handbook.
21       Q.  Do you know if there's an employee handbook at
22   Victory Mitsubishi while you worked there?
23       A.  Yes.
24       Q.  Did you ever read the employee handbook at
25   Victory Mitsubishi while you worked there?

Page 92

DAVID PEREZ

1
2    A.  Don't recall.
3        Q.  Did you ever give the employee manual handbook to
4    any sales associates while you worked there?
5        A.  Yes.
6        Q.  Did you ever tell them anything from the employee
7    handbook?
8        A.  Yes.
9        Q.  But, in fact, is it true or not that there's no
10   written policy as to when to pull -- when and when not
11   to pull a consumer's credit report?
12       There's, in fact, no document that you've seen at
13   the dealership that instructs about that issue; is that
14   correct.
15       A.  I wouldn't know.
16       MR. KESHAVARZ:  Why don't we take a break
17   for lunch.  Half hour break.
18       Is that enough time for everyone?
19       MR. GOODMAN:  I mean, I'd prefer less, and
20   let's just get this over with.  Half hour.
21       THE WITNESS:  Me too.
22       MR. GOODMAN:  I mean --
23       MR. KESHAVARZ:  I have to get it over with,
24   too.  But I think a half-hour break and get back on at
25   1:45.



DAVID PEREZ                                          November 21, 2022
FRANCOIS V. VICTORY AUTO GROUP                              93—96

Page 93

1                    DAVID PEREZ
2        Does that work for everyone?
3        MR. GOODMAN:  I suppose.
4        How much more are you going to have after
5    1:45?
6        MR. KESHAVARZ:  I don't know.  I don't know.
7        (A recess was taken at 1:14 p.m.)
8    Q.  Mr. Perez, while you worked at the dealership
9    from May -- time period of May 2020 forward, is there
10   anyone who worked at the dealership that has the
11   following description:  Man, six-two, slender, caramel
12   skin?
13       Is there anyone that worked there from May 2020
14   forward that meets that description?
15   A.  I don't recall.
16   Q.  How would you describe the height, weight, skin
17   color of Mr. Stavros or Stavros?
18       What does he look like -- height, weight, skin
19   color, as far as, you can recall?
20   A.  He's about my height.  Much slimmer than I am.
21   And little darker than I am.
22   Q.  When you say your height, tell me that height
23   again, please?
24   A.  About five-five.
25   Q.  Great.  Thanks.  Okay.

Page 94

1                    DAVID PEREZ
2        By the way, do you know who the sales associate
3    was for Miss Francois' deal?
4    A.  Not that I can remember.
5    Q.  How would you go about finding out who it was?
6    A.  I would have to look to the deal jacket.  It
7    should say.
8    Q.  We'll get to that in a few minutes.  All right.
9        So when we started going through the steps in a
10   typical sale and finance, we went through the steps for
11   the sales associate.  They meet with the customer.  They
12   get information from the customer.  They fill out -- the
13   associate fills out a credit application with the
14   customer, the sales associate?
15   A.  Yes.
16   Q.  The sales associate gets a copy of the driver's
17   license.
18   A.  Correct.
19   Q.  And the sales associate writes down the make,
20   model, VIN of the vehicle that customer's interested in.
21   A.  That's correct.
22   Q.  And the customer -- in the credit application,
23   does the associate fill out anything about the price of
24   the vehicle?
25   A.  No.  Not that I can remember.

Page 95

1                    DAVID PEREZ
2    Q.  And then -- well, you did this for a living,
3    right?
4        You know all the papers that go in a deal, right?
5        From 2017 to 2021, you would know the entire
6    process for selling and financing a car, right?
7        MR. GOODMAN:  Object to form.
8    A.  I would.
9    Q.  So you would know all the papers that get filled
10   out and given to you and the process for the sale and
11   financing of a car, right?
12       MR. GOODMAN:  Object to form.  Asked and
13   answered.
14   A.  I would.
15   Q.  So you know all the papers that the auto salesman
16   would give you in the sale and finance of a car, right?
17       MR. GOODMAN:  Object to form.  Asked and
18   answered.
19       Go ahead.
20   A.  I would.
21   Q.  So I apologize if this is repeating myself,
22   because we've done this a couple of hours earlier.  Bear
23   with me.  We can go through this very quickly.
24       What information does the associate get from the
25   consumer and the associate give to you?

Page 96

1                    DAVID PEREZ
2    A.  The credit app, what vehicle they're interested
3    in, copy of the license, how much they're looking to put
4    down.
5    Q.  Anything else that the associate would get from
6    the consumer or otherwise give to you in a typical sale
7    and finance?
8        MR. GOODMAN:  Object to form.  Asked and
9    answered.
10       Go ahead.
11   A.  Just those things I mentioned.
12   Q.  What information would be on the credit app?
13   A.  Customer's name, date of birth, Social Security
14   number, address, where they're living at, phone number
15   where to best contact them, appointment information, how
16   long they've been there, how much they make, phone
17   number for the job and their signature.
18   Q.  When the associate gives you the information,
19   does the associate, typically, have to verify any of the
20   information on the credit application?
21       MR. GOODMAN:  Object to the form.
22       Go ahead.
23   A.  Yes.
24   Q.  In what way is a sales associate supposed to
25   verify the information on the credit application before



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
97–100

Page 97

DAVID PEREZ

1   the associate gives it to you?
2   A. That the person who filled out the credit app is
3   the person they say they are.
4   Q. Anything else that the associate is supposed to
5   verify before he or she gives the documents to you?
6   A. No.
7   Q. Now, so what happens when you get the documents
8   from the sales associate?
9   What happens next?
10      MR. GOODMAN: Object to form.
11      Go ahead.
12   A. I run the credit, see what's on the credit.
13   Depending on what I see, I let the customer know what
14   I'm going to require, what I'm not going to require.
15   Q. Do you do anything else after the associate gives
16   you the information from the customer, other than run
17   the credit, see what's on the credit and see what is
18   required for a down payment?
19      MR. GOODMAN: Asked and answered.
20      Go ahead.
21   A. If everything checks out, we give it to the
22   finance manager, and the finance manager runs it to the
23   bank.
24   Q. You said if everything checks out for you.

Page 98

DAVID PEREZ

1   What else -- I just want to make sure I'm
2   covering everything you do in a typical sales finance.
3   You run the credit, see what's on the credit, see what's
4   required for the down payment.
5   Is there anything else that you do, at that
6   point, in the sales and finance agreement?
7   A. Well, if I see something that I don't like on the
8   credit, I'll ask them about it.
9   Q. Anything else that you would do on a typical
10   sales?
11   A. That's about it.
12   Q. When you say the same thing you didn't like about
13   it, what do you mean?
14   A. Like, a previous auto.
15   Q. Previous what?
16   A. Auto.
17   Q. Okay.
18   A. I'll ask them about it if it's, you know, a
19   negative standing or whether, you know, late payments.
20   Anything like that.
21   Q. You're saying negative standing?
22   A. Yes.
23   Q. What do you mean by negative standing?
24   A. So if the car was repossessed back whenever they

Page 99

DAVID PEREZ

1   had that auto or if there's any late payments.
2   Q. Wait a minute. What are you -- I'm a little
3   turned around. I apologize. Because you do this in
4   your industry, you know exactly everything you talk
5   about. And I don't know a darn thing. So I apologize.
6   You said negative standing.
7   Is that information that you get from the
8   consumer's credit report?
9   You said you pull the credit report to see
10   previous auto, negative standing and late auto payments;
11   is that right?
12   A. So when you do a hard credit check, which is what
13   I'm doing when the customer comes and they sign the
14   credit app, it gives me your whole history of what
15   you've been doing with your credit.
16   Q. And what are you looking at that might raise a
17   red flag that would make you want to talk to the
18   customer?
19   A. As I previously stated, if there's any negative
20   accounts, negative or any previous autos that went bad
21   or any late payments.
22   Q. And are you submitting this credit application to
23   prospective finance companies?
24   A. I don't do the submitting. But the finance

Page 100

DAVID PEREZ

1   manager does.
2   Q. You just pull the reports?
3   A. That is correct.
4   Q. So tell me about -- and this is all done
5   electronically, right?
6      MR. GOODMAN: Object to form.
7      Go ahead.
8   A. Yes.
9   Q. So how does that process work?
10   What's the interface you use, and how does it
11   work?
12   Is it called Dealertrack or you tell me?
13   A. Well, it's called Dealertrack. Pull up the
14   Dealertrack login, and you type in the information
15   that's provided.
16   Q. The information it asks for?
17   You said --
18   A. Provided by the consumer.
19   Q. Sorry?
20   A. The information provided by the consumer.
21   Q. So -- and then what happens in the Dealertrack
22   system?
23      MR. GOODMAN: Objection to form.
24      Go ahead.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
101–104

Page 101

DAVID PEREZ

1   A. It will run the credit.
2   Q. What other information would be on the
3   Dealertrack system?
4   A. I'm sorry.  I didn't understand the question.
5   Q. What other information would be on the
6   Dealertrack system during the course of the sales and
7   financing of a vehicle?
8   A. Their job info.  The bank approval.
9   Q. What other information would be available through
10  Dealertrack in a typical sales and finance?
11          MR. GOODMAN:  Asked and answered.
12          Go ahead, again.
13  A. Bank approval.
14  Q. That's all the information you have up to that
15  point, right?
16  A. That's correct.
17  Q. So what's the next step in a typical sales and
18  financing of a vehicle?
19  A. Once we have the approval, the customer sits down
20  with the finance manager.  They go over their options
21  and --
22  Q. Let me pause you one second.
23          When we got the approval, what do you mean by
24  when we got the approval?

Page 102

DAVID PEREZ

1   I thought you didn't submit anything to any
2   finance companies.
3           So what do you mean, when we got the approval?
4   A. Well, when I say we, I mean the store.  I don't
5   submit it.  My finance manager does.  But we work for
6   the same store.  So, the approval.
7   Q. So you get the approval from who?
8   A. From the bank.
9   Q. And the bank gives an approval based on credit
10  application that is electronically submitted from
11  Victory Mitsubishi to the banks, right?
12  A. Correct.
13  Q. Now, when you said when we got approval, when you
14  go to the -- when the finance manager -- sorry.
15          Is the next person the finance manager that gets
16  involved?
17          Is that what you said?
18  A. That is correct.
19  Q. When you start providing the information to the
20  finance manager, do you know if the consumer is approved
21  by any of the finance companies?
22  A. Not until the finance manager says that they're
23  approved.
24  Q. So how does that work, normally?

Page 103

DAVID PEREZ

1   Do you go to the finance manager's office and
2   talk to him or her or how does that information go back
3   and forth between you and the finance manager?
4   A. So after I run the credit and see what I have to
5   see, I give them the folder or the file with the
6   customer's information, how much they're looking to put
7   down.  That way, they can start working on the deal.
8   Q. When you start working the deal, what do you
9   mean?
10  A. Well, they got to send it to the bank.
11  Q. So you go with the physical file.
12          And that's the documents that are in the deal
13  jacket; is that right?
14  A. That is correct.
15  Q. And did you say you physically bring that
16  information over to the finance manager?
17  A. Yes.
18  Q. And in May 2020 forward, that finance manager was
19  Yessica Vallejo, right?
20  A. That is correct.
21  Q. So what would happen -- so you go -- Ms. Vallejo
22  has an office in May 2020 forward?
23  A. Yes.
24  Q. I'm sorry.

Page 104

DAVID PEREZ

1   Did you say you know how long she worked there?
2   How far back she was working there?
3   2017 or?
4   A. I wouldn't know.
5   Q. Well, you would know, because you worked there.
6           But when you started working there, you said it
7   was someone else.
8           Do you remember how long you were when that
9   person left and Ms. Vallejo started?
10          Was it a month, was it a year, was it two years
11  after you started?
12  A. I don't recall.
13  Q. Okay.  That's fine.  So you go with the physical
14  deal jacket to see Ms. Vallejo.
15          What happens next?
16  A. She submits it to the bank.
17  Q. She electronically submits it to the bank?
18  A. Correct.
19  Q. Is there a reason why she needs the physical
20  documents in order to electronically submit it to the
21  banks?
22  A. To verify the information.
23  Q. I see.
24          Would she run the credit again when you bring her



DAVID PEREZ                                          November 21, 2022
FRANCOIS V. VICTORY AUTO GROUP                       105–108

Page 105

1          DAVID PEREZ
2   the deal jacket?
3          MR. GOODMAN:  Object to the form.
4     A.  No.
5     Q.  Now, the items that you discussed that were in
6   the deal jacket that you saw before your deposition, are
7   those the same documents that you would typically give
8   to Ms. Vallejo in a typical sales and finance agreement?
9     A.  The credit app and their license, yes.
10    Q.  And would there be anything else that you would,
11  typically, put in that folder, other than what you
12  described earlier in your deposition?
13    A.  If the bank requires it, and they ask for proof
14  of residence or paystubs, we would get that.
15    Q.  But you would put that in the file folder that
16  you bring Ms. Vallejo?
17    A.  No, I wouldn't know until she submits what the
18  bank's going to ask for.
19    Q.  All right.  That's why I was turned around a
20  little bit.
21        For how long does that process take, generally?
22    A.  Depends on the bank.
23    Q.  I mean, are we talking about a -- well, the
24  submissions, are the, typically, sent to multiple banks?
25        MR. GOODMAN:  Objection to form.

Page 106

1          DAVID PEREZ
2        Go ahead.
3     A.  That I know of?
4        I wouldn't know.
5     Q.  Well, it's sent to more than one bank?
6     A.  I wouldn't know, sir.  I don't do finance.
7     Q.  Well, I know.
8        But she tells you what happens with the credit
9   applications, Ms. Vallejo does?
10        MR. GOODMAN:  Object to form.
11    A.  She tells if it's approved or not approved.
12    Q.  And, typically, she tells you that while you're
13  standing there?
14    A.  No.
15    Q.  How long does it typically take when you get her
16  the deal jacket and when she's able to tell you about
17  approval from any of the prospective finance companies?
18    A.  It varies.
19    Q.  What's the typical range?
20    A.  It varies.
21    Q.  There's no typical range?
22    A.  No.
23    Q.  It could be ten minutes?
24        MR. GOODMAN:  Objection.  He answered no
25  typical range.

Page 107

1          DAVID PEREZ
2     Q.  Go ahead.
3     A.  It varies.
4     Q.  I know.
5        It could be ten minutes sometimes; is that right?
6     A.  It could be ten minutes.  It could be 20 minutes.
7   It could be an hour.  It could be the next day, sir.  It
8   varies.  Each person's credit -- each person's credit
9   history, credit score, is different.  So I wouldn't be
10  able to tell you, typically, 10, 20, 30, 40 minutes.  I
11  wouldn't be able to tell you.  It varies.
12    Q.  So the customer's normally waiting at the
13  dealership when you have Ms. Vallejo submit the credit
14  application, right?
15    A.  That is correct.
16    Q.  Then what's the next step, typically?
17    A.  Once we have the approval, they sit down with the
18  finance manager, and they go over the payment, the
19  interest rate.  The contract, pretty much.
20    Q.  Typically, does that happen while -- the same day
21  that the consume is there, typically?
22        MR. GOODMAN:  Object to form.
23    A.  Can vary.  Sometimes the customer would have to
24  come back the next day.
25    Q.  Is that normal that a customer would have to come

Page 108

1          DAVID PEREZ
2   back?
3        MR. GOODMAN:  Objection to form.
4     A.  Depends.
5     Q.  Okay.  Fine.
6        And now when the --
7        MR. KESHAVARZ:  I'm sorry?
8        MR. GOODMAN:  We have, like, radiator steam
9   hammer thing happening in here.  Maybe, you can hear
10  that.
11        Let's take a couple of minutes.  It will
12  pass.  It's very annoying.
13        MR. KESHAVARZ:  I'll just sit here with my
14  camera off and wait until I see you back on the screen.
15        MR. GOODMAN:  Okay.  Sorry about that.
16        (A recess was taken at 2:07 p.m.)
17    Q.  When Ms. Vallejo gets the response to the credit
18  application, would she let you know what it said?
19    A.  No.  She would just tell me whether it was
20  approved or not.
21    Q.  Would she normally say if, something like, that
22  the consumer cannot move forward unless they get a
23  co-applicant?
24    A.  That is correct.
25    Q.  And then you would relay that to the consumer



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
109–112

Page 109

DAVID PEREZ

2  directly or just to the auto salesperson?

3      A.  I would relate that to the consumer directly.

4      Q.  Now, is Dealertrack the computer system -- is

5  that the name of the computer system the dealership uses

6  in the sales and financing of a vehicle?

7          MR. GOODMAN:  Object to the form.

8          Go ahead.

9      A.  It was, when I was there.

10     Q.  Was there any other database or software that you

11  guys used while you were at Victory Mitsubishi in the

12  sales and financing of vehicles, other than Dealertrack?

13     A.  I don't understand the question.

14     Q.  Sure.  Is Dealertrack the only software you guys

15  used at Victory Mitsubishi while you were there in the

16  sales and financing of vehicles?

17     A.  Yes.

18     Q.  And all the documents that are signed or that

19  have to do with the deal, are those typically scanned in

20  into the Victory Mitsubishi's computer system?

21     A.  I don't understand the question.

22     Q.  Sure.  If you're at Dealertrack and you want to

23  see the forms that have been submitted, would there be a

24  section on the screen where you can see what the forms

25  are?

Page 110

DAVID PEREZ

2          MR. GOODMAN:  Objection to form.

3          Time frame?

4      Q.  During the process of the sale of a vehicle.

5      A.  No, not necessarily.

6      Q.  When you say not necessarily, in what cases would

7  there be?

8      A.  Well, the only thing that I would be able to pull

9  up is the person's credit.  And that's only for a

10  certain amount of time.

11     Q.  And how long?

12     A.  Thirty days.

13     Q.  So is the credit information that was pulled

14  available to the dealership for more than 30 days after

15  it's pulled?

16          MR. GOODMAN:  Object to the form.

17          Go ahead.

18     A.  Just for the 30 days.

19     Q.  And is the credit report normally printed out and

20  put in the deal file?

21     A.  No.

22     Q.  Because in this instance, we have a printed copy

23  of her credit report by the dealership in the deal file.

24          Do you have any idea how that would get there?

25     A.  Would not know.

Page 111

DAVID PEREZ

2      Q.  Are there any other -- any document or

3  information from Dealertrack that would get printed out

4  and physically put in the deal file?

5      A.  I don't understand the question.

6      Q.  Sure.  This is electronic information that you

7  can see in Dealertrack, right?

8          MR. GOODMAN:  Objection.

9          I'm sorry.  Can I hear that again?

10     Q.  Sure.  There's electronic information that you

11  can see on the screen when you're on Dealertrack, right?

12          MR. GOODMAN:  When?

13     Q.  During the sale and financing of a vehicle,

14  right?

15          MR. GOODMAN:  Go ahead.

16     A.  The contract?

17     Q.  Is the retail sales contract typically available

18  on Dealertrack?

19          MR. GOODMAN:  Objection to form.

20     A.  We get it from Dealertrack.

21     Q.  So tell me how that process works.

22          When Vallejo types in the information and submits

23  the credit, what kind of information is on the

24  Dealertrack system, at that point, and what kind of

25  documents are there?

Page 112

DAVID PEREZ

2      A.  The first name, last name, Social, date of birth.

3      Q.  And the submissions to the credit reporting -- to

4  the credit application submission, would also be on

5  Dealertrack after Ms. Vallejo submits it, right?

6      A.  That's the credit app I just described.

7      Q.  But the credit application, the electronic credit

8  application is still stored on Dealertrack.

9          That's not deleted from Victory Mitsubishi's

10  system, is it?

11          MR. GOODMAN:  Objection to form.

12     A.  I wouldn't know.

13     Q.  What's the next step, typically, after

14  Ms. Vallejo runs -- submits the credit application?

15          What's next?

16     A.  Once she has the answer from the bank, she'll sit

17  down with the customer and go over their payment,

18  interest rate, bring us the bank approval.

19     Q.  At some point, is there a buyer's order printed

20  out?

21          MR. GOODMAN:  A what?

22          MR. KESHAVARZ:  Buyer's order.

23          MR. GOODMAN:  Go ahead.

24     A.  Usually, when they sit down with her.

25     Q.  And there's also a retail installment sales



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
113–116

Page 113

DAVID PEREZ

1  contract that's printed out?
2
3       MR. GOODMAN:  Objection to form.
4   A.  When they sit down with her.
5   Q.  What other papers does the finance manager sit
6  down with the customer with?
7   A.  Wouldn't know.
8   Q.  Well, you're not there?
9       You don't see it?
10      Have you ever physically seen it?
11  A.  That's not part of my job, sir.  I wouldn't know
12  what else she brings to the business table.
13  Q.  Would the buyer's order get signed by the
14  consumer?
15  A.  Of course.
16  Q.  Retail installment contract gets signed by the
17  consumer?
18  A.  Of course.
19  Q.  And where is that -- are the signings done in
20  Ms. Vallejo's office?
21  A.  In her office.
22  Q.  And there are video cameras in her office, right?
23      MR. GOODMAN:  Time frame?
24      Object to the form.
25  Q.  You can answer.

Page 114

DAVID PEREZ

1
2      I can't hear you.
3   A.  Yes.
4   Q.  There are video cameras in all the offices at
5  Victory Mitsubishi while you were there, right?
6       MR. GOODMAN:  Asked and answered.
7   A.  Yes, while I was there.
8   Q.  And as you understand it, the sales -- the
9  contracts being signed are being video recorded while
10  they're being signed by the consumer.
11      Is that your understanding?
12      MR. GOODMAN:  Object to form.
13  A.  I wouldn't know.
14  Q.  Have you ever seen any screens anywhere in the
15  dealership that shows the video that's being taken from
16  the cameras?
17  A.  No.
18  Q.  And the buyer's order and retail installment
19  agreement, that's generated from the Dealertrack system,
20  right?
21      MR. GOODMAN:  Asked and answered.
22  A.  Yes.
23  Q.  The finance manager also goes over add-ons, like,
24  extended warranties, service contract, etchings, that
25  type of things, right?

Page 115

DAVID PEREZ

1   A.  I wouldn't know.
2
3   Q.  You have no idea?
4   A.  That's not part of my job, sir.  So I don't know.
5   Q.  At that point -- have you ever seen anyone
6  address the cameras anywhere in the office in the
7  dealership?
8       MR. GOODMAN:  Sorry.  Address?
9   Q.  Well, in Ms. Vallejo's office, did you ever see
10  her, like, adjust the location of the camera?
11      Move it a little bit?
12      Turn it?
13  A.  Wouldn't know.
14  Q.  You would know if you've seen it or not.
15      Have you ever seen it?
16  A.  No.
17  Q.  Now, the camera in her office on the -- is it,
18  like, a ball that's on the screen of the computer?
19      Is it on the ceiling?
20      Where is it?
21  A.  I don't recall.
22  Q.  Are there any cameras on the top of the computer
23  screen of any of the -- anywhere in the dealership that
24  you've seen while you were there?
25  A.  No.

Page 116

DAVID PEREZ

1
2   Q.  When you say you see cameras around, are they
3  from the ceiling?
4   A.  Some of them.
5   Q.  Where else are some of them?
6       On tables?
7   A.  No.
8   Q.  Where else are they, other than the ceilings?
9       Where else are video cameras at Victory
10  Mitsubishi, other than the ceiling when you worked
11  there?
12  A.  Well, when I was there, there was cameras on the
13  walls looking at the lot.
14  Q.  The cameras are inside.
15      Where else would the cameras inside be, other
16  than the ceilings, as far as, you can recall?
17      MR. GOODMAN:  Asked and answered.
18      Look, you're paying for the transcript.
19      Go ahead --
20  Q.  Go ahead.
21      MR. GOODMAN:  This is crazy.
22  A.  Wouldn't know.
23  Q.  Well, you would know what you saw.
24      Where else would you see it, other than in the
25  dealership?



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
117–120

Page 117

1            DAVID PEREZ
2       In the physical dealership, where else did you
3   see video cameras, other than on the ceilings?
4           MR. GOODMAN:  Asked and answered.
5    A. I don't remember, sir.
6    Q. Okay.  I mean, you would know, but you don't
7   remember.  That's fine.  That's a different answer.
8       The salespeople that you worked with when you
9   first started -- strike that.
10       The sales associates that worked there while you
11  -- when you first started at the dealership, did those
12  pretty much stay there throughout the entire time you
13  were there?
14           MR. GOODMAN:  Object to form.
15           Go ahead.
16    A. I wouldn't remember.
17    Q. You don't remember?
18    A. I don't remember.
19    Q. Okay.  That's fine.
20       Do you know -- I apologize if I asked this.
21       Were you ever accused of doing anything dishonest
22  in the sales or financing of a car while you were at
23  Victory Mitsubishi?
24           MR. GOODMAN:  That's asked and answered.
25   Object to the form.

Page 118

1            DAVID PEREZ
2    Do it again, David.  Go ahead.
3    A. No, I was not.
4    Q. Has the dealership Victory Mitsubishi ever been
5   accused of doing anything deceptive in the sales and
6   financing of vehicles while you were there?
7           MR. GOODMAN:  Object to the form.
8    A. I wouldn't know, sir.  That's above my pay grade.
9    Q. You don't know?
10           MR. GOODMAN:  He just said he wouldn't know.
11  You want him to repeat everything he says?
12       C'mon.
13    Q. And has any person at the dealership ever been
14  discipline -- any person at the Victory Mitsubishi ever
15  been -- any employee ever been disciplined for alleged
16  misconduct at the dealership?
17           MR. GOODMAN:  Object to form.
18    A. Not that I can recall.
19    Q. How is your pay calculated while you were --
20  first of all, as a sales associate at the dealership,
21  how was your pay calculated?
22    A. It was based on the amount of cars that I sold.
23    Q. There's no base salary?
24       It's based totally on commission?
25    A. I had a base salary.

Page 119

1            DAVID PEREZ
2    Q. When you worked as a sales associate, what was
3   the base salary?
4    A. I don't remember.
5    Q. Fine.  That's fine.
6       Do you know when you left -- let me ask it to you
7   this way.
8       Do you know around May 2022, do you know what the
9   base salary for sales associates were?
10           MR. GOODMAN:  You mean May 2020?
11           MR. KESHAVARZ:  2020.  Sorry.  Nice catch.
12    A. I wouldn't know.
13    Q. Do you have any idea what the base salary of any
14  of the sales associates are the dealership Victory
15  Mitsubishi?
16           MR. GOODMAN:  He said he wouldn't know.
17  You're just asking the same thing over and over again.
18    Q. Fine.
19       You were paid a base salary and commission on
20  vehicles you sold, correct?
21    A. Correct.
22    Q. Most of the income that you got was based on the
23  commission?
24           MR. GOODMAN:  Object to form.
25           Go ahead.

Page 120

1            DAVID PEREZ
2    A. Yes.
3    Q. About how much did you make while you worked as a
4   sales associate at the dealership?
5           MR. GOODMAN:  Objection.  Do you -- object.
6   This --
7           MR. KESHAVARZ:  I'm trying to get through
8   the payment structure.
9           MR. GOODMAN:  I don't think this is an
10  appropriate question.  I'm going to -- we'll take -- I'm
11  going to take that under advisement.
12       Take it up with your list of issues.
13    Q. When you're sales manager did you get paid a base
14  salary?
15    A. Yes.
16    Q. Did you get paid a commission, as well?
17    A. Yes, I did.
18    Q. Did you get a source of any pay, other than a
19  commission and a base salary?
20    A. I don't understand.
21    Q. Did you get paid in any other manner, other than
22  a base salary while sales manager at Victory Mitsubishi?
23    A. No.
24    Q. And was most of your income while you were a
25  sales manager based on commissions?



DAVID PEREZ                                                November 21, 2022
FRANCOIS V. VICTORY AUTO GROUP                                      121–124

Page 121

DAVID PEREZ

1
2      MR. GOODMAN:  Object to the form.
3      You can answer.  Go ahead.
4   A.  Yes.
5   Q.  Would you say, roughly, 80 percent of your income
6  as a sales manager was based on commissions?
7   A.  Yes.
8   Q.  And is that true, roughly, 80 percent of your
9  income as a sales associate was based on commissions?
10  A.  Yes.
11  Q.  Now, when you say commission, how does that work?
12     Is it a percentage of the total sales price?
13     Is it -- how is that calculated?
14  A.  Well, it depends on the dealership.  But most
15  dealerships that I worked in paid when cars were sold.
16  Q.  Just on the number of cars, not on the sales
17  price?
18  A.  Just on the number of cars.
19  Q.  And that was true at Victory Mitsubishi?
20  A.  When I was there, yes.
21  Q.  And that's for both the pay for sales associates
22  and sales manager, their commission is solely based on
23  the number of sales of the vehicles, not on the price of
24  the vehicles, correct?
25  A.  When I was there, yes.

Page 122

DAVID PEREZ

1
2   Q.  And that's also true, then, that the commission
3  to the associate or to you was not based on add-ons that
4  were sold with the vehicle, solely the number of
5  vehicles?
6   A.  I don't understand the question.
7   Q.  There are add-ons for the sale of a vehicle,
8  like, extended warranties, etchings, rustproofing that
9  get added on to the price of the vehicle, correct?
10  A.  Okay.  Correct.
11  Q.  And the dealership gets a certain percentage of
12  profit from that, correct?
13  A.  I wouldn't know.
14  Q.  Well, if a dealerships sells an extended warranty
15  for 3,000 and only pays 1,700 or for -- something along
16  those lines, right, there's a markup there, right?
17  A.  I wouldn't know.
18  Q.  You wouldn't know.  Okay.
19     You get a recap to show how much -- have you ever
20  seen a recap to see who was paid how much in a deal?
21  A.  That's above my pay grade, sir.
22  Q.  Do you know if finance manager got paid based
23  on anything other than -- strike that.
24     Do you know if the finance manager gets paid a
25  base salary?

Page 123

DAVID PEREZ

1
2   A.  I wouldn't know.
3   Q.  Do you know if the manager's paid a base salary?
4   A.  I was paid a base salary.  I was a manager.
5   Q.  Well, I'm getting at Stavros.  You called him a
6  manager.  You called him a general manager.
7   A.  I wouldn't know, sir.
8   Q.  And you don't know if either the finance manager
9  or Mr. Stavros gets paid a commission, in any way.
10     Do you know if they get paid a commission in any
11  way?
12  A.  I would not know, sir.
13  Q.  Now, when you got paid, who issued the paycheck?
14     Who was it issued by?
15  A.  What do you mean, sir?
16  Q.  Well, did you get a physical paycheck or direct
17  deposit?
18  A.  Physical paycheck.
19  Q.  Is it -- who's it issued by?
20     It should say, like, Mitsubishi Motors.
21     Who --
22  A.  Victory Mitsubishi.
23  Q.  It said Victory Mitsubishi?
24     Didn't say Victory Mitsubishi Group or Spartan
25  Group?

Page 124

DAVID PEREZ

1
2     Just said Victory Mitsubishi on your pay checks;
3  is that right?
4   A.  I don't remember.
5   Q.  And did the name of whoever wrote your check, did
6  that change, at any point, from when you started working
7  there and when you ended?
8   A.  What?
9     I didn't understand the question.
10  Q.  Sure.  Were you always paid by the same company
11  the whole time you worked at the dealership?
12  A.  Don't remember.
13  Q.  Do you know if the -- you don't know if it was
14  issued by one company at one point and a different
15  company at another point?
16     You don't know?
17  A.  I don't remember, sir.
18  Q.  How would you find that out?
19     MR. GOODMAN:  Objection.
20     How would he find it out?
21     Go ahead.
22  A.  I wouldn't.  I would have to -- I don't know.  I
23  don't have my paystubs, so I wouldn't be able to.
24  Q.  All right.  When you paid your taxes, did you pay
25  -- did you get a W-2 from the dealership or did you get



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
125–128

Page 125

DAVID PEREZ

2  a W-9 or did you get another tax form?
3     A. I got a W-2.
4     Q. And who did it say was your employer on the W-2?
5        Was it Victory Mitsubishi?
6     A. Can't recall.
7     Q. Do you know if the employer listed on the W-2 had
8  ever changed during the course of your time at the
9  dealership?
10    A. I wouldn't know.
11    Q. You don't remember?
12    A. I --
13       MR. GOODMAN: He just said he doesn't know.
14    A. I wouldn't know, sir.
15    Q. Let's talk about other people who worked at the
16  dealership while you were there. Yessica Vallejo, you
17  talked about her job and how she interacted.
18       Was Yessica Vallejo also one of your managers?
19       Did she oversee your work?
20       MR. GOODMAN: Asked and answered.
21       Go ahead.
22    A. No.
23    Q. Stavros was the only person who oversaw your
24  work?
25       MR. GOODMAN: Asked and answered.

Page 126

DAVID PEREZ

2       Go ahead.
3     A. Yes.
4     Q. And were you ever disciplined, for any reason,
5  while you were working at Victory Mitsubishi?
6       MR. GOODMAN: Object to form.
7       Go ahead.
8     A. No.
9     Q. You were never written up for anything?
10    A. No.
11    Q. When you applied for your job at Victory
12  Mitsubishi, did you have to give an employment history?
13    A. No.
14    Q. Did you have to have a background check done?
15    A. Don't remember.
16    Q. Do you remember signing authorization for someone
17  to do a background check on you?
18    A. I don't remember.
19    Q. What's your understanding about what this lawsuit
20  is about?
21       MR. GOODMAN: Objection to the form.
22    A. Sorry. I didn't hear the question.
23    Q. What is your understanding of what this lawsuit
24  is about?
25       MR. GOODMAN: Note my objection.

Page 127

DAVID PEREZ

2       Go ahead.
3     A. From my understanding, Miss Francois is saying
4  that she wasn't at the dealership.
5     Q. I couldn't hear that. But, I'm sorry, there was
6  one more thing I have to ask about Mr. Orsaris. This
7  will be the last time I'm jumping back.
8       Mr. Orsaris was your boss. So he was aware of
9  all of the work you were doing at the dealership.
10       He supervised you doing everything that you were
11  doing, right?
12       MR. GOODMAN: Object to the form. Object to
13  what he was aware of.
14       This witness can testify to, go ahead and
15  answer.
16    A. Yes.
17    Q. So he, Mr. Orsaris, instructed you about any
18  policies that you had to comply with, right?
19    A. I'm sorry.
20       What?
21    Q. Mr. Orsaris would be the one who instructed you
22  on any policies that you had to comply with, right?
23    A. Yes.
24    Q. But you didn't have any specific policies as to
25  credit reporting or credit pulls, right?

Page 128

DAVID PEREZ

2       There wasn't any specific policy at the
3  dealership as to credit reporting or credit pulling.
4       There wasn't a specific policy as to that aspect
5  at the dealership; is that right?
6       MR. GOODMAN: Can I hear the question again,
7  please?
8     Q. As to the specific aspect of pulling credit
9  reports, there wasn't a specific policy at the
10  dealership as to that narrow issue, was there?
11       MR. GOODMAN: Objection to form. And I
12  believe mischaracterizes prior testimony.
13       But, go ahead.
14    A. I don't understand the question.
15       What are you asking?
16       MR. GOODMAN: Ahmad?
17       MR. KESHAVARZ: Yes.
18       MR. GOODMAN: Somebody just came in that
19  needs to sign some papers. I need five minutes to deal
20  with this.
21       MR. KESHAVARZ: That's fine. I'll be
22  sitting here in front of my camera. Just step back when
23  you're ready.
24       (A recess was taken at 2:34 p.m.)
25    Q. What type of reputation in the community for



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
129–132

Page 129

DAVID PEREZ

1
2 honesty do you believe that Victory Mitsubishi has?
3      MR. GOODMAN: Object to the form.
4      Go ahead.
5   A. I wouldn't know.
6   Q. Do you have an opinion about the reputation of
7 Victory Mitsubishi?
8      MR. GOODMAN: Objection.
9      Go ahead.
10   A. Good.
11   Q. Good in what way?
12   A. We're honest.
13   Q. Victory Mitsubishi has that reputation for being
14 honest.
15      Is that what you're saying?
16   A. Yes, sir.
17   Q. Does Victory Mitsubishi have a reputation for
18 anything other than being honest?
19   A. Not that I know of.
20   Q. Did the dealership change its practice of selling
21 vehicles, in any way, during the -- as a result of the
22 Covid-19 pandemic?
23   A. Yes.
24   Q. In what way?
25   A. We were by appointment only.

Page 130

DAVID PEREZ

1
2   Q. Any other way?
3   A. No.
4   Q. For what period of time were you -- was the
5 dealership by appointment only?
6   A. Until the State said that we can start bringing
7 employees back.
8   Q. The mandatory shutdown period, you're talking
9 about?
10   A. Yeah.
11   Q. By May of 2020, you're back to -- the dealership
12 was back to normal operations?
13      MR. GOODMAN: Object to form.
14      Go ahead.
15   A. Around that time, yeah.
16   Q. So we last left things about what you're
17 understanding of what this lawsuit was about.
18      So what is your understanding of what this
19 lawsuit was about?
20   A. So my understanding is that Miss Francois is
21 saying that it's -- I believe it's fraud. That she
22 wasn't at the dealership.
23   Q. Do you have any other understanding about what
24 the lawsuit is?
25   A. No.

Page 131

DAVID PEREZ

1
2   Q. So, basically, is it your understanding that
3 Miss Francois is alleging that the dealership Victory
4 Mitsubishi sold a car in her name to someone that wasn't
5 her?
6      Was that, basically, what your understanding is?
7      MR. GOODMAN: Object to form.
8      Go ahead.
9   A. Yes.
10   Q. Now, did you have any personal -- strike that.
11      You said that you got paid commission.
12      Do you have a goal for the number of vehicles you
13 should sell?
14      MR. GOODMAN: Personal goal or?
15      MR. KESHAVARZ: Yeah.
16      MR. GOODMAN: Object to form.
17   A. No.
18   Q. Typically, what's the average number of vehicles
19 that you sell in, say, a week?
20      MR. GOODMAN: Time frame?
21      Object to form.
22   Q. A week since 2020 -- since May of 2020?
23   A. I wouldn't remember.
24   Q. I mean right now -- before you left, what was the
25 typical number of vehicle that you sold in a day?

Page 132

DAVID PEREZ

1
2      A week?
3      A month?
4      Just give me a general idea.
5      Was it five?
6      A thousand?
7      Just give me a general idea, please.
8      MR. GOODMAN: Object to form.
9      Go ahead.
10   A. It depends on the day. It depends on the week.
11 It all depends.
12   Q. In a typical month, about how many vehicles would
13 you sell?
14      MR. GOODMAN: Objection to form.
15   Q. Just give me a ballpark answer.
16   A. Anywhere between 250 to 270.
17   Q. You would sell between 250 and 270 vehicles a
18 month on average; is that right?
19      MR. GOODMAN: You, personally, or the
20 dealership?
21      THE WITNESS: The dealership.
22      MR. GOODMAN: He's asking you.
23      THE WITNESS: Oh, me?
24   Q. So the deals you get commission on -- let me put
25 it to you this way.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
133–136

Page 133

DAVID PEREZ

1
2     The deals you get commission on, about how many
3  deals do you get a commission on in, say, in a typical
4  month?
5     A.  250-270.
6     Q.  Okay.  Thanks.
7        So that means you worked on 250 to 270 deals in a
8  typical month?
9     A.  Give or take, yeah.
10    Q.  Now, do you remember anything about the sale and
11 financing of the vehicle as to Miss Francois?
12    A.  Don't remember.
13    Q.  So you don't recall ever meeting Miss Francois?
14    A.  No.
15    Q.  You don't recall ever seeing a driver's license
16 of Miss Francois?
17    A.  No.  Not from what far back.
18    Q.  Sorry?
19    A.  Not from that far back.
20    Q.  You reviewed some documents in preparation for
21 your deposition.
22    A.  That is correct.
23    Q.  Did that help refresh your memory, in any way?
24    A.  No.
25    Q.  So do you know if Miss Francois ever came to the

Page 134

DAVID PEREZ

1
2  Victory Mitsubishi dealership, at any point, ever?
3     A.  Yes.
4     Q.  And when did she come to the dealership?
5     A.  When the credit was signed.
6     Q.  What date?
7     A.  May-something.
8     Q.  How do you know that Miss Francois was at the
9  dealership on the date the credit application was
10 signed?
11       How do you know that?
12    A.  Because I have a signed credit app with her
13 license.
14    Q.  But do you remember her being there and having
15 her sign the document?
16    A.  Well, she must have been, sir, because I have a
17 signed credit app with her license.
18    Q.  So you don't know -- okay.
19       So you're assuming she was there, because there
20 was a document, a credit application, signed and dated.
21       So because of that, you assume that Miss Francois
22 was there, at that time; is that right?
23            MR. GOODMAN:  Object to form.
24    A.  Not assume.  I -- I know she was there.
25    Q.  How do you personally know that she was there?

Page 135

DAVID PEREZ

1
2     A.  Because, sir, we wouldn't have a signed credit
3  app or license, if she wasn't there.
4     Q.  Well, if somebody else came there and said that
5  she was Miss Francois, that person could have signed the
6  application and given the driver's license of
7  Miss Francois, right?
8     A.  No, sir.  Because we verify.
9     Q.  So are you saying -- you would have to verify
10 how?
11    A.  By matching the license.
12    Q.  So you're saying that the only way Victory
13 Mitsubishi would have a consumer sign a credit
14 application is if they viewed the driver's license and
15 they viewed the face of the consumer and confirmed the
16 driver's license matched the face, correct?
17    A.  That is correct.
18    Q.  And if during Covid the person might have had a
19 mask, Victory Mitsubishi would have required that person
20 to take off that mask, at least for a moment, to confirm
21 the person on the driver's license was the same as the
22 person in front of him or her; is that correct?
23    A.  At some point, sir, we would have told them to
24 bring down their mask, yes.
25    Q.  And do you know, other than the fact that there's

Page 136

DAVID PEREZ

1
2  a signed credit application and the driver's license, do
3  you know if that happened in this instance?
4            MR. GOODMAN:  Know if what happened?
5            To pull down the mask?
6            MR. KESHAVARZ:  Yeah or -- strike that.
7     Q.  Let me ask a different question.
8        The person who would have confirmed the identify
9  of Miss Francois, the driver's license and the credit
10 application, that would have been the sales associate,
11 correct?
12    A.  No.  Back in Covid, it would have been myself or
13 Stavros.  Mostly, Stavros.
14    Q.  In May 2020, Mr. Stavros would been the one to
15 confirm the identify of anyone signing a credit
16 application or bringing in a driver's license; is that
17 right?
18    A.  Correct.
19    Q.  And same thing for June 2020?
20    A.  Correct.
21    Q.  Same thing for September 2020?
22    A.  I don't recall September.
23    Q.  So did you have sales associates working at
24 Victory Mitsubishi in May and June of 2020?
25    A.  After they told us we can hire everybody back,



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
137–140

Page 137

1           DAVID PEREZ
2 yes.
3    Q.  But May and June of 2020, in fact, Victory
4 Mitsubishi had sales associates working again, right?
5         MR. GOODMAN:  Object to the form.
6         Go ahead.
7    A.  Yes.
8    Q.  So by May or June of 2020, it would be the sales
9 associate who would be confirming the identify of
10 anybody who came in and applied for financing, right?
11        MR. GOODMAN:  Objection.  Asked and
12 answered.  Mischaracterizes.
13        Go ahead.
14    A.  Stavros would.
15    Q.  No, no, no, no.
16        Why -- if the salespeople -- sales associate's
17 job is to confirm the identify of the person signing a
18 credit application, right?
19    A.  That is correct.
20    Q.  And that changed for some period of time when the
21 sales associates were no longer working at the
22 dealership, correct?
23    A.  No.
24    Q.  By May and June of 2020, well, I think you said
25 this, right, the number of employees was back to normal

Page 138

1           DAVID PEREZ
2 and the dealership was operating as normal, at that
3 point, right?
4         MR. GOODMAN:  Objection.  He didn't say
5 that.  He said, if that's when --
6         MR. KESHAVARZ:  Okay.  It wasn't, I guess.
7         Let me rephrase the question so the record
8 is clear.
9    Q.  By May and June of 2020, were the number of sales
10 associates back to normal, and was Victory Mitsubishi
11 operating as it normally would?
12        MR. GOODMAN:  Object to form.
13        Go ahead.
14    A.  After they told us, yes.  After they told us to
15 hire everybody back, yes.
16    Q.  But I guess what I'm trying to find out more
17 narrowly is, was the dealership up and running as normal
18 by May and June of 2020?
19        MR. GOODMAN:  Object to form as to what's
20 normal.
21        But, go ahead.
22    A.  Yeah, I don't understand when you say normal.
23    Q.  Well, the sales associates were back at the
24 dealership by -- definitely by May and June of 2020,
25 right?

Page 139

1           DAVID PEREZ
2    A.  Yes.
3    Q.  And the sales associates, by May or June of 2020,
4 since they were back, their normal job was to confirm
5 the identify of the people signing the credit
6 applications, right?
7         That's the normal part of their job, right?
8         MR. GOODMAN:  Object to form.
9         Go ahead.
10    A.  Normally, yes.  But we still had the mask
11 mandate.
12    Q.  Fine.
13        But by May or June of 2020, the auto salespeople
14 were back.
15        And those would be the people who would be in
16 charge of determining whether the person signing the
17 credit application was the person in front of them,
18 right?
19        MR. GOODMAN:  Object to form.
20        Go ahead.
21    A.  Normally, yes.
22    Q.  But by May and June of 2020, it would be the --
23 let me take this in two steps.  Okay.  Because I think I
24 know the answer, but I want to make sure the record's
25 crystal clear here.

Page 140

1           DAVID PEREZ
2        By May and June of 2020, the sales associates had
3 returned to working at Victory Mitsubishi, correct?
4         MR. GOODMAN:  Objection to form.
5         Go ahead.
6    A.  Yes.
7    Q.  And the sales associates, one of their job
8 functions is, they were the ones to determine whether
9 the person signing the credit application was the person
10 alleged to be -- was the person alleging to be -- strike
11 that.
12        The job of sales associate, by May and June of
13 2020, in fact, the entire time the sales associates were
14 there, would be to confirm the identify of the person
15 signing the credit application, right?
16        That's the job, one of the jobs of the sale
17 associate, right?
18        MR. GOODMAN:  Object to form.
19        Go ahead.
20    A.  Again, that's one of the jobs of a sales
21 associate, yes.  But we still had mask mandates.  So it
22 wasn't -- I couldn't have or we couldn't have a
23 salesperson ask about, you know, remove your mask or put
24 your mask down.
25    Q.  Let's put that aside for a second.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
141—144

Page 141

DAVID PEREZ

1
2    Regardless of the mask mandate, by May and June
3  of 2020, it would be the sales associates who would
4  confirm the identify of the person signing the credit
5  applications, correct?
6    A.  Under normal circumstances, yes.
7    Q.  I'm not asking about normal circumstances.  I'm
8  asking for the dates.
9    In May and June of 2020 --
10   A.  You're asking dates --
11      MR. GOODMAN:  Let him finish.
12      Go ahead, Ahmad.
13   Q.  I'm just asking specifically, May and June of
14  2020, it would be the sales associates who would confirm
15  the identify of the person who signed the credit
16  application; is that correct?
17      MR. GOODMAN:  That's 2020, he's talking
18  about.
19      THE WITNESS:  Yeah, I told him how many
20  times.  Stavros.
21   A.  No, Stavros.
22   Q.  Well, I guess I'm confused.  If the sales
23  associates are back by May and June of 2020, why aren't
24  the sales associates asking to confirm the identify of
25  the person who is signing the credit applications?

Page 142

DAVID PEREZ

1
2    A.  Because they couldn't have them telling the
3  customer to remove their mask.
4    Q.  And would Stavros ask -- would Stavros ask the
5  consumer to remove their mask to confirm the identify of
6  the person who's signing the credit application?
7    A.  He or myself would take them to another office
8  and have them bring it down briefly, yes.
9    Q.  And so you would make sure when contracts were --
10  strike that.
11      So the issue is not who did it, it's the location
12  of where it was done, right?
13      In an office or not in an office, is that what
14  you're saying?
15      MR. GOODMAN:  Objection to form.
16      Go ahead.
17   A.  Yes.
18   Q.  So anyone could have done it.  It's just whether
19  the person was -- where the person physically was when
20  they were asked to bring down their mask, right?
21      MR. GOODMAN:  Objection to form.  That's not
22  what he testified to.
23   Q.  You can answer.
24   A.  Either myself or Stavros, May 2020 and June 2020,
25  would verify the people's identify.

Page 143

DAVID PEREZ

1
2    Q.  Regardless if the person had a mask?
3      MR. GOODMAN:  Object to form.  Objection.
4    A.  Well, we weren't allowing people without masks to
5  come in.
6    Q.  So you're saying in May/June 2020, no one came
7  into the dealership to purchase a vehicle who did not
8  have a mask.
9      Is that what you're saying?
10   A.  As per the mandate, yes.
11   Q.  And you remember that?
12      MR. GOODMAN:  Objection.
13      Go ahead.
14   A.  Yes.
15   Q.  Now -- so regardless of who checks pulling down
16  the mask or not, there would be a salesperson -- sales
17  associate involved in the sales of financing of vehicles
18  in September and -- excuse me -- in May/June of 2020,
19  right?
20      That was still being done by sales associates,
21  right?
22   A.  To gather the information, yes.
23   Q.  Sales associates would see who was there filling
24  out the credit application, right?
25   A.  Gathering the information.

Page 144

DAVID PEREZ

1
2    Q.  The sales associate, in May and June of 2020,
3  would be the ones who would have seen the consumer sign
4  the credit application, correct?
5    A.  No.
6    Q.  They would not?
7      Okay.
8      And sales associates would look at the ID of the
9  person who came in to sign the credit application,
10  right?
11   A.  I don't understand the question.
12   Q.  Sure.  The person -- the sales associate would
13  check the ID of the person who was going to sign the
14  credit application, right?
15      MR. GOODMAN:  Objection to form.
16      Go ahead.
17   A.  Normally, yes.
18   Q.  And that's true in May and June of 2020, right?
19   A.  That's what I'm letting you know, sir.  Either
20  myself or Stavros would check the identify.
21   Q.  Did you normally work weekends in May or June of
22  2020?
23   A.  Yes.
24   Q.  Did Mr. Stavros normally work weekends in May and
25  June of 2020?



DAVID PEREZ                                    November 21, 2022
FRANCOIS V. VICTORY AUTO GROUP                 145—148

Page 145

DAVID PEREZ

2  A.  Yes.
3     Q.  Now, in May and June of 2020, Victory Mitsubishi
4  would not have allowed financing to go through to a
5  consumer unless they had the consumer remove their mask
6  and confirm the face of the person in the driver's
7  license with the face of the person sitting in front of
8  them, correct.
9         MR. GOODMAN:  Objection to form.
10        Go ahead.
11  A.  Yes.
12     Q.  Okay.  Now, I guess what I don't understand is,
13  if the dealership, if you can ask the consumer to pull
14  down their mask, and Stavros can ask the consumer to
15  remove their mask to confirm their identity, why
16  couldn't the sales associate ask the consumer to take
17  off their mask and confirm the identify on the driver's
18  license?
19  A.  I was instructed not to let them.
20     Q.  But do you know why?
21  A.  Above my pay grade.
22     Q.  And can you think of any reason why a sales
23  associate couldn't ask the consumer to take off their
24  mask briefly to confirm their identify?
25     Can you think of any reason why the sales

Page 146

DAVID PEREZ

2  associate couldn't do that, but you could?
3         MR. GOODMAN:  Objection to form.
4         Is he now an expert witness?
5     Q.  Go ahead.  You can answer.
6         (Simultaneous cross talk.)
7         MR. GOODMAN:  He can think of-
8     Q.  You can answer.
9         MR. GOODMAN:  Go ahead.
10  A.  It's above my pay grade.
11     Q.  I know.  But you can't think of any reason why a
12  sales associate couldn't ask a -- couldn't ask a
13  consumer to remove their mask and you could?
14     Can you think of any reason why that would be?
15     Can you think of any reason?
16         MR. GOODMAN:  Objection.
17         Don't answer it again.  You've already
18  answered it.
19         MR. KESHAVARZ:  He never did, actually.
20     Q.  Go ahead.  You can answer.
21         MR. HOFFMAN:  Put that on your list.  We'll
22  talk about it.  We'll take it under advisement.
23     Q.  You said it's above your pay grade, right?
24     That was your answer before, right?
25  A.  That's correct.

Page 147

DAVID PEREZ

2     Q.  But I'm not asking you if it's above your pay
3  grade.
4     I'm asking you, as you're sitting here today, can
5  you think of any reason, other than the fact that that's
6  the way it was, can you think of any reason about why
7  you could tell a consumer, Stavros can tell a consumer
8  to pull down their mask to confirm their identify, but a
9  sales associate couldn't?
10     Sitting here today, can you think of a reason why
11  that may be?
12         MR. GOODMAN:  Objection.
13         Don't answer that.
14         Put that on the list, if you want.
15     Q.  You can answer.
16         MR. KESHAVARZ:  It's not the same question.
17         MR. GOODMAN:  It's an even worse question.
18     Q.  Go ahead.  You can answer.
19  A.  Above my pay grade.
20     Q.  That's the only reason why you think it had to be
21  done by you or Stavros, right?
22     It's the only reason you can think of?
23         MR. GOODMAN:  You're going to ask that again
24  for the fourth or fifth time?
25         Put it on your list.  We'll take it under

Page 148

DAVID PEREZ

2  advisement.
3     Q.  How could you determine who at the dealership
4  would have, if anyone, would have confirmed the identify
5  of the person who claimed to be Miss Francois?
6     Is there any document you can check that would
7  give you that indication?
8         MR. GOODMAN:  Object to the form.
9         You can answer.
10  A.  I didn't understand the question.
11     Q.  So sitting here today, is there anything that the
12  dealership could check, you can check, anyone could
13  check to determine who would be the person who confirmed
14  Miss Francois' identify in May or June of 2020?
15         MR. GOODMAN:  Object to form.
16         Go ahead.
17  A.  I wouldn't know.
18     Q.  There's no document that -- no one initialled
19  anywhere or took any notes to say, oh, I checked this
20  person's identity in May/June of 2020?
21  A.  I wouldn't know, sir.
22     Q.  When you checked someone's identity in May or
23  June of 2020, did you make any notation anywhere that
24  you confirmed the identify of the consumer?
25  A.  No.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
149–152

Page 149

DAVID PEREZ

1
2   Q.  Why not?
3        MR. GOODMAN:  Object to form.
4        Go ahead.
5   A.  I wasn't told to keep records.
6   Q.  Well, wouldn't you want -- as a sales manager,
7   the person in the position of authority at the
8   dealership, to make sure that you take steps to confirm
9   the identify of the person whose name the loan is under
10  is, in fact, that person?
11       Wouldn't you want to keep a report of that?
12       MR. GOODMAN:  Objection to form.
13       Go ahead.
14  A.  We did make sure, sir.  We asked them to put down
15  their mask for a brief second.
16  Q.  Why wouldn't you make a notation about who made
17  confirmation of identify?
18       Why wouldn't you do that?
19       MR. GOODMAN:  Objection.
20       Go ahead.
21  A.  I wasn't told to.
22  Q.  Well, did you have any concerns that people
23  coming in to buy cars with masks on might not be the
24  same person they're contending to be on the credit
25  application?

Page 150

DAVID PEREZ

1
2        MR. GOODMAN:  Object to form.
3        Go ahead.
4   A.  Before anything was done, we will verify, sir.
5   Q.  So you didn't have any concerns?
6        MR. GOODMAN:  Object to form.
7   A.  No.
8   Q.  Was anyone else at the dealership, other than you
9   and Mr. Stavros, allowed to confirm the identify of
10  persons signing credit applications in May or June of
11  2020?
12       MR. GOODMAN:  Object to form.  Asked and
13  answered, many times.
14       Go ahead.
15  A.  Me and Mr. Stavros.
16  Q.  Not Yessica Vallejo?
17  A.  No.
18  Q.  Did you say you were going to take -- you took
19  the consumer into a different -- into a particular room
20  to ask them to pull down their mask?
21  A.  Into an office, yes.
22  Q.  Whose office?
23  A.  Stavros.
24  Q.  Well, when you had asked the consumer to pull
25  down their mask to confirm their identity, would you do

Page 151

DAVID PEREZ

2   it in Mr. Stavros' office?
3   A.  It would depend.
4   Q.  Normally, where would you do it?
5   A.  If Stavros' office wasn't available, I would go
6   to the next available office.
7   Q.  Which is who?
8   A.  I wouldn't know.
9   Q.  So there are just empty offices at Victory
10  Mitsubishi?
11       Is that what you're saying?
12       MR. GOODMAN:  No.  That's not what he's
13  saying.  Objection.
14  Q.  I'm asking you, whose other offices are there at
15  Victory Mitsubishi, other than Mr. Stavros that you
16  might take a consumer into to ask him or her to pull
17  down their mask to confirm their identity?
18  A.  I wouldn't know, sir.
19  Q.  Well, who else had an office at Victory
20  Mitsubishi in May or June of 2020, other than
21  Mr. Stavros Orsaris?
22       MR. GOODMAN:  And Yessica, he testified to.
23       Go ahead.
24  A.  That I can recall?
25       I don't recall.

Page 152

DAVID PEREZ

1
2   Q.  Besides you can't recall, the only persons who
3   had offices in May or June of 2020 at Victory Mitsubishi
4   are Stavros Orsaris and Yessica Vallejo.
5        Those are the only two people, correct?
6        MR. GOODMAN:  Object to form.
7        Go ahead.
8   A.  Correct.
9   Q.  So you would ask the consumer to pull down their
10  mask in either the office of Mr. Stavros or
11  Miss Vallejos, correct?
12       MR. GOODMAN:  No.  Objection.  You're
13  mischaracterizing his testimony.
14  Q.  Go ahead.
15       MR. GOODMAN:  He said others he didn't
16  remember.
17       MR. KESHAVARZ:  Well, no.  Say objection to
18  the form of the question.
19  Q.  So the question is, you only remember -- there's
20  only two offices -- the only two people who had offices
21  at Victory Mitsubishi in May and June of 2020, that's
22  Stavros Orsaris and Yessica Vallejos; is that true or
23  not?
24  A.  Were they the only offices available?
25  Q.  Yes.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
153–156

Page 153

DAVID PEREZ

1
2    A.  No.  There was other offices in there.
3    Q.  Well, that's what I'm asking.
4        Whose other offices were there at the dealership
5    in May or June 2020?
6        That's what I'm asking?
7    A.  I wouldn't remember, sir.
8    Q.  Other employees?
9        MR. GOODMAN:  He said he can't remember.
10   How many times you want him to say he can't remember?
11   Q.  Why was it pulled down in a closed environment of
12   an office as opposed to outside, say, outside?
13       Wouldn't that be -- outside be safer?
14       MR. GOODMAN:  Objection to form.  It's
15   getting argumentative, also.
16   Q.  Go ahead.  You can answer.
17   A.  Not necessarily.
18   Q.  Why not?
19       MR. GOODMAN:  Objection.
20   A.  Because we're surrounded by other people.
21   Q.  And Mr. Stavros had a camera in his office, too,
22   right?
23       Everyone had cameras, right?
24       MR. GOODMAN:  Object to form.  Asked and
25   answered.

Page 154

DAVID PEREZ

1
2        Go ahead.
3    A.  Yes.
4    Q.  All right.
5        And do you know if Mr. Stavros Orsaris had any
6    part of the sale and financing of the vehicle in May or
7    June of 2020?
8        Do you have any knowledge of that?
9    A.  I wouldn't remember.
10   Q.  Is there any document that you would check that
11   would tell you whether Stavros Orsaris had any role in
12   the sale and financing of a vehicle in May or June of
13   2020?
14   A.  Wouldn't know that, sir.
15   Q.  Would there be any way to find out?
16   A.  I wouldn't.
17   Q.  Is there some way to check to see who might have
18   logged in to, say, Dealertrack and reviewed
19   Miss Francois' account?
20       Would that tell you -- strike that.
21       If someone at the dealership looked at
22   Miss Francois' account, would that be tracked somewhere
23   in Dealertrack who else had hands on the account?
24   A.  I wouldn't know.
25   Q.  You don't know one way or the other?

Page 155

DAVID PEREZ

1
2        MR. GOODMAN:  What was the question?
3    Q.  You don't know if there's any way that the
4    Dealertrack tracks who is logged in to work on a file --
5    on a consumer's account?
6        There's no way of knowing that on Dealertrack?
7    A.  I wouldn't know, sir.
8    Q.  Well, can you do that?
9        When you log in, is there a way to tell that you
10   logged into an account before?
11       MR. GOODMAN:  He just said he didn't know.
12       Go ahead.
13   Q.  For you.
14   A.  I wouldn't know, sir.
15   Q.  What is DealerSocket?
16   A.  It is our -- we input customers' name and phone
17   number, and that's how we make appointments.
18   Q.  I didn't hear the first part of the sentence.
19       Can you say that again, please?
20   A.  It's our CRM.
21   Q.  What is a CRM?
22       What does CRM stand for?
23   A.  Don't know what CRM stands for.  What it's always
24   been called.  Pretty much, like, a log of the customers
25   that we've contacted, and they have come into the

Page 156

DAVID PEREZ

1
2    dealership.
3    Q.  So -- and that's -- the DealerSocket program, is
4    that an accurate way to describe it?
5    A.  What do you mean?
6    Q.  Well, if I call it the DealerSocket system, are
7    you saying that when a customer calls in or you're
8    interacting with a customer, that you put the customer's
9    contact information into the DealerSocket system?
10   A.  Yes.  We put their name and phone number.
11   Q.  So when that customer calls in or a call is made
12   to that customer, DealerSocket keeps track of calls that
13   are made or received with that customer, correct?
14   A.  I wouldn't know.
15   Q.  Well, how does DealerSocket work?
16       MR. GOODMAN:  Object to form.
17       Do you know how it works?
18   A.  I wouldn't know.
19   Q.  Have you ever used DealerSocket?
20   A.  No.
21       MR. KESHAVARZ:  I will ask Emma if she can
22   mark as an exhibit Defendant's Production 49 through 67
23   as Plaintiff's Exhibit 18.  Let's start marking the
24   exhibits with 18, because we left the last deposition, I
25   think, at Exhibit 17.  So let's just continue from that



DAVID PEREZ                                              November 21, 2022
FRANCOIS V. VICTORY AUTO GROUP                          157–160

Page 157

DAVID PEREZ

2  to mark Exhibit 18 would be Defendant's document
3  production pages 49 through 67.
4      MR. GOODMAN:  I'm going to be off for one
5  second.  I'll be right back.
6      Stay there.
7      (Plaintiff's Exhibit Nos. 18 through 20 were
8  deemed marked for identification.)
9      MR. KESHAVARZ:  They are Bates-stamped
10  Defendant's 42 through 48 would be Exhibit 18;
11  Defendant's Bates-stamped 49 to 69 would be Exhibit 19;
12  and Defendant's page 113 would be Plaintiff's Exhibit
13  20.
14    Q.  Mr. Perez, take a look at Exhibit No. 18,
15  documents Bates-stamped Defendants 48 through -- excuse
16  me -- 42 through 48.
17      And let me know when you're done, please.
18    A.  I'm done.
19    Q.  On the bottom lower left it says,
20  "DealerSocket.com."
21      Do you see that?
22    A.  I see that.
23    Q.  And on the top it says, "DealerSocket," right?
24    A.  Okay.
25    Q.  Is that right?

Page 158

DAVID PEREZ

2    A.  Yes.
3    Q.  Are these texts that are printed out through the
4  DealerSocket system?
5    A.  I wouldn't know.
6    Q.  Do you know what this document is that's
7  Exhibit 18?
8    A.  I wouldn't.
9    Q.  Have you ever seen anything like the text on the
10  top of page Defendant's 42, where it says, "Victory
11  Mitsubishi.  Welcome."
12      Have you ever seen any text like that?
13    A.  I wouldn't.
14    Q.  Well, does the DealerSocket keep track of texts
15  that are sent to and from prospective customers?
16    A.  I wouldn't know, sir.
17    Q.  Have you ever sent texts out through
18  DealerSocket?
19    A.  I wouldn't know.
20    Q.  Have you ever sent a text to a consumer through
21  any system of Victory Mitsubishi?
22    A.  I wouldn't.
23    Q.  I'm sorry.
24      Is that a yes or a no?
25    A.  No.

Page 159

DAVID PEREZ

2    Q.  All right.
3      MR. KESHAVARZ:  So then for the court
4  reporter, I guess, let's label this DealerSocket texts
5  to give it a title.
6    Q.  Going down on -- well, do you know if there are
7  texts that go back and forth between auto sales
8  associates and customers?
9    A.  I wouldn't know.
10    Q.  Because on the bottom of Defendant's 42, it says,
11  "You'll be good to go.  You just have to come in with
12  proof of income, proof of address and license."
13      Do you see that?
14    A.  I see it, sir.
15    Q.  And so you don't know if this is a message going
16  between someone at Victory Mitsubishi and a prospective
17  customer?
18    A.  I wouldn't know.
19    Q.  Did you use any sort of texting or messaging
20  application when you communicated with customers, at any
21  point, while you worked at Victory Mitsubishi?
22      MR. GOODMAN:  You just asked him that, and
23  he just said no.
24      Go ahead, answer again.
25    A.  No.

Page 160

DAVID PEREZ

2    Q.  Who is Tameeka Richards?
3    A.  I wouldn't know, sir.
4    Q.  That's not someone who ever worked at the
5  dealership?
6    A.  I wouldn't know.
7    Q.  All right.
8      If you go back to Exhibit 18, page Defendant's
9  45, it says, "Hi, Mr. Milano, this is Dahiara Castillo
10  at Victory Mitsubishi.  First name spelled
11  D-A-H-I-A-R-A Castillo.
12      Do you know Dahiara Castillo, who might have
13  worked at Victory Auto in June of 2020?
14    A.  I wouldn't.
15    Q.  Would you know all the people who your sales
16  associates were in May and June 2020?
17    A.  I wouldn't recall.
18    Q.  Well, you were the boss of everyone who was a
19  sales associate in May/June of 2020, right?
20      MR. GOODMAN:  Object to the form.
21    A.  Yes.
22    Q.  So you'd be in charge of supervising all your
23  sales associates, right?
24    A.  Yes.
25    Q.  And you'd be charged with tracking the



DAVID PEREZ                                    November 21, 2022
FRANCOIS V. VICTORY AUTO GROUP                          161–164

Page 161
DAVID PEREZ

1
2  performance of all the sales associates, right?
3  A. Yes.
4  Q. So you would have to know who all the sales
5  associates were who worked under you, correct?
6  A. Yes.
7  Q. And you've never heard the name Dahiara Castillo
8  before?
9  A. No.
10    MR. GOODMAN: Objection. And the question
11  assumes Dahiara Castillo was a sales associate. You
12  never established that. There's no evidence.
13  Q. Well the only people who worked at -- correct me
14  if I'm wrong, the only titles at Victory Mitsubishi
15  while you were there, one was the manager or, maybe, the
16  general manager Stavros, right?
17    That's one title, correct?
18  A. Correct.
19  Q. Then there's the finance manager who is Yessica
20  Vallejo, correct?
21  A. Correct.
22  Q. Then there's you, who was the sales manager,
23  correct?
24  A. Correct.
25  Q. Then there are about 20 or so sales associates,

Page 162
DAVID PEREZ

1
2  correct?
3    MR. GOODMAN: Object to form and I don't
4  think that's --
5  Q. Is that correct?
6  A. Give or take, yes.
7  Q. Ten to 20 sales people working in servicing for
8  vehicles, correct?
9  A. Correct.
10  Q. Are there any other groups of people who worked
11  at the dealership while you were there, other than those
12  categories of people?
13    MR. GOODMAN: If you know.
14  A. Not that I can recall.
15  Q. Going down to the bottom of page 45, "Hi, Farrah.
16  This is Chelsea Lopez at Victory Mitsubishi."
17    Did I read that correctly?
18  A. Yes.
19  Q. Is Chelsea Lopez someone who worked at Victory
20  Mitsubishi in May 2020 through the date that you left?
21    MR. GOODMAN: Is that a question?
22    MR. KESHAVARZ: Yes.
23    MR. GOODMAN: What's the question?
24  Q. Do you know if Chelsea Lopez ever worked at
25  Victory Mitsubishi?

Page 163
DAVID PEREZ

1
2  A. I wouldn't know.
3  Q. Can't hear you.
4  A. Wouldn't know.
5  Q. Does Victory Mitsubishi get customers through
6  websites?
7  A. I wouldn't know, sir.
8  Q. You wouldn't know how customers get to the
9  dealership to purchase cars?
10    You don't know that?
11  A. I don't know. That's above my pay grade. I
12  don't know how they get their customers.
13  Q. You never talked to customers and they said, hey,
14  I got to you guys online?
15    That never happened in all the years you worked
16  there?
17    MR. GOODMAN: Object to form.
18  Argumentative.
19    Go ahead.
20  A. No.
21    (Whereupon, Ms. Caterine dropped off the
22  call and a brief recess was taken at 3:41 p.m.).
23  Q. Do you know if there's anyone who works in online
24  sales -- strike that.
25    Do you know if there's an online sales division

Page 164
DAVID PEREZ

1
2  at Victory Mitsubishi while you were working there?
3  A. I wouldn't know.
4  Q. If you look at -- take a look at Exhibit 19,
5  pages Bates-stamped 49 through 69.
6    And let me know when you're done.
7    MR. KESHAVARZ: Let's go off the record a
8  quick second.
9    (Whereupon, an off-the-record discussion was
10  held.)
11  Q. Are you on Plaintiff's 19, Mr. Perez?
12  A. Yes, I am.
13  Q. On the top, let's identify -- at the top it says,
14  "DealerSocket work notes" on the top of page 49.
15    It says that, correct?
16  A. That is correct.
17  Q. Let's identify that for the court reporter that
18  way.
19    Do you have any idea what Exhibit No. 19 is?
20  A. I have no idea what this is.
21  Q. When you talked about DealerSocket system
22  tracking calls from specific consumers going back and
23  forth, do you remember that testimony?
24    MR. GOODMAN: I don't remember anything like
25  that. Object to the form.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
165—168

Page 165

DAVID PEREZ

1
2    Q.  My recollection -- let me just can ask the
3    question, again.  Because, obviously, my understanding
4    might be wrong.  So let me ask you again.
5        So tell me what your understanding of the
6    DealerSocket system or CRM is, however you want to
7    describe it?
8    A.  So it keeps track of the people that show up to
9    the dealership.  Like, input their phone number, their
10   name.
11   Q.  That's information that's obtained after the
12   consumer gets to the dealership, correct?
13   A.  Or if they call in, because we do have a phone
14   number.
15   Q.  So if they call in with an interest to the
16   dealership, that information from the consumer would be
17   typed into the system and tracked through the
18   DealerSocket?
19   A.  I wouldn't know.
20   Q.  So you don't know what DealerSocket does or CRM
21   does with information typed in.
22       Is that what you're saying?
23   A.  That is correct.
24   Q.  Did you attempt to gather any documents you might
25   have regarding the sale or financing of agreement in the

Page 166

DAVID PEREZ

1
2    name of Miss Francois?
3        Did you take any steps to determine whether you
4    had any e-mails or texts, phone records or any other
5    documentation related to that?
6    A.  I'm sorry.
7        What's the question?
8    Q.  Did you take any steps to locate any documents
9    related to this lawsuit, to the sale and financing of
10   the vehicle in the name of Miss Francois?
11   A.  No.  I don't keep copies of anything.
12   Q.  Did you check for any records?
13   A.  I would.  I don't have copies of anything, sir.
14   Q.  Would you ever -- were you asked to check for any
15   records related to Miss Francois or this lawsuit?
16       MR. GOODMAN:  Objection.  Privileged.
17       Don't answer.
18   Q.  Do you know who at the dealership would know
19   about the operation of DealerSocket?
20   A.  I wouldn't know, sir.
21   Q.  Do you believe Mr. Stavros Orsaris would know?
22       MR. GOODMAN:  Object to the form.
23   A.  I wouldn't know.
24   Q.  Are there different buildings for Victory
25   Mitsubishi or there's only one building?

Page 167

DAVID PEREZ

1
2    A.  I wouldn't know.
3    Q.  So you don't know if there's someone else --
4    well, strike that.
5        You don't know.  All right.
6        Looking at Exhibit No. 20, Bates-stamped
7    Defendant's 113.
8        Do you know what this is?
9    A.  No, I don't know what this is.
10   Q.  All right.
11       MR. KESHAVARZ:  For the court reporter, why
12   don't we just identify that as DealerSocket page 113 for
13   the record.
14       All right.  Let's move on then.
15       And I'd ask Emma to forward for exhibits the
16   deal jacket cover that's Defendant's page 1 -- the deal
17   jacket that's, Defendant's pages 1 through 36; the
18   credit report, that's Defendant's 37 through 40; and
19   dealership screen shots, document production Defendant's
20   85 through 92.
21       MR. GOODMAN:  While Emma is doing that,
22   let's take a break.  We'll need to receive it and print
23   it out.  It will take a few minutes.  So let's go off,
24   and we'll be back in five minutes.
25       (A recess was taken at 3:48 p.m.)

Page 168

DAVID PEREZ

1
2    (Plaintiff's Exhibit Nos. 21 through 23 were
3    deemed marked for identification.)
4    Q.  Mr. Perez, take a look at Exhibit 23, and let me
5    know when you're done.
6    A.  I'm done.
7    Q.  Is this the interface with the Dealertrack system
8    that you were testifying to before?
9        MR. GOODMAN:  Objection to form.
10       Go ahead.
11   A.  Yes.
12   Q.  Now, have you ever had a situation where someone
13   comes to purchase a vehicle, and then because of some
14   issues with sales or financing have to come back in a
15   month or two, and you have to go back into Dealertrack
16   and try to address the consumer's concerns?
17       That's happened to you before, right?
18   A.  I don't recall, sir.
19   Q.  Now, if you were working still at the dealership,
20   would you be able to log in to Dealertrack system to see
21   the Dealertrack information as to Miss Francois?
22       MR. GOODMAN:  Object to the form.
23   Hypothetical.
24       Go ahead.
25   A.  No.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
169–172

Page 169

DAVID PEREZ

1
2    Q.  Why not?
3    A.  Well, as you can see, the third page of
4    everything gets, like, starred out.  So date of birth
5    and stuff like that, we are no longer able to see that.
6    Q.  So you're talking about the third page, which is
7    Defendant's page 87.  You're saying the date of birth is
8    starred out.
9        And you can see the full date of birth, if you
10   were to log back into Dealertrack now and look up
11   Miss Francois' account; is that correct?
12   A.  After a month, you wouldn't be able to see that.
13   Q.  But you can see everything else in the
14   Dealertrack system as to Miss Francois, other than that?
15       MR. GOODMAN:  When?
16       Objection to form.
17   Q.  Now, if you were able to log into the Dealertrack
18   system?
19   A.  I'm not understanding the question.
20   Q.  If you were able to log in to the Dealertrack
21   system at Victory Mitsubishi right now, you can see
22   anything that's in the Dealertrack system as to
23   Miss Francois, other than the starred out date of birth
24   on page Defendant's 87, correct?
25   A.  The only thing that we would be able to see would

Page 170

DAVID PEREZ

1
2    be the second page.
3    Q.  Page -- the second page.
4        The page that's Defendant's Exhibit 86?
5        Is that the second page at the bottom?
6    A.  Yes.
7    Q.  Now what about that page could you see or not
8    see?
9    A.  No.  I'm saying, I would only be able to see
10   that.
11   Q.  You wouldn't -- couldn't see any other
12   information about what Dealertrack has -- what's on the
13   Dealertrack system as to Miss Francois, other than those
14   pages that are in front of you right now on Exhibit 23?
15   A.  That's correct.
16   Q.  Why not?
17       What can't you log in to see the rest of the
18   information in the Dealertrack system about
19   Miss Francois's purchase?
20   A.  That's above my pay grade.
21   Q.  So you don't know one way or the other, if you
22   could log in to the Dealertrack system now and review
23   the information in Miss Francois' account.
24       Is that what you're saying?
25       MR. GOODMAN:  That is what he said.  Asked

Page 171

DAVID PEREZ

1
2    and answered.
3        Hang on one second.  Let me get the rest of
4    the printout.
5        Okay.  I think we have everything now.
6        Sorry about that.
7        Go ahead.
8    Q.  So my question is, if you were at the Victory
9    Mitsubishi today, and you were logging into the
10   Dealertrack system, can you view any information
11   available on Dealertrack, other than what's on pages --
12   pages on Exhibit 23?
13   A.  I don't know.
14   Q.  You don't know one way or the other?
15       MR. GOODMAN:  That's what he just said.
16   A.  Correct.  I don't know, sir.
17   Q.  Now, when you have a credit application that you
18   -- you pull a credit report and Yessica Vallejo submits
19   a credit application and so forth, how much longer -- is
20   there any time period that you could no longer access
21   the information on Dealertrack regarding Miss Francois'
22   account?
23   A.  Thirty days.
24   Q.  Sorry?
25   A.  Thirty days.  That's all the time they give you.

Page 172

DAVID PEREZ

1
2    Q.  Only for 30 days you can review the credit
3    report, correct?
4    A.  Correct.
5    Q.  But after 30 days, can you review any other
6    information -- well, after 30 days, you can still review
7    other information that's in the Dealertrack system
8    regarding Miss Francois, right?
9    A.  I wouldn't know.
10   Q.  You don't know one way or the other?
11   A.  Correct.
12   Q.  You've never had to do that in any sale ever more
13   than 30 days after the signing of the retail sales
14   contract?
15       You never had to go back and look at the deal --
16   look at what's in the Dealertrack system for a sale?
17       That never happened to you the entire time you
18   worked at Victory Mitsubishi?
19       MR. GOODMAN:  Object to form.
20       Go ahead.
21   A.  No.
22   Q.  Has anyone ever come back to you in the 250 to
23   270 deals that you've done a month -- for all the years
24   you worked at Victory Mitsubishi, no consumer has come
25   back and told you there was a problem with the financing



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
173—176

Page 173

1             DAVID PEREZ
2  of a sale of a vehicle and they need to give the vehicle
3  back?
4        Has that ever happened to you?
5        MR. GOODMAN:  Do you mean a consumer?
6        Object to form.
7        As opposed to a bank coming back?
8        Object to form.  I'm sorry.
9   A.  I wouldn't know.
10   Q.  So -- well, you use the term I wouldn't know, and
11  I'm not sure if that means I don't remember.  So let me
12  narrow this down.
13   A.  I'm saying, I wouldn't know, sir.  Because I
14  wouldn't know.
15   Q.  Well, I'm asking what you do know.
16      In your experience selling 250 to 270 cars a
17  month in all the years you were with the dealership,
18  you're saying you've never had a specific instance where
19  a consumer has come back and said there's been a problem
20  with the financing terms, I have to give the car back.
21      Has that ever happened, as far as, you can recall
22  in all the sales that you've had at Victory Mitsubishi?
23        MR. GOODMAN:  Object to the form.
24        You can answer.
25   A.  I don't know.

Page 174

1             DAVID PEREZ
2   Q.  Not that you can recall or you don't recall a
3  single instance that's happened?
4   A.  That's correct.
5   Q.  Have you had a single instance where a consumer's
6  come back and complained about any of the sales or
7  financing for any of the 250 to 270 deals you've done a
8  month for the last few years at Victory Mitsubishi?
9      Someone ever come back to you and complained that
10  something deceptive or unfair happened with any car
11  sales?
12        MR. GOODMAN:  Objection to form.  Asked and
13  answered.
14        Go ahead.
15   A.  I wouldn't know.
16   Q.  You don't recall sitting here today?
17   A.  No, I wouldn't know, sir.
18   Q.  Well, I wouldn't know isn't the same thing as
19  sitting here today.
20      Do you remember if that ever happened?
21   A.  I wouldn't know.  I'm not privileged --
22   Q.  What do you mean by you wouldn't know?
23   A.  Because, sir, they don't let me know that
24  information.  I'm in charge of the sales.
25   Q.  Right.  If someone comes back and has problems

Page 175

1             DAVID PEREZ
2  with the sales -- sometimes consumers come back and have
3  problems with the sale and has come back to talk to you,
4  right?
5   A.  No, sir.
6   Q.  No one's ever come back and talked to you about a
7  problem they had with a sale in the 250 to 270 sales a
8  month in all the years you've worked at the dealership.
9      Is that what you're saying; yes or no?
10        MR. GOODMAN:  Asked and answered three or
11  four times already.
12        Please, can we move on?
13   Q.  Go ahead.
14      Yes or no?
15   A.  I am not in charge of that.
16   Q.  I didn't ask you if you were in charge of this --
17   A.  No.
18   Q.  -- that's a different question.
19      Sorry?
20   A.  Same question, no.
21   Q.  No, no consumer's ever come back to you in all
22  the deals you've done and said they had a problem with
23  the sales or financing of a vehicle from Victory
24  Mitsubishi?
25      Is that what you're saying?

Page 176

1             DAVID PEREZ
2        MR. GOODMAN:  Asked and answered.
3   Q.  Is that what you're saying?
4        MR. GOODMAN:  This is ridiculous.
5        Go ahead.
6   A.  I wouldn't know, sir.
7   Q.  So that's what you're saying, correct?
8        MR. GOODMAN:  How many times --
9   A.  I wouldn't know, correct.
10   Q.  You don't remember a single time that ever
11  happened, correct?
12        MR. GOODMAN:  We're up to, like, number
13  seven of this question.
14   Q.  Go ahead.
15        MR. GOODMAN:  No, don't go ahead.
16        Stop it.
17        Move on.
18        MR. KESHAVARZ:  Well, he's not answered the
19  question.
20        MR. GOODMAN:  He answered it seven different
21  times.
22        MR. KESHAVARZ:  But he's not answering the
23  question I'm asking.
24        MR. GOODMAN:  Maybe more.
25   Q.  So you don't recall a single instance that's



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
177–180

Page 177

DAVID PEREZ

1
2  happened, is that correct; yes or no, is that correct?
3      MR. GOODMAN:  Jesus fucking Christ.
4  A.  Sir, I wouldn't know.
5  Q.  Why wouldn't you know?
6  A.  Because it's above my pay grade.
7  Q.  Because they would complain to someone else is
8  what you're saying?
9  A.  I wouldn't know.
10  Q.  Has anyone ever complained about any sale or
11  financing of any vehicle ever while you were at Victory
12  Mitsubishi?
13      MR. GOODMAN:  To him, you mean?
14      Is that your question?
15  Q.  Ever, as far as you're aware.
16      MR. GOODMAN:  Asked and answered.
17  Q.  Has a customer had a problem with the sales or
18  financing of any car at Victory Mitsubishi while you
19  worked there; yes or no?
20      Has that ever happened, as far as, you know?
21  A.  Again --
22  Q.  As far as you know.
23  A.  Again, I wouldn't know.
24  Q.  As far as you know, has it ever happened; yes or
25  no?

Page 178

DAVID PEREZ

1
2      MR. GOODMAN:  Okay.  That's it.  We're not
3  answering another time.
4      You can put it on your list and go to the
5  judge, call the court, whatever you want to do.
6      This is absurd.  It's argumentative,
7  wasteful, and we need to move forward.
8      MR. KESHAVARZ:  Mark for a ruling.
9  Q.  Do you know whose phone number 347-995-5054 is?
10  A.  I wouldn't know.
11  Q.  Do you have your phone on you?
12  A.  I do.
13  Q.  Can you call that number and see if you have that
14  name in your contacts and whose name that is?
15      MR. GOODMAN:  We're not doing that.
16  Q.  Will you do that or not, sir?
17      MR. GOODMAN:  Absolutely not.  I will not
18  allow it.
19      MR. KESHAVARZ:  I'm asking him.
20  Q.  Yes or no?
21      MR. GOODMAN:  And I'm telling you, I'm not
22  letting him do it.  It's not going to happen.
23  Q.  Will you check your -- leave a mark here at the
24  deposition, and ask if you could check your cell phone
25  to see if you have that phone number listed anywhere as

Page 179

DAVID PEREZ

1
2  a contact and put the name of the contact there.
3      Will you do that?
4      MR. GOODMAN:  Take it under advisement.
5  Q.  Will you do that?
6      Do you have any problem doing that, Mr. Perez?
7      MR. GOODMAN:  Take it under advisement.
8      MR. KESHAVARZ:  I understand that.
9  Q.  Mr. Perez, do you have any problems with that?
10      MR. GOODMAN:  Take it under advisement.
11  Q.  I'd like to turn your attention to Exhibit No.
12  21, Defendant's Bates-stamped 1 through 36.
13      It starts -- the first page, I believe, is the
14  deal file jacket.
15      MR. GOODMAN:  You got this one?
16      Oh, here.
17      Okay.  Take a look.
18  A.  Okay.
19  Q.  Before I ask about that exhibit, have you -- to
20  your knowledge, have you ever met Miss Francois, at any
21  point?
22      I asked you this before, and I think I know the
23  answer, but I want to make sure.
24      At any point in time, have you ever met --
25  believe you met Miss Francois?

Page 180

DAVID PEREZ

1
2      MR. GOODMAN:  Object to form.  Asked and
3  answered.
4      Go ahead.
5  A.  I never met her.
6  Q.  You don't remember she came back to the
7  dealership on September 2020 and complained that she'd
8  been defrauded?
9      You don't remember anything about that?
10  A.  I wouldn't know.
11  Q.  And has anyone at the dealership ever told you
12  that Miss Francois claimed that she was defrauded by
13  Victory Mitsubishi?
14      Anyone at the dealership ever tell you that?
15  A.  I wouldn't know, sir.
16  Q.  You don't remember?
17  A.  No, I wouldn't know.  That's above my pay grade.
18  Q.  Ever hear the name Emmanuel Laforest?
19  A.  Yes.
20  Q.  Who is that?
21      MR. GOODMAN:  Who is that?
22  Q.  Who is Emmanuel Laforest?
23  A.  A customer.
24  Q.  How do you know he was a customer?
25  A.  Because of what I have here in front of me.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
181–184

Page 181
DAVID PEREZ
1
2   Q.  I see.
3       Do you remember ever meeting Emmanuel Laforest?
4   A.  Don't remember, sir.
5   Q.  Do you remember -- did anyone at the car
6   dealership tell you the name Emmanuel Laforest, at any
7   point?
8       MR. GOODMAN:  Objection to form.
9       Go ahead.
10  A.  Don't recall.
11  Q.  Is the exhibit in front of you the deal file that
12  you reviewed in preparation for your deposition?
13  A.  Yes.
14  Q.  Were there any other documents in the deal file
15  that are not in front of you now?
16      Strike that.
17      Were there any documents in the deal file that
18  you reviewed in preparation for your deposition that is
19  not in front of you now?
20  A.  No.
21  Q.  And now the reverse question.
22      Were there any documents that are in front of you
23  now that were not in the deal jacket that you reviewed
24  in preparation for your deposition?
25  A.  I don't understand the question.

Page 182
DAVID PEREZ
1
2   Q.  Well, I guess I'm asking the reverse.
3       All the documents that you reviewed in
4   preparation for your deposition is in front of you now,
5   right?
6   A.  Yes.
7   Q.  Basically, I'm just wondering, were there any
8   additional document that are in front of you now -- in
9   other words, are there more pages now than there were in
10  the deal jacket that you saw last Thursday?
11  A.  No.
12  Q.  All right.
13      Then the document that you saw last Thursday was
14  the original documents, correct?
15      MR. GOODMAN:  Were the what?
16      I'm sorry.
17  Q.  They weren't photocopies of documents.
18      They were the original documents, right?
19      Is that right?
20  A.  I don't recall.
21  Q.  Is there anything in the deal file that you have
22  in front of you that indicates who -- strike that.
23      In the deal file that's in front of you, who can
24  you tell that was involved in the sale and financing of
25  a vehicle to Miss Francois?

Page 183
DAVID PEREZ
1
2   A.  I wouldn't know.
3   Q.  Do the documents tell you?
4       MR. GOODMAN:  Look at the documents and see
5   who was involved.
6   A.  Yessica.
7   Q.  If you said something, I couldn't hear?
8       MR. GOODMAN:  Yessica.
9   Q.  Okay.  And what document page number are you
10  looking at?
11  A.  That was page number Defendant's 16.
12  Q.  All right.
13      Why don't we just take it from the top.  Why
14  don't you start with the first page.
15      What is the first page of Defendant's Exhibit 1?
16      What is that?
17  A.  That's the front of the deal jacket.
18  Q.  Says in the lower right-hand side, "JSE8212."
19      What does that mean?
20  A.  I wouldn't know.
21  Q.  But this is the deal file that you physically
22  bring in to show to Yessica Vallejo, right?
23  A.  That's correct.
24  Q.  Do you write anything on the deal file?
25  A.  No.

Page 184
DAVID PEREZ
1
2   Q.  Do you put the sticker on the deal file on page
3   1?
4   A.  No.
5   Q.  How is that generated?
6   A.  I wouldn't know.
7   Q.  Would you bring the deal file to Ms. Vallejo?
8       Is it in a jacket that looks like page 1 -- the
9   folder that looks like page 1?
10  A.  Yes.
11  Q.  When you give it to her, do you give it to her
12  with a jacket that's blank?
13  A.  Yes.
14  Q.  All right.  Turning to exhibit page number 2.
15      Do you remember if you've seen this -- from your
16  own memory, sitting here today, do you remember if
17  you've seen Defendant's page 2 before?
18  A.  Part of it.
19  Q.  What do you remember seeing before, in your own
20  memory?
21      MR. GOODMAN:  Object to form.
22      You're saying before meeting -- before he
23  prepped for the deposition -- before he saw it last week
24  or what?
25      MR. KESHAVARZ:  Exactly.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
185–188

Page 185
DAVID PEREZ

1
2   A.  Yeah.  This credit app that we used at Victory.
3   Q.  Now do you remember -- other than looking at it
4   last week and looking at it now, do you remember seeing
5   this document?
6        MR. GOODMAN:  He means filled out.
7        I assume, Ahmad, with it filled out, not the
8   blank form.
9        MR. KESHAVARZ:  Exactly.
10  A.  No, I don't remember.
11  Q.  Do you recognize any handwriting on Defendant's
12  Exhibit 2?
13       MR. GOODMAN:  What's the question?
14       Does he recognize the handwriting?
15  Q.  Do you recognize any of the handwriting on
16  Defendant's Exhibit 2, page 2.
17  A.  I'm looking.
18  Q.  You don't recognize it?
19       MR. GOODMAN:  He said I'm looking.
20       MR. KESHAVARZ:  Oh, sorry.
21  Q.  I'm sorry.
22       What was the answer?
23       MR. GOODMAN:  He didn't give an answer.
24  He's still looking at it.
25  Q.  Just so it's clear, do you recognize any

Page 186
DAVID PEREZ

1
2   handwriting on the page that Defendant's 2?
3        MR. GOODMAN:  You can answer.
4   A.  Yeah.
5   Q.  Whose handwriting do you recognize on Defendant's
6   page 2?
7   A.  If you take a look on the top where it says
8   applicant --
9   Q.  Yes.
10  A.  -- 0/0 --
11  Q.  Yeah.
12  A.  -- that's my handwriting.
13  Q.  Okay.  And anything else on the document that's
14  who handwriting that you recognize?
15  A.  No.
16  Q.  The 10,000 down number 3095, you recognize that
17  handwriting?
18  A.  No, I don't.
19  Q.  The 0/0 that's your handwriting that you wrote,
20  what does that mean?
21  A.  Well, when I ran the credit, usually, I will put
22  what the credit was or is at the time.
23  Q.  And what is 0/0 mean to you?
24  A.  He had no credit.
25  Q.  I can't hear you.

Page 187
DAVID PEREZ

1
2   A.  He had no credit.
3   Q.  You mean bad credit or no credit history, at all?
4   A.  No credit history, at all.
5   Q.  All right.
6        And would you have run the credit for the
7   applicant named Emmanuel Laforest or the co-applicant
8   Farrah Jean Francois?
9        Do you know?
10  A.  Well, that's the 0/0 on top of Emmanuel.  So I
11  would have run Emmanuel's.
12  Q.  So if you ran Miss Francois' credit, and there
13  wasn't any credit on file, at all, for her, you would
14  put 0/0 for her, right?
15  A.  If I had ran it, yes.
16  Q.  And did you run a credit for Miss Francois?
17  A.  From what I'm looking at, no.
18  Q.  Based -- well, did you ever run credit for --
19  check Miss Francois' credit report, at any point?
20  A.  I wouldn't know.
21  Q.  You mean, you don't remember; is that right?
22  A.  Same thing.  I don't remember.  But I can tell
23  you, if I did, I would have made an indication.
24  Q.  And what would you have written down and where?
25  A.  Whatever it was at the point.

Page 188
DAVID PEREZ

1
2   Q.  You mean you'd write down her credit score?
3   A.  Uh-huh.  Yes.
4   Q.  And from what credit reporting agency would you
5   write the score down?
6   A.  From the ones that we use.
7   Q.  And which credit reporting agencies did Victory
8   Mitsubishi use while you were there?
9   A.  Experian and TransUnion.
10  Q.  And those numbers, that credit score from
11  Experian and TransUnion would often be different
12  numbers, correct?
13  A.  Yes.
14  Q.  And that's because, it's your understanding, that
15  TransUnion and Equifax have different scoring models, so
16  the numbers would be different, correct?
17  A.  I'm sorry, I couldn't hear you.
18  Q.  Is it your understanding that the numbers are
19  different, because they're different score criteria for
20  TransUnion and Equifax?
21  A.  I don't understand the question.
22  Q.  I mean, so TransUnion might use, hypothetically,
23  1 to 10 and Equifax might use a score of 1 to 5.
24       Is that one of the reasons why there would be
25  different credit scores from different credit reporting



DAVID PEREZ                                                November 21, 2022
FRANCOIS V. VICTORY AUTO GROUP                                      189–192

Page 189

DAVID PEREZ

1  agencies; is that right?
2   A.  I wouldn't know what they use to put their credit
3  scores.
4   Q.  Why TransUnion and Equifax for credit scores when
5  you would check?
6   A.  I wouldn't know, sir.
7   Q.  And we've established already -- strike that.
8       According to the documents from the deal file and
9  -- strike that.
10      Sitting here today, do you know if any of the
11  employment information that's listed on Defendant's 2
12  was verified by Victory Mitsubishi?
13  A.  I wouldn't know, sir.
14  Q.  And by wouldn't you, you don't know; is that
15  right?
16  A.  I wouldn't know.
17  Q.  It seems as if we're having a disconnect in the
18  phrasing.  And there's no reason to argue about it.
19      But when you say I wouldn't know, do you mean I
20  don't know either way?
21      Is that what you mean?
22  A.  No.  I mean, I wouldn't know if they did or they
23  didn't.  It's not part of my job, sir.  So I'm answering
24  how I can.  I wouldn't know.

Page 190

DAVID PEREZ

1   Q.  That wouldn't have been part of your normal job.
2       But when you say you wouldn't know, that means
3  you don't know, even if wasn't part of your job, right?
4       MR. GOODMAN:  Objection to the form.
5   Q.  As a normal course of business with Victory
6  Mitsubishi, they wouldn't ask to verify employment or
7  income unless the finance company said that that was a
8  stipulation of getting credit; is that correct?
9       MR. GOODMAN:  Object to form.
10      Go ahead.
11  A.  Yes.
12  Q.  Now -- and so anything on page 2 indicate to you
13  who at Victory Mitsubishi was involved in attempted sale
14  or financing, other than yourself, on exhibit -- on page
15  2?
16  A.  No.
17  Q.  Page 3, what is that document?
18  A.  This is a receipt for money that was given.
19  Q.  Who, typically, issues the receipts?
20  A.  I wouldn't know.
21  Q.  So you don't know -- nothing in this document
22  indicates to you who, at Victory Mitsubishi, was
23  involved, at this point, regarding this vehicle, right?
24  A.  I wouldn't know who.

Page 191

DAVID PEREZ

1   Q.  Pages 4, 5, 6, 7, 8, 9, is that the retail
2  installment sales contract for the attempt to sell the
3  used 2017 BMW 5 series vehicle?
4   A.  Yes.
5   Q.  And this is listed in the name of Miss Francois,
6  correct?
7   A.  Yes.
8   Q.  Now, if a person was an applicant purchasing a
9  vehicle, the dealership would only consider the credit
10  of the applicant, not the co-applicant in making a loan
11  for the vehicle; is that correct?
12  A.  I wouldn't know.
13  Q.  And in the retail sales installment contract for
14  the sale of a vehicle, the dealership would only list
15  the applicant, not the co-applicant as the purchaser for
16  the vehicle; is that correct?
17  A.  I wouldn't know.
18  Q.  The signature on pages 4 through 9, is that a
19  digital signature, is that affixed or is that a manual
20  signature that's placed on a physical piece of paper?
21  A.  I wouldn't know, sir.  This is above --
22  Q.  Page 10.
23      Sorry?
24  A.  That's above my pay grade.

Page 192

DAVID PEREZ

1   Q.  I mean, you're a manager there.  That's confusing
2  to me.
3   A.  This has to do with finance, sir.  I told you I'm
4  a sales manager.  We have a finance manager.
5   Q.  And you pull the credit for the purchases of
6  extended credit, right?
7   A.  To see what they are on their credit.
8   Q.  So you pull -- all right.
9       Do you recognize the signatures on page 9?
10  A.  No.
11  Q.  Who normally signs resale installment sales
12  contracts for the dealership?
13      Is that Ms. Vallejo?
14  A.  The finance manager, yes.
15  Q.  Would you recognize the signature of Ms. Vallejo?
16  A.  No.
17  Q.  You've seen Ms. Vallejo's signature a number of
18  times in the 250 to 270 car sales you did in a month for
19  the last two years plus you worked at the dealership,
20  right?
21      MR. GOODMAN:  Object to the form.
22  Q.  You've seen her signature a bunch of times,
23  right?
24  A.  No.



DAVID PEREZ                                    November 21, 2022
FRANCOIS V. VICTORY AUTO GROUP                 193—196

Page 193

DAVID PEREZ
1
2      MR. GOODMAN:  Objection.
3    Q.  Have you ever seen her signature before?
4      MR. GOODMAN:  Objection.
5    A.  No.
6    Q.  Page Defendant's 10, what is that?
7      Wait.  Wait.  Strike that.
8      Going back, is anything in the retail sales
9  contract indicate to you who was involved in the sale
10  and financing of the vehicle?
11    A.  No.
12    Q.  What's page 10?
13    A.  Looks like it's a motor vehicle document.
14    Q.  What type of document?
15    A.  I don't really know.
16    Q.  So working at a car dealership for your entire
17  career, you don't know what Exhibit No. 10 is.
18      Is that what you're saying?
19      MR. GOODMAN:  Objection.  Argumentative.
20  Objection form.
21    Q.  Is that what you're saying; yes or no?
22    A.  That is correct.  I don't do motor vehicles, sir.
23      MR. KESHAVARZ:  So just for the record, this
24  document is entitled "Vehicle Registration Title
25  Application Dealer Sales."

Page 194

DAVID PEREZ
1
2    Q.  Do you know if this information on this form gets
3  filled out by the dealership?
4    A.  I wouldn't know.
5    Q.  What were the finance companies that Victory
6  Mitsubishi used for the time that you worked there?
7    A.  I'm sorry?
8    Q.  Who are the finance companies that Victory
9  Mitsubishi used while you worked there?
10    A.  I don't recall.
11    Q.  Did you know, at any point, and just don't recall
12  now or is that something you never knew?
13    A.  I'm sorry?
14    Q.  Is that something that you know at some point or
15  something that you never knew?
16      MR. GOODMAN:  How can he answer that?
17      Object to form.
18    Q.  Go ahead.
19    A.  I don't know.
20    Q.  What's Defendant's page 11?
21      What is that?
22    A.  Vehicle inspection report.
23    Q.  Have you ever seen a document like this before?
24    A.  Yeah.
25    Q.  This is one of the documents that you were taking

Page 195

DAVID PEREZ
1
2  to Ms. Vallejo?
3    A.  No.
4    Q.  Do you know why facility name is listed as Bronx
5  Suzuki and not Victory Mitsubishi?
6    A.  I wouldn't know, sir.
7    Q.  Do you know if Victory Mitsubishi was ever known
8  as Bronx Suzuki?
9    A.  I wouldn't know.
10    Q.  Anything in this document indicate to you who's
11  involved in the sales and financing of the vehicle?
12    A.  No.
13    Q.  What is Defendant page 12?
14    A.  I don't know what this is.
15    Q.  You've never seen a dealership recap sheet
16  before?
17    A.  No.
18      MR. GOODMAN:  Can we stop with the faux
19  surprise there and just ask questions, please?
20    Q.  And it says, "House sales rep 999."
21      What does that mean?
22      MR. GOODMAN:  He just said he doesn't know
23  what this is.
24      Now you're going to ask him to describe
25  parts of it?

Page 196

DAVID PEREZ
1
2      MR. KESHAVARZ:  That's right.
3    Q.  Do you know what house sales representative 999
4  means?
5    A.  I wouldn't know.
6    Q.  Do you know what ID numbers are in the next to
7  last bracket?
8      Says, "ID 8031.  Name:  Yessica Vallejo."
9      Do you know what ID means?
10    A.  I wouldn't know.
11    Q.  You've never seen it before?
12    A.  No.
13    Q.  No employee has ever used the ID name or number
14  in all the years -- you've never noticed that in all the
15  years you've worked at the dealership?
16    A.  No.
17    Q.  Do you have an ID number?
18    A.  I wouldn't know.
19    Q.  You mean you don't remember?
20      Is that what you mean?
21      MR. GOODMAN:  No.
22    A.  No.  I wouldn't know.
23    Q.  So -- okay.
24      So it says, "Commission 317 for Yessica Vallejo."
25      Do you know if that means she was actually



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
197–200

Page 197

DAVID PEREZ

2  supposed to get a commission of that amount?
3    A.  I wouldn't know.
4    Q.  On the upper -right-hand side it says, "Date:
5  July 15, 2020."
6       Is that the date of printout?
7    A.  I wouldn't know.
8    Q.  Is this document -- strike that.
9       Have you ever seen a deal file after the
10  consummation of a deal, after the deal is done, have you
11  ever seen the deal jacket after that?
12          MR. GOODMAN:  Object to form.
13          Go ahead.
14    A.  On Thursday.
15    Q.  I'm sorry?
16    A.  On Thursday, sir.
17    Q.  But in all the years you've worked at Victory
18  Mitsubishi, you've never seen what's in a deal file
19  after the car is sold.
20       Is that what you're saying?
21    A.  That is correct.
22    Q.  So you don't know if Exhibit -- the recap sheet
23  that's Exhibit 12, you don't know if that's something
24  that normally goes into the dealership -- into the deal
25  file?

Page 198

DAVID PEREZ

2    A.  I wouldn't know.
3    Q.  Is information on -- from Exhibit 12, page 12 --
4  excuse me -- something that would be listed in the
5  Dealertrack system?
6    A.  I wouldn't know.
7    Q.  Have you ever seen it listed in the Dealertrack
8  system?
9    A.  I wouldn't know.
10    Q.  What is page 13?
11    A.  Looks like a service contract.
12    Q.  Have you ever seen service contract like page 13
13  before preparation for your deposition today?
14    A.  I'm sorry.
15       I didn't understand the question.
16    Q.  Have you ever seen a form like this before your
17  preparation for your deposition today -- - preparation
18  for your deposition?
19    A.  No.
20    Q.  Do you recognize the signature of the sales
21  representative?
22    A.  I'm sorry?
23    Q.  On the bottom of page 13, do you recognize the
24  signature?
25    A.  Yessica.

Page 199

DAVID PEREZ

2    Q.  Getting back to Defendant's page 2, the credit
3  application and co-application dated May 30th, 2020, I
4  see there's signatures for someone named Emmanuel
5  Laforest and Farah Jean Francois.
6       Do you see that?
7    A.  I see the signatures.
8    Q.  So since those -- both names are both signed,
9  does that mean that someone at the dealership should
10  have confirmed the identity of Laforest and Francois by
11  looking at the license -- their license -- the driver's
12  licenses on May 30th, 2020?
13    A.  That means that it was confirmed.
14    Q.  And that person who would have confirmed would
15  have either been you, Stavros or an auto salesperson,
16  correct?
17          MR. GOODMAN:  Or what?
18          What was the last thing you said?
19          MR. KESHAVARZ:  Or auto salesperson.
20    A.  Me or Stavros.
21    Q.  You or Stavros.  Okay.
22       Do you remember checking in this case?
23    A.  I don't recall.
24    Q.  So what I was getting to before our break was
25  Defendant's page 13.

Page 200

DAVID PEREZ

2       The signature of the sales representative, do you
3  know whose signature that is?
4    A.  Well, it says Yessica.  So I'm assuming it's
5  hers.
6    Q.  But you don't recognize the signature?
7    A.  I've never seen her signature.
8    Q.  And there's a signature on page Defendant 13,
9  does that look to you like the same signature on
10  Defendant 9?
11          MR. GOODMAN:  Object to the form.
12          You're asking for a handwriting expert now.
13          I object.
14    Q.  You can answer.
15    A.  You said what page?
16    Q.  Sure.  The signature on page 9 and the signature
17  on page 13, the signatures appear to be the same?
18          MR. GOODMAN:  Object to the form.
19    A.  I wouldn't know.
20    Q.  You don't have an opinion one way or the other?
21          MR. GOODMAN:  That's what he just said.
22          Let's move on.
23    Q.  I noted on page 9 there's no printed name for
24  someone at Mitsubishi, no printed title.
25       Should a retail installment contract be fully



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
201–204

Page 201

DAVID PEREZ

1
2 completed before the consumer signs it?
3     MR. GOODMAN:  Object to form.
4     Go ahead.
5   A.  I wouldn't know.
6   Q.  You don't know if a retail sales contract should
7 be fully completed before being signed by a consumer at
8 a dealership?
9     You don't know one way or the other?
10     MR. GOODMAN:  That's what he just said.
11   A.  I wouldn't know, sir.
12   Q.  Well, when you get paid for a commission on 250
13 to 270 cars a month, what is the commission per car?
14   A.  I don't recall.
15   Q.  $1,000?
16     $10?
17     $50?
18     Ballpark.
19     MR. GOODMAN:  He said he doesn't recall.
20   Q.  More than $10 per car?
21   A.  I don't recall.  It could be less than $10 a car.
22     MR. GOODMAN:  He just said he doesn't
23 recall.
24   Q.  You can answer.
25     MR. GOODMAN:  No.  We're not going to do

Page 202

DAVID PEREZ

1
2 this constant asking the same question.
3   Q.  $1 a car?
4   A.  I don't recall, sir.
5   Q.  It could be a $1 car.
6     Is that you're saying?
7     It's possible that your commission could have
8 been $1 a car.
9     Is that possible?
10     Is that correct?
11     MR. GOODMAN:  Objection to form.
12 Argumentative.
13   Q.  Go ahead.  You can answer.
14     It's possible it could have been $1 per car for
15 your commission per car; is that right?
16     MR. GOODMAN:  Objection.
17   A.  I don't recall.
18   Q.  So the answer's yes, it's possible?
19     MR. GOODMAN:  No.  The answer's not yes.
20 The answer's I don't recall.
21     Let's go.
22     MR. KESHAVARZ:  Mark it for a ruling.
23   Q.  Is it possible you can have been paid more than
24 $10,000 per car sale?
25     MR. GOODMAN:  Objection.

Page 203

DAVID PEREZ

1
2 Don't answer.
3     Mark it for a ruling.
4   Q.  Is there anyone else who worked at the dealership
5 in the time you worked there whose salesperson code is
6 Y-E-S-S?
7   A.  Don't recall.
8   Q.  Do you know of anyone -- do you know what a
9 salesperson code is?
10   A.  I do not.
11   Q.  Going to page 14, what is page 14?
12   A.  Looks like a printout from Dealertrack.
13   Q.  Why do you say that?
14   A.  Because it says Dealertrack on the top.
15   Q.  Are you able to print out -- have you ever seen
16 this document before deposition preparation for today?
17     Have you ever seen this document before last
18 week?
19   A.  No.
20   Q.  On the top it says, "Contract details print," and
21 on the left it says, "7/1/2020."
22     Do you believe this document, page 14, was
23 printed out on July 1st, 2020?
24   A.  I wouldn't know.
25   Q.  Do you know if this is the type of document that

Page 204

DAVID PEREZ

1
2 normally goes into deal file?
3   A.  I wouldn't know.
4   Q.  Is this document something that you'd be able to
5 review on Dealertrack regarding Miss Francois?
6   A.  I wouldn't know.
7   Q.  It says, "Capital One booked."
8     Do you know what booked means?
9   A.  I would not.
10   Q.  It says, "Dealer participation $1,420.84."
11     Do you know what dealer participation means?
12   A.  I wouldn't know.
13   Q.  Dealer fee $2,930, do you know what dealer fee
14 is?
15   A.  I wouldn't know.
16   Q.  Amount financed says, "$29,462.81."
17     Do you know what the term "Amount financed"
18 means?
19   A.  I wouldn't know, sir.
20   Q.  It says, "Relationship manager:  Andrew Lattin."
21     Is there anyone who worked at the dealership
22 Victory Mitsubishi named Andrew Lattin?
23   A.  I wouldn't know, sir.
24   Q.  Would the relationship manager be the
25 relationship manager at Capital One Auto Finance?



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
205—208

Page 205

DAVID PEREZ

1
2    A.  I wouldn't know.
3    Q.  Would the app ID number that's listed be the app
4   ID number for Capital One Auto Finance?
5    A.  I wouldn't know.
6    Q.  Do you know if the phone number listed underneath
7   Andrew Lattin is the phone number for Capital One Auto
8   Finance?
9    A.  I wouldn't know.
10    Q.  Do you know what a funding manager is that's
11   listed on the document?
12        Do you know what a funding manager is?
13    A.  I wouldn't know.
14    Q.  You never heard the term before today?
15    A.  No.
16    Q.  Defendant's page 15, have you ever seen this form
17   before called a "Used Car Consumer's Bill of Right"?
18        Have you ever seen this form before?
19    A.  Before Thursday, no.
20    Q.  Showing you defendant's 16.  This is a buyers
21   order for Victory Mitsubishi for the purchase of a car
22   in Ms. Francois' name, correct?
23    A.  Correct.
24    Q.  And according to this document, the salesman says
25   "House sales rep."

Page 206

DAVID PEREZ

1
2        Do you know what house sales rep means?
3    A.  No.
4    Q.  It says, "Customer number:  Yessica Vallejo."
5        Do you know what that means?
6    A.  I wouldn't know.
7    Q.  It says in the upper-right-hand corner, "$3,000
8   Interstate Star Auto."
9        Do you know what Interstate Star Auto is?
10    A.  I wouldn't know.
11    Q.  Do you know what the $3,000 charge to Interstate
12   Star Auto means?
13    A.  I wouldn't know.
14    Q.  Says, "License and title."
15        Do you know what license and title means?
16    A.  I wouldn't know.
17    Q.  It says, "Sales tax 8.875."
18        Do you know what sales tax means?
19    A.  I know what sales tax is, yes.
20    Q.  Sorry?
21    A.  I do know what sales tax is, yes.
22    Q.  "Tire disposal fee not applicable."
23        Do you know what tire disposal fee is?
24    A.  I wouldn't know.
25    Q.  "New York State Inspection fee of $37."

Page 207

DAVID PEREZ

1
2        Do you know what a New York State inspection fee
3   is?
4    A.  Yes.
5    Q.  What is a New York State inspection fee?
6    A.  A New York State inspection fee is for the
7   inspection sticker that you get every year for your
8   vehicle.
9    Q.  Is there an inspection sticker that Victory
10   Mitsubishi gets for the vehicles that it sells?
11    A.  I wouldn't know.
12    Q.  You don't know if the cars sold by Victory
13   Mitsubishi have current state inspection stickers on
14   them?
15    A.  I wouldn't know.  I don't do anything with
16   service.
17    Q.  Where it says, "Deposit $9,000," do you know what
18   that means?
19    A.  That means they give $9,000 down.
20    Q.  And "Cash on delivery $9,000," do you know what
21   that means?
22    A.  That they gave $9,000 down.
23    Q.  But, in fact, going back to the receipt that's
24   page 3, in fact, only $8,600 was put down in cash,
25   right?

Page 208

DAVID PEREZ

1
2    A.  I wouldn't know.
3    Q.  That's what it says -- page 3 says, right?
4        MR. GOODMAN:  You're asking him if that's
5   what the document says?
6        Is that what it says?
7    A.  Yes.
8    Q.  Do you know why Victory would say it's a $8,600
9   payment, cash payment, when it gives a consumer a
10   receipt?
11        But it tells in the buyer's order that there was
12   $9,000 put down.
13        Do you know why there would be a difference
14   between those two?
15    A.  I would not know.
16    Q.  Do you know if that means that someone at the
17   dealership pocketed the $400 difference?
18        MR. GOODMAN:  Object to form.  Outrageous.
19   This is ridiculous.
20    Q.  You can answer.
21    A.  I wouldn't know.
22    Q.  Did you ever -- the signature that says --
23   appears to be from Miss Francois on page 16, you don't
24   know if that's Miss Francois' signature, right?
25    A.  I wouldn't know, sir.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
209—212

Page 209

DAVID PEREZ

2  Q.  You don't know.
3      You didn't see any of the signatures -- any of
4  the signed documents that are in front of you as Exhibit
5  -- deal file, Exhibit 21, that we're reviewing?
6      You don't -- you haven't seen any of those people
7  sign the documents?
8      MR. GOODMAN:  Objection to the form.
9      What was the question?
10     Never seen --
11  Q.  Any of the documents -- well, I'll just go to --
12  Defendant 15, did you see anyone sign that document?
13  A.  I wouldn't know.
14  Q.  Page 13, did you see anyone sign that document?
15  A.  I don't remember.
16  Q.  I can't hear you.
17  A.  I don't remember.
18  Q.  In the upper-right-hand side it says, "3385/157."
19     Do you know whose handwriting that is?
20  A.  I wouldn't know.
21  Q.  Do you know what that means?
22  A.  I do not.
23  Q.  The handwritten dates and contract price, do you
24  recognize that handwriting?
25  A.  I do not.

Page 210

DAVID PEREZ

2  Q.  Did you see -- going back to the resale
3  installment and sales contract, page 9, did you see any
4  of those signatures being made?
5  A.  I don't remember.
6  Q.  Did you see any of the signatures on the retail
7  installment sales contracts on any of the pages, pages 4
8  through 8, being -- 4 through 9 being made?
9  A.  Don't remember.
10  Q.  After a buyers order is signed, those documents
11  are scanned into Victory Mitsubishi's file, right?
12  A.  I wouldn't know.
13  Q.  There would only be one signed retail buyer
14  order, like page 16, regarding the sale, right?
15  A.  I wouldn't know.
16  Q.  Page 17, have you seen this document before?
17  A.  No.
18  Q.  Is this a response to a credit application by
19  Capital One Auto Finance?
20  A.  I would not know.
21  Q.  Do you know what stipulations are by a finance
22  company looking to finance the purchase of a vehicle
23  from Victory Mitsubishi?
24  A.  I wouldn't know.
25  Q.  You don't know what a stipulation is by a finance

Page 211

DAVID PEREZ

2  company?
3      MR. GOODMAN:  Object to form.
4  A.  No.
5  Q.  Do you have to go back sometimes to talk to a
6  consumer, saying there is a problem with the financing
7  of a vehicle?
8  A.  I don't understand the question.
9  Q.  Did you ever go back to a consumer that says,
10  finance company says that you need to provide proof of
11  income, proof of residence or anything like?
12  A.  Yes, I've done that before.
13  Q.  That's because that's a stipulation by the
14  finance company?
15  A.  Oh, okay.
16  Q.  I'm asking you.
17  A.  Well, I thought you knew that you're telling me.
18  I wouldn't know, sir.
19  Q.  But you have the ability to look at pages --
20  documents that are pages 17 and 18 on Dealertrack?
21      MR. GOODMAN:  Object to form.  Asked and
22  answered many times.  Wasteful.
23      Move on.
24  A.  No.
25  Q.  Have you seen exhibit -- the form that's Exhibit

Page 212

DAVID PEREZ

2  -- that's Defendant's 19, have you seen that form
3  before?
4  A.  This appears to be a credit application.
5  Q.  Did you see page document 19 signed?
6      Did you see it physically signed?
7  A.  I don't remember.
8  Q.  And did you -- did the dealership information
9  printed out on Exhibit page 19, that's information that
10  is put into the computer by Victory Mitsubishi, right?
11      MR. GOODMAN:  Object to form.
12  A.  I wouldn't know.
13  Q.  All right.
14      Do you know what page 21 is?
15  A.  I wouldn't know.
16  Q.  Going back to page 19.
17      Did you say that was a credit application, right?
18  A.  Yes, sir.
19  Q.  Is that the document that -- is that the document
20  that the auto salesperson would have the consumer sign
21  and then bring to you?
22      MR. GOODMAN:  Object to form.
23      Go ahead.
24  A.  No.
25  Q.  The form that the auto salesperson would have



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
213—216

Page 213

DAVID PEREZ

2 signed and brought to you, is the form entitled "Credit
3 application," that's Defendant page 2, correct?
4    A.  That is correct.
5    Q.  Have you ever seen a form like page 22,
6 Defendant's 22?
7    A.  No.
8    Q.  Do you know what a collision avoidance system is?
9    A.  I do.
10    Q.  What is it?
11    A.  You want me to describe what it does?
12    Q.  Do you know -- optional equipment, do these
13 optional items that are put into the sales price of the
14 vehicle that was financed in Miss Francois' name?
15    A.  I'm sorry.
16       What was the question?
17    Q.  Were these optional components that were put into
18 the car and that were sold in Miss Francois' name that's
19 on page 22?
20    A.  I wouldn't know.
21    Q.  Why are there -- on page 22, why is the sales
22 price for the vehicle 26,575, but on the next page of
23 the same form, the sales place is $30,125?
24    A.  I wouldn't know.
25    Q.  Who would know?

Page 214

DAVID PEREZ

2       Who, at the dealership, would know?
3          MR. GOODMAN:  Object to the form.
4          Go ahead.
5    A.  Finance.
6    Q.  Yessica Vallejo?
7    A.  Finance, yeah.
8    Q.  Anyone else?
9    A.  I wouldn't know.
10    Q.  Would Mr. Stavros know?
11    A.  I wouldn't know.
12    Q.  All right.
13       Do you know what page 24 is?
14    A.  No.
15    Q.  Do you know if -- do you know if the finance
16 companies would more likely fund a deal if there's a
17 larger cash down payment than if there isn't?
18    A.  I wouldn't know, sir.
19    Q.  Page 26, what is that?
20    A.  This is the sales worksheet.
21    Q.  Is that in -- is the handwriting there yours?
22    A.  No.
23    Q.  Why does it have your name, David Perez, as the
24 sales person in the upper-right-hand side?
25    A.  I wouldn't know.

Page 215

DAVID PEREZ

2    Q.  Were you the salesperson for this deal that's
3 reflected on page 26?
4    A.  Don't remember.
5    Q.  Are you also the salesperson for vehicles when
6 you're working as the finance manager -- when you were
7 working as the sales manager?
8          MR. GOODMAN:  Wait.  Object to form.
9          What was the question again?
10    Q.  Are you ever both the sales associate and the
11 sales manager on any deal or now that you're a sales
12 manager, you're never a salesperson?
13       Which one?
14    A.  Never a salesperson.
15    Q.  So is there any reason you can think why you name
16 would be listed as the salesperson on page 26?
17    A.  I would not.
18    Q.  Do you recognize whose handwriting it is on page
19 26?
20    A.  No, I don't.
21    Q.  Do you know why the stock -- what's a stock
22 number?
23    A.  That's the -- that's the number we give to a car
24 when they come from the auction.
25    Q.  And this car was purchased from an auction; is

Page 216

DAVID PEREZ

2 that right?
3    A.  More than likely, yes.
4    Q.  And you say that because there's a stock number.
5       A stock number means that the vehicle was
6 purchased at auction, correct?
7    A.  Any vehicle that we buy, got on trade or get from
8 the auction gets a stock number.
9    Q.  Do you know why the -- I could check the VIN
10 numbers -- but do you know why the mileage listed here
11 44,000 miles, but other documents are listed with a
12 lower mileage?
13    A.  I wouldn't know.
14    Q.  Do you know why the price is 35,995, and the
15 price of the vehicle on other documents is much lower?
16    A.  I wouldn't know.
17    Q.  This is called a "Four square," right, this
18 document?
19          MR. GOODMAN:  You told us before you don't
20 know anything about this business, at all.
21    Q.  And Four Square is used when talking from a --
22 something that's filled out from the auto salesperson
23 when talking to the consumer right?
24    A.  Correct.
25    Q.  So the consumer -- the auto salesperson would



DAVID PEREZ                                      November 21, 2022
FRANCOIS V. VICTORY AUTO GROUP                          217–220

Page 217

DAVID PEREZ

1
2  fill in the numbers that's on the Four Square that's
3  page 26, right?
4      A.  Not the price.  The cash down, the type of
5  vehicle they're looking at, if they have a trade in.
6      Q.  I'm sorry.
7          Did you say yes or no?
8          Did you say the salesperson would put down the
9  price on the --
10     A.  Wouldn't.
11         MR. GOODMAN:  Would not.
12     Q.  So do you know if the salesperson put down the
13  cash down payment of 10,000?
14     A.  I wouldn't know.
15     Q.  When you were salesperson, would you put down
16  that, the cash down?
17     A.  Yes.  If that's what the customer told me.
18     Q.  And the cross out of the trade-in, is that
19  something the salesperson would do?
20     A.  They could, if there was no trade in.
21     Q.  The salesperson wouldn't put down the monthly
22  payment that the consumer wants or the price of the
23  vehicle the consumer wants?
24     A.  No.
25     Q.  So then what's the purpose of the squares that

Page 218

DAVID PEREZ

1
2  are priced monthly payment, if that's not something
3  filled out by the -- either the consumer or the auto
4  salesperson?
5      Why do they have those boxes there?
6      Why do you have the Four Square there?
7          MR. GOODMAN:  Object to form.
8          You can answer, if you understand.
9      A.  I don't know why.
10     Q.  But Defendant's Exhibit 26 is something that's
11  filled out by the salesperson, right?
12     A.  I'm sorry?
13     Q.  Defendant's Exhibit 26 is something that's filled
14  out by the salesperson, correct?
15     A.  Most of the stuff, yes.
16     Q.  And does the finance person fill it out --
17  finance manager?
18     A.  No.
19     Q.  When was this form filled out, can you tell, this
20  document?
21     A.  I wouldn't know.
22     Q.  Is this a document that's generated,
23  Bates-numbered 26, a document generated by DealerSocket
24  software?
25     A.  I wouldn't know.

Page 219

DAVID PEREZ

1
2      Q.  On the lower-right-hand side in very small font
3  underneath the signature -- underneath the finance
4  manager it says, "5/20/2020 at 2:16 p.m."
5          Does this mean this document was printed by
6  Mitsubishi -- Victory Mitsubishi on May 30th, 2020, at
7  2:16 p.m.?
8      A.  I don't know.
9      Q.  In the lower-left-hand side it says, "Salesman"
10  and it has a number "10362."
11         Is that -- do you know what that number is?
12     A.  I don't know.
13     Q.  You'd be the sales manager as of May 2020, right?
14     A.  That is correct.
15     Q.  So if that number refers to you, you would know
16  what that number meant, right?
17     A.  I would not.
18     Q.  Have you ever seen pages -- driver's licenses
19  that are pages 27 and 28 before last week?
20     A.  I don't remember.
21         MR. GOODMAN:  Probably not before last week.
22         Is that the question?
23         MR. KESHAVARZ:  Yeah.
24         MR. GOODMAN:  You said ever.
25         MR. KESHAVARZ:  No.  I said before last

Page 220

DAVID PEREZ

1
2  week.
3          MR. GOODMAN:  Oh, okay.  If you did, I
4  missed it.
5      A.  I don't remember.
6      Q.  Page 29, what is page 29, if you know?
7      What is that form, excuse me?
8      A.  Motor vehicle form.
9      Q.  Have you ever seen this form before your
10  preparation for your deposition?
11     A.  No.
12     Q.  Have you ever seen the back of the -- apparently
13  the back of the form, Defendant's page 30?
14         Have you ever seen that before preparation for
15  your deposition in this case?
16     A.  No.
17     Q.  Do you know whose signature is on the bottom
18  right-hand side of Defendant page 29 -- the signature of
19  authorized representative?
20     A.  Where?
21     Q.  Defendant's 29, lower-right-hand side there's a
22  signature above signature of dealer authorized
23  representative.
24         Do you recognize whose signature that is?
25     A.  I do not.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
221–224

Page 221

DAVID PEREZ

1
2   Q.  Do you know what Exhibit page 31 is?
3   A.  Do I know what this is?
4   Q.  Yeah.
5   A.  It's an insurance ID card.
6   Q.  Do you know what page 32 is?
7   A.  Appears to be a copy of a license plate.
8   Q.  Do you know if that's the license plate of the
9   vehicle sold under the name of Miss Francois?
10  A.  I don't remember.
11  Q.  Page 33, have you ever seen this form before?
12  A.  No.
13  Q.  Do you recognize either of the signatures that
14  are on the bottom of page 33 that are dated 6/29/2020?
15  A.  No.
16  Q.  Did you see anyone sign page 33?
17  A.  I don't remember.
18  Q.  Did you ever see a form like page Defendant's 34?
19  A.  Have I seen a document like this?
20  Q.  A form that looked like this before?
21  A.  Yes.
22  Q.  What is it?
23  A.  This is a title for a vehicle.
24  Q.  Was this vehicle sold to Victory Mitsubishi on
25  February 28, 2020?

Page 222

DAVID PEREZ

1
2   A.  I wouldn't know.
3   Q.  Is that what it says?
4       MR. GOODMAN:  You're asking him what the
5   form says?
6       MR. KESHAVARZ:  Yes.
7   A.  Yes.  That's what it says.
8   Q.  Have you ever seen a form like page 35 before?
9   A.  No.
10  Q.  Have you ever seen a form like page 36 before?
11  A.  No.
12  Q.  Have you ever seen a form like page 37/38 before?
13      MR. GOODMAN:  We don't have 37/38.
14      MR. KESHAVARZ:  Oh, apologies.  That's my
15  super secret file that I have.  We will forward.
16      MR. GOODMAN:  We do have it.  I'm sorry.  It
17  was apparently sent and printed separately.
18      MR. KESHAVARZ:  What was that exhibit number
19  on that one, Emma?
20      What did we want to mark that one as?
21      That one is --
22      MS. CATERINE:  Exhibit 22.
23      MR. KESHAVARZ:  Exhibit 22, Bates-stamped
24  Defendant's 37 to 40.
25  Q.  Do you recognize page 37 and 38?

Page 223

DAVID PEREZ

1
2   A.  Yes.
3   Q.  What is it?
4   A.  It is a credit file.
5   Q.  Is this the credit report Victory Mitsubishi
6   pulled on my client Farah Jean Francois?
7   A.  I wouldn't know.
8   Q.  Is there anything in the document -- well, have
9   you seen a document like page 37 and 38 before?
10      MR. GOODMAN:  Have you seen a document like
11  that?
12      I didn't hear the question.
13      MR. KESHAVARZ:  Yeah.
14  Q.  That resembles page 37/38?
15      Ever see one before?
16  A.  Yes.
17  Q.  And did you see that because that's a credit
18  report that you pull, as far as your job, when you
19  worked at Victory Mitsubishi, right?
20  A.  That was part of my job, yes.
21  Q.  So looking at the document that's 37 and 38 --
22  looking at page 38, does that indicate to you that this
23  credit report was pulled by Victory Mitsubishi?
24  A.  Yes.
25  Q.  Where on page 37/38 does it indicate to you that

Page 224

DAVID PEREZ

1
2   this Experian credit report was pulled by Victory
3   Mitsubishi?
4   A.  Was pulled by Victory Mitsubishi?
5       Page 38 says bureau report date 5/30/2020
6   8:55:46 p.m.
7   Q.  Now, it says "Bureau date pulled May 30th, 2020,
8   at 8:55 p.m.; is that right, on page 38?
9   A.  Yes.
10  Q.  Does that mean Victory Mitsubishi pulled this
11  Experian credit report that's pages 37 and 38 on May
12  30th, 2020, at 8:55 p.m.?
13      MR. GOODMAN:  Object to the form.  You're
14  asking him what it means?
15      Go ahead, if you can understand.
16  A.  It means it was pulled around that time, yes.
17  Q.  So Victory Mitsubishi pulled this credit report
18  at 8:55 p.m. on May 30th, 2020, correct?
19      MR. GOODMAN:  Objection.  Asked and
20  answered.
21  A.  Correct.
22  Q.  Now, Mitsubishi -- I think you testified before
23  that Victory Mitsubishi has to destroy any -- strike
24  that.
25      I think you testified before that Victory



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
225–228

Page 225

DAVID PEREZ

1
2    Mitsubishi doesn't have access to any credit report on
3    Dealertrack more than 30 days after the date of the
4    credit application; is that right?
5        A.  I'm not understanding.
6        Q.  Sure.  Is there a limit of time in which the
7    dealership, Victory Mitsubishi, can have access to the
8    credit report that it pulls on a consumer?
9        A.  Thirty days.
10       Q.  Thirty days from the date of the credit
11   application, correct?
12       A.  Yes.
13       Q.  And so that's -- after 30 days, it's no longer --
14   the credit report's no longer able to be viewed by the
15   dealership on Dealertrack, correct?
16           MR. GOODMAN:  Object to form.
17       A.  Correct.
18       Q.  Is the credit report of the consumer ever printed
19   out and put in the deal file?
20       A.  I wouldn't know.
21       Q.  Do you have any idea how the dealership could
22   have a copy my client's Experian credit report?
23           I'll represent to you it was produced around
24   September 20, 2020.
25           Do you have any idea how Victory Mitsubishi could

Page 226

DAVID PEREZ

2    still have this credit report?
3        A.  I wouldn't.
4        Q.  Would you have been the person to pull the credit
5    report that is Exhibit 37, pages 37/38?
6        A.  I don't know.  I don't know.
7        Q.  Would anybody else at the dealership be
8    authorized to pull a credit report, other than yourself,
9    on May 30th, 2020?
10       A.  Stavros.
11       Q.  Sorry?
12       A.  Stavros.
13       Q.  Anyone else?
14       A.  No.
15       Q.  Do the associate auto sales people have access to
16   the Dealertrack program?
17       A.  They do not.
18       Q.  So you're saying, even if the auto sales people
19   wanted to pull a credit report, they couldn't use the
20   Dealertrack system to do that.
21           Is that what you're saying?
22       A.  They don't have access to the Dealertrack system.
23       Q.  And do you know if you pulled the credit report
24   that's pages -- strike that -- pages 39 to 40, that's
25   the TransUnion credit report that was pulled by Victory

Page 227

DAVID PEREZ

2    Mitsubishi as to my client, correct?
3        A.  Yes.
4        Q.  And that was pulled by Victory Mitsubishi on May
5    30th, 2020, at 8:55 p.m., correct?
6        A.  That is correct.
7        Q.  Did you pull this credit report?
8        A.  I don't remember.
9        Q.  Is there anything on the document, the TransUnion
10   credit report document, Defendant's 39 and 40, that
11   would indicate who at Mitsubishi pulled the credit
12   report.
13       A.  I wouldn't know, sir.
14       Q.  As a general rule, you'd be the person to pull
15   credit reports as of May and June 2020, correct?
16           MR. GOODMAN:  Object to form.
17       A.  Can you repeat that?
18       Q.  Generally, in May and June 2020, that would be
19   your job to pull consumer credit reports in relation to
20   obtaining financing.
21           That would be your job, right?
22           MR. GOODMAN:  Object to form.
23       A.  My job and Stavros.
24       Q.  Primarily your job to pull credit reports for
25   financing, right?

Page 228

DAVID PEREZ

2           MR. GOODMAN:  Object to form.
3        A.  Myself or Stavros, whoever's available.
4        Q.  But it was primarily your job to pull credit
5    reports for financing.  That's your --
6           MR. GOODMAN:  Objection to form.  Asked and
7    answered.
8           Go ahead.
9        A.  Myself or Stavros.
10       Q.  I'm sorry.
11           I couldn't hear you.
12       A.  Myself or Stavros.
13       Q.  It was Stavros' primary job to pull credit
14   reports for finance --
15           MR. GOODMAN:  Objection to form.
16       A.  I wouldn't know.
17       Q.  What's Stavros' primary job in relation to your
18   work?
19           MR. GOODMAN:  Object to form.
20       A.  He's my boss.
21       Q.  And is Stavros, typically, involved in the sales
22   and financing agreements of vehicles or any deals that
23   you were ever involved in?
24           MR. GOODMAN:  Object to form.
25       A.  Whoever's available.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
229–232

Page 229

DAVID PEREZ

1
2    Q. I can't hear you.
3    A. Whoever is available.
4    Q. What role would Stavros Orsaris have in the sales
5 and financing of a vehicle?
6        MR. GOODMAN:  Object to form.
7    A. I wouldn't know.
8    Q. Because you went through the steps.
9        When you say whoever's available, what do you
10 mean by that?
11       Because you went through the steps from the auto
12 salesperson to you, to the finance person back down to
13 the consumer.  I didn't hear anyone else in the chain.
14       When you say whoever's available, who else is
15 available?
16       What do you mean?
17    A. Myself or Stavros.
18    Q. I can't hear you.
19    A. Myself or Stavros.  Whichever one of us is
20 available.
21    Q. So sometimes an auto salesperson would get the
22 signed credit application and driver's license and not
23 go to you, but go to Stavros to pull the credit report,
24 correct?
25    A. It's whoever's available, sir.

Page 230

DAVID PEREZ

1
2    Q. I'm sorry?
3    A. Whoever's available, sir.
4    Q. I understand that.
5       But normally, the auto salesperson goes to you to
6 pull a credit report in the normal course of business.
7       That's normally how it goes, right?
8        MR. GOODMAN:  Object to form as to what
9 normal means.
10       Go ahead.
11    A. If it's not busy, yes.
12    Q. Well, I would imagine it's busy a lot in a car
13 dealership.
14       So is there any -- who is available to most, in
15 terms of -- wait a minute.
16       Why would you not be available to pull credit
17 reports?
18       That's your job.
19       Why wouldn't you be available, if you were
20 working that day?
21        MR. GOODMAN:  Object to form.
22    A. I might be talking to a customer.
23    Q. But customer interactions are generally done by
24 the auto sales people, right?
25        MR. GOODMAN:  Object to form.

Page 231

DAVID PEREZ

1
2    A. But if I have to talk to a customer, I'm going to
3 talk to a customer, sir.
4    Q. So it would be an unusual situation where Stavros
5 would pull credit reports as opposed to you?
6       That would just be an atypical situation, right?
7        MR. GOODMAN:  Object to form.  Repetitive.
8 Argumentative.  Wasteful.
9    Q. You can answer.
10    A. It's whoever is available at that time.
11    Q. And who's available more often, you or Stavros?
12        MR. GOODMAN:  Object to form.  Time frame?
13    A. I wouldn't remember.
14    Q. Is Ms. Vallejo authorized to pull credit reports?
15    A. Yes.
16    Q. Does she pull credit reports in the regular
17 course of sales that you were involved in, the 250 to
18 270 sales a month?
19        MR. GOODMAN:  Objection.  He didn't say all
20 of those sales involved pulling credit reports.  You're
21 just assuming things and throwing it into questions.
22       Go ahead.
23    Q. Let me just ask you the question.
24       Is it normal for Miss Yessica Vallejos to pull
25 credit reports?

Page 232

DAVID PEREZ

1
2        MR. GOODMAN:  Object to form.  Object to
3 form.
4    A. No.
5    Q. And under what circumstances would she pull a
6 credit report?
7    A. If me or Stavros weren't available.
8    Q. Is there any way to check to determine who pulled
9 Miss Francois' credit report?
10       Any way to check?
11        MR. GOODMAN:  Asked and answered.
12    A. I wouldn't know.
13    Q. Would that be on Dealertrack?
14        MR. GOODMAN:  Asked and answered.
15    A. I would not know.
16        MR. KESHAVARZ:  If we can send as exhibits
17 -- let's send as exhibits Defendant page 41, which
18 appears to be an online credit app.  And pages 49 to 69,
19 which appear to be iPhone screen shots.  And --
20        MS. CATERINE:  We already marked 49 through
21 69 as Exhibit 19.
22        MR. GOODMAN:  You already asked questions
23 about 49 and 69.
24        MR. KESHAVARZ:  Thank you.
25       This is mislabelled.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
233—236

Page 233

1           DAVID PEREZ
2           Mark as an exhibit Defendant pages 70
3   through 72, which appear to be iPhone screen shots.
4           MR. GOODMAN:  Well, we don't have those.
5   We'll have to go through that process again, also.  But
6   suppose we'll waste some more time doing it now.
7           (A recess was taken at 5:34 p.m.)
8           (Plaintiff Exhibit Nos. 24 through 27 were
9   deemed marked for identification.)
10          MR. KESHAVARZ:  Mr. Goodman, can you give
11  that page to your client, subpoena response page 557?
12      Q.  I'm showing you what's marked Plaintiff's Exhibit
13  26, Bates-stamped subpoena responses 557, and also
14  stamped as DTI49.
15      First of all, just looking at the document
16  overall, does that appear to be, roughly speaking, the
17  screen that you would see on the Dealertrack system --
18  one of the screens you would see on the Dealertrack
19  system?
20      A.  No.
21      Q.  Now, read this document to yourself, and let me
22  know when you're done.
23      A.  I'm sorry?
24      Q.  Read this document to yourself, and let me know
25  when you're done, please.

Page 234

1           DAVID PEREZ
2       A.  I'm done.
3       Q.  So I'll represent to you that this was produced
4   by Dealertrack in response to a subpoena.
5       And in the lower-left-hand side it says,
6   "Dealertrack website," correct?
7       A.  Correct.
8       Q.  And it says, "Copyright Dealertrack Technologies"
9   on the bottom, correct?
10      A.  Correct.
11      Q.  And on top it says, "Deal jacket Dealertrack,"
12  correct?
13      A.  That's correct.
14      Q.  And in the upper left it says, "Dealertrack FNI,"
15  correct?
16      A.  Correct.
17      Q.  So this appears to be a Dealertrack screen shot
18  about the pull of the credit -- strike that.
19      A Dealertrack screen shot regarding information
20  about Emmanuel Laforest?
21          MR. GOODMAN:  Appear to him to be that or
22  appear to you to be that?
23          MR. KESHAVARZ:  Yeah.
24          MR. GOODMAN:  What does appear mean?
25          Object to form.

Page 235

1           DAVID PEREZ
2       Q.  Go ahead.
3       A.  It has Mr. Emmanuel's name.
4       Q.  So is the answer yes?
5       A.  Yes.
6       Q.  Looking at the top of the document, the header,
7   are these headers that you would see in Dealertrack --
8   FNI, leads, create, deals, book out and so forth?
9       A.  I don't remember.
10      Q.  Because book out was one of the documents that we
11  looked at before.
12          MR. GOODMAN:  Is that a question?
13          Object to form.
14      A.  I don't remember.
15      Q.  The left-hand side where it has "Tab, summary,
16  archive, application, credit decisions, contract, after
17  market compliance, documents and ID verifications," are
18  those the types of tabs that you would see on the
19  Dealertrack system?
20      A.  What's the question?
21      Q.  The tabs on the left-hand-side column which I
22  just went through as part of the summary, are these tabs
23  you would see in the Dealertrack system on Victory's
24  end?
25      A.  Depends on what you have access to.

Page 236

1           DAVID PEREZ
2       Q.  But the tabs on the left side are tabs that you
3   can see on Dealertrack on the end for Victory
4   Mitsubishi, correct?
5           MR. GOODMAN:  Object to the form.
6           Go ahead.
7       A.  Correct.
8       Q.  And you're seeing a screen that's similar to the
9   history section of the document in front of you,
10  correct?
11          MR. GOODMAN:  What?
12      Q.  Where it has "History 2020," and it goes down and
13  has "Adverse action recommended, verification" and goes
14  down all the way through "Credit bureau pulled and deal
15  jacket created," those are things you would see on your
16  Dealertrack system, right?
17      A.  Correct.
18      Q.  So starting at the bottom and going up, at 4:38
19  says, "D. Perez deal jacket created."
20      So you created the deal jacket at 4:38 p.m.
21  regarding this transaction that's Bates 557, correct?
22      A.  That's what it appears to be.
23      Q.  And this is a dealer jacket created for Emmanuel
24  Laforest, correct?
25      A.  Again, that's what it appears to be.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
237–240

Page 237

DAVID PEREZ

2   Q.  And at 4:20 -- going from the bottom up, at
3   4:39 p.m., you pulled the credit report -- well -- five
4   things happened at 4:39.
5        You pulled the credit report of Mr. Laforest at
6   4:39 p.m., right?
7        MR. GOODMAN:  What's the question?
8        You have to repeat that.  I'm sorry.
9   Q.  Sure.  At 4:39 it says a number of actions taken
10  by you, D. Perez.  So on Saturday, May 30th at 4:39, you
11  sent a credit bureau authorization to Dealertrack and
12  pulled Mr. Emmanuel Laforest's credit report, correct?
13  A.  That's what it appears to be.
14  Q.  And you're saying that when you pulled the credit
15  report, that there was no credit history for
16  Mr. Laforest, right?
17  A.  I don't really know.  But based on what you've
18  shown me, yes.
19  Q.  That's because you wrote 0/0 on the credit
20  application over his name, right?
21  A.  That's correct.
22  Q.  So you tried to pull two different credit
23  reports, because there are two credit reports listed at
24  4:39 under your name.
25       So you attempted to pull two different credit

Page 238

DAVID PEREZ

2   reports for Mr. Laforest, but there was no credit
3   history for either of them; is that right?
4   A.  I'm not understanding the question.
5   Q.  Well, you said you pulled credit report -- tried
6   to pull a credit report for Mr. Laforest, but there was
7   no credit history.
8        That's why you put down 0/0, correct?
9   A.  Correct.
10  Q.  And Exhibit 26 shows two different credit bureau
11  pulls or attempts to pull, correct?
12  A.  Based on this, yes.
13  Q.  So you tried to pull two credit reports from two
14  different credit reporting agencies, and neither of them
15  had a credit file for Mr. Laforest, correct?
16       MR. GOODMAN:  Objection to form.
17       Go ahead.
18  A.  From what I can see, yes.
19  Q.  And those credit reporting agencies that you
20  pulled, at that time, was Equifax and TransUnion,
21  correct?
22  A.  Experian and TransUnion.
23  Q.  I always get those two mixed up.  I can't tell
24  you how many cases I have where I switch those two.  All
25  right.

Page 239

DAVID PEREZ

2        At the top it says, "June 20th" -- "Saturday,
3   June 20th, 3:08 a.m."  Says, "Adverse action
4   recommended."
5        Do you see that?
6   A.  Okay.
7   Q.  An adverse action notice has to be sent out when
8   someone applies for credit while at the dealership when
9   that application is denied, right?
10  A.  I wouldn't know.
11  Q.  But -- all right.  That's fine.
12       MR. KESHAVARZ:  Emma, if you could forward
13  these other exhibits over, which are the documents that
14  you referenced the Bates numbers of, can you just
15  forward those over, please?
16       And while you do that -- Emma's been way
17  ahead of me, which is the issue.
18  Q.  I want to point your attention to what Emma
19  previously e-mailed you as Exhibit 24, Bates-stamped
20  Defendant's 41.
21       Please review that, and let me know when you're
22  done.
23  A.  I'm done.
24  Q.  All right.
25       What is that?

Page 240

DAVID PEREZ

2   A.  This looks to be a credit application.
3   Q.  Now, this would be the credit application for
4   Emmanuel Laforest, correct?
5   A.  According to the name on it, yes.
6   Q.  And you would fill in the information for a
7   credit application as part of your job, right?
8        MR. GOODMAN:  Object to form.
9        Go ahead.
10  A.  Well --
11  Q.  Sorry?
12  A.  I'm looking it over.
13  Q.  Take your time.
14  A.  This application wasn't filled out by us.
15  Q.  Who was it filled out by, if you can tell?
16  A.  I wouldn't be able to tell.
17  Q.  What makes you think it wasn't filled out by the
18  dealership?
19  A.  Well, at the bottom this extranetdealetc.com.
20  That's not filled out by us.  This is normally filled
21  out by the consumer.
22  Q.  What do you mean it's normally filled out by the
23  consumer?
24       What is?
25  A.  So pretty much, this right here is a credit app



DAVID PEREZ                                              November 21, 2022
FRANCOIS V. VICTORY AUTO GROUP                          241–244

Page 241

1              DAVID PEREZ
2    that the consumer fills out on our website.
3      Q.  I see.
4            And that was -- and based on this credit
5    application, you would pull Mr. Laforest's credit
6    report?
7      A.  No.  So what it does is, it's a soft credit
8    check.  So gives us a brief, like, history of his
9    credit.  And with that, we can call the customer and
10   tell him, hey, you know, come on in.  We can help you
11   out and get you into a vehicle.
12     Q.  We were talking before about the person being --
13   the consumer being there in person.
14           But you're saying through Victory Mitsubishi's
15   website, a consumer can fill in information to make an
16   online credit application; is that right?
17     A.  So there's a difference between a soft credit and
18   a hard credit pull.  Soft credit does not hit your
19   credit.
20     Q.  Soft credit doesn't affect your credit score?
21         You have to say "Yes" or "No."
22     A.  No, it doesn't.
23     Q.  But a soft credit pull still provides you all the
24   information that's on the credit report about prior late
25   payments?

Page 242

1              DAVID PEREZ
2      A.  Not necessarily.
3      Q.  So what I'm trying to figure out is this.
4            There's an online credit application process that
5    someone can go through through the Victory Mitsubishi
6    website; is that true?
7      A.  Yes.
8      Q.  And that's what happened in this instance with
9    Mr. Laforest, correct?
10     A.  By the looks of it, yes.
11     Q.  And just on the bottom it says, "Defendant 41."
12         I'll represent to you that this was a document
13   produced by the car dealership during the course of
14   litigation.  It wasn't from me or someone else.  This is
15   the car dealership's paper.
16         So how does that work?
17         You filled out -- can you tell when the credit
18   application was filled out?
19     A.  If you can tell?
20     Q.  Yeah.
21     A.  No.
22     Q.  All right.
23         But he was just -- when Mr. Laforest submitted
24   the credit application, he was just solely submitting it
25   for himself, correct?

Page 243

1              DAVID PEREZ
2      A.  I wouldn't be able to tell based on this.
3      Q.  But there's no co-applicant in the credit
4    application, based on Exhibit 24, right?
5      A.  Again, sir, I wouldn't be able to tell just based
6    off this.
7      Q.  What else would you be able to look at on the
8    online credit application process?
9          MR. GOODMAN:  Object to form.
10         Go ahead.
11     A.  Just the information he provides.
12     Q.  Now on the bottom it says -- above the
13   applicant's signature it says, "This is a printable
14   version."
15         Do you see that?
16     A.  I see it.
17     Q.  Just read that sentence to yourself, and then let
18   me know so I can ask you a question about it.
19     A.  Okay, I read it.
20     Q.  Now, it says that the applicant quote,
21   "Authorizes us to disclose and forward all of the
22   information we collect as described above to financial
23   institutions for application processes."
24         Did I read that correctly?
25     A.  You read it.

Page 244

1              DAVID PEREZ
2      Q.  And it says, if you click on that submission,
3    then you're authorizing Victory Mitsubishi to, in fact,
4    do that, submit the financial applications to finance
5    companies, right?
6      A.  That's what it states on here.
7      Q.  And in order to do that, Victory Mitsubishi would
8    do a soft credit pull as to Mr. Laforest, correct?
9      A.  Well, once he fills out the application, the soft
10   credit pull happens automatically.
11     Q.  And that information about the soft credit pull
12   would be in the Dealertrack system, correct?
13     A.  That, I wouldn't know.
14     Q.  So let me talk about this online credit
15   application process.
16         When there's a process doing it online, does the
17   dealership then send the customer a link to fill out the
18   credit application?
19         Is there a link for the consumer to fill out --
20   let me strike that.
21         Why wouldn't the dealership have the consumer
22   come in to the store and fill out an application, as
23   opposed to doing it online?
24         MR. GOODMAN:  Objection to form.
25     A.  I'm not understanding the question.



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
245–248

Page 245

DAVID PEREZ

1
2    Q.  Why wouldn't the dealership just have people come
3  in person to the store to fill out a credit application,
4  as opposed to doing it online?
5           MR. GOODMAN:  Objection.
6           If you know.
7    A.  I wouldn't know.
8    Q.  Where did Victory Mitsubishi submit an
9  application to a financial institution to for
10  Mr. Laforest, based on the credit application that's
11  Exhibit 24?
12    A.  Can you repeat the question?
13    Q.  Sure.  So Exhibit 24 says that Victory Mitsubishi
14  is going to use the information in Exhibit 24 to submit
15  credit applications for the financing of a vehicle.
16           Where would we find those credit applications?
17    A.  We wouldn't submit it based on this.  I can't
18  verify that it's you.
19    Q.  I see.
20           So where it says, "We'll submit it to the finance
21  company," in fact -- wait a minute.
22           You said you can't verify if the consumer filling
23  out the information is the person who he contends to be,
24  right?
25           MR. GOODMAN:  Object to the form.  Asked and

Page 246

DAVID PEREZ

1
2  answered.
3    Q.  Well, wait.  This is what I'm trying to figure
4  out.
5           Based only on the information submitted by the
6  consumer or Victory Mitsubishi's website, that
7  information being Exhibit 24, based solely on that,
8  Mitsubishi does a soft credit pull on the name of the
9  person on the online credit application, correct?
10    A.  No, sir.
11    Q.  Okay.
12           Go ahead.
13    A.  As soon as -- for example, as soon as I fill out
14  an application, the minute I hit submit, it pulls it.
15  We don't pull it.  It automatically does it, as soon as
16  I hit submit.  I fill it out, put my information, David
17  Perez, so and so, my Social, my date of birth, my work
18  history, it automatically pulls it.
19           Doesn't mean that, say someone at the dealership
20  is going to submit it.  I still have to verify that it's
21  you.
22    Q.  So when the person fills out the online
23  application, when he or she clicks submit, that's the
24  authorization for the soft pull of the credit report,
25  correct?

Page 247

DAVID PEREZ

1
2    A.  That's correct.
3    Q.  And that information from the soft pull goes to
4  Victory Mitsubishi, correct?
5    A.  I wouldn't know.
6    Q.  Well, what would happen?
7           Why would Victory Mitsubishi ask you to click
8  through to submit credit application, if, in fact, that
9  information from a soft credit pull is not going to
10  Victory Mitsubishi?
11           Why would the website say that, then?
12    A.  Well, I don't know, sir.
13    Q.  Can you think of any reason why?
14           MR. GOODMAN:  Objection.
15           You don't have to think of reasons.
16    A.  I wouldn't know.
17    Q.  So you're saying the representation that's on the
18  bottom above the signature is untrue?
19           MR. GOODMAN:  Objection to form.
20           Go ahead.
21    A.  I'm not understanding the question.
22    Q.  Well, because the applicant's signature, the
23  information above it, is what is represented to the
24  consumer on Victory Mitsubishi's website when the
25  consumer fills out that application, right?

Page 248

DAVID PEREZ

1
2    A.  Okay.
3    Q.  Is that true?
4           MR. GOODMAN:  Is what true?
5           Object to form.
6    Q.  That above the applicant's signature is the
7  information.  Says, "Printable version of an online
8  application received and forwarded."
9           That's what's shown to the consumer filling out
10  an online application on the Victory Mitsubishi's
11  website, right?
12           MR. GOODMAN:  Asked and answered.
13           THE WITNESS:  I don't understand.
14           MR. GOODMAN:  I don't know what he's trying
15  to say.
16    Q.  Is the -- you see that sentence that says, "This
17  is a printable version of an online application"?
18           You see that?
19    A.  Yes.
20    Q.  And it says, "Whereas the applicant clicks on the
21  online submit button, it authorizes us to disclose and
22  forward all of the information we collect as described
23  above to the financial institutions for application
24  processing."
25           Did I read that sentence correctly?



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
249–252

Page 249

DAVID PEREZ

1
2    MR. GOODMAN: You've asked that two or three
3  times already.  The answer was yes.
4       You don't have to answer again.
5    Q.  And that is -- so that's a representation that's
6  made on Mitsubishi's website to the consumer who's
7  filling out the online credit application, right?
8    MR. GOODMAN: Objection to form.
9       I don't know what he's asking.
10   A.  Are you asking -- I'm not getting it.
11   Q.  That sentence, is that on the screen that the
12  consumer clicks on to submit the application?
13   A.  I wouldn't know what's on the screen.
14   Q.  Because it says, "Click here to submit."
15       All right.
16       So then what happens next after the consumer
17  fills out the online credit application?
18       You said the consumer -- what's the next step in
19  the process?
20   A.  They're usually called.  Once they're called, we
21  are inviting them in to see what we can do for them.
22   Q.  Is that the auto salesperson who would normally
23  call?
24   A.  That, I wouldn't know who would.
25   Q.  So then when the consumer is contacted to come

Page 250

DAVID PEREZ

1
2  in, that happened for Mr. Laforest.
3       Mr. Laforest was reached out to, and he came in
4  about purchasing a vehicle, right?
5    A.  I would assume so, based on the handwritten
6  information that we have.
7    Q.  Excellent.
8       So the website application was prior to May 30th,
9  2020; is that what you're saying?
10   A.  I wouldn't know.
11   Q.  What document's in the possession of Victory
12  Mitsubishi would say the time that that -- the day that
13  online credit application was made?
14   A.  I wouldn't know.
15   Q.  Let's go through Exhibit 25, Bates-stamped
16  Defendant's 20 through -- 70 through 72.
17       MR. GOODMAN: We're at 6:10.  So this is the
18  last exhibit that we're going to deal with.
19       MR. KESHAVARZ: We have a court-ordered
20  deposition.  We have eight hours.
21       (Simultaneous cross talk.)
22       MR. GOODMAN: Feel free to --
23       MR. KESHAVARZ: -- plus breaks.
24       MR. GOODMAN: I'll be happy to let you take
25  it up with the judge.

Page 251

DAVID PEREZ

1
2       Go ahead.
3    Q.  Mr. Perez, you know you're here pursuant to a
4  court order, right?
5       MR. GOODMAN: You don't have to answer that.
6    Q.  You understand that?
7       MR. GOODMAN: Don't answer.
8    Q.  Do you understand that or no?
9       MR. GOODMAN: Ahmad, do you want to move
10  forward?
11       We're done.
12   Q.  So how did you find out there was a lawsuit
13  against you?
14   A.  What do you mean?
15   Q.  How did you know you were being sued?
16   A.  I was contacted.
17   Q.  By who?
18   A.  I don't remember if it was Mr. Patrick or
19  Mr. Nicholas.
20   Q.  So you understand the allegations in the
21  complaint are that the dealership submitted a credit
22  application in the name of my client, got a loan out in
23  my client's name, and she suffered all this harm.
24       You understood that, right?
25       MR. GOODMAN: Asked and answered.  We've

Page 252

DAVID PEREZ

1
2  been over this.
3       Let's go.
4    Q.  Yes?
5    A.  Correct.
6    Q.  So when you found out that you were sued, did you
7  contact anyone at the dealership to ask if any of the
8  allegations in the lawsuit were true?
9       MR. GOODMAN: Objection.  Privileged.
10       Don't answer.
11       MR. KESHAVARZ: Wait a minute.  Not to the
12  attorney.
13       MR. GOODMAN: You can answer when you were
14  contacted.
15       MR. KESHAVARZ: I didn't ask about the
16  attorney.
17   Q.  Did you contact anyone at the dealership to ask
18  if any of the allegation that were alleged were true?
19   A.  No, I didn't.
20   Q.  Why not?
21       Weren't you curious?
22   A.  No.  Because I know we wouldn't do something like
23  that.
24   Q.  You didn't ask for any information when you found
25  out you were sued?



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
253–256

Page 253

DAVID PEREZ

1
2    A.  No.
3         MR. GOODMAN:  Object to form.
4    Q.  Is it possible that someone at the dealership
5    might have gone rogue and done this?
6         Is that, at all, possible?
7         MR. GOODMAN:  Objection to form.
8         Don't answer.
9         What's possible?
10   Q.  Well, I mean, there's an allegation of some
11   pretty serious stuff, and you never asked anyone at the
12   dealership if any of the allegations were true?
13        Is that what you're testifying to?
14        MR. GOODMAN:  Asked and answered.
15        You did testify to that.  You're not going
16   to do it again.
17   Q.  Yes or no?
18        MR. GOODMAN:  He answered no.
19   Q.  If you review Exhibit 25, let me know when you're
20   done -- Bates-stamped 70-72.
21   A.  I'm not reviewing it.
22   Q.  Sorry?
23   A.  I'm not reviewing it.
24   Q.  Do you have any idea what that is?
25   A.  No.

Page 254

DAVID PEREZ

1
2    Q.  Did anyone ever tell you that there were texts
3    with Mr. Laforest?
4         Anyone at the dealership ever tell you that?
5    A.  No, sir.
6    Q.  At the dealership, did anyone tell you that
7    Mr. Laforest sent a video where the vehicle was?
8    A.  No.
9    Q.  If a customer came to the dealership and told you
10   or a sales associate that they had a complaint, what
11   would you or the sales associate do?
12        MR. GOODMAN:  A complaint about what?
13        Object to form.
14        MR. KESHAVARZ:  About the sales or financing
15   of a vehicle.
16   A.  I wouldn't know anything about that, sir.
17   Q.  My question is, if a customer came to the
18   dealership and told you or told you that they had a
19   complaint about a fraud at the dealership, what would
20   you do?
21   A.  Again, I wouldn't know anything about that.
22   Q.  If someone asked you that, was there anything you
23   would do?
24        MR. GOODMAN:  Object to the form.
25        Go ahead.

Page 255

DAVID PEREZ

1
2    A.  I don't understand the question.
3    Q.  If someone came to you and said, I've been ripped
4    off at the car dealership, what would you do?
5         Would you tell Mr. Stavros?
6         What would you do?
7    A.  I wouldn't know, sir.  Nobody ever came up to me.
8    Q.  Why is the date on the retail installment sales
9    contract on June 29th when the application for the loan
10   was May 30th?
11   A.  I wouldn't know.
12   Q.  Going to Defendant's Exhibit 21 on page
13   Defendant's 13, the e-mail address here is
14   Francois@gmail.com.
15        That's not a real e-mail address, right?
16        That e-mail address doesn't exist, does it?
17   A.  Which one, sir?
18        MR. GOODMAN:  What page are you on?
19        MR. KESHAVARZ:  Exhibit 21, Defendant's page
20   13.  It has an e-mail address Defendant's 37.
21   A.  37?
22        What did you ask, again?
23   Q.  Where it says, "Permissible code" -- excuse me.
24   Let me say that again.
25        Where it says, "Permissible purpose code:  T-00,"

Page 256

DAVID PEREZ

1
2    what does that mean?
3    A.  Would not know.
4    Q.  On that same page where it says, "0092 request of
5    product option not allowed," what does that mean?
6    A.  Would not know.
7    Q.  Same page says, "0086 similar Social Security
8    number on file," what does that mean?
9    A.  Would not know.
10   Q.  Would that raise any red flags to you, in terms
11   of submitting credit reporting information to your
12   finance manager?
13        MR. GOODMAN:  Object to form.
14   A.  I wouldn't know.
15   Q.  Next page, Exhibit 22, Defendant's page 38, what
16   does "0027CKTP:  Input Social Security number issue date
17   unverified," what does that mean?
18   A.  Would not know.
19   Q.  Exhibit -- same page, what does quote, "0335AG8
20   too many inquiries last 12 months mean"?
21   A.  Wouldn't know.
22   Q.  And that's on the credit reports that you pull,
23   right?
24   A.  I don't know if I pulled these, sir.
25   Q.  But you review credit -- part of your job is to



DAVID PEREZ                                    November 21, 2022
FRANCOIS V. VICTORY AUTO GROUP                 257–260

Page 257
DAVID PEREZ
1
2  review credit reports, in terms of financing options for
3  the consumer, right?
4      A.  I don't do the submissions.
5      Q.  No.
6          But you pull credit reports, right?
7      A.  Yes, sir.
8      Q.  And you look at the credit reports, right?
9      A.  Yes.
10     Q.  And it says, "To many in the last 12 months."
11         And you have no idea what that means?
12     A.  No.  That's not part of my job.
13     Q.  And it says -- well, it's your job to pull the
14  credit reports.
15         It's not your job to interpret anything?
16     A.  No.  That's why I hand it off to a finance
17  manager.  They know what things are.
18     Q.  So if there's no red flag in the credit report to
19  you, so if there's anything -- so if there's nothing in
20  the credit report, no matter what it is, that would be a
21  red flag to you that would make you want to talk to the
22  consumer; is that right?
23         MR. GOODMAN:  Object to the form.
24     A.  No.
25     Q.  All right.

Page 258
DAVID PEREZ
1
2          MR. GOODMAN:  All right, Ahmad.  We're
3  getting done here.  And meanwhile, your screen is
4  shaking continuously, which is very irritating.
5          You got any more questions?
6          Let's go.
7          MR. KESHAVARZ:  Indeed I do.
8          MR. GOODMAN:  Well, you got a couple of
9  minutes left and we're going to shut it down.
10     Q.  Going back to page -- subpoena response 557.
11  That's Exhibit -- what exhibit number is that?
12         MS. CATERINE:  Exhibit 26.
13         MR. KESHAVARZ:  Thank you.
14     Q.  Let me know when you're there.
15     A.  I'm there.
16     Q.  All right.
17         The first entry on the bottom says, "Deal jacket
18  created."
19         And that means that was when the account for that
20  consumer was created on Dealertrack, right?
21     A.  I wouldn't know.  I've never seen this before.
22     Q.  Well, the entry on the bottom says, "David Perez"
23  -- "D. Perez deal jacket created 4:38 p.m.," right?
24     A.  Correct.
25     Q.  And that means that you created the deal jacket

Page 259
DAVID PEREZ
1
2  on that day and time, right?
3          MR. GOODMAN:  Object to form.
4      A.  Based on what's on the paper, yes.
5      Q.  So each customer for the dealership should have a
6  deal jacket screen like Exhibit -- the exhibit that's
7  subpoena response 557, right?
8      A.  I would not know, sir.
9      Q.  Well, in order to get a deal jacket, the code is
10  generated by the document that you're looking at in
11  front of you, right?
12         MR. GOODMAN:  Objection to form.
13         You've been over this already.  He doesn't
14  know.
15     Q.  You can answer.
16     A.  I don't know, sir.
17     Q.  Where it says, "June 20th, 2020, adverse action
18  recommended," why did it take so long to send an adverse
19  action or to be recommended, given the date of the
20  credit application?
21     A.  I wouldn't know.
22     Q.  In fact, on May 30th, 2020, you knew that
23  Mr. Laforest's credit was no good, because you got a 0/0
24  indicating that there was no credit information on him,
25  right?

Page 260
DAVID PEREZ
1
2      A.  According to the documents, yes.
3      Q.  So on May 30th, 2020, you knew you couldn't
4  finance a sale of a vehicle for Mr. Laforest, right?
5      A.  According to the documents, that is correct.
6      Q.  But then you run a credit report on a woman named
7  Jamie Singer, correct?
8      A.  I don't know who that is.
9      Q.  If you look at page 566 -- subpoena 566, which is
10  Exhibit --
11         MS. CATERINE:  We haven't marked that one
12  yet.
13         MR. KESHAVARZ:  If you could mark that --
14         MR. GOODMAN:  We're not going there.
15         Time's up.
16         (Simultaneous cross talk.)
17         MR. KESHAVARZ:  No.  We have seven hours.
18         Madame Court Reporter, how much time do we
19  have left?
20         How much time has been used?
21         MR. GOODMAN:  I'm excusing the witness.
22         MR. KESHAVARZ:  Wait.  Wait.  Wait.
23         MR. GOODMAN:  We got here because you didn't
24  mark exhibits on time, and you waited all day to get to
25  something you're interested in.  So that's not my



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

November 21, 2022
261—264

Page 261

DAVID PEREZ

1
2 problem.  That's not the witness' problem.
3          MR. KESHAVARZ:  So how much time --
4          MR. GOODMAN:  So we're going to adhere to
5 the rules of the court, and we're going to be done.
6          We're not doing another six minutes.  We
7 didn't want lunch.  This problem is because you didn't
8 mark exhibits and circulate them.
9          MR. KESHAVARZ:  And I wanted to start at
10 10:00, and you wanted to start at 11:00.
11          Let's just finish --
12          MR. GOODMAN:  That has nothing to do with
13 it.  It's now 6:30.
14          MR. KESHAVARZ:  Let's finish this up.
15          MR. GOODMAN:  No.
16          MR. KESHAVARZ:  This is what I suggest as a
17 comprise.  I suggest that we start up -- finish up
18 Mr. Perez' deposition at 10:00, spend a few minutes.
19 Wrap up
20          MR. GOODMAN:  He's not coming back.
21          MR. KESHAVARZ:  -- wrap up everything.
22          MR. GOODMAN:  You can go and make an
23 applications or any (indiscernible) remarks that you
24 want.  I'm happy to talk to the court about that.
25          This is all your problem.  It's 6:25 now.

Page 262

DAVID PEREZ

1
2 We're finished.
3    Q.  All right.
4          If you look at page -- exhibit --
5          MR. GOODMAN:  No, we're not looking at page
6 anything.
7          MR. KESHAVARZ:  All right.  I'm going to
8 call -- you're available to talk to the court at 10:00,
9 so that we can get a ruling about finishing up another
10 few minutes for Mr. Perez?
11          MR. GOODMAN:  You can call the court and ask
12 for five more minutes.
13          MR. KESHAVARZ:  If you're available, I'm
14 glad to call the court.
15          MR. GOODMAN:  I'm not available at
16 10:00 tomorrow.  I'll be preparing for your client's
17 deposition.
18          MR. KESHAVARZ:  What time do you want to
19 call the court?
20          MR. GOODMAN:  I don't want to call the
21 court.
22          MR. KESHAVARZ:  We're going to call the
23 court at 10:00.
24          Are you going to be available?
25          MR. GOODMAN:  I will not.

Page 263

DAVID PEREZ

1
2          MR. KESHAVARZ:  This is not rocket --
3          Madame Court Reporter, can you tell me the
4 exact amount of time that we're allowed for the court,
5 as used?
6          As, if we're going to go off the record --
7          MR. GOODMAN:  Why are we asking the court
8 reporter for what's a rule of the court?
9          It's seven hours.
10          MR. KESHAVARZ:  All right.  All right.
11          I'm not going to ask any more questions.
12          MR. GOODMAN:  That's right.
13          MR. KESHAVARZ:  Madame Court Reporter,
14 e-mail me exactly how much time has elapsed, including
15 all of the breaks.  And then I'm going to call the court
16 at 10:00 and ask to allow me to finish up whatever
17 remaining time we have prior to the retire deposition of
18 my client.
19          Deposition will remain open.  I guess we're
20 off the record, because I won't be allowed to ask any
21 more questions.
22          THE STENOGRAPHER:  Mr. Goodman, since this
23 is a federal deposition, there is no courtesy copy.
24          Will you be ordering a copy of today's
25 transcript?

Page 264

DAVID PEREZ

1
2          MR. GOODMAN:  I will have to inquire as to
3 whether my client wants to do that.  I don't have an
4 answer for you immediately.
5          Will you be doing the deposition that is now
6 scheduled for this Wednesday in this same case?
7          THE STENOGRAPHER:  No, I am not available
8 that day.
9          I'll e-mail you to see if you want to order
10 a copy of the transcript, and you can reply to that
11 e-mail either way.
12          MR. KESHAVARZ:  All right.  Off the record.
13          (Whereupon, this proceeding was
14 concluded at 6:27 p.m.)
15
16          _____
17                DAVID PEREZ
18 _____
19 Subscribed and sworn to
20 before me this _____
21 day of _____, 2022.
22
23 _____
24    Notary Public
25



DAVID PEREZ
FRANCOIS V. VICTORY AUTO GROUP

**Page 265**

```
1                 I N D E X
2
3   Examinations                              Page
    DAVID PEREZ        THE STENOGRAPHER          4
4                      MR. KESHAVARZ             4
5
6                 E X H I B I T S
7   No.        Description                     Page
8   18    DealerSocket texts, Bates-stamped     157
          Defendant's 42 through 48
9
    19    DealerSocket work notes,              157
10        Bates-stamped 49 to 69
11  20    DealerSocket texts, Defendant's page  157
          113
12
    21    Deal jacket, Defendant's 1-36         168
13
    22    Credit report, Defendant's 37-40      168
14
    23    Dealership screen shots, Defendant's  168
15        85-92
16  24    Online credit application             233
17  25    IPhone screens, Defendant's 70-72     233
18  26    Laforest Dealertrack deal jacket      233
19  27    Singer Dealertrack deal jacket        233
20
21         QUESTIONS MARKED FOR A RULING
22  Question                         Page   Line
23  What was your -- Mr. Perez, what was  9      9
    your residence address in May of
24  2020?
25
```

**Page 266**

```
1   Despite the objection of Mr. Goodman,   10    19
    will you tell me your current address
2   -- residential address and address on
    May 20th, 2022; yes or no?
3
    Did you have the same cell phone        13    13
4   number in January 1, 2019?
5   Did you pay Mr. Goodman anything to     31    20
    retain you in this matter?
6
    Now, do you know if there's insurance   32    10
7   coverage that might be covering any
    of the claims in any judgments
8   entered against you in this case?
9   About how much did you make while you  120     3
    worked as a sales associate at the
10  dealership?
11  But you can't think of any reason why  146    11
    a sales associate couldn't ask a --
12  couldn't ask a consumer to remove
    their mask and you could?
13
    I'm asking you, as you're sitting      147     4
14  here today, can you think of any
    reason, other than the fact that
15  that's the way it was, can you think
    of any reason about why you could
16  tell a consumer, Stavros can tell a
    consumer to pull down their mask to
17  confirm their identify, but a sales
    associate couldn't?
18
    Has a customer had a problem with the  177    17
19  sales or financing of any car at
    Victory Mitsubishi while you worked
20  there; yes or no?
21  Has that ever happened, as far as,
    you know?
22
    It's possible it could have been $1    202    14
23  per car for your commission per car;
    is that right?
24
    Is it possible you can have been paid  202    23
25  more than $10,000 per car sale?
              CERTIFICATION
```

**Page 267**

```
1   STATE OF NEW YORK  )
2                         ss.:
    COUNTY OF NASSAU   )
3
4        I, SINDEE J. BAUM a Notary Public for
5   and within the State of New York, do hereby certify:
6        That the witness whose examination is
7   herein before set forth, appeared remotely and was duly
8   sworn and that such examination is a true and accurate
9   transcription of stenographic notes of the testimony
10  given by that witness.
11       I further certify that I am not related
12  to any of the parties to the action by blood or marriage
13  and that I am in no way interested in the outcome of
14  this matter.
15       IN WITNESS WHEREOF, I have hereunto set
16  my hand this 5th day of December, 2022.
17
18
19
20            SINDEE J. BAUM
21
22
23
24
25
```

**Page 268**

```
1             ERRATA SHEET
2   CASE NAME: FARAH JEAN FRANCOIS v. VICTORY AUTO GROUP LLC
    d/b/a VICTORY MITSUBISHI, SPARTAN AUTO GROUP LLC d/b/a
3   VICTORY MITSUBISHI, JOHN DOE 1-6 and PHILIP ARGYROPOULOS
    DATE OF DEPOSITION: 11/21/2022
4   WITNESS' NAME: DAVID PEREZ
5   PAGE/LINE(S)/      CHANGE            REASON
6   ___/___/_____/_____
7   ___/___/_____/_____
8   ___/___/_____/_____
9   ___/___/_____/_____
10  ___/___/_____/_____
11  ___/___/_____/_____
12  ___/___/_____/_____
13  ___/___/_____/_____
14  ___/___/_____/_____
15  ___/___/_____/_____
16  ___/___/_____/_____
17
18            DAVID PEREZ
19  SUBSCRIBED AND SWORN TO
20  BEFORE ME THIS_____DAY
21  OF_____, 2022.
22
23  _____
            NOTARY PUBLIC
24
25  MY COMMISSION EXPIRES_____
```

