1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK

3  -----------------------------------------X
   FARAH JEAN FRANCOIS,

4
                              PLAINTIFF,

5

6       -against-         Case No.:
                          1:22-cv-4447-JSR

7

8  VICTORY AUTO GROUP LLC d/b/a
   VICTORY MITSUBISHI,

9  SPARTAN AUTO GROUP LLC d/b/a
   VICTORY MITSUBISHI,

10 STAVROS ORSARIS,
   YESSICA VALLEJO,

11 DAVID PEREZ,
   DIANE ARGYROPOULOS, AND

12 PHILIP ARGYROPOULOS,

13                          DEFENDANTS.
   -----------------------------------------X

14

15              DATE: November 22, 2022

16              TIME: 11:00 A.M.

17

18

19      VIRTUAL DEPOSITION of the Plaintiff,

20 FARAH JEAN FRANCOIS, taken by the

21 Defendant, pursuant to a Notice and to the

22 Federal Rules of Civil Procedure, held at

23 the above date and time, before Victoria

24 Chumas and Sophia Toribio, Notaries Public

25 of the State of New York.

Page 2

```
 1
 2  A P P E A R A N C E S :
 3
 4  THE LAW OFFICE OF AHMAD KESHAVARZ
       Attorneys for the Plaintiff
 5   FARAH JEAN FRANCOIS
       16 Court Street, Suite 2600
 6   Brooklyn, New York 11241
       BY: AHMAD KESHAVARZ, ESQ.
 7   ahmad@newyorkconsumerattorney.com
 8
     NICHOLAS GOODMAN & ASSOCIATES, PLLC
 9   Attorneys for the Defendants
       VICTORY AUTO GROUP LLC d/b/a
10   VICTORY MITSUBISHI,
       SPARTAN AUTO GROUP LLC d/b/a
11   VICTORY MITSUBISHI,
       STAVROS ORSARIS,
12   YESSICA VALLEJO,
       DAVID PEREZ,
13   DIANE ARGYROPOULOS, AND
       PHILIP ARGYROPOULOS
14   333 Park Avenue South, Suite 3A
       New York, New York 10010
15   BY: H. NICHOLAS GOODMAN, ESQ.
       ngoodman@ngoodmanlaw.com
16
17  ALSO PRESENT:
18  PATRICK L. SELVEY, JR., ESQ. with Nicholas
       Goodman & Associates
19
20
21          *    *    *
22
23          *    *    *    *
24
25
```

Page 3

```
 1
 2   F E D E R A L   S T I P U L A T I O N S
 3
 4     IT IS HEREBY STIPULATED AND AGREED by and
 5   between the counsel for the respective
 6   parties herein that the sealing, filing and
 7   certification of the within deposition be
 8   waived; that the original of the deposition
 9   may be signed and sworn to by the witness
10   before anyone authorized to administer an
11   oath, with the same effect as if signed
12   before a Judge of the Court; that an
13   unsigned copy of the deposition may be used
14   with the same force and effect as if signed
15   by the witness, 30 days after service of
16   the original & 1 copy of same upon counsel
17   for the witness.
18
19     IT IS FURTHER STIPULATED AND AGREED that
20   all objections except as to form, are
21   reserved to the time of trial.
22
23          *    *    *    *
24
25
```

Page 4

```
 1          F. FRANCOIS
 2   F A R A H   J E A N   F R A N C O I S,
 3   called as a witness, having been first duly
 4   sworn by a Notary Public of the State of
 5   New York, was examined and testified as
 6   follows:
 7          THE COURT REPORTER:  Please
 8     state your name for the record.
 9   A.  Farah Jean Francois.
10          THE COURT REPORTER:  What is
11     your address?
12   A.  719 West 180th Street, New
13   York, New York 10033.
14  EXAMINATION BY
15  MR. GOODMAN:
16   Q.  Good morning, Ms. Francois.  My
17   name is Nicholas Goodman.  I represent the
18   defendants in the lawsuit that you
19   commenced.  I will be asking you a series
20   of questions today.  Have you ever
21   testified at a deposition before?
22   A.  No.
23   Q.  Have you ever testified in a
24   courtroom before?
25   A.  No.
```

Page 5

```
 1          F. FRANCOIS
 2   Q.  Have you ever testified under
 3   oath in any circumstances before?
 4   A.  No.
 5   Q.  Have you ever sued anyone
 6   before this case?
 7   A.  No.
 8   Q.  Has anyone ever sued you before
 9   this case?
10   A.  No.
11   Q.  Or presently?
12   A.  No.
13   Q.  Just, the court reporter went
14   over an important rule about letting me
15   finish asking the question before you start
16   answering because she can't take two people
17   at the same time.
18          Another important rule is that
19   if there is anything that you do not
20   understand about the question that I asked,
21   it is very important that you tell us that
22   you did not understand, okay?  Do you
23   understand that?
24   A.  Yes, correct.
25   Q.  If I ask a question and you
```

Page 6

```
 1            F. FRANCOIS
 2  answer and you did not say that you did not
 3  understand, do you agree it would be fair
 4  to assume that you did understand the
 5  question?
 6         MR. KESHAVARZ:  Objection to
 7     form.
 8     Q.   You can answer.   You can
 9  answer the question.
10         MR. KESHAVARZ:  When I say
11     "objection to form," you do not have
12     to worry about what that means.  You
13     can go ahead and answer the question,
14     unless I tell you not to answer.
15         So I made an objection to the
16     form, and you can go ahead and answer
17     the question.
18     A.   Okay.  Thank you.
19         MR. GOODMAN:  Can you read back
20     the question, please, Ms. Court
21     Reporter?
22         (Whereupon, the referred to
23     question was read back by the
24     Reporter.)
25         MR. KESHAVARZ:  Objection,
```

Page 7

```
 1            F. FRANCOIS
 2     form.
 3     Q.   Go ahead, you can answer.
 4     A.   Yes.
 5     Q.   Are you on any medications
 6  today that might affect your ability to
 7  testify accurately?
 8     A.   No.
 9     Q.   Have you had any alcohol in the
10  last 24 hours, drank any alcohol?
11     A.   No.
12     Q.   Okay.  Smoke any marijuana?
13     A.   No, none of them.
14     Q.   Any illegal drugs in the last
15  24 hours?
16     A.   No.
17     Q.   Okay.  Where were you born Ms.
18  Francois?
19     A.   I was born in Haiti.
20     Q.   What is your native language?
21     A.   French.
22     Q.   Would that be French Creole.
23     A.   Yeah, French Creole.
24     Q.   Okay.  And when did you first
25  arrive in the United States?
```

Page 8

```
 1            F. FRANCOIS
 2     A.   It was in 2013, November of
 3  2013, yes.
 4     Q.   And what is your current
 5  citizenship status?
 6     A.   Resident.  I have my green
 7  card.
 8     Q.   Okay.  What is the date you got
 9  your green card?
10     A.   I got my green card last year.
11     Q.   What was your status before
12  that?
13         MR. KESHAVARZ:  Objection,
14     form.
15     A.   I had a work authorization,
16  just to work in the United States.
17     Q.   Work authorization.  Did you
18  have any specific visa status?
19     A.   Yes, I had visa.  I had visa.
20     Q.   Okay.  When you arrived in the
21  United States in November of 2013, have you
22  stayed in the United States ever since
23  then?
24     A.   Yeah.
25     Q.   You never went back to Haiti?
```

Page 9

```
 1            F. FRANCOIS
 2     A.   I went to visit this year,
 3  yeah.  It was in February.
 4     Q.   Okay.  Had you ever been in the
 5  United States before November of 2013?
 6     A.   I'm sorry.  Say that again.
 7     Q.   Have you been to the United
 8  States before November of 2013?
 9     A.   Yes, I come to visit two times
10  before I decided to stay.
11     Q.   Okay.  And when you arrived,
12  you arrived in the United States on
13  November 7, 2013?
14     A.   Yes.
15     Q.   And, in fact, you arrived at
16  Kennedy Airport?
17     A.   Yes.
18     Q.   And you were arrested at
19  Kennedy Airport, correct?
20         MR. KESHAVARZ:  Objection to
21     form.
22     A.   Yes.
23     Q.   And you had nine-and-a-half
24  kilograms of cocaine in your bag at the
25  time?
```

3 (Pages 6 - 9)

F. FRANCOIS

1
2      MR. KESHAVARZ:  Objection to
3   form.
4      A.   My friend had the suitcase.
5   The case was dismissed, it was not mine.
6      Q.   That was not your bag?
7      A.   No.  This is the reason they
8   dismissed the case.
9      Q.   Have you ever been convicted of
10  a crime?
11     A.   Never.
12     Q.   The address you gave on 719
13  West 180th Street, how long have you lived
14  at that address?
15     A.   I just have like six months
16  living here.  It is my aunt's.  She just
17  had her husband dead.  Her husband died.
18  And I just come here and move in at --
19  (Indiscernible.)
20     Q.   Wait.  Say that again, please.
21     A.   145 West 111th Street, New
22  York, New York, Apartment 8.
23     Q.   So your testimony is that you
24  have been staying at the address on
25  West 180th Street for six --

F. FRANCOIS

1
2      A.   Because I am a nurse and my
3   auntie, she is sick, and I am taking care
4   of her.
5      Q.   You have to let me finish
6   first.  That's one of those rules.
7      A.   Okay.
8      Q.   Prior to staying with your aunt
9   at West 180th Street you were living at 145
10  West 111th, is that your testimony?
11     A.   Yes, sir.
12     Q.   And what is your aunt's name?
13     A.   Say that again.
14     Q.   The name of your aunt?
15     A.   Jidal Anicette.
16     Q.   Can you spell that for the
17  court reporter, please?
18     A.   Jidal, J-I-D-A-L, Anicette,
19  A-N-I-C-E-T-T-E.
20     Q.   And the other address you just
21  gave us, 145 West 111th Street, how long
22  did you live there?
23        Are you saying that is actually
24  your current address?
25     A.   Since I came to America, before

F. FRANCOIS

1
2   I moved to my husband, finally moved to my
3   husband, this is where I used to live.  And
4   I am still living here.
5      Q.   Okay.  Where do you receive
6   mail?
7      A.   My mail?
8         MR. KESHAVARZ:  Objection to
9      form.
10     A.   Now I receive my mail at 145
11  where I am living.
12     Q.   How long have you lived there?
13     A.   Since I come to America, I was
14  living there.  And when I get married in
15  2018, I moved with my husband in Brooklyn.
16     Q.   In Brooklyn?
17     A.   Yes.
18     Q.   Currently, who do you live
19  with, who resides at 145 West 111th?
20     A.   My uncle's mom, my grand auntie
21  live in there, and my other uncle live
22  there.
23     Q.   What are there names, please?
24     A.   My uncle, Papito Momplaisir.
25     Q.   Spell that for the court

F. FRANCOIS

1
2   Reporter.
3      A.   Papito, P-A-P-I-T-O, last name
4   Momplaisir, M-O-M-P-L-A-I-S-I-R.
5      Q.   Okay.  Now you said there is
6   another uncle that lives there?
7      A.   Yes.  My other uncle is living
8   there.
9      Q.   What is his name?
10     A.   Gregory, G-R-E-G-O-R-Y, last
11  name Momplaisir, M-O-M-P-L-A-I-S-I-R.
12     Q.   Okay.  And then I think you
13  said a third person lives there?
14     A.   Yeah.  It is my grandmother.
15     Q.   From the time you arrived in
16  the United States, you lived at that
17  address November 2013 at 145 West 111th,
18  and you lived there straight through until
19  2018 when you got married and you moved to
20  Farragut --
21     A.   Yes, correct.
22     Q.   And then when did you move out
23  of Farragut Road and back to 145
24  West 111th?
25     A.   I moved -- I moved definitely

1         F. FRANCOIS
2 moved there in 2020.
3     Q.   You moved out of there, out of
4 Farragut Road in 2020?
5     A.   Yes.
6     Q.   What month?
7     A.   It was December or November.
8 I don't really remember which month it was.
9     Q.   Okay.  I am going to ask you
10 some more about that later.
11        Let's go to that Farragut Road
12 address when you moved in there in 2018.
13        Do you remember the month of
14 the year that you moved?
15     A.   Yes, it was after my birthday.
16     Q.   So that's sometime after
17 May 30th of that year?
18     A.   It was May 31, 2018.
19     Q.   Okay.  Who lived there when you
20 moved in there?
21     A.   My husband, his mom, his dad,
22 his grandma.  His grandmother lived on the
23 first floor with her auntie.  And then when
24 I moved there, grandfather was living
25 there.  He was living there with his

1         F. FRANCOIS
2 grandma on the first floor.  His auntie
3 also lived on the first floor.  And another
4 auntie on the second floor.
5        And we lived with his mom.  It
6 was three bedroom.  And his mom was close
7 to the kitchen.  And my husband and I was
8 in the second one.  And the last room in
9 the corner was Emmanual Laforest room.
10     Q.   Emmanual Laforest?
11     A.   Yes.
12     Q.   That is your husband's brother?
13     A.   Yes.
14     Q.   And so he had a bedroom in that
15 house, correct, Emmanual Laforest?
16     A.   He had a bedroom.  Like he
17 never had a bedroom.  We was planning to
18 rent the room.  Since I moved in, I never
19 met him.  He was coming at 2:00 a.m.,
20 3:00 a.m. in the morning; he was already
21 gone.
22     Q.   When you moved out in late
23 2020, as you said, who lived in that
24 address, at that address on Farragut Road?
25     A.   It was still his mom, his dad,

1         F. FRANCOIS
2 all of his family was there because after I
3 had a big fight with my husband about what
4 he did, and then his family.  And then
5 after that I was scared because he was
6 telling me it was not going to stay like
7 that.
8        MR. KESHAVARZ:  Just one
9     second.
10        (Whereupon, an off-the-record
11     discussion was held.)
12     Q.   You used the words, and you
13 will correct me if I am wrong, "it's not
14 going to stay like that."  What did you
15 mean by that?
16     A.   Because I was telling my
17 father-in-law that I have to go to the
18 police because he has been -- he never told
19 me how he got my social, and I said I have
20 to go to the police for that.  And he said
21 if I go to the police and he gets arrested,
22 it is not going to stay like that.
23        Even my husband and my
24 grandfather-in-law was agreeing to go back
25 to my uncle.  Since he was living in the

1         F. FRANCOIS
2 street, they do not know what he was going
3 to do with me when I come back in after
4 work.
5     Q.   You said something about living
6 in the street.  Who was living in the
7 street?
8     A.   Basically, we say that he was
9 living in the street because he was never
10 in the house.  He never come in the house.
11 We never saw him.  If you ask him if he saw
12 me when he was there, he will tell you no.
13 He was not in our wedding or anything.
14     Q.   Who, are you talking about,
15 Emmanual Laforest?
16     A.   Yes.
17     Q.   So you had a fight with your
18 husband.  What is your husband's name?
19     A.   I was fighting with my husband
20 because that's not the first time -- when
21 my husband was explaining to me that was
22 not the first time he did that to someone,
23 and he was one that was paying.
24        And then I said to my husband
25 how could you keep it to you.  Emmanual

Page 18

```
1              F. FRANCOIS
2  needs to be in jail.  He could kill someone
3  and they would think it is me because the
4  card, it is in my name.
5         MR. GOODMAN:  I will move to
6      strike the non-responsive portion.
7     Q.   My question is, what was your
8  husband's name?
9     A.   Stanley Laforest.
10    Q.   And so when you were married on
11  -- when were you married?  What is the
12  date?
13    A.   June 14, 2018.
14    Q.   Okay.  And are you now
15  divorced?
16    A.   No, we are still married.  We
17  are trying to build our relationship.  He
18  was trying.
19    Q.   Have you seen a lawyer, either
20  one of you seen a lawyer about the
21  situation?
22    A.   He want me to do that, but it
23  just like, I don't believe in telling other
24  people our story.  We can just figure out
25  our stuff by ourself.
```

Page 19

```
1              F. FRANCOIS
2     Q.   So let's go back to that
3  address on Farragut Road.  I think you
4  described three different floors or levels
5  in the house?
6     A.   It is three floors.
7     Q.   Is it like a brownstone?
8     A.   It is a house, but house is
9  three floors.  It is no elevator.  It is
10  stairs.  You go to grandma, then auntie,
11  then the last one you go to us.
12    Q.   And is there anybody, other
13  than that group of people you described
14  that was living in that same building if
15  it's a different entrance or --
16    A.   No.  Only one entrance.
17         MR. KESHAVARZ:  Objection to
18      form.  Go ahead.
19    Q.   You can answer.
20    A.   Only one entrance is that.
21    Q.   Okay.  And was there a mailbox
22  at that building?
23    A.   Yes.
24    Q.   Where was the mailbox?
25    A.   The mailbox is just one.  The
```

Page 20

```
1              F. FRANCOIS
2  guy comes to deliver for us.  Sometimes
3  they give to grandma.  Sometimes it is
4  little box that's very small he put it.
5  But if it was in the morning he give it to
6  grandma or grandpa if they was there.
7     Q.   That little box, did it have a
8  lock on it?
9     A.   No.
10    Q.   Okay.  Did you receive mail
11  addressed to you at that address?
12         MR. KESHAVARZ:  Objection,
13      form.
14    Q.   You can answer.
15    A.   Yeah, my driver's license, all
16  of my things is there.  Still have the
17  address and everything.
18    Q.   All right.  Did you -- do you
19  have any children?
20    A.   No, I am just pregnant.
21    Q.   You are pregnant now?
22    A.   Yes.
23    Q.   Congratulations.
24    A.   Thank you so much.
25    Q.   If I can ask, who is the
```

Page 21

```
1              F. FRANCOIS
2  father; is it Stanley?
3     A.   Can I speak to my lawyer first?
4         MR. KESHAVARZ:  Do you need to
5      ask?
6     Q.   What did you say before that?
7     A.   Say that again.
8     Q.   You gave an answer before your
9  lawyer said anything.
10    A.   I said, I need to speak to my
11  lawyer.
12         MR. KESHAVARZ:  Do you need to
13      go into this?  It's personal.
14    Q.   How many months pregnant are
15  you?
16    A.   I just turned six months today.
17    Q.   Can you tell us Stanley
18  Laforest's date of birth?
19    A.   Definitely.  He is born on
20  REDACTED          t one year before me.
21    Q.   Where does he live now?
22    A.   Still living in Brooklyn.
23    Q.   Same address, Farragut Road?
24    A.   No, he is not living there.
25    Q.   Do you know his current
```

6 (Pages 18 - 21)

Page 22

F. FRANCOIS

1  address?
3  A. He is living with his friend
4  now. We are trying to get everything back
5  to do our stuff.
6  Q. What is the address, the street
7  address where he lives now?
8  A. He is living in Canarsie.
9  Q. Do you know the street address?
10  A. Canarsie.
11  Q. Do you know the name of the
12  street or the building?
13  A. No, because most of the time he
14  is coming here. I do not go to Brooklyn.
15  Q. He comes to you in Manhattan?
16  A. Yeah. And he is in school,
17  also, too.
18  Q. When is the last time you saw
19  him?
20  A. Last time it was on Saturday.
21  We went to my goddaughter's birthday.
22  Q. Okay. Up until the time you
23  came to the United States, you lived in
24  Haiti; is that correct?
25  A. Yes.

Page 23

F. FRANCOIS

2  Q. Okay. What town in Haiti was
3  it?
4  A. I used to live in Delmas, 95
5  Street.
6  Q. Is that Port-au-Prince?
7  A. Yes, Port-au-Prince.
8  Q. Okay. Let me ask you, do you
9  have a current New York State driver's
10  license?
11  A. Yeah, I do have my driver's
12  license.
13  Q. Do you have it with you?
14  A. Yeah.
15  Q. Can you read the number into
16  the record, the driver's license number?
17  A. My driver's license number?
18  A. Yes.
19  A. REDACTED
20  Q. When did you first obtain --
21  strike that.
22  Did there come a time that you
23  obtained a learner's permit for driving in
24  New York?
25  A. Yeah.

Page 24

F. FRANCOIS

2  Q. When was that?
3  A. I don't remember.
4  Q. Okay.
5  A. I don't remember when I got my
6  permit, and then my license. I really
7  don't remember.
8  Q. Okay. And when did -- well,
9  when did you first get a license, not a
10  learner's permit, but an actual driver's
11  license?
12  A. It did not take me long to get
13  the driver's license after I got my permit
14  because after I passed, then I went to
15  driving school and take some class, some
16  learning. And then after that, I go take
17  the test and pass. I don't remember.
18  Q. If I told you it was 2016,
19  would that refresh your recollection?
20  A. I think so, something like
21  that, '16.
22  Q. Okay. So did there come a time
23  that you applied for a new driver's license
24  from the State of New York in 2020 or maybe
25  late 2019?

Page 25

F. FRANCOIS

2  A. 2020, because my driver's
3  license was expired, and I went to
4  Department of Motor Vehicles to get a new
5  one.
6  Q. And the driver's license you
7  had before you went to get the new one, it
8  was a Class D license, correct?
9  A. Yes. It was a Class D license.
10  Q. Okay. And the driver's license
11  you have now, the one you got in 2020 was a
12  Class C license, correct?
13  A. Correct.
14  Q. Why did you change from Class D
15  to Class C?
16  A. The reason that I changed to
17  Class D, I was planning to do Uber. I was
18  planning to do Uber driving with my car
19  back then. And then they say to me you
20  have to change to do. With Class D you
21  can't do it, to work with limousines,
22  things like that. You have to get Class E
23  [sic], and that is the reason that I
24  changed.
25  Q. Okay. So you were going to be

7 (Pages 22 - 25)

F. FRANCOIS

1  F. FRANCOIS
2 an Uber driver. Did you ever drive for
3 Uber or Lift or anything --
4      A.   No, because the school did not
5 give me time. I was in nursing school at
6 that time.
7      Q.   Okay. Did you -- the license
8 that you applied for in 2020 when you went
9 to change it from D to E, did you receive
10 that -- did you actually receive that
11 license?
12     A.   No. They mailed it to me with
13 my title. It was both my driver's license
14 and my title. And it was in March for
15 COVID, which I went there to do it because
16 you have to take the appointment online. I
17 went there and did it. And they said I
18 will receive it by April or May because a
19 lot of people have appointments. I never
20 received it by July. I went there and said
21 I need my title because I can't drive
22 without the new title. And they said they
23 sent it to me. I know I never received.
24          And the woman said, yes, you
25 received it with your license. And I said

1  F. FRANCOIS
2 I did not receive that. And they say said,
3 okay, we are going to do another copy to
4 you, but definitely we sent it to the
5 address.
6      Q.   And that address was Farragut
7 Road?
8      A.   Yes, correct.
9      Q.   And you mentioned the title,
10 you said you have the title?
11     A.   Yeah, for my car.
12     Q.   What title are you referring
13 to?
14     A.   Nissan Rogue 2010. I still
15 have it.
16     Q.   When did you purchase the
17 Nissan Rogue 2010?
18     A.   I purchased that in 2020. It
19 was January of 2020.
20     Q.   And when you were planning to
21 be an Uber driver, were you going to drive
22 the Nissan Rogue 2010?
23     A.   No. I was about to drive my
24 uncle's car because my uncle was about to
25 do that.

1  F. FRANCOIS
2      Q.   Your uncle was about to do
3 what?
4      A.   Was about to give me his car to
5 do Uber, and then to do everything with the
6 Uber.
7      Q.   Which uncle was that?
8      A.   Papito Momplaisir.
9      Q.   What kind of car did he have?
10     A.   He has a Toyota.
11     Q.   Okay. In the Farragut Road
12 house, how many, if any, people in that
13 house had a car available to them?
14          MR. KESHAVARZ: Objection to
15     form.
16     A.   My husband, me -- my husband
17 and me.
18     Q.   So your husband had his own
19 car?
20     A.   Yes, he has his own car.
21     Q.   What about Emmanual Laforest?
22          MR. KESHAVARZ: Objection to
23     form. Go ahead. You can answer.
24     A.   Emmanual, I can't tell you
25 about his car because I never -- he never

1  F. FRANCOIS
2 tell me. Ever saw me one day. He was
3 never there. Even when his daddy was in
4 the hospital, he never come in.
5      Q.   So while you -- you got that
6 car, when did you say? Sorry, the Nissan
7 Rogue 2010, you bought in January 2020?
8      A.   Yeah.
9      Q.   So you never got -- your
10 testimony is you received the driver's
11 license, the new driver's license, Class E
12 driver's license in the mail, correct?
13     A.   I never received in my hand,
14 but they sent it in the mail.
15     Q.   Okay. But during the time that
16 you were waiting for it to arrive, you
17 still had your old driver's license,
18 correct?
19     A.   Yes.
20     Q.   All right. And just tell me
21 how -- where did you drive back -- we are
22 talking about late 2019 into 2020. How
23 were you using your car? I guess you
24 bought it January 2020, so --
25     A.   I did not use the car for 2019,

Page 30

F. FRANCOIS

1
2 I was using train from Brooklyn, come to
3 42nd Street, and then go to my job because
4 I used to work in TD Bank. I used to do
5 customer service.
6      Q.   But as of January 2020, you
7 bought the Nissan Rogue, right?
8      A.   Yes.
9      Q.   What did you use that car for?
10     A.   I used the car to go to work,
11 go to my house, go to back and forth to
12 work, and then for my house.
13     Q.   Did you say back and forth to
14 work?
15     A.   Work, go to my home. Sometimes
16 I go to New Jersey for the school because I
17 was in nursing school.
18     Q.   Okay. So during that time you
19 were using the driver's license you had
20 since 2016, right?
21     A.   During this time when I got my
22 car, it take me time to do the process to
23 do everything for the car. I drive that,
24 yes, and by March, yeah, February, March
25 because my husband used to drive it before.

Page 31

F. FRANCOIS

1
2      Q.   I am talking about the driver's
3 license, your license you drove with when
4 you went out to drive to New Jersey or
5 drive to work and back. You had the
6 license that you got in 2016, correct?
7      A.   Yeah, I got the license in
8 2016, yeah.
9      Q.   So if you -- strike that.
10         That license that you got in
11 2016 that you were using after you bought
12 the Nissan Rogue, where did you keep that
13 license? Was it in a purse, a wallet? You
14 tell me.
15     A.   I still have it here because
16 all of my old license stay with me here in
17 the wallet.
18     Q.   If that license we are talking
19 about, the license from 2016 had been taken
20 out of your wallet, you would have known
21 that, correct?
22         MR. KESHAVARZ:  Objection to
23     form.
24     A.   Yeah.
25     Q.   When you went back to the DMV

Page 32

F. FRANCOIS

1
2 when you said I never got the license, you
3 went back in July to get the license, you
4 also got a Class E license, correct?
5      A.   Yes.
6      Q.   So were you still planning to
7 drive for Uber in July of 2020?
8      A.   Yeah. I was planning to still
9 drive for that, yes.
10     Q.   Okay. But your testimony is
11 you never drove for Uber or Lift or any
12 other --
13     A.   No.
14     Q.   You have to let me finish.
15         -- or any other delivery
16 services?
17     A.   No.
18     Q.   Okay. Can you tell us what
19 your highest level of education is?
20     A.   Associated degree. And now I
21 am doing my master.
22     Q.   From what did you -- from what
23 institution did you receive your degree?
24     A.   Accounting.
25     Q.   But what school?

Page 33

F. FRANCOIS

1
2      A.   It is in Haiti.
3      Q.   What is the name of it?
4      A.   The name of the school?
5      Q.   Yes.
6      A.   Business Institute of the West
7 Indies.
8      Q.   What year did you receive that
9 associate degree?
10     A.   2010, 2011.
11     Q.   Okay. And after that have you
12 received any other degree from any other
13 educational institution?
14     A.   Yes, from my nursing Hope
15 College.
16     Q.   Your nursing, where was that,
17 in Haiti or the United States?
18     A.   No, in Miami. I took the class
19 online.
20     Q.   Class online?
21     A.   Hope College.
22     Q.   Have you lived anywhere in the
23 United States other than New York City?
24     A.   No.
25     Q.   So you got a degree from Hope

9 (Pages 30 - 33)

Page 34

```
1           F. FRANCOIS
2  College?
3      A.   I got a diploma, LPN, licensed
4  practical nurse.
5      Q.   Licensed practical nurse?
6      A.   Yes.
7      Q.   Okay.  And have you ever worked
8  as a licensed practical nurse?
9      A.   Yes, this is what I do.  I am
10 just coming from work.
11     Q.   Just now?
12     A.   Yeah. I am working for Bronx
13 Care Hospital.
14     Q.   Bronx Care?
15     A.   Yeah, Bronx Care Hospital.
16     Q.   Okay.  When did you get that
17 degree, what year?
18     A.   Last year.
19         MR. GOODMAN:  I need just one
20     minute.  I'm sorry.
21         (Whereupon, an off-the-record
22     discussion was held.)
23     Q.   Let's go through your
24 employment history.  So when you came to
25 the United States, where were you first
```

Page 35

```
1           F. FRANCOIS
2  employed?
3      A.   I was working Gary Null's
4  Uptown Whole Food.
5      Q.   And what is Gary Null's Uptown
6  Whole Food?
7      A.   It is a whole food store and he
8  licensed -- has his own organic produce,
9  like vitamins.
10     Q.   When did you first become
11 employed by Gary Null's Uptown Whole Food?
12     A.   It was January 2014.
13     Q.   So within a month after you got
14 here?
15     A.   Yeah.
16     Q.   Okay.  And what was your
17 position there?
18     A.   I started as a cashier, and
19 then assistant, and then store manager.
20     Q.   Okay.  And when did you leave
21 the employment of Gary Null's Whole Food?
22     A.   I leave Gary in 2018 to work
23 for TD Bank.
24     Q.   Okay.  Why did you leave?
25     A.   Because I was working for a
```

Page 36

```
1           F. FRANCOIS
2  better thing.
3      Q.   Better opportunity?
4      A.   Yes, better opportunity.
5      Q.   More money?
6      A.   Not about money, but more
7  opportunity because I was going to try to
8  do what I learn in my country about
9  accounting.
10     Q.   Okay.  So do you remember the
11 month of 2018?
12     A.   No, I don't remember the month
13 when I left Gary.
14     Q.   Did you leave on good terms, or
15 did he fire you?
16     A.   Yes, good terms.
17     Q.   Is that establishment still in
18 business?
19     A.   Yes.  They are on 89th Street
20 and Broadway, 2421 Broadway and 89th
21 Street.
22     Q.   You said you left and you went
23 to TD Bank?
24     A.   Yes.
25     Q.   When were you first employed by
```

Page 37

```
1           F. FRANCOIS
2  TD Bank?
3      A.   I am employed by TD Bank on
4  September 2018, yeah.  It was 2018.
5      Q.   What was your position at TD
6  Bank?
7      A.   I was a teller, and then I
8  become teller II, and then after that, I
9  become customer service representative.
10     Q.   What was the last --
11     A.   Customer service
12 representative.
13     Q.   Representative?
14     A.   Yeah.
15     Q.   Okay.  How long did you work at
16 TD Bank?
17     A.   I just left TD last year after
18 my graduation.
19     Q.   That is after your graduation
20 from Hope College?
21     A.   Yes, when I graduated from the
22 nursing and I decided to go into health
23 care.
24     Q.   So when was your graduation?
25     A.   My graduation was in
```

10 (Pages 34 - 37)

Page 38

1       F. FRANCOIS
2  November 2020.
3       Q.   And that is when you left TD
4  Bank, around there?
5       A.   I left TD after that in
6  December.
7       Q.   And what is your next
8  employment after TD?
9       A.   After TD Bank, I was working as
10  a nurse.  I was working for Fairview Center
11  and then Bronx Care.
12       Q.   Did you say Fairview Center?
13       A.   Fairview Center Nursing Care.
14       Q.   Okay.
15       A.   And then Bronx Care Health
16  System Hospital.
17       Q.   Okay.  So let's go back to TD
18  Bank.  Did you work in a specific branch?
19       A.   Yes, at 158th and Broadway.
20  3798 157th Street, New York, New York.
21       Q.   Okay.  And were you ever
22  subject of discipline there?
23       A.   No.
24       Q.   Okay.  Customer complaints
25  about you, were there any?

Page 39

1       F. FRANCOIS
2       A.   No.
3       Q.   Okay.  Now, you then went, you
4  said, to Fairview Center Nursing Care --
5       A.   Yes, I am still working for
6  them.  I am doing part-time.  I used to do
7  full-time, but when I got the new job for
8  the hospital.  I am working for them
9  part-time.
10       Q.   But for a while, you were
11  working for them full-time?
12       A.   Yeah, full-time.
13       Q.   When did that change to
14  part-time?
15       A.   Just like two months,
16  September it was two months.
17       Q.   So what do you do for
18  them?  What are your duties and functions?
19       A.   Do wound care, give medication,
20  take care of my patients, give them like
21  vitamins, IV fluid, and then if they have
22  any...
23       Q.   Do you have one patient you're
24  assigned to or --
25       A.   No, I got 42 patients.

Page 40

1       F. FRANCOIS
2       Q.   42 patients?
3       A.   Yeah.
4       Q.   That's currently?
5       A.   Yeah, it's a nursing home.
6       Q.   It is a nursing home?
7       A.   Yeah.
8       Q.   What is the address of that
9  nursing home?
10       A.   Fairview is 6970 Grand Central
11  Parkway, Forrest Hill Queens, New York.
12       Q.   And you said earlier in this
13  deposition that you just came from work
14  there?
15       A.   No.  Not from Fairview.  From
16  Bronx care.  I even took myself -- this is
17  my customer gave it to me today because
18  today is six months.
19       Q.   Did you work an overnight
20  shift?  What are your hours of work?
21       A.   For Fairview sometimes I work
22  3:00 to 11:00, and then from Bronx Care, I
23  work 12:00 to 8:30.
24       Q.   So you're basically working --
25  is your testimony you are working from

Page 41

1       F. FRANCOIS
2  3:00 p.m. to 8:30 a.m.?
3       A.   Yeah.  But for Fairview, like
4  yesterday, I work 3:00 to 11:00.  And then
5  today I take off because my lawyer was
6  telling me I have to be up.  But at 12:00,
7  I have to go to Bronx to work.
8       Q.   At midnight, 12:00?
9       A.   Yeah.  Midnight, 12:00 to 8:30
10  in the morning.
11       Q.   Okay.  So, basically, you are
12  working two different jobs at the same
13  time; is that fair, or you tell me?
14       A.   It is fair because Fairview I
15  just give them three days - Monday,
16  Wednesday, Saturday.  Sometimes I give them
17  Monday, Tuesday, Wednesday.
18       Q.   Okay.  All right.  I want to
19  ask you some questions about Emmanual
20  Laforest.  You told us some things about
21  him already, but I want to ask you some
22  more.
23       A.   Sure.
24       Q.   When did you first meet him?
25       A.   I meet him from this January

11 (Pages 38 - 41)

1          F. FRANCOIS
2 because I was about to call the police for
3 him again, he keep my green card.
4     Q.    He what?
5     A.    He kept my green card.
6     Q.    He kept your green card?
7     A.    Yes.
8     Q.    How did he get your green card?
9     A.    Because my address is still
10 there. And my lawyer called me and said
11 you never received the green card. I said
12 I never received it. Since last year I
13 never receive it. They said okay, go to
14 the post office. Post office said, they
15 deliver it. They gave to tall black guy,
16 skinny. Called my husband and he said we
17 are going to call the police and we are
18 going to know who has the green card, which
19 is by the time he is coming and I go to
20 talk to grandma. And I said to him, you
21 have my paper. He said, no, I do not have
22 your paper. And I said you go to the
23 police. They are going to find out if he
24 have mine. Then he said, okay, I think I
25 put it upstairs. Let me check that. That

1          F. FRANCOIS
2 was in January.
3     Q.    January of 2022, this year?
4     A.    Yes.
5     Q.    Okay. When is the first time
6 you met Emmanual Laforest?
7     A.    This is the first time he saw
8 me eye-for-eye. I never met him.
9     Q.    You never saw him before
10 January of this year?
11    A.    No. I just saw him in pictures
12 and grandma was showing me the picture of
13 him. And then I was listening that he was
14 in jail in 2018 and he is coming out in 2019.
15 I never saw him.
16    Q.    Okay. When did you -- I think
17 you said your grandma told you --
18    A.    His grandma, but I call her
19 "grandma."
20    Q.    Grandma told you he Was in jail
21 in 2018 and he was coming out in 2019?
22    A.    He was in jail for lot of
23 things, which I found out from the court
24 also. Brooklyn court was telling me this
25 is not the only case he has. He has other

1          F. FRANCOIS
2 cases he has to go.
3     Q.    And when did grandma tell you
4 that?
5     A.    When I was like just going
6 there and asking grandma I would like to
7 meet all of the family. She said don't
8 count on that. You will not see him here.
9 Most of us do not want that because he
10 always in trouble with the cops.
11    Q.    So that's like 2018 that you --
12    A.    Yeah, 2018 she was telling me
13 that.
14    Q.    All right. So as of that time
15 you already knew that he was a convicted
16 criminal, right?
17    A.    To tell you the truth, the
18 family not telling me about stories, but
19 they said he has a problem with cops for
20 basically child support, things like that.
21 That is why they was telling me. They
22 never told me he was a criminal. I would
23 never marry his bother.
24    Q.    But they said he was in jail,
25 right?

1          F. FRANCOIS
2     A.    For child support saying he
3 never paid his child support. Grandma was
4 telling me stories.
5     Q.    Did he ever have children that
6 lived at the Farragut Road address?
7     A.    No, never even his girlfriend.
8 He never brought there.
9     Q.    So there came a time that you
10 said -- that was January of this year you
11 said you were going to call the police
12 about the green card, right?
13    A.    Mm-hm.
14    Q.    You have to say "yes" for the
15 record?
16    A.    Yes.
17    Q.    Before January of this year did
18 there come a time that you went to the
19 police about Emmanual Laforest?
20    A.    Yes.
21    Q.    When was that?
22    A.    It was in September when I find
23 out that he -- I found out about the title,
24 receiving the title in my name.
25    Q.    Okay. And did you talk to him

F. FRANCOIS

1
2 before you went to the police?
3    A.   On the phone, over the phone,
4 yeah.
5    Q.   So when is the first time you
6 ever talked to Emmanual Laforest on the
7 phone?
8    A.   Okay.  The first time I spoke
9 to him over the phone was when I find out
10 about the title.  The first person I call,
11 I called my husband.  I said did you buy a
12 car?  He said no, why would I need the car?
13 I said I received the title, but the title
14 have address and they send to that address.
15 I did not buy a BMW.  I did not need a car.
16 And he said you are sure you did not.  I
17 said no.
18          Grandpa give me the mail, ask
19 grandpa.  And he asked grandpa and find out
20 which is after that they find out that
21 Emmanual have a BM.  And he called me.
22 She said Emmanual has a BM, but Emmanual
23 does not have access to your things.  How
24 could he have your social and your social
25 is in your hand and ID?  I said okay, find

F. FRANCOIS

1
2 out.
3          When grandpa asked him, he said
4 no, he did not.  I said I am going to the
5 police now, even though it is already
6 10:00 p.m.  I am going to the police now.
7 I am not coming to the house, and I am
8 staying in my friend's house.  Grandpa call
9 him and said Farah is going to the police;
10 we have to find out if this is you.  And he
11 called me, grandpa phoned telling me he was
12 doing something, and he was going to remove
13 my name telling my another story.
14          MR. GOODMAN:  So I move to
15       strike the nonresponsive portions.
16    Q.   So if Emmanual Laforest
17 testified under oath in this case that he
18 had a conversation with you around
19 June/July of 2020, is that accurate?  Is he
20 telling the truth?
21    A.   No, he is not telling the
22 truth.  I was in 145 for COVID.
23    Q.   For COVID?
24    A.   Yeah, this period was for
25 COVID-19.

F. FRANCOIS

1
2    Q.   When did you leave Farragut
3 Road and start staying at 145?  In 2020?
4    A.   I live definitely it was in
5 2020 after I got in fight with the family
6 after what Emmanual did.
7    Q.   I know, but you said, if I
8 understand you correctly, you said you were
9 staying at 145 because of COVID?
10    A.   Because my asthma was getting
11 bad and grandpa had COVID on the first
12 floor.  I could not stay on the first
13 floor.  I went to my uncle for a week or
14 two weeks, I think, for COVID.  Because
15 every night I having problem breathing with
16 my asthma.  My family was scared I got the
17 COVID.
18    Q.   When were those one or two
19 weeks that you when the to 145 in 2020?
20    A.   That was before we celebrate
21 rate our -- before my birthday.  That was
22 before my birthday.  That was in May.  It
23 was the flag of Haiti.  It was May 18th.
24    Q.   The flag of Haiti?
25    A.   That is -- May 18th is like the

F. FRANCOIS

1
2 date of the flag of Haiti.
3    Q.   Okay.  So back to the question.
4 So Emmanual Laforest testified that in June
5 or July had he a conversation with you
6 about the BMW; is that true?
7    A.   No, never.
8    Q.   Okay.  And if Emmanual Laforest
9 testified that in that conversation with
10 you about the BMW he told you that he was
11 going to pay it off by December and you
12 said you were cool with that, did that
13 happen?
14    A.   No, never.  I never said that
15 to him.
16    Q.   Okay.  When is the first time
17 you had a conversation with him about the
18 BMW?
19    A.   It is the date that I find out
20 about the paper when his dad called him he
21 has to come to the house because he has to
22 talk to Farah because Farah is about to go
23 to police, which is he come.  It was 11:00
24 something and then he called me.  I was in
25 Canarsie see with my friend's house.  And

13 (Pages 46 - 49)

Page 50

F. FRANCOIS

1        F. FRANCOIS
2   then he called me and he said, hi, I have
3   Emmanual. I'm sorry I lie to my dad. Yes,
4   it was me using your information.
5        I said, okay, first of all, the
6   only question I want to ask you is how do
7   you have my social? Because I have my
8   social with me. They did not need your
9   social. It was only paper with your name.
10  I said no that is impossible. You can't
11  buy a car with paper, with mail. They need
12  to have my information. And then I said
13  okay, since you don't want to tell me the
14  truth, tomorrow early I am going to the
15  police, which is then you have to tell the
16  police the truth. And then after that he
17  would say yes, I got the ID. I received in
18  the mail. I keep it here and give to my
19  brother or my dad.
20     Q.   Okay, so let me stop you there.
21  I'm sorry.
22        MR. KESHAVARZ: Were you done
23     with your answer?
24        MR. GOODMAN: Well, it's
25     nonresponsive. She is giving a

Page 51

F. FRANCOIS

1        F. FRANCOIS
2   narrative response.
3        MR. KESHAVARZ: If it is or it
4     isn't, were you done? Were you done
5     with what you were going to say.
6     A.   No. I am not. 'Cause he was
7   telling me it was the first time we talk.
8   I am saying the first time we spoke was
9   about the fight about the title under my
10  name.
11     Q.   But the question was "when" was
12  that conversation.
13     A.   It was in September because I
14  find out about the title in September.
15     Q.   Okay. So if he testified he
16  had a conversation with you in June/July
17  sometime during the summer, that was a lie,
18  correct?
19     A.   Yes. That was definitely a
20  lie.
21     Q.   And if you testified that he
22  had your driver's license since 2019 and he
23  had been keeping it and meaning to give it
24  back to you, that was not true either, was
25  it?

Page 52

F. FRANCOIS

1        F. FRANCOIS
2     A.   That was not true because they
3   sent to me in March and it was expired
4   when I applied for it. And they sent to
5   me after I went to the DMV to apply for
6   that.
7     Q.   But he could have had your
8   other driver's license?
9     A.   How could have it if I had my
10  old driver's license? I have proof of
11  that. I have some here with me, and then I
12  have the rest of all of my paper inside.
13     Q.   So you would've known if he --
14  his testimony was that he found your
15  driver's license -- I'm sorry -- somebody
16  gave him your driver's license to give back
17  to you and he kept it since 2019; that is
18  not true, is it?
19     A.   That's not true.
20        MR. KESHAVARZ: Objection to
21     form. Mr. Goodman, the testimony is
22     the testimony. I don't want you to
23     represent --
24        MR. GOODMAN: Thank you.
25        MR. KESHAVARZ: If you have a

Page 53

F. FRANCOIS

1        F. FRANCOIS
2   question, you have a question.
3   You're representing his testimony,
4   and I don't know if that's accurate.
5   I don't care, but I'm --
6        MR. GOODMAN: I appreciate it.
7        MR. KESHAVARZ: You're welcome.
8     Q.   Ms. Francois, I want you to
9   assume that he testified first that someone
10  gave him your driver's license and he meant
11  to give it back to you but he couldn't give
12  it back to you because he didn't have your
13  number; is accurate? If he did testify to
14  that, is that correct?
15     A.   That is not correct. Who is
16  going to give it to him?
17     Q.   I don't know. I am only
18  representing what he testified to.
19     A.   Okay. No one would give it to
20  him. The mail box or always give to
21  grandma or grandpa.
22     Q.   I Want you to assume that he
23  testified under oath that there were
24  occasions when you would leave your
25  driver's license out in the apartment by

14 (Pages 50 - 53)

Page 54

F. FRANCOIS
1
2 the door and it was available there and he
3 came across it there; was that accurate?
4     A.   It is not accurate because the
5 mail guy, the guy was always bring the
6 mail, and he always give it to grandma or
7 grandpa or sometimes who ever is coming
8 because he knows us was living there.
9 That is when he give it to him, to give the
10 mail. He gives all the mail.
11        Him, he chose to open everybody
12 mail. Then he like grandpa pass saying he
13 open everybody mail. And he found my ID
14 and found W-2 from Whole Food. He never
15 gave it back to me. He keep it.
16    Q.   Did you have his -- in the
17 first part of the year 2020 did you have
18 his cell phone number?
19    A.   No.
20    Q.   Did he have your cell phone
21 number?
22    A.   He has my cell phone number
23 because he asked grandpa for that. When he
24 asked my husband he wanted to talk to me,
25 he asked grandpa. He said call Farah about

Page 55

F. FRANCOIS
1
2 what you are going to do with the car to
3 remove her.
4    Q.   But if he wanted to communicate
5 with you, he could have done that through
6 your husband, which is his brother,
7 correct?
8        MR. KESHAVARZ:   Objection to
9     form.
10    Q.   Correct?
11    A.   No. It is not correct. They
12 are not talking. It has been a while since
13 my husband was paying for him. It has been
14 a while. That's why my husband did not
15 invite him to our wedding or anything.
16 They are not talking at all.
17    Q.   When you and Stanley got
18 married and your husband told you -- you
19 knew he had a brother named Emmanual?
20    A.   Yeah, I know because I know his
21 mom and dad only have two boys.
22    Q.   So your husband told you we're
23 not going to invite him to our wedding?
24    A.   He did not say that. I was
25 telling all of his family is going to be

Page 56

F. FRANCOIS
1
2 there, which is something I didn't ask him
3 where is his brother because it is not like
4 it was really important. It was not a big
5 wedding. It is something we went to the
6 court. We do and after that we did a
7 ceremony between my family and his mom and
8 dad, which is who was there.
9    Q.   I thought I heard you testify
10 your husband told you he was not going to
11 invite his brother to the wedding?
12    A.   He was telling me before he
13 would never be because what he did --
14 remember, I told you before he did the same
15 thing with my husband paying for him for
16 what he did.
17        MR. GOODMAN:   Can you read that
18     back?
19        (Whereupon, the referred to
20     answer was read back by the
21     Reporter.)
22    Q.   When you say "paying for him"
23 for what he did," what did you mean?
24    A.   He was telling me after that he
25 was telling me that he got somebody's

Page 57

F. FRANCOIS
1
2 credit card or something and used that
3 person's credit card. And the fight was
4 him because of his dad. His dad had a
5 problem of heart attack. Did not want
6 his dad to get any worse. He handled all
7 of the money. He never come to the house
8 looking for him. My husband told me that
9 after that he never spoke to him.
10    Q.   Okay. So if I want you to
11 assume Mr. Laforest gave testimony in this
12 case under oath that he found your driver's
13 license on the floor on the apartment at
14 Farragut Road, is that accurate?
15    A.   That is not accurate.
16    Q.   Was he lying when he said that?
17    A.   Yeah, definitely lying.
18    Q.   Okay. I want you to assume
19 that Mr. Emmanual Laforest testified that
20 he had been paying off the car, the BMW.
21 Did he tell you that?
22    A.   No, he did not because the
23 owner of the -- the son owner tell me they
24 are going to make him bring the car back.
25 Capital one was telling me it was going to

15 (Pages 54 - 57)

Page 58

F. FRANCOIS

1
2 be more because they were never paying
3 interest. It is going to be more than
4 $29,000. If he did, that's not true.
5 That is between him and them. But they
6 never told me about that.
7     Q.   Okay. I want you to assume he
8 gave some testimony about paying off the
9 tickets that he got, the parking tickets,
10 the tolls, those tickets. If he testified
11 to that, was he lying when he said that?
12     A.   No. I have a ticket I just
13 received for the BMW that I have to go to
14 bring to court because now I am waiting for
15 them to give me all of papers to send to
16 the court and to remove my name. My name
17 is -- what is it that they call when you
18 did not pay? They send my name to -- I
19 forget what they call it. When you owe
20 money and you never pay, they then send
21 your name there. I don't remember. I
22 think I received a paper here. He never
23 paid that.
24     Q.   That's my question. Did
25 Emmanual Laforest ever pay for any of the

Page 59

F. FRANCOIS

1
2 parking tickets that were given to BMW?
3     A.   No, if he said that, they would
4 not sent them to me.
5     Q.   He may have paid one or two,
6 but not the rest?
7     A.   He may have paid one or two,
8 but he got a lot. I have all of that. I
9 give that to my lawyer. Most them he did
10 not pay.
11     Q.   You don't know if he paid any
12 though?
13     A.   I don't know because I never
14 spoke to him about that. He made someone
15 text me. After they texted me telling me I
16 blocked all of the number. The detective
17 told me to block all the number. I never
18 know anything about that.
19     Q.   What do you mean somebody
20 texted you?
21     A.   Somebody texted me. I think
22 the day they arrest him somebody texted me
23 saying you will never come back to
24 Brooklyn, which is -- I was afraid and then
25 I called the detective. He said block any

Page 60

F. FRANCOIS

1
2 number; do not answer. And I was telling
3 my husband that.
4     Q.   Correct me if I'm wrong. On
5 the day you had him arrested or thereabouts
6 somebody texts and you said you can never
7 come back to Brooklyn. Is that --
8     A.   Yes. They said that, yeah.
9 He has a lot of people calling me, and I
10 block their number calling me saying a lot
11 of bad words which is -- that is the reason
12 that made me change everything.
13     Q.   Do you know who texted you?
14     A.   I don't know, but when I say
15 that to his dad and his family asked him
16 you said you don't know which. I know it's
17 him because that is person I have a problem
18 with. I never have a problem with no one
19 in this country.
20     Q.   So you went to the police.
21 What happened next? Just tell me what
22 happened when you went to the police about
23 --
24     A.   When I went for I find the
25 title or back for what happened? Which one

Page 61

F. FRANCOIS

1
2 you want?
3     Q.   The first time you went to the
4 police.
5     A.   The first time I went to the
6 police, I went to the police, I said I need
7 to talk with someone because somebody used
8 my information. They said to me do I have
9 the proof. I said yes, I have the proof.
10 And I bring the title and then I also have
11 the paper that Capital One sent about the
12 loan that I need to pay I did not pay. And
13 then I go with them. With that, they say
14 there is a name where you buy the car.
15 The first police did not believe that.
16 They said that's strange, did you ever go
17 to that place? I said I don't know where
18 is that in Bronx because this is a place I
19 never went. They said you have to go
20 there. Pretend that you don't know -- you
21 don't want to buy the car. Ask them to
22 give you the paper where you signed because
23 it says that you are the one that went and
24 by the car. Which is what I did. After I
25 went to the police they said go there and

16 (Pages 58 - 61)

Page 62

F. FRANCOIS

1
2 then them give you the paper, come back to
3 us.
4     Q.   Okay.  I am going to go through
5 that in a minute.  So you went through that
6 with the police, and what happened next?
7 Did there come a time that you had a
8 conversation with a district attorney?
9     A.   No.  The person I went to was
10 just police who was taking my deposition
11 and everything.  And they said detective is
12 not here, but we want you to do something
13 with that.  We want you to bring us more
14 proof because the person Emmanual Laforest,
15 and you are married to his family.  That's
16 your husband's bother.  We need more proof.
17         Can I just take a break real
18 quick?
19         (Whereupon, a short recess was
20      taken.)
21     Q.   I want to go back Ms. Francois.
22 I want you to assume that Emmanual Laforest
23 testified under oath in this case he did
24 not know you were married to Stanley
25 Laforest.  Was he lying about that?

Page 63

F. FRANCOIS

1
2     A.   I can't say yes, no because I
3 never saw him, like I said to you.  Nobody
4 never knew what he was doing.  I can't say
5 to you yes or no because nobody know what
6 he was doing.
7     Q.   I want you to assume he
8 testified in terms of where you lived, and
9 specifically about Farragut Road, you
10 really just came and went there.  You did
11 not really live there.  You were just
12 coming and going there.
13     A.   Okay, that's not true.  I have
14 a picture everywhere in the house where my
15 husband's clothes was, where the bathroom
16 was.
17     Q.   One thing I am curious about,
18 you said he was never really and you also
19 said the mail would be handed to grandma or
20 grandpa or somebody.  When would he have
21 the an opportunity to steal the mail?
22         MR. GOODMAN:  Objection to
23      form.  Go ahead.
24     A.   That question I don't know how
25 he would be able to do that because only

Page 64

F. FRANCOIS

1
2 thing I can think is grandpa was telling
3 that before was one week before or two
4 weeks he always come early in the morning
5 at 6:00 a.m. 7:00 a.m. asking about did you
6 receive any mail; did you receive any mail?
7 Grandpa already had the mail, which is the
8 title.  Grandpa did not give it to him
9 because it was my name on it because that
10 is the reason he was coming early, early
11 every morning just to get the title.
12 Because I would never know that something
13 was in my name because if I did not have
14 the title I would never now know nobody did
15 that.  That is the reason, I can't tell
16 you how did he get the mail.
17     Q.   Okay.  I want you to assume he
18 testified you were only a family friend of
19 the family.
20     A.   Family friend, I married his
21 brother.  If I was a family friend -- I
22 married his brother.  We've married for
23 years married.
24     Q.   So he was lying about that too,
25 wasn't he?

Page 65

F. FRANCOIS

1
2     A.   Yes, because we married and we
3 are still married.
4     Q.   Basically, you can't believe
5 anything he says, can you?
6         MR. KESHAVARZ:  Objection to
7      the form of the question.
8         MR. GOODMAN:  Thank you.
9     Q.   You can answer.
10     A.   No.  I can't lie because most
11 of the time he is lying, but I can't tell
12 you how he gets the mail.  Then for me
13 married, a friend?  Okay.  I am a friend
14 and living with your brother and like we
15 here are now.
16     Q.   Okay.  Let's go back to you
17 went to the police, the police asked you to
18 get more documentation, correct?
19     A.   Yes.
20     Q.   And so what did you do next?
21     A.   Okay.  Next what I did was I
22 called my uncle and explained to him about
23 that, which he said find out the address
24 because I send him the picture of the deal.
25 I did not know where the dealership is.

17 (Pages 62 - 65)

Page 66

F. FRANCOIS

1
2 My uncle find out for me and my uncle also
3 called them to make appointment, which they
4 give my uncle an appointment.
5    Q.   Okay.  I'm sorry.  Your uncle,
6 when you say your "uncle," that's Papito?
7    A.   Correct.
8    Q.   Right?
9    A.   Yes.
10   Q.   How old is Papito?
11   A.   Papito is 57.
12   Q.   And he is your uncle on your
13 mother's side or your father's side?
14   A.   He is my uncle because my mom
15 and her mom's sister was cousin.  We have
16 been calling family.  In my country we
17 still call family cousin or auntie.
18   Q.   Okay.  So is he not --
19   A.   My dad and my mom, no.
20   Q.   He is not related to you by
21 blood?
22   A.   Yes.  He is related to me by
23 blood because my grandma, it was my
24 grandma's sister.
25   Q.   So he is the son of your

Page 67

F. FRANCOIS

1
2 grandma's sister?
3    A.   Yes.
4    Q.   All right.  And so go ahead.
5 He told us he made an appointment at the
6 dealership?
7    A.   Yes.
8    Q.   Okay.  And did there come a
9 time that you went to the dealership?
10   A.   I'm sorry.  Yeah.  When we got
11 the time and the date they give him the
12 hour that we have to go there.  And then we
13 went there when I went there and then I saw
14 when I went --
15   Q.   Okay, okay.  Let me just ask
16 the questions.  What is the date that you
17 went there?
18   A.   The date that I went there was
19 in September, but I don't remember the
20 specific date that I when the there.
21   Q.   Okay.  And when is the first
22 time that you spoke to anybody at the
23 dealership about this BMW situation,
24 whether it was on the phone or in person?
25   A.   The day that I went there.

Page 68

F. FRANCOIS

1
2    Q.   So before the day you went
3 there you never spoke to anybody at the
4 dealership?
5    A.   No.
6    Q.   It was Papito who called to
7 make the appointment?
8    A.   Yes.
9    Q.   So the day you when the there
10 you went with Papito?
11   A.   Yes.
12   Q.   Anyone else?
13   A.   No, me and my uncle both.
14   Q.   When you got there, did you
15 meet with anybody specifically?
16   A.   Yeah.  After I said I am here
17 to see someone to talk about the car, then
18 she called the guy who was behind her.
19   Q.   Okay.  And do you know that
20 guy's name?
21   A.   No, I don't remember that guy's
22 name.  I don't remember the guy I met.
23   Q.   Can you describe him?
24   A.   Definitely.  He was a little
25 like a little fat.

Page 69

F. FRANCOIS

1
2    Q.   Wait.  I don't know what you're
3 saying.
4    A.   I don't want to say fat.  He
5 was a Spanish guy.
6    Q.   A Spanish guy.  How long tall
7 was he?
8    A.   Not too tall because his belly
9 was big and then he was...
10   Q.   Did he have a beard?
11   A.   Yeah, he had a beard.  I
12 remember his face.
13   Q.   Did you then have a
14 conversation with him?
15   A.   Yes, because he was busy and we
16 sit and waiting, waiting.  And I was like
17 -- he was like, when he come in sorry, we
18 were really busy.  I said I want to see the
19 paper I signed because I need to do
20 something.
21   Q.   When you asked that question, I
22 need to see the papers, was Papito sitting
23 with you or was he --
24   A.   Yeah, we were both talking to
25 the guy.

18 (Pages 66 - 69)

Page 70

```
1            F. FRANCOIS
2    Q.   Were you in an office?
3    A.   No, we were inside of the
4  dealership.
5    Q.   In the showroom?  Were you
6  sitting in a chair?
7    A.   Yeah, we were sitting.  They
8  give us a chair when we come in.  We were
9  sitting.
10   Q.   And was the person you were
11 talking to behind a desk?
12   A.   No.  He came to u.  He leave
13 his desk because I was like been waiting
14 for a while.  They never come to talk to
15 us.  There were other people waiting.
16 Finally, he saw my face so mad he come to
17 me and said she said you have been waiting
18 for us.  Sorry.  I had another customer.
19       And I told him the reason I
20 come in.  And he said we can't give you the
21 paper today because we do not keep them
22 when the person finish buying the car.  It
23 is in another place.  He slowed me the
24 other place which was already closed
25 because it was 4:00, 5:00.
```

Page 71

```
1            F. FRANCOIS
2    Q.   When you came in you saw a
3  receptionist, correct?
4    A.   Yes.
5    Q.   And then from the receptionist
6  how long was it after you talked to the
7  receptionist that you talked to the person
8  you described?
9    A.   It was a while because we had
10 been sitting.  We had been sitting.  We had
11 been sitting.  I went there, it was early.
12 The appointment was early.  I think it was
13 1:30 and we end up talking to him about
14 4:00.  We had been sitting three hours.
15   Q.   During those three hours did he
16 come over and say, I know you are here, I
17 am going to talk to you later, or did he
18 just not --
19   A.   He come to us and I know you
20 are waiting, but I have other people.  I am
21 going to finish with them and I will be
22 back.
23   Q.   Then he came back and you
24 stated I want to see papers, and he said
25 they are in a different location, right?
```

Page 72

```
1            F. FRANCOIS
2    A.   Yes, he showed me where they
3  were.
4    Q.   What happened next?
5    A.   I said I need them.  He said I
6  understand, but you have to come in two
7  days.  It was Tuesday or Monday, and he
8  said you have to come in Thursday to get
9  it.  And I said okay, what time.  And he
10 said you can come in about 2:00.  And I
11 said I need paper.  He said when you come
12 in, paper will be available for you.
13   Q.   Did you have any other
14 conversation with him?  Did you say
15 anything to him?  Did he say anything to
16 you?
17   A.   Not the day.  I did not say
18 anything about that.  All I was saying was
19 I need the paper that I signed.
20   Q.   And then after he told you you
21 have to come back in two days, you left?
22   A.   Yes, me and my uncle, we left.
23   Q.   How did you get to the
24 dealership that day?
25   A.   My uncle drive me there.
```

Page 73

```
1            F. FRANCOIS
2    Q.   Okay.  So he has his own car?
3    A.   Yeah, he has his own car.
4    Q.   So then you left after he told
5  you to come back in two days.  What
6  happened next?  Did you go back to the
7  police?
8    A.   I go back to the police and I
9  told them.  They said okay, go back get the
10 paper.  He said the paper will be ready,
11 you have to go get the paper.
12   Q.   So did you go back in two days?
13   A.   Yes, I do.  I was more early.
14   Q.   Did you go back with anyone?
15   A.   Yeah, with my uncle.
16   Q.   So you both went back two days
17 later?
18   A.   Yes.
19   Q.   Okay.  And what happened then?
20   A.   When I went there, I was
21 sitting a while, sitting, sitting, and the
22 guy was saying the paper is not ready.  It
23 took a while.  I said, listen, and I was
24 mad.  I said listen, first of all, let me
25 tell you the truth.  I have never been
```

19 (Pages 70 - 73)

F. FRANCOIS

1      F. FRANCOIS
2  here, and I don't know the place.  You guys
3  did something on my name.  I don't know who
4  did that.  And a lot of people was
5  listening.  He said I don't know what you
6  are talking about.  What happened?  Explain
7  to me.
8      Q.   Hold on.  The person you were
9  talking to, this is now two days later, the
10  second visit, right?
11     A.   Yeah.
12     Q.   Who were you talking to?
13     A.   The same person that was
14  telling me to come get the paper.
15     Q.   The same one you described
16  before?
17     A.   Mm-hm.
18     Q.   Okay.  So what did he tell you
19  about where the papers were when, whether
20  the papers were ready, whatever it was?
21     A.   He was telling me the paper is
22  not ready, and he told me it is not ready
23  because there were a lot of things he was
24  doing.  We have to make another
25  appointment, which I was getting mad.  I

F. FRANCOIS

1      F. FRANCOIS
2  said I am not coming here.  And he said
3  what?  I have never been to this place.  I
4  never come here.  I said I got a paper from
5  you guys someone come here with my
6  information, and you sell a person a car
7  under my name.  You used all of my
8  information.  He said okay, give me one
9  second.  He goes straight -- I saw him go
10  to a young guy that has an office, and the
11  guy look at me and send him to get me and
12  my uncle.
13     Q.   Okay.  And so when you went in
14  to talk to that young guy?
15     A.   Yeah.  And then I went there --
16     Q.   Hold on.  Did you go into his
17  office?
18     A.   Yeah.  Me and my uncle.
19     Q.   Can you describe that young
20  guy?
21     A.   It looks like he was a Spanish
22  guy, but he was telling me he is the
23  owner's son.
24     Q.   Okay.
25     A.   He is the owner's son.  He gave

F. FRANCOIS

1      F. FRANCOIS
2  me his card.
3      Q.   He gave you his card?
4      A.   Yes, he has my number.  He was
5  texting me.  He was calling me.
6      Q.   Okay.  Slow down.
7      A.   Yeah.
8      Q.   Do you have his card?  Do you
9  still have his card?
10     A.   No.  I don't have that.  I
11  don't know where I put the card.
12     Q.   Did you ever give the card to
13  your lawyer?
14     A.   No.  Because I was looking for
15  the card because I was moving from my
16  husband house to come my home.  Grandma
17  house I did not know where I put this
18  paper.
19     Q.   Describe him again.  Young, but
20  let's do more detail.  What did he look
21  like?
22     A.   He looked like a Spanish guy,
23  black hair.  He had like black hair.  And
24  he was sitting in his office telling me
25  that we can fix that.  Is he went and get

F. FRANCOIS

1      F. FRANCOIS
2  another paper.  He bring all of those
3  papers.
4      Q.   He brought the papers?
5      A.   Yeah, and he put it in the
6  table.  And he was telling me I am very
7  sorry for what happened, but I am going to
8  explain to you.  And then he showed me a
9  copy of the ID and Emmanual ID.
10     Q.   Okay.  Hold on a second.
11          You described him as young,
12  maybe Spanish guy, black hear.  How tall?
13     A.   Not like tall, tall, tall, but
14  I can give him six-three or six-two.  I
15  don't know.
16     Q.   When you say "young," how old
17  is young?
18     A.   Young.  People can be 50 and
19  you look young.  But young, he was looking
20  more young than his father because he was
21  in the next office next to him.
22     Q.   How do you know his father was
23  in the office next to him?
24     A.   Because he when he call his
25  father and father come to me and present

F. FRANCOIS

1
2 himself, he said I'm his father.  I am
3 owner of the place.
4        (Whereupon, an off-the-record
5        discussion was held.)
6    Q.   We are at a point now where he
7 laid out the papers on the table.  This
8 young guy and you said words to the effect
9 of -- you correct me if I am wrong -- he
10 wants to fix this problem, right?
11    A.   Yes.
12    Q.   Okay.  And what did he say he
13 was going to do to fix the problem?
14    A.   Okay.  First of all, you want
15 the paper.  He wanted to make sure he
16 showed me the ID they have on file.  And
17 then he showed me the paper and said this
18 is your driver's license, and this is
19 Emmanual's.  Did you know that guy showed
20 me, Emmanual Laforest, and you live at the
21 same address on the driver's license?  And
22 then also it was on the later paper that
23 had information about my social, things
24 like that.  Which is where I tried to take
25 a picture of that.  He stopped me and he

F. FRANCOIS

1
2 said no, you cannot do that.
3    Q.   All right.  He showed you the
4 picture or he showed you a copy of your
5 driver's license and Emmanual's driver's
6 license.  What was the information that you
7 had about that?
8    A.   First of all, I said this is
9 the driver's license I never received from
10 the DMV.  How could you guys that?  He said
11 that this is the person who come to buy the
12 car.
13    Q.   Okay.  And go ahead.  What is
14 the next conversation that you had?
15    A.   And then I was mad.  I said
16 what you guys did is not good.  He was
17 telling me it is COVID.  I said I
18 understand a person buys the car online.
19 Because I am customer service; I can do an
20 account online.  We do not have power to
21 control that.  But the person come in
22 person to do this, but you do not see me.
23 And it is my ID and you guys still sell him
24 that.  He said it was one of my employees
25 that did that.

F. FRANCOIS

1
2    Q.   So he said -- I'm sorry.  I
3 didn't pick that up.  What was the last
4 thing you said?
5    A.   It was one of the employees
6 that did this.
7    Q.   So he said it was one of the
8 employees that did this?
9    A.   Yeah.
10    Q.   And then what happened next?
11    A.   And then he said, you know,
12 it's COVID.  We do not have -- I said stop
13 telling me about COVID.  That has nothing
14 do to with that because he went in person.
15 He said okay, what you are going to do
16 since you have the title?  Can you leave
17 the title.  I said no way.  He said me and
18 my dad are going to fix that.  And his dad
19 come and present himself.  He said you do
20 not have to go to the police, things like
21 that.  We are going to ask him to bring the
22 car back.  I said no Capital One be calling
23 me at the job.  I have being stressing.  I
24 have to answer them because they think I
25 don't want to pay them.

F. FRANCOIS

1
2    Q.   So hold on.  He said leave the
3 title for the car?  He said I will take
4 care of this if you leave the title to the
5 car, and you said no way, right?
6    A.   Yeah.
7    Q.   Okay.  And then so why didn't
8 you want to leave the title?
9    A.   Leave the title?  What I am
10 dealing now -- I think what they did to me
11 is not fair putting me in stress and make
12 me almost lose my job by crying because I
13 come to this country to get a better life
14 to help my family, not to be doing what
15 they are doing to people.
16        Atny1:  I move to strike the
17        nonresponsive portion.
18    Q.   So did he explain to you why he
19 needed the title?
20    A.   Yes.  He said with the title
21 they are going to ask him to bring the car
22 and then pay the loan.  They said they were
23 take the responsibility to pay the $20,000
24 loan with the Capital One, which is they're
25 going to remove everything on my name.

21 (Pages 78 - 81)

F. FRANCOIS

1
2    Q.   He basically said if you leave
3  the title we are going to take care of all
4  of this, get the car back, pay off the
5  loan, and everything is resolved;
6  that's is what he told you right?
7    A.   Yeah, that's what he said.
8    Q.   Why didn't you want to do that?
9    A.   Because I know they are not
10 going to do it.
11   Q.   How did you know they were not
12 going to do it?
13   A.   If they were doing that, why
14 didn't they ask him to bring the car?  Why
15 didn't he pay the loan?  When he finished
16 the lease -- they will tell me we pay the
17 loan and you can bring the title.  I will
18 bring the title after they pay the loan.
19   Q.   What you're saying is you did
20 not trust them to do what they said they
21 were going to do, right?
22   A.   Yes, because they didn't want
23 to show me the guy picture who did that.
24 I said let get the information of the guy
25 who sell him.  I have to go to the police

F. FRANCOIS

1
2  because maybe they did that to other people
3  who don't know.  If I did not receive the
4  title, I will not know what happened on my
5  name.
6    Q.   So you decided not to do what
7  they asked you to do to fix the problem.
8  What did you do next?
9        MR. KESHAVARZ:  Objection to
10     the form of the question.  You can
11     answer.
12        The question is: "What did you
13     do next?"
14     I object foot form of "what did
15     you do next?"  The predicate was
16     untrue, so that is what I was
17     objecting to.
18        MR. GOODMAN:  How is it untrue
19     that was her testimony?
20        MR. KESHAVARZ:  All right.
21     What did you do next?  Go ahead.
22   A.   Next, when they said that, I
23 when the to the police because the police
24 was needing me to get information about
25 Emmanual Laforest, the ID, all of that.

F. FRANCOIS

1
2  Then, I have all of the picture of the
3  paper, which I take the picture.  He said
4  to me to delete it.  I did not delete it.
5  I went to the police and shared it to the
6  police.
7    Q.   Okay.  When did you take
8  pictures of all of the papers?
9    A.   When they had it in the place.
10   Q.   In the dealership?
11   A.   Yeah.
12   Q.   I though you said before they
13 said do not take a picture of it?
14   A.   I already took it.  They say
15 don't take it, but I already took the
16 picture.
17   Q.   So then you went back to the
18 police with the pictures, correct?
19   A.   Yes.
20   Q.   All right.  And what happened?
21 What did the police say at that point?
22   A.   Okay.  And then they go
23 upstairs in a room and they have a lot of
24 information.  I give them Emmanual's
25 information.  They saw it on the driver's

F. FRANCOIS

1
2  license and compared with what they have in
3  their thing.  They bring a big picture and
4  showed me this is him.  This is him.  This
5  is him.  And I said yes, this is the same
6  person.  And they said okay, they are going
7  to pursue with the thing.  And this is what
8  happened.
9    Q.   Okay.  When is the next time
10 you talked to the police after they said we
11 are going to pursue him?
12   A.   They called me and said they
13 are going to -- they arrested him.  And
14 they called me and said they arrested him
15 and they are going to send me a picture to
16 identify if it is him.
17   Q.   And did that happen?
18   A.   Yes, it did.  They sent me a
19 picture.
20   Q.   During this process when is the
21 first time you spoke to your husband
22 Stanley Laforest about what you were doing
23 with the police?
24   A.   He is the one saying I want you
25 to go to the police because you don't know

22 (Pages 82 - 85)

F. FRANCOIS
1
2 everything my brother did to the car.  He
3 may end up doing something and kill someone
4 and use the car or whatever, and it is
5 going to end up going to you because the
6 car is in your name and you could get
7 arrested for that.
8     Q.   Did there come a time that you
9 learned the dealership actually did get the
10 car back from Emmanual Laforest?
11        MR. KESHAVARZ:  Objection to
12     form.  Go ahead.
13     A.   The guy, the son's dealer, they
14 called me he.  Told me we have the car
15 back.  He did not get the car back because
16 my husband saw Emmanual with the car.  The
17 day he told me he has the car, he not have
18 the car.
19     Q.   Do you think they ever got the
20 car back?
21     A.   I don't know.  I never asked
22 because they were calling me to bring the
23 title, title, title.  And I blocked the
24 number.  And I was blocking every number I
25 did not know because I was scared.

F. FRANCOIS
1
2     Q.   So if we have pictures of the
3 car being brought back, would that change
4 your impression of whether the car was
5 taken back or not?
6        MR. KESHAVARZ:  Objection form.
7     It's also speculation.
8     Q.   You can answer.
9     A.   No, because for me that does
10 not mean nothing because what they were
11 doing with Emmanual.  Bring the car, not
12 bring the car.  They are still not paying
13 the Capital One.  It is still affected
14 online.
15     Q.   You understand they could not
16 pay Capital One unless they have the title?
17        MR. KESHAVARZ:  Objection,
18     form.  No predicate for testifying,
19     but you can go ahead and answer the
20     question, if you know.
21     A.   I don't know.
22     Q.   Okay.  Did anybody at the
23 dealership explain to you we need the title
24 in order to pay off Capital One?
25     A.   They were telling me you bring

F. FRANCOIS
1
2 they title and we do the Capital One, but
3 they never explained to me we need the
4 title to pay Capital One.
5     Q.   Okay.  So what's the next
6 interaction you had with the police about
7 this situation after they sent you that
8 picture of him?
9     A.   I said that was him, and after
10 that I received call from Brooklyn federal,
11 which I received a call.  There was a woman
12 calling me and explaining to me all of the
13 process.  And then also they were giving
14 me, the police, I think, where I am he
15 can't be close to me because I been
16 receiving people calling me telling me
17 things like that.
18        I said to them I am even scared
19 to go to work because I don't want them to
20 come to my job.  And she was telling me all
21 of the process.
22     Q.   Now, who was this woman?  You
23 said a woman called you?
24     A.   My lawyer has the name of that.
25 It is Brooklyn federal.  It is the federal

F. FRANCOIS
1
2 court, the lawyer in front of him was going
3 to have to go to the court every time.
4     Q.   It is a district attorney, a
5 prosecuting attorney?
6     A.   Yes.
7     Q.   Okay.  And you gave your lawyer
8 that name?
9     A.   Yeah, they have woman name who
10 was to call me.
11     Q.   When did you give your lawyer
12 that name?
13        MR. KESHAVARZ:  Do not talk
14     about when you gave me information.
15     You can talk about when you got it,
16     but you can't talk about your
17     communication.
18        MR. GOODMAN:  I am not asking
19     your communication.  I am asking the
20     date.  That's not communication.
21     A.   The day that the woman contact
22 me?
23     Q.   What is the date the woman
24 contacted you?
25     A.   I would have to go through all

23 (Pages 86 - 89)

Page 90

1             F. FRANCOIS
2  of my emails.  It was by email, then she
3  was trying to call me, but I never
4  answered.  And then she sent me an email.
5  Did you need it now?
6        MR. GOODMAN:  We can leave a
7     blank in the transcript if the court
8     reporter would do that?
9     A.   (Information requested:_____
10  _____).
11    Q.   After that date, how long after
12  that did you call the your attorney?
13    A.   I don't remember.
14    Q.   Was it a day?  Was it a week?
15  Was it a month?
16        MR. KESHAVARZ:  Asked and
17     answered.  She said she did not
18     answer.
19        MR. GOODMAN:  Asked and
20     answered from you, that's pretty
21     rich.
22    Q.   Go ahead.  You can answer.
23    A.   I don't remember.
24    Q.   I am asking you if you can
25  approximate whether it was a short length

Page 91

1             F. FRANCOIS
2  of time, a long length of time, a month of
3  time, a year of time.
4        MR. KESHAVARZ:  Objection to
5     the form of the question.
6     A.   I don't remember.  That's all I
7  can say.  Because I don't remember really
8  because me and her we spoke multiple times.
9  I don't remember.
10    Q.   Okay.  And this prosecutor you
11  spoke to many times, when is the last time
12  you spoke to her?
13    A.   The last time I spoke to her
14  was in 2021.
15    Q.   Okay.
16    A.   I don't remember.  I can't give
17  you the date of the year.  I don't
18  remember.
19    Q.   All right.  What was that
20  conversation?  What did you say to her and
21  what did she say to you?
22    A.   She was going over all they
23  already know about, what the police already
24  told her.  And then she will repeat
25  everything, and I said to her yes, and then

Page 92

1             F. FRANCOIS
2  I also -- when I got on the phone with her,
3  she told me I was telling her that I just
4  received a call, and which is when that
5  person said it me.  And she said okay, we
6  are going to give the police restrict
7  something, like that he can't be close to
8  you.  She was telling me he is going to
9  have to come and have a code for him to go,
10  and I don't have to be face-to-face to him,
11  which is like basically telling me all of
12  the process, how they are going to do
13  everything in the Brooklyn court.
14    Q.   Did that happen?  Did he come
15  to court?
16    A.   The last time I spoke to her
17  she was telling me he had a court in April.
18  I don't know if he went, if he didn't went.
19  I don't know.
20    Q.   Did there ever come a point she
21  told you the case had been dismissed?
22    A.   No.
23    Q.   Did there of come a point you
24  told her you did not want to prosecute the
25  case?

Page 93

1             F. FRANCOIS
2     A.   No, I never said that to her.
3     Q.   Okay.  Do you know what
4  happened to the case?
5     A.   I don't know what happened to
6  the case.
7     Q.   You never wanted to find out?
8  You never wanted to call her and ask what
9  happened to that case?
10    A.   No, because she was telling me
11  it was another attorney was going to do the
12  case because she just have to tell me and
13  get all of the information for me, but
14  another person is going to contact me.
15    Q.   Did that other person ever
16  contact you?
17    A.   No, they did not contact me.
18    Q.   Again, maybe I asked it, maybe
19  she answered.
20        What was the date?  When was
21  the last time you had that conversation
22  with the prosecutor?
23    A.   I don't remember.
24    Q.   I think you said 2021?
25    A.   Yeah, I spoke to her when she

Page 94

F. FRANCOIS

1
2 was telling me he has a court.
3    Q.   He has what?
4    A.   He has a court.  He has to go
5 to the court.  It was in 2021.
6    Q.   I mean, early 2021, late 2021?
7    A.   I don't remember.
8    Q.   Okay.  When is the last time
9 you had any conversation with anyone at the
10 dealership?
11    A.   For the dealership it was in
12 2020 because nobody ever called me or said
13 anything else.
14    Q.   I think you testified that you
15 blocked their number?
16    A.   Yeah, I blocked there son
17 number because sometimes he called me in
18 the number and sometimes he called me at
19 different number.  I don't know if it was
20 him, if it was Emmanual friend had been
21 texting me.  I don't know.  I was scared
22 and all I wanted to do is block everyone
23 who deals with that because I did not want
24 nobody to wait for me on the street and end
25 up doing something to me.

Page 95

F. FRANCOIS

1
2    Q.   Did you think someone from the
3 dealership was going to wait for you on the
4 street?
5    A.   Maybe the guy who did that was
6 there if it was a friend doing that with
7 him with people ID and information.  If
8 they did that, what could they not do?
9       MR. GOODMAN:  I move to strike
10    the nonresponsive portion.
11    Q.   So you testified that there
12 were calls that came to you from the
13 dealership after the time that you were
14 there the second time, correct?
15    A.   Yes, correct.
16    Q.   Did you take those calls?
17    A.   Yes, the son owner I spoke to
18 him, which he was telling me that to bring
19 the title.  And then he told me that they
20 got the car, they just waiting for me to
21 bring the title.
22    Q.   Okay.  And what did you tell
23 him?
24    A.   I just said to him yes because
25 I did not want to continue the conversation

Page 96

F. FRANCOIS

1
2 because I was at work.
3    Q.   You were what?
4    A.   I was at work, working.
5    Q.   So you said yes, yes to what?
6    A.   Yes to I will call you.  I will
7 let you know when, and then that's it.
8    Q.   And then you decided never to
9 call him back?
10    A.   Yeah.
11    Q.   You never did call him back?
12    A.   No.
13    Q.   Okay.  And he had told you in
14 the last conversation we have the car, if
15 you bring the title we can take care of all
16 of this, right?
17       MR. KESHAVARZ:  Objection,
18    form.
19    Q.   You can answer.
20    A.   He did not say it like that.
21    Q.   What did he say?  Tell me what
22 he said.
23    A.   He said bring the title
24 Emmanual bring the car and this is when I
25 say to him okay.  I called my husband.  He

Page 97

F. FRANCOIS

1
2 said no, my auntie just saw Emmanual just
3 in the car, which is true.  Emmanual was in
4 the car.  And they did not get the car.
5 That's how I knew they were lying.
6    Q.   That's what you told them?  I
7 am not asking what you thought.  I am
8 asking what you said to the person from the
9 dealership when they said we have the car
10 just bring in the title.
11    A.   I just said to them yeah,
12 okay.
13    Q.   And that was the end of the
14 conversation?
15    A.   Yeah, because I was at work.
16 I did not want to continue the conversation
17 because I had customer in front of me.
18    Q.   A customer told you?
19    A.   I customer in front of me.  I
20 was opening an account for a customer.
21    Q.   And that was the last
22 conversation you had with anybody at the
23 dealer ship?
24    A.   After this, they tried to call
25 me and I did not pic up the phone again.

25 (Pages 94 - 97)

F. FRANCOIS

1
2    Q.   When was the first time you
3  spoke to your attorney that's on this
4  deposit right now?
5          MR. KESHAVARZ: He is just
6    asking for a date.
7          MR. GOODMAN:  I am asking the
8    questions.
9    Q.   What is the date, when did you
10  first speak to Mr. Keshavarz?
11         MR. KESHAVARZ: Just the date,
12    go ahead.
13   A.   I don't remember the date.
14   Q.   Okay.  What time of year was
15  it?
16   A.   The time?  It was in the
17  afternoon.  That's all I mean.
18   Q.   The time of year, not the time
19  of day.  Was it winter?  Was it summer was?
20  Outside, was snow on the ground?
21   A.   No, I was at work when I called
22  him.  I was at work and then I called him
23  from my work phone.
24   Q.   Was it before or after you went
25  to the dealership to talk about the --

F. FRANCOIS

1
2    A.   It --
3    Q.   You have to let me finish the
4  question.
5          Was it before or after you went
6  the dealership to talk about the problem
7  with the BMW?
8          MR. KESHAVARZ:  Objection to
9    form.  Go ahead.  Was it before or
10    after.
11   A.   I think it was after.  This is
12  a long time after.
13   Q.   Okay.  How long after?
14   A.   Because what they did to me
15  happened in 2020 because I remember I spoke
16  to my lawyers between 2021, I guess.  Yeah,
17  because when actually I had been received
18  letter from Capital One and when I called
19  company Capital One I received letter from
20  ATM -- MTA.  And then also from parking
21  ticket, a lot of tickets.  It was driving
22  my crazy.
23         MR. KESHAVARZ:  Just pause for
24    a second.
25   Q.   Now, you are saying it was in

F. FRANCOIS

1
2  2021 that you first spoke to Mr. Keshavarz?
3          MR. KESHAVARZ:  Objection to
4    form.
5    A.   Because the thing happened in
6  2020, okay?  If this happened in 2020, I
7  did not contact any lawyer after that.  I
8  was trying to resolve anything if they can
9  remove with Capital One and fix everything
10  they did on my credit.  All of those
11  things, which they never did anything.
12  Which is, like I said, I have to file a
13  lawyer.  It was the next year I am pretty
14  sure.  I am not really sure.
15   Q.   Capital One did rescinded your
16  loan, correct?
17   A.   Say that again.
18   Q.   They fixed the problem with the
19  loan on the car, correct, capital one?
20         MR. KESHAVARZ:  Objection to
21    form.
22   A.   I don't know because I never
23  checked with them because I received a lot
24  of letter from them, and I gave to my
25  lawyer.

F. FRANCOIS

1
2    Q.   As we sit here today was it
3  your understanding the loan from Capital
4  One in your name is still open?
5          MR. KESHAVARZ:  Objection to
6    form go ahead.
7    A.   I don't know if it is still
8  open.
9    Q.   Okay.  When you first spoke to
10  a lawyer, who was it?  Who is the first
11  lawyer you spoke to?
12   A.   The first lawyer I spoke about
13  the case?
14   Q.   Yes.
15   A.   I spoke with my lawyer and then
16  get my lawyer that's it.
17   Q.   Who was it?
18         MR. KESHAVARZ:  He is just
19    asking a name.  If you know the first
20    lawyer that spoke to you about what
21    happened.
22   A.   When I called it was Emma, and
23  they put me to Ahmad.
24   Q.   And you do not know when that
25  conversation was in 2021?

26 (Pages 98 - 101)

Page 102

F. FRANCOIS
1
2    A.   I had conversation in 2021.
3    Q.   Wait, what?
4    A.   2021.
5    Q.   Okay.  When did you retain your
6  lawyer in this case?
7        MR. KESHAVARZ:  Objection.
8    A.   I don't understand.
9    Q.   Did you sign some papers that
10  Mr. Keshavarz's law firm is going to be
11  your attorney in this case?
12    A.   Yes.
13    Q.   When was that?
14    A.   I don't know the date.  Not the
15  date that I really spoke to him, but after
16  we decide I said I want him it present to
17  me.
18    Q.   Was it your understanding that
19  that representation was to file a lawsuit
20  or for something else?
21    A.   I was considering that with
22  everything that I was doing.  I could not
23  say to you.
24    Q.   In other words, to help you
25  through the process of the letters and the

Page 103

F. FRANCOIS
1
2  tolls and tickets and all of that stuff?
3    A.   I already have everything.
4    Q.   Say it again.  I'm sorry.  I
5  did not understand.
6    A.   I already have everything
7  because everything was coming in my mail
8  every week.  I already have everything.
9    Q.   When you say you "have
10  everything," what do you mean?
11    A.   MTA, parking ticket, Capital
12  One, all of that.
13    Q.   Okay.  I understand you have
14  all of that documentation that is what you
15  are saying, right?
16    A.   Mm-hm.
17    Q.   You have to say "yes."
18    A.   Yes.
19    Q.   My question is, you had all of
20  that, you went to the lawyer to help you
21  work through all of that, correct?
22        MR. KESHAVARZ:  Objection to
23    the form of the question.
24        Whenever you are good for a
25    lunch break.

Page 104

F. FRANCOIS
1
2        MR. GOODMAN:  We are not going
3    to break with an open question.
4    That's for sure.
5        MR. KESHAVARZ:  I am not saying
6    that.
7    Q.   You can answer, Ms. Francois?
8    A.   Can you repeat the question
9  again?
10    Q.   What I am asking is you told us
11  you have everything, that is with your
12  terminology; you had everything.  All of
13  that documents you have, the papers from
14  the MTA and the parking tickets and Capital
15  One and all of that, right?
16    A.   Yes.
17    Q.   And then when you signed up
18  with your attorney the purpose of that was
19  to have assistance to work through all of
20  that, to deal with all of that, right?
21        MR. KESHAVARZ:  Objection to
22    the form of the question.
23    A.   Yes.
24    Q.   Okay.  At that point was your
25  purpose to file a lawsuit?

Page 105

F. FRANCOIS
1
2        MR. KESHAVARZ:  Objection to
3    form.  He is not asking for our
4    conversation he is just asking what
5    your thought was.
6    A.   Okay.
7    Q.   Did you go to your lawyer to
8  file a lawsuit?
9        MR. KESHAVARZ:  Objection to
10    form.  You can go ahead.
11    A.   I went to my lawyer first to
12  get all of those things and help me fix
13  what they did on my name.  That is the
14  first thing I went to my lawyer to do.
15  For me remove all of my credit online,
16  TransUnion, Experian.  My plan is to work
17  and save my money and buy a house.  And I
18  was not able to do because I had to hire a
19  lawyer to fix all of my stuff because it
20  was too much for me.
21    Q.   Okay.  You understand that you
22  are now in a lawsuit?  Your lawyers filed
23  on your behalf a lawsuit against the
24  dealership and some individual people; you
25  understand that, correct?

27 (Pages 102 - 105)

F. FRANCOIS
1
2    A.   Yes.
3    Q.   Whose idea was it to file a
4 lawsuit?
5         MR. KESHAVARZ:  Objection to
6    the form of the question.  Don't
7    answer.
8         You're talking about
9    communications with my client.  I am
10   not going to allow her to answer that
11   one.
12   Q.   When was it that there was a
13 decision to file a lawsuit?
14        MR. KESHAVARZ:  Do not answer
15   that.
16        MR. GOODMAN:  I am asking about
17   a date.
18   A.   For me it is the same question
19 you asked me before.  It is like your same
20 question.
21   Q.   It is not the same question, so
22 I am asking you a timeframe.
23        When was it that a decision was
24 made to file a lawsuit?
25        MR. KESHAVARZ:  Objection to

F. FRANCOIS
1
2    the form of the question.
3         Not asking about our
4    communications.  If you have an
5    answer based on your own knowledge,
6    not from your conversations.
7         MR. GOODMAN:  All right, that
8    is a talking objection.  We can do
9    without that.
10   Q.   Go ahead Ms. Francois, you can
11 answer the question.
12   A.   I don't remember the date.  I
13 don't remember nothing about it.
14   Q.   You do not remember anything
15 about that?
16        MR. KESHAVARZ:  Objection to
17   the form of the question.  You can
18   answer.
19   A.   I feel like I am --
20 (Indiscernible.)
21   Q.   You feel like what?  I'm sorry.
22   A.   I don't remember.
23   Q.   You said you feel like
24 something.
25   A.   I said I feel like I don't

F. FRANCOIS
1
2 remember.  I am trying to remember.
3    Q.   I'm just going to ask --
4    A.   I was really stressing.  All I
5 remember was my job was too much calling.
6 My bos was telling me take one week stay
7 home and fix about that, which that was too
8 much for me.
9    Q.   When was it that your boss told
10 you to take a week?
11   A.   It was when they were like
12 calling me up, right, September or October
13 the dealer was calling me, Emmanual was
14 calling me, and his friend was calling me.
15 I don't even answer Capital One, the one
16 was calling me most.
17   Q.   When was that?  Was that in
18 2020?  Was that in 2021?
19   A.   Yeah, 2020.
20   Q.   It was in 2020.  Who was
21 Emmanual's friend that was calling you?
22   A.   I don't know.  They were just
23 calling and then saying telling me that's
24 not going to stop, that's not going to stay
25 like that.

F. FRANCOIS
1
2         MR. GOODMAN:  Mr. Keshavarz is
3    very hungry.  Let's take a lunch
4    break.
5         (Whereupon, a short recess was
6    taken.)
7         (Whereupon, at 2:17 P.M., Court
8    Reporter Victoria Chumas was relieved
9    by Sophia Toribio.)
10 EXAMINATION BY
11 MR. GOODMAN:
12   Q.   Ms. Francois, a couple of
13 questions I forgot from earlier:  Have you
14 been known by any other names other than
15 Farah Jean Francois?
16   A.   No, Farah Jean Francois.
17   Q.   Have you ever been known as
18 Farah Felix?
19   A.   No.
20   Q.   Did you ever adopt the name
21 Laforest as your married name?
22   A.   No, I'm still keeping my dad
23 name.
24   Q.   I'm sorry?
25   A.   I'm still keeping my dad name.

28 (Pages 106 - 109)

Page 110

F. FRANCOIS

1
2 I never changed by name, Farah Jean
3 Francois.
4     Q.   Also, you testified from
5 receiving some, I believe you said they
6 were text messages telling you things like
7 don't come back to Brooklyn, you correct me
8 if I'm wrong.  Were those in the form of
9 text messages?
10     A.   Yeah, it was in the text
11 message.
12     Q.   You got text messages that you
13 interpreted as being threatening to you; is
14 that fair?
15     A.   Yes.
16     Q.   Do you still have those text
17 messages?
18     A.   No, because I lost that phone.
19     Q.   What was the number of that
20 phone?
21     A.   The phone number, it was the
22 same.  The phone number I have is the same
23 number.
24     Q.   Who was the phone provider?
25     A.   It was a Samsung.  The phone

Page 111

F. FRANCOIS

1
2 was a Samsung.
3     Q.   Was it AT&T or was it T-Mobile?
4     A.   It was T-Mobile, I guess.
5     Q.   So, you lost that phone and
6 replaced it with the same number?
7     A.   Yeah, the same number.  I still
8 have the same number.
9     Q.   What is that number?
10     A.   (917) 291-5097.
11     Q.   So, we were talking about when
12 you retained your attorney.
13        Tell me what you did in
14 preparation for this deposition.
15     A.   Say that again, sorry.
16     Q.   What did you do to prepare for
17 this deposition?
18        MR. KESHAVARZ:  He's not asking
19     what was said between us, if
20     anything.  He's just asking what you
21     did, not the contents of what you
22     did.  Go ahead.
23     A.   Okay.  What I did, just like
24 everything that happened to tell you.  To
25 explain everything the same way that's

Page 112

F. FRANCOIS

1
2 happening and only know what was happening
3 and then explain the same, that's all.
4     Q.   When was that that you did
5 that?  You're talking about a conversation
6 you had with your attorney?
7     A.   No.
8     Q.   Okay.  I'm asking what you did
9 to prepare for your deposition today.
10     A.   (No response.)
11     Q.   Did you talk to your attorney;
12 yes or no?
13     A.   Yeah, I talk with my attorney,
14 yeah.
15     Q.   Was it both of them, Emma and
16 Ahmad, or just one of them?
17     A.   Yeah, both of them.  I was in
18 communication with both of them.
19     Q.   When were you last in
20 communication with both of them?
21     A.   This morning, to remind me the
22 time.  Because I was at work, do not forget
23 about the time that I have to be home.
24     Q.   How long did you talk to them
25 this morning?

Page 113

F. FRANCOIS

1
2     A.   How long?
3     Q.   How long?
4     A.   Maybe about 20 minutes or
5 10 minutes.
6     Q.   Before that, when was the last
7 time you spoke to them in preparation for
8 this deposition?
9     A.   I spoke with them yesterday,
10 with Emma yesterday.
11     Q.   Just yes or no, did the
12 conversation include what happened at the
13 deposition yesterday of the Defendant?
14     A.   I don't understand.
15     Q.   Did that conversation include
16 discussion about a deposition that happened
17 in this case yesterday?
18     A.   Yeah, what's going to happen,
19 everything.
20     Q.   No.  I'm asking about a
21 deposition that happened in this case of a
22 witness from one of the Defendants that was
23 deposed yesterday, did you talk about that?
24     A.   I don't remember.
25     Q.   You can't remember from

29 (Pages 110 - 113)

Page 114

```
 1         F. FRANCOIS
 2   yesterday?
 3      A.   I don't remember because I
 4   don't understand really what you're trying
 5   to ask me.
 6      Q.   What I'm trying to ask you is
 7   whether you had a discussion with your
 8   attorneys, Emma, I guess it was, about a
 9   deposition in this case of a witness,
10   someone that you sued in this case, that
11   happened yesterday?
12         MR. KESHAVARZ:  This is
13      attorney-client privilege, but go
14      ahead I'll let her answer this one
15      question.
16         THE WITNESS:  I don't
17      understand the question.
18         MR. KESHAVARZ:  I can tell you
19      the answer, Nicholas.  The answer is
20      no, but if you want to keep on asking
21      it, go ahead.
22         MR. GOODMAN:  Well, as I
23      understand, you weren't part of that
24      conversation, Ahmad, it was Emma.
25         MR. KESHAVARZ:  Go ahead.  Go
```

Page 115

```
 1         F. FRANCOIS
 2   ahead, ask your question.
 3         MR. GOODMAN:  Can the Reporter
 4      read back the question, please.
 5         (Whereupon, the referred to
 6      question was read back by the
 7      Reporter.)
 8      A.   No.
 9      Q.   How long was your conversation
10   with Emma yesterday?
11      A.   I don't remember, because I was
12   not keeping remember all the conversation I
13   had with them.
14      Q.   What time of day did that
15   discussion take place?
16      A.   The time?  I was at work when
17   Emma called me.  I don't remember what time
18   it is, because I was giving my patient
19   medication and I was taking care of a
20   patient and I just pick up the phone.
21      Q.   So, you don't remember what
22   time it was and you don't remember how long
23   it was, right, even though it was just
24   yesterday?
25      A.   Because I was at work.  Like I
```

Page 116

```
 1         F. FRANCOIS
 2   said, I was at work, I was with my patient,
 3   giving one of my patient medication.  She
 4   called me, I just pick up the phone and
 5   then she just told me remember tomorrow is
 6   the day, if you receive all the papers,
 7   that you have to check all those papers.  I
 8   say okay.  And then she say okay, we will
 9   call you tomorrow morning just to remind
10   you again.
11      Q.   Okay, so the answer is no.
12         So, Ms. Francois, what were all
13   the papers?  Did you review any papers in
14   preparation for your deposition?
15      A.   The paper that she's talking
16   about is like the same paper you have.
17   This one that you're showing me, that's the
18   ones that I was trying to go to my e-mail
19   to just look at now.  I wasn't able to do
20   that.
21      Q.   You tell me, what were the
22   papers?
23      A.   The same one that you shared to
24   the screen.
25      Q.   The one I shared to the screen
```

Page 117

```
 1         F. FRANCOIS
 2   was the Capital One Fraud Submission?
 3      A.   I'm pretty sure that's one of
 4   the thing.  Something like that they might
 5   e-mail it to me.
 6      Q.   My question is very simple,
 7   it's not difficult.  What documents did you
 8   review in preparation for your deposition
 9   today?
10      A.   What paper that I review?
11      Q.   Correct.
12      A.   All the paper that you have
13   there.
14      Q.   How do you know what I have?
15      A.   Well, the paper that I know you
16   have, all that I see that happen to the
17   case, all the paper, that's all the paper.
18   From the Capital One, from the dealership,
19   all those papers.
20         MR. GOODMAN:  Move to strike
21      the nonresponsive portions.
22      Q.   Ms. Francois, did your
23   attorneys send you papers to look at in
24   preparation for your deposition?
25      A.   Did my attorney send me paper
```

30 (Pages 114 - 117)

F. FRANCOIS

1   to look at? Yeah, they send me paper.
2   They send me a paper from -- this morning
3   they send me an e-mail. If I'm right, this
4   morning they send me an e-mail and
5   yesterday again they would send me an
6   e-mail also.
7      Q.  So, what documents were in that
8   e-mail for you to review in preparation for
9   your deposition?
10     A.  It's my deposition that I did.
11     Q.  What do you mean by that? What
12  deposition did you do?
13     A.  I have to go to my e-mail to
14  look at this thing.
15         MR. KESHAVARZ: Don't check
16     your e-mail. The question is: Do
17     you remember what you reviewed or
18     not?
19     Q.  You said a deposition that you
20  gave, what deposition did you give?
21     A.  All those paper that you have
22  in your hand, just to look at all those
23  paper again, like I say to you.
24     Q.  Let me ask you one more time:
25

F. FRANCOIS

1   How do you know what papers I have in my
2   hand?
3      A.  The Capital One, I'm telling
4   you about -- it can be the same I have or
5   it can be you have different one. The
6   Capital One and then also the dealership,
7   the paper that they gave it me about
8   Emmanuel bought this car, that's all the
9   paper. And then also, what I explain to my
10  lawyer what happened since September 2021.
11  It's all those paper.
12     Q.  So, it's your testimony that
13  the dealership gave you papers about what
14  happened, about Emmanuel buying the car?
15     A.  This is not what I say.
16     Q.  Okay. Did you take pictures of
17  those papers?
18     A.  They give me a paper, the paper
19  which that I bought the car, because they
20  was assume that it was me.
21     Q.  Who gave you that paper?
22     A.  The son.
23     Q.  Whose son?
24     A.  The owner son. The owner son,

F. FRANCOIS

1   like I told you, bring me to the office and
2   I sit down with him and he called his dad
3   and they come to the office and show me the
4   paper. Which I know it had Capital One on
5   it and all the bill of the car.
6      Q.  So, did they give you a copy of
7   that paper?
8      A.  Yeah, they give me some of them
9   because they didn't give me all of them.
10     Q.  And do you have those papers
11  today, what they gave you?
12     A.  Yeah, I have some of the paper,
13  the one that they give it to me.
14         MR. GOODMAN: I will call for
15     production of the papers that were
16     given to Farah Francois on the date
17     that she was at the dealership
18     according to her testimony. Some of
19     the papers, that's her testimony.
20         MR. KESHAVARZ: They've been
21     produced. Go ahead.
22         MR. GOODMAN: Have they been
23     identified as the papers that were
24     produced on that day? Because you

F. FRANCOIS

1   gave us a document dump of 4,000
2   pages and you never responded to the
3   demand that you identify which papers
4   were --
5         MR. KESHAVARZ: I think you
6      might want to just ask her about the
7      papers. Just show her the papers and
8      ask her.
9         MR. GOODMAN: I just did ask
10     her and she's not answering.
11  BY MR. GOODMAN:
12     Q.  And previously this morning,
13  Ms. Francois, you gave testimony about
14  taking photographs with your phone of
15  papers that were on a desk. Do you
16  remember that?
17     A.  Yes. Which is like I said to
18  you, it was my copy of my driver's license,
19  they have there, and Emmanuel driver's
20  license. Which they didn't want me to take
21  the picture. This is the one I have proof
22  to give it to the police to tell them this
23  is all the information they gave to me,
24  yeah.

31 (Pages 118 - 121)

Page 122

```
1          F. FRANCOIS
2     Q.   How many photographs did you
3  take when you were in the dealership of
4  papers?
5     A.   One, because they didn't let me
6  want to take a picture.  They said no,
7  that's illegal, you cannot take a picture.
8  I said I can, if it's my ID, if it's my
9  information in that.
10     Q.   Just so I'm clear, it may be
11  repetitive but I want to be clear on this:
12  There was a point on your second visit to
13  the dealership, you claim that you were at
14  the dealership twice, correct?
15     A.   Yeah.
16     Q.   And you were with Papito both
17  times, correct?
18     A.   Yes.
19     Q.   And the second time your
20  testimony is that someone retrieved papers
21  from this transaction with the BMW and
22  Emmanuel, correct?
23     A.   Yeah.
24     Q.   And showed you the papers,
25  correct?
```

Page 123

```
1          F. FRANCOIS
2     A.   Yeah, and showed me the paper
3  that who have my driver's license on it and
4  then Emmanuel driver's license.
5     Q.   And you took a photograph of
6  one page that had your driver's license and
7  Emmanuel's driver's license; is that
8  correct?
9     A.   Correct.
10     Q.   Just one photo?
11     A.   Yeah.
12       MR. GOODMAN:  And I would ask
13    that you produce the photo that was
14    taken.  Not a photocopy of the
15    license, but the actual photo from
16    your phone as you transmitted it to
17    wherever you transmitted it and that
18    that be produced.
19     Q.   So, Ms. Francois, in addition
20  to taking a picture with your phone of that
21  driver's license, you also received copies
22  of what you said were some of the papers
23  from the file, correct?
24     A.   Yeah.
25     Q.   And you left the dealership
```

Page 124

```
1  with the photo on your phone and some of
2  the papers, right?
3     A.   Yeah.
4     Q.   What did you do with the photo
5  and the papers?
6     A.   I went to the police.  This is
7  what I did, I went to the police with that.
8     Q.   And Papito was there to witness
9  all of this, right?  He saw all of this?
10     A.   Yeah, he went to the police
11  with me too.
12     Q.   He also went to the police with
13  you?
14     A.   Yeah.
15     Q.   But he saw all of this?  He saw
16  the papers on the table at the dealership?
17     A.   Yeah, because he was next to
18  me.  It was both of us sitting, showing
19  both of us the paper.
20     Q.   Okay.  Now, refresh my
21  recollection, when was it that you left the
22  employ of the TD Bank and went to the
23  nursing employment?
24     A.   December.
```

Page 125

```
1          F. FRANCOIS
2     Q.   Of 2021?
3     A.   Yeah, last December.
4     Q.   Last December, okay.
5     A.   Yeah.
6       MR. GOODMAN:  All right.  Let's
7    look, Ms. Reporter, if we can, at
8    Exhibit A, the Capital One Fraud
9    Submission.  And if we want to mark
10    that, I mean, I guess we can mark it
11    Defendant's Exhibit A, if there's no
12    objection.  We haven't marked any
13    previously, so it would begin with
14    Exhibit A.  And I guess you're going
15    to need to share the screen.
16       THE COURT REPORTER:  Sure.
17       (Whereupon, the aforementioned
18    document was marked as Defendant's
19    Exhibit A for identification as of
20    this date by the Reporter.)
21       (Screen sharing.)
22       MR. GOODMAN:  If you could
23    please scroll to the next page.  It
24    should have a Bates stamp on the
25    bottom of Francois 18.
```

32 (Pages 122 - 125)

1        F. FRANCOIS
2        (Reporter complies.)
3        MR. GOODMAN: Okay,
4    Ms. Reporter, can you expand that out
5    so we can see the entire page.
6        (Reporter complies.)
7        MR. GOODMAN: Thank you.
8 BY MR. GOODMAN:
9    Q.   Ms. Francois, I want you to
10 look at what's on the screen now as the
11 second page of Defendant's Exhibit A.  Take
12 a look at that and tell me when you're
13 finished looking at that.
14        (Whereupon, the Witness peruses
15    the document.)
16    A.   Yeah, I finished to look at.
17    Q.   So, what is that?
18    A.   That's the Affidavit that they
19 kept calling me.  I told them that wasn't
20 me who did that.  I never applied for a
21 loan.
22    Q.   And you filled this out on
23 September 23rd of 2020.  You see that date
24 on there?
25    A.   Yes.

1        F. FRANCOIS
2    Q.   And you listed your address as
3 2914 Farragut Road, correct?
4    A.   Uh-huh.
5        THE COURT REPORTER: Is that a
6    yes or no?
7    A.   Yes.
8        MR. GOODMAN: Can you please
9    scroll down to the next page.
10        (Reporter complies.)
11        MR. KESHAVARZ: I just want to
12    make sure, Ms. Francois, are you able
13    to read the document that's in front
14    of you?  Because it's kind of small
15    on your screen.
16        THE WITNESS: Yeah, I do.  I
17    do.  I see my name on it, "Farah Jean
18    Francois."
19        MR. KESHAVARZ: I just wanted
20    to make sure.
21        THE WITNESS: Thank you, Ahmad.
22 BY MR. GOODMAN:
23    Q.   So, you see now this is the
24 third page.  It should have a Bates stamp
25 on the bottom of Francois 19.  Again, can

1        F. FRANCOIS
2 you direct your attention to the checked
3 boxes.  It says, "Tell us about your
4 situation:"  Do you see that?
5    A.   Yeah.
6    Q.   And it says, "Types of Identity
7 Theft you have experienced:"
8    A.   Uh-huh.
9    Q.   And you checked "Loans" and you
10 checked "Other."  Do you see that?
11    A.   Yes.
12    Q.   What did you mean by "Other?"
13    A.   My ID, my Social, this is all
14 the things that have been stolen.
15    Q.   Then under number 2 it says
16 "What Happened:"  And it says, "What was
17 your first indication that you might be a
18 victim of identity theft? (check all that
19 apply):"  Did I read all of that correctly?
20    A.   Yeah.
21    Q.   And you checked the box for
22 "Mail Service Disrupted."  Do you see that?
23    A.   Yeah.
24    Q.   What does that mean?  What did
25 that mean to you?  Why did you check that

1        F. FRANCOIS
2 box?
3    A.   I checked that box because that
4 was mail the DMV send it to me, to my
5 address and then I never received that
6 mail.  Which is somebody else receive it,
7 which is Emmanuel Laforest receive it and
8 keep the mail.
9    Q.   And you also checked the box
10 that said "Noticed Credit Report
11 Inaccuracies."
12    A.   Yes.
13    Q.   Why did you check that box?
14    A.   Because I received from
15 Experian that my credit score been going
16 down.  And when I click on that to review
17 that and I see the loan on that.
18    Q.   How long had your credit score
19 been going down as of September 23rd of
20 2020?
21        MR. KESHAVARZ: Objection to
22    form.
23    Q.   You can answer.
24    A.   I think since -- because it's
25 not the first place he went to visit with

33 (Pages 126 - 129)

F. FRANCOIS

1      F. FRANCOIS
2  my information.  All those place he went is
3  in my credit.  That's when all the place he
4  went, every time you check your credit, it
5  put your credit score down.
6      Q.   All the places he went?  Where
7  did he go?  What do you mean by all the
8  places he went?
9      A.   He went to the dealership with
10  that, which is they check my credit.  This
11  is put my credit down.
12      Q.   How did that put your credit
13  down?
14      A.   That put my credit down because
15  my credit -- listen, when you apply for a
16  loan and you never pay your loan, whatever
17  you apply, whatever you did, you never pay
18  for that, that's not going to put your
19  score up, it put your score down.
20      Q.   What was your credit score on
21  September 23rd of 2020?
22      MR. KESHAVARZ:  Objection to
23   form.
24      A.   I don't remember.
25      Q.   Is it your testimony that it

F. FRANCOIS

1      F. FRANCOIS
2  was lower on September 23, 2020 that it had
3  been before May 30th of 2020?
4      MR. KESHAVARZ:  Objection to
5   form.
6      A.   Yeah.
7      Q.   So, your testimony is it went
8  down from May of 2020 to September of 2020?
9      MR. KESHAVARZ:  Objection to
10   form.
11      You can answer.
12      A.   It keep going down because it's
13  not going up.  That's all I know, that my
14  credit keep going down because I had my
15  credit -- I was trying to work on my credit
16  to build my credit to get more credit to
17  apply for a loan to get my house.  I was
18  trying to save money to buy my house which
19  is like that did affect me because that put
20  me more down.
21      Q.   What put you more down?
22      A.   The loan.  $20,000 is not easy.
23      Q.   On the Exhibit A, third page,
24  the one we have on the screen, if you see
25  down at the bottom, "How much money, if

F. FRANCOIS

1      F. FRANCOIS
2  any, have you had to pay as a result of
3  identity theft?"  Did I read that
4  correctly?
5      A.   Yeah, 29,462.81.  That's the
6  loan that they get for the Capital One.
7      Q.   But you didn't have to pay
8  that, did you?
9      A.   I don't know, but me, I was
10  scared because someone been calling me and
11  been telling me that I never pay nothing.
12  I didn't know if I have to pay or not pay.
13  All I know is that was my name on it and
14  that was coming to me that I have to pay
15  that money, which I never got that loan
16  and --
17      MR. GOODMAN:  Move to strike
18   the nonresponsive portion.
19      Q.   Did you ever pay 29,462.81?
20      A.   No.
21      Q.   Did you ever pay anything on
22  the Capital One loan?
23      A.   No.  Why would I pay something
24  that I did not do?
25      Q.   So, you never paid a dollar,

F. FRANCOIS

1      F. FRANCOIS
2  thank you.
3      And, in fact, your
4  understanding, as a result of this Fraud
5  Affidavit and Questionnaire, Capital One
6  rescinded the loan.  They pulled it back
7  and said you're not responsible for it
8  anymore; isn't that correct?
9      A.   I don't know about that because
10  they didn't tell me.  Capital One didn't
11  tell me what they were going to do.  They
12  just sent me this paper.
13      Q.   They never sent you a paper
14  that said we've acknowledged your
15  application and we've determined to rescind
16  your loan?  You never got that?
17      A.   I don't remember, but they send
18  me a paper that I have to notarize it.
19  They was telling me that the paper had to
20  be notarized and then send it back to them.
21  I don't remember.
22      Q.   So, if I told you that the
23  document from Capital One in which they
24  said the loan is resolved, you're not
25  responsible anymore is actually attached as

34 (Pages 130 - 133)

F. FRANCOIS

1 an exhibit to your Complaint in this
2 lawsuit, would that refresh your
3 recollection?
4        MR. KESHAVARZ:  Objection to
5    form.
6    Q.   Go ahead, you can answer it.
7    A.   Well, if it's there, but I
8 don't remember all those paper that they
9 send it to me.
10   Q.   But you said you don't know
11 whether you're still responsible for this
12 loan or not.  Is that your testimony?
13   A.   Yeah, because my name was on
14 it.  It was on my name, which is like if
15 something is on your name you have to pay
16 for that.  That's why I don't know if I'm
17 responsible for that.
18   Q.   As you sit here today, you
19 think you still have to pay for this loan?
20      MR. KESHAVARZ:  Objection to
21   form.
22   A.   I don't know.
23   Q.   Well, did your lawyer ever tell
24 you anything about that?


F. FRANCOIS

1        MR. KESHAVARZ:  No, no, don't
2    answer that.
3        You know better than that,
4    Counsel.
5    Q.   Yes or no?
6        MR. KESHAVARZ:  No, don't
7    answer that question.
8    Q.   Okay.  By the way, you just
9 testified that Capital One was calling you,
10 telling you that you had to pay this
11 morning.  Remember you gave that testimony?
12   A.   No, this is not what I said.  I
13 said Capital One been calling me saying
14 that I've been late in paying, which is I
15 never paid them since I bought the car,
16 which is Capital One did not know it wasn't
17 me, and me neither, I didn't know that the
18 do loan under my name.
19   Q.   When is the first time Capital
20 One called you and told you you're late on
21 the payment?
22   A.   In 2020.  I do not remember
23 when the first time they called me.
24   Q.   But you never paid anything

F. FRANCOIS

1 toward this loan, right?  That was your
2 testimony correct?
3    A.   No.
4    Q.   Right.  No, you didn't pay,
5 correct?
6    A.   Yes, I did not pay anything.
7    Q.   Okay.  So, that means that the
8 loan was taken out in May, it would have
9 already been delinquent by three months by
10 the time we got to September, correct?
11      MR. KESHAVARZ:  Objection to
12   form.
13   Q.   You can answer.
14   A.   I'm not a lawyer, I don't know
15 nothing about that, which is that's why I
16 got a lawyer to do, a person who know
17 better about that because I don't know
18 nothing about that.  This is the first time
19 that happened to me, somebody stole all my
20 information and did things like that.  I
21 don't know nothing about that, how do that
22 work, if they going to remove it or they
23 did not remove it.  I don't know nothing
24 about that.

F. FRANCOIS

1    Q.   So, as you sit here today you
2 think you might still have to pay on this
3 loan, right?
4        MR. KESHAVARZ:  Objection.
5    Form, asked and answered.  Go ahead.
6    A.   I don't know.
7    Q.   You don't know, okay.  But let
8 me ask again:  When, I'm asking for a date,
9 it doesn't have to be an exact date, but
10 approximately when, was it June, July,
11 August, that Capital One called you, as you
12 said they did, to tell you that you were
13 late in paying on this loan?
14      MR. KESHAVARZ:  Objection to
15   form.
16   A.   I really don't remember the
17 date that they call me.  I don't know when.
18   Q.   But it was before you filed
19 this fraud application, your fraud claim,
20 correct?
21      MR. KESHAVARZ:  Objection.
22   Form, asked and answered.
23      MR. GOODMAN:  Neither are a
24   fair objection, but go ahead, you can

35 (Pages 134 - 137)

F. FRANCOIS

1
2    answer.
3    A.   You say if it's before I filed
4  the --
5    Q.   You said before, your
6  testimony, which will stand on the record,
7  that Capital One had been calling you to
8  tell you you were late on payment on the
9  loan, correct?
10   A.   Yeah.  They e-mailed -- they
11 mailed me, because when I received the
12 title I received the paper from Capital One
13 too, saying about the late bill.
14   Q.   Your testimony is that grandma
15 or grandpa at 2914 Farragut would collect
16 the mail from the mailman, correct?
17   A.   Yes.
18   Q.   And then they would give you
19 the mail that was for you, right?
20   A.   Yeah.  They give it to my
21 father-in-law because sometimes when I go
22 there, I already asleep because sometimes I
23 finish work at 6:30, 7:00, typically close
24 at 7:00.
25   Q.   Would they give it to your

F. FRANCOIS

1
2  husband, Stanley?
3    A.   No, they give it to my
4  father-in-law.  My father-in-law sometimes
5  give it to Stanley or sometimes give it to
6  me when he saw me when I come home after
7  work.
8        MR. GOODMAN:  Give me one
9     second.
10       (Brief pause.)
11       MR. GOODMAN:  Okay, that's all
12    I have for Exhibit A, so we can take
13    that off the screen.
14       (Screen sharing stopped.)
15 BY MR. GOODMAN:
16   Q.   I want to ask you,
17 Ms. Francois, you understand that in this
18 lawsuit you're claiming that you suffered
19 certain damages, you lost certain things as
20 a result of what you say, what you claim
21 the dealership did, right?  You understand
22 that?
23   A.   Yes.
24   Q.   So, I want to ask you to tell
25 me, in terms of dollars, I'm not asking you

F. FRANCOIS

1
2  about the stress that you suffered, the
3  emotional stress, the bags under your eyes
4  and all that, I'm not asking you that now,
5  I'm going to ask you.  Right now, I'm
6  asking you to tell me how what you say the
7  dealership did damaged you in terms of
8  dollars.  Can you answer that?
9        MR. KESHAVARZ:  Objection,
10    form.  Go ahead.
11       THE WITNESS:  I really don't
12    understand the question.  Can you
13    explain to me, Ahmad?
14       MR. KESHAVARZ:  No.  If you
15    don't understand the question, just
16    say you don't understand the
17    question.
18   A.   Yeah, I don't understand the
19 question.
20   Q.   Okay.  I want you to tell me
21 every dollar that you spent out of your
22 pocket that you claim was a result of what
23 the dealership did in this lawsuit?
24       MR. KESHAVARZ:  Objection to
25    form.  Go ahead.

F. FRANCOIS

1
2    A.   I don't remember.
3    Q.   What was that?  You don't know?
4    A.   Yeah.  I don't remember I said.
5    Q.   Okay.  There are certain
6  parking violations that were attributed to
7  the BMW, correct?
8    A.   Yes.
9    Q.   It got parking tickets, right?
10   A.   Yeah, I got MTA tickets from
11 coming from New Jersey and things like
12 that.
13   Q.   Did you ever pay anything out
14 of your own pocket, your own money to pay
15 off the parking violations?
16   A.   No, but I still have them here,
17 because they still remove them.
18   Q.   Did you pay anything for the
19 violations for the tolls, you know, the
20 tunnels and the bridges, did you pay
21 anything out of your pocket for those
22 violations?
23   A.   MTA?  No, I don't remember.
24   Q.   Yeah, I'm sorry, MTA is the
25 right way to phrase that.

36 (Pages 138 - 141)

Page 142

```
1        F. FRANCOIS
2    A.   Yeah, I don't remember.
3    Q.   No, you didn't pay anything,
4 correct?
5        MR. KESHAVARZ:  Objection to
6    form.  What did you say?
7    Q.   Did you pay any money out of
8 your own pocket toward alleviating, or
9 whatever the word is, those violations with
10 the MTA?
11        MR. KESHAVARZ:  Objection to
12    form.
13    A.   (No response.)
14    Q.   You can answer.
15    A.   I don't know.
16    Q.   You don't know?
17    A.   Yeah, because I really don't
18 understand your question.
19        MR. KESHAVARZ:  That's fine.
20    If you don't understand, say you
21    don't answer.
22    A.   Yeah, I don't understand your
23 question.  I don't know what your question
24 is.
25    Q.   There were certain violations
```

Page 143

```
1        F. FRANCOIS
2 issued by the MTA for the BMW, correct?
3    A.   Uh-huh.
4    Q.   You have to say yes.
5    A.   Yes.
6    Q.   And they came to you because
7 you were the title owner registered on the
8 car, correct?
9    A.   Yes.
10    Q.   Did you pay anything toward
11 those violations to make those violations
12 go away?
13        MR. KESHAVARZ:  Objection to
14    form.
15    Q.   You can answer.
16    A.   I still have a lot.  I still
17 haven't paid them because I'm going to go
18 in Bronx, because I went there to tell them
19 that, they ask me about a lot of paper.  I
20 still have a lot to pay, that MTA thing,
21 and no, I haven't paid.
22    Q.   You haven't paid anything to
23 date, right.
24        MR. GOODMAN:  And I'm going to
25    move to strike the nonresponsive
```

Page 144

```
1        F. FRANCOIS
2    portion.
3    Q.   There were certain moving
4 violations, right, the camera violations
5 where the camera took a picture of the BMW
6 violating some Vehicle and Traffic Law, do
7 you remember that?
8    A.   Yeah, all those paper.
9    Q.   Did you pay anything out of
10 your own pocket toward those violations?
11        MR. KESHAVARZ:  Objection,
12    form.  Go ahead.
13    A.   I don't know.  I don't
14 remember.
15    Q.   If you don't know, who would
16 know?
17        MR. KESHAVARZ:  Objection,
18    form.
19    A.   I said I don't remember.
20    Q.   Well, you said "I don't know,"
21 and then you said you --
22    A.   I don't remember, I don't
23 remember, because there was a lot of paper
24 that keep coming, sending to me under my
25 name.
```

Page 145

```
1        F. FRANCOIS
2    Q.   Right.
3    A.   Which is I don't remember.
4 Which you said in 2020, I was so depressed.
5 You think I'm going to remember everything
6 that he did and everything that the dealer
7 did?  No.
8    Q.   I'm not asking you to remember.
9 I'm asking you what you paid, money.
10    A.   I told you those bills still
11 under my name because I still have to go.
12 The last time I went to Bronx, they said to
13 remove them I have to go to the police; not
14 only the police paper that I bring it who
15 says 17th Precinct and things like that
16 that I went there.  They said they want all
17 those paper.  I have to go to Brooklyn to
18 get all those papers and then to bring it
19 to them.  Even MTA, they asked me do the
20 same thing, too.
21    Q.   Who asked you to do that, MTA
22 and who else?
23    A.   MTA and then the parking ticket
24 that he has.  All the parking ticket he
25 take in the firefighter that he put the
```

37 (Pages 142 - 145)

F. FRANCOIS

1      car, leaving the car, whatever.  It's fine,
2   he can leave the car because the car is not
3   in his name, so that is not going to
4   connect to him.
5      Q.   Do you have a date that you're
6   supposed to go take that?
7      A.   No, they told me to remove it
8   that I have to go get those papers.
9      Q.   When did they tell you that?
10     A.   When I went there to ask them,
11  which is like all those tickets is not me,
12  it's something like someone doing take all
13  my information and then buy a car under my
14  name.  I even bring them the Capital One
15  thing, which is the customer was telling
16  me, okay, to remove that we need more
17  proof, you have to go to the police.  She
18  was telling me about the form that I have
19  to ask them and then I will have to come
20  back and make an appointment, which is not
21  like you go to the court, you have to make
22  an appointment online.
23     Q.   But isn't it true you started
24  the process of getting those tickets

F. FRANCOIS

1      removed and those violations removed in
2   September and October of 2020, correct?
3      A.   Yeah, I've been trying to get
4   those tickets to remove and then most of
5   those tickets they asking me for that.
6      Q.   You're saying now, it's more
7   than two years later, you still haven't
8   gotten them removed?
9      A.   Yeah, still the BMW, I still
10  receive that.
11     Q.   What does that mean?  The
12  BMW -- say that again.
13     A.   I still receive the ticket that
14  he never paid which is, okay, credit.  They
15  send me in the credit thing I have to pay,
16  which is all those bills I did not pay,
17  they send it to the credit.
18     Q.   They send it to the credit?
19  What does that mean, they send it to the
20  credit?
21     A.   Okay, if you buy something and
22  you never pay for that, where they send it?
23  They send it to credit; yes, no?
24     Q.   I don't know what you mean.  I

F. FRANCOIS

1      don't really understand you.  Do you mean
2   to a collection agency?
3      A.   To the collection, yes.
4      Q.   Okay.  So, you're receiving
5   letters from collection agencies; is that
6   correct?
7      A.   Yeah, yeah.  I did receive some
8   paper from collection.
9      MR. GOODMAN:  Okay, and I would
10     ask that those papers received from
11     collection agencies concerning
12     violations on the BMW be preserved
13     and produced.  I call for their
14     production from Ms. Francois.
15     Q.   By the way, are you aware of
16  Mr. Emmanuel Laforest using your identity
17  for any purpose beyond or other than
18  purchasing the BMW?
19     A.   I don't know.  That's why I go
20  to the police, because I don't know what he
21  did with my ID, with my Social, who was in
22  his hand.  And with the car, that's why I
23  was scared, because I say he may kill
24  someone and then leave it in the car.  Who

F. FRANCOIS

1      the police going to look for is me, because
2   the car is in my name.  That's why,
3   basically, I went to the police.
4      MR. GOODMAN:  Move to strike
5      the nonresponsive portion.
6      Q.   So, Ms. Francois, the question
7   is very simple:  Are you aware of any other
8   use that he made of your identity other
9   than the --
10     A.   I don't know.
11     Q.   Well, have you received any
12  bills, any mail, anything from collection
13  agencies for things he bought or credit
14  cards he took out, anything like that?
15     MR. KESHAVARZ:  Objection,
16     form.
17     You can answer.
18     A.   I put to receive there, in 2914
19  Farragut, in front of the house, to 284 all
20  the mail, to not let me receive anything.
21  So, I moved there, I'm not living there
22  anymore.  Everything that he receive, he
23  will keep it, he will not give it to me.  I
24  even told you early that he received my

F. FRANCOIS

1      F. FRANCOIS
2 Green Card, he keep it.
3   Q.  Let me ask you this:  Why
4 didn't you sue Emmanuel Laforest in this
5 case?
6      MR. KESHAVARZ:  Objection,
7   form.
8     If you have an understanding
9   that's not based on our
10  conversations, then you can answer.
11  But if you have an understanding
12  that's based on our conversations,
13  then don't answer it.
14     MR. GOODMAN:  I object to that,
15  but go ahead, you can answer.
16  A.  You say why I did not sue --
17  Q.  Why didn't you sue him?  He did
18 all this wrong to you.
19  A.  Did Emmanuel apply for Capital
20 One or you?  The dealership put my name in
21 Capital One without checking the people who
22 is coming to do things.  Because he was not
23 online.  If he was online, it's different
24 thing.  Because I know about customer
25 service.  Like I said to them, I'm a

F. FRANCOIS

1      F. FRANCOIS
2 customer service employee for TD Bank.  I
3 know that Emmanuel was coming with the ID
4 and sitting in front of them and they see,
5 they see my ID, they see a woman on that.
6 Why didn't you ask them for that?
7     MR. GOODMAN:  I move to strike
8  the nonresponsive portion.
9     THE WITNESS:  (Inaudible.)
10    (Whereupon, the Witness stands
11  up.)
12     MR. KESHAVARZ:  Why don't we
13  take five minutes?
14     THE WITNESS:  No, I'm okay,
15  Ahmad.  I'm okay, I'm okay.
16     MR. KESHAVARZ:  All right.
17  Just let us know if you change your
18  mind.  It's not an endurance test.
19     MR. GOODMAN:  If you want one,
20  Ahmad, we can do it for you.  I mean,
21  it's up to you.
22     THE WITNESS:  No, I'm okay, I'm
23  good.
24    (Whereupon, the Witness sits
25  down.)

F. FRANCOIS

1      F. FRANCOIS
2     MR. GOODMAN:  Okay, you know
3  what, we will take a break after I
4  ask this question.  I hope I get an
5  answer to it.
6 BY MR. GOODMAN:
7   Q.  Again, why did you not sue
8 Emmanuel Laforest?  You chose to bring a
9 lawsuit against a whole bunch of people and
10 companies, but you didn't sue him and he's
11 the one that stole everything from you,
12 lied so much.  Why not?
13  A.  Like I said, did Emmanuel was
14 the one who was like put all my information
15 in Capital One?  Is Emmanuel who is the one
16 who is looking for my credit?
17  Q.  Yes, he was.
18  A.  He was not the one.  Emmanuel
19 did not do it online.  Like I said, if he
20 was online, that's another thing because
21 you don't have access to see who is behind
22 the computer, but he was in person --
23     MR. GOODMAN:  Objection.  Move
24  to strike the nonresponsive portions.
25     MR. KESHAVARZ:  Wait.  Let her

F. FRANCOIS

1      F. FRANCOIS
2  finish her answer.
3     Go ahead, Ms. Francois.
4  A.  He was in person and he sit
5 down with someone there, which they have
6 the video.  Like I said to them, you guys
7 have to show the police the video when I
8 went there, because I never been there.
9 They said, okay, it's fine, we know you
10 never been there.  Okay, so why didn't
11 they, when Emmanuel give them my Social and
12 my ID, why they didn't say this is a woman,
13 this is not that person here, this is only
14 you here, we cannot do that; why they
15 didn't do that?
16  Q.  Okay, I'm not here to answer
17 questions, you're not here to ask
18 questions.
19     MR. GOODMAN:  I move to strike
20  the nonresponsive --
21  A.  I'm just answering your
22 questions.
23  Q.  That's not an answer.
24  A.  Yes, it is.
25     MR. GOODMAN:  I move to strike

39 (Pages 150 - 153)

F. FRANCOIS

1       F. FRANCOIS
2    the nonresponsive portions.
3     Q.   Who told you at the dealership
4 we agree, you weren't ever here? You just
5 said that.
6     A.   The son told me that. The
7 father told me that when they said, yes,
8 he's the one who is bringing the ID, which
9 is your ID and which is his ID. When they
10 put all the paper, they put it in front of
11 me (indicating).
12     Q.   So, I'm going to ask one more
13 time, it's pretty risky but I'll try it.
14      You went to the police about
15 Emmanuel Laforest, you testified today
16 about all the lying and deception and
17 thievery that he did and identity theft,
18 and yet, you chose not to bring a lawsuit
19 against him, why?
20     A.   Say that again. Ask your
21 question again.
22     Q.   For all that he's done bad to
23 you, you didn't want to bring him into this
24 lawsuit?
25     A.   Emmanuel, that's why I went to

F. FRANCOIS

1       F. FRANCOIS
2 the police, because what he did is the
3 police. But the basic people who did more,
4 who damaged all that is the dealership,
5 because the dealership is supposed to be --
6 whoever the customer come to your store
7 with somebody ID, you're not supposed to
8 accept that person if that person is not in
9 person who signed. Which is he falsified
10 my signature, which is not me and --
11     Q.   So --
12     MR. KESHAVARZ: Wait, don't
13    interrupt her, don't interrupt her.
14     MR. GOODMAN: I'm not
15    interrupting anybody.
16     MR. KESHAVARZ: Yes, you are.
17    Were you done, Ms. Francois?
18     THE WITNESS: No, I'm not done.
19     MR. KESHAVARZ: Then continue
20    and finish your answer, please.
21     A.   Yeah, it was their
22 responsibility to look at the ID. First of
23 all, it was not a man ID, it was a woman
24 ID. He went in there, he is a man ID, he
25 brought his ID. Why the dealership not

F. FRANCOIS

1       F. FRANCOIS
2 keeping his ID and say if you want to buy
3 the car, we're going to have to do it under
4 your name, but not under that person
5 because that person is not here, that
6 person is supposed to be here to do that.
7     MR. GOODMAN: I move to strike
8    the nonresponsive portion.
9     And, Ahmad, since you seem to
10    be out of control with your witness,
11    I would like you to please advise her
12    just to answer questions that are
13    being asked of her.
14     MR. KESHAVARZ: Actually, she
15    answered that perfectly.
16     MR. GOODMAN: I figured you
17    would say that, but you know better,
18    so.
19 BY MR. GOODMAN:
20     Q.   Okay, but my question is you
21 seem to be saying that Emmanuel Laforest
22 went to the dealership alone; is that your
23 understanding?
24     MR. KESHAVARZ: Objection --
25     A.   That's what they say to me.

F. FRANCOIS

1       F. FRANCOIS
2     Q.   That's what who said to you?
3     A.   I said that to you. The son of
4 the dealer, the guy who went into his
5 office and sit down with the son, he said
6 Emmanuel come and sit down with the ID and
7 employee, one of his employee did it for
8 Emmanuel.
9     Q.   So, your testimony, I just want
10 to make sure we're clear on this, your
11 testimony is that the son, you're calling
12 him, at the dealership told you that
13 Emmanuel Laforest was alone at the
14 dealership? He didn't bring anybody with
15 him?
16     A.   No, he say Emmanuel brought the
17 ID. I said did he bring a woman? Because
18 I asked them that question, did they
19 brought a woman there? They said no, he's
20 coming here, but it was not us who do that,
21 it was the employee.
22     Q.   That's your testimony, okay.
23     A.   That's what they say.
24     Q.   That's what they say, okay.
25     I've asked you before to tell

Page 158

1          F. FRANCOIS
2  me everything that happened in that
3  conversation and now we're hearing new
4  parts of that conversation.
5      A.   It's not new part.  I told you
6  about that they say -- when they say they
7  don't have no control about that because
8  it's COVID, which is I told them don't tell
9  me about COVID because it was not online,
10 COVID had nothing to do about that.  If it
11 was online, that's another thing, but he
12 was in person and sit down with you guys
13 and you guys did this.
14     Q.   But this is the first time
15 you're telling me that you asked the
16 question did he bring a woman with him?
17         MR. KESHAVARZ:  Are you going
18     to argue with her?  What's your next
19     question?  Don't argue with my
20     client.  What's your question?
21     Q.   Is this the first time that you
22 told them that?
23         MR. KESHAVARZ:  Objection,
24     form.  Go ahead.
25     Q.   Why did you not tell me that

Page 159

1          F. FRANCOIS
2  before when I asked you --
3      A.   I told you, but you didn't
4  listen.
5      Q.   I didn't listen, okay.
6      A.   They bring all the paper.  They
7  bring all they paper, they say I'm going to
8  show you what he do.  And then they put all
9  the paper.  They put it in front of me and
10 my uncle in the office.  And then, he has
11 my driver's license copy and Emmanuel
12 driver's license copy.
13     Q.   Okay.
14     A.   Okay.
15         MR. GOODMAN:  All right.  I
16     guess I was in a different place when
17     all that happened, but let's take a
18     ten-minute break.
19         MR. KESHAVARZ:  Ms. Francois,
20     do you want to keep on going and get
21     this over with?
22         THE WITNESS:  Yeah, I want to
23     keep on going.
24         MR. GOODMAN:  No, we're taking
25     a break.

Page 160

1          F. FRANCOIS
2          THE WITNESS:  I just want to
3     keep on going and finish this up
4     because this thing really is
5     stressing me since 2020.
6          (Whereupon, Mr. Goodman logs
7     off the Zoom meeting.)
8          MR. KESHAVARZ:  All right,
9     let's take a break for ten minutes.
10         (Whereupon, at 3:06 P.M., a
11     short recess was taken.)
12         (Back on the record at
13     3:25 P.M.)
14         MR. GOODMAN:  Are you ready?
15         MR. KESHAVARZ:  Yes.
16         MR. GOODMAN:  Ms. Francois?
17         THE WITNESS:  Yes.
18 BY MR. GOODMAN:
19     Q.   In this case, are you claiming
20 that you have certain damages due to monies
21 you expended on postage?
22     A.   Say that again.
23         MR. GOODMAN:  Can you read it
24     back, please.
25         (Whereupon, the referred to

Page 161

1          F. FRANCOIS
2     question was read back by the
3     Reporter.)
4      A.   What does that mean "postage?"
5  Because I don't get it, "postage."
6      Q.   Well, it's your claim.  You've
7  claimed postage, so you tell me what you
8  meant by that when you claimed that.
9          MR. KESHAVARZ:  Objection,
10     form.
11     Q.   You can answer.
12     A.   I don't know what you're
13 talking about.
14     Q.   Okay.  And in this case you've
15 make certain claims for monies you spent
16 for copying.  Do you know that you did make
17 that claim?
18     A.   Yeah.  All these paper, I make
19 a copy of that, yeah.
20     Q.   How much did you spend on
21 copying?
22     A.   I don't remember because I have
23 to do copy for the police, I have to do
24 copy for Capital One, I have to do copy for
25 MTA to send all those paper.

41 (Pages 158 - 161)

F. FRANCOIS

1
2        MR. GOODMAN:  Move to strike
3    the nonresponsive portion.
4    Q.   I'm asking you the dollar
5 amount that you are claiming as damages
6 from copying.
7    A.   I don't know.  I don't know.  I
8 don't know to tell you that.
9    Q.   Did you take documents to like
10 a FedEx, Kinko's or something to have them
11 copied?  Where did you have the copies?
12 I'm sorry, let me rephrase it.
13    A.   Staples, Staples.  I went to
14 Staples and other places.  I went to
15 Staples when they were asking me for
16 copies.  I don't remember the other place I
17 went for copies.
18    Q.   Do you have receipts for that?
19    A.   No, it's since 2020 and I'm
20 moving from where I used to live, so I did
21 not keep any receipt of that.
22    Q.   Okay, thank you.
23        Now, one of your claims in this
24 case is that you had to, quote, put your
25 stuff in storage.  Do you know that to be

F. FRANCOIS

1
2 one of your claims in this lawsuit?
3    A.   Yeah, because I was scared
4 about that.  Because Emmanuel was so mad
5 and then his friend, when they been calling
6 me on the phone and calling me and then
7 giving me that and then calling me on
8 blocked numbers, my husband was scared.  He
9 said you have to go to your friend or go to
10 your family.  And then all that thing we
11 get, my bed, all my stuff from my room.  I
12 couldn't bring everything back to my uncle
13 because I was not living there anymore and
14 I have to put everything in storage.
15    Q.   Is it still in storage?
16    A.   No, I get rid of that because
17 I've been paying storage.  You have to pay
18 storage every month, every month, so no.
19    Q.   How many months was it in
20 storage?
21    A.   I leave it there for three or
22 four months and then after that I used the
23 car and then after that all that I got with
24 me is my clothes and all of that I just
25 left it.

F. FRANCOIS

1
2    Q.   Do you have any receipts for
3 those three or four months?
4    A.   No, I don't have any receipt
5 for that.  That was not in any mind to keep
6 receipt for nothing.  I'm losing my mind to
7 save my life, to get out of Brooklyn.
8    Q.   Okay.  So, the reason you had
9 to put your stuff in storage was because
10 you were threatened by Emmanuel Laforest or
11 people with him, correct?
12    A.   Yes.
13    Q.   And you also, in this case, are
14 claiming stress of your marriage, correct?
15    A.   Yes.
16    Q.   Now, if I understood your
17 earlier testimony, again, you correct me if
18 I'm wrong, you're trying to reconcile with
19 Stanley Laforest now, correct?
20    A.   We try to -- what we built,
21 what we had, like he say that you cannot
22 let go, what happened with my brother, and
23 then destroy us.  I say that if I knew your
24 brother was like -- for me, I tell him a
25 lot of things.  I say your brother can be a

F. FRANCOIS

1
2 killer, he can be anyone.  Because if I
3 know he be stealing people's stuff, I would
4 never marry to you, I would never want my
5 baby will have nothing to do with your
6 family.  And it was like every day we would
7 have those fighting.  Like, when he coming
8 to see me, to visit me, I would always say
9 you know what, I want to stop our
10 relationship.  This is our stress because
11 he was going through a lot.  He has to stop
12 school, because he was in nursing school
13 also, him, and that was a lot for us.
14    Q.   So, where are you at right now
15 with him?
16    A.   He call me asking me if
17 everything is okay, how is the school.
18 Since he know I go back to school, I'm
19 taking RN, because I did not stop from the
20 nursing school.  And he always -- if I have
21 homework to do, I ask him because he
22 already finish from RN, I ask him and he
23 give me some answers and helping me with
24 the school sometimes.
25    Q.   So, you're also claiming in

42 (Pages 162 - 165)

Page 166

F. FRANCOIS

1  F. FRANCOIS
2  this case that your credit was damaged as a
3  result of what happened with the BMW; is
4  that correct?
5      A.  Yes.
6      Q.  How do you understand that your
7  credit was damaged?
8      A.  I understand because whatever
9  you buy, whatever you bought, if you don't
10 pay on time, what is going to happen?  It's
11 going to drop your credit.  Which is what
12 happened to my credit score, it's been
13 dropping, dropping, dropping, dropping,
14 never go back where it used to do and I was
15 trying to build my credit.  Like I said
16 before, I was trying to build my credit to
17 be able to save my money to buy my house
18 and which is like my credit been going
19 down, going down which I can never do that.
20     Q.   What is the highest credit
21 score that you ever had?
22         MR. KESHAVARZ:  Objection,
23      form.
24     A.  (No response.)
25     Q.  You can answer.

Page 167

1  F. FRANCOIS
2      A.  Answer?  I have to give a
3  specific number or I don't have to give a
4  specific number?
5          MR. KESHAVARZ:  Just listen to
6      the question.  If you know the answer
7      to the question, then say what the
8      answer is.  If you don't know, then
9      you say you don't know.  Just listen
10     to the question.  Go ahead.
11     A.  I had credit.  I had credit it
12 was like 780 before I had that.  And then
13 after that, my credit been dropping and
14 then I been trying to build my credit
15 again.
16     Q.  When was your credit score 780?
17     A.  I think when I get the credit.
18 I don't remember when was that.
19     Q.  Approximately, when?  Was it
20 2016?  Was it 2018?
21     A.  To tell you the truth, I don't
22 have a specific years, a specific day it
23 was that.  But you asked me the highest
24 score my credit been, I tell you the
25 highest score my credit was and then after

Page 168

1  F. FRANCOIS
2  that it drop.
3      Q.  So, the highest was 780,
4  correct?
5      A.  Yeah, it was 780.
6      Q.  780, okay.  So, do you have any
7  documentation that would establish that,
8  that would show that 780?
9      A.  No, no.  Because the reason it
10 was 780 is because I got American Express.
11 To get American Express, your credit have
12 to be good.  I have an American Express
13 card before and I have a Macy's before.
14     Q.  So, the highest ever was 780.
15 What's the lowest it's been?
16     A.  I don't remember the lower.
17 Because after that, I was not keep tracking
18 my credit score, keep tracking my credit
19 score because I know every time you go into
20 your credit score sometimes they damage
21 your credit score.  I know that I will not
22 keep checking my credit cards and things
23 like that because I was planning to save my
24 money to buy my house, so that's why I was
25 working on my credit.  So, I never go to my

Page 169

1  F. FRANCOIS
2  credit to tell you exactly the lower it was
3  after that.
4          MR. GOODMAN:  Okay.  Can we put
5      letter D up?  It's marked as D, we
6      can make it Exhibit B to keep it
7      sequential.
8          That would be Plaintiff's
9      Experian Report 6/11/21, Exhibit D on
10     the e-mail, if you could share that
11     on the screen, please.
12         (Whereupon, the aforementioned
13     document was marked as Defendant's
14     Exhibit B for identification as of
15     this date by the Reporter.)
16         (Screen sharing.)
17         MR. GOODMAN:  Before I ask you
18     questions about this, I just want to
19     state for the record that we call for
20     the production of any documents,
21     documentation concerning the
22     Plaintiff's credit score prior to
23     5/30/2020 and, most specifically, a
24     credit score of 780.
25 BY MR. GOODMAN:

43 (Pages 166 - 169)

F. FRANCOIS

1
2    Q.   Can you see it on the screen,
3  Ms. Francois?
4    A.   Yeah, I see it and I see the
5  date was June 11, 2021.
6    Q.   Correct.
7    A.   After that.
8    Q.   Yes.  Do you know what this is
9  generally?  You can look through all the
10  pages if you want.  What is it?
11    A.   This is my credit score.
12    Q.   Take your time, if you need to
13  take your time.
14    A.   This is showing the credit
15  score.
16    Q.   Okay.  And what is your credit
17  score on this document?
18    A.   On this document, it shows 492
19  from June 11, 2021.
20    Q.   This was produced by your
21  attorneys.  How did you come to have this
22  credit report dated in June of 2021?
23    A.   I don't get the question.
24    Q.   The question is:  Did you ask
25  for this?  Did you personally request this

F. FRANCOIS

1
2  credit report?
3    A.   Yeah, I was request for it to
4  see everything that happened on my account.
5  Like I said before, I don't know how he did
6  all that he did on my account.  Which is
7  like the police was asking me to get my
8  credit report and then they can see all
9  that he did on my account.
10    Q.   Okay.  And is this something
11  your attorneys asked you to do?
12        MR. KESHAVARZ:  Wait a minute,
13    don't answer that question.  That's
14    clearly attorney-client
15    communication.  Don't answer that
16    question.
17        MR. GOODMAN:  No, it's not, but
18    okay.
19        MR. KESHAVARZ:  Did your
20    attorneys ask you to do that?  I
21    don't know how much more of an
22    attorney-client privilege that is.
23        So, don't answer that question.
24    What's the next question?
25        THE WITNESS:  Yeah.

F. FRANCOIS

1
2        MR. GOODMAN:  Yeah,
3    Ms. Francois, okay.
4        MR. KESHAVARZ:  What's your
5    next question?
6  BY MR. GOODMAN:
7    Q.   Did you see anything -- and you
8  can look through it now if you want, there
9  are 23 pages here -- did you find anything
10  in this report that you identified as being
11  something that Emmanuel Laforest did with
12  your identity that caused your credit to go
13  down?
14    A.   Just give me one second.  I'm
15  just going to get my glasses.
16        (Brief pause.)
17        MR. KESHAVARZ:  Objection,
18    form, but then I'll ask the Court
19    Reporter to go page by page for all
20    23 pages.  Just let us know when
21    you're done reading each page.
22        (Brief pause.)
23    A.   Okay, I see the credit score,
24  giving you the credit score, yes.
25    Q.   Well, the question was:  Was

F. FRANCOIS

1
2  there anything in this report that you
3  attributed to or you identified as
4  something that Emmanuel Laforest did with
5  your identity that caused this report to be
6  what it is?
7        MR. KESHAVARZ:  Objection.
8    Q.   Your attorney wanted you to go
9  through each page one by one.
10        MR. KESHAVARZ:  Objection,
11    form.  Are you asking her to go
12    through the document and ask her
13    what's in it?  Is that what you're
14    asking?
15        MR. GOODMAN:  No, you said you
16    wanted the Court Reporter to go
17    through every page.  I'm not saying
18    that.
19        MR. KESHAVARZ:  What's the
20    question on the table, Madame Court
21    Reporter?  Can you repeat it, please.
22        (Whereupon, the referred to
23    question was read back by the
24    Reporter.)
25        MR. KESHAVARZ:  Objection to

44 (Pages 170 - 173)

F. FRANCOIS

1  
2  the form of the question.
3      We're looking at one page on
4  the front of the screen. You may
5  answer, if you know.
6      MR. GOODMAN: Well, and you
7  previously, Ahmad, asked the Court
8  Reporter to go page by page through
9  all 23 pages. If that's what your
10  problem is, let us do that. That's
11  fine with me. If the Witness needs
12  to go through it, that's appropriate.
13      (Brief pause.)
14  BY MR. GOODMAN:
15      Q. Can you answer the question,
16  Ms. Francois?
17      A. Like I said, I just see my
18  credit. The credit is in my name and it's
19  492, Experian, date June 11, 2021. And
20  then give you bill, 11,760; 6,055 and then
21  give you 17,815. That's all I see in front
22  of me.
23      Q. Well, there are 23 pages there,
24  if you need to look at them to answer my
25  question. And my question again is: You

F. FRANCOIS

1  
2  previously testified that you wanted to
3  pull your credit report so you could find
4  out anything that Emmanuel Laforest did to
5  harm your credit.
6      A. Yeah, that's what the detective
7  was asking me.
8      Q. Right. So, do you see now, if
9  you want to look at it now, or did you find
10  then any evidence of anything Emmanuel
11  Laforest did with your identity that might
12  have resulted in this credit score being
13  what it is?
14      MR. KESHAVARZ: Objection to
15  form.
16      A. This is the day after. This is
17  June 11, 2020. That happened, the thing
18  that Emmanuel did and the dealer did on my
19  credit was in 2020. So, this one is 2021.
20      MR. GOODMAN: Move to strike
21  the nonresponsive portion.
22      Q. Again, I'm asking you, it's not
23  a hard question, is there anything in this
24  report that you attribute to Emmanuel
25  Laforest that caused this credit report to

F. FRANCOIS

1  
2  be what it is?
3      MR. KESHAVARZ: Objection to
4  the form of the question. Go ahead.
5      A. Yes.
6      Q. What is it? Show us.
7      A. It's not up on that, but if you
8  can go through the one that's in 2020, it
9  can show you everything that he did. You
10  can see everything in my credit score. You
11  would see the loan and every time that it
12  go down and then they say for late pay,
13  late pay, late pay. You can see
14  everything.
15      MR. GOODMAN: Okay. I will
16  call for the production of the credit
17  report from May of 2020 or prior to
18  May 30th of 2020 that the Witness is
19  now referring to that she says will
20  show us everything about what her
21  credit score was and how it came
22  down. I call for that production.
23      Q. Okay, do you see that red
24  circle there with 990 percent?
25      MR. KESHAVARZ: One second,

F. FRANCOIS

1  
2  there is someone at my door. You can
3  stay on the record, just give me one
4  second.
5      (Brief pause.)
6      MR. KESHAVARZ: Sorry, go
7  ahead.
8      Q. Ms. Francois, do you see that
9  figure in the middle that says 990 percent
10  inside the red and orange circle?
11      A. Yes.
12      Q. Do you know what that means?
13      A. They saying 990 percent they
14  say overall credit use.
15      Q. Correct. Do you understand
16  what that means?
17      MR. KESHAVARZ: Objection to
18  form.
19      Q. You can answer.
20      A. Not really. 990 percent? No,
21  not really. I don't understand what that
22  means.
23      MR. GOODMAN: Okay. Let's turn
24  to the third page of this report and
25  it should say Francois 95 on the

45 (Pages 174 - 177)

F. FRANCOIS

2    bottom.

3      (Reporter complies.)

4    Q.   Now, do you see up at the top

5 that this says -- I don't know if I'm

6 pronouncing it right -- Comenity

7 Bank/Victoria?  Do you see that on the

8 upper left?

9    A.   Yeah, I see it.

10    Q.   So, it says you had a charge

11 card with this bank; is that correct?

12    A.   Yeah, I see it shows.

13    Q.   Okay.  And it shows if you look

14 down at the bottom with the green dots and

15 the red numbers, do you see that?

16    A.   Uh-huh.

17    Q.   It says, for example, in

18 April 2020 there is a 30, a red number 30

19 there, do you see that?

20    A.   Uh-huh.

21    Q.   Do you understand what that

22 means?

23    A.   It says 30.

24    Q.   Does it mean you were 30 days

25 late in your payment?

F. FRANCOIS

2    A.   Yeah, that was my Victoria

3 Secret, when I lost it and I stopped paying

4 them, yeah, and it went to credit.

5    Q.   I'm sorry, I didn't get that.

6 What was your answer?

7    A.   I said that's my Victoria

8 credit, when I stopped using them and I

9 tell them to get me refund, because I

10 didn't like what they told me about

11 (inaudible) --

12    THE COURT REPORTER:  I'm sorry,

13   please repeat yourself.

14    A.   That's the Victoria Secret.

15 That's 30 days late which is that I did not

16 pay them.  And then they was calling me.  I

17 said they did because they have like they

18 have to take the money directly and the

19 lady was telling me that they was trying

20 and they couldn't get it and then after

21 that I paid it.

22    Q.   Okay.  So, you see that as of

23 September you were 90 days late on that --

24    A.   You can see all that.  You can

25 see all that since 2020 which is is -- my

F. FRANCOIS

2 computer just stopped -- which is 2020

3 you're going to see a lot like 60 days,

4 90 days, that I didn't want to do nothing

5 in my account.  Like for September you're

6 going to see 90 days.  Yeah, 90 days, yeah.

7    Q.   How about May of 2021?

8    A.   I'm talking about 2020.  90

9 days in September 2020, did you see that

10 too?

11    Q.   Yeah, I see that, it's 90.

12    A.   Oh, so okay.

13    Q.   Do you understand that late

14 payments, these 30, 60, 90 days late

15 payments affect your credit score?

16    A.   This is not from Victoria

17 Secret.

18    Q.   I don't know what this is.  It

19 says Comenity Bank.

20    A.   Okay.  That's why I say to see

21 the date, see the year, it was 2020.  It

22 was in September 2020, which is like three

23 months.  90 days mean three months that

24 never got any paid.

25    Q.   Right, exactly.  My question

F. FRANCOIS

2 is:  Do you understand that not paying for

3 90 days will affect your credit score?

4    MR. KESHAVARZ:  Objection,

5   form.

6    A.   (No response.)

7    Q.   Yes or no?

8    A.   Yes, I understand, but I have

9 nothing to do with that.  Which is like

10 fraud happen in my account, so before you

11 do anything you have to know what's going

12 on with your account.  So, that's the

13 reason the detective tell me to get all the

14 report, don't do nothing in your account,

15 get all your report and then tell them to

16 send you all the credit report.

17    Q.   So, this says that in July of

18 2020 you were 30 days delinquent, in August

19 of 2020 you were 60 days delinquent.  Is it

20 your testimony that you were already aware

21 of what Emmanuel Laforest did as of that

22 date?

23    A.   No, no, I did not aware.  I

24 told you, like I said before, I went about

25 September.  If I have known what he did, I

Page 182

F. FRANCOIS
1
2 would contact Capital One early. You see
3 the date that Capital One which is with me,
4 which is the date that I put all the paper,
5 which is in September, which is the date
6 that I find out everything that happened.
7 Before, I didn't know anything about that.
8    Q.   But as of September, on this
9 card you were already 90 days late,
10 correct?
11        MR. KESHAVARZ: Objection to
12    form.
13    Q.   Yes or no?
14    A.   Yes.
15    Q.   And you didn't know about what
16 Emmanuel Laforest did until September,
17 right?
18    A.   Yeah, I didn't know anything
19 that he did. Like I said to you, I was not
20 about my credit checking everything. Like
21 I didn't want to go through my credit,
22 which is I have to leave my credit, just
23 I'm trying to save money to build my
24 credit. I didn't know what was happening
25 in my credit because I was not checking my

Page 183

F. FRANCOIS
1
2 credit every second, every time.
3    Q.   You were checking your credit
4 every second, every time or you were not?
5    A.   No, I was not checking my
6 credit every second, every time. If I
7 check that, I would know that since the day
8 that he did that.
9        MR. GOODMAN: Move to strike.
10    Go to two pages down, Francois
11    97.
12        MR. SELVEY: If it helps, I can
13    take over the screen sharing there,
14    if that would be easier so you can
15    transcribe and not have to switch
16    between those two things.
17        THE COURT REPORTER: Yes,
18    please. I'd appreciate that.
19        MR. SELVEY: 97 you asked for?
20        MR. GOODMAN: Yes.
21    (Brief pause.)
22        MR. SELVEY: 97, does everybody
23    see that?
24        MR. GOODMAN: Yes, I see it.
25        Do you see it, Ahmad?

Page 184

F. FRANCOIS
1
2        MR. KESHAVARZ: It's small.
3    I'm on my iPad.
4        MR. GOODMAN: Okay.
5 BY MR. GOODMAN:
6    Q.   Ms. Francois, do you see what's
7 on the screen now?
8    A.   Uh-huh.
9    Q.   You have to say yes.
10    A.   Yes.
11    Q.   Do you see on the upper left
12 corner, this is a TD Bank N.A., and if you
13 go down to account type it's an unsecured
14 loan. Do you see that?
15    A.   Yeah.
16    Q.   So, you had an unsecured loan,
17 original amount was 10,000 from TD Bank,
18 correct?
19    A.   Yeah, from my job, yes.
20    Q.   Do you see in 2021, February
21 and March, you were 30 days late for those
22 two payments?
23        MR. KESHAVARZ: Objection to
24    form.
25    A.   Yeah, I see it.

Page 185

F. FRANCOIS
1
2    Q.   And you understand that those
3 late payments can affect your credit score?
4        MR. KESHAVARZ: Objection to
5    form.
6    Q.   You can answer.
7    A.   Yeah.
8        MR. GOODMAN: Let's go to
9    Francois 99.
10    A.   But did you verify the ones
11 that I paid too, for 2020 and 2021? Did
12 you verify that also?
13    Q.   You're not here to ask
14 questions, just answer please. Okay, so
15 we're on Francois 99 and if you look at
16 this one it says a Amex in the upper left.
17 Do you see that? There is an Amex credit
18 card, do you see that?
19    A.   I see it.
20    Q.   Do you see starting in
21 October 2020 all the way into February of
22 2021 you got to the point of being 120
23 late?
24        MR. KESHAVARZ: Objection to
25    form.

47 (Pages 182 - 185)

F. FRANCOIS

2   A.   Okay.
3   Q.   Do you see that?
4   A.   Yeah, because he didn't want to
5 pay for that because I didn't know if it
6 was Emmanuel who is using it and he denied
7 it. I said if it was not him using it,
8 when I asked his family, which he never
9 said that it was him because I didn't have
10 any proof, because I went to -- I call
11 American Express and say there is a lot of
12 things doing in the account and I said it
13 was not me, I'm not going to pay for that.
14   Q.   Are you saying that it was
15 Emmanuel Laforest that was --
16   A.   I did not say it because I
17 didn't have any proof. If you do not have
18 proof you cannot say that someone did
19 something. I didn't have proof and I asked
20 my father-in-law to ask him. He said he
21 never used my credit card, which is he
22 never got my credit card he never used
23 my credit card. This was after fighting,
24 fighting, fighting, we moved all those
25 credit, it wasn't me doing that. That's

F. FRANCOIS

2 why you can see after February, March, the
3 account become good because then we know it
4 was not me.
5   Q.   Okay, but you got the
6 statements for this account, did you not?
7   A.   That was in my old, my old
8 phone. This account is closed. I don't
9 use this account.
10   Q.   No, but before the account was
11 closed, you could see what the charges were
12 that were causing the amounts due, correct?
13        MR. KESHAVARZ: Objection,
14     form.
15   A.   I don't know. I don't remember
16 if I receive it or not.
17   Q.   I'm sorry. Did you see any
18 charges that you didn't make on that card?
19        MR. KESHAVARZ: Objection,
20     form.
21   A.   When they calling me, I was on
22 the phone with customer service and telling
23 me that you're really late. I said there
24 is a lot of things you have that it's not
25 me and I want you guys to go over all that

F. FRANCOIS

2 and they were doing investigation and after
3 that they tried to remove certain things
4 and then it go back to normal.
5   Q.   What was the last part of that?
6 "He go back to no more?"
7   A.   Normal. You can see in March
8 everything is green, in April everything is
9 green.
10   Q.   Yeah, in May of 2021 it was
11 30 days late and then they closed the
12 account, right?
13        MR. KESHAVARZ: Objection,
14     form.
15   A.   Yeah, I request them to close
16 the account. I was request them to close
17 the account.
18   Q.   And you did that because why?
19   A.   Because, like I said, I was
20 trying to save. I didn't want to use all
21 that credit card. I was trying to close
22 some of credit card. I say I have to close
23 it because I don't really use it.
24   Q.   But you understand that going
25 120 days late can affect your credit score,

F. FRANCOIS

2 correct?
3        MR. KESHAVARZ: Objection,
4     form.
5   A.   I don't know.
6   Q.   Pardon?
7   A.   I don't know.
8   Q.   You don't know, okay.
9   A.   Uh-huh.
10        MR. GOODMAN: Let's go to
11     Francois 101.
12        (Mr. Selvey complies.)
13   Q.   Same question: This is a Bank
14 of America credit card, correct?
15   A.   (No response.)
16   Q.   You had a Bank of America
17 credit card from 2016, starting in 2016?
18   A.   I had it and I close it in
19 March, which is that the customer service
20 she did not close it, which they have been
21 charging. I went to Capital One telling
22 them that I been closing this account since
23 March, why I got those thing? And then
24 which is they saying she never closed it,
25 she never closed the account. Which is

48 (Pages 186 - 189)

Page 190

F. FRANCOIS

2  after that, when I went in May, they closed
3  it after that.  You can see June, July,
4  August, they close it because I closed that
5  with the customer service and which is she
6  never close it.
7      Q.   Why did you close this account?
8      A.   Because, like I said, I didn't
9  need to use credit cards.  Which is I can
10 use my debit card and just go buy something
11 and just pay cash.
12         MR. GOODMAN:  Let's go to
13     Francois 103.
14         (Mr. Selvey complies.)
15         MR. GOODMAN:  No, let's skip
16     that one.  Let's keep moving.
17     Q.   These accounts, the one that we
18 just looked at -- let me go back there.
19 I'm sorry, I apologize.
20         That was the Bank of America
21 that you closed, you said you closed in May
22 of 2021, right?  Correct?
23     A.   Uh-huh.  Yes.
24     Q.   Did you pay off the balance
25 when you closed the card?

Page 191

F. FRANCOIS

2      A.   Of course you have to pay all
3  your balance because if you don't pay that
4  it's going to go to, um --
5      Q.   Collections?
6      A.   Yes.
7      Q.   Amex, you paid off the balance
8  due?
9      A.   Yeah, I paid everything.
10     Q.   So, if these company report it
11 as a charge off, that would be incorrect
12 because you actually paid it?
13     A.   Yeah.
14     Q.   Okay.  Just to look at that
15 American Express, Francois 99, you had a
16 balance of $6,210.  So, your testimony is
17 you paid $6,210 to close that account?
18     A.   After they remove, like I say
19 to you, after they removed the one that it
20 said was in May, it drop down.  It was not
21 6,000, it drop down because after
22 they removed like -- they find out, like I
23 was saying, they were doing investigation
24 and see that it was not me, all of that was
25 online, because people would order online,

Page 192

F. FRANCOIS

2  like a scam.  It wasn't me and then they
3  drop it down and I pay what I have to pay
4  and the account end up closed.
5      Q.   How much did you have to pay?
6      A.   I don't remember how much it
7  was.
8          MR. GOODMAN:  Let's go to
9      Francois 112.
10         (Mr. Selvey complies.)
11     Q.   Do you see this page in front
12 of you?  Do you see down, halfway down it
13 says "What's hurting," do you see that?
14     A.   Yeah.  "You have a serious
15 delinquency, 60 days past due or greater,"
16 yeah.
17     Q.   It also says, "Number of
18 accounts that were ever 60 days late or
19 worse or have" --
20     A.   The accounts that you just
21 reviewed with me.
22     Q.   Right.  It says, "Virtually no
23 FICO High Achievers have a 60 days late
24 payment or worse listed on their credit
25 report."  Do you see that?

Page 193

F. FRANCOIS

2      A.   Yeah.  This is the account,
3  like I said, you just reviewed with me.
4      Q.   Yes.  And then, if you go down,
5  it says "High credit usage" and it says
6  "You've made heavy use of your available
7  revolving credit."  Do you see that?
8      A.   Where do you see that?
9      Q.   Down at the bottom, it says
10 "High credit usage."
11     A.   Yeah.
12     Q.   It says, "Ratio of your
13 revolving balances to your credit."  I
14 can't read the rest of that underneath
15 "Francois."
16         Then, if you go to the next
17 page, it lists various reasons that went in
18 to causing your credit score to be 492.  Do
19 you see all that?
20     A.   But did you go to the before,
21 how much it was and all it drop down
22 like that?  No.
23     Q.   I don't answer questions, I ask
24 questions.
25         MR. KESHAVARZ:  But if the

49 (Pages 190 - 193)

F. FRANCOIS
1
2    document says what it says, what's
3    your question other than being --
4         MR. GOODMAN: I asked her if
5    she read all that and did she
6    understand all that.
7    A.   I say you show it to me and I
8    read that.
9    Q.   Okay. So, do you understand
10   that nothing in these two pages of
11   explanations for your credit score have
12   anything to do with what Emmanuel Laforest
13   did, the loan on the car from Capital One?
14   A.   Yeah, it did have something to
15   do that.
16   Q.   What did --
17   A.   That's why I say to go to 2020
18   and you can see, but you keep staying in
19   2021 but you never go to 2020, before what
20   he did. It was everything, but you never
21   go to that.
22   Q.   Why don't you or your attorney
23   show us something from 2020 to establish
24   that, if you think that's the case?
25        MR. KESHAVARZ: If you have a

F. FRANCOIS
1
2    question, ask the question.
3         MR. GOODMAN: That is a
4    question.
5    Q.   Why don't you or your attorneys
6    provide us with the documentation to show
7    what you claim it will show? Why don't you
8    do that?
9         MR. KESHAVARZ: The documents
10   say what they say. What's your
11   question as to my client?
12        MR. GOODMAN: I just asked her
13   why doesn't she produce it.
14   A.   Since you say you cannot answer
15   questions, I would like to ask you if you
16   got a loan for $29,000 in your account and
17   let's say your credit score was 600 and you
18   never paid for six months, what's going to
19   happen to your credit score? It's going to
20   drop down, correct?
21   Q.   I really don't not want to get
22   into a back-and-forth with you, but I will
23   tell you --
24   A.   So, let's get into 2020 because
25   we're talking about what happened in 2020.

F. FRANCOIS
1
2    Q.   Okay. I would certainly say
3    that if that loan was rescinded and Capital
4    One took it off your credit report and it
5    came to nothing at all and amounted to
6    nothing in terms of your credit, I would
7    say it had zero affect on your credit
8    score.
9         MR. KESHAVARZ: Objection. All
10   right, so what's the question?
11   Q.   That's what I would say in
12   response to the question that you asked me.
13        MR. KESHAVARZ: Okay, so what's
14   the next question?
15        MR. GOODMAN: Okay, let's go to
16   the one that I want to go to, the
17   TransUnion.
18        (Screen sharing stopped.)
19        MR. GOODMAN: That would be
20   Exhibit H, which we can now make
21   whatever the next one is,
22   Ms. Reporter.
23        THE COURT REPORTER: We're up
24   to Exhibit C, as in Charles.
25        MR. GOODMAN: Thank you.

F. FRANCOIS
1
2         (Whereupon, the aforementioned
3    document was marked as Defendant's
4    Exhibit C for identification as of
5    this date by the Reporter.)
6         (Screen sharing.)
7  BY MR. GOODMAN:
8    Q.   Ms. Francois, do you see what's
9  on the screen right now?
10   A.   Yes, I see the last phone, my
11 Social and 2022, May 2022.
12   Q.   Do you see down at the bottom
13 it says, "AKA Francois FA Jean," and then
14 the last one says, "Jean F. Farah?"
15   A.   Yeah.
16   Q.   Do you see that?
17   A.   Yeah.
18   Q.   Did you ever go by Jean F.
19 Farah?
20   A.   No, my name is Farah Jean
21 Francois.
22   Q.   Okay. Is everything else
23 accurate on that page, as far as you know?
24   A.   Yeah, my name and Social, yeah.
25   Q.   Did you cause this credit

50 (Pages 194 - 197)

1           F. FRANCOIS
2  report to be generated?
3           MR. KESHAVARZ:  Objection to
4      form.
5      A.   I don't understand.
6      Q.   How did you come about to have
7  this credit report?
8           MR. KESHAVARZ:  Objection to
9      form.
10     A.   (No response.)
11     Q.   Where did it come from?  Did
12 you order it yourself?  Did somebody else
13 order it?
14          MR. KESHAVARZ:  Objection to
15     form.  Go ahead.
16     A.   (No response.)
17     Q.   You can answer.
18     A.   I don't know.  I don't
19 understand what you're asking me.
20     Q.   I'm asking you how did you come
21 about receiving this credit report?
22          MR. KESHAVARZ:  Objection to
23     form.  Go ahead.
24     A.   I don't know.
25     Q.   Well, I mean, do you remember

1           F. FRANCOIS
2  ordering a credit report for yourself?
3           MR. KESHAVARZ:  Objection to
4      form.  Go ahead.
5      A.   I don't remember.
6           MR. GOODMAN:  All right, let's
7      go to Francois 309.
8           (Mr. Selvey complies.)
9      Q.   You see that it says, "Amex
10 Department Stores?"  Do you see what that
11 is?  Did you have a credit card with Amex
12 Department Stores?
13     A.   No, I don't have any credit
14 card no more.
15     Q.   Well, it's what it says there
16 on the page.  You can see it for yourself.
17 Is it accurate or inaccurate?
18          MR. KESHAVARZ:  Objection to
19     form.
20     A.   (No response.)
21     Q.   Do you see that?  Do you
22 remember having that credit card that's
23 reported there?
24     A.   That's the American Express we
25 were talking about which is closed.

1           F. FRANCOIS
2      Q.   So, is that the same American
3  Express card that we --
4      A.   I don't know, that's why I'm
5  asking you.  I don't know.  I don't have no
6  idea about what you're showing me.  This is
7  2022, I have no idea about that.
8           MR. GOODMAN:  Can we go to
9      Francois 316.
10          (Mr. Selvey complies.)
11     Q.   Do you have a credit card or
12 credit account with Century 21 Department
13 Stores?
14     A.   That was Century.  That was Old
15 Navy.  I don't remember that.
16          MR. KESHAVARZ:  The screen I
17     see says "Francois 316."  Is that
18     what you meant?
19          MR. GOODMAN:  Yes.  On the
20     bottom it says "Century 21 Department
21     Stores" and it has an address in
22     Columbus, Ohio.  The next page, 317,
23     shows it was closed in 2020.
24     A.   Which is paid.  You see it
25 says, "Paid, Closed; was Paid as agreed."

1           F. FRANCOIS
2      Q.   Was what?
3      A.   I'm just reading what they say,
4  that the account was paid and then closed
5  as agreed.
6      Q.   Yeah, "Payment Received $0."
7  "Paid, Closed; was Paid as agreed."  Okay.
8           Next page, 318, Macy's.  Do you
9  have a Macy's credit card?
10     A.   Yeah.  Like I said before, I
11 said it to you, I had a Macy's credit card
12 which is I called them and we talked about
13 a lot of things and then closed it.  The
14 card closed since long.  This Macy's card
15 closed long time.
16     Q.   Why did you close the Macy's
17 card?
18     A.   Because I don't need the credit
19 card.  Like I say to you, I don't need to
20 use credit card because I was trying to
21 build and save my money to buy my house.
22     Q.   Okay.  Page 320, you had an Old
23 Navy account, a credit card for Old Navy.
24 You closed that one also, correct?
25     A.   Yes.

51 (Pages 198 - 201)

F. FRANCOIS

1
2    Q.   And then you had, on Page 322,
3 Francois 322, you had "SYNCB/PPC," do you
4 know what that means?
5    A.   What is that?
6    Q.   322.  Do you see where it says
7 "SYNC?"  It's a revolving credit account,
8 credit card.
9    A.   Which credit card is that?
10    Q.   I don't know.  I'm asking you
11 if you recognize it.
12    A.   Because I don't remember that.
13 I don't remember that.
14    Q.   Okay.  There's TD Bank.  You
15 had a credit card with TD Bank also?
16    A.   Yes.
17    Q.   By the way, I think that SYNC,
18 that's PayPal.  Do you have a PayPal
19 account?
20    A.   Yeah, I have my PayPal.  I'm
21 still using my PayPal.
22    Q.   Is there anything in this
23 report that you can see that indicates that
24 what the loan that was taken out with
25 Capital One for the BMW had an affect on

F. FRANCOIS

1
2 your credit score?
3         MR. KESHAVARZ:  Objection to
4     form.
5    A.   I don't know.
6         MR. GOODMAN:  All right, we're
7     almost done here.
8         Let's look at the Equifax
9     Report and that would be Exhibit F on
10     the e-mail, which will now be marked
11     as Exhibit D.
12         (Whereupon, the aforementioned
13     document was marked as Defendant's
14     Exhibit D for identification as of
15     this date by the Reporter.)
16         MR. GOODMAN:  Give me five
17     minutes or at least three or
18     four minutes.  I have to do
19     something.
20         MR. KESHAVARZ:  All right.
21     Just come back on the screen when
22     you're ready.
23         (Screen sharing stopped.)
24         (Whereupon, at 4:13 P.M., a
25     short recess was taken.)

F. FRANCOIS

1
2         (Back on the record at
3     4:21 P.M.)
4         MR. GOODMAN:  Right now I think
5     it may not have been marked.  It's
6     what's called Exhibit E on the
7     e-mail, the Penfed Credit Union
8     adverse notice.  And we're not going
9     to use the Equifax Report that I had
10     previously marked as the next one.
11     If you can un-mark it, fine.  If not,
12     then we'll just go to the next
13     letter.
14         THE COURT REPORTER:  Yes, let's
15     just go to the next letter for ease
16     of the transcript.
17         MR. GOODMAN:  Okay, that's
18     fine.
19         MR. KESHAVARZ:  You're saying
20     you're not suing the Equifax Report
21     of 5/12/2022?
22         MR. GOODMAN:  That is what I
23     said.
24         MR. KESHAVARZ:  Okay.
25         MR. GOODMAN:  Okay, so we can

F. FRANCOIS

1
2     mark this one that's on the screen
3     now as Exhibit E.
4         (Whereupon, the aforementioned
5     document was marked as Defendant's
6     Exhibit E for identification as of
7     this date by the Reporter.)
8         (Screen sharing.)
9 BY MR. GOODMAN:
10    Q.   Ms. Francois, do you see what's
11 on the screen right now marked --
12    A.   No, if you can make it a little
13 bigger because I am not able to see it.
14         (Mr. Selvey complies.)
15    Q.   Is that better?  Can you see it
16 better now?
17    A.   Yes.
18    Q.   Take a look at it and when
19 you're done let us know.
20         (Whereupon, the Witness peruses
21     the document.)
22    A.   Yeah.
23    Q.   Okay.  So, did there come a
24 time that you made a request for a loan in
25 the amount of $42,596 in 2022 from Penfed?

52 (Pages 202 - 205)

1          F. FRANCOIS
2     A.   Penfed?
3     Q.   Yes.
4     A.   No, I don't remember that.  I
5 don't remember that.  What is Penfed?
6     Q.   If you look up at the top, it
7 says Penfed Credit Union and this is an
8 Adverse Action Form addressed to you.  Your
9 attorneys took out your address and other
10 information.  Do you see that?
11    A.   Yeah, I see it, but what is
12 that?
13    Q.   Well, I'm asking you.
14    A.   I'm asking you because you
15 bring it to me, because I don't know, so
16 that's why I'm asking you.
17    Q.   Well, you're the deposition
18 witness, so I'm asking you whether you
19 applied for a loan in the amount of
20 $42,596?
21    A.   I don't know because I don't
22 know what is that.  So, I'm just aware.  I
23 don't know about that, that's why I'm
24 asking you to give me more information and
25 to remind me because I don't know what is

1          F. FRANCOIS
2 that.
3     Q.   Well, take a look at what's on
4 the screen and see if that's refreshes your
5 recollection.
6     A.   I don't know.  That doesn't
7 refresh my recollection.
8     Q.   You don't know, okay.
9     A.   Yeah.
10    Q.   So, if you claimed in this
11 case, according to the legal documents,
12 that one of your damages is that you were
13 denied credit because of what you claim the
14 Defendant --
15    A.   Can you go down so I can see
16 all that and I can read what is about that?
17         (Mr. Selvey complies.)
18         (Whereupon, the Witness peruses
19    the document.)
20    A.   Isn't this about the car?
21    Q.   Apparently.  That's why I'm
22 asking you.  Why did you seek this loan?
23 It does reference "Auto Gallery Imports."
24    A.   That's a car.  That's a car.
25    Q.   So, you were trying to buy a

1          F. FRANCOIS
2 car?  This is a car loan.  You were looking
3 for a car loan, correct?
4     A.   Yes, I went to give them my car
5 and then to do exchange with car.
6     Q.   And they denied your credit,
7 correct?
8     A.   Yeah, they denied because my
9 credit here was too low.
10    Q.   Okay.  And do you see on there
11 it indicates your credit score, it says
12 "584?"
13    A.   Yeah, which is like I said to
14 you, after I closed all my credit card I
15 tried to work on my credit to get my credit
16 coming up.
17    Q.   And do you see that it says --
18 I'm going to read from it -- "Key factors
19 that adversely affect your credit score:"
20 Do you see that?
21    A.   Yeah, I see.  Yes, I see it.
22    Q.   And the first one is, "Time
23 since delinquency is too recent or
24 unknown."  Do you see that?
25    A.   Yes.

1          F. FRANCOIS
2     Q.   Okay.  "Length of time accounts
3 have been established."  Do you see that?
4     A.   Yeah, I see it.
5     Q.   Do you need a minute?
6     A.   No, I'm just putting my chair.
7 I'm okay.  I'm okay.
8     Q.   Do you see "Number of accounts
9 with delinquency?"
10    A.   Yeah, I see it.
11    Q.   And do you see "Serious
12 delinquency?"
13    A.   Yeah.
14    Q.   Do you see "Number of
15 inquiries, 'INQ,' adversely affected the
16 score.  Impact not significant."  Do you
17 see that?
18    A.   Yeah, I see.
19    Q.   Okay.  So, do you understand
20 that Penfed told you we cannot extend you
21 credit for this car loan because of those
22 reasons that are stated there?
23         MR. KESHAVARZ:  Objection to
24    form.
25    A.   No, I don't understand that.  I

53 (Pages 206 - 209)

F. FRANCOIS

1           F. FRANCOIS
2  don't understand all that thing they
3  saying, "13, 14, 18, 39." I don't know.
4      Q.   You don't understand that?
5      A.   Uh-uh.
6      Q.   You have to say no.
7      A.   No.
8      Q.   Is it your claim that the loan
9  that was taken out by Mr. Laforest had
10  anything to do with this rejection of your
11  credit from Penfed for the car loan?
12     A.   If you go in 2020, you can see.
13     Q.   Again, I would certainly like
14  to see if that could be provided. But in
15  any event, I thought you were trying to
16  save your money for a house and this is a
17  car loan --
18     A.   Yeah, because my car, it
19  changed, my car.
20     Q.   What do you mean?
21     A.   It changed that car. That you
22  give your car, they will tell you, okay,
23  the car, I'm going to buy the car from you
24  for 5,000, for 10,000, which they are going
25  to remove the value of your car and then

1           F. FRANCOIS
2  the rest you going to have to end up
3  paying. Because I was about to change my
4  car with them.
5      Q.   My question is: Did I
6  misunderstand you when you said you were
7  trying to save for a house not a car?
8      A.   Yeah, I was trying for house.
9  It was 2020, after our marriage me and my
10  husband was planning to buy house, but
11  COVID coming and then everything was
12  affected everyone which is what I was
13  saying. Because we were not planning to
14  stay in his family house for two years or
15  for three years.
16     Q.   Who owns that house on Farragut
17  Road in Brooklyn? Who is the owner?
18     A.   His grandma and his grandpa is
19  the owner of the house.
20         MR. GOODMAN: Could we please
21     pull up what's marked as Exhibit G,
22     which will now be Exhibit F for the
23     deposition.
24         (Whereupon, the aforementioned
25     document was marked as Defendant's

1           F. FRANCOIS
2     Exhibit F for identification as of
3     this date by the Reporter.)
4         (Mr. Selvey complies.)
5         MR. GOODMAN: Maybe you can
6     blow that up a little bit so
7     Ms. Francois and all of us can see it
8     a little better.
9         (Mr. Selvey complies.)
10  BY MR. GOODMAN:
11     Q.   Okay, take a look at that and
12  let us know when you're done.
13         (Whereupon, the Witness peruses
14     the document.)
15     A.   Yeah, that's my Mercedes-Benz.
16  That's the first place I went to the car to
17  do the change for that.
18     Q.   So, this is another car loan
19  that you sought, that you applied --
20     A.   That's the first car loan I
21  went.
22     Q.   That's the first one you went?
23     A.   Yeah.
24     Q.   Okay. Do you see the specific
25  reasons for the action taken on your

1           F. FRANCOIS
2  application?
3      A.   Yeah, yeah, they was telling me
4  the same thing because my credit was down.
5      Q.   Where it says, "Presence of
6  recent delinquency on file," do you
7  understand that to have anything to do with
8  the Capital One loan and Emmanuel Laforest?
9         MR. KESHAVARZ: Objection to
10     form.
11     A.   I don't know.
12     Q.   What about "No comparable
13  credit?" Same question.
14         MR. KESHAVARZ: Objection to
15     form.
16     A.   I don't know about that, what
17  you're saying.
18     Q.   "High loan amount relative to
19  vehicle value," does that have anything to
20  do with Emmanuel Laforest and Capital One?
21         MR. KESHAVARZ: Objection to
22     form.
23     A.   No idea about that.
24     Q.   No idea.
25         MR. KESHAVARZ: Mr. Goodman, it

54 (Pages 210 - 213)

F. FRANCOIS

1    F. FRANCOIS
2    is now 4:32, if you'd like to take my
3    client's deposition beyond 5:00,
4    that's fine, but now would be the
5    time to get the Court Reporter in.
6    If 5:00 comes and the deposition runs
7    out of time, then I'm not bringing my
8    client back.  So, now is time to make
9    the call if you want to.  Do you want
10   to go past 5:00?
11   MR. GOODMAN:  I'll see what I
12   want to do.  I hear what you're
13   saying.  Let's not take any more of
14   the record with your comments.
15 BY MR. GOODMAN:
16   Q.   Ms. Francois, in your Complaint
17 in this case, are you familiar with the
18 Complaint that your attorneys filed for you
19 in this case?
20   A.   If I'm familiar with what?
21   Q.   The Complaint.  The legal
22 document where you started the lawsuit that
23 we're here about today.
24   A.   Yeah, I know what it is, yeah.
25   Q.   Did you ever read that

1    F. FRANCOIS
2 Complaint?
3    A.   Yeah, because everything that
4 my lawyer did, my lawyer contact me and
5 talk to me about everything my lawyer have
6 to do.
7    MR. GOODMAN:  Move to strike
8    the portion that is nonresponsive.
9    Q.   Did you actually read the
10 Complaint?
11   A.   Yes.
12   Q.   You did read the Complaint,
13 okay.  And you know that in the Complaint
14 you allege that when you learned about the
15 identity theft, you could not stop crying?
16   A.   Yes.
17   Q.   Have you stopped crying yet?
18   MR. KESHAVARZ:  Objection to
19   form.
20   A.   I don't know.
21   Q.   You don't know?  Are you still
22 crying?
23   A.   I'm still not crying, but I'm
24 still trying to figure out what happened to
25 me.

1    F. FRANCOIS
2    Q.   When did you stop crying?
3    MR. KESHAVARZ:  Objection to
4    form.
5    A.   I don't remember when I stopped
6 crying because that was take me a while
7 because me almost losing my job and I was
8 in school, keep dropping school, calling
9 out, I cannot coming to school.  It was not
10 easy for me.
11   Q.   You said several times almost
12 losing your job, first of all, what job was
13 that?
14   A.   TD Bank.
15   Q.   How is it that you almost lost
16 your job?
17   A.   Like I said early, because they
18 been calling me and then I was customer
19 service worker at the time and then my
20 phone I have to answer.  Capital One was
21 calling me and then the dealer's son was
22 texting me, calling me about to send the
23 title and my boss saw me answer phone and
24 then I was with customer in front of me and
25 he said you're going to have to take one

1    F. FRANCOIS
2 week and we're going to have to request you
3 to stop coming for one week to figure out
4 to what happened to you and to deal with
5 that and then when you feel you're able to
6 coming back to work, you can coming back to
7 work.
8    Q.   Nobody ever actually told you
9 you might lose your job over this, correct?
10 In fact, they actually accommodated you to
11 give you the opportunity to deal with it;
12 is that correct?
13   MR. KESHAVARZ:  Objection to
14   form.
15   A.   That's not what it is.  Because
16 if they stop me they will replace me with
17 someone because I could not be able to do
18 my job.
19   Q.   Did anybody tell you that, that
20 they might replace you with someone?
21   A.   Yeah, because I was crying.
22 Because every time Capital One calling me
23 and if I'm coming back, I went to the
24 bathroom crying and then my assistant was
25 seeing me crying and then my boss was

55 (Pages 214 - 217)

Page 218

```
 1        F. FRANCOIS
 2 asking her why Farah been crying, you know
 3 Farah have a customer, if she not able to
 4 do the job, she have to let us know.
 5    Q.  But you were able to do the
 6 job, correct?
 7    A.  I was not 100 able to do the
 8 job because I was more concerned about what
 9 Capital One going to do.  Because every
10 time they say, okay, they're going to call
11 me back, they will call me back, which that
12 was about that.
13    Q.  So, in terms of your crying and
14 going to the bathroom, how much of that had
15 to do with the threats that you thought you
16 were getting from Emmanuel Laforest?
17    A.  Can you explain it to me better
18 because I don't get it?
19        MR. KESHAVARZ: Objection.
20    Q.  According to you, you received
21 texts from Emmanuel Laforest or maybe other
22 people --
23    A.  Uh-huh.
24    Q.  -- that basically threatened
25 you, you can't come back to Brooklyn, stuff
```

Page 219

```
 1        F. FRANCOIS
 2 like that, correct?  Am I right about that?
 3    A.  Yes, correct.
 4    Q.  Okay.  And I would imagine that
 5 caused you distress, correct?  In fact, you
 6 already testified to that?
 7    A.  Yeah, that make me stress and
 8 that make me -- if I go to work, I was
 9 always like this, to look on the street, to
10 see if somebody following me to my job, to
11 see where I'm working, if something is
12 going to happen to me.
13        MR. KESHAVARZ: Let me pause
14    you, Mr. Goodman.  I'm going to have
15    some redirect.  So, when are you
16    going to be done?  I'm going to have
17    some questions of my own and that
18    might take --
19        MR. GOODMAN: You didn't
20    mention that before.  Thank you for
21    bringing that up, Ahmad.  How much do
22    you have about?
23        MR. KESHAVARZ: I doubt I have
24    a lot, but it's already 4:37.  I
25    don't want to be precluded from
```

Page 220

```
 1        F. FRANCOIS
 2 following up.
 3        MR. GOODMAN: All right, so I
 4    guess we're going to have to get
 5    another reporter then.  You didn't
 6    mention that.
 7        Can you call now, Madame
 8    Reporter?  How long would it be?
 9        THE COURT REPORTER: Yes.
10        (Whereupon, an off-the-record
11    discussion was held.)
12        MR. GOODMAN: Can you read back
13    my last question, whatever the last
14    thing I said was.
15        (Whereupon, the referred to
16    question and answer were read back by
17    the Reporter.)
18 BY MR. GOODMAN:
19    Q.  Ms. Francois, wouldn't it be
20 fair to say that the amount of emotional
21 distress you had, the crying, is really
22 caused by Emmanuel Laforest?  His threats
23 to you and everything he did, what you
24 learned about him stealing from you,
25 stealing your identity, your mail, that's
```

Page 221

```
 1        F. FRANCOIS
 2 what caused your stress, correct?
 3        MR. KESHAVARZ: Objection to
 4    form.
 5    A.  Yes.
 6    Q.  Thank you.  Your Complaint also
 7 alleges that you took time off from work.
 8 How much?  Is that the one week you took
 9 off, that your boss at TD Bank said take a
10 week and figure it out?  Was there any
11 other time off from work?
12    A.  Yeah.  Remember I took one week
13 because the week after that happened, I was
14 having customer.  I was open a mortgage for
15 the customer and then I did not put the
16 correct information, which is I was not
17 concentrated 100 percent, and the
18 information of the customer did not go
19 correct.  And which is my boss call me and
20 tell me that which is why I was telling you
21 to take a week because you're not
22 concentrated enough.  I had said that and I
23 said I'm sorry.  I went to my office and
24 did it correct and then after that I left
25 and then take one week and then coming back
```

56 (Pages 218 - 221)

Page 222

```
 1          F. FRANCOIS
 2   after one week that I take off.
 3       Q.   Well, the question was: Did
 4   you take any other time off of work other
 5   than that one week that you just told us
 6   about and previously told us about?
 7       A.   No.  If I have to go to police,
 8   I just take one day or call out.  By the
 9   time this happened, I been calling out.
10   Today I can call out, tomorrow I can come
11   in.  Tomorrow I been like calling out for
12   days to go to work.
13          MR. GOODMAN:  Move to the
14       strike the nonresponsive portion.
15       Q.   Ms. Francois --
16       A.   It is an answer to the question
17   because I take a day to fix those papers,
18   to go to the police, get those paper and
19   then to print that paper and send it to
20   Capital One.  And then they even send me to
21   Capital One to go in person.
22       Q.   When was that that they sent
23   you to Capital One in person?
24       A.   Because it is after they ask
25   me, they need me to staples the paper.  And
```

Page 223

```
 1          F. FRANCOIS
 2   then I said where do I'm going to send the
 3   papers?  They said you have to go to any
 4   Capital One and then give it to the
 5   customer service, give it to one of them
 6   and explain to them.  They will send me a
 7   number that I have to give it to them and
 8   they will send, they will fax those paper
 9   to them.
10       Q.   When was that that that
11   happened?
12       A.   I don't remember the day.  I
13   don't remember the day.  It is after I fill
14   all those papers and staples that.  It was
15   maybe in September or October.
16       Q.   Of 2020, correct?
17       A.   Yeah, maybe September or
18   October, between that.
19       Q.   When did you receive a response
20   from Capital One that they made a decision
21   on your fraud claim?
22       A.   I don't remember.  I don't
23   remember when did I receive that.  No, the
24   date, I don't remember that.
25       Q.   But you did receive a response
```

Page 224

```
 1          F. FRANCOIS
 2   at some point in time, you just don't
 3   remember when, correct?
 4       A.   Yeah, they been sending me
 5   paper.  I received a lot of paper from
 6   them.  So, I received paper from them.  I
 7   don't remember of when exactly the date I
 8   receive each of those paper.
 9       Q.   Okay.  And those papers
10   actually told you that they took that loan
11   off of your credit report, correct?
12          MR. KESHAVARZ:  Objection to
13       form.
14       A.   I don't remember.
15       Q.   You don't remember that?
16       A.   No.
17       Q.   So, did you lose any pay or
18   salary from TD Bank for the time that you
19   took off that you claimed had to do with
20   this problem, with the BMW claim?
21          MR. KESHAVARZ:  Objection to
22       form.
23       A.   Say that again.  I don't get
24   it.
25       Q.   I'm sorry.  Did you lose any
```

Page 225

```
 1          F. FRANCOIS
 2   pay?  Did you lose anything from your
 3   paycheck, any salary for the time that you
 4   say that you took off, that one week you
 5   took off and maybe another day or two, if I
 6   understood you correctly?
 7       A.   Yeah, if you did not go to
 8   work, if you don't have any sick days,
 9   which they are not going to pay you.  I
10   already took one week, it is my sick days.
11   The one week that I take it is my sick
12   days.  After that, you call out, call out
13   which you're not going to get paid.  And I
14   was not focused on that.  All I was focused
15   on was to figure out to fix those things.
16       Q.   So, how much money did you lose
17   as a result of not working on those days?
18       A.   I don't know.  I don't
19   remember.
20       Q.   Are you claiming that in this
21   case?
22          MR. KESHAVARZ:  Objection,
23       form.  "Claiming that in this case?"
24       Q.   Are you alleging damages in
25   this case for the amount you say that you
```

57 (Pages 222 - 225)

Page 226

```
1          F. FRANCOIS
2  weren't paid for the time you took off from
3  TD Bank?
4        MR. KESHAVARZ:  Objection to
5     the form of the question.
6        You may answer, if you know.
7     A.  I don't know.  I don't know.
8     Q.  You don't know, okay.  You also
9  alleged in your Complaint that the stress
10 from this situation caused you to lose as
11 much as 25 pounds.  Do you remember that?
12    A.  Yeah, and I have a picture of
13 that, definitely.
14       MR. GOODMAN:  I will call for
15    the production of that picture.
16    Q.  How much did you weigh on
17 May 30th of 2020?
18    A.  I weigh before, I was like 147,
19 147.
20    Q.  When were you 147?
21    A.  Before my birthday.  Like on
22 May, June, I was 147, but I keep dropping,
23 losing weight September, October, November.
24 Yeah, I lose a lot of weight.
25    Q.  Well, at the lowest weight that
```

Page 227

```
1          F. FRANCOIS
2  you went down to after you found out about
3  what Emmanuel Laforest did to you, what was
4  that weight?
5     A.  I was losing -- I remember I
6  lose -- I become 122 the last time I went
7  to my doctor.  And then he was telling me
8  did you sick?  What happened to you?  And I
9  was explaining to my doctor what happened
10 to me.  Because he was thinking it's from
11 my asthma.  I said no, my asthma has
12 nothing to do with that.
13    Q.  What's the name of that doctor?
14    A.  That's the PCP I have before
15 when I was in MetroPlus, but which I'm not
16 in MetroPlus now.
17    Q.  What's his or her name?
18    A.  I don't remember his name.  I
19 don't remember his name because I don't use
20 MetroPlus no more.  I'm using Health First.
21       MR. GOODMAN:  I ask the
22    Reporter to leave a space in the
23    transcript, you can fill in his name.
24    And I will call for production of an
25    authorization for the doctor, for the
```

Page 228

```
1          F. FRANCOIS
2     records from that doctor that would
3     corroborate, or not, the testimony
4     that Ms. Francois just gave about
5     weight loss and what she told the
6     doctor.
7
8     Q.  What is your weight today?
9     A.  My weight now?  I'm 170.
10    Q.  But you're pregnant now right?
11    A.  Yeah.
12    Q.  So, before you got pregnant,
13 what was your weight?
14       MR. KESHAVARZ:  Objection.
15    A.  My weight was 155.
16    Q.  So, you went down to 122 and
17 then came back up to 155; is that fair?
18    A.  Yeah, I'm 150 before I get
19 pregnant.  Yeah, yeah, I was 150, 155.
20    Q.  So, when you went down to 122,
21 were you uncomfortable at 122?  Were you
22 unhappy being that way?
23    A.  My anemia was worse because I
24 have anemia.
25    Q.  Are you on any medication for
```

Page 229

```
1          F. FRANCOIS
2  anemia?
3     A.  No, no, I wasn't taking no
4  medication.  And I would go see the doctor
5  just because I need a pump for my asthma.
6  I went to see my doctor and he weighed me
7  and by that time he said you're losing
8  weight and I explained to him what
9  happened.
10    Q.  So, you mentioned a pump for
11 your asthma, do you still use the pump?
12    A.  Yeah, I have asthma.
13    Q.  And that's been constant from
14 before May of 2020?
15    A.  No, I was never have that
16 constantly, constantly, but after that,
17 when I'm stressing, it's been like getting
18 worse.  After that, I don't use it
19 constantly.
20    Q.  After what?  You said "after
21 that."
22    A.  If I'm not stressing on
23 anything, I don't use my pump constantly,
24 like I have to take it every day, no.
25    Q.  Are you claiming that after you
```

58 (Pages 226 - 229)

Page 230

```
1            F. FRANCOIS
2  found out about the Capital One loan, after
3  you found out what Emmanuel Laforest did to
4  you, did you have to use your pump more
5  frequently?
6      A.  Definitely.  The same day I
7  used it more twice because I was with my
8  friend in the car, she was with me and she
9  said get your pump because you couldn't
10 breathe.  Yeah, I use it.
11     Q.  Who prescribed you that pump?
12     A.  My doctor.  Because since I was
13 young I have asthma.
14     Q.  The same doctor?
15     A.  Every doctor that I see
16 prescribe me my pump for my asthma,
17 Ventolin.
18     Q.  You also alleged in your
19 Complaint that you could not sleep.  Was
20 there a period of time that you lost sleep?
21     A.  Yeah, this day I did not sleep
22 all day.  And after that, I would be
23 thinking about when that's going to be end,
24 when that's going to be end, always
25 thinking my name.  Like I was saying, that
```

Page 231

```
1            F. FRANCOIS
2  I was scared that he did something with the
3  car.  Because most people that I explain
4  they say, hey, if he do something with the
5  car, it's going to be on you, the police is
6  going to go after you because the car is in
7  your name.  That makes me very scared.
8      Q.  Were you scared because
9  Emmanuel Laforest was threatening
10 you through text messages?
11         MR. KESHAVARZ:  Objection,
12     form.
13     Q.  You can answer.
14     A.  Say that again.
15     Q.  Let me rephrase the question.
16         Did you lose sleep because
17 Emmanuel Laforest, you were afraid of
18 Emmanuel Laforest because he had threatened
19 you with text messages that you can't come
20 back to Brooklyn, that stuff?
21         MR. KESHAVARZ:  Objection to
22     form.
23     A.  I was losing sleep because what
24 happened to me because I couldn't imagine
25 that me in this situation.  Always I was
```

Page 232

```
1            F. FRANCOIS
2  scared about what he can do with the car
3  because I don't know the type of a friend
4  that he have that he can end up with the
5  car and that can cause me in this country
6  because it was like that can put me in
7  trouble.
8      Q.  So, him threatening you, that
9  did not cause you to lose sleep?
10         MR. KESHAVARZ:  Objection to
11     form.
12     A.  Yes, of course, because I'm
13 scared.
14     Q.  You were scared, right?
15     A.  Yeah, of course.
16     Q.  Okay.  You also, in your
17 Complaint, you said that you, quote, got
18 black bags under your eyes?
19     A.  Say that again.
20     Q.  I'll just read Paragraph 162 of
21 Plaintiff's Amended Complaint.
22         "She could not sleep" -- "she"
23 is you -- "and got black bags under her
24 eyes from the lack of sleep."
25         THE WITNESS:  What does that
```

Page 233

```
1            F. FRANCOIS
2      mean, Ahmad?
3      Q.  That's your Complaint.  This is
4  your Complaint in this lawsuit.
5      A.  They say I do blackmail?
6      Q.  Black bags under your eyes.
7      A.  Oh, yeah, under my eyes.  Yeah,
8  because I couldn't sleep, like my eyes were
9  getting black.  When you don't sleep, your
10 eyes will look like so tired.  Like you're
11 going to get like dark circle and the bag
12 here is going to end up getting big because
13 you're not sleeping enough.
14     Q.  How long did you have black
15 bags under your eyes?
16     A.  That definitely I cannot tell
17 you how long it take that to remove all of
18 it, how long it took me to go back to that.
19     Q.  You can't tell you?
20     A.  I don't have a time.
21     Q.  Did you seek any treatment from
22 any healthcare professional or cosmetician
23 or something to take care of your black
24 bags?
25     A.  No.
```

59 (Pages 230 - 233)

Page 234

```
1          F. FRANCOIS
2     Q.   Did you buy any special formula
3  or makeup or anything for those black bags
4  under your eyes?
5     A.   I usually don't wear makeup,
6  no.
7          MR. KESHAVARZ:  Madame Court
8     Reporter, how are we doing in getting
9     a replacement?
10         THE COURT REPORTER:  They
11    haven't responded yet.
12 BY MR. GOODMAN:
13    Q.   Ms. Francois, can you tell me
14 who Darline, D-A-R-L-I-N-E, Dumel,
15 D-U-M-E-L is?
16    A.   Yes, Darline is my best friend
17 and I'm the godmom of her daughter.
18    Q.   And the what?
19    A.   Godmom of her daughter.
20    Q.   You are the godmother of her
21 daughter?
22    A.   Yes.
23    Q.   What is her address?
24    A.   The address is in New Jersey.
25 It's 19 Montrose, South Orange, New Jersey.
```

Page 235

```
1          F. FRANCOIS
2     Q.   19 what?
3     A.   Montrose, M-O-N-T-R-O-S-E.
4     Q.   Montrose?
5     A.   Yeah.
6     Q.   Now, she's your best friend.
7  Who is she?  Is she a co-worker?  Did she
8  work with you?  Is she your friend from the
9  neighborhood?
10    A.   No, we been friends since we
11 were in Haiti.
12    Q.   She's from Haiti also?
13    A.   Yes, she's from Haiti also.
14    Q.   Were you with her on May 30th
15 of 2020?
16    A.   Yeah, that was for my birthday.
17 She was doing a birthday party for me at
18 her house in New Jersey.
19    Q.   Who else was at that party?
20    A.   Another of her friends that she
21 invited because it was basically a surprise
22 party.
23    Q.   It was a what?
24    A.   It was a surprise.  A party
25 surprise.
```

Page 236

```
1          F. FRANCOIS
2     Q.   Okay.  Was your husband there?
3     A.   No, my husband wasn't there
4  because we didn't know that we were going
5  to have a party.  Because I just went there
6  to visit Darline and then she say you're
7  not going home.
8     Q.   Did you spend the night there
9  that night?
10    A.   Yeah, all night, because it was
11 my birthday.
12    Q.   Can you tell me who Hilda Perez
13 is?
14    A.   That's my assistant manager
15 from TD Bank.
16    Q.   Just tell me -- I should have
17 asked you before -- what was your job at TD
18 Bank?  Just tell me your duties and
19 functions.  You said you were a --
20    A.   Customer service
21 representative.
22    Q.   What did you do as a customer
23 service representative?
24    A.   It was in December, after my
25 graduation from the nursing school.
```

Page 237

```
1          F. FRANCOIS
2     Q.   No, what did you do?  What were
3  your functions?
4     A.   What I do is open checking
5  account, saving account, apply for
6  mortgage, loan for customer.  And also, if
7  they have a fraud on the account, if they
8  have fraud like doing online on the
9  account, I have to make the complaint for
10 them and send it to the back office and
11 then the back office will figure out all
12 about that.
13    Q.   Who did you report to?  Who was
14 the next person, your boss, let's put it
15 that way, at TD Bank?
16    A.   Hilda Perez.  And then my old
17 manager who was there, he's not there
18 anymore, was my old manager.  Radamos
19 Alvelo was my manager.
20         THE COURT REPORTER:  What's the
21    name?
22         THE WITNESS:  Radamos Alvelo.
23    It's R-A-D-A-M-O-S.  Alvelo is
24    A-L-V-E-L-O.
25         MR. KESHAVARZ:  How are we
```

60 (Pages 234 - 237)

Page 238

1           F. FRANCOIS
2     doing with the new reporter, Sophia?
3        (Whereupon, an off-the-record
4        discussion was held.)
5  EXAMINATION BY
6  MR. KESHAVARZ:
7     Q.   Ms. Francois, do you remember
8  the testimony --
9        MR. SELVEY:  Oh, so you're just
10       going to go?  Is this your deposition
11       Ahmad?
12    Q.   Ms. Francois, do you
13  remember --
14       MR. GOODMAN:  No, Ahmad, we're
15       not doing this.
16    Q.   Do you remember --
17       MR. GOODMAN:  No, no, no,
18       Ahmad.
19       THE WITNESS:  Let me just hear
20       the one question that he has to ask
21       me.  Let me just hear it.
22       MR. GOODMAN:  How many
23       questions do you have, Ahmad?
24       MR. KESHAVARZ:  I will be done
25       in four minutes if you stop

Page 239

1           F. FRANCOIS
2     interrupting me.
3        MR. GOODMAN:  I'm interrupting
4     you in my deposition?  I mean, come
5     on, this is outrageous.  Your
6     behavior is just unreal, Ahmad.
7        MR. KESHAVARZ:  All right, but
8     you don't have a Court Reporter for a
9     long enough period, so stop
10    interrupting me and let me just ask
11    my questions, okay.
12       MR. GOODMAN:  I'm not going to
13    stop interrupting you.  You just
14    don't take over like that.
15       THE WITNESS:  Oh, Lord.
16  BY MR. KESHAVARZ:
17    Q.   Ms. Francois, do you remember
18  your testimony before, about crying at
19  work?  Do you remember that?
20    A.   Yes.
21       MR. GOODMAN:  Objection to
22       form.
23    Q.   Is part of the reason you were
24  crying was because Capital One was calling
25  you and saying you owed them money?

Page 240

1           F. FRANCOIS
2        MR. GOODMAN:  Objection to
3     form.
4     A.   Yes, definitely because
5  although I'm going to get all that money,
6  this is what make me crying and I was
7  stressing.
8     Q.   Now, would any of this have
9  happened, with Mr. Laforest calling you or
10 threatening you, if the dealership did not,
11 in fact, pull your credit and, in fact,
12 give a loan in your name, and --
13    A.   This would --
14       MR. GOODMAN:  Objection to
15       form.  This doesn't fairly --
16    A.   Yes, this would never happen --
17       THE COURT REPORTER:  I'm sorry,
18       you need to stop.  Please speak one
19       at a time --
20       THE WITNESS:  Thank you.
21       THE COURT REPORTER:  -- because
22       I cannot get you all if you're
23       speaking at the same time, so please
24       respect the job that I have to do.
25          I could not even get the full

Page 241

1           F. FRANCOIS
2     question down, so here is what I have
3     on the record.
4        (Whereupon, the referred to
5        question was read back by the
6        Reporter.)
7     Q.   And process a loan with Capital
8  One for a $30,000 loan and give a car to
9  Emmanuel Laforest.  None of that would have
10 happened if it wasn't for the dealership,
11 right?
12    A.   Yeah, nothing --
13       MR. GOODMAN:  Hold on a minute,
14       hold on a minute.  I object to the
15       form of the question.  It's an
16       outrageous question.  It also calls
17       for a legal conclusion which is
18       completely inappropriate.  So, this
19       is outrageous what we're doing right
20       now --
21       MR. KESHAVARZ:  You can answer
22       it.
23       MR. GOODMAN:  You took over the
24       deposition to ask a completely
25       objectionable question.

61 (Pages 238 - 241)

Page 242

F. FRANCOIS
1
2    MR. KESHAVARZ:  You can answer.
3    MR. GOODMAN:  It's outrageous.
4    MR. KESHAVARZ:  You can answer.
5    A.   If the dealership was not doing
6  that and Capital One would not have all the
7  $30,000 money, I would continue with my
8  life, the life I had before.  I would never
9  be stressed, never crying and never almost
10  losing my job for that.  That would never
11  happen.
12    Q.   The last thing was we were
13  talking about texts, you didn't know who
14  the texts were coming from, correct?
15    A.   No.  That's what I said early,
16  I didn't know who texted me.  It can be the
17  dealership, it can be Emmanuel.  I don't
18  know who specifically was calling me,
19  that's why I was afraid.
20    MR. KESHAVARZ:  All right,
21    thank you.
22  CONTINUED EXAMINATION BY
23  MR. GOODMAN:
24    Q.   And, Ms. Francois, isn't it
25  true that if Emmanuel Laforest had not

Page 243

F. FRANCOIS
1
2  stolen your driver's license, had not gone
3  to somebody to get your Social Security
4  number, had not gone to the dealership and
5  taken out a loan in your name, if Emmanuel
6  Laforest hadn't done all of those things,
7  you would have been able to live your life
8  without crying and going in distress as you
9  said; isn't that correct?
10    A.   Yeah, that was the question.
11  If they didn't do all that, I would never
12  have any stress, anything like that and my
13  marriage would always continue, I would
14  never have all those problem that I had.
15    Q.   Right, and that's because
16  Emmanuel Laforest is a criminal, who stole
17  your identity, right?
18    A.   Because of what the dealer and
19  Emmanuel --
20    Q.   No, it wasn't because --
21    MR. KESHAVARZ:  Don't interrupt
22    her.
23    A.   Because the dealer was the one
24  who pulled up my credit.  The dealer is the
25  one who had access to Capital One.

Page 244

F. FRANCOIS
1
2    Q.   Yeah, okay.  So, Emmanuel
3  Laforest didn't have anything to do with
4  it, correct?  Is that your testimony?
5    A.   This is not what I say.  This
6  is not what I say.  Because the dealership
7  and Emmanuel is both the one who commit
8  that.  I'm not saying that Emmanuel was
9  innocent, no, I will never say that.  If I
10  know he was innocent, I would not go to the
11  police.
12    Q.   Okay, so, Ms. Francois --
13    MR. KESHAVARZ:  Wait, were you
14    done?
15    MR. GOODMAN:  No, I'm not done,
16    Ahmad.
17    MR. KESHAVARZ:  Ms. Francois,
18    were you done with your answer?
19    THE WITNESS:  No, I was not
20    done with my answer.
21    MR. KESHAVARZ:  Okay.  Finish
22    your answer, please.
23    MR. GOODMAN:  No, you were
24    done.
25    MR. KESHAVARZ:  Finish your

Page 245

F. FRANCOIS
1
2    answer.
3    MR. GOODMAN:  Don't finish your
4    answer.  I have a question for you.
5    MR. KESHAVARZ:  No --
6    A.   I don't have access to finish
7  my question?  If you ask me a question and
8  I'm not done, I don't have access to finish
9  it?  I think I have access.  If you ask me
10  a question, I have to answer you to give
11  you the correct answer.
12    Q.   No.  This is not your
13  opportunity just to talk all you want about
14  anything you want to talk about.  This is
15  about questions and answers.  Okay?
16    MR. KESHAVARZ:  Finish your
17    answer.
18    A.   So, then you're asking me
19  question without answer.
20    Q.   I'm asking you if you
21  understand you're under oath in this --
22    A.   Yeah, that's why I want to give
23  specific what happened, because I remember
24  everything here, in my head, of what
25  happened to me and who did that and all

62 (Pages 242 - 245)

1          F. FRANCOIS
2 those things was stressing me and all those
3 things make me crying and leaving my house,
4 leaving my relationship, my marriage.
5    Q.   Okay.  And so, I'm asking you
6 if you're comfortable, if you're okay,
7 under oath, changing the testimony that you
8 gave previously when your attorney asked
9 you leading questions to change your
10 testimony?  Are you okay with that?
11      MR. KESHAVARZ:  Wait, that's
12    not a question.
13      MR. GOODMAN:  No, that is a
14    question.
15      MR. KESHAVARZ:  What's your
16    answer.
17    Q.   What's your answer,
18 Ms. Francois?  Are you okay with that?
19    A.   No, my lawyer never asked me
20 that.  My lawyer never asked me that.
21 Which is what I've been saying since this
22 morning, when you were telling me why I did
23 not sue Emmanuel.  I say Emmanuel and the
24 dealer, the dealer who is the most person
25 who affect me because they are the one who

1          F. FRANCOIS
2 checking my information because they
3 couldn't check Emmanuel, none of that would
4 have happened.  They didn't check Emmanuel,
5 they check the information and they sitting
6 with Emmanuel and give him form and filling
7 all those paper and sign that means it's me
8 sign, which is that they are the one and
9 Emmanuel caused me all that stressed.
10    Q.   Emmanuel caused you all that
11 stress, right?
12    A.   No, I said the dealer.  If you
13 listen to what I'm saying, the dealer and
14 Emmanuel, because the dealer, he's the one
15 who let Emmanuel do that.  Because if I
16 come to you and ask you for something, you
17 reject me, that will never happen.
18      MR. GOODMAN:  Move to strike
19    the nonresponsive portion.  I'm done.
20    Let's close this out.  This is just
21    outrageous.  This is silly.  I'm
22    finished.  Let's close the
23    deposition.
24      MR. KESHAVARZ:  Thank you.
25      MR. GOODMAN:  Thank you,

1          F. FRANCOIS
2 Ms. Reporter.  We don't need to hear
3 anymore of this.
4      MR. KESHAVARZ:  We reserve the
5    right to review and revise.  Just
6    e-mail the transcript to me at my
7    e-mail address.  All I need is an
8    E-trans.
9      THE COURT REPORTER:  Okay,
10    thank you.
11      And Nicholas, are you ordering
12    a copy of the transcript?
13      MR. GOODMAN:  Yes, I am.
14      THE COURT REPORTER:  All right.
15    Thank you.
16      (Whereupon, at 5:10 P.M., the
17    Examination of this Witness was
18    concluded.)
19
20      ○      ○      ○      ○
21
22
23
24
25

1          F. FRANCOIS
2       D E C L A R A T I O N
3
4    I hereby certify that having been
5 first duly sworn to testify to the truth, I
6 gave the above testimony.
7
8    I FURTHER CERTIFY that the foregoing
9 transcript is a true and correct transcript
10 of the testimony given by me at the time
11 and place specified hereinbefore.
12
13
14
        _____
15       FARAH JEAN FRANCOIS
16
17
18 Subscribed and sworn to before me
19 this _____ day of _____ 20___.
20
21
        _____
22    NOTARY PUBLIC
23
24
25

63 (Pages 246 - 249)

Page 250

```
 1          F. FRANCOIS
 2        E X H I B I T S
 3
 4 DEFENDANT'S EXHIBITS:
 5
 6 EXHIBIT  EXHIBIT              PAGE
 7 LETTER   DESCRIPTION
 8 Exh A    Capital One
          Fraud Submission    125
 9
          Exh B  Plaintiff's Experian
10         Report dated 6/11/21    169
11 Exh C   TransUnion Personal
          Report dated 5/12/22   197
12
          Exh D  Equifax Credit Report   203
13
          Exh E  Penfed Credit Union
14         Adverse Action Form
          dated 6/29/22     205
15
          Exh F  Mercedes-Benz Financial
16         Services, Notice Of
          Action Taken And
17         Statement Of Reasons,
          dated 6/14/22     212
18
19
          (Exhibits retained by Counsel.)
20
21
22
23
24
25
```

Page 252

```
 1          F. FRANCOIS
 2 INFORMATION AND/OR DOCUMENTS REQUESTED
 3 INFORMATION AND/OR DOCUMENTS     PAGE
 4 Production of the credit report
   from May of 2020 or prior to
 5 May 30th of 2020 that the Witness
   says will show everything about
 6 what her credit score was and
   how it came down        176
 7
   Production of picture showing
 8 weight loss        226
 9 Space provided for name of
   doctor          227, 228
10
   Authorization for records from
11 doctor that would corroborate
   weight loss and what Plaintiff
12 told the doctor      227, 228
13
14     QUESTIONS MARKED FOR RULINGS
15 PAGE LINE QUESTION
16 (None)
17
18
19
20
21
22
23
24
25
```

Page 251

```
 1          F. FRANCOIS
 2        I N D E X
 3
 4 EXAMINATION BY              PAGE
 5 MR. GOODMAN              4, 242
 6 MR. KESHAVARZ              238
 7
 8
 9 INFORMATION AND/OR DOCUMENTS REQUESTED
10 INFORMATION AND/OR DOCUMENTS     PAGE
11 Production of the papers that
   were given to Farah Francois
12 on the date that she was at
   the dealership        120
13
   Production of photo that was
14 taken at the dealership    123
15 Preservation and production of
   papers received from collection
16 agencies concerning violations
   on the BMW          148
17
   Production of any documents,
18 documentation concerning the
   Plaintiff's credit score prior
19 to 5/30/2020 and, most
   specifically, a credit score
20 of 780          169
21
   (Continued on the following page.)
22
23
24
25
```

Page 253

```
 1          F. FRANCOIS
 2        C E R T I F I C A T E
 3
 4 STATE OF NEW YORK     )
                  : SS.:
 5 COUNTY OF ORANGE     )
 6
 7     I, VICTORIA CHUMAS, (pages 1-108,
 8 253), a Notary Public for and within the
 9 State of New York, do hereby certify:
10     That the witness whose examination is
11 hereinbefore set forth was duly sworn and
12 that such examination is a true record of
13 the testimony given by that witness.
14     I further certify that I am not
15 related to any of the parties to this
16 action by blood or by marriage and that I
17 am in no way interested in the outcome of
18 this matter.
19     IN WITNESS WHEREOF, I have hereunto
20 set my hand this 10th day of January 2023.
21
22
23  VICTORIA CHUMAS
24
25
```

Page 254

```
 1          F. FRANCOIS
 2        C E R T I F I C A T E
 3
   STATE OF NEW YORK      )
 4               : SS.:
   COUNTY OF ORANGE       )
 5
 6      I, SOPHIA TORIBIO, (pages 109-252,
 7   254), a Notary Public for and within the
 8   State of New York, do hereby certify:
 9      That the witness whose examination is
10   hereinbefore set forth was duly sworn and
11   that such examination is a true record of
12   the testimony given by that witness.
13      I further certify that I am not
14   related to any of the parties to this
15   action by blood or by marriage and that I
16   am in no way interested in the outcome of
17   this matter.
18      IN WITNESS WHEREOF, I have hereunto
19   set my hand this 10th day of January 2023.
20
21
22
        SOPHIA TORIBIO
23
24
25
```

Page 255

```
 1            ERRATA SHEET
           VERITEXT/NEW YORK REPORTING, LLC
 2
     CASE NAME: Francois, Farah Jean v. Victory Auto Group LLC
 3   DATE OF DEPOSITION: 11/22/2022
     WITNESSES' NAME: Farah Jean Francois
 4
 5   PAGE  LINE (S)   CHANGE        REASON
 6   ___|_____|_____|_____
 7   ___|_____|_____|_____
 8   ___|_____|_____|_____
 9   ___|_____|_____|_____
10   ___|_____|_____|_____
11   ___|_____|_____|_____
12   ___|_____|_____|_____
13   ___|_____|_____|_____
14   ___|_____|_____|_____
15   ___|_____|_____|_____
16   ___|_____|_____|_____
17   ___|_____|_____|_____
18   ___|_____|_____|_____
19   ___|_____|_____|_____
20   ___|_____|_____|_____
21         Farah Jean Francois
22   SUBSCRIBED AND SWORN TO BEFORE ME
     THIS ____ DAY OF _____, 20__.
23
24
     _____
25   (NOTARY PUBLIC)        MY COMMISSION EXPIRES:
```

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400