UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CIVIL ACTION NO: 1:22-cv-4447-JSR

FARAH JEAN FRANCOIS, :
Plaintiff, :
vs. :
:
VICTORY AUTO GROUP, LLC, d/b/a :
VICTORY SPARTAN AUTO GROUP, :
LLC, d/b/a VICTORY MITSUBISHI, :
STAVROS ORSARIS, YESSICA :
VALLEJO, DAVID PEREZ, DIANE :
ARGYROPOULOS and PHILIP :
ARGYROPOULOS, :
Defendants. :
- - - - - - - - - - - - - - - -

Remote Deposition of JAMI SINGER taken in the above-mentioned matter before Michelle Gruendel, a Certified Court Reporter and Notary Public of the State of New Jersey, taken remotely via Zoom on December 13, 2022 commencing at 3:35 p.m.

ESQUIRE DEPOSITION SOLUTIONS
1384 Broadway, 22nd Floor
New York, New York 10018
212-687-8010

A P P E A R A N C E S: (VIA ZOOM)

LAW OFFICE OF AHMAD KESHAVARZ
BY: EMMA CATERINE, ESQ.
16 Court Street, Suite 2600
Brooklyn, New York 11241
917-945-9848
E-MAIL: Emma@newyorkconsumerattorney.com
For the Plaintiff, Farah Jean Francois

NICHOLAS GOODMAN & ASSOCIATES, PLLC
BY: NICHOLAS GOODMAN, ESQ.
333 Park Avenue S
New York, New York 10010
212-227-9003
E-MAIL: NGoodman@NGoodmanlaw.com
For the Defendants, Victory Auto Group, LLC, d/b/a Victory Spartan Auto Group, LLC, d/b/a Victory Mitsubishi

A L S O P R E S E N T: (VIA ZOOM)

ROBERT CALVERT, NEW YORK NOTARY

AHMAD KESHAVARZ, ESQ.

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| JAMI SINGER | MS. CATERINE | 4, 34 |
| | MR. GOODMAN | 15, 35 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| NO EXHIBITS MARKED | | |

JAMI SINGER, having been first duly sworn according to law, testified as follows:
DIRECT EXAMINATION BY MS. CATERINE:
Q. All right. Miss Singer, where do you reside?
A. Brooklyn, New York.
Q. Okay. What is your phone number?
A. 347-401-4158.
Q. And what is your e-mail address?
A. JamiSinger@gmail.com.
Q. Okay. What do you know about the Victory Mitsubishi dealership in the Bronx?
MR. GOODMAN: Object to form.
Q. So throughout the deposition Mr. Goodman is going to be -- might be making some objections, like objection to form. You're still required to answer the question even after he makes those objections.
A. Okay.
I didn't know where -- I didn't know of them at all until, until Emanuel LaForest asked me, can I use your Social when you're there, when I'm there to see if I could get the car under you as a -- as you as my co-signer.
Q. Okay. Have you ever been to the dealership in person?



Page 5

A. No.
Q. Okay. Did you have a car on May 30th, 2020?
A. What do you mean?
Q. Did you own or lease a car in May, on May 30th of 2020?
A. No.
Q. Were you interested in buying a car around that time?
A. No.
Q. Okay. Do you know Farah Jean Francois?
A. No.
Q. How do you know Emanuel LaForest?
A. We used to date.
Q. And around when did you date?
A. 2016 and we became friends.
Q. And when did Mr. LaForest ask you -- around when did Mr. LaForest ask you if he could use your Social Security number?
A. In May, 2020.
Q. And did he -- how did he ask you that? Was it over a phone call? Was it through text message?
A. Text message.
Q. Text message.
Do you still have those text messages?
A. No.

Page 6

Q. Okay. And prior to him asking you for your Social Security number had he talked to you about getting a car?
A. He did, and he said he was trying to get it under his name and nobody -- and not anybody else. I said --
(Technical interruption. The court reporter seeks clarification.)
A. What was I saying? He was trying to get the car under his name and not put it under anybody else's Social and he just asked if he could use mine and just do a co-signer on the, on the car.
Q. Was that the first time he had ever asked you to co-sign on something or had he asked you to do that ever before?
A. He asked me before, but I went with him to go get the car.
Q. I see. And what dealership was that, if you remember?
A. Major World.
Q. Major World in Queens?
A. Yes.
Q. And around when did you go to Major World with him?
A. I would say, like, March, 2019.

Page 7

Q. Okay. When he texted you asking for your Social Security number, do you know if he was already at the dealership or was this before he went to the dealership?
A. He, he was actually sitting down with the guy, the -- to do the financing.
Q. Okay. And did he tell you that over text message or did he tell you that later?
A. Text messages.
Q. Okay. Did he ask you for your driver's license in addition to your Social Security number?
A. Yes.
Q. Okay. And after you provided the driver's license and Social Security number to him did he tell you if he was able to get the car?
A. He told me --
MR. GOODMAN: Objection to form.
A. He told me that I wasn't able to do it with him and that was the last thing I heard.
Q. Okay. Were you employed on May 30th, 2020?
A. Yes.
Q. And what were you doing at that time for work?
A. I worked for Northwell Health.
Q. And what did you do for Northwell Health?

Page 8

A. I'm in the billing -- the revenue cycle, so I verify insurances and authorizations for patients.
Q. And around this time on May 30th, 2020 did you ever work on Saturdays?
A. No.
Q. Okay. And I think I may have asked this before, but have you ever been inside the Victory Mitsubishi dealership, even if you were just there with a friend, for example, who was buying a vehicle and you weren't buying a vehicle?
A. No, have not.
Q. Okay. Do you know a woman named Yessica Vallejo?
A. No.
Q. In the year 2020 did you attempt to purchase any cars for yourself or co-signing for another person besides what we talked about with Emanuel LaForest?
A. No.
Q. What were you doing on the morning of May 30th, 2020?
A. I was with my family.
Q. And is your family in Brooklyn?
A. Yes, and Long Island.
Q. Okay. Do you remember if you were in



Page 9

Brooklyn or Long Island on May 30th?
A. No, I don't.
Q. That's fine. It is a long time ago, I understand.
Generally on Saturdays during this time period, May 30th, 2020, you know, this is right after the pandemic started, what were you doing on Saturdays at that time, generally speaking?
A. We just started getting my family together and we were just hanging out inside the house, probably. I'm not too sure, but I do have pictures of my family, me with them, so that's how I know.
Q. I see. So you have pictures dated from May 30th, around that time?
A. Yes.
Q. Okay. And do you remember what you were doing specifically that day? Was it just hanging out?
A. I was with my nieces and my nephews, so when I'm with my nieces and my nephews I'm only with them. Like, I don't leave. I don't run out of the house to leave them in the house. I just hang out with them, cause I'm the cool aunt, the fun aunt.
Q. How many nieces and nephews do you have?
A. Quite a few.

Page 10

Q. So were you with them the whole day on May 30th?
A. Yes.
Q. Did you have dinner with them?
A. Yes.
Q. Do you remember what you had for dinner?
A. No.
MR. GOODMAN: Objection. Come on.
Q. And on the night of May 30th, 2020 were you at your own home? Were you at a family member's home? Do you remember?
A. Either my home or a family member's home. I don't remember.
Q. Okay. When did you learn that Mr. LaForest had purchased a vehicle from Victory Mitsubishi?
A. I had no idea.
Q. In the year 2020 did you ever see Mr. LaForest driving a vehicle?
A. No.
Q. Did you see Mr. LaForest at all in person in the year 2020?
A. No.
Q. Did you know that Mr. LaForest was arrested in connection to the purchase of this vehicle?
A. I didn't until a few days later.

Page 11

Q. A few days after he was arrested?
A. I didn't until a few days after.
Q. And was he the one who told you about it?
A. He just told me there was an issue with the car that he just got and that's all he said.
Q. Okay. And when did you find out about this lawsuit?
A. The day your office called me.
Q. I see.
MR. GOODMAN: For the record, can the record reflect Mr. Keshavarz just waved, made some kind of waving gesture like that with the -- and smiled. I'm not sure what the meaning is, but I'd just like that --
MR. KESHAVARZ: Do you remember who you spoke with?
THE WITNESS: You.
MR. GOODMAN: Let's have one attorney ask the questions.
MR. KESHAVARZ: All right.
MR. GOODMAN: Now he's laughing uproariously.
MR. KESHAVARZ: Mystery solved. Thanks.
Q. So the day that Mr. LaForest texted you saying -- asking if he could use your Social

Page 12

Security number and driver's license to purchase a vehicle, you said that was in May of 2020, correct?
A. Yes.
Q. And did you respond to him on the same day with your Social Security number and a picture of your driver's license?
A. Yes.
Q. Okay. Did Mr. LaForest ever mention trying to purchase a vehicle with your Social Security number and driver's license in September of 2020?
A. No.
Q. All right. I am going to attempt to share the screen now. Everyone wish me luck because I am very technologically inept.
Miss Singer, can you see what's on the screen right now?
A. Yes.
Q. Okay. My first question is, do you recognize this phone number, starting with 347?
A. Maybe it was one of the text free apps I used. Maybe I did. I don't remember.
Q. Okay. If you don't, if you don't know, that's fine. Just -- we don't want you to guess at anything. Just say what you know.
A. All right.



Q. And I can zoom in more if you would like me to, but is this a picture of your driver's license on the screen?
A. Yes.
Q. Okay. And this number right here ending with Redacted, is that your Social Security number?
A. Correct.
MS. CATERINE: Okay. I would just like to reflect for the record that I was showing the witness Exhibit 25, Bates stamped Defendants 70 through 72.
Q. Let's see if I could figure out how to do this.
Okay. Miss Singer, has Victory Mitsubishi ever contacted you by phone for any reason?
A. No.
Q. Has Victory Mitsubishi ever contacted you by e-mail for any reason?
A. No.
Q. Have you ever received any letters from Victory Mitsubishi?
A. No.
Q. And you said that you went to Major World in -- with Mr. LaForest in March of 2019?
A. Yes.

Q. Did you go to any other car dealerships with Mr. LaForest?
A. No.
Q. And do you remember what day it was in May of 2020 that you texted with Mr. LaForest?
A. I'm not too sure what day.
Q. Do you remember what day of the week it was?
A. No.
Q. Do you remember if it was towards the end of the month or towards the beginning of the month?
A. I'm not too sure.
Q. Okay. And you said you were with your nephews and nieces on May 30th, 2020, correct?
A. Yes.
Q. Were you babysitting them or were you with more family members? What was it? I'm sorry.
A. I was with more family members.
Q. I see. Do you still have those pictures from May 30th of 2020?
A. Yes.
Q. Okay. Could you provide those pictures to us?
A. Sure, but I'm not in them. It's just pictures of my nieces and nephews that I took.
Q. I see. Taken with your phone?

A. Yes.
Q. I see.
MS. CATERINE: Okay. I don't have any more questions for this witness. Mr. Goodman, do you have any questions now?
MR. GOODMAN: Yeah, I do.
CROSS EXAMINATION BY MR. GOODMAN:
Q. Good afternoon, Miss Singer. Again, my name is Nicholas Goodman and I do represent the defendants in the case that Farah Jean Francois brought against them, the reason you're here today.
You said at the beginning of your testimony you reside in Brooklyn, New York. Could you give us your street address, please?
A. REDACTED
Q. Okay. How long have you lived at that address?
A. 31 years.
Q. Okay. And what is your date of birth?
A. REDACTED
Q. Okay. Thank you.
You gave a phone number, that was 347-301-4158. Did I get that correct?
A. No. It's 347-401-4158.
Q. Okay. Glad I asked.

Is that the same number that you used -- strike that.
Is that a cell phone number, I assume?
A. Yes.
Q. Is that the same number you were using in May of 2020?
A. Yes.
Q. And who is your cell phone provider? Who is it today?
A. Verizon.
Q. And who was it in May of 2020? I'm sorry.
A. Verizon.
Q. Yeah. You break up sometimes. Sorry about that.
Do you have the same actual phone, the same piece of hardware today that you had in May of 2020?
A. No.
Q. Okay. What happened to that phone that you did have in May of 2020?
A. I got a new phone.
Q. All right. Now, you testified about some pictures that you have of your nieces from May 30th of 2020. Are they -- and you said they're on your phone. They're on your current phone; is that



correct?
A. Yes.
MS. CATERINE: Objection to form.
Q. Okay. So they transferred over from your old phone to the -- they were taken -- strike that.
Those pictures were taken on your cell phone, correct?
A. Yes, and it was saved to my Google drive, my Google photos, and that's why I still have it.
Q. Okay. So when Miss Caterine asked you questions about May 30th of 2020, you already knew that you had pictures from that exact date, correct?
A. Yes.
Q. So you must have looked for them before today, correct?
A. Yes.
Q. And is that something that Miss Caterine or Mr. Keshavarz asked you to do?
A. No.
Q. How did you come about looking for those photographs before today's deposition?
A. I was looking for photos of my cousin who recently passed away in March of 2020.
Q. Okay. And how did you come to find those

exact photos on that exact day, May 30th of 2020?
A. Because I was looking at the videos for my nieces and nephews that they made.
Q. Okay. So before -- you also testified that you don't know the day that Mr. LaForest texted you about your Social Security number and your driver's license, right?
A. Correct.
Q. So you don't know if that was May 30th or not, correct?
MS. CATERINE: Objection to form.
Q. I'm sorry. What was the answer?
A. Correct.
Q. And you don't know if that was a Saturday or any other day of the week, correct?
MS. CATERINE: Objection to form.
Q. What was the answer?
A. Correct.
Q. But somehow at this deposition you knew exactly what you were doing on May 30th of 2020, right?
MS. CATERINE: Objection to form.
Q. You can answer.
A. When my cousin passed away I spent time with my nieces and my nephews and my family --

Q. Okay.
A. -- almost every single weekend.
Q. Okay. But somehow you were fixated on the May 30th in this deposition, right?
A. I guess, but no.
Q. That's not something that Mr. Keshavarz ever suggested to you, right?
A. No.
Q. Is that what you're saying?
A. Yes.
Q. When is the first time you spoke to Mr. Keshavarz?
A. The week he called me to see if I could do this, do this deposition.
Q. When was that?
A. Two weeks ago, I believe.
Q. Okay.
A. I'm not -- I don't really remember.
Q. And tell me about that conversation. What did he say to you? What did you say to him?
A. He was just asking me if I ever went down to the dealership, if I gave Emanuel LaForest the okay to use my Social and, my Social Security number and my driver's license and I said yes and then he -- and then that was it.

Q. Okay. That's the whole conversation you had with him?
A. And how do I know Emanuel LaForest. That was it.
Q. Okay. Did he ever suggest the date of May 30th, 2020?
A. No.
Q. He never said that day?
A. No.
Q. Okay.
A. I only know that because of the Credit Karma thing that was on my -- when I looked at my Credit Karma, that's when I saw the credit run.
Q. Okay. When you say he asked you about whether you had given your Social Security number and driver's license to Emanuel LaForest, you said you had, correct?
A. Yes.
Q. And you were okay with that, you gave Emanuel LaForest your permission to use your Social Security number and driver's license, correct?
MS. CATERINE: Objection --
A. Correct.
MS. CATERINE: -- to form.
Q. Again, for some reason when you speak Emma



Page 21

steps over the witness. Was the answer yes?
A. Yes.
Q. Okay. So you were willing to co-sign the loan with Mr. LaForest in May of 2020 for the purchase of the vehicle, correct?
A. Correct.
Q. And you, in fact, had previously done that at Major World in 2019, I believe you said?
A. Yes. I went with him.
Q. Right. And you -- were you a co-signer on the vehicle loan, on the financing for the vehicle that was the purchased at Major World?
MS. CATERINE: Objection to form.
Q. Okay. That's what's happening. I don't know what the problem is, but go ahead.
A. Yes.
Q. Are you still obligated for payments on that loan?
A. No.
Q. What happened to that loan?
A. From what he told me was that they -- he traded in that car.
Q. Okay. When did he tell you that?
A. In the Summertime of 2019.
Q. Okay. And what bank or financial institution

Page 22

financed that purchase of that vehicle?
A. I believe Credit -- Capital One.
Q. Okay. Did you ever receive any correspondence or documentation from Capital One about that loan?
A. I don't remember.
Q. Okay. Did you ever get anything from Capital One that said the loan was terminated or rescinded or paid off?
A. I don't remember.
Q. Okay. And you mentioned that -- strike that.
Other than the conversation you told us about with Mr. Keshavarz did you have any other conversations with him?
A. No.
Q. When is the first time you spoke to Miss Caterine?
A. Today.
Q. Okay. Did you speak to anyone else from their office, Law Office of Ahmad Keshavarz?
A. No.
Q. All right. Could you tell us now, what is your present relationship with Emanuel LaForest?
A. Just friends.
Q. Best friends, okay.

Page 23

A. Just friends. Just friends.
Q. Just friends or best friends?
A. Just, J-U-S-T.
Q. Just friends, okay.
Where does he live now?
A. I don't know.
Q. Okay. What's his phone number today?
A. I would have to look in my phone for that.
Q. Yeah. Could you do that, please?
A. It is 718-213-0288.
MS. CATERINE: Could we just have the record reflect that she was reading that from her phone, please?
Q. Okay. When is the last time you saw Mr. LaForest in person?
A. 2021.
Q. What month in 21?
A. I don't remember.
Q. Okay. When is the last time you spoke with Mr. LaForest?
A. I would say I just spoke to him yesterday and then before that a few times here and there.
Q. What did you speak to him about yesterday?
A. How's his job going and just to check-up on him.

Page 24

Q. Okay. Is it your testimony you haven't spoken to him about this case?
A. No.
Q. He never brought that up, right?
A. No.
Q. Okay. Are you aware of Mr. LaForest's criminal convictions?
MS. CATERINE: Objection to form.
A. No.
Q. You know he's been convicted of crimes, correct?
MS. CATERINE: Objection to form.
A. When we first started dating he was in jail but that was about it. That's all I know.
Q. When did he get out of jail?
A. April, 2017.
Q. How did it come about that you began dating him while he was in jail?
MS. CATERINE: Objection to form.
A. He wasn't in jail when we started dating. He was out of jail when we started dating and then he ended up going to jail.
Q. Okay. How long was he in jail?
A. From December to April.
Q. Okay. Do you know why he was in jail?



A. No.
Q. Okay. So you said -- you used the term dating at various points. Did there come a point when you stopped dating Mr. LaForest and became just friends?
A. Yes. In December, 2018.
Q. Okay. So when you co-signed the loan with him at Major World you were just friends, correct?
A. Yes.
Q. I didn't hear an answer.
A. Yes.
Q. Okay. Now, did you ever -- when you were dating did you ever live together with Mr. LaForest?
A. No.
Q. Did you ever visit him at his address on Farragut Road in Brooklyn?
A. Yes.
Q. How many times did you visit there?
A. While we were dating?
Q. Yes.
A. All the time.
Q. Okay. Did you sleep over there? Spend the night there?
A. Like twice.

Q. Okay. And when you say all the time, was that once a week? Twice a week? You tell me.
A. We were together almost all the time.
Q. Okay. Including at that address, correct?
A. Yes.
Q. All right. Who else lived there, at that address?
A. His parents, brother, aunt, cousin, grandparents.
Q. Okay. Was his brother Stanley LaForest?
A. Yes.
Q. Okay. Do you know him?
A. Yes.
Q. When is the last time you spoke to him?
A. A while ago.
Q. Okay. And do you know Mr. LaForest's wife?
A. No.
Q. Okay. Was his wife there, at that Farragut Road address when you were there with Mr. LaForest, Emanuel LaForest?
A. No.
Q. Okay. Now -- strike that.
Is it your testimony that Mr. LaForest never told you that he actually purchased a vehicle on May 30th of 2020, or in May --

MS. CATERINE: Objection to form.
Q. -- of 2020?
A. Correct. I was never told.
Q. Okay. Did he ever -- did you ever get a ride in his BMW vehicle?
A. No. No.
Q. Okay. And then he later told you, you said, correct me if I'm wrong, that there had been a problem with the vehicle and he had been arrested, correct?
MS. CATERINE: Objection to form.
A. No. He didn't tell me anything to it.
Q. I didn't get the answer.
A. He told me he was arrested but he didn't tell me anything regarding to why he was arrested.
Q. I thought you said it was about the vehicle, there was a problem with the purchase of the vehicle?
A. No.
Q. Okay. When you said he told you he was -- had been arrested, when was that?
A. I don't even remember. I don't remember.
Q. Okay. Did he tell you that in person?
A. No.
Q. How did he tell you that?

A. He called me.
Q. He called you on the phone?
A. Yeah.
Q. Okay. And what did you do in response to being told that he had been arrested?
A. I said okay, are you okay, and then that was it.
Q. Okay. Did he ask you for any money for bail, anything like that?
A. No.
Q. Okay. Now, you also, you mentioned that he, Emanuel LaForest had asked you for your driver's license. Did he ask for your -- for you to send him, text him a photograph of your driver's license or just a driver's license number or what?
A. He asked me to send him the photo of my driver's license.
Q. Okay. And he also asked for your Social Security number?
A. Correct.
Q. Didn't he already have that from before, at Major World?
A. No.
Q. Okay. Had you ever entered into any other loan or financial arrangement with Mr. LaForest?



Page 29

A. No.
Q. Okay. And you said that when he texted you from -- on May 30th he was, what you said was "sitting with the guy". How do you know it was a guy?
A. I was just saying that he was just sitting with the -- because I forgot the word, how to do it -- the sales rep.
Q. Okay. So you don't know if the sales rep was a man or a woman?
A. Correct.
MS. CATERINE: Objection to form.
Q. You don't know the name of the sales rep?
A. No.
Q. What did Mr. LaForest text you -- you didn't have an actual conversation with him that day, did you?
A. No.
Q. Or did you?
Okay. Did he text you any, anything else other than the question or the request that you send him your Social Security number and a photo of your driver's license?
A. No.
Q. Okay. That was it? Your testimony is you

Page 30

don't know what happened after that?
A. No, I don't.
Q. Okay. What's your understanding of why you're here today?
A. They explained to me that something with the dealership, how somebody was -- how Francis, whatever her name is, is -- Farah, that somebody -- wow, I can't even talk right now. That the car was purchased under her and she wasn't there and they just wanted to know if I was there and my Social and driver's license was also used.
Q. Okay. So all that was explained to you by Mr. Keshavarz?
A. Yes.
Q. So you did have more of a conversation with him than you told us before --
MS. CATERINE: Objection to form.
Q. -- correct?
A. He just explained to me why and that I needed -- that the testimony. That was it.
Q. Okay. Have you ever been arrested yourself?
A. No.
MS. CATERINE: Objection to form.
Q. Did you graduate from high school?
A. Yes.

Page 31

Q. Where was that?
A. Abraham Lincoln High School.
Q. Okay. Have you had any education after high school?
A. Yes. I'm in college now.
Q. Which college?
A. I'm doing on-line school, Ashworth.
Q. What's it called?
A. It's called Ashworth.
Q. Ashworth, okay.
Other than that, do you have any certifications, nursing or health care or anything in that regard?
A. No. I just been working.
Q. Okay. Who's your employer?
A. Northwell.
Q. And how long have you been with Northwell?
A. Since January of 2019.
Q. Okay. And when did you graduate Abraham Lincoln High School?
A. 2009.
Q. What did you do between 2009 and January, 2019?
A. I was in and out of Kingsborough. I would go and then I would stop. I would work. I always

Page 32

worked. I either worked two jobs or one job.
Q. Okay. What kind of work?
A. I did -- I was working at Party City, Lowe's, then I worked at an after-school program and then I started working in the health care. I started doing phys -- I became a physical therapy aide and then went into, then went into dermatology and then went to pain management and now I'm at North, Northwell Health.
Q. Right. Have you ever been married?
A. Nope.
Q. Do you have any children?
A. No.
Q. The last time you saw Emanuel LaForest, where was that?
A. In Flatbush.
Q. Was it that Farragut Road address, that 2940 Farragut --
A. No.
Q. -- Road?
No, okay.
And he told you he had been arrested. Did he ever tell you what happened to his case?
A. He never told me nothing about the case.
Q. Okay. So did he ever tell that you Farah



Francois had approved his purchase of a vehicle after the fact, after he had purchased it?
MS. CATERINE: Objection --
A. No.
MS. CATERINE: -- to form.
Q. Okay. Give me one second here.
A. Just a quick question. Do you know how much longer is this gonna be?
Q. I'm not gonna be more than a minute here.
A. Oh, okay.
Q. I can't speak for Miss Caterine.
MS. CATERINE: I probably just have one more question for you once Mr. Goodman is done and then you'll be free to go.
THE WITNESS: Okay. No problem.
Q. Okay. Miss Singer, do you own a motor vehicle today?
A. No.
Q. Okay. And you did not on May -- in May of 2020, either?
A. Correct.
Q. Okay. You have a driver's license, I think we saw a picture of it, correct?
A. Correct.
Q. Okay. Do you ever use that driver's license

for purposes of driving a motor vehicle?
A. Yes. I'm under my dad's policy.
Q. Okay. So you have access to your dad's car?
A. Yes.
Q. Where does your dad live?
A. With me.
Q. So you have -- who do you live with there?
A. My mom and dad.
Q. Okay. And was that the same in May of 2020, that you had access to your dad's car?
A. Yes.
Q. What kind of vehicle is that?
A. A Jeep Compass.
Q. Did you ever give Mr. LaForest a ride in your Jeep Compass, your dad's Jeep Compass?
A. Yes.
Q. When was that?
A. Years ago.
Q. Okay.
A. Probably 2019.
Q. I have no more questions.
REDIRECT EXAMINATION BY MS. CATERINE:
Q. Okay. Miss Singer, just following up, you mentioned something about Credit Karma to Mr. Goodman when he was asking you questions. Could

you explain that?
MR. GOODMAN: Objection to form.
A. When -- I forget. I don't know how to say his name. When Mr. --
Q. Keshavarz.
A. Keshavarz, when he called me he asked me -- when he was asking me the question, I said I just have the Credit Karma report and that's when I know what date my credit was ran from Victory.
Q. Okay. And was that date May 30th, 2020?
A. Yes.
Q. And so based on your credit being run on May 30th, 2020 do you think your text messages with Emanuel LaForest were on or around May 30th, 2020?
MR. GOODMAN: Object to form.
A. I think, yes.
Q. Okay. No more questions. Thank you, so much, Miss Singer.
A. Thank you.
RECROSS EXAMINATION BY MR. GOODMAN:
Q. Miss Singer, I have one more question.
A. Okay.
Q. When did you pull the Credit Karma report?
A. The day I got the phone call.
Q. Right. So that's something Mr. Keshavarz put

you up to, correct?
MS. CATERINE: Objection to form.
MR. KESHAVARZ: Objection. Form.
MR. GOODMAN: Yeah. You're not participating, Ahmad. Please be quiet.
Q. Did you -- is that correct? That's something he asked you to do?
MS. CATERINE: Objection to form.
A. Not -- no.
Q. What do you mean not, no?
A. He didn't. I asked -- he asked if it was ran and I said I don't know and then I looked myself.
Q. Okay. That's fine.
Thank you. No more questions.
MS. CATERINE: All right. Thank you, Miss Singer. Have a good day.
MR. KESHAVARZ: Thank you for your time.
(At 4:23 p.m. proceedings were concluded.)

CERTIFICATE

I, MICHELLE GRUENDEL, a Certified Court Reporter and Notary Public of the State of New Jersey, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically and digitally at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Michelle Gruendel

MICHELLE GRUENDEL, C.C.R.
C.C.R. License No. 30X100190500
Notary Public of the
State of New Jersey

J U R A T

I have read my testimony in the foregoing transcript and believe it to be true and correct to the best of my knowledge and belief.

______________________________ ____________
Witness DATE

SUBSCRIBED and SWORN to before me this__________ day of _____________, 2022, in the jurisdiction aforesaid.

_______________________ ___________________
My Commission Expires Notary Public

E R R A T A

I wish to make the following changes, for the following reasons:

PAGE LINE

____ ____ CHANGE:___________________________
REASON:___________________________
____ ____ CHANGE:___________________________
REASON:___________________________
____ ____ CHANGE:___________________________
REASON:___________________________
____ ____ CHANGE:___________________________
REASON:___________________________
____ ____ CHANGE:___________________________
REASON:___________________________
____ ____ CHANGE:___________________________
REASON:___________________________
____ ____ CHANGE:___________________________
REASON:___________________________

_________________________ __________
WITNESS' SIGNATURE DATE

