```
          N47DFRAO

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   FARAH JEAN FRANCOIS,

 4              Plaintiff,

 5         v.                                22 CV 04447

 6   VICTORY AUTO GROUP, LLC, d/b/a
     VICTORY MITSUBISHI,
 7
                Defendant.
 8                                           Oral Argument
     ------------------------------x
 9                                           New York, N.Y.
                                             April 7, 2023
10                                           3:00 p.m.

11   Before:

12                      HON. JED S. RAKOFF,

13                                           District Judge

14                            APPEARANCES

15   LAW OFFICE OF AHMAD KESHAVARZ
          Attorney for Plaintiff
16   BY:  AHMAD KESHAVARZ
          EMMA CATARINE
17
     NICHOLAS GOODMAN & ASSOCIATES, PLLC
18        Attorney for Defendant
     BY:  HENRY NICHOLAS GOODMAN
19        PATRICK L. SELVEY

20

21

22

23

24

25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

1           (Case called; appearances noted)

2           THE COURT:  Good afternoon, everyone.

3           Thank you for your papers on the motion for summary

4    judgment.  When I have oral argument, it's not for you to

5    repeat what's in your papers.  It's for you to bring to the

6    Court's attention anything that you thought you didn't have an

7    opportunity to bring to the Court's attention in your papers,

8    or I may have some questions for you as well.

9           So let's start with moving counsel.

10          MR. GOODMAN:  May it please the Court.  Nicholas

11   Goodman for the defendants.

12          I would begin by pointing your Honor to the issue of

13   willful neglect under 1681(q) and (n, (q) being the under false

14   pretences provision of the FCRA.  And that feeds back to

15   1681(n), willful violation.

16          THE COURT:  Yes.  So if I understand the allegations,

17   and of course you dispute many of these allegations, but if I

18   understand the allegations, they are that your clients ran

19   three credit checks in a row, first for Laforest; then for a

20   friend of Laforest named Jamie Singer; and, finally, for

21   plaintiff when Laforest pulled out plaintiff's driver's license

22   after the first two credit checks didn't work.

23          Assuming for the sake of argument those facts,

24   wouldn't that give rise to a plausible inference this firm was

25   just trying to make a sale, and couldn't find someone with good

enough credit, and was blindly ignoring whether Laforest had plaintiff's authorization?

MR. GOODMAN: No, I don't think it does support that inference, your Honor, and the reason is Laforest had more than just the physical driver's license of Ms. Francois, the actual driver's license. He also had her Social Security number. That's something that we all and anyone would expect to be kept private. He had that.

The driver's license also had the exact same address Ms. --

THE COURT: If you were a thief, and you stole someone's driver's license and Social Security card, could you then get a car at your client's place of business?

MR. GOODMAN: No, but that's also not the issue in the case. This is a FCRA case about the credit pulls only. What happened thereafter I'm not here to -- we didn't move to dismiss the negligence count on its merits. So we're just talking about a permissible purpose to pull the credit report in the first instance. And, more specifically, pursuant to the statute, which we all agree applies to a person which has reason to believe, and case law consistently speaks to a good faith basis to believe, that it has a legitimate business need, I'm quoting the statute for the information, "in connection with the business transaction that is initiated by the consumer."

1          So our position is --
2          THE COURT:  What was the reason given for, after the
3  attempt was made to get the car in Laforest's name, and then in
4  someone else's name, and why didn't you just stop the music
5  then?  What was the reason why you said, let's go, continue?
6          MR. GOODMAN:  No.  The credit pull is purely to screen
7  whether someone has adequate credit, and whether or not to send
8  a credit application to a specific financial institution.  The
9  credit pull itself was not part of the transaction.  It was not
10 part of the loan application.
11         THE COURT:  I don't know what emerged during
12 discovery.  Were there other instances where your client sold
13 cars to people other than the persons appearing before them?
14         MR. GOODMAN:  None at all, Judge.  Nothing on the
15 record.
16         THE COURT:  So what induced them to do it this time?
17         MR. GOODMAN:  Well, again, we're not talking about he
18 sold the car to somebody.  We're talking about the credit pull.
19         THE COURT:  That's fair enough.
20         MR. GOODMAN:  And the credit pull was, again, merely
21 to decide whether -- there are certain banks that will not take
22 an application for anyone that has a credit score under, say,
23 700 or 600.  So you do the -- they do the credit pull to make a
24 decision about whether or to which institution --
25         THE COURT:  Why wouldn't you want to contact directly

1    the person whose credit is being put in issue?

2             MR. GOODMAN:  Why would you not want to contact?

3             THE COURT:  Yes.

4             MR. GOODMAN:  You may want to contact, but the FCRA

5    and case law, even at the circuit level, does not require any

6    such contact.

7             And, your Honor, I would point out, it's a very common

8    refrain from these cases of plaintiffs who say, well, why

9    didn't you just pick up the phone and call me; why didn't you

10   make any effort at all.  And several of the cases, I can cite

11   them for you if you like, some of them are in our papers, a

12   couple I left out, but there are actual indications that maybe

13   something is wrong here, the misspelling of a name in the *Heim*

14   case, H-e-i-m versus H-e-l-m.  And still in that case a

15   permissible purpose was found.

16            So in this district --

17            THE COURT:  Well, are any of those from the Second

18   Circuit?

19            MR. GOODMAN:  Not from the Second Circuit.  From

20   within this district, Judge Spatt, and the *Showstack* case is in

21   this district, *Showstack* having been cited many times, that it

22   says very directly, point blank, there is no duty to

23   investigate before you do a credit pull.  That is distinct and

24   apart from other sections of the FCRA, such as 1681(s-2)(B),

25   1681(e).  Those provisions do require investigation, reasonable

1    investigation.  They require that by their terms, and also case

2    law, as construed them, that, accordingly, for a reasonable

3    investigation.

4            THE COURT:  I want to make sure I understand your

5    position.  So if someone comes in to buy a car, and they don't

6    have themselves adequate credit, but they say, I'll -- well,

7    Joe will put up the credit, and then you check Joe's credit

8    rating and it turns out to be terrible, so then they say, okay,

9    well, Jane will put up the credit.  My good friend Jane.

10   Here's her driver's license.  And you, in my hypothetical, you

11   check out her credit, and it's less.

12           And so in my hypothetical, you go through ten of

13   these, and, finally, you find a name that's given of my great

14   uncle Max will put up the credit, and you accept that.

15           You're saying there's no set of circumstances where

16   any of that could be called willful?

17           MR. GOODMAN:  Well, first of all, let me say, your

18   Honor, very clearly, in this case, my client's flatly denied

19   that --

20           THE COURT:  Oh, I understand.

21           MR. GOODMAN:  Yes.

22           THE COURT:  I understand, but of course at this stage

23   I am -- I have to take everything most favorably to the

24   non-movement, provided it's supported by admissible evidence.

25           MR. GOODMAN:  Absolutely, your Honor.  I agree.  And I

1    am arguing from the perspective that Mr. Laforest was there
2    alone.  But to answer your hypothetical, under the protocols
3    that my client operates with, that could not -- that would not
4    happen.  You wouldn't go through ten different people who
5    weren't there and find somebody with credit if they were not
6    present and there to proceed with the purchase of a car.
7             But, again, we're talking about the initial step, the
8    credit pull.  All it was -- we don't issue credit.  We don't
9    write loans.  This dealership doesn't do that.  We just pull
10   the credit report.
11            THE COURT:  That's an important distinction, and not
12   lost on the Court.
13            MR. GOODMAN:  And I appreciate that.
14            THE COURT:  Let's move on.
15            In terms of negligence, as I understand what you said
16   a minute ago, your position, basically, there is they haven't
17   adduced or pled or both adequate allegations of negligence; but
18   not that they couldn't.  You're not reaching that issue.
19   You're just saying they've -- it's a failure to come forward
20   with either relevant claims or relevant proof.
21            MR. GOODMAN:  Right.  We're past pleading.  This is
22   summary judgment.  They have not produced any proof, any
23   admissible evidence disclosed during discovery of economic
24   damages.  None.  It's just not a --
25            THE COURT:  That's a different question, but, since

1    you move to that question, what about -- it's not much, but
2    what about postage?
3              MR. GOODMAN:  Well, if the claim that changed in the
4    course of the motion practice, from two letters that were sent
5    to dispute the credit pull of the hard -- the report of the
6    credit pull, to now three letters that had to do with the fines
7    imposed by whatever authority for the driving a car toll
8    violation, whatever it was, for those three, I suppose there is
9    no quantification of it.
10             I certainly asked this plaintiff at deposition many
11   times, over and over again, to articulate every item of
12   out-of-pocket loss, and she didn't do it.  She doesn't have any
13   receipts for it.  If the issue in this case is three letters of
14   postage, you know, I'm willing to stipulate that we'll pay for
15   those three postages.  That's fine.  We can have judgment taken
16   against us now if that's -- well, I don't want to offer
17   judgment, but you know what I'm -- great, that's three --
18             THE COURT:  Yes, I hear what you're saying.
19             MR. GOODMAN:  Judge, I'm sorry.
20             THE COURT:  No.  Go ahead.
21             MR. GOODMAN:  I just wanted to clarify both back to
22   the earlier point when you were -- before your hypothetical.
23   Ms. Francois was the second credit pull, not the third.  We
24   didn't go through Laforest, and then Singer, and then Francois.
25   It went Laforest to Francois, just to be clear.

1          THE COURT:  All right.  Thank you for clarifying.

2          All right.  I think we're ready to hear from

3  plaintiff's counsel.

4          Thank you very much.

5          MR. GOODMAN:  Thank you, Judge.

6          MS. CATERINE:  Good afternoon again, your Honor.

7  Plaintiff will start with the most important issue to respond

8  to in the reply by the defendants, which is whether the

9  impermissible obtaining and use of Ms. Francois' credit report

10 caused her emotional distress.

11         Our opposition addressed this issue on pages 9 through

12 12, and their reply responded on pages 3 through 5.  And one of

13 the key arguments that we want to address from the reply is

14 that they argue that the emotional distress was not caused by

15 the impermissible credit pulls, because Victory Mitsubishi is

16 not a creditor.  That is incorrect.  Victory Mitsubishi is a

17 creditor, and specifically used Ms. Francois --

18         THE COURT:  Well, let me move away from the emotional

19 distress for a minute.

20         MS. CATERINE:  Yes, your Honor.

21         THE COURT:  With respect to lost pay, is she claiming

22 now any lost pay?  What lost pay?

23         MS. CATERINE:  We don't have a precise figure.  She

24 missed a week of work without pay.

25         THE COURT:  How can you not have a precise figure?

N47DFRAO

1  Discovery is over.

2      MS. CATERINE: I understand, your Honor. We've just
3  had difficulty in obtaining the documents.

4      THE COURT: Well, she presumably knows what she's
5  paid. At her deposition, when she was asked about this, she
6  said -- when asked how much, she said, "I don't know. I don't
7  remember." That seems odd.

8      MS. CATERINE: Well, I think it's, you know, an issue
9  of she changed jobs recently. You know, she was working at TD
10 Bank, and now she's working at a different job, and her wages
11 -- excuse me, her wages varied. And I think that's why she had
12 difficulty in terms of remembering.

13     THE COURT: So on the question of postage --

14     MS. CATERINE: Yes, your Honor.

15     THE COURT: -- are you claiming anything other than
16 normal first class mail postage?

17     MS. CATERINE: Yes, your Honor. The letters on their
18 face suggest not only mailing, but the actual cost of mailing,
19 because they're marked certified mail return receipts
20 requested.

21     THE COURT: All right. How much is that?

22     MS. CATERINE: I don't recall off the top of my head.
23 I think it's around like $5 is the fee.

24     THE COURT: Okay. If your adversary were willing to
25 pay that, does this case go away?

1          MS. CATERINE:  Well, no, your Honor.

2          So in terms of establishing economic damages, I
3    believe their briefing was as to summary judgment with our
4    state law negligence claim.  As to the FCRA credit --
5    impermissible credit pull claims, we are claiming emotional
6    distress for those claims, and those actual damages can be up
7    to $125,000 in the Southern District.

8          THE COURT:  Now, regarding the individual defendants,
9    why should I keep them in the case?

10         MS. CATERINE:  I'll start with Diane Argyropoulos.
11   Responding to their argument in their reply, defendants argue
12   that plaintiff does not seriously dispute that Diane left the
13   implementation and enforcement of FCRA compliance to her
14   general manager Stavros Orsaris.  To the contrary, plaintiff
15   seriously disputes this, as in our 56.1 statement, Docket Entry
16   54, paragraph 20, we cite to a number of different facts.

17         She is the signatory to the agreement Victory had with
18   the vendor KBC that provides it with credit reports.  She was
19   the only person trained by Dealertrack on compliance,
20   specifically with a focus on security of the computer systems.

21         THE COURT:  I'm not sure I understand your theory, if
22   your theory is that she willfully disregarded her
23   responsibilities to oversee proper compliance with the laws you
24   say are violated?

25         MS. CATERINE:  That's right, your Honor, or, in the

1    alternative, that she negligently did so.

2             THE COURT:  What is it that she did that shows willful
3    disregard?

4             MS. CATERINE:  Well, so, for example, there's a number
5    of different instances related to the impermissible credit
6    pulls of Ms. Francois' credit report, showing a lack of
7    computer security, which she had been trained to enforce, such
8    as the use of an ex-employee's login information, the former
9    employee, Yosmaily Ventura, to login and actually pull
10   Ms. Francois' credit report.  And to this day, because --

11            THE COURT:  Wait.  Assuming for the sake of argument
12   that that was negligence, why is it willful?

13            MS. CATERINE:  In regard to just their complete lack
14   of procedures, your Honor.  They don't have any written
15   policies or procedures in regard to pulling credit reports.
16   They say they just rely on their agreement with Capital One,
17   and in that agreement with Capital One --

18            THE COURT:  Who says they have to have practices of
19   written procedures, a manual?  I mean, where are you getting
20   that from?

21            MS. CATERINE:  Well, it would be one thing, your
22   Honor, if they had practices which prevented identity theft,
23   but clearly, as this case shows, they do not.  And in the
24   agreement, which they rely on with Capital One, they even
25   misrepresent who their general manager and sales manager is in

1     that agreement.  They say it's Chris Orsaris, and then in

2     deposition they said that was not actually the case.

3             THE COURT:  Go ahead.  You wanted to talk about the

4     other individuals?

5             MS CATERINE:  In regard to Victory Auto Group, in

6     response to their argument in their reply, defendant makes the

7     conclusory argument that the notion that in May 2020 the owners

8     of Victory Auto were exercising complete domination over

9     Spartan, specifically complete domination in respect to pulling

10    plaintiff's credit report, and using that domination for the

11    purpose of committing a fraud against plaintiff.

12            THE COURT:  What's the fraud that would allow veil

13    piercing?

14            What did Victory Auto Group do that was fraudulent?

15            MS. CATERINE:  Well, your Honor, our argue is that

16    Victory Auto Group and Spartan Auto Group are essentially

17    synonymous with each other.  They're interchangeable --

18            THE COURT:  No.  No.  I understand the argument about

19    overlap, but for corporate veil piercing, you need evidence of

20    fraud.  I don't see it.  Maybe I missed it.

21            MS. CATERINE:  Well, your Honor, there is, for

22    example, the use of a credit application with the header

23    Victory Auto Group on it, and they also use a form with the

24    header of Bronx Suzuki, which was another name for the

25    dealership at one point in its history.

    And they also will -- we have Diana Argyropoulos essentially saying she had to change the dealership name when it became a Mitsubishi franchise.

    THE COURT:  Finally, with regard to Philip Argyropoulos, do I read your papers correctly that you no longer contend there is sufficient evidence of liability on his part?

    MS. CATERINE:  Yes, your Honor.  After the close of discovery, we've determined --

    THE COURT:  All right.  So he will be dismissed.

    MS. CATERINE:  Yes, your Honor.

    THE COURT:  All right.  Anything else you wanted to cover?

    MS. CATERINE:  Yes, your Honor.

    I just wanted to emphasize that Victory Mitsubishi was a creditor here.  We think this is a very important thing to point out.

    The face of the retail installment contract itself lists Victory as the seller creditor, and Victory, in fact, extended credit in Ms. Francois' name for the sale of the vehicle.  It only assigned that credit subsequently to Capital One.  And this is the way that motor vehicle retail installment contracts work.

    You have a case on point from the Southern District, *Garcia v. Chrysler Capital, LLC*, from the Southern District,

1    2016.  I have a copy here if you'd like to see the physical
2    copy.
3              THE COURT:  Well, did you give a copy to your
4    adversary?
5              MS. CATERINE:  Not as of yet.  This wasn't something
6    that we cited in the opposition briefing, because we didn't
7    understand --
8              THE COURT:  No.  No.  I understand that you wanted the
9    opportunity to raise it here.  But then the proper thing is to
10   call up your adversary and say, you know, we're going to be
11   citing in oral argument such and such a case.  Here's the
12   citation.  So that he can respond.
13             I mean, to present it now, without his even knowing
14   you were going to present it, is, you've seen him in an awkward
15   position, to say the least.
16             MS. CATERINE:  Well, we failed to do that, your Honor,
17   but even without looking at the case, it's just clear from the
18   face of the contract itself.  It lists Victory Mitsubishi as
19   the creditor, and then it says at the bottom of the contract
20   that they're assigning their interest in the contract to
21   Capital One.
22             THE COURT:  Thank you very much.
23             Thanks to both counsel.
24             MS. CATERINE:  Thank you, your Honor.
25             THE COURT:  I will take this matter under advisement,

N47DFRAO

1  and get you at least a bottom line decision, and probably a
2  full opinion by the end of April.  Then we'll see where we go
3  from there.
4              Thanks very much.
5              (Adjourned)